# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

---

### CASE NO.  8:19-CV-00008-VMC
### BANKRUPTCY CASE NO. 8:10-BK-03846-CPM
### ADVERSARY CASE NO. 8:11-AP-00809-CPM

---

## PEPI CAPITAL, L.P.,


**Appellant,**

**vs**

## FIDDLER'S CREEK, LLC, et al.

**Appellees.**

---

### APPELLANT'S APPENDIX
### VOLUME 1
### AA00001-AA00184

---

### On Appeal from The United States Bankruptcy Court
### Middle District of Florida, Tampa Division

**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
*Attorneys for Pepi Capital, L.P.*

## TABLE OF CONTENTS

| VOL. | BATES RANGE | DOCUMENT |
|---|---|---|
| 1 | AA00001-AA00057 | Complaint, filed July 20, 2011, (Doc. No. 1 In Adv. Case No. 8:11-ap-00809) |
| 1 | AA00058-AA00184 | Pepi Capital, L.P.'S Original Answer, Affirmative Defenses and Counterclaims, filed December 27, 2011, together with exhibits (Doc. No. 22 in Adv. Case No. 8:11-ap-00809) |

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

In re:                                    Chapter 11

**FIDDLER'S CREEK, LLC**                  **Case No. 8:10-bk-03846-KRM**
951 LAND HOLDINGS, LLC                    Case No. 8:10-bk-03852-KRM
DY ASSOCIATES, LLC                        Case No. 8:10-bk-03856-KRM
GBFC DEVELOPMENT, LLC                     Case No. 8:10-bk-03864-KRM
FC MARINA, LLC                            Case No. 8:10-bk-03872-KRM
FC BEACH, LLC                             Case No. 8:10-bk-03873-KRM
FC GOLF, LLC                              Case No. 8:10-bk-03875-KRM
DY LAND HOLDINGS II, LLC                  Case No. 8:10-bk-03878-KRM
FC PARCEL 73, LLC                         Case No. 8:10-bk-03881-KRM
FC COMMERCIAL, LLC                        Case No. 8:10-bk-03888-KRM
FC HOTEL, LLC                             Case No. 8:10-bk-03886-KRM
FC RESORT, LLC                            Case No. 8:10-bk-03896-KRM
GULF BAY HOSPITALITY COMPANY, LLC         Case No. 8:10-bk-03898-KRM
GULF BAY HOTEL COMPANY, LLC               Case No. 8:10-bk-03905-KRM
GBP DEVELOPMENT, LLC                      Case No. 8:10-bk-03908-KRM
GB PENINSULA, LTD.                        Case No. 8:10-bk-03909-KRM
951 LAND HOLDINGS, LTD.                   Case No. 8:10-bk-03911-KRM
DY LAND ASSOCIATES, LTD.                  Case No. 8:10-bk-03918-KRM
GBFC DEVELOPMENT, LTD.                    Case No. 8:10-bk-03920-KRM
GBFC MARINA, LTD.                         Case No. 8:10-bk-03928-KRM
FC BEACH, LTD.                            Case No. 8:10-bk-03934-KRM
FC GOLF, LTD.                             Case No. 8:10-bk-03937-KRM
FC HOTEL, LTD.                            Case No. 8:10-bk-03938-KRM
FC RESORT, LTD.                           Case No. 8:10-bk-03947-KRM
GULF BAY HOSPITALITY, LTD.                Case No. 8:10-bk-03949-KRM
GULF BAY HOTEL COMPANY, LTD.              Case No. 8:10-bk-03950-KRM
GBP DEVELOPMENT, LTD.                     Case No. 8:10-bk-03952-KRM
FIDDLER'S CREEK MANAGEMENT, INC.          Case No. 8:10-bk-03954-KRM

                                          **(Jointly Administered under**
       **Debtors.**                        **Case No. 8:10-bk-03846-KRM)**
_____/

**AA00001**

FIDDLER'S CREEK, LLC, and its twenty-seven                    ADV. CASE NO.
subsidiaries and affiliates[1]

     Plaintiffs,

v.

PEPI CAPITAL, L.P.

     Defendant.

_____/

## **COMPLAINT**

    Plaintiffs, FIDDLER'S CREEK, LLC ("Fiddler's Creek") and twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Plaintiffs" or Debtors"), as Debtors in Possession, by and through undersigned counsel, sue Defendant, PEPI CAPITAL, L.P. ("Defendant" or "PEPI"), and allege:

## **PARTIES AND JURISDICTION**

    1.    This is an adversary proceeding brought by Plaintiffs pursuant to 11 U.S.C. §542 and Fed. R. Bankr. P. 7001(1) to recover money damages and for turnover.

    2.    This is a core proceeding under 28 U.S.C. §157(b)(2)(E) and venue of this proceeding is properly before this Court pursuant to 28 U.S.C. §1409(a), as Debtors' chapter 11 bankruptcy cases are pending in this District.

    3.    All conditions precedent have occurred, been waived or been excused.

---

[1] 951 Land Holdings, LLC; DY Associates, LLC; GBFC Development, LLC; FC Marina, LLC; FC Beach, LLC; FC Golf, LLC; DY Land Holdings II, LLC; FC Parcel 73, LLC; FC Commercial, LLC; FC Hotel, LLC; FC Resort, LLC; Gulf Bay Hospitality Company, LLC; Gulf Bay Hotel Company, LLC; GBP Development, LLC; GB Peninsula, Ltd.; 951 Land Holdings, Ltd.; DY Land Associates, Ltd.; GBFC Development, Ltd.; GBFC Marina, Ltd.; FC Beach, Ltd.; FC Golf, Ltd.; FC Hotel, Ltd.; FC Resort, Ltd.; Gulf Bay Hospitality, Ltd.; Gulf Bay Hotel Company, Ltd.; GBP Development, Ltd.; and Fiddler's Creek Management, Inc.

AA00002

4.      Plaintiffs are Florida business entities with their principal place of business in Collier County, Florida.

5.      Defendant is a Delaware limited partnership[2] authorized to do business in the State of Florida and has availed itself of the jurisdiction of this Court by virtue of, among other things, filing its Application by PEPI Capital, L.P. for Payment of Administrative Expense Claim on March 2, 2010 (the "Application") [D.E. 50][3] in the main bankruptcy case, and filing twenty-eight (28) proofs of claims on or about August 31, 2010, one in each of the Debtors' bankruptcy cases, asserting a claim in the amount of $1,405,000.00.

6.      Additionally, long-arm jurisdiction exists under Florida's Long Arm Statute such that the Court may properly exercise personal jurisdiction over Defendant pursuant to sections 48.193(1)(a) & (g), and (2), Florida Statutes.

## FACTS COMMON TO ALL COUNTS

7.      The underlying bankruptcy cases were commenced by the filing of twenty-eight (28) Voluntary Petitions under chapter 11 of the United States Bankruptcy Code on February 23, 2010 (the "Petition Date") [D.E. 1].

8.      No trustee or examiner has been appointed.

9.      On March 9, 2010, the Office of the United States Trustee's Office filed a Notice of Appointment of Homeowners' Committee [D.E. 72].

10.     On April 12, 2010, the Office of the United States Trustee's Office filed an Amended Notice of Appointment of Homeowners' Committee and Notice of Change of

---

[2] PEPI is an affiliate of Perot Investments of Dallas, Texas.
[3] The Application was subsequently withdrawn by Defendant on April 12, 2010 [D.E. 133].

3

AA00003

Designation From Homeowners' Committee to Official Unsecured Creditors' Committee [D.E. 132].

11.     Each of the Debtors in the Chapter 11 Cases owns, operates and/or is otherwise affiliated with the fully integrated, premier master planned residential community known as "Fiddler's Creek" in southwestern Florida.

12.     Prior to the Petition Date, the homebuilding industry in the United States experienced a significant downturn in the demand for new homes and an oversupply of new and existing homes available for sale. The negative impact of these events and trends were worsened by the turmoil in the mortgage and credit markets in late 2008 and through 2009, adversely impacting the Debtors' continued access to needed financing.

13.     As such, the Debtors' filing for bankruptcy was precipitated by the failed agreements of future financing and existing loan restructuring by its lenders, failed agreements and promises of future lenders, as well as the financial credit crunch that affected all sectors of the economy in 2008. These financial difficulties were strained even further when certain of the Debtors' lenders experienced financial difficulties, which prevented them from providing additional loans to and/or restructuring existing loans with the Debtors.  As a result, as of the Petition Date, the Debtors had substantial equity in their properties, but were experiencing a liquidity crisis.

14.     Consequently, prior to the Petition Date, the Debtors engaged in a search for debtor-in-possession financing to provide liquidity to them in connection with and during an anticipated chapter 11 bankruptcy filing.  After meeting with and speaking to a number of parties, the Debtors ultimately elected to proceed with PEPI as their debtor-in-possession lender in connection with a proposed debtor-in-possession loan in the amount of $27,000,000.00.

4

Thereafter, and as a result of further negotiations, Fiddler's Creek, together with its affiliates and subsidiaries, entered into a Term Sheet with Petrus Private Investments, L.P.,[4] dated October 29, 2009 (the "Term Sheet"), for a credit facility to the Debtors, with total advances of up to $27,000,000.00 (the "Proposed DIP Loan"), which Proposed DIP Loan would be used to fund the Debtors' Chapter 11 bankruptcy reorganization. A copy of the Term Sheet is attached hereto as **Exhibits "A"**.

15. After signing of the Term Sheet, the Debtors continued further negotiations with PEPI on the terms and conditions of the Proposed DIP Loan, which negotiations resulted ultimately in the signing of a certain Commitment Letter, dated December 31, 2009 (the "Commitment Letter") between Fiddler's Creek, LLC and GB Peninsula, Ltd. and PEPI. A copy of the Commitment Letter is attached hereto as **Exhibit "B"**.

16. Prior to the Petition Date, the Debtors paid PEPI in excess of $955,000.00 (the "Fee Amount") pursuant to the terms of the Commitment Letter and Term Sheet, which amount was comprised of the payment of approximately $550,000.00 to reimburse PEPI's out-of-pocket due diligence expenses (including legal fees) and $405,000.00 as payment of one-half of a "Commitment Fee" under the terms of the Commitment Letter.

17. In addition to paying the Fee Amount to PEPI in connection with the Proposed DIP Loan, the Debtors also paid substantial expenses (including legal fees) incurred by their own professionals in connection with the PEPI negotiations.

18. In exchange for the Fee Amount and other related payments, the Debtors were to receive the Proposed DIP Loan in the amount of $27,000,000.00 from PEPI. Instead, just a few

---

[4] After the signing of the Term Sheet, Petrus Private Investments, L.P., changed its name to PEPI Capital, LP.

5

days prior to the anticipated Petition Date and as the Debtors were in final preparations for the filing of these Chapter 11 cases, PEPI breached the Term Sheet and Commitment Letter. Such actions by PEPI forced the Debtors, at the last minute, to approach the Debtors' principal, Mr. Aubrey Ferrao, to negotiate the terms of a replacement debtor-in-possession loan with an entity controlled by Mr. Ferrao, namely Gulf Bay Capital, Inc. ("Gulf Bay Capital"). Rather than allow the Debtors to face the dire prospects of a chapter 11 bankruptcy proceeding without financing, Mr. Ferrao, through Gulf Bay Capital, reluctantly and at the last minute agreed to make a DIP loan to the Debtors with total advances of up to $25,000,000.00.

19. Consequently, and as a result of such breach, on February 22, 2010, the Debtors served PEPI with a default letter asserting that PEPI had defaulted under the terms of the Commitment Letter and demanding the return of the Commitment Fee (the "Default Letter"). A copy of the Default Letter is attached hereto as **Exhibit "C"**.

20. As asserted in the Default Letter, PEPI defaulted under the terms of the Commitment Letter for several reasons, including but not limited to:

(i) refusing to provide Fiddler's Creek with written notice that PEPI had completed its due diligence in connection with the Proposed DIP Loan, prior to the Debtors having to file for bankruptcy;

(ii) deleting certain critical provisions from the loan documents, required by the Commitment Letter, related to the waterfall and concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Proposed DIP Loan in respect of the waterfall; and

6

(iii) modifying the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sale process.

21. Pursuant to the Commitment Letter, the Debtors paid the Fee Amount to PEPI and had otherwise adhered to all of the agreed terms and conditions of the Term Sheet and Commitment Letter.

22. Despite the Debtors' good faith compliance with the Term Sheet and Commitment Letter, PEPI never provided the Debtors with anything of value and/or the Proposed DIP Loan in exchange for the Fee Amount.

23. Similarly, PEPI never provided the Debtors with a complete accounting of how the Fee Amount was spent and whether any amounts remain unspent.

24. Additionally, PEPI has failed and refused, despite repeated demand, to tender a repayment of the Fee Amount to Debtors.

25. As of the Petition Date, the Debtors were owed not less than $955,000.00 from the PEPI.

26. On August 31, 2010, PEPI filed twenty-eight (28) claims, which are listed on the attached **Exhibit "D,"** one in each of the Debtors' cases asserting a claim in the total amount of $1,405,000.00 (the "PEPI Claims"), which is comprised of the balance of the alleged Commitment Fee of $405,000 and an asserted "break-up" fee allegedly owed to PEPI under the Commitment Letter in the amount of $1,000,000.

AA00007

27.     As a result of the defaults by PEPI, the Debtors never sought approval of the Proposed DIP Loan with the Bankruptcy Court and the Bankruptcy Court never approved the allowance and/or payment of the "Break Up" fee to PEPI.

28.     On April 15, 2011, the Debtors filed the *Debtors' Substantive Omnibus Objection to Claims filed by Pepi Capital, L.P.* [D.E.1134].

29.     On June 6, 2011, PEPI filed a Response *Opposing Debtor's Substantive Omnibus Objection to Claims* [D.E.1323].

## COUNT I
## BREACH OF CONTRACT

30.     The allegations of fact set forth in paragraphs 1 through 29 are re-alleged and incorporated herein as if set forth in full.

31.     The Debtors entered the Term Sheet and the Commitment Letter with PEPI for the Proposed DIP Loan providing for total advances of up to $27,000,000.00, that was to be finalized prior to the Debtors' filing for chapter 11 bankruptcy and subject only to the approval of the Bankruptcy Court.

32.     Pursuant to the Term Sheet and the Commitment Letter, the Debtors paid the Fee Amount to PEPI, under the belief that PEPI would faithfully execute their obligations and responsibilities under the Commitment Letter and consummate the Proposed DIP Loan in accordance with the terms specifically provided in and required by the Commitment Letter upon the approval of the Bankruptcy Court.

33.     The Debtors performed all of their duties and obligations pursuant to the Term Sheet and Commitment Letter.

8

34. Despite the Debtors' compliance with the terms of the Term Sheet and Commitment Letter, Defendant breached the Commitment Letter by (i) materially altering the terms of the Commitment Letter (ii) deleting and redrafting critical provisions required to be in the loan documents, and (iii) failing to comply with the due diligence sign off requirement under the Commitment Letter.

35. Despite repeated demand upon Defendant, PEPI has failed to tender repayment of the Fee Amount.

36. As a result of PEPI's breach of the Term Sheet and Commitment Letter, the Debtors have been damaged in an amount not less than $955,000.00.

**WHEREFORE**, Plaintiffs respectfully request the entry of judgment against Defendant in the amount of not less than $955,000.00, together with interest at the statutory rate thereof, and costs and attorneys' fees to the extent permitted by law, and for such further relief as this Court deems just and proper.

## COUNT II
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

37. The allegations of fact set forth in paragraphs 1 through 29 are re-alleged and incorporated herein as if set forth in full.

38. The Term Sheet and Commitment Letter between the Debtors and PEPI concerning the Proposed DIP Loan contained an implied covenant of good faith and fair dealing by and between the parties which prohibits either party from engaging in any activity or conduct which would prevent the other party from receiving the benefits of the contract.

9

39.     The Debtors fully performed all covenants, conditions and obligations required by them to be performed by the Term Sheet and Commitment Letter, except to the extent waived, excused or made impossible by PEPI's breach of the Term Sheet and Commitment Letter.

40.     PEPI, in acting or failing to act as alleged above, breach the implied covenant of good faith and fair dealing.  As a direct and proximate result of the breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount of not less than $955,000.00.

**WHEREFORE**, Plaintiffs respectfully request the entry of judgment against Defendant in the amount of not less than $955,000.00, together with interest at the statutory rate thereof, and costs and attorneys' fees to the extent permitted by law, and for such further relief as this Court deems just and proper.

## COUNT III
## UNJUST ENRICHMENT

41.     The allegations of fact set forth in paragraphs 1 through 29 above are re-alleged and incorporated herein as if set forth in full.

42.     Pursuant to the Commitment Letter, PEPI required the payment of the Fee Amount as a condition precedent to consummation of the Proposed DIP Loan.

43.     The Debtors paid the Fee Amount and PEPI accepted and has retained the benefit of the Fee Amount.

44.     The Debtors are entitled to repayment of the Fee Amount in full since PEPI failed and refused to consummate the Proposed DIP Loan under the terms of the Commitment Letter.

45.     PEPI has been unjustly enriched by accepting the benefit of the Fee Amount without providing a Proposed DIP Loan and/or any value to the Debtors in return.

AA00010

46.     The Debtors have demanded repayment of the Fee Amount from PEPI, and PEPI has failed and refused to pay same.

47.     As a result, PEPI has been unjustly enriched in the amount of not less than $955,000.00.

**WHEREFORE**, Plaintiffs respectfully request the entry of judgment against Defendant in the amount of not less than $955,000.00, together with interest at the statutory rate thereof, and costs and attorneys' fees to the extent permitted by law, and for such further relief as this Court deems just and proper.

## COUNT IV
## TURNOVER

48.     The allegations of fact set forth in paragraphs 1 through 29 are re-alleged and incorporated herein as if set forth in full.

49.     PEPI is in possession of property of the bankruptcy estate.

50.     The property may be used by the Debtors in connection with its administration of the Chapter 11 Cases.

51.     The Debtors have sought to recover the property from PEPI, but PEPI has refused to turn over the property to the Debtors.

52.     The refusal of PEPI to turnover estate property is made in bad faith since PEPI has not provided the Debtors with anything of value and/or the Proposed DIP Loan in exchange for the Fee Amount.

53.     The Debtors are entitled to recover the property pursuant to 11 U.S.C. §542.

**WHEREFORE**, Plaintiffs respectfully request the entry of judgment against Defendant, directing Defendant to turn over money owed to the bankruptcy estates in the amount of not less

AA00011

than $955,000.00, together with interest at the statutory rate thereof, and costs and attorneys' fees to the extent permitted by law, and for such further relief as this Court deems just and proper.

## COUNT V
## OBJECTION TO PROOFS OF CLAIM FILED BY PEPI

54.     The allegations of facts set forth in paragraphs 1 through 29 are re-alleged and are incorporated herein as if set forth in full.

55.     This is an action objecting to each of the 28 claims filed by PEPI on August 31, 2010, which are listed on the attached **Exhibit "D,"** in each of the Debtors' cases asserting a claim in the total amount of $1,405,000.00

56.     The Pepi Claims listed on **Exhibit "D"** are based upon PEPI's assertion that it is entitled to the balance of the Commitment Fee ($405,000) and a "Break Up" fee ($1,000,000) in connection with the Term Sheet and Commitment Letter.  The Debtors dispute the PEPI Claims, deny that the Debtors owe any amounts to PEPI, object to each of the PEPI Claims and request the entry of an Order disallowing and expunging the PEPI Claims.

57.     The Debtors object to the PEPI Claims on the grounds that (i) PEPI has never provided the Debtors with a complete accounting of how the Fee Amount was spent and whether any amounts remain unspent; (ii) PEPI did not provide the Debtors with anything of value and/or the Proposed DIP Loan in exchange for the Fee Amount; (iii) PEPI breached the terms of the Commitment Letter, and (iv) the Bankruptcy Court never approved the terms or payment of the "Break Up" fee, which was clearly a requirement and condition precedent to the obligation to pay the "Break Up" fee even if PEPI had not breached the terms and conditions of the Commitment Letter.

12

AA00012

58.     Accordingly, the Debtors have no obligation to make any additional payments to PEPI nor is PEPI entitled to a "Break-Up" fee.  As a result, the Debtors object to the PEPI Claims in their entirety and seek a judgment disallowing the PEPI Claims against the Debtors' estate.

**WHEREFORE**, Plaintiffs respectfully request the entry of a judgment disallowing PEPI's Claims in their entirety and grant such other and further relief as the Court deems just and proper.

Dated this <u>20th</u> day of July, 2011.

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Debtors-in-Possession
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:    _/s/ *Mariaelena Gayo-Guitian*_
        Mariaelena Gayo-Guitian, Esq.
        Fla. Bar No.  0813818
        mguitian@gjb-law.com
        Paul J. Battista, Esq.
        Florida Bar No. 884162
        pbattista@gjb-law.com

13

AA00013

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via electronic mail to Alan J. Perlman, Esquire, Counsel for PEPI Capital, L.P, Roetzel & Andress 350 Las Olas Boulevard Las Olas Centre II Suite 1150 P.O. Box 30310 Fort Lauderdale, FL 33303-0310 and all other counsel identified on the CM/ECF service list maintained by the Court in this case on the 20th day of July, 2011.

By: /s/ Mariaelena Gayo-Guitian
Mariaelena Gayo-Guitian, Esq.

14

AA00014

**SERVED VIA CM/ECF and/or**
**Electronic Mail**

Regions Bank
c/o Lara Fortney Gross, Esq.
c/o Raymond Miller, Esq.
Gunster Yoakley & Stewart, P.A.
2 South Biscayne Boulevard, Ste 3400
Miami, FL 33131-1897
rmiller@gunster.com
lgross@gunster.com

Fifth Third Bank
c/o Mark J. Wolfson, Esq.
c/o Jennifer Hayes, Esq.
Foley & Lardner LLP
100 N. Tampa Street, Ste. 2700
Tampa, Florida 33602
mwolfson@foley.com
jhayes@foley.com

Florida Financial Investments, Inc.
c/o Donald Kirk, Esq.
501 E. Kennedy Boulevard
Suite 1700
Tampa, Florida 33602
dkirk@fowlerwhite.com

Gulf Bay Capital, Inc.
c/o Stephen R. Leslie, Esq.
Stichter, Riedel, Blain & Prosser
110 East Madison Street
Suite 200
Tampa, Florida 33602-47
Sleslie.ecf@srbp.com

William J. Simonitsch, Esq.
K&L Gates
Wachovia Financial Center
200 S. Biscayne Blvd
Ste 3900
Miami, FL 33131
Bill.simonitsch@klgates.com

Aleida Martinez-Molina, Esq.
Weiss Serota Helfman
2525 Ponce de Leon Blvd.
Coral Gables, FL 33134
amartinez@wsh-law.com

Roberta A. Colton, Esq.
POB 1102
Tampa, FL 33601
racolton@trenam.com

Alberto F. Gomez, Jr., Esq.
Morse & Gomez, PA
119 S. Dakota Ave
Tampa, FL 33606
algomez@morsegomez.com

Hywel Leonard, Esq.
Carlton Fields, PA
POB 3239
Tampa, FL 33601
hleon@carltonfields.com

Ricardo Alberto Reyes, Esq.
Tobin & Reyes, P.A.
5355 Town Center Rd.
Boca Raton, Florida 33486-1005
rar@tobinreyes.com

William Grady Morris, Esq.
P.O. Box 2056
Marco Island, Florida 34146-2056
wgmorrislaw@embarqmail.com

Douglas Gonzales, Esq.
Weiss Serota Helfman
200 E. Broward Blvd.
Ste 1900
Fort Lauderdale, FL 33301
dgonzales@wsh-law.com

Phillip Brougham, Chairman of
Homeowners Committee
8587 Pepper Tree Way
Naples, FL 34114
pbrougham@earthlink.net

**MASTER SERVICE LIST**
**FIDDLER'S CREEK, LLC.,** *et al.*
*Case No. 9:10-bk-03846*

Raymond David
8579 Bellagio Drive
Naples, FL 34114
rdavid1@comcast.net

Glenn Vician
8605 Broadway
Merrillville, IN 46410
glennvician@gmail.com

Torben Christensen
9270 Campanile Circle # 204
Naples, FL 34114
flyfan@aol.com

Al Love, Committee Vice chairman
7685 Mulberry Lane
Naples, FL 34114
alove41@comcast.net

G. Weber Gaskin
9279 Menaggio Court., # 102
Naples, FL 34114
gwgaskin@comcast.com

Bob Baldocchi
7730n Mulberry Lane
Naples, FL 34114
Bobkat7730@comcast.net

Paul S. Singerman, Esq.
Jordi Guso, Esq.
Debi Evans Galler, Esq.
Counsel for Ad Hoc Homeowners
Committee
200 South Biscayne Boulevard
Suite 1000
Miami, FL  33131
JGuso@bergersingerman.com
dgaller@bergersingerman.com
singerman@bergersingerman.com

Amanda L. Barton, Esq.
Counsel for the ITG Tax Free Income &
Capital Appreciation Fund, LTD.
13490 Old Livingston Road
Naples, Florida 34109
abarton@itgholdings.com

Christopher Kasten, Esq.
Bush Ross
P.O. Box 3913
Tampa, FL 33601-3913
ckasten@bushross.com

Thomas M. Messana, Esq.
Scott A. Underwood, Esq.
Attorneys for U.S. Bank National Assoc.
401 East Las Olas Boulevard, Suite 1400
Ft. Lauderdale, FL 33301
tmessana@mws-law.com
sunderwood@mws-law.com

Jeffrey W. Warren, Esq.
Bush Ross, P.A.
POB 3913
Tampa, FL 33601-3913
jwarren@bushross.com

J. Steven Wilkes
Office of the United States Trustee
501 E. Polk Street
Tampa, FL 33602
Steven.wilkes@usdoj.gov

W. Keith Fendrick, Esq.
Holland & Knight, LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602
keith.fendrick@hklaw.com

Edmund Whitson, Esq.
Counsel for Colonnade Naples Land LLC
Akerman Senterfitt
SunTrust Financial Center
401 E. Jackson St.
Suite 1700
Tampa, FL 33602-5250
Edmund.whitson@akerman.com

**MASTER SERVICE LIST**
**FIDDLER'S CREEK, LLC.,** *et al.*
*Case No. 9:10-bk-03846*

Robert E. Stochel, Esq.
Hoffman & Stochel
One Professional Center, Suite 306
Crown Point, IN 46307
res@reslaw.org

Eric John Vasquez, Esq.
Suite 201
900-6th Ave S
Naples, FL 34102
evasquez@ejvlawoffice.com

Laura Fortney Gross, Esq.
Counsel for Regions Bank
Gunster, Yoakley & Stewart, P.A.
777 South Flagler Drive, Suite 500E
West Palm Beach, FL 33401
lgross@gunster.com

David M. Landis, Esq.
Jon E. Kane, Esq.
Counsel for Tomen America, Inc
Mateer & Harbert, P.A. &
225 E. Robinson Street, Suite 600
Post Office Box 2854
Orlando, Florida 32802-2854
dlandis@mateerharbert.com
jkane@mateerharbert.com

Patricia A. Redmond, Esq.
Counsel for Aubrey Ferrao
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
predmond@stearnsweaver.com

Glenn S. Vician, Esq.
8605 Broadway
Merrillville, Indiana 46410
Glennsvician2@bbbvonline.com

Robert A DeMarco, Esq.
Treiser, Collins & Vernon
3080 Tamiami Trail East
Naples, FL 34112
(239) 649-4900
rdemarco@swflalaw.com

John B. Hutton, Esq.
Counsel for US Bank National Asoc.
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL 33131
huttonj@gtlaw.com

Robert A. Soriano, Esq.
Greenberg Traurig, P.A.
625 East Twiggs Street, Suite 100
Tampa, Florida 33602
soriano@gtlaw.com

Mark David Bloom, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
bloomm@gtlaw.com

Aaron P. Honaker, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
honakera@gtlaw.com

Jeffrey Gilbert, Esq.
Greenberg Traurig, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
gilbergj@gtlaw.com

Andrew L. Much, Esq.
Textron Financial Corporation
11575 Great Oaks Way, Suite 210
Alpharetta, GA 30022
amuch@textronfinancial.com

**MASTER SERVICE LIST**
**FIDDLER'S CREEK, LLC.,** *et al.*
*Case No. 9:10-bk-03846*

Stephen R. Leslie, Esq
Stichter, Riedel, Blain & Prosser, P.A.
Attorneys for Gulf Bay Capital, Inc.
110 Madison Street - Suite 200
Tampa, Florida 33602
sleslie@srbp.com

Mark D. Hildreth, Esq.
Attorney for Iberia Bank
Shumaker, Loop & Kendrick, LLP
PO Box 49948
Sarasota, FL 34230-6948
mhildreth@slk-law.com

Warren S. Bloom, Esq.
Amy E. Lowen, Esq.
Greenberg Traurig, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL 32801
bloomw@gtlaw.com
lowena@gtlaw.com

Trial Attorney
Office of the U.S. Trustee, Region 21
501 E. Polk Street, Suite 1200
Tampa, Florida 33602
steven.wilkes@usdoj.gov

**SERVED VIA FIRST CLASS U.S. MAIL**

Fiddler's Creek, LLC, *Et Al*
Attn: Tony DiNardo
8156 Fiddler's Creek Pkwy
Naples, FL 34114

Regions Bank
Attn: Gloria Sloop
1900 5th Ave N, 12th FL
Birmingham, AL 35203

Regions Bank
4851 N Tamiami Trail
Naples, FL 34103

Tomen America, Inc.
Stuart A. Krause, Esq.
Zeichner Ellman & Krause
575 Lexington Ave
New York, NY 10022

Tomen America, Inc.
805 Third Avenue
New York, NY 10022

IberiaBank
2150 Goodlette Rd.
Naples, FL 34102

Textron Financial Corporation
c/o Mark Bloom, Esq.
Greenberg Traurig
1221 Brickell Ave
Miami, FL 33131

Fifth Third Bank
c/o Brian Giles, Esq.
Statman, Harris & Eyrich, LLC
3700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202

Fifth Third Bank
999 Vanderbilt Beach Rd
Naples, FL 34108

Mellon United, N.A.
Commercial Loan Division
1111 Brickell Ave, 30th Floor
Miami, FL 33131

Florida Financial Investments, Inc.
8156 Fiddler's Creek Pkwy
Naples, FL 34114

Aon Risk Services Inc Of NY
Po Box 7247-7376
Philadelphia, PA
19170-7376

AA00018

## MASTER SERVICE LIST
## FIDDLER'S CREEK, LLC., *et al.*
### Case No. 9:10-bk-03846

Ash City USA
PMB 816 60 Industrial Pkwy
Buffalo, NY 14227

Avalon Risk Inc.
240 Cedar Knolls Rd
Suite 308
Cedar Knolls, NJ 07927

Bellagio Village Association
5067 Tamiami Trail East
Naples, FL 34113

Carriage Limousine LLC
678 Bald Eagle Dr Ste #4
Marco Island, FL 34115

Century Link
Po Box 96064
Charlotte, NC 28296-0064

Colonnade Properties, LLC
c/o Chris Glinski
380 Lexington Ave., Suite 710
New York, NY 10168

Cranberry Crossing
5067 Tamiami Trail East
Naples, FL 34114

Evans Oil Company
3170 S Horseshoe Dr
Po Box 856
Naples, FL 34106

FBS Property Tax Abatement LLC
200 S Biscayne Boulevard
Suite 2300
Miami, FL 33131

Grand Western Brands Inc.
Po Box 21046
Ft Lauderdale, FL 33335-1046

Guymann Construction Of FL
305 SW 3rd St
Cape Coral, FL 33991-1961

Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611

John Deere Landscapes
One John Deere Place
Moline, Illinois 61265

Lee County Port Authority
11000 Term. Access Rd
#8671
Ft Myers, FL 33913-8899

Sysco West Coast FL
Po Box 1839
Palmetto, FL 34220

Tampa Bay Trane
902 N Himes
Tampa, FL 33609

Textron Business Services Inc
Dept At 40219
Atlanta, GA 31192-0219

The Advocacy Group At
Tew Cardenas LLC
215 South Monroe St Ste
702
Tallahassee, FL 32301

Titleist/Acushnet Company
Po Box 532402
Charlotte, NC 28290-2402

United Capital Funding Corp.
Po Box 31246
Tampa, FL 33631-3246

Collier County Tax Collector
2800 N. Horseshoe Drive
Naples, FL 34104

**MASTER SERVICE LIST**
**FIDDLER'S CREEK, LLC.,** *et al.*
*Case No. 9:10-bk-03846*

The City of Naples
City Attorney
735 Eighth Street South, 2nd Floor
Naples, FL 34102

Internal Revenue Service
PO Box 21126
Philadelphia, PA 19114

Internal Revenue Service
Special Procedures – Insolvency
7850 SW 6th Court
Plantation, FL 33324

Special Asst. U.S. Attorney
2110 First Street, Suite 3-137
Ft Myers, FL 33901

The Honorable Eric H. Holden, Jr.
Attorney General of the U.S.
950 Pennsylvania Avenue, NW Room 4400
Washington, DC 20530-0001

State of Florida
Department of Revenue
c/o Frederick F. Rudzik
PO Box 6668
Tallahassee, FL 32314

Securities and Exchange Commission
Branch of Reorganization
3475 Lenox Road, N.E., #1000
Atlanta, GA 30326-1232

Diane L. Jensen, Esq.
Local Counsel for Regions Bank
Pavese Law Firm
Post Office Drawer 1507
Ft. Myers, FL 33902

Glenn & Dawn Vician
467 Scarborough Rd.
Valparaiso, IN 46385

Glenn & Dawn Vician
9225 Museo Cir.
Unit 201
Naples, FL 34114-9522

Stephen & Shelia Shulman
5807 Fox Hollow Court
Ann Arbor, MI 48105

Stephen & Shelia Shulman
8589 Bellagio Dr.
Naples, FL 34114

Matthew & Christine Suffoletto
205 Whetherburn Dr
Wexford, PA 15090-8869

Matthew & Christine Suffoletto
189 Richmond Ct
Marco Island, FL 34145

Steven & Ellen Taub
POB 18547
Tampa, FL 33679-8547

Steven & Ellen Taub
107 Wisteria Lane
Media, PA 19063-1668

Steven & Ellen Taub
9283 Menaggio Ct
Naples, Florida 34114

Raymond & Carole David
8579 Bellagio Drive
Naples, FL 34114

Kimberly A. Potter, Esq.
McCumber Daniels Buntz Hartig Puig, P.A.
One Urban Centre
4830 W. Kennedy Blvd, Ste 300
Tampa, FL 33609

**MASTER SERVICE LIST**
**FIDDLER'S CREEK, LLC.,** *et al.*
*Case No. 9:10-bk-03846*

Mark J. Woodward, Esq.
Woodward Pires & Lombardo, P.A.
3200 N. Tamiami Trail N.
Ste 200
Naples, FL 34103

# EXHIBIT A

AA00022

# PEROT INVESTMENTS, INC.

2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

October 20, 2009

Fiddler's Creek LLC
c/o Ken Montgomery
Belmont Capital Partners LLC
14741 Rudolph Dadey Dr.
Charlotte, NC 28277

Dear Mr. Montgomery:

Subject to the terms and conditions set forth herein, Petrus Private Investments, L.P. is willing to enter into this Term Sheet pursuant to which Petrus Private Investments, L.P. or its affiliates, for itself as agent (the "Agent"), and Petrus Private Investments L.P. ("PEPI") and/or its affiliates, as lender, as well as various lenders from time to time (collectively, the "Lenders") would consider providing an underwritten commitment for up to $27,000,000 (Twenty-seven million dollars) in debtor in possession financing to Fiddler's Creek LLC and certain of its subsidiaries and affiliates described below pursuant to the terms and conditions further described below. The conduct of the parties hereunder shall be governed by a commercially reasonable standard.

Debtor in Possession Financing -- Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and those subsidiaries and affiliates set forth on Schedule A attached hereto and made a part hereof (collectively, the "Borrower"). |
| Lenders: | Petrus Private Investments, L.P. or designated affiliate and others |
| The DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a commitment (the "Commitment Letter") to Borrower for up to $27,000,000 in the aggregate of debtor in possession financing prior to and for use in connection with the Borrower's anticipated voluntary Chapter 11 bankruptcy proceedings. The Commitment Letter shall consist of a term loan in an amount up to $27,000,000 subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") overseeing the anticipated chapter 11 bankruptcy proceedings for the Borrower (the "Loan"). The Loan is not a revolving line of credit. Specifically, the repayment of any existing loan balance |

AA00023

will not provide additional or renewed availability under the Loan.

| | |
|---|---|
| Purpose and Proceeds: | The proceeds of the Loan shall be used in accordance with a budget to be submitted by the Borrower to the Lender and approved by the Lender in connection with the issuance of the Commitment Letter, which Budget shall include, among other things, the Borrower's operating expenses, working capital needs of Borrower, the Borrower's professional fees for the bankruptcy proceedings and the costs associated with this financing. No proceeds of the Loan will be advanced while any event of default has occurred and has not been cured, or unless and until the conditions precedent thereto have been fulfilled. |
| Loan Draws: | Subject to Lender approval, one or more draws may be made under the Loan, including if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent advances from time to time thereafter. |
| Unused Loan Fee: | Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on any remaining Loan Amount not yet drawn by the Borrower. |
| Term Sheet and Expenses: | On execution of this Term Sheet by all parties, Borrower shall a) pay to Lenders a non-refundable and fully earned Term Sheet fee of $25,000 (the "Initial Term Sheet Fee"), b) pay to Lenders an initial expense deposit of $200,000 to cover the Lenders' out of pocket expenses (including all customary costs associated with the continuing Chapter 11 process and Lenders' due diligence in underwriting, documenting, and closing the loan (including attorney fees), c) proceed exclusively with Lenders to issue the Commitment Letter, and d) provide any and all documents and information reasonably requested by the Lenders in order to proceed with the issuance of the Commitment Letter. In addition, Borrower shall deliver to Lenders upon two (2) business day's written request from time to time such additional deposits as may be necessary, in Lenders' sole discretion, to cover continuing out of pocket expenses in excess of the initial expense deposit through the maturity and payment in full of the Loan, provided however that the total amount required to be reimbursed by the |

AA00024

Borrower for Lender's out of pocket expenses through the issuance of the Commitment Letter shall not exceed $300,000. On termination of this Term Sheet, any unused portion of the expense deposit will be credited or refunded to the Borrower; provided, however, should Borrower execute a commitment with any entity other than Lender, or otherwise obtain debtor in possession funding from any source other than Lender, then, in addition to the Initial Term Sheet Fee, Lender shall also retain an additional $75,000 of the initial expense deposit as a non-refundable, fully earned and immediately payable additional Term Sheet fee (the "Additional Term Sheet Fee"). Borrower agrees to advance additional funds to Lender should insufficient initial expense deposit funds remain to pay in full the Additional Term Sheet Fee. In addition, the Initial Term Sheet Fee will be applied to the Commitment Fee set forth below.

| | |
|---|---|
| Loan Amount: | Up to $27,000,000 |
| Interest Rate: | 12%, payable monthly in arrears but not greater than the maximum rate provided by applicable law. |
| Default Rate: | Upon the occurrence of an Event of Default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law. |
| Mandatory Prepayments: | Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds shall be applied first to the Loan unless otherwise agreed to by Lenders. Until such time as this Loan has been paid in full, no payments of principal shall be paid to any existing secured creditors without the prior written approval of the Lenders, unless identified in the Budget to be approved by the Lenders. |
| Closing Date: | The Loan shall be funded upon (i) approval thereof by the Bankruptcy Court with the form of the Orders entered by the Bankruptcy Court in connection therewith to be acceptable to Lenders in their sole discretion, (ii) completion of all conditions precedent in the sole judgment of Lenders, and (iii) Lenders receipt of the Commitment Fee and payment in full of all expenses. |
| Maturity Date: | The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later Extension Date as set forth below)(the "Initial Maturity Date"), (b) the effective date of a plan of reorganization which has been confirmed by an order of the Bankruptcy Court, or (c) the date upon which a final order is entered by the Bankruptcy Court either (i) |

AA00025

converting the Borrowers' Chapter 11 case to a case under Chapter 7 or (ii) approving one or more 363 sales of all or substantially all of the Borrowers' assets (unless agreed to by Lenders), or (iii) appointing a trustee or examiner (with expanded powers) in the Borrowers' Chapter 11 case or (iv) dismissal of any of the Borrowers' bankruptcy cases or (v) the occurrence of an uncured event of default under the DIP Financing.

**Acceptance Date:** Borrower must accept this term sheet by 5:00 p.m. Dallas time on October 20, 2009.

**Commitment Fee:** A Commitment Fee in the amount of 3% of the Loan Amount shall be fully earned, non-refundable, and payable immediately to Lenders upon Lender's issuance of the Commitment Letter and execution of the Commitment Letter by both Lender and Borrower. If issued, the Commitment Letter will provide, amongst other customary terms, that it will expire unless the Loan is approved by the Bankruptcy Court on or before January 15, 2010 .

**Exit Fee:** 2% of the total advances made under the Loan actually drawn by the Borrower, payable upon a) payment in full of the Loan at maturity, b) any partial principal payment of the Loan prior to maturity, or c) any other reduction of the Loan.

**Break-Up Fee:** Upon and after Lenders' issuance of the Commitment Letter, Borrower shall be obligated to pay a Break-Up Fee of $1,000,000 to the Lenders in the sole event that Borrowers fail to consummate the Loan with the Lender, but instead accept and proceed to closing on alternative financing that is approved by the Bankruptcy Court. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. Borrower shall take all necessary action in the Bankruptcy Court to pay the Break-Up Fee, when it accrues, including, without limitation, stipulating that such fee is an allowed chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

**Collateral:** All indebtedness and obligations under Loan will be secured by a court-ordered priming lien and first priority senior security interests in all assets, proceeds and cash collateral thereof of the Borrower and its affiliates and subsidiaries set forth on Schedule A hereto, tangible and

AA00026

intangible, including but not limited to all lockbox agreements and lockbox cash, cash and cash equivalents, restricted cash, cash collateral, depository accounts, accounts receivable, contract rights, inventory, improved and unimproved real property, personal property, plant, equipment, fixtures, vehicles, and intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); Lenders would also receive a pledge of 100% of the stock of Borrower in its subsidiaries and affiliates set forth on Schedule A hereto (subject to tax limitations, the pledge of foreign subsidiary stock shall be limited to the maximum percent allowed by applicable tax laws), in the sole discretion of the Lender, Loan guarantees from some or all of Borrower's subsidiaries and affiliates not identified on Schedule A hereto, and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Collateral"). The Collateral shall have no permitted encumbrances senior or equal to the Lender's DIP Liens except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral and as may be specifically agreed to by Lenders in their sole discretion.

| | |
|---|---|
| Collateral Monitoring Fee: | Borrower shall pay to Lenders a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding. |
| Extension Date: | Provided no uncured event of default has occurred or exists as of the initial or second extension date, and no earlier termination triggering event has occurred or exists as of the initial or second extension date, the Borrower may extend the Initial Maturity Date for two (2) consecutive six (6) month periods. |
| Extension Fee: | An Extension Fee equal to 0.5% of the Loan Amount, adjusted for any pay downs, shall be payable for each exercised extension. To exercise each extension, the Borrower shall provide a 30 day notice to Lenders together with payment of Extension Fee. |
| DIP Provisions: | Borrower anticipates filing a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") for all parent and subsidiary entities and will obtain (a) an interim order of the Bankruptcy Court approving the Loan on an interim basis (the "Interim Order"), and/or (b) will within forty-five (45) days after the entry of such interim order or seventy–five (75) days after the filing of the bankruptcy case obtain a final order (the "Final Order") (collectively, the "Orders") of the Bankruptcy Court approving the Loan on a final |

AA00027

basis, and fixing the DIP Funding Date, which Orders shall not have been reversed, modified, amended, stayed or vacated. Subject to Lender approval, one or more draws may be made under the Loan, including, if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent scheduled advances from time to time thereafter. The Orders shall provide that the Loan shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by a senior priming first lien on all of the Collateral then owned or thereafter acquired by the Borrower pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees and other administrative expenses as may be agreed to by Lenders). The Orders shall, at a minimum, contain provisions under Section 364 (e) granting all such senior and priming liens and claims to Lenders for all monies actually advanced even if such Orders are subsequently vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Lenders to immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens and claims granted to Lenders shall contain cross default and cross collateral provisions with all other debt and contracts.

Other Conditions Precedent:

Standard for loans and customary for transactions of this type to Lenders' sole satisfaction, including but not limited to the following:

1. All Borrower fees payable to Lenders shall be current, including without limitation, all fees of Lenders' professionals

2. Appraisals may be performed by appraisers retained and acceptable to Lenders. The current MAI Appraisal issued by Integra in May 2009 will be provided to assist Lenders in the initial valuation of the collateral. An update to the existing Appraisal may be conducted post filing.

3. All Borrower administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or

AA00028

addressed in a manner deemed appropriate by the Lenders in their sole discretion.

4. Lenders completion of due diligence to its satisfaction; Lenders' due diligence will include, but not be limited to, review of all CDD related documentation, review of interim financial statements and documentation, appraisals, appropriate insurance coverage, examination of the Collateral and title thereto and additional due diligence related to the Borrower's business, industry, legal, environmental and technical related matters

5. Completion of legal due diligence investigation by the Lenders' counsel; with results satisfactory to the Lenders and their counsel, of all matters which Lender deems relevant, in its sole discretion, including, without limitation, those matters shown on Schedule B attached hereto.

6. Receipt by the Lenders of 90-day cash budget and final 2010 budget and business plan through the anticipated exit from Chapter 11 from the Borrower satisfactory to the Lenders in both form and substance (the "Budget").

7. Borrower shall have executed and delivered such DIP Credit Agreements, documents and instruments as are customary in connection with DIP financing and such other documentation required by and acceptable to Lenders and its counsel including, without limitation, a release of all claims through the time of funding, guarantees of Borrower subsidiaries and affiliates requested by Lender, mortgages, security agreements, and promissory note, and Borrower and guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the Lenders liens and claims

8. Commitments for mortgagee title insurance, with appropriate surveys, in form and substance satisfactory to Lender.

9. Reasonable and customary opinions of counsel to the Borrower as to the transactions contemplated hereby which opinions are satisfactory to the Lenders

AA00029

10. Corporate resolutions, certificates and other documents as the Lenders shall reasonably request

11. All necessary consents and approvals to the financing shall have been obtained

12. The Lenders must be satisfied that any financial statements delivered to it fairly present the business and financial condition of the Borrower and its subsidiaries

13. No material misstatements in or omissions from the materials previously furnished to the Lenders for its review

14. No previously undisclosed intercompany transactions shall have occurred

15. The absence of any litigation or other proceeding the result of which might have a material adverse effect on the Borrower and its affiliates and subsidiaries, including, without limitation, those matters shown on attached Schedule B

16. The proposed financing is subject to the condition that no material changes in governmental regulations or policies affecting the Borrower or the Lenders involved in this transaction occur prior to the Closing Date

17. Borrower shall be in good standing in its state of incorporation and qualified to do business in other states in which Collateral is located

18. All liens and claims granted to Lenders in connection with the Loan shall be priming, first priority liens and claims, and all existing liens contract rights, rights of redemption, and all existing third party and Borrower (and its affiliates and subsidiaries) rights and obligations of any type shall be subordinate to the liens, claims and interests of Lenders.

19. All DIP Financing motions, orders and bankruptcy court documentation shall be acceptable in form and substance to Lenders.

20. Until all Borrower obligations are paid in full to Lenders, Borrower shall provide to Lenders not less

AA00030

than two business days advance notice of any filings made in the bankruptcy case(s) of Borrower, provided that the Borrower shall provide as much notice as is reasonably possible for emergency motions. Lenders shall be given not less than five business days advance notice of any hearing regarding the DIP Financing.

21. Such other conditions precedent as the Lenders may require in its discretion.

**Collateral Monitoring**

Ongoing Collateral monitoring; Lenders, Agent or their financial advisor, shall have customary rights to enter and inspect the premises, interview employees, examine books and records, etc., with reasonable notice to the Borrower. The Borrower shall provide Lenders with all reports provided to any third party as well as such financial reports as Lenders may request on a periodic basis.

**Guarantees:**

At the Lender's discretion, all of the Borrower subsidiaries and affiliates, as listed on Schedule A, shall execute the Loan documents and become jointly and severally liable under the terms Loan. The Borrower represents that all of the entities that comprise Fiddlers' Creek and GB Peninsula Ltd. are included as Borrowers on Schedule A.

**Representations and Warranties:**

Customary for transactions of this nature

**Covenants:**

Definitive documentation to contain affirmative and negative covenants acceptable to Lenders and customary for transactions of this type including but not limited to:

1. No line item in the agreed budget shall exceed in any period, or in aggregate, a 10% variance from the amount provided for in the Budget.
2. Certain asset sales, lot sales and milestones as to borrower's business plan and ultimate exit from bankruptcy
3. Limitations on capital expenditures
4. Prohibitions on additional indebtedness without Lenders consent
5. Restricted payments and related party transactions prohibited without Lenders consent
6. Restriction on the Borrower's ability to transfer or sell assets without Lenders consent (including pursuant to sale/leaseback transactions), unless required in conjunction with this Financing, with such proceeds used first to repay the Lenders
7. Limitation on incurrence of liens subject to Lenders reasonable consent
8. Restriction on subsidiaries' ability to issue or sell capital stock

AA00031

9. Restriction on the Borrower's ability to consolidate, merge or transfer all or substantially all of assets and the assets of its subsidiaries or affiliates
10. The Budget must be submitted to Lenders as soon as possible after execution of this term sheet, and subject to the satisfaction of the Lenders in both form and substance, will be attached to the Commitment Letter.
11. Maintain adequate insurance coverage satisfactory to Lenders in its sole discretion
12. Asset sales will be subject to minimum release prices satisfactory to Lenders in Lenders sole discretion
13. Covenants to Lender's satisfaction with regard to the payment of debt service, assessments and any other matter relating to the CDD obligations

| | |
|---|---|
| Events of Default: | Customary for transactions of this nature and such other Events of Default Lenders requires in its sole discretion including a breach of the variance covenant relating to the Agreed Budget. |
| Governing Law: | To Be Determined and acceptable to Lenders. |
| Expenses and Indemnification: | Until such time as the Loan is paid in full, Lenders shall be reimbursed, upon demand, for all direct and indirect costs, fees, and expenses, which shall be paid by Borrower. |
| | Indemnification provisions customary for transactions will be provided for in the definitive documentation |

By signing this letter, both parties acknowledge that: (i) this letter is not a binding commitment on the part of any person to provide or arrange for financing on the terms and conditions set forth herein or otherwise; (ii) any such commitment on the part of the Lenders would be in a separate written instrument signed by the Lenders following satisfactory completion of the Lender's initial due diligence, internal review and approval process, including approval by the Lenders executive management (which approvals have not yet been sought or obtained); (iii) this letter supersedes any and all discussions and understandings, written or oral, between or among the Lenders and any other person as to the subject matter hereof; and (iv) the Lenders may, at any level of its approval process, decline any further consideration of the proposed financing and terminate its approval process. Under no circumstances would the Lenders or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result from this letter, or the proposed financing or any other related financing.

To confirm your desire that the Lenders continue its due diligence process which could lead us to seek approval for the above proposed transaction, time being of the essence, please execute and return this letter at the earliest possible time, but in any event by no later than 5:00 p.m. Dallas time on October 20, 2009, along with the Term Sheet Fee and initial Expense Deposit (this offer to enter into a Term Sheet will expire on such date if not accepted by then).

AA00032

Petrus Private Investments, L.P.

By Perot Investments, Inc., its General Partner

By:_____
Name:   David Radunsky
Title:      Chief Operating Officer


Agreed and Accepted this 20th day of October, 2009.

Fiddler's Creek LLC (on behalf of itself, its subsidiaries and affiliates)
By: *Anthony DiNardo*
Name:   Anthony DiNardo
Title:      Attorney In Fact




Schedule A

Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

AA00033

| STATUS | FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|---|
| ACTIVE | 951 LAND HOLDINGS LTD | Limited Partnership | 03/14/00 | 59-3684895 |
| ACTIVE | 951 Land Holding LLC | General Partner | 4/7/2000 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | DY LAND ASSOCIATES LTD | Limited Partnership | 03/14/00 | 59-3684898 |
| ACTIVE | DY Associates LLC | General Partner | 04/07/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GBFC Development LTD | Limited Partnership | 03/14/00 | 59-3684897 |
| ACTIVE | GBFC Development LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GBFC MARINA LTD | Limited Partnership | 03/14/00 | 59-3684890 |
| ACTIVE | FC Marina LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC BEACH LTD | Limited Partnership | 03/14/00 | 59-3684896 |
| ACTIVE | FC Beach LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC GOLF LTD | Limited Partnership | 12/03/02 | 03-0509355 |
| ACTIVE | FC Golf LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | DY LAND HOLDINGS II, LLC | Limited Liability Company | 04/25/08 | 26-2495367 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC PARCEL 73, LLC | Limited Liability Company | 04/25/08 | 26-2494498 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC COMMERCIAL, LLC | Limited Liability Company | 04/25/08 | 26-2495276 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC HOTEL, LTD | Limited Partnership | 03/30/04 | 34-2024547 |
| ACTIVE | FC Hotel, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC RESORT, LTD | Limited Partnership | 03/30/04 | 34-2024546 |
| ACTIVE | FC Resort, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GULF BAY HOSPITALITY LTD | Limited Partnership | 12/31/2003 | 59-3790126 |
| ACTIVE | GULF BAY HOSPITALITY COMPANY LLC | GEN PARTNER | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GULF BAY HOTEL COMPANY LTD | Limited Partnership | 12/4/2002 | 56-2495068 |
| ACTIVE | GULF BAY HOTEL COMPANY LLC | General Partner | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FIDDLER'S CREEK LLC | Limited Liability Company | | 59-3639729 |
| ACTIVE | GBFC II LP | Managing Member | | |
| | GBFC II TWO LLC | Member | | |
| ACTIVE | GBFC II LP | Limited Partnership | | 59-3705460 |
| ACTIVE | GBFC II LLC | General Partner | | |
| ACTIVE | GB 100 LTD | Limited Partner | | |
| ACTIVE | GB 100 LTD | Limited Partnership | 12/07/95 | 65-0628890 |
| ACTIVE | GB100 Inc | General Partner | 02/22/93 | 65-0395715 |
| Active | Fiddler's Creek Management Inc | Sub Charter C | 10/11/94 | 65-0532185 |
| ACTIVE | GB Peninsula Ltd  (Land) | Limited Partnership | | 59-3692446 |
| ACTIVE | GB Peninsula Inc (Gen .Partner) | General Partner | | 59-3692447 |
| ACTIVE | GBP Development Ltd (sell house) | Subsidary of Peninsula | | TBD |
| | GB Peninsula Ltd | Limited Partner | | 59-3692446 |
| ACTIVE | GBP Development LLC | General Partner | | TBD |

AA00034

Schedule B

Schedule of Outstanding Litigation for relating to Fiddler's Creek LLC

and Affiliates and Subsidiaries

AA00035

# EXHIBIT B

AA00036

# PEPI CAPITAL, L.P.
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek, LLC
8156 Fiddler's Creek Parkway
Naples, FL 34114

Dear Mr. DiNardo,

Reference is made to the negotiations still ongoing between Fiddler's Creek, LLC and GB Peninsula, Ltd., on the one hand (collectively referred to as "Fiddlers") and PEPI Capital, L.P. on the other hand ("PEPI"), regarding the terms a proposed debtor-in-possession loan in the maximum amount of $27 million from PEPI to Fiddlers as contemplated by that certain Term Sheet letter, dated October 20, 2009, between Fiddlers and Petrus Private Investments, L.P., n/k/a PEPI, an executed copy of which is attached hereto (the "Proposed Loan"). Among other things, the terms of the Proposed Loan include a requirement that Fiddlers, upon finalizing and signing a commitment letter in connection with such Proposed Loan, will pay a commitment fee to PEPI in the amount of $785,000 (the "Commitment Fee") plus an expense deposit in the amount of $250,000 (the "Deposit") (collectively, the Commitment Fee and Deposit shall be referred to herein as the "Payment").

Today, PEPI is executing and issuing a commitment letter (the "Commitment Letter") to Fiddlers in connection with the Proposed Loan. In order to insure that the Payment is made in a timely manner if and when Fiddlers and PEPI finalize and execute the Commitment Letter or a revised version thereof acceptable to Fiddlers and PEPI, Fiddlers will make the Payment today, notwithstanding that the Commitment Letter has been issued by PEPI but not yet been executed by Fiddlers.

PEPI agrees that if the Payment is paid to PEPI on or before December 31, 2009, and the Commitment Letter or a revised version thereof is not finalized and executed by each of Fiddlers and PEPI on or before Thursday, January 14, 2010 at 5 P.M., eastern time, (the "Deadline") for any reason or no reason whatsoever based on the sole and absolute discretion of Fiddlers and/or PEPI, then PEPI agrees to and shall return and pay back to Fiddlers on or before 5:00 pm (eastern) on January 15, 2010 the Payment in full without any deduction or set off, and without any interest. PEPI agrees herein that it shall not have any defense, counterclaim or right to withhold or delay the return of the Payment if the Commitment Letter or a revised version thereof is not finalized and executed by Fiddlers. In such event, the Payment will be returned by PEPI to Fiddlers in accordance with the wire instructions attached to this letter. In the event the Commitment Letter or a revised version thereof is finalized and executed by Fiddlers and PEPI prior to the Deadline, then PEPI shall be entitled to retain the Payment pursuant to and in accordance with the Commitment

AA00037

Fiddler's Creek
December 31, 2009
Page 2 of 3

Letter or a revised version thereof and the Commitment Fee shall be fully earned and paid effective December 31, 2009.

Neither the terms of this letter, nor the payment of the Payment to PEPI pursuant hereto, nor the receipt of such Payment hereunder by PEPI shall or is intended to require Fiddlers or PEPI to agree to any  terms in the Commitment Letter or the negotiations related thereto prior to its execution and delivery by Fiddlers and PEPI, and each of Fiddlers and PEPI are free to negotiate any and all issues related to the Commitment Letter and execute or refrain from executing any version of the Commitment Letter in their respective sole and absolute discretion.

For the avoidance of doubt, the Commitment Letter issued by PEPI today does not restrict, amend, or limit the terms of this letter agreement, and this letter agreement does not restrict, amend, or limit the terms of such Commitment Letter.

This letter will be effective and binding on PEPI upon Fiddlers execution of this letter and delivery of a copy of this letter to PEPI, together with Fiddlers wire instructions attached, and the receipt by PEPI of the Payment on or before December 31, 2009.

Very truly yours,

PEPI Capital, L.P.

By:_____
David Radunsky, Chief Operating Officer
of its general partner

Agreed, with wire instructions attached.
Fiddler's Creek, LLC                    GB Peninsula, Ltd

By:_____        By:_____

AA00038

Fiddler's Creek
December 31, 2009
Page 3 of 3

Wire Instructions for Fiddlers:

Regions Bank
Attn. Marco Island Branch
ABA #: 062000019
Credit to: DY Land Associates, LTD
Address: 8156 Fiddlers' Creek Pkwy
Naples, FL 34114
Acct # 4640306224

# PEROT INVESTMENTS, INC.

2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

October 20, 2009

Fiddler's Creek LLC
c/o Ken Montgomery
Belmont Capital Partners LLC
14741 Rudolph Dadey Dr.
Charlotte, NC 28277

Dear Mr. Montgomery:

Subject to the terms and conditions set forth herein, Petrus Private Investments, L.P. is willing to enter into this Term Sheet pursuant to which Petrus Private Investments, L.P. or its affiliates, for itself as agent (the "Agent"), and Petrus Private Investments L.P. ("PEPI") and/or its affiliates, as lender, as well as various lenders from time to time (collectively, the "Lenders") would consider providing an underwritten commitment for up to $27,000,000 (Twenty-seven million dollars) in debtor in possession financing to Fiddler's Creek LLC and certain of its subsidiaries and affiliates described below pursuant to the terms and conditions further described below. The conduct of the parties hereunder shall be governed by a commercially reasonable standard.

Debtor in Possession Financing -- Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and those subsidiaries and affiliates set forth on Schedule A attached hereto and made a part hereof (collectively, the "Borrower"). |
| Lenders: | Petrus Private Investments, L.P. or designated affiliate and others |
| The DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a commitment (the "Commitment Letter") to Borrower for up to $27,000,000 in the aggregate of debtor in possession financing prior to and for use in connection with the Borrower's anticipated voluntary Chapter 11 bankruptcy proceedings. The Commitment Letter shall consist of a term loan in an amount up to $27,000,000 subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") overseeing the anticipated chapter 11 bankruptcy proceedings for the Borrower (the "Loan"). The Loan is not a revolving line of credit. Specifically, the repayment of any existing loan balance |

Fiddler's Creek LLC Term Sheet
10/20/2009

Fiddlerscreektermsheet.doc
Page 1 of 13

AA00040

will not provide additional or renewed availability under the Loan.

**Purpose and Proceeds:** The proceeds of the Loan shall be used in accordance with a budget to be submitted by the Borrower to the Lender and approved by the Lender in connection with the issuance of the Commitment Letter, which Budget shall include, among other things, the Borrower's operating expenses, working capital needs of Borrower, the Borrower's professional fees for the bankruptcy proceedings and the costs associated with this financing. No proceeds of the Loan will be advanced while any event of default has occurred and has not been cured, or unless and until the conditions precedent thereto have been fulfilled.

**Loan Draws:** Subject to Lender approval, one or more draws may be made under the Loan, including if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent advances from time to time thereafter.

**Unused Loan Fee:** Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on any remaining Loan Amount not yet drawn by the Borrower.

**Term Sheet and Expenses:** On execution of this Term Sheet by all parties, Borrower shall a) pay to Lenders a non-refundable and fully earned Term Sheet fee of $25,000 (the "Initial Term Sheet Fee"), b) pay to Lenders an initial expense deposit of $200,000 to cover the Lenders' out of pocket expenses (including all customary costs associated with the continuing Chapter 11 process and Lenders' due diligence in underwriting, documenting, and closing the loan (including attorney fees), c) proceed exclusively with Lenders to issue the Commitment Letter, and d) provide any and all documents and information reasonably requested by the Lenders in order to proceed with the issuance of the Commitment Letter. In addition, Borrower shall deliver to Lenders upon two (2) business day's written request from time to time such additional deposits as may be necessary, in Lenders' sole discretion, to cover continuing out of pocket expenses in excess of the initial expense deposit through the maturity and payment in full of the Loan, provided however that the total amount required to be reimbursed by the

AA00041

Borrower for Lender's out of pocket expenses through the issuance of the Commitment Letter shall not exceed $300,000. On termination of this Term Sheet, any unused portion of the expense deposit will be credited or refunded to the Borrower; provided, however, should Borrower execute a commitment with any entity other than Lender, or otherwise obtain debtor in possession funding from any source other than Lender, then, in addition to the Initial Term Sheet Fee, Lender shall also retain an additional $75,000 of the initial expense deposit as a non-refundable, fully earned and immediately payable additional Term Sheet fee (the "Additional Term Sheet Fee"). Borrower agrees to advance additional funds to Lender should insufficient initial expense deposit funds remain to pay in full the Additional Term Sheet Fee. In addition, the Initial Term Sheet Fee will be applied to the Commitment Fee set forth below.

| | |
|---|---|
| Loan Amount: | Up to $27,000,000 |

Interest Rate:               12%, payable monthly in arrears but not greater than the maximum rate provided by applicable law.

Default Rate:                Upon the occurrence of an Event of Default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law.

Mandatory Prepayments:       Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds shall be applied first to the Loan unless otherwise agreed to by Lenders. Until such time as this Loan has been paid in full, no payments of principal shall be paid to any existing secured creditors without the prior written approval of the Lenders, unless identified in the Budget to be approved by the Lenders.

Closing Date:                The Loan shall be funded upon (i) approval thereof by the Bankruptcy Court with the form of the Orders entered by the Bankruptcy Court in connection therewith to be acceptable to Lenders in their sole discretion, (ii) completion of all conditions precedent in the sole judgment of Lenders, and (iii) Lenders receipt of the Commitment Fee and payment in full of all expenses.

Maturity Date:               The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later Extension Date as set forth below)(the "Initial Maturity Date"), (b) the effective date of a plan of reorganization which has been confirmed by an order of the Bankruptcy Court, or (c) the date upon which a final order is entered by the Bankruptcy Court either (i)

AA00042

converting the Borrowers' Chapter 11 case to a case under Chapter 7 or (ii) approving one or more 363 sales of all or substantially all of the Borrowers' assets (unless agreed to by Lenders), or (iii) appointing a trustee or examiner (with expanded powers) in the Borrowers' Chapter 11 case or (iv) dismissal of any of the Borrowers' bankruptcy cases or (v) the occurrence of an uncured event of default under the DIP Financing.

Acceptance Date:

Borrower must accept this term sheet by 5:00 p.m. Dallas time on October 20, 2009.

Commitment Fee:

A Commitment Fee in the amount of 3% of the Loan Amount shall be fully earned, non-refundable, and payable immediately to Lenders upon Lender's issuance of the Commitment Letter and execution of the Commitment Letter by both Lender and Borrower. If issued, the Commitment Letter will provide, amongst other customary terms, that it will expire unless the Loan is approved by the Bankruptcy Court on or before January 15, 2010 .

Exit Fee:

2% of the total advances made under the Loan actually drawn by the Borrower, payable upon a) payment in full of the Loan at maturity, b) any partial principal payment of the Loan prior to maturity, or c) any other reduction of the Loan.

Break-Up Fee:

Upon and after Lenders' issuance of the Commitment Letter, Borrower shall be obligated to pay a Break-Up Fee of $1,000,000 to the Lenders in the sole event that Borrowers fail to consummate the Loan with the Lender, but instead accept and proceed to closing on alternative financing that is approved by the Bankruptcy Court. The Break-Up Fee shall be payable on the earlier of (1) funding of the alternative financing or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. Borrower shall take all necessary action in the Bankruptcy Court to pay the Break-Up Fee, when it accrues, including, without limitation, stipulating that such fee is an allowed chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

Collateral:

All indebtedness and obligations under Loan will be secured by a court-ordered priming lien and first priority senior security interests in all assets, proceeds and cash collateral thereof of the Borrower and its affiliates and subsidiaries set forth on Schedule A hereto, tangible and

AA00043

intangible, including but not limited to all lockbox agreements and lockbox cash, cash and cash equivalents, restricted cash, cash collateral, depository accounts, accounts receivable, contract rights, inventory, improved and unimproved real property, personal property, plant, equipment, fixtures, vehicles, and intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); Lenders would also receive a pledge of 100% of the stock of Borrower in its subsidiaries and affiliates set forth on Schedule A hereto (subject to tax limitations, the pledge of foreign subsidiary stock shall be limited to the maximum percent allowed by applicable tax laws), in the sole discretion of the Lender, Loan guarantees from some or all of Borrower's subsidiaries and affiliates not identified on Schedule A hereto, and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Collateral"). The Collateral shall have no permitted encumbrances senior or equal to the Lender's DIP Liens except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral and as may be specifically agreed to by Lenders in their sole discretion.

| | |
|---|---|
| Collateral Monitoring Fee: | Borrower shall pay to Lenders a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding. |
| Extension Date: | Provided no uncured event of default has occurred or exists as of the initial or second extension date, and no earlier termination triggering event has occurred or exists as of the initial or second extension date, the Borrower may extend the Initial Maturity Date for two (2) consecutive six (6) month periods. |
| Extension Fee: | An Extension Fee equal to 0.5% of the Loan Amount, adjusted for any pay downs, shall be payable for each exercised extension. To exercise each extension, the Borrower shall provide a 30 day notice to Lenders together with payment of Extension Fee. |
| DIP Provisions: | Borrower anticipates filing a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") for all parent and subsidiary entities and will obtain (a) an interim order of the Bankruptcy Court approving the Loan on an interim basis (the "Interim Order"), and/or (b) will within forty-five (45) days after the entry of such interim order or seventy-five (75) days after the filing of the bankruptcy case obtain a final order (the "Final Order") (collectively, the "Orders") of the Bankruptcy Court approving the Loan on a final |

AA00044

basis, and fixing the DIP Funding Date, which Orders shall not have been reversed, modified, amended, stayed or vacated. Subject to Lender approval, one or more draws may be made under the Loan, including, if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent scheduled advances from time to time thereafter. The Orders shall provide that the Loan shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by a senior priming first lien on all of the Collateral then owned or thereafter acquired by the Borrower pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees and other administrative expenses as may be agreed to by Lenders). The Orders shall, at a minimum, contain provisions under Section 364 (e) granting all such senior and priming liens and claims to Lenders for all monies actually advanced even if such Orders are subsequently vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Lenders to immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens and claims granted to Lenders shall contain cross default and cross collateral provisions with all other debt and contracts.

**Other Conditions Precedent:**

Standard for loans and customary for transactions of this type to Lenders' sole satisfaction, including but not limited to the following:

1. All Borrower fees payable to Lenders shall be current, including without limitation, all fees of Lenders' professionals

2. Appraisals may be performed by appraisers retained and acceptable to Lenders. The current MAI Appraisal issued by Integra in May 2009 will be provided to assist Lenders in the initial valuation of the collateral. An update to the existing Appraisal may be conducted post filing.

3. All Borrower administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or

AA00045

addressed in a manner deemed appropriate by the Lenders in their sole discretion.

4. Lenders completion of due diligence to its satisfaction; Lenders' due diligence will include, but not be limited to, review of all CDD related documentation, review of interim financial statements and documentation, appraisals, appropriate insurance coverage, examination of the Collateral and title thereto and additional due diligence related to the Borrower's business, industry, legal, environmental and technical related matters

5. Completion of legal due diligence investigation by the Lenders' counsel, with results satisfactory to the Lenders and their counsel, of all matters which Lender deems relevant, in its sole discretion, including, without limitation, those matters shown on Schedule B attached hereto.

6. Receipt by the Lenders of 90-day cash budget and final 2010 budget and business plan through the anticipated exit from Chapter 11 from the Borrower satisfactory to the Lenders in both form and substance (the "Budget").

7. Borrower shall have executed and delivered such DIP Credit Agreements, documents and instruments as are customary in connection with DIP financing and such other documentation required by and acceptable to Lenders and its counsel including, without limitation, a release of all claims through the time of funding, guarantees of Borrower subsidiaries and affiliates requested by Lender, mortgages, security agreements, and promissory note, and Borrower and guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the Lenders liens and claims

8. Commitments for mortgagee title insurance, with appropriate surveys, in form and substance satisfactory to Lender.

9. Reasonable and customary opinions of counsel to the Borrower as to the transactions contemplated hereby which opinions are satisfactory to the Lenders

AA00046

10. Corporate resolutions, certificates and other documents as the Lenders shall reasonably request

11. All necessary consents and approvals to the financing shall have been obtained

12. The Lenders must be satisfied that any financial statements delivered to it fairly present the business and financial condition of the Borrower and its subsidiaries

13. No material misstatements in or omissions from the materials previously furnished to the Lenders for its review

14. No previously undisclosed intercompany transactions shall have occurred

15. The absence of any litigation or other proceeding the result of which might have a material adverse effect on the Borrower and its affiliates and subsidiaries, including, without limitation, those matters shown on attached Schedule B

16. The proposed financing is subject to the condition that no material changes in governmental regulations or policies affecting the Borrower or the Lenders involved in this transaction occur prior to the Closing Date

17. Borrower shall be in good standing in its state of incorporation and qualified to do business in other states in which Collateral is located

18. All liens and claims granted to Lenders in connection with the Loan shall be priming, first priority liens and claims, and all existing liens contract rights, rights of redemption, and all existing third party and Borrower (and its affiliates and subsidiaries) rights and obligations of any type shall be subordinate to the liens, claims and interests of Lenders.

19. All DIP Financing motions, orders and bankruptcy court documentation shall be acceptable in form and substance to Lenders.

20. Until all Borrower obligations are paid in full to Lenders, Borrower shall provide to Lenders not less

AA00047

than two business days advance notice of any filings made in the bankruptcy case(s) of Borrower, provided that the Borrower shall provide as much notice as is reasonably possible for emergency motions. Lenders shall be given not less than five business days advance notice of any hearing regarding the DIP Financing.

21. Such other conditions precedent as the Lenders may require in its discretion.

**Collateral Monitoring**

Ongoing Collateral monitoring; Lenders, Agent or their financial advisor, shall have customary rights to enter and inspect the premises, interview employees, examine books and records, etc., with reasonable notice to the Borrower. The Borrower shall provide Lenders with all reports provided to any third party as well as such financial reports as Lenders may request on a periodic basis.

**Guarantees:**

At the Lender's discretion, all of the Borrower subsidiaries and affiliates, as listed on Schedule A, shall execute the Loan documents and become jointly and severally liable under the terms Loan. The Borrower represents that all of the entities that comprise Fiddlers' Creek and GB Peninsula Ltd. are included as Borrowers on Schedule A.

**Representations and Warranties:**

Customary for transactions of this nature

**Covenants:**

Definitive documentation to contain affirmative and negative covenants acceptable to Lenders and customary for transactions of this type including but not limited to:

1. No line item in the agreed budget shall exceed in any period, or in aggregate, a 10% variance from the amount provided for in the Budget.
2. Certain asset sales, lot sales and milestones as to borrower's business plan and ultimate exit from bankruptcy
3. Limitations on capital expenditures
4. Prohibitions on additional indebtedness without Lenders consent
5. Restricted payments and related party transactions prohibited without Lenders consent
6. Restriction on the Borrower's ability to transfer or sell assets without Lenders consent (including pursuant to sale/leaseback transactions), unless required in conjunction with this Financing, with such proceeds used first to repay the Lenders
7. Limitation on incurrence of liens subject to Lenders reasonable consent
8. Restriction on subsidiaries' ability to issue or sell capital stock

9. Restriction on the Borrower's ability to consolidate, merge or transfer all or substantially all of assets and the assets of its subsidiaries or affiliates

10. The Budget must be submitted to Lenders as soon as possible after execution of this term sheet, and subject to the satisfaction of the Lenders in both form and substance, will be attached to the Commitment Letter.

11. Maintain adequate insurance coverage satisfactory to Lenders in its sole discretion

12. Asset sales will be subject to minimum release prices satisfactory to Lenders in Lenders sole discretion

13. Covenants to Lender's satisfaction with regard to the payment of debt service, assessments and any other matter relating to the CDD obligations

| | |
|---|---|
| Events of Default: | Customary for transactions of this nature and such other Events of Default Lenders requires in its sole discretion including a breach of the variance covenant relating to the Agreed Budget. |
| Governing Law: | To Be Determined and acceptable to Lenders. |
| Expenses and Indemnification: | Until such time as the Loan is paid in full, Lenders shall be reimbursed, upon demand, for all direct and indirect costs, fees, and expenses, which shall be paid by Borrower. |
| | Indemnification provisions customary for transactions will be provided for in the definitive documentation |

By signing this letter, both parties acknowledge that: (i) this letter is not a binding commitment on the part of any person to provide or arrange for financing on the terms and conditions set forth herein or otherwise; (ii) any such commitment on the part of the Lenders would be in a separate written instrument signed by the Lenders following satisfactory completion of the Lender's initial due diligence, internal review and approval process, including approval by the Lenders executive management (which approvals have not yet been sought or obtained); (iii) this letter supersedes any and all discussions and understandings, written or oral, between or among the Lenders and any other person as to the subject matter hereof; and (iv) the Lenders may, at any level of its approval process, decline any further consideration of the proposed financing and terminate its approval process. Under no circumstances would the Lenders or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result from this letter, or the proposed financing or any other related financing.

To confirm your desire that the Lenders continue its due diligence process which could lead us to seek approval for the above proposed transaction, time being of the essence, please execute and return this letter at the earliest possible time, but in any event by no later than 5:00 p.m. Dallas time on October 20, 2009, along with the Term Sheet Fee and initial Expense Deposit (this offer to enter into a Term Sheet will expire on such date if not accepted by then).

Petrus Private Investments, L.P.

By Perot Investments, Inc., its General Partner

By: _____
Name:  David Radunsky
Title:    Chief Operating Officer


Agreed and Accepted this 20th day of October, 2009.

Fiddler's Creek LLC (on behalf of itself, its subsidiaries and affiliates)

By: _____
Name:  Anthony DiNardo
Title:    Attorney In Fact




Schedule A

Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

AA00050

### FIDDLER'S CREEK LLC

| STATUS | | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|---|
| ACTIVE | 951 LAND HOLDINGS LTD | Limited Partnership | 03/14/00 | 59-3684895 |
| ACTIVE | 951 Land Holding LLC | General Partner | 4/7/2000 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | DY LAND ASSOCIATES LTD | Limited Partnership | 03/14/00 | 59-3684898 |
| ACTIVE | DY Associates LLC | General Partner | 04/07/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GBFC Development LTD | Limited Partnership | 03/14/00 | 59-3684897 |
| ACTIVE | GBFC Development LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GBFC MARINA LTD | Limited Partnership | 03/14/00 | 59-3684890 |
| ACTIVE | FC Marina LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC BEACH LTD | Limited Partnership | 03/14/00 | 59-3684898 |
| ACTIVE | FC Beach LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC GOLF LTD | Limited Partnership | 12/03/02 | 03-0509355 |
| ACTIVE | FC Golf LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | DY LAND HOLDINGS II, LLC | Limited Liability Company | 04/25/08 | 26-2495367 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC PARCEL 73, LLC | Limited Liability Company | 04/25/08 | 26-2494498 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC COMMERCIAL, LLC | Limited Liability Company | 04/25/08 | 26-2495276 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC HOTEL, LTD | Limited Partnership | 03/30/04 | 34-2024547 |
| ACTIVE | FC Hotel, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FC RESORT, LTD | Limited Partnership | 03/30/04 | 34-2024548 |
| ACTIVE | FC Resort, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GULF BAY HOSPITALITY LTD | Limited Partnership | 12/31/2003 | 59-3790126 |
| ACTIVE | GULF BAY HOSPITALITY COMPANY LLC | GEN PARTNER | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | GULF BAY HOTEL COMPANY LTD | Limited Partnership | 12/4/2002 | 56-2495068 |
| ACTIVE | GULF BAY HOTEL COMPANY LLC | General Partner | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | FIDDLER'S CREEK LLC | Limited Liability Company | | 59-3639729 |
| ACTIVE | GBFC II LLC | Managing Member | | |
| | GBFC II TWO LLC | Member | | |
| ACTIVE | GBFC II LP | Limited Partnership | | 59-3705460 |
| ACTIVE | GBFC II LLC | General Partner | | |
| ACTIVE | GB 100 LTD | Limited Partner | | |
| ACTIVE | GB 100 LTD | Limited Partnership | 12/07/95 | 65-0628890 |
| ACTIVE | GB100 Inc | General Partner | 02/22/93 | 65-0395715 |
| Active | Fiddler's Creek Management Inc | Sub Charter C | 10/11/94 | 65-0532185 |
| ACTIVE | GB Peninsula Ltd (Land) | Limited Partnership | | 59-3692446 |
| ACTIVE | GB Peninsula Inc (Gen .Partner) | | | 59-3692447 |
| ACTIVE | GBP Development Ltd (sell house) | Subsiduary of Peninsula | | TBD |
| ACTIVE | GB Peninsula Ltd | Limited Partner | | 59-3692446 |
| ACTIVE | GBP Development LLC | General Partner | | TBD |

Schedule B

Schedule of Outstanding Litigation for relating to Fiddler's Creek LLC

and Affiliates and Subsidiaries

AA00052

# EXHIBIT C

AA00053



**GENOVESE**
**JOBLOVE &**
**BATTISTA**
———— P.A. ————
*Attorneys at Law*

Paul J. Battista, Esq.
Telephone: 305.372.2457
E-mail: pbattista@gjb-law.com

February 22, 2010

***Via Email and US Mail***
Jeffrey R. Fine, Esq.
K&L Gates
1717 Main Street, Suite 2800
Dallas, TX 75201

Re: Commitment Letter, dated as of December 31, 2009, between PEPI Capital, L.P. ("PEPI") and each of Fiddler's Creek, LLC and GB Peninsula, Ltd. (the "Commitment Letter") in connection with a proposed $27 million debtor-in-possession loan (the "Loan")

Dear Jeff:

As you know, this firm represents Fiddler's Creek, LLC and GB Peninsula, Ltd., and their respective subsidiaries and affiliates as the proposed borrowers and guarantors (collectively, "Fiddlers"), in connection with the Loan proposed under and pursuant to the terms of the Commitment Letter. Regrettably and for the reasons stated below, Fiddlers is compelled to assert that PEPI is in material default of and under the terms of the Commitment Letter. As a result and pursuant to the terms of the Commitment Letter, Fiddlers demands the immediate return of the Commitment Fee previously paid in the amount of $405,000. Fiddlers also reserves any and all other rights and remedies available to it under applicable law as a result of such default.

Specifically, Fiddlers asserts that PEPI has defaulted under the terms of the Commitment Letter for several reasons, including (i) the stated refusal by PEPI to provide Fiddlers with notice that PEPI has completed its due diligence in connection with the Loan, and (ii) the decision by PEPI to delete from the loan documents those certain critical provisions of the waterfall required by the Commitment Letter concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Loan in respect of the waterfall. PEPI also materially modified the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sales process.

AA00054

Jeffrey R. Fine, Esq.
Page 2

As you know, over the course of the last couple of months, including both before and after the signing of the Commitment Letter, Fiddlers at all times made it clear, as reflected in the terms of the Commitment Letter, that it would not file the proposed chapter 11 bankruptcy cases without a written confirmation from PEPI that PEPI had completed its due diligence in connection with the Loan. In fact, the Commitment Letter clearly states that the Commitment Letter would terminate if Fiddlers failed to file its chapter 11 cases on "the close of business on February 8, 2010 (or such later date that is three business days after [PEPI] has advised [Fiddlers] it has completed its due diligence...." Notwithstanding, during a phone conference call that took place during the early evening on Tuesday, February 16, 2010, representatives of PEPI for the first time unequivocally stated that PEPI would not be providing notice of the completion of its due diligence until, at the earliest, at the time of the closing of the Loan. As a result of such position, which is contrary to the provisions of the Commitment Letter and the clear understanding of the parties, Fiddlers was faced with the prospect of filing the chapter 11 cases without the benefit of knowing whether PEPI had completed its due diligence and therefore whether PEPI was prepared to make the Loan.

In addition, as was discussed and heavily negotiated prior to the signing of the Commitment Letter, PEPI was aware of the importance to Fiddlers, and to the prospect of dealing with the senior secured lenders to Fiddlers in connection with the proposed priming nature of the Loan, of the provisions of the collateral waterfall described above, including related to an escrow for deeds in lieu of foreclosure and consent judgments, and more importantly the agreement by PEPI in the Commitment Letter to include provisions dealing with valuation mechanisms related to the collateral waterfall and the reduction of the Loan balance related thereto. Notwithstanding the importance of such provisions, and the clear terms of the Commitment Letter in connection therewith, PEPI recently informed Fiddlers that it was simply not willing to include such provisions in the loan documents for the Loan.

Once again, it is certainly regrettable and unfortunate that Fiddlers is required to assert these defaults under the Commitment Letter. However, Fiddlers has been placed in an untenable position as a result of such defaults and therefore is compelled to take this action and to reserve any and all rights and remedies available to it.

Thank you for your attention to this matter.

Sincerely,

Paul J. Battista

cc:     Anthony DiNardo

AA00055

# EXHIBIT D

AA00056

**Fiddler's Creek, LLC PEPI Capital Claims**

| ENTITY | CASE NO. | CLAIM NO. |
|---|---|---|
| Fiddler's Creek, LLC | 9:10-bk-03846-ALP | 204 |
| 951 LAND HOLDINGS, LLC | 9:10-bk-03852-ALP | 139 |
| DY ASSOCIATES, LLC | 9:10-bk-03856-ALP | 127 |
| GBFC DEVELOPMENT, LLC | 9:10-bk-03864-ALP | 124 |
| FC MARINA, LLC | 9:10-bk-03872-ALP | 149 |
| FC BEACH, LLC | 9:10-bk-03873-ALP | 133 |
| FC GOLF, LLC | 9:10-bk-03875-ALP | 153 |
| DY LAND HOLDINGS, LLC | 9:10-bk-03878-ALP | 131 |
| FC PARCEL, LLC | 9:10-bk-03881-ALP | 133 |
| FC HOTEL, LLC | 9:10-bk-03886-ALP | 130 |
| FC COMMERCIAL, LLC | 9:10-bk-03888-ALP | 132 |
| FC RESORT, LLC | 9:10-bk-03896-ALP | 129 |
| GULF BAY HOSPITALITY COMPANY, LLC | 9:10-bk-03898-ALP | 129 |
| GULF BAY HOTEL, LLC | 9:10-bk-03905-ALP | 130 |
| GBP DEVELOPMENT, LLC | 9:10-bk-03908-ALP | 131 |
| GB PENINSULA, LTD. | 9:10-bk-03909-ALP | 134 |
| 951 LAND HOLDINGS, LTD. | 9:10-bk-03911-ALP | 156 |
| DY LAND ASSOCIATES, LTD. | 9:10-bk-03918-ALP | 137 |
| GBFC DEVELOPMENT, LTD. | 9:10-bk-03920-ALP | 153 |
| GBFC MARINA, LTD. | 9:10-bk-03928-ALP | 190 |
| FC BEACH, LTD. | 9:10-bk-03934-ALP | 138 |
| FC GOLF, LTD. | 9:10-bk-03937-ALP | 174 |
| FC HOTEL, LTD. | 9:10-bk-03938-ALP | 131 |
| FC RESORT, LTD. | 9:10-bk-03947-ALP | 139 |
| GULF BAY HOSPITALITY, LTD. | 9:10-bk-03949-ALP | 134 |
| GULF BAY HOTEL COMPANY, LTD. | 9:10-bk-03950-ALP | 132 |
| GBP DEVELOPMENT, LTD. | 9:10-bk-03952-ALP | 137 |
| FIDDLER'S CREEK MANAGEMENT, INC. | 9:10-bk-03954-ALP | 134 |

AA00057

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In Re:                                                          Case No. 8:10-bk-03846-KRM
                                                                Chapter 11
**Fiddler's Creek, LLC,**
**And its twenty-seven subsidiaries and affiliates**

      **Debtor(s).**

_____

**Fiddler's Creek, LLC**
**And its twenty-seven subsidiaries and affiliates**

      **Plaintiffs and Counter-Defendants,**

**vs.**                                                         Adv. Pro. No. 8:11-ap-00809-KRM

**Pepi Capital, L.P.**

      **Defendant and Counter-Plaintiff.**

_____

### PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 8(b) and 13, as well as Federal Rules of Bankruptcy Procedure 7008 and 7013, Defendant and Counter-Plaintiff PEPI Capital, L.P. ("PEPI" or "Defendant")[1] respectfully files this Original Answer, Affirmative Defenses and Counterclaims. PEPI Answers the Complaint filed in the above-styled and numbered adversary proceeding by Plaintiffs and Counter-Defendants Fiddler's Creek, LLC and twenty-seven (27) of its subsidiaries and affiliates (collectively "Fiddler's Creek" or "Debtors"), and asserts Counterclaims arising from the same transactions and occurrences against Fiddler's Creek.

_____

[1] PEPI was formerly known as Petrus Private Investments, LP, but changed its name to PEPI Capital, LP during the time period at issue in this lawsuit.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 1

AA00058

# I. INTRODUCTION AND OVERVIEW

1.   This breach of contract lawsuit arises from the Chapter 11 bankruptcy of Fiddler's Creek, LLC and twenty-seven (27) of its subsidiaries and affiliates.   Immediately prior to filing bankruptcy, Fiddler's Creek was on the cusp of closing on a $27 million in debtor-in-possession ("DIP") loan from PEPI.  Indeed, Fiddler's Creek and PEPI had entered into a Term Sheet[2] and, subsequently, a formal and binding Commitment Letter[3] with each other and PEPI stood at the ready to close and fund.   However, despite months of negotiation and extensive due diligence, Fiddler's Creek suddenly spurned the DIP financing offered by PEPI and instead accepted fundamentally the same DIP loan from Gulf Bay Capital, Inc. ("Gulf Bay"), an affiliate of Fiddler's Creek's founder, developer and Chief  Executive Officer, Mr. Aubrey J. Ferrao ("Mr. Ferrao").   In simple terms, PEPI served as an unwitting and involuntary "stalking horse" for Mr. Ferrao and Gulf Bay, even as Fiddler's Creek repeatedly—but falsely—assured PEPI that it was the "only horse in the race" to provide Fiddler's Creek with DIP financing.

---

[2] A true-and-correct copy of the October 20, 2009 Term Sheet is attached as "Exhibit A" and is incorporated herein for all purposes.

[3] The document attached as Exhibit "B" to the Complaint is not the Commitment Letter issued by PEPI and signed by the Debtors.  A true-and-correct copy of the Commitment Letter signed by the parties on January 27, 2010 (but dated effective December 31, 2009) is attached hereto as "Exhibit E," is defined below, and is incorporated herein for all purposes.  Moreover, on October 20, 2009, PEPI and Fiddler's Creek, LLC, on behalf of itself, its subsidiaries and affiliates, signed a Term Sheet (copy attached hereto as Exhibit "A").  Thereafter, on December 31, 2009, PEPI executed and issued to the Debtors a Commitment Letter for a $27 million DIP loan facility which the Debtors did not sign and accept (copy attached hereto as Exhibit "B"). Concurrently, on December 31, 2009, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Fee Letter Agreement concerning further negotiations between the parties through January 14, 2010, and the payment of fees in relation to the Commitment Letter (copy attached hereto as Exhibit "C").  Thereafter, on January 15, 2010, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Amended Fee Letter Agreement concerning further negotiations between the parties through January 29, 2010, and the payment of fees in relation to the Commitment Letter (copy attached hereto as Exhibit "D").  Finally, on January 27, 2010, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Commitment Letter, to be effective as of December 31, 2009, in which PEPI executed and issued its Commitment Letter for a $27 million DIP lending facility for the Debtors (copy attached hereto as Exhibit "E," the "PEPI Commitment Letter").

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 2

2.  Fiddler's Creek's last minute decision to leave PEPI "at the alter" and to instead accept DIP financing from Mr. Ferrao's Gulf Bay Capital rendered Fiddler's Creek liable to PEPI for the "Break-Up Fee" of $1 million ($1,000,000.00) expressly provided for in both the Term Sheet and the PEPI Commitment Letter.  Indeed, the contractual language requiring Fiddler's Creek to pay PEPI the Break-Up fee could not be more plain or direct.[4]  The Break-Up Fee is an industry recognized business term designed to allow PEPI to go through the intense and time consuming process of offering DIP financing to Fiddler's Creek without fear that these efforts would be mooted by an eleventh hour decision by Fiddler's Creek to accept financing from an alternative DIP lender.  This was the exact scenario that ultimately transpired, and because Fiddler's Creek spurned PEPI in favor of accepting DIP financing from Mr. Ferrao's Gulf Bay Capital, PEPI is contractually entitled to receive full payment of the $1 million Break-Up Fee from Fiddler's Creek.  However, Fiddler's Creek has refused to pay PEPI the Break-Up Fee.

3.  In addition to owing PEPI the Break-Up Fee, Fiddler's Creek has also failed to pay PEPI 1/2 of the contractually required "Commitment Fee"—a sum of $405,000.  Under the plain language of the PEPI Commitment Letter, Fiddler's Creek became liable to PEPI for "100% of the $810,000 Commitment Fee" upon the January 27, 2010 issuance and execution of the PEPI Commitment Letter,[5] one-half of which was to be paid immediately and the remaining one-half

---

[4] *See* Exhibit A at p. 4; Exhibit E at p. 10.

[5] *See* Exhibit E at p. 5, dated to be effective December 31, 2009.  In reality, the entire Commitment Fee of $810,000 was paid to PEPI on December 31, 2009.  Pursuant to request of the Debtors, 1/2 of the Commitment Fee, or $405,000, was returned to the Debtors on January 27, 2010, the date the PEPI Commitment Letter was issued by PEPI and signed by the Debtors. The Debtors remained liable to pay the remaining 1/2 of the Commitment Fee and acknowledged their obligation to pay same to PEPI when they signed the PEPI Commitment Letter on January 27, 2010. *See* Exhibit E at pp. 9-10.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 3

of which was due upon Fiddler's Creek's receipt of its first advance under a DIP loan.[6]  Only $405,000 (or 1/2) of the Commitment Fee has been paid to PEPI, and Fiddler's Creek continues to owe the remaining $405,000 to PEPI.  Fiddler's Creek's last-minute decision to spurn the DIP financing offered by PEPI does not alter Fiddler's Creek's obligation to pay the entire Commitment Fee, which Fiddler's "deemed fully earned" by PEPI immediately upon Fiddler's Creek's execution of the PEPI Commitment Letter.[7]

4.  Notwithstanding that it initiated the last minute break-up with PEPI in favor of accepting a substantially identical DIP loan from its own CEO's company, Fiddler's Creek has now sued PEPI for breach of contract and related claims, and seeks the return of all fees it paid to PEPI under the Term Sheet and PEPI Commitment Letter.  Fiddler's Creek's claims lack any merit, and are a transparent attempt to distract the Court from Fiddler's Creek's liability to PEPI for the Break-Up Fee and the second half of the already "fully earned" and "non-refundable" Commitment Fee.[8]  Consistent with the plain language of the Term Sheet and the PEPI Commitment Letter, PEPI asks that the Court enter a Judgment denying Fiddler's Creeks claims against PEPI and holding that Fiddler's Creek owes PEPI both the Break-Up Fee ($1,000.000.00) and the remaining half of the Commitment Fee ($405,000.00).

<u>ANSWER TO FIDDLER'S CREEK'S COMPLAINT</u>

<u>A. Parties and Jurisdiction</u>

5.  PEPI admits the allegations contained in paragraph 1 of Fiddler's Creek's Complaint.

---

[6] *See* Exhibit A at p. 4; Exhibit E at pp. 9-10.

[7] *See* Exhibit A at p. 4; Exhibit E at pp. 9-10.

[8] *Id.*

6.   PEPI, for limited purposes, admits the allegations contained in paragraph 2 of Fiddler's Creek's Complaint—including the allegation that, as presently constituted, this case is a core proceeding under 11 U.S.C. § 157(b)(2).  However, in the event that additional or other parties are ultimately joined in this litigation, PEPI reserves its right to assert that this litigation is not a core proceeding under 11 U.S.C. § 157(b)(2), to otherwise question the existence of bankruptcy jurisdiction and to request a trial by jury of all fact issues.  To the extent it is later determined this is a non-core proceeding, then PEPI does not consent to the entry of final judgment by an Article I Court, or to the Article I Court conducting a jury trial.

7.   PEPI denies that all conditions precedent to Fiddler's Creek's breach of contract claim and related claims have been met, waived or excused.  The conditions precedent to the Term Sheet are set out at pages 6-8 of Exhibit A to this Answer.  These conditions precedent must all be met "***to Lender's [PEPI's] sole satisfaction***."  *Id.* at 6 (emphasis added).  PEPI denies that, *inter alia*, conditions precedent # 1, #4, #5, #11, #19, #20 and #21 to the Term Sheet were met by Fiddler's Creek.  Similarly, the conditions precedent to the Commitment Letter are set out at pages 15-17 of Exhibit E to this Answer and, with Additional Conditions Precedent set out 22-27 ("Additional Conditions Precedent") of Exhibit E to this Answer.  All these conditions precedent must be met "as required by [PEPI's] Agent in its reasonable discretion." *Id*. at 15.  PEPI denies that, *inter alia*, conditions precedent # 1, #2, #3, #4, #5, #6, #7, #13, #14, #15 and #16 to the Commitment Letter were met by Fiddler's Creek.  PEPI further denies that, *inter alia*, Additional Conditions Precedent # 1, #2, #52, #53, #54, #55, #56 and #57 were met by Fiddler's Creek.  *See* Exhibit E at pages 22-27.  Because Fiddler's Creek failed to fulfill numerous and express conditions precedent to the Term Sheet and the Commitment Letter, Fiddler's Creek's breach of contract claim and related quasi-contractual claims all fail.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 5

8.  PEPI admits the allegations contained in paragraph 4 of Fiddler's Creek's Complaint.

9.  PEPI admits the allegations contained in paragraph 5 of Fiddler's Creek's Complaint, except as to those in footnote 2.  At the time the Commitment Letter and Term Sheet were signed Perot Investments Inc. was the general partner of PEPI.  Perot Investments Inc. is no longer the general partner of PEPI.

10. PEPI admits the allegations contained in paragraph 6 of Fiddler's Creek's Complaint.

**B. Alleged Facts Common to All Counts**

11. PEPI admits the allegations contained in paragraph 7 of Fiddler's Creek's Complaint.

12. PEPI admits the allegations contained in paragraph 8 of Fiddler's Creek's Complaint.

13. PEPI admits the allegations contained in paragraph 9 of Fiddler's Creek's Complaint.

14. PEPI admits the allegations contained in paragraph 10 of Fiddler's Creek's Complaint.

15. PEPI admits the allegations contained in paragraph 11 of Fiddler's Creek's Complaint.

16. PEPI admits that prior to the date of Fiddler's Creek's bankruptcy petition the homebuilding industry and housing market in the United States went into a general recession consistent with the general allegations contained in paragraph 12 of the Complaint.  However, PEPI lacks knowledge and information sufficient to form a belief as to the specific impact of these macro economic developments on Fiddler's Creek and its affiliates, including any "adverse impact" on Fiddler's Creek's "continued access to needed financing" as alleged in paragraph 12.

17. PEPI lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of Fiddler's Creek's Complaint, which purport to generally describe the origins of Fiddler's Creek's "liquidity crisis" and subsequent bankruptcy.  PEPI also lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of Fiddler's Creek's Complaint, which purport to describe "financial

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 6

difficulties" experienced by unnamed and unidentified "Debtors' lenders" who were allegedly "prevented [ ] from providing additional loans and/or restructuring existing loans with the Debtors."

18. PEPI lacks knowledge and information sufficient to form a belief as to the truth of allegations in paragraph 14 of Fiddler's Creek's Complaint that Fiddler's Creek "engaged in a search for debtor-in-possession financing" that involved "meeting with and speaking to a number of parties" before selecting PEPI as its debtor-in-possession ("DIP") lender. PEPI admits the remaining allegations contained in paragraph 14 of Fiddler's Creek's Complaint.

19. PEPI denies the allegations contained in paragraph 15 of Fiddler's Creek's Complaint because they are factually incorrect or incomplete and further because Debtors have attached exhibits to their Complaint which do not accurately reflect the documents actually signed by the parties. Specifically, on October 20, 2009, PEPI and Fiddler's Creek, LLC, on behalf of itself, its subsidiaries and affiliates, signed a Term Sheet (copy attached hereto as Exhibit "A"). Thereafter, on December 31, 2009, PEPI executed and issued to the Debtors a Commitment Letter for a $27 million DIP loan facility which the Debtors did not sign and accept (copy attached hereto as Exhibit "B"). Concurrently, on December 31, 2009, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Fee Letter Agreement concerning further negotiations between the parties through January 14, 2010, and the payment of fees in relation to the Commitment Letter (copy attached hereto as Exhibit "C"). Thereafter, on January 15, 2010, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Amended Fee Letter Agreement concerning further negotiations between the parties through January 29, 2010, and the payment of fees in relation to the Commitment Letter (copy attached hereto as Exhibit "D"). Finally, on January 27, 2010, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 7

AA00064

certain Commitment Letter, to be effective as of December 31, 2009, in which PEPI executed and issued its Commitment Letter for a $27 million DIP lending facility for the Debtors (copy attached hereto as Exhibit "E," the "PEPI Commitment Letter"). PEPI denies that the document identified by the Debtors in paragraph 15 of the Complaint is the PEPI Commitment Letter.

20. PEPI admits it was paid $405,000, which is one-half of the commitment fee, as well as reimbursement for some, but not all, of its legal fees and expenses, including fees and expenses incurred in enforcing its rights and remedies in this matter.

21. PEPI lacks knowledge and information sufficient to form a belief as to the truth of allegations in paragraph 17 of Fiddler's Creek's Complaint. PEPI lacks knowledge and information regarding the alleged "substantial expenses" Fiddler's Creek allegedly incurred from its "own professionals in connection with the PEPI negotiations."

22. PEPI denies the allegations in paragraph 18 of Fiddler's Creek's Complaint.

23. PEPI admits the allegation in Paragraph 19 that "on February 22, 2010, the Debtors served PEPI with a default letter asserting that PEPI had defaulted under the terms of the Commitment Letter and demanding the return of the Commitment Fee." However, PEPI denies the underlying allegation in paragraph 19 that PEPI breached or otherwise defaulted under the Commitment Letter and/or Term Sheet. PEPI further denies the substance and merit of the February 22, 2010 default letter attached to the Debtors' Complaint as Exhibit C (the "Default Letter"), and PEPI denies all allegations contained in the Default Letter.

24. PEPI denies the allegations in paragraph 20 of Fiddler's Creek's Complaint.

25. PEPI denies the allegations in paragraph 21 of Fiddler's Creek's Complaint.

26. PEPI denies the allegations in paragraph 22 of Fiddler's Creek's Complaint.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 8

27. PEPI believes that it provided accounting information to the Debtors and therefore denies the allegation in paragraph 23 of Fiddler's Creek's Complaint that it has failed to provide "Debtors with a complete accounting of how the Fee Amount was spent and whether any amounts remain unspent."  Moreover, PEPI denies the underlying allegation in paragraph 23 that it was obligated to provide such an accounting to Debtors.  In addition, beginning October 16, 2009, the Debtors wired to PEPI a total of $1,360,000, which included payment in full of the Commitment Fee of $810,000 on December 31, 2009, plus advances for PEPI's expenses.  Pursuant to request by the Debtors, 1/2 of the Commitment Fee, or $405,000, was wired back to the Debtors on January 27, 2010, the date the PEPI Commitment Letter was issued by PEPI and signed by the Debtors.  To date PEPI has received 1/2 of the Commitment Fee, or $405,000, plus expense advances of $550,000, for a total of $955,000.

28. PEPI admits the allegation in paragraph 24 of Fiddler's Creek's Complaint that it has refused to "tender a repayment of the Fee Amount to the Debtors."  However, PEPI denies the underlying allegation in paragraph 24 that it was somehow obligated to tender any sort of repayment to Debtors.

29. PEPI denies the allegations in paragraph 25 of Fiddler's Creek's Complaint.

30. PEPI admits the allegations in paragraph 26 of Fiddler's Creek's Complaint, and further admits that Exhibit D to the Debtors Complaint properly lists the twenty-eight (28) claims filed by PEPI in the Fiddler's Creek Bankruptcy.   However, PEPI denies that its claims are limited to the balance of the commitment fee plus the break-up fee.  PEPI's proofs of claim specifically assert attorney fees and expenses in enforcing its claims as well as a broad reservation of all rights, claims and privileges to which PEPI may be entitled to exercise.

31. PEPI denies the allegations in paragraph 27 of Fiddler's Creek's Complaint that there are any "defaults by PEPI." PEPI lacks knowledge and information sufficient to form a belief as to the truth of the remaining allegation contained in paragraph 27 of Fiddler's Creek's Complaint regarding Fiddler's Creek's belief that "as a result" of PEPI's alleged defaults "Debtors never sought approval of the Proposed DIP Loan with the Bankruptcy Court and the Bankruptcy Court never approved the allowance and/or payment of the 'Break Up' fee to PEPI."

32. PEPI admits the allegations in paragraph 28 of Fiddler's Creek's Complaint.

33. PEPI admits the allegations in paragraph 29 of Fiddler's Creek's Complaint.

## **Count 1: Breach of Contract**

34. All the statements, admissions and denials as set forth in paragraphs 1 through 33 are re-alleged and incorporated herein as if set forth in full.

35. PEPI denies the allegation in paragraph 31 of Fiddler's Creek's Complaint insofar as the Debtors incorrectly reference a document other than the PEPI Commitment Letter. The terms of the PEPI Commitment Letter speak for itself.

36. PEPI denies that the documents referenced in paragraph 32 of Fiddler's Creek's Complaint constitute the PEPI Commitment Letter, and therefore denies the allegations in paragraph 32. PEPI also lacks knowledge or information to either admit or deny the assertions made in paragraph 32 of Fiddler's Creek's Complaint.

37. PEPI denies the allegations in paragraph 33 of Fiddler's Creek's Complaint.

38. PEPI denies the allegations in paragraph 34 of Fiddler's Creek's Complaint.

39. PEPI admits the allegation in paragraph 35 of Fiddler's Creek's Complaint that it has refused to "tender a repayment of the Fee Amount to the Debtors." However, PEPI denies the

underlying allegation in paragraph 35 that it was somehow obligated to make any repayment to Debtors.

40. PEPI denies the allegations in paragraph 36 of Fiddler's Creek's Complaint as well as the "WHEREFORE" paragraph directly thereafter.

### Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

41. All the statements, admissions and denials as set forth in paragraphs 1 through 40 are re-alleged and incorporated herein as if set forth in full.

42. Paragraph 38 of Fiddler's Creek's Complaint sets forth a purely legal conclusion rather than a factual allegation. As such, no admission or denial is required.

43. PEPI denies the allegations in paragraph 39 of Fiddler's Creek's Complaint.

44. PEPI denies the allegations in paragraph 40 of Fiddler's Creek's Complaint.

### Count III: Unjust Enrichment

45. All the statements, admissions and denials as set forth in paragraphs 1 through 44 are re-alleged and incorporated herein as if set forth in full.

46. To the extent that the Debtors were referring to the PEPI Commitment Letter, PEPI denies the allegations in paragraph 42 of Fiddler's Creek's Complaint, and the terms of the PEPI Commitment Letter speak for itself.

47. PEPI admits it was paid $405,000, which is one-half of the fee amount, but denies the allegations in paragraph 43 of Fiddler's Creek's Complaint insofar as the Debtors are attempting to assert that they paid the entire fee amount which is due PEPI.

48. PEPI denies the allegations in paragraph 44 of Fiddler's Creek's Complaint.

49. PEPI denies the allegations in paragraph 45 of Fiddler's Creek's Complaint, and asserts that PEPI provided value to the Debtors, amongst other things, in the form of the PEPI Commitment Letter.

50. PEPI admits the allegation in paragraph 46 of Fiddler's Creek's Complaint that Debtors have demanded repayment from PEPI and that PEPI has refused to make any repayment to Debtors. PEPI denies the underlying allegation in paragraph 46 that Debtors are entitled to any such repayment.

51. PEPI denies the allegations in paragraph 47 of Fiddler's Creek's Complaint as well as the "WHEREFORE" paragraph directly thereafter.

## Count IV: Turnover

52. All the statements, admissions and denials as set forth in paragraphs 1 through 51 are re-alleged and incorporated herein as if set forth in full.

53. PEPI denies the allegations in paragraph 49 of Fiddler's Creek's Complaint.

54. PEPI denies the allegations in paragraph 50 of Fiddler's Creek's Complaint.

55. PEPI denies the allegations in paragraph 51 of Fiddler's Creek's Complaint.

56. PEPI denies the allegations in paragraph 52 of Fiddler's Creek's Complaint.

57. PEPI denies the allegations in paragraph 53 of Fiddler's Creek's Complaint.

## Count V: Debtors' Objection to proofs of Claim Filed by PEPI

58. All the statements, admissions and denials as set forth in paragraphs 1 through 56 are re-alleged and incorporated herein as if set forth in full.

59. PEPI admits that part of the allegation in paragraph 55 of Fiddler's Creek's Complaint that PEPI filed twenty-eight (28) claims in the Fiddler's Creek bankruptcy on August 31, 2010, but denies that its claims are limited to $1,405,000.  PEPI is asserting claims for a single recovery in

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 12

an amount of not less than $1,405,000.00, plus attorney fees and costs in regard to efforts to collect the claims, as well as all other rights, claims and privileges to which PEPI is entitled. PEPI also admits that Exhibit D to the Complaint properly lists the filed twenty-eight (28) claims in the Fiddler's Creek bankruptcy. The remainder of Paragraph 55 of Fiddler's Creek's Complaint sets forth a legal conclusion rather than a factual allegation. As such, no admission or denial is required.

60. PEPI admits that part of the allegation in paragraph 56 of Fiddler's Creek's Complaint that PEPI's claims in the Fiddler's Creek Bankruptcy "are based upon PEPI's assertion that it is entitled to the balance of the Commitment Fee ($405,000) and a 'Break Up' fee ($1,000,000) in connection with the Term Sheet and Commitment Letter." However, PEPI is also asserting attorney fees and costs in regard to efforts to collect the claims, as well as all other rights, claims and privileges to which PEPI is entitled. Without conceding the merits or validity of Debtors' objections, PEPI admits the allegation in paragraph 56 of the Complaint that Debtors dispute the validity of PEPI's claims in the Fiddler's Creek Bankruptcy.

61. PEPI admits the allegations in paragraph 57 of Fiddler's Creek's Complaint, insofar as paragraph 57 simply recites and summarizes the basis for Debtors' objections to PEPI's claims in the Fiddler's Creek Bankruptcy. However, PEPI denies the objections summarized in paragraph 57 of Fiddler's Creek's Complaint have merit or are in any way valid.

62. PEPI denies the allegations in paragraph 58 of Fiddler's Creek's Complaint.

## PEPI'S AFFIRMATIVE DEFENSES

63. Pursuant to Federal Rule of Civil Procedure 8(c) and Federal Rules of Bankruptcy Procedure 7008, PEPI asserts the following affirmative defenses to all of Fiddler's Creek's claims.

64. **Waiver and/or Unclean Hands.** In addition to lacking factual merit, Fiddler's Creek's causes of action against PEPI all fail because of the affirmative defense of waiver. By failing to pay the full Commitment Fee and the Break-Up Fee, Fiddler's Creek has intentionally engaged in conduct manifestly inconsistent with its asserted rights under the PEPI Commitment Letter and Term Sheet. Separately, by rejecting the DIP financing offered by PEPI in favor of alternative DIP financing offered by Mr. Ferrao's Gulf Bay Capital, Fiddler's Creek has intentionally engaged in conduct manifestly inconsistent with its asserted rights under the PEPI Commitment Letter and Term Sheet. Through its conduct, Fiddler's Creek has intentionally relinquished its asserted right to enforce any terms of the PEPI Commitment Letter and Term Sheet.

65. **Equitable Estoppel and/or Estoppel by Acceptance of the Benefits.** Fiddler's Creek is estopped from attempting to enforce terms of the PEPI Commitment Letter and Term Sheet against PEPI. Because it used PEPI as an unwitting and involuntary "stalking horse" for its own CEO's (Mr. Ferrao's) competing DIP financing offer, equity precludes Fiddler's Creek from enforcing any terms of the PEPI Commitment Letter and Term Sheet against PEPI. More specifically, equitable estoppel precludes Fiddler's Creeks claims because Debtors: (1) Falsely represented that they would pay PEPI the remaining one-half of the Commitment Fee and the entirety of the Break-Up Fee; (2) Debtors knew these representations were false when made; (3) Debtors intended PEPI to act on these false representations regarding payment of the remaining one-half of the Commitment Fee and the entirety of the Break-Up Fee; (4) PEPI was unaware of the falsity of Debtors' representations; and (5) PEPI relied to its detriment on Debtors' false representations by moving forward with the proposed DIP financing and expending considerable effort and resources thereon.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 14

66. Fiddler's Creek's claims are further barred, in whole or in part, by the doctrines of repudiation, discharge by repudiation of a dependent promise, discharge by a material breach, first breach, and revocation.

67. Fiddler's Creek's claims are barred, in whole or in part, by the failure to satisfy all conditions precedent and/or conditions subsequent.

68. Fiddler's Creek's claims are barred, in whole or in part, by the terms of the Term Sheet and PEPI Commitment Letter.

69. Fiddler's Creek's claims are barred, in whole or in part, because Fiddler's Creek's own conduct, acts, omissions and/or fault was the proximate or producing cause of any alleged injuries or damages suffered by it.

## CONCLUSION TO PEPI'S ANSWER

**Wherefore,** Defendant PEPI respectfully requests the entry of a judgment denying all relief to Fiddler's Creek and dismissing all of Fiddler's Creek's Claims against PEPI with prejudice. PEPI also requests such other and further relief as the Court deems proper.

## PEPI'S COUNTERCLAIMS

70. Pursuant to Federal Rule of Civil Procedure 13 and Federal Rule of Bankruptcy Procedure 7013, Defendant and Counter-Plaintiff PEPI Capital, L.P. asserts the following mandatory counterclaims against Plaintiff and Counter-Defendant Fiddler's Creek, LLC and twenty-seven (27) of its subsidiaries and affiliates (collectively "Fiddler's Creek" or "Debtors").

## Parties and Jurisdiction

71. PEPI's Counterclaims arise from the same transactions and occurrences at issue in Fiddler's Creek's Complaint. The parties to the Complaint and the Counterclaims are identical. Accordingly, all the factual statements, admissions and denials as set forth in paragraphs 1

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 15

through 65 are re-alleged and incorporated herein as if set forth in full in the Counterclaims section of this pleading.

72. The basis for the Court's jurisdiction over PEPI's Counterclaims is substantially identical to the basis for the Court's jurisdiction over Fiddler's Creek's Complaint. Accordingly, absent the joinder of additional or other parties, this is a core proceeding under 28 U.S.C. § 157(b)(2) and venue is proper under 28 U.S.C. § 1409(a).[9]

## Facts Common to All PEPI's Counterclaims

73. PEPI, rather than Fiddler's Creek, is the legitimately aggrieved party in this breach of contract dispute. As fully set forth in PEPI's Response Opposing Debtors' Substantive Omnibus Objection to Claims Filed by PEPI Capital, L.P.,[10] PEPI is a spurned DIP lender and the proverbial "bride left at the alter." Despite months of effort negotiating a complicated $27 million DIP Loan, and despite repeated assurances from (among others) Fiddler's Creek's founder, developer and Chief Executive Officer, Mr. Aubrey J. Ferrao that PEPI was the DIP lender selected by the Debtors, on the eve of its Chapter 11 filings Fiddler's Creek rejected the DIP financing offered by PEPI and instead accepted DIP financing from one of Mr. Ferrao's own companies, Gulf Bay Capital.

74. The DIP loan extended by Mr. Ferrao's Gulf Bay to Fiddler's Creek was fundamentally the same loan that PEPI had proposed to make to the Debtors. Indeed, Gulf Bay's DIP loan to Fiddler's Creek used many of the same documents negotiated by PEPI and prepared by PEPI's

---

[9] PEPI reserves its right should additional or other parties be joined in this litigation to otherwise characterize this litigation.

[10] A true-and-correct copy of PEPI's Response Opposing Debtors' Substantive Omnibus Objection to Claims Filed by PEPI Capital, L.P. ("PEPI's Response") is attached as "Exhibit G" and is incorporated herein for all purposes.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 16

counsel.  In other words, Fiddler's Creek—working in concert with Mr. Ferrao and Gulf Bay—used PEPI as an unwitting and involuntary "stalking horse" for the DIP loan, going so far as to use PEPI's work product to paper Mr. Ferrao's substitute DIP loan to Fiddler's Creek.

75. PEPI's efforts to offer DIP financing to Fiddler's Creek—including conducting due diligence, negotiating terms and drafting closing papers—extended over many months and involved a considerable expenditure of time, energy and resources.  PEPI continued these efforts in reasonable reliance on repeated assurances from Mr. Ferrao and other senior representatives of Fiddler's Creek that PEPI was the "only horse in the race" to provide DIP financing.  Over the course of its efforts to provide DIP financing to Fiddler's Creek, Mr. Ferrao and Fiddler's Creek's counsel (among others) repeatedly stated that Fiddler's Creek had selected PEPI as its DIP lender and that no other potential DIP lenders were under consideration.  These repeated representations were false and misleading.

76. PEPI's diligent efforts to close the DIP loan were also based on its reasonable belief that even if Fiddler's Creek ultimately accepted financing from an alternative DIP lender, PEPI would remain contractually entitled to a sizeable "Break-Up Fee" and the remaining one-half of the "Commitment Fee" as alleged *infra*.  In other words, PEPI worked tirelessly to close the DIP loan to Fiddler's Creek because it reasonably believed that even in a "worst case scenario" where Fiddler's Creek accepted alternative DIP financing, PEPI would be still be contractually entitled to payment of the "Break-Up Fee" and the remaining one-half of the "Commitment Fee" from Fiddler's Creek.

A.    The Term Sheet.

77. PEPI's work to provide DIP financing to Fiddler's Creek began in earnest with the signing of the Term Sheet on October 20, 2009.  The Term Sheet is a valid and enforceable contract

between PEPI and Fiddler's Creek. A true-and-correct copy of the October 20, 2009 Term Sheet

is attached as "Exhibit A" and is incorporated herein for all purposes.

78. In the Term Sheet, the parties agreed to a plain English "Break Up Fee" provision designed

to protect PEPI in the event that Fiddler's Creek decided to "switch horses" and accept DIP

financing from an alternative lender:

> Break-Up Fee: Upon and after lenders issuance of a Commitment Letter,
> Borrower [Fiddler's Creek] **shall be obligated to pay a Break-Up Fee of**
> **$1,000,000 to Lenders [PEPI] in the event that Borrowers fail to consummate**
> **the Loan with the Lender and instead proceed to closing on alternative**
> **financing that is approved by the Bankruptcy Court** . . . The Break-Up fee is
> in addition to any other fee or expense reimbursement herein . . . Borrower shall
> take all necessary action in the Bankruptcy Curt to pay the Break-Up Fee, when it
> accrues . . . ."

*See* Term Sheet (Exhibit A) at p. 10 (emphasis added).

79. The Term Sheet also included a plain English provision establishing a "Commitment Fee"

that PEPI would "fully earn" upon execution of the "Commitment Letter" by the parties: "A

Commitment Fee in the Amount of 3% of the Loan Amount **shall be fully earned, non-**

**refundable, and payable immediately** to the Lenders [PEPI] upon Lender's issuance of the

Commitment Letter and execution of the Commitment Letter by both Lender and Borrower."

*See* Term Sheet (Exhibit A) at p. 4 (emphasis added). Stated simply, the "Commitment Fee"

would be fully earned by PEPI and fully owed by Fiddler's Creek upon the signing of the PEPI

Commitment Letter.[11]

------

[11] Specifically, on October 20, 2009, PEPI and Fiddler's Creek, LLC, on behalf of itself,
its subsidiaries and affiliates, signed a Term Sheet (copy attached hereto as Exhibit "A").
Thereafter, on December 31, 2009, PEPI executed and issued to the Debtors a Commitment
Letter for a $27 million DIP loan facility which the Debtors did not sign and accept (copy
attached hereto as Exhibit "B"). Concurrently, on December 31, 2009, PEPI, Fiddler's Creek,
LLC and GB Peninsula, Ltd. executed that certain Fee Letter Agreement concerning further
negotiations between the parties through January 14, 2010, and the payment of fees in relation to
the Commitment Letter (copy attached hereto as Exhibit "C"). Thereafter, on January 15, 2010,
PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Amended Fee Letter

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 18

## B.     The Commitment Letter

80. PEPI and Fiddler's Creek took the next step towards finalizing the $27 million DIP loan by signing the PEPI Commitment Letter on January 27, 2010.[12]  The PEPI Commitment Letter is a valid and enforceable contract between PEPI and Fiddler's Creek.  A true-and-correct copy of the January 27, 2010 PEPI Commitment Letter is attached as "Exhibit E" and is incorporated herein for all purposes.

81. Like the Term Sheet before it, the PEPI Commitment Letter contains a Plain English provision confirming the existence of the $1 million Break-Up Fee that Fiddler's Creek promised to pay PEPI if it accepted DIP financing from a lender other than PEPI:

> Break-Up Fee: If the Company [Fiddler's Creek], directly or indirectly, **enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the Credit Facility [the PEPI DIP Loan]  that is approved by the Bankruptcy Court, then the Company immediately shall pay to PEPI a break-up fee of $1,000,000.**  The Break-Up Fee is in addition to any other amount paid or payable hereunder.  . . . The Company shall take all necessary action in the Bankruptcy Curt to authorize payment of the Break-Up Fee when it accrues . . . ."

*See* PEPI Commitment Letter (Exhibit E) at p. 10 (emphasis added).  By executing the PEPI Commitment Letter with this provision in it, both PEPI and Fiddler's Creek recognized that the Break-Up Fee represents a reasonable and viable industry recognized mechanism by which PEPI could protect itself against serving as an uncompensated "stalking horse" for other DIP lender

---

Agreement concerning further negotiations between the parties through January 29, 2010, and the payment of fees in relation to the Commitment Letter (copy attached hereto as Exhibit "D"). Finally, on January 27, 2010, PEPI, Fiddler's Creek, LLC and GB Peninsula, Ltd. executed that certain Commitment Letter, to be effective as of December 31, 2009, in which PEPI executed and issued its Commitment Letter for a $27 million DIP lending facility for the Debtors (copy attached hereto as Exhibit "E," the "PEPI Commitment Letter").

[12] Although signed January 27, 2010, the Commitment Letter is dated effective as of December 31, 2009.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 19

(including Mr. Ferrao's Gulf Bay Capital). Indeed, absent the Break-Up Fee provision, PEPI would not have entered into the PEPI Commitment Letter or continued to work on the transaction.

82. Using plain English, the PEPI Commitment Letter also reconfirmed the existence of the Commitment Fee originally established in the Term Sheet: "Upon [PEPI's] Agent's issuance of this Commitment Letter execution of this Commitment Letter by both Agent and Company [Fiddler's Creek], 100% of the $810,000 Commitment Fee **shall be deemed fully earned** . . . ." *See* PEPI Commitment Letter (Exhibit E) at p. 9 (emphasis added). Because PEPI, Fiddler's Creek and GB Peninsula executed the PEPI Commitment Letter, the Commitment Fee was "fully earned" and is owed to PEPI in full by Fiddler's Creek. The "fully earned" and owed status of the Commitment Fee is not altered by the Parties' agreement that the Commitment Fee was payable in installments: 1/2 immediately upon issuance and execution of the PEPI Commitment Letter and the remaining 1/2 upon Fiddler's Creek's receipt of its first advance under a DIP loan. To date, only $405,000 (the initial installment) of the $810,000 Commitment Fee has been paid to PEPI, and Fiddler's Creek continues to owe and has failed to pay the second installment of the Commitment Fee (the remaining 1/2, or $405,000).

## C.    Fiddler's Creek Spurns PEPI in Favor of Mr. Ferrao's Gulf Bay Capital

83. Following the execution of the PEPI Commitment Letter, PEPI systematically and steadily moved forward with its due diligence and produced a complete set of closing papers for the DIP loan to Fiddler's Creek. PEPI was prepared to close and fund the DIP loan—and again advised the Debtors of that readiness on February 23, 2010—the eve of the bankruptcy filing.

84. Throughout this process, representatives of Fiddler's Creek (including Mr. Ferrao and Fiddler's Creek's counsel) repeatedly assured PEPI that it was the only DIP lender with whom

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 20

the Debtors were working. However, rather than closing on the DIP loan offered by PEPI, Fiddler's Creek instead made an eleventh hour switch to an alternative DIP loan from Mr. Ferrao's own Gulf Bay Capital. The DIP loan that Mr. Ferrao's Gulf Bay Capital made to Fiddler's Creek was substantially identical to the DIP loan that PEPI had been on the cusp of closing with Fiddler's Creek. Indeed, the Ferrao/Gulf Bay replacement DIP loan used many of the same closing documents and papers originally prepared by PEPI's counsel.

85. Fiddler's Creek attempted to justify and excuse its decision to spurn PEPI by sending a letter (the "Default Letter") asserting that PEPI was "in material default of and under the terms of the Commitment Letter." Fiddler's Creek's Default Letter was a transparent and ineffective attempt to escape the consequences (including, most obviously, payment of the $1 million Break-Up Fee required by both the Term Sheet and the PEPI Commitment Letter) of Fiddler's Creek's last-minute decision to abandon its chosen DIP lender, PEPI, for a company run by Fiddler's Creek's own CEO, Mr. Ferrao. Fiddler's Creek's Default Letter failed to identify any actual material defaults under or breaches of the PEPI Commitment Letter by PEPI.

86. One day after receiving the Default Letter, PEPI sent Fiddler's Creek a detailed responsive letter dated February 23, 2010 ("PEPI's Response Letter").[13] PEPI's Response Letter made clear that "all material due diligence on the [DIP] Loan has been completed by PEPI and **PEPI is ready, willing and able to immediately fund the Loan** in accordance with the Commitment Letter upon the receipt of Bankruptcy Court Approval." Response Letter (Exhibit F) at p. 2

---

[13] A true-and-correct copy of PEPI's Response Letter is attached as "Exhibit F" and is incorporated herein for all purposes.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 21

(emphasis added). In other words, notwithstanding the Default Letter, PEPI remained prepared to promptly close and fund the DIP loan to Fiddler's Creek.

87. In the wake of PEPI's Response Letter and notwithstanding the PEPI Commitment Letter and Term Sheet, Fiddler's Creek declined to move forward with DIP financing from PEPI and instead closed on the Ferrao/Gulf Bay DIP loan. Instead of accepting DIP financing from PEPI, Fiddler's Creek ultimately closed on a $25 million DIP loan from Gulf Bay, and that transaction was approved by the Bankruptcy Court.

**D.    Fiddler's Creek Refuses to Pay the Break-Up Fee or the Commitment Fee.**

88. By electing to accept DIP financing from Ferrao/Gulf Bay instead of from PEPI, Fiddler's Creek contractually obligated itself to pay the $1 million Break-Up Fee to PEPI. The plain language of both the Term Sheet and PEPI Commitment Letter make Fiddler's Creek's obligation to pay PEPI the Break-Up Fee manifest and undeniable. But despite multiple demands from PEPI, Fiddler's Creek has failed to pay the Break-Up Fee.

89. Fiddler's Creek obligation to pay PEPI the remaining $405,000 of the Commitment Fee is equally manifest and undeniable under the plain language of the PEPI Commitment Letter and the Term Sheet. But, once again, Fiddler's Creek has rejected PEPI's demand that it make this contractually required payment.

90. PEPI has filed claims in the Fiddler's Creek bankruptcy seeking payment at a minimum, of the Break-Up Fee and Commitment Fee (as well as the attorney fees and costs of collection of same), and Fiddler's Creek has responded with an Omnibus Objection [D.E. 1134] to PEPI's claims. However, because Fiddler's Creek has brought the instant Adversary Proceeding against PEPI, PEPI is now obligated under FRCP 13 and FRBP 7013 to assert its claims arising from

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 22

Fiddler's Creek's breaches of the PEPI Commitment Letter and Term Sheet as mandatory counterclaims.[14]

### Count 1: Breach of Contract

91. All the facts and allegations as set forth in paragraphs 1 through 90 are re-alleged and incorporated herein as if set forth in full.

92. The Term Sheet and the PEPI Commitment Letter are both valid, enforceable contracts between Fiddler's Creek and PEPI.

93. PEPI has performed or has been excused from performing all of its material obligations and duties under the Term Sheet and the PEPI Commitment Letter. It was Fiddler's Creek, not PEPI, who declined to consummate the DIP loan contemplated by the Term Sheet and PEPI Commitment Letter.

94. Notwithstanding PEPI's performance of its contractual obligations, Fiddler's Creek has breached the Term Sheet and PEPI Commitment Letter by: (1) refusing PEPI's demand for payment of the $1 million Break-Up Fee after Fiddler's Creek decided to accept DIP financing from a lender other than PEPI; and (2) refusing PEPI's demand for payment of the remaining $405,000 on the "fully earned" Commitment Fee.

95. As a direct result of these breaches of contract by Fiddler's Creek, PEPI has been damaged in an amount not less than $1.405 million dollars.

96. **Wherefore,** PEPI respectfully requests the entry of judgment against Fiddler's Creek in an amount not less than $1.405 million dollars, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

_____

[14] PEPI's proofs of claim specifically assert attorney fees and expenses in enforcing its claims as well as a broad reservation of all rights, claims and privileges to which PEPI may be entitled to exercise.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 23

## Count 2: Account Stated/Open Account

97. All the facts and allegations as set forth in paragraphs 1 through 96 are re-alleged and incorporated herein as if set forth in full.

98. Before the institution of this action, Fiddler's Creek had business relations with PEPI; and, expressly agreed to pay PEPI the sum of $1.405 million dollars (which amount is comprised of the Break-Up Fee and the remaining 1/2 of the Commitment Fee) as set forth in the Account, a copy of which is attached hereto as Exhibits A through E and is incorporated by reference herein.

99. By and through its execution of the Account, Fiddler's Creek agreed (and did not object) that the amount of the Account was correct and due. Fiddler's Creek expressly promised to pay and became bound and liable to pay PEPI in the principal amount of $1.405 million dollars, the amount of the Account.

100. To date, Fiddler's Creek has failed to pay the Account (the Break-Up Fee and/or the remaining 1/2 of the Commitment Fee), which has caused PEPI damages.

101. Fiddler's Creek owes PEPI the sum of $1.405 million dollars, which amount is due with interest according to the attached Account.

102. All conditions precedent to PEPI's claim have been performed or have occurred.

103. **Wherefore,** PEPI respectfully requests the entry of judgment against Fiddler's Creek in an amount not less than $1.405 million dollars, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

## Count 3: Breach of Implied Covenant of Good Faith and Fair Dealing

104. All the facts and allegations as set forth in paragraphs 1 through 103 are re-alleged and incorporated herein as if set forth in full.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 24

105.    The Term Sheet and the PEPI Commitment Letter are both valid, enforceable contracts between Fiddler's Creek and PEPI and, as such, both contain an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing prohibits each party from engaging in activity or conduct that would prevent the other party from receiving the benefit of the contracts.

106.    PEPI has performed or has been excused from performing all of its material obligations and duties under the Term Sheet and the PEPI Commitment Letter.  As such, PEPI is entitled to the protections of the implied covenant of good faith and fair dealing.

107.    Fiddlers Creek has breached the implied covenant of good faith and fair dealing by: (1) seeking out and accepting DIP financing from a lender other than PEPI on the eve of closing on the DIP loan offered by PEPI; (2) refusing PEPI's demand for payment of the $1 million Break-Up Fee after Fiddler's Creek decided to accept DIP financing from a lender other than PEPI; and (3) refusing PEPI's demand for payment of the remaining $405,000 on Commitment Fee, which was "fully earned" by PEPI and owed by Fiddler's Creek upon execution of the PEPI Commitment Letter.

108.    As a direct result of these breaches of the implied covenant of good faith and fair dealing by Fiddler's Creek, PEPI has been damaged in an amount not less than $1.405 million dollars.

109.    **Wherefore,** PEPI respectfully requests the entry of judgment against Fiddler's Creek in an amount not less than $1.405 million dollars, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

## **Count 4: Promissory Estoppel**

110.    All the facts and allegations as set forth in paragraphs 1 through 109 are re-alleged and incorporated herein as if set forth in full.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 25

111.     Fiddler's Creek, through its officers and agents, made a series of representations and promises to PEPI over the course of the proposed DIP loan transactions (including during the negotiation of the Term Sheet and the PEPI Commitment Letter) to the effect that PEPI was the "only horse in the race" to provide DIP financing to Fiddler's Creek and that Fiddler's Creek had selected PEPI as its DIP lender.

112.     Acting in reasonable reliance on Fiddler's Creek's repeated representations and promises that it had selected PEPI as its DIP lender, PEPI moved forward with the proposed DIP transaction—including by expending substantial time, energy and resources in an effort to close the DIP loan with Fiddler's Creek.  PEPI would not have moved forward as rapidly or comprehensively with the proposed DIP transaction (including the preparation of a complete set of closing papers) absent these representations and assurances from Fiddler's Creek.

113.     PEPI's reliance on Fiddler's Creek's repeated representations and promises that it had selected PEPI as its DIP lender was foreseeable to—and, indeed, intended by—Fiddler's Creek.

114.     PEPI was damaged by its reasonable reliance on Fiddler's Creek's repeated representations and promises that it had selected PEPI as its DIP lender.  Injustice can be avoided only by compensating for the amount that it was damaged in reliance on Fiddler's Creek's unfulfilled promises.

115.     **Wherefore,** PEPI respectfully requests the entry of judgment against Fiddler's Creek in an amount equal to the damages that PEPI will show it suffered in reliance on Fiddler's Creek's promises, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

### Count 5: Negligent Misrepresentation

116.     All the facts and allegations as set forth in paragraphs 1 through 115 are re-alleged and incorporated herein as if set forth in full.

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIMS – PAGE 26

117.    Fiddler's Creek, through its officers and agents, made a made a series of material misrepresentations to PEPI over the course of the proposed DIP loan transactions (including during the negotiation of the Term Sheet and the PEPI Commitment Letter) to the effect that PEPI was the "only horse in the race" to provide DIP financing to Fiddler's Creek and that Fiddler's Creek had selected PEPI as its DIP lender.  These material misrepresentations were intended to induce PEPI to keep working on closing the DIP loan transaction with Fiddler's Creek.  Fiddler's Creek also represented that they would pay a break-up fee of $1 million to PEPI if they selected a party other than PEPI to complete the DIP loan.

118.    Fiddler's Creek made these misrepresentations without knowledge as to their truth or falsity, and under circumstances in which Fiddler's Creek ought to have known of its falsity.  More specifically, Fiddler's Creek knew or should have known that PEPI was not the "only horse in the race" to provide DIP financing and the Fiddler's Creek was seeking DIP financing from other potential lenders.  Fiddler's Creek did not exercise reasonable care or competence in communicating with PEPI.  Moreover, Fiddler's Creek concurrently communicated to PEPI that it would pay the break up fee to PEPI if it moved forward with another lender—which Fiddler's Creek now resists paying.

119.    Fiddler's Creek intended PEPI to rely on its misrepresentations, and made these misrepresentations in order to induce PEPI to keep moving forward with the DIP loan transaction.

120.    PEPI reasonably relied to its detriment on Fiddler's Creek's misrepresentations that it had selected PEPI as its DIP lender and that PEPI was "the only horse in the race," and that if another horse was "picked" Fiddler's Creek would compensate PEPI with the break up fee. Fiddler's Creek's material misrepresentations misled PEPI into expending enormous time, energy and

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 27

resources on attempting to close the DIP loan. Fiddler's Creek's misrepresentations foreseeably induced PEPI to take actions that it would not otherwise have taken.

121.     Fiddler's Creek's negligent misrepresentations proximately caused damages to PEPI, as acting in reasonable reliance on Fiddler's Creek's negligent misrepresentations, PEPI expended considerable time, energy and resources in attempting to close the DIP loan.

122.     **Wherefore,** PEPI respectfully requests the entry of judgment against Fiddler's Creek in an amount equal to the damages that PEPI will show it suffered in reliance on Fiddler's Creek's negligent misrepresentations, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

## Count 6: Fraudulent Nondisclosure

123.     All the facts and allegations as set forth in paragraphs 1 through 122 are re-alleged and incorporated herein as if set forth in full.

124.     Fiddler's Creek failed to disclose and concealed from PEPI that Fiddler's Creek was seeking DIP financing from other sources—including from a company, Gulf Bay, affiliated with Fiddler's Creek's CEO, Mr. Ferrao.  Far from disclosing this critical fact to PEPI, Fiddler's Creek (through Mr. Ferrao, its counsel and other senior representatives) instead falsely but repeatedly assured PEPI that PEPI was the only DIP lender from whom Fiddler's Creek was seeking financing.

125.     Fiddler's Creek knew that PEPI would assert the break up fee and potentially terminate the DIP loan transaction if it learned that Fiddler's Creek was seeking DIP financing from other sources.  Consistent with its desire to conceal its search for alternative DIP financing from PEPI, Fiddler's Creek also knew that its affirmative representations to PEPI that PEPI was the only

DIP lender from whom Fiddler's Creek was seeking financing as well as assurances that it would honor the break up fee if it were not, were false and misleading.

126.    Fiddler's Creek intentionally and purposefully concealed from PEPI that Fiddler's Creek was seeking DIP financing from other sources in order to induce PEPI to continue working on the DIP loan transaction.

127.    By moving forward with the DIP loan transaction, PEPI acted in reasonable reliance on Fiddler's Creek intentional concealment of its search for seeking DIP financing from other sources as well as its assurances that it would pay the break up fee and remaining 1/2 of the Commitment Fee.  PEPI was damaged as a result of that reasonable reliance on Fiddler's Creek intentional concealment of its search for seeking DIP financing from alternative sources.

**128.    Wherefore,** PEPI respectfully requests the entry of judgment against Fiddler's Creek in an amount equal to the damages that PEPI will show it suffered in reasonable reliance on Fiddler's Creek's intentional concealment, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

<u>**CONCLUSION TO PEPI'S COUNTERCLAIMS**</u>

For all the foregoing reasons, as well as for those reasons set out in PEPI's Response Opposing Debtors' Substantive Omnibus Objection to Claims Filed by PEPI Capital, L.P., PEPI respectfully requests that the Court enter judgment on all its claims against Fiddler's Creek in an amount not less than $1.405 million, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.  PEPI requests such additional relief as is permitted by law or equity and is deemed just and proper by this Court.

Respectfully submitted,

ROETZEL & ANDRESS

PEPI CAPITAL, L.P.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS – PAGE 29

/s/ *Alan J. Perlman*
Alan J. Perlman
Florida Bar No. 826006
Joshua B. Alper
Florida Bar No. 0059875
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile: (954) 462-4260
E-mail: aperlman@ralaw.com

ATTORNEYS FOR PEPI CAPITAL, L.P.

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 2090-1(A)

**I HEREBY CERTIFY** a true and correct copy of the foregoing was served on 27th day of December, 2011 via CM/ECF on all parties who are registered for electronic service.

By: /s/ Alan J. Perlman
Alan J. Perlman, Esq.

EXHIBIT A

# PEROT INVESTMENTS, INC.
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

October 20, 2009

Fiddler's Creek LLC
c/o Ken Montgomery
Belmont Capital Partners LLC
14741 Rudolph Dadey Dr.
Charlotte, NC 28277

Dear Mr. Montgomery:

Subject to the terms and conditions set forth herein, Petrus Private Investments, L.P. is willing to enter into this Term Sheet pursuant to which Petrus Private Investments, L.P. or its affiliates, for itself as agent (the "Agent"), and Petrus Private Investments L.P. ("PEPI") and/or its affiliates, as lender, as well as various lenders from time to time (collectively, the "Lenders") would consider providing an underwritten commitment for up to $27,000,000 (Twenty-seven million dollars) in debtor in possession financing to Fiddler's Creek LLC and certain of its subsidiaries and affiliates described below pursuant to the terms and conditions further described below. The conduct of the parties hereunder shall be governed by a commercially reasonable standard.

Debtor in Possession Financing -- Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and those subsidiaries and affiliates set forth on Schedule A attached hereto and made a part hereof (collectively, the "Borrower"). |
| Lenders: | Petrus Private Investments, L.P. or designated affiliate and others |
| The DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a commitment (the "Commitment Letter") to Borrower for up to $27,000,000 in the aggregate of debtor in possession financing prior to and for use in connection with the Borrower's anticipated voluntary Chapter 11 bankruptcy proceedings. The Commitment Letter shall consist of a term loan in an amount up to $27,000,000 subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") overseeing the anticipated chapter 11 bankruptcy proceedings for the Borrower (the "Loan"). The Loan is not a revolving line of credit. Specifically, the repayment of any existing loan balance |

Fiddler's Creek LLC Term Sheet
10/20/2009

Fiddlerscreektermsheet.doc
Page 1 of 13

AA00089

will not provide additional or renewed availability under the Loan.

Purpose and Proceeds: The proceeds of the Loan shall be used in accordance with a budget to be submitted by the Borrower to the Lender and approved by the Lender in connection with the issuance of the Commitment Letter, which Budget shall include, among other things, the Borrower's operating expenses, working capital needs of Borrower, the Borrower's professional fees for the bankruptcy proceedings and the costs associated with this financing. No proceeds of the Loan will be advanced while any event of default has occurred and has not been cured, or unless and until the conditions precedent thereto have been fulfilled.

Loan Draws: Subject to Lender approval, one or more draws may be made under the Loan, including if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent advances from time to time thereafter.

Unused Loan Fee: Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on any remaining Loan Amount not yet drawn by the Borrower.

Term Sheet and Expenses: On execution of this Term Sheet by all parties, Borrower shall a) pay to Lenders a non-refundable and fully earned Term Sheet fee of $25,000 (the "Initial Term Sheet Fee"), b) pay to Lenders an initial expense deposit of $200,000 to cover the Lenders' out of pocket expenses (including all customary costs associated with the continuing Chapter 11 process and Lenders' due diligence in underwriting, documenting, and closing the loan (including attorney fees), c) proceed exclusively with Lenders to issue the Commitment Letter, and d) provide any and all documents and information reasonably requested by the Lenders in order to proceed with the issuance of the Commitment Letter. In addition, Borrower shall deliver to Lenders upon two (2) business day's written request from time to time such additional deposits as may be necessary, in Lenders' sole discretion, to cover continuing out of pocket expenses in excess of the initial expense deposit through the maturity and payment in full of the Loan, provided however that the total amount required to be reimbursed by the

AA00090

Borrower for Lender's out of pocket expenses through the issuance of the Commitment Letter shall not exceed $300,000. On termination of this Term Sheet, any unused portion of the expense deposit will be credited or refunded to the Borrower; provided, however, should Borrower execute a commitment with any entity other than Lender, or otherwise obtain debtor in possession funding from any source other than Lender, then, in addition to the Initial Term Sheet Fee, Lender shall also retain an additional $75,000 of the initial expense deposit as a non-refundable, fully earned and immediately payable additional Term Sheet fee (the "Additional Term Sheet Fee"). Borrower agrees to advance additional funds to Lender should insufficient initial expense deposit funds remain to pay in full the Additional Term Sheet Fee. In addition, the Initial Term Sheet Fee will be applied to the Commitment Fee set forth below.

**Loan Amount:** Up to $27,000,000

**Interest Rate:** 12%, payable monthly in arrears but not greater than the maximum rate provided by applicable law.

**Default Rate:** Upon the occurrence of an Event of Default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law.

**Mandatory Prepayments:** Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds shall be applied first to the Loan unless otherwise agreed to by Lenders. Until such time as this Loan has been paid in full, no payments of principal shall be paid to any existing secured creditors without the prior written approval of the Lenders, unless identified in the Budget to be approved by the Lenders.

**Closing Date:** The Loan shall be funded upon (i) approval thereof by the Bankruptcy Court with the form of the Orders entered by the Bankruptcy Court in connection therewith to be acceptable to Lenders in their sole discretion, (ii) completion of all conditions precedent in the sole judgment of Lenders, and (iii) Lenders receipt of the Commitment Fee and payment in full of all expenses.

**Maturity Date:** The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later Extension Date as set forth below)(the "Initial Maturity Date"), (b) the effective date of a plan of reorganization which has been confirmed by an order of the Bankruptcy Court, or (c) the date upon which a final order is entered by the Bankruptcy Court either (i)

AA00091

converting the Borrowers' Chapter 11 case to a case under Chapter 7 or (ii) approving one or more 363 sales of all or substantially all of the Borrowers' assets (unless agreed to by Lenders), or (iii) appointing a trustee or examiner (with expanded powers) in the Borrowers' Chapter 11 case or (iv) dismissal of any of the Borrowers' bankruptcy cases or (v) the occurrence of an uncured event of default under the DIP Financing.

| | |
|---|---|
| Acceptance Date: | Borrower must accept this term sheet by 5:00 p.m. Dallas time on October 20, 2009. |

Commitment Fee:

A Commitment Fee in the amount of 3% of the Loan Amount shall be fully earned, non-refundable, and payable immediately to Lenders upon Lender's issuance of the Commitment Letter and execution of the Commitment Letter by both Lender and Borrower. If issued, the Commitment Letter will provide, amongst other customary terms, that it will expire unless the Loan is approved by the Bankruptcy Court on or before January 15, 2010 .

Exit Fee:

2% of the total advances made under the Loan actually drawn by the Borrower, payable upon a) payment in full of the Loan at maturity, b) any partial principal payment of the Loan prior to maturity, or c) any other reduction of the Loan.

Break-Up Fee:

Upon and after Lenders' issuance of the Commitment Letter, Borrower shall be obligated to pay a Break-Up Fee of $1,000,000 to the Lenders in the sole event that Borrowers fail to consummate the Loan with the Lender, but instead accept and proceed to closing on alternative financing that is approved by the Bankruptcy Court. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. Borrower shall take all necessary action in the Bankruptcy Court to pay the Break-Up Fee, when it accrues, including, without limitation, stipulating that such fee is an allowed chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

Collateral:

All indebtedness and obligations under Loan will be secured by a court-ordered priming lien and first priority senior security interests in all assets, proceeds and cash collateral thereof of the Borrower and its affiliates and subsidiaries set forth on Schedule A hereto, tangible and

AA00092

intangible, including but not limited to all lockbox agreements and lockbox cash, cash and cash equivalents, restricted cash, cash collateral, depository accounts, accounts receivable, contract rights, inventory, improved and unimproved real property, personal property, plant, equipment, fixtures, vehicles, and intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); Lenders would also receive a pledge of 100% of the stock of Borrower in its subsidiaries and affiliates set forth on Schedule A hereto (subject to tax limitations, the pledge of foreign subsidiary stock shall be limited to the maximum percent allowed by applicable tax laws), in the sole discretion of the Lender, Loan guarantees from some or all of Borrower's subsidiaries and affiliates not identified on Schedule A hereto, and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Collateral"). The Collateral shall have no permitted encumbrances senior or equal to the Lender's DIP Liens except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral and as may be specifically agreed to by Lenders in their sole discretion.

**Collateral Monitoring Fee:** Borrower shall pay to Lenders a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding.

**Extension Date:** Provided no uncured event of default has occurred or exists as of the initial or second extension date, and no earlier termination triggering event has occurred or exists as of the initial or second extension date, the Borrower may extend the Initial Maturity Date for two (2) consecutive six (6) month periods.

**Extension Fee:** An Extension Fee equal to 0.5% of the Loan Amount, adjusted for any pay downs, shall be payable for each exercised extension. To exercise each extension, the Borrower shall provide a 30 day notice to Lenders together with payment of Extension Fee.

**DIP Provisions:** Borrower anticipates filing a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") for all parent and subsidiary entities and will obtain (a) an interim order of the Bankruptcy Court approving the Loan on an interim basis (the "Interim Order"), and/or (b) will within forty-five (45) days after the entry of such interim order or seventy–five (75) days after the filing of the bankruptcy case obtain a final order (the "Final Order") (collectively, the "Orders") of the Bankruptcy Court approving the Loan on a final

AA00093

basis, and fixing the DIP Funding Date, which Orders shall not have been reversed, modified, amended, stayed or vacated. Subject to Lender approval, one or more draws may be made under the Loan, including, if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent scheduled advances from time to time thereafter. The Orders shall provide that the Loan shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by a senior priming first lien on all of the Collateral then owned or thereafter acquired by the Borrower pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees and other administrative expenses as may be agreed to by Lenders). The Orders shall, at a minimum, contain provisions under Section 364 (e) granting all such senior and priming liens and claims to Lenders for all monies actually advanced even if such Orders are subsequently vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Lenders to immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens and claims granted to Lenders shall contain cross default and cross collateral provisions with all other debt and contracts.

Other Conditions Precedent:

Standard for loans and customary for transactions of this type to Lenders' sole satisfaction, including but not limited to the following:

1. All Borrower fees payable to Lenders shall be current, including without limitation, all fees of Lenders' professionals

2. Appraisals may be performed by appraisers retained and acceptable to Lenders. The current MAI Appraisal issued by Integra in May 2009 will be provided to assist Lenders in the initial valuation of the collateral. An update to the existing Appraisal may be conducted post filing.

3. All Borrower administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or

addressed in a manner deemed appropriate by the Lenders in their sole discretion.

4. Lenders completion of due diligence to its satisfaction; Lenders' due diligence will include, but not be limited to, review of all CDD related documentation, review of interim financial statements and documentation, appraisals, appropriate insurance coverage, examination of the Collateral and title thereto and additional due diligence related to the Borrower's business, industry, legal, environmental and technical related matters

5. Completion of legal due diligence investigation by the Lenders' counsel, with results satisfactory to the Lenders and their counsel, of all matters which Lender deems relevant, in its sole discretion, including, without limitation, those matters shown on Schedule B attached hereto.

6. Receipt by the Lenders of 90-day cash budget and final 2010 budget and business plan through the anticipated exit from Chapter 11 from the Borrower satisfactory to the Lenders in both form and substance (the "Budget").

7. Borrower shall have executed and delivered such DIP Credit Agreements, documents and instruments as are customary in connection with DIP financing and such other documentation required by and acceptable to Lenders and its counsel including, without limitation, a release of all claims through the time of funding, guarantees of Borrower subsidiaries and affiliates requested by Lender, mortgages, security agreements, and promissory note, and Borrower and guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the Lenders liens and claims

8. Commitments for mortgagee title insurance, with appropriate surveys, in form and substance satisfactory to Lender.

9. Reasonable and customary opinions of counsel to the Borrower as to the transactions contemplated hereby which opinions are satisfactory to the Lenders

AA00095

10. Corporate resolutions, certificates and other documents as the Lenders shall reasonably request

11. All necessary consents and approvals to the financing shall have been obtained

12. The Lenders must be satisfied that any financial statements delivered to it fairly present the business and financial condition of the Borrower and its subsidiaries

13. No material misstatements in or omissions from the materials previously furnished to the Lenders for its review

14. No previously undisclosed intercompany transactions shall have occurred

15. The absence of any litigation or other proceeding the result of which might have a material adverse effect on the Borrower and its affiliates and subsidiaries, including, without limitation, those matters shown on attached Schedule B

16. The proposed financing is subject to the condition that no material changes in governmental regulations or policies affecting the Borrower or the Lenders involved in this transaction occur prior to the Closing Date

17. Borrower shall be in good standing in its state of incorporation and qualified to do business in other states in which Collateral is located

18. All liens and claims granted to Lenders in connection with the Loan shall be priming, first priority liens and claims, and all existing liens contract rights, rights of redemption, and all existing third party and Borrower (and its affiliates and subsidiaries) rights and obligations of any type shall be subordinate to the liens, claims and interests of Lenders.

19. All DIP Financing motions, orders and bankruptcy court documentation shall be acceptable in form and substance to Lenders.

20. Until all Borrower obligations are paid in full to Lenders, Borrower shall provide to Lenders not less

AA00096

than two business days advance notice of any filings made in the bankruptcy case(s) of Borrower, provided that the Borrower shall provide as much notice as is reasonably possible for emergency motions. Lenders shall be given not less than five business days advance notice of any hearing regarding the DIP Financing.

21. Such other conditions precedent as the Lenders may require in its discretion.

**Collateral Monitoring**

Ongoing Collateral monitoring; Lenders, Agent or their financial advisor, shall have customary rights to enter and inspect the premises, interview employees, examine books and records, etc., with reasonable notice to the Borrower. The Borrower shall provide Lenders with all reports provided to any third party as well as such financial reports as Lenders may request on a periodic basis.

**Guarantees:**

At the Lender's discretion, all of the Borrower subsidiaries and affiliates, as listed on Schedule A, shall execute the Loan documents and become jointly and severally liable under the terms Loan. The Borrower represents that all of the entities that comprise Fiddlers' Creek and GB Peninsula Ltd. are included as Borrowers on Schedule A.

**Representations and Warranties:**

Customary for transactions of this nature

**Covenants:**

Definitive documentation to contain affirmative and negative covenants acceptable to Lenders and customary for transactions of this type including but not limited to:

1. No line item in the agreed budget shall exceed in any period, or in aggregate, a 10% variance from the amount provided for in the Budget.
2. Certain asset sales, lot sales and milestones as to borrower's business plan and ultimate exit from bankruptcy
3. Limitations on capital expenditures
4. Prohibitions on additional indebtedness without Lenders consent
5. Restricted payments and related party transactions prohibited without Lenders consent
6. Restriction on the Borrower's ability to transfer or sell assets without Lenders consent (including pursuant to sale/leaseback transactions), unless required in conjunction with this Financing, with such proceeds used first to repay the Lenders
7. Limitation on incurrence of liens subject to Lenders reasonable consent
8. Restriction on subsidiaries' ability to issue or sell capital stock

AA00097

9. Restriction on the Borrower's ability to consolidate, merge or transfer all or substantially all of assets and the assets of its subsidiaries or affiliates

10. The Budget must be submitted to Lenders as soon as possible after execution of this term sheet, and subject to the satisfaction of the Lenders in both form and substance, will be attached to the Commitment Letter.

11. Maintain adequate insurance coverage satisfactory to Lenders in its sole discretion

12. Asset sales will be subject to minimum release prices satisfactory to Lenders in Lenders sole discretion

13. Covenants to Lender's satisfaction with regard to the payment of debt service, assessments and any other matter relating to the CDD obligations

Events of Default: Customary for transactions of this nature and such other Events of Default Lenders requires in its sole discretion including a breach of the variance covenant relating to the Agreed Budget.

Governing Law: To Be Determined and acceptable to Lenders.

Expenses and Indemnification: Until such time as the Loan is paid in full, Lenders shall be reimbursed, upon demand, for all direct and indirect costs, fees, and expenses, which shall be paid by Borrower.

Indemnification provisions customary for transactions will be provided for in the definitive documentation

By signing this letter, both parties acknowledge that: (i) this letter is not a binding commitment on the part of any person to provide or arrange for financing on the terms and conditions set forth herein or otherwise; (ii) any such commitment on the part of the Lenders would be in a separate written instrument signed by the Lenders following satisfactory completion of the Lender's initial due diligence, internal review and approval process, including approval by the Lenders executive management (which approvals have not yet been sought or obtained); (iii) this letter supersedes any and all discussions and understandings, written or oral, between or among the Lenders and any other person as to the subject matter hereof; and (iv) the Lenders may, at any level of its approval process, decline any further consideration of the proposed financing and terminate its approval process. Under no circumstances would the Lenders or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result from this letter, or the proposed financing or any other related financing.

To confirm your desire that the Lenders continue its due diligence process which could lead us to seek approval for the above proposed transaction, time being of the essence, please execute and return this letter at the earliest possible time, but in any event by no later than 5:00 p.m. Dallas time on October 20, 2009, along with the Term Sheet Fee and initial Expense Deposit (this offer to enter into a Term Sheet will expire on such date if not accepted by then).

Petrus Private Investments, L.P.

By Perot Investments, Inc., its General Partner

By: _____
Name:  David Radunsky
Title:    Chief Operating Officer


Agreed and Accepted this 20th day of October, 2009.

Fiddler's Creek LLC (on behalf of itself, its subsidiaries and affiliates)

By: _____
Name:  Anthony DiNardo
Title:    Attorney In Fact




Schedule A

Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

AA00099

| STATUS | **FIDDLER'S CREEK LLC** | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|---|
| ACTIVE | **951 LAND HOLDINGS LTD** | Limited Partnership | 03/14/00 | 59-3684895 |
| ACTIVE | 951 Land Holding LLC | General Partner | 4/7/2000 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **DY LAND ASSOCIATES LTD** | Limited Partnership | 03/14/00 | 59-3684898 |
| ACTIVE | DY Associates LLC | General Partner | 04/07/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GBFC Development LTD** | Limited Partnership | 03/14/00 | 59-3684897 |
| ACTIVE | GBFC Development LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GBFC MARINA LTD** | Limited Partnership | 03/14/00 | 59-3684890 |
| ACTIVE | FC Marina LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC BEACH LTD** | Limited Partnership | 03/14/00 | 59-3684896 |
| ACTIVE | FC Beach LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC GOLF LTD** | Limited Partnership | 12/03/02 | 03-0509355 |
| ACTIVE | FC Golf LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **DY LAND HOLDINGS II, LLC** | Limited Liability Company | 04/25/08 | 26-2495367 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC PARCEL  73, LLC** | Limited Liability Company | 04/25/08 | 26-2494498 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC COMMERCIAL, LLC** | Limited Liability Company | 04/25/08 | 26-2495276 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC HOTEL, LTD** | Limited Partnership | 03/30/04 | 34-2024547 |
| ACTIVE | FC Hotel, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC RESORT, LTD** | Limited Partnership | 03/30/04 | 34-2024546 |
| ACTIVE | FC Resort, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GULF BAY HOSPITALITY LTD** | Limited Partnership | 12/31/2003 | 59-3790126 |
| ACTIVE | GULF BAY HOSPITALITY COMPANY LLC | GEN PARTNER | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GULF BAY HOTEL COMPANY LTD** | Limited Partnership | 12/4/2002 | 56-2495068 |
| ACTIVE | GULF BAY HOTEL COMPANY LLC | General Partner | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FIDDLER'S CREEK LLC** | Limited Liability Company | | 59-3639729 |
| ACTIVE | GBFC II LP | Managing Member | | |
| | GBFC II TWO LLC | Member | | |
| ACTIVE | **GBFC II LP** | Limited Partnership | | 59-3705460 |
| ACTIVE | GBFC II LLC | General Partner | | |
| ACTIVE | GB 100 LTD | Limited Partner | | |
| ACTIVE | **GB 100 LTD** | Limited Partnership | 12/07/95 | 65-0628890 |
| ACTIVE | GB100 Inc | General Partner | 02/22/93 | 65-0395715 |
| Active | **Fiddler's Creek Management Inc** | Sub Charter C | 10/11/94 | 65-0592185 |
| ACTIVE | **GB Peninsula Ltd   (Land)** | Limited Partnership | | 59-3692446 |
| ACTIVE | GB Peninsula Inc (Gen .Partner) | General Partner | | 59-3692447 |
| ACTIVE | **GBP Development Ltd (sell house)** | Subsiduary of Peninsula | | TBD |
| | GB Peninsula Ltd | Limited Partner | | 59-3692446 |
| ACTIVE | GBP Development LLC | General Partner | | TBD |

**AA00100**

Schedule B

Schedule of Outstanding Litigation for relating to Fiddler's Creek LLC

and Affiliates and Subsidiaries

EXHIBIT B

AA00102

# PEPI CAPITAL, L.P.
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek LLC
8156 Fiddlers Creek Parkway
Naples, FL 34114

Commitment Letter
**$27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility**

Dear Mr. DiNardo:

PEPI Capital, L.P., as Agent[1] and Lender (collectively, "PEPI") is pleased to confirm to Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company") the commitment of PEPI to provide a senior secured debtor-in-possession multiple advance term loan facility to the Company with total advances of up to $27,000,000 (the "Credit Facility") based upon and subject to the terms and conditions set forth in this letter and the term sheet and exhibits attached as Exhibit A hereto (the "Term Sheet" and all exhibits thereto together with this letter, collectively, the "Commitment Letter").

While PEPI has provided a commitment for the entire amount of the Credit Facility, subject to the terms and conditions of this Commitment Letter and the Term Sheet, PEPI may syndicate some of the Credit Facility to additional lenders with a corresponding reduction in PEPI's share of the Credit Facility. PEPI's obligations under the Credit Facility are not contingent upon or conditioned upon syndication of the Credit Facility. Moreover, PEPI has no plans to syndicate the Credit Facility, however, PEPI has the absolute and sole right to syndicate some or all of the Credit Facility.

PEPI shall manage all aspects of any syndication of the Credit Facility, including the timing of all offers to potential lenders, the allocation and acceptance of commitments, the amount offered, and the compensation provided to any lender. The Company agrees that no lender will receive any compensation for its participation in the Credit Facility except as expressly agreed to and offered by PEPI.

The Company agrees to cooperate in PEPI's syndication efforts and use commercially reasonable efforts, at no additional out of pocket cost to the Company, to assist PEPI in forming a syndicate acceptable to PEPI. Such assistance shall include but not be limited to (a) using commercially reasonable efforts to make senior management and representatives of the Company available to participate in meetings and to provide information to potential lenders at such times and places as PEPI may

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Term Sheet attached hereto as Exhibit A.

1 of 88

DA-3072429 v11 1203528-00006

AA00103

reasonably request, and (b) using commercially reasonable efforts to provide all information reasonably deemed necessary by PEPI to complete the syndication, subject to confidentiality agreements in form and substance reasonably satisfactory to the Company and PEPI. The terms of the Commitment Letter, including those attached as Exhibit A, shall not be modified due to PEPI's syndication efforts.

The Company hereby represents, warrants and covenants that (i) all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading, and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to PEPI by or on behalf of the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to PEPI such Information and Projections as PEPI may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is true and correct on the Closing Date of the Credit Facility.

The Company will promptly reimburse PEPI for all reasonable costs and expenses incurred by PEPI in connection with its continuing review of the Information and Projections and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), any and all due diligence, any and all loan documentation for the Credit Facility, the closing of the Credit Facility, and the enforcement of any of PEPI's rights and remedies under this Commitment Letter, in each case including, without limitation, reasonable attorneys' fees and legal expenses, appraisal fees, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus out-of-pocket expenses for the field examiners of PEPI in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses), and in each case whether or not the Credit Facility closes.

All such charges and expenses are to be paid to PEPI upon demand, together with such advance funds on account of such charges and expenses as PEPI may from time to time request or PEPI may require that the Company pay such charges directly. PEPI has the right to apply to such charges and expenses any sums received from or on behalf of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation. Deposits for expenses received by PEPI will be returned to the Company without interest, less the expenses and charges described above if the Credit Facility does not close, and applied to reduce the loans if the Credit Facility closes.

The Company and all Guarantors agree to indemnify and hold harmless PEPI, and each director, partner, officer, employee, attorney, advisor, agent and affiliate of PEPI (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any and all losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any

AA00104

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

AA00105

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 5 p.m., eastern time, on or before January 5, 2010 together with (i) a wire transfer payable to PEPI in the amount of $785,000.00 which represents the Commitment Fee described in the Term Sheet, less the $25,000 Term Sheet Fee, and (ii) a wire transfer payable to PEPI in the amount of $250,000.00 which represents an additional deposit for expenses. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on January 22, 2010, unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

This Commitment Letter may be executed in any number of counterparts, each of which shall be

DA-3072429 v11 1203528-00006

AA00106

an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter is for the sole benefit of the Company and may not be relied upon by any third party. This Commitment Letter may not be assigned by the Company without the prior written consent of PEPI and may not be amended, waived, or modified, except in writing signed by PEPI and the Company.

This Commitment Letter is governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

PEPI, THE COMPANY AND ALL GUARANTORS EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

This letter is pursuant to that certain Term Sheet letter dated October 20, 2009, addressed to Mr. Ken Montgomery of Belmont Capital Partners LLC, advisor to you, by Agent under Agent's prior name.

If the Company accepts and agrees to the foregoing, please so indicate by executing the enclosed copy of this letter and returning it to PEPI on or before 5 p.m., eastern time, January 5, 2010, to be effective as of December 31, 2009.

Very truly yours,

PEPI CAPITAL, L.P.

By: _____
David Radunsky, Chief Operating Officer of its general partner

ACCEPTED to be effective as of December 31, 2009:

FIDDLER'S CREEK LLC, on behalf of itself and its subsidiaries,

By:_____
Name:_____
Title:_____

GB PENINSULA, LTD., on behalf of itself and its subsidiaries,

By:_____
Name:_____
Title:_____

DA-3072429 v11 1203528-00006

AA00107

EXHIBIT C

AA00108

**PEPI CAPITAL, L.P.**
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek, LLC
8156 Fiddler's Creek Parkway
Naples, FL 34114

Dear Mr. DiNardo,

Reference is made to the negotiations still ongoing between Fiddler's Creek, LLC and GB Peninsula, Ltd., on the one hand (collectively referred to as "Fiddlers") and PEPI Capital, L.P. on the other hand ("PEPI"), regarding the terms a proposed debtor-in-possession loan in the maximum amount of $27 million from PEPI to Fiddlers as contemplated by that certain Term Sheet letter, dated October 20, 2009, between Fiddlers and Petrus Private Investments, L.P., n/k/a PEPI, an executed copy of which is attached hereto (the "Proposed Loan"). Among other things, the terms of the Proposed Loan include a requirement that Fiddlers, upon finalizing and signing a commitment letter in connection with such Proposed Loan, will pay a commitment fee to PEPI in the amount of $785,000 (the "Commitment Fee") plus an expense deposit in the amount of $250,000 (the "Deposit") (collectively, the Commitment Fee and Deposit shall be referred to herein as the "Payment").

Today, PEPI is executing and issuing a commitment letter (the "Commitment Letter") to Fiddlers in connection with the Proposed Loan. In order to insure that the Payment is made in a timely manner if and when Fiddlers and PEPI finalize and execute the Commitment Letter or a revised version thereof acceptable to Fiddlers and PEPI, Fiddlers will make the Payment today, notwithstanding that the Commitment Letter has been issued by PEPI but not yet been executed by Fiddlers.

PEPI agrees that if the Payment is paid to PEPI on or before December 31, 2009, and the Commitment Letter or a revised version thereof is not finalized and executed by each of Fiddlers and PEPI on or before Thursday, January 14, 2010 at 5 P.M., eastern time, (the "Deadline") for any reason or no reason whatsoever based on the sole and absolute discretion of Fiddlers and/or PEPI, then PEPI agrees to and shall return and pay back to Fiddlers on or before 5:00 pm (eastern) on January 15, 2010 the Payment in full without any deduction or set off, and without any interest. PEPI agrees herein that it shall not have any defense, counterclaim or right to withhold or delay the return of the Payment if the Commitment Letter or a revised version thereof is not finalized and executed by Fiddlers. In such event, the Payment will be returned by PEPI to Fiddlers in accordance with the wire instructions attached to this letter. In the event the Commitment Letter or a revised version thereof is finalized and executed by Fiddlers and PEPI prior to the Deadline, then PEPI shall be entitled to retain the Payment pursuant to and in accordance with the Commitment

AA00109

Fiddler's Creek
December 31, 2009
Page 2 of 3

Letter or a revised version thereof and the Commitment Fee shall be fully earned and paid effective December 31, 2009.

Neither the terms of this letter, nor the payment of the Payment to PEPI pursuant hereto, nor the receipt of such Payment hereunder by PEPI shall or is intended to require Fiddlers or PEPI to agree to any   terms in the Commitment Letter or the negotiations related thereto prior to its execution and delivery by Fiddlers and PEPI, and each of Fiddlers and PEPI are free to negotiate any and all issues related to the Commitment Letter and execute or refrain from executing any version of the Commitment Letter in their respective sole and absolute discretion.

For the avoidance of doubt, the Commitment Letter issued by PEPI today does not restrict, amend, or limit the terms of this letter agreement, and this letter agreement does not restrict, amend, or limit the terms of such Commitment Letter.

This letter will be effective and binding on PEPI upon Fiddlers execution of this letter and delivery of a copy of this letter to PEPI, together with Fiddlers wire instructions attached, and the receipt by PEPI of the Payment on or before December 31, 2009.

Very truly yours,

PEPI Capital, L.P.

By: _____

David Radunsky, Chief Operating Officer
of its general partner

Agreed, with wire instructions attached.
Fiddler's Creek, LLC

By: _____

GB Peninsula, Ltd

By: _____

Fiddler's Creek
December 31, 2009
Page 3 of 3

Wire Instructions for Fiddlers:

Regions Bank
Attn. Marco Island Branch
ABA #: 062000019
Credit to: DY Land Associates, LTD
Address: 8156 Fiddlers' Creek Pkwy
Naples, FL 34114
Acct # 4640306224

AA00111

EXHIBIT D

AA00112

# PEPI CAPITAL, L.P.
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991


January 15, 2010
AMENDMENT LETTER

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek, LLC
8156 Fiddler's Creek Parkway
Naples, FL 34114

Dear Mr. DiNardo,

    This Amendment Letter amends and supersedes that certain letter (the "Fee Letter Agreement") dated December 31, 2009, by and between Fiddler's Creek, LLC and GB Peninsula, Ltd., on the one hand (collectively referred to as "Fiddlers") and PEPI Capital, L.P. on the other hand ("PEPI"), regarding the terms of a proposed debtor-in-possession loan in the maximum amount of $27 million from PEPI to Fiddlers as contemplated by that certain Term Sheet letter, dated October 20, 2009, between Fiddlers and Petrus Private Investments, L.P., n/k/a PEPI, (the "Proposed Loan"). Among other things, the terms of the Proposed Loan include a requirement that Fiddlers, upon finalizing and signing a commitment letter in connection with such Proposed Loan, will pay a commitment fee to PEPI in the amount of $785,000 (the "Commitment Fee") plus an expense deposit in the amount of $250,000 (the "Deposit") (collectively, the Commitment Fee and Deposit shall be referred to herein as the "Payment").

    Pursuant to the Fee Letter Agreement, Fiddlers deposited the Payment with PEPI on December 31, 2009, and PEPI continues to hold the Payment. PEPI also executed and issued a commitment letter (the "Commitment Letter") to Fiddlers in connection with the Proposed Loan which was not accepted by Fiddlers prior to its expiration at 5 p.m. on January 5, 2010. In order to insure that PEPI can continue to pay counsel fees in connection with the Proposed Loan, Fiddlers agrees that the Deposit may be utilized by PEPI to pay reasonable attorney's fees and expenses of up to $25,000 incurred in further negotiating the Commitment Letter notwithstanding that the Commitment Letter has not been accepted by Fiddlers.

    PEPI agrees that if the Commitment Letter or a revised version thereof is not finalized and executed by each of Fiddlers and PEPI on or before Friday, January 29, 2010 at 5 P.M., eastern time, (the "Deadline") for any reason or no reason whatsoever based on the sole and absolute discretion of Fiddlers and/or PEPI, then PEPI agrees to and shall return and pay back to Fiddlers on or before 5:00 pm (eastern) on February 1, 2010 the Payment in full less that portion of the Deposit used to pay up to $25,000 in PEPI's expenses associated with the Commitment Letter, without any other deduction or set off, and without any interest. PEPI agrees herein that it shall not have any defense, counterclaim or right to withhold or delay the return of the Payment (except for the expense money used) if the Commitment Letter or a revised version thereof is not finalized and executed by Fiddlers. In such event, the Payment, less that portion of the Deposit used to pay up to

Fiddler's Creek
January 15, 2010
Page 2 of 3

$25,000 in PEPI's expenses associated with the Commitment Letter, will be returned by PEPI to Fiddlers in accordance with the wire instructions attached to this letter. In the event the Commitment Letter or a revised version thereof is finalized and executed by Fiddlers and PEPI prior to the Deadline, then PEPI shall be entitled to retain the Payment pursuant to and in accordance with the Commitment Letter or a revised version thereof and the Commitment Fee shall be fully earned and paid effective December 31, 2009.

Neither the terms of this letter, nor the payment of the Payment to PEPI pursuant hereto, nor the receipt of such Payment hereunder by PEPI, nor the permission to utilize the Deposit to compensate PEPI for reasonable expenses associated with the Documentation, shall or is intended to require Fiddlers or PEPI to agree to any terms in the Commitment Letter or the negotiations related thereto prior to its execution and delivery by Fiddlers and PEPI, and each of Fiddlers and PEPI are free to negotiate any and all issues related to the Commitment Letter and execute or refrain from executing any version of the Commitment Letter in their respective sole and absolute discretion.

This Amendment Letter will be effective and binding on PEPI upon Fiddlers execution of this letter and delivery of a copy of this letter to PEPI.

Very truly yours,

PEPI Capital, L.P.

By: _____
David Radunsky, Chief Operating Officer
of its general partner

Agreed, with wire instructions attached.

Fiddler's Creek, LLC

By: _____

GB Peninsula, Ltd

By: _____

AA00114

Fiddler's Creek
January 15, 2010
Page 3 of 3

Wire Instructions for Fiddlers:

Wachovia
Eagle Creek Financial Center
12604 East Tamiami Trail, Naples, FL  34113
Account #2000051074915
GBFC Development, Ltd
ABA#063000021

AA00115

EXHIBIT E

AA00116

# PEPI CAPITAL, L.P.

2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

Dated as of December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek LLC
8156 Fiddlers Creek Parkway
Naples, FL 34114

Commitment Letter
**$27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility**

Dear Mr. DiNardo:

PEPI Capital, L.P., as Agent[1] and Lender (collectively, "PEPI") is pleased to confirm to Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company") the commitment of PEPI to provide a senior secured debtor-in-possession multiple advance term loan facility to the Company with total advances of up to $27,000,000 (the "Credit Facility") based upon and subject to the terms and conditions set forth in this letter and the term sheet and exhibits attached as Exhibit A hereto (the "Term Sheet" and all exhibits thereto together with this letter, collectively, the "Commitment Letter").

While PEPI has provided a commitment for the entire amount of the Credit Facility, subject to the terms and conditions of this Commitment Letter and the Term Sheet, PEPI may syndicate some of the Credit Facility to additional lenders with a corresponding reduction in PEPI's share of the Credit Facility. PEPI's obligations under the Credit Facility are not contingent upon or conditioned upon syndication of the Credit Facility. Moreover, PEPI has no plans to syndicate the Credit Facility, however, PEPI has the absolute and sole right to syndicate some or all of the Credit Facility.

PEPI shall manage all aspects of any syndication of the Credit Facility, including the timing of all offers to potential lenders, the allocation and acceptance of commitments, the amount offered, and the compensation provided to any lender. The Company agrees that no lender will receive any compensation for its participation in the Credit Facility except as expressly agreed to and offered by PEPI.

The Company agrees to cooperate in PEPI's syndication efforts and use commercially reasonable efforts, at no additional out of pocket cost to the Company, to assist PEPI in forming a syndicate acceptable to PEPI. Such assistance shall include but not be limited to (a) using commercially reasonable efforts to make senior management and representatives of the Company available to participate in meetings and to provide information to potential lenders at such times and places as PEPI may

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Term Sheet attached hereto as Exhibit A.

DA-3072429 v11 1203528-00006

AA00117

reasonably request, and (b) using commercially reasonable efforts to provide all information reasonably deemed necessary by PEPI to complete the syndication, subject to confidentiality agreements in form and substance reasonably satisfactory to the Company and PEPI. The terms of the Commitment Letter, including those attached as Exhibit A, shall not be modified due to PEPI's syndication efforts.

The Company hereby represents, warrants and covenants that (i) all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading, and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to PEPI by or on behalf of the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to PEPI such Information and Projections as PEPI may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is true and correct on the Closing Date of the Credit Facility.

The Company will promptly reimburse PEPI for all reasonable costs and expenses incurred by PEPI in connection with its continuing review of the Information and Projections and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), any and all due diligence, any and all loan documentation for the Credit Facility, the closing of the Credit Facility, and the enforcement of any of PEPI's rights and remedies under this Commitment Letter, in each case including, without limitation, reasonable attorneys' fees and legal expenses, appraisal fees, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus out-of-pocket expenses for the field examiners of PEPI in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses), and in each case whether or not the Credit Facility closes.

All such charges and expenses are to be paid to PEPI upon demand, together with such advance funds on account of such charges and expenses as PEPI may from time to time request or PEPI may require that the Company pay such charges directly. PEPI has the right to apply to such charges and expenses any sums received from or on behalf of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation. Deposits for expenses received by PEPI will be returned to the Company without interest, less the expenses and charges described above if the Credit Facility does not close, and applied to reduce the loans if the Credit Facility closes.

The Company and all Guarantors agree to indemnify and hold harmless PEPI, and each director, partner, officer, employee, attorney, advisor, agent and affiliate of PEPI (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any and all losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any

DA-3072429 v11 1203528-00006

AA00118

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

AA00119

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

AA00120

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter is for the sole benefit of the Company and may not be relied upon by any third party. This Commitment Letter may not be assigned by the Company without the prior written consent of PEPI and may not be amended, waived, or modified, except in writing signed by PEPI and the Company.

This Commitment Letter is governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

PEPI, THE COMPANY AND ALL GUARANTORS EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

This letter is pursuant to that certain Term Sheet letter dated October 20, 2009, addressed to Mr. Ken Montgomery of Belmont Capital Partners LLC, advisor to you, by Agent under Agent's prior name.

If the Company accepts and agrees to the foregoing, please so indicate by executing the enclosed copy of this letter and returning it to PEPI on or before 6 p.m., eastern time, January 27, 2010, to be effective as of December 31, 2009.

Very truly yours,

PEPI CAPITAL, L.P.

By: _____

David Radunsky, Chief Operating Officer of its general partner

AA00121

ACCEPTED to be effective as of December 31, 2009:

**Fiddler's Creek, LLC**

By: GBFC II Two, LLC

By: _Anthony D. Nardo_

Anthony DiNardo, as Chief Financial Officer

and not individually

**GB Peninsula, Ltd.**

By: GB Peninsula, Inc.

By: _Anthony D. Nardo_

Anthony DiNardo, as Secretary/Treasurer

and not individually

DA-3072429 v11 1203528-00006

**AA00122**

## EXHIBIT A

### PEPI Capital, L.P.

**$27,000,000 Senior Secured Debtor-In-Possession Multiple Advance Term Loan Credit Facility ("Credit Facility")**

**Summary of Principal Terms and Conditions ("Term Sheet")**

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company"). |
| Agent: | PEPI Capital, L.P. |
| Lenders: | PEPI Capital, L.P. or its designated affiliate and/or other lenders who may be added from time to time. |
| Guarantors: | All subsidiaries and affiliates of the Company that are listed on Exhibit E (collectively, the "Guarantors"). |
| DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a multiple advance senior secured debtor-in-possession - term loan credit facility with aggregate advances of up to $27,000,000 (the "Loan") for use in connection with the anticipated voluntary Chapter 11 bankruptcy filings by the Company and the Guarantors (the "Bankruptcy Cases"), subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") or any other court taking jurisdiction over such Bankruptcy Cases. The Loan is not a revolving line of credit. Specifically, the repayment of any principal amount of the Loan may not be reborrowed and will not provide additional or renewed availability under the Loan. Advances under the Loan will be subject to limitation based on the maximum outstanding balance at any particular time as set forth on Exhibit D. |
| Purpose and Proceeds: | The proceeds of the Loan shall be used in accordance with an 18-month budget and business plan through the anticipated exit from the Bankruptcy Cases submitted by the Company to the Agent and approved by the Agent in connection with the execution of the Commitment Letter, with any amendments to the budget thereafter to be approved by the Agent (collectively, the "18 Month Budget"). The initial 18-Month Budget attached hereto as Exhibit G is hereby approved by the Lender. The 18 Month Budget shall include, among other things, the Company's operating expenses, working capital needs, professional fees for the bankruptcy proceedings, financing costs for secured lenders, real estate taxes, CDD assessments and the fees and costs |

AA00123

associated with the Loan and the preparation and negotiation of documentation for the Loan. Subject to the prior approval of the Agent, Managed Expenses set forth in the 18 Month Budget shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on Exhibit D as of the respective dates set forth on Exhibit D. No proceeds of the Loan will be advanced unless and until each condition precedent thereto has been fulfilled, and with respect to the Initial Advance or any subsequent advances under the Credit Facility, no proceeds of the Loan will be advanced while any event of default has occurred and is continuing there under. The Company will provide to Agent, no later than 15 days prior to each calendar quarter-end, an updated 13-week cash budget for the upcoming 13-week period.

|                  |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                          |
|------------------|--|
| Loan Advances:   | Upon and after entry of the Interim Order (hereinafter defined) by the Bankruptcy Court, an advance in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility (the "Initial Advance") may be made in an amount not to exceed $4 million consistent with the initial 13-week budget for amounts for the period of time between the filing of the Bankruptcy Cases and the hearing on the Final Order. Upon entry of the Final Order by the Bankruptcy Court, additional advances (the "Subsequent Advances" and together with the Initial Advance, the "Loan Advances") may be made from time to time thereafter in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility. The Subsequent Advances will be made monthly, with the Company providing Agent with each request for a Loan Advance at least 5 business days prior to any Loan Advance. Loan Advances will be made in multiples of $100,000, with a minimum amount of $500,000. Aggregate Loan Advances may not exceed $27,000,000.00. |
| Unused Loan Fee: | Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on the amount of the Loan not yet advanced to the Company. Such fee may be paid from the proceeds of the Loan. |
| Expenses:        | Upon two (2) business day's written request from Agent, the Company shall deliver to Agent such deposits as may be necessary, in Agent's reasonable discretion, to cover continuing out of pocket expenses through the maturity and payment in full of the Loan. The Company has provided $275,000 as a deposit for Agent expenses related to Agent due diligence and preparation of this Commitment Letter. In addition to the Commitment Fee, pursuant to the terms of the Fee Letter Agreement (defined below) the Company has deposited an additional $250,000 with Agent, and Agent may retain the |

AA00124

$250,000 expense deposit, to cover Agent expenses related to remaining due diligence, loan documentation and other third party expenses Agent will incur to obtain Loan approval by the Bankruptcy Court. The deposit is not a cap or a limit on such expenses and the Company shall pay to Agent any expenses in addition to the deposit upon demand. Upon and after funding of the Loan, the Company will advance to Agent such additional expenses as may be required in the reasonable discretion of the Agent to cover continuing expenses of Agent in monitoring and administering the Loan. Subject to Bankruptcy Court approval and inclusion in the approved 18 Month Budget, the Company will reimburse to third parties those expenses and costs advanced to or paid on behalf of the Company to the Agent associated with the Bankruptcy Cases, this Commitment Letter, and closing of the Credit Facility.

| | |
|---|---|
| Loan Amount: | Up to $27,000,000, disbursed in multiple advances consisting of the Initial Advance and the Subsequent Advances. At no time shall the outstanding Loan balance exceed $15,000,000. Further, the Loan balance shall not exceed the "Maximum Outstanding Loan Balance" set forth on <u>Exhibit D</u> as of the date set forth on <u>Exhibit D</u>. |
| Interest Rate: | 12% per annum, payable monthly in arrears but not greater than the maximum rate provided by applicable law. |
| Default Rate: | Upon the occurrence of an event of default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law. |
| Mandatory Prepayments: | Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds (defined as gross receipts from sale of assets, less costs of closing, including but not limited to, title costs, commissions, CDD buy down, real estate taxes, other allowable normal and customary closing costs) (the "<u>Net Asset Sales Proceeds</u>") shall be applied first to the Loan unless otherwise agreed to by Agent. Until such time as the Loan has been paid in full (including, without limitation, all principal, interest and fees), no payments of principal or interest shall be paid to any existing secured creditors without the express prior written approval of Agent, unless identified in the 18 Month Budget approved by Agent. For avoidance of doubt, the 18 Month Budget includes the payment of interest to secured creditors with mortgage liens on the assets of the Company during the period of the 18 Month Budget. |
| Closing Date: | The Initial Advance shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of an Interim Order in form and substance satisfactory to Agent in its reasonable |

AA00125

discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Initial Advance to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of the Commitment Fee at the time of the Initial Advance and payment in full of all expenses. The Subsequent Advances shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of a Final Order in form and substance satisfactory to Agent in its reasonable discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Subsequent Advances to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of payment in full of all expenses.

Maturity Date:

The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later date as set forth Extension below in the section entitled "Extension Date")(the "Initial Maturity Date"), (b) the entry by the Bankruptcy Court of an order confirming a plan of reorganization for the Company or any Guarantor (unless expressly agreed to by Agent), or (c) the date upon which a final order is entered by the Bankruptcy Court either (i) converting the Company's or any Guarantor's Chapter 11 case to a case under Chapter 7 (unless expressly agreed to by Agent), (ii) approving one or more 363 sales of all or substantially all of the Company's or any Guarantor's assets (unless expressly agreed to by Agent), (iii) appointing a trustee or examiner (with or without expanded powers) in the Company's or any Guarantor's Chapter 11 case, (iv) dismissal of any of the Company's or any Guarantor's bankruptcy cases (unless expressly agreed to by Agent), or (d) the occurrence of an event of default under the Loan documentation and the expiration of any applicable cure period.

Acceptance Date:

The Company must accept this Commitment Letter by 6 p.m. eastern time on January 27, 2010, to be effective as of December 31, 2009.

Commitment Fee:

On December 31, 2009, the Company and Agent entered into that certain fee letter agreement, as amended by that certain amended fee letter agreement dated January 15, 2010 (collectively, the "Fee Letter Agreement") under which the Company deposited with Agent in escrow the sum of $785,000 to be applied, with the previously paid application fee of $25,000, to the payment of an $810,000 commitment fee (the "$810,000 Commitment Fee Deposit Escrow"). Upon Agent's issuance of this Commitment Letter and execution of this Commitment Letter by both Agent and the Company, 100% of the $810,000 commitment fee (the "Commitment Fee") shall be deemed fully earned, but shall be paid to the Agent by the Agent retaining one half of the $810,000 Commitment Fee Deposit

AA00126

Escrow as a non-refundable payment and the remaining unpaid one-half of the Commitment Fee ($405,000.00) shall be financed as part of the Credit Facility and shall be paid to Agent upon funding of the Initial Advance. The remaining one half of the $810,000 Commitment Fee Deposit Escrow will then be wired the next business day by Agent to the account designated by the Company in the Fee Letter Agreement.

**Exit Fee:** 2% of the funds used to pay the principal outstanding at any time of the Loan, whether (a) upon payment in full of the Loan at maturity, (b) any partial principal payment of the Loan prior to maturity, or (c) any other reduction in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility of the principal amount of the Loan.

**Break-Up Fee:** If the Company directly or indirectly, enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the Credit Facility that is approved by the Bankruptcy Court, then the Company immediately shall pay to PEPI a break-up fee of $1,000,000 (the "Break-Up Fee"). The Break-Up Fee is in addition to any other amount paid or payable hereunder. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing, or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. The Company shall take all necessary action in the Bankruptcy Court to authorize the payment of the Break-Up Fee when it accrues including, without limitation, stipulating that such fee is an allowed Chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

**Collateral:** The Initial Advance and all indebtedness and obligations under the Loan associated with the Initial Advance will be secured by a Bankruptcy Court-ordered Interim Order providing for first priority liens and first priority senior security interests in all unencumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership

AA00127

interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Unencumbered Collateral") and senior priming liens on all Collateral (as defined below) of the Company and Guarantors. The Subsequent Advances (together with the Initial Advance upon entry of the Final Order, the Loan Advances) and all indebtedness and obligations under the Loan associated with the Initial Advance and the Subsequent Advances will be secured by a Bankruptcy Court-ordered Final Order providing for first priority priming liens and first priority senior security interests in all Unencumbered Collateral and all encumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing, together with the Unencumbered Collateral, being referred to as the "Collateral"). Both the Unencumbered Collateral and the Collateral shall have no permitted encumbrances senior or equal to the Agent's and the Lenders' liens and security interests except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral, and those matters commonly included as exceptions to title insurance policies in Southwest Florida that may be specifically agreed to in writing by Agent in its sole discretion ("Permitted Liens"). Permitted Liens shall also include the Replacement Liens as defined below, provided that all such Replacement Liens shall be subordinate to the Agent and Lender's liens. Final loan documentation will include provisions that provide for the granting of replacement liens (the "Replacement Liens") subordinate to those of the Agent and Lender to be provided to those secured lenders who have the collateral securing their respective prepetition allowed secured claims sold during the Bankruptcy Cases by the Company and the proceeds from which are not paid to such secured lender in accordance with their prepetition loan documents. The Agent agrees that all such Replacement Liens may be subordinate to its senior priming liens on remaining real estate assets of the Company. For purposes of illustration only, if the Company sells a developed

DA-3072429 v11 1203528-00006

AA00128

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the **"Minimum Net Cumulative Sales Covenant if not paying Managed Expenses"** set forth on Exhibit D for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly. In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development , Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

AA00129

6. The Tarpon Club owned by GBFC Marina, Ltd.;

7. The Creek Golf Course owned by FC Golf, Ltd.;

8. The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;

9. The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc.;

10. The undeveloped land including in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America; and

11. The Fiddlers' Creek Sales and Administration buildings owned by 951 Land Holding, Ltd.

| | |
|---|---|
| Cash Account | All cash from Net Asset Sale Proceeds and other operating cash will be held in accounts pledged to benefit of the Agent and over which Agent shall have control (the "Cash Collateral Accounts"), which Cash Collateral Accounts shall be debtor in possession accounts in accordance with the guidelines of the Office of the United States Trustee and shall be disbursed pursuant to the 18 Month Budget so long as there is no pending event of default. All Net Asset Sale Proceeds shall be paid to the Agent to be applied to reduce the Loan. All cash generated from the operations of the Company ("Operating Cash") shall be deposited into separate Cash Collateral Accounts and may be used by the Company in accordance with the 18 Month Budget. |
| Use of Cash Collateral | So long as no event of default occurs and is continuing under the Loan, the Company may use cash in the Cash Collateral Accounts, other than Net Asset Sale Proceeds which shall be paid to the Lender to reduce the Loan, in accordance with the 18 Month Budget. The use of Operating Cash in accordance with the 18 Month Budget as provided herein shall not be deemed a Loan Advance. |
| Collateral Monitoring Fee: | The Company shall pay to Agent a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding or there is any remaining availability under the Loan. The Collateral Monitoring Fee may be paid from the proceeds of the Loan. |
| Extension Date: | Upon 30 days' prior written notice to Agent, payment of the |

DA-3072429 v11 1203528-00006

AA00130

| | |
|---|---|
| | Extension Fee (hereinafter defined), and submission to Agent of an approved budget for the extension period, the Company may extend the Initial Maturity Date for up to two (2) consecutive six (6) month periods, _provided_ that as of the date of any proposed extension no uncured event of default has occurred and is continuing, and no earlier termination triggering event has occurred. |
| Extension Fee: | An Extension Fee equal to 0.5% of the then-outstanding principal balance on the Loan plus any amount not yet advanced under the Loan (the "Extension Fee"), shall be payable by the Company for each exercised extension on or before the date of each such extension. The Extension Fee may be paid from the proceeds of the Loan. |
| DIP Provisions: | The Company will obtain (a) within forty-five (45) days of filing of the Bankruptcy Cases an interim order of the Bankruptcy Court approving the Initial Advance (the "Interim Order"), and (b) will within forty-five (45) days after the entry of such Interim Order obtain a final order (the "Final Order"; and collectively with the Interim Order, the "Orders") of the Bankruptcy Court approving the Loan Advances on a final basis, and fixing the funding date for the Subsequent Advances, which Final Order shall not have been appealed, reversed, modified, amended, stayed or vacated. Subject to Agent's approval, one or more advances may be made under the Loan in accordance with the terms herein. The Interim Order shall provide that the Initial Advance shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by first priority liens on and first priority senior security interests in favor of Agent and the Lenders in all of the Unencumbered Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code and also secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other administrative expenses as may be agreed to by Agent and Permitted Liens). The Final Order shall provide that the Initial Advance together with the Subsequent Advances shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other |



AA00131

administrative expenses as may be agreed to by Agent and Permitted Liens). The Orders as entered by the Bankruptcy Court shall be in form and substance acceptable to Agent in its reasonable discretion, and at a minimum, shall contain provisions under Section 364(e) granting all such senior and priming liens, security interests and claims to Agent and the Lenders for all monies actually advanced even if such Orders are subsequently appealed, vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Agent and the Lenders to, upon five business days notice to the Company, immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens, security interests and claims granted to Agent and the Lenders shall contain cross default and cross collateral provisions with all other debt owed to the Lender. Agent and Lenders shall have no obligation to fund the Initial and Subsequent Advances should the Orders, at the time of Closing and funding, have been stayed, or as to the Final Order, is subject to appeal or modification, or otherwise not be in a form satisfactory to Agent in its reasonable discretion.

**Other Conditions Precedent:**

Standard and customary for loans and transactions of this type and such other conditions precedent to the Initial Advance and each Subsequent Advance under the Loan as required by Agent in its reasonable discretion including, but not limited to, the following:

1. All the Company fees payable to Agent shall be current as provided herein, including without limitation, all fees of Agent's professionals.

2. Subject to the 18 Month Budget and limited by the terms and conditions herein, all of the Company's chapter 11 administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or addressed in a manner satisfactory to Agent in its reasonable discretion.

3. Completion of due diligence to the satisfaction of Agent, such due diligence to include, but not be limited to, examination of the Collateral and title thereto and additional due diligence related to the Company's business, industry, legal, environmental and technical related matters.

4. Completion of legal due diligence investigation by counsel to Agent, with results satisfactory to Agent and its counsel, of all matters which Agent deems relevant, in its reasonable discretion.

15 of 45

AA00132

5. The Company shall have executed and delivered all documentation required by Agent and its counsel in form and substance satisfactory to Agent and its counsel including, without limitation, a general release of all claims against Agent and Lenders through the time of funding, and the Company and Guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the liens, security interests and claims of Agent and the Lenders.

6. All necessary consents and approvals for the Company to enter into the Credit Facility shall have been obtained.

7. Receipt of current financial statements. Further, Agent must be satisfied that all financial statements required by Agent have been received and delivered to it fairly present the business and financial condition of the Company and its subsidiaries.

8. No material misstatements in or omissions from the materials previously furnished to Agent for its review.

9. No previously undisclosed intercompany transactions shall have occurred. Further, Agent must be satisfied that all listings of inter company transactions and transactions with affiliates required by Agent have been received.

10. There shall not be any litigation or other proceeding the result of which might have a material adverse effect on the Company and its affiliates and subsidiaries or any of their assets other than as listed on Exhibit F.

11. No material changes in governmental regulations or policies having a material adverse effect on the Company shall have occurred prior to the Closing Date.

12. The Company and each Guarantor shall be in good standing in its state of incorporation and qualified to do business in any state in which Collateral is located.

13. All motions, orders and bankruptcy court documentation regarding the Loan shall be in form and substance reasonably satisfactory to Agent and consistent with the terms herein.

14. Until all the Company obligations are paid in full to Agent and the Lenders, the Company shall provide to Agent not less than two (2) business days' advance notice of any filings made in the bankruptcy case(s) of

DA-3072429 v11 1203528-00006

AA00133

the Company and the Guarantors, provided that the Company and Guarantors shall provide as much notice as is reasonably possible for emergency motions. Agent shall be given not less than five (5) business days' advance notice of any hearing regarding the Loan.

15. Such other commercially reasonable conditions precedent as Agent may require in its reasonable discretion, including, without limitation, satisfaction of each of the items listed on <u>Exhibit B</u> attached hereto.

16. Florida Financial Investments, Inc. shall execute and deliver to Agent documentation to subordinate its liens on the Collateral to those liens granted Agent and Lenders in the Interim and Final Orders consistent with the terms of this Commitment Letter.

**Collateral Monitoring**

Agent or its financial advisor shall have customary rights to enter and inspect the premises, interview employees and accountants, and examine books and records, etc., upon reasonable notice to the Company. The Company shall provide Agent with all reports provided to any third party as well as such financial reports as Agent may request from time to time.

**Guarantees:**

All of the Guarantors shall guaranty the Loan and shall execute the Loan documents required by Agent. The Company represents, warrants, covenants and agrees that (i) all of the entities that operate, own, or control real estate within the Fiddlers' Creek development are listed on <u>Exhibit E</u>, provided however that the Guarantors shall not include GB 31, Ltd., Fiddler's Creek Foundation,Inc. or Aubrey Ferrao, (ii) all of such entities shall be Guarantors, and (iii) all of such entities will be the subject of individual chapter 11 case filings. For avoidance of doubt, equity interests in the Company owned by Mr. Ferrao will be pledged as Collateral under the Loan.

**Representations and Warranties:**

Customary for loans and transactions of this type and such other representations and warranties required by Agent in its reasonable discretion.

**Covenants:**

Definitive documentation to contain affirmative and negative covenants customary for loans and transactions of this type and such other affirmative and negative covenants required by Agent in its reasonable discretion, including but not limited to:

1. The actual amount spent for any line item in the 18 Month Budget shall not vary from the amount provided for such item in the 18 Month Budget by more than 10% in any 13 week period, or in the aggregate.

17 of 45



AA00134

2. Covenants related to asset sales, lot sales and milestones related to the Company's business plan and ultimate exit from bankruptcy, as specified in Exhibits C and D.

3. Limitations on maximum outstanding loan balance as set forth in Exhibit D.

4. Prohibitions on additional indebtedness without the Agent's prior written consent.

5. Restricted payments and related party transactions prohibited without the Agent's consent.

6. Restriction on the Company's ability to transfer or sell assets outside of the ordinary course of business without the Agent's consent (including pursuant to sale/leaseback transactions), unless required in conjunction with the Loan, with all proceeds used first to repay the Loan.

7. Limitation on incurrence of liens subject to the Agent's reasonable consent.

8. Subject to the limitations in the 18 Month Budget and contained herein, maintain all taxes (including without limitation ad valorem taxes) current with respect to the Collateral as authorized by Bankruptcy Court order.

9. Restriction on subsidiaries' ability to issue or sell ownership interests, unless as included in the Company's Plan of Reorganization.

10. Restriction on the Company's ability to consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries or affiliates.

11. Subject to the limitations in the 18 Month Budget and contained herein, maintain adequate insurance coverage in types and amounts satisfactory to Agent in its reasonable discretion.

12. The Company and the Guarantors will maintain current status on obligations with respect to assessments and other obligations to Community Development District #1 ("CDD#1") and Community Development District #2 ("CDD#2"). Subject to the prior approval of the Agent, Managed Expenses under the 18 Month Budget, including past due obligations to CDD#2 2003A Series, 2003 B Series, and 2004 Series bonds, shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on Exhibit D as of the respective dates set forth on Exhibit D. Otherwise, the Company and the Guarantors will make no payment of any CDD#1 or CDD#2 assessments for debt service, either pre-petition or post-petition.

18 of 45

AA00135

13. The Company shall make representations that the debt service and outstanding assessments as of 12/31/09 are $3,858,191.26, and $36,671,476.99 respectively, for CDD1 and $3,470,653.89 and $72,887,413.41 respectively, for CDD2.

14. The Company shall represent that all land securing the 2003 and 2004 CDD2 bonds is platted and subject to final platting.

15. Subject to the limitations in the 18 Month Budget and contained herein and unless otherwise prohibited by the Bankruptcy Code, the Company will perform all obligations and responsibilities with respect to their participation, management and oversight of Fiddlers Creek Foundation, Tarpon Club and Fiddlers Creek Golf Club to ensure the club operations continue to provide their respective services to the members of each club.

16. Deposit of all Net Asset Sale Proceeds into Cash Collateral Account.

17. Weekly and monthly reporting to Agent, including:
    a. Weekly Sales Report to be submitted no later than close of business on the Wednesday following, to include:
        i. Closed sales by unit or property description, with buyer, sales price, costs of sales (including any commissions, and CDD buy downs), and net sales proceeds, and identifying any special discounts or concessions
        ii. Listing of assets put under contract, including sale price, release price, expected closing date, down payment
        iii. Weekly sales pipeline report, including any residential units, bulk lots, home sites, hotel condo, land or any other material asset of the Company
        iv. Report on any marketing activity undertaken
        v. Closings Report (Sales Price less seller costs for net cash at closing).
    b. Rolling 13 week cash forecast with comparison of actual to projected, including comments explaining variances from the forecast and 18 Month Budget
    c. Monthly update of litigation and property liens
    d. Monthly report of changes in any club membership roll, including:
        i. Additions
        ii. Submitted resignations
        iii. Removals
        iv. Delinquencies
    e. Monthly report on status of Community Development District projects and cash balances
    f. Monthly reports on any permitting and zoning activity

AA00136

g. Monthly financial reports for each Debtor, including a balance sheets and separate reports for each operating entity (golf course, clubs, etc.).

h. All reports submitted to any creditor, creditor committee, US Trustee, or other governmental authority

i. A monthly narrative description of the status of sales, development, legal, CDD, operating properties, HOA, financing and bankruptcy issues such that we are fully informed as to the status of the project

j. A rolling monthly forecast to be provided quarterly, which shall include the year-to-date actual results (i.e., from the funding date to the current period) plus receipts and disbursements which are anticipated to be incurred for the next 18 months, together with a comparison to the approved business plan

k. Monthly operating statement and statement of cash receipts and disbursements showing both the current month and year-to-date actual results compared to the approved business plan

l. Such other weekly or monthly reports that Agent may request

**Events of Default:**

Customary for loans and transactions of this type and such other Events of Default required by Agent in its reasonable discretion including, but not limited to, a breach of the variance covenant relating to the Budget, exceeding maximum outstanding loan balance for a specific period as set forth on <u>Exhibit D</u>, failing to achieve minimum cumulative sales as set forth on <u>Exhibit D</u>, or selling assets at prices less than the minimum release prices as set forth on <u>Exhibit C</u>. In addition, the events of default shall contain reasonable notice and cure provisions before acceleration of the debt and enforcement of remedies.

**Purchase Option:**

The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral and other

supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan documentation.

| | |
|---|---|
| Governing Law: | State of Florida. |
| Due Diligence: | There is a due diligence checklist which shall be updated regularly to reflect the delivery and receipt of items required by the conditions precedent terms herein. |
| Expenses and Indemnification: | Until such time as the Loan is paid in full, the Company shall reimburse Agent, upon demand, for all direct and indirect costs, fees, and expenses of Agent. Indemnification and release provisions customary for loans and transactions of this type and satisfactory to Agent in its reasonable discretion will be provided for in the definitive documentation. |

21 of 45

AA00138

## EXHIBIT B

### Additional Conditions Precedent

1.  Payment of the Commitment Fee to Agent.

2.  Bankruptcy Court Approval of the Credit Facility and all documentation for the Credit Facility shall be in form and substance acceptable to Lender.

3.  Delivery to Agent of Certified Articles/Certificates of Formation/Organization for the Company and each limited liability company Guarantor or general partner of a Guarantor.

4.  Delivery to Agent of Certified Certificates of Limited Partnership for each limited partnership Guarantor.

5.  Delivery to Agent of Certified Articles/Certificates of Incorporation for each corporate Guarantor or general partner of a Guarantor.

6.  Delivery to Agent of Operating Agreements/Regulations for the Company and each limited liability company Guarantor or general partner of a Guarantor.

7.  Delivery to Agent of Agreements of Limited Partnership for each limited partnership Guarantor.

8.  Delivery to Agent of Bylaws for each corporate Guarantor or general partner of a Guarantor.

9.  Delivery to Agent of Certificates of Existence and Good Standing for the Company, each Guarantor, and each general partner of a Guarantor from such person's jurisdiction of organization and, if not organized in Florida, from the State of Florida.

10. Delivery to Agent of appraisals from early 2009 for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an appraiser, satisfactory to Agent. The Agent consents to Integra Realty as being satisfactory to the Agent for this purpose only.

11  Delivery to Agent of current ALTA or comparable Surveys for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by a surveyor, satisfactory to Agent.

12. Delivery to Agent of current Phase I Environmental Reports for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an engineer, satisfactory to Agent.

13. Delivery to Agent of Zoning Letters for all real property collateral.

14. Delivery to Agent of Flood Letters for all real property collateral.

15. Delivery to Agent of Utility Letters for all real property collateral.

16. As to the Interim Order, delivery to Agent of Title Searches / Commitments for Mortgagee's Title Insurance Policies for all unencumbered real property collateral in form and substance, and prepared by a title company, satisfactory to Agent. As to the Final Order, delivery to Agent of

Title Searches / Commitments for Mortgagee's Title Insurance Policies for all real property collateral in form and substance, and prepared by a title company, satisfactory to Agent and showing no title exceptions other than those approved by Agent.

17. For each Community Development District affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

    A.    Enabling Legislation or Creation Order;

    B.    Construction of its Board of Directors;

    C.    Name and contact information for each board member;

    D.    Name and contact information for its attorney;

    E.    Name and contact information for its financial advisor and/or bookkeeper;

    F.    Name and contact information for its auditor;

    G.    Name and contact information for its engineer;

    H.    Copy of each Project Improvement Acquisition Agreement entered into by the CDD and any developer of land in the district;

    I.    Each assignment of the Project Improvement Acquisition Agreements in item H;

    J.    Copy of the last offering statement;

    K.    Copy of the last audit;

    L.    Confirmation of the development status of land within the CDD;

    M.    Confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD;

    N.    Identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD;

    O.    It's budget;

    P.    All bank account information;

    Q.    Assessments on all properties for debt service and other operations;

    R.    Financial statements for the CDD;

    S.    Annual assessments;

    T.    Total bond obligations related to debtor-owned properties in each bond issue (by unit/lot); and

DA-3072429 v11 1203528-00006

AA00140

U. Copies of all annual financial information and operating data delivered as part of the CDD's continuing disclosure obligations pursuant to its offering statement.

18. For each Homeowner's Association affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A. Identification of the specific real property collateral subject to the Homeowner's Association;

B. Documentation of its financial condition;

C. Its organizational documents;

D. Its budget;

E. Its Financial Statements;

F. Any CCRs (with all amendments);

G. The results of a Facility Inspection (pool, building, entries, etc.);

H. An overhead analysis;

I. A list of Declarants and Board positions (i.e., who controls); and

J. Comprehensive Dues information (land, lots, homes, etc.).

19. Delivery to Agent of copies of the real property tax statements for all real property collateral.

20. Delivery to Agent of all plats for all real property collateral.

21. Delivery to Agent of a list of leases with affiliated entities, in form and substance satisfactory to Agent.

22. Delivery to Agent of a list of all payments or other obligations required to maintain entitlements and zoning, in form and substance satisfactory to Agent.

23. Delivery to Agent of Financial Statements for the Company and each Guarantor, in form and substance satisfactory to Agent.

24. Delivery to Agent of a 13 week Cash budget for the Company and its subsidiaries, in form and substance satisfactory to Agent.

25. Delivery to Agent of the 2010 Budget and Business Plan for the Company and its subsidiaries, in form and substance satisfactory to Agent.

26. Delivery to Agent of UCC Searches for the Company and each Guarantor.

27. Delivery to Agent of a list of all existing lenders to the Company or any Guarantor in form and substance satisfactory to Agent.

DA-3072429 v11 1203528-00006

AA00141

28. Identification by the Company of the specific real property collateral impacted by each existing loan to the Company or any Guarantor, in form and substance satisfactory to Agent.

29. Delivery to Agent of copies of all existing loan and collateral documents for each existing loan to the Company or any Guarantor.

30. Identification by the Company of all outstanding receivables for all real and personal property collateral, in form and substance satisfactory to Agent. Delivery to Agent of all operating cash flow reports for any revenue generating activity at the project.

31. Delivery to Agent of a list showing the amount of deposits being held by each owner of real property collateral and any anticipated forfeitures, in form and substance satisfactory to Agent.

32. Delivery to Agent of a list of all fixed assets of the Company and each Guarantor, including, without limitation, vehicles and equipment, in form and substance satisfactory to Agent.

33. Delivery to Agent of a list of all copyrights, trademarks and patents owned or licensed to the Company and each Guarantor, in form and substance satisfactory to Agent.

34. Delivery to Agent of a detailed description and summary of all insurance currently held by the Company and each Guarantor and a list of any pending claims, in each case in form and substance satisfactory to Agent..

35. Delivery to Agent of copies of the most recent tax returns filed by the Company and each Guarantor.

36. Delivery to Agent of a list, in form and substance satisfactory to Agent, of any pending litigation against the Company, any Guarantor, or any of their respective assets, including, without limitation, any real or personal property collateral.

37. Delivery to Agent of a list and copies of any agreements containing a right of first refusal with respect to any real or personal property collateral.

38. Delivery to Agent of copies of any joint venture agreements entered into by the Company or any Guarantor.

39. The execution of and delivery to Agent by the Company and each Guarantor, as applicable, of each of the following documents, in form and substance satisfactory to Agent:

    A.    Loan Agreement;

    B.    Promissory Note;

    C.    Security Agreement (shareholder of the Company, the Company and each Guarantor);

    D.    Pledge Agreement (the Company and each Guarantor) covering such person's ownership interests in the Company and its subsidiaries;

    E.    Stock Power (for each certificated ownership interest pledged to Agent and Lenders);

    F.    Account Control Agreements for each deposit account of the Company and each

DA-3072429 v11 1203528-00006

AA00142

Guarantor;

G.      Guaranty Agreement (Guarantors);

H.      Mortgages for all real property collateral and security agreements and financing statements for all personal property collateral;

I.      Assignments of Leases and Rents for all real property collateral;

J.      Environmental Indemnities for all real property collateral;

K.      Assignments of all material contracts of the Company and each Guarantor;

L.      Omnibus Officer's Certificates of the Company and each Guarantor with Incumbency; and

M.      Notice of Final Agreement.

40.      Preparation and filing of UCC-1 Financing Statements for the Company and each Guarantor.

41.      Delivery to Agent of all stock certificates or other certificates of ownership in the Company and its subsidiaries pledged as collateral.

42.      Delivery to Agent of Legal Opinion Letters from legal counsel to the Company and each Guarantor containing customary opinions of legal counsel including, without limitation, legal opinions with respect to the Company, the Guarantors, all documentation for the Loan, the collateral, and the transactions contemplated hereby, all of which opinions are satisfactory to the Agent and its counsel.

44.      Delivery to Agent of Certificates of Insurance for all insurance held by the Company and each Guarantor.

45.      Delivery to Agent of Insurance Policy Endorsements for all insurance held by the Company and each Guarantor in form and substance acceptable to Agent.

46.      Delivery to Agent of Resolutions/Unanimous Consent of the Company and each Guarantor in form and substance satisfactory to Agent and authorizing, among other things, the Loan, all transactions contemplated hereby, and all documentation for the Loan and such transactions.

47.      Delivery to Agent of Mortgagee's Title Insurance Policies for all encumbered and unencumbered real property collateral in form and substance, and issued by a title company, satisfactory to Agent, containing Endorsements satisfactory to Agent, and subject only to exceptions approved by Agent.

48.      Payment of all mortgage taxes on all real property collateral except as agreed to by the Company and the Agent.

49.      Filing of Bankruptcy Petitions in the Bankruptcy Court for the Company and all related entities and subsidiaries.

50.      Delivery by the Company of Creditor accounts payable listings and service lists for each filing

AA00143

entity.

51.  Filing of First Day motions with the Bankruptcy Court customary for chapter 11 bankruptcies of this type.

52.  Filing with the Bankruptcy Court of motion for use of cash collateral in form satisfactory to Agent and the Company.

53.  The Bankruptcy Court's entering of the Interim Order in form satisfactory to Agent and the Company.

54.  The Bankruptcy Court's entering of the Final Order in form satisfactory to Agent and the Company.

54.  The Bankruptcy Court's entering an order for the use of cash collateral in accordance with the 18 Month Budget, which is in form satisfactory to Agent and the Company.

55.  Filing of a motion for debtor-in-possession financing with the Bankruptcy Court in form satisfactory to Agent and the Company.

56.  Timely delivery to Agent of any other materials and information requested by Agent and needed in Agent's reasonable discretion for completion of Agent's due diligence with respect to the Company, the Guarantors and the collateral, including, without limitation, all real and personal property collateral.

57.  Without the prior express written approval of the Agent and Lenders, the Company and each Guarantor shall not (i) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or terminate any provision of the Credit Facility or any protection granted to Agent and the Lenders there under, or (B) extinguish, subordinate or diminish any security interest, lien or claim of the Agent or any Lender, or (ii) seek, consent to, or join in the approval of any matter or any plan of reorganization which purports to do any of the things described in (i)(A) and (i)(B).  Any such action taken by the Company or any Guarantor will be an enforceable Event of Default under the Credit Facility, and if such action is taken by the Company or any Guarantor, the commitment of Agent to provide the Credit Facility will terminate and Agent and the Lenders will have no obligation to provide any advances under the Credit Facility.

DA-3072429 v11 1203528-00006

AA00144

## Minimum Release Price/CDD Buy down Schedule
## Exhibit C

| Village | Unit | Minimum Gross Sale Price | CDD Buy down | Minimum Release Price |
|---|---|---|---|---|
| Cotton Green | Lot 45 | 201,719 | 6,100 | 174,618 |
| Mallards Landing | 31-A | 414,720 | 20,327 | 345,743 |
| Bellagio | 6 | 713,359 | 17,257 | 624,241 |
| Bellagio | 11 | 605,063 | 17,257 | 526,556 |
| Bellagio | 16 | 380,439 | 17,257 | 308,932 |
| Bellagio | 30 | 629,909 | 17,257 | 551,402 |
| Bellagio | 33 | 640,941 | 17,257 | 562,434 |
| Bellagio | 34 | 688,505 | 17,257 | 609,997 |
| Bellagio | 35 | 290,137 | 17,257 | 211,630 |
| Majorca | 4 | 888,783 | 25,035 | 794,098 |
| Majorca | 5 | 1,027,459 | 25,035 | 918,424 |
| Cranberry Crossing | 25 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 30 | 356,270 | 25,907 | 298,863 |
| Cranberry Crossing | 36 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 43 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 47 | 450,162 | 25,907 | 382,605 |
| Sauvignon | 8 | 963,115 | 15,718 | 877,396 |
| Serena | 6-102 | 161,954 | 11,398 | 123,492 |
| Serena | 7-201 | 249,337 | 11,398 | 210,875 |
| Serena | 8-201 | 246,405 | 11,398 | 207,943 |
| Serena | 11-202 | 254,468 | 11,398 | 216,006 |
| Serena | 13-202 | 247,584 | 11,398 | 209,122 |
| Serena | 15-201 | 477,800 | 11,398 | 439,338 |
| Serena | 17-102 | 508,548 | 11,398 | 459,354 |
| Serena | 17-201 | 518,231 | 11,398 | 479,769 |
| Serena | 17-202 | 652,546 | 11,398 | 593,182 |
| Serena | 19-101 | 435,318 | 11,398 | 396,856 |
| Serena | 19-102 | 435,318 | 11,398 | 396,856 |
| Serena | 19-201 | 539,653 | 11,398 | 501,191 |
| Marengo | 1-102 | 160,765 | 13,943 | 125,822 |
| Marengo | 3-202 | 153,857 | 13,943 | 116,814 |
| Marengo | 4-103 | 155,683 | 13,943 | 120,740 |
| Marengo | 6-202 | 394,182 | 13,943 | 357,139 |
| Marengo | 7-203 | 144,227 | 13,943 | 107,184 |
| Marengo | 8-204 | 186,745 | 13,943 | 146,552 |

DA-3072429 v11 1203528-00006

AA00145

| | | | | |
|---|---|---|---|---|
| Marengo | 9-201 | 420,959 | 13,943 | 380,766 |
| Marengo | 9-203 | 388,387 | 13,943 | 351,344 |
| Marengo | 10-103 | 374,163 | 13,943 | 332,220 |
| Marengo | 10-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 10-203 | 398,637 | 13,943 | 354,594 |
| Marengo | 10-204 | 431,670 | 13,943 | 383,077 |
| Marengo | 11-102 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-103 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-201 | 434,199 | 13,943 | 394,006 |
| Marengo | 11-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 11-203 | 398,637 | 13,943 | 361,594 |
| Millbrook | 10 | 728,692 | 45,420 | 629,824 |
| Millbrook | 11 | 884,609 | 45,420 | 774,729 |
| Millbrook | 12 | 878,236 | 45,420 | 768,806 |
| Millbrook | 13 | 900,143 | 45,420 | 789,166 |
| Callista | 06-101 Model | 514,434 | 11,748 | 465,936 |
| Callista | 06-102 Model | 476,295 | 11,748 | 429,897 |
| Callista | 06-103 | 421,565 | 11,748 | 383,566 |
| Callista | 06-104 | 470,261 | 11,748 | 430,863 |
| Callista | 06-201 | 396,997 | 11,748 | 354,449 |
| Callista | 06-202 Model | 564,532 | 11,748 | 516,033 |
| Callista | 06-203 | 476,992 | 11,748 | 436,193 |
| Callista | 06-204 Model | 645,349 | 11,748 | 591,951 |
| Callista | 10-101 | 463,267 | 11,748 | 423,869 |
| Callista | 10-102 | 421,565 | 11,748 | 383,566 |
| Callista | 10-103 | 423,102 | 11,748 | 383,704 |
| Callista | 10-104 | 468,622 | 11,748 | 429,224 |
| Callista | 10-202 | 465,408 | 11,748 | 426,010 |
| Callista | 10-203 | 469,158 | 11,748 | 429,760 |
| Callista | 12-101 | 457,911 | 11,748 | 418,513 |
| Callista | 12-103 | 303,544 | 11,748 | 265,545 |
| Callista | 12-104 | 200,036 | 11,748 | 160,638 |
| Callista | 12-201 | 265,387 | 11,748 | 222,839 |
| Callista | 12-203 | 338,560 | 11,748 | 297,762 |
| Callista | 12-204 | 265,387 | 11,748 | 222,839 |
| Callista | 13-101 | 338,466 | 11,748 | 299,068 |
| Callista | 13-103 | 307,155 | 11,748 | 269,157 |
| Callista | 13-202 | 452,556 | 11,748 | 411,758 |
| Callista | 13-203 | 210,469 | 11,748 | 169,670 |
| Callista | 14-101 | 340,071 | 11,748 | 300,673 |
| Callista | 14-102 | 372,434 | 11,748 | 334,436 |
| Callista | 14-103 | 190,391 | 11,748 | 152,393 |
| Callista | 14-202 | 256,612 | 11,748 | 215,814 |

DA-3072429 v11 1203528-00006

AA00146

| | | | | |
|---|---|---|---|---|
| Callista | 14-204 | 294,341 | 11,748 | 251,792 |
| Callista | 15-101 | 447,201 | 11,748 | 407,803 |
| Callista | 15-102 | 406,500 | 11,748 | 368,502 |
| Callista | 15-103 | 229,847 | 11,748 | 191,849 |
| Callista - SOLD | 15-104 | | 11,748 | -39,398 |
| Callista | 15-201 | 413,047 | 11,748 | 370,499 |
| Callista | 15-202 | 342,480 | 11,748 | 301,682 |
| Callista | 15-203 | 342,480 | 11,748 | 301,682 |
| Callista | 16-102 | 191,194 | 11,748 | 153,195 |
| Callista | 16-204 | 297,921 | 11,748 | 255,373 |
| Callista | 17-101 | 271,056 | 11,748 | 231,658 |
| Callista | 17-102 | 246,566 | 11,748 | 208,568 |
| Callista | 17-103 | 324,542 | 11,748 | 286,544 |
| Callista | 17-201 | 348,916 | 11,748 | 306,368 |
| Callista | 17-203 | 274,000 | 11,748 | 233,202 |
| Menaggio | 4-102 | 658,237 | 8,558 | 608,029 |
| Menaggio | 5-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 5-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-102 | 502,117 | 8,558 | 453,309 |
| Menaggio | 11-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-201 | 845,892 | 8,558 | 788,684 |
| Menaggio | 12-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-201 | 639,878 | 8,558 | 591,070 |
| Menaggio | 16-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 16-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-201 | 322,770 | 8,558 | 273,962 |
| Menaggio - SOLD | 19-102 | 314,272 | 8,558 | 272,464 |
| Chiasso | Lot # 1 | 1,497,350 | 33,100 | 1,394,250 |
| Chiasso | Lot # 2 | 1,559,146 | 33,100 | 1,456,046 |
| Chiasso | Lot # 3 | 1,751,889 | 33,100 | 1,648,789 |
| | 116 | | | 0 |
| | | | | 0 |
| Mahogany Bend | B23 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B24 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B27 | 212,735 | 13,943 | 184,975 |

DA-3072429 v11 1203528-00006

**AA00147**

| | | | | | |
|---|---|---|---|---|---|
| Mahogany Bend | B28 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B29 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B30 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B31 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B32 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B33 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B34 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B35 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B36 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B37 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B38 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C1 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C2 | | | 13,943 | -27,760 |
| Mahogany Bend | C3 | | | 13,943 | -27,760 |
| Mahogany Bend | C4 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C5 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C6 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C7 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C8 | | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C9 | | 212,735 | 13,943 | 184,975 |
| Isla Del Sol | | 2 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 3 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 4 | | 13,943 | -32,293 |
| Isla Del Sol | | 10 | | 13,943 | -32,293 |
| Isla Del Sol | | 17 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 18 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 19 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 20 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 22 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 25 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 28 | 140,203 | 13,943 | 107,910 |
| Isla Del Sol | | 29 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 30 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 31 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 32 | | 13,943 | -32,293 |
| Isla Del Sol | | 33 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | | 34 | 325,841 | 13,943 | 293,548 |

DA-3072429 v11 1203528-00006

AA00148

# EXHIBIT D

### Fiddler's Creek

### Cumulative Home Sales/Maximum Outstanding Loan Balance Covenant

| Date | Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses | Minimum Net Cumulative Sales Covenant if not paying Managed Expenses | Maximum Outstanding Loan Balance Covenant |
|---|---|---|---|
| January 31, 2010 | $12,000,000 | | $10,000,000 |
| February 28, 2010 | $12,000,000 | | $10,000,000 |
| March 31, 2010 | $12,000,000 | | $10,000,000 |
| April 30, 2010 | $12,000,000 | | $10,000,000 |
| May 31, 2010 | $12,000,000 | | $10,000,000 |
| June 30, 2010 | $12,000,000 | $5,000,000 | $10,000,000 |
| July 31, 2010 | $12,000,000 | | $12,000,000 |
| August 31, 2010 | $12,000,000 | | $12,000,000 |
| September 30, 2010 | $12,000,000 | $8,000,000 | $13,000,000 |
| October 31, 2010 | $15,000,000 | | $15,000,000 |
| November 30, 2010 | $15,000,000 | | $15,000,000 |
| December 31, 2010 | $15,000,000 | $12,000,000 | $15,000,000 |
| January 31, 2011 | $15,000,000 | | $12,000,000 |
| February 28, 2011 | $15,000,000 | | $10,000,000 |
| March 31, 2011 | $20,000,000 | $20,000,000 | $8,000,000 |
| April 30, 2011 | $20,000,000 | | $6,000,000 |

DA-3072429 v11 1203528-00006

**AA00149**

| May 31, 2011 | $20,000,000 | | $5,000,000 |
| June 30, 2011 | $30,000,000 | $30,000,000 | $0 |

DA-3072429 v11 1203528-00006

AA00150

EXHIBIT E

**Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries**

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| 951 LAND HOLDINGS LTD | Limited Partnership | 03/14/00 | 59-3684895 |
|    951 Land Holdings LLC | General Partner | 04/07/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| DY LAND ASSOCIATES LTD | Limited Partnership | 03/14/00 | 59-3684898 |
|    DY Associates LLC | General Partner | 04/07/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| GBFC DEVELOPMENT LTD | Limited Partnership | 03/14/00 | 59-3684897 |
|    GBFC Development LLC | General Partner | 04/06/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| GBFC MARINA LTD | Limited Partnership | 03/14/00 | 59-3684890 |
|    FC Marina LLC | General Partner | 04/06/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC BEACH LTD | Limited Partnership | 03/14/00 | 59-3684896 |
|    FC Beach LLC | General Partner | 04/06/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC GOLF LTD | Limited Partnership | 12/03/02 | 03-0509355 |
|    FC Golf LLC | General Partner | 11/25/02 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| DY LAND HOLDINGS II, LTD | Limited Liability Company | 04/25/08 | 26-2495367 |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC PARCEL 73, LLC | Limited Liability Company | 04/25/08 | 26-2494498 |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC COMMERCIAL, LLC | Limited Liability Company | 04/25/08 | 26-2495276 |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC HOTEL, LTD | Limited Partnership | 03/30/04 | 34-2024547 |
|    FC Hotel, LLC | General Partner | 11/25/02 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC RESORT, LTD | Limited Partnership | 03/30/04 | 34-2024546 |
|    FC Resort, LLC | General Partner | 11/25/02 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| GULF BAY HOSPITALITY LTD | Limited Partnership | 12/31/03 | 59-3790126 |
|   GULF BAY HOSPITALITY COMPANY, LLC | GEN PARTNER | 11/25/02 | N/A |
|    Fiddler's Creek LLC | Limited Partner | | |

DA-3072429 v11 1203528-00006

**AA00151**

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| GULF BAY HOTEL COMPANY LTD | Limited Partnership | 12/04/02 | 56-2495068 |
|    GULF BAY HOTEL COMPANY, LLC | General Partner | 11/25/02 | N/A |
|    Fiddler's Creek LLC | Limited Partner | | |
| | | | |
| FIDDLER'S CREEK LLC | Limited Liability Company | | 59-3639729 |
|    GBFC II LLC | Managing Member | | |
|    GBFC II TWO LTD | Member | | |
| | | | |
| GBFC II LP | Limited Partnership | | 59-3705460 |
|    GBFC II LLC | General Partner | | |
|    GB 100 LTD | Limited Partner | | |
| | | | |
| GB 100 LTD | Limited Partnership | 12/07/95 | 65-0628890 |
|    GB 100 Inc. | General Partner | 02/22/93 | 65-0395715 |
| | | | |
| Fiddler's Creek Management Inc. | Sub Charter C | 10/11/94 | 65-0532185 |
| | | | |
| GB Peninsula Ltd (Land) | Limited Partnership | | 59-3692446 |
|    GB Peninsula Inc (Gen. Partner) | General Partner | | 59-3692447 |
| | | | |
| GBP Development Ltd (sell house) | Subsidiary of Peninsula | | TBD |
|    GB Peninsula Ltd | Limited Partner | | 59-3692446 |
|    GBP Development LLC | General Partner | | TBD |

DA-3072429 v11 1203528-00006

**AA00152**

## EXHIBIT F

### Material Pending Litigation

| ENITITY NAME | | CASE NAME | CASE NUMBER; COURT | TYPE OF ACTION |
|---|---|---|---|---|
| **GB PENINSULA, LTD.** | | | | |
| GB Peninsula, Ltd.<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 001 | GBP Development, Ltd.<br>vs.<br>Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician<br>vs.<br>GBP Development, Ltd.,<br>GBP Development, LLC<br>and GB Peninsula, Ltd. | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission (return of deposit)<br><br>Contract Rescission/ Counterclaim for Specific Performance |
| GB Peninsula, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp.<br>vs.<br>GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action<br>/ Counterclaim to be filed |
| **GBP DEVELOPMENT, LTD.** | | | | |
| GBP Development, Ltd.<br>GBP Development LLC | 003 | Mark Chaikin<br>vs.<br>GBP Development, Ltd.<br>GBP Development, LLC.<br>Gulf Bay Homes, Ltd.<br>Gulf Bay Homes, Inc.<br>951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br>Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |
| GBP Development, Ltd.<br>GBP Development, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 001 | GBP Development, Ltd.<br>vs.<br>Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician<br>vs.<br>GBP Development, Ltd., | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier | Specific Performance / Counterclaim for Contract Rescission (return of deposit)<br><br>Contract Rescission/ Counterclaim for Specific Performance |

DA-3072429 v11 1203528-00006

AA00153

| | | | | |
|---|---|---|---|---|
| | | GBP Development, LLC and GB Peninsula, Ltd. | County, Florida | |
| GBP Development, Ltd. | 004 | Daniel Sussman and Peter Ferrara vs. GBP Development, Ltd. Fiddler's Creek Realty, Inc. | Case No. 05-1585-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| GBP Development, Ltd. | 005 | Daniel Sussman and Roberta Sussman vs. GBP Development, Ltd. | Case No. 07-1358-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| **THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs. Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership **Counts for:** Breach of Contract Piercing Corp Veil Dissipation of Escrow Civil Conversion Statutory Conversion and Civil Theft |
| GBP Development, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action / Counterclaim to be filed |
| GBP Development, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |
| **951 LAND HOLDINGS, LTD.** | | | | |
| 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |

– Page 37 of 45

DA-3072429 v11 1203528-00006

AA00154

| | | | |
|---|---|---|---|
| | | Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | |
| 951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint;<br>Rescission of Membership<br><br>**Counts for:**<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |

### FIDDLER'S CREEK, LLC

| | | | |
|---|---|---|---|
| Fiddler's Creek, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint;<br>Rescission of Membership<br><br>**Counts for:**<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| Fiddler's Creek, LLC | 007 | Textron Financial Corp. vs.<br>FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action<br><br>/ Counterclaim filed |
| Fiddler's Creek, LLC | ## | Fiddler's Creek, LLC vs.<br>Cushman Wakefield, Inc. and Cushman Wakefield Sonnenblick Goldman | Case No. 10-00272-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract; B/ Fiduciary Duty; B/Good Faith and Fair Dealing; Tortuous Interference, etc. |

### FC GOLF, LTD.

| | | | |
|---|---|---|---|
| FC Golf, Ltd.<br>The Golf Club at Fiddler's Creek<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>**Counts for:**<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow |

DA-3072429 v11 1203528-00006

**AA00155**

| | | | | Civil Conversion Statutory Conversion and Civil Theft |
|---|---|---|---|---|
| | | LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | | |
| FC Golf, Ltd. | 007 | Textron Financial Corp. vs. FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action / Counterclaim filed |
| FC Golf, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |

**FIDDLER'S CREEK MANAGEMENT, INC.** (LLC)
(currently being represented by Foundation insurance company counsel)

| | | | | |
|---|---|---|---|---|
| Fiddler's Creek Mgt, Inc. | 008 | Sally and Gerald Bergmoser vs. Fiddler's Creek Foundation, Inc. d/b/a The Club and Spa at Fiddler's Creek and Fiddler's Creek Management, LLC | Case No. 09-4388-CA; 20th Judicial Circuit, Collier County, Florida | Damages |

**GBFC DEVELOPMENT, LTD.**

| | | | | |
|---|---|---|---|---|
| GBFC Development, Ltd. **THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 009 | John and Jane Baldwin vs. Gulf Bay Construction Co. Gulf Bay Construction Co. GBFC Development, Ltd. | Case No. 08-8984-CA; 20th Judicial Circuit, Collier County, Florida | Damages |
| GBFC Development, Ltd. | 010 | Thomas and Sandra Gollinger vs. GBFC Development, Ltd. | Case No. 08-6226-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 011 | GBFC Development, Ltd. vs. Frederick Smith | Case No. 08-9676-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 012 | Ellen Spear v GBFC Development, Ltd. | Case No. 07-2193-CA [Marengo] ; 20th Judicial Circuit, Collier County, Florida | Contract rescission/ Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 013 | GBFC Development, Ltd. vs. Leonard Bubri | Case No. 09-2148-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

**AA00156**

| GBFC Development, Ltd. | 014 | GBFC Development, Ltd. Vs. Dennis Bauries and Brian Cramer | Case No. 08-3953-CA [Marengo]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
|---|---|---|---|---|
| GBFC Development, Ltd. | 015 | GBFC Development, Ltd. vs. Thomas and Kelly Armstrong | Case No. 09-3528-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 016 | GBFC Development, Ltd. vs. Steen, Eric | Case No. 09-3453-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / **DEFAULT JUDGMENT ENTERED** |
| GBFC Development, Ltd. | 017 | GBFC Development, Ltd. vs. David and Jane Moreton | Case No. 08-9678-CA [Service accepted by the Foreign] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 018 | GBFC Development, Ltd. vs. Michael and Susan Lofstedt | Case No. 08-9184-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 019 | GBFC Development, Ltd. vs. Michael Tierney and Melvin Christiansen | Case No. 08-8396-CA [Awaiting Service – Foreign National] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 020 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0848-CA [Awaiting Service – Foreign National] [Callista 12-104]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 021 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0847-CA [Awaiting Service – Foreign National] [Callista 12-204]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 022 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2486-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |

DA-3072429 v11 1203528-00006

**AA00157**

| | | | | |
|---|---|---|---|---|
| GBFC Development, Ltd. | 023 | Robert and Charlene Edwards vs. GBFC Development, Ltd. | Case No. 07-2458-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 024 | Brian and Jody Boland vs. GBFC Development, Ltd. | Case No. 08-7795-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Specific Performance |
| | | GBFC Development, Ltd. vs. Brian and Jody Boland | Case No. 08-8395-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 025 | GBFC Development, Ltd. vs. Jay and Myra Browne | Case No. 08-9677-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 026 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2485-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 027 | GBFC Development, Ltd. vs. Mark and Kimberly Woolley | Case No. 09-3529-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 028 | GBFC Development, Ltd. vs. Brannigan, Jane R. | Case No. 09-2149-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

AA00158

## EXHIBIT G

### Approved 18-Month Budget

### (In $000's)

DA-3072429 v11 1203528-00006

AA00159

Attachment A
Fidler-Corsi, LLC and Subsidiaries
Consolidated Budget for DIP Loan

| Expense Category | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| Club Subsidy | (15) | (14) | (16) | (18) | (16) | (16) | (0) | (0) | (0) | (6) | (8) | (22) | (17) | (18) | (19) | (20) | (17) | (8) | (212) |
| Real Estate Taxes | | | | | | | | | | | | | | | | (838) | | | (3,376) |
| CDD Maintenance Funding | | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (1,477) |
| CDD Debt Service Assessments | | | (3,472) | | (1,140) | | | | | | (1,042) | | | | | | (1,130) | | (5,773) |
| Development Fee | | | | | | | | | | | | | | | | | | | |
| General Development | (80) | (9) | (9) | (20) | (7) | (9) | (96) | (9) | (9) | (59) | (26) | (28) | (69) | (21) | (3) | (106) | (11) | (3) | (572) |
| Parcel Construction | (9) | (9) | (9) | (9) | (9) | (9) | (90) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (442) |
| Outside Consultants/Brickyard Cost | (90) | (326) | (20) | (7) | (20) | (100) | (100) | (75) | (75) | (75) | (73) | (75) | (89) | (21) | (2) | (289) | (290) | (200) | (3,026) |
| Marketing | (100) | (66) | (66) | (87) | (26) | (96) | (93) | (54) | (33) | (42) | (38) | (98) | (135) | (86) | (99) | (120) | (99) | (57) | (1,137) |
| Project Administration | (376) | (233) | (132) | (130) | (115) | (128) | (128) | (115) | (115) | (120) | (107) | (98) | (135) | (253) | (104) | (132) | (132) | (117) | (2,966) |
| Parcel Administration | (182) | (300) | (2,242) | (2,242) | (439) | (67) | (82) | (64) | (441) | (68) | (428) | (19) | (17) | (407) | (442) | (3,022) | (244) | (18) | (9,845) |
| DIP Loan Commitment Fee reimbursement | (816) | | | | | | | | | | | | | | | | | | (816) |
| DIP Loan closing expenses | (596) | | | | | | | | | | | | | | | | | | (596) |
| Collateral Monitoring Fee | | (6) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (124) |
| DIP Loan Unused Availability Fee | | | | | | | | | | | | | | | | | | | |
| DIP Loan Interest (included on base rate) | (7) | (11) | (4) | (7) | (11) | (41) | (100) | (79) | (44) | (48) | (55) | (55) | (80) | (107) | (62) | (162) | (188) | (52) | (686) |
| Contingency | (2) | | (62) | (97) | (211) | (49) | (49) | (77) | (72) | (55) | (185) | (55) | (81) | (107) | (92) | (172) | (189) | (55) | (2,907) |
| Total Operating Budget | (2,488) | (1,332) | (6,460) | (4,967) | (2,345) | (559) | (720) | (354) | (447) | (381) | (2,093) | (428) | (997) | (1,178) | (687) | (4,058) | (2,178) | (590) | (30,506) |
| Financing Payments | (446) | (446) | (493) | (533) | (507) | (492) | (403) | (417) | (417) | (417) | (496) | (481) | (526) | (526) | (586) | (640) | (644) | (564) | (8,992) |
| Total Expenses | (3,137) | (1,785) | (7,955) | (4,889) | (9,813) | (6,018) | (1,432) | (7,268) | (988) | (892) | (2,470) | (910) | (4,021) | (4,290) | (1,323) | (4,726) | (2,701) | (1,156) | (41,033) |
| Cumulative Expenses | (3,137) | (4,917) | (12,239) | (17,148) | (26,019) | (31,086) | (32,188) | (24,479) | (24,383) | (25,379) | (27,851) | (28,761) | (30,294) | (31,498) | (33,241) | (38,015) | (40,509) | (41,658) | |
| Managed Expenses | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | 838 | | | | | | | | | | | | 838 | | | 2,575 |
| Parcel Administration Real Estate Taxes | | | 2,173 | 2,424 | | | | | | | | | | | | 1,994 | | | 6,591 |
| CDD Debt Service Assessments | | | 2,472 | | 1,130 | | | | | | 1,042 | 39 | 91 | 107 | 62 | | 1,130 | 93 | 5,773 |
| Contingency | 244 | 121 | 654 | 397 | 335 | 48 | 65 | 79 | 44 | 53 | 185 | 18 | 91 | 107 | 62 | 372 | 198 | 53 | 2,997 |
| Total | 244 | 121 | 6,169 | 3,659 | 1,345 | 48 | 65 | 79 | 44 | 53 | 1,227 | | | | | 3,204 | 1,328 | | 17,937 |
| Base Expenses | (3,137) | (1,785) | (6,417) | (9,638) | (1,723) | (1,618) | (1,135) | (7,189) | (982) | (992) | (1,430) | (910) | (1,321) | (1,629) | (1,273) | (1,923) | (1,923) | (1,149) | |
| Cumulative Managed Expenses | 244 | 366 | 6,535 | 10,193 | 11,526 | 11,593 | 11,649 | 11,728 | 11,773 | 11,825 | 13,053 | 13,092 | 13,183 | 13,289 | 13,352 | 16,556 | 13,884 | 17,937 | |
| Net Cumulative Expenses | (2,892) | (4,551) | (5,744) | (6,975) | (8,493) | (9,483) | (20,539) | (11,759) | (12,609) | (13,554) | (14,798) | (15,669) | (17,102) | (18,689) | (19,909) | (21,459) | (22,925) | (24,011) | |
| Maximum DIP Loan Balance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 12,000 | 12,000 | 13,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | |
| Managed Expense Sales Trigger/Covenant | | | 12,000 | | 12,000 | 12,000 | 5,000 | 12,000 | 12,000 | 8,000 | 15,000 | 12,000 | 15,000 | 12,000 | 20,000 | 20,000 | 20,000 | 10,000 | 10,000 |
| Sales Covenant (if no Managed expenses paid) | | | | | | | | | | | | | | | | | | | |

DA-3072429 v11 1203528-00006

AA00160

44

AA00161

45

AA00162

EXHIBIT F

AA00163

# K&L|GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX 75201-7342

t 214.939.5500          www.klgates.com

February 23, 2010

Jeffrey R. Fine
Partner
D 214.939.5567
F 214.939.5849
jeff.fine@klgates.com

**Via E-Mail pbattista@gib-law.com**

Paul J. Battista, Esq.
Partner
Genovese Joblove & Battista, P.A.
Bank of America Tower
at International Place
100 Southeast Second Street,
44th Floor
Miami, Florida 33131

Re:     Commitment Letter (the "Commitment Letter"), dated as of December 31, 2009, between PEPI Capital, L.P. ("PEPI") and Fiddler's Creek, LLC and GB Peninsula, Ltd. (the "Borrowers") in connection with a $27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility (the "Loan")

Dear Paul:

I forwarded to PEPI your letter to me dated February 22, 2010 (the "Letter") which asserts that PEPI "is in material default of and under the terms of the Commitment Letter." PEPI was shocked by the Letter and disagrees with the assertions made therein, especially because PEPI has worked diligently and reasonably with the Borrowers to negotiate and address Borrower concerns by modifying Commitment Letter provisions, such as taking out the syndication terms and committing to fund the whole loan itself.

At no time has PEPI ever been notified, or warned by Borrowers that it thought PEPI had materially defaulted on the terms of the Commitment Letter, and PEPI is disappointed that Borrowers had not expressed its concerns to PEPI and worked them out, as compared to pursuing this approach on the brink of chapter 11 filing, and after so much work and effort on the part of both parties.

For the sake of brevity, PEPI will make very brief comments below, and will expand upon these comments at a later date, if appropriate:

1. In PEPI's February 16, 2010 call with the Borrowers, it was reported that all PEPI due diligence had been completed except for receipt of title information, which although repeatedly promised to us, had been delayed since early December 2009.

DA-3092287 v3

**AA00164**

# K&L|GATES

Paul J. Battista, Esq.
February 23, 2010
Page 2

2. As late as Thursday, February 18, 2010, Borrowers were advising PEPI that the draft Loan documents were acceptable to Debtors except for the verbiage of the Purchase Option. PEPI was promised rewording by your counsel of the Purchase Option language, continued to check over the weekend to inquire why a rewording of the language had not been forwarded, and PEPI is still waiting for the promised rewording of the Purchase Option provision.

3. As had been previously indicated to you, all material due diligence on the Loan has been completed by PEPI and PEPI is ready, willing and able to immediately fund the Loan in accordance with the Commitment Letter upon receipt of Bankruptcy Court approval. Although PEPI has also told you repeatedly during this past week that the Borrowers are free to file Chapter 11 at any time, please consider this your formal 3 business day notice that due diligence has been completed. Let us know if, for some important reason, Debtors need an extension of the contractual deadline.

4. Regarding the deed in lieu and consent judgment provision on page 12 of the Commitment Letter, please remember that this provision was originally proposed by you for Lender's benefit. Later, you realized that consent judgments are not available under Florida law and that the provision therefore, could not be performed. If you are now telling PEPI that you were mistaken about the availability of consent judgments and want to put that provision back into the Loan documents, PEPI will certainly review your proposed provision. Likewise, the valuation mechanism you refer to is only in regard to a deed in lieu of foreclosure, and if you believe that a deed in lieu of foreclosure provision, and its related valuation mechanism, should be included in the Loan, even though PEPI does not require it, then PEPI will promptly review deed in lieu language and will negotiate the provisions of a valuation mechanism for deeds in lieu of foreclosure and will include that in the Loan documentation.

5. In regard to the wording of the waterfall provisions of the Loan, PEPI was under the impression that wording of those provisions was acceptable to the Borrowers. If that is not the case, then PEPI wants to cure this inadvertent misunderstanding and will diligently review the wording of the waterfall provisions as you think are compatible with the terms of the Commitment Letter.

6. While due diligence on the Loan is completed, PEPI has consistently advised Borrowers that conditions precedent remain active and must be satisfied through funding. We believe that this is entirely standard in transactions of this type and clearly anticipated by the Commitment Letter.

**K&L|GATES**

Paul J. Battista, Esq.
February 23, 2010
Page 3

    Finally, I want to reiterate on behalf of PEPI that any perceived missteps on it part were inadvertent and certainly were not intentional. PEPI agrees with you that the negotiation process has been lengthy and complex, but PEPI maintains that it has at all times acted in good faith and looks forward to promptly completing funding of the Loan.

Sincerely,

Jeffrey R. Fine

cc:    David Radunsky

AA00166

EXHIBIT G

AA00167

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
Tampa Division
www.flmb.uscourts.gov

In re:                                                    Case No. 9:10-bk-03846-KRM
FIDDLER'S CREEK, LLC, et al. [1]

                                                          Chapter 11

_____/

## RESPONSE OPPOSING DEBTORS' SUBSTANTIVE OMNIBUS OBJECTION TO CLAIMS FILED BY PEPI CAPITAL, L.P. [DOCKET NO. 1134]

PEPI Capital, L.P., a Delaware limited partnership[2] ("PEPI"), hereby files[3] its response

in opposition to the Debtors' Substantive Omnibus Objection to Claims (the "Claim Objection")

and respectfully moves the Court, after opportunity for notice and evidentiary hearing, to deny

the Claim Objection, allow the PEPI Claim and order the Debtors to pay said claim forthwith, as

follows:

### A.    Background

1.    PEPI was the proposed DIP lender, until the very last hour, at which time PEPI

was left at the proverbial pre-petition altar. Despite months of effort negotiating a complicated

$27 million DIP Loan, and despite repeated assurances by Mr. Aubrey J. Ferrao, Chief Executive

---

[1]    The Debtors seeking jointly administered proceedings are: (i) Fiddler's Creek, LLC; (ii) 951 Land Holdings, LLC; (iii) 951 Land Holdings, Ltd.; (iv) DY Associates, LLC; (v) DY Land Associates, Ltd.; (vi) FC Beach, LLC; (vii) FC Beach, Ltd.; (viii) FC Golf, LLC; (ix) FC Golf, Ltd.; (x) FC Hotel, LLC; (xi) FC Hotel, Ltd.; (xii) FC Marina, LLC; (xiii) FC Resort, LLC; (xiv) FC Resort, Ltd.; (xv) Fiddler's Creek Management, Inc.; (xvi) GBFC Development, LLC; (xvii) GBFC Development, Ltd.; (xviii) GBFC Marina, Ltd.; (xix) Gulf Bay Hospitality Debtors, LLC; (xx) Gulf Bay Hospitality, Ltd.; (xxi) Gulf Bay Hotel Debtors, LLC; (xxii) Gulf Bay Hotel Debtors, Ltd.; (xxiii) DY Land Holdings II, LLC; (xxiv) FC Commercial, LLC; (xxv) FC Parcel 73, LLC; (xxvi) GB Peninsula, Ltd.; (xxvii) GBP Development, Ltd. and (xxviii) GBP Development, Ltd.

[2]    PEPI is an affiliate of Perot Investments of Dallas, Texas.

[3]    PEPI received an extension to June 6, 2011, to file its responsive pleadings.

Chief Executive Officer and founder of Fiddler's Creek (the "Developer" or "Mr. Ferrao"), that PEPI was the DIP lender selected by these Debtors, on the eve of the Chapter 11 filings, PEPI was spurned as the DIP lender with a trumped up default letter. In what appears to be a naked attempt by the Debtors (and the Developer) to avoid paying the remainder of the Commitment Fee and the $1 million Break Up Fee, Gulf Bay Capital, Inc., ("Gulf Bay" or "Ferrao DIP Lender"), an affiliate of Mr. Ferrao, utilizing the same documents negotiated by PEPI, provided fundamentally the same DIP loan that PEPI was prepared to fund. Based on the circumstances, including that the Court approved the Gulf Bay DIP Loan, PEPI is entitled to, *inter alia*, the remaining Commitment Fee of $405,000, and payment of the $1 million Break Up Fee.

2.      Four months prior to filing these Chapter 11 cases, on October 20, 2009, Fiddler's Creek, LLC, signed a term sheet with PEPI[4] to "consider providing an underwritten commitment for up to $27,000,000 in debtor in possession financing to Fiddler's Creek and certain of its subsidiaries and affiliates," all of which are now debtors before this Court. A perusal of the Term Sheet, a copy of which is attached hereto as Exhibit "A," indicates that many of the terms, including the interest rate of 12%, is identical to that awarded the Ferrao DIP Lender in the Emergency Motion for Approval of DIP financing (the "Ferrao DIP Loan").

3.      Indeed, three months *after* execution of the Term Sheet, after countless hours of negotiation and due diligence, Fiddler's and PEPI signed a Commitment Letter (the "PEPI Commitment Letter"), a copy of which is attached hereto as Exhibit "B," which when compared to the Gulf Bay commitment letter attached to the Debtors' DIP Motion, is substantially identical in many respects. Virtually all of the elements of the Ferrao DIP Loan were conceived,

---

[4] After the signing of the term Sheet, Petrus private Investments, LP, changed its name to PEPI Capital, L.P.

37937 v_02 \ 124752.0001

AA00169

negotiated and finalized by PEPI as part of the PEPI DIP Loan. [5]   In fact, in the period between

execution of the Term Sheet and the Commitment Letter, Mr. Ferrao's counsel emerged as

significant participants in the negotiation of the Commitment Letter, with copies of most

correspondence on the matter sent to Mr. Ferrao's counsel, and his counsel participating in key

negotiating phone conferences with PEPI and its counsel.   PEPI is shocked and appalled that the

very people who were telling PEPI that it is the "only horse in the race" never revealed that they

were prepared to make fundamentally the same DIP loan using PEPI's carefully negotiated work

product.

4.     After the PEPI Commitment Letter was signed on January 27, 2010, PEPI

diligently completed its due diligence and produced a complete set of closing papers.   PEPI was

prepared to close and fund the PEPI DIP Loan—and advised the Debtors of that fact on February

23, 2010—the eve of the bankruptcy filing.   Beginning prior to the signing of the Commitment

Letter on January 27, 2010, Mr. Ferrao's counsel were taking an increasingly substantial role in

the negotiation of the DIP Loan Documents—to the point where Mr. Ferrao's counsel in the

beginning part of February was the primary negotiator of certain key documents such as the DIP

Loan Agreement.

5.     By February 17, 2010, there was just one point that was in contention—the

wording of a "Purchase Option" providing Mr. Ferrao (or his companies) the opportunity to

purchase the PEPI DIP Loan at par if the Debtors defaulted in payment of the PEPI DIP Loan—a

term beneficial to Mr. Ferrao, but without tangible benefit to the Debtors or their creditors.   As it

---

[5]   The final PEPI DIP Loan documents include negotiated modifications to some of the Commitment Letter terms
which both Debtor's and Mr. Ferrao's counsel had advised PEPI were acceptable—until Mr. Ferrao decided to make
the DIP loan himself.   In addition, the Ferrao DIP Commitment Letter does not contain a deed in lieu and valuation
mechanism—something which the Debtor's complain in their default letter is a "critical provision" of the PEPI
Commitment Letter.

37937 v_02 \ 124752.0001

AA00170

had consistently required, PEPI would only consent to a Purchase Option for the developer if upon exercising the Purchase Option there were a full release by all Debtors, which obviously requires the review and approval of this Bankruptcy Court. When PEPI would not budge on this point, Fiddler's Creek concocted a "default letter" [6] claiming that PEPI had defaulted in its Commitment, demanding return of the Commitment Fee, and conveniently setting up a defense to payment of the remainder of the Commitment Fee and the Break-Up Fee provided for in the PEPI Commitment Letter. Interestingly, one of the two reasons given in the default letter as grounds for PEPI's default under the Commitment Letter is "the decision by PEPI to delete from the loan documents those certain critical provisions of the waterfall required by the Commitment Letter concerning an escrow for deeds in lieu of foreclosure and consent judgments, and most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Loan in respect of the waterfall." Exhibit "C," page 1. Of course, the provision is so "critical" that it is completely missing from the Ferrao Commitment Letter, and PEPI had deleted it (and offered to put it back in) because it was first suggested by Debtors counsel, and Debtors counsel advised PEPI that the consent judgment could not be given under Florida law.

6.      Even after receiving the transparently biased default letter, PEPI responded with its own letter indicating that it remained available to close *and fund* the PEPI DIP Loan. A copy of the PEPI response letter is attached hereto as Exhibit "D."

7.      Prior to the receipt of the default letter, PEPI was advised on numerous occasions by the Debtors' counsel that PEPI was the only game in town, that despite lengthy efforts by the Debtors, they had been unable to obtain financing from any source on more favorable terms than

---

[6]   A copy of the "default letter" is attached hereto as Exhibit "C."

37937 v_02 \ 124752.0001

AA00171

that offered by PEPI. Similarly, Mr. Ferrao repeatedly affirmed to PEPI that they had selected PEPI as the DIP lender - "had selected their horse and were going to ride it." In its proposed Motion for DIP Financing, carefully crafted by the Debtors on February 15 and forwarded to PEPI, the Debtors stated:

> "Over the past twelve (12) months, the Debtors, with the assistance of their professionals, have worked with brokers and a variety of lenders to attempt to secure both an out of court refinancing of their debt as well as debtor in possession financing related to these Chapter 11 cases. In those efforts, the Debtors negotiated with several different lenders, provided each of them with substantial due diligence, paid due diligence fees and negotiated different term sheets for such debt. Notwithstanding such efforts, the Debtors were not able to obtain financing (whether in court or out of court) on terms more favorable than the [PEPI] DIP Loan." [7]

8. PEPI has every reason to believe that Debtors meant what they said when they forwarded those words to PEPI. Certainly, PEPI relied upon what it was being told by the Debtors as to the importance of PEPI to the plans to file chapter 11 and obtain financing to continue the Debtors' operations while the market returned to prior levels. Moreover, PEPI relied upon the Debtors' promise to provide for a break-up fee as an inducement to PEPI devoting substantial time and resources to underwriting and approving this very complicated loan.

9. As best expressed by the Debtors:

> "As set forth above in detail, the Debtors have determined, in the exercise of their best business judgment, that entering into the DIP Loan is warranted, necessary and in the best interests of the Debtors and their bankruptcy estates. One of the terms and conditions of the DIP Loan is the requirement of the Debtors to pay to the DIP Lender an amount equal to $1,000,000 (the "Break-Up Fee") in the event the Debtors, directly or indirectly, enter into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the DIP Loan that is approved by this Court. The Break-Up Fee is in addition to any other amount paid or

---

[7] Debtor's final form DIP Motion forwarded to PEPI on February 15, 2010, and attached hereto as Exhibit "E."

37937 v_02 \ 124752.0001

AA00172

payable under the DIP Loan.  Per the terms of the DIP Loan, the Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing, or (2) 30 days after approval of the alternative financing by this Court." Exhibit "E," paragraph 80.

10.     The approval of a Break Up Fee was always a requirement of the PEPI DIP Loan.

As the Debtors were ready to argue to this Court:

> "The Debtors assert that such approval is beneficial to the Debtors' estates and creditors because it affords the Debtors the means necessary to induce the DIP Lender to move forward with the DIP Loan." Exhibit "E," paragraph 82.

11.     PEPI agrees with this statement.  Absent the Break Up Fee, neither PEPI, nor any other arms length lender, would have committed the time or resources to underwrite and approve this DIP Loan.  Had the Debtor's equity owner indicated prior to February 23 that he would provide the DIP financing, which he didn't, no arms length DIP lender would have even considered entering into the Commitment Letter without a very substantial Break Up Fee.

12.     Importantly, the PEPI Break Up Fee is only payable by the Debtors if the Debtors seek alternative financing that is also approved by this Court—as has happened in this case.  Again as most clearly stated by the Debtors:

> "Given the unique nature of these Debtors and the DIP Loan, the Debtors do not believe that any such alternative financing is available.  In fact, the Debtors explored all such options prior to entering into the DIP Loan with the DIP Lender.  The approval of breakup fees in connection with the larger chapter 11 cases has become an establish means of insuring that third party lenders and purchasers are protected from being a "stalking horse," whether it is for the purchase of assets or the advancement of a debtor in possession loan." Exhibit "E," paragraph 82.

13.     In fact, in its First Day Papers, the Debtors emphasized the two year process in finding a DIP lender:

> "79. Well in advance of the Petition Date, the Debtors, with the assistance of their financial advisors, assessed the financing needs of the companies and explored various

37937 v_02 \ 124752.0001

AA00173

financing alternatives. Beginning in March 2008, the Debtors solicited numerous proposals for financing, including debtor in possession financing, from various institutions. These efforts culminated in extended discussions with multiple institutions, and ultimately, a firm proposal from Gulf Bay Capital, Inc., (the "DIP Lender"). After carefully considering the proposal submitted by DIP Lender, evaluating the terms and costs associated with the proposal, I believe that the proposal by DIP Lender provides the most advantageous and flexible terms to the Debtors' estates. Accordingly, Fiddler's Creek and GB Peninsula, Ltd., negotiated and reached an agreement to enter into, subject to approval of the Court, senior secured term loan credit facility in the aggregate amount of Twenty-Five Million and No/100 Dollars ($25,000,000.00) (the "Credit Facility") subject to the terms and conditions set forth in the Commitment Letter dated February 23, 2010 (the "Commitment Letter") attached as *Exhibit A* to the DIP Motion, together with all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of the DIP Lender in connection therewith, including, without limitation, a loan and security agreement, guaranty agreements, notes, mortgages, deeds of trust, Uniform Commercial Code ("UCC") financing statements, and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as each may be amended, restated, modified or supplemented and in effect from time to time, the "DIP Loan Documents")." *Declaration of Anthony DiNardo In Support of Chapter 11 Petitions And First Day Pleadings,* Docket No. 29, at page 30 - 31.

37937 v_02 \ 124752.0001

AA00174

Of course, no mention is made of PEPI's pivotal role in being the *first* entity to offer, and execute, a firm commitment to lend, which PEPI remained willing and able to fulfill post-petition.

14.     At no time did PEPI imagine it would become the "stalking horse" to Mr. Ferrao. Absent the Break Up Fee provision, PEPI would not have entered into the Commitment Letter. Given these circumstances, the Debtors actions in obtaining approval of the Ferrao DIP Loan clearly triggers the provisions of the Commitment Letter providing for payment to PEPI of the $1 million Break Up Fee. [8]

15.     Moreover, in further reliance on the Debtors' promises, and as further inducement to provide the Commitment Letter, the Debtors stipulated that they would bring an application for approval of the Break Up Fee as an administrative expense claim. The Commitment Letter provides:

> "The Break-Up Fee is in addition to any other fee or expense reimbursement herein. The Company [Fiddler's Creek and GB Peninsula] shall take all necessary action in the Bankruptcy Court to authorize the payment of the Break-Up Fee when it accrues including, without limitation, stipulating that such fee is an allowed Chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary." Commitment Letter, Exhibit "B," page 10.

**B.     The Commitment Fee**

1.     From the inception of the Term Sheet, the Commitment Fee negotiated between the parties has always been 3%, earned immediately, and pursuant to the Term Sheet, to be paid upon issuance of the Commitment Letter. At the request of Fiddler's Creek, PEPI agreed that the Commitment Fee could be paid in two installments, one-half upon issuance of the Commitment

---

[8]  PEPI reserves the right to supplement or amend the arguments herein upon any hearing on this matter.

Letter, and one-half upon approval of the Initial Advance of $4 million under the Credit Facility. One-half of the Commitment Fee was paid to PEPI upon issuance of the Commitment Letter, but although earned, the remaining one-half of the Commitment Fee is currently due and owing from the Debtors. As has been previously noted, the Break Up Fee is in addition to all other fees due under the Commitment Letter, including the one-half of the unpaid Commitment Fee. PEPI has additional claims based on the provisions of the Commitment Letter attached to the PEPI Claim, including without limitation, as to indemnification.

C.    **Argument and Authorities**

1.    PEPI believes it fulfilled all prerequisites to making the PEPI DIP Loan. PEPI strenuously disputes that it was in material default of the Commitment Letter. PEPI was ready to make the PEPI DIP Loan. The Debtors had given no prior warning to PEPI that the Debtors, on the eve of filing these chapter 11 cases, would advise PEPI that equity would instead make the DIP Loan. PEPI is entitled to an allowed claim, payable immediately, for the Break Up Fee and the unpaid portion of the Commitment Fee.

2.    PEPI has concisely stated the facts supporting its entitlement to allowance and payment of the claim described therein as an allowed claim of the Debtors' estates. In short, the Debtors led-on PEPI and had it both negotiate and prepare all of the documentation of the Ferrao DIP loan, only to freeze PEPI out at the alter and replace it post-petition with the Debtors' principal as the Debtors' DIP lender. The Debtors, as debtors-in-possession, obtained the full value of PEPI's work-product for their insider, made use of that work-product post-petition, and left PEPI with nothing more than payment of its expenses in preparing that insiders' deal documents and a partial payment of a fully earned commitment fee. The documents the Debtors used to lead-on PEPI to prepare the Debtors' insider's DIP documents promised PEPI a "break-

- 9 -

up" fee in the event that the Debtors, as debtors-in-possession, eventually took another DIP suitor, as, indeed, they did post-petition. Otherwise, PEPI will not rehearse the facts at issue here, but fully incorporates and re-alleges the facts as set out above.

      3.    The Debtors' Objection makes clear that they would have the Court take a profoundly different view of the facts. The Debtors claim not to have led PEPI down the aisle only to abscond with the ring and a pre-selected alternative suitor. Instead, they allege that PEPI breached its contractual obligations to the Debtors and provided the Debtors with no benefit pre- or post-petition.

      (a)    Since 2000, this Court has faced scenarios, like that presented by PEPI, a party to a pre-petition financial accommodation contract with the debtors continued to perform (and offered performance) on that contract post-petition, thus providing the debtor with consideration (a direct benefit) post-petition. *See, e.g., In re Sports Shinko (Florida) Co., Ltd.*, 333 B.R. 483 (Bankr. M.D. Fla. 2005) (Court allowed administrative expense claim incurred pursuant to the pre-petition contract). As Chief Judge Glenn explained, citing, in part, to *Section 20*,

> "In order to qualify for payment as an administrative expense a claimant must prove that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (*or alternatively that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefited the estate.*" *In re Five Star Partners, L.P.*, 193 B.R. 603, 613 (Bankr. N.D. Ga. 1996) (quoting *In re United Trucking Service, Inc.*, 851 F.2d 159, 161-62 (6th Cir. 1988) (emphasis supplied.
>
> "An administrative expense claimant has the burden of proving that either the debtor-in-possession incurred the transaction on which the claim is based *or that the claimant furnished consideration to the debtor-in-possession and that the transaction resulted in a direct benefit to the debtor-in-possession.*" *In re Section 20 Land Group, Ltd.*, 261 B.R. 711, 716 (Bankr. M.D. Fla. 2000) (emphasis supplied. See also *in re D.M. Kaye & Sons Transport, Inc.*, 259 B.R. 114, 120 (Bankr. D.S.C. 2001) and *In re Southern Soya Corporation*, 251 B.R. 302, 308 (Bankr. D.S.C. 2000).

A key purpose of the rule is to ensure that the benefit was provided to the *postpetition* estate, in contrast to the *prepetition* debtor.

*Id.* at 500.

4.      Where the direct benefit provided pursuant to a pre-petition contract with a debtor was actually received by the post-petition trustee for the bankruptcy estate, Judge Glenn granted administrative expense treatment to the resulting claim. *Id.* at 500-01. Here, PEPI negotiated lengthy and complex loan documents which the Debtors *and their principal,* stepped into post-petition in making the DIP Loan. In the absence of those negotiated documents, and the underlying due diligence of PEPI as a stalking horse which the principal relied upon, the DIP Loan could not have been made in a timely manner.

5.      Courts in other districts have similarly found that where a debtor contracted pre-petition to pay a break-up fee and a debtor-in-possession, indeed, received the benefit of using that party's contract as a stalking horse post-petition, the stalking-horse party is entitled to the allowance of its break-up fee as an administrative expense of the debtor-in-possession's bankruptcy estate. *In re CXM, Inc.*, 307 B.R. 94, 103-04 (Bankr. N.D. Ill. 2004); *see also Matter of Ohio Ferro-Alloys Corp.,* 96 B.R. 795 (Bankr. N.D. Ohio 1989) (spurned DIP lender entitled to fees).

6.      PEPI has alleged that, post-petition, it complied with the financial accommodation contract it executed with the Debtors pre-petition (and which the Debtors had no legal right to terminate before their petition date). Providing the Debtors, as debtors-in-possession, with post-petition access to such funds in accordance with their financial accommodation contract was part of the post-petition consideration given by PEPI to the Debtors as debtors-in-possession.

37937 v_02 \ 124752.0001

7.    PEPI has alleged that the Debtors, after leading it on and having it negotiate and draft a complete set of DIP documents, then turned around post-petition as debtors-in-possession and had the Debtors' principal's step into the role of lender in PEPI's DIP documents. Debtors, as debtors-in-possession, made use of PEPI's work product post-petition and derived the benefit of those documents. The Debtors, as debtors-in-possession, substantially benefited from their post-petition use of PEPI's work-product, in that it allowed them to avoid locating a third party lender and negotiating a new, complete set of loan documents; as the Debtors admit in the Debtors' Objection, the negotiation of PEPI's DIP documents took the parties months to complete and required hundreds of thousands of dollars of due diligence on PEPI's part.

8.    Accordingly, pursuant to the actual, governing law recognized by this Court, the facts as alleged by PEPI would entitle it to allowance of its claim. *See In re Nat'l Ass'n of Professional Martial Artists, Inc.,* 328 B.R. 853, 857 (Bankr. M.D.Fla. 2005) (suggests entitlement to fees for DIP financing if there is a benefit to the estate).

9.    Of course, the relevant facts are disputed. The Debtors deny that they received any benefit from PEPI, either pre- or post-petition.

10.    The actual governing law will require the Court to decide on the basis of a full evidentiary record which set of factual allegations are true: (a)(i) that PEPI continued post-petition to provide the Debtors with access to millions of dollars of reserved DIP financing as required by a live financial accommodation contract between the Debtors and PEPI and (ii) that the Debtors as debtors-in-possession, made post-petition use of PEPI's deal documents to produce the set of DIP documents they submitted for an insider transaction between themselves and their principal; or (b) that the Debtors never received any benefit of any kind from PEPI.

- 12 -

AA00179

11.     As part of the inducement for PEPI to enter into the Commitment Letter was an

understanding that the Debtors would prepare arguments for the Court and creditors as to why

PEPI was entitled to loan protections, such as the Break Up Fee.  Instead of rewriting the

Debtor's arguments, PEPI believes it is illustrative of the Debtor's intentions if it presents to the

Court the very arguments that the Debtors had propounded to PEPI as recently as February 15,

for the approval of the Break Up Fee.  Those arguments are included in paragraphs 83 through

86 of the Debtor's Motion attached hereto as Exhibit "E."  Although restated below verbatim,

PEPI reserves the right to offer alternative or amended arguments in favor of the awarding of the

Break Up Fee[9]:

- Paragraph 83, Exhibit "E":  "Three different approaches have been used by the bankruptcy

  courts in assessing the validity and enforceability of bidding incentives, including payment of

  break up fees.  The first approach – the business judgment test – is based on the corporate

  control cases and applies the business judgment rule to make certain that such protections are

  promoted, not deterred, and that the fees are reasonable in relationship to the size of the

  transaction and the bidder's efforts. *See In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D.

  Col. 1992), adopting *In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y.

  1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re

  Metaldyne Corp.,* 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) (applying business

  judgment test to Debtor's selection of stalking horse bidder); *see also Cottle v. Stores

  Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in

  corporate control context). This approach also has been endorsed by a leading bankruptcy

  treatise. See 3 *Collier on Bankruptcy* § 363.02[6] at 363-21 (15th ed. 2005) (courts "should

---

[9]   PEPI reserves the right to supplement or amend the arguments herein upon any hearing on this matter.

37937 v_02 \ 124752.0001

AA00180

approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.")."

- Paragraph 84, Exhibit "E": "The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected. See *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("this Court declines to follow other Bankruptcy Court's opinions where break-up fees are treated as another topic of corporate negotiation without reference to what in fact is in the best interests of the estate."); see also *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (adopting *America West*); *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (same)."

- Paragraph 85, Exhibit "E": "The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate." See *In re O'Brien Environmental Energy, Inc.*, 181 F. 3d 527, 535 (3d Cir. 1999) (concluding that none of the cases which support the first two approaches "offers a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision"); see also *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C. (In re Tama Beef Packing, Inc.)*, 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) (adopting reasoning of *O'Brien* and holding that administrative expense jurisprudence is applicable); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (citing *Tama Beef* as applicable circuit precedent); *In re Dorado Marine, Inc.*, 332 B.R. 637 (M.D. Fla. 2005) (using administrative expense test, citing *O'Brien*); *In re Beth Israel Hospital Ass'n of Passaic,*

- 14 -

2007 WL 2049881 at *15 (Bankr. D.N.J. July 12, 2007) (break-up fees must be determined by the same standard applied to the allowance of any administrative expense); (*In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (parties agreed that *O'Brien* set forth correct standard)."

- Paragraph 86, Exhibit "E": "The Debtors submit that under each of the above tests the proposed Break Up Fee will preserve and enhance the Debtors' estates as it is a vital protection required by the DIP Lender in order to go forward with the DIP Loan. Without this protection, the DIP Lender may elect to withdraw from the DIP Loan, leaving the Debtors' estates without the necessary funding they need to preserve assets and maximize the value of the Debtors' estates. Moreover, the amount of the proposed Break Up Fee, 3.7% of the DIP Loan is reasonable under the circumstances and in light of the substantial time and effort that the DIP Lender has invested in negotiating the terms and conditions of the DIP Loan as well as all of the due diligence that has been done in connection therewith. The Debtors submit that the amount of the Break-Up Fee is consistent with both market rates and recent break up fees that have been approved in other large Chapter 11 cases in the context of sale cases. See *In re Continuum Care Services, Inc.*, No. 07-10749-JKO (Bankr. S.D. Fla. December 12, 2007) (approving breakup fee in the amount of $360,000 [3.0%]); *In re Gemini Cargo Logistics, Inc.*, No. 06-10870 (Bankr. S.D. Fla. April 17, 2006) (approving break-up fee payable in connection with exit financing and expense reimbursement of reasonable out-of-pocket expenses); *In re Picadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. September 14, 2004) (approving payment of expense reimbursement as bidder protection); see also *In re Tribune Company*, No. 08-13141(KJC) (Bankr. D. Del. August 31, 2009) (approving "Investor Protections" related to sale of Chicago Cubs that included a

potential $20,000,000 maximum breakup fee [2.49%]); *In re Solutia Inc.*, Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. October 19, 2005) (approving termination fee of $7.5 million [2.94%] and reimbursement of expenses up to $2 million); *In re Magellan Health Servs., Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. September 8, 2003) (approving termination fee of $4 million [2.6%] and reimbursement of expenses up to $1 million); *In re Genuity Inc.*, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. December 16, 2002) (approving breakup fee of $10 million [4.1%] and expense reimbursement up to $3 million)."

WHEREFORE, based upon the foregoing arguments, and with full reservation of an opportunity, after notice and a hearing, to present evidence in its favor, PEPI respectfully requests approval and immediate payment of its claim, including the remainder of its Commitment Fee in the amount of $405,000, and a Break Up Fee of $1,000,000 and indemnification.

Respectfully submitted,

ROETZEL & ANDRESS

/s/Alan J. Perlman
Alan J. Perlman
Florida Bar No. 826006
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile: (954) 462-4260
E-mail: aperlman@ralaw.com
*Attorneys for PEPI Capital, L.P.*

- 16 -

37937 v_02 \ 124752.0001

AA00183

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on  June 6, 2011, a true and correct copy of the foregoing

was served via CM/ECF on all parties who are registered for electronic notice.

### ROETZEL & ANDRESS

By: /s/ Alan J. Perlman _____
     Alan J. Perlman, Esq.

- 17 -

AA00184