# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

---

## CASE NO.  8:19-CV-00008-VMC
## BANKRUPTCY CASE NO. 8:10-BK-03846-CPM
## ADVERSARY CASE NO. 8:11-AP-00809-CPM

---

## PEPI CAPITAL, L.P.,

### Appellant,

### vs

## FIDDLER'S CREEK, LLC, et al.

### Appellees.

---

## APPELLANT'S APPENDIX
## VOLUME 2
## AA00185-AA00419

---

### On Appeal from The United States Bankruptcy Court
### Middle District of Florida, Tampa Division

**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
*Attorneys for Pepi Capital, L.P.*

## **TABLE OF CONTENTS**

| VOL. | BATES RANGE | DOCUMENT |
|------|-------------|----------|
| 2 | AA00185-AA00202 | Answer and Affirmative Defenses By Plaintiff Counterclaimants, filed on February 21, 2012, (Doc No. 32 in Case No. 8:11-ap-00809) |
| 2 | AA00203-AA00276 | Pepi First Amended Third Party Complaint Against 3rd Party Gulf Bay, filed June 4, 2012, (Doc No. 51 in Case No. 8:11-ap-00809) |
| 2 | AA00277 -AA00287 | Party Defendant's Answer and Affirmative Defenses to First Am. 3rd party complaint, filed June 18, 2012, (Doc No. 55 in Case No. 8:11-ap-00809) |
| 2 | AA00288-AA00290 | Exhibit 6 to Deposition Transcript of Steven Blasnick, filed December 8, 2014, (Doc. No. 80-7 in Adv. Case No. 8:11-ap-00809) |
| 2 | AA00291-AA00300 | Excerpts from deposition transcript of Jeffrey Fine, filed December 8, 2014, (pp. 86,87,89,156,157), (Doc. No. 82-1 in Adv. Case No. 8:11-ap-00809) |
| 2 | AA00301-AA00346 | Exhibit to Deposition Transcript of Steven Blasnick, Commitment letter, filed December 8, 2014, (Doc. No. 80-3 in Adv. Case no. 8:11-ap-00809) |
| 2 | AA00347 | Exhibit 25 to Deposition Transcript of C.J Lorio, filed December 8, 2014, (Doc. No. 81-19 in Adv. Case No. 8:11-ap-00809) |
| 2 | AA00348-AA00382 | Plaintiffs' Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed December 09, 2014, (Doc. No. 84 in Adv. Case No. 8:11-ap-00809) |
| 2 | AA00383-AA00397 | Excerpts from deposition transcript of Anthony DiNardo, filed March 2, 2015, (pp. 28, 29, 36, 45,46-50, 156, 160-162,173, 178, 183-185, 187-189,192, 207, 227) (Doc. No. 96-1 in Adv. Case No. 8:11-ap-00809) |

| VOL. | BATES RANGE | DOCUMENT |
|------|-------------|----------|
| 2 | AA00398-AA00402 | Excerpts from deposition transcript Excerpt of Anthony DiNardo, filed March 2, 2015, (pp. 7-10), (Doc. No. 96-2 in Adv. Case No. 8:11-ap-00809) |
| 2 | AA00403-AA00407 | Excerpts from Deposition Transcript of Aubrey Ferrao, filed March 2, 2015, (pp. 28, 30, 48), (Doc. No. 96-3 in Adv. Case No. 8:11-ap-00809) |
| 2 | AA00408-AA00419 | Exhibit 3 to Affidavit of Jeffrey Fine, filed March 2, 2015, (Doc. No. 99-3 in Adv. Case No. 8:11-ap-00809) |

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 |
| **FIDDLER'S CREEK, LLC, and its twenty-seven subsidiaries and affiliates,** | **Case No. 8:10-bk-03846-KRM** |
| | **(Jointly Administered under** |
| Debtors. | **Case No. 8:10-bk-03846-KRM)** |

_____/

**FIDDLER'S CREEK, LLC, and its twenty-seven subsidiaries and affiliates,**

      **Plaintiffs/Counter-Defendants,**          **ADV. CASE NO. 8:11-ap-00809-KRM**

**v.**

**PEPI CAPITAL, L.P.**

      **Defendant/Counter-Plaintiff.**

_____/

**PEPI CAPITAL, L.P.,**

      **Third Party Plaintiff,**

**v.**

**GULF BAY CAPITAL, INC. and**
**AUBREY J. FERRAO,**

      **Third Party Defendants.**

_____/

**ANSWER AND AFFIRMATIVE DEFENSES BY**
**PLAINTIFFS/COUNTER-DEFENDANTS, FIDDLER'S CREEK, LLC TO**
**DEFENDANT/COUNTER-PLAINTIFF, PEPI CAPITAL, L.P'S COUNTERCLAIMS**

      Plaintiffs/Counter-Defendants, FIDDLER'S CREEK, LLC ("Fiddler's Creek") and

twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Plaintiffs/Counter-

Defendants" or Fiddler's"), by and through counsel, hereby file their Answer and Affirmative Defenses to the Counterclaims in corresponding numbered paragraphs as set forth  in PEPI Capital, L.P.'s Original Answer, Affirmative Defenses and Counterclaims [D.E. 22] (the "Counterclaims") filed by Defendant/Counter-Plaintiff, PEPI CAPITAL, L.P. ("Defendant/Counter-Plaintiff" or "PEPI") and state, , as follows:

## Parties and Jurisdiction[1]

1.     Plaintiffs/Counter-Defendants state that no response is required as to the allegations in paragraph 70 of the Counterclaims because it asserts only legal conclusions.  To the extent that a response to paragraph 70 of the Counterclaims is deemed necessary Plaintiffs/Counter-Defendants deny the allegations contained therein.

2.     Plaintiffs/Counter-Defendants state that no response is required as to paragraph 71 of the Counterclaims as it only seeks to re-allege and incorporate in the Counterclaims the same factual statements, admissions and denials set forth in paragraphs 1-65 of the Answer. To the extent that a response is deemed required, Plaintiffs/Counter-Defendants re-allege and incorporate by reference herein all of the allegations contained in the Complaint filed by Plaintiffs in this matter.

3.     Plaintiffs/Counter-Defendants admit the allegations set forth in paragraph 72 of the Counterclaims.

## Facts Common to All Pepi's Counterclaim

4.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 73 of the Counterclaims.

---

[1]  For convenience and clarity, Fiddler's Answer utilizes the same headings as set forth in Pepi's Counterclaims beginning on p. 15 of Pepi Capital, L.P.'s Original Answer, Affirmative Defenses and Counterclaims [D.E.22].

AA00186

5.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 74 of the Counterclaims.

6.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 75 of the Counterclaims.

7.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 76 of the Counterclaims.

8.      Plaintiffs/Counter-Defendants admit that Exhibit "A" is a true and correct copy of the October 20, 2009 Term Sheet.  Plaintiffs/Counter-Defendants deny the remaining allegations set forth in paragraph 77 of the Counterclaims.

9.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 78 of the Counterclaims.

10.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 79 of the Counterclaims.

11.      Plaintiffs/Counter-Defendants admit that Exhibit "E" is a true and correct copy of the January 27, 2010 Commitment Letter. Plaintiffs/Counter-Defendants deny the remaining allegations set forth in paragraph 80 of the Counterclaims.

12.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 81 of the Counterclaims.

13.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 82 of the Counterclaims.

14.      Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 83 of the Counterclaims.

AA00187

15.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 84 of the Counterclaims.

16.     Plaintiffs/Counter-Defendants admit that a Default Letter was sent to Pepi on February 22, 2010, asserting that PEPI was "in material default of and under the terms of the Commitment Letter." Plaintiffs/Counter-Defendants deny the remaining allegations set forth in paragraph 85 of the Counterclaims.

17.     Plaintiffs/Counter-Defendants admit that Exhibit F is a true and correct copy of the Pepi Response Letter. Plaintiffs/Counter-Defendants deny the remaining allegations set forth in paragraph 86 of the Counterclaims.

18.     Plaintiffs/Counter-Defendants admit that Fiddler's Creek closed on a $25 million DIP loan from Gulf Bay and that the transaction was approved by the Bankruptcy Court. Plaintiffs/Counter-Defendants deny the remaining allegations set forth in paragraph 87 of the Counterclaims.

19.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 88 of the Counterclaims.

20.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 89 of the Counterclaims.

21.     Plaintiffs/Counter-Defendants admit that Pepi has filed claims in the Fiddler's Creek bankruptcy seeking payment of the Break-Up Fee and Commitment Fee (as well as the attorney fees and costs of collection of same) and Fiddler's Creek has responded with an Omnibus Objection [D.E. 1134] to Pepi's Claims. Plaintiffs/Counter-Defendants state that no response is required as to the balance of the allegations in paragraph 90 of the Counterclaims because it asserts only legal conclusions.  To the extent that a response to the balance of the

4

allegations in paragraph 90 of the Counterclaims is deemed necessary Plaintiffs/Counter-Defendants deny the allegations contained therein.

### **Count I: Breach of Contract**

22.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 91 which incorporates all facts and allegations set forth in paragraphs 1-90.

23.     Plaintiffs/Counter-Defendants refer the Court to the documents appended to Plaintiffs Complaint [D.E.1] and Plaintiffs Notice of Filing Commitment Letter as Supplemental Exhibit to Complaint [D.E.21] for their complete text and legal import. Plaintiffs/Counter-Defendants state that no response is required as to the balance of the allegations in paragraph 92 of the Counterclaims because it asserts only legal conclusions.  To the extent that a response to the balance of the allegations in paragraph 92 of the Counterclaims is deemed necessary Plaintiffs/Counter-Defendants deny the allegations contained therein.

24.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 93 of the Counterclaims.

25.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 94 of the Counterclaims.

26.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 95 of the Counterclaims.

27.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 96 of the Counterclaims.

## Count 2: Account Stated/ Open Account

28.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 97 which incorporates all facts and allegations set forth in paragraphs 1-96.

29.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 98 of the Counterclaims.

30.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 99 of the Counterclaims.

31.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 100 of the Counterclaims.

32.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 101 of the Counterclaims.

33.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 102 of the Counterclaims.

34.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 103 of the Counterclaims.

## Count 3: Breach of Implied Covenant of Good Faith and Fair Dealing

35.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 104 which incorporates all facts and allegations set forth in paragraphs 1-103.

36.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 104 of the Counterclaims.

37.     Plaintiffs/Counter-Defendants state that no response is required as to the allegations in paragraph 105 of the Counterclaims because it asserts only legal conclusions.

AA00190

38.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 106 of the Counterclaims.

39.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 107 of the Counterclaims.

40.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 108 of the Counterclaims.

41.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 109 of the Counterclaims.

### Count 4: Promissory Estoppel

42.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 110 which incorporates all facts and allegations set forth in paragraphs 1-109.

43.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 111 of the Counterclaims.

44.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 112 of the Counterclaims.

45.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 113 of the Counterclaims.

46.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 114 of the Counterclaims.

47.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 115 of the Counterclaims.

AA00191

## Count 5: Negligent Misrepresentation

48.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 116 which incorporates all facts and allegations set forth in paragraphs 1-115.

49.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 117 of the Counterclaims.

50.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 118 of the Counterclaims.

51.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 119 of the Counterclaims.

52.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 120 of the Counterclaims.

53.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 121 of the Counterclaims.

54.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 122 of the Counterclaims.

## Count 6: Fraudulent Nondisclosure

55.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 123 which incorporates all facts and allegations set forth in paragraphs 1-122.

56.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 124 of the Counterclaims.

57.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 125 of the Counterclaims.

AA00192

58.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 126 of the Counterclaims.

59.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 127 of the Counterclaims.

60.     Plaintiffs/Counter-Defendants deny the allegations set forth in paragraph 128 of the Counterclaims.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
**(Failure to Plead Ultimate Facts)**

61.     The Bankruptcy Court should dismiss the Counterclaims in their entirety or require a more definite statement pursuant to Rule 1.140, *Fla. R. Civ. P,* to the extent that the Counterclaims allege mere ultimate conclusions of law and fail to allege ultimate facts, as required by Rule 1.110(b), *Fla. R. Civ. P.*

### SECOND AFFIRMATIVE DEFENSE
**(Failure to State a Cause of Action)**

62.     The Defendant/Counter-Plaintiff has failed to state a cause of action for which relief can be granted with respect to all of the Counterclaims. Significantly, the Counterclaims do not state legally cognizable claims under Rule 12(b)(6), *Fed. R. Civ. P.*, as incorporated by Rule 7030, *Fed. R. Bankr. P.*, and Rule 1.140(b)(6), *Fla. R. Civ. P.,* to the extent that the Defendant/Counter-Plaintiff failed to fund the Proposed DIP Loan and thus, did not provide Plaintiffs/Counter-Defendants with anything of value in exchange for the payment of the Commitment Fee under that certain Commitment Letter, dated December 31, 2009, between Fiddler's Creek, LLC and GB Peninsula, Ltd. and PEPI (the "Commitment Letter"). Moreover, the Bankruptcy Court never approved the "Break Up" Fee, which was clearly a requirement and

9

condition precedent to the obligation to pay the "Break Up" Fee, even if the Defendant/Counter-Plaintiff had not anticipatorily and first breached the terms and conditions of the Commitment Letter.

**THIRD AFFIRMATIVE DEFENSE**
**(Failure to Comply with Condition Precedent)**

63.     The Defendant/Counter-Plaintiff is barred from prosecuting the Counterclaims against Plaintiffs/Counter-Defendants since, among other things, Defendant/Counter-Plaintiff has not performed all conditions precedent under the Commitment Letter. Specifically, the Defendant/Counter-Plaintiff (i) refused to provide Fiddler's Creek with written notice that PEPI had completed its due diligence in connection with a proposed credit facility to the Debtors, with total advances of up to $27,000,000.00 (the "Proposed DIP Loan"), prior to the Debtors having to file for bankruptcy; (ii) deleted certain critical provisions from the loan documents, required by the Commitment Letter, related to the waterfall and concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Proposed DIP Loan in respect of the waterfall; and (iii) modified the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sale process. Additionally, the Bankruptcy Court never approved the terms or payment of the alleged "Break Up" Fee, which was clearly a requirement and condition precedent to the obligation to pay the "Break Up" Fee, even if Defendant/Counter-Plaintiff had not anticipatorily and first breached the terms and conditions of the Commitment Letter.

10

Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Breach of Contract must be dismissed.

## FOURTH AFFIRMATIVE DEFENSE
### (Excuse of Performance and/or Anticipatory Breach)

64.     For the reasons stated in the Plaintiffs/Counter-Defendants' Third Affirmative Defense above, the Defendant/Counter-Plaintiff anticipatory breached and/or committed a prior breach of the terms and conditions of the Commitment Letter and, therefore, Plaintiffs/Counter-Defendants are excused from any further performance and/or obligation of payment for any alleged Counterclaims being sued upon in this action. As a result of PEPI'S s anticipatory breach of (i) the Term Sheet entered into by Fiddler's Creek, together with its affiliates and subsidiaries, and Petrus Private Investments, L.P.,[4] dated October 29, 2009 (the "Term Sheet") and (ii) the Commitment Letter, Fiddler's Creek was forced, at the last minute, to approach the Debtors' principal, Mr. Aubrey Ferrao, to negotiate the terms of a replacement debtor-in-possession loan with Gulf Bay Capital, Inc. ("Gulf Bay Capital, Inc."), which breach by PEPI ultimately delayed and increased the costs and expenses of the bankruptcy proceedings. Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Breach of Contract must be dismissed.

## FIFTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

65.     For the reasons stated in all of the Plaintiffs/Counter-Defendants' Affirmative Defenses above, Defendant/Counter-Plaintiff is barred and precluded from prosecuting the Counterclaims and recovering damages, if any, against Plaintiffs/Counter-Defendants under the doctrine of Unclean Hands. Moreover, prior to the Petition Date, the Fiddler's Creek paid PEPI in excess of $955,000.00 (the "Fee Amount") pursuant to the terms of the Commitment Letter and Term Sheet, which sum was comprised of the payment of approximately $550,000.00 to

11

reimburse PEPI's out-of-pocket due diligence expenses (including legal fees) and $405,000.00 as payment of one-half of a "Commitment Fee" under the terms of the Commitment Letter. In addition to paying the Fee Amount to PEPI in connection with the Proposed DIP Loan, the Plaintiffs/Counter-Defendants also paid substantial expenses (including legal fees) incurred by their own professionals in connection with negotiating the transaction. In exchange for the Fee Amount and other related payments, Fiddler's Creek was to receive the Proposed DIP Loan in the amount of $27,000,000.00 from PEPI for which the Defendant/Counter-Plaintiff knew was critical to the filing of the Chapter 11 cases. Instead, just a few days prior to the anticipated Petition Date, and as the Plaintiffs/Counter-Defendants were in final preparations for the filing of these Chapter 11 cases, PEPI having full knowledge of the urgency of the DIP Loan, purposely and willfully delayed approval of the financing in order to extract additional fees from the Plaintiffs/Counter-Defendants and, at the same time, engaged in other improper acts and practices by (i) refusing to provide Fiddler's Creek with written notice that Defendant/Counter-Plaintiff had completed its due diligence in connection with the proposed credit facility to the Plaintiffs/Counter-Defendants; (ii) deleting certain critical provisions from the loan documents, required by the Commitment Letter, related to the waterfall and concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Proposed DIP Loan in respect of the waterfall; and (iii) unilaterally seeking to modify the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to contemporaneously foreclose and obtain foreclosure judgments on all of the collateral , thereby relegating the waterfall concept solely to the foreclosure sale process. Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Breach of Contract must be dismissed.

12

## SIXTH AFFIRMATIVE DEFENSE
### (Estoppel)

66.     For the reasons stated in Plaintiffs/Counter-Defendants' Third, Fourth and Fifth Affirmative Defenses above, the Defendant/Counter-Plaintiff is estopped from recovering any damages against the Plaintiffs/Counter-Defendants alleged Counterclaims to the extent that (i) Defendant/Counter-Plaintiff falsely represented that it would fund the Proposed DIP Loan; (ii) Defendant/Counter-Plaintiff knew these representations were false when made; (iii) Defendant/Counter-Plaintiff intended for the Plaintiffs/Counter-Defendants to act on these false representations regarding payment of one-half of the Commitment Fee; (iv) Plaintiffs/Counter-Defendants were unaware of the falsity of Defendant/Counter-Plaintiff's representations; and (v) Plaintiffs/Counter-Defendants relied to their detriment on Defendant/Counter-Plaintiff's false representations by advancing one-half of the Commitment Fee, paying a substantial amount of the Defendant/Counter-Plaintiffs' costs (including legal fees) and expending considerable effort and resources in negotiating the Term Sheet and Commitment Letter. Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Breach of Contract must be dismissed.

## SEVENTH AFFIRMATIVE DEFENSE
### (Recoupment)

67.     Plaintiffs/Counter-Defendants are entitled to recoupment of the costs and expenses incurred by the bankruptcy estate and any damages which might be recoverable by the Plaintiffs/Counter-Defendants as a result of Defendant/Counter-Plaintiff's anticipatory and prior breach of, and failure to fund the Proposed DIP Loan pursuant to, the terms of the Term Sheet and Commitment Letter. Specifically, the Plaintiffs/Counter-Defendants were forced to seek alternative DIP financing from Gulf Bay Capital on the eve on bankruptcy, which caused

13

unnecessary delays and ultimately increased the costs and expenses of the bankruptcy proceedings.

## EIGHTH AFFIRMATIVE DEFENSE
### (Setoff/Offset)

68.     Defendant/Counter-Plaintiff is barred and precluded from recovering damages against Plaintiffs/Counter-Defendants, in whole or in part, by application of the doctrine of set-off and/or offset to the extent that Defendant/Counter-Plaintiff has collected and applied payments toward satisfaction of the alleged Counterclaims being sued upon in this action.

## NINTH AFFIRMATIVE DEFENSE
### (No Prior Course of Dealing)

69.     Defendant/Counter-Plaintiff is barred and precluded from recovering damages against Plaintiffs/Counter-Defendants for Account Stated and/or Open Account because there were no prior dealings between the parties. Defendant/Counter-Plaintiff has never provided the Plaintiffs/Counter-Defendants with a complete accounting of how the Commitment Fee was spent and whether any amounts remain unspent. Further, Defendant/Counter-Plaintiff did not provide the Plaintiffs/Counter-Defendants with anything of value and/or the Proposed DIP Loan in exchange for the Commitment Fee. Moreover, the Bankruptcy Court never approved the terms or payment of the "Break Up" Fee, which was clearly a requirement and condition precedent to the obligation to pay the "Break Up" Fee, even if the Defendant/Counter-Plaintiff had not breached the terms and conditions of the Commitment Letter.     Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Account Stated / Open Account must be dismissed.

## TENTH AFFIRMATIVE DEFENSE
### (Failure of Consideration)

70.     The Defendant/Counter-Plaintiff is barred and precluded from recovering

14

damages against the Plaintiffs/Counter-Defendants, in whole or in part, to the extent that there is no consideration to support payment of the "Break Up" Fee (even if the condition precedent of Bankruptcy Court approval was satisfied) and/or the balance of the Commitment Fee by Plaintiffs/Counter-Defendants, since Defendant/Counter-Plaintiff failed to fund the Proposed DIP Loan and/or provide any value to the Plaintiffs/Counter-Defendants in exchange for Plaintiffs/Counter-Defendants' good faith advancement of one-half of the Commitment Fee.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Failure to Plead Fraud with Requisite Specificity)**

71.     With respect to Count 6 (Fraudulent Nondisclosure) of the Counterclaims, Defendant/Counter-Plaintiff fails to state a cause of action cognizable under Florida law in that the Defendant/Counter-Plaintiff has failed to plead fraud with the requisite specificity required by Rule 9(b), *Fed. R. Civ. P.*, as made applicable by Rule 7009, *Fed. R. Bankr. P.*, and Rule 1.120, *Fla. R. Civ. P.*  Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Fraudulent Nondisclosure must be dismissed.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Economic Loss Doctrine)**

72.     With Respect to Count 5 (Negligent Misrepresentation) and Count 6 (Fraudulent Nondisclosure) of the Counterclaims, Defendant/Counter-Plaintiff fails to state a proper cause of action pursuant to Florida law, to the extent that such Counterclaims violate the Economic Loss Doctrine. The alleged obligations imposed upon the Plaintiffs/Counter-Defendants under the Term Sheet and Commitment Letter, if any, were strictly contractual and thus, are inconsistent with allegations of such Counterclaims based in tort.

15

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Unenforceability of Break Up Fee Provision)

73.　The Defendant/Counter-Plaintiff is further barred and precluded from seeking to enforce the Break Up Fee provision of the Term Sheet and Commitment Letter since, among other things, the amount of the Break Up Fee is in the nature of a penalty rather than a liquidated damages clause and not a reasonable related to and/or based upon just compensation for any allowed measurable damages resulting from the alleged breach of the Contract by Fiddler's Creek.　As such, the Break up Fee provision is unenforceable under Florida law.　Alternatively, any recovery of damages is limited to the actual damages, if any, incurred by the Defendant/Counter-Plaintiff based upon injuries proximately caused by or attributable to the actions of Fiddler's Creek.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Unconscionability of Break Up Fee Provision)

74.　For the reasons stated in Plaintiffs/Counter-Defendants' Thirteenth Affirmative Defense above, the Break Up Fee Provision is unconscionable and severable from the Contract and, therefore, unenforceable as a matter of law.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Waiver)

75.　In accordance with the doctrine of Waiver　and for the reasons stated in the Plaintiffs/Counter-Defendants'　Affirmative Defenses above, the Defendant/Counter-Plaintiff is barred from recovering any damages on the alleged Counterclaims being sued upon in this action. As a result of the Defendant/Counter-Plaintiff's anticipatory and prior breach of the terms and conditions of the Term Sheet and Commitment Letter by failing to fund the Proposed DIP Loan, PEPI has intentionally relinquished its asserted right to enforce any terms of the

16

AA00200

Commitment Letter and Term Sheet. Accordingly, the Counterclaims against Plaintiffs/Counter-Defendants for Breach of Contract must be dismissed.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Payment)

76.     For the reasons stated above, in the event that the Court determines that Plaintiffs/Counter-Defendants is liable, in whole or part, under the Term Sheet and/or Commitment Letter, then Plaintiffs/Counter-Defendants have fully satisfied and discharged any and all obligations allegedly due to PEPI under the doctrine of payment.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Accord and Satisfaction)

77.     The Defendant/Counter-Plaintiff is barred and estopped from seeking to prosecute the Counterclaims and recover damages in this action, since PEPI received and accepted payment in full accord and satisfaction of any obligations allegedly due by Plaintiffs/Counter-Defendants for the Commitment Fee and Break Up Fee, including any other provisions of the Term Sheet and Commitment Letter.

**Dated this <u>21st</u> day of February, 2012.**

> **GENOVESE JOBLOVE & BATTISTA, P.A.**
> Attorneys for Plaintiffs/Counter-Defendants
> 100 Southeast Second Street, Suite 4400
> Miami, Florida 33131
> Telephone: (305) 349-2300
> Facsimile : (305) 349-2310
>
> By:    /s/ *Mariaelena Gayo-Guitian*
>           Mariaelena Gayo-Guitian, Esq.
>           Fla. Bar No.  0813818
>           mguitian@gjb-law.com
>           Paul J. Battista, Esq.
>           Florida Bar No. 884162
>           pbattista@gjb-law.com

17

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via electronic mail to Alan J. Perlman, Esquire, Counsel for PEPI Capital, L.P, Roetzel & Andress 350 Las Olas Boulevard Las Olas Centre II Suite 1150 P.O. Box 30310 Fort Lauderdale, FL 33303-0310 and all other counsel identified on the CM/ECF service list maintained by the Court in this case on the 21st day of February, 2012.

By: /s/ Mariaelena Gayo-Guitian
Mariaelena Gayo-Guitian, Esq.

## SERVICE LIST

Alan J Perlman on behalf of Defendant Pepi Capital, L.P.
aperlman@ralaw.com, msaez@ralaw.com

18

AA00202

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION
#### www.flmb.uscourts.gov

In Re:

Fiddler's Creek, LLC,
**And it's twenty-seven subsidiaries and affiliates**

      **Debtor(s).**
_____

Fiddler's Creek, LLC
**And it's twenty-seven subsidiaries and affiliates**

      **Plaintiffs and Counter-Defendants,**

Vs.

Pepi Capital, L.P.

      **Defendant, Counter-Plaintiff and**
      **Third Party Plaintiff**
_____
Pepi Capital, L.P.

      **Third-Party Plaintiff**

Vs.
Gulf Bay Capital, Inc.

      **Third-Party Defendant.**
_____

**Case No. 8:10-bk-03846-KRM**
**Chapter 11**

**Adv. Pro. No. 8:11-ap-00809-KRM**

## PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC.

Pursuant to Federal Rule of Civil Procedure 14, as well as Federal Rules of Bankruptcy

Procedure 7014, Defendant and Counter-Plaintiff and Third-Party Plaintiff PEPI Capital, L.P.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST**
**THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 1**

("PEPI" or "Third-Party Plaintiff")[1] respectfully files this First Amended Third-Party Complaint against Third-Party Defendant Gulf Bay Capital, Inc. ("Gulf Bay" or "Third-Party Defendant") in the above-styled and numbered Adversary Proceeding brought by Plaintiffs and Counter-Defendants Fiddler's Creek, LLC and twenty-seven (27) of its subsidiaries and affiliates (collectively "Fiddler's Creek" or "Debtors"). This Third-Party Complaint asserts claims arising from the same transactions, occurrences and set of facts that are the subject of Fiddler's Creek's claim against PEPI.

## I. INTRODUCTION AND OVERVIEW

1.       The claims asserted by Third-Party Plaintiff PEPI against Third-Party Defendant Gulf Bay are closely related to and, indeed, arise from the Chapter 11 bankruptcy of Debtor Fiddler's Creek, LLC and twenty-seven (27) of its subsidiaries and affiliates.  Immediately prior to filing bankruptcy, Fiddler's Creek was on the cusp of closing on a $27 million debtor-in-possession ("DIP") loan from PEPI.  Indeed, Fiddler's Creek and PEPI had entered into a formal contractual relationship through a Term Sheet[2] and, subsequently, a binding Commitment Letter[3] and, consistent with those contractual terms, PEPI stood ready to close and fund the DIP loan to Fiddler's Creek (as evidenced at the financing hearing).  However, despite months of negotiation and extensive due diligence, Fiddler's Creek suddenly spurned the DIP financing offered by PEPI and instead accepted a substantially similar DIP loan from Third-Party Defendant Gulf

---

[1] PEPI was formerly known as Petrus Private Investments, L.P., but changed its name to PEPI Capital, LP during the time period at issue in this lawsuit.  In the interest of clarity and consistency, Plaintiff PEPI Capital, L.P. (f/k/a/ is referred to as Petrus Private Investments, L.P.) is referred to as "PEPI" at all times in this document.

[2] A true-and-correct copy of the October 20, 2009 Term Sheet is attached as "Exhibit A" and is incorporated herein for all purposes.

[3] A true-and-correct copy of the January 27, 2010 Commitment Letter is attached as "Exhibit B" and is incorporated herein for all purposes.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 2**

AA00204

Bay.  Gulf Bay is an independent company and a stranger to the contractual relationship between Fiddler's Creek and PEPI, but, despite its lack of privity with PEPI, it was nonetheless fully aware of the existence of the contractual relationship between Fiddler's Creek and PEPI at all relevant times.  Gulf Bay's intentional and purposeful actions interfered with, disrupted and ultimately resulted in the termination of the PEPI-Fiddler's Creek contractual relationship.  As a stranger to the PEPI-Fiddler's Creek contractual relationship, Gulf Bay's eleventh hour appearance and interference prevented the consummation of the PEPI's DIP loan to Fiddler's Creek, thereby depriving PEPI of the substantial profit it would have earned had it provided the DIP financing for Fiddler's Creek.

2.     At bottom, Gulf Bay's interference with the contractual relationship between PEPI and Fiddler's Creek—a transaction to which Gulf Bay was a stranger—was tortious, and caused the dissolution of that once-promising business relationship.  Fiddler's Creek's last-minute decision to leave PEPI "at the altar" and to instead accept DIP financing from Gulf Bay would not have occurred but for Gulf Bay's last minute insertion of itself into the "race" to provide the DIP Loan—and to thereby oust PEPI from the transaction.  PEPI suffered substantial monetary damages as a result of Gulf Bay's last-minute and improper interference with its contractual relationship with Fiddler's Creek.

3.     The central question raised in both Fiddler's Creek's claims against PEPI and also in PEPI's mandatory counter-claims against Fiddler's Creek in the Adversary Proceeding is who is responsible for the breach of the contract—specifically, the Term Sheet and Commitment Letter—between PEPI and Fiddler's Creek.  That core question cannot be fully answered without examining the role played by Gulf Bay in interfering with the Fiddler's Creek-PEPI relationship and ultimately inducing Fiddler's Creek to spurn PEPI and breach its contractual obligations to

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 3**

PEPI. Although Gulf Bay's role in ousting PEPI from providing DIP financing to Fiddler's Creek is related to certain aspects of the Complaint, it involves separate, independent and distinct tort causes of action, which are different than the contractual privity claims asserted against the Plaintiff. As such, the Court should also hear and resolve PEPI's claims against Third-Party Defendant Gulf Bay in this Adversary Proceeding.

## II. PEPI'S THIRD-PARTY CLAIMS AGAINST GULF BAY

4.      Pursuant to Federal Rule of Civil Procedure 14 and Federal Rule of Bankruptcy Procedure 7014, Defendant and Counter-Plaintiff and Third-Party Plaintiff PEPI Capital, L.P. asserts the following Third-Party Claims in the above-styled and numbered Adversary Proceeding brought by Plaintiffs and Counter-Defendants Fiddler's Creek, LLC and twenty-seven (27) of its subsidiaries and affiliates (collectively "Fiddler's Creek" or "Debtors").

### Parties and Jurisdiction

5.      Although PEPI's Third-Party Claims are independent, they do relate to certain of the same transactions, facts and occurrences at issue in both Fiddler's Creek's Complaint and in PEPI's Counterclaims. PEPI's Third-Party Claims are substantially related to Debtor Fiddler's Creek's above-captioned bankruptcy, and the resolution of PEPI's Third-Party Claims is closely related to the above-captioned Adversary Proceeding filed against PEPI by Debtor Fiddler's Creek. Accordingly, PEPI's Third-Party Claims against non-debtor Gulf Bay constitutes an "otherwise related" non-core proceeding under 28 U.S.C. § 157(c).

6.      Venue in this Court is proper under 28 U.S.C. § 1409(a), as the underlying bankruptcy is pending in this district.

7.      All conditions precedent have occurred, been waived or excused.

8.      Third-Party Plaintiff PEPI is a Delaware limited partnership.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 4**

9.     Third-Party Defendant Gulf Bay is a Florida corporation with its principle place of business in Naples, Florida.  Gulf Bay may be served through its registered agent, Joseph L. Parisi, at 8156 Fiddler's Creek Parkway, Naples, Florida 34114.

## Facts Common to All PEPI's Claims Against Gulf Bay

10.     As fully set forth in PEPI's Response Opposing Debtors' Substantive Omnibus Objection to Claims Filed by PEPI Capital, L.P., PEPI is a spurned DIP lender and the proverbial "bride left at the altar."  Despite months of effort negotiating a complicated $27 million DIP Loan, and despite repeated assurances from Fiddler's Creek's senior executive leadership that PEPI was the DIP lender selected by the Debtors, on the eve of its Chapter 11 filings Fiddler's Creek rejected the DIP financing offered by PEPI and instead accepted DIP financing from Third-Party Defendant Gulf Bay.  This last-minute rejection of the DIP financing offered by PEPI—and contracted for by Fiddler's Creek—was the direct result of knowing and intentional interference by Gulf Bay.

11.     Gulf Bay is an independent company that is neither owned nor controlled by Fiddler's Creek; Gulf Bay and Fiddler's Creek are separate, independent companies, each with its own distinct corporate existence.  Gulf Bay was a stranger to the contractual and business relationship between PEPI and Fiddler's Creek.  There was no privity between PEPI and Third-Party Defendant Gulf Bay; no contractual relationship of any sort currently exists or has ever existed between PEPI and Gulf Bay.  However, because Gulf Bay and Fiddler's Creek share a common Chief Executive Officer, Mr. Aubrey J. Ferrao ("Ferrao"), Gulf Bay had access to full insider knowledge of all terms, conditions and aspects of the contractual and business relationship between PEPI and Fiddler's Creek.  Gulf Bay successfully used this insider knowledge to oust PEPI from providing DIP financing to Fiddler's Creek.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 5**

12. The DIP loan extended by Gulf Bay to Fiddler's Creek was fundamentally the same loan that PEPI had already agreed to make to the Debtors, and that PEPI was "ready, willing and able" to fund. Indeed, Gulf Bay improperly benefitted from PEPI's diligent efforts to provide DIP financing to Fiddler's Creek, as after ousting PEPI from the transaction, Gulf Bay used documents and closing papers prepared by PEPI (and its counsel) to "paper" the substitute DIP loan to Fiddler's Creek. In other words, Gulf Bay used PEPI as an unwitting and involuntary "stalking horse" for the DIP loan, intervening to improperly oust PEPI at the last minute and going so far as to use PEPI's work product to "paper" Gulf Bay's substitute DIP loan to Fiddler's Creek.

13. Gulf Bay's last-minute intervention and interference with a relationship to which it was a stranger prevented PEPI from closing the DIP loan to Fiddler's Creek, and from realizing the profits and benefits that would have flowed from closing the DIP loan. Absent Gulf Bay's improper interference, PEPI would not have been "left at the altar" by Fiddler's Creek, and would instead have been the DIP lender for Fiddler's Creek.

**A. Gulf Bay is a Stranger to the Contractual and Business Relationship Between PEPI and Fiddler's Creek.**

14. The business relationship between PEPI and Fiddler's Creek was governed by two contracts, the Term Sheet and the Commitment Letter. Gulf Bay was not a party to either. PEPI's work to provide DIP financing to Fiddler's Creek began in earnest with the signing of the Term Sheet on October 20, 2009. The Term Sheet is a valid and enforceable contract between PEPI and Fiddler's Creek. A true-and-correct copy of the October 20, 2009 Term Sheet is attached as "Exhibit A" and is incorporated herein for all purposes.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 6**

15.     Although an independent company and a stranger to the Term Sheet, Gulf Bay was aware of the existence of the Term Sheet executed by PEPI and Fiddler's Creek, including its specific terms and conditions

16.     PEPI and Fiddler's Creek soon continued and expanded their contractual relationship by signing the Commitment Letter on January 27, 2010.[4]  The Commitment Letter is a valid and enforceable contract between PEPI and Fiddler's Creek.  A true-and-correct copy of the January 27, 2010 Commitment Letter is attached as "Exhibit B" and is incorporated herein for all purposes.

17.     Although an independent company and a stranger to the Commitment Letter, Gulf Bay was aware of the existence of the Commitment Letter executed by PEPI and Fiddler's Creek, including its specific terms and conditions.

18.     Although an independent company and a stranger to the PEPI-Fiddler's Creek business relationship, Gulf Bay was aware of PEPI's ongoing efforts to close the $27 million DIP loan to Fiddler's Creek, including the specific terms and conditions of the proposed DIP loan. Moreover, unbeknownst to PEPI, Gulf Bay had access to all of the loan and closing documents prepared by PEPI as part of PEPI's offering of the $27 million DIP Loan to Fiddler's Creek.

19.     Although an independent company and a stranger to the PEPI-Fiddler's Creek business relationship, Gulf Bay was aware that, immediately prior to Fiddler's Creek's filing of bankruptcy, PEPI had informed Fiddler's Creek that PEPI was "ready, willing and able" to close and fund the DIP loan.

**B.     Gulf Bay Interferes and Induces Fiddler's Creek to Spurn PEPI and to Instead Accept Alternative DIP Financing from Gulf Bay.**

---

[4] Although signed January 27, 2010, the Commitment Letter is dated effective as of December 31, 2009.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 7**

AA00209

20.     Following the execution of the Commitment Letter with Fiddler's Creek, PEPI systematically and steadily moved forward with its due diligence and produced a complete set of closing papers for its $27 million DIP loan to Fiddler's Creek.  PEPI was prepared to close and fund the DIP loan—and again advised the Debtors of that readiness on February 23, 2010—the eve of Fiddler's Creek's bankruptcy filing.

21.     Rather than closing on the DIP loan offered by PEPI, Fiddler's Creek instead made an eleventh hour switch to an alternative DIP loan offered by Gulf Bay.  Gulf Bay was, in effect, "sitting on the sidelines" when it saw an opportunity to improperly profit by inserting itself into the DIP transaction, and it therefore improperly interfered with the deal that PEPI and Fiddler's Creek had achieved, ousting PEPI in the process.  The alternative DIP loan from Gulf Bay Capital to Fiddler's Creek was made with Gulf Bay's full knowledge of all the terms and conditions of PEPI's nearly-closed DIP loan with Fiddler Creek.  Indeed, the DIP loan that Gulf Bay made to Fiddler's Creek was substantially identical to the DIP loan that PEPI had been on the cusp of closing with Fiddler's Creek prior to Gulf Bay's interference.  Vividly illustrating its improper origins, the Gulf Bay replacement DIP loan used many of the same closing documents and papers originally prepared by PEPI's counsel.

22.     Gulf Bay interfered with the business relationship between PEPI and Fiddler's Creek by convincing Fiddler's Creek to reject the DIP loan contracted for in the Term Sheet and the Commitment Letter, thereby ousting PEPI from the transaction.  Gulf Bay achieved this result by using its relationship with Fiddler's Creek, including its knowledge of all the terms and conditions of PEPI's nearly-closed DIP loan to Fiddler's Creek.  Despite being a stranger to the PEPI-Fiddler's Creek relationship, Gulf Bay used its insider knowledge of the PEPI-Fiddler's

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST
THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 8**

**AA00210**

Creek loan to offer and close its own replacement DIP loan to Fiddler's Creek, improperly causing Fiddler's Creek to oust PEPI from the transaction in the process.

23.     Acting in concert with and under the influence of Gulf Bay, Fiddler's Creek attempted to justify and excuse its decision to spurn PEPI by sending a letter (the "Default Letter") asserting that PEPI was "in material default of and under the terms of the Commitment Letter." Fiddler's Creek's Default Letter was a transparent and ineffective attempt to escape the consequences of Gulf Bay's push for Fiddler's Creek's last-minute decision to abandon its chosen DIP lender, PEPI, and to instead accept DIP financing from Gulf Bay. Fiddler's Creek's Default Letter failed to identify any actual material defaults under or breaches of the Term Sheet or Commitment Letter by PEPI.

24.     Notwithstanding PEPI's effort to proceed, Fiddler's Creek declined to move forward with DIP financing from PEPI due to the actions and/or interference of Gulf Bay. Based on this wrongful conduct, instead of closing the DIP financing with PEPI as called for in the Term Sheet and the Commitment Letter, Fiddler's Creek ultimately closed on a $25 million DIP loan from Gulf Bay ("papered" with documents prepared by PEPI), with that transaction subsequently approved by the Bankruptcy Court.

25.     Having refused to close the DIP financing from PEPI in favor of accepting Gulf Bay's alternative DIP loan, Fiddler's Creek—still acting under the influence and inducement of Gulf Bay—next: (1) refused PEPI's demand for payment of the $1 million Break-Up Fee after Fiddler's Creek decided to accept DIP financing from a lender other than PEPI; and (2) refused PEPI's demand for payment of the remaining $405,000 on the "fully earned" Commitment Fee. Because, acting under the influence or inducement of Gulf Bay, Fiddler's Creek did not properly or validly withdraw from (or "break up") its contractual relationship with PEPI, Gulf Bay's

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST**
**THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 9**

interference with—and ultimate destruction of—the contractual relationship between PEPI and Fiddler's Creek was unjustified and improper.

**C.     PEPI Suffers Damages as a Result of Gulf Bay's Improper Interference.**

26.     PEPI has suffered monetary damages as a result of Gulf Bay's interference with its contractual and business relationship with Fiddler's Creek.  PEPI's damages include, but are not limited to, its lost profits resulting from Fiddler's Creek's last-minute breach of the DIP financing from PEPI due to the interference by Gulf Bay.

27.     Gulf Bay substantially benefitted from its interference with the contractual and business relationship between PEPI and Fiddler's Creek, as Gulf Bay realized the profits and all other benefits that resulted from making the DIP loan to Fiddler's Creek.

28.     Having induced Fiddler's Creek to reject PEPI's DIP financing, Gulf Bay further induced Fiddler's Creek to breach the Term Sheet and Commitment Letter by: (1) refusing PEPI's demand for payment of the $1 million Break-Up Fee after Fiddler's Creek decided to accept DIP financing from a lender other than PEPI; and (2) refusing PEPI's demand for payment of the remaining $405,000 on the "fully earned" Commitment Fee.  To date, and as a result Gulf Bay's interference, Fiddler's Creek has failed to pay PEPI the $1.405 million it is owed under the plain language of the Term Sheet and the Commitment Letter.  Gulf Bay's interference with those contracts was neither justified nor privileged.

<u>**Count 1: Tortious Interference with Contract Against Gulf Bay**</u>

29.     All the facts and allegations as set forth in paragraphs 1 through 28 are re-alleged and incorporated herein as if set forth in full.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 10**

**AA00212**

30.     The Term Sheet and the Commitment Letter are both valid, enforceable contracts between Fiddler's Creek and PEPI, and the Gulf Bay was fully aware of the existence of these contracts.

31.     Third-Party Defendant Gulf Bay willfully and intentionally interfered with the contracts between Fiddler's Creek and PEPI, including, more specifically, the Term Sheet and Commitment Letter.  Gulf Bay's intentional interference was unjustified.

32.     As a direct result of the willful interference of Third-Party Defendant Gulf Bay, PEPI has suffered actual damages in an amount including, but not limited to, its lost profits under its contracts with Fiddler's Creek.  But for Gulf Bay's willful interference, PEPI would have closed the DIP loan with Fiddler's Creek, and PEPI would have realized substantial profits as a result.

33.     Wherefore, PEPI respectfully requests the entry of judgment against Third-Party Defendant Gulf Bay, in an amount equal to the damages that PEPI will show it suffered as a direct and foreseeable result of the interference by Gulf Bay, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

### Count 2: Tortious Interference with Advantageous Business Relationship Against Gulf Bay

34.     All the facts and allegations as set forth in paragraphs 1 through 33 are re-alleged and incorporated herein as if set forth in full.

35.     An ongoing and advantageous business relationship existed between Fiddler's Creek and PEPI, and Gulf Bay was fully aware of the existence of this business relationship.

36.     Third-Party Defendant Gulf Bay willfully and intentionally interfered with the ongoing and advantageous business relationship between Fiddler's Creek and PEPI.  Gulf Bay's intentional interference was unjustified.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 11**

37.     As a direct result of the interference of Third-Party Defendant Gulf Bay, PEPI has suffered actual damages in an amount including, but not limited to, the lost profits it would have earned from making the DIP loan to Fiddler's Creek.

38.     Wherefore, PEPI respectfully requests the entry of judgment against Third-Party Defendant Gulf Bay, in an amount equal to the damages that PEPI will show it suffered as a direct and foreseeable result of the interference by Third-Party Defendant Gulf Bay, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.

## CONCLUSION

For all the foregoing reasons, PEPI respectfully requests that the Court enter judgment against Third-Party Defendant Gulf Bay Capital, Inc., in an amount equal to the damages that PEPI will show it suffered, on all its claims against Gulf Bay, plus interest at the statutory rate, costs and attorneys' fees as permitted by law.   PEPI requests such additional relief as is permitted by law or equity and is deemed just and proper by this Court.

Respectfully submitted,

ROETZEL & ANDRESS

/s/ *Alan J. Perlman*
Alan J. Perlman
Florida Bar No. 826006
Joshua B. Alper
Florida Bar No. 0059875
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile:  (954) 462-4260
E-mail:  aperlman@ralaw.com

ATTORNEYS FOR PEPI CAPITAL, L.P.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 12**

AA00214

**CERTIFICATE OF SERVICE
AND COMPLIANCE WITH LOCAL RULE 2090-1**

**I HEREBY CERTIFY** a true and correct copy of the foregoing was served on 4th day of June, 2012 via CM/ECF on all parties who are registered for electronic service.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1.

By: /s/ Alan J. Perlman
Alan J. Perlman, Esq.

**PEPI CAPITAL, L.P.'S FIRST AMENDED THIRD-PARTY COMPLAINT AGAINST
THIRD-PARTY DEFENDANT GULF BAY CAPITAL, INC. – PAGE 13**

AA00215

EXHIBIT A

AA00216

## PEROT INVESTMENTS, INC.
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

October 20, 2009

Fiddler's Creek LLC
c/o Ken Montgomery
Belmont Capital Partners LLC
14741 Rudolph Dadey Dr.
Charlotte, NC 28277

Dear Mr. Montgomery:

Subject to the terms and conditions set forth herein, Petrus Private Investments, L.P. is willing to enter into this Term Sheet pursuant to which Petrus Private Investments, L.P. or its affiliates, for itself as agent (the "Agent"), and Petrus Private Investments L.P. ("PEPI") and/or its affiliates, as lender, as well as various lenders from time to time (collectively, the "Lenders") would consider providing an underwritten commitment for up to $27,000,000 (Twenty-seven million dollars) in debtor in possession financing to Fiddler's Creek LLC and certain of its subsidiaries and affiliates described below pursuant to the terms and conditions further described below. The conduct of the parties hereunder shall be governed by a commercially reasonable standard.

Debtor in Possession Financing -- Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and those subsidiaries and affiliates set forth on Schedule A attached hereto and made a part hereof (collectively, the "Borrower"). |
| Lenders: | Petrus Private Investments, L.P. or designated affiliate and others |
| The DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a commitment (the "Commitment Letter") to Borrower for up to $27,000,000 in the aggregate of debtor in possession financing prior to and for use in connection with the Borrower's anticipated voluntary Chapter 11 bankruptcy proceedings. The Commitment Letter shall consist of a term loan in an amount up to $27,000,000 subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") overseeing the anticipated chapter 11 bankruptcy proceedings for the Borrower (the "Loan"). The Loan is not a revolving line of credit. Specifically, the repayment of any existing loan balance |

Fiddler's Creek LLC Term Sheet
10/20/2009

AA00217

will not provide additional or renewed availability under the Loan.

**Purpose and Proceeds:**

The proceeds of the Loan shall be used in accordance with a budget to be submitted by the Borrower to the Lender and approved by the Lender in connection with the issuance of the Commitment Letter, which Budget shall include, among other things, the Borrower's operating expenses, working capital needs of Borrower, the Borrower's professional fees for the bankruptcy proceedings and the costs associated with this financing. No proceeds of the Loan will be advanced while any event of default has occurred and has not been cured, or unless and until the conditions precedent thereto have been fulfilled.

**Loan Draws:**

Subject to Lender approval, one or more draws may be made under the Loan, including if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent advances from time to time thereafter.

**Unused Loan Fee:**

Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on any remaining Loan Amount not yet drawn by the Borrower.

**Term Sheet and Expenses:**

On execution of this Term Sheet by all parties, Borrower shall a) pay to Lenders a non-refundable and fully earned Term Sheet fee of $25,000 (the "Initial Term Sheet Fee"), b) pay to Lenders an initial expense deposit of $200,000 to cover the Lenders' out of pocket expenses (including all customary costs associated with the continuing Chapter 11 process and Lenders' due diligence in underwriting, documenting, and closing the loan (including attorney fees), c) proceed exclusively with Lenders to issue the Commitment Letter, and d) provide any and all documents and information reasonably requested by the Lenders in order to proceed with the issuance of the Commitment Letter. In addition, Borrower shall deliver to Lenders upon two (2) business day's written request from time to time such additional deposits as may be necessary, in Lenders' sole discretion, to cover continuing out of pocket expenses in excess of the initial expense deposit through the maturity and payment in full of the Loan, provided however that the total amount required to be reimbursed by the

AA00218

Borrower for Lender's out of pocket expenses through the issuance of the Commitment Letter shall not exceed $300,000. On termination of this Term Sheet, any unused portion of the expense deposit will be credited or refunded to the Borrower; provided, however, should Borrower execute a commitment with any entity other than Lender, or otherwise obtain debtor in possession funding from any source other than Lender, then, in addition to the Initial Term Sheet Fee, Lender shall also retain an additional $75,000 of the initial expense deposit as a non-refundable, fully earned and immediately payable additional Term Sheet fee (the "Additional Term Sheet Fee"). Borrower agrees to advance additional funds to Lender should insufficient initial expense deposit funds remain to pay in full the Additional Term Sheet Fee. In addition, the Initial Term Sheet Fee will be applied to the Commitment Fee set forth below.

| | |
|---|---|
| Loan Amount: | Up to $27,000,000 |
| Interest Rate: | 12%, payable monthly in arrears but not greater than the maximum rate provided by applicable law. |
| Default Rate: | Upon the occurrence of an Event of Default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law. |
| Mandatory Prepayments: | Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds shall be applied first to the Loan unless otherwise agreed to by Lenders. Until such time as this Loan has been paid in full, no payments of principal shall be paid to any existing secured creditors without the prior written approval of the Lenders, unless identified in the Budget to be approved by the Lenders. |
| Closing Date: | The Loan shall be funded upon (i) approval thereof by the Bankruptcy Court with the form of the Orders entered by the Bankruptcy Court in connection therewith to be acceptable to Lenders in their sole discretion, (ii) completion of all conditions precedent in the sole judgment of Lenders, and (iii) Lenders receipt of the Commitment Fee and payment in full of all expenses. |
| Maturity Date: | The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later Extension Date as set forth below)(the "Initial Maturity Date"), (b) the effective date of a plan of reorganization which has been confirmed by an order of the Bankruptcy Court, or (c) the date upon which a final order is entered by the Bankruptcy Court either (i) |

AA00219

converting the Borrowers' Chapter 11 case to a case under Chapter 7 or (ii) approving one or more 363 sales of all or substantially all of the Borrowers' assets (unless agreed to by Lenders), or (iii) appointing a trustee or examiner (with expanded powers) in the Borrowers' Chapter 11 case or (iv) dismissal of any of the Borrowers' bankruptcy cases or (v) the occurrence of an uncured event of default under the DIP Financing.

Acceptance Date:

Borrower must accept this term sheet by 5:00 p.m. Dallas time on October 20, 2009.

Commitment Fee:

A Commitment Fee in the amount of 3% of the Loan Amount shall be fully earned, non-refundable, and payable immediately to Lenders upon Lender's issuance of the Commitment Letter and execution of the Commitment Letter by both Lender and Borrower. If issued, the Commitment Letter will provide, amongst other customary terms, that it will expire unless the Loan is approved by the Bankruptcy Court on or before January 15, 2010 .

Exit Fee:

2% of the total advances made under the Loan actually drawn by the Borrower, payable upon a) payment in full of the Loan at maturity, b) any partial principal payment of the Loan prior to maturity, or c) any other reduction of the Loan.

Break-Up Fee:

Upon and after Lenders' issuance of the Commitment Letter, Borrower shall be obligated to pay a Break-Up Fee of $1,000,000 to the Lenders in the sole event that Borrowers fail to consummate the Loan with the Lender, but instead accept and proceed to closing on alternative financing that is approved by the Bankruptcy Court. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. Borrower shall take all necessary action in the Bankruptcy Court to pay the Break-Up Fee, when it accrues, including, without limitation, stipulating that such fee is an allowed chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

Collateral:

All indebtedness and obligations under Loan will be secured by a court-ordered priming lien and first priority senior security interests in all assets, proceeds and cash collateral thereof of the Borrower and its affiliates and subsidiaries set forth on Schedule A hereto, tangible and

AA00220

intangible, including but not limited to all lockbox agreements and lockbox cash, cash and cash equivalents, restricted cash, cash collateral, depository accounts, accounts receivable, contract rights, inventory, improved and unimproved real property, personal property, plant, equipment, fixtures, vehicles, and intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); Lenders would also receive a pledge of 100% of the stock of Borrower in its subsidiaries and affiliates set forth on Schedule A hereto (subject to tax limitations, the pledge of foreign subsidiary stock shall be limited to the maximum percent allowed by applicable tax laws), in the sole discretion of the Lender, Loan guarantees from some or all of Borrower's subsidiaries and affiliates not identified on Schedule A hereto, and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Collateral"). The Collateral shall have no permitted encumbrances senior or equal to the Lender's DIP Liens except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral and as may be specifically agreed to by Lenders in their sole discretion.

Collateral Monitoring Fee:

Borrower shall pay to Lenders a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding.

Extension Date:

Provided no uncured event of default has occurred or exists as of the initial or second extension date, and no earlier termination triggering event has occurred or exists as of the initial or second extension date, the Borrower may extend the Initial Maturity Date for two (2) consecutive six (6) month periods.

Extension Fee:

An Extension Fee equal to 0.5% of the Loan Amount, adjusted for any pay downs, shall be payable for each exercised extension. To exercise each extension, the Borrower shall provide a 30 day notice to Lenders together with payment of Extension Fee.

DIP Provisions:

Borrower anticipates filing a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") for all parent and subsidiary entities and will obtain (a) an interim order of the Bankruptcy Court approving the Loan on an interim basis (the "Interim Order"), and/or (b) will within forty-five (45) days after the entry of such interim order or seventy-five (75) days after the filing of the bankruptcy case obtain a final order (the "Final Order") (collectively, the "Orders") of the Bankruptcy Court approving the Loan on a final

AA00221

basis, and fixing the DIP Funding Date, which Orders shall not have been reversed, modified, amended, stayed or vacated. Subject to Lender approval, one or more draws may be made under the Loan, including, if required by the Borrower, sufficient funds necessary to cover the Borrowers' obligations from the bankruptcy petition date through the date of a final order on the DIP financing, but not to exceed an amount equal to $5 million upon Bankruptcy Court entry of the Interim Order, a second advance of $15 million minus the amount of the interim draws upon Bankruptcy Court entry of the Final Order, and subsequent scheduled advances from time to time thereafter. The Orders shall provide that the Loan shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by a senior priming first lien on all of the Collateral then owned or thereafter acquired by the Borrower pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees and other administrative expenses as may be agreed to by Lenders). The Orders shall, at a minimum, contain provisions under Section 364 (e) granting all such senior and priming liens and claims to Lenders for all monies actually advanced even if such Orders are subsequently vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Lenders to immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens and claims granted to Lenders shall contain cross default and cross collateral provisions with all other debt and contracts.

**Other Conditions Precedent:**

Standard for loans and customary for transactions of this type to Lenders' sole satisfaction, including but not limited to the following:

1. All Borrower fees payable to Lenders shall be current, including without limitation, all fees of Lenders' professionals

2. Appraisals may be performed by appraisers retained and acceptable to Lenders. The current MAI Appraisal issued by Integra in May 2009 will be provided to assist Lenders in the initial valuation of the collateral. An update to the existing Appraisal may be conducted post filing.

3. All Borrower administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or

addressed in a manner deemed appropriate by the Lenders in their sole discretion.

4. Lenders completion of due diligence to its satisfaction; Lenders' due diligence will include, but not be limited to, review of all CDD related documentation, review of interim financial statements and documentation, appraisals, appropriate insurance coverage, examination of the Collateral and title thereto and additional due diligence related to the Borrower's business, industry, legal, environmental and technical related matters

5. Completion of legal due diligence investigation by the Lenders' counsel, with results satisfactory to the Lenders and their counsel, of all matters which Lender deems relevant, in its sole discretion, including, without limitation, those matters shown on Schedule B attached hereto.

6. Receipt by the Lenders of 90-day cash budget and final 2010 budget and business plan through the anticipated exit from Chapter 11 from the Borrower satisfactory to the Lenders in both form and substance (the "Budget").

7. Borrower shall have executed and delivered such DIP Credit Agreements, documents and instruments as are customary in connection with DIP financing and such other documentation required by and acceptable to Lenders and its counsel including, without limitation, a release of all claims through the time of funding, guarantees of Borrower subsidiaries and affiliates requested by Lender, mortgages, security agreements, and promissory note, and Borrower and guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the Lenders liens and claims

8. Commitments for mortgagee title insurance, with appropriate surveys, in form and substance satisfactory to Lender.

9. Reasonable and customary opinions of counsel to the Borrower as to the transactions contemplated hereby which opinions are satisfactory to the Lenders

AA00223

10. Corporate resolutions, certificates and other documents as the Lenders shall reasonably request

11. All necessary consents and approvals to the financing shall have been obtained

12. The Lenders must be satisfied that any financial statements delivered to it fairly present the business and financial condition of the Borrower and its subsidiaries

13. No material misstatements in or omissions from the materials previously furnished to the Lenders for its review

14. No previously undisclosed intercompany transactions shall have occurred

15. The absence of any litigation or other proceeding the result of which might have a material adverse effect on the Borrower and its affiliates and subsidiaries, including, without limitation, those matters shown on attached Schedule B

16. The proposed financing is subject to the condition that no material changes in governmental regulations or policies affecting the Borrower or the Lenders involved in this transaction occur prior to the Closing Date

17. Borrower shall be in good standing in its state of incorporation and qualified to do business in other states in which Collateral is located

18. All liens and claims granted to Lenders in connection with the Loan shall be priming, first priority liens and claims, and all existing liens contract rights, rights of redemption, and all existing third party and Borrower (and its affiliates and subsidiaries) rights and obligations of any type shall be subordinate to the liens, claims and interests of Lenders.

19. All DIP Financing motions, orders and bankruptcy court documentation shall be acceptable in form and substance to Lenders.

20. Until all Borrower obligations are paid in full to Lenders, Borrower shall provide to Lenders not less

AA00224

than two business days advance notice of any filings made in the bankruptcy case(s) of Borrower, provided that the Borrower shall provide as much notice as is reasonably possible for emergency motions. Lenders shall be given not less than five business days advance notice of any hearing regarding the DIP Financing.

21. Such other conditions precedent as the Lenders may require in its discretion.

**Collateral Monitoring**

Ongoing Collateral monitoring; Lenders, Agent or their financial advisor, shall have customary rights to enter and inspect the premises, interview employees, examine books and records, etc., with reasonable notice to the Borrower. The Borrower shall provide Lenders with all reports provided to any third party as well as such financial reports as Lenders may request on a periodic basis.

**Guarantees:**

At the Lender's discretion, all of the Borrower subsidiaries and affiliates, as listed on Schedule A, shall execute the Loan documents and become jointly and severally liable under the terms Loan. The Borrower represents that all of the entities that comprise Fiddlers' Creek and GB Peninsula Ltd. are included as Borrowers on Schedule A.

**Representations and Warranties:**

Customary for transactions of this nature

**Covenants:**

Definitive documentation to contain affirmative and negative covenants acceptable to Lenders and customary for transactions of this type including but not limited to:

1. No line item in the agreed budget shall exceed in any period, or in aggregate, a 10% variance from the amount provided for in the Budget.
2. Certain asset sales, lot sales and milestones as to borrower's business plan and ultimate exit from bankruptcy
3. Limitations on capital expenditures
4. Prohibitions on additional indebtedness without Lenders consent
5. Restricted payments and related party transactions prohibited without Lenders consent
6. Restriction on the Borrower's ability to transfer or sell assets without Lenders consent (including pursuant to sale/leaseback transactions), unless required in conjunction with this Financing, with such proceeds used first to repay the Lenders
7. Limitation on incurrence of liens subject to Lenders reasonable consent
8. Restriction on subsidiaries' ability to issue or sell capital stock

AA00225

9. Restriction on the Borrower's ability to consolidate, merge or transfer all or substantially all of assets and the assets of its subsidiaries or affiliates
10. The Budget must be submitted to Lenders as soon as possible after execution of this term sheet, and subject to the satisfaction of the Lenders in both form and substance, will be attached to the Commitment Letter.
11. Maintain adequate insurance coverage satisfactory to Lenders in its sole discretion
12. Asset sales will be subject to minimum release prices satisfactory to Lenders in Lenders sole discretion
13. Covenants to Lender's satisfaction with regard to the payment of debt service, assessments and any other matter relating to the CDD obligations

**Events of Default:** Customary for transactions of this nature and such other Events of Default Lenders requires in its sole discretion including a breach of the variance covenant relating to the Agreed Budget.

**Governing Law:** To Be Determined and acceptable to Lenders.

**Expenses and Indemnification:** Until such time as the Loan is paid in full, Lenders shall be reimbursed, upon demand, for all direct and indirect costs, fees, and expenses, which shall be paid by Borrower.

Indemnification provisions customary for transactions will be provided for in the definitive documentation

By signing this letter, both parties acknowledge that: (i) this letter is not a binding commitment on the part of any person to provide or arrange for financing on the terms and conditions set forth herein or otherwise; (ii) any such commitment on the part of the Lenders would be in a separate written instrument signed by the Lenders following satisfactory completion of the Lender's initial due diligence, internal review and approval process, including approval by the Lenders executive management (which approvals have not yet been sought or obtained); (iii) this letter supersedes any and all discussions and understandings, written or oral, between or among the Lenders and any other person as to the subject matter hereof; and (iv) the Lenders may, at any level of its approval process, decline any further consideration of the proposed financing and terminate its approval process. Under no circumstances would the Lenders or any of its affiliates be liable for any punitive, exemplary, consequential or indirect damages which may be alleged to result from this letter, or the proposed financing or any other related financing.

To confirm your desire that the Lenders continue its due diligence process which could lead us to seek approval for the above proposed transaction, time being of the essence, please execute and return this letter at the earliest possible time, but in any event by no later than 5:00 p.m. Dallas time on October 20, 2009, along with the Term Sheet Fee and initial Expense Deposit (this offer to enter into a Term Sheet will expire on such date if not accepted by then).

AA00226

Petrus Private Investments, L.P.

By Perot Investments, Inc., its General Partner

By: _____

Name:  David Radunsky

Title:    Chief Operating Officer


Agreed and Accepted this <u>20th</u> day of October, 2009.

Fiddler's Creek LLC (on behalf of itself, its subsidiaries and affiliates)

By: _____

Name:  Anthony DiNardo

Title:    Attorney In Fact


Schedule A

Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

AA00227

| STATUS | | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|---|
| **FIDDLER'S CREEK LLC** | | | | |
| ACTIVE | **951 LAND HOLDINGS LTD** | Limited Partnership | 03/14/00 | 59-3684895 |
| ACTIVE | 951 Land Holding LLC | General Partner | 4/7/2000 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **DY LAND ASSOCIATES LTD** | Limited Partnership | 03/14/00 | 59-3684898 |
| ACTIVE | DY Associates LLC | General Partner | 04/07/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GBFC Development LTD** | Limited Partnership | 03/14/00 | 59-3684897 |
| ACTIVE | GBFC Development LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GBFC MARINA LTD** | Limited Partnership | 03/14/00 | 59-3684890 |
| ACTIVE | FC Marina LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC BEACH LTD** | Limited Partnership | 03/14/00 | 59-3684896 |
| ACTIVE | FC Beach LLC | General Partner | 04/06/00 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC GOLF LTD** | Limited Partnership | 12/03/02 | 03-0509355 |
| ACTIVE | FC Golf LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **DY LAND HOLDINGS II, LLC** | Limited Liability Company | 04/25/08 | 26-2495367 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC PARCEL 73, LLC** | Limited Liability Company | 04/25/08 | 26-2494498 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC COMMERCIAL, LLC** | Limited Liability Company | 04/25/08 | 26-2495276 |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC HOTEL, LTD** | Limited Partnership | 03/30/04 | 34-2024547 |
| ACTIVE | FC Hotel, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FC RESORT, LTD** | Limited Partnership | 03/30/04 | 34-2024546 |
| ACTIVE | FC Resort, LLC | General Partner | 11/25/02 | |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GULF BAY HOSPITALITY LTD** | Limited Partnership | 12/31/2003 | 59-3790126 |
| ACTIVE | GULF BAY HOSPITALITY COMPANY LLC | GEN PARTNER | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **GULF BAY HOTEL COMPANY LTD** | Limited Partnership | 12/4/2002 | 56-2495068 |
| ACTIVE | GULF BAY HOTEL COMPANY LLC | General Partner | 11/25/2002 | N/A |
| ACTIVE | Fiddler's Creek LLC | Limited Partner | | |
| ACTIVE | **FIDDLER'S CREEK LLC** | Limited Liability Company | | 59-3639729 |
| ACTIVE | GBFC II LP | Managing Member | | |
| | GBFC II TWO LLC | Member | | |
| ACTIVE | **GBFC II LP** | Limited Partnership | | 59-3705460 |
| ACTIVE | GBFC II LLC | General Partner | | |
| ACTIVE | GB 100 LTD | Limited Partner | | |
| ACTIVE | **GB 100 LTD** | Limited Partnership | 12/07/95 | 65-0628890 |
| ACTIVE | GB100 Inc | General Partner | 02/22/93 | 65-0395715 |
| Active | Fiddler's Creek Management Inc | Sub Charter C | 10/11/94 | 65-0592185 |
| ACTIVE | GB Peninsula Ltd (Land) | Limited Partnership | | 59-3692446 |
| ACTIVE | GB Peninsula Inc (Gen .Partner) | General Partner | | 59-3692447 |
| ACTIVE | **GBP Development Ltd (sell house)** | Subsiduary of Peninsula | | TBD |
| | GB Peninsula Ltd | Limited Partner | | 59-3692446 |
| ACTIVE | GBP Development LLC | General Partner | | TBD |

Fiddler's Creek LLC Term Sheet
10/20/2009

Fiddlerscreektermsheet.doc
Page 12 of 13

AA00228

Schedule B

Schedule of Outstanding Litigation for relating to Fiddler's Creek LLC

and Affiliates and Subsidiaries

AA00229

EXHIBIT B

AA00230

# PEPI CAPITAL, L.P.

2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

Dated as of December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek LLC
8156 Fiddlers Creek Parkway
Naples, FL 34114

Commitment Letter
**$27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility**

Dear Mr. DiNardo:

PEPI Capital, L.P., as Agent[1] and Lender (collectively, "<u>PEPI</u>") is pleased to confirm to Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "<u>Company</u>") the commitment of PEPI to provide a senior secured debtor-in-possession multiple advance term loan facility to the Company with total advances of up to $27,000,000 (the "<u>Credit Facility</u>") based upon and subject to the terms and conditions set forth in this letter and the term sheet and exhibits attached as <u>Exhibit A</u> hereto (the "<u>Term Sheet</u>" and all exhibits thereto together with this letter, collectively, the "<u>Commitment Letter</u>").

While PEPI has provided a commitment for the entire amount of the Credit Facility, subject to the terms and conditions of this Commitment Letter and the Term Sheet, PEPI may syndicate some of the Credit Facility to additional lenders with a corresponding reduction in PEPI's share of the Credit Facility. PEPI's obligations under the Credit Facility are not contingent upon or conditioned upon syndication of the Credit Facility. Moreover, PEPI has no plans to syndicate the Credit Facility, however, PEPI has the absolute and sole right to syndicate some or all of the Credit Facility.

PEPI shall manage all aspects of any syndication of the Credit Facility, including the timing of all offers to potential lenders, the allocation and acceptance of commitments, the amount offered, and the compensation provided to any lender. The Company agrees that no lender will receive any compensation for its participation in the Credit Facility except as expressly agreed to and offered by PEPI.

The Company agrees to cooperate in PEPI's syndication efforts and use commercially reasonable efforts, at no additional out of pocket cost to the Company, to assist PEPI in forming a syndicate acceptable to PEPI. Such assistance shall include but not be limited to (a) using commercially reasonable efforts to make senior management and representatives of the Company available to participate in meetings and to provide information to potential lenders at such times and places as PEPI may

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Term Sheet attached hereto as Exhibit A.

1 of 45

DA-3072429 v11 1203528-00006

AA00231

reasonably request, and (b) using commercially reasonable efforts to provide all information reasonably deemed necessary by PEPI to complete the syndication, subject to confidentiality agreements in form and substance reasonably satisfactory to the Company and PEPI. The terms of the Commitment Letter, including those attached as Exhibit A, shall not be modified due to PEPI's syndication efforts.

The Company hereby represents, warrants and covenants that (i) all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading, and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to PEPI by or on behalf of the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to PEPI such Information and Projections as PEPI may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is true and correct on the Closing Date of the Credit Facility.

The Company will promptly reimburse PEPI for all reasonable costs and expenses incurred by PEPI in connection with its continuing review of the Information and Projections and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), any and all due diligence, any and all loan documentation for the Credit Facility, the closing of the Credit Facility, and the enforcement of any of PEPI's rights and remedies under this Commitment Letter, in each case including, without limitation, reasonable attorneys' fees and legal expenses, appraisal fees, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus out-of-pocket expenses for the field examiners of PEPI in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses), and in each case whether or not the Credit Facility closes.

All such charges and expenses are to be paid to PEPI upon demand, together with such advance funds on account of such charges and expenses as PEPI may from time to time request or PEPI may require that the Company pay such charges directly. PEPI has the right to apply to such charges and expenses any sums received from or on behalf of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation. Deposits for expenses received by PEPI will be returned to the Company without interest, less the expenses and charges described above if the Credit Facility does not close, and applied to reduce the loans if the Credit Facility closes.

The Company and all Guarantors agree to indemnify and hold harmless PEPI, and each director, partner, officer, employee, attorney, advisor, agent and affiliate of PEPI (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any and all losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any

AA00232

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

AA00233

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

AA00234

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter is for the sole benefit of the Company and may not be relied upon by any third party. This Commitment Letter may not be assigned by the Company without the prior written consent of PEPI and may not be amended, waived, or modified, except in writing signed by PEPI and the Company.

This Commitment Letter is governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

PEPI, THE COMPANY AND ALL GUARANTORS EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

This letter is pursuant to that certain Term Sheet letter dated October 20, 2009, addressed to Mr. Ken Montgomery of Belmont Capital Partners LLC, advisor to you, by Agent under Agent's prior name.

If the Company accepts and agrees to the foregoing, please so indicate by executing the enclosed copy of this letter and returning it to PEPI on or before 6 p.m., eastern time, January 27, 2010, to be effective as of December 31, 2009.

Very truly yours,

PEPI CAPITAL, L.P.

By: _____

David Radunsky, Chief Operating Officer of its general partner

DA-3072429 v11 1203528-00006

AA00235

ACCEPTED to be effective as of December 31, 2009:

**Fiddler's Creek, LLC**

By: GBFC II Two, LLC

By: _Anthony DiNardo_

Anthony DiNardo, as Chief Financial Officer

and not individually

**GB Peninsula, Ltd.**

By: GB Peninsula, Inc.

By: _Anthony DiNardo_

Anthony DiNardo, as Secretary/Treasurer

and not individually

DA-3072429 v11 1203528-00006

**AA00236**

# EXHIBIT A

## PEPI Capital, L.P.

### $27,000,000 Senior Secured Debtor-In-Possession Multiple Advance Term Loan Credit Facility ("Credit Facility")

### Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company"). |
| Agent: | PEPI Capital, L.P. |
| Lenders: | PEPI Capital, L.P. or its designated affiliate and/or other lenders who may be added from time to time. |
| Guarantors: | All subsidiaries and affiliates of the Company that are listed on Exhibit E (collectively, the "Guarantors"). |
| DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a multiple advance senior secured debtor-in-possession - term loan credit facility with aggregate advances of up to $27,000,000 (the "Loan") for use in connection with the anticipated voluntary Chapter 11 bankruptcy filings by the Company and the Guarantors (the "Bankruptcy Cases"), subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") or any other court taking jurisdiction over such Bankruptcy Cases. The Loan is not a revolving line of credit. Specifically, the repayment of any principal amount of the Loan may not be reborrowed and will not provide additional or renewed availability under the Loan. Advances under the Loan will be subject to limitation based on the maximum outstanding balance at any particular time as set forth on Exhibit D. |
| Purpose and Proceeds: | The proceeds of the Loan shall be used in accordance with an 18-month budget and business plan through the anticipated exit from the Bankruptcy Cases submitted by the Company to the Agent and approved by the Agent in connection with the execution of the Commitment Letter, with any amendments to the budget thereafter to be approved by the Agent (collectively, the "18 Month Budget"). The initial 18-Month Budget attached hereto as Exhibit G is hereby approved by the Lender. The 18 Month Budget shall include, among other things, the Company's operating expenses, working capital needs, professional fees for the bankruptcy proceedings, financing costs for secured lenders, real estate taxes, CDD assessments and the fees and costs |

AA00237

associated with the Loan and the preparation and negotiation of documentation for the Loan. Subject to the prior approval of the Agent, Managed Expenses set forth in the 18 Month Budget shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on Exhibit D as of the respective dates set forth on Exhibit D. No proceeds of the Loan will be advanced unless and until each condition precedent thereto has been fulfilled, and with respect to the Initial Advance or any subsequent advances under the Credit Facility, no proceeds of the Loan will be advanced while any event of default has occurred and is continuing there under. The Company will provide to Agent, no later than 15 days prior to each calendar quarter-end, an updated 13-week cash budget for the upcoming 13-week period.

**Loan Advances:** Upon and after entry of the Interim Order (hereinafter defined) by the Bankruptcy Court, an advance in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility (the "Initial Advance") may be made in an amount not to exceed $4 million consistent with the initial 13-week budget for amounts for the period of time between the filing of the Bankruptcy Cases and the hearing on the Final Order. Upon entry of the Final Order by the Bankruptcy Court, additional advances (the "Subsequent Advances" and together with the Initial Advance, the "Loan Advances") may be made from time to time thereafter in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility. The Subsequent Advances will be made monthly, with the Company providing Agent with each request for a Loan Advance at least 5 business days prior to any Loan Advance. Loan Advances will be made in multiples of $100,000, with a minimum amount of $500,000. Aggregate Loan Advances may not exceed $27,000,000.00.

**Unused Loan Fee:** Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on the amount of the Loan not yet advanced to the Company. Such fee may be paid from the proceeds of the Loan.

**Expenses:** Upon two (2) business day's written request from Agent, the Company shall deliver to Agent such deposits as may be necessary, in Agent's reasonable discretion, to cover continuing out of pocket expenses through the maturity and payment in full of the Loan. The Company has provided $275,000 as a deposit for Agent expenses related to Agent due diligence and preparation of this Commitment Letter. In addition to the Commitment Fee, pursuant to the terms of the Fee Letter Agreement (defined below) the Company has deposited an additional $250,000 with Agent, and Agent may retain the

AA00238

$250,000 expense deposit, to cover Agent expenses related to remaining due diligence, loan documentation and other third party expenses Agent will incur to obtain Loan approval by the Bankruptcy Court. The deposit is not a cap or a limit on such expenses and the Company shall pay to Agent any expenses in addition to the deposit upon demand. Upon and after funding of the Loan, the Company will advance to Agent such additional expenses as may be required in the reasonable discretion of the Agent to cover continuing expenses of Agent in monitoring and administering the Loan. Subject to Bankruptcy Court approval and inclusion in the approved 18 Month Budget, the Company will reimburse to third parties those expenses and costs advanced to or paid on behalf of the Company to the Agent associated with the Bankruptcy Cases, this Commitment Letter, and closing of the Credit Facility.

| | |
|---|---|
| Loan Amount: | Up to $27,000,000, disbursed in multiple advances consisting of the Initial Advance and the Subsequent Advances. At no time shall the outstanding Loan balance exceed $15,000,000. Further, the Loan balance shall not exceed the "Maximum Outstanding Loan Balance" set forth on <u>Exhibit D</u> as of the date set forth on <u>Exhibit D</u>. |
| Interest Rate: | 12% per annum, payable monthly in arrears but not greater than the maximum rate provided by applicable law. |
| Default Rate: | Upon the occurrence of an event of default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law. |
| Mandatory Prepayments: | Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds (defined as gross receipts from sale of assets, less costs of closing, including but not limited to, title costs, commissions, CDD buy down, real estate taxes, other allowable normal and customary closing costs) (the "<u>Net Asset Sales Proceeds</u>") shall be applied first to the Loan unless otherwise agreed to by Agent. Until such time as the Loan has been paid in full (including, without limitation, all principal, interest and fees), no payments of principal or interest shall be paid to any existing secured creditors without the express prior written approval of Agent, unless identified in the 18 Month Budget approved by Agent. For avoidance of doubt, the 18 Month Budget includes the payment of interest to secured creditors with mortgage liens on the assets of the Company during the period of the 18 Month Budget. |
| Closing Date: | The Initial Advance shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of an Interim Order in form and substance satisfactory to Agent in its reasonable |



AA00239

discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Initial Advance to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of the Commitment Fee at the time of the Initial Advance and payment in full of all expenses. The Subsequent Advances shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of a Final Order in form and substance satisfactory to Agent in its reasonable discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Subsequent Advances to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of payment in full of all expenses.

| | |
|---|---|
| **Maturity Date:** | The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later date as set forth Extension below in the section entitled "Extension Date")(the "Initial Maturity Date"), (b) the entry by the Bankruptcy Court of an order confirming a plan of reorganization for the Company or any Guarantor (unless expressly agreed to by Agent), or (c) the date upon which a final order is entered by the Bankruptcy Court either (i) converting the Company's or any Guarantor's Chapter 11 case to a case under Chapter 7 (unless expressly agreed to by Agent), (ii) approving one or more 363 sales of all or substantially all of the Company's or any Guarantor's assets (unless expressly agreed to by Agent), (iii) appointing a trustee or examiner (with or without expanded powers) in the Company's or any Guarantor's Chapter 11 case, (iv) dismissal of any of the Company's or any Guarantor's bankruptcy cases (unless expressly agreed to by Agent), or (d) the occurrence of an event of default under the Loan documentation and the expiration of any applicable cure period. |
| **Acceptance Date:** | The Company must accept this Commitment Letter by 6 p.m. eastern time on January 27, 2010, to be effective as of December 31, 2009. |
| **Commitment Fee:** | On December 31, 2009, the Company and Agent entered into that certain fee letter agreement, as amended by that certain amended fee letter agreement dated January 15, 2010 (collectively, the "Fee Letter Agreement") under which the Company deposited with Agent in escrow the sum of $785,000 to be applied, with the previously paid application fee of $25,000, to the payment of an $810,000 commitment fee (the "$810,000 Commitment Fee Deposit Escrow"). Upon Agent's issuance of this Commitment Letter and execution of this Commitment Letter by both Agent and the Company, 100% of the $810,000 commitment fee (the "Commitment Fee") shall be deemed fully earned, but shall be paid to the Agent by the Agent retaining one half of the $810,000 Commitment Fee Deposit |

AA00240

Escrow as a non-refundable payment and the remaining unpaid one-half of the Commitment Fee ($405,000.00) shall be financed as part of the Credit Facility and shall be paid to Agent upon funding of the Initial Advance. The remaining one half of the $810,000 Commitment Fee Deposit Escrow will then be wired the next business day by Agent to the account designated by the Company in the Fee Letter Agreement.

Exit Fee:

2% of the funds used to pay the principal outstanding at any time of the Loan, whether (a) upon payment in full of the Loan at maturity, (b) any partial principal payment of the Loan prior to maturity, or (c) any other reduction in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility of the principal amount of the Loan.

Break-Up Fee:

If the Company directly or indirectly, enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the Credit Facility that is approved by the Bankruptcy Court, then the Company immediately shall pay to PEPI a break-up fee of $1,000,000 (the "Break-Up Fee"). The Break-Up Fee is in addition to any other amount paid or payable hereunder. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing, or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. The Company shall take all necessary action in the Bankruptcy Court to authorize the payment of the Break-Up Fee when it accrues including, without limitation, stipulating that such fee is an allowed Chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

Collateral:

The Initial Advance and all indebtedness and obligations under the Loan associated with the Initial Advance will be secured by a Bankruptcy Court-ordered Interim Order providing for first priority liens and first priority senior security interests in all unencumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership

AA00241

interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Unencumbered Collateral") and senior priming liens on all Collateral (as defined below) of the Company and Guarantors. The Subsequent Advances (together with the Initial Advance upon entry of the Final Order, the Loan Advances) and all indebtedness and obligations under the Loan associated with the Initial Advance and the Subsequent Advances will be secured by a Bankruptcy Court-ordered Final Order providing for first priority priming liens and first priority senior security interests in all Unencumbered Collateral and all encumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing, together with the Unencumbered Collateral, being referred to as the "Collateral"). Both the Unencumbered Collateral and the Collateral shall have no permitted encumbrances senior or equal to the Agent's and the Lenders' liens and security interests except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral, and those matters commonly included as exceptions to title insurance policies in Southwest Florida that may be specifically agreed to in writing by Agent in its sole discretion ("Permitted Liens"). Permitted Liens shall also include the Replacement Liens as defined below, provided that all such Replacement Liens shall be subordinate to the Agent and Lender's liens. Final loan documentation will include provisions that provide for the granting of replacement liens (the "Replacement Liens") subordinate to those of the Agent and Lender to be provided to those secured lenders who have the collateral securing their respective prepetition allowed secured claims sold during the Bankruptcy Cases by the Company and the proceeds from which are not paid to such secured lender in accordance with their prepetition loan documents. The Agent agrees that all such Replacement Liens may be subordinate to its senior priming liens on remaining real estate assets of the Company. For purposes of illustration only, if the Company sells a developed

AA00242

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the **"Minimum Net Cumulative Sales Covenant if not paying Managed Expenses"** set forth on Exhibit D for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly. In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development , Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

DA-3072429 v11 1203528-00006

AA00243

6. The Tarpon Club owned by GBFC Marina, Ltd.;

7. The Creek Golf Course owned by FC Golf, Ltd.;

8. The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;

9. The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc.;

10. The undeveloped land including in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America; and

11. The Fiddlers' Creek Sales and Administration buildings owned by 951 Land Holding, Ltd.

| | |
|---|---|
| Cash Account | All cash from Net Asset Sale Proceeds and other operating cash will be held in accounts pledged to benefit of the Agent and over which Agent shall have control (the "Cash Collateral Accounts"), which Cash Collateral Accounts shall be debtor in possession accounts in accordance with the guidelines of the Office of the United States Trustee and shall be disbursed pursuant to the 18 Month Budget so long as there is no pending event of default. All Net Asset Sale Proceeds shall be paid to the Agent to be applied to reduce the Loan. All cash generated from the operations of the Company ("Operating Cash") shall be deposited into separate Cash Collateral Accounts and may be used by the Company in accordance with the 18 Month Budget. |
| Use of Cash Collateral | So long as no event of default occurs and is continuing under the Loan, the Company may use cash in the Cash Collateral Accounts, other than Net Asset Sale Proceeds which shall be paid to the Lender to reduce the Loan, in accordance with the 18 Month Budget. The use of Operating Cash in accordance with the 18 Month Budget as provided herein shall not be deemed a Loan Advance. |
| Collateral Monitoring Fee: | The Company shall pay to Agent a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding or there is any remaining availability under the Loan. The Collateral Monitoring Fee may be paid from the proceeds of the Loan. |
| Extension Date: | Upon 30 days' prior written notice to Agent, payment of the |

DA-3072429 v11 1203528-00006

AA00244

Extension Fee (hereinafter defined), and submission to Agent of an approved budget for the extension period, the Company may extend the Initial Maturity Date for up to two (2) consecutive six (6) month periods, provided that as of the date of any proposed extension no uncured event of default has occurred and is continuing, and no earlier termination triggering event has occurred.

Extension Fee:

An Extension Fee equal to 0.5% of the then-outstanding principal balance on the Loan plus any amount not yet advanced under the Loan (the "Extension Fee"), shall be payable by the Company for each exercised extension on or before the date of each such extension. The Extension Fee may be paid from the proceeds of the Loan.

DIP Provisions:

The Company will obtain (a) within forty-five (45) days of filing of the Bankruptcy Cases an interim order of the Bankruptcy Court approving the Initial Advance (the "Interim Order"), and (b) will within forty-five (45) days after the entry of such Interim Order obtain a final order (the "Final Order"; and collectively with the Interim Order, the "Orders") of the Bankruptcy Court approving the Loan Advances on a final basis, and fixing the funding date for the Subsequent Advances, which Final Order shall not have been appealed, reversed, modified, amended, stayed or vacated. Subject to Agent's approval, one or more advances may be made under the Loan in accordance with the terms herein. The Interim Order shall provide that the Initial Advance shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by first priority liens on and first priority senior security interests in favor of Agent and the Lenders in all of the Unencumbered Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code and also secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other administrative expenses as may be agreed to by Agent and Permitted Liens). The Final Order shall provide that the Initial Advance together with the Subsequent Advances shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other

AA00245

administrative expenses as may be agreed to by Agent and Permitted Liens). The Orders as entered by the Bankruptcy Court shall be in form and substance acceptable to Agent in its reasonable discretion, and at a minimum, shall contain provisions under Section 364(e) granting all such senior and priming liens, security interests and claims to Agent and the Lenders for all monies actually advanced even if such Orders are subsequently appealed, vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Agent and the Lenders to, upon five business days notice to the Company, immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens, security interests and claims granted to Agent and the Lenders shall contain cross default and cross collateral provisions with all other debt owed to the Lender. Agent and Lenders shall have no obligation to fund the Initial and Subsequent Advances should the Orders, at the time of Closing and funding, have been stayed, or as to the Final Order, is subject to appeal or modification, or otherwise not be in a form satisfactory to Agent in its reasonable discretion.

**Other Conditions Precedent:** Standard and customary for loans and transactions of this type and such other conditions precedent to the Initial Advance and each Subsequent Advance under the Loan as required by Agent in its reasonable discretion including, but not limited to, the following:

1. All the Company fees payable to Agent shall be current as provided herein, including without limitation, all fees of Agent's professionals.

2. Subject to the 18 Month Budget and limited by the terms and conditions herein, all of the Company's chapter 11 administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or addressed in a manner satisfactory to Agent in its reasonable discretion.

3. Completion of due diligence to the satisfaction of Agent, such due diligence to include, but not be limited to, examination of the Collateral and title thereto and additional due diligence related to the Company's business, industry, legal, environmental and technical related matters.

4. Completion of legal due diligence investigation by counsel to Agent, with results satisfactory to Agent and its counsel, of all matters which Agent deems relevant, in its reasonable discretion.

15 of 45



AA00246

5. The Company shall have executed and delivered all documentation required by Agent and its counsel in form and substance satisfactory to Agent and its counsel including, without limitation, a general release of all claims against Agent and Lenders through the time of funding, and the Company and Guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the liens, security interests and claims of Agent and the Lenders.

6. All necessary consents and approvals for the Company to enter into the Credit Facility shall have been obtained.

7. Receipt of current financial statements. Further, Agent must be satisfied that all financial statements required by Agent have been received and delivered to it fairly present the business and financial condition of the Company and its subsidiaries.

8. No material misstatements in or omissions from the materials previously furnished to Agent for its review.

9. No previously undisclosed intercompany transactions shall have occurred. Further, Agent must be satisfied that all listings of inter company transactions and transactions with affiliates required by Agent have been received.

10. There shall not be any litigation or other proceeding the result of which might have a material adverse effect on the Company and its affiliates and subsidiaries or any of their assets other than as listed on Exhibit F.

11. No material changes in governmental regulations or policies having a material adverse effect on the Company shall have occurred prior to the Closing Date.

12. The Company and each Guarantor shall be in good standing in its state of incorporation and qualified to do business in any state in which Collateral is located.

13. All motions, orders and bankruptcy court documentation regarding the Loan shall be in form and substance reasonably satisfactory to Agent and consistent with the terms herein.

14. Until all the Company obligations are paid in full to Agent and the Lenders, the Company shall provide to Agent not less than two (2) business days' advance notice of any filings made in the bankruptcy case(s) of

AA00247

the Company and the Guarantors, provided that the Company and Guarantors shall provide as much notice as is reasonably possible for emergency motions. Agent shall be given not less than five (5) business days' advance notice of any hearing regarding the Loan.

15. Such other commercially reasonable conditions precedent as Agent may require in its reasonable discretion, including, without limitation, satisfaction of each of the items listed on <u>Exhibit B</u> attached hereto.

16. Florida Financial Investments, Inc. shall execute and deliver to Agent documentation to subordinate its liens on the Collateral to those liens granted Agent and Lenders in the Interim and Final Orders consistent with the terms of this Commitment Letter.

| | |
|---|---|
| Collateral Monitoring | Agent or its financial advisor shall have customary rights to enter and inspect the premises, interview employees and accountants, and examine books and records, etc., upon reasonable notice to the Company. The Company shall provide Agent with all reports provided to any third party as well as such financial reports as Agent may request from time to time. |
| Guarantees: | All of the Guarantors shall guaranty the Loan and shall execute the Loan documents required by Agent. The Company represents, warrants, covenants and agrees that (i) all of the entities that operate, own, or control real estate within the Fiddlers' Creek development are listed on <u>Exhibit E</u>, provided however that the Guarantors shall not include GB 31, Ltd., Fiddler's Creek Foundation,Inc. or Aubrey Ferrao, (ii) all of such entities shall be Guarantors, and (iii) all of such entities will be the subject of individual chapter 11 case filings. For avoidance of doubt, equity interests in the Company owned by Mr. Ferrao will be pledged as Collateral under the Loan. |
| Representations and Warranties: | Customary for loans and transactions of this type and such other representations and warranties required by Agent in its reasonable discretion. |
| Covenants: | Definitive documentation to contain affirmative and negative covenants customary for loans and transactions of this type and such other affirmative and negative covenants required by Agent in its reasonable discretion, including but not limited to: |

1. The actual amount spent for any line item in the 18 Month Budget shall not vary from the amount provided for such item in the 18 Month Budget by more than 10% in any 13 week period, or in the aggregate.

DA-3072429 v11 1203528-00006

AA00248

2. Covenants related to asset sales, lot sales and milestones related to the Company's business plan and ultimate exit from bankruptcy, as specified in <u>Exhibits C</u> and <u>D</u>.

3. Limitations on maximum outstanding loan balance as set forth in <u>Exhibit D</u>.

4. Prohibitions on additional indebtedness without the Agent's prior written consent.

5. Restricted payments and related party transactions prohibited without the Agent's consent.

6. Restriction on the Company's ability to transfer or sell assets outside of the ordinary course of business without the Agent's consent (including pursuant to sale/leaseback transactions), unless required in conjunction with the Loan, with all proceeds used first to repay the Loan.

7. Limitation on incurrence of liens subject to the Agent's reasonable consent.

8. Subject to the limitations in the 18 Month Budget and contained herein, maintain all taxes (including without limitation ad valorem taxes) current with respect to the Collateral as authorized by Bankruptcy Court order.

9. Restriction on subsidiaries' ability to issue or sell ownership interests, unless as included in the Company's Plan of Reorganization.

10. Restriction on the Company's ability to consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries or affiliates.

11. Subject to the limitations in the 18 Month Budget and contained herein, maintain adequate insurance coverage in types and amounts satisfactory to Agent in its reasonable discretion.

12. The Company and the Guarantors will maintain current status on obligations with respect to assessments and other obligations to Community Development District #1 ("CDD#1") and Community Development District #2 ("CDD#2"). Subject to the prior approval of the Agent, Managed Expenses under the 18 Month Budget, including past due obligations to CDD#2 2003A Series, 2003 B Series, and 2004 Series bonds, shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on <u>Exhibit D</u> as of the respective dates set forth on <u>Exhibit D</u>. Otherwise, the Company and the Guarantors will make no payment of any CDD#1 or CDD#2 assessments for debt service, either pre-petition or post-petition.

DA-3072429 v11 1203528-00006

AA00249

13. The Company shall make representations that the debt service and outstanding assessments as of 12/31/09 are $3,858,191.26, and $36,671,476.99 respectively, for CDD1 and $3,470,653.89 and $72,887,413.41 respectively, for CDD2.

14. The Company shall represent that all land securing the 2003 and 2004 CDD2 bonds is platted and subject to final platting.

15. Subject to the limitations in the 18 Month Budget and contained herein and unless otherwise prohibited by the Bankruptcy Code, the Company will perform all obligations and responsibilities with respect to their participation, management and oversight of Fiddlers Creek Foundation, Tarpon Club and Fiddlers Creek Golf Club to ensure the club operations continue to provide their respective services to the members of each club.

16. Deposit of all Net Asset Sale Proceeds into Cash Collateral Account.

17. Weekly and monthly reporting to Agent, including:

    a. Weekly Sales Report to be submitted no later than close of business on the Wednesday following, to include:

        i. Closed sales by unit or property description, with buyer, sales price, costs of sales (including any commissions, and CDD buy downs), and net sales proceeds, and identifying any special discounts or concessions

        ii. Listing of assets put under contract, including sale price, release price, expected closing date, down payment

        iii. Weekly sales pipeline report, including any residential units, bulk lots, home sites, hotel condo, land or any other material asset of the Company

        iv. Report on any marketing activity undertaken

        v. Closings Report (Sales Price less seller costs for net cash at closing).

    b. Rolling 13 week cash forecast with comparison of actual to projected, including comments explaining variances from the forecast and 18 Month Budget

    c. Monthly update of litigation and property liens

    d. Monthly report of changes in any club membership roll, including:

        i. Additions

        ii. Submitted resignations

        iii. Removals

        iv. Delinquencies

    e. Monthly report on status of Community Development District projects and cash balances

    f. Monthly reports on any permitting and zoning activity

AA00250

g. Monthly financial reports for each Debtor, including a balance sheets and separate reports for each operating entity (golf course, clubs, etc.).

h. All reports submitted to any creditor, creditor committee, US Trustee, or other governmental authority

i. A monthly narrative description of the status of sales, development, legal, CDD, operating properties, HOA, financing and bankruptcy issues such that we are fully informed as to the status of the project

j. A rolling monthly forecast to be provided quarterly, which shall include the year-to-date actual results (i.e., from the funding date to the current period) plus receipts and disbursements which are anticipated to be incurred for the next 18 months, together with a comparison to the approved business plan

k. Monthly operating statement and statement of cash receipts and disbursements showing both the current month and year-to-date actual results compared to the approved business plan

l. Such other weekly or monthly reports that Agent may request

**Events of Default:** Customary for loans and transactions of this type and such other Events of Default required by Agent in its reasonable discretion including, but not limited to, a breach of the variance covenant relating to the Budget, exceeding maximum outstanding loan balance for a specific period as set forth on <u>Exhibit D</u>, failing to achieve minimum cumulative sales as set forth on <u>Exhibit D</u>, or selling assets at prices less than the minimum release prices as set forth on <u>Exhibit C</u>. In addition, the events of default shall contain reasonable notice and cure provisions before acceleration of the debt and enforcement of remedies.

**Purchase Option:** The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral and other

20 of 45

AA00251

supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan documentation.

Governing Law:                     State of Florida.

Due Diligence:                     There is a due diligence checklist which shall be updated regularly to reflect the delivery and receipt of items required by the conditions precedent terms herein.

Expenses and Indemnification:      Until such time as the Loan is paid in full, the Company shall reimburse Agent, upon demand, for all direct and indirect costs, fees, and expenses of Agent.  Indemnification and release provisions customary for loans and transactions of this type and satisfactory to Agent in its reasonable discretion will be provided for in the definitive documentation.

21 of 45

AA00252

## EXHIBIT B

### Additional Conditions Precedent

1.  Payment of the Commitment Fee to Agent.

2.  Bankruptcy Court Approval of the Credit Facility and all documentation for the Credit Facility shall be in form and substance acceptable to Lender.

3.  Delivery to Agent of Certified Articles/Certificates of Formation/Organization for the Company and each limited liability company Guarantor or general partner of a Guarantor.

4.  Delivery to Agent of Certified Certificates of Limited Partnership for each limited partnership Guarantor.

5.  Delivery to Agent of Certified Articles/Certificates of Incorporation for each corporate Guarantor or general partner of a Guarantor.

6.  Delivery to Agent of Operating Agreements/Regulations for the Company and each limited liability company Guarantor or general partner of a Guarantor.

7.  Delivery to Agent of Agreements of Limited Partnership for each limited partnership Guarantor.

8.  Delivery to Agent of Bylaws for each corporate Guarantor or general partner of a Guarantor.

9.  Delivery to Agent of Certificates of Existence and Good Standing for the Company, each Guarantor, and each general partner of a Guarantor from such person's jurisdiction of organization and, if not organized in Florida, from the State of Florida.

10. Delivery to Agent of appraisals from early 2009 for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an appraiser, satisfactory to Agent. The Agent consents to Integra Realty as being satisfactory to the Agent for this purpose only.

11  Delivery to Agent of current ALTA or comparable Surveys for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by a surveyor, satisfactory to Agent.

12. Delivery to Agent of current Phase I Environmental Reports for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an engineer, satisfactory to Agent.

13. Delivery to Agent of Zoning Letters for all real property collateral.

14. Delivery to Agent of Flood Letters for all real property collateral.

15. Delivery to Agent of Utility Letters for all real property collateral.

16. As to the Interim Order, delivery to Agent of Title Searches / Commitments for Mortgagee's Title Insurance Policies for all unencumbered real property collateral in form and substance, and prepared by a title company, satisfactory to Agent. As to the Final Order, delivery to Agent of

AA00253

Title Searches / Commitments for Mortgagee's Title Insurance Policies for all real property collateral in form and substance, and prepared by a title company, satisfactory to Agent and showing no title exceptions other than those approved by Agent.

17. For each Community Development District affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

    A.    Enabling Legislation or Creation Order;

    B.    Construction of its Board of Directors;

    C.    Name and contact information for each board member;

    D.    Name and contact information for its attorney;

    E.    Name and contact information for its financial advisor and/or bookkeeper;

    F.    Name and contact information for its auditor;

    G.    Name and contact information for its engineer;

    H.    Copy of each Project Improvement Acquisition Agreement entered into by the CDD and any developer of land in the district;

    I.    Each assignment of the Project Improvement Acquisition Agreements in item H;

    J.    Copy of the last offering statement;

    K.    Copy of the last audit;

    L.    Confirmation of the development status of land within the CDD;

    M.    Confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD;

    N.    Identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD;

    O.    It's budget;

    P.    All bank account information;

    Q.    Assessments on all properties for debt service and other operations;

    R.    Financial statements for the CDD;

    S.    Annual assessments;

    T.    Total bond obligations related to debtor-owned properties in each bond issue (by unit/lot); and

DA-3072429 v11 1203528-00006

AA00254

U. Copies of all annual financial information and operating data delivered as part of the CDD's continuing disclosure obligations pursuant to its offering statement.

18. For each Homeowner's Association affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A. Identification of the specific real property collateral subject to the Homeowner's Association;

B. Documentation of its financial condition;

C. Its organizational documents;

D. Its budget;

E. Its Financial Statements;

F. Any CCRs (with all amendments);

G. The results of a Facility Inspection (pool, building, entries, etc.);

H. An overhead analysis;

I. A list of Declarants and Board positions (i.e., who controls); and

J. Comprehensive Dues information (land, lots, homes, etc.).

19. Delivery to Agent of copies of the real property tax statements for all real property collateral.

20. Delivery to Agent of all plats for all real property collateral.

21. Delivery to Agent of a list of leases with affiliated entities, in form and substance satisfactory to Agent.

22. Delivery to Agent of a list of all payments or other obligations required to maintain entitlements and zoning, in form and substance satisfactory to Agent.

23. Delivery to Agent of Financial Statements for the Company and each Guarantor, in form and substance satisfactory to Agent.

24. Delivery to Agent of a 13 week Cash budget for the Company and its subsidiaries, in form and substance satisfactory to Agent.

25. Delivery to Agent of the 2010 Budget and Business Plan for the Company and its subsidiaries, in form and substance satisfactory to Agent.

26. Delivery to Agent of UCC Searches for the Company and each Guarantor.

27. Delivery to Agent of a list of all existing lenders to the Company or any Guarantor in form and substance satisfactory to Agent.

DA-3072429 v11 1203528-00006

AA00255

28. Identification by the Company of the specific real property collateral impacted by each existing loan to the Company or any Guarantor, in form and substance satisfactory to Agent.

29. Delivery to Agent of copies of all existing loan and collateral documents for each existing loan to the Company or any Guarantor.

30. Identification by the Company of all outstanding receivables for all real and personal property collateral, in form and substance satisfactory to Agent. Delivery to Agent of all operating cash flow reports for any revenue generating activity at the project.

31. Delivery to Agent of a list showing the amount of deposits being held by each owner of real property collateral and any anticipated forfeitures, in form and substance satisfactory to Agent.

32. Delivery to Agent of a list of all fixed assets of the Company and each Guarantor, including, without limitation, vehicles and equipment, in form and substance satisfactory to Agent.

33. Delivery to Agent of a list of all copyrights, trademarks and patents owned or licensed to the Company and each Guarantor, in form and substance satisfactory to Agent.

34. Delivery to Agent of a detailed description and summary of all insurance currently held by the Company and each Guarantor and a list of any pending claims, in each case in form and substance satisfactory to Agent..

35. Delivery to Agent of copies of the most recent tax returns filed by the Company and each Guarantor.

36. Delivery to Agent of a list, in form and substance satisfactory to Agent, of any pending litigation against the Company, any Guarantor, or any of their respective assets, including, without limitation, any real or personal property collateral.

37. Delivery to Agent of a list and copies of any agreements containing a right of first refusal with respect to any real or personal property collateral.

38. Delivery to Agent of copies of any joint venture agreements entered into by the Company or any Guarantor.

39. The execution of and delivery to Agent by the Company and each Guarantor, as applicable, of each of the following documents, in form and substance satisfactory to Agent:

   A. Loan Agreement;

   B. Promissory Note;

   C. Security Agreement (shareholder of the Company, the Company and each Guarantor);

   D. Pledge Agreement (the Company and each Guarantor) covering such person's ownership interests in the Company and its subsidiaries;

   E. Stock Power (for each certificated ownership interest pledged to Agent and Lenders);

   F. Account Control Agreements for each deposit account of the Company and each

DA-3072429 v11 1203528-00006

AA00256

Guarantor;

G.   Guaranty Agreement (Guarantors);

H.   Mortgages for all real property collateral and security agreements and financing statements for all personal property collateral;

I.   Assignments of Leases and Rents for all real property collateral;

J.   Environmental Indemnities for all real property collateral;

K.   Assignments of all material contracts of the Company and each Guarantor;

L.   Omnibus Officer's Certificates of the Company and each Guarantor with Incumbency; and

M.   Notice of Final Agreement.

40.   Preparation and filing of UCC-1 Financing Statements for the Company and each Guarantor.

41.   Delivery to Agent of all stock certificates or other certificates of ownership in the Company and its subsidiaries pledged as collateral.

42.   Delivery to Agent of Legal Opinion Letters from legal counsel to the Company and each Guarantor containing customary opinions of legal counsel including, without limitation, legal opinions with respect to the Company, the Guarantors, all documentation for the Loan, the collateral, and the transactions contemplated hereby, all of which opinions are satisfactory to the Agent and its counsel.

44.   Delivery to Agent of Certificates of Insurance for all insurance held by the Company and each Guarantor.

45.   Delivery to Agent of Insurance Policy Endorsements for all insurance held by the Company and each Guarantor in form and substance acceptable to Agent.

46.   Delivery to Agent of Resolutions/Unanimous Consent of the Company and each Guarantor in form and substance satisfactory to Agent and authorizing, among other things, the Loan, all transactions contemplated hereby, and all documentation for the Loan and such transactions.

47.   Delivery to Agent of Mortgagee's Title Insurance Policies for all encumbered and unencumbered real property collateral in form and substance, and issued by a title company, satisfactory to Agent, containing Endorsements satisfactory to Agent, and subject only to exceptions approved by Agent.

48.   Payment of all mortgage taxes on all real property collateral except as agreed to by the Company and the Agent.

49.   Filing of Bankruptcy Petitions in the Bankruptcy Court for the Company and all related entities and subsidiaries.

50.   Delivery by the Company of Creditor accounts payable listings and service lists for each filing

DA-3072429 v11 1203528-00006

AA00257

entity.

51.   Filing of First Day motions with the Bankruptcy Court customary for chapter 11 bankruptcies of this type.

52.   Filing with the Bankruptcy Court of motion for use of cash collateral in form satisfactory to Agent and the Company.

53.   The Bankruptcy Court's entering of the Interim Order in form satisfactory to Agent and the Company.

54.   The Bankruptcy Court's entering of the Final Order in form satisfactory to Agent and the Company.

54.   The Bankruptcy Court's entering an order for the use of cash collateral in accordance with the 18 Month Budget, which is in form satisfactory to Agent and the Company.

55.   Filing of a motion for debtor-in-possession financing with the Bankruptcy Court in form satisfactory to Agent and the Company.

56.   Timely delivery to Agent of any other materials and information requested by Agent and needed in Agent's reasonable discretion for completion of Agent's due diligence with respect to the Company, the Guarantors and the collateral, including, without limitation, all real and personal property collateral.

57.   Without the prior express written approval of the Agent and Lenders, the Company and each Guarantor shall not (i) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or terminate any provision of the Credit Facility or any protection granted to Agent and the Lenders there under, or (B) extinguish, subordinate or diminish any security interest, lien or claim of the Agent or any Lender, or (ii) seek, consent to, or join in the approval of any matter or any plan of reorganization which purports to do any of the things described in (i)(A) and (i)(B).  Any such action taken by the Company or any Guarantor will be an enforceable Event of Default under the Credit Facility, and if such action is taken by the Company or any Guarantor, the commitment of Agent to provide the Credit Facility will terminate and Agent and the Lenders will have no obligation to provide any advances under the Credit Facility.

DA-3072429 v11 1203528-00006

AA00258

## Minimum Release Price/CDD Buy down Schedule
## Exhibit C

| Village | Unit | Minimum Gross Sale Price | CDD Buy down | Minimum Release Price |
|---|---|---:|---:|---:|
| Cotton Green | Lot 45 | 201,719 | 6,100 | 174,618 |
| Mallards Landing | 31-A | 414,720 | 20,327 | 345,743 |
| Bellagio | 6 | 713,359 | 17,257 | 624,241 |
| Bellagio | 11 | 605,063 | 17,257 | 526,556 |
| Bellagio | 16 | 380,439 | 17,257 | 308,932 |
| Bellagio | 30 | 629,909 | 17,257 | 551,402 |
| Bellagio | 33 | 640,941 | 17,257 | 562,434 |
| Bellagio | 34 | 688,505 | 17,257 | 609,997 |
| Bellagio | 35 | 290,137 | 17,257 | 211,630 |
| Majorca | 4 | 888,783 | 25,035 | 794,098 |
| Majorca | 5 | 1,027,459 | 25,035 | 918,424 |
| Cranberry Crossing | 25 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 30 | 356,270 | 25,907 | 298,863 |
| Cranberry Crossing | 36 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 43 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 47 | 450,162 | 25,907 | 382,605 |
| Sauvignon | 8 | 963,115 | 15,718 | 877,396 |
| Serena | 6-102 | 161,954 | 11,398 | 123,492 |
| Serena | 7-201 | 249,337 | 11,398 | 210,875 |
| Serena | 8-201 | 246,405 | 11,398 | 207,943 |
| Serena | 11-202 | 254,468 | 11,398 | 216,006 |
| Serena | 13-202 | 247,584 | 11,398 | 209,122 |
| Serena | 15-201 | 477,800 | 11,398 | 439,338 |
| Serena | 17-102 | 508,548 | 11,398 | 459,354 |
| Serena | 17-201 | 518,231 | 11,398 | 479,769 |
| Serena | 17-202 | 652,546 | 11,398 | 593,182 |
| Serena | 19-101 | 435,318 | 11,398 | 396,856 |
| Serena | 19-102 | 435,318 | 11,398 | 396,856 |
| Serena | 19-201 | 539,653 | 11,398 | 501,191 |
| Marengo | 1-102 | 160,765 | 13,943 | 125,822 |
| Marengo | 3-202 | 153,857 | 13,943 | 116,814 |
| Marengo | 4-103 | 155,683 | 13,943 | 120,740 |
| Marengo | 6-202 | 394,182 | 13,943 | 357,139 |
| Marengo | 7-203 | 144,227 | 13,943 | 107,184 |
| Marengo | 8-204 | 186,745 | 13,943 | 146,552 |

DA-3072429 v11 1203528-00006

AA00259

| | | | | |
|---|---|---|---|---|
| Marengo | 9-201 | 420,959 | 13,943 | 380,766 |
| Marengo | 9-203 | 388,387 | 13,943 | 351,344 |
| Marengo | 10-103 | 374,163 | 13,943 | 332,220 |
| Marengo | 10-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 10-203 | 398,637 | 13,943 | 354,594 |
| Marengo | 10-204 | 431,670 | 13,943 | 383,077 |
| Marengo | 11-102 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-103 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-201 | 434,199 | 13,943 | 394,006 |
| Marengo | 11-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 11-203 | 398,637 | 13,943 | 361,594 |
| Millbrook | 10 | 728,692 | 45,420 | 629,824 |
| Millbrook | 11 | 884,609 | 45,420 | 774,729 |
| Millbrook | 12 | 878,236 | 45,420 | 768,806 |
| Millbrook | 13 | 900,143 | 45,420 | 789,166 |
| Callista | 06-101 Model | 514,434 | 11,748 | 465,936 |
| Callista | 06-102 Model | 476,295 | 11,748 | 429,897 |
| Callista | 06-103 | 421,565 | 11,748 | 383,566 |
| Callista | 06-104 | 470,261 | 11,748 | 430,863 |
| Callista | 06-201 | 396,997 | 11,748 | 354,449 |
| Callista | 06-202 Model | 564,532 | 11,748 | 516,033 |
| Callista | 06-203 | 476,992 | 11,748 | 436,193 |
| Callista | 06-204 Model | 645,349 | 11,748 | 591,951 |
| Callista | 10-101 | 463,267 | 11,748 | 423,869 |
| Callista | 10-102 | 421,565 | 11,748 | 383,566 |
| Callista | 10-103 | 423,102 | 11,748 | 383,704 |
| Callista | 10-104 | 468,622 | 11,748 | 429,224 |
| Callista | 10-202 | 465,408 | 11,748 | 426,010 |
| Callista | 10-203 | 469,158 | 11,748 | 429,760 |
| Callista | 12-101 | 457,911 | 11,748 | 418,513 |
| Callista | 12-103 | 303,544 | 11,748 | 265,545 |
| Callista | 12-104 | 200,036 | 11,748 | 160,638 |
| Callista | 12-201 | 265,387 | 11,748 | 222,839 |
| Callista | 12-203 | 338,560 | 11,748 | 297,762 |
| Callista | 12-204 | 265,387 | 11,748 | 222,839 |
| Callista | 13-101 | 338,466 | 11,748 | 299,068 |
| Callista | 13-103 | 307,155 | 11,748 | 269,157 |
| Callista | 13-202 | 452,556 | 11,748 | 411,758 |
| Callista | 13-203 | 210,469 | 11,748 | 169,670 |
| Callista | 14-101 | 340,071 | 11,748 | 300,673 |
| Callista | 14-102 | 372,434 | 11,748 | 334,436 |
| Callista | 14-103 | 190,391 | 11,748 | 152,393 |
| Callista | 14-202 | 256,612 | 11,748 | 215,814 |

DA-3072429 v11 1203528-00006

AA00260

| | | | | |
|---|---|---|---|---|
| Callista | 14-204 | 294,341 | 11,748 | 251,792 |
| Callista | 15-101 | 447,201 | 11,748 | 407,803 |
| Callista | 15-102 | 406,500 | 11,748 | 368,502 |
| Callista | 15-103 | 229,847 | 11,748 | 191,849 |
| Callista - SOLD | 15-104 | | 11,748 | -39,398 |
| Callista | 15-201 | 413,047 | 11,748 | 370,499 |
| Callista | 15-202 | 342,480 | 11,748 | 301,682 |
| Callista | 15-203 | 342,480 | 11,748 | 301,682 |
| Callista | 16-102 | 191,194 | 11,748 | 153,195 |
| Callista | 16-204 | 297,921 | 11,748 | 255,373 |
| Callista | 17-101 | 271,056 | 11,748 | 231,658 |
| Callista | 17-102 | 246,566 | 11,748 | 208,568 |
| Callista | 17-103 | 324,542 | 11,748 | 286,544 |
| Callista | 17-201 | 348,916 | 11,748 | 306,368 |
| Callista | 17-203 | 274,000 | 11,748 | 233,202 |
| Menaggio | 4-102 | 658,237 | 8,558 | 608,237 |
| Menaggio | 5-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 5-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-102 | 502,117 | 8,558 | 453,309 |
| Menaggio | 11-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-201 | 845,892 | 8,558 | 788,684 |
| Menaggio | 12-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-201 | 639,878 | 8,558 | 591,070 |
| Menaggio | 16-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 16-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-201 | 322,770 | 8,558 | 273,962 |
| Menaggio - SOLD | 19-102 | 314,272 | 8,558 | 272,464 |
| Chiasso | Lot # 1 | 1,497,350 | 33,100 | 1,394,250 |
| Chiasso | Lot # 2 | 1,559,146 | 33,100 | 1,456,046 |
| Chiasso | Lot # 3 | 1,751,889 | 33,100 | 1,648,789 |
| 116 | | | | 0 |
| | | | | 0 |
| Mahogany Bend | B23 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B24 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B27 | 212,735 | 13,943 | 184,975 |

DA-3072429 v11 1203528-00006

AA00261

| | | | | |
|---|---|---|---|---|
| Mahogany Bend | B28 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B29 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B30 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B31 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B32 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B33 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B34 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B35 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B36 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B37 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B38 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C1 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C2 | | 13,943 | -27,760 |
| Mahogany Bend | C3 | | 13,943 | -27,760 |
| Mahogany Bend | C4 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C5 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C6 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C7 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C8 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C9 | 212,735 | 13,943 | 184,975 |
| Isla Del Sol | 2 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 3 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 4 | | 13,943 | -32,293 |
| Isla Del Sol | 10 | | 13,943 | -32,293 |
| Isla Del Sol | 17 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 18 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 19 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 20 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 22 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 25 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 28 | 140,203 | 13,943 | 107,910 |
| Isla Del Sol | 29 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 30 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 31 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 32 | | 13,943 | -32,293 |
| Isla Del Sol | 33 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 34 | 325,841 | 13,943 | 293,548 |

DA-3072429 v11 1203528-00006

AA00262

# EXHIBIT D

### Fiddler's Creek

### Cumulative Home Sales/Maximum Outstanding Loan Balance Covenant

| Date | Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses | Minimum Net Cumulative Sales Covenant if not paying Managed Expenses | Maximum Outstanding Loan Balance Covenant |
|---|---|---|---|
| January 31, 2010 | $12,000,000 | | $10,000,000 |
| February 28, 2010 | $12,000,000 | | $10,000,000 |
| March 31, 2010 | $12,000,000 | | $10,000,000 |
| April 30, 2010 | $12,000,000 | | $10,000,000 |
| May 31, 2010 | $12,000,000 | | $10,000,000 |
| June 30, 2010 | $12,000,000 | $5,000,000 | $10,000,000 |
| July 31, 2010 | $12,000,000 | | $12,000,000 |
| August 31, 2010 | $12,000,000 | | $12,000,000 |
| September 30, 2010 | $12,000,000 | $8,000,000 | $13,000,000 |
| October 31, 2010 | $15,000,000 | | $15,000,000 |
| November 30, 2010 | $15,000,000 | | $15,000,000 |
| December 31, 2010 | $15,000,000 | $12,000,000 | $15,000,000 |
| January 31, 2011 | $15,000,000 | | $12,000,000 |
| February 28, 2011 | $15,000,000 | | $10,000,000 |
| March 31, 2011 | $20,000,000 | $20,000,000 | $8,000,000 |
| April 30, 2011 | $20,000,000 | | $6,000,000 |

DA-3072429 v11 1203528-00006

**AA00263**

| | | |
|---|---|---|
| May 31, 2011 | $20,000,000 | $5,000,000 |
| June 30, 2011 | $30,000,000 | $30,000,000 | $0 |

DA-3072429 v11 1203528-00006

AA00264

## EXHIBIT E

### Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| 951 LAND HOLDINGS LTD | Limited Partnership | 03/14/00 | 59-3684895 |
|   951 Land Holdings LLC | General Partner | 04/07/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| DY LAND ASSOCIATES LTD | Limited Partnership | 03/14/00 | 59-3684898 |
|   DY Associates LLC | General Partner | 04/07/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| GBFC DEVELOPMENT LTD | Limited Partnership | 03/14/00 | 59-3684897 |
|   GBFC Development LLC | General Partner | 04/06/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| GBFC MARINA LTD | Limited Partnership | 03/14/00 | 59-3684890 |
|   FC Marina LLC | General Partner | 04/06/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC BEACH LTD | Limited Partnership | 03/14/00 | 59-3684896 |
|   FC Beach LLC | General Partner | 04/06/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC GOLF LTD | Limited Partnership | 12/03/02 | 03-0509355 |
|   FC Golf LLC | General Partner | 11/25/02 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| DY LAND HOLDINGS II, LTD | Limited Liability Company | 04/25/08 | 26-2495367 |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC PARCEL 73, LLC | Limited Liability Company | 04/25/08 | 26-2494498 |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC COMMERCIAL, LLC | Limited Liability Company | 04/25/08 | 26-2495276 |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC HOTEL, LTD | Limited Partnership | 03/30/04 | 34-2024547 |
|   FC Hotel, LLC | General Partner | 11/25/02 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC RESORT, LTD | Limited Partnership | 03/30/04 | 34-2024546 |
|   FC Resort, LLC | General Partner | 11/25/02 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| GULF BAY HOSPITALITY LTD | Limited Partnership | 12/31/03 | 59-3790126 |
|   GULF BAY HOSPITALITY COMPANY, LLC | GEN PARTNER | 11/25/02 | N/A |
|   Fiddler's Creek LLC | Limited Partner | | |

DA-3072429 v11 1203528-00006

**AA00265**

| **FIDDLER'S CREEK LLC** | **TYPE** | **DATE INCORP** | **FED ID #** |
|---|---|---|---|
| GULF BAY HOTEL COMPANY LTD | Limited Partnership | 12/04/02 | 56-2495068 |
|    GULF BAY HOTEL COMPANY, LLC | General Partner | 11/25/02 | N/A |
|    Fiddler's Creek LLC | Limited Partner | | |
| | | | |
| <u>FIDDLER'S CREEK LLC</u> | Limited Liability Company | | 59-3639729 |
|    GBFC II LLC | Managing Member | | |
|    GBFC II TWO LTD | Member | | |
| | | | |
| GBFC II LP | Limited Partnership | | 59-3705460 |
|    GBFC II LLC | General Partner | | |
|    GB 100 LTD | Limited Partner | | |
| | | | |
| GB 100 LTD | Limited Partnership | 12/07/95 | 65-0628890 |
|    GB 100 Inc. | General Partner | 02/22/93 | 65-0395715 |
| | | | |
| Fiddler's Creek Management Inc. | Sub Charter C | 10/11/94 | 65-0532185 |
| | | | |
| GB Peninsula Ltd (Land) | Limited Partnership | | 59-3692446 |
|    GB Peninsula Inc (Gen. Partner) | General Partner | | 59-3692447 |
| | | | |
| GBP Development Ltd (sell house) | Subsidiary of Peninsula | | TBD |
|    GB Peninsula Ltd | Limited Partner | | 59-3692446 |
|    GBP Development LLC | General Partner | | TBD |

DA-3072429 v11 1203528-00006

**AA00266**

EXHIBIT F

**Material Pending Litigation**

| ENTITY NAME | | CASE NAME | CASE NUMBER; COURT | TYPE OF ACTION |
|---|---|---|---|---|
| **GB PENINSULA, LTD.** | | | | |
| GB Peninsula, Ltd.<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 001 | GBP Development, Ltd.<br>vs.<br>Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician<br>vs.<br>GBP Development, Ltd.,<br>GBP Development, LLC<br>and GB Peninsula, Ltd. | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission (return of deposit)<br><br>Contract Rescission/ Counterclaim for Specific Performance |
| GB Peninsula, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp.<br>vs.<br>GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action<br>/ Counterclaim to be filed |
| **GBP DEVELOPMENT, LTD.** | | | | |
| GBP Development, Ltd.<br>GBP Development LLC | 003 | Mark Chaikin<br>vs.<br>GBP Development, Ltd.<br>GBP Development, LLC.<br>Gulf Bay Homes, Ltd.<br>Gulf Bay Homes, Inc.<br>951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br>Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |
| GBP Development, Ltd.<br>GBP Development, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 001 | GBP Development, Ltd.<br>vs.<br>Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician<br>vs.<br>GBP Development, Ltd., | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier | Specific Performance / Counterclaim for Contract Rescission (return of deposit)<br><br>Contract Rescission/ Counterclaim for Specific Performance |

DA-3072429 v11 1203528-00006

AA00267

| | | | |
|---|---|---|---|
| | | GBP Development, LLC and GB Peninsula, Ltd. | County, Florida |
| GBP Development, Ltd. | 004 | Daniel Sussman and Peter Ferrara vs. GBP Development, Ltd. Fiddler's Creek Realty, Inc. | Case No. 05-1585-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| GBP Development, Ltd. | 005 | Daniel Sussman and Roberta Sussman vs. GBP Development, Ltd. | Case No. 07-1358-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| **THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs. Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership **Counts for:** Breach of Contract Piercing Corp Veil Dissipation of Escrow Civil Conversion Statutory Conversion and Civil Theft |
| GBP Development, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action / Counterclaim to be filed |
| GBP Development, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |
| **951 LAND HOLDINGS, LTD.** | | | | |
| 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |

DA-3072429 v11 1203528-00006

AA00268

| | | | |
|---|---|---|---|
| | | Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | |
| 951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>**Counts for:**<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| **FIDDLER'S CREEK, LLC** | | | |
| Fiddler's Creek, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>**Counts for:**<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| Fiddler's Creek, LLC | 007 | Textron Financial Corp. vs.<br>FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action<br><br>/ Counterclaim filed |
| Fiddler's Creek, LLC | ## | Fiddler's Creek, LLC vs.<br>Cushman Wakefield, Inc. and Cushman Wakefield Sonnenblick Goldman | Case No. 10-00272-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract; B/ Fiduciary Duty; B/Good Faith and Fair Dealing; Tortuous Interference, etc. |
| **FC GOLF, LTD.** | | | |
| FC Golf, Ltd.<br>The Golf Club at Fiddler's Creek<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>**Counts for:**<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow |

DA-3072429 v11 1203528-00006

AA00269

| | | | | |
|---|---|---|---|---|
| | | LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | | Civil Conversion Statutory Conversion and Civil Theft |
| FC Golf, Ltd. | 007 | Textron Financial Corp. vs. FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action / Counterclaim filed |
| FC Golf, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |

**FIDDLER'S CREEK MANAGEMENT, INC**. (LLC)
(currently being represented by Foundation insurance company counsel)

| | | | | |
|---|---|---|---|---|
| Fiddler's Creek Mgt, Inc. | 008 | Sally and Gerald Bergmoser vs. Fiddler's Creek Foundation, Inc. d/b/a The Club and Spa at Fiddler's Creek and Fiddler's Creek Management, LLC | Case No. 09-4388-CA; 20th Judicial Circuit, Collier County, Florida | Damages |

**GBFC DEVELOPMENT, LTD.**

| | | | | |
|---|---|---|---|---|
| GBFC Development, Ltd. **THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 009 | John and Jane Baldwin vs. Gulf Bay Construction Co. Gulf Bay Construction Co. GBFC Development, Ltd. | Case No. 08-8984-CA; 20th Judicial Circuit, Collier County, Florida | Damages |
| GBFC Development, Ltd. | 010 | Thomas and Sandra Gollinger vs. GBFC Development, Ltd. | Case No. 08-6226-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 011 | GBFC Development, Ltd. vs. Frederick Smith | Case No. 08-9676-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 012 | Ellen Spear v GBFC Development, Ltd. | Case No. 07-2193-CA [Marengo] ; 20th Judicial Circuit, Collier County, Florida | Contract rescission/ Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 013 | GBFC Development, Ltd. vs. Leonard Bubri | Case No. 09-2148-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

**AA00270**

| GBFC Development, Ltd. | 014 | GBFC Development, Ltd. Vs. Dennis Bauries and Brian Cramer | Case No. 08-3953-CA [Marengo]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
|---|---|---|---|---|
| GBFC Development, Ltd. | 015 | GBFC Development, Ltd. vs. Thomas and Kelly Armstrong | Case No. 09-3528-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 016 | GBFC Development, Ltd. vs. Steen, Eric | Case No. 09-3453-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / **DEFAULT JUDGMENT ENTERED** |
| GBFC Development, Ltd. | 017 | GBFC Development, Ltd. vs. David and Jane Moreton | Case No. 08-9678-CA [Service accepted by the Foreign] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 018 | GBFC Development, Ltd. vs. Michael and Susan Lofstedt | Case No. 08-9184-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 019 | GBFC Development, Ltd. vs. Michael Tierney and Melvin Christiansen | Case No. 08-8396-CA [Awaiting Service – Foreign National] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 020 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0848-CA [Awaiting Service – Foreign National] [Callista 12-104]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 021 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0847-CA [Awaiting Service – Foreign National] [Callista 12-204]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 022 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2486-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |

DA-3072429 v11 1203528-00006

AA00271

| GBFC Development, Ltd. | 023 | Robert and Charlene Edwards vs. GBFC Development, Ltd. | Case No. 07-2458-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
|---|---|---|---|---|
| GBFC Development, Ltd. | 024 | Brian and Jody Boland vs. GBFC Development, Ltd. | Case No. 08-7795-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Specific Performance |
| | | GBFC Development, Ltd. vs. Brian and Jody Boland | Case No. 08-8395-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 025 | GBFC Development, Ltd. vs. Jay and Myra Browne | Case No. 08-9677-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 026 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2485-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 027 | GBFC Development, Ltd. vs. Mark and Kimberly Woolley | Case No. 09-3529-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 028 | GBFC Development, Ltd. vs. Brannigan, Jane R. | Case No. 09-2149-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

**AA00272**

**EXHIBIT G**

**Approved 18-Month Budget**

**(In $000's)**

DA-3072429 v11 1203528-00006

AA00273

Attachment A
Fiddler Creek, LLC and Subsidiaries
Consolidated Budget for DIP Loan

| Expense Category | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | |

*(The detailed monthly figures in this budget table are not legibly reproducible at the available resolution. Expense categories listed include: Club Subsidy; Real Estate Taxes; CDD Maintenance Funding; CDD Debt Service Assessments; Development Fee; General Development; Parcel Construction; Outside Consultant/Brokerage Cost; Marketing; Project Administration; Parcel Administration; DIP Loan Commitment Fee reimbursement; DIP Less Commitment Fee reimbursement; DIP Loan closing expenses; Collateral Monitoring Fee; DIP Loan Unused Availability Fee; DIP Loan Exit Fee; Contingency; Total Operating Budget; Financing Payments; Total Expenses; Cumulative Expenses; Managed Expenses; Real Estate Taxes; Parcel Administration Real Estate Taxes; CDD Debt Service Assessments; Contingency; Total; Base Expenses; Cumulative Managed Expenses; Net Cumulative Expenses; Maximum DIP Loan Balance; Managed Expense Sales Trigger/Covenant; Sales Covenant (if no Managed expenses paid).)*

– Page 43 of 45

DA-3072429 v11 1203528-00006

AA00274

44

AA00275

45

AA00276

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates     Case No.: 8:10-BK-03846-KRM
(Jointly Administered)

     Debtors

_____/     Chapter 11

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates,

     Plaintiffs/Counterdefendants,

vs.     Adv. Proc. No.: 11-ap-00809-KRM

PEPI CAPITAL, L.P.,

     Defendant/Counterplaintiff and
     Third Party Plaintiff
_____

PEPI CAPITAL, L.P.,

     Third Party Plaintiff,

vs.

GULF BAY CAPITAL, INC.,

     Third-Party Defendant.
_____/

**THIRD PARTY DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO
FIRST AMENDED THIRD-PARTY COMPLAINT**

Third Party Defendant, Gulf Bay Capital, Inc. ("Gulf Bay"), by and through

undersigned counsel, hereby files its answer to First Amended Third-Party Complaint filed

1

AA00277

by Third-Party Plaintiff, PEPI Capital, L.P. ("PEPI"), and states:

1.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 1 of the Amended Third-Party Complaint related to the source of PEPI's claims; therefore, the same are denied.  Gulf Bay denies the remaining allegations in paragraph 1 of the Amended Third-Party Complaint.

2.     Denied.

3.     Denied.

4.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 4 of the Amended Third-Party Complaint; therefore, the same are denied.

5.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 5 of the Amended Third-Party Complaint; therefore, the same are denied.

6.     Gulf Bay admits the allegations in paragraph 6 of the Amended Third-Party Complaint, for jurisdictional purposes only.

7.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 7 of the Amended Third-Party Complaint; therefore, the same are denied.

8.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 8 of the Amended Third-Party Complaint; therefore, the same are denied.

9.     Gulf Bay admits the allegations in paragraph 9 of the Amended Third-Party Complaint.

10.    Denied.

11.    Gulf Bay admits that it is a Florida corporation who, at all times material

2

AA00278

hereto, has maintained its corporate formalities. Gulf Bay denies the remaining allegations in paragraph 11 of the Amended Third-Party Complaint.

12.     Denied.

13.     Denied.

14.     Gulf Bay admits that it is not party to the Term Sheet and the Commitment Letter, copies of which are attached to the Amended Third-Party Complaint as Exhibits "A" and "B," respectively.  Gulf Bay is without sufficient knowledge to admit or deny the remaining allegations in paragraph 14 of the Amended Third-Party Complaint; therefore, the same are denied.

15.     Denied.

16.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 16 of the Amended Third-Party Complaint; therefore, the same are denied.

17.     Denied.

18.     Denied.

19.     Denied.

20.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 20 of the Amended Third-Party Complaint; therefore, the same are denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

AA00279

25.     Denied.

26.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 26 of the Amended Third-Party Complaint; therefore, the same are denied.

27.     Denied.

28.     Denied.

### Count 1:  Tortious Interference with Contract Against Gulf Bay

29.     Gulf Bay re-alleges and re-avers its answers to paragraphs 1 through 28, as if set forth fully herein.

30.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 26 of the Amended Third-Party Complaint regarding the validity and/or enforceability of the Term Sheet and/or the Commitment Letter; therefore, the same are denied.  Gulf Bay denies the remaining allegations in paragraph 30 of the Amended Third-Party Complaint.

31.     Denied.

32.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 32 of the Amended Third-Party Complaint; therefore, the same are denied.

33.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 33 of the Amended Third-Party Complaint; therefore, the same are denied.

### Count 2:  Tortious Interference with Advantageous Business Relationship Against Gulf Bay

34.     Gulf Bay re-alleges and re-avers its answers to paragraphs 1 through 33, as if set forth fully herein.

4

AA00280

35.     Denied.

36.     Denied.

37.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 37 of the Amended Third-Party Complaint; therefore, the same are denied.

38.     Gulf Bay is without sufficient knowledge to admit or deny the allegations in paragraph 38 of the Amended Third-Party Complaint; therefore, the same are denied.

39.     Gulf Bay denies any and all allegations not expressly admitted herein.

### Affirmative Defenses

First Affirmative Defense

40.     PEPI'S claims against Gulf Bay in the Amended Third-Party Complaint are barred as the act of providing debtor-in-possession ("DIP") financing is a legal act and not tortious.    The Commitment Letter, by its express terms, permitted Fiddler's Creek to use a different lender; therefore, Gulf Bay's actions cannot be considered unjustified interference.

41.     Thus, Fiddler's Creek, LLC engaged in a rightful action by selecting Gulf Bay as the DIP lender, and therefore PEPI cannot state a claim for tortious interference against Gulf Bay.

Second Affirmative Defense

42.     PEPI'S claims against Gulf Bay in the Amended Third-Party Complaint are barred by the doctrine of waiver.

43.     On February 24, 2010, Fiddler's Creek sought court approval of obtaining senior secured post-petition financing by and through Gulf Bay (the "Emergency Motion").

AA00281

[DE #10]  PEPI did not file any paper in opposition thereto.  On March 3, 2010, an evidentiary hearing was held regarding Fiddler's Creek's Emergency Motion.  PEPI did not voice any opposition to the Emergency Motion at the evidentiary hearing.  Finally, on March 10, 2010, the Bankruptcy Court granted Fiddler's Creek, LLC's Emergency Motion related to its receipt of DIP financing by Gulf Bay, and thereby expressly approved Gulf Bay as the Debtors' DIP lender.  [DE #73].

44.     Following the ruling on the Emergency Motion, the Court held multiple interim hearings regarding each of the Debtors' periodic requests for increases of limited additional funding from Gulf Bay.  PEPI failed to object to any of the same.

45.     Accordingly, PEPI voluntarily and intentionally waived its claims against Gulf Bay.

Third Affirmative Defense

46.     PEPI'S claims against Gulf Bay in the Amended Third-Party Complaint are barred by the doctrine of collateral estoppel.

47.     As set forth above in Gulf Bay's second affirmative defense, PEPI failed to object to Fiddler's Creek's agreement to obtain DIP financing from Gulf Bay in the bankruptcy proceeding.  As such, PEPI is estopped from asserting claims against Gulf Bay related to Fiddler's Creek's accepting of DIP financing from Gulf Bay.

Fourth Affirmative Defense

48.     PEPI'S claims against Gulf Bay in the Amended Third-Party Complaint are barred by the doctrine of waiver.

6

AA00282

49.     On August 31, 2010, PEPI filed twenty-eight (28) claims, which are listed on Exhibit "A" to Debtors' Substantive Omnibus Objection To Claims Filed By PEPI Capital, L.P. [DE #1134], in each of the Debtors' cases asserting a claim in the total amount of $1,405,000.00 (the "PEPI Claims").   By and through the PEPI Claims, PEPI seeks the balance of a Commitment Fee and Break-Up Fee in connection with the Term Sheet and Commitment Letter, not the benefit of a DIP loan with Fiddler's Creek.   In light of the foregoing, PEPI has waived any right to seek additional damages against Gulf Bay.

Fifth Affirmative Defense

50.     PEPI'S claims against Gulf Bay in the Amended Third-Party Complaint are barred by the PEPI's own election of remedies.

51.     As set forth more fully in Gulf Bay's fourth affirmative defense, on August 31, 2010, PEPI filed twenty-eight (28) claims, the "PEPI Claims," seeking the balance of a Commitment Fee and Break-Up Fee in connection with the Term Sheet and Commitment Letter, not the benefit of a DIP loan with Fiddler's Creek.  In light of the foregoing, PEPI has affirmative elected its remedies for any alleged wrongdoing with respect to Fiddler's Creek's acceptance of DIP financing from Gulf Bay.

Sixth Affirmative Defense

52.     PEPI'S claims against Gulf Bay in the Amended Third-Party Complaint are barred by ratification.

53.     As set forth more fully in Gulf Bay's fourth affirmative defense, on August 31, 2010, PEPI filed twenty-eight (28) claims, the "PEPI Claims," seeking the balance of a

7

AA00283

Commitment Fee and Break-Up Fee in connection with the Term Sheet and Commitment Letter, not the benefit of a DIP loan with Fiddler's Creek. In so doing, PEPI ratified Fiddler's Creek's acceptance of DIP financing from Gulf Bay.

Seventh Affirmative Defense

54.    PEPI's claims against Gulf Bay in its Amended Third-Party Complaint are barred by its prior breach. As set forth more fully in Fiddler's Creek, LLC's third affirmative defense to PEPI's counterclaims [DE #32 ¶¶ 63-64], incorporated herein by reference, PEPI anticipatorily breached and/or committed a prior breach of the terms and conditions of the Commitment Letter. Such breach occurred prior to Gulf Bay's offer to provide DIP financing to Fiddler's Creek, LLC. As such, Gulf Bay's actions did not (and could not) interfere with an existing contractual or advantageous business relationship.

Eighth Affirmative Defense

55.    PEPI's claims against Gulf Bay in its Amended Third-Party Complaint are barred by Florida's Economic Loss Rule. Specifically, by and through its Amended Third-Party Complaint, PEPI seeks to supplement its breach of contract counterclaims against Fiddler's Creek, LLC with tort claims against Gulf Bay which simply and impermissibly are disguised breach of contract claims against Fiddler's Creek.

Ninth Affirmative Defense

56.    PEPI's claims against Gulf Bay in the Amended Third-Party Complaint are barred as, in the absence of a duty owed by Gulf Bay to PEPI, Gulf Bay was entitled to conduct its business and legal affairs in the manner it determined to be in its own best

8

AA00284

interests without regard to the effects on PEPI.

57.     By and through its Amended Third-Party Complaint, PEPI fails to (and cannot truthfully) plead any duty owed by Gulf Bay to PEPI.   Moreover, Gulf Bay clearly acted in its own best interest in offering to act as Fiddler's Creek, LLC's DIP lender.  Therefore, PEPI cannot state a claim for tortious interference against Gulf Bay with respect to Fiddler's Creek's acceptance of DIP financing from Gulf Bay.

Tenth Affirmative Defense

58.     PEPI's claims against Gulf Bay in the Amended Third-Party Complaint are barred as any alleged interference was, in fact, lawful competition for which PEPI has no legal recourse, in tort or otherwise, against Gulf Bay, as a matter of law.  Moreover, Gulf Bay's actions were clearly lawful competition in offering to act as Fiddler's Creek, LLC's DIP lender.

Eleventh Affirmative Defense

59.     PEPI failed to state a claim for which relief can be granted against Gulf Bay for tortious interference in the Amended Third-Party Complaint.  Specifically, PEPI fails to allege any tortious conduct on the party of Gulf Bay.  At most, PEPI's allegations rise to the level of negligent interference, which is not actionable, as a matter of law.

Twelfth Affirmative Defense

60.     PEPI's claims against Gulf Bay in its Amended Third-Party Complaint are barred to the extent that Count 2 is wholly redundant to Count 1.  Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of

9

AA00285

action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship. In this case, PEPI has failed to allege any facts that support a business relationship between itself and Fiddler's Creek separate and apart from the contract at issue in these proceedings. As such, its claims are redundant, and PEPI should not recover under Count 2.

WHEREFORE, Third Party Defendant, Gulf Bay Capital, Inc., having answered the Amended Third-Party Complaint filed by Third-Party Plaintiff, PEPI Capital, L.P., and asserted certain affirmative defenses to the claims therein, respectfully requests that this Court enter judgment in Third-Party Defendant's favor and against Third-Party Plaintiff, for costs, and for such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCL RULE 2090-1

WE HEREBY CERTIFY that on June 18, 2012, we electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to: Alan J. Perlman, Esq., Roetzel & Andress, Attorneys for PEPI Capital, 350 E. Las Olas Blvd., Suite 1150, Ft. Lauderdale, Florida 33301; and Paul J. Battista, Esq. and Heather Harmon, Esq., Genovese Joblove & Battista, P.A., Attorneys for Debtors, 100 S.E. 2nd St., 44th Floor, Miami, Florida 33131.

TOBIN & REYES, P.A. • THE PLAZA – SUITE 204 • 5355 TOWN CENTER ROAD • BOCA RATON, FLORIDA • 33486

AA00286

I HEREBY FURTHER CERTIFY that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1.

Respectfully submitted,

s/Ricardo A. Reyes
Ricardo A. Reyes
Florida Bar No. 864056
Carrie Stolzer Robinson
Florida Bar No. 0354030
TOBIN & REYES, P.A.
Attorneys for Third-Party Defendant
5355 Town Center Road
Boca Raton, Florida 33486
Phone:      (561) 620-0656
Fax:        (561) 620-0657
rar@tobinreyes.com
csrobinson@tobinreyes.com

AA00287

# K&L | GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX 75201-7342

ı 214.939.5500    www.klgates.com

February 23, 2010

Jeffrey R. Fine
Partner
D 214.939.5567
F 214.939.5849
jeff.fine@klgates.com

**Via E-Mail pbattista@gib-law.com**

Paul J. Battista, Esq.
Partner
Genovese Joblove & Battista, P.A.
Bank of America Tower
at International Place
100 Southeast Second Street,
44th Floor
Miami, Florida 33131

Re:    Commitment Letter (the "Commitment Letter"), dated as of December 31, 2009, between PEPI Capital, L.P. ("PEPI") and Fiddler's Creek, LLC and GB Peninsula, Ltd. (the "Borrowers") in connection with a $27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility (the "Loan")

Dear Paul:

I forwarded to PEPI your letter to me dated February 22, 2010 (the "Letter") which asserts that PEPI "is in material default of and under the terms of the Commitment Letter." PEPI was shocked by the Letter and disagrees with the assertions made therein, especially because PEPI has worked diligently and reasonably with the Borrowers to negotiate and address Borrower concerns by modifying Commitment Letter provisions, such as taking out the syndication terms and committing to fund the whole loan itself.

At no time has PEPI ever been notified, or warned by Borrowers that it thought PEPI had materially defaulted on the terms of the Commitment Letter, and PEPI is disappointed that Borrowers had not expressed its concerns to PEPI and worked them out, as compared to pursuing this approach on the brink of chapter 11 filing, and after so much work and effort on the part of both parties.

For the sake of brevity, PEPI will make very brief comments below, and will expand upon these comments at a later date, if appropriate:

1. In PEPI's February 16, 2010 call with the Borrowers, it was reported that all PEPI due diligence had been completed except for receipt of title information, which although repeatedly promised to us, had been delayed since early December 2009.

DA-3092287 v3



AA00288

**K&L|GATES**

Paul J. Battista, Esq.
February 23, 2010
Page 2

    2.  As late as Thursday, February 18, 2010, Borrowers were advising PEPI that the draft Loan documents were acceptable to Debtors except for the verbiage of the Purchase Option. PEPI was promised rewording by your counsel of the Purchase Option language, continued to check over the weekend to inquire why a rewording of the language had not been forwarded, and PEPI is still waiting for the promised rewording of the Purchase Option provision.

    3.  As had been previously indicated to you, all material due diligence on the Loan has been completed by PEPI and PEPI is ready, willing and able to immediately fund the Loan in accordance with the Commitment Letter upon receipt of Bankruptcy Court approval. Although PEPI has also told you repeatedly during this past week that the Borrowers are free to file Chapter 11 at any time, please consider this your formal 3 business day notice that due diligence has been completed. Let us know if, for some important reason, Debtors need an extension of the contractual deadline.

    4.  Regarding the deed in lieu and consent judgment provision on page 12 of the Commitment Letter, please remember that this provision was originally proposed by you for Lender's benefit. Later, you realized that consent judgments are not available under Florida law and that the provision therefore, could not be performed. If you are now telling PEPI that you were mistaken about the availability of consent judgments and want to put that provision back into the Loan documents, PEPI will certainly review your proposed provision. Likewise, the valuation mechanism you refer to is only in regard to a deed in lieu of foreclosure, and if you believe that a deed in lieu of foreclosure provision, and its related valuation mechanism, should be included in the Loan, even though PEPI does not require it, then PEPI will promptly review deed in lieu language and will negotiate the provisions of a valuation mechanism for deeds in lieu of foreclosure and will include that in the Loan documentation.

    5.  In regard to the wording of the waterfall provisions of the Loan, PEPI was under the impression that wording of those provisions was acceptable to the Borrowers. If that is not the case, then PEPI wants to cure this inadvertent misunderstanding and will diligently review the wording of the waterfall provisions as you think are compatible with the terms of the Commitment Letter.

    6.  While due diligence on the Loan is completed, PEPI has consistently advised Borrowers that conditions precedent remain active and must be satisfied through funding. We believe that this is entirely standard in transactions of this type and clearly anticipated by the Commitment Letter.

AA00289

K&L|GATES

Paul J. Battista, Esq.
February 23, 2010
Page 3

Finally, I want to reiterate on behalf of PEPI that any perceived missteps on it part were inadvertent and certainly were not intentional. PEPI agrees with you that the negotiation process has been lengthy and complex, but PEPI maintains that it has at all times acted in good faith and looks forward to promptly completing funding of the Loan.

Sincerely,

Jeffrey R. Fine

cc:    David Radunsky

AA00290

ORIGINAL

Page 1

No. 8:10-bk-03846-KRM

| | | |
|---|---|---|
| In re: | ) | UNITED STATES |
| | ) | BANKRUPTCY COURT |
| FIDDLER'S CREEK, LLC, et al. | ) | |
|   Debtors, | ) | |
| _____ | ) | |
| FIDDLER'S CREEK, LLC, et al. | ) | |
|  Plaintiffs/Counterdefendants, | ) | |
| v. | ) | |
| PEPI CAPITAL, L.P. | ) | MIDDLE DISTRICT |
|   Defendant/Counterplaintiff | ) | OF FLORIDA |
| and Third Party Plaintiff. | ) | |
| | ) | |
| _____ | ) | |
| PEPI CAPITAL, L.P. | ) | |
|   Third Party Plaintiff, | ) | |
| v. | ) | |
| GULF BAY CAPITAL, INC., | ) | |
|   Third Party Defendant | ) | TAMPA DIVISION |

-----------------------------------------

ORAL DEPOSITION OF

JEFFREY FINE

FRIDAY, MAY 30, 2014

-----------------------------------------

    ANSWERS AND DEPOSITION OF JEFFREY FINE, a
witness produced at the instance of the Plaintiffs,
taken in the above styled and numbered cause, on the
30th day of May, 2014, from 9:07 A.M. to 4:03 P.M.
before Jacqueline Love-Worline, CSR, RPR, a Certified
Court Reporter in and for the State of Texas, at The Law
Offices of Dykema Gossett, PLLC, 1717 Main Street, Suite
4000, Dallas, Texas, 75201.

AA00291

Page 2

1                    A P P E A R A N C E S

2

3    FOR THE DEFENDANT/COUNTERPLAINTIFF and THIRD PARTY
     PLAINTIFF/THIRD PARTY PLAINTIFF: PEPI CAPITAL, L.P.

4

                         Mr. Alan J. Perlman
5                        Roetzel
                         350 East Las Olas Boulevard
6                        Las Olas Centre II, Suite 1150
                         Fort Lauderdale, FL  33301
7                        Phone:  954-462-4150

8    FOR THE THIRD PARTY DEFENDANTS:  GULF BAY CAPITAL

9                        Mr. Ricardo A. Reyes, Attorney
                         Tobin & Reyes, P.A.
10                       225 N.E. Mizner Boulevard, Suite 510
                         Boca Raton, FL  33432
11                       Phone:  561-620-0656

12   ALSO PRESENT:

13                       Mr. David Radunsky
                         General Counsel
14                       Petrus Asset Management Company.
                         2300 W. Plano Parkway
15                       Plano, TX  75075
                         Phone: 972-535-1983

16

17

18

19

20

21

22

23

24

25

AA00292

Page 86

1    filing of any bankruptcy, yes.

2        Q.   Did Mr. Battista tell you that he did not want

3    to file a Chapter 11 petition on behalf of Fiddler's

4    Creek until Pepi provided confirmation due diligence was

5    completed --

6              MR. PERLMAN:  Objection to form.

7        Q.   -- in the same time frame that is negotiated in

8    the Commitment Letter?

9        A.   No.  That's not what he -- that's not my

10   recollection of what he said or the general theme of

11   the conversation with him.

12       Q.   You do not recollect Mr. Battista saying that?

13             MR. PERLMAN:  Objection.  Asked and

14   answered.

15       A.   Not specifically as you -- as you have said

16   it?

17       Q.   Did you and Mr. Battista have conversations

18   during the drafting of the Commitment Letter about Pepi

19   providing notice that it had completed due diligence

20   prior to the bankruptcy being filed?

21             MR. PERLMAN:  Objection to the form.

22       A.   Yes, as a matter of fact, we did.

23       Q.   And tell me about those conversations that you

24   remember.  What did Mr. Battista say to you first and

25   what did you say in response?

Veritext Florida Reporting Co.

Page 87

1      A.   Okay.   I recall a series of conversations.   It

2   wasn't just one conversation.   It was a series of

3   conversations where Mr. Battista talked about some sort

4   of written notification of, I guess, due diligence sign

5   off.   I had told him broadly that I would make inquiry

6   of my client as to whether or not that was something I

7   think that they could provide and then got back to him

8   and told him that we would not provide it.

9      Q.   This was when the Commitment Letter was being

10   negotiated?

11      A.   Yes.   Yes, that's my recollection.

12      Q.   Can you identify one single e-mail from you at

13   any point in time -- not even limiting it to the

14   negotiation of the Commitment Letter -- where you stated

15   to Mr. Battista that Pepi will not provide a written due

16   diligence sign off?

17             MR. PERLMAN:   Objection to form.

18      A.   Sitting here right now I can't do that.   I

19   don't have all my e-mails in front of me.

20      Q.   Because there is no such e-mails right?

21      A.   No, I have not --

22             MR. PERLMAN:   Objection to form.

23      Q.   Have you told Mr. Battista that Pepi would not

24   provide a due diligence sign off?

25      A.   I don't know.   I don't know.

Page 89

1    off?

2        A.   No, I don't have a specific recollection of

3    that.   What I do recollect is that the timing -- we

4    signed -- there was a signing of the Commitment Letter

5    on, I think, about January 27th and Mr. Battista and I

6    were talking about him filing the Chapter 11 case.   He

7    was hoping to get it done by Monday, February 8th.   And

8    by the way, that was the genesis of the February 8th

9    date that's in this paragraph in the Commitment Letter.

10   So we must have been having those conversations just

11   prior to the signing of the Commitment Letter.   And so

12   if there was discussion about some sort of due

13   diligence sign off, I would say that it -- unlike your

14   question where you said it was after the signing, I

15   would say it was before the signing of the Commitment

16   Letter.

17       Q.   So what you're saying to me is before the

18   Commitment Letter was signed Mr. Battista made a request

19   for a written due diligence sign off.   Is that what

20   you're saying?

21       A.   Yes, and which we told him no, we would not

22   provide.

23       Q.   Isn't it true that after the Commitment Letter

24   was signed, Mr. Battista on multiple occasions wrote to

25   you requesting due diligence sign off?

AA00295

Page 156

1      A.    Yes, that's the response letter.

2      Q.    If I can draw your attention to the second

3    page?

4      A.    Yes.

5      Q.    In number three, specifically.  If you can go

6    there.

7      A.    Yes.

8      Q.    The second sentence of your paragraph reads,

9    "although Pepi has told you repeatedly during this past

10   week that the borrowers are free to file Chapter 11 at

11   any time, please consider this your formal three

12   business day notice that due diligence has been

13   completed." Did I read that correctly?

14     A.    Yes, you certainly did.  I think you left one

15   word out but fundamentally that's what it says, yes.

16     Q.    Okay.  You were providing a written due

17   diligence sign off to Mr. Battista in that sentence;

18   correct?

19          MR. PERLMAN:  Objection to form.

20     A.    No, I -- actually, what I was providing was

21   the formal three day -- three business day notice

22   that's referenced in the parenthetical on Page 4 of the

23   Commitment Letter.  That's exactly what we were

24   providing.

25     Q.    The formal three business day notice of what?

AA00296

Page 157

1        A.    That due diligence had been completed.

2        Q.    Would you agree that prior to February 23,

3    2010, Pepi had not provided the formal three business

4    day notice that due diligence had been completed?

5              MR. PERLMAN:   Objection to form.

6        A.    I would say to you that they had not provided

7    the formal notice that's referenced in that paragraph.

8    I would agree with you on that. I would not agree with

9    you if the implication of your question is that we had

10   not provided them with notice that due diligence had

11   been completed.

12       Q.    If we can go to paragraph four, the one that

13   begins with the word "likewise." I'm sorry, the sentence

14   that begins with the word "likewise."  Can you find

15   that, please?

16       A.    Yes, that's about the middle of paragraph

17   four.

18       Q.    Right, and it's a six-line sentence.  Do you

19   see that?

20       A.    Yes, yes.

21       Q.    Did you reference any agreement between the

22   parties to delete the deed in lieu valuation mechanism

23   from the loan agreement in that sentence?

24       A.    Give me a moment to read it.  No, I don't.  In

25   that particular sentence, I don't explicitly reference

AA00297

Page 226

No. 8:10-bk-03846-KRM

```
1
2    In re:                              )    UNITED STATES
                                         )    BANKRUPTCY COURT
3    FIDDLER'S CREEK, LLC, et al.        )
       Debtors,                          )
4    _____        )
     FIDDLER'S CREEK, LLC, et al.        )
5      Plaintiffs/Counterdefendants,     )
     V.                                  )
6    PEPI CAPITAL, L.P.                  )    MIDDLE DISTRICT
       Defendant/Counterplaintiff        )    OF FLORIDA
7    and Third Party Plaintiff.          )
                                         )
8    PEPI CAPITAL, L.P.                  )
         Third Party Plaintiff,          )
9    V.                                  )
     GULF BAY CAPITAL, INC.,             )
10       Third Party Defendant           )    TAMPA DIVISION
11
12             ---------------------------------------
                       REPORTER'S CERTIFICATE
                            JEFREY FINE
13                     FRIDAY, MAY 30, 2014
               ---------------------------------------
14
15             I, Jacqueline Love-Worline, CSR, RPR, the
16   undersigned certified shorthand reporter in and for the
17   State of Texas, hereby certify to the following:
18             That the witness, JEFFREY FINE, was duly
19   sworn by the officer and that the transcript of the
20   oral deposition is a true record of the testimony given
21   by the witness;
22             That the amount of time used by each
23   party at the deposition is as follows:
24             MR. REYES:  6 HOURS 20 MINUTES
25             MR. PERLMAN:  0 HOURS 0 MINUTES
```

Page 227

1           That pursuant to information given to the
2   deposition officer at the time said testimony was
3   taken, the following includes counsel for all parties
4   of record:
5   FOR THE DEFENDANT/COUNTERPLAINTIFF and THIRD PARTY
    PLAINTIFF/THIRD PARTY PLAINTIFF: PEPI CAPITAL, L.P.
6
                    Mr. Alan J. Perlman
7                   Roetzel
                    350 East Las Olas Boulevard
8                   Las Olas Centre II, Suite 1150
                    Fort Lauderdale, FL  33301
9                   Phone:  954-462-4150
10
11  FOR THE THIRD PARTY DEFENDANTS:  GULF BAY CAPITAL
12                  Mr. Ricardo A. Reyes, Attorney
                    Tobin & Reyes, P.A.
13                  225 N.E. Mizner Boulevard, Suite 510
                    Boca Raton, FL  33432
14                  Phone:  561-620-0656
15  ALSO PRESENT:
16                  Mr. David Radunsky
                    General Counsel
17                  Petrus Asset Management Company.
                    2300 W. Plano Parkway.
18                  Plano, TX  75075
                    Phone: 972-535-1983
19
20           I further certify that I am neither
21  counsel for, related to, nor employed by any of the
22  parties or attorneys in the action in which this
23  proceeding was taken, and further that I am not
24  financially or otherwise interested in the outcome of
25  the action.

Page 228

```
1              Further certification requirements

2    pursuant to Rule 203 of TRCP will be certified to after

3    they have occurred.

4              Certified to me by me on the _____ day

5    of _____, 2014

6

7

8

9    _____
     JACQUELINE LOVE-WORLINE, CSR, RPR
10   Texas CSR No. 8970
     Expiration Date: 12/31/15
11   Fredericks Reporting & Litigation
     Services, LLC
12   Firm Registration No. 611
     3305 Northland Drive Suite 403,
13   Austin,  TX 78731
     Telephone: (512) 477-9911
14   Fax: (512) 345-1417

15

16

17

18

19

20

21

22

23

24

25
```

# PEPI CAPITAL, L.P.
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

Dated as of December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek LLC
8156 Fiddlers Creek Parkway
Naples, FL 34114

Commitment Letter
**$27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility**

Dear Mr. DiNardo:

PEPI Capital, L.P., as Agent[1] and Lender (collectively, "PEPI") is pleased to confirm to Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company") the commitment of PEPI to provide a senior secured debtor-in-possession multiple advance term loan facility to the Company with total advances of up to $27,000,000 (the "Credit Facility") based upon and subject to the terms and conditions set forth in this letter and the term sheet and exhibits attached as Exhibit A hereto (the "Term Sheet" and all exhibits thereto together with this letter, collectively, the "Commitment Letter").

While PEPI has provided a commitment for the entire amount of the Credit Facility, subject to the terms and conditions of this Commitment Letter and the Term Sheet, PEPI may syndicate some of the Credit Facility to additional lenders with a corresponding reduction in PEPI's share of the Credit Facility. PEPI's obligations under the Credit Facility are not contingent upon or conditioned upon syndication of the Credit Facility. Moreover, PEPI has no plans to syndicate the Credit Facility, however, PEPI has the absolute and sole right to syndicate some or all of the Credit Facility.

PEPI shall manage all aspects of any syndication of the Credit Facility, including the timing of all offers to potential lenders, the allocation and acceptance of commitments, the amount offered, and the compensation provided to any lender. The Company agrees that no lender will receive any compensation for its participation in the Credit Facility except as expressly agreed to and offered by PEPI.

The Company agrees to cooperate in PEPI's syndication efforts and use commercially reasonable efforts, at no additional out of pocket cost to the Company, to assist PEPI in forming a syndicate acceptable to PEPI. Such assistance shall include but not be limited to (a) using commercially reasonable efforts to make senior management and representatives of the Company available to participate in meetings and to provide information to potential lenders at such times and places as PEPI may

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Term Sheet attached hereto as Exhibit A.

EXHIBIT 3
Deponent
Date Rptr.
WWW.DEPOBOOK.COM

AA00301

reasonably request, and (b) using commercially reasonable efforts to provide all information reasonably deemed necessary by PEPI to complete the syndication, subject to confidentiality agreements in form and substance reasonably satisfactory to the Company and PEPI. The terms of the Commitment Letter, including those attached as Exhibit A, shall not be modified due to PEPI's syndication efforts.

The Company hereby represents, warrants and covenants that (i) all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading, and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to PEPI by or on behalf of the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to PEPI such Information and Projections as PEPI may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is true and correct on the Closing Date of the Credit Facility.

The Company will promptly reimburse PEPI for all reasonable costs and expenses incurred by PEPI in connection with its continuing review of the Information and Projections and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), any and all due diligence, any and all loan documentation for the Credit Facility, the closing of the Credit Facility, and the enforcement of any of PEPI's rights and remedies under this Commitment Letter, in each case including, without limitation, reasonable attorneys' fees and legal expenses, appraisal fees, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus out-of-pocket expenses for the field examiners of PEPI in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses), and in each case whether or not the Credit Facility closes.

All such charges and expenses are to be paid to PEPI upon demand, together with such advance funds on account of such charges and expenses as PEPI may from time to time request or PEPI may require that the Company pay such charges directly. PEPI has the right to apply to such charges and expenses any sums received from or on behalf of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation. Deposits for expenses received by PEPI will be returned to the Company without interest, less the expenses and charges described above if the Credit Facility does not close, and applied to reduce the loans if the Credit Facility closes.

The Company and all Guarantors agree to indemnify and hold harmless PEPI, and each director, partner, officer, employee, attorney, advisor, agent and affiliate of PEPI (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any and all losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any

DA-3072429 v11 1203528-00006

**AA00302**

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

DA-3072429 v1! 1203528-00006

AA00303

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion.  The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010.  Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter.  The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.  All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder.  The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence.  This Commitment Letter may not be contradicted by evidence of any alleged oral agreement.  No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act.  To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it.  Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

4 of 45

DA-3072429 v11 1203528-00006

**AA00304**

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter is for the sole benefit of the Company and may not be relied upon by any third party. This Commitment Letter may not be assigned by the Company without the prior written consent of PEPI and may not be amended, waived, or modified, except in writing signed by PEPI and the Company.

This Commitment Letter is governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

PEPI, THE COMPANY AND ALL GUARANTORS EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

This letter is pursuant to that certain Term Sheet letter dated October 20, 2009, addressed to Mr. Ken Montgomery of Belmont Capital Partners LLC, advisor to you, by Agent under Agent's prior name.

If the Company accepts and agrees to the foregoing, please so indicate by executing the enclosed copy of this letter and returning it to PEPI on or before 6 p.m., eastern time, January 27, 2010, to be effective as of December 31, 2009.

Very truly yours,

PEPI CAPITAL, L.P.

By: _____

David Radunsky, Chief Operating Officer of its general partner

DA-3072429 v11 1203528-00006

AA00305

ACCEPTED to be effective as of December 31, 2009:

*Fiddler's Creek, LLC*

By: GBFC II Two, LLC

By: _Anthony D. Nardo_

Anthony DiNardo, as Chief Financial Officer

and not individually


**GB Peninsula, Ltd.**

By: GB Peninsula, Inc.

By: _Anthony D. Nardo_

Anthony DiNardo, as Secretary/Treasurer

and not individually

DA-3072429 v11 1203528-00006

**AA00306**

## EXHIBIT A

## PEPI Capital, L.P.

### $27,000,000 Senior Secured Debtor-In-Possession Multiple Advance Term Loan Credit Facility ("Credit Facility")

#### Summary of Principal Terms and Conditions ("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company"). |
| Agent: | PEPI Capital, L.P. |
| Lenders: | PEPI Capital, L.P. or its designated affiliate and/or other lenders who may be added from time to time. |
| Guarantors: | All subsidiaries and affiliates of the Company that are listed on Exhibit E (collectively, the "Guarantors"). |
| DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a multiple advance senior secured debtor-in-possession - term loan credit facility with aggregate advances of up to $27,000,000 (the "Loan") for use in connection with the anticipated voluntary Chapter 11 bankruptcy filings by the Company and the Guarantors (the "Bankruptcy Cases"), subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") or any other court taking jurisdiction over such Bankruptcy Cases. The Loan is not a revolving line of credit. Specifically, the repayment of any principal amount of the Loan may not be reborrowed and will not provide additional or renewed availability under the Loan. Advances under the Loan will be subject to limitation based on the maximum outstanding balance at any particular time as set forth on Exhibit D. |
| Purpose and Proceeds: | The proceeds of the Loan shall be used in accordance with an 18-month budget and business plan through the anticipated exit from the Bankruptcy Cases submitted by the Company to the Agent and approved by the Agent in connection with the execution of the Commitment Letter, with any amendments to the budget thereafter to be approved by the Agent (collectively, the "18 Month Budget"). The initial 18-Month Budget attached hereto as Exhibit G is hereby approved by the Lender. The 18 Month Budget shall include, among other things, the Company's operating expenses, working capital needs, professional fees for the bankruptcy proceedings, financing costs for secured lenders, real estate taxes, CDD assessments and the fees and costs |

6 of 45

DA-3072429 v11 1203528-00006

AA00307

associated with the Loan and the preparation and negotiation of documentation for the Loan. Subject to the prior approval of the Agent, Managed Expenses set forth in the 18 Month Budget shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on <u>Exhibit D</u> as of the respective dates set forth on <u>Exhibit D</u>. No proceeds of the Loan will be advanced unless and until each condition precedent thereto has been fulfilled, and with respect to the Initial Advance or any subsequent advances under the Credit Facility, no proceeds of the Loan will be advanced while any event of default has occurred and is continuing there under. The Company will provide to Agent, no later than 15 days prior to each calendar quarter-end, an updated 13-week cash budget for the upcoming 13-week period.

**Loan Advances:**    Upon and after entry of the Interim Order (hereinafter defined) by the Bankruptcy Court, an advance in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility (the "<u>Initial Advance</u>") may be made in an amount not to exceed \$4 million consistent with the initial 13-week budget for amounts for the period of time between the filing of the Bankruptcy Cases and the hearing on the Final Order. Upon entry of the Final Order by the Bankruptcy Court, additional advances (the "<u>Subsequent Advances</u>" and together with the Initial Advance, the "Loan <u>Advances</u>") may be made from time to time thereafter in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility. The Subsequent Advances will be made monthly, with the Company providing Agent with each request for a Loan Advance at least 5 business days prior to any Loan Advance. Loan Advances will be made in multiples of \$100,000, with a minimum amount of \$500,000. Aggregate Loan Advances may not exceed \$27,000,000.00.

**Unused Loan Fee:**    Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on the amount of the Loan not yet advanced to the Company. Such fee may be paid from the proceeds of the Loan.

**Expenses:**    Upon two (2) business day's written request from Agent, the Company shall deliver to Agent such deposits as may be necessary, in Agent's reasonable discretion, to cover continuing out of pocket expenses through the maturity and payment in full of the Loan. The Company has provided \$275,000 as a deposit for Agent expenses related to Agent due diligence and preparation of this Commitment Letter. In addition to the Commitment Fee, pursuant to the terms of the Fee Letter Agreement (defined below) the Company has deposited an additional \$250,000 with Agent, and Agent may retain the

DA-3072429 v11 1203528-00006

**AA00308**

$250,000 expense deposit, to cover Agent expenses related to remaining due diligence, loan documentation and other third party expenses Agent will incur to obtain Loan approval by the Bankruptcy Court. The deposit is not a cap or a limit on such expenses and the Company shall pay to Agent any expenses in addition to the deposit upon demand. Upon and after funding of the Loan, the Company will advance to Agent such additional expenses as may be required in the reasonable discretion of the Agent to cover continuing expenses of Agent in monitoring and administering the Loan. Subject to Bankruptcy Court approval and inclusion in the approved 18 Month Budget, the Company will reimburse to third parties those expenses and costs advanced to or paid on behalf of the Company to the Agent associated with the Bankruptcy Cases, this Commitment Letter, and closing of the Credit Facility.

Loan Amount:

Up to $27,000,000, disbursed in multiple advances consisting of the Initial Advance and the Subsequent Advances. At no time shall the outstanding Loan balance exceed $15,000,000. Further, the Loan balance shall not exceed the "Maximum Outstanding Loan Balance" set forth on Exhibit D as of the date set forth on Exhibit D.

Interest Rate:

12% per annum, payable monthly in arrears but not greater than the maximum rate provided by applicable law.

Default Rate:

Upon the occurrence of an event of default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law.

Mandatory Prepayments:

Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds (defined as gross receipts from sale of assets, less costs of closing, including but not limited to, title costs, commissions, CDD buy down, real estate taxes, other allowable normal and customary closing costs) (the "Net Asset Sales Proceeds") shall be applied first to the Loan unless otherwise agreed to by Agent. Until such time as the Loan has been paid in full (including, without limitation, all principal, interest and fees), no payments of principal or interest shall be paid to any existing secured creditors without the express prior written approval of Agent, unless identified in the 18 Month Budget approved by Agent. For avoidance of doubt, the 18 Month Budget includes the payment of interest to secured creditors with mortgage liens on the assets of the Company during the period of the 18 Month Budget.

Closing Date:

The Initial Advance shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of an Interim Order in form and substance satisfactory to Agent in its reasonable

8 of 45

AA00309

discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Initial Advance to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of the Commitment Fee at the time of the Initial Advance and payment in full of all expenses. The Subsequent Advances shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of a Final Order in form and substance satisfactory to Agent in its reasonable discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Subsequent Advances to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of payment in full of all expenses.

Maturity Date:

The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later date as set forth below in the section entitled "Extension Date")(the "Initial Maturity Date"), (b) the entry by the Bankruptcy Court of an order confirming a plan of reorganization for the Company or any Guarantor (unless expressly agreed to by Agent), or (c) the date upon which a final order is entered by the Bankruptcy Court either (i) converting the Company's or any Guarantor's Chapter 11 case to a case under Chapter 7 (unless expressly agreed to by Agent), (ii) approving one or more 363 sales of all or substantially all of the Company's or any Guarantor's assets (unless expressly agreed to by Agent), (iii) appointing a trustee or examiner (with or without expanded powers) in the Company's or any Guarantor's Chapter 11 case, (iv) dismissal of any of the Company's or any Guarantor's bankruptcy cases (unless expressly agreed to by Agent), or (d) the occurrence of an event of default under the Loan documentation and the expiration of any applicable cure period.

Acceptance Date:

The Company must accept this Commitment Letter by 6 p.m. eastern time on January 27, 2010, to be effective as of December 31, 2009.

Commitment Fee:

On December 31, 2009, the Company and Agent entered into that certain fee letter agreement, as amended by that certain amended fee letter agreement dated January 15, 2010 (collectively, the "Fee Letter Agreement") under which the Company deposited with Agent in escrow the sum of $785,000 to be applied, with the previously paid application fee of $25,000, to the payment of an $810,000 commitment fee (the "$810,000 Commitment Fee Deposit Escrow"). Upon Agent's issuance of this Commitment Letter and execution of this Commitment Letter by both Agent and the Company, 100% of the $810,000 commitment fee (the "Commitment Fee") shall be deemed fully earned, but shall be paid to the Agent by the Agent retaining one half of the $810,000 Commitment Fee Deposit

9 of 45

AA00310

Escrow as a non-refundable payment and the remaining unpaid one-half of the Commitment Fee ($405,000.00) shall be financed as part of the Credit Facility and shall be paid to Agent upon funding of the Initial Advance. The remaining one half of the $810,000 Commitment Fee Deposit Escrow will then be wired the next business day by Agent to the account designated by the Company in the Fee Letter Agreement.

Exit Fee:

2% of the funds used to pay the principal outstanding at any time of the Loan, whether (a) upon payment in full of the Loan at maturity, (b) any partial principal payment of the Loan prior to maturity, or (c) any other reduction in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility of the principal amount of the Loan.

Break-Up Fee:

If the Company directly or indirectly, enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the Credit Facility that is approved by the Bankruptcy Court, then the Company immediately shall pay to PEPI a break-up fee of $1,000,000 (the "Break-Up Fee"). The Break-Up Fee is in addition to any other amount paid or payable hereunder. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing, or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. The Company shall take all necessary action in the Bankruptcy Court to authorize the payment of the Break-Up Fee when it accrues including, without limitation, stipulating that such fee is an allowed Chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

Collateral:

The Initial Advance and all indebtedness and obligations under the Loan associated with the Initial Advance will be secured by a Bankruptcy Court-ordered Interim Order providing for first priority liens and first priority senior security interests in all unencumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership

10 of 45

**AA00311**

interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Unencumbered Collateral") and senior priming liens on all Collateral (as defined below) of the Company and Guarantors. The Subsequent Advances (together with the Initial Advance upon entry of the Final Order, the Loan Advances) and all indebtedness and obligations under the Loan associated with the Initial Advance and the Subsequent Advances will be secured by a Bankruptcy Court-ordered Final Order providing for first priority priming liens and first priority senior security interests in all Unencumbered Collateral and all encumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing, together with the Unencumbered Collateral, being referred to as the "Collateral"). Both the Unencumbered Collateral and the Collateral shall have no permitted encumbrances senior or equal to the Agent's and the Lenders' liens and security interests except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral, and those matters commonly included as exceptions to title insurance policies in Southwest Florida that may be specifically agreed to in writing by Agent in its sole discretion ("Permitted Liens"). Permitted Liens shall also include the Replacement Liens as defined below, provided that all such Replacement Liens shall be subordinate to the Agent and Lender's liens. Final loan documentation will include provisions that provide for the granting of replacement liens (the "Replacement Liens") subordinate to those of the Agent and Lender to be provided to those secured lenders who have the collateral securing their respective prepetition allowed secured claims sold during the Bankruptcy Cases by the Company and the proceeds from which are not paid to such secured lender in accordance with their prepetition loan documents. The Agent agrees that all such Replacement Liens may be subordinate to its senior priming liens on remaining real estate assets of the Company. For purposes of illustration only, if the Company sells a developed

DA-3072429 v11 1203528-00006

**AA00312**

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the **"Minimum Net Cumulative Sales Covenant if not paying Managed Expenses"** set forth on <u>Exhibit D</u> for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly.   In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development , Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

12 of 45

AA00313

6. The Tarpon Club owned by GBFC Marina, Ltd.;

7. The Creek Golf Course owned by FC Golf, Ltd.;

8. The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;

9. The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc.;

10. The undeveloped land including in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America; and

11. The Fiddlers' Creek Sales and Administration buildings owned by 951 Land Holding, Ltd.

| | |
|---|---|
| Cash Account | All cash from Net Asset Sale Proceeds and other operating cash will be held in accounts pledged to benefit of the Agent and over which Agent shall have control (the "Cash Collateral Accounts"), which Cash Collateral Accounts shall be debtor in possession accounts in accordance with the guidelines of the Office of the United States Trustee and shall be disbursed pursuant to the 18 Month Budget so long as there is no pending event of default. All Net Asset Sale Proceeds shall be paid to the Agent to be applied to reduce the Loan. All cash generated from the operations of the Company ("Operating Cash") shall be deposited into separate Cash Collateral Accounts and may be used by the Company in accordance with the 18 Month Budget. |
| Use of Cash Collateral | So long as no event of default occurs and is continuing under the Loan, the Company may use cash in the Cash Collateral Accounts, other than Net Asset Sale Proceeds which shall be paid to the Lender to reduce the Loan, in accordance with the 18 Month Budget. The use of Operating Cash in accordance with the 18 Month Budget as provided herein shall not be deemed a Loan Advance. |
| Collateral Monitoring Fee: | The Company shall pay to Agent a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding or there is any remaining availability under the Loan. The Collateral Monitoring Fee may be paid from the proceeds of the Loan. |
| Extension Date: | Upon 30 days' prior written notice to Agent, payment of the |

DA-3072429 v1 1 1203528-00006

**AA00314**

Extension Fee (hereinafter defined), and submission to Agent of an approved budget for the extension period, the Company may extend the Initial Maturity Date for up to two (2) consecutive six (6) month periods, provided that as of the date of any proposed extension no uncured event of default has occurred and is continuing, and no earlier termination triggering event has occurred.

Extension Fee:

An Extension Fee equal to 0.5% of the then-outstanding principal balance on the Loan plus any amount not yet advanced under the Loan (the "Extension Fee"), shall be payable by the Company for each exercised extension on or before the date of each such extension. The Extension Fee may be paid from the proceeds of the Loan.

DIP Provisions:

The Company will obtain (a) within forty-five (45) days of filing of the Bankruptcy Cases an interim order of the Bankruptcy Court approving the Initial Advance (the "Interim Order"), and (b) will within forty-five (45) days after the entry of such Interim Order obtain a final order (the "Final Order"; and collectively with the Interim Order, the "Orders") of the Bankruptcy Court approving the Loan Advances on a final basis, and fixing the funding date for the Subsequent Advances, which Final Order shall not have been appealed, reversed, modified, amended, stayed or vacated. Subject to Agent's approval, one or more advances may be made under the Loan in accordance with the terms herein. The Interim Order shall provide that the Initial Advance shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by first priority liens on and first priority senior security interests in favor of Agent and the Lenders in all of the Unencumbered Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code and also secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other administrative expenses as may be agreed to by Agent and Permitted Liens). The Final Order shall provide that the Initial Advance together with the Subsequent Advances shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other

DA-3072429 v11 1203528-00006

AA00315

administrative expenses as may be agreed to by Agent and Permitted Liens). The Orders as entered by the Bankruptcy Court shall be in form and substance acceptable to Agent in its reasonable discretion, and at a minimum, shall contain provisions under Section 364(e) granting all such senior and priming liens, security interests and claims to Agent and the Lenders for all monies actually advanced even if such Orders are subsequently appealed, vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Agent and the Lenders to, upon five business days notice to the Company, immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens, security interests and claims granted to Agent and the Lenders shall contain cross default and cross collateral provisions with all other debt owed to the Lender. Agent and Lenders shall have no obligation to fund the Initial and Subsequent Advances should the Orders, at the time of Closing and funding, have been stayed, or as to the Final Order, is subject to appeal or modification, or otherwise not be in a form satisfactory to Agent in its reasonable discretion.

**Other Conditions Precedent:** Standard and customary for loans and transactions of this type and such other conditions precedent to the Initial Advance and each Subsequent Advance under the Loan as required by Agent in its reasonable discretion including, but not limited to, the following:

1. All the Company fees payable to Agent shall be current as provided herein, including without limitation, all fees of Agent's professionals.

2. Subject to the 18 Month Budget and limited by the terms and conditions herein, all of the Company's chapter 11 administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or addressed in a manner satisfactory to Agent in its reasonable discretion.

3. Completion of due diligence to the satisfaction of Agent, such due diligence to include, but not be limited to, examination of the Collateral and title thereto and additional due diligence related to the Company's business, industry, legal, environmental and technical related matters.

4. Completion of legal due diligence investigation by counsel to Agent, with results satisfactory to Agent and its counsel, of all matters which Agent deems relevant, in its reasonable discretion.

DA-3072429 v11 1203528-00006

**AA00316**

5. The Company shall have executed and delivered all documentation required by Agent and its counsel in form and substance satisfactory to Agent and its counsel including, without limitation, a general release of all claims against Agent and Lenders through the time of funding, and the Company and Guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the liens, security interests and claims of Agent and the Lenders.

6. All necessary consents and approvals for the Company to enter into the Credit Facility shall have been obtained.

7. Receipt of current financial statements. Further, Agent must be satisfied that all financial statements required by Agent have been received and delivered to it fairly present the business and financial condition of the Company and its subsidiaries.

8. No material misstatements in or omissions from the materials previously furnished to Agent for its review.

9. No previously undisclosed intercompany transactions shall have occurred. Further, Agent must be satisfied that all listings of inter company transactions and transactions with affiliates required by Agent have been received.

10. There shall not be any litigation or other proceeding the result of which might have a material adverse effect on the Company and its affiliates and subsidiaries or any of their assets other than as listed on Exhibit F.

11. No material changes in governmental regulations or policies having a material adverse effect on the Company shall have occurred prior to the Closing Date.

12. The Company and each Guarantor shall be in good standing in its state of incorporation and qualified to do business in any state in which Collateral is located.

13. All motions, orders and bankruptcy court documentation regarding the Loan shall be in form and substance reasonably satisfactory to Agent and consistent with the terms herein.

14. Until all the Company obligations are paid in full to Agent and the Lenders, the Company shall provide to Agent not less than two (2) business days' advance notice of any filings made in the bankruptcy case(s) of

AA00317

the Company and the Guarantors. provided that the Company and Guarantors shall provide as much notice as is reasonably possible for emergency motions. Agent shall be given not less than five (5) business days' advance notice of any hearing regarding the Loan.

15. Such other commercially reasonable conditions precedent as Agent may require in its reasonable discretion, including, without limitation, satisfaction of each of the items listed on Exhibit B attached hereto.

16. Florida Financial Investments, Inc. shall execute and deliver to Agent documentation to subordinate its liens on the Collateral to those liens granted Agent and Lenders in the Interim and Final Orders consistent with the terms of this Commitment Letter.

Collateral Monitoring

Agent or its financial advisor shall have customary rights to enter and inspect the premises, interview employees and accountants, and examine books and records, etc., upon reasonable notice to the Company. The Company shall provide Agent with all reports provided to any third party as well as such financial reports as Agent may request from time to time.

Guarantees:

All of the Guarantors shall guaranty the Loan and shall execute the Loan documents required by Agent. The Company represents, warrants, covenants and agrees that (i) all of the entities that operate, own, or control real estate within the Fiddlers' Creek development are listed on Exhibit E, provided however that the Guarantors shall not include GB 31, Ltd., Fiddler's Creek Foundation, Inc. or Aubrey Ferrao, (ii) all of such entities shall be Guarantors, and (iii) all of such entities will be the subject of individual chapter 11 case filings. For avoidance of doubt, equity interests in the Company owned by Mr. Ferrao will be pledged as Collateral under the Loan.

Representations and Warranties:

Customary for loans and transactions of this type and such other representations and warranties required by Agent in its reasonable discretion.

Covenants:

Definitive documentation to contain affirmative and negative covenants customary for loans and transactions of this type and such other affirmative and negative covenants required by Agent in its reasonable discretion, including but not limited to:

1. The actual amount spent for any line item in the 18 Month Budget shall not vary from the amount provided for such item in the 18 Month Budget by more than 10% in any 13 week period, or in the aggregate.

DA-3072429 v11 1203528-00006

AA00318

2. Covenants related to asset sales, lot sales and milestones related to the Company's business plan and ultimate exit from bankruptcy, as specified in Exhibits C and D.

3. Limitations on maximum outstanding loan balance as set forth in Exhibit D.

4. Prohibitions on additional indebtedness without the Agent's prior written consent.

5. Restricted payments and related party transactions prohibited without the Agent's consent.

6. Restriction on the Company's ability to transfer or sell assets outside of the ordinary course of business without the Agent's consent (including pursuant to sale/leaseback transactions), unless required in conjunction with the Loan, with all proceeds used first to repay the Loan.

7. Limitation on incurrence of liens subject to the Agent's reasonable consent.

8. Subject to the limitations in the 18 Month Budget and contained herein, maintain all taxes (including without limitation ad valorem taxes) current with respect to the Collateral as authorized by Bankruptcy Court order.

9. Restriction on subsidiaries' ability to issue or sell ownership interests, unless as included in the Company's Plan of Reorganization.

10. Restriction on the Company's ability to consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries or affiliates.

11. Subject to the limitations in the 18 Month Budget and contained herein, maintain adequate insurance coverage in types and amounts satisfactory to Agent in its reasonable discretion.

12. The Company and the Guarantors will maintain current status on obligations with respect to assessments and other obligations to Community Development District #1 ("CDD#1") and Community Development District #2 ("CDD#2"). Subject to the prior approval of the Agent, Managed Expenses under the 18 Month Budget, including past due obligations to CDD#2 2003A Series, 2003 B Series, and 2004 Series bonds, shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on Exhibit D as of the respective dates set forth on Exhibit D. Otherwise, the Company and the Guarantors will make no payment of any CDD#1 or CDD#2 assessments for debt service, either pre-petition or post-petition.

DA-3072429 v11 1203528-00006

AA00319

13. The Company shall make representations that the debt service and outstanding assessments as of 12/31/09 are $3,858,191.26, and $36,671,476.99 respectively, for CDD1 and $3,470,653.89 and $72,887,413.41 respectively, for CDD2.

14. The Company shall represent that all land securing the 2003 and 2004 CDD2 bonds is platted and subject to final platting.

15. Subject to the limitations in the 18 Month Budget and contained herein and unless otherwise prohibited by the Bankruptcy Code, the Company will perform all obligations and responsibilities with respect to their participation, management and oversight of Fiddlers Creek Foundation, Tarpon Club and Fiddlers Creek Golf Club to ensure the club operations continue to provide their respective services to the members of each club.

16. Deposit of all Net Asset Sale Proceeds into Cash Collateral Account.

17. Weekly and monthly reporting to Agent, including:
    a. Weekly Sales Report to be submitted no later than close of business on the Wednesday following, to include:
        i. Closed sales by unit or property description, with buyer, sales price, costs of sales (including any commissions, and CDD buy downs), and net sales proceeds, and identifying any special discounts or concessions
        ii. Listing of assets put under contract, including sale price, release price, expected closing date, down payment
        iii. Weekly sales pipeline report, including any residential units, bulk lots, home sites, hotel condo, land or any other material asset of the Company
        iv. Report on any marketing activity undertaken
        v. Closings Report (Sales Price less seller costs for net cash at closing).
    b. Rolling 13 week cash forecast with comparison of actual to projected, including comments explaining variances from the forecast and 18 Month Budget
    c. Monthly update of litigation and property liens
    d. Monthly report of changes in any club membership roll, including:
        i. Additions
        ii. Submitted resignations
        iii. Removals
        iv. Delinquencies
    e. Monthly report on status of Community Development District projects and cash balances
    f. Monthly reports on any permitting and zoning activity

19 of 45

**AA00320**

g.  Monthly financial reports for each Debtor, including a balance sheets and separate reports for each operating entity (golf course, clubs, etc.).

h.  All reports submitted to any creditor, creditor committee, US Trustee, or other governmental authority

i.  A monthly narrative description of the status of sales, development, legal, CDD, operating properties, HOA, financing and bankruptcy issues such that we are fully informed as to the status of the project

j.  A rolling monthly forecast to be provided quarterly, which shall include the year-to-date actual results (i.e., from the funding date to the current period) plus receipts and disbursements which are anticipated to be incurred for the next 18 months, together with a comparison to the approved business plan

k.  Monthly operating statement and statement of cash receipts and disbursements showing both the current month and year-to-date actual results compared to the approved business plan

l.  Such other weekly or monthly reports that Agent may request

**Events of Default:**

Customary for loans and transactions of this type and such other Events of Default required by Agent in its reasonable discretion including, but not limited to, a breach of the variance covenant relating to the Budget, exceeding maximum outstanding loan balance for a specific period as set forth on Exhibit D, failing to achieve minimum cumulative sales as set forth on Exhibit D, or selling assets at prices less than the minimum release prices as set forth on Exhibit C. In addition, the events of default shall contain reasonable notice and cure provisions before acceleration of the debt and enforcement of remedies.

**Purchase Option:**

The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral and other

AA00321

supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan documentation.

Governing Law:                     State of Florida.

Due Diligence:                     There is a due diligence checklist which shall be updated regularly to reflect the delivery and receipt of items required by the conditions precedent terms herein.

Expenses and Indemnification:      Until such time as the Loan is paid in full, the Company shall reimburse Agent, upon demand, for all direct and indirect costs, fees, and expenses of Agent.   Indemnification and release provisions customary for loans and transactions of this type and satisfactory to Agent in its reasonable discretion will be provided for in the definitive documentation.

DA-3072429 v11 1203528-00006

AA00322

## EXHIBIT B

### Additional Conditions Precedent

1. Payment of the Commitment Fee to Agent.

2. Bankruptcy Court Approval of the Credit Facility and all documentation for the Credit Facility shall be in form and substance acceptable to Lender.

3. Delivery to Agent of Certified Articles/Certificates of Formation/Organization for the Company and each limited liability company Guarantor or general partner of a Guarantor.

4. Delivery to Agent of Certified Certificates of Limited Partnership for each limited partnership Guarantor.

5. Delivery to Agent of Certified Articles/Certificates of Incorporation for each corporate Guarantor or general partner of a Guarantor.

6. Delivery to Agent of Operating Agreements/Regulations for the Company and each limited liability company Guarantor or general partner of a Guarantor.

7. Delivery to Agent of Agreements of Limited Partnership for each limited partnership Guarantor.

8. Delivery to Agent of Bylaws for each corporate Guarantor or general partner of a Guarantor.

9. Delivery to Agent of Certificates of Existence and Good Standing for the Company, each Guarantor, and each general partner of a Guarantor from such person's jurisdiction of organization and, if not organized in Florida, from the State of Florida.

10. Delivery to Agent of appraisals from early 2009 for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an appraiser, satisfactory to Agent. The Agent consents to Integra Realty as being satisfactory to the Agent for this purpose only.

11. Delivery to Agent of current ALTA or comparable Surveys for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by a surveyor, satisfactory to Agent.

12. Delivery to Agent of current Phase I Environmental Reports for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an engineer, satisfactory to Agent.

13. Delivery to Agent of Zoning Letters for all real property collateral.

14. Delivery to Agent of Flood Letters for all real property collateral.

15. Delivery to Agent of Utility Letters for all real property collateral.

16. As to the Interim Order, delivery to Agent of Title Searches / Commitments for Mortgagee's Title Insurance Policies for all unencumbered real property collateral in form and substance, and prepared by a title company, satisfactory to Agent. As to the Final Order, delivery to Agent of

Title Searches / Commitments for Mortgagee's Title Insurance Policies for all real property collateral in form and substance, and prepared by a title company, satisfactory to Agent and showing no title exceptions other than those approved by Agent.

17.   For each Community Development District affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A.   Enabling Legislation or Creation Order;

B.   Construction of its Board of Directors;

C.   Name and contact information for each board member;

D.   Name and contact information for its attorney;

E.   Name and contact information for its financial advisor and/or bookkeeper;

F.   Name and contact information for its auditor;

G.   Name and contact information for its engineer;

H.   Copy of each Project Improvement Acquisition Agreement entered into by the CDD and any developer of land in the district;

I.   Each assignment of the Project Improvement Acquisition Agreements in item H;

J.   Copy of the last offering statement;

K.   Copy of the last audit;

L.   Confirmation of the development status of land within the CDD;

M.   Confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD;

N.   Identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD;

O.   It's budget;

P.   All bank account information;

Q.   Assessments on all properties for debt service and other operations;

R.   Financial statements for the CDD;

S.   Annual assessments;

T.   Total bond obligations related to debtor-owned properties in each bond issue (by unit/lot); and

DA-3072429 v11 1203528-00006

AA00324

U.   Copies of all annual financial information and operating data delivered as part of the CDD's continuing disclosure obligations pursuant to its offering statement.

18.   For each Homeowner's Association affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A.   Identification of the specific real property collateral subject to the Homeowner's Association;

B.   Documentation of its financial condition;

C.   Its organizational documents;

D.   Its budget;

E.   Its Financial Statements;

F.   Any CCRs (with all amendments);

G.   The results of a Facility Inspection (pool, building, entries, etc.);

H.   An overhead analysis;

I.   A list of Declarants and Board positions (i.e., who controls); and

J.   Comprehensive Dues information (land, lots, homes, etc.).

19.   Delivery to Agent of copies of the real property tax statements for all real property collateral.

20.   Delivery to Agent of all plats for all real property collateral.

21.   Delivery to Agent of a list of leases with affiliated entities, in form and substance satisfactory to Agent.

22.   Delivery to Agent of a list of all payments or other obligations required to maintain entitlements and zoning, in form and substance satisfactory to Agent.

23.   Delivery to Agent of Financial Statements for the Company and each Guarantor, in form and substance satisfactory to Agent.

24.   Delivery to Agent of a 13 week Cash budget for the Company and its subsidiaries, in form and substance satisfactory to Agent.

25.   Delivery to Agent of the 2010 Budget and Business Plan for the Company and its subsidiaries, in form and substance satisfactory to Agent.

26.   Delivery to Agent of UCC Searches for the Company and each Guarantor.

27.   Delivery to Agent of a list of all existing lenders to the Company or any Guarantor in form and substance satisfactory to Agent.

DA-3072429 v11 1203528-0000؟

**AA00325**

28. Identification by the Company of the specific real property collateral impacted by each existing loan to the Company or any Guarantor, in form and substance satisfactory to Agent.

29. Delivery to Agent of copies of all existing loan and collateral documents for each existing loan to the Company or any Guarantor.

30. Identification by the Company of all outstanding receivables for all real and personal property collateral, in form and substance satisfactory to Agent. Delivery to Agent of all operating cash flow reports for any revenue generating activity at the project.

31. Delivery to Agent of a list showing the amount of deposits being held by each owner of real property collateral and any anticipated forfeitures, in form and substance satisfactory to Agent.

32. Delivery to Agent of a list of all fixed assets of the Company and each Guarantor, including, without limitation, vehicles and equipment, in form and substance satisfactory to Agent.

33. Delivery to Agent of a list of all copyrights, trademarks and patents owned or licensed to the Company and each Guarantor, in form and substance satisfactory to Agent.

34. Delivery to Agent of a detailed description and summary of all insurance currently held by the Company and each Guarantor and a list of any pending claims, in each case in form and substance satisfactory to Agent..

35. Delivery to Agent of copies of the most recent tax returns filed by the Company and each Guarantor.

36. Delivery to Agent of a list, in form and substance satisfactory to Agent, of any pending litigation against the Company, any Guarantor, or any of their respective assets, including, without limitation, any real or personal property collateral.

37. Delivery to Agent of a list and copies of any agreements containing a right of first refusal with respect to any real or personal property collateral.

38. Delivery to Agent of copies of any joint venture agreements entered into by the Company or any Guarantor.

39. The execution of and delivery to Agent by the Company and each Guarantor, as applicable, of each of the following documents, in form and substance satisfactory to Agent:

    A.    Loan Agreement;

    B.    Promissory Note;

    C.    Security Agreement (shareholder of the Company, the Company and each Guarantor);

    D.    Pledge Agreement (the Company and each Guarantor) covering such person's ownership interests in the Company and its subsidiaries;

    E.    Stock Power (for each certificated ownership interest pledged to Agent and Lenders);

    F.    Account Control Agreements for each deposit account of the Company and each

DA-3072429 v11 1203528-00006

AA00326

Guarantor;

G.    Guaranty Agreement (Guarantors);

H.    Mortgages for all real property collateral and security agreements and financing statements for all personal property collateral;

I.    Assignments of Leases and Rents for all real property collateral;

J.    Environmental Indemnities for all real property collateral;

K.    Assignments of all material contracts of the Company and each Guarantor;

L.    Omnibus Officer's Certificates of the Company and each Guarantor with Incumbency; and

M.    Notice of Final Agreement.

40.    Preparation and filing of UCC-1 Financing Statements for the Company and each Guarantor.

41.    Delivery to Agent of all stock certificates or other certificates of ownership in the Company and its subsidiaries pledged as collateral.

42.    Delivery to Agent of Legal Opinion Letters from legal counsel to the Company and each Guarantor containing customary opinions of legal counsel including, without limitation, legal opinions with respect to the Company, the Guarantors, all documentation for the Loan, the collateral, and the transactions contemplated hereby, all of which opinions are satisfactory to the Agent and its counsel.

44.    Delivery to Agent of Certificates of Insurance for all insurance held by the Company and each Guarantor.

45.    Delivery to Agent of Insurance Policy Endorsements for all insurance held by the Company and each Guarantor in form and substance acceptable to Agent.

46.    Delivery to Agent of Resolutions/Unanimous Consent of the Company and each Guarantor in form and substance satisfactory to Agent and authorizing, among other things, the Loan, all transactions contemplated hereby, and all documentation for the Loan and such transactions.

47.    Delivery to Agent of Mortgagee's Title Insurance Policies for all encumbered and unencumbered real property collateral in form and substance, and issued by a title company, satisfactory to Agent, containing Endorsements satisfactory to Agent, and subject only to exceptions approved by Agent.

48.    Payment of all mortgage taxes on all real property collateral except as agreed to by the Company and the Agent.

49.    Filing of Bankruptcy Petitions in the Bankruptcy Court for the Company and all related entities and subsidiaries.

50.    Delivery by the Company of Creditor accounts payable listings and service lists for each filing

DA-3072429 v11 1203528-00006

AA00327

entity.

51. Filing of First Day motions with the Bankruptcy Court customary for chapter 11 bankruptcies of this type.

52. Filing with the Bankruptcy Court of motion for use of cash collateral in form satisfactory to Agent and the Company.

53. The Bankruptcy Court's entering of the Interim Order in form satisfactory to Agent and the Company.

54. The Bankruptcy Court's entering of the Final Order in form satisfactory to Agent and the Company.

54. The Bankruptcy Court's entering an order for the use of cash collateral in accordance with the 18 Month Budget, which is in form satisfactory to Agent and the Company.

55. Filing of a motion for debtor-in-possession financing with the Bankruptcy Court in form satisfactory to Agent and the Company.

56. Timely delivery to Agent of any other materials and information requested by Agent and needed in Agent's reasonable discretion for completion of Agent's due diligence with respect to the Company, the Guarantors and the collateral, including, without limitation, all real and personal property collateral.

57. Without the prior express written approval of the Agent and Lenders, the Company and each Guarantor shall not (i) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or terminate any provision of the Credit Facility or any protection granted to Agent and the Lenders there under, or (B) extinguish, subordinate or diminish any security interest, lien or claim of the Agent or any Lender, or (ii) seek, consent to, or join in the approval of any matter or any plan of reorganization which purports to do any of the things described in (i)(A) and (i)(B). Any such action taken by the Company or any Guarantor will be an enforceable Event of Default under the Credit Facility, and if such action is taken by the Company or any Guarantor, the commitment of Agent to provide the Credit Facility will terminate and Agent and the Lenders will have no obligation to provide any advances under the Credit Facility.

DA-3072429 v11 1203528-00006

AA00328

## Minimum Release Price/CDD Buy down Schedule
## Exhibit C

| Village | Unit | Minimum Gross Sale Price | CDD Buy down | Minimum Release Price |
|---|---|---|---|---|
| Cotton Green | Lot 45 | 201,719 | 6,100 | 174,618 |
| Mallards Landing | 31-A | 414,720 | 20,327 | 345,743 |
| Bellagio | 6 | 713,359 | 17,257 | 624,241 |
| Bellagio | 11 | 605,063 | 17,257 | 526,556 |
| Bellagio | 16 | 380,439 | 17,257 | 308,932 |
| Bellagio | 30 | 629,909 | 17,257 | 551,402 |
| Bellagio | 33 | 640,941 | 17,257 | 562,434 |
| Bellagio | 34 | 688,505 | 17,257 | 609,997 |
| Bellagio | 35 | 290,137 | 17,257 | 211,630 |
| Majorca | 4 | 888,783 | 25,035 | 794,098 |
| Majorca | 5 | 1,027,459 | 25,035 | 918,424 |
| Cranberry Crossing | 25 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 30 | 356,270 | 25,907 | 298,863 |
| Cranberry Crossing | 36 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 43 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 47 | 450,162 | 25,907 | 382,605 |
| Sauvignon | 8 | 963,115 | 15,718 | 877,396 |
| Serena | 6-102 | 161,954 | 11,398 | 123,492 |
| Serena | 7-201 | 249,337 | 11,398 | 210,875 |
| Serena | 8-201 | 246,405 | 11,398 | 207,943 |
| Serena | 11-202 | 254,468 | 11,398 | 216,006 |
| Serena | 13-202 | 247,584 | 11,398 | 209,122 |
| Serena | 15-201 | 477,800 | 11,398 | 439,338 |
| Serena | 17-102 | 508,548 | 11,398 | 459,354 |
| Serena | 17-201 | 518,231 | 11,398 | 479,769 |
| Serena | 17-202 | 652,546 | 11,398 | 593,182 |
| Serena | 19-101 | 435,318 | 11,398 | 396,856 |
| Serena | 19-102 | 435,318 | 11,398 | 396,856 |
| Serena | 19-201 | 539,653 | 11,398 | 501,191 |
| Marengo | 1-102 | 160,765 | 13,943 | 125,822 |
| Marengo | 3-202 | 153,857 | 13,943 | 116,814 |
| Marengo | 4-103 | 155,683 | 13,943 | 120,740 |
| Marengo | 6-202 | 394,182 | 13,943 | 357,139 |
| Marengo | 7-203 | 144,227 | 13,943 | 107,184 |
| Marengo | 8-204 | 186,745 | 13,943 | 146,552 |

DA-3072429 v11 1203528-00006

AA00329

| | | | | |
|---|---|---|---|---|
| Marengo | 9-201 | 420,959 | 13,943 | 380,766 |
| Marengo | 9-203 | 388,387 | 13,943 | 351,344 |
| Marengo | 10-103 | 374,163 | 13,943 | 332,220 |
| Marengo | 10-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 10-203 | 398,637 | 13,943 | 354,594 |
| Marengo | 10-204 | 431,670 | 13,943 | 383,077 |
| Marengo | 11-102 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-103 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-201 | 434,199 | 13,943 | 394,006 |
| Marengo | 11-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 11-203 | 398,637 | 13,943 | 361,594 |
| Millbrook | 10 | 728,692 | 45,420 | 629,824 |
| Millbrook | 11 | 884,609 | 45,420 | 774,729 |
| Millbrook | 12 | 878,236 | 45,420 | 768,806 |
| Millbrook | 13 | 900,143 | 45,420 | 789,166 |
| Callista | 06-101 Model | 514,434 | 11,748 | 465,936 |
| Callista | 06-102 Model | 476,295 | 11,748 | 429,897 |
| Callista | 06-103 | 421,565 | 11,748 | 383,566 |
| Callista | 06-104 | 470,261 | 11,748 | 430,863 |
| Callista | 06-201 | 396,997 | 11,748 | 354,449 |
| Callista | 06-202 Model | 564,532 | 11,748 | 516,033 |
| Callista | 06-203 | 476,992 | 11,748 | 436,193 |
| Callista | 06-204 Model | 645,349 | 11,748 | 591,951 |
| Callista | 10-101 | 463,267 | 11,748 | 423,869 |
| Callista | 10-102 | 421,565 | 11,748 | 383,566 |
| Callista | 10-103 | 423,102 | 11,748 | 383,704 |
| Callista | 10-104 | 468,622 | 11,748 | 429,224 |
| Callista | 10-202 | 465,408 | 11,748 | 426,010 |
| Callista | 10-203 | 469,158 | 11,748 | 429,760 |
| Callista | 12-101 | 457,911 | 11,748 | 418,513 |
| Callista | 12-103 | 303,544 | 11,748 | 265,545 |
| Callista | 12-104 | 200,036 | 11,748 | 160,638 |
| Callista | 12-201 | 265,387 | 11,748 | 222,839 |
| Callista | 12-203 | 338,560 | 11,748 | 297,762 |
| Callista | 12-204 | 265,387 | 11,748 | 222,839 |
| Callista | 13-101 | 338,466 | 11,748 | 299,068 |
| Callista | 13-103 | 307,155 | 11,748 | 269,157 |
| Callista | 13-202 | 452,556 | 11,748 | 411,758 |
| Callista | 13-203 | 210,469 | 11,748 | 169,670 |
| Callista | 14-101 | 340,071 | 11,748 | 300,673 |
| Callista | 14-102 | 372,434 | 11,748 | 334,436 |
| Callista | 14-103 | 190,391 | 11,748 | 152,393 |
| Callista | 14-202 | 256,612 | 11,748 | 215,814 |

DA-3072429 v11 1203528-00006

AA00330

| | | | | |
|---|---|---|---|---|
| Callista | 14-204 | 294,341 | 11,748 | 251,792 |
| Callista | 15-101 | 447,201 | 11,748 | 407,803 |
| Callista | 15-102 | 406,500 | 11,748 | 368,502 |
| Callista | 15-103 | 229,847 | 11,748 | 191,849 |
| Callista - SOLD | 15-104 | | 11,748 | -39,398 |
| Callista | 15-201 | 413,047 | 11,748 | 370,499 |
| Callista | 15-202 | 342,480 | 11,748 | 301,682 |
| Callista | 15-203 | 342,480 | 11,748 | 301,682 |
| Callista | 16-102 | 191,194 | 11,748 | 153,195 |
| Callista | 16-204 | 297,921 | 11,748 | 255,373 |
| Callista | 17-101 | 271,056 | 11,748 | 231,658 |
| Callista | 17-102 | 246,566 | 11,748 | 208,568 |
| Callista | 17-103 | 324,542 | 11,748 | 286,544 |
| Callista | 17-201 | 348,916 | 11,748 | 306,368 |
| Callista | 17-203 | 274,000 | 11,748 | 233,202 |
| Menaggio | 4-102 | 658,237 | 8,558 | 608,029 |
| Menaggio | 5-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 5-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-102 | 502,117 | 8,558 | 453,309 |
| Menaggio | 11-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-201 | 845,892 | 8,558 | 788,684 |
| Menaggio | 12-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-201 | 639,878 | 8,558 | 591,070 |
| Menaggio | 16-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 16-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-201 | 322,770 | 8,558 | 273,962 |
| Menaggio - SOLD | 19-102 | 314,272 | 8,558 | 272,464 |
| Chiasso | Lot # 1 | 1,497,350 | 33,100 | 1,394,250 |
| Chiasso | Lot # 2 | 1,559,146 | 33,100 | 1,456,046 |
| Chiasso | Lot # 3 | 1,751,889 | 33,100 | 1,648,789 |
| | 116 | | | 0 |
| | | | | 0 |
| Mahogany Bend | B23 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B24 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B27 | 212,735 | 13,943 | 184,975 |

DA-3072429 v11 1203528-00006

AA00331

| | | | | |
|---|---|---|---|---|
| Mahogany Bend | B28 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B29 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B30 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B31 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B32 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B33 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B34 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B35 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B36 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B37 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B38 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C1 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C2 | | 13,943 | -27,760 |
| Mahogany Bend | C3 | | 13,943 | -27,760 |
| Mahogany Bend | C4 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C5 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C6 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C7 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C8 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C9 | 212,735 | 13,943 | 184,975 |
| Isla Del Sol | 2 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 3 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 4 | | 13,943 | -32,293 |
| Isla Del Sol | 10 | | 13,943 | -32,293 |
| Isla Del Sol | 17 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 18 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 19 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 20 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 22 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 25 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 28 | 140,203 | 13,943 | 107,910 |
| Isla Del Sol | 29 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 30 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 31 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 32 | | 13,943 | -32,293 |
| Isla Del Sol | 33 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 34 | 325,841 | 13,943 | 293,548 |

DA-3072429 v11 1203528-00006

AA00332

## EXHIBIT D

### Fiddler's Creek

### Cumulative Home Sales/Maximum Outstanding Loan Balance Covenant

| Date | Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses | Minimum Net Cumulative Sales Covenant if not paying Managed Expenses | Maximum Outstanding Loan Balance Covenant |
|---|---|---|---|
| January 31, 2010 | $12,000,000 | | $10,000,000 |
| February 28, 2010 | $12,000,000 | | $10,000,000 |
| March 31, 2010 | $12,000,000 | | $10,000,000 |
| April 30, 2010 | $12,000,000 | | $10,000,000 |
| May 31, 2010 | $12,000,000 | | $10,000,000 |
| June 30, 2010 | $12,000,000 | $5,000,000 | $10,000,000 |
| July 31, 2010 | $12,000,000 | | $12,000,000 |
| August 31, 2010 | $12,000,000 | | $12,000,000 |
| September 30, 2010 | $12,000,000 | $8,000,000 | $13,000,000 |
| October 31, 2010 | $15,000,000 | | $15,000,000 |
| November 30, 2010 | $15,000,000 | | $15,000,000 |
| December 31, 2010 | $15,000,000 | $12,000,000 | $15,000,000 |
| January 31, 2011 | $15,000,000 | | $12,000,000 |
| February 28, 2011 | $15,000,000 | | $10,000,000 |
| March 31, 2011 | $20,000,000 | $20,000,000 | $8,000,000 |
| April 30, 2011 | $20,000,000 | | $6,000,000 |

– Page 32 of 45

DA-3072429 v11 1203528-00006

AA00333

| | | |
|---|---|---|
| May 31, 2011 | $20,000,000 | $5,000,000 |
| June 30, 2011 | $30,000,000 | $30,000,000 | $0 |

DA-3072429 v11 1203528-00006

AA00334

EXHIBIT E

Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| 951 LAND HOLDINGS LTD | Limited Partnership | 03/14/00 | 59-3684895 |
|   951 Land Holdings LLC | General Partner | 04/07/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| DY LAND ASSOCIATES LTD | Limited Partnership | 03/14/00 | 59-3684898 |
|   DY Associates LLC | General Partner | 04/07/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| GBFC DEVELOPMENT LTD | Limited Partnership | 03/14/00 | 59-3684897 |
|   GBFC Development LLC | General Partner | 04/06/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| GBFC MARINA LTD | Limited Partnership | 03/14/00 | 59-3684890 |
|   FC Marina LLC | General Partner | 04/06/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC BEACH LTD | Limited Partnership | 03/14/00 | 59-3684896 |
|   FC Beach LLC | General Partner | 04/06/00 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC GOLF LTD | Limited Partnership | 12/03/02 | 03-0509355 |
|   FC Golf LLC | General Partner | 11/25/02 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| DY LAND HOLDINGS II, LTD | Limited Liability Company | 04/25/08 | 26-2495367 |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC PARCEL 73, LLC | Limited Liability Company | 04/25/08 | 26-2494498 |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC COMMERCIAL, LLC | Limited Liability Company | 04/25/08 | 26-2495276 |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC HOTEL, LTD | Limited Partnership | 03/30/04 | 34-2024547 |
|   FC Hotel, LLC | General Partner | 11/25/02 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| FC RESORT, LTD | Limited Partnership | 03/30/04 | 34-2024546 |
|   FC Resort, LLC | General Partner | 11/25/02 | |
|   Fiddler's Creek LLC | Limited Partner | | |
| GULF BAY HOSPITALITY LTD | Limited Partnership | 12/31/03 | 59-3790126 |
|   GULF BAY HOSPITALITY COMPANY, LLC | GEN PARTNER | 11/25/02 | N/A |
|   Fiddler's Creek LLC | Limited Partner | | |

DA-3072429 v11 1203528-00006

AA00335

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| GULF BAY HOTEL COMPANY LTD | Limited Partnership | 12/04/02 | 56-2495068 |
| GULF BAY HOTEL COMPANY, LLC | General Partner | 11/25/02 | N/A |
| Fiddler's Creek LLC | Limited Partner | | |
| | | | |
| FIDDLER'S CREEK LLC | Limited Liability Company | | 59-3639729 |
| GBFC II LLC | Managing Member | | |
| GBFC II TWO LTD | Member | | |
| | | | |
| GBFC II LP | Limited Partnership | | 59-3705460 |
| GBFC II LLC | General Partner | | |
| GB 100 LTD | Limited Partner | | |
| | | | |
| GB 100 LTD | Limited Partnership | 12/07/95 | 65-0628890 |
| GB 100 Inc. | General Partner | 02/22/93 | 65-0395715 |
| | | | |
| Fiddler's Creek Management Inc. | Sub Charter C | 10/11/94 | 65-0532185 |
| | | | |
| GB Peninsula Ltd (Land) | Limited Partnership | | 59-3692446 |
| GB Peninsula Inc (Gen. Partner) | General Partner | | 59-3692447 |
| | | | |
| GBP Development Ltd (sell house) | Subsidiary of Peninsula | | TBD |
| GB Peninsula Ltd | Limited Partner | | 59-3692446 |
| GBP Development LLC | General Partner | | TBD |

DA-3072429 v11 1203528-00006

AA00336

**EXHIBIT F**

**Material Pending Litigation**

| ENITIY NAME | | CASE NAME | CASE NUMBER; COURT | TYPE OF ACTION |
|---|---|---|---|---|
| **GB PENINSULA, LTD.** | | | | |
| GB Peninsula, Ltd.<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 001 | GBP Development, Ltd.<br>vs.<br>Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician<br>vs.<br>GBP Development, Ltd.,<br>GBP Development, LLC<br>and GB Peninsula, Ltd. | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission (return of deposit)<br><br>Contract Rescission/ Counterclaim for Specific Performance |
| GB Peninsula, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp.<br>vs.<br>GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No, 09-10583-CA | Foreclosure Action<br><br>/ Counterclaim to be filed |
| **GBP DEVELOPMENT, LTD.** | | | | |
| GBP Development, Ltd.<br>GBP Development LLC | 003 | Mark Chaikin<br>vs.<br>GBP Development, Ltd.<br>GBP Development, LLC.<br>Gulf Bay Homes, Ltd.<br>Gulf Bay Homes, Inc.<br>951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br>Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |
| GBP Development, Ltd.<br>GBP Development, LLC<br><br>**THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 001 | GBP Development, Ltd.<br>vs.<br>Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician<br>vs.<br>GBP Development, Ltd., | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier | Specific Performance / Counterclaim for Contract Rescission (return of deposit)<br><br>Contract Rescission/ Counterclaim for Specific Performance |

DA-3072429 v11 1203528-00006

**AA00337**

|  |  | GBP Development, LLC and GB Peninsula, Ltd. | County, Florida |  |
|---|---|---|---|---|
| GBP Development, Ltd. | 004 | Daniel Sussman and Peter Ferrara vs. GBP Development, Ltd. Fiddler's Creek Realty, Inc. | Case No. 05-1585-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| GBP Development, Ltd. | 005 | Daniel Sussman and Roberta Sussman vs. GBP Development, Ltd. | Case No. 07-1358-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs. Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>Counts for: Breach of Contract Piercing Corp Veil Dissipation of Escrow Civil Conversion Statutory Conversion and Civil Theft |
| GBP Development, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action<br><br>/ Counterclaim to be filed |
| GBP Development, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |
| 951 LAND HOLDINGS, LTD. |  |  |  |  |
| 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |

DA-3072429 v11 1203528-00006

AA00338

| | | | | |
|---|---|---|---|---|
| | | Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | | |
| 951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftn-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint;<br>Rescission of Membership<br><br>Counts for:<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| **FIDDLER'S CREEK, LLC** | | | | |
| Fiddler's Creek, LLC<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftn-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint;<br>Rescission of Membership<br><br>Counts for:<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| Fiddler's Creek, LLC | 007 | Textron Financial Corp. vs.<br>FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action<br><br>/ Counterclaim filed |
| Fiddler's Creek, LLC | ## | Fiddler's Creek, LLC vs.<br>Cushman Wakefield, Inc. and Cushman Wakefield Sonnenblick Goldman | Case No. 10-00272-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract;<br>B/ Fiduciary Duty;<br>B/Good Faith and Fair Dealing;<br>Tortuous Interference, etc. |
| **FC GOLF, LTD.** | | | | |
| FC Golf, Ltd.<br>The Golf Club at Fiddler's Creek<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, | Case No. 09-CV-314-Ftn-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>Counts for:<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow |

**AA00339**

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao |  | Civil Conversion Statutory Conversion and Civil Theft |
| FC Golf, Ltd. | 007 | Textron Financial Corp. vs. FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action / Counterclaim filed |
| FC Golf, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |

**FIDDLER'S CREEK MANAGEMENT, INC. (LLC)**
(currently being represented by Foundation insurance company counsel)

|  |  |  |  |  |
|---|---|---|---|---|
| Fiddler's Creek Mgt, Inc. | 008 | Sally and Gerald Bergmoser vs. Fiddler's Creek Foundation, Inc. d/b/a The Club and Spa at Fiddler's Creek and Fiddler's Creek Management, LLC | Case No. 09-4388-CA; 20th Judicial Circuit, Collier County, Florida | Damages |

**GBFC DEVELOPMENT, LTD.**

|  |  |  |  |  |
|---|---|---|---|---|
| GBFC Development, Ltd. **THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 009 | John and Jane Baldwin vs. Gulf Bay Construction Co. Gulf Bay Construction Ltd. GBFC Development, Ltd. | Case No. 08-8984-CA; 20th Judicial Circuit, Collier County, Florida | Damages |
| GBFC Development, Ltd. | 010 | Thomas and Sandra Gollinger vs. GBFC Development, Ltd. | Case No. 08-6226-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 011 | GBFC Development, Ltd. vs. Frederick Smith | Case No. 08-9676-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 012 | Ellen Spear v GBFC Development, Ltd. | Case No. 07-2193-CA [Marengo] ; 20th Judicial Circuit, Collier County, Florida | Contract rescission/ Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 013 | GBFC Development, Ltd. vs. Leonard Bubri | Case No. 09-2148-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

**AA00340**

| | | | | |
|---|---|---|---|---|
| GBFC Development, Ltd. | 014 | GBFC Development, Ltd. Vs. Dennis Baurics and Brian Cramer | Case No. 08-3953-CA [Marengo]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 015 | GBFC Development, Ltd. vs. Thomas and Kelly Armstrong | Case No. 09-3528-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 016 | GBFC Development, Ltd. vs. Steen, Eric | Case No. 09-3453-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / DEFAULT JUDGMENT ENTERED |
| GBFC Development, Ltd. | 017 | GBFC Development, Ltd. vs. David and Jane Moreton | Case No. 08-9678-CA [Service accepted by the Foreign] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 018 | GBFC Development, Ltd. vs. Michael and Susan Lofstedt | Case No. 08-9184-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 019 | GBFC Development, Ltd. vs. Michael Tierney and Melvin Christiansen | Case No. 08-8396-CA [Awaiting Service – Foreign National] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 020 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0848-CA [Awaiting Service – Foreign National] [Callista 12-104]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 021 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0847-CA [Awaiting Service – Foreign National] [Callista 12-204]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 022 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2486-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |

DA-3072429 v11 1203528-00006

AA00341

| GBFC Development, Ltd. | 023 | Robert and Charlene Edwards vs. GBFC Development, Ltd. | Case No. 07-2458-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
|---|---|---|---|---|
| GBFC Development, Ltd. | 024 | Brian and Jody Boland vs. GBFC Development, Ltd. | Case No. 08-7795-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Specific Performance |
| | | GBFC Development, Ltd. vs. Brian and Jody Boland | Case No. 08-8395-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 025 | GBFC Development, Ltd. vs. Jay and Myra Browne | Case No. 08-9677-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 026 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2485-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 027 | GBFC Development, Ltd. vs. Mark and Kimberly Woolley | Case No. 09-3529-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 028 | GBFC Development, Ltd. vs. Brannigan, Jane R. | Case No. 09-2149-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

AA00342

EXHIBIT G

**Approved 18-Month Budget**

(In $000's)

DA-3072429 v11 1203528-00006

AA00343

Attachment A
Filder Creek LLC and Subsidiaries
Consolidated Budget for DIP Loan

| Expense Category | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Club Subsidy | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | | | | | | | | | | | |
| COD Maintenance Funding | | | | | | | | | | | | | | | | | | | |
| COD Debt Service Assessments | | | | | | | | | | | | | | | | | | | |
| Development Fee | | | | | | | | | | | | | | | | | | | |
| General Development | | | | | | | | | | | | | | | | | | | |
| Presol Construction | | | | | | | | | | | | | | | | | | | |
| Qualify Consultant/Third party Cost | | | | | | | | | | | | | | | | | | | |
| Marketing | | | | | | | | | | | | | | | | | | | |
| Project Administration | | | | | | | | | | | | | | | | | | | |
| Presol Administration | | | | | | | | | | | | | | | | | | | |
| DIP Loan Commitment Fee reimbursement | | | | | | | | | | | | | | | | | | | |
| DIP Loan closing expenses | | | | | | | | | | | | | | | | | | | |
| Collateral Monitoring Fee | | | | | | | | | | | | | | | | | | | |
| DIP Loan Unused Availability Fee | | | | | | | | | | | | | | | | | | | |
| DIP Loan R&A Fee (modeled on base pilot) | | | | | | | | | | | | | | | | | | | |
| Contingency | | | | | | | | | | | | | | | | | | | |
| Total Operating Budget | | | | | | | | | | | | | | | | | | | |
| Financing Payments | | | | | | | | | | | | | | | | | | | |
| Total Expense | | | | | | | | | | | | | | | | | | | |
| Cumulative Expenses | | | | | | | | | | | | | | | | | | | |
| Managed Expenses | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | | | | | | | | | | | |
| Presol Administrative Real Estate Taxes | | | | | | | | | | | | | | | | | | | |
| COD Debt Service Assessments | | | | | | | | | | | | | | | | | | | |
| Contingency | | | | | | | | | | | | | | | | | | | |
| Total | | | | | | | | | | | | | | | | | | | |
| Base Expense | | | | | | | | | | | | | | | | | | | |
| Cumulative Managed Expenses | | | | | | | | | | | | | | | | | | | |
| Net Cumulative Expenses | | | | | | | | | | | | | | | | | | | |
| Minimum DIP Loan Balance | | | | | | | | | | | | | | | | | | | |
| Managed Expenses Sales Trigger/Covenant | | | | | | | | | | | | | | | | | | | |
| Sales Covenant (if no Managed expenses paid) | | | | | | | | | | | | | | | | | | | |

DA-3072429 v11 1203528-00006

AA00344

44

AA00345

45

AA00346

| From: | CJ Lorio |
|---|---|
| Sent: | Saturday, February 20, 2010 9:26 PM |
| To: | 'dinardoa@gulfbay.com' |
| Subject: | Status |

Tony, the dearth of communication at this stage is disconcerting to us.  I was hoping we had good lines of communication to address and resolve issues in manner that this loan could be approved and executed.  Can we set a time to have a call tomorrow to go through the issues you have or what other decisions you have made.

KLGates and we have suspended all work on this loan.
CJ Lorio
--------------------------
Sent from my BlackBerry Wireless Handheld

1



Δ π EXHIBIT 25
Deponent LORIO
Date 5 28 14 Rptr.
WWW.DEPOBOOK.COM

PEPI00014811

AA00347

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates     Case No.: 8:10-BK-03846-KRM
(Jointly Administered)

       Debtors,

_____/     Chapter 11

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates,

       Plaintiffs/Counterdefendants,

vs.     Adv. Proc. No.: 11-ap-00809-KRM

PEPI CAPITAL, L.P.,

       Defendant/Counterplaintiff and
       Third Party Plaintiff,

_____

PEPI CAPITAL, L.P.,

       Third Party Plaintiff,

vs.

GULF BAY CAPITAL, INC. and
AUBREY J. FERRAO,

       Third Party Defendants.

_____/

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Now comes Fiddler's Creek, LLC ("Fiddler's Creek") and its twenty-seven, pre-confirmation, subsidiaries (collectively the "Debtors"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056, and moves for partial summary judgment against Pepi Capital, L.P. ("PEPI") on Counts 1 and 2 of the Complaint [D.E. 1] finding and concluding, based on the undisputed material facts set

forth below, that PEPI (i) breached the terms of the Commitment Letter (defined below[1]) because it failed and refused to incorporate certain material and critical terms of the DIP Loan (defined below) that were contained in the Commitment Letter into the final loan documentation for the proposed DIP Loan, which breach occurred first and prior to any alleged breach by the Debtors of the Commitment Letter, thereby relieving the Debtors from performing any further obligations under the Commitment Letter, and/or (ii) anticipatorily breached the Commitment Letter by failing and refusing to provide the Debtors with the due diligence sign off contemplated in the Commitment Letter prior to the filing of the Chapter 11 proceedings, thereby also relieving the Debtors from performing any further obligations under the Commitment Letter.

## I.    PRELIMINARY STATEMENT

In 2009, the Debtors, like the rest of the real estate developers in the country, were in the midst of the worst real estate recession and banking crisis since the Great Depression. Against that backdrop, the Debtors concluded that they needed to file a Chapter 11 bankruptcy in order to reorganize their financial affairs and preserve the tens of millions of dollars of equity that the Debtors believed existed in their real estate.

In order to file and successfully prosecute a Chapter 11 bankruptcy, the Debtors required a debtor in possession loan. In connection therewith, the Debtors were introduced to several different potential lenders, but ultimately elected to proceed with PEPI as a potential lender for debtor-in-possession financing. Over the course of more than three (3) months in late 2009 and early 2010, the Debtors and PEPI spent a substantial amount of time, money and effort heavily negotiating the terms of a Term Sheet (defined below) and then ultimately a Commitment Letter

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Complaint.

2

for the provision of a $27 million debtor in possession loan (the "DIP Loan") to be made from PEPI to the Debtors in the context of a Chapter 11 bankruptcy expected to be filed by the Debtors. The Commitment Letter, which was 45 pages long and superseded the Term Sheet, was signed on January 27, 2010, but was effective as of December 31, 2009. From PEPI's perspective and among the other requirements for the DIP Loan contained in the Commitment Letter, PEPI required that the Debtors grant to PEPI a first priority mortgage lien on all of the Debtors' real estate, which mortgage lien would prime and be ahead of the existing prepetition mortgage liens in favor of the Debtors' eight (8) separate senior secured mortgage lenders (collectively, the "Prepetition Lenders") who had pre-existing first priority mortgage liens on different parcels of the Debtors' real property (the "Priming Lien Requirement"). From the Debtors' perspective, the Commitment Letter contemplated and provided, among other things, that PEPI would provide written notice to the Debtors that PEPI had completed its due diligence in connection with the proposed DIP Loan as a condition to the Debtors filing their Chapter 11 bankruptcy proceedings (the "Due Diligence Sign-Off"). In fact, the Due Diligence Sign-Off was also required by and important to PEPI as a mechanism to establish a deadline by which the Debtors had to file their Chapter 11 bankruptcy proceedings, failing which PEPI's commitment to lend would terminate.

In order to satisfy the Priming Lien Requirement and deliver a priming first lien mortgage to PEPI on the Debtors' real estate in the Chapter 11 proceedings, the Debtor proposed and required that the Commitment Letter contain certain material and critical provisions designed to provide "adequate protection" to the Prepetition Lenders who were being primed by the DIP Loan pursuant to Section 364(d) of the Bankruptcy Code. Specifically, the Commitment Letter unequivocally required that the loan documentation for the DIP Loan contain (i) provisions for

3

an escrow for deeds in lieu of foreclosure and consent judgments, as well as a valuation mechanism so that if any real property is taken through a deed in lieu of foreclosure by PEPI, then the debt under the DIP Loan would be reduced according to such valuation mechanism (the "<u>Escrow Provision</u>"), and (ii) provisions establishing a "waterfall" listing of the Debtors' real estate and, importantly, an agreement by PEPI that it would not foreclose on any real estate in the waterfall unless and until it <u>first collected</u> on all of the real estate higher up in the waterfall (the "<u>Waterfall Provision</u>").

The Commitment Letter also specifically required that the "[t]erms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein … and …. **shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein**." As a result, the unambiguous terms of the Commitment Letter required that the Escrow Provision and the Waterfall Provision be incorporated into the loan documentation for the DIP Loan. As set forth in more detail below, PEPI affirmatively decided **<u>not</u>** to include the Escrow Provision in the loan documentation that PEPI prepared in connection with the DIP Loan. Moreover, PEPI failed and refused to incorporate a critical and material aspect of the Waterfall Provision into the loan documentation for the DIP Loan, namely that PEPI insisted that it be able to foreclose on **<u>all</u>** of the real estate in the waterfall at the same time, and then conduct foreclosure sales of such real estate in accordance with the waterfall. PEPI's deletion of the Escrow Provision and proposed revision to the terms of the Commitment Letter as it related to the Waterfall Provision were material deviations from the terms of the Commitment Letter, and were unacceptable to the Debtors.

As set forth below in more detail, the Debtors made several attempts to resolve the proposed amendments to the Commitment Letter raised by PEPI to the Escrow Provision and the

4

Waterfall Provision of the Commitment Letter, but to no avail. Ultimately, PEPI refused to comply with these critical terms of the Commitment Letter and the parties did not reach agreement on amending the Commitment Letter in connection therewith. As a result, based on the undisputed material facts set forth herein, PEPI clearly and indisputably breached the terms of the Commitment Letter as it related to the Escrow Provision and the Waterfall Provision. Moreover, at the time of PEPI's breach, the Debtors were in full compliance with the Commitment Letter. Therefore, as a result of PEPI's breach of the Commitment Letter, the Debtors were excused from performing any further obligations thereunder.

In addition to the above described first breach by PEPI of the Commitment Letter, PEPI also anticipatorily breached the Commitment Letter by unequivocally refusing to perform its obligation under the Commitment Letter to provide the Debtors with written confirmation that PEPI's due diligence was complete prior to the Debtors' filing for bankruptcy. The Commitment Letter required, and PEPI understood, that PEPI needed to provide the Due Diligence Sign-Off to the Debtors before the Debtors were willing to file their Chapter 11 bankruptcy petitions. PEPI knew that the Debtors could not take the substantial risk of filing a Chapter 11 proceeding without the assurance, through the Due Diligence Sign-Off, that they would have a lender ready, willing and able to make the DIP Loan upon approval by the Bankruptcy Court. In fact, the Debtors continuously requested that PEPI provide the Due Diligence Sign-Off. PEPI continued to rebuff all of the Debtors' requests. Ultimately on a conference call on February 16, 2010, PEPI unequivocally and for the first time told the Debtors that it was never going to provide such a written confirmation until, at the earliest, the closing of the DIP Loan, which was obviously not going to occur until after the filing of the Chapter 11 proceedings. The above facts are undisputed.

5

As a result of the above actions and breaches by PEPI, the Debtors were forced to default PEPI under the Commitment Letter, and seek and obtain last minute debtor-in-possession financing from Gulf Bay Capital, Inc. ("Gulf Bay"), an entity owned and controlled by Aubrey Ferrao, the Debtors' principal.

Based on the undisputed facts set forth herein, the Debtors are entitled to partial summary judgment as a matter of law that (A) PEPI (i) first breached the terms of the Commitment Letter by failing and refusing to incorporate the Escrow Provision and a critical aspect of the Waterfall Provision into the loan documentation for the DIP Loan, and/or (ii) anticipatorily breached the Commitment Letter by ultimately and unequivocally refusing to provide the Due Diligence Sign-Off that the Debtors required, and the Commitment Letter contemplated, for the Debtors to file their Chapter 11 petitions, and (B) as a result of such breaches by PEPI, the Debtors were relieved from any and all further obligations under the Commitment Letter, including the obligation to pay any further amounts to PEPI for a commitment fee, expenses and/or the Break Up Fee.

## II.    UNDISPUTED MATERIAL FACTS

Each of the Debtors in the above referenced Chapter 11 cases owns, operates and/or is otherwise affiliated with the fully integrated, premier master planned residential community known as "Fiddler's Creek" in Southwest Florida.  [D.E. 22, ¶15]   Prior to February 23, 2010 (the "Petition Date"), the homebuilding industry in the United States experienced a significant downturn in the demand for new homes and an oversupply of new and existing homes available for sale. [D.E. 22, ¶16]

Before the Debtors filed these chapter 11 cases in the United States Bankruptcy Court for

AA00353

the Middle District of Florida (the "Bankruptcy Court"), PEPI understood that it was important to the Debtors that they have debtor-in-possession financing in order to file Chapter 11, including to ensure that the Debtors would have sufficient liquidity during their Chapter 11 bankruptcy proceedings. (Deposition of Charles Joseph Lorio,[2] dated May 28, 2014 (the "Lorio Depo") p. 90, lines 12-25)   The Debtors elected to proceed with PEPI as their debtor-in-possession lender in connection with the DIP loan.   [D.E. 22, ¶18]

### 1.   The Negotiations Related to, and the Inclusion of, Specific Material Terms in the Commitment Letter

On October 29, 2009, the Debtors entered into a term sheet with Petrus Private Investments, L.P.[3] (the "Term Sheet") for the DIP Loan with total advances of up to $27 million, which DIP Loan would be used to fund the Debtors' Chapter 11 bankruptcy reorganization. [D.E. 1, ¶14, Ex. A] [D.E. 22, ¶18] (Lorio Depo. p. 57, lines 21-24 [Depo. Exh. 1][4]; Deposition of Steve Blasnick,[5] dated May 27, 2014 (the "Blasnick Depo") p. 28, lines 8-15; Ex. 1)   PEPI understood and was aware that it was proposing to fund a DIP Loan in the context of a Chapter 11 bankruptcy for the Debtors, and that the DIP Loan needed to be in place at the time the Debtors filed for bankruptcy so that the DIP Loan could be approved by the Bankruptcy Court and funded soon after Debtors filed their Chapter 11 proceedings. (Blasnick Depo. p. 30, lines 20-25; p. 31, lines 1-9; Lorio Depo. p. 90, lines 12-25) PEPI also understood and was aware that

---

[2]   Mr. Lorio is a private investment analyst for PEPI who was the person responsible at PEPI for the DIP Loan and who negotiated the Commitment Letter for PEPI. (Lorio Depo., p. 37, lines 2-15; p. 58, lines 2-21) A certified copy of the Lorio Depo., together with exhibits was filed in this action on December 8, 2014   [D.E. 81].   Relevant excerpts of the Lorio Depo. are attached hereto as composite **Exhibit "A."**

[3]   After the Term Sheet was signed, Petrus Private Investments, L.P. changed its name to PEPI.

[4]   Copies of the Deposition Exhibits cited herein are attached hereto in numerical order following the deposition excerpts attached hereto as Exhibits A through D.

[5]   Mr. Blasnick is the president of the general partner of PEPI and the chief executive responsible for everything at PEPI. (Blasnick Depo., p. 4, lines 18-20; p. 9,lines 2-8)  A certified copy of the Blasnick Depo., together with exhibits was filed in this action on December 8, 2014  [D.E.  80].  Relevant excerpts of the Blasnick Depo. are attached hereto as composite **Exhibit "B."**

AA00354

PEPI needed to complete its due diligence for the DIP Loan so as to assure the Debtors that PEPI would not refuse to fund the DIP Loan after the Chapter 11 filings based on due diligence issues. (Deposition of David Radunsky,[6] dated May 28, 2014 (the "Radunsky Depo") p. 95, lines 20-25; p. 96, lines 1-17; Lorio Depo. p. 91, lines 2-25; p. 92, lines 1-25; p. 93, lines 1-12; p. 94, lines 7-13)

Between October 2009 and the end of December 2009, the Debtors and PEPI negotiated the material terms of the DIP Loan, which were to be incorporated into a binding commitment letter. As a result thereof, on December 31, 2009, PEPI executed and issued to the Debtors a Commitment Letter for the $27 million proposed DIP Loan (the "Initial Commitment Letter"). (Deposition of Jeffrey Ross Fine,[7] dated May 30, 2014 (the "Fine Depo") p. 59, lines 10-25; p. 60, lines 1-6; Depo. Exh. 40) However, the Debtors did not accept the Initial Commitment Letter because it did not include the Escrow Provision and the Waterfall Provision that the Debtors required in order to address the manner in which PEPI could foreclose on the collateral securing the DIP Loan if the Debtors defaulted thereunder, while also providing adequate protection to the Debtors' Prepetition Lenders as required by section 364(d) of the Bankruptcy Code. (Lorio Depo. p. 81, lines 11-25; Depo. Exh. 11)

Thereafter, PEPI and the Debtors continued to negotiate the Initial Commitment Letter throughout January 2010, including specifically the Waterfall Provision and the Escrow Provision dealing with the manner in which PEPI could foreclose on the collateral that secured

---

[6] Mr. Radunsky is the chief operating officer and general counsel for PEPI. (Radunsky Depo. p. 13, lines 3-7) A certified copy of the Radunsky Depo., together with exhibits was filed in this action on December 8, 2014 [D.E. 83]. Relevant excerpts of the Radunsky Depo. are attached hereto as composite **Exhibit "C."**

[7] Mr. Fine was outside counsel to PEPI in connection with the DIP Loan while at K&L Gates, and was designated by PEPI as its Rule 30(b)(6) corporate representative in connection herewith. (Fine Depo. p. 6, lines 5-11) A certified copy of the Fine Depo., together with exhibits was filed in this action on December 8, 2014 [D.E. 82]. Relevant excerpts of the Fine Depo. are attached hereto as composite **Exhibit "D."**

AA00355

the DIP Loan.  In connection therewith, on January 6, 2010, the Debtors' counsel emailed PEPI's counsel proposing the concept of escrowing deeds in lieu of foreclosure and consent judgments, as well as establishing a valuation mechanism in connection with the foreclosure process.  (Fine Depo. p. 72, lines 24-25; p. 73, lines 1-14; Depo. Exh. 12)    PEPI recognized that the Escrow Provision and the Waterfall Provision assured the Debtors' Prepetition Lenders that their collateral would be secure if there was a default under the DIP Loan, which was critical to getting the DIP Loan approved by the Bankruptcy Court as it provided adequate protection to the Prepetition Lenders as required by Section 364(d) of the Bankruptcy Code.  (Lorio Depo. p. 63, lines 22-25; p. 64, lines 1-15; p. 81, lines 11-25; Depo. Exh. 10; Fine Depo. p. 80, lines 11-23)  PEPI also was in favor of the Escrow Provision because it addressed PEPI's concern that there be sufficient collateral to re-pay the obligations under the DIP Loan and also gave PEPI a quicker process to foreclose on the collateral.  (Lorio Depo. p. 64, lines 20-25; p. 65, lines 1-25; p. 66, lines 1-9; Depo. Exh. 10)

Lorio recommended that the Escrow Provision be included in the Commitment Letter.  (Lorio Depo. p. 66, lines 2-9)    PEPI agreed with the concepts proposed by Debtors related to the Escrow Provision and the Waterfall Provision, and incorporated those concepts into the Commitment Letter.  (Lorio Depo. p. 65, lines 13-16; p. 66, lines 2-9; Depo. Exh. 13; Depo. Exh. 2 p. 12 of 45)  In an email dated January 11, 2010, PEPI informed the Debtors that it would add the deed in lieu of foreclosure concept in the Commitment Letter because it shows the other creditors that the waterfall was real.  (Lorio Depo. p. 81, lines 11-25; Depo. Exh. 13; Fine Depo. p. 76, line 25; p. 77, lines 1-8)    Moreover, PEPI agreed that the waterfall concept provided protection to the Debtors' other Prepetition Lenders because "they did not have to worry about their collateral being impacted by the DIP loan if collateral further up the line that did not

9

involve them was first foreclosed upon and sold to satisfy the indebtedness." (Fine Depo. p. 80, lines 11-23)

PEPI's counsel emailed the Debtors' counsel on January 15, 2010 to confirm that PEPI had incorporated the "concept of deeds in lieu, etc. in the waterfall concept" into the Commitment Letter. (Lorio Depo. p. 83, lines 7-14; Depo. Exh. 14)  On January 27, 2010, PEPI executed and issued a second commitment letter to the Debtors (the "Commitment Letter"), to be effective December 31, 2009, containing the Escrow Provision and the Waterfall Provision, and the Debtors accepted it.  [D.E. 22, ¶19] (Lorio Depo. p. 58, lines 8-11; Radunsky Depo. p. 43, lines 23-25; p. 44, lines 1-9; Ex. 2; Blasnick Depo. p. 33, lines 22-25)    PEPI agreed and acknowledged that once signed, both the Debtors and PEPI were bound by the Commitment Letter, and could not change the terms thereof.  (Blasnick p. 90, lines 19-25)   The Commitment Letter superseded the Term Sheet.  (Blasnick Depo. p. 55, lines 16-25; p. 56, lines 1-11)  Thus, the Escrow Provision and the Waterfall Provision became obligations under the Commitment Letter.  (Lorio Depo. p. 82, lines 18-21)

The Escrow Provision in the Commitment Letter provides, in pertinent part as follows:

> **In addition**, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly.

(Depo. Ex. 2, p. 12 of 45)    The Waterfall Provision in the Commitment Letter provides, in pertinent part as follows:

> **In addition**, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not

10

foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list.

(Depo. Ex. 2, p. 12 of 45)

PEPI understood and agreed that the Escrow Provision and the Waterfall Provision together gave assurances to the Debtors' Prepetition Lenders that their collateral was secure in the event of any default under the DIP Loan. (Lorio Depo. p. 63, lines 22-25; p. 64, lines 1-15; p. 81, lines 11-25; p. 109, lines 12-24; Fine Depo. p.76, lines 13-25; p. 77, lines 1-8; p. 80, lines 11-23; Radunsky Depo. p. 73, lines 24-25; p. 74, lines 1-5; Depo. Exh. 14)

The Commitment Letter also included language dealing with the requirement for written notice from PEPI to the Debtors related to the completion of PEPI's due diligence prior to the Debtors filing for bankruptcy. (Radunsky Depo. p. 83, lines 20-23) Specifically, the Commitment Letter provides as follows:

> The obligations of PEPI to provide the Credit Facility under this Commitment Letter if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1), the closing of business on February 8, 2010 **(or such later date that is 3 business days after Agent has advised Company that it has completed its due diligence)**, unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.

(Depo. Ex. 2, p. 4 of 45) (emphasis added).

PEPI understood and agreed that the emphasized language referred to a written notice from PEPI to the Debtors that due diligence in respect of the DIP Loan had been completed. (Blasnick Depo. p. p. 53, lines 4-16; Lorio Depo. p. 171, lines 23-25; p. 72, lines 1-5) In fact,

11

PEPI also required this language because PEPI needed to have an ultimate deadline by which its commitment to lend would expire if the Debtors did not proceed forward. (Lorio Depo. p. 172, lines 6-14; Radunsky Depo. p. 103, lines 10-25). As such, pursuant to the above language, the expiration date for PEPI's commitment to lend the DIP Loan was February 8, 2010. However, PEPI understood and agreed that such deadline could be extended because in the event PEPI did not give the Debtors written notice of completion of due diligence prior to February 8, 2010, then the above language in fact extended PEPI's commitment to lend past February 8, 2010 through the date which was three days **after** PEPI provided written notice that due diligence was completed. (Blasnick Depo. p. 53, lines 4-16). In other words, PEPI's notice to the Debtors that its due diligence was complete triggered the time within which the Debtors had to file bankruptcy, and in turn, if the Debtors failed to file bankruptcy within the three day period, then PEPI's commitment to fund the DIP Loan would terminate. (Radunsky Depo. p. 83, lines 20-23; p. 86, lines 10-25) Whether such notice was provided by PEPI prior to or after February 8, 2010, the only way PEPI could trigger a deadline to terminate its commitment to lend was to provide the written notice of completion of its due diligence. (Radunsky Depo. p. 103, lines 10-25) Otherwise, PEPI's commitment to lend would be perpetual. As a result, the only way PEPI could impose a deadline on its commitment to lend was to provide the Due Diligence Sign-Off to the Debtors as contemplated under the Commitment Letter. In addition, PEPI knew that the Debtors wanted confirmation from PEPI that PEPI's due diligence was complete before the Debtors filed for bankruptcy. (Blasnick Depo. p. 30, lines 20-25; p. 31, lines 1-9; Fine Depo. p. 95, lines 15-18; Radunsky Depo. p. 83, lines 20-23)

> **2.** **PEPI's Refusal to Include the Escrow Provison and a Critical Aspect of the Waterfall Provision in the Proposed DIP Loan Documentation**

12

Shortly after signing the Commitment Letter, PEPI began preparing the final loan documents for the DIP Loan that were required to contain terms consistent with, and not materially different from, the terms of the Commitment Letter.  (Lorio Depo. p. 110, lines 9-25; p. 111, lines 1-4;  Blasnick Depo. p. 49, lines 11-25; p. 50, lines 1-9)   Indeed, the Commitment Letter expressly provides as follows:

> The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and the Term Sheets and such documentation of the Credit Facility **shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein**.

(Depo. Ex. 2, p. 4 of 45)(emphasis added)   This provision of the Commitment Letter clearly reflected the understanding between the Debtors and PEPI that the documentation for the DIP Loan would not contain terms materially different from the terms contained in the Commitment Letter.  (Blasnick Depo. p. 49, lines 11-25; p. 50, lines 1-9)   While PEPI was free to suggest amendments to the Commitment Letter by proposing terms different from those contained in the Commitment Letter, if the Debtors did not agree to such proposed terms, then PEPI would be unable to unilaterally change the terms of the Commitment Letter in and through the DIP Loan documentation.  (Blasnick Depo. p. 90, lines 19-25)   Both the Debtors and PEPI agreed to be bound by the Commitment Letter.  (Blasnick Depo. p. 90, lines 19-25)

As set forth above, PEPI clearly agreed to the Escrow Provision in the Commitment Letter.  However, PEPI ultimately refused to include the Escrow Provision in the DIP Loan documentation contrary to the terms of the Commitment Letter through and as of February 23, 2010, which was the date that the Debtors were forced to issue the default letter to PEPI. (Blasnick Depo. p. 94, lines 3-11; Lorio Depo. p. 155, lines 8-25; p. 56, lines 1-3;  Fine Depo. p.

AA00360

136, lines 22-25; p. 137, lines 1-4; p. 141, lines 18-25, p. 142, lines 1-20)   Specifically, while the Escrow Provision was included in an initial draft of the DIP Loan documentation circulated on February 2, 2010 by PEPI, namely in section 10.4 of the proposed loan agreement, [Lorio Depo. p. 110, lines 9-25; p. 111, lines 1-25; p. 112, lines 1-15; Depo Exh. 16], later on February 11, 2010, Lorio wrote to the Debtors and stated as follows:

> "the evaluation mechanism for deed in lieu of foreclosure – we [PEPI] do not need these and to get this moving and avoid complexity **propose deleting this in the structure entirely**."

(Lorio Depo. p. 112, lines 11-15; p. 113, lines 11-25; p. 114, lines 1-15; p. 119, lines 6-25; p. 120, lines 1-21; Depo. Exh. 17)

Among other things, PEPI did not agree to the proposed valuation mechanism relating to the foreclosure of the collateral securing the DIP Loan.  *Id.*  The next day, February 12, 2010, representatives of the Debtors and PEPI had a conference call to discuss the Escrow Provision, namely the deeds in lieu of foreclosure and the valuation mechanism related to the DIP Loan. (Fine Depo. p. 128, lines 2-8)   As a result of the February 12th conference call, and in an effort to resolve the disagreement related to the Escrow Provision, as well as to try to finalize the DIP Loan documentation so that the Debtors could file for bankruptcy, counsel to the Debtors on February 15, 2010 proposed a potential solution, which was to pursue the interim order without a resolution of the issues involving the Escrow Provision, and rely on the "commercially reasonable" language related thereto.  (Depo Exh 21)(Lorio Depo. p. 143, lines 15-25; p. 144, lines 1-4; Fine Depo. p. 129, lines 6-25).   For the final order on the DIP Loan, counsel to the Debtors also proposed a different valuation structure for the foreclosures.  *Id.*  Notwithstanding such efforts to propose an alternate solution to PEPI's refusal to honor the Escrow Provision in the Commitment Letter, PEPI did not agree.  (Fine Depo. p. 130, lines 1-25; p. 131, lines 1-17)

14

Specifically, on February 16, 2010, Lorio wrote to the Debtors and stated as follows:

> We probably need to discuss the waterfall and where we are on that. I think **there is not agreement right now on how we would work through collateral in a foreclosure process**.

(Depo. Exh. 19) (emphasis added).

On February 16, 2010, representatives of and counsel for PEPI and the Debtors had a conference call to discuss, among other things, the absence of the Escrow Provision and the proposed revised Waterfall Provision in PEPI's revised version of the proposed loan agreement for the DIP Loan. (Fine Depo. p. 125, lines 21-24; p. 135, lines 14-24; p. 136, lines 22-25; p. 137, lines 1-4) During that conference call, PEPI told the Debtors that it would not agree to the valuation mechanism relating to the foreclosure on the collateral that counsel to the Debtors had proposed on February 15, 2010 as a solution to PEPI's refusal to abide by the Escrow Provision in the Commitment Letter. (Fine Depo. p. 136, lines 13-25; p. 137, lines 1-5; Depo. Exh. 19) In addition, PEPI further advised the Debtors on such conference call that the proposed loan agreement for the DIP Loan would not incorporate any language that effectuated the Escrow Provision related to the deeds in lieu of foreclosure and the consent judgments. (Fine Depo. p. 136, lines 13-25; p. 137, lines 1-4) Essentially, PEPI confirmed on such conference call that it would not agree to include the Escrow Provision in the loan documentation notwithstanding the terms of the Commitment Letter.

That same day, PEPI sent the Debtors a revised proposed loan agreement for the DIP Loan and suggested that the parties have another conference call "to go over the suggested changes to [sic] loan agreement just sent over so we can finish the document." (Depo. Ex. 22) Upon reviewing the revised proposed loan agreement for the DIP Loan that PEPI sent on February 16, 2010, the Debtors' counsel noted that PEPI's version of the waterfall provision

15

AA00362

(contained in section 10.4 of the proposed loan agreement) "did not match the loan commitment." (Depo. Exh. 20, p. 52)

In addition to the above refusal to honor the Escrow Provision of the Commitment Letter, PEPI continued to insist that the loan documentation include a Waterfall Provision that was materially different from the terms of the Commitment Letter. On February 17, 2010, PEPI's counsel sent the Debtors a further revised draft of the proposed loan agreement for the DIP Loan. (Fine Depo. p. 139, lines 19-25; p. 140, lines 1-3; Radunsky Depo. Exh. 23) Consistent with PEPI's representations during the February 16th conference call, the revised loan agreement did not include the Escrow Provision regarding an escrow for deed in lieu of foreclosure and the consent judgments, or the valuation mechanism related to the foreclosure sale of the collateral, all of which was contrary to the terms of the Commitment Letter. (Lorio Depo. p. 155, lines 8-15; p. 156, lines 1-3; Radunsky Depo. p. 128, lines 19-25; p. 129, lines 1-7; p. 129, lines 21-25; p. 130, lines 1-7) Moreover, PEPI's revised version of the proposed loan agreement for the DIP Loan materially revised the Waterfall Provision in the Commitment Letter by insisting that PEPI be allowed to foreclose on all of the collateral at one time, as opposed to "first collect" out of each parcel of property before moving onto the next parcel in the waterfall. (Fine Depo. p. 141, lines 12-25; p. 142, lines 1-20)

Specifically and importantly, PEPI's version of the proposed loan agreement for the DIP Loan sent to the Debtors on February 17, 2010 provided, in section 10.4 thereof, that PEPI had the right to foreclose on the Debtors' real estate and obtain foreclosure judgments on **all of the collateral within the waterfall at the same time**. (Fine Depo. p. 142, lines 9-20)(emphasis added). This provision was contrary to the terms of the Commitment Letter in that the Commitment Letter clearly required that PEPI use "**commercially reasonable efforts to first**

16

collect out of the property described in the numbered items before it in the below list." Instead of providing language requiring that PEPI **first collect** out of each parcel of property in waterfall before moving on to collect on the next parcel, PEPI insisted on a process where it could foreclose on all of the property at one time and then schedule foreclosure sales one at a time to recover on its debt. The foreclosure process that PEPI insisted on including in the DIP Loan documentation, which was contrary to the terms of the Commitment Letter, clearly did not provide assurances to the Debtors' Prepetition Lenders that their collateral was secure, a critical provision for approval of the DIP Loan, which was also understood by PEPI. (Lorio Depo. p. 63, lines 22-25; p. 64, lines 1-15; p. 81, lines 11-25; Fine Depo. p.76, lines 13-25; p. 77, lines 1-8; p. 80, lines 11-23; Radunsky Depo. p. 73, lines 24-25; p. 74, lines 1-5; Depo. Exh. 14)

### 3. PEPI's Refusal to Provide the Debtors with a Due Diligence Sign-Off

On numerous occasions while the Debtors and PEPI were preparing and revising the proposed loan documentation for the DIP Loan, counsel for the Debtors repeatedly requested the Due Diligence Sign-Off from PEPI as provided for in the Commitment Letter. (Lorio's Depo. p. p. 91, lines 2-14; p. 93, lines 5-12; p. 94, lines 7-13; Radunsky's Depo. p. 103, lines 10-25; p. 104, lines 1-25; Depo Exhs. 28, 29; Fine's Depo. p. 95, lines 1-18; p. 96, lines 11-25; p. 97, line 1; p. 99, lines 1-9; p. 100, lines 17-20; Depo Exhs. 28, 29, 43, 44, and 45) On each occasion, PEPI either (i) did not address the Debtors' requests, (ii) provided just a status of its due diligence efforts, or (iii) verbally (but not in writing) assured the Debtors that its due diligence was substantially completed. (Lorio Depo. p. 103, lines 13-25; Radunsky Depo. p. 103, lines 10-25; p. 104, lines 1-25; Fine Depo p. 96, lines 11-23; p. 100, lines 21-23; p. 102, lines 1-6) However, despite the Debtors' requests, PEPI refused to provide the Debtors with a ***written*** confirmation that PEPI's due diligence was in fact completed as contemplated under the

AA00364

Commitment Letter.  (Lorio Depo. p. 94, lines 7-13; p. 105,lines 5-9; Radunsky Depo. p. 96, lines 22-24; p. 97, lines 3-18; p. 104, lines 11-25; Fine Depo p. 102, lines 1-6, p. 105, lines 7-13; p. 106, lines 11-25; p. 107, line 1)  Moreover, PEPI was aware that the Debtors required notice of the completion of due diligence so that the Debtors would know that PEPI was ready to fund the DIP Loan.  (Radunsky Depo. p. 83, lines 20-23)  In his deposition, Lorio admitted that the Debtors "had requested a written sign off for completion of due diligence and we never gave one."  (Lorio Depo. p. 94, lines 7-13)

As set forth above, on February 16, 2010, representatives of and counsel for PEPI and the Debtors attended a conference call.  In addition to discussing the Escrow Provision and the Waterfall Provision as referenced above, the Debtors and PEPI discussed the Debtors' request for the Due Diligence Sign-Off.  (Fine Depo. p. 125, lines 21-24; p. 135, lines 14-24; p. 136, lines 22-25; p. 137, lines 1-4)  During the conference call on February 16, 2010, PEPI for the first time told the Debtors, unequivocally, that it would not provide the Debtors with written confirmation that PEPI's due diligence was completed until, at the earliest, the closing of the DIP Loan.  (Lorio Depo. p. 149, lines 24-25; p. 150, lines 1-8; Fine Depo. p. 135, lines 14-24)  This position was contrary to the Commitment Letter and the parties' understanding that the Debtors would not file their Chapter 11 petitions until PEPI gave written confirmation that its due diligence was completed.  (Lorio Depo. p. 90, lines 12-25; p. 91, lines 1-8; Fine Depo. p. 95, lines 15-18)  Moreover, such position was inconsistent with PEPI's own testimony and desire to have a deadline by which its commitment to lend would expire.  (Lorio Depo. p. 172, lines 6-14; Radunsky Depo. p. 103, lines 10-25).  Clearly, under the language of the Commitment Letter, if written notice of the Due Diligence Sign-Off was not provided by PEPI, then there would be no deadline triggered by which the Debtors were required to file Chapter 11, which in turn would

18

AA00365

mean that PEPI's commitment to lend would never expire. Having a perpetual commitment to lend was not acceptable to PEPI. (Lorio Depo. p. 172, lines 6-14). Therefore, any argument by PEPI that a Due Diligence Sign-Off was not contemplated or required under the Commitment Letter is belied by the testimony of its own representatives.

### 4. Debtors' Notice of Default / Termination Letter and PEPI's Response

PEPI clearly breached the Commitment Letter when it made its unequivocal representations to the Debtors during the February 16, 2010 conference call that (i) PEPI would not include the Escrow Provisions in the proposed loan agreement for the DIP Loan consistent with the terms of the Commitment Letter, and (ii) PEPI would not provide a Due Diligence Sign-Off until the DIP Loan actually closed post-petition. In addition, PEPI clearly breached the Commitment Letter when it insisted on language in the proposed loan agreement that it be allowed to pursue foreclosures on **all** of the Debtors' real estate at the same time, as opposed to first collecting out of each such parcel before moving onto the next parcel. As such, on February 22, 2014, the Debtors, through their counsel, sent PEPI a letter declaring PEPI in default of the Commitment Letter for each of the above specific reasons, thereby terminating the Commitment Letter. (Blasnick Depo. p. 70, lines 14-25; Depo. Exh. 5) Specifically, the Debtors' notice of default to PEPI provided as follows:

> Regrettably and for the reasons stated below, Fiddlers is compelled to assert that PEPI is in material default of and under the terms of the Commitment Letter. . . .
>
> Specifically, Fiddlers asserts that PEPI has defaulted under the terms of the Commitment Letter for several reasons, including (i) the stated refusal by PEPI to provide Fiddlers with notice that PEPI has completed its due diligence in connection with the Loan, and (ii) the decision by PEPI to delete from the loan documents those certain critical provisions of the waterfall required by the Commitment Letter concerning an escrow for deeds in lieu of

19

foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Loan in respect of the waterfall. PEPI also materially modified the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sales process. (Depo. Ex. 5)

As a result of such defaults by PEPI and the need to have debtor in possession financing for the Chapter 11, the Debtors immediately sought and obtained a debtor-in-possession loan from Gulf Bay, and thereafter on February 23, 2010 filed their Chapter 11 petitions (the "Petition Date"). [Case No. 8:10-BK-03846-KRM, D.E. 1].

On the Petition Date, PEPI, though its counsel, sent the Debtors a response to the Debtor's notice of default. (Fine Depo. p. 155, lines 10-25; p. 156, line 1; Depo. Exh. 6)  In its response and contrary to its position all along that it would not provide the Due Diligence Sign-Off, PEPI finally provided written confirmation that its due diligence was completed and formally commenced the three day deadline for the filing of bankruptcy pursuant to the Commitment Letter.  Namely, PEPI stated as follows:

As had been previously indicated to you, **all material due diligence on the Loan has been completed by PEPI** and PEPI is ready, willing and able to immediately fund the Loan in accordance with the Commitment Letter upon receipt of Bankruptcy Court approval. Although PEPI has also told you repeatedly during this past week that the Borrowers are free to file Chapter 11 at any time, **please consider this your formal 3 business day notice that due diligence has been completed**. (Depo. Exh. 6) (Emphasis added).

(Lorio Depo. p. 171, lines 12-25; p. 172, lines 1-5; Fine Depo. p. 156, lines 8-25; p. 157, line 1)

Both Lorio and PEPI's counsel have acknowledged that PEPI's February 23, 2010 response letter provided the written Due Diligence Sign-Off required under the Commitment

20

AA00367

Letter for the purpose of activating the three day time period which the Debtors were seeking

from PEPI in advance of filing for Chapter 11. (Lorio Depo., p. 172, lines 22-25; p. 173, line 1;

Radunsky Depo. p. 140, lines 13-22)    However, by the time PEPI actually gave written

confirmation that its due diligence was complete, the Debtors had already issued their default

letter to PEPI under the Commitment Letter, secured alternative financing with Gulf Bay and

filed for bankruptcy.   (Lorio Depo. p. 171, lines 23-25; p. 172, lines 1-14)  PEPI's response

letter is the best evidence that PEPI knew and understood the requirements of the Commitment

Letter in regards to the Due Diligence Sign-Off.   PEPI's response letter wholly undermines any

argument that PEPI can or may make that it was not required to provide the Due Diligence Sign-

Off prior to the Debtors' filing for bankruptcy.

      In addition, and even though too late and despite prior positions to the contrary, PEPI

belatedly attempted in its response letter to **negotiate** the Escrow Provision in the proposed loan

agreement for the DIP Loan to include the deed in lieu of foreclosure provision and the related

valuation mechanism.  Specifically, PEPI stated as follows:

> Likewise the valuation mechanism you refer to is only in regard to
> a deed in lieu of foreclosure and if you believe that a deed in lieu
> of foreclosure provision and its related valuation mechanism
> should be included in the loan. . . then Pepi . . will **negotiate** the
> provisions of a valuation mechanisms for deeds in lieu of
> foreclosure and will include that in the loan documentation.
> (Emphasis added).

Clearly, PEPI's response establishes that PEPI was not willing, in fact, to include the Escrow

Provision in the loan agreement for the DIP Loan as required by the Commitment Letter.

(Blasnick Depo. p. 94, lines 3-11; Lorio Depo. p. 174, lines 15-25; p. 175, lines 1-4)  Moreover,

PEPI had already agreed once in the Commitment Letter to include the Escrow Provision in the

loan documentation.   As set forth above, PEPI had made it clear to the Debtors that it was

AA00368

unwilling to include the Escrow Provision in the loan documents despite the requirements of the Commitment Letter. The fact that PEPI changed its position on February 23, 2010 in reaction to the Debtors' default letter did not, and does not, change the fact that PEPI had already breached the Commitment Letter. Again, PEPI's response letter is the best evidence that PEPI knew and understood the requirements of the Commitment Letter and that PEPI had breached those requirements.

> ### 5.    The Debtors are Relieved from Further Obligations under the Commitment Letter.

As a result of the clear defaults by PEPI outlined above, the Debtors were and are relieved of any further obligations to comply with the terms of the Commitment Letter, including being able to seek and obtain a separate debtor-in-possession loan from Gulf Bay free of any obligation to pay a Break Up Fee or any other amounts to PEPI under the Commitment Letter. To that end, the Commitment Letter explicitly and clearly provides as follows:

> All indemnities and obligations of the Company and its subsidiaries shall survive the termination of this Commitment Letter or the commitment of Pepi hereunder, **provided however, such indemnities and obligations shall not survive in the event of a default by Pepi hereunder**.

Based on the above undisputed facts, PEPI breached the Commitment Letter, the Commitment Letter was terminated and the Debtors were relieved from further performing their obligations under it. (Blasnick Depo. p. 51, lines 7-25; p. 52, line 1)

## III.    MEMORANDUM OF LAW

### A.    STANDARD FOR GRANTING MOTIONS FOR SUMMARY JDUGMENT

Under Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings under Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper if "the

AA00369

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Summary judgment will not be entered if there exists an issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). However, the mere existence of some alleged factual dispute will not necessarily defeat a properly supported motion for summary judgment. Rather, there must be a genuine issue of material fact that might affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 247-48, 106 S. Ct. at 2510.

Once a properly supported motion for summary judgment is filed, a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by the respondent:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(e). Under *Celotex*, Rule 56 requires the entry of summary judgment if the respondent fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552. Even if there exists a scintilla of evidence to support the nonmoving party's position, that is insufficient to defeat summary judgment as there must be evidence that a reasonable juror could find for the non-movant to support a verdict. *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512.

23

AA00370

The pleadings, exhibits and deposition transcripts submitted in this adversary proceeding and cited herein demonstrate the undisputed material facts which establish that PEPI breached the Commitment Letter, and thus, partial summary judgment should be entered in favor of the Debtors on Counts 1 and 2 of the Complaint, as a matter of law, finding and concluding that such breaches occurred and relieving the Debtors from any further obligations under the Commitment Letter from and after such breaches.

### B. THE DEBTORS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT THAT (I) PEPI BREACHED THE COMMITMENT LETTER, AND (II) AS A RESULT, THE DEBTORS ARE EXCUSED FROM ANY FURTHER OBLIGATIONS THEREUNDER

"A binding loan commitment is a contract between the lender and borrower; therefore, basic contract principles apply." *Freeman Horn, Inc. v. Trustmark Nat. Bank*, 245 B.R. 820, 826 (S.D. Miss. 1999). *See also Bluevack, Inc. v. Walter E. Heller & Co. of Florida*, 331 So. 2d 359, 360 (Fla. 3d DCA 1976) (noting that it is well recognized that parties can make an enforceable contract binding them to prepare and execute a subsequent agreement provided that the agreement is definite and certain upon all the subjects to be embraced). Thus, lenders will be held liable for breach of a commitment letter if they impose new conditions or terms not set forth in the commitment letter. *Id.* (citing *999 v. C.I.T. Corp.*, 776 F.2d 866, 871 (9th Cir.1985)). In such a situation, the borrower is justified in refusing financing from the lender that was subject to the new unjustified condition, and instead, seeking replacement financing. *999 v. C.I.T. Corp.*, 776 F.2d at 871. In other words, when a lender refuses to comply with a commitment letter, the borrower is permitted to cease performing under the commitment letter and will not be found in default. *See, e.g.*, *Teachers Ins. and Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491, 505-06 (S.D. N.Y. 1987).

24

In *Teachers Insurance and Annuity Ass'n v. Tribune Co.*, Tribune sought to sell its property and defer a substantial portion of the purchase price. The buyer of the property proposed to give Tribune a non-recourse long term mortgage note, against which Tribune would "match-fund" the mortgage, or, in other words, borrow an amount from Teachers approximately equal to the mortgage note from the buyer. Under the loan agreement with Teachers, Tribune would have the right to repay its obligation to Teachers by putting to Teachers the mortgage note that Tribune received from the buyer in connection with the sale of the property. *Id*. at 492.

Teachers agreed to lend the money to Tribune and, and in connection therewith, sent a commitment letter to Tribune with a two page term sheet that covered all the basic economic terms of the proposed loan. *Id*. The commitment letter provided that Tribune and Teachers had made a "binding agreement" to borrow and to lend on the agreed terms, subject to the preparation and execution of final documents satisfactory to both sides and the approval of Tribune's board of directors. *Id*.

Before the final agreements were prepared, however, Tribune refused to continue to negotiate further unless Teacher's agreed that Tribune's obligations to borrow would be contingent on its ability to report the loan on its financial statement by an off-balance-sheet offset. *See Id*. 495-96. However, neither the commitment letter nor the two page term sheet made reference to offset accounting. *See Id*. at 496.

Teachers, as the proposed lender, brought an action against Tribune for breach of the commitment letter related to the loan. The district court found that the commitment letter was a binding agreement and that Tribune, as the proposed borrower, breached the agreement by insisting on conditions that were incompatible with the initial agreement. *Id*. at 506. Specifically, Tribune insisted on a condition to the loan that was not provided for in the

AA00372

commitment letter.  Since Teachers did not agree to such condition, Tribune was not able to require that such new condition be added to the final loan documents.  Moreover, Tribune was not able to refuse to perform its obligations under the commitment letter when Teachers did not agree to the new condition.  As a result, Teachers was able to declare Tribune in default under the commitment letter based on Tribune's demand for such new condition, and seek damages in connection therewith.  *See Id.*

While the *Teachers Insurance* Court dealt with a breaching party's insistence that a new material term be added to the commitment letter that was not previously included in the commitment letter, the same analysis applies to the present case with PEPI.  Here, PEPI insisted on proposed loan documents related to the DIP Loan that deleted and revised material terms of the Commitment Letter that PEPI had already contractually agreed to in the Commitment Letter.  In this case, as in the *Teachers Insurance* case, PEPI, as a party to a binding commitment letter, attempted to circumvent the terms of the Commitment Letter by both proposing a material change to, and deleting certain material terms of, the Commitment Letter in the context of the proposed loan documents.  As in the *Teachers Insurance* case, such effort constitutes a breach of the binding Commitment Letter.   PEPI, as the breaching party, already entered into the Commitment Letter, and "did not negotiate for and did not obtain its right to" any additional modifications.  *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 505 (S.D.N.Y. 1987).

If a party to a contract materially breaches a contract, then the other party's duty to perform is excused.  *Acciard v. Whitney*, 2:07-CV-00476-FTM-36, 2011 WL 4552564, at *5 (M.D. Fla. Sept. 30, 2011).  Thus, a party's failure to continue to perform an agreement is not considered a default, if the other party to the agreement breached the agreement first.  *Jones v.*

26

*Warmack*, 967 So. 2d 400, 402 (Fla. 1st DCA 2007).

In *Plantation Key Developers, Inc. v. Colonial Mortgage Co. of Indiana, Inc.*, 589 F.2d 164, 169 (Fifth Cir. 1979), a lender was found in breach of its commitment letter to provide a mortgage loan to a developer by refusing to extend the loan at the interest rate set forth in the commitment letter. Based on the lender's refusal to honor the interest rate in the commitment letter, the developer was relieved from paying the extension fee, and filed an action against the lender for breach of contract and fraud. *Id.* at 167. *See also In re Maxko Petroleum, LLC*, 425 B.R. 852, 873 (Bankr. S.D. Fla. 2010) *aff'd sub nom. Palm Beach Int'l, Inc. v. Salkin*, 10-60995-CIV, 2010 WL 5418995 (S.D. Fla. Dec. 23, 2010) and *aff'd sub nom. Hage v. Salkin*, 10-60996-CIV, 2011 WL 336723 (S.D. Fla. Jan. 31, 2011) (holding that the defendants' default under their purchase contracts before any obligation on the part of the debtor arose relieved the debtor of its obligation to perform under the contracts).

The same principle applies here. PEPI's failure to prepare the loan documentation for the DIP Loan that included the Escrow Provision and a critical aspect of the Waterfall Provision was a breach of the Commitment Letter that relieved Debtors from further performing under the Commitment Letter. The Commitment Letter clearly provided that the final loan documentation include the Escrow Provision for (1) the escrowing of the deeds in lieu and consent judgments, and (2) a valuation mechanism for the collateral connected to the deeds in lieu. (Depo. Ex. 2, p. 12) Moreover, the Commitment Letter also clearly provided that the final loan documentation include a requirement as part of the Waterfall Provision that PEPI be required to *first collect* out of each piece of collateral in the waterfall before moving on to the next piece of collateral. These provisions were heavily negotiated and were critical to the Debtors' effort to "adequately protect" the Debtors' Prepetition Lenders so as enable the Debtors to deliver Bankruptcy Court

AA00374

approval of the Priming Lien Requirement to PEPI in connection with the DIP Loan.

It is undisputed by PEPI's own representatives that the proposed loan agreement for the DIP Loan that was presented by PEPI to the Debtors on February 17, 2010 did not include the Escrow Provision and the above referenced critical aspect of the Waterfall Provision required by the Commitment Letter. (Depo Ex. 23; Lorio Depo. p. 155-56; Radunsky Depo. 127-28; Fine Depo. p. 141-42) Rather, the proposed loan agreement for the DIP Loan that PEPI presented to the Debtors at such time permitted PEPI to commence foreclosure lawsuits against **all** of the collateral at the same time upon a default under the DIP Loan, rather than stagger such foreclosures as provided in the Commitment Letter. (Depo. Exs. 5 and 23; Fine Depo. p. 142, lines 9-20) Also, the Escrow Provision for deeds in lieu of foreclosure and consent judgments were not included in the proposed loan agreement for the DIP Loan that PEPI presented at such time. (Blasnick Depo. p. 94, lines 3-11; Lorio Depo. p. 155, lines 8-25; p. 56, lines 1-3; Fine Depo. p. 136, lines 22-25; p. 137, lines 1-4; p. 141, lines 18-25, p. 142, lines 1-20)

The above undisputed material facts clearly establish that PEPI was unwilling to include the Escrow Provision and a critical aspect of the Waterfall Provision in the proposed loan agreement for the DIP Loan as required under the Commitment Letter, which actions constituted a breach of the Commitment Letter. Thus, the Debtors are entitled to a partial summary judgment in respect of Counts 1 and 2 of the Complaint that PEPI breached the Commitment Letter, which first breach terminated the Commitment Letter and thereby relieved the Debtors from continuing to perform under the Commitment Letter, as a matter of law, including the obligation to pay any further amounts to PEPI for a commitment fee, expenses and/or the Break

Up Fee.[8]  *See Teachers Insurance and Annuity Ass'n v. Tribune Co.* 670 F. Supp. At 506; *999 v. C.I.T. Corp.*, 776 F.2d at 871; *Plantation Key Developers*, 589 F.2d at 169

### C.    DEBTORS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT BASED ON PEPI'S ANTICIPATORY BREACH OF THE COMMITMENT LETTER WHEN IT REFUSED TO PROVIDE A DUE DILIGENCE SIGN-OFF BEFORE THE DEBTORS' BANKRUTPCY FILING

It is well settled in Florida that "where one party, even before the time for performance of the contract has arrived, renounces it to the other party, the latter may act on the renunciation, treat the contract as broken, and sue before the time for performance." *Barbara G. Banks, P.A. v. Thomas D. Lardin, P.A.*, 938 So. 2d 571, 575 (Fla. 4th DCA 2006) (quoting *Sullivan v. McMillan*, 26 Fla. 543, 8 So. 450, 457 (1890)).  "An anticipatory breach occurs before the time has come when there is a present duty to perform as the result of the breaching party's words or acts evincing an intention to refuse performance in the future."  *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F. Supp. 2d 1350 (M.D. Fla. 2007) (citing *Alvarez v. Rendon*, 953 So. 2d 702, 709 (Fla. 5th DCA 2007))) (inner quotations omitted).

Thus, a party's anticipatory repudiation of a contract relieves the non-breaching party of its duty to perform under the contract and creates an immediate cause of action for breach of contract.  *See In re Maxko Petroleum, LLC*, 425 B.R. at 873.  *See also Gaylis v. Caminis*, 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984) ("The law is clear that a repudiation relieves the non-breaching party of its duty to tender performance and gives rise to a claim for damages"); *Hospital Mortgage Group v. First Prudential Development Corp.,* 411 So.2d 181, 182 (Fla.1982)("In dealing with anticipatory repudiations the law is clear that a repudiation gives rise to a claim for damages by the non-breaching party…Therefore, the non-breaching party is

---

[8] The Debtors reserve the right to seek damages against PEPI for such breaches.

AA00376

relieved of its duty to tender performance and has an immediate cause of action against the breaching party."); *Twenty–Four Collection, Inc. v. M. Weinbaum Construction, Inc.*, 427 So.2d 1110, 1111 (Fla. 3d DCA 1983) ("The law is clear that where one party to the contract arbitrarily demands performance not required by the contract and couples this demand with a refusal to further perform unless the demand is met, the party has anticipatorily repudiated the contract… which anticipatory repudiation relieves the non-breaching party of its duty to further perform and creates in it an immediate cause of action for breach of contract…").

*United California Bank v. Prudential Insurance Co.*, 140 Ariz. 238, 681 P.2d 390 (Ariz. Ct. App. 1983), involved a lender's anticipatory breach of its commitment letter. In that case, Prudential Insurance Company ("Prudential") was the commercial lender that was the intended "take-out" lender for the construction of a Hyatt Regency Hotel in downtown Phoenix. 140 Ariz. at 246, 681 P.2d at 398. Prudential had agreements with the developer of the hotel, HRP Hotel Company ("HRP"), and with United California Bank ("UCB"), the developer's construction lender. Prudential extended to HRP a permanent loan commitment for $24,500,000 signed by its Associate General Manager. 140 Ariz. at 248, 681 P.2d at 400. Neither the commitment letter nor any amendment to it provided for a "first mortgage" or referred to any specific terms to any priority that Prudential's lien was to receive. *Id.*

When the hotel opened for business, substantial numbers and amounts of mechanics' and materialmens' liens were filed against the hotel, in the total amount of approximately $7,000,000. HRP was unwilling to remove the liens due to the amount required for a bond. 140 Ariz. at 251, 681 P.2d at 403. UCB, HRP and Prudential met to discuss the remaining items to be satisfied for Prudential to fund the permanent loan. During this meeting and in a letter sent thereafter, Prudential maintained, for the first time, that it was entitled to a first mortgage under

30

the loan application and that the loan application was incorporated into the commitment letter by reference. Thus, Prudential refused to fund the permanent loan until it received an "in-fact first lien," which would require all the mechanics' and materialmens' liens be paid or satisfied before the loan could close. *Id*.

A couple of months later, HRP and UCB delivered evidence of satisfaction of the terms of the commitment letter to Prudential. However, Prudential rejected the tender based on its assertion of the failure to comply with the terms of the commitment letter due to the presence of the mechanics' liens, and as a result refused to fund the loan. 140 Ariz. at 251-52, 681 P.2d at 403-04.

Essentially, Prudential refused to fund the loan as required under the commitment letter unless it secured an "in-fact first position lien." However, the trial court found that Prudential's position was contrary to the commitment letter, which entitled Prudential to only an insured first lien. Thus, the trial court found that Prudential's insistence on an actual first lien was, as a matter of law, an anticipatory breach of contract. 140 Ariz. At 277, 681 P.2d at 429. On appeal, the Arizona Court of Appeals agreed with the trial court and held that Prudential's unequivocal refusal to fund the loan unless it had a first lien on the property, to which it had no right under the commitment letter, constituted an anticipatory breach. According to the court:

> Prudential, by insisting as early as November 1976 and thereafter upon a first lien it had no right to claim, and by refusing to perform on any other basis, declared that it would not perform its obligations set forth in the commitment letter and the Five-Party Agreement. This was an anticipatory repudiation within the language of *Diamos* [*v. Hirsch*, 91 Ariz. 304, 372 P.2d 76 (1962)].

> Whether a party repudiates its contract obligations on the basis of an alleged "contract interpretation" or for some other reason is legally irrelevant; **one party's "insistence upon terms which are not contained in a contract constitutes an**

31

**anticipatory repudiation thereof.**" *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir.1976) (repudiation based upon party's interpretation of "conditions precedent" in contract); *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283 (7th Cir.1974); *Menako v. Kassien*, 265 Wis. 269, 61 N.W.2d 332 (1953).

140 Ariz. at 278, 681 P.2d at 430 (emphasis added).

Similarly in this case, PEPI anticipatorily breached the Commitment Letter during the February 16, 2010 conference call with the Debtors when it announced, unequivocally and for the first time, that it was not going to provide the Due Diligence Sign-Off until the DIP Loan was actually funded, at the earliest. (Lorio Depo. p. 90, lines 12-25; p. 91, lines 1-18; p. 149, lines 24-25; p. 150, lines 1-8; Fine Depo. p. 95, lines 15-18; p. 135, lines 14-24) PEPI's position was contrary to the terms of the Commitment Letter. A written confirmation from PEPI that PEPI had completed its due diligence ***before*** the Debtors filed for bankruptcy was provided for in the Commitment Letter, and was essential to Debtors' filing for bankruptcy. (Depo. Ex. 15, p. 4; Lorio Depo. p. 90, lines 12-25; p. 91, lines 1-8; p. 149, lines 24-25; p. 150, lines 1-8; Fine Depo. p. 95, lines 15-18) Pursuant to paragraph 4 of the Commitment Letter, notice of PEPI's completion of its due diligence was required to trigger the time for the Debtors to file for bankruptcy. PEPI also understood the significance of the Debtors' need for a written confirmation that PEPI completed its due diligence before Debtors filed for bankruptcy. Blasnick Depo. p. 30, lines 20-25; p. 31, lines 1-9; Fine Depo. p. 95, lines 15-18; Radunsky Depo. p. 83, lines 20-23) However, PEPI maintained that such a sign-off was not required, and thus, decided it would not provide the Debtors with the Due Diligence Sign-Off as required under the Commitment Letter before they filed for bankruptcy. ((Lorio Depo. p. 94, lines 7-13; p. 101, lines 3-10; p. 149, lines 24-25; p. 150, lines 1-8; Fine Depo. p. 135, lines 14-24) Yet,

AA00379

after the Debtors declared PEPI in default for failing to provide the Due Diligence Sign-Off, PEPI finally gave the Debtors notice that it had completed its due diligence and that the three day notice requirement under the Commitment Letter in connection therewith had been triggered. (Depo Ex. 6; Lorio Depo. p. 172, lines 22-25; p. 173, line 1; Radunsky Depo. p. 140, lines 13-22)

Moreover, any effort by PEPI to claim that the Due Diligence Sign-Off was not required is belied by the testimony of PEPI's own representatives. Namely, PEPI representatives have testified that PEPI required the Due Diligence Sign-Off as a mechanism to trigger the three day time period during which the Debtors had to file bankruptcy, and if the Debtors did not do so, then PEPI's commitment to lend under the Commitment Letter would terminate. (Lorio Depo. p. 172, lines 22-25; p. 173, line 1). Therefore, it was clearly contemplated, as now admitted by PEPI, that the Due Diligence Sign-Off had to be provided prior to the filing of the bankruptcy by the Debtors, or PEPI's commitment to lend thereunder would never terminate. PEPI has made it clear that they needed a deadline in respect of their commitment to lend. (Lorio Depo. p. 172, lines 6-14; Radunsky Depo., p. 85, lins 6-14; p. 86, lines 10-25).

The facts are undisputed that PEPI refused to provide the Due Diligence Sign-Off before the Debtors filed for bankruptcy. PEPI's unequivocal notice on February 16, 2010 that it was not going to perform an obligation of the Commitment Letter constitutes an anticipatory breach of the Commitment Letter. As a result, the Debtors are entitled to partial summary judgment that PEPI anticipatorily breached the Commitment Letter in respect of Counts 1 and 2 of the Complaint, thereby relieving the Debtors from continuing to perform under the Commitment Letter, as a matter of law, including the obligation to pay any further amounts to PEPI for a commitment fee, expenses and/or the Break Up Fee. *See In re Maxko Petroleum, LLC*, 425 B.R.

33

at 873.  *See also Gaylis v. Caminis*, 445 So. 2d 1063, 1065 (Fla. 3d DCA 1984); *Hospital Mortgage Group v. First Prudential Development Corp.,* 411 So.2d 181, 182 (Fla.1982); *Twenty–Four Collection, Inc. v. M. Weinbaum Construction, Inc.,* 427 So.2d 1110, 1111 (Fla. 3d DCA 1983).

IV.    **CONCLUSION**

The material facts are undisputed that PEPI (i) first breached the terms of the Commitment Letter by failing and refusing to incorporate the Escrow Provision and a critical aspect of the Waterfall Provision into the loan documents for the DIP Loan, and/or (ii) anticipatorily breached the Commitment Letter by ultimately and unequivocally refusing to provide the Due Diligence Sign Off that the Debtors required, and the Commitment Letter contemplated, for the Debtors to file their Chapter 11 petitions.  As a result of such breaches by PEPI, the Debtors were relieved from any and all further obligations under the Commitment Letter, including the obligation to pay any further amounts to PEPI for a commitment fee, expenses and/or the Break Up Fee.  Therefore, the Debtors are entitled to partial summary judgment on Counts 1 and 2 of the Complaint in accordance therewith.

WHEREFORE, the Debtors move this Court for entry of an order finding and concluding, as a matter of law based on the above undisputed material facts, that (A) PEPI (i) first breached the terms of the Commitment Letter by failing and refusing to incorporate the Escrow Provision and a critical aspect of the Waterfall Provision into the loan documents for the DIP Loan, and/or (ii) anticipatorily breached the Commitment Letter by ultimately and unequivocally refusing to provide the Due Diligence Sign Off that the Debtors required, and the Commitment Letter contemplated, for the Debtors to file their Chapter 11 petitions, (B) as a result of such breaches by PEPI, the Debtors were relieved from any and all further obligations

34

AA00381

under the Commitment Letter, including the obligation to pay any further amounts to PEPI for a commitment fee, expenses and/or the Break Up Fee, and (C) for such other and further relief as this Court deems just and proper.

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCL RULE 2090-1

WE HEREBY CERTIFY that on December 9, 2014, we electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to: Alan J. Perlman, Esq., Roetzel & Andress, Attorneys for PEPI Capital, 350 E. Las Olas Blvd., Suite 1150, Ft. Lauderdale, Florida 33301.

I HEREBY FURTHER CERTIFY that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Plaintiff
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Phone: (305) 349-2300
Fax: (305) 349-2310


/s/ Paul J. Battista
Paul J. Battista, Esq.
Florida Bar No. 884162
pbattista@gjb-law.com
Mariaelena Gayo-Guitian, Esq.
Florida Bar No. 813818
mguitian@gjb-law.com

AA00382

**1**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                    CASE NO.: 8:10-BK-03846-KRM
FIDDLER'S CREEK, LLC, et al.,
                          Jointly Administered
                          Chapter 11
        Debtors,
_____/
FIDDLER'S CREEK, LLC, et al.
        Plaintiffs/Counterdefendants,
                          Adv. Pro. No.
                          8:11-ap-00809-KRM
v.
PEPI CAPITAL, L.P.
        Defendant/Counterplaintiff and
        Third Party Plaintiff.
_____/
PEPI CAPITAL, L.P.
        Third Party Plaintiff,
v.
GULF BAY CAPITAL, INC.,
        Third Party Defendant.
_____/

DEPOSITION OF FIDDLER'S CREEK CORPORATE
REPRESENTATIVE, ANTHONY DiNARDO
VOLUME 1 OF 2

Monday, February 9, 2015
10:01 p.m. - 5:15 p.m.

ROETZEL & ANDRESS, LPA
850 Park Shore Drive, Trianon Centre - Third Floor
Naples, Florida 34103

Stenographically Reported By:
Amory Ranck, FPR
Florida Professional Reporter

**2**

APPEARANCES:

On behalf of Fiddler's Creek, LLC:

    GENOVESE, JOBLOVE & BATTISTA, P.A.
    100 Southeast Second Street
    44th Floor
    Miami, Florida 33131
    305.349.2300
    BY: PAUL J. BATTISTA, ESQUIRE
    pbattista@gjb-law.com

On behalf of PEPI Capital, LP:
    TOBIN & REYES, P.A.
    The Plaza
    5355 Town Center Road
    Suite 204
    Boca Raton, Florida 33486
    561-620-0656
    BY: RICARDO REYES, ESQUIRE
    rar@tobinreyes.com

On behalf of Gulf Bay Capital, Inc.:
    ROETZEL & ANDRESS, LPA
    350 E. Las Olas Boulevard
    Suite 1150
    Fort Lauderdale, Florida 33301
    (954) 462-4150
    BY: ALAN J. PERLMAN, ESQUIRE
    aperlman@ralaw.com

**3**

INDEX OF PROCEEDINGS
Deposition of FIDDLER'S CREEK CORPORATE
REPRESENTATIVE, ANTHONY DiNARDO
                                          Page
Direct Examination by Mr. Perlman         7

EXHIBITS

| Number | | Page |
|---|---|---|
| 1 | Notice of Taking Deposition | 163 |
| 2 | PEPI Capital Commitment Letter | 163 |
| 3 | Due Diligence Checklist | 163 |
| 4-1 | Email fr Paul Battista 2/9/10 @ 6:45 PM | 163 |
| 4-2 | Email fr Kenny Springfield 2/10/10 @ 4:14 PM | 163 |
| 4-3 | Email fr Elizabeth Helm 2/11/10 @ 11:30 AM | 163 |
| 4-4 | Email fr Jeffrey Fine 2/11/10 @ 12:40 PM | 163 |
| 4-5 | Email fr Joseph Meister 2/11/10 @ 1:38 PM | 163 |
| 4-6 | Email fr Jane Houk 2/12/10 @ 11:37 AM | 163 |
| 4-7 | Email fr Jane Houk 2/12/10 @ 3:12 PM | 163 |

**4**

EXHIBITS CONTINUED

| Number | | Page |
|---|---|---|
| 4-8 | Email fr Jeffrey Fine 2/12/10 @ 4:32 PM | 163 |
| 4-9 | Email fr Noel Hollister 2/12/10 @ 4:34 PM | 163 |
| 4-10 | Email fr Paul Battista 2/12/10 @ 4:40 PM | 163 |
| 4-11 | Email fr Paul Battista 2/13/10 @ 9:21 AM | 163 |
| 4-12 | Email fr Tony DiNardo 2/13/10 @ 11:56 AM 18-Month Business Plan | 163 |
| 4-13 | Email fr David Fields 2/14/10 @ 2:05 PM | 163 |
| 4-14 | Email fr Paul Battista 2/15/10 @ 10:45 AM | 163 |
| 4-15 | Email fr Joseph Meister 2/15/10 @ 12:09 PM | 163 |
| 4-16 | Email fr Jane Houk 2/15/10 @ 2:11 PM | 163 |
| 4-17 | Email fr Paul Battista 2/15/10 @ 12:21 PM | 163 |
| 4-18 | Email fr Jane Houk 2/15/10 @ 2:56 PM | 163 |
| 4-19 | Email fr Mark Woodward 2/15/10 @ 3:53 PM | 163 |
| 4-20 | Email fr Joseph Meister 2/15/10 @ 4:12 PM | 163 |
| 4-21 | Email fr Jane Houk 2/15/10 @ 4:14 PM | 163 |

25

1    default. My question is what's the answer if PEPI is
2    not in default?
3            MR. BATTISTA: Objection.
4            MR. REYES: Object to the form.
5            MR. PERLMAN: Hold on. Mr. Reyes, who do
6    you represent?
7            MR. REYES: Gulf Bay Capital, party to the
8    case. I can object to the form of any question,
9    you're assuming for tort interference.
10           MR. PERLMAN: What I don't want is, you
11   know, being double teamed.
12           MR. REYES: You're not being double teamed.
13   Any party can object to the form of your question.
14   I'm objecting to the form of your question. I have
15   that right.
16           MR. PERLMAN: Okay. What's the problem
17   with the form of the question, Mr. Reyes?
18           MR. REYES: He already answered your
19   question.
20           MR. PERLMAN: He did?
21           MR. REYES: A moment ago. He said he'd
22   seek legal advice on a hypothetical then you asked
23   again.
24           THE WITNESS: I would seek legal advice on
25   a hypothetical. That's your answer.

26

1            BY MR. PERLMAN:
2        Q   So you negotiated this document and you're
3    unable to tell me what this paragraph provides with
4    regard to the company's obligation to pay these
5    reasonable expenses whether or not the credit
6    facility closed?
7            MR. BATTISTA: Objection.
8        Q   Is that your testimony?
9        A   No. My testimony is that I negotiated this
10   document with legal counsel and if I was given a
11   hypothetical or a situation I would not come to any
12   conclusions without discussing it with my legal
13   counsel.
14       Q   Okay. At the time this document was
15   signed, what was your understanding about the
16   company's obligation pursuant to this paragraph on
17   page 2 of Exhibit 2?
18           MR. REYES: Object to the form.
19       A   I don't understand what you mean by my
20   understanding.
21       Q   You signed this document, correct?
22       A   That's correct.
23       Q   You reviewed and approved its form?
24       A   That's correct.
25       Q   At that time, what was your understanding

27

1    of this paragraph?
2            MR. REYES: Object to the form.
3            MR. BATTISTA: Objection.
4            MR. REYES: Asked and answered.
5        A   It was my understanding if the due
6    diligence was completed by PEPI they would be
7    entitled to the funds. If the due diligence was not
8    completed by PEPI, they would not be entitled to any
9    reimbursements. PEPI had to perform things here,
10   too. PEPI had to meet the commitments of this
11   commitment letter and also finish their due diligence
12   and not breach.
13       Q   When you reviewed, executed and approved
14   the commitment letter marked as Exhibit 2, was it
15   your understanding on behalf of Fiddler's that
16   Fiddler's was precluded from disclosing this
17   commitment letter to all third parties?
18       A   I don't recall at this time. If it was
19   something in the commitment letter, then that was the
20   case. I don't recall.
21       Q   Okay. Can you turn to page 3 please. Take
22   a look at the second full paragraph starting, Except
23   as required by applicable law, read that to yourself
24   and let me know when you're done.
25       A   Yes.

28

1        Q   Did Fiddler's disclose the commitment
2    letter to any other potential lender?
3        A   No.
4        Q   Did Fiddler's disclose the commitment
5    letter to Mr. Ferrao or any of his entities so as to
6    provide an alternative loan as previously
7    contemplated by PEPI Capital?
8            MR. REYES: Object to the form.
9        A   Mr. Ferrao saw this commitment letter but I
10   did not provide this commitment letter to anyone else
11   other than Paul Battista, Jane Houk, Peter Desiderio
12   and myself.
13       Q   So is it your testimony that Gulf Bay
14   Capital never saw this commitment letter?
15       A   No. I didn't say that. Just by
16   coincidence that the same parties of Fiddler's Creek,
17   i.e. Tony DiNardo was involved in Gulf Bay Capital
18   and Jane Houk was involved in Gulf Bay Capital so she
19   had knowledge of this commitment letter.
20       Q   Who on behalf of Fiddler's authorized the
21   disclosure of this commitment letter --
22       A   There was no --
23       Q   You have to let me finish.
24       A   Sorry. Thought you were finished.
25       Q   Outside of the confines of Fiddler's Creek?

7 (Pages 25 to 28)

29

1    MR. REYES: Object to the form of the
2  question.
3    A  There was no disclosure to any third-party
4  or any individual who was not involved with the
5  negotiations of the commitment letter and doing the
6  loan documents with PEPI.
7    Q  So are you suggesting that by the reference
8  in the word quote, any third-party, closed quote,
9  that you, Mr. DiNardo, were free to form any entity
10  you chose fit to provide a similar or identical
11  debtor in possession loan to Fiddler's?
12    MR. BATTISTA: Object to the form.
13    MR. REYES: Object to the form.
14    A  I'm going to give you an understanding of
15  how I know the mind works. Maybe in legal situations
16  you could build a firewall in an artificial entity,
17  but human beings, once they put data in their mind
18  and have data in their mind, can't segregate memory
19  into certain boxes and create firewalls.
20    So when — yes, did I have knowledge of
21  this commitment letter, yes, I did. Did Jane Houk
22  have knowledge of this commitment letter, yes, she
23  did. So when she transformed and I transformed to
24  Gulf Bay, did I have knowledge, yes, I did.
25    But I did not willingly transfer this

30

1  information to any third-party who did not have the
2  information while we were negotiating with PEPI
3  Capital.
4    MR. PERLMAN: Okay. Can you read my
5  question back, please?
6    (Thereupon, the requested portion of the
7  record was read back by the reporter.)
8    MR. BATTISTA: Objection.
9    MR. REYES: You have my objection.
10    THE WITNESS: I gave you my answer.
11  BY MR. PERLMAN:
12    Q  Were you precluded from forming an entity
13  to provide the same loan based on this paragraph?
14    MR. BATTISTA: Objection.
15    A  I'm not an attorney and I would need
16  attorney's advice on this.
17    Q  When you approved the commitment letter,
18  what was your understanding of the use of the phrase
19  any third-party in this second full paragraph of
20  page 3 of Exhibit 2?
21    A  Any individual who was not party to this
22  document.
23    Q  Was Gulf Bay Capital a party to this
24  document?
25    A  Individuals in Gulf Bay document (sic) were

31

1  not party to this document, had no knowledge of this
2  document.
3    Q  I'm sorry?
4    MR. REYES: Can I hear that answer? Speak
5  a little slower.
6    (Thereupon, the requested portion of the
7  record was read back by the reporter.)
8    A  I'm sorry. Gulf Bay Capital.
9    MR. PERLMAN: Can you read it one more
10  time?
11    (Thereupon, the requested portion of the
12  record was read back by the reporter.)
13  BY MR. PERLMAN:
14    Q  So then by your definition Gulf Bay was a
15  third-party pursuant to this paragraph on page 3,
16  correct?
17    A  No. I'm not saying that.
18    MR. REYES: Object to the form.
19    Q  You answered —
20    A  I said — you're talking on segregating
21  Gulf Bay Capital as a thinking, living entity that
22  has a brain. I'm saying to you the parties who were
23  negotiating this commitment letter and the loan
24  document were PEPI Capital.
25    Those individuals who were involved in Gulf

32

1  Bay Capital have a memory and with that memory they
2  have knowledge but it wasn't simultaneously. This
3  document, the involvement in Gulf Bay Capital
4  occurred after notice was given by Fiddler's Creek,
5  LLC on February 22nd that PEPI was in breach.
6    Then Gulf Bay Capital prior to that time
7  was inactive without a bank account, then Gulf Bay
8  Capital was activated. A bank account was opened up
9  February 23rd and those individuals that were
10  involved with PEPI, some of those individuals, i.e.
11  Anthony DiNardo was involved in Gulf Bay Capital so
12  did have knowledge of this document.
13    But Anthony DiNardo was not paralleling his
14  negotiations with PEPI Capital and Gulf Bay Capital.
15  An event occurred. After that event occurred then we
16  started a path with Gulf Bay Capital. They weren't
17  simultaneous.
18    Q  So I take your answer and explanation to
19  mean that had that event, as you describe it or
20  referenced it, not occurred, you understood the
21  company couldn't disclose the commitment letter to
22  anyone including Gulf Bay entities, correct?
23    MR. REYES: Object to the form.
24    A  If there was not a breach by PEPI Capital
25  on this commitment letter and this, we would have

8 (Pages 29 to 32)

AA00385

Case 8:11-ap-00809-RCT   Doc 96-1   Filed 03/02/15   Page 9 of 69

33

1  gone forward with PEPI Capital. There was no need to
2  discuss this document with any entity. At this time,
3  from October 20, 2009 to February 22, 2010, Fiddler's
4  Creek, LLC did not discuss DIP financing with any
5  entity or shared any information with any entity
6  other than PEPI Capital.
7      Q   Okay. Can you read back my question,
8  please?
9         (Thereupon, the requested portion of the
10  record was read back by the reporter.)
11      THE WITNESS: And I answered it. Told you
12  exactly what we did during that period of time.
13  BY MR. PERLMAN:
14      Q   Are you unable to answer that question in a
15  yes or no format?
16      A   I answered the question to the best of my
17  knowledge telling you the facts of what happened in
18  that period of time. I'm not here to answer
19  hypotheticals.
20      Q   It's not a hypothetical. When you signed
21  this instrument, PEPI was not -- there was no event
22  as you describe it, correct?
23      A   What event are you referring to?
24      Q   The one you referenced in your prior
25  answer.

34

1      A   What was that?
2      Q   All you referenced was an event.
3      A   What event was that?
4      Q   I'd have to ask you what you're referring
5  to.
6      A   Then I don't know what you're talking
7  about. Tell me what event you were talking about.
8      Q   Previously you testified under oath
9  and you used the word event, you have no idea --
10      A   No, I labeled it event.
11      Q   Excuse me, excuse me.
12      A   I labeled the event a breach.
13      Q   Excuse me. Okay. I told you she can only
14  take one of us down.
15      A   Sorry.
16      Q   Okay. Do you recall in your prior answer
17  the use of the word event?
18      A   No. I didn't, I said breach in PEPI
19  Capital.
20      Q   Can you please find that?
21      A   That's the event. That's the point --
22      Q   Can you not interrupt her?
23      MR. REYES: Is there a question pending?
24      Q   Yeah, there is. I'm trying --
25      MR. REYES: Finish.

35

1      A   Finish your question.
2      Q   Okay. Putting aside your reference of an
3  event or a breach?
4      A   Okay.
5      Q   When this commitment letter of Exhibit 2
6  was signed, I'm referring to that second full
7  paragraph of page 3 of Exhibit 2, was it your
8  understanding this commitment letter could not be
9  shown to any third-party including any of the Gulf
10  Bay entities?
11      MR. BATTISTA: Objection.
12      A   I answered this question by telling you
13  what I did and the people around me did during this
14  period of time.
15      Q   Okay. So you're unable to answer that
16  question in yes or no?
17      A   I'm telling you how I answered it. I
18  answered with the facts that happened during that
19  period of time, what we did. We did not share this
20  information with any entity outside of Fiddler's
21  Creek, LLC prior to PEPI's breach of the commitment
22  letter.
23      Q   I understand that response. My question is
24  when you signed this commitment letter, did you
25  understand that Fiddler's and its affiliated

36

1  borrowers were precluded from disclosing the
2  commitment letter to any third-party including any
3  Gulf Bay entity, yes or no?
4      MR. BATTISTA: Objection. The problem with
5  the question, Alan, is -- we're wasting a lot of
6  time. You keep including Gulf Bay companies. He's
7  saying people affiliated with Gulf Bay companies were
8  the same people affiliated with Fiddler's Creek.
9  We're dancing around that issue. You keep asking
10  that way. I keep objecting. He keeps going back to
11  his old answer. If you keep including Gulf Bay
12  companies, we're going to be going round, round,
13  round.
14      A   I told you exactly what happened during
15  that period of time.
16      Q   All right. Let me rephrase. Was it your
17  understanding when Exhibit 2 was executed that this
18  paragraph on page 3 of Exhibit 2 precluded Fiddler's
19  from disclosing the commitment letter to any other
20  entity?
21      A   Yes.
22      Q   Thank you.
23         (Off the record.)
24  BY MR. PERLMAN:
25      Q   Can you take a look at Exhibit 2, please,

9 (Pages 33 to 36)

45

1  that was my understanding how that worked.
2     Q   Okay. Looking at the waterfall on that
3  same page, specifically parcel described in 1 through
4  11.
5     A   They're not all parcels.
6     Q   I'm just referring to them as parcels.
7     A   The first one says cash on hand.
8     Q   Okay. Strike my question. Other than item
9  1 of 1 through 11, are any of the properties listed
10 thereafter owned by Fiddler's Creek?
11    A   Yes. Wait, let me -- all the properties
12 between 2 and 11 are either owned by fully -- by
13 subsidiaries fully owned by Fiddler's Creek, LLC or
14 its sister company GB Peninsula, Ltd.
15    Q   Now, the waterfall description of items 1
16 through 11, was that the order of the waterfall that
17 was to be incorporated in the corresponding loan
18 documents with PEPI?
19    A   Without a doubt.
20    Q   And is this the same waterfall schedule, if
21 you will, that was incorporated into the loan
22 agreement between Fiddler's and Gulf Bay Capital?
23    A   Yes.
24    Q   Now, item number 2 states that property is
25 owned by FC Hotel Limited, correct?

46

1     A   Yes.
2     Q   So I guess my question is: Is that correct
3  to your best information and belief?
4     A   Yes.
5        MR. BATTISTA:  Is what correct?
6     Q   FC --
7     A   Remaining unencumbered hotel condo units
8  owned by FC Hotel Limited.
9     Q   Okay. Is the reference to ownership item 3
10 regarding GB Peninsula Limited and 951 Holding
11 Limited also correct?
12    A   Yes. They had -- all they're referring to
13 is they owned unencumbered properties. Both those
14 entities had unencumbered properties, that's correct.
15    Q   Okay. And item 4 is describing additional
16 property owned by GBFC Development Limited and GB
17 Peninsula Limited as the owners; is that likewise
18 correct?
19    A   Yes.
20    Q   Okay. And item 5, is the ownership shown
21 by 951 Land Holding Limited correct?
22    A   Yes.
23    Q   Item 6 is the tarpon club owned by GBFC
24 Marina Limited?
25    A   Yes.

47

1     Q   Item 7 --
2     A   Well, the tarpon club has properties.
3        MR. BATTISTA:  Are we talking about now or
4  then?
5     Q   Then.
6     A   Yeah, that's how I understood it.
7     Q   I understand it was a while ago. Yes,
8  Mr. DiNardo, you're correct then.
9     A   The tarpon club, the tarpon club and the
10 golf club, they both owned real estate in like Number
11 6 says tarpon club, it was marina and condominium
12 units owned by GBFC Marina Ltd. We used the word
13 tarpon club, the tarpon club is a doing business as.
14    Q   Certainly. Okay. Continuing down the
15 line, item 7, the creek golf course is that -- was
16 that owned by FC Golf Limited?
17    A   That's correct.
18    Q   Okay. Then there's a description of
19 commercial property for item 8?
20    A   That's correct.
21    Q   Known as Parcel 71 and commercial property
22 located at State Road 41 and State Road 951?
23    A   Yes. Parcel 73 we lumped into this
24 category but Parcel 73 is zoned as an ACLF.
25    Q   That's fine. My question is who owned

48

1  Parcel 73, what --
2     A   I think FC -- I don't recall at this time.
3  I don't know if we had a special entity for it or it
4  was part of another entity. It was ultimately owned
5  by Fiddler's Creek, LLC.
6     Q   If there was a special entity that owned
7  it, who do you think that entity would be?
8     A   Excuse me?
9     Q   Which entity would that be?
10    A   There might have been an entity called
11 Parcel 73, FC Parcel 73, LLC at the time. I don't
12 know if that was post or prior. Do you remember?
13       MR. BATTISTA:  I'm not being deposed.
14       MR. REYES:  Not today.
15    Q   If it wasn't FC Parcel 73, LLC, what
16 entity?
17    A   Then it would be the commercial property.
18 I don't know the exact title for that entity.
19    Q   Okay. For the commercial property located
20 at State Road 41 and 951, what entity owned --
21    A   The entity that held the commercial
22 property. I don't recall the exact name of that
23 entity at this time.
24    Q   Is it an entity we've named so far?
25    A   I don't recall the name at this time.

49

1    Q   If you go to item 9, the undeveloped land
2    included in the property known as the DRI Parcel,
3    what entity owned the DRI Parcel?
4        A   Reviewing these letters, first of all I
5    think there was multiple entities that owned the DRI
6    Parcel but going over this waterfall, this waterfall
7    is an attempt to categorize the property according to
8    the mortgage that was on the property.
9        Q   Yeah, I understand that.
10       A   Okay.  So that's why, like the DRI Parcel
11   Number 2, there was a legal description for that.
12   There might have been multiple entities that owned it
13   or might have been one entity, I don't recall at this
14   time.
15       Q   Okay.  Well, let's go with DRI Parcel in
16   number 9, do you know what entity or entities owned
17   that parcel?
18       A   Again, there was a legal description to
19   that mortgage.  It could have been one or multiple
20   properties, I don't know.  I don't recall at this
21   time.
22       Q   Do you recall who the mortgagor may have
23   been with respect to the mortgage in favor of Florida
24   Financial Investment, Inc. concerning DRI Parcel?
25       A   Florida Investment, Inc. was the mortgagor.

50

1        MR. BATTISTA:  Mortgagee.
2        A   Mortgagor would be those entities that
3    owned those properties.  I don't recall at this time.
4        Q   Item number 10 relates to DRI Parcel
5    Number 2 encumbered by a lien in favor of Tomen
6    America as mortgagee.  Do you recall who the
7    mortgagors were in that regard?
8        A   I don't recall at this time.
9        Q   Is it correct the item described in
10   number 11 was owned at the time by 951 Land Holding
11   Limited?
12       A   Yes.
13       Q   Did you understand that the commitment
14   letter contained a condition precedent including the
15   completion of due diligence to the satisfaction of
16   PEPI?
17       MR. BATTISTA:  Objection.
18       A   Yes.  But prior to the closing of the loan
19   and prior to the termination of this commitment
20   letter, otherwise the due diligence would have been
21   open ended.
22       Q   Was it your practice at Fiddler's Creek
23   that contracts would provide for you to receive
24   notice and an opportunity to cure to the extent a
25   default was alleged?

51

1        MR. REYES:  Object to the form.
2        A   Depends on our contract.  It was no --
3    things that we did, I don't know, I mean we did
4    thousands of contracts.  I don't know what they all
5    had.  I didn't negotiate all the contracts.  I had
6    legal teams.
7        Q   Was it a customary provision?
8        A   I don't know.  I don't know if we had a
9    customary.  Let me put it this way, we didn't have a
10   policy book that said this is what you have to have
11   in the contract.
12       Q   Was it your understanding that such a
13   provision would be included with regard to the loan
14   documents with respect to this commitment letter?
15       A   It would all -- whatever is negotiated is
16   negotiated per the document.
17       Q   You have no recollection if this commitment
18   letter provided that the loan documents would give
19   the parties notice of default and an opportunity to
20   cure?
21       A   This document does not.  There's no cure
22   provision in this document.  This document was
23   negotiated over November, December, January, 90 days,
24   so whatever is in this document is what was
25   negotiated.

52

1        Q   Right.  I'm asking you if this document
2    states that the loan documents would include a notice
3    and cure provision?
4        A   Does it say here?
5        MR. BATTISTA:  He's asking if you know.
6        Q   I'm asking if you know.
7        A   I don't know at this time.
8        Q   You've been in the real estate business how
9    many years?
10       A   I think I started in 1978.  That's a long
11   time.
12       Q   You've seen peaks and valleys for sure.
13   Was it customary in your experience that notice be
14   given in connection with defaults with an opportunity
15   to cure?
16       MR. REYES:  Object to the form.
17       MR. BATTISTA:  Objection.
18       A   When this loan was negotiated in my --
19       MR. REYES:  He's asking in your experience.
20       A   I understand.  In my experience.  Let me
21   finish.  When this loan was negotiated -- since 1978
22   to when this loan was done, I had, and no real estate
23   executive had experienced prior to the depression,
24   what happened during that time.
25       It was referred to -- it's referred to the

WWW.USLEGALSUPPORT.COM
813-876-4722

AA00388

153

1    (Thereupon, the requested portion of the
2  record was read back by the reporter.)
3      THE WITNESS: I knew we disclosed to the
4  bankruptcy court that this was a DIP loan that was
5  provided by an insider. I performed in accordance
6  with attorneys' guidance to create firewalls and do
7  everything that was pursuant as a fiduciary to
8  Fiddler's Creek, LLC.
9      MR. PERLMAN: Okay. Read it back again,
10 please.
11     MR. BATTISTA: The answer or the question?
12     MR. PERLMAN: Question.
13     (Thereupon, the requested portion of the
14 record was read back by the reporter.)
15     THE WITNESS: I answered that.
16 BY MR. PERLMAN:
17   Q   No, you didn't. I asked you --
18     MR. REYES: Potential concerns of whom.
19   A   I answered that according to the court.
20   Q   No, no, that's not the question. I'm not
21 asking --
22   A   What's the question?
23   Q   My question is whether or not Fiddler's had
24 any concern as to whether or not the court would
25 approve an insider loan involving Aubrey and/or his

154

1  company Gulf Bay Capital?
2    A   And I said we disclosed --
3      MR. BATTISTA: Did you have concerns, were
4  you aware Fiddler's had concerns?
5    A   Were there concerns, all I knew at the time
6  whatever DIP, be it an affiliated company DIP or
7  independent DIP, was always at the discretion of the
8  judge. So whatever the judge decided that was the
9  outcome. And I understood that having a third-party
10 loan had a high probability of getting approved by a
11 judge than having a related-party loan.
12   Q   Were you or Fiddler's concerned that the
13 court may not approve an insider DIP loan, yes or no?
14   A   I think there was a probability that the
15 court may not approve an insider DIP loan or certain
16 third-party loans, same situation, just a matter of
17 degree and depending what the judge says. When I go
18 to court, I don't know that the judge has his mind
19 predetermined.
20   Q   Okay. And this relates to when you
21 testified earlier where Mr. Battista expressed a
22 concern -- strike that. Strike that.
23     So based on your testimony that there was a
24 probability that the court would not approve the
25 insider DIP loan, you had no assurance that the DIP

155

1  loan between Fiddler's and Gulf Bay Capital would be
2  approved when the bankruptcy case was commenced by
3  Fiddler's, correct?
4    A   That's correct.
5    Q   What was Fiddler's Plan B should the court
6  not approve that DIP facility?
7      MR. BATTISTA: Objection.
8    A   At that time if the court didn't approve
9  Gulf Bay Capital's, Inc. DIP loan, I would have been
10 out of money and I would have been at the mercy of
11 the court, so whatever happens during a bankruptcy
12 process would have happened. I had no Plan B at that
13 time.
14   Q   Is my understanding correct that there are
15 no escrow provisions with regard to the loan between
16 Fiddler's and Gulf Bay Capital?
17     MR. REYES: Object to the form.
18   A   I don't recall at this time.
19   Q   You don't recall?
20   A   I think there were no escrow -- I'm not
21 definitely sure. I don't recall all the ins and outs
22 of the documents.
23   Q   You don't recall if there was an escrow for
24 deeds in lieu?
25   A   The escrow, the waterfall?

156

1    Q   No.
2      MR. BATTISTA: Escrow for deeds in lieu and
3  escrow for consent judgments.
4    Q   Was there escrow consent provision for Gulf
5  Bay Capital, yes or no?
6    A   I don't recall.
7    Q   Was there an escrow for stipulated
8  judgments of foreclosure in the loan between
9  Fiddler's and Gulf Bay Capital?
10   A   I don't recall if there was. We had the
11 escrow clause. Course the escrow clause was for the
12 protection of the DIP lender and Gulf Bay Capital
13 knew the assets so they did not need the escrow
14 clause. So my recollection is we didn't put it in
15 because that's what the escrow clause was supposed to
16 protect.
17     The escrow clause and this consent judgment
18 were for the benefit of the DIP lender, so if we
19 didn't put them in, we put Gulf Bay Capital at a
20 disadvantage from other DIP vendors, but Gulf Bay
21 Capital had the knowledge of the value of the assets
22 so it didn't require the escrow clause.
23   Q   So based on that, your belief was they were
24 not in the loan agreement, correct?
25     MR. BATTISTA: Yes or no.

157

1     A   My recollection based on that is yes.

2     Q   What I said was correct?

3     A   Yes. Can we take a break, please?

4     MR. PERLMAN: Sure.

5     (Off the record.)

6     BY MR. PERLMAN:

7     Q   I may or may not have marked some or all of

8 these, back on, it will depend upon your response, I

9 had requested that Mr. Battista provide me with the

10 documents that were produced that he believes reflect

11 notification of a default by PEPI to Fiddler's in

12 connection with the PEPI loan and commitment letter.

13 These are the documents that Mr. Battista tagged for

14 that response?

15     A   Okay.

16     Q   I'd ask for you to review each, not the

17 enclosures just the cover email and they're all

18 pretty concise. I'm sure you're familiar with them

19 all at this stage, take a look at those then let me

20 know when you're ready for questions.

21     MR. BATTISTA: While he's doing that,

22 Mr. Perlman, what I did in response to your request,

23 I put together those documents I believed based on my

24 review were responsive to question 7 through 13 on

25 your document request.

158

1     I don't know if it was limited to just

2 notice of default. There were six requests for

3 production I responded to. I also made it clear this

4 was with the reservation of rights in case I missed

5 others.

6     A   This was January --

7     Q   Absolutely.

8     MR. BATTISTA: To be clear I didn't discuss

9 that with Mr. Reyes or Mr. DiNardo.

10     (Off the record.)

11     THE WITNESS: No. There's more.

12     MR. BATTISTA: I identified those two.

13     BY MR. PERLMAN:

14     Q   That's true?

15     A   What you told me I want to repeat what I'm

16 looking for because this is a little new for me in a

17 depo. Is this what Battista produced to you which

18 documented PEPI's breach of the commitment letter?

19     Q   I don't know that I would phrase it that

20 way and let me clarify something because Paul is

21 correct. What I omitted from your pile was the

22 February 22nd default letter that Mr. Battista

23 issued.

24     A   You also omitted, there's an email on

25 February 11th from CJ Lorio to me. It's not in here.

159

1     Q   Maybe it's in there and you missed it.

2 We'll take a look. Anyways, the specific query that

3 I asked Mr. Battista to focus on was what documents,

4 what emails, et cetera, demonstrate a notification by

5 Fiddler's to PEPI prior to the 2/22 letter from

6 Mr. Battista to Mr. Fine that PEPI was in default of

7 the commitment letter. That's what I'm looking for.

8     MR. BATTISTA: That is not what you asked

9 me in the email and not what I limited my search to.

10 You asked me for responsive documents to requests 7

11 through 13. It is broader than what you just stated.

12     MR. PERLMAN: That may be so but I think

13 for purpose of my questioning for today I'm going to

14 narrow the scope to notice of a default or

15 termination excluding the February 22, 2010 letter.

16     MR. BATTISTA: Maybe ask the question --

17 let's ask the question opposed to focusing on the

18 documents then he can answer.

19     THE WITNESS: Am I aware?

20     MR. REYES: There's no question.

21     MR. BATTISTA: He has to ask the question.

22 It's easier than dealing with these documents right

23 now.

24     THE WITNESS: What's your question?

25     BY MR. PERLMAN:

160

1     Q   So you have just quickly, we appreciate

2 that, reviewed a dozen or more documents that

3 Mr. Battista identified to me that were responsive to

4 the area that we talked about previously, correct?

5     A   What is that area because I didn't know

6 what to tell you?

7     MR. PERLMAN: Off the record.

8     (Off the record.)

9     BY MR. PERLMAN:

10     Q   Excluding the email dated February 22, 2010

11 from Mr. Battista to Mr. Fine.

12     A   Can I see it?

13     Q   I'm excluding it.

14     A   Excluding it.

15     Q   Excluding that email are you aware of any

16 other written communication on behalf of Fiddler's to

17 PEPI whereby Fiddler's states PEPI is in default of

18 the commitment letter?

19     A   No.

20     Q   Okay.

21     A   I'm not aware of any.

22     Q   That saved a lot of time.

23     MR. BATTISTA: It does. Read 7 through 13.

24     A   We're on the record --

25     Q   Okay. So Requests for Production Number 8,

WWW.USLEGALSUPPORT.COM
813-876-4722

AA00388B

161

1  a copy of any written notice or warning you sent to
2  PEPI indicating it had breached or was in material
3  default of the commitment letter. That's basically
4  the same question I just asked you, correct?
5      MR. REYES: Object to the form.
6      A  I answered the question.
7      Q  Right. So the answer would be you're not
8  aware of any documents other than the February 22,
9  2010?
10      MR. REYES: To be clear, are you asking
11  were the words breach or default used or Fiddler's
12  was asking.
13      MR. BATTISTA: It's important, it's
14  important to be specific.
15      Q  I understand. Request Number 8?
16      A  I don't care about your request, just ask
17  the question.
18      Q  I will. It's based on this question or the
19  request. It asks for a copy of any written notice or
20  warning that you sent to PEPI indicating that it had
21  breached or was in material default of the commitment
22  letter. With the exception of this February 22, 2010
23  email from Mr. Battista to Mr. Fine, are you aware of
24  any other responsive documents?
25      A  I'm not aware of anything in writing.

162

1      Q  Okay.
2      A  Up to February 22nd that was sent to PEPI
3  or its counsel.
4      Q  Item 13 requests all documents reflecting
5  that you informed PEPI of your intent to terminate
6  and/or no longer seek DIP financing from PEPI. My
7  question to you, sir, is other than this email from
8  Mr. Battista dated February 22, 2010, are you aware
9  of any other responsive documents?
10      A  I am not.
11      MR. REYES: You mean letter?
12      Q  Sorry.
13      A  Of any written document that was sent to
14  PEPI regarding default or breach prior to the
15  February 22nd letter or email that was sent from Paul
16  Battista to PEPI.
17      Q  Did there come a time in which PEPI
18  responded to Mr. Battista's email of February 22nd?
19      MR. BATTISTA: You mean letter.
20      A  Letter.
21      Q  Letter sent via email dated February 22nd.
22      A  Yes.
23      Q  And that's a letter sent via email the very
24  next day, correct?
25      A  Dated February 23rd.

163

1      Q  The very next day, right?
2      A  Yes.
3      Q  Did the debtor ever respond to that email?
4      MR. BATTISTA: The one from PEPI, Mr. Fine.
5      Q  Yeah.
6      A  What we found in that letter that was --
7      MR. BATTISTA: Did we respond is what he
8  asked.
9      A  To my recollection, no.
10      MR. PERLMAN: Okay. I don't think it makes
11  sense to get into my next area because not much is
12  going to get accomplished in ten minutes.
13      THE WITNESS: Makes sense to me.
14      MR. REYES: We'll be back here 10:00
15  tomorrow.
16      THE WITNESS: Yeah.
17      MR. PERLMAN: Yeah, he's got a workout.
18      MR. BATTISTA: We'll read.
19      (The referred-to documents were marked by
20  the court reporter for identification as Exhibits
21  1-4-47.)
22      (The proceedings adjourned at 5:15 p.m. to
23  be resumed the following day.)
24
25

164

1      *   *   *   *   *
2      CONTINUED TO VOLUME 2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

41 (Pages 161 to 164)

AA00388C

173

1  discretion, then it says including, correct?
2      A  Yes.
3      Q  Okay.  So did you -- do you agree with me
4  that this document states that the following is a
5  list of items that are conditions precedent to the
6  initial advance and each subsequent advance?
7      A  Yes.
8      Q  Okay.  And if you take a look at Items 3
9  and 4, both of those relate to the completion of due
10  diligence in certain areas to the satisfaction of
11  agent or satisfactory to agent, correct?
12      A  Yes.
13      Q  Okay.  And in fact, these conditions
14  precedent that must be satisfied prior to the initial
15  advance and each subsequent advance continue on the
16  following page, items 5 through 14?
17      A  Let me read 5 through 14.
18      Q  You don't necessarily have to read them.
19  I'm just asking you to confirm the conditions
20  precedent to the initial advance and subsequent
21  advance start on page 15, items 1 through 4, continue
22  on page 16, items 5 through 14 and then continue
23  again on page 17, balance of 14 through 16; is that
24  correct?
25      A  That's correct.

174

1      Q  Then turning to item 15, that itself
2  references additional conditions precedent as agent
3  may require in its reasonable discretion including --
4      A  Wait, wait, you're talking about item 15?
5      Q  Yes.
6      A  Okay.
7      Q  Right.  So item 15 on page 17 provides
8  for --
9      A  Page 19 I have.
10      Q  I'm referring to the bottom.
11      A  The bottom says 19 of 45.  That's what mine
12  says, looking at 15, 19 of 45.
13      Q  Okay.
14      A  Is this correct?
15      Q  That's fine.  I must be looking at a
16  different pagination.
17      MR. REYES:  He's in the covenants section,
18  the condition precedent section, he asked you right
19  here.
20      A  That one, I'm sorry.
21      MR. PERLMAN:  Thank you, Mr. Reyes.  Two
22  points.
23      THE WITNESS:  You should give me the
24  numbers on the top.
25      MR. REYES:  Why don't we decide when doing

175

1  these things DE filed, document entry items, use the
2  page number so later on the record --
3      MR. PERLMAN:  I think --
4      THE WITNESS:  103 of 138.
5  BY MR. PERLMAN:
6      Q  Correct, correct.  So we were all literally
7  on the same page before, though, with regard to the
8  other two conditions precedent, correct?
9      A  Yes.
10      Q  All right.  So now we are all on 17 of 45,
11  which is page 19 of 47, I'm sorry, 103 of 138 for
12  DE84-1, correct?
13      A  Yes.
14      Q  Okay.  Now, item 15 I think you've just
15  reviewed states, Such other commercially reasonable
16  conditions precedent as agent may require in its
17  reasonable discretion, including, and it references
18  the items in Exhibit B attached hereto?  Yes?
19      A  Yes.
20      Q  If you can turn to Exhibit B.
21      A  Which is what?
22      Q  DE108 of 138.
23      A  108.
24      Q  Page 108 of 138 of DE84-1.
25      A  Okay.

176

1      Q  All right.  And this is Exhibit B and it
2  states additional conditions precedent, correct?
3      A  Yes.
4      Q  The very first one is payment of the
5  commitment fee to agent?  Yes?
6      A  Yes.
7      Q  You can glance down to 16, refers to title
8  searches and commitments, correct?
9      A  Sixteen says interim order.
10      Q  As to the interim order, delivery to agent
11  of title searches commitments, right?
12      A  Yes.
13      Q  Okay.  Then the additional conditions
14  precedent continue on the very next page primarily
15  with number 17.
16      A  Right.
17      Q  Then continuing on the following page,
18  page 110 of 138?
19      A  Yes.
20      Q  Okay.  And for example, 18 is asking
21  information for each HOA, correct?
22      A  Yes.
23      Q  And item 26 is asking for delivery to agent
24  of ECC searches, correct?
25      A  What number?

177

1  Q  26.
2  A  Yes.
3  Q  And the conditions precedent of Exhibit B
4  continue to the following page, page 111 of 138
5  starting at 28, correct?
6  A  Yes.
7  Q  And for example, 39F on the very bottom
8  requires the account control agreements we talked
9  about yesterday, correct?
10 A  Yes.
11 Q  And the conditions precedent continue again
12 the very next page, 112 of 138?
13 A  Yes.
14 Q  Including sub j, the environmental
15 indemnities, see that?
16 A  Yes.
17 Q  And then 42, delivery to agent of legal
18 opinion letters, see that?
19 A  Yes.
20 Q  And you see 46, delivery to agent of
21 resolutions, unanimous consents?
22 A  Yes.
23 Q  And 47, mortgagee's title insurance policy,
24 see that?
25 A  Yes.

178

1  Q  And the conditions precedent continue to
2  final page, 113 of 138, starting with 51, which
3  includes 56, which states, Timely delivery to agent
4  of any other materials and information requested by
5  agent and needed in agent's reasonable discretion for
6  completion of agent's due diligence.  See that?
7  A  Right.  So these are all the conditions
8  PEPI is asking of me before they initially fund the
9  loan.
10 Q  Right.  But this in particular says
11 completion of agent's due diligence, see that?
12 A  Yes.  But these are all conditions that
13 have to be met for them to fund.
14 Q  Right.  So --
15 A  As long as we're talking -- what's the
16 major premise, what it says, for them to give the
17 initial advance.
18 Q  Right.  Yesterday we went through a series
19 of emails from various parties including your -- the
20 agent's and representatives of Fiddler's, the
21 borrowers, the debtors that related to the legal
22 description, title insurance, budget and Mr. Ferrao's
23 effort to modify the option to remove the release.
24 MR. REYES:  Say again, please.  I want to
25 hear the question again.

179

1  (Thereupon, the requested portion of the
2  record was read back by the reporter.)
3  MR. REYES:  Object to the form.
4  Mischaracterizes the exhibits and the testimony.
5  Q  Let me rephrase.  I don't know that we did
6  an email on the option.  So let me carve that out.
7  My bad.  I know we talked about it.
8  A  Especially nothing from Mr. Ferrao that I
9  recall, so would you rephrase?
10 Q  Sure.  No problem.
11 Yesterday you testified concerning various
12 emails involving authorized legal representatives and
13 agents of Fiddler's that were communicating with PEPI
14 as to the legal description for the property, title
15 insurance for the loan, the required budget pursuant
16 to the commitment letter and certain other aspects,
17 which appeared at those times to be open and/or
18 pending.  Do you recall that testimony?
19 MR. REYES:  Object to the form.  That is
20 compounded to put them all together.
21 A  Yeah.  Can you take it one at a time?
22 You're saying what has to do with the loan closing,
23 you said the loan closing.
24 Q  No.
25 A  That's where I'm confused.

180

1  Q  Okay.  Do you recall emails yesterday
2  whereby the parties were trying to finalize the legal
3  description?
4  A  Yes.
5  Q  Okay.  Do you recall emails yesterday where
6  the parties were trying to finalize issues related to
7  the mortgagee title insurance policy in favor of
8  PEPI?
9  A  Yes.
10 Q  Do you recall emails yesterday concerning
11 an amended or revised budget that was required under
12 the commitment letter?
13 A  Yes.
14 Q  While those emails were pending, was it
15 your understanding directly or based on your agents
16 that due diligence for PEPI was not completed?
17 A  Not because of those emails, due diligence
18 with PEPI was not completed because PEPI didn't give
19 us a standard of what the due diligence should be and
20 PEPI didn't request any additional information.
21 Q  Okay.
22 A  And PEPI, and PEPI on June -- February 16th
23 where I had a telephone call with CJ Lorio and David
24 Fine (sic) and Paul Battista said to me they had no
25 intent to give me a due diligence sign-off.  So I

4 (Pages 177 to 180)

181

1  don't know what PEPI's standard was. All I know is
2  the documents you showed me yesterday were a
3  combination of due diligence and loan closings and I
4  don't know how PEPI filtered that out and said this
5  is due diligence and this is loan closing.
6     Q   When you say sign-off, you mean in writing,
7  correct?
8     A   Yes. Because they told me they had no
9  intent giving me a due diligence sign-off.
10    Q   Okay. Is it fair to say that until the
11 legal description was finalized, due diligence
12 regarding the legal description was open?
13    A   No. Because, let me put it this way: The
14 legal descriptions, there are things when you do a
15 loan closing that take a little longer or people ask
16 a little more questions and those things eventually
17 get fleshed out because the lawyers are both working
18 in good faith.
19        Mark Woodward was working in good faith,
20 responsive as possible, all the data was there. He
21 brought in Alan Atlas of the title company to help
22 PEPI with their understanding. I remember I had many
23 a conversation letting PEPI understand the CDD and
24 giving them all their documents.
25        Like PEPI's attorney said, they're going

182

1  90 miles an hour, if they're going 90 miles an hour,
2  I'm doing twice that. So what PEPI needed to sign
3  off the due diligence they never made that explicit.
4  Little things, a certificate of good standing, those
5  are post-closing items, things PEPI should have said
6  we're signed off, but there will be no loan because
7  of A, B and C and everybody accepts that.
8         We never had that communication, we never
9  had anything from PEPI, we're so close, just need
10 this, this and this for the due diligence sign-off.
11 What we did have is we were constantly asking PEPI
12 where are you with the due diligence. That's why
13 their lawyer was sending these closing checklists all
14 the time.
15        No clarification, what is due diligence and
16 what is closing checklist and we did have extensive
17 conversations on the deed in lieu for foreclosure in
18 escrow, the consent judgment, the evaluation and the
19 Waterfall and that's paramount.
20    Q   If you can just answer the question.
21    A   I thought I did.
22    Q   I'm not sure what you're talking about.
23 It's the same speech you tried to deliver three times
24 yesterday.
25    A   I'm not giving a speech. I'm telling you

183

1  where we were at that time.
2     Q   Just answer the question and we can stay on
3  schedule. Given what you just stated, why was the
4  entire Fiddler's team, Ms. Houk, Mr. Battista and
5  yourself, negotiating with Fiddler's and
6  communicating with Fiddler's with regard to complying
7  with the commitment letter and moving forward with
8  the DIP facility and the bankruptcy after the 16th?
9     A   What I stated is that understanding the
10 economic consequences we were looking at, we were
11 looking at the end of Fiddler's Creek, which has at
12 that time 1,750 members, not finishing our
13 obligations, which PEPI made a requirement of keeping
14 the foundation open, keeping the tarpon club open,
15 keeping the golf club open, so we had a viable
16 community where we had human beings living in that
17 community who called Fiddler's Creek their home and
18 neighborhood.
19        I was facing no alternative on the 16th.
20 On the 17th, we saw PEPI's loan documents and again
21 the waterfall issue was not resolved. On the 18th, I
22 had a discussion with Paul Battista to help me to get
23 an understanding of where I am. From that
24 discussion, both Paul and I decided on the 18th to
25 tell Mr. Ferrao this is where we are and we

184

1  believe -- both Paul and I believe that without the
2  due diligence sign-off, without the waterfall, that
3  we really don't have a DIP loan and that PEPI
4  breached the waterfall clause, which that's what I
5  paid them a $1,360,000 for.
6         All they had to do was take that verbatim
7  and not negotiate that. That was nonnegotiable.
8  That's why it took so long from December 31st to
9  January 27th to have that document after I had risked
10 $1,360,000.
11    Q   Okay.
12    A   I'm not finished with my answer.
13    Q   Go ahead.
14    A   You asked the question why'd it take so
15 long.
16    Q   I'm going to ask it again.
17    A   You can ask it a thousand times and she can
18 read it. It's going to be the same answer.
19    Q   She will read it.
20    A   Let me finish.
21    Q   Go ahead.
22    A   On the 18th Paul Battista and I spoke to
23 Mr. Ferrao and told him we do not have a DIP loan and
24 would he provide a DIP. He came back to us on the
25 19th and said yes, he would. Then Mr. Battista wrote

5 (Pages 181 to 184)

AA00390

185

1  an email to all the parties involved and said stand
2  down. And that's why negotiations were going on.
3  That's why I even spoke and kept negotiations going
4  because I had no alternative.
5    Q   Before I go back to my initial question,
6  you said Mr. Battista said in the email to all
7  parties involved to stand down?
8    A   On the 19th.
9    Q   And who are all the parties involved?
10   A   Jane Houk and Peter Desiderio.
11   Q   On the borrower's side?
12   A   On the borrower's side.
13   Q   Okay.
14   A   Because he was going to craft the letter to
15  PEPI.
16   Q   Okay. Can you read back my question,
17  please?
18   (Thereupon, the requested portion of the
19  record was read back by the reporter.)
20   MR. REYES: Pretty complete answer.
21   MR. PERLMAN: I didn't get an answer to
22  that question.
23   MR. REYES: I disagree. Want him to answer
24  it again?
25  BY MR. PERLMAN:

186

1    Q   Yeah. Why were those negotiations
2  continuing after the 16th?
3    A   I just answered the question.
4    Q   You gave me a story about the 17th, 18th
5  and 19th.
6    A   Those are the facts that happened at that
7  time. I'm not giving you a story. I'm giving you an
8  answer. If that's not satisfactory, that answer is
9  not satisfactory, you can take it up with the judge.
10   Q   I just want an answer to the question.
11   A   I gave you an answer to the question.
12  You're telling me you're not satisfied with the
13  answer to the question.
14   Q   No, no.
15   A   I have a right to give an answer to your
16  questions. If you don't like my answer, you can tell
17  the judge and say I'm in contempt.
18   Q   All right. Was what you said --
19   A   That's ridiculous, he doesn't like my
20  answer.
21   Q   That's not what I said.
22   A   I answered that question.
23   Q   We may have a dispute as to that.
24   A   Fine.
25   MR. REYES: The answer is complete. He

187

1  said exactly why the negotiations continued.
2    Q   You don't need to -- did you say earlier
3  the parties were required to negotiate in good faith?
4    A   Yes.
5    Q   And that requires effective communications,
6  correct?
7    MR. REYES: Object to the form.
8    A   No. I was -- we negotiated in good faith
9  until PEPI stopped negotiating good faith. There is
10  a waterfall clause escrow clause that was negotiated
11  that shouldn't have been put into the loan documents
12  on February 2nd. That clause was in the loan
13  documents.
14   On February 11th that clause was modified
15  in the loan documents. I said to Lorio in an email
16  he's diluting the waterfall. That was not good faith
17  after it was in the commitment letter.
18   Q   Okay.
19   A   I had no alternative and I kept on telling
20  you that our theme is if I had another DIP lender
21  trying to make you understand the economics of the
22  time, this is a real estate recession, if I had
23  another alternative I would have gone there. I had
24  no alternatives.
25   I was in good faith. I was keeping -- I

188

1  was spending legal money. I was spending lawyers,
2  paying for PEPI's fees. I was paying for Gulf Bay's
3  fees trying to get PEPI to give me what was in the
4  commitment letter and they did not. So I did
5  negotiate in good faith. They did not.
6    I have 45 pages here of a commitment letter
7  of a term, all the conditions why they can't fund.
8  Okay. But one thing I did get is I got the
9  waterfall. They tried to modify it. That was not
10  acceptable. They had to do due diligence and give me
11  a time when it was completed and they did not.
12   So I was negotiating in good faith. I
13  think they were not negotiating in good faith. I
14  would like to try to figure out -- one day I'll find
15  out what their motive is.
16   Q   Am I correct that negotiating in good faith
17  requires effective communications?
18   A   Yes.
19   MR. REYES: Object to the form.
20   Q   Okay. And do I understand your answer to
21  mean that the negotiations continued beyond the 16th
22  because you had no other option at that time and your
23  team was trying to salvage the facility?
24   A   Yes.
25   Q   Okay.

6 (Pages 185 to 188)

AA00391

189

1  A   Or, I want to answer that else -- or
2  depending where we were, I might have had to take
3  renegotiated terms. Two things, not only salvage the
4  facility, take the renegotiation terms that PEPI gave
5  me so I had to look at that, too.
6  Q   What was the problem with the waterfall
7  that in PEPI's view they perceived the ability to
8  file multiple foreclosures at once?
9  A   That's right.
10  Q   Okay. Do you know if the Gulf Bay facility
11  allows multiple foreclosures to be filed or pending
12  at the same time?
13  A   No, one at a time the way it was supposed
14  to go, one by one, one by one so I could protect the
15  creditors because our goal was to get out of Chapter
16  11, not go into Chapter 7.
17  Q   Was Mr. Battista's default letter dated the
18  22nd deliberately delayed for any strategic
19  advantages on behalf of Fiddler's?
20  A   Mr. Battista --
21  Q   Yes or no.
22  A   No, it wasn't delayed.
23  Q   Why wasn't it --
24  A   He had to work the weekend to get the
25  letter -- I want to finish the answer. He had to

190

1  work the weekend to get the letter.
2  Q   Why wasn't the letter sent on the 16th?
3  A   Just like I discussed with you, on the
4  16th, CJ Lorio told us he had no intent to give us
5  the due diligence. On the 17th, we saw the loan
6  agreements and there was no correction to the
7  waterfall to the original language. That was in the
8  February 2nd draft of the loan. It got changed.
9  So on the 18th, Mr. Battista and I are
10  huddling and reviewing all this and weighing all our
11  risks and what has to happen on the 18th. We told --
12  we recommended to Mr. Ferrao, I have no cash at this
13  time. I have payroll that has to be paid. I have
14  payroll that has to be made. I have consultants. I
15  have no cash.
16  So we told Mr. Ferrao we are looking at
17  either doing a 7 and we were analyzing all the risks
18  that what has to encompass a 7 and either do it or we
19  need him to do a DIP loan, give us a DIP so we have
20  cash. He wanted to think about it overnight and gave
21  us a yes answer on the 19th, and from that yes
22  answer, we knew we had a DIP.
23  Mr. Battista then said we have to stand
24  down. He advised us to stand down and said he would
25  draft the letter that would go to PEPI.

191

1  Q   Okay.
2  A   He did that.
3  Q   Okay.
4  A   And it went out Monday.
5  Q   The 22nd?
6  A   The 22nd is a Monday.
7  Q   Okay. So let me break down my question
8  since I didn't really get an answer.
9  MR. REYES: Object to the form.
10  Q   You said Mr. Lorio advised you on the 16th
11  that a written due diligence sign-off would not be
12  issued, correct?
13  MR. REYES: Object to the form.
14  A   No. Mr. Lorio advised us on the 16th with
15  Mr. Battista on the phone, with CJ Lorio on the
16  phone, with David Fine (sic), PEPI has no intent to
17  give us a due diligence sign-off until the closing of
18  the loan.
19  MR. REYES: When you say David Fine (sic),
20  you mean David and Jeff Fine? It's David Radunsky
21  and Jeff Fine.
22  THE WITNESS: Yes, yes. I'm not sure David
23  Radunsky was on the phone. I know it was Fine.
24  MR. REYES: When you say David Fine --
25  THE WITNESS: Sorry.

192

1  MR. REYES: Should be David, Fine, two
2  different people.
3  BY MR. PERLMAN:
4  Q   Okay. So why didn't Mr. Battista issue the
5  default letter on the 16th based on that call?
6  MR. BATTISTA: Objection. Asked and
7  answered.
8  MR. REYES: Joined.
9  Q   Why?
10  MR. BATTISTA: Objection.
11  Q   It's noted.
12  A   Because I don't know what was in Battista's
13  head at that time. All I told you is that from that
14  letter we waited -- I gave Paul Battista instructions
15  let's try to keep this thing going. I have no
16  alternative. And the straw that broke the camel's
17  back on the 17th was the loan to draft loan documents
18  that modified what we negotiated in good faith with
19  PEPI.
20  We negotiated in good faith with PEPI the
21  language on the waterfall. PEPI modified that. Let
22  me finish. I'm not finished with my question. When
23  they came to my attention I huddled up with Paul
24  Battista on the 18th. This was drastic. I was
25  risking all of Fiddler's Creek.

7 (Pages 189 to 192)

AA00392

193

1    I had to have Mr. Battista and I, I told
2  Paul, both of us have to have a discussion with
3  Mr. Ferrao as the owner of Fiddler's Creek. We had
4  that discussion on the 18th. Mr. Ferrao's response
5  and our conclusion or my conclusion to Mr. Ferrao
6  was, the only way you could avoid Chapter 7 is we
7  need a DIP loan, would you provide it.
8    And he responded to me I'm not going to
9  give you an answer now. I have to think about it.
10  And he came back to me on the 19th in the morning. I
11  don't remember what time. It was before 12:00.
12  That's what I recall.
13    And from that Mr. Battista sent an email to
14  say everybody stand down and Mr. Battista said he
15  would draft a letter to PEPI. Why it took
16  Mr. Battista, why he didn't finish it Friday
17  afternoon, why did he work on the weekends and get it
18  done, you got to ask Mr. Battista.
19    Q   Okay.
20    A   He had my instructions to give a letter on
21  the 19th.
22    Q   Right. If Mr. Ferrao came back on the
23  **19th and said I'm not providing a DIP facility, was**
24  **it Fiddler's intention to continue to negotiate and**
25  **resolve issues with PEPI?**

194

1    MR. REYES:  Object to the form. Calls for
2  speculation. Let me get my objection in.
3    A   I don't know what I would have done at that
4  time. I know what I did. I know what the facts were
5  at the time. I don't know what the hypotheticals
6  would have been.
7    Q   Okay. So Aubrey comes back and says I'll
8  **do it. At that point you instruct Mr. Battista to**
9  **declare the default, correct?**
10    A   That's correct. A-U-B-R-E-Y.
11    MR. REYES:  Lorio is Lorio, not Florio.
12    MR. PERLMAN:  Did it yesterday, too.
13    MR. REYES:  Can we agree --
14    THE WITNESS:  When I say Florio, it's
15  Lorio.
16    BY MR. PERLMAN:
17    Q   This will be Composite Exhibit 5.
18    A   This is more than one document.
19    Q   Keep them together, one composite exhibit,
20  **5-1, 5-2, 5-3.**
21    MR. BATTISTA:  Can you identify which Bates
22  stamp is the first page?
23    MR. PERLMAN:  This is the shorter of the
24  two stacks in your email dated 2/15, 10:22 on top.
25  You can drop that last exhibit. I think we're only

195

1  using the first three.
2    MR. BATTISTA:  Okay.
3    BY MR. PERLMAN:
4    Q   Wait a second. Okay. Before you is
5  **Composite Exhibit 5 consisting of three emails, the**
6  **first of which we'll reference as Exhibit 5-1. It's**
7  **an email from Mr. Battista to Mr. Fine dated**
8  **February 15, 2010. See that?**
9    A   Uh-huh.
10    Q   Yes?
11    A   Yes.
12    MR. PERLMAN:  Okay. Off the record one
13  second.
14    (Off the record.)
15    MR. PERLMAN:  It starts off with I'll
16  attach.
17    THE WITNESS:  6830 is the Bates.
18    MR. REYES:  But Stearns Weaver production,
19  not Fiddler's.
20    MR. BATTISTA:  I'm looking at Fiddler's.
21    MR. REYES:  It's 6830.
22    MR. BATTISTA:  Don't worry. Got it.
23    MR. PERLMAN:  I apologize for whatever
24  reason --
25    THE WITNESS:  For clarification.

196

1    MR. PERLMAN:  -- the Fiddler's version did
2  not have all the attachment so we're going to use the
3  Stearns Weaver version.
4    THE WITNESS:  Sounds fine.
5    MR. BATTISTA:  Okay.
6    BY MR. PERLMAN:
7    Q   Okay. Looking at Exhibit 5-1, which is
8  **Bates stamp 6830, this is an email from Mr. Battista**
9  **to Mr. Fine dated February 15, 2010, correct?**
10    A   That's correct.
11    Q   And can you read aloud Mr. Battista's first
12  **sentence, please?**
13    A   All, I think that's the word, attached is
14  what I believe to be the final version of the DIP
15  motion.
16    Q   Okay.
17    A   Subject to some tweaks on the purchase
18  option to make it consistent with the loan documents
19  and subject to speaking with Jeff on the carve out.
20    Q   Okay. So this is your authorized
21  **representative speaking on behalf of Fiddler's to**
22  **PEPI conveying what he believes to be the final**
23  **version of the DIP motion, right?**
24    A   That's correct, on the 15th, that's
25  correct.

8 (Pages 193 to 196)

205

1    Q   Yes. Can you read that to yourself quickly
2  and let me know when you're ready.
3    A   Okay.
4    Q   Do you see the terminology whereby a
5  general release would be issued to PEPI in that
6  purchase option prepared by your lawyers?
7    MR. REYES: Can you read the question
8  again?
9    (Thereupon, the requested portion of the
10  record was read back by the reporter.)
11    THE WITNESS: I don't know if this is the
12  whole language to the purchase option.
13  BY MR. PERLMAN:
14    Q   That's my question is do you see the word
15  release?
16    A   I don't see it. Am I missing it? I don't
17  see any releases.
18    Q   Thank you.
19    MR. BATTISTA: Are you on page 8411?
20    A   8411, yeah.
21    MR. REYES: Can I look at it?
22    MR. PERLMAN: Can you look at it on the
23  other side or can you not look over his shoulder?
24    MR. REYES: I don't know why you asked --
25  says general release.

206

1    THE WITNESS: I missed it.
2    MR. REYES: Second to last.
3    THE WITNESS: I mean, with documents, I
4  missed the word. I was reading it fast to speed
5  things up, says which document shall include among
6  other things a general release of all claims. I do
7  see it.
8  BY MR. PERLMAN:
9    Q   Okay.
10    A   This looks like the usual suspects,
11  everybody but me.
12    Q   Okay. I'm showing you what's been marked
13  Exhibit 6-2, which is an email from counsel for
14  Fiddler's to counsel for PEPI dated February 17th at
15  4:23 p.m., correct?
16    A   Yes.
17    Q   Okay. And the email from counsel for
18  Fiddler's states: The following are our comments to
19  the purchase option redraft sent to us today. It was
20  our understanding based upon the conference call last
21  night that the purchase option would be triggered on
22  the maturity date, then a parenthetical. See that?
23    A   Yes.
24    Q   Okay. All right. Can you take a look at
25  the following?

207

1    A   Before -- I'm not a lawyer.
2    MR. REYES: There's no question. Just look
3  at it.
4    A   I'm looking.
5    MR. REYES: When you're done, he'll ask you
6  a question.
7    A   I looked at it.
8    Q   Can you explain to me why Fiddler's is
9  negotiating the purchase option as of 4:23 on
10  February 17th?
11    MR. REYES: Object to the form.
12    A   As of this time, we did not give a stand
13  down to any of the attorneys and everybody was doing
14  status quo because as of this time, I know on the
15  17th, I don't know what time when I got a loan draft,
16  the waterfall clause was not consistent with what we
17  negotiated with in the commitment letter. So
18  everything was ongoing.
19    Q   Okay. So when you say status quo, you mean
20  full steam ahead, let's get this thing closed if we
21  can?
22    A   Yes. Because I did not have that decision
23  made until the 19th.
24    MR. REYES: Can I see 6-2 for a second?
25    Q   Okay. Showing you what's been marked

208

1  Exhibit 6-3, the top email is from Mr. Battista to
2  Mr. Fine dated February 17, 2010 at 6:00 p.m. and
3  there appears to be an email chain initiated by
4  Mr. Battista earlier that day at 2:20 p.m. See that?
5    A   Yes.
6    Q   Okay. And they're discussing the breakup
7  fee, correct?
8    A   Says question of -- don't know what they're
9  discussing even though there's a reference breakup
10  fee, talks about he has -- Battista says it is not a
11  fair -- it is not a fair response given what has
12  happened since then. So I don't know what he's
13  referring to.
14    Q   Do you have any personal knowledge
15  regarding this communication?
16    A   No. I don't.
17    Q   It says borrower lender trying to resolve
18  issues concerning the breakup fee as of this date,
19  correct?
20    MR. REYES: Object to the form.
21    A   I don't know. I have no knowledge of this
22  communication.
23    Q   What's it regarding at the top? Does it
24  say question on break up fee?
25    A   Reference on question on breakup fee but

11 (Pages 205 to 208)

AA00394

Case 8:11-ap-00809-KRM   Doc 96-1   Filed 03/02/15   Page 57 of 69

225

1  commitment letter. We accepted in the commitment
2  letter. We accepted it now.
3      Q  Okay. My question is limited. If the --
4  to exercise the option, require the general release
5  and the bankruptcy court said you can't issue it, do
6  you agree with me Aubrey could not have exercised the
7  option?
8      MR. REYES: Object to the form.
9      MR. BATTISTA: Objection.
10     A  I'm not dealing with hypotheticals. I
11  don't know.
12     Q  What don't you know?
13     A  I don't know what would have happened.
14  It's not my decision. I'm not a lawyer. I don't
15  know if that option could have been worked on or not.
16  I had a whole bunch of lawyers telling me a lot of
17  things at this time.
18     Q  Why are you asking PEPI to let you know if
19  the collateral assignment in lieu of the general
20  release will get everyone through this issue?
21     MR. REYES: Are you reading from something
22  right now? He has nothing in front of him.
23     MR. PERLMAN: He doesn't need anything.
24  Don't interrupt. If you have a question, say it.
25     MR. REYES: What are you reading from?

226

1      THE WITNESS: I don't --
2      MR. PERLMAN: I'm not reading anything.
3  Don't interrupt.
4      MR. REYES: I'm just asking.
5      MR. BATTISTA: I'm objecting to the
6  question.
7      THE WITNESS: Repeat the question.
8      MR. PERLMAN: Read it back.
9      (Thereupon, the requested portion of the
10  record was read back by the reporter.)
11     MR. REYES: Then objection to form that I
12  joined.
13     THE WITNESS: I'm listening to my attorneys
14  and working this issue out. I did not fully
15  understand the issue. To me, the issue was
16  irrelevant compared to everything else happening at
17  this time. I had bigger issues, which were the
18  waterfall, the intent to not sign off on the due
19  diligence.
20     You can't even get here with the option
21  agreement unless you have the due diligence sign-off
22  and you have the waterfall provisions because you
23  have to have a loan to have an option.
24     Q  All right. If you have --
25     A  At this point in time -- I'm answering the

227

1  question.
2      Q  Not really.
3      A  At this point in time, I don't have any of
4  this stuff. And I really -- this is Battista coming
5  up with issue we're negotiating in good faith,
6  whatever PEPI wants at this particular point in time,
7  we're trying to deliver.
8      Q  Okay. So if you have these other big
9  issues, why are you dealing with the request to get
10  the collateral assignments in lieu of the general
11  release?
12     MR. REYES: Object to the form.
13     A  Because at this time I'm continuing to go
14  down all the avenues until I know what we're going to
15  do, like I told you many a time. I had nobody else
16  to go to.
17     Q  Okay. I'm showing you what's marked
18  Exhibit 6-12 Stearns Weaver 9700, an email from Fine
19  to Houk 2/18/2010 at 3:32, see that?
20     A  Yes.
21     Q  Mr. Fine attached acceptable purchase
22  option language he sent to Paul on the 18th, correct?
23     A  Yes.
24     Q  Okay. Showing the witness 6-13 an email
25  from Springfield to DiNardo on February 18, 2010 at

228

1  4:35, Fiddler's 6318, which states to you, sir, it
2  reads, Tony, I talked to David and Jeff, the bottom
3  line is the general release will have to remain.
4  Unfortunately there will not be any change to that
5  component.
6      A  That's why he said unfortunately,
7  unfortunately because my discussions --
8      Q  There's no question, but do you recall
9  receiving this email?
10     A  Yes.
11     Q  Is that, in fact, what it says?
12     A  Yes.
13     Q  Okay. So as of this date in time the
14  parties are still trying to resolve the purchase
15  option language, correct?
16     A  No. It was resolved.
17     Q  I'm showing you Exhibit 6-14, an email from
18  Mr. DiNardo to Ms. Houk and Paul Battista dated
19  February 18, 2010 at 4:49 p.m. whereby you,
20  Mr. DiNardo, are forwarding Mr. Springfield's earlier
21  email to you, correct?
22     A  Yes.
23     Q  Okay. Showing you what's marked Exhibit
24  6-15, an email in response to yours that we talked
25  about from Mr. Battista to you dated February 18th at

16 (Pages 225 to 228)

AA00395

257

1　A　Yeah, make it.

2　Q　I'm asking you to read.

3　A　Okay.

4　Q　I apologize that we're sharing this but can

5 you pass it back.

6　A　That's all right.

7　Q　In this email and at Bates stamped Stearns

8 Weaver 9307 subsection 10.4 C it says, Lender may

9 file one or more real property foreclosure actions in

10 Florida State or federal court and obtain one or more

11 judgments of foreclosure, see that?

12　A　Yeah, I read that.

13　Q　Okay. Was that provision still

14 objectionable to the debtor as of February 17th?

15　A　The whole -- I'm not going to dice the

16 provisions line by line. What I am going to say is

17 this was discussed with me and my attorneys and they

18 told me because there's something in there that says

19 the lender may exercise. There's a paragraph couple

20 pages to foreclose on all the property. Can I have

21 that for a second?

22　Q　Sure.

23　A　Respecting the order of.

24　Q　Can you just identify what section you're

25 reading from?

258

1　A　D.

2　Q　10.4D?

3　A　Lender may exercise rights or remedies all

4 collateral real property any time after the

5 occurrence during the contingency, okay, including

6 without any collateral -- blah, blah, blah -- lender

7 shall not be required first to exhaust rights,

8 remedies against particular collateral including

9 without limitation.

10　　　All these paragraphs, okay, was explained

11 to me that this is not what was negotiated in the

12 commitment letter and my interpretation was I was

13 agreeing with what my counsel was advising me at that

14 time.

15　Q　Right. That was what you described moments

16 ago?

17　A　That there wasn't a pecking order.

18　Q　That there would be a pecking order?

19　A　That's what we negotiated.

20　Q　Right. And although there may not have

21 been a problem with the actual pecking order, your

22 position was I think you stated there couldn't be a

23 suit until the sale on the next item in the pecking

24 order, correct?

25　A　That's what my understanding was. All I

259

1 was told is that language is not in conformity with

2 what was negotiated in the commitment letter.

3　Q　Okay. When you focused on Exhibit D it

4 says, Except as otherwise provided in section 10.4A

5 and B, and B has the required sequence of the

6 waterfall items. See that?

7　　　MR. REYES: Can I hear the question again.

8　A　What is the question?

9　Q　Yeah, read -- when you read D you omitted

10 the reference to B, which is incorporated?

11　　　MR. REYES: Read me the question.

12　Q　That's the question, when you read what D

13 provided, you excluded the verbiage within D that

14 makes it subject to 10.4B, correct?

15　　　MR. REYES: Object to the form.

16　A　No. What I am saying is the -- what all

17 this is saying, I relied on my attorneys'

18 understanding to explain it to me to make sure it was

19 in conformity with the commitment letter. When you

20 take B out, put A in, take D, I don't know. I relied

21 on my counsel's advice to me to make sure what I

22 negotiated as a businessman in the commitment letter

23 was in the loan.

24　Q　Can you explain to me what was not in

25 conformity with the commitment letter?

260

1　A　What I understood is that in the commitment

2 letter, the collateral is in a given waterfall and

3 each item would be foreclosed on and the proceeds

4 realized applied against the loan for PEPI then the

5 next step would go, the next piece would go.

6　Q　When you say next step, next piece?

7　A　Next item in the waterfall, if Number 2 was

8 the first one we used, because Number 1 was cash,

9 then Number 3. Then it would be Number 4, then

10 Number 5 until PEPI was totally paid off.

11　Q　Right. Would the next step be to sell the

12 next sequential parcel?

13　A　Yes.

14　Q　Okay. Having read 10.4 of this email, do

15 you know whether or not the terminology as drafted

16 does what you just described?

17　A　It is my understanding it does not.

18　Q　I know what you've been --

19　A　Like I said, I relied on attorneys to help

20 me -- it was -- it's a thick document. It refers

21 back and forth to different exhibits, was explained

22 to me that this does not comply with what we

23 negotiated.

24　Q　Right. I'm asking.

25　A　And what my reading is it doesn't.

24 (Pages 257 to 260)

AA00396

269

```
1      A   That's fine.
2      Q   I think we have that stipulation on record.
3  I don't want to go back on that.
4         MR. REYES:  Not going back.  Paul told you
5  we'll endeavor to do it.  We'll ask what it entails,
6  what it includes.
7         THE WITNESS:  I'll show everybody.
8         MR. REYES:  We can tell you what he
9  provides.
10        MR. PERLMAN:  We're past that.
11        THE WITNESS:  I don't understand what you
12 are saying.  I'm almost there.  I can show interest
13 payment.  What costs are you talking about?
14     BY MR. PERLMAN:
15     Q   Any costs that —
16     A   Whose side am I talking about?
17     Q   Any cost Fiddler's had to pay to Gulf Bay.
18     A   Fine.  No problem.
19        MR. REYES:  That we're doing.  I thought
20 you meant the PEPI analysis.
21     A   No, no, no.  I said no to PEPI analysis.
22     Q   We're deferring on that?
23        MR. REYES:  We were saying the same thing a
24 different way.
25     Q   Sorry about that.
```

270

```
1         Other than the $955,000, is Fiddler's
2  pursuing any other damages in the Complaint?
3      A   That's what I understand the damages to be
4  as of this time.
5      Q   Okay.  I asked that the representative be
6  designated with any and all —
7      A   This?
8         MR. REYES:  Haven't asked the question.
9      Q   — any and all damages, sought, alleged or
10 asserted.
11     A   There's a clause.  I have to get my
12 understanding from my counsel of reimbursement of
13 legal fees, so I don't want to discuss that here but
14 there's a time I can assert my legal fees and I want
15 to hold that to counsel when I have the opportunity
16 to assert that.  I'm not a cop, I'm not an attorney
17 to know what I can assert for legal fees.
18     Q   Okay.  Anything else?
19     A   No.
20     Q   All right.  Thank you.
21     A   Okay.  That takes care of Fiddler's Creek.
22        MR. BATTISTA:  I'm going to break off.
23        (The referred-to documents were marked by
24 the court reporter for identification as Exhibits
25 5-8.)
```

271

```
1         (The proceedings concluded at 2:40 p.m.)
2         (Reading and signing of the deposition was
3  not waived by the witness and all parties.)
```

272

```
            CERTIFICATE OF OATH


     STATE OF FLORIDA
     COUNTY OF LEE


         I, Amory Ranck, Florida Professional
     Reporter, Notary Public, State of Florida, certify
     that FIDDLER'S CREEK CORPORATE REPRESENTATIVE,
     ANTHONY DINARDO personally appeared before me and was
     duly sworn.
         WITNESS my hand and official seal this 9TH
     day of February 2015.

                              Amory Ranck

         _____
         AMORY RANCK, FPR
         Notary Public, State of Florida
         My Commission No. FF175118
         Expires: 11/09/18
```

AA00397

**1**

```
           UNITED STATES BANKRUPTCY COURT
            MIDDLE DISTRICT OF FLORIDA
                  TAMPA DIVISION
In re:          CASE NO.:  8:10-BK-03846-KRM
FIDDLER'S CREEK, LLC, et al.,
                         Jointly Administered
                         Chapter 11
         Debtors,
_____/
FIDDLER'S CREEK, LLC, et al.
          Plaintiffs/Counterdefendants,
                         Adv. Pro. No.
                         8:11-ap-00809-KRM
v.
PEPI CAPITAL, L.P.
          Defendant/Counterplaintiff and
          Third Party Plaintiff.
_____/
PEPI CAPITAL, L.P.
          Third Party Plaintiff,
v.
GULF BAY CAPITAL, INC.,
          Third Party Defendant.
_____/

   DEPOSITION OF GULF BAY CAPITAL'S CORPORATE
      REPRESENTATIVE, ANTHONY DINARDO

        Tuesday, February 10, 2015
          2:42 P.m. - 4:10 p.m.

            ROETZEL & ANDRESS, LPA
850 Park Shore Drive, Trianon Centre - Third Floor
            Naples, Florida 34103

        Stenographically Reported By:
              Amory Ranck, FPR
          Florida Professional Reporter
```

**2**

```
APPEARANCES:

On behalf of Fiddler's Creek, LLC:

   GENOVESE, JOBLOVE & BATTISTA, P.A.
   100 Southeast Second Street
   44th Floor
   Miami, Florida 33131
   305.349.2300
   BY: PAUL J. BATTISTA, ESQUIRE
   (Via Telephone)
   pbattista@gjb-law.com

On behalf of PEPI Capital, LP:
   TOBIN & REYES, P.A.
   The Plaza
   5355 Town Center Road
   Suite 204
   Boca Raton, Florida 33486
   561-620-0656
   BY: RICARDO REYES, ESQUIRE
   rar@tobinreyes.com

On behalf of Gulf Bay Capital, Inc.:
   ROETZEL & ANDRESS, LPA
   350 E. Las Olas Boulevard
   Suite 1150
   Fort Lauderdale, Florida 33301
   (954) 462-4150
   BY: ALAN J. PERLMAN, ESQUIRE
   aperlman@ralaw.com
```

**3**

```
          INDEX OF PROCEEDINGS
Deposition of GULF BAY CAPITAL'S CORPORATE
REPRESENTATIVE, ANTHONY DINARDO
                                  Page
Direct Examination by Mr. Perlman      4
Certificate of Oath             32
Certificate of Reporter         33
Read and Sign Letter            34
Errata Sheet                    35

            EXHIBITS
Number              Page
1    Notice of Taking Deposition    31
2    Email fr Jane Houk             31
     2/19/10 @ 6:54 PM
3    Email fr Jane Houk             31
     2/20/10 @ 7:38 PM
4    Email fr Jane Houk             31
     2/20/10 @ 9:01 PM
5    Emergency Motion for Entry of  31
     Interim and Final Orders
6    Notice of Filing Proposed DIP  31
     Credit and Security Agreement
7    Exhibit E                      31
8    Bates SWM010481-010492         31
9    Email fr Jane Houk             31
     3/1/10 @ 7:40 PM
10   Notice of Filing Loan Documents 31
     With Gulf Bay Capital, Inc.
```

**4**

```
   Deposition taken before Amory Ranck, Florida
Professional Reporter and Notary Public in and for
the State of Florida at Large in the above cause.
             • • • • •
   THE COURT REPORTER:  Please raise your
right hand.
   Do you solemnly swear or affirm that the
testimony you are about to give will be the truth,
the whole truth, and nothing but the truth?
   THE WITNESS:  I do.
GULF BAY CAPITAL'S CORPORATE REPRESENTATIVE,
      ANTHONY DINARDO,
having been first duly sworn, was examined and
testified as follows:
      DIRECT EXAMINATION
BY MR. PERLMAN:
   Q  I apologize for the formality, Mr. DiNardo.
   A  No worry.  Get it right.
   Q  Can you state your name and business
address?
   A  No apologies.
   MR. REYES:  Can you state your name and
business address?
   A  Anthony DiNardo, D-I-N-A-R-D-O.  You want
my business address?
```

1 (Pages 1 to 4)

AA00398

Page 5

1      Q   Sure.
2      A   1856 Fiddler's Creek Parkway, Naples,
3   Florida 34114.
4          MR. REYES:  Any copies for me on this one?
5          MR. PERLMAN:  Only copy I have.
6          MR. REYES:  I mean the other ones.
7          MR. PERLMAN:  I did not give them to Paul.
8   Thought you'd want them.
9          MR. REYES:  I do.
10   BY MR. PERLMAN:
11      Q   I'm showing you Exhibit 1, which is the
12   deposition notice for Gulf Bay Capital for today.
13   Have you seen that before?
14      A   Yes.
15      Q   Okay.  Are you the designated
16   representative with the most knowledge from Gulf Bay
17   Capital concerning the items listed in Exhibit A?
18      A   Yes.
19      Q   Did you nominate yourself in that regard or
20   what was the process for that determination to be
21   made?
22      A   Sometime between February 19th in the
23   afternoon and February 22nd after Mr. Ferrao had
24   decided to provide DIP financing to Fiddler's Creek,
25   LLC, since we had no entity or bank accounts or

Page 6

1   attorneys, Mr. Ferrao and I had some phone
2   conversations in which I recommended, I don't know
3   the exact date because I know Jane Houk wanted to
4   create a new entity.
5          And I recommended to Mr. Ferrao we had an
6   inactive corporation called Fiddler's Creek Capital,
7   Inc.
8          MR. REYES:  Fiddler's Creek Capital, Inc.?
9      A   Sorry, Gulf Bay Capital, Inc.  Sorry.
10          MR. REYES:  Okay.
11      Q   I knew what you meant.
12      A   Gulf Bay Capital, Inc., and we could put
13   that in play, and I maintain all the books and
14   records and was involved in -- as chief financial
15   officer as to Gulf Bay Capital, Inc.
16      Q   So your position at Gulf Bay Capital, Inc.
17   is --
18      A   Chief financial officer.
19      Q   Or was chief financial officer at the time?
20      A   Yes.
21      Q   What were your responsibilities as CFO?
22      A   I was involved in working out the DIP
23   financing between Fiddler's Creek, LLC and Gulf Bay
24   Capital.  I was dealing with both attorneys who was
25   involved in doing the DIP financing, which would be

Page 7

1   Paul Battista for Fiddler's Creek, LLC and Jane Houk
2   for Gulf Bay Capital, Inc.
3          I was part of -- I was involved and part of
4   the decision to hire Holly Riddel as attorney to
5   represent Gulf Bay Capital in the foreclose -- Gulf
6   Bay Capital in the bankruptcy proceeding of Fiddler's
7   Creek, LLC, and I was responsible for doing all of
8   the billing and monitoring the loans between
9   Fiddler's Creek, LLC and Gulf Bay Capital, I was
10   responsible for the financial statements and the
11   books and records of Fiddler's Creek Capital, Inc. --
12          MR. REYES:  Gulf Bay Capital.
13      A   Gulf Bay Capital.  Sorry, I'm tired.  Can
14   you fix that for me?
15      Q   Were you able to do that?  Yes.  I was
16   going to ask you to do that, correct it on the
17   record.
18          I'm showing you what's been marked
19   Exhibit 2, an email dated February 19th from Ms. Houk
20   to Mr. Battista.  Take a second and review her email,
21   if you could, please.
22      A   Okay.
23      Q   The comparison of the term sheet that Gulf
24   Bay Capital's lawyer is referring to, is that
25   between -- is that a comparison, excuse me, of the

Page 8

1   terms of the loan from PEPI compared to the terms of
2   the loan of Gulf Bay Capital?
3      A   I recall seeing a document that does a
4   comparison between the commitment letter that PEPI
5   proposed and we executed with PEPI and the loan that
6   we were going to create, yes.
7      Q   Okay.  So is it your belief when it says
8   comparison that's what it refers to?
9      A   I don't know if they're comparing different
10   renditions of internal term sheets from Gulf Bay
11   Capital against each other or comparing a Gulf Bay
12   Capital term sheet against the PEPI term sheet, I
13   can't tell.  I know there was a comparison done
14   between the loan document and PEPI's commitment
15   letter.
16      Q   Were there comparisons done between PEPI's
17   commitment letter and Gulf Bay's commitment letter?
18      A   I really don't -- I know there was a
19   comparison done between -- I saw a document between
20   PEPI's commitment letter and the Gulf Bay Capital
21   loan or term sheet.  I'd say the term sheet, yes.
22   But I don't know if that email referred to that
23   comparison.
24      Q   Fair enough.  I'm handing you what was
25   marked Exhibit 3, I'm giving to Mr. Reyes first then

2  (Pages 5 to 8)

AA00399

## 9

I'll ask you some questions. When you're done, if you can take a look and let me know when you're ready. It's an email from Gulf Bay counsel to Mr. Battista dated February 20, 2010 regarding comparison of Gulf Bay and PEPI loan.

A   Okay.

Q   All right. Do I understand this email to suggest that the Gulf Bay Capital DIP loan was based on the versions prepared with regard to PEPI?

A   Yes.

Q   Okay.

A   As a starting point, Word document.

MR. REYES: This is Number 4. Zero for four, no copy for me.

MR. PERLMAN: I know.

MR. REYES: Doing great.

MR. PERLMAN: I have the rest, though.

MR. REYES: Uh-huh. Amory doesn't believe you.

THE WITNESS: This is what I remember seeing.

BY MR. PERLMAN:

Q   Okay. Was the PEPI commitment letter used for the initial draft of the Gulf Bay Capital loan with Fiddler's?

## 10

A   Say that again.

Q   Was the PEPI commitment letter used to formulate the commitment letter between Gulf Bay and Fiddler's?

A   No. The PEPI commitment letter was used as a benchmark to see what PEPI had and what we had to do to come up with a more favorable DIP loan than what PEPI was producing. That was our goal, to create a more favorable DIP loan.

Q   That's what Exhibit 4 relates to?

A   Yes. That's why if you notice less the fees, wanted to make sure that there's more capital, we were going through all the points and wanted to make sure that in the end Gulf Bay Capital was more favorable than PEPI's because we knew we'd have to face the concept that it was an insider DIP loan.

Q   This reflects the commitment fee was under discussion. What was the final result?

A   I think there was no commitment fee.

Q   I guess we'll find out.

A   When I do the calculation, yeah. Pretty sure there wasn't a commitment fee.

Q   The Gulf Bay facility did not include a purchase option, correct?

A   Yes.

## 11

Q   It did or did not?

A   It did not include a purchase option because there was no pledge, there was no collateral pledge of the stock of Fiddler's Creek, LLC so without the pledge of the stock you don't need the purchase option. That was the catalyst that required the repurchase option in the PEPI deal, required the pledge of the stock of Fiddler's Creek, LLC.

Q   Wasn't the real reason because Mr. Ferrao had -- was the principle of the lending enterprise and wouldn't need to require --

A   That's --

MR. REYES: Let him finish his question.

A   Yes. You couldn't pledge to yourself, two concepts. What caused the pledge, the pledge resulted in the option agreement and you can't -- once you take away one, you don't need the other.

Q   Right. But in the PEPI facility, if there was a default, Mr. Ferrao always had the protection of exercising the option under the commitment letter and taking over the facility, correct?

A   Correct.

Q   But because Gulf Bay was owned by him, he didn't need a purchase option to perform that task in the substitute facility because he was already the

## 12

lender, if you will, because he owned and controlled Gulf Bay?

A   That's correct.

Q   So the notion of the purchase option was rendered moot, correct?

A   That's correct.

Q   If you can turn to the last page and read me the Bates stamp number on the bottom right?

A   9982.

Q   Can you explain to me what that purports to say with regard to the remedies?

A   Says, Foreclosure pursuant to the Waterfall, this is Gulf Bay Capital, but no foreclosure on the equity interest because there's no collateral, equity interest is not collateral and PEPI says foreclosure pursuant to the waterfall, commercial reasonable effort to abide by the waterfall and foreclosure of equity interest.

Q   Okay. What's the distinction other than the equity interest?

A   Well, we said it's specific order. They're using the word commercial efforts to abide. We're saying we'll abide by the waterfall. Again, this is the synopsis without putting all the other sound facts without a doubt in the Gulf Bay Capital loan,

3   (Pages 9 to 12)

AA00400

Case 8:11 ap 00809 KRM   Doc 96 2   Filed 03/02/15   Page 8 of 9

**29**

1  Fiddler's, different and distinct than the Gulf Bay
2  facility; is that your testimony?
3      A   My testimony is PEPI could have gone to the
4  judge and the judge could have decided what to do
5  because the judge would have heard the testimony of
6  not only the debtor, not only if PEPI hypothetically
7  went in front of the judge, he would have heard all
8  the testimony of all the secured creditors and the
9  unsecured creditors and he would have decided what to
10  do.
11      Q   Did Mr. Fine's letter of February 23rd
12  indicate PEPI's desire to be the lender?
13      MR. REYES:  Object to the form.
14      Q   Did I say February 22nd or 23rd?
15      MR. REYES:  That's not why I'm objecting.
16      A   Mr. Fine's letter --
17      Q   Let's start with my question.
18      A   I'm answering.
19      Q   Did it indicate --
20      A   No.  Because Mr. Fine's letter still
21  indicated that PEPI wanted to negotiate the
22  waterfall.  This was after almost a hundred days.
23  There's a point when negotiations stop and what
24  people pay for in a commitment letter translates into
25  documents to fruition.

**30**

1      It can't just go on.  When the money is
2  gone, when the pressure is put on, when decisions
3  have to be made, you can't make decisions in a
4  vacuum.  The money is gone, decisions have to be made
5  and PEPI still wants to negotiate.
6      Q   Was there ever an email to PEPI that said
7  we're not negotiating this issue any further at any
8  point?
9      A   Not to my knowledge, I don't know.  All I
10  know is it was left in Paul Battista's hands.  After
11  the letter, I don't know if Paul Battista had any
12  conference calls with Mr. Fine.
13      Q   If Gulf Bay didn't provide the facility, do
14  you believe the debtors would have borrowed from
15  Fiddler's?
16      A   I don't have to answer that hypothetical.
17  All I know is Gulf Bay did provide the facility and
18  because they had a facility in the end, I was dealing
19  with a potential DIP lender who was not negotiating
20  in good faith and I was able to put them in breach.
21      If I would have had Gulf Bay's commitment
22  prior, I would have put them in breach sooner.  Now
23  you're not asking me questions with regards to Gulf
24  Bay Capital.  You're asking me questions in regards
25  to Fiddler's Creek and I don't want those questions

**31**

1  anymore.
2      MR. PERLMAN:  Okay.  Do you have any cross?
3      MR. REYES:  I don't think so.  One second.
4      THE WITNESS:  I hope not.
5      MR. REYES:  No.
6      MR. PERLMAN:  Is he going to read?
7      MR. REYES:  He's going to read.
8      MR. PERLMAN:  I'd like a copy, please.
9      THE WITNESS:  Are we done?
10      MR. PERLMAN:  We're done.
11      (The referred-to documents were marked by
12  the court reporter for identification as Exhibits
13  1-10.)
14      (The proceedings concluded at 4:10 p.m.)
15      (Reading and signing of the deposition was
16  not waived by the witness and all parties.)

**32**

1                 CERTIFICATE OF OATH

3  STATE OF FLORIDA
4  COUNTY OF LEE

8      I, Amory Ranck, Florida Professional
9  Reporter, Notary Public, State of Florida, certify
10  that GULF BAY CAPITAL'S CORPORATE REPRESENTATIVE
11  ANTHONY DINARDO personally appeared before me and was
12  duly sworn.
13      WITNESS my hand and official seal this 10th
14  day of February 2015.

                          *Amory Ranck*
                 _____
                 AMORY RANCK, FPR
                 Notary Public, State of Florida
                 My Commission No. FF175118
                 Expires: 11/09/18

8  (Pages 29 to 32)

AA00401

33

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF LEE

I, AMORY RANCK, Florida Professional
Reporter, do hereby certify that I was authorized to
and did stenographically report the foregoing
deposition of GULF BAY CAPITAL'S CORPORATE
REPRESENTATIVE, ANTHONY DINARDO; that a review of the
transcript was requested; and that the transcript is
a true record of my stenographic notes.

I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the
parties' attorneys or counsel connected with the
action, nor am I financially interested in the
action.

Dated this 16th day of February 2015.

_Amory Ranck_
AMORY RANCK, FPR
Florida Professional Reporter

---

34

February 16, 2015

GULF BAY CAPITAL'S CORPORATE REPRESENTATIVE,
ANTHONY DINARDO
GENOVESE, JOBLOVE & BATTISTA, P.A.
100 Southeast Second Street
44th Floor
Miami, Florida 33131

re: FIDDLER'S CREEK, LLC V. PEPI CAPITAL, LP, ET AL.
    DEPOSITION of GULF BAY CAPITAL'S CORPORATE
    REPRESENTATIVE, ANTHONY DINARDO
    Taken February 10, 2015
    1236522

The transcript of the above-referenced proceeding has
been prepared and is being provided to your office
for review by the witness.

We respectfully request that the witness complete
their review with 30 days and return the errata sheet
to our office.

Thank you,

AMORY RANCK, FPR
U.S. Legal Support, Inc.
2180 West First Street
River View Place, Suite 230
Fort Myers, Florida 33901
239-561-3526

CC via transcript: Counsel

---

35

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

Re: FIDDLER'S CREEK, LLC V. PEPI CAPITAL, LP, et al.
Case No.: 8:10-BK-03846-KRM
GULF BAY CAPITAL'S CORPORATE REPRESENTATIVE,
ANTHONY DINARDO
February 10, 2015
1236522

PAGE  LINE    CHANGE          REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated
in it are true.
                                    _____
Date    GULF BAY CAPITAL'S CORPORATE
        REPRESENTATIVE, ANTHONY DINARDO

---

9 (Pages 33 to 35)

AA00402

~~Case 8:11-ap-00809-KRM   Doc 96-3   Filed 03/02/15   Page 1 of 16~~

**1**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:        CASE NO.:  8:10-BK-03946-KRM
FIDDLER'S CREEK, LLC, et al.,
                          Jointly Administered
                          Chapter 11
        Debtors,
_____/
FIDDLER'S CREEK, LLC, et al.
      Plaintiffs/Counterdefendants,
                          Adv. Pro. No.
                          8:11-ap-00809-KRM
v.
PEPI CAPITAL, L.P.
      Defendant/Counterplaintiff and
      Third Party Plaintiff.
_____/
PEPI CAPITAL, L.P.
      Third Party Plaintiff,
v.
GULF BAY CAPITAL, INC.,
      Third Party Defendant.
_____/

DEPOSITION OF AUBREY FERRAO

Friday, February 13, 2015
10:03 a.m. - 11:53 a.m.

ROETZEL & ANDRESS, LPA
850 Park Shore Drive, Trianon Centre - Third Floor
Naples, Florida 34103

Stenographically Reported By:
Amory Ranck, FPR
Florida Professional Reporter

**3**

INDEX OF PROCEEDINGS
Deposition of AUBREY FERRAO        Page
Direct Examination by Mr. Perlman      4
Certificate of Oath            61
Certificate of Reporter        62
Read and Sign Letter          63
Errata Sheet                  64

EXHIBITS

Number                              Page
1    Email fr Paul Battista        60
     1/6/10 @ 9:02 AM
2    Email fr Jeffrey Fine         60
     1/26/10 @ 3:07 PM

3    Email fr Patricia Redmond     60
     1/15/10 @ 11:57 AM
4    Email fr Patricia Redmond     60
     1/7/10 @ 10:37 AM

5    Email fr Paul Battista        60
     2/18/10 @ 5:00 PM
6    Email fr Jeffrey Fine         60
     2/19/10 @ 5:22

7    Email fr Tony DiNardo         60
     2/19/10 @ 4:27 PM
8    Email fr Paul Battista        60
     2/21/10 @ 8:48 AM

9    Email fr Paul Battista        60
     2/19/10 @ 11:38 AM
10   Email fr Paul Battista        60
     2/19/10 @ 11:39 AM

11   Email fr Peter Desiderio      60
     2/11/10 @9:23
     Environmental Indemnity and
     Pledge Agreement

**2**

APPEARANCES:

On behalf of Fiddler's Creek, LLC:
   GENOVESE, JOBLOVE & BATTISTA, P.A.
   100 Southeast Second Street
   44th Floor
   Miami, Florida 33131
   305.349.2300
   BY: PAUL J. BATTISTA, ESQUIRE
   pbattista@gjb-law.com

On behalf of PEPI Capital, LP:
   TOBIN & REYES, P.A.
   The Plaza
   5355 Town Center Road
   Suite 204
   Boca Raton, Florida 33486
   561-620-0656
   BY: RICARDO REYES, ESQUIRE
   (Via Telephone)
   rar@tobinreyes.com

On behalf of Gulf Bay Capital, Inc.:

   ROETZEL & ANDRESS, LPA
   350 E. Las Olas Boulevard
   Suite 1150
   Fort Lauderdale, Florida 33301
   (954) 462-4150
   BY: ALAN J. PERLMAN, ESQUIRE
   aperlman@ralaw.com

**4**

Deposition taken before Amory Ranck, Florida
Professional Reporter and Notary Public in and for
the State of Florida at Large in the above cause.
        * * * * *
        THE COURT REPORTER:  Please raise your
right hand.
        Do you solemnly swear or affirm that the
testimony you are about to give will be the truth,
the whole truth, and nothing but the truth?
        THE WITNESS:  I do.
        AUBREY FERRAO,
having been first duly sworn, was examined and
testified as follows:
        DIRECT EXAMINATION
BY MR. PERLMAN:
    Q   Good morning, sir.  Can you please state
your name and business address?
    A   My name is Aubrey Ferrao and the business
address is 8156 Fiddler's Creek Parkway, Naples.
    Q   And what business is conducted there?
    A   Real estate primarily and investments.
    Q   Including Fiddler's Creek?
    A   Yeah, real estate.
    Q   Okay.  Have you been deposed before?
    A   Yes.

1 (Pages 1 to 4)

AA00403

**25**

1  A  I heard from Tony DiNardo that he and
2  Mr. Battista were -- couldn't get a signoff from
3  Perot, PEPI, on due diligence items and I also heard,
4  but this is before the 22nd so you're asking on the
5  22nd?
6  Q  Yeah.
7  A  I guess what happened before would be the
8  same thing on the 22nd, correct?
9  Q  I don't know how you're going to answer it,
10  so I can't respond, but --
11  A  If the default letter went out on the 22nd,
12  it would incorporate what -- I would guess it would
13  track what they told me. Is that your question? I
14  didn't read the default letter.
15  Q  Okay. My question was as of that date,
16  were there many outstanding due diligence items for
17  PEPI?
18  A  I don't know.
19  MR. BATTISTA:  Objection.
20  A  All I know is PEPI refused to sign off on
21  due diligence.
22  Q  Okay. Was there ever a closing scheduled
23  for PEPI in the Fiddler's entities?
24  A  I don't know because there was no due
25  diligence signoff. Because of that we couldn't -- we

**26**

1  wouldn't have a lender, so I don't know when the
2  closing was scheduled, was supposed to be scheduled
3  or happened or didn't happen.
4  Q  Were you ever aware of a closing being
5  scheduled in connection with the PEPI loan?
6  A  I presume we'd close before, but we filed
7  for Chapter 11.
8  MR. BATTISTA:  Do you know?
9  A  I don't know.
10  Q  Do you know if PEPI ever refused to appear
11  for a closing?
12  A  I don't know. Well, I guess I would -- if
13  they refused to sign off on due diligence there
14  wouldn't be a closing, that's what they said.
15  Q  Do you know if PEPI walked away from the
16  loan as of that date and time?
17  MR. BATTISTA:  Objection.
18  A  As of the 22nd when the default letter --
19  Q  Yeah.
20  A  Yes, I would say they defaulted so they
21  walked away.
22  Q  Okay. Putting aside the allegation they
23  defaulted, before that letter was issued, would you
24  testify under oath that PEPI walked away from that
25  loan?

**27**

1  MR. BATTISTA:  Objection.
2  A  Are you saying if we say they didn't
3  default?
4  Q  No. As of before that letter was written,
5  did PEPI walk away from that loan, yes or no?
6  A  Yes.
7  MR. BATTISTA:  Objection.
8  Q  How so?
9  A  They didn't give Paul and Tony a due
10  diligence signoff. Without a due diligence signoff I
11  was told, my understanding, we went into Chapter 11
12  and could go from 11 to 7 because we didn't have a
13  lender. Our lender was PEPI.
14  Q  Did PEPI ever state it would not lend
15  money, the monies to Fiddler's?
16  MR. BATTISTA:  Objection.
17  A  It said it would not give a due diligence
18  signoff. Without that they are not committed as a
19  lender.
20  Q  It never said it wouldn't lend, correct?
21  A  I don't know. We couldn't go into 11
22  without due diligence signoff.
23  Q  Did PEPI ever refuse to state when it would
24  fund?
25  A  I don't know. Wasn't involved with PEPI at

**28**

1  that time.
2  Q  But as of the 22nd you got tired of the
3  delays from PEPI and decided to default them,
4  correct?
5  MR. BATTISTA:  Objection.
6  A  As of the 22nd we defaulted PEPI based on
7  the phone call I had with Paul Battista and
8  Mr. DiNardo.
9  Q  That phone call was when, the evening of
10  the 18th?
11  A  Yes. You're right.
12  Q  So my question was were they defaulted
13  because you were tired of the process involving PEPI?
14  MR. BATTISTA:  Objection.
15  A  They were defaulted for a very simple
16  reason.
17  Q  So it wasn't because you were tired of it,
18  is that what you're telling me?
19  A  I was going to continue. I was collecting
20  my thoughts. The reason was Tony DiNardo told me
21  that Fiddler's had no more money, ran out of money,
22  couldn't make the following payroll so -- and we
23  couldn't get due diligence signoff.
24  So we didn't -- PEPI was not a lender
25  because we couldn't file the Chapter 11 with -- with

WWW.USLEGALSUPPORT.COM
813-876-4722

AA00404

**29**

a lender who is not committed because if we went in,
we'd be totally at the mercy of anybody and the 11
would melt into a 7. So for two reasons, lack of
money, Fiddler's was looking at a meltdown with no
money and no lender. Those were the two reasons,
major reasons, it's all about money.

Q   Right. So it wasn't because you were tired
of it, correct?

A   I wasn't even involved in the back and
forth.

Q   So I'm right?

A   It was -- a Chapter 11 restructuring is all
about cash or the lack thereof. When there was no
money left in the company, there was no ability to
get PEPI to sign off on due diligence, which means
then we definitely had a lender. That's what we had
to do.

Q   So I'm right when I say they were not --
PEPI was not defaulted because you were tired of it,
correct?

MR. BATTISTA:  Objection.

A   I don't think you're right. I don't think
that was an issue. I think the issue was a lack of
cash and lack of lender, the inability of the lender
to confirm they would sign off on the due diligence

**30**

and proceed to funding.

Q   And the evening of the 18th, that was when
Mr. DiNardo suggested that you provide the financing
and become the new DIP lender, correct?

A   He asked me to.

Q   He asked you to do what I just said?

A   Yes, would I provide DIP financing.

Q   And was that the first time you'd ever
considered that concept?

A   No.

Q   When else did you consider being the DIP
lender?

A   Early on in the process. I had a
discussion when I first met Mr. Battista with
Patricia Redmond. Paul asked me if I would provide
DIP financing and I said no.

Q   Why'd you say no?

A   Because I was not interested in providing
DIP financing at the time.

Q   Why?

A   Because I had many, many other assets and I
didn't know how much of my money would have to go to
different areas, allocation. And we're just also
funding Fiddler's through Florida Financial.

Q   What does that mean?

**31**

A   The lender lent money to Fiddler's.

Q   Was that an entity you owned?

A   Yes.

Q   So what about it? You were already
providing financing individually through Florida
Financial which lent money to Fiddler's?

A   Yes. We made a commitment, I had made a
commitment to fund Fiddler's through Florida
Financial and I fulfilled my commitment.

Q   So on February 18th when you have this
discussion with Mr. DiNardo and Mr. Battista, what
happened to your previous allocation concerns of your
other obligations?

A   I was looking at a meltdown of Fiddler's
Creek. I wanted to preserve my equity. I thought we
had a DIP lender in Perot and since they were
reneging on their commitment by not providing a
signoff, I had to look -- I didn't want to be here
but I looked at a complete meltdown of Fiddler's
Creek. That means my equity would be gone.

My employees who had been with me a very
long time would have no payroll checks coming and
we'd lose our human capital, which is very important
for us. And Number 3, we had sold approximately a
little under 2,000 homes to people in Fiddler's Creek

**32**

and the community would have been melted down as
well.

Based on those three reasons, I considered
what Mr. DiNardo and Mr. Battista asked me. Didn't
want to do it but we had, I had very little choice.

MR. BATTISTA:  Start with I?

MR. PERLMAN:  Correct.

MR. REYES:  Will you identify it so I know
what it is?

BY MR. PERLMAN:

Q   Give me a second. Mr. Ferrao, I've handed
you what's been marked Exhibit 1, an email from
Mr. Battista to Jeff Fine copying Patricia Redmond on
January 6, 2010. If you see on Item 1, the reference
there is status of Trish's request for a right of
first refusal on the debt, see that?

A   Yes.

Q   Okay. That's more or less the option we've
talked about before that you stated was Trish's idea,
correct?

A   Yes. If you say that's the same thing, I
don't know. I haven't seen this email.

Q   Okay. The next exhibit, Exhibit 2 is an
email chain on top. It's an email from Mr. Fine to
Patricia Redmond dated January 26, 2010. It says,

AA00405

45

A   You and Peter.

Q   Desiderio.

A   They were representing Fiddler's Creek.

Q   Okay.  You and Peter were going to redraft the purchase option paragraph and send that to me for review.  See that sentence?

A   Yes.

Q   Were you aware of those circumstances?

A   No.

Q   Do you have any understanding as to what the redraft of the purchase option would have revealed?

A   No.

Q   Do you know whether or not the redraft of the purchase option was ever sent by either Jane or Peter Desiderio on behalf of Fiddler's Creek in response to this letter?

A   I don't know.

Q   Do you have a question?

A   I'm not supposed to ask the questions.

MR. BATTISTA:  If Mr. Perlman will agree to answer, maybe we can ask them.

Q   I probably would.  Now looking back at Exhibit 6, at this point in time you already decided to be the DIP lender, correct?

46

A   I called them on Friday morning so this is 5/22, yes.

Q   Okay.  The next item what I've marked Exhibit 7 is two emails, top of which is Mr. DiNardo to Mr. Springfield, February 19th at 4:27 p.m.  See that?

A   Kenny to Tony then Tony to Kenny, correct.

Q   Yes.  Initial email is from Kenny to Tony on the 19th at 4:14 p.m.  What's up with the radio silence, correct?

A   Yes.

Q   Mr. DiNardo writes back 4:27, Kenny, we're conferring with counsel, we'll get back to you as soon as we can.  Thanks.  See that?

A   Yes.

Q   Fiddler's had already -- you had already decided to be the DIP lender for Fiddler's at this time, correct?

A   This is on Friday?

Q   Yeah.

A   I told -- I said I would agree to be the DIP lender on Friday morning.

Q   Right.  This is Friday afternoon?

A   This is Friday afternoon, yes, I had.

Q   So why didn't Mr. DiNardo tell

47

Mr. Springfield about those circumstances?

A   You need to ask Mr. DiNardo.  You had him for a day and a half.

Q   I'm asking you.

MR. BATTISTA:  Do you know, that's all.

A   No.

(Off the record.)

BY MR. PERLMAN:

Q   Had you decided at this time to keep the fact you were providing the facility in place of PEPI a secret to PEPI?

A   Had I?  Nothing to do with it.

Q   You're Fiddler's, aren't you?

A   Yes.  But I told them I would do it on Friday morning.  After that, that was all I did.

Q   Did Mr. DiNardo ever tell you I'm not going to tell PEPI you're providing the DIP loan?

A   No.  He did not.  All I agreed to was provide the DIP, which was $25 million.

(Off the record.)

BY MR. PERLMAN:

Q   Okay.

A   This is lawyer-to-lawyer stuff.

Q   Yeah.  I'm showing you what's been marked Exhibit 8, an email from Mr. Battista to the

48

attorneys at Stearns Weaver, February 21, 2010.  See that?

A   Yes.

Q   Okay.  Can you just take a look at the middle paragraph, if you will, and let me know when you had a chance to review that quickly?

A   Yes.  The second paragraph, right?

Q   Sure.

MR. BATTISTA:  The big one.

A   Whole thing.  I read it.

Q   Did you have a concern that the PEPI loan was potentially a loan to own?

A   We thought about it, but they wouldn't give us the due diligence signoff.  There's a suspicion.  We thought about it.  They wouldn't approve the waterfall or whatever they changed.  I don't know what the waterfall was.  The lawyers and Tony know.  There was a couple things and we just -- without -- the fear was going into court with no lender and 11 becoming 7, which would have been very bad.  How do you get lawyer-to-lawyer stuff?

MR. BATTISTA:  We'll talk off the record.

Q   To answer your question because borrower and lender --

A   Okay.

12  (Pages 45 to 48)

AA00406

**61**

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF LEE

I, Amory Ranck, Florida Professional
Reporter, Notary Public, State of Florida, certify
that AUBREY FERRAO personally appeared before me and
was duly sworn.

WITNESS my hand and official seal this 13th
day of February 2014.

_Amory Ranck_
AMORY RANCK, FPR
Notary Public, State of Florida
My Commission No. FF175118
Expires: 11/09/18

**63**

February 23, 2015
AUBREY FERRAO
GENOVESE, JOBLOVE & BATTISTA, P.A.
100 Southeast Second Street
44th Floor
Miami, Florida 33131

re: FIDDLER'S CREEK v. PEPI
    DEPOSITION of AUBREY FERRAO
    Taken February 13, 2014
    1236514
The transcript of the above-referenced proceeding has
been prepared and is being provided to your office
for review by the witness.
We respectfully request that the witness complete
their review with 30 days and return the errata sheet
to our office.

Thank you,

AMORY RANCK, FPR
U.S. Legal Support, Inc.
2180 West First Street
River View Place, Suite 230
Fort Myers, Florida 33901
239-561-3526

CC via transcript: Counsel

**62**

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF LEE

I, AMORY RANCK, Florida Professional
Reporter, do hereby certify that I was authorized to
and did stenographically report the foregoing
deposition of AUBREY FERRAO; that a review of the
transcript was requested; and that the transcript is
a true record of my stenographic notes.

I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the
parties' attorneys or counsel connected with the
action, nor am I financially interested in the
action.

Dated this 23rd day of February 2015.

_Amory Ranck_
AMORY RANCK, FPR
Florida Professional Reporter

**64**

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re: FIDDLER'S CREEK v. PEPI
Case No.: 8:10-BK-03846-KRM
AUBREY FERRAO
February 13, 2014
1236514

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |
|      |      |        |        |

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated
in it are true.

Date _____    AUBREY FERRAO

16  (Pages 61 to 64)

AA00407

## Erenbaum, Jessica

| | |
|---|---|
| **From:** | Peter Desiderio <PDesiderio@stearnsweaver.com> |
| **Sent:** | Wednesday, February 17, 2010 4:23 PM |
| **To:** | 'Helm, Elizabeth' |
| **Cc:** | McCaughan, William P.; Daniel, Rick; David Radunsky; Fields, David; CJ Lorio; K Springfield; Soards, Anthony; Cox, John; Fine, Jeffrey; Jane Houk; Battista, Paul J.; Jane Houk; Battista, Paul J. |
| **Subject:** | Purchase Option |

The following are our comment to the Purchase Option redraft sent to us today. It was our understanding, based upon the conference call last night, that the Purchase Option would be triggered on the Maturity Date (or an earlier date if the Lender gave notice of Lender's intent to foreclose on or seek recovery against the collateral or equity interests).

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.



EXHIBIT
3

FIDD 003933

AA00408

**3.6 Purchase Option.** ~~It is the intent of~~ Lender and Borrowers <u>hereby agree</u> that Borrowers have the option to purchase the Loan as set forth in this <u>Section 3.6</u> ~~before~~ <u>and</u> Lender ~~forecloses~~ <u>agrees not to foreclose</u> on <u>or seek recovery against</u> any of the Collateral or ~~exercises~~ <u>exercise</u> its voting, consent, or management rights with respect to any of the Equity Interests <u>until after such option to purchase has expired.</u> In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the **"*Designated Buyer*"**) for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided,* <u>that the parties hereby agree</u> that the purchase of the Loan ~~has~~ <u>shall</u> be closed and ~~been~~ consummated within the Purchase Option Period. <u>[NOTE: THESE CHANGES ARE NECESSARY BECAUSE THE LENDER COULD FAIL TO TIMELY COMPLY WITH THE CLOSING REQUIREMENT OR BE UNABLE TO DO SO DUE TO FORCE MAJEURE AND THEREBY CAUSE THE TERMINATION OF THE OPTION].</u> The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term **"*Purchase Option Period*"** shall ~~mean the 30-day~~ period commencing on the ~~later~~ <u>earlier</u> of (i) the ~~Maturity Date~~ <u>date of the Required Notice (as hereinafter defined),</u> and (ii) <u>the Maturity Date and expiring on the later of thirty days after (x) the Maturity Date and (y)</u> the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided,* that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers <u>(the "Required Notice")</u> that Lender ~~is in the process of selling or causing~~ <u>has elected to foreclose on, seek recovery against or sell or cause</u> to be sold any of the Collateral or ~~exercising~~ <u>exercise</u> the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further,* that Lender shall not <u>foreclose on, seek recovery against or</u> sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option. <u>Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, Lender agrees to give Borrower written notice thereof before Lender seeks to foreclose on, recover against or sell or cause to be sold any of the Collateral or seeks to exercise the voting, consent, or management rights of a holder of any Equity Interest.</u>

FIDD 003934
AA00409

## Erenbaum, Jessica

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Wednesday, February 17, 2010 6:00 PM |
| **To:** | 'Fine, Jeffrey' |
| **Subject:** | RE: Question on Break Up Fee |

Jeff, I appreciate the response, but it is not a fair response given what has happened since then. There are several things in the commitment letter that were heavily negotiated, carefully chosen and agreed upon and yet have either changed or been eliminated in their entirety. I am trying to address an issue that is a real issue and one that is sure to come up. If you are telling me that your client is unwilling to consider the issue and attempt to resolve and address it, which we think would be a reasonable thing to do, then please tell me that. I do not think there are many scenarios that I am concerned about. My sole concern is that your client refuses to fund after we get the final order for any reason (whether it is failure of title, failure of conditions etc etc) and we are able to get one of the other lenders to step up and fund notwithstanding the issue that prevented your client from funding, then it is pretty clear to us at least that no break up fee should be due and certainly not one at 25%.

Paul

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Wednesday, February 17, 2010 5:22 PM
**To:** Battista, Paul J.
**Subject:** RE: Question on Break Up Fee

Paul: There are many scenarios that could occur and the language both in the Loan Agreement, and the Commitment Letter before it, was carefully chosen, thoroughly negotiated and there were discussions on this very topic a number of times. Nothing has changed on this.

Thanks,

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

---

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Wednesday, February 17, 2010 2:20 PM
**To:** Fine, Jeffrey
**Cc:** Jane Houk; Patricia Redmond; Tony DiNardo; Guitian, Mariaelena; Schuster, Michael; Harmon, Heather
**Subject:** Question on Break Up Fee

Jeff, in reviewing the break up fee which we are trying to get approved, it occurs to us that it is possible that we could get the initial funding completed, and then we are unable to satisfy one or more of Pepi's conditions to closing on the final order (like title insuance etc). In that situation, it is possible that other lenders on the project could come forward with a

FIDD 003940

AA00410

funding package for their property and some general coverage. As drafted, it appears as though the break up fee of 1.0 mm may be due on a 4.0 mm loan. That does not seem to be the concept of the deal, including because it would be a 25% fee. Please confirm that the fee is only due if we try to replace your client when they are otherwise ready, willing and able to fund.

Thanx

## GENOVESE JOBLOVE & BATTISTA
P.A.
*Attorneys at Law*

**Paul J. Battista, Esq.**
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone: (305) 349-2300
Direct: (305) 372-2457
Facsimile: (305) 349-2310
Cell: (305) 812-8030
E-mail: pbattista@gjb-law.com

www.gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information contained herein. Also, please notify sender that you have received this communication in error, and delete the copy thereof you have received. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

FIDD 003941

AA00411

## Erenbaum, Jessica

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Thursday, February 18, 2010 10:37 AM |
| **To:** | 'Fine, Jeffrey' |
| **Subject:** | RE: Please call or email me asap on the remaning issues we discussed last night? |

Thanx.

Any update?  The day is beginning to get away from us in terms of filing.

Paul

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 7:10 AM
**To:** Battista, Paul J.
**Subject:** Re: Please call or email me asap on the remaning issues we discussed last night?

I wasn't able to reach elizabeth yet. We will put in a provision re the defaulted contracts. I need to speak with elizabeth re the purchase option language. I will get back to you as soon as possible.
Thank you.

Jeffrey Fine

----- Original Message -----
From: Battista, Paul J. <pbattista@gjb-law.com>
To: Fine, Jeffrey
Sent: Thu Feb 18 06:02:15 2010
Subject: Please call or email me asap on the remaning issues we discussed last night?

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.
-------------------------
Sent from my BlackBerry Wireless Device

This electronic message contains information from the law firm of K&L Gates LLP.  The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited.  If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

FIDD 000414

AA00412

| | |
|---|---|
| **From:** | Peter Desiderio |
| **Sent:** | Thursday, February 18, 2010 11:13 AM |
| **To:** | 'Helm, Elizabeth' |
| **Subject:** | RE: Fiddler's Creek Loan Sale Agreement |

Please advise as to the status of the redraft of the Purchase Option. Thanks.

Peter L. Desiderio, Esq.
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
New River Center, Suite 2100
200 East Las Olas Boulevard
Fort Lauderdale, Florida 33301
Phone: 954-462-9540
Fax: 954-462-9567
email: pdesiderio@stearnsweaver.com

1

SWM009563

AA00413

| | |
|---|---|
| **From:** | K Springfield |
| **To:** | Tony DiNardo |
| **Date:** | Thursday, February 18, 2010 11:41:14 AM |

Tony, I just talked to Jeff and they are completing language and you should have shortly.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

FIDD 006315
AA00414

| | |
|---|---|
| **From:** | Fine, Jeffrey <Jeff.Fine@klgates.com> |
| **Sent:** | Thursday, February 18, 2010 12:12 PM |
| **To:** | Battista, Paul J. |
| **Cc:** | k.springfield@pgrp.net; cj.lorio@pgrp.net; david.radunsky@pgrp.net; Helm, Elizabeth; Cox, John |
| **Subject:** | Fiddler's |

Paul:  Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this <u>Section 3.6</u> before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests.  In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the *"Designated Buyer"*) for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period.  The Designated Buyer may be any Debtor or any Affiliate of any Debtor.  Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person.  The purchase option shall be referenced in the Mortgages.  As used herein, the term *"Purchase Option Period"* shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further,* that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired.  Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or lifting of stay could threaten such Debtor's ability to operate in accordance with or execute the Business Plan; for purposes of clarity, an event of default under an agreement for debt for Money Borrowed, which event of default exists on the Petition Date, shall not be an Event of Default hereunder unless the additional events described in this <u>Section 9.8</u> have occurred;

Please let me know if you have any questions.

FIDD 003979
AA00415

Thanks!

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

FIDD 003980

AA00416

| From: | K Springfield |
|-------|---------------|
| Sent: | Thursday, February 18, 2010 12:13 PM |
| To: | Tony DiNardo |
| Subject: | FW: Fiddler's |

Here is the final language that was sent to Paul. No more changes so that you can go ahead and file.

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 11:12 AM
**To:** Battista, Paul J.
**Cc:** K Springfield; CJ Lorio; David Radunsky; Helm, Elizabeth; Cox, John
**Subject:** Fiddler's

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the *"Designated Buyer"*) for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term *"Purchase Option Period"* shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further,* that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or

REVIEW060481

AA00417

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Thursday, February 18, 2010 12:15 PM |
| **To:** | 'Fine, Jeffrey' |
| **Cc:** | k.springfield@pgrp.net; cj.lorio@pgrp.net; david.radunsky@pgrp.net; Helm, Elizabeth; Cox, John |
| **Subject:** | RE: Fiddler's |

Thanx Jeff. We are reviewing now and will respond asap. On the break up fee discussion from last night, I would propose to add a sentence to the DIP motion that clarifies the issue that we discussed.

Thanx and we will be right back to you

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 12:12 PM
**To:** Battista, Paul J.
**Cc:** k.springfield@pgrp.net; cj.lorio@pgrp.net; david.radunsky@pgrp.net; Helm, Elizabeth; Cox, John
**Subject:** Fiddler's

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the *"Designated Buyer"*) for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided,* that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term *"Purchase Option Period"* shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided,* that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further,* that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

FIDD 000418
AA00418

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or lifting of stay could threaten such Debtor's ability to operate in accordance with or execute the Business Plan; for purposes of clarity, an event of default under an agreement for debt for Money Borrowed, which event of default exists on the Petition Date, shall not be an Event of Default hereunder unless the additional events described in this <u>Section 9.8</u> have occurred;

Please let me know if you have any questions.

Thanks!

Jeffrey R. Fine
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

FIDD 000419
AA00419