# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

---

### CASE NO. 8:19-CV-00008-VMC
### BANKRUPTCY CASE NO. 8:10-BK-03846-CPM
### ADVERSARY CASE NO. 8:11-AP-00809-CPM

---

### PEPI CAPITAL, L.P.,

#### Appellant,

#### vs

### FIDDLER'S CREEK, LLC, et al.

#### Appellees.

---

### APPELLANT'S APPENDIX
### VOLUME 3
### AA00420-AA00650

---

### On Appeal from The United States Bankruptcy Court
### Middle District of Florida, Tampa Division

**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
*Attorneys for Pepi Capital, L.P.*

## TABLE OF CONTENTS

| VOL. | BATES RANGE | DOCUMENT |
|---|---|---|
| 3 | AA00420-AA00452 | Notice of Filing Exhibits in Support of Opposition to Debtors MPSJ,  filed March 2, 2015, (Doc No. 97 in Adv. Case No. 8:11-ap-00809) |
| 3 | AA00453 -AA00498 | Pepi Capital, L.P.'s Response In Opposition to Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed March 2, 2015, (Doc. No. 100 in Adv. Case No. 8:11-ap-00809) |
| 3 | AA00499-AA00551 | Plaintiffs' Reply to Defendant's Response to Motion for Partial Summary Judgment,  filed March 12, 2015, (Doc. No. 102 in Adv. Case No. 8:11-ap-00809) |
| 3 | AA00552-AA00650 | Plaintiff's Notice of Filing Additional Exhibits In Support of Plaintiff's Reply To Pepi Capital, L.P.'s Response In Opposition to Debtors' Motion for Partial Summary Judgment And Incorporated Memorandum of Law, filed March 12, 2015, (Doc No. 103 in Adv. Case No. 8:11-ap-00809) Part 1 |

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:                                          **Case No. 8:10-bk-03846-KRM**

**FIDDLER'S CREEK, LLC, et al.**
                                                **Jointly Administered**

                                                **Chapter 11**

                         Debtors.
_____/

**FIDDLER'S CREEK, LLC, et al.**

                         Plaintiffs,            **Adv. Pro. No. 8:11-ap-00809-KRM**
v.

**PEPI CAPITAL, L.P.**

                         Defendant.
_____/

### NOTICE OF FILING EXHIBITS IN SUPPORT OF RESPONSE IN OPPOSITION TO DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Pepi Capital, L.P. ("Pepi Capital"), by and through its undersigned counsel, hereby files the following in support of its Response in Opposition to Debtors' Motion for Partial Summary Judgment:

1.     Due Diligence Checklist email to Debtors 2/17/10 @ 1:43 p.m.

2.     Due Diligence Checklist email to Debtors 2/17/10 @ 4:24 p.m.

3.     Email from Debtors on 2/18/10 at 4:39 p.m., regarding due diligence on title insurance matters.

4.     Gulf Bay Loan Documents (excerpts) (DE 157).

Dated:  March 2, 2015.

**ROETZEL & ANDRESS**

/s/Alan J. Perlman
Alan J. Perlman
Florida Bar No. 826006
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile:  (954) 462-4260
E-mail:  aperlman@ralaw.com
*Attorneys for Pepi Capital, L.P.*

<u>**CERTIFICATE OF SERVICE**
**AND COMPLIANCE WITH LOCAL RULE 2090-1(A)**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on March 2, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

/s/Alan J. Perlman
Alan J. Perlman

AA00421

| From: | Helm, Elizabeth [Elizabeth.Helm@klgates.com] |
|---|---|
| Sent: | Wednesday, February 17, 2010 1:43 PM |
| To: | Jane Houk; Battista, Paul J.; Peter Desiderio |
| Cc: | McCaughan, William P.; Daniel, Rick; David Radunsky; Fields, David; CJ Lorio; K Springfield; Soards, Anthony; Cox, John; Fine, Jeffrey |
| Subject: | Closing checklist |
| Attachments: | DA-#3088816-v3-closing_checklist_(PEPI_Fiddler_s_Creek).DOC |

Attached is the updated closing checklist, based on what I understand to remain outstanding. Please advise respecting updates thereto.

**Elizabeth Helm**
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
214.939.5827
214.939.5849
elizabeth.helm@klgates.com

**This message and all attachments are confidential and may be protected by the attorney-client or other privileges. Any review, use, disclosure or distribution by persons other than the intended recipients is prohibited and may be unlawful. If you believe this message has been sent to you in error, please notify the sender by replying to this transmission or calling K&L Gates at 214-939-5500 and delete this message and any copy of it (in any form) without disclosing it. Unless expressly stated in this e-mail, nothing in this message should be construed as a digital or electronic signature.**

**As required by United States Treasury Regulations, this communication is not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on such taxpayer under United States federal tax laws.**

**Thank you.**

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Elizabeth.Helm@klgates.com.

1



No. 4-39
Name: DiNardo
Date: 4/9/15
Amory Ranck

SWM009258

**AA00422**

Closing Checklist
DIP Loan and Security Agreement
between
PEPI Capital, L.P. as agent and a lender,
Fiddler's Creek LLC and GB Peninsula, Ltd., as borrowers
and the guarantors party thereto

**Please note that, per discussion on 2.16, the indication of completion or receipt does not equate to an agreement that a condition to funding has been satisfied.**

*Loan Documents*

| | Document | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | DIP Loan and Security Agreement | KLG | | open |
| | Ex A – Real Property | | | awaiting final legal descriptions |
| | Ex B – Form of Interim Order | | | completed |
| | Ex C – Notice of Borrowing | | | completed |
| | Ex D – 18 Month Budget | | | received |
| | Ex E – Collateral Waterfall | | | awaiting legal descriptions to match the properties |
| | Ex F – Form of Deed of Trust | | | open |
| | Sched 5.1(a) – Unencumbered Collateral | | | outstanding |
| | Sched 5.1(b) – Collateral encumbered only by Permitted Liens | | | outstanding |
| | Sched 5.2 – Intellectual Property | | | outstanding |
| | Sched 5.3 – Material Contracts | | | outstanding |
| | Sched 5.5 – Debtors' Org Info | | | outstanding |
| | Sched 5.13 – Capitalization | | | outstanding |
| | Sched 7.3 – Min Release Price | | | received |
| 2 | Promissory Note | KLG | | final |
| 3 | Pledge Agreements | KLG | | Please advise if this is final |
| | a. GBFC II Two, LLC | | | |
| | b. GBFC II, L.P. | | | |
| | c. GB Peninsula, Inc. | | | |
| | d. *NEWCO [GBPenn LP?]* | | | |
| | Certificates/Powers of Sale | BC/KLG | | Our understanding is that only corporate interests are certificated; form of power of sale has been sent |
| 4 | Mortgages | KLG | | We are revising to add concepts related to the purchase option and the default issues raised 2.16. |
| | a. "Borrower" | | | |
| | b. "Guarantors". | | | |
| 5 | Assignments of Rents and Leases | KLG | | Please advise if this is final |
| | a. "Borrower" | | | |

SWM009259

AA00423

| | | | | |
|---|---|---|---|---|
| | b. "Guarantors" | | | |
| 6 | Environmental Indemnity Agreements | KLG | | Please advise if this is final |
| 7 | Subordination Agreement – Florida Financial Investments | KLG | | Revising |
| 8 | Deposit Account Control Agreements | | | *Debtors need to have their bank provide the proposed form* |
| 9 | Notice of final agreement | KLG | | Final |
| 10 | UCC-1 financing statement | KLG | | |
| | Fiddler's Creek LLC | | | |
| | GB Peninsula, Ltd. | | | |
| | 951 Land Holdings, Ltd. | | | |
| | 951 Land Holdings, LLC | | | |
| | DY Land Associates, Ltd. | | | |
| | DY Associates, LLC | | | |
| | DY Land Holdings II, LLC, | | | |
| | FC Beach, Ltd. | | | |
| | FC Beach, LLC | | | |
| | FC Commercial, LLC | | | |
| | FC Golf, Ltd. | | | |
| | FC Golf, LLC | | | |
| | FC Hotel, Ltd. | | | |
| | FC Hotel, LLC | | | |
| | FC Marina, LLC | | | |
| | FC Parcel 73, LLC | | | |
| | FC Resort, Ltd. | | | |
| | FC Resort LLC | | | |
| | Fiddler's Creek Management, Inc. | | | |
| | GBFC Development, Ltd. | | | |
| | GBFC Development, LLC | | | |
| | GBFC Marina, Ltd | | | |
| | GBP Development, Ltd. | | | |
| | Gulf Bay Hospitality Ltd | | | |
| | Gulf Bay Hospitality Company, LLC | | | |
| | Gulf Bay Hotel Company, Ltd | | | |
| | Gulf Bay Hotel Company, LLC | | | |
| | *GB 31, Ltd.* | | | |
| 11 | Authorization to file fin. stmt/UCC-1 financing statement | KLG | | |
| | a. GBFC II Two, LLC | | | |
| | b. GBFC II, L.P. | | | |
| | c. GB Peninsula, Inc. | | | |
| | d. *GBPenn, Ltd.* | | | |
| 12 | Opinion of obligors' counsel | KLG | | Draft sent to obligors' counsel |
| 13 | Closing instruction letter | KLG | | |
| 14 | Closing statement | Woodward | | |

CLOSING CHECKLIST – PAGE 2 OF 10

SWM009260

AA00424

*Due Diligence – Organizational*

| | Document | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | GB Peninsula, Inc. [pledgor and GP of GP Peninsula, Ltd.] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 2 | GB Peninsula, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 3 | GBP Development, LLC [GP of GBP Development, Ltd. and a guarantor] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 4 | FC Beach LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 5 | FC Beach Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 6 | GBFC Development LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 7 | GBFC Development Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |

SWM009261

AA00425

| 8 | DY Associates LLC | | | |
|---|---|---|---|---|
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 9. | DY Land Associates Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 10 | 951 Land Holdings, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 11 | 951 Land Holdings, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 12 | FC Golf LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | Certificate of Formation contains restrictions on guaranteeing third party debt |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 13 | FC Golf Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 14 | FC Marina LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |

CLOSING CHECKLIST – PAGE 4 OF 10

SWM009262

AA00426

| | | | | |
|---|---|---|---|---|
| | c. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 15 | GBFC Marina Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 16 | FC Hotel LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 17 | FC Hotel Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 18 | FC Resort LLC | | | |
| | a. Officer's certificate | | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 19 | FC Resort Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 20 | Gulf Bay Hotel Company, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 21 | Gulf Bay Hotel Company, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 22 | Gulf Bay Hospitality Company LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |

CLOSING CHECKLIST – PAGE 5 OF 10

SWM009263

AA00427

| | | | | |
|---|---|---|---|---|
| | f. Certificates of authority | | | X |
| 23 | Gulf Bay Hospitality Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 24 | Fiddler's Creek Management, Inc. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 25 | DY Land Holdings II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 26 | FC Commercial, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 27 | FC Parcel 73, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 28 | Fiddler's Creek, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |

SWM009264

AA00428

| 29 | GBP Development, Ltd. | | | |
|---|---|---|---|---|
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 30 | GBFC II Two, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | **Missing** |
| | f. Certificates of authority | | | **Missing** |
| 31 | GPFC II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | **Unnecessary** |
| 31 | GBFC II, L.P. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | **Missing** |
| | c. Operating agreement | | | **Missing** |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | **Missing** |
| | f. Certificates of authority | | | **Missing** |
| 32 | GB 31, Ltd. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | **Missing** |
| | f. Certificates of authority | | | **Missing** |
| 33 | GBPenn LP, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | **Unnecessary** |

*Due Diligence – Real Estate*

| | Item | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | Phase Is for the project | | | received |
| 2 | Most recent surveys of the project | | | received |
| 3 | Reissue of commitments by parties | Woodward | | received; minor comments from KLG |

SWM009265

AA00429

| | | | | have been given to Mark Woodward |
|---|---|---|---|---|
| 4 | Pro forma policies | Woodward | | *marked commitments will come before funding, based on agreements to changes to the commitments* |
| 5 | Zoning letters | | | part of CDD |
| 6 | Flood letters | | | received |
| 7 | Utility letters | | | part of CDD |
| 8 | Real property tax statements | | | received |
| 9 | Plats | | | received |
| 10 | Information for each CDD | | | received |
| 11 | Estoppel certs for each HOA | | | received some; some outstanding |
| 12 | List of all leases between any debtor and any of its affiliates | | | outstanding |
| 13 | List of obligations required to maintain entitlements and zoning | | | outstanding |
| 14 | List of unencumbered properties | Woodward | | Mark has identified and is revising to give legals |
| 15 | Identification of waterfall properties | Woodward | | Mark is revising to give legal descriptions |
| 16 | Proof of legals by title company | Woodward | | in process but not completed |
| 17 | Breakout of Marsh Cove property by owner | Woodward | | Mark is working on this |
| 18 | **Information needed from title company for tie-in endorsement** | | | **Are we still getting this endorsement?** |
| 19 | Confirmation from title company respecting restrictions in various org docs' raising a potential defense | | | outstanding; sent to underwriter; do not anticipate a response before tomorrow |

*Bankruptcy Requirements*

| | Item | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | Each Debtor's case is pending | | | |
| 2 | Each Debtor has filed its petition and 1st day motions | | | |
| 3 | Receipt of orders approving cash collateral and budget motions | | | |
| 4 | Receipt of payables aging and service list | | | received |
| 5 | Entry of interim order | | | |
| 6 | Evidence that no motion has been filed to appt a trustee or convert to Ch 7 | | | |

SWM009266

AA00430

*Other Diligence*

| | Item | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | Description of insurance and list of pending claims | | | received |
| 2 | Insurance policies and required endorsements | | | received policies; *need endorsements* |
| 3 | No material change in litigation | | | |
| 4 | Financial statements of each debtor | | | received |
| 5 | Reports of Project cash flow and revenue generating activity | | | received |
| 6 | Most recently filed federal and state tax returns for each debtor | | | received |
| 7 | 13 Week Budget for Debtors | | | **PEPI, please confirm receipt** |
| 8 | 18 Month Budget and business plan for Debtors | | | received |
| 9 | UCC/tax lien/judgment lien searches<br>Fiddler's Creek LLC<br>GB Peninsula, Ltd.<br>951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br>DY Land Associates, Ltd.<br>DY Associates, LLC<br>DY Land Holdings II, LLC,<br>FC Beach, Ltd.<br>FC Beach, LLC<br>FC Commercial, LLC<br>FC Golf, Ltd.<br>FC Golf, LLC<br>FC Hotel, Ltd.<br>FC Hotel, LLC<br>FC Marina, LLC<br>FC Parcel 73, LLC<br>FC Resort, Ltd.<br>FC Resort LLC<br>Fiddler's Creek Management, Inc.<br>GBFC Development, Ltd.<br>GBFC Development, LLC<br>GBFC Marina, LTD<br>GBP Development, Ltd.<br>Gulf Bay Hospitality Ltd<br>Gulf Bay Hospitality Company, LLC<br>Gulf Bay Hotel Company, Ltd<br>Gulf Bay Hotel Company, LLC<br>[GBP Development, LLC]<br><br>GBFC II Two, LLC [pledgor]<br>GBFC II, L.P. [pledgor]<br>GB Peninsula, Inc. [pledgor]<br>AJF [pledgor] | | | received for Debtors<br><br>**Please advise if debtors' counsel will obtain searches for the nondebtor pledgors.** |

CLOSING CHECKLIST – PAGE 9 OF 10

SWM009267

AA00431

| 10 | Current debt<br>a. List of all lenders<br>b. Description of facilities<br>c. Copies of all loan documents<br>d. Description of collateral | | | received |
|---|---|---|---|---|
| 11 | Collateral reports<br>a. ID of all receivables<br>b. list of deposits and anticipated forfeitures<br>c. list of fixed assets<br>d. list of IP owned or licensed<br>e. copies of all agreements containing a right of<br>first refusal for any collateral | | | **PEPI, please<br>confirm receipt** |
| 12 | Copies of joint venture agreements | | | **PEPI, please<br>confirm receipt** |
| 13 | Collateral/books/records review | | | completed |

CLOSING CHECKLIST – PAGE 10 OF 10

SWM009268

AA00432

| From: | Meister, Joseph [Joseph.Meister@klgates.com] |
|---|---|
| Sent: | Wednesday, February 17, 2010 4:24 PM |
| To: | Jane Houk |
| Cc: | Helm, Elizabeth; Cox, John; Daniel, Rick |
| Subject: | Outstanding Corporate Diligence Items |
| Attachments: | DA-#3089037-v4-Closing_Checklist_-_Meister.DOC |

Jane:

Attached again is the checklist of corporate diligence items. Of the outstanding items, the document I am most interested in reviewing is the **operating agreement for GBFC II, LP.**

Would you please send this to me as soon as possible?

Thx,

Joe Meister

**D. Joseph Meister**
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5441
Fax: 214.939.6100
E-mail: joseph.meister@klgates.com
Website: www.klgates.com

Anchorage | Austin | Beijing | Berlin | Boston | Charlotte | Chicago | Dallas | Dubai | Fort Worth | Frankfurt | Harrisburg | Hong Kong | London | Los Angeles | Miami | Moscow | New York | Newark | Orange County | Palo Alto | Paris | Pittsburgh | Portland | Raleigh | Research Triangle Park | San Diego | San Francisco | Seattle | Shanghai | Singapore | Spokane | Taipei | Tokyo | Washington, D.C.

<<DA-#3089037-v4-Closing_Checklist_-_Meister.DOC>>

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Joseph.Meister@klgates.com.



No.: 4-41
Name: DiNardo
Date: 2/9/15
Amory Ranck

SWM009534

AA00433

*Due Diligence – Organizational*

| | Document | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | GB Peninsula, Inc. [pledgor and GP of GP Peninsula, Ltd.] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 2 | GB Peninsula, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 3 | GBP Development, LLC [GP of GBP Development, Ltd. and a guarantor] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 4 | FC Beach LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 5 | FC Beach Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 6 | GBFC Development LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 7 | GBFC Development Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |

SWM000935
AA00434

| 8 | DY Associates LLC | | | |
|---|---|---|---|---|
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 9 | DY Land Associates Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 10 | 951 Land Holdings, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 11 | 951 Land Holdings, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 12 | FC Golf LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | Certificate of Formation contains restrictions on guaranteeing third party debt |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 13 | FC Golf Ltd | | | X |
| | a. Certificate of LP | | | |
| | b. LP agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 14 | FC Marina LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |

SWM0009536

AA00435

| | | | | |
|---|---|---|---|---|
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 15 | GBFC Marina Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 16 | FC Hotel LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 17 | FC Hotel Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 18 | FC Resort LLC | | | |
| | a. Officer's certificate | | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 19 | FC Resort Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 20 | Gulf Bay Hotel Company, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 21 | Gulf Bay Hotel Company, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 22 | Gulf Bay Hospitality Company LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |

SWM009537

AA00436

| | | | | |
|---|---|---|---|---|
| | f. Certificates of authority | | | X |
| 23 | Gulf Bay Hospitality Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 24 | Fiddler's Creek Management, Inc. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 25 | DY Land Holdings II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 26 | FC Commercial, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 27 | FC Parcel 73, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 28 | Fiddler's Creek, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |

SWM000958

AA00437

| 29 | GBP Development, Ltd. | | | |
|---|---|---|---|---|
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 30 | GBFC II Two, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | **Missing** |
| | f. Certificates of authority | | | **Missing** |
| 31 | GPFC II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | **Unnecessary** |
| 32 | GBFC II, L.P. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | **Missing** |
| | c. Operating agreement | | | **Missing** |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | **Missing** |
| | f. Certificates of authority | | | **Missing** |
| 33 | GB 31, Ltd. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | **Missing** |
| | f. Certificates of authority | | | **Missing** |
| 34 | GBPenn LP, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | **Unnecessary** |

**From:** Jane Houk
**Sent:** Thursday, February 18, 2010 4:39 PM
**To:** 'Helm, Elizabeth'
**Cc:** 'Mark Woodward'
**Subject:** FW: Language for Title Company on Organizational Documents

Jeff/Elizabeth:

As a condition precedent to the Loan Agreement, the Lender must receive confirmation from Chicago Title that the title insurance policies being issued for the benefit of the Lender will not include exceptions or defenses to coverages or payment based on prohibitions in the org docs. Alan has confirmed to us that there will be no exceptions to title for this issue. Please let me know if email below is acceptable to Lender, or if you have a specific confirmation form we need to get executed.

Thanks,
Jane

**From:** Atlas, Alan [mailto:AtlasA@CTT.com]
**Sent:** Thursday, February 18, 2010 12:40 PM
**To:** Jane Houk
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** RE: Language for Title Company on Organizational Documents

For purposes of insuring the lien of the DIP mortgage, I have no objections to the language below..

*Alan Atlas*

*State Underwriting Counsel*

**Fidelity National Title Group**

*4210 Metro Parkway, Suite 210*

*Fort Myers, FL 33916*

*Phone No. 239-275-8212, Ext. 223*

*Fax No. 239-275-3194*

*E-Mail Address:* *atlasa@ctt.com*

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Wednesday, February 17, 2010 6:17 PM
**To:** Atlas, Alan
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** FW: Language for Title Company on Organizational Documents

1



No: 4-45
Name: DiNardo
Date: 2/9/15
Amory Ranck

SWM009702

**AA00439**

Alan:

At your request, attached as a Word document are the relevant provisions in the organizational documents of each of the five entities mentioned to you previously. In addition, below are the relevant excerpts from the Motion and Order.

Please contact me if you have any questions regarding same.

Best regards,
Jane

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Wednesday, February 17, 2010 3:56 PM
**To:** Jane Houk
**Subject:** Language for Title Company on Organizational Documents

Here is the language now in the motion on this issue:

1.      Furthermore, none of the restrictive provisions contained in the Debtors' corporate governance documents would impair the Court's ability to approve the DIP Loan or the ability of the Debtors to file these Chapter 11 Cases. Specifically, the corporate governance documents of the following five (5) Debtors contain restrictive provisions which either (a) purport to require the consent of such Debtor's secured creditor to the DIP Loan, (b) contain restrictions upon the entering into of indebtedness or guarantying debts of others which would conflict with the terms of the DIP Loan, or (c) prohibit the filing of a bankruptcy petition: (i) FC Parcel 73, LLC (Tomen); (ii) FC Commercial, LLC (Tomen); (iii) DY Land Holdings II, LLC (Tomen); (iv) FC Golf, LLC (Textron); and (v) FC Golf, Ltd. (Textron).

2.      However, organizational documents do not supersede the rights afforded by the Bankruptcy Code, and this principal is expressly recognized in the Bankruptcy Code. For example, the definition of "property of the estate" in Section 541 provides that a debtor's becomes property of the estate "notwithstanding any provisions in an agreement, transfer instrument *or applicable nonbankruptcy law* that restricts or conditions such transfer of such interest by the debtor." 11 U.S.C. § 541(c)(1)(A) (emphasis added). Also, the Bankruptcy Code allows implementation of a chapter 11 plan of reorganization through amendments or additions to a debtor's organizational document. See, e.g., 11 U.S.C. § 1123(a)(5)(I) (noting that a chapter 11 "plan shall—provide adequate means for the plan's implementation, such as—amendment of the debtor's charter"); U.S.C. § 1123(a)(6) (noting that a chapter 11 plan shall "provide for the inclusion in the charter of the debtor . . . a provision prohibiting the issuance of nonvoting equity securities"); *see also,* <u>Final Order Authorizing Debtors</u>

2

SWM009703

AA00440

to, *inter alia*, Obtain Postpetition Secured Financing, C.P. # 527 at ¶ 17(i), *In re General Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (authorizing Debtors to implement any necessary amendment to its certificate of incorporation, bylaws or comparable governing documents in order to comply with post-petition DIP loan). Accordingly, the Debtors are entitled to pursue their rights under the Bankruptcy Code to use their cash and to encumber their property, regardless of any purported limitations contained in the organizational documents, so long as the Debtors obtain this Court's approval pursuant to the applicable provisions of the Bankruptcy code.

3.      Moreover, the purported restrictions in the organizational documents on the ability of certain Debtors to file a voluntary petition in bankruptcy constitute unenforceable pre-petition waivers which would adversely affect the interests of third parties. *See In re South East Fin. Associates, Inc.*, 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) (Paskay, J.) ("A prepetition waiver of bankruptcy benefits may be binding unless the agreement was obtained by coercion, fraud or mutual mistake of fact. Such waivers are not self-executing and are not binding on third parties. Thus, if a waiver adversely affects other creditors, it is unlikely that the waiver will be enforced.") (citations omitted).

4.      In this case, the Debtors have a large number of secured and unsecured creditors, each of whom is a third party that is not bound by any such restriction and would be detrimentally impacted by a dismissal, because the approval of the DIP Loan as contemplated by this Motion would be in the best interests of all creditors. As a result, these restrictions are unenforceable, and do not impair any Debtors' ability to institute these chapter 11 proceedings. *See Id.*

--------------------

Here is the language in the order that grants the ability to borrow money and grant liens:

In order to enable them to continue to operate their business during the Interim Period (as defined below), subject to the terms and conditions of this Interim Order, the DIP Loan Agreement, the other DIP Loan Documents, and the Budget (which Budget may not be materially amended or modified during the Interim Period), the Debtors are hereby authorized under the DIP Loan to borrow up to the amount of the Initial Advance during the Interim Period. Notwithstanding any provision of its certificate or articles of incorporation, bylaws, operating agreement, partnership agreement, membership agreement, certificate of formation, certificate of limited partnership, regulations, or comparable governing documents to the contrary, each Debtor is authorized to, and each officer, member, manager, partner, or other comparable authorized signatory of each

3

SWM009704

AA00441

Debtor is hereby authorized to cause such Debtor to, jointly and severally guarantee and pay the DIP Obligations of each other Debtor obligated under the DIP Loan Agreement, and pledge, mortgage and grant security interests in its assets to secure such DIP Obligations, and to execute and enter into any and all of the DIP Loan Agreement, the DIP Loan Documents, and all other documents and transactions necessary to implement and effectuate the terms of the DIP Loan and the DIP Loan Agreement.

Paul

**GENOVESE**
**JOBLOVE &**
**BATTISTA**
P.A.
*Attorneys at Law*
www.gjb-law.com

**Paul J. Battista, Esq.**
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone:    (305) 349-2300
Direct:    (305) 372-2457
Facsimile: (305) 349-2310
Cell:      (305) 812-8030
E-mail: pbattista@gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information contained herein. Also, please notify sender that you have received this communication in error, and delete the copy thereof you have received. Thank you.

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

SWM009705

AA00442

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| **FIDDLER'S CREEK, LLC.** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |
| | |
| | **(Jointly Administered under** |
| Debtors. | **Case No. 9:10-bk-03846-ALP)** |
| _____/ | |

**NOTICE OF FILING LOAN DOCUMENTS WITH GULF BAY CAPITAL, INC.**

Fiddler's Creek, LLC ("Fiddler's Creek"), by and through undersigned counsel, hereby

gives notice and files copies of the following documents: (i) Promissory Note by and between



No.: _10_
Name: GBC di Nardo
Date: _2/10/15_
Amory Ranck

AA00443

INSTR 4417002  OR 4555  PG 3218  RECORDED 4/13/2010 2:32 PM PAGES 143  Page 2 of 144
DWIGHT E. BROCK, COLLIER COUNTY CLERK OF THE CIRCUIT COURT
DOC@.35 $14,000.00  INT@.002 $8,000.00  REC $1,217.00  INDX $11.00
OBLD $4,000,000.00  OBLI $4,000,000.00

PREPARED BY RECORDING
REQUESTED BY, AND WHEN
RECORDED MAIL TO:

B. Michael Bachman, Jr., Esq.
Stichter Riedel Blain & Prosser P.A.
110 East Madison Street, Suite 200
Tampa, Florida  33602

MORTGAGE
ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND
FIXTURE FILING

MADE BY

FIDDLER'S CREEK, L.L.C., as Borrower,
GB PENINSULA, LTD., as Borrower and Mortgagor,

and each of

DY LAND ASSOCIATES, LTD.,
DY LAND HOLDINGS II, LLC, FC BEACH, LTD.,
FC COMMERCIAL, LLC, FC GOLF, LTD., FC HOTEL, LTD.,
FC PARCEL 73, LLC, FC RESORT, LTD.,
GBFC DEVELOPMENT, LTD., GBFC MARINA, LTD.,
GBP DEVELOPMENT, LTD., and 951 LAND HOLDINGS, LTD.,
as Mortgagors

to

GULF BAY CAPITAL, INC.,
a Florida corporation, as Mortgagee

---

Effective as of March 3, 2010

THE SECURED PARTY (MORTGAGEE) DESIRES THIS MORTGAGE TO BE INDEXED AGAINST
THE RECORD OWNERS OF THE REAL ESTATE DESCRIBED HEREIN.  THIS MORTGAGE IS
BEING RECORDED IN COLLIER COUNTY, FLORIDA, AND MORTGAGOR IS PAYING $8,000.00
IN NONRECURRING INTANGIBLE PERSONAL PROPERTY TAX AND $14,000.00 IN
DOCUMENTARY STAMP TAX TO THE CIRCUIT COURT FOR COLLIER COUNTY.

AA00444

# MORTGAGE
## ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

This Mortgage, Assignment of Rents, Security Agreement and Fixture Filing (this "Mortgage") is effective as of March 3, 2010 (the "Effective Date") and is made and entered into between Gulf Bay Capital, Inc., a Florida corporation ("Mortgagee"), and Fiddler's Creek, LLC, a Delaware limited liability company ("Fiddler's") and GB Peninsula, Ltd., a Florida limited partnership ("GB") (each of Fiddler's and GB shall be referred to herein individually as "Borrower" and collectively as "Borrowers") and all of the following (referred to herein collectively as "Mortgagor Guarantors"): DY Land Associates, Ltd., a Florida limited partnership, DY7 and Holdings II, LLC, a Florida limited liability company, FC Beach, Ltd., a Florida limited partnership, FC Commercial, LLC, a Florida limited liability company, FC Golf, Ltd., a Florida limited partnership, FC Hotel, Ltd., a Florida limited partnership, FC Parcel 73, LLC, a Florida limited liability company, FC Resort, Ltd., a Florida limited partnership, GBFC Development, Ltd., a Florida limited partnership, GBFC Marina, Ltd., a Florida limited partnership, GBP Development, Ltd., a Florida limited partnership, and 951 Land Holdings, Ltd., a Florida limited partnership. GB and Mortgagor Guarantors shall each be referred to in this Mortgage individually as "Mortgagor" and collectively as "Mortgagors". The Mortgagors are executing this Mortgage in their capacity as debtors-in-possession in the Chapter 11 Case. The principal place of business of Borrowers and Mortgagors is 8156 Fiddler's Creek Parkway, Naples, Florida 34114. The principal address of Mortgagee is 8156 Fiddler's Creek Parkway, Naples, Florida 34114.

## WITNESSETH:

WHEREAS, On February 23, 2010 (the "Petition Date") the Borrowers, the Mortgagor Guarantors and certain affiliates of the Mortgagor Guarantors (the Mortgagor Guarantors and certain affiliates of the Mortgagor Guarantors, other than the Borrowers, collectively, the "Guarantors"), filed voluntary petitions with the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division (such United States Bankruptcy Court or any other court having jurisdiction over the voluntary Chapter 11 bankruptcy filings by the Borrowers and Guarantors shall be referred to in this Mortgage as the "Bankruptcy Court") initiating a case under Chapter 11 of the Bankruptcy Code under the case numbers listed on Exhibit A attached hereto and made a part hereof (collectively, the "Chapter 11 Case") and Borrowers and Guarantors have continued in possession of their assets and in the operation and management of their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, Borrowers have an immediate need for funds to continue to operate their business and have requested that the Mortgagee extend Debtor-in-Possession financing on a first priority secured basis to Borrowers in connection with the Chapter 11 Case.

AA00445

law, including all amendments thereto which may become effective from time to time after the date hereof.

(h) <u>Sale of Personal Property</u>. Mortgagee shall have the discretionary right to cause some or all of the Property, which constitutes personal property, to be sold or otherwise disposed of in any combination and in any manner permitted by applicable law.

(i) For purposes of this power of sale, Mortgagee may elect to treat as personal property any Property which is intangible or which can be severed from the Premises or Improvements without causing structural damage. If it chooses to do so, Mortgagee may dispose of any personal property, in any manner permitted by Article 9 of the Uniform Commercial Code of the State in which the Property is located, including any public or private sale, or in any manner permitted by any other applicable law.

(ii) In connection with any sale or other disposition of such Property that is personal property, Mortgagor agrees that the following procedures constitute a commercially reasonable sale: Mortgagee shall mail written notice of the sale to Mortgagor not later than thirty (30) days prior to such sale. Mortgagee will publish notice of the sale in a local daily newspaper of general circulation. Upon receipt of any written request, Mortgagee will make the Property available to any bona fide prospective purchaser for inspection during reasonable business hours. Notwithstanding Mortgagee shall be under no obligation to consummate a sale if in its judgment, none of the offers received by it equals the fair value of the Property offered for sale. The foregoing procedures do not constitute the only procedures that may be commercially reasonable.

(i) <u>Foreclosure Sales; Exercise of Certain Remedies</u>.

(a) If the Property consists of more than one lot, parcel or item of property, Mortgagee may:

(x) Designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition, provided that the foreclosure sales and/or actions only as to the Designated Real Estate Collateral (as hereinafter defined) shall be subject to the provisions of <u>Section 6.3(i)(b)(x)</u>; and

(y) Elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under or in connection with judicial proceedings, or by virtue of a judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner Mortgagee may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale"; and any two or more, "Foreclosure Sales"), provided that the foreclosure sales and/or actions only as to the Designated Real Estate Collateral (as hereinafter defined) shall be subject to the provisions of <u>Section 6.3(i)(b)(x)</u>.

If Mortgagee chooses to have more than one Foreclosure Sale, Mortgagee at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same

15

AA00446

day, or on such different days and at such different times and in such order as Mortgagee may deem to be in its best interests. No Foreclosure Sale shall terminate or affect the liens of this Mortgage on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full.

(b)    Notwithstanding anything to the contrary set forth herein or in any other Loan Document:

(x)    Mortgagee may file one or more real property foreclosure actions in Florida state or federal court and obtain one or more judgments of foreclosure that permit foreclosure and/or auction sales of all or any part of the Property; *provided, however*, that **only** with respect to the real property collateral described in Exhibits C (3) through Exhibit C (10) attached hereto (the "Designated Real Estate Collateral") Mortgagee shall use its commercially reasonable efforts to (i) first hold foreclosure and/or auction sales on the collateral described in Exhibit C (1) and Exhibit C (2) (the "Previously Unencumbered Real Estate") and (ii) to conduct the foreclosure sales for the Designated Real Estate Collateral in the numerical order of each such Exhibit C (commencing with the Designated Real Estate Collateral in Exhibit C (3) and ending with the Designated Real Estate Collateral in Exhibit C (10)) in such a manner as not to obtain a final judgment of foreclosure on one of the properties identified in the list of the Designated Real Estate Collateral unless and until Mortgagee has previously used commercially reasonable efforts to first collect on the Designated Real Estate Collateral described in the numbered Exhibit C before it (for example, Exhibit C (3) is before Exhibit C (4) and Mortgagee agrees to use commercially reasonable efforts to hold foreclosure sales and/or auction on the property described in Exhibit C (3) before holding a foreclosure sale and/or auction on the Property described in Exhibit C (4)). In exercising Mortgagee's rights (including, without limitation, Mortgagee's obligation to use commercially reasonable efforts as set forth in this Section), Mortgagee shall be entitled to use, as the value of the Property, the price at which such Property is sold at any foreclosure auction at which there is competitive bidding. Notwithstanding anything to the contrary contained in this Section 6.3(i)(b)(x) or otherwise in this Mortgage, this provision shall not restrict or impose any limitations whatsoever on the Mortgagee from conducting foreclosure sales and/or auctions on any Property or other Collateral not specifically described in Exhibit C (3) through Exhibit C (10), nor restrict the Mortgagee from exercising any rights or enforcing other remedies at any time.

(y)    Except as otherwise provided in Section 6.3(i)(b)(x) respecting the order of realization on the Designated Real Estate Collateral, Mortgagee may (i) exercise its rights and remedies with respect to the Designated Real Estate Collateral and any other Property or Collateral (including, without limitation, Collateral which is Real Property) at any time after the occurrence and during the continuance of an Event of Default and (ii) Mortgagee shall not be required first to exhaust its rights and remedies against any particular Property or other Collateral, including, without limitation, Real Property, of each Borrower

16

AA00447

OR 4555  PG 3235

before pursuing Property or other Collateral, including, without limitation, Real Property, of any Guarantor.

(z)  Notwithstanding any of the provisions of this Section 6.3 to the contrary, Mortgagee may accept a deed in lieu of foreclosure with respect to any and all Property, without waiving any rights to subsequently foreclosure or pursue any and all other rights whatsoever against any Property.

6.4    Credit Bids.   At any Foreclosure Sale, any person, including Mortgagor or Mortgagee, may bid for and acquire the Property or any part of it to the extent permitted by then applicable law.  Instead of paying cash for such property, Mortgagee may settle for the purchase price by crediting the sales price of the property against the following obligations:

(a) First, the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Mortgagor is obligated to pay or reimburse Mortgagee under Section 5.9 of this Mortgage; and

(b) Second, all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose.

6.5    Application of Foreclosure Sale Proceeds.  Mortgagee shall apply the proceeds of any Foreclosure Sale in the following manner:

(a)    First, to pay the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Mortgagor is obligated to reimburse Mortgagee under Section 5.9 of this Mortgage;

(b)    Second, to pay the portion of the Secured Obligations attributable to any sums expended or advanced by Mortgagee under the terms of this Mortgage which then remain unpaid;

(c)    Third, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose; and

(d)    Fourth, to remit the remainder, if any, to the person or persons entitled to it.

6.6    Application of Rents and Other Sums.   Mortgagee shall apply any and all Rents collected by it, and any and all sums other than proceeds of a Foreclosure Sale which Mortgagee may receive or collect under Section 2.3 above, in the following manner:

(a)    First, to pay the portion of the Secured Obligations attributable to the costs and expenses of operation and collection that may be incurred by Mortgagee or any receiver;

(b)    Second, to pay all other Secured Obligations in any order and proportions as Mortgagee in its sole discretion may choose; and

(c)    Third, to remit the remainder, if any, to the person or persons entitled to it.

17

AA00448

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "Agreement") is effective as of the 3rd day of March, 2010 (the "Effective Date") and is made and entered into between Gulf Bay Capital, Inc., a Florida corporation ("Lender"), and Fiddler's Creek, LLC, a Delaware limited liability company ("Fiddler's") as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, and GB Peninsula, Ltd., a Florida limited partnership ("GB") as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (each of Fiddler's and GB shall be referred to herein individually as "Borrower" and collectively as "Borrowers") and all of the following as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code (each referred to herein individually as "Guarantor" and collectively as "Guarantors"): DY Associates, LLC, a Delaware limited liability company, DY Land Associates, Ltd, a Florida limited partnership, DY Land Holdings II, LLC, a Florida limited liability company, FC Beach, LLC, a Delaware limited liability company, FC Beach, Ltd., a Florida limited partnership, FC Commercial, LLC, a Florida limited liability company, FC Golf, LLC, a Delaware limited liability company, FC Golf, Ltd., Florida limited partnership, FC Hotel, LLC, a Delaware limited liability company, FC Hotel, Ltd., a Florida limited partnership, FC Marina, LLC, a Delaware limited liability company, FC Parcel 73, LLC, a Florida limited liability company, FC Resort, LLC, a Delaware limited liability company, FC Resort, Ltd., a Florida limited partnership, Fiddler's Creek Management, Inc., a Florida corporation, GBFC Development, LLC, a Delaware limited liability company, GBFC Development, Ltd., a Florida limited partnership, GBFC Marina, Ltd., a Florida limited partnership, GBP Development, LLC, a Florida limited liability company, GBP Development, Ltd., a Florida limited partnership, Gulf Bay Hospitality Company, LLC, a Delaware limited liability company, Gulf Bay Hospitality, Ltd., a Florida limited partnership, Gulf Bay Hotel Company, LLC, a Delaware limited liability company, Gulf Bay Hotel Company, Ltd., a Florida limited partnership, 951 Land Holdings, LLC, a Delaware limited liability company, and 951 Land Holdings, Ltd., a Florida limited partnership. The principal place of business of Borrowers and Guarantors is 8156 Fiddler's Creek Parkway, Naples, Florida 34114. In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, capitalized terms used in this Agreement have the meanings assigned to them in Schedule A (Definitions), attached hereto and made a part hereof.

### WITNESSETH:

WHEREAS, On February 23, 2010 (the "Petition Date") Debtors filed voluntary petitions with the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division (such United States Bankruptcy Court or any other court having jurisdiction over the anticipated voluntary Chapter 11 bankruptcy filings by the Borrowers and Guarantors shall be referred to in this Agreement as the "Bankruptcy Court") initiating a case under Chapter 11 of the Bankruptcy Code under the case numbers listed on Exhibit G hereto (collectively, the "Chapter 11 Case") and Debtors have continued in possession of their assets and in the operation and management of their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

#204904 v10

AA00449

WHEREAS, Borrowers have requested that the Lender enter into this Agreement to extend Debtor-in-Possession financing on a first priority secured basis to Borrowers in connection with the Chapter 11 Case.

WHEREAS, Each Guarantor has agreed to guaranty the obligations of each Borrower hereunder, and each of Borrowers and Guarantors has agreed to secure its obligations to Lender hereunder with first priority liens on and first priority senior security interests in favor of Lender on all of its property, whether real, personal or mixed, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein.

WHEREAS, Lender is willing to make the following loan to Borrowers (the "Loan"), subject to the terms, requirements, conditions and other provisions of this Agreement and subject to the approval of the Bankruptcy Court: (i) Lender shall provide a multiple advance senior secured debtor-in-possession term loan credit facility with cumulative aggregate Advances of up to $25,000,000, with the maximum outstanding balance at any one time not to exceed $12,000,000.00; (ii) each cash advance (an "Advance") made by Lender to Borrowers shall be made in accordance with the 18 Month Budget; provided that (a) from and after the entry of the Interim Order until the entry of the Final Order, the aggregate Advances (each such advance, an "Interim Advance") shall be consistent with the applicable 13 Week Budget for such period (or such lesser budgeted period approved by the Bankruptcy Court for such applicable period) and shall not in the aggregate exceed $4 million and (b) from and after the entry of the Final Order, the aggregate advances shall not exceed $25,000,000, less the aggregate amount of Interim Advances made; (iii) Advances shall be made in multiples of $100,000; (iv) the proceeds of the Loan shall be used in accordance with the Lender and Bankruptcy Court-approved 18 Month Budget and business plan and (v) subject to the Lender's approval, all real estate taxes, parcel administration real estate taxes, CDD debt service assessments, any CDD "on roll" assessments, contingency expenses and any other costs or expenses identified in the 18 Month Budget as "Managed Expenses" shall be paid only if the Borrowers obtain the applicable cumulative inventory sales set forth in Section 6.9 of this Agreement.

NOW THEREFORE, in consideration of the premises set forth above and the mutual covenants and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    LOAN ; PAYMENT TERMS; MATURITY.

1.1    Advances.

(a)    Subject to the terms and conditions of this Agreement, Lender agrees, on the terms and conditions set forth herein, to make (i) the Interim Advance(s) to Borrowers upon the fulfillment by Debtors of the applicable conditions set forth in Section 2 and (ii) all other Advances to Borrowers no more frequently than once every month, during the period from the Final Order Entry Date until the Maturity Date upon the fulfillment by Debtors of the applicable conditions set forth in Section 2. After giving effect to an Advance, (x) the aggregate amount of all Advances made to Borrowers, regardless of whether all or any part of such Advances have been repaid or are then outstanding, shall not exceed the Maximum Loan Amount, and (y) the aggregate amount of Advances then outstanding to Borrowers shall not exceed the Maximum

AA00450

        (iii)    If the sale is to be a public sale, Lender also shall give notice of the time and place by publishing a notice one time at least ten (10) days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

        (l)    Lender may credit bid and purchase at any public or private sale;

        (m)    Any deficiency that exists after disposition of the Debtor Collateral as provided above will be paid, jointly and severally, immediately by Debtors. Any excess will be returned, without interest and subject to the rights of third Persons, by Lender to Debtors; and

        (n)    In addition to the foregoing rights in this Section 8.2, Lender shall have all other rights and remedies available to it at law or in equity pursuant to any other Loan Documents, including any lease assignments, lease mortgages, and real property mortgages or deeds of trust.

    8.3    Remedies Cumulative. Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Orders, the Bankruptcy Code, the Code, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Default or Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

    8.4    Exercise of Certain Remedies. Notwithstanding anything to the contrary set forth herein or in any other Loan Document:

        (a)    Lender may file one or more real property foreclosure actions in Florida state or federal court and obtain one or more judgments of foreclosure that permit foreclosure and/or auction sales of all or any part of the Property; *provided, however,* that **only with respect to the real property collateral described in Exhibits E (3) through Exhibit E (10)** attached hereto (the "Designated Real Estate Collateral") Lender shall use its commercially reasonable efforts to (i) first hold foreclosure and/or auction sales on the collateral described in Exhibit E (1) and Exhibit E (2) (the "Previously Unencumbered Real Estate") and (ii) to conduct the foreclosure sales for the Designated Real Estate Collateral in the numerical order of each such Exhibit E (commencing with the Designated Real Estate Collateral in Exhibit E (3) and ending with the Designated Real Estate Collateral in Exhibit E (10)) in such a manner as not to obtain a final judgment of foreclosure on one of the properties identified in the list of the Designated Real Estate Collateral unless and until Lender has previously used commercially reasonable efforts to first collect out of the Designated Real Estate Collateral described in the numbered Exhibit E before it (for example, Exhibit E (3) is before Exhibit E (4) and Lender agrees to use commercially reasonable efforts to hold foreclosure sales and/or auction on the property described in Exhibit E (3) before holding a foreclosure sale and/or auction on the Property described in Exhibit E (4)). In exercising Lender's rights (including, without limitation, Lender's obligation to use commercially reasonable efforts as set forth in this Section), Lender shall be entitled to use, as the value of the Property, the price at which such Property is sold at any foreclosure auction at which there is competitive bidding. Notwithstanding anything to the contrary contained in this Section 8.4(a) or otherwise in this Mortgage, this provision shall not

#204904 v10

AA00451

restrict or impose any limitations whatsoever on the Lender from conducting foreclosure sales and/or auctions on any Property or other Collateral not specifically described in Exhibit E (3) through Exhibit E (10), nor restrict the Lender from exercising any rights or enforcing other remedies at any time.

(b)  Except as otherwise provided in <u>Section 8.4(a)</u> respecting the order of realization on the Designated Real Estate Collateral, Lender may (i) exercise its rights and remedies with respect to the Designated Real Estate Collateral and any other Property or Collateral (including, without limitation, Collateral which is Real Property) at any time after the occurrence and during the continuance of an Event of Default and (ii) Lender shall not be required first to exhaust its rights and remedies against any particular Property or other Collateral, including, without limitation, Real Property, of each Borrower before pursuing Property or other Collateral, including, without limitation, Real Property, of any Guarantor.

(c)  Notwithstanding any of the provisions of this <u>Section 8.4</u> to the contrary, Lender may accept a deed in lieu of foreclosure with respect to any and all Property, without waiving any rights to subsequently foreclosure or pursue any and all other rights whatsoever against any Property.

9.    **TAXES AND EXPENSES.**

Unless prohibited by the Bankruptcy Code or Bankruptcy Court, if any Debtor fails to pay any monies (whether taxes, rents, assessments, insurance premiums, or otherwise) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, to the extent that Lender determines that such failure by such Debtor could result in a Material Adverse Change, in its discretion and without prior notice to Debtors, Lender may do any or all of the following: (a) make payment of the same or any part thereof; (b) set up such reserves in Borrowers' loan account as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in <u>Section 2(j)</u>, and take any action with respect to such policies as Lender deems prudent. Any such amounts paid by Lender shall constitute Lender Expenses. Any such payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Default or Event of Default under this Agreement. Lender need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

10.   **WAIVERS.**

10.1  <u>Demand; Protest, etc.</u>  Each Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of acceleration, notice of intent to accelerate, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Debtor may in any way be liable, *provided*, that Lender shall give Borrowers notice of default prior to Lender's exercise (after the expiration of all applicable cure periods) of rights and remedies against the Collateral.

#204904 v10

28

AA00452

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In re:                                         **Case No. 8:10-bk-03846-KRM**

**FIDDLER'S CREEK, LLC, et al.**

                                                **Jointly Administered**
                                                **Chapter 11**

          Debtors.
_____/

**FIDDLER'S CREEK, LLC, et al.**

          **Plaintiffs/Counterdefendants,**     **Adv. Pro. No. 8:11-ap-00809-KRM**

v.

**PEPI CAPITAL, L.P.**

          **Defendant/Counterplaintiff and**
          **Third Party Plaintiff.**
_____/

**PEPI CAPITAL, L.P.**

          **Third Party Plaintiff,**

v.

**GULF BAY CAPITAL, INC.,**

          **Third Party Defendant.**
_____/

## PEPI CAPITAL, L.P.'S RESPONSE IN OPPOSITION TO DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

PEPI Capital, L.P. ("PEPI"), by and through its undersigned counsel and pursuant to Rule

56 of the Federal Rules of Civil Procedure, made applicable to these proceedings by virtue of

Rule 7056 of the Federal Rules of Bankruptcy Procedure, respectfully files its Response in

Opposition to the Debtors' Motion for Partial Summary Judgment [DE 84] with respect to Count

AA00453

I (Breach of Contract) and Count II (Breach of the Covenant of Good Faith and Fair Dealing) [DE 1], and requests that this Court enter a judgment in favor of PEPI, awarding PEPI the balance of the Commitment Fee and the Break Up Fee owed by the Debtors under the applicable agreement, plus post-petition interest, attorneys' fees and costs it incurred,[1] and in support of the relief requested herein, PEPI states as follows:

### Preliminary Statement

Simply put, PEPI disputes the factual allegations asserted by the Debtors', as well as the legal basis relied upon in connection with the Debtors' Motion. Indeed, although conspicuously absent from the Debtors' brief, there are a multitude of legal theories that preclude any ability for the Court to grant the relief requested by the Debtors. This conclusion is likewise compelled based on the facts as well. However, prior to that presentation and analysis, somewhat of an overview is needed so the Court has a proper understanding of the matters raised and the context related thereto.

Indeed, this is required for two significant reasons. First, the Debtors failed to incorporate, let alone touch upon, the numerous legal issues involved, including the most fundamental concerning the duty to negotiate in good faith. Second, to correct the Debtors attempt to distract the Court from the dispositive fact that only _after_ the Debtors' turned to Mr. Ferrao to replace PEPI did the Debtors declare a default, which  a) not coincidentally, occurred literally within hours after PEPI rejected their efforts to modify a provision in the Commitment Letter that jeopardized Mr. Ferrao's only vehicle to safeguard his equity – the Purchase Option;

---

[1] The Debtors have conceded that if PEPI was not in default, the Debtors owe PEPI the entire Commitment Fee and Break-up Fee under the Commitment Letter (DiNardo, p. 40, DiNardo/Gulf Bay, p. 23).

AA00454

and b) in doing so, the Debtors provided no notice of termination or an opportunity to cure to PEPI.

## I.   UNDISPUTED FACTS

### A.   Overview

For a period of several months prior to the Debtors filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code, PEPI and the Debtors diligently negotiated a complicated $27,000,000.00 DIP Loan for the benefit of the Debtors.  Affidavit of Jeffrey R. Fine, ¶ 5. During this time, PEPI continuously made significant concessions to alleviate all concerns and requests made by the Debtors, and in turn, received repeated assurances by the Debtors and Aubrey Ferrao ("Ferrao"), the Managing Member of the Debtors, that PEPI would be the DIP Loan lender for the Debtors.  *Id.*  Notwithstanding the continuing efforts to finalize the underlying loan documents, at the very end it appeared that the Debtors were reluctant to comply with the obligation of obtaining a release in favor of PEPI in connection with any assignment of the loan to an insider of the Debtors, as required under the Purchase Option[2] provision of the Commitment Letter.  *Id., ¶* 6. In addition to the possible loss of Mr. Ferrao's only device to protect his equity, the Debtors were also concerned that PEPI's intention was a "loan to own" (Ferrao Trans., p. 48).

Consequently, on the eve of the Debtors' Chapter 11 filings, with no prior warnings or indication of any potential termination, and instead of negotiating in good faith with PEPI, and only <u>after</u> the Debtors obtained Mr. Ferrao's secret agreement to be the new DIP lender, the Debtors manufactured a purported Default Letter alleging reasons the Debtors believed PEPI

---

[2] Significantly, per the Debtors testimony, the Purchase Option was the sole and final safety net for Mr. Ferrao to safeguard his tens of millions of dollars in equity in the project from PEPI in the event of a default.  (DiNardo, p. 54-55, Ferrao p. 15, 16, 18, 43-44)

3

would not fund the DIP Loan and, therefore, was in default under the Commitment Letter. (Fine Aff). Unlike prior negotiation experiences, however, which included the resolution of issues presented during the course of the loan documentation process, the Debtors, *after* securing the replacement loan with Mr. Ferrao, and being non-responsive for several days, actually unilaterally terminated the DIP Loan Agreement and provided no opportunity for PEPI to cure or deal with the manufactured alleged default. Fine Aff., ¶ 6.  Nonetheless, within 24 hours, PEPI responded that it was in fact ready, willing, and able to fund the loan per the Commitment Letter and the applicable loan documents. *Id.*

What actually transpired is both significant and dispositive to the issue to be decided by the Court – who breached first.  Instead of complying with the Commitment Letter and negotiating in good faith, secretly the Debtors and Mr. Ferrao, ultimately via his other entity, Gulf Bay Capital, Inc. ("Gulf Bay"), chose to utilize virtually the same confidential documents negotiated by PEPI and the Debtors to facilitate fundamentally the same DIP loan that PEPI was prepared to fund to the Debtors (with all of its nuanced, particular, and unusual provisions).  Fine Aff., ¶ 7.  Notably, what took PEPI and the Debtors several months to negotiate, Ferrao, through Gulf Bay, was able to achieve in less than three (3) days or so. Only now, given the manufactured termination, the Purchase Option for the insider was a non-issue, the Debtors obligation under the Break Up Fee could in theory be disputed, there was no risk of a "loan to own" and most importantly, knowing an insider priming lien was a problem, the Debtors were able to choreograph the appearance of no other option for financing in its bankruptcy cases, which were filed the very next day.

**B.      The Negotiation and Execution of the Commitment Letter.**

Specifically, on October 20, 2009, the Debtors signed a Term Sheet with PEPI that outlined the general provisions of a DIP Loan to the Debtors and certain of its subsidiaries and affiliates for up to $27,000,000.00.  *Id., ¶* 8.  Upon execution of the Term Sheet, Ferrao, as the Managing Member of the Debtors, and the Debtors' counsel participated in key telephone conferences with PEPI to finalize the terms of the DIP Loan.  *Id., ¶* 9.  During the course of negotiating the Commitment Letter, the Debtors and Ferrao demanded that the Commitment Letter include significant and unusual provisions.  *Id., ¶* 10.  First, instead of a customary provision that upon a default, the lender has a right to foreclose on whatever collateral the lender chooses, the Debtors insisted that the DIP Loan contain a waterfall concept that specified the order of priority of the collateral to be sold by PEPI in the event the Debtors were in default under the DIP Loan.  *Id.*

PEPI acquiesced and the waterfall concept was included in the Commitment Letter.  In connection with the waterfall concept, the Debtors suggested, for PEPI's benefit (to "speed" the foreclosure and sale process), that deeds in lieu of foreclosure and consent judgments be held in escrow and used instead of an ordinary foreclosure process.  *Id., ¶* 11.  Although the deeds in lieu of foreclosure and consent judgment provision were included in the Commitment Letter, the parties later learned that, apparently, said instruments were not available under Florida law in connection with an initial loan or created an issue for title insurance.  *Id., ¶* 12.  As a result, because said provisions were either subject to waiver as a benefit of PEPI or simply not performable under Florida law, the deeds in lieu of foreclosure and consent judgment provisions were not included for the time being in certain draft loan documents being negotiated by the

5

parties at that time. *Id.* Nevertheless, throughout the process, PEPI remained in agreement with the waterfall concept, a fact it communicated to the Debtors many times. *Id.*

Second, very late in the negotiation process, Ferrao raised a new term - that he would require a right of first refusal for the Debtors' principal to acquire the DIP Loan from PEPI upon default of the DIP Loan. *Id.* Not satisfied with restricting PEPI's ability to sell particular properties through the use of the waterfall concept, Ferrao demanded that he have the ability to take over the loan obligations himself upon a default (the "Purchase Option"). *Id.* Such a provision was included in the Commitment Letter. *Id.* The Debtors and PEPI eventually signed the Commitment Letter effective December 31, 2009. *Id.*, ¶ 14.

### C. Items Related to Due Diligence, the Loan Documents, and Closing.

The parties continued to finalize the necessary loan documents in order to close under the facility. *Id.*, ¶ 15. In order to successfully close the DIP Loan and fund, numerous conditions precedent needed to be satisfied pursuant to the parties' Closing and Due Diligence Checklist. *Id.* As the parties progressed towards finalizing the documents to close and fund the DIP Loan, PEPI updated the items set forth in the above-mentioned checklists. *Id.* At all times, the due diligence review and closing process was extensive, was ongoing in nature and continuously updated. *Id.* Multiple parties on behalf of the Debtors and PEPI were tasked with working on specified matters, especially in view of the magnitude of the transaction contemplated by the Commitment Letter. *Id.* Indeed, the legal description of the property that was to be encumbered by the DIP Loan was over fifty (50) pages. *Id.*

PEPI was prepared to proceed with the DIP Loan pursuant to the Commitment Letter (unless otherwise agreed), a fact it communicated to the Debtors numerous times, including on

AA00458

February 16, 2010. *Id.,* ¶ 16. By February 17, 2010, the actual DIP Loan documents were substantially completed, which Debtors' counsel communicated to Affiant in an e-mail that very day. *Id.*

During this time, it also appeared that all of the loan documents were close to final form and ready for filing (with the primary exception of the Purchase Option). *Id.,* ¶ 17. As such, the Debtors were only commenting on the break-up fee in the event PEPI was not the DIP lender and the Purchase Option. *Id.* For example, the Debtors' counsel requested clarification of a scenario he believed was "a real issue and one that [was] sure to come up." *Id.* Indeed, the Debtors wanted confirmation that that the negotiated break-up fee would only be due "if [the Debtors] tr[ied] to replace [PEPI] when [PEPI was] otherwise ready, willing, and able to fund." *Id.* Pursuant to the course of conduct between the parties, this aspect, like many others, was resolved. *Id.*

With respect to the Purchase Option mentioned above, the Commitment Letter required that the Debtors execute a full release in favor of PEPI, which had to be approved by the Bankruptcy Court. *Id.,* ¶ 18. Contrary to the mandatory language in the Commitment Letter, the Debtors proposed language requesting instead that PEPI simply accept an assignment and indemnification. *Id.* On February 18, 2010, counsel for PEPI sent counsel for the Debtors an e-mail including the final language of the Purchase Option that it would accept, keeping the language related to the full release, and PEPI also informed the Debtors that it may proceed to file the Debtors' Chapter 11 cases. *Id.,* ¶ 19. On February 19, 2010, PEPI believed the issues raised by the Debtors related to the Purchase Option were nearing resolution. *Id.*, ¶ 20. PEPI expected that the Debtors would file their bankruptcy petitions any time and that the DIP Loan would close with PEPI as the lender. *Id.* To the surprise of PEPI, the Debtors ceased

7

communicating with PEPI, and in response to an inquiry regarding the sudden silence, the Debtors' misled PEPI intentionally and stated that it was conferring with counsel. *Id.,* ¶ 21. The Debtors' silence was ended with the termination and the bankruptcy filings the next day, with its affiliate (Gulf Bay) as the proposed DIP lender. *Id.*

However, unbeknownst to PEPI, following PEPI's 5:00 p.m. or so rejection of the Debtors' request to modify the Purchase Option under the Commitment Letter (*Id.*), within hours the Debtors reached out to Mr. Ferrao for the very first time to suggest that he be the new DIP Lender (DiNardo, pgs. 183, 184; Ferrao, p. 30). After thinking about it overnight, in the following morning (2/19/10) he agreed to provide the facility. *Id.* Only <u>AFTER</u> Mr. Ferrao agreed to replace PEPI, did the Debtors' decide to declare a default (DiNardo, p. 194; Ferrao, p. 28), which still was not communicated to PEPI until several days later, on February 22, 2010. (*Id.;* Fine Aff. ¶ 26 (vi, ix). Quite interesting, is that although the Debtors' abandoned the negotiations with PEPI and procured Mr. Ferrao as the new lender, the Debtors' kept it a secret from PEPI and instead misled them to believe they were simply conferring with counsel. (Fine Aff., Note 7). Given no knowledge of the Debtors' true actions, PEPI continued to attempt to finalize the open issue on the Purchase Option and continued its efforts to pursue to close the loan (Fine Aff., ¶ 26 xviii, xix, xx) - actions clearly not demonstrative of a party allegedly in breach.

## II.   <u>SUMMARY OF ARGUMENTS</u>

Given that the legal analysis is very extensive, in an effort to assist the Court, the following shall serve as a summary of the legal positions, which are organized based on the corresponding issues raised in the Motion:

AA00460

### A.    Breach of Contract

I.    Alleged Default – <u>ESCROW</u>:  suggested removal of escrow provision, whereby stipulated judgment of foreclosure and deeds in lieu would be held in escrow "to speed the foreclosure and sale process" for PEPI:

    i.    Debtors' Motion is legally flawed and factually deficient because it fails to: a) assert any damages which is required to maintain a breach claim; and/or b) affirmatively demonstrate the ability to perform, and the relief requested is not contained in the Complaint, thereby precluding any relief whatsoever.

    ii.    Any such request was simply a suggestion/request in the form of a negotiation and never presented as an unequivocal demand, thus never rising to the level of, or constituting, a breach.

    iii.    Given a foreclosure was still required, the request was not a "material" breach by any definition and regardless, the need to foreclose under Florida law rendered the request "substantially the same" as permitted by the Commitment Letter.

    iv.    The provisions are not "performable" under Florida law, so the removal could never create a material breach.

    v.    Because the escrow provision was a right and benefit of PEPI to "speed" the foreclosure, PEPI was free to waive same (no different than Gulf Bay waived under the Court approved DIP Facility).

    vi.    By continuing to negotiate the various issues and loan agreements, the Debtors' voluntarily waived any alleged breach so as to pursue the DIP facility.

    vii.    By intentionally misleading PEPI as to the status of the completion of the negotiations of the final loan agreements, and intentionally failing to advise PEPI of the secret and purported breach, the Debtors' are estopped from asserting any breach prior to February 22, 2010, which is subsequent to a breach by the Debtors.

    viii.    By abandoning the negotiations with PEPI and instead obtaining a replacement DIP lender via Mr. Ferrao, the Debtors' breached their obligation to negotiate in good faith with PEPI, as well as the duty of good faith and fair dealings and/or course of conduct.    Moreover, the Debtors breached the Commitment Letter and the above duties yet again by intentionally refusing to not only inform PEPI at that very moment, but by instead misrepresenting the precise facts and delaying the delivery of the true facts to the point where it was too late for PEPI to resolve the matters raised.  Additionally, the Debtors' also breached their obligations to negotiate in good faith/good faith and fair dealings, by not

AA00461

providing PEPI with notice and an opportunity to cure. The Debtors likewise breached the Commitment Letter by disclosing same to Gulf Bay. By this conduct, the Debtors' either breached first or have unclean hands, either of which preclude the relief requested.

II.     Alleged Default – <u>WATERFALL</u>:  suggested mechanism of one or more foreclosure judgments which restricted PEPI's sale process to the Debtors' specified list in which properties would be sold one at a time upon a default.

i.  Debtors' Motion is legally flawed and factually deficient  - incorporating A(I)(i).

ii.  Any such request was simply a suggestion/request in the form of a negotiation and never presented as an unequivocal demand – incorporating A(I)(ii).

iii. Given that the Debtors proposed and in fact still insist upon, stipulated judgments of foreclosure  in escrow *for* PEPI, the entry of 1 single foreclosure judgment that restricts the order in which properties shall be sold per the Waterfall list,  is not material and regardless constitutes "substantially the same" as allowed under the Commitment Letter, particularly  in view of the controlling provision to use "commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list."

iv. The Debtors' assertion is not legally performable under res judicata and Florida law, and therefore no material breach can exist.

v.  By continuing to negotiate the various issues and loan agreements, the Debtors' voluntarily waived any alleged breach - incorporating A(I)(vi).

vi. By intentionally misleading PEPI as to the status of the completion of the negotiations of the final loan agreements, and intentionally failing to advise PEPI of the secret and purported breach, the Debtors' are estopped - incorporating A(I)(vii).

vii. By abandoning the negotiations with PEPI and instead obtaining a replacement DIP lender via Mr. Ferrao, the Debtors' breached their obligation to negotiate in good faith with PEPI, as well as the duty of good faith and fair dealings and/or course of conduct, etc., and  either breached first or have unclean hands - incorporating A(I)(viii).

10

**B.    Anticipatory Breach**

I.    Alleged Default – refusal by PEPI to issue a "written" due diligence sign off as a

pre-condition to the Debtors filing their bankruptcy proceedings.

    i.  Debtors' Motion is legally flawed and factually deficient because it  seeks relief never plead in the Complaint, and also fails to affirmatively demonstrate the mandatory element of the ability to perform or damages for that matter, thereby precluding any relief whatsoever.

    ii.  Due diligence is one of many conditions precedent solely to the actual "funding" (not filing) under the Commitment Letter, which would only occur subsequent to the commencement of a bankruptcy.

    iii.  PEPI regularly advised the Debtors via a checklist and verbally as to the completion of certain due diligence as contemplated by the Commitment Letter. Thus, any allegation of a breach was premature given that due diligence continued under the Commitment Letter until funding and therefore no breach could be alleged any earlier. Consequently, the alleged breach was not "material" given that other conditions precedent existed that needed to be satisfied prior to any actual funding.

    iv.  There is no obligation for PEPI to deliver a "written" due diligence sign off to PEPI under the Commitment Letter as a prerequisite to the Debtors filing bankruptcy. Rather, the provision mistakenly relied upon by the Debtors is solely a right of PEPI to terminate its obligations to fund under the Commitment Letter and because it is clear and unambiguous, the Debtors' are legally prohibited from asking this Court to re-write said provisions.

    v.  By continuing to negotiate the various issues and loan agreements, the Debtors' voluntarily waived any alleged breach so as to pursue the DIP facility - incorporating A(I)(vi).

    vi.  By intentionally misleading PEPI as to the status of the completion of the negotiations of the final loan agreements, and intentionally failing to advise PEPI of the secret and purported breach, the Debtors' are estopped - incorporating A(I)(vii).

    vii.  By abandoning the negotiations with PEPI and instead obtaining a replacement DIP lender via Mr. Ferrao, the Debtors' breached their obligation to negotiate in good faith with PEPI, as well as the duty of good faith and fair dealings and/or course of conduct, etc. and either breached first or have unclean hands - incorporating A(I)(viii).

AA00463

## III.    LEGAL ARGUMENT

Based on the disputed material facts and the applicable law, the Debtors are precluded from obtaining  any relief by way of their Motion.  This conclusion is inescapable based on the following facts and legal arguments:

### A.    PEPI's Suggested Removal of Escrow Provisions Did Not Constitute a Material Breach of the Commitment Letter

i.    Debtors' Motion is legally flawed and factually deficient, thereby <u>precluding any relief whatsoever.</u>

First, both sides agree that under Florida law, damages are a mandatory element for a breach of contract claim to properly exist.   The Debtors' Motion however, fails to affirmatively assert damages, which is fatal.   See <u>Belle RP, LLC v. JPS Capital Partners, LLC</u>, 2009 WL 3644343 (S.D. Fla. 2009) (general issues of material fact as to damages precluded summary judgment).  Instead, the Debtors' actually only request a declaratory determination, a count never pled in either Count I or II of its Complaint.  See Motion, pgs. 5, 6, 22, 24, 28, 33, and 35. Consequently, no claim for a breach has been factually established and there is no right to adjudicate a non-existent, surprise  declaratory claim.[3]

Moreover, the Motion is deficient given that the Complaint asserts the element that the "Debtors performed  all  of  their  duties  and  obligations  pursuant  to  the  Term  Sheet  and Commitment Letter"  (DE 1, p. 8, ¶ 33).  Yet no evidence exists or has been presented in this regard, thereby precluding any relief.  Nor is there any undisputed fact in support of Debtors self-

---

[3] PEPI objects to and would oppose any effort by the Debtors' to attempt to cure these defects in any reply.  They are limited to their Motion and any effort to supplement the Motion would be procedurally improper and fundamentally prejudicial.  Second, their designated representative failed to perform the task associated with this area and additionally did not timely produce certain records related thereto.  As a result, it would be unfair and prejudicial to allow the Debtors to benefit from their discovery manipulation.

AA00464

serving and unfounded statement that "at the time of PEPI's breach, the Debtors were in full compliance with the Commitment Letter." (Motion, p. 5). Based on the complete void regarding these elements, the Motion must be denied. See, <u>Randolph Equities, LLC v. Carbon Capital, Inc.</u>, 648 F.Supp. 2d 507, 520 (S.D.N.Y. 2009) (to prevail on breach claims, plaintiff must establish that it was ready, willing, and able to satisfy preconditions to closing). See also, <u>U.S. v. Speed</u>, 75 U.S. 77, 81 (1868) (before claimant can recover for breach, he must show a readiness, a willingness, and an offer on his part to perform); <u>Terell v. Nelson</u>, 58 So. 989 (1912) (he who seeks to recover for the breach of a contact must aver an ability, readiness, or willingness to comply with same).

> ii.     Any such request was simply a suggestion by PEPI while negotiating the loan documents and no facts exist that suggest it was an absolute unequivocal <u>demand, thereby never constituting a breach.</u>

Initially, it is critical for the Court to realize that even the Debtors' have agreed that the negotiations by PEPI in this regard were mere "suggestions" and in no way demands. This is self-evident from the Debtors' Motion itself, which consistently refers to the process as "proposed amendments", "agreeing on amending" and "PEPI was free to suggest" (Motion , pgs. 4, 5, 13).   Importantly, however, nowhere do the Debtors demonstrate any evidence that such proposals were anything other than that  - negotiations.  All that is asserted by the Debtors is a factually lacking and baseless argument that PEPI "refused" to incorporate the escrow provision. However, that is contradicted by their very own Motion and evidence, as well as the Fine Affidavit.

Specifically, the Debtors mistakenly rely on their Exhibit 16, whereby Mr. Lorio merely sends an email to "propose" deleting the provision to avoid complexity and advance the loan process (Motion, p. 14).  Likewise, Mr. Fine's actual deposition testimony is contrary to the

13

Debtors own argument – " that there would be a mechanism that would be acceptable." (Fine Depo. p. 136, 1 20) (emphasis added). Contrary to the Debtors presentation, Mr. Fine also testified the escrow provision would not be in the draft documents "for the time being." (Fine Depo. P. 136 – 137). Additionally, the Debtors have presented absolutely no evidence to substantiate the claim that PEPI mandated or refused anything. The documents refute that very notion, and simply reflect the parties' negotiation of loan documents. Finally, and to close the loop, the Court need only review the Fine Affidavit, whereby he avers that at no time did PEPI ever unequivocally demand that the escrow provision be removed (Fine Aff., ¶ 26 iii, xv) nor was PEPI ever previously aware that the suggestion would be a basis for the Debtors to terminate the Commitment Letter. (*Id.*, ¶ 26 vi, viii, ix). In fact, PEPI even advised the Debtors, while the documents were being negotiated, that if they think something needs to be in the loan per the Commitment Letter, it will be put in. (Radunsky, p. 121, 122).

Regardless, the Debtors themselves acknowledge never making any such default in writing to PEPI other than on February 22, 2010 (DiNardo, p. 160-162). Moreover, once PEPI was advised of the Debtors' position, PEPI advised of its ability to revise the documents accordingly (Fine Aff., ¶ 6). As such, the Motion cannot be granted as a matter of law. See Belle R.P. LLC, (S.D. Fla. 2009) (summary judgment denied on breach claim where defendant asserts it "requested, but did not demand a modification"). *Compare*, 999 v. CIT Corp., 776 F.2d 866 (9th Cir. 1985) (parties "demanded" and "insisted").

> iii.    Given a foreclosure was still required, the request was not a "material" breach and regardless, the need to foreclose under Florida law rendered the request "substantially the same" as permitted by the Commitment Letter.

Oddly and quite telling, the Debtors are contesting the request by PEPI to remove the escrow provisions, which means the process to divest their very ownership rights would actually

AA00466

be delayed, which obviously prejudices PEPI as the lender.  Regardless, the simple fact that a foreclosure process is still required under Florida law compels the conclusion that there is no *material* default. In fact, the removal of escrows only helps the Debtors and therefore certainly cannot be alleged to constitute a material breach of anything.  This determination is based on common sense and consistent with Florida law.   See, <u>Beefy Trails Inc. v. Beefy King Intern, Inc.</u>, 267 So.2d 853, 857 (Fla. 4th DCA 1972) (to constitute a vital or material breach, a party's non-performance must "go to the essence of the contact").

Additionally, the Commitment Letter states that the terms and conditions of the loan documentation "shall be substantially the same as those set forth [t]herein." (Fine Aff., ¶ 24).   It follows, that because under Florida law a foreclosure is still required to divest the title owner, the proposed loan agreements were "substantially the same" notwithstanding the removal of the mechanism to "speed" PEPI's foreclosure process under the Commitment Letter.  *Compare*, <u>SIGA Technologies, Inc. v. PharmAthene</u>, 67 A.3d 330 (Del. 2013) (ultimatum to alter agreement to include radically, dramatically different terms that significantly favored party was not substantially similar).  Thus, no breach exists both factually and legally.

iv.     The escrow provisions are not "performable" under Florida law, so the <u>suggested removal is not a material breach.</u>

As the Court is aware, contractual provisions that are contrary to public policy are unenforceable.  See, <u>American Cas Co. v. Coastal Caisson Drill Co., 542 So.2d 957, 958 (Fla. 1989)</u>; <u>Alterra Healthcare Grp. V. Bryant</u>, 937 So.2d 263, 270 (Fla. 4th DCA 2006).  The escrow provision as to the deed in lieu, which  would be conveyed to PEPI upon default, was not performable on this basis.

15

Indeed, Florida is a lien theory state in which instruments purporting to convey interests in property as security for a debt are deemed mortgages. In particular, Florida Statutes section 697.01(1) provides:

> All conveyances, obligations conditioned or defeasible, bills of sale or other instruments of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money, whether such instrument be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages.

The statute is designed to protect a borrower's equity of redemption where there is no formal mortgage. *See* <u>Rothschild Reserve Intern., Inc. v. Silver</u>, 830 So.2d 224, 226 (Fla. 4th DCA 2002). Accordingly, contractual provisions in debt instruments "relating to forfeiture and self-help possession (or 'repossession') violate public policy and are not enforced or recognized as valid as such in law or in equity." *See* <u>Cain & Bultman, Inc. v. Miss Sam, Inc.</u>, 409 So.2d 114, 120 (Fla. 5th DCA 1982).

In fact, "[a] contract for deed is treated like a mortgage and the seller who seeks to accelerate and foreclose his interest under it must prove both default and acceleration." *See* <u>Parise v. Citizens Nat'l Bank</u>, 438 So.2d 1020 (Fla. 5th DCA 1983). In general, the concept concerns transactions between sellers and buyers, *see* <u>Free v. Free</u>, 936 So.2d 699, 703 (Fla. 5th DCA 2006), but it includes transactions in which property would be forfeited to a creditor in the event of a default in a debt obligation. *See* <u>Cain & Bultman, Inc.</u>, (Fla. 5th DCA 1982). See also, <u>Mid-State Investment Corp. v. O'Steen</u>, 133 So.2d 455 (Fla. 1st DCA 1961) (the court determined that the contract was deemed a mortgage pursuant to section 697.01 and, upon default, the corporation had nothing more than a mortgage lien); <u>Kirkland v. Miller</u>, 702 So.2d

16

620, 621 (Fla. 5th DCA 1999) (determining the instrument to be a mortgage designed to avoid foreclosure proceedings).

Likewise, stipulated judgments of foreclosure at the time of an initial loan are unenforceable under Florida Law.  In Hawke v. Broward National Bank of Fort Lauderdale, 220 So.2d 678 (Fla. 4th DCA 1969), the court considered a case in which a borrower gave a lender a note containing a confession of judgment.  The court determined that, although the note was enforceable otherwise, the confession of judgment provision was void.  *See Id*. at 679; *see also*, Vineberg v. Brunswick Corp., 391 F.2d 184, 186 (5th Cir. 1968); Matter of Caniglia, 17 B.R. 1982 (Bankr. M.D. Fla. 1982) (recognizing that "Fla.Stat. s 55.05 proscribes the use of a power of attorney to confess judgment made before an action is brought and declares any judgment so obtained to be null and void" but determining that Illinois law applied).

Although the above is dispositive, PEPI was also advised for title insurance reasons that the escrow concept created certain issues, including the potential need to still foreclose any junior liens, so as to form a good faith basis to request the proposed removal. (See Fine Aff., ¶ 12).  This is consistent with PEPI's right under the Commitment  Letter - definitive documentation "reasonably satisfactory to PEPI and its counsel in all respects".  (Fine Aff., ¶ 23).

> v.  Because the escrow provision was a right and benefit of PEPI to "speed" the foreclosure, PEPI was free to waive same (no different than what Gulf Bay waived under the Court approved DIP Facility).

Knowing that the escrow was to "speed" the foreclosure for PEPI, it is shocking that the Debtors would attempt to argue how critically important the provision was, when they completely waived any such notion by removing it from the insider loan with Gulf Bay.  Even more telling, is the Debtors' own admission that the escrow provision was a benefit of Gulf Bay

AA00469

that Gulf Bay as "lender" could and did waive (DiNardo/Gulf Bay, p. 13, 14). The Debtors are at least correct in this regard and the same must be true for PEPI. The Debtors admission on this point also dispenses with its nonsensical argument that the escrow (which actually speeds up the foreclosure process) somehow was beneficial to junior liens. Surely, if that was to be believed, the escrow provision would still exist in the Gulf Bay facility. The escrow was a right of PEPI (Fine Aff., ¶ 26 xvii), (Radunsky, p. 90) and therefore can be waived by PEPI.

A party who has a condition or provision in a contract solely for its benefit is free to waive it. Specifically, Florida law allows insurance companies to waive policy provisions enacted solely for their benefit. Such provisions are "solely for the protection of the company, which it may waive if it elects to do so, just as it may waive any other provision of the contract made for its personal benefit." Martinez v. Saez, 650 So.2d 668, 669 (Fla. 3rd DCA 1995) citing Miller v. Gulf Life Ins. Co., 12 So.2d 127, 130 (Fla. 1942). *See also*, New England Merchants Nat. Bank v. Rosenfield, 679 F.2d 467, 473 (5th Cir. 1982) ("condition was for the sole benefit of [the bank], which was therefore free to waive it."). There can be no doubt as to this argument – the escrow "would speed up the litigation that would happen if PEPI foreclosed." (DiNardo, p. 44).

This is the law in many jurisdictions. "It is a well-established principle of California law that 'a contracting party may waive conditions placed in a contract solely for the party's benefit.'" Wyler Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 662 (9th Cir. 1998); See Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (2d Cir. 2006) ("Under New York law, a party may unilaterally waive a contract provision inserted solely for its benefit."); Stephens v. Trust For Pub. Land, 475 F. Supp. 2d 1299, 1315 (N.D. Ga. 2007) ("[i]t is well recognized that a party to a contract may waive contractual provisions for his benefit.");

18

AA00470

Lanna v. Greene, 399 A.2d 837, 841 (Conn. 1978) ("The general rule is that a party for whose benefit a provision in a contract is intended may waive his rights under such provision."). Based on the undisputed fact that the escrow was to "speed" the foreclosure process *for* PEPI, no breach exists by PEPI suggesting to remove said benefit.

> vi.     By continuing to negotiate the various issues and loan agreements, the Debtors waived any alleged breach so as to pursue the DIP facility.

Even assuming the request by PEPI was in some manner a material default, the Debtors' waived any right to assert a default by virtue of their subsequent conduct.  Specifically, the Debtors continued to negotiate the loan agreements and discrete issues up through and including February 19, 2010. (DiNardo, pgs. 129, 183, 207).  In fact, the Debtors elected to proceed in this manner because PEPI was the sole lender willing to provide the Debtors with a DIP facility and the Debtors had no alternatives.  (DiNardo, pgs. 227, 185, 187-189, 207).   Such conduct constitutes waiver, and as such, the Debtors' have no right to assert a default.  *See,* Bristol W. Ins. Co. v. Albertson, 41 So.3d 378, 381 (Fla. 4th DCA 2010) (citing Husky Rose, Inc. v. Allstate Ins. Co., 19 So.3d 1085, 1088 (Fla. 4th DCA 2009) (citation omitted)). "Proof of these elements 'may be express, or implied from conduct or acts that lead a party to believe a right has been waived.'" Mid-Continent Cas. Co. v. Basdeo, 742 F.Supp.2d 1293, 1330 (S.D. Fla. 2010), *aff'd,* 477 F. App'x 702 (11th Cir. 2012).

Applying the above standards, and PEPI unaware of any alleged default (Fine Aff., ¶ 26 vi, viii, ix), there is no doubt the Debtors' expressly, or via their conduct and actions, waived any such alleged breach so as to keep the facility alive and in play.  (DiNardo, pgs. 185,187-189, 192, 207, 227, 129).

> vii.   By intentionally misleading PEPI as to the status of the completion of the negotiations of the final loan agreements, and intentionally failing to advise PEPI of the secret and purported breach, the Debtors' are estopped from asserting any

AA00471

breach prior to February 22, 2010, which is subsequent to a breach by the Debtors.

As demonstrated above, the Debtors never issued a default or advised PEPI they would terminate based on the request to remove the escrow. (DiNardo, p. 160-163; Fine Aff., ¶ 26 vi, viii, ix). PEPI relied on this conduct and continued its due diligence, efforts to negotiate the loan documents in good faith and expended resources (Fine Aff., ¶ 28). In fact, many communications from the Debtors actually revealed how close the parties were and that little other than the Purchase Option remained open (Fine Aff., ¶ 20). Even after the Debtors chose to give PEPI's loan to Mr. Ferrao, the Debtors still failed to advise PEPI and in fact intentionally misled them as to the status of the loan. (See Fine Aff., Note 7 and Composite Exh. 5 thereto). Having conducted themselves in this manner, and given the reliance by PEPI, the Debtors are estopped from asserting any such a default under Florida law. That is, "[e]quitable estoppel is grounded on a notion of fair dealing and good conscience. It is designed to aid the law in the administration of justice where without its aid injustice might result." DeShong v. Seaboard Coast Line R.R., 737 F.2d 1520, 1522 (11th Cir. 1984). Equitable estoppel may be used "to preclude a party [who has made representations of fact through his words or conduct] '[f]rom asserting rights which might perhaps have otherwise existed ... as against another person, who in good faith relied upon such conduct.'" Marine Transp. Servs. Sea-Barge Grp., Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1138-39 (11th Cir. 1994).

Intending to proceed with PEPI as the only source of funding (DiNardo, pgs. 183, 185, 187-189, 207) and having not issued a written default at the time (Id., p. 160-162), given the reliance by PEPI (Fine Aff., ¶ 28) the Debtors' are estopped from trying to do so retroactively as a matter of law.

AA00472

In <u>Acosta v. Dist. Bd. of Trustees of Miami-Dade Cmty. Coll.</u>, 905 So. 2d 226, 228-29 (Fla. 3rd DCA 2005), former students brought a breach of contract and fraud action against a college arising out of a tuition increase.  There, the Court stated:

> 'Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.'

*Id.* at 228.

Accordingly, *Acosta* appears to support the argument that even if PEPI defaulted, the Debtors, through its conduct/continued negotiation of terms, was barred from enforcing the alleged breach due to its failure to declare a breach of contract then.  <u>Pretka v. Kolter City Plaza II Inc.</u>, No. 09-80706-CIV-MARRA, 2013 WL 1192378, at *5 (S.D. Fla. Mar. 22, 2013) aff'd, 550 F. App'x 830 (11th Cir. 2013)  (plaintiffs cannot fail to notify defendant of a material breach of the contract, induce defendant to continue to perform under the contract, have defendant complete its performance under the contract and then assert the prior breach as a basis to excuse their own performance).  In <u>MDS (Canada) Inc. v. Rad Source Technologies, Inc.</u>, the 11th Circuit cited to *Acosta* acknowledging, "the rule of law: 'Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.'"  720 F.3d 833, 851 (11th Cir. 2013), certified question answered, 143 So.3d 881 (Fla. 2014).

The Debtors elected not to declare a default and instead to continue negotiations to finalize the loan documents based on its need to obtain financing from PEPI. (DiNardo, p. 183, 185, 187-189, 192, 207, 227, 129).   No default was issued and PEPI relied on the process. The Debtors furthered PEPI's belief and understanding by intentionally not disclosing they procured

AA00473

a new lender for several days.  (Fine Aff., Note 7, ¶ 27).  As such, the Debtors "acquiesced" and no breach could exist.

> viii.   By: 1) breaching its duty to negotiate in good faith, abandoning PEPI and failing to provide notice and opportunity to cure; 2) breaching the "truthful" provision of the Commitment Letter and by misleading PEPI of the status; and 3) secretly negotiating with Gulf Bay in violation of the "non-disclosure" provision, <u>the Debtors either breached first or have unclean hands.</u>

For obvious reasons,  the Debtors' Motion is completely void with regard to the dispositive legal issue  to be determined  by the Court – the duty to negotiate in good faith.  This duty likewise exists under the doctrines of good faith and fair dealings, course of conduct of the parties and/or "legitimate expectation."   Based on either, however, by the Debtors own admissions, it is overwhelming  clear that the Debtors breached their obligations by: i) abandoning the negotiations with PEPI and secretly  obtaining a replacement loan with Gulf Bay; and ii) failing to provide notice of the alleged default or providing an opportunity to cure to PEPI.  In addition to the above, the Debtors further breached  the "truthful" and "non-disclosure" provisions under the Commitment Letter.

To best understand the Debtors' primary duty to negotiate in good faith, the Court need only review <u>Teachers Ins. & Annuity Ass'n of America v. Bulter</u>, 626 F.Supp. 1229 (S.D.N.Y. 1986). In addition to being remarkably instructive on several issues raised in the instant matter, that Court properly discusses the obligations of the parties in regards to a commitment letter. In *Teachers,* the parties entered into a binding commitment letter where Teachers would lend money to OCCA subject to drafting closing documents in accordance with the terms of the commitment letter. The parties resolved all disagreements regarding the proposed language of the closing documents, except the language to be used in the default prepayment provision.  *Id.* at 1230.

AA00474

Just prior to closing the final loan documents, OCCA's attorney informed the lender that OCCA was unwilling to accept the loan from Teachers as long as the disputed default prepayment provision was included. *Id.* Teachers commenced an action for damages based upon a claim of breach of contract - that the defendant failed to negotiate the closing documents in good faith.[4] *Id.* OCCA countered that it was Teachers who breached the contract by insisting on the inclusion of a provision in the closing documents that was not in the commitment letter. *Id.* Further, OCCA alleged that they refused to close because they could not meet the commitment letter's requirements that the subject building be pre-leased by the closing date. *Id.*

The *Teachers* court held that both parties "were required to negotiate in good faith with respect to the closing documents needed to consummate the transaction. [OCCA] breached that duty to negotiate in good faith and therefore breached the contract with Teachers." *Id.* at 1232. Moreover, the court held that OCCA could not rely on the pre-leasing requirement as an opt out, as the requirement "was clearly for the benefit of Teachers alone; a condition which Teachers could, and ultimately did, waive." *Id.* In sum, the court held:

> Defendant's actions during the last few months prior to the scheduled closing date conclusively establish that, as the closing drew near, the defendants deliberately intended not to proceed with this loan—at least not on the terms contained in the Commitment Letter. By contrast, Teachers not only took the steps necessary to close the loan, as it was obligated to do under the Commitment Letter, but it offered the defendants alternatives designed to reduce the likelihood of a default. *Id.* at 1233.

The evidence showed that the defendants tried to use the default prepayment provision as a "pretext" for not going forward with the loan, despite Teachers willingness to close the deal and continue to negotiate in good faith. Importantly, "instead of making a counteroffer or

---

[4] Interestingly, similar to the allegation that the Debtors breached since the significant Purchase Option was not unconditional (release required), in *Teachers*, the Plaintiff argued that OCCA breached because of the interest rate change. Additionally, the Debtors were concerned PEPI was a "loan to own", which made the need for an unconditional Purchase Option even more critical. (Exh. 5 to Fine Aff.)

AA00475

engaging in good faith negotiations…defendants arbitrarily refused to negotiate and insisted that [the disputed provision] be deleted in its entirety." *Id.* at 1235 (emphasis added).  Accordingly, the Court found that OCCA breached the commitment letter. *Id.* at 1236.

There are amazing factual similarities between the *Teachers* case and the instant dispute between the Debtors and PEPI.  Both involve binding commitment letters where the parties agreed to finalize documents for a loan.  Both involve one party unilaterally terminating the contract and refusing to counteroffer/negotiate in good faith based on ulterior motives - based on the "pretext" of a purported default that actually could be waived.  Here, the Debtors pretext was that PEPI breached by not including an escrow provision per the terms of the Commitment letter.  In *Teachers*, the OCCA argued that they could back out of the deal for failing to meet a pre-leasing requirement.  The *Teachers* court rejected this argument, as the provision was solely for Teacher's benefit and could therefore be waived.   This is exactly what the Debtors have admitted as to the escrow, with respect to Gulf Bay in its DIP facility, which was waived (DiNardo/Gulf Bay, p. 13, 14).  Accordingly, PEPI is free to waive the escrow provision, as it is solely for its benefit, and the Debtors cannot use it as an excuse or "pretext" to assert a default.

Moreover, the *Teachers* court found that the OCCA was "less than forthright" during the negotiations and said nothing about backing out of the deal while they simultaneously negotiated with other lenders. *Id.* at 1233.  Disturbingly similar to our facts, here, the Debtors went radio silent during the final stage and instead of negotiating with PEPI, secretly approached Mr. Ferrao to replace PEPI.  The Debtors' are attempting to do *exactly* what the defendants in *Teachers* tried to do: "[w]hen they were unable to persuade Teachers to lower the interest rate…and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an *eleventh hour comparison of the closing documents to the Commitment Letter to come up with an*

24

*ostensible reason for not going forward with the loan*." *Id.* at 1236 (emphasis added). Here, within hours of PEPI rejecting the Debtors request to remove the release provision in the Purchase Option to make it unconditional, the Debtors secretly approached Mr. Ferrao to replace PEPI. (DiNardo, p. 183, 184; Ferrao, p. 30). After Mr. Ferrao agreed, the Debtors were "less than forthright" and mislead PEPI intentionally as to the status of the finalization of the loan documents.[5] Per the testimony of both the Debtors and Mr. Ferrao, it was only <u>after</u> the loan was stolen from PEPI, that the Debtors declared a default. (DiNardo, p. 194; Ferrao, p. 28) The Debtors' even admit they were in breach given their admission that negotiating (DiNardo, p. 194; Ferrao, p. 28) in good faith requires "communicating effectively" (DiNardo, p. 188), which clearly was not the case towards PEPI. There can be no dispute that the Debtors breached their obligation to negotiate in good faith by abandoning the loan, not providing a counter-proposal and having Mr. Ferrao take over PEPI's position. Although rather shocking, the Debtors made this point abundantly clear when it mistakenly volunteered that if Mr. Ferrao would have taken over the PEPI loan *sooner*, the Debtors would have terminated PEPI *earlier* (DiNardo, p. 30, Gulf Bay). There can be no doubt to the Court that the Debtors decided to breach their obligations to PEPI and present the loan to Mr. Ferrao instead.

Additionally, and as the parties agree, under Florida law, "every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." <u>Centurion Air Cargo, Inc. v. United Parcel Serv. Co.</u>, 420 F.3d 1146, 1151 (11th Cir. 2005). As in the present case, where parties are under a duty to perform, "the courts will enforce a duty of

---

[5] *See* Composite Exhibit in Note 7 to Fine Affidavit, consisting of the Debtors deliberate efforts to mislead PEPI as to the true status of the PEPI loan. This conclusion is inescapable given the 11:38 secret email confirming Gulf Bay as lender compared with the 4:47 email from Debtors that same day (2/19/10) misleading PEPI by stating they are "conferring with counsel and will get back to you [PEPI] as soon as we can."

AA00477

good faith, *including good faith negotiation*, in order that a party not escape from the obligation he has contracted to perform." Candid Productions, Inc. v. International Skating Union, 530 F. Supp. 1330, 1334-35 (S.D.N.Y. 1982); *see generally* Venn v. St. Paul Fire and Marine Ins. Co., 99 F. 3d 1058, 1065 (11th Cir. 1996).

As set forth in Wallace v. NCL (Bahamas) Ltd., 891 F.Supp.2d 1343, 1352 (S.D.Fla. 2012), "Florida law imposes a duty of good faith and fair dealing on parties to a contract." *Id.* By implication, each contractual party "promises to perform" his "part of the bargain in good faith" and "expects the other party to do the same." *Id.* (quoting Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1097 (Fla. 1st DCA 1999)). Such a promise applies "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Id.* (*quoting* Publix Super Mkts. v. Wilder Corp. of Del., 876 So.2d 652, 654 (Fla.2d DCA 2004)). Significantly, if "the terms of the contract afford a party substantial discretion to promote the party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Id.* (*quoting* Cox, 732 So.2d at 1097–98).

As explained above, while the Debtors and PEPI discussed the final provisions of the Purchase Option, inexplicably and with no prior notice or indication of termination whatsoever, the Debtors concocted the "Default Letter," dated February 22, 2010, stating that PEPI was in default under the Commitment Letter, of course only after Mr. Ferrao agreed to fund (DiNardo, p. 194; Ferrao p. 28). Most importantly, PEPI sent the Debtors a Response Letter, dated February 23, 2010 (24 hours after it received the Default Letter), confirming that it was ready, willing, and able to close on the PEPI DIP Loan per the Commitment Letter (Fine Aff., ¶ 6). The Debtors

never even responded to PEPI (DiNardo, p. 163), which fact by itself renders the Debtors' story almost unbelievable.

Based on the foregoing, the Debtors breached the implied covenant of good faith and fair dealing when they failed to negotiate in good faith, and failed to provide notice and/or refused to allow PEPI to cure the purported default so that the parties could fulfill their contractual obligations as originally intended. Clearly, the intent of the Commitment Letter was for PEPI to provide the Debtors with a DIP loan for its Chapter 11 cases. The expectation of the parties was that each would fulfill their end of the bargain. The Debtors chose not to do so and did so first.

Additionally, given the circumstances and conduct of the Debtors, Fiddlers had created a "legitimate expectation" that it would provide notice to PEPI of a default under the Commitment Letter and an  adequate amount of time to cure said defaults. Indeed, the course of conduct between the parties clearly establishes that the Debtors owed a duty to PEPI to negotiate honestly and provide reasonable notice of a default and an opportunity to cure. *See* T-3 Martinsville, LLC v. U.S. Holding, LLC, 916 N.E.2d 205, 207 (Ind. Ct. App. 2009). In *U.S. Holding,* several landlords sought rehearing of the trial court's determination that they failed to provide reasonable notice and an opportunity to cure to a commercial tenant who had missed several rent payments. The landlords argued that under the contract, only certain "events of default" required notice and an opportunity to cure. However, for several months, the parties entered into negotiations and proposed various solutions to the non-payment issues under the lease. By virtue of the ongoing negotiations, coupled with the declaration of default without notice, the court held that the course of conduct in actively negotiating made it that neither side can suddenly declare the contract terminated and "simply walk away." Instead, Landlords were required to give

AA00479

reasonable notice to USH with an opportunity to perform within a reasonable amount of time before taking action to terminate the Lease. *Id.* (emphasis added).

Like in *U.S. Holdings*, the Debtors here intentionally acquiesced by willingly not declaring a prior default so as to keep the Commitment Letter alive and available since they had no "plan B" or other alternatives (DiNardo, pgs. 183, 185, 187-189, 192, 207, 227). Similar to the facts in *U.S. Holding*, the Debtors and PEPI continued to "actively negotiate" solutions to several issues with the Commitment Letter, including the Purchase Option provision. Accordingly, the Debtors are simply not allowed to "walk away" in the final negotiations. Thus, as the parties were actively negotiating terms of the DIP facility, the Debtors were required to give PEPI an opportunity to perform prior to terminating the Commitment Letter.

Unrelated to the duty of good faith and fair dealings, contracting parties "may modify the written agreement through their conduct in the course of performance." Saglio v. Chrysler First Commercial Corp., 839 F.Supp. 830, 834 (M.D.Fla. 1993); s*ee* Pan American Engineering Co., Inc. v. Poncho's Construction Co., 387 So.2d 1052, 1053 (Fla. 4th DCA 1980); Barile Excavating v. Vacuum Under–Drain, 362 So.2d 117, 119 (Fla. 1st DCA 1978); Fletcher v. Laguna Vista Corp., 275 So.2d 579, 580–81 (Fla. 1st DCA 1973); *see also* Wisconsin Knife Works v. Nat'l Metal Crafters, 781 F.2d 1280, 1294 (7th Cir. 1986) ("based on conduct or other means of expression induced a reasonable belief by [the contracting party] that strict enforcement was not insisted upon, but that . . . modified performance was satisfactory and acceptable as equivalent").

The case of Duffield v. First Interstate Bank of Denver, N.A., 13 F.3d 1403, 1406 (10th Cir. 1993) is also instructive. There, a lending bank unilaterally assigned revenues from gas and oil wells to itself without giving notice to the borrower/owner. The borrower argued that the

AA00480

lender breached the terms of the subject mortgage requiring the lender to give the borrower notice prior to exercising its assignment rights. The borrower further argued that the lender's conduct breached the duty of good faith and fair dealing.

The *Duffield* court held that: "[t]he Bank created a reasonable expectation in Mr. Duffield that the assignment provision would not be used absent a good reason and an adequate chance to cure so that the basic structure of the loan would not be frustrated. Thus, under both *Big Horn* and Colorado law, the Bank breached an implied covenant of good faith and fair dealing by invoking the assignment provision without reasonable prior notice and without a good faith basis for doing so." *Id.* Based on the negotiations with the Debtors, PEPI had a reasonable expectation that both notice and an opportunity to cure would be provided (Fine Aff., ¶ 29).

Throughout the parties' contractual relationship, the Debtors permitted PEPI to revise, negotiate or correct any and all issues the Debtors believed to exist during the performance of the parties' contractual negotiations and drafting. (Fine Aff., ¶ 6). By doing so, the Debtors and PEPI modified the applicable agreements to include a new contractual term – the right to cure any alleged defaults upon notice. To suggest otherwise would be the exact opposite of the Debtors explanation of negotiating in good faith - "effective communications." (DiNardo, p. 188). Therefore, the Debtors had the obligation to provide notice and to allow PEPI to cure any purported default before it chose to terminate the Commitment Letter with PEPI.

In fact, if a contract contains no termination provisions, "the intention of the parties with respect to…termination is to be determined from the surrounding circumstances and by application of a reasonable construction of the agreement as a whole." Sound City, Inc. v. Kessler, 316 So.2d 315, 318 (Fla. 1st DCA 1975). Further, the contract "will be terminable within a reasonable time depending on the circumstances and that it may <u>not</u> be terminated by

AA00481

either party <u>without first</u> giving *reasonable notice.*" *Id.* (emphasis added); *see* <u>Perri v. Byrd</u>, 436 So.2d 359, 361 (Fla. 1st DCA 1983) (party terminating contract must give reasonable notice to the other party); <u>City of Homestead v. Beard</u>, 600 So.2d 450, 453 (Fla. 1992) (contract may be terminated at will upon the giving of reasonable notice); *see* <u>Crawford v. David Shapiro & Co., P.A.</u>, 490 So.2d 993, 996 (Fla. 3rd DCA 1986) (party may seek to recover damages caused by failure of other party to give reasonable notice of termination).

Alternatively, "[i]f at any time during the negotiations time became, because of an act of either of the parties, of the essence of the contract, the other party was entitled to a reasonable time after notice of such act within which to perform the contract." <u>Felt v. Morse</u>, 85 So. 656, 657 (Fla. 1920).

The above law is important because the Commitment Letter is silent as to a default notice or cure provision. However, as stated above, it is well-established under Florida law that a party wishing to terminate a contract *must give reasonable notice* of the intention to terminate, and also allow a reasonable amount of time for the defaulting party to cure. *Id.* ("[N]otice of the rescission must be brought home to the opposite party, and reasonable time must be given him after the notice to comply…[and also] allow him a reasonable time thereafter to comply with the contract…."). [6] Although primarily involving sales contracts without closing deadlines, the same rationale applies given the Commitment Letter here.

Indeed, in *Felt*, a purchaser and seller of land entered into an agreement for the sale of land in Florida. There was no formal written contract. *Id.* As the sale negotiations continued, the purchaser's attorneys noted several defects in the chain of title. *Id.* Additionally, the value of

---

[6] It should be noted further that the Commitment Letter provided that the loan documents would provide for reasonable notice and an opportunity to cure in the event *the Debtors* committed an event of default.

AA00482

the property began to drop. *Id.* In order to facilitate the sale, the seller began to correct the defects in title. *Id.* While this was occurring, an employee of the purchaser notified an agent of the seller that the purchaser intended to rescind the contract. *Id.* The Florida Supreme Court found that the purchaser had not given sufficient notice of his intention to terminate the contract, and also determined it was "incumbent upon [the seller] to so notify the [buyer] and allow him a reasonable time thereafter within which to comply with the contract." *Id.* at 658.

In the present case, the Debtors did not negotiate in good faith. The Debtors instead abandoned the negotiations, did not counter and ran to a new lender behind PEPI's back. In doing so, the Debtors failed to give any, let alone sufficient, notice of its intent to declare a default and terminate the Commitment Letter. (Fine Aff., ¶ 6, 26 vi, viii, ix). When viewing the Commitment Letter as a whole and the course of dealing between the parties, the Debtors were under a duty to provide PEPI with reasonable notice should it decide to allege a breach with a reasonable opportunity to cure. Moreover, PEPI promptly notified the Debtors that it was willing and ready to comply with all the terms of the Commitment Letter and to provide the DIP financing. (*Id.,* ¶ 6). Regardless, by virtue of the Florida Supreme Court's holding in *Felt*, the Debtors were required to give PEPI a reasonable time to cure any alleged defaults (in addition to providing reasonable notice of those defaults). As the Debtors did not provide adequate notice of default to PEPI nor a reasonable opportunity for PEPI to cure, the Debtors failed to negotiate in good faith. *See* Kessler, 316 So.2d at 318 ("However, breach of the contract prior to the expiration of the time provided in such reasonable notice will, upon proper proof, subject the breaching party to damages.").

Under Florida law, unclean hands may be used as an affirmative defense where a party is injured by another's conduct. Shahar v. Green Tree Servicing, LLC, 125 So. 3d 251, 255 (Fla.

31

**AA00483**

4th DCA 2013). Florida law recognizes that an "unclean hands" defense, which has developed from the maxim "one who seeks the aid of equity must do so with clean hands," see Yost v. Rieve Enter., Inc., 461 So. 2d 178, 184 (Fla. 1st DCA 1984), arises when a party is guilty of conduct so vile that it is "condemned by honest and reasonable men." Hensel v. Aurilio, 417 So. 2d 1035, 1038 (Fla. 4th DCA 1982). Courts have instructed that "[u]nscrupulous practices, overreaching, concealment, trickery or other unconscientious conduct are sufficient to bar relief." *Id.* If the foregoing conduct is not the very definition of unclean hands, than there must not be such a claim at all.

This conclusion is mandated by the record, but driven home even further based on the Debtors' intentional breach of the "non-disclosure" and "truthful" provisions.

The Commitment Letter states:

> Except as required by applicable law, this Commitment and the contents of it ***shall not be disclosed by the Company to any third party without the prior written consent of PEPI***

[DE 22-5, pg. 4].

As explained above, there is no dispute that the Debtors disclosed the Commitment Letter and loan documents to Gulf Bay in breach of the confidentiality provisions contained in the Commitment Letter. The Debtors admit as much (DiNardo, p. 28, 29, 36), hence the conclusion is beyond debate. Clearly, without stealing PEPI's work product, it would have been impossible for the Debtors to finalize the terms of the Gulf Bay loan in a mere three days. In fact, Mr. DiNardo testified the PEPI Commitment Letter and loan documents were not only disclosed and shared with Gulf Bay, but actually formed the basis of their deal and documents (DiNardo, II, p. 7-10, 18-19).

The Debtors likewise breach the "truthful" provision of the Commitment Letter:

> (i) "all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its

32

business (the "Information") is and will be complete <u>and correct in all
material respects</u> as of the date made available to PEPI and does not
<u>and will not contain any untrue statement of material fact or omit to
state a material fact</u> necessary to make the statements contained therein
<u>not materially misleading.</u>"  (Commitment Letter, p. 2) (emphasis
added).

At this point, it is quite obvious the communication from the Debtors that they
were "conferring" when they had already secured a replacement lender, is anything
but truthful, as demonstrated by Note 4 above.  If nothing else, this behavior bolsters
the determination of unclean hands, if not worse. Again, it was PEPI still chasing the
Debtors at the end to finalize the loan agreements to close and fund.  Little did PEPI
know that the agreed upon Purchase Option restriction (release) and the Debtors'
paranoid concern that PEPI was a "loan to own" lender, would result in the Debtors
replacing PEPI with Mr. Ferrao as its lender, who actually was advised to do so from
the very beginning. ( Exhibit 6 to Fine Aff.; Ferrao, p. 30 and p. 59).

**B.   Waterfall – Suggested Mechanism of One or More Foreclosure
Judgments Which Restricted PEPI's Sale Process to the Debtors' Specified List
of Properties to be Sold One at a Time, is Not a Material Breach of the
Commitment Letter.**

(i)  Legally flawed/factually deficient -  Incorporate A(I)(i).

(ii)  Suggestions/negotiations are not a breach -  Incorporate A(I)(ii).

(iii) The proposal by PEPI which honors the Debtors' order in which
properties are to be sold does not constitute a material breach and/or is
"substantially the same" as the Commitment Letter provision to use
commercially reasonable efforts to first collect out of the prior property
<u>listed.</u>

The essence of the Waterfall was to restrict the order in which the Debtors'
properties would be sold by PEPI upon a default.  The Debtors' do not challenge or even
dispute that PEPI is <u>not</u> in breach of this aspect of the Waterfall.  (DiNardo, p. 255).

33

Rather, the Debtors simply allege the "pretext" of a default merely because PEPI proposed to file one or more foreclosure actions (DiNardo, p. 189). Putting aside the Debtors motivation in choosing its characterization, the truth of the matter is that by honoring the Waterfall (list of sale order of properties), PEPI cannot possibly be in breach of the Commitment Letter. There is no prohibition in the Commitment Letter to one or more foreclosure suits. Interestingly, there is no such prohibition in the Gulf Bay facility either (E 157-2, p. 18, (b)(x), "Mortgagee may file one or more real property foreclosure actions in Florida state or federal court and obtain one or more judgments of foreclosure"). This point should now be self-evident to the Court. In fact, the Debtors' position makes absolutely no sense yet again.

That is the case because they agreed to a process that would "speed" PEPI's foreclosure efforts. To later suggest that 10 or more multiple suits would be required is not only not in the Commitment Letter, but is also commercially unreasonable and in fact a breach of the Debtors' obligation under the Commitment Letter to "speed the judgment and foreclosure process". The Court can certainly take judicial notice that the process suggested by the Debtors would take several years to complete, if not longer in Florida. Simply put, given that the Waterfall list of the sale order was being honored, the request to pursue one or more foreclosures was clearly commercially reasonable. See Applefield v. Fidelity Federal Sav. & Loan Ass'n of Tampa, 137 So.2d 259, 261 (Fla.2d DCA 1962) ("It is the rule in Florida that a sale in parcels is preferred over a sale en masse where the former is practical and equitable to all parties."). Consequently, because this suggestion incorporates a commercially reasonable mechanism to first collect out of the prior property in the Waterfall, no alleged breach exists. (DiNardo, p. 260).

AA00486

        (iv)    The Debtors' assertion is not legally performable under <u>Florida law and Res Judicata</u>.

The following law should come as no surprise to the Court. That is, the principles of merger and estoppel appear to prevent multiple foreclosures in multiple cases. A mortgage is given to secure a debt, usually evidenced by a note. However, a note loses its character upon being liquidated into a judgment. *See,* <u>Weston Orlando Park, Inc. v. Fairwinds Credit Union</u>, 86 So.3d 1186, 1187 (Fla. 5th DCA 2012) ("The doctrine of merger provides that when a valid and final judgment is rendered in favor of a plaintiff, the original debt or cause of action upon which an adjudication is predicated merges into the final judgment, and, consequently, the cause's independent existence terminates."). Thus, upon the conclusion of the first foreclosure action, there is no longer a debt to support subsequent foreclosures of the mortgage. See *Id*. ("a subsequent action for the same cause on the notes and mortgages is barred."). This concept is sometimes referred to as estoppel by judgment. *See* <u>Sunshine Utilities Equipment, Inc. v. Treasure Coast Utilities, Inc.</u>, 421 So.2d 1096, 1097 (Fla. 4th DCA 1982).

Another reason the multiple foreclosure practice is prohibited is the doctrine of res judicata, in that multiple actions would almost certainly rely on suing for the same default. See <u>Singleton v. Greymar Associates</u>, 882 So.2d 1004, 1006 (Fla. 2004) ("a foreclosure action and an acceleration of the balance due, based upon the same default may bar a subsequent action on that default").

To put the above in proper context, the PEPI DIP loan was a *single* note and only *one* mortgage. Although subtle, the point that must be stressed is that the actual list of properties in the Waterfall, have common owners (DiNardo, pgs. 45, 46 50). Because there are several listed properties owned by the ***identical*** title owner, any subsequent proceeding will be barred as a matter of Florida law under the doctrines of merger, estoppel by judgment or res judicata. *Id.*

AA00487

Perhaps this was what the Debtors intended for PEPI. It is of no matter, however given that the Commitment Letter required "commercially reasonable efforts" by PEPI, which is what it proposed. (Fine Aff., ¶ 23)

Moreover, drastically different then the PEPI Commitment Letter, the Debtors commitment letter with Gulf Bay specifically provided that Gulf Bay could only obtain one foreclosure *judgment* at a time. In addition to constituting a completely different term entirely, the Court must not lose sight on the obvious - Mr. Ferrao owned and controlled **both** the borrower <u>and</u> lender, so to delay the foreclosure process while he still controlled the properties, is absolutely without prejudice. That scenario, however, is the definition of unreasonable when the Lender was simply a lender, like PEPI, and did not own the subject properties through another vehicle. Clearly, PEPI had every right to suggest the above in view of the Commitment Letter, which provided the loan was subject to definitive documents "reasonably satisfactory to PEPI and its counsel in all respects". (Fine Aff., ¶ 23)

> (v.) Waiver of default from continuing negotiations - Incorporate A (I)(vi) Above.

> (vi.) By intentionally misleading PEPI as to the status of the completion of the negotiations of the final loan agreements, and intentionally failing to advise PEPI of the secret and purported breach, the Debtors' are estopped - Incorporate A (I)(vii) Above.

> (vii.) By: 1) breaching its duty to negotiate in good faith, abandoning PEPI and failing to provide notice and opportunity to cure, etc., the Debtors either breached first or have unclean hands - Incorporate A (I)(viii) Above.

## II. Anticipatory Breach

### A. There Exists No Obligation for PEPI to Issue a "Written" Due Diligence Sign Off as a Condition for the Debtors to file Reorganization

AA00488

      i.  Debtors' Motion is legally flawed and factually deficient because it seeks relief never plead in the Complaint, and also fails to affirmatively demonstrate the mandatory element of the ability to perform or damages for that matter, thereby precluding any relief <u>whatsoever.</u>

Similar to the other defects, the Motion is fatal as to this alleged claim as well. Simply put, said claim does not exist in the Complaint, let alone Counts I and II at all. Having never pled it, no Motion can grant it. Further, the Motion seeks only declaratory relief on this as well, which the Court knows was likewise never pled. See Section III (A)(i) above.

Additionally, the Motion is defective on the actual merits. It is well established under Florida law that "[t]he holder of the duty based upon a condition precedent cannot profit from an anticipatory repudiation of a contract that he would have breached himself. It follows that if performance of the conditions precedent is excused the ability to perform them must still be shown." <u>Hospital Mortg. Group v. First Prudential Development Corp.</u>, 411 So.2d 181, 183 (Fla. 1982). Moreover, Florida law distinguishes between anticipatory repudiation as a *defense* and anticipatory repudiation asserted as a basis for *affirmative relief* "In the latter situation, the party seeking affirmative relief cannot establish that the repudiating party's breach caused him damages unless he proves that he would have been able to perform the contract if the repudiating party had not breached it." <u>Ryan v. Landsource Holding Co., LLC</u>, 127 So.3d 764, 768 (Fla. 2nd DCA 2013).

Thus, for the Debtors to succeed on its Motion, they are required to *show* that they could have performed all conditions precedent required. This has not been done, nor can it. The Debtors never agreed to the Option provision at the time of their alleged "breach," nor were any indemnifications from Mr. Ferrao to be provided, nor was any other evidence on the remaining dozens of conditions precedent to the loan presented by the Debtors. As certain conditions

37

AA00489

precedent have not been satisfied, the Debtors cannot prove that it had the ability to perform the contract had PEPI not allegedly breached, thereby precluding the relief requested via the Motion.

The dispositive law on the issue is contained in the *Hospital Mortgage Group* case, decided by the Florida Supreme Court. In *Hospital Mortgage Group,* a lender and real estate developer entered into a commitment letter to develop motels. <u>Hospital Mortgage Group</u>, 411 So.2d at 182. The commitments had a number of conditions, which had to be met by a certain date. *Id.* After the date expired, the parties agreed to extend the time required to comply with the commitment letter's conditions indefinitely. *Id.*

The lender subsequently terminated the agreement via letter, and cited the developer's failure to meet all of the conditions in the contract (specifically, providing certain documentation). The developer brought suit. The lower district court found that because the lender anticipatorily repudiated the commitment letter, the developer was not required to comply with the conditions precedent i.e., supply the required documentation to the lender. In reversing the district court, the Florida Supreme Court held that the "non-breaching party is required to plead and prove compliance with all conditions precedent or the ability to comply if the performance has been excused by the repudiation." *Id.* at 183. The court found that the developer had not shown compliance with all of the required conditions precedent, and thus, "to allow recovery [by the developer] is to give them credit for doing what they were unable to do...." *Id.*

Likewise, in <u>Cohen v. Champlain Towers North Associates</u>, 452 So.2d 989, 991 (Fla. 3rd DCA 1984), a seller and purchaser entered into a purchase contract for a condominium unit, which was subject to the purchaser obtaining financing. The contract also provided that if the

38

purchaser could not obtain the requisite financing, the seller would provide or obtain for the purchaser a loan with comparable rates to those being charged by institutional lenders, or the seller would return any deposits. *Id.* The purchaser put down a large down payment and began to apply for financing. *Id.*

Prior to the closing date, the purchaser informed the seller that it could not obtain the requisite financing, and requested a return of her deposit. *Id.* The seller refused to return the deposit, and argued that because the purchaser refused to accept financing from the seller, the purchaser had anticipatorily breached the contract. *Id.* The purchaser argued that the seller could not retain the deposit as damages, because the seller had failed to prove it had the ability to comply with the condition precedent of supplying the mortgage financing at rates comparable to other institutional lenders. *Id.* The *Cohen* court found that the seller "did not plead nor prove that it could have performed the condition precedent, i.e., to provide or obtain for plaintiff [a loan at the institutional rates]." *Id.* Accordingly, judgment was entered for the purchaser.

As such, it is clear that in order for the Debtors to succeed on any claim for anticipatory repudiation, they must show that they had the ability to comply with all conditions precedent of the Commitment Letter, regardless of PEPI's alleged prior breach. *See* Ryan, 127 So. 3d at 768 (to prevail on claim for anticipatory breach, party is required to establish its ability to perform the contract); Craigside, LLC v. GDC View, LLC, 74 So.3d 1087, 1090 (Fla. 1st DCA 2011) ("Anticipatory repudiation obviates the requirement that the conditions be performed, but not that they be performable."). Thus, because the Debtors are unable to show its ability to comply, or failed to, their claim that PEPI anticipatorily breached the commitment letter fails as a matter of law.

(ii.) Due diligence is just one of several conditions precedent to "funding" only under the Commitment Letter

39

AA00491

As stated in the Fine Affidavit and the Commitment Letter itself, due diligence was to be completed to the satisfaction of PEPI and its counsel, and more importantly, was continuing in nature and actually a condition precedent to both the "Initial Advance and each Subsequent Advance". (Fine Aff., ¶ 24). PEPI's commitment was also subject to "completion of and reasonable satisfaction in all material respects with a due diligence investigation" (Id., ¶23), which was a fraction of the items included in the conditions precedent Section of the Commitment Letter.

Applying simple contract interpretation principals, PEPI's due diligence was limited to that, always within its discretion and more importantly, related only to the actual *funding* of the loan – having absolutely nothing to with the Debtors' filing a proceeding. To be sure, the funding would only take place subsequent to any bankruptcy being filed, hence the terminology, "post-petition financing". Surely, this is not news to the Debtors since one of the many other conditions precedent to fund included an Order from the Bankruptcy Court.

> iii. PEPI regularly advised the Debtors via a checklist and verbally as to the completion of certain due diligence as contemplated by the Commitment Letter. Thus, any allegation of a breach was premature given that due diligence continued under the Commitment Letter until funding and therefore no breach could be alleged any earlier. Consequently, the alleged breach was not "material" given that other conditions precedent existed that needed to be satisfied prior to <u>any actual funding.</u>

All parties agree that not only did the Commitment Letter provide for a due diligence checklist, but that it was routinely updated throughout the process. (Fine Aff., ¶ 15, 24 and Exhibit 3 thereto). That was exactly what was contemplated by the "Due Diligence Section" on pg. 21 of the Commitment Letter (Fine Aff., p. 24, 26 xii). Importantly, this was the case as the parties approached the finalization of the loan agreement negotiations, as reflected by Exhibits 4-39 and 4-41 to the DiNardo deposition. (See Notice of Filing Exhibits). These two exhibits

demonstrate the updated due diligence communications as of February 17, 2010, including corporate and real estate due diligence status.  Although a few due diligence items remained open (DiNardo, p. 133), PEPI had advised the Debtors they were satisfied with the corporate and real estate due diligence (Fine Aff., ¶ 26 iv).   The Debtors have even conceded this point (Motion, p. 17, ¶ 3, PEPI "verbally…assured the Debtors that its due diligence was substantially completed").

Significantly, however, under the Commitment Letter, due diligence continued until "funding."  (Fine Aff., ¶ 24).  Hence, any suggestions of a breach of due diligence prior to that point in time of funding would be premature. Moreover, the Commitment Letter contained dozens of conditions precedent excluding due diligence entirely.  As conceded to by the Debtors, title insurance for PEPI was just one example (DiNardo, p. 81).  And, as demonstrated by DiNardo Deposition Exhibit 4-45, as of February 18, 2010, the Debtors were still in the process of finalizing that aspect with PEPI. (See Notice of Filing in Support).  As a result, any alleged default was by definition premature.  The Debtors can point to nothing in the Commitment to suggest PEPI's obligations to fund is not subject to the conditions precedent.  This  position is beyond attack, even by the Debtors. It follows, that even had the non-existing "written due diligence sign off" been required, it is of no matter since there remained dozens of conditions precedent to be satisfied to fund under the loan.  Consequently, the alleged breach was not *material* by any definition and no claim exists as a matter of law.  See *Beefy Trails*, (Fla. 4 DCA 1972).

> iv.    There is no obligation for PEPI to deliver a "written" due diligence sign off to PEPI under the Commitment Letter as a prerequisite to the Debtors filing bankruptcy. Rather, the provision mistakenly relied upon by the Debtors is solely a right of PEPI to terminate its obligations to fund under the Commitment Letter and

41

because it is clear and unambiguous, the Debtors' are legally prohibited from asking this Court to re-write said provisions.

The mistaken reference by the Debtors related to a right exclusively of PEPI so as to terminate its obligations to fund, which is clear and unambiguous, thereby legally precluding the Debtors' efforts to re-write said provision. There is no obligation for PEPI to provide a "written" due diligence sign off in order for the Debtors to file bankruptcy. In fact, the Debtors request for a written due diligence sign off to be included in the Commitment Letter was rejected (Fine Depo. 86-87, 89).

No such provisions to the contrary, as incorrectly suggested by the Debtors, actually exists in the Commitment Letter (Fine Aff., ¶ 26 xiii, xiv). What does exist however, is a mechanism whereby PEPI in its absolute and sole discretion, could proceed to terminate its obligations to fund. The Commitment Letter could not remain open ended indefinitely. (Lorio, p. 95-97). Thus, PEPI (not the Debtors) had a contractual right to terminate its obligation to fund unless certain actions were taken (*Id.,* Fine Aff., ¶ 30). This right of PEPI was completely different than the due diligence required to *fund* as referenced above under the conditions precedent Section of the Commitment Letter.

Clearly, the Debtors are confused and subsequent to the execution of the Commitment Letter are asking for something that does not exist. Specifically, the Debtors completely ignore the dozens of conditions precedent and instead incorrectly believe all that is needed for PEPI to fund is due diligence and a court order. (DiNardo, p. 62-63). This however is grossly incorrect. (See Commitment Letter and Exhibit B thereto; Fine Aff., ¶ 24). Regardless, the assurance the Debtors were seeking, actually already existed – i.e., the Commitment Letter itself. That contained the obligations of PEPI to fund.

Specifically, the Commitment Letter stated:

42

AA00494

The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: (1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised the Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date; and (2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.

See PEPI's Commitment Letter, p. 4.

The provision mistakenly relied upon by the Debtors is solely a right of PEPI to terminate its obligations to fund under the Commitment Letter (Fine Depo., p. 156; Fine Aff., p. 30). Because it is clear and unambiguous, the Debtors' are legally prohibited to ask this Court to re-write said provisions. That provision is not a right of the Debtors and their improper request is nothing more than a demand to revise and re-write the provision to make it a condition precedent owed to them in order to file bankruptcy. If they wanted that, they should have requested it. It is not in the Commitment Letter and they can't ask the Court to re-write the Commitment Letter in said regard as a matter of law.[7] Indeed, Florida courts uniformly hold that "where the language of a contract is clear and unambiguous, a trial court is not at liberty to modify the agreement and therefore must give effect to its express provisions." Dickerson Florida, Inc. v. McPeek, 651 So. 2d 186, 187 (Fla. 4th DCA 1995). More importantly, "a trial court may not rewrite the terms of a contract in an effort to relieve one of the parties from the apparent hardship of an improvident bargain." Id. Likewise, "it is not the role of the trial court to make an otherwise valid contract more reasonable from the standpoint of one of the contracting parties." Id.; see Beach Street Bikes, Inc. v. Bourgett's Bike Works, Inc., 900 So. 2d 697, 701 (Fla. 5th DCA 2005); see also

---

[7] In an ironic legal twist, applying the case law cited by the Debtors in their Motion, the Debtors demand for this unheard of instrument and/or refusal to proceed without it, is actually a breach by the Debtors, since it is a new and radical term beyond the Commitment Letter.

43

AA00495

<u>Andersen Windows, Inc. v. Hochberg</u>, 997 So. 2d 1212, 1214 (Fla.3d DCA 2008) ("[c]ourts, without dispute, are not authorized to rewrite clear and unambiguous contracts . . . , [a]nd where a contract is clear and unambiguous, it must be enforced as written").

Thus, given PEPI's termination right is both clear and unambiguous, the Debtors' are legally powerless to alter said provision. *Id.* It is important to note that the Debtors' rationale in trying to re-write the Commitment Letter, was a combination of its self-induced and baseless belief the PEPI loan was a "loan to own" (Ferrao, p. 48) coupled with the risks of the safety net in the form of the Purchase Option not functioning. However, internally justified, the fact remains no such contractual provision existed in the Commitment Letter.

> (v.)    Waiver of default from continuing negotiations - Incorporate A(I) (vi) Above.

> (vi.)    By intentionally misleading PEPI as to the status of the completion of the negotiations of the final loan agreements, and intentionally failing to advise PEPI of the secret and purported breach, the Debtors' are estopped - Incorporate A(I) (vii) Above.

> (vii.)    By: 1) breaching its duty to negotiate in good faith, abandoning PEPI and failing to provide notice and opportunity to cure, etc. the Debtors either breached first or have unclean hands - Incorporate A(I) (viii) Above.

## <u>CONCLUSION</u>

Certainly, with PEPI as the sole lender and  no "plan B," the Debtors could never have declared a default against PEPI and risk a complete meltdown of the Fiddlers project, until <u>after</u> Mr. Ferrao agreed to take PEPI's loan.  The most troubling aspect for the Court, however, is why the Debtors never informed PEPI earlier of the either the termination, or more importantly,  that Mr. Ferrao would be offered the loan or was in fact taking PEPI's loan ?  Likewise, why did the Debtors intentionally mislead PEPI by actually responding after Mr. Ferrao chose to take PEPI's

AA00496

loan, that they were simply conferring with counsel and would advise quickly?  And finally, how could the Debtors ever get an insider priming lien approved if PEPI was still involved (which the Debtors knew was a concern) (DiNardo, p. 154-155) ?

Although rhetorical in nature, the answer is obvious but lengthy, and begins with the not coincidental, 5:00 p.m. communication from PEPI on February 18, 2010 that the Purchase Option would not be unconditional and the very suspect timing of the Debtors' call with Mr. Ferrao *that same evening*, for him to take over the PEPI loan for the very first time.    The Debtors paranoid and mistaken concern that the PEPI loan was a "loan to own" confirms how critically important it was that Mr. Ferrao's Purchase Option be unconditional. When the Debtors realized that would not be the case, they never countered or negotiated further under the Commitment Letter and instead simply abandoned the loan with PEPI.    By doing so, and keeping PEPI in the dark until the filing, they created the appearance of no other lender and that the *insiders* (Gulf Bay) terms were reasonable since they tracked the PEPI loan (DiNardo/Gulf Bay, p. 10, 7-9, 18-19) (Hrg. Trans., p. 254, 3/3/10), with neither PEPI or the Court ever being told that Mr. Ferrao was actually advised to be the DIP lender from the very beginning (Exh. 6 to Fine Aff.); (Ferrao, p. 30).

To remove any doubt, the Court need only consider the Debtors' very own fundamental position – they absolutely had to have the non-existent written due diligence  sign off to file a bankruptcy (notwithstanding the assurance of the Commitment Letter).    That convenient assertion, however, *cannot* be reconciled with the Debtors filing, which, by their own admissions, had absolutely no "assurance" of any DIP financing  due to the risks associated with the insider status of the lender.  (DiNardo, p. 154-155).   The fact that the Debtors rely on cases that are either grossly distinguishable or simply not applicable certainly does not assist their

45

feeble campaign. PEPI has never added a new condition or demanded an alteration, and as a result, the cases cited by the Debtors are of no help to their Motion.

The Court however, need not determine the answers to these quite informative queries, for the Debtors' conduct and actions constitute a breach of the Commitment Letter or at a minimum, conduct constituting filthy if not simply unclean hands by any definition.

Wherefore, based upon the foregoing, PEPI Capital, L.P. respectfully requests that this Court deny the Motion and enter such other and further relief that this Honorable Court may deem just and proper for PEPI Capital, LLC.

Dated: March 2, 2015.

**ROETZEL & ANDRESS**

/s/Alan J. Perlman
Alan J. Perlman
Florida Bar No. 826006
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile: (954) 462-4260
E-mail: aperlman@ralaw.com

*Attorneys for PEPI Capital, L.P.*

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 2090-1

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on March 2, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1.

/s/Alan J. Perlman
Alan J. Perlman

9089287 _1

AA00498

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates          Case No.: 8:10-BK-03846-KRM
                                                          (Jointly Administered)
      Debtors
_____/          Chapter 11

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates,

      Plaintiffs/Counterdefendants,

vs.          Adv. Proc. No.: 11-ap-00809-KRM

PEPI CAPITAL, L.P.,

      Defendant/Counterplaintiff and
      Third Party Plaintiff
_____

PEPI CAPITAL, L.P.,

      Third Party Plaintiff,

vs.

GULF BAY CAPITAL, INC. and
AUBREY J. FERRAO,

      Third Party Defendants.
_____/

**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE TO
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes Fiddler's Creek, LLC ("Fiddler's Creek") and its twenty-seven, pre-

confirmation, subsidiaries (collectively the "Debtors"), by and through undersigned counsel, and

1

AA00499

files this Reply (this "Reply") to Pepi Capital, L.P.'s ("PEPI") Response in Opposition to Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law [DE 100] (the "Response").

## I.      PRELIMINARY STATEMENT

In the Response, PEPI attempts, over the course of 46 pages, to confuse and obfuscate the legal issues, and/or attempt to create disputed issues of material fact where none exist.[1] PEPI hopes to exhaust the Court to the point of "throwing up its hands" and simply deny the Plaintiff's Motion for Partial Summary Judgment and Incorporated Memorandum of Law [DE 84] (the "SJ Motion")[2] leaving the issues presented in the SJ Motion to be decided at trial.  PEPI's Response is coupled with a lengthy affidavit from Jeffrey Fine, counsel to PEPI in connection with the Commitment Letter and the DIP Loan.  A simple reading of the Fine Affidavit, however, evidences that it is not a traditional affidavit that sets forth facts.  Rather, it reads more like a pleading where Mr. Fine is advocating PEPI's legal position, interpreting the Commitment Letter, taking positions based on discovery from the Debtors and, amazingly, in paragraph 26 of the Affidavit, setting forth 20 separate conclusory statements that are presented as "facts."  As set forth below in more detail, the Fine Affidavit is legally improper, based primarily on conjecture and nothing more than a transparent attempt to create factual issues where none exist.

When the legal issues and undisputed material facts are brought back into focus by the Plaintiff in this Reply, the Court will find that partial summary judgment should be granted.

---

[1] PEPI also unfortunately cites to the deposition transcripts of Mr. DiNardo and Mr. Ferrao to "establish facts" in support of its arguments that are directly contrary to the actual testimony from Mr. DiNardo and Mr. Ferrao.  The Plaintiff has identified those instances when PEPI has mischaracterized the deposition testimony in the body of this Reply.

[2] All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the SJ Motion.

AA00500

Simply stated, PEPI is unable to escape the stark reality that the undisputed material facts set forth in the SJ Motion, and not contradicted by PEPI in the Response, establish that PEPI (i) breached the terms of the Commitment Letter because it expressly failed and refused to incorporate the correct Waterfall Provision and any of the Escrow Provisions that were specifically and expressed required by the terms of the Commitment Letter into the final loan documentation for the proposed DIP Loan, which breach occurred first and prior to any alleged breach by the Debtors of the Commitment Letter, thereby relieving the Debtors from performing any further obligations under the Commitment Letter; and (ii) anticipatorily breached the Commitment Letter by expressly stating that it had no intent to ever provide the Debtors with the Due Diligence Sign-Off contemplated in the Commitment Letter prior to the filing by the Debtors of their Chapter 11 proceedings, thereby also relieving the Debtors from performing any further obligations under the Commitment Letter.

At the outset, and as one of the prime examples of PEPI's attempt to confuse the issues before the Court is the fact that PEPI, in the very first paragraph of the Response, has violated this Court's Order dated January 23, 2015 [DE 92] (the "Scheduling Order") in connection with the briefing schedule that this Court established (at PEPI's request) in connection with the SJ Motion. Specifically, the Scheduling Order required that PEPI respond to the SJ Motion by March 2, 2015 and that the Plaintiff shall have 10 days - until March 12, 2015 - to reply to PEPI's Response. The Scheduling Order also specifically provided that PEPI could seek its own separate summary judgment, or partial summary judgment, by filing such separate motion on or before March 23, 2015, in which event the Plaintiff would have 20 days to respond. Instead of complying with the Scheduling Order, PEPI surreptitiously now seeks its own summary

judgment on separate and distinct issues not raised by the Plaintiff in the SJ Motion. Namely, in the very first paragraph of the Response, PEPI requests that "*this Court enter a judgment in favor of PEPI, awarding PEPI the balance of the Commitment Fee and the Break-Up Fee* …." (*See* Response at p. 2.) Further, on page 4 of the Response, PEPI asks the Court to determine "*who breached first*" – claiming at various points in the Response that the Debtors breached the Commitment Letter based on pure conjecture and guesswork. (*See* Response at p. 4.) Moreover, PEPI argues at the very end of the Response that "*the Debtors' conduct and actions constitute a breach of the Commitment Letter.*" (*See* Response at p. 46.) While the Plaintiff will address PEPI's conjecture and allegations of the Debtors' breach in more detail below, the fact is that PEPI cannot use the Response to seek an affirmative grant of summary judgment in its favor based on the Scheduling Order, in particular on issues not raised in the Debtors' SJ Motion in the first instance. PEPI's effort to seek such affirmative relief is a blatant attempt to confuse and unnecessarily complicate the issues before the Court in the SJ Motion and to try to handicap the Plaintiff in this Reply because, among other things, the Plaintiff would normally have 20 days to respond to PEPI's separate summary judgment motion pursuant to the Scheduling Order as opposed to the 10 days to file this Reply. As a result, the Court should simply ignore any references in the Response to allegations of an alleged breach by the Debtors of the Commitment Letter or any purported "facts" advanced by PEPI in connection therewith.

In addition, PEPI expends a great deal of energy on "issues" that it argues existed with the Purchase Option in connection with the DIP Loan, claiming, contrary to the record evidence, that the Purchase Option was the "real" reason the Debtors defaulted PEPI, as opposed to PEPI's actual breach of the Commitment Letter in regard to the Waterfall Provision, the Escrow

4

Provisions and the Due Diligence Sign-Off.  However, as will be clear from this Reply, PEPI does not have any evidence to support its hypothesis and, more importantly, PEPI actually knows that the record evidence completely and unequivocally contradicts the position it takes in the Response in respect of the Purchase Option because the record on this point was actually established by PEPI in its depositions of Mr. DiNardo and Mr. Ferrao.

At bottom, the Purchase Option discussion in the Response is the classic "red herring" advanced by PEPI in the hopes of creating a material issue of fact where none exists.  In fact, the best evidence that PEPI could garner in support of its theory is a statement by Jeffrey Fine, counsel to PEPI in connection with the DIP Loan, that it "***appeared** that the Debtors were **reluctant** to comply with the obligation of obtaining a release in favor of PEPI*."  (*See* Response at p. 3.)  As is discussed in more detail below, "*appearing*" to be "*reluctant*" is a far cry from a breach by the Debtors, and is hardly evidence of a *sub rosa* reason for the Debtors to concoct a default against PEPI, which did not happen.  The Court should likewise ignore any effort by PEPI to advance its hypothetical theory in regards to the Purchase Option.

For ease of review by the Court, the Plaintiff has replied to the various issues raised in PEPI's Response below in the order that they first appear in the Response.  The Plaintiff respectfully requests that the Court grant the SJ Motion in favor of the Plaintiff for the reasons set forth herein,

## II.      ISSUES WITH PEPI'S VERSION OF THE UNDISPUTED FACTS

As set forth in the SJ Motion, the Plaintiff believes that there are simply no genuine issues of material fact in respect of the Plaintiff's position that PEPI breached the Commitment Letter in respect of the Waterfall Provision, the Escrow Provisions and the Due Diligence Sign-

AA00503

Off.  In its Response, however, PEPI consumes six pages describing its version of "undisputed" facts in support of the various forms of relief that it seeks in the Response. [3]  As set forth below in more detail, PEPI's facts are either (i) not facts at all, but pure conjecture, theory and wishful thinking; (ii) not supported by the record evidence; or (iii) are immaterial to the issues in the SJ Motion.  As a result, PEPI's version of the "undisputed" facts does not prevent the Court from granting the SJ Motion.  Notwithstanding, certain of the "undisputed" facts asserted by PEPI are so troubling as to require the Plaintiff to set the record straight and correct the numerous deficiencies with them below.[4]

*First*, in footnote 1, PEPI asserts that the Debtors "*conceded*" that if PEPI was not in default, then the Debtors would owe the entire Commitment Fee and the Break Up Fee, citing to deposition testimony of Mr. DiNardo, the Debtor's chief financial officer and the representative of Gulf Bay Capital, Inc. ("Gulf Bay").   PEPI's assertion is inaccurate because an objection was lodged to each of the questions asked by PEPI that elicited the testimony in question from Mr. DiNardo, including because such question and answer required a legal conclusion from Mr. DiNardo, who is not a lawyer.  Therefore, it is inappropriate to conclude that the Debtors conceded anything in this regard.  More importantly, whether the Debtors conceded anything in the hypothetical situation where PEPI did not default under the Commitment Letter is irrelevant to the issues before the Court on the SJ Motion.

---

[3] It is important to note that PEPI does not contest the Debtors' recitation of the facts.  Rather, PEPI simply advances its version of the "undisputed facts" which, as set forth herein, do not properly contest the Debtors' facts.

[4] The Debtors apologize to the Court for the length of this Reply, but given the number of deficiencies in PEPI's Response, the Debtors have no choice but to take the time to properly refute them.  Anything less would play into PEPI's clear intention to confuse matters before the Court.

AA00504

*Second*, on page 3 of the Response, PEPI states that it "*continuously made significant concessions to alleviate **all** concerns and requests made by the Debtors ….*" (emphasis added). Presumably, PEPI makes this statement to support its argument that the Debtors did not have a basis to default PEPI under the Commitment Letter. Not only is PEPI wrong about its presumption, but this statement is belied by the testimony of PEPI's own representatives.[5] Specifically, as set forth in the SJ Motion, the principal bases for the Debtors' default of PEPI were PEPI's refusal (i) to include the correct Waterfall Provision and any of the Escrow Provisions in the DIP loan documents; and (ii) PEPI's admission that it had no intent to provide the Due Diligence Sign-Off. These critical issues were clearly not alleviated by PEPI.

In fact, contrary to the generalized statement above by PEPI, PEPI's representatives testified unequivocally that PEPI ultimately refused to include the Escrow Provisions in the DIP Loan documentation contrary to the terms of the Commitment Letter through and as of February 23, 2010, which was the date that the Debtors were forced to issue the default letter to PEPI. (Blasnick Depo. p. 94, lines 3-11; Lorio Depo. p. 155, lines 8-25; p. 156, lines 1-3; Fine Depo. p. 136, lines 22-25; p. 137, lines 1-4; p. 141, lines 18-25, p. 142, lines 1-20)[6] In fact, while the Escrow Provisions and the Waterfall Provision were properly included in an initial draft of the DIP Loan documentation circulated by PEPI on February 2, 2010 [Lorio Depo. p. 110, lines 9-

---

[5] In addition, another of many examples where PEPI did not alleviate the Debtors' concerns is evidenced in Exhibit 3 to Mr. Fine's affidavit, which includes an email string on February 17, 2010 at 5:22 p.m. between Mr. Fine and Mr. Paul J. Battista (counsel to the Debtors). Mr. Battista raises an issue concerning the break-up fee and Mr. Fine, instead of resolving the issue as represented by PEPI above, responded and told Mr. Battista *"There are many scenarios that could occur and the language both in the Loan Agreement, and the Commitment Letter before it, was carefully chosen, thoroughly negotiated and there were discussions on this very topic a number of times. Nothing has changed on this."* [emphasis added].

[6] All references to the depositions of Blasnick,Lorio, Radunsky and Fine shall mean the deposition transcripts submitted by the Plaintiff in connection with the SJ Motion. In addition, all references to "Depo. Exh. ___" shall refer to the exhibits submitted by the Plaintiff in connection with the SJ Motion.

AA00505

25; p. 111, lines 1-25; p. 112, lines 1-15; Depo Exh. 16], later on February 11, 2010, Lorio wrote

to the Debtors and stated as follows:

> "the evaluation mechanism for deed in lieu of foreclosure – we
> [PEPI] do not need these and to get this moving and avoid
> complexity **propose deleting this in the structure entirely**."

(Depo. Exh. 17; Lorio Depo p. 112, lines 11-15; p. 119, lines 6-25; p. 120, lines 1-21)

Moreover, on February 16, 2010, representatives of and counsel for PEPI and the Debtors

had a conference call to discuss, among other things, the absence of the Escrow Provisions and

the proposed revised Waterfall Provision in PEPI's revised version of the proposed loan

agreement for the DIP Loan.  (Fine Depo. p. 125, lines 21-24; p. 135, lines 14-24; p. 136, lines

22-25; p. 137, lines 1-4)  During that conference call, PEPI told the Debtors that it would not

agree to the valuation mechanism relating to the foreclosure on the collateral that counsel to the

Debtors had proposed on February 15, 2010 as a solution to PEPI's refusal to abide by the

Escrow Provisions in the Commitment Letter.  (Fine Depo. p. 136, lines 13-25; p. 137, lines 1-5;

Depo. Exh. 19)  In addition, PEPI further advised the Debtors on such conference call that the

proposed loan agreement for the DIP Loan would not incorporate any language that effectuated

the Escrow Provisions related to the deeds in lieu of foreclosure and the consent judgments.

(Fine Depo. p. 136, lines 13-25; p. 137, lines 1-4)

Lastly, on the February 16, 2010 conference call, and despite repeated requests over the

course of many weeks from the Debtors' counsel, PEPI for the first time told the Debtors,

unequivocally, that it had no intent to provide the Debtors with written confirmation that PEPI's

due diligence was completed until, at the earliest, the closing of the DIP Loan.  (Lorio Depo. p.

149, lines 2-5; lines 7-25; p. 150, line 1-8; Radunsky Depo. p. 96, lines 22-24; p. 97, lines 3-18).

8

AA00506

Based on the above, it is undisputed that PEPI did not alleviate any of the three principal concerns expressed by the Debtors during the negotiation process over the DIP loan documentation, which three bases constituted the defaults asserted by the Debtors against PEPI. As a result, PEPI cannot now create a disputed issue of material fact through a generalized statement by Mr. Fine in his affidavit that "all" of the Debtors' concerns were alleviated in the negotiation process, thereby implying that such defaults did not exist, were otherwise resolved or waived. PEPI's argument on this point is untenable.

*Third*, PEPI asserts on page 3 of the Response that "*it appeared that the Debtors were reluctant to comply with the obligation of obtaining a release in favor of PEPI*" in connection with the Purchase Option. As set forth above, this is not a "fact," let alone a material fact. Mr. Fine's supposition that the Debtors "appeared reluctant" is nothing more than pure conjecture by Mr. Fine unsupported by any fact. As a matter of law, a party's belief or speculation as to the nature of the facts is never competent summary judgement evidence. *Riley v. Univ. of Alabama Health Servs. Foundation, P.C.*, 990 F.Supp.2d 1177 (N.D. Ala. 2014); *Sanchez v. Miami-Dade Dept. of Corrs. & Rehab.*, slip copy, No. 05-22655-CIV, 2008 WL 1995007 at *9 (S.D. Fla. 2008). "Bare suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment." *Astro Tel, Inc. v. Verizon Florida, LLC*, 979 F.Supp.2d 1284, 1295 (M.D. Fla. 2013)(inner quotations omitted). Mere expression of opinion or legal conclusions should not be given any consideration or weight whatsoever. *OneBeacon Ins. Co. v. U.S. Foods, Inc.*, slip copy, No. 13C4656, 2014 WL 2937476 at *5-6 (M.D. Ill. 2014); *G.D. Searle & Co v. Chas. Pfizer & Co.*, 231 F.2d 316, 318 (7th Cir. 1956).

AA00507

Moreover, the only record evidence concerning the Debtors' or Mr. Ferrao's position on the release included in the Purchase Option is the deposition testimony of both Mr. DiNardo and Mr. Ferrao taken by PEPI. [7]  Specifically, both Mr. DiNardo and Mr. Ferrao specifically and unequivocally testified that the Debtors accepted PEPI's decision not to eliminate the release requirement from the purchase option.  (DiNardo Depo., p. 198, lines 15-25; p. 199, lines 1-3, lines 8-21; p. 221, lines 2-25; p. 224, lines 23-25; p. 225, lines 1-2) (Ferrao Depo. p. 23, lines 14-21; p, 39, lines 24-25; p. 40, lines 1-23; 41, lines 5-24)[8]  As a result, PEPI cannot create a disputed issue of material fact with suppositions from Mr. Fine in light of the record evidence before the Court.

*Fourth*, PEPI asserts on page 3 of the Response that the Debtors "*with no prior warnings ... and instead of negotiating in good faith ... manufactured a purported Default Letter ....*" Even though PEPI cites to the Fine Affidavit to support these statements, the reality is that these statements are simply not facts.  Rather, they constitute advocacy on the part of Mr. Fine, who acted as counsel to PEPI, based again solely on his suppositions.  As such these statements are wholly insufficient to create a disputed issue of material fact in respect of the SJ Motion.  *Astro*, 979 F.Supp.2d at 1295-96.

---

[7] In footnote 2 of the Response and in direct contradiction of the record evidence of Mr. DiNardo and Mr. Ferrao's deposition testimony, PEPI amazingly asserts that Mr. DiNardo and Mr. Ferrao testified that the Purchase Option was the "sole and final safety net for Mr. Ferrao to safeguard his tens of millions in equity in the project...."  Not only did Mr. DiNardo and Mr. Ferrao not testify in the manner alleged by PEPI, but they both testified that Mr. Ferrao had alternatives other than the Purchase Option in order to preserve his equity in the project, including loaning money to the Debtors to simply repay PEPI.  Ferrao Depo. p. 44, lines 2-11; DiNardo Depo. p. 55, lines 2-21.

[8] All references to "DiNardo Depo." or "Ferrao Depo." shall mean the deposition transcripts of Mr. DiNardo and Mr. Ferrao taken by PEPI and filed by PEPI in connection with its Response. In addition, all references to "Gulf Bay Exh." shall mean the exhibits from the deposition of Mr. DiNardo offered by Gulf Bay, which exhibits are being filed simultaneously herewith by the Plaintiff.

AA00508

Moreover, and importantly, the record evidence establishes that PEPI received several prior warnings from the Debtors on the critical issues raised in the SJ Motion, and PEPI rebuffed the Debtors' good faith efforts to resolve such issues time and again. Specifically, as set forth above and in the SJ Motion, the Debtors, through counsel, repeatedly requested the Due Diligence Sign-Off from PEPI over the course of several weeks after the Commitment Letter was signed. Such repeated requests from Debtors' counsel clearly provided notice to PEPI about this issue and the opportunity to cure. However, the Debtors' good faith efforts to resolve this issue over the course of weeks was met with an unequivocal rejection by PEPI on February 16, 2010, and even more troubling, an admission that PEPI never had any intent to perform. The suggestion that the Debtors did not provide prior notice to PEPI, or that the Debtors were not negotiating this issue in good faith, is simply unfounded.

In addition, the uncontroverted facts show Debtors negotiated in good faith with respect to the Waterfall Provision and the Escrow Provisions, the other two enumerated defaults asserted by the Debtors. For example, in an effort to resolve the issues raised by PEPI related to the Escrow Provisions and the Waterfall Provision, as well as to try to finalize the DIP Loan documentation so that the Debtors could file for bankruptcy, counsel to the Debtors on February 15, 2010 proposed a temporary solution to PEPI on these issues. Since PEPI was refusing to honor the Commitment Letter as written, Debtors proposed having an interim order entered without a resolution of the issues involving the Escrow Provisions and the Waterfall Provision, and rely only on the "commercially reasonable" language related thereto. (Depo. Exh. 21; Lorio Depo. p. 143, lines 15-25; p. 144, lines 1-4; Fine Depo. p. 129, lines 6-25). For the final order on the DIP Loan, counsel to the Debtors also proposed a modified valuation structure for the

11

AA00509

foreclosures since PEPI refused to follow the terms of the Commitment Letter. *Id.* Notwithstanding such efforts to propose an alternate solution to PEPI's refusal to honor the Escrow Provisions and the Waterfall Provision in the Commitment Letter, PEPI did not agree. (Fine Depo. p. 130, lines 10-25; p. 131, lines 1-17)  Specifically, on February 16, 2010, Lorio wrote to the Debtors and stated as follows:

> We probably need to discuss the waterfall and where we are on that.  I think **there is not agreement right now on how we would work through collateral in a foreclosure process**.

(Depo. Exh. 19) (emphasis added).

As discussed above, the Debtors were unable to convince PEPI to honor any portion of the Escrow Provisions or the Waterfall Provision during the infamous February 16, 2010 evening conference call.  When the Debtors received another draft of the proposed DIP loan agreement from PEPI the next day, Debtors' counsel again placed PEPI on notice that PEPI's version of the Waterfall Provision (contained in section 10.4 of the proposed loan agreement) "did not match the loan commitment."  (Depo. Exh. 20, p. 52)

Based on the above, it is undisputed that the Debtors, though counsel, warned PEPI several times that PEPI was not complying with the Escrow Provisions and the Waterfall Provision during the negotiation process.  Moreover, Debtors' counsel attempted in good faith to propose a solution to resolve PEPI's refusal to include such provisions, only to be told "**there is not agreement right now on how we would work through collateral in a foreclosure process.**"  (Depo. Exh. 19) (emphasis added).  PEPI has no one to blame but itself for its default under the Commitment Letter.

12

As a result, any effort by PEPI in the Response to create a disputed issue of material fact as to the Debtors' warnings to PEPI or good faith efforts to resolve the critical issues that led to the Default Letter are without merit and unsupportable. Even assuming the Debtors were required to provide any notice or prior warnings to PEPI (which PEPI concedes was not required by the Commitment Letter (*See* Response, p. 30)), the Debtors clearly did so and made every effort to resolve the matters with proposed solutions that were simply rejected by PEPI.

*Fifth,* on page 4 of the Response, PEPI asserts that the Debtors were "*non-responsive for several days*" after securing the replacement DIP loan from Mr. Ferrao and then "*terminated the DIP Loan Agreement and provided no opportunity for PEPI to cure or deal with the manufactured alleged default*." Again, PEPI takes several liberties with the "facts" in an effort to try to either (i) create a disputed fact that they hope will prevent the entry of summary judgment in favor of the Plaintiff; or (ii) attempt to support their legal arguments of waiver, estoppel or lack of good faith discussed and refuted in more detail below.

Again, PEPI's effort is misguided. Specifically, the record evidence is that the Debtors obtained the replacement DIP loan from Mr. Ferrao on the morning of Friday, February 19, 2010. Up until that time, the Debtors continued to respond to PEPI and its counsel on issues related to the DIP loan documentation other than the Due Diligence Sign-Off, and the Waterfall Provision and Escrow Provisions.[9] From Friday through Monday, the Debtors worked on a number of items, including preparation of the Default Letter to PEPI. As a result, the allegation that the Debtors were "non-responsive for several days" is simply untrue. Rather, the Debtors

---

[9] As set forth above, by this time, PEPI had already unequivocally rejected the Waterfall Provision and the Escrow Provisions and have clearly stated that it would not provide the Due Diligence Sign-Off prior to the closing of the DIP Loan. As such, PEPI, not the Debtors, ended the negotiations on these subjects.

13

AA00511

did not respond to PEPI over the course of one business day and two weekend days. Moreover, the Debtors did not terminate the DIP Loan Agreement. Rather, the Debtors asserted that PEPI was in material default of the Commitment Letter (which expressly states that Debtors' obligations thereunder do not survive an event of default).

Still further, even though the Commitment Letter did not require notice of default and an opportunity to cure be given the PEPI, the Debtors, as set forth above in detail, placed PEPI on notice of, and warned PEPI about, the fact that PEPI was not complying with the Commitment Letter in respect of the Waterfall Provision and the Escrow Provisions. In addition, the Debtors placed PEPI on notice on repeated occasions that they needed the Due Diligence Sign-Off under the Commitment Letter in order to file the Chapter 11 bankruptcies. Given these undisputed facts, PEPI can hardly say that the Debtors did not give them a myriad of opportunities to resolve the issues in a manner consistent with the Commitment Letter.

*Sixth*, on page 4 of the Response, PEPI asserts through Mr. Fine's affidavit that PEPI "*was in fact ready, willing and able to fund the loan per the Commitment Letter and the applicable loan documents.*" Notwithstanding this self-serving statement by Mr. Fine, the record evidence again belies his testimony. In fact, Mr. Fine himself prepared and sent a letter, dated February 23, 2010, to the Debtors' counsel responding to the Debtors' Default Letter. (Blasnick Depo., Exh. 6). In that response letter, Mr. Fine stated, contrary to his own Affidavit in connection with the Response, that PEPI was prepared to **negotiate** the Escrow Provisions to include the deed in lieu of foreclosure provision and the related valuation mechanism. Specifically, PEPI stated as follows:

14

AA00512

> Likewise the valuation mechanism you refer to is only in regard to a deed in lieu of foreclosure and if you believe that a deed in lieu of foreclosure provision and its related valuation mechanism should be included in the loan. . . then Pepi . . will **negotiate** the provisions of a valuation mechanisms for deeds in lieu of foreclosure and will include that in the loan documentation.
> (Depo. Exh. 6, ¶4) (emphasis added).

Clearly, PEPI's response establishes that PEPI was, in fact, <u>not</u> ready, willing and able to fund the DIP Loan as Mr. Fine asserts in the Fine Affidavit.  Rather, PEPI wanted to continue to negotiate the terms of the DIP Loan despite having already taken very clear positions to the contrary on several occasions prior to such time.  (Blasnick Depo. p. 94, lines 3-11; Lorio Depo. p. 174, lines 15-25; p. 175, lines 1-4)  As a result of the above, PEPI cannot now attempt through Mr. Fine's contradictory Affidavit to create a disputed issue of material fact concerning its willingness to fund the DIP Loan after receiving the Debtors' Default Letter.

Moreover and importantly, PEPI's response letter actually admits and confirms the existence of the defaults asserted by the Debtors in their Default Letter.  In fact, contrary to PEPI's position all along that it would not provide the Due Diligence Sign-Off, PEPI finally provided written confirmation of the Due Diligence Sign-Off in the response letter when it confirmed that its due diligence was completed and, in connection therewith, formally commenced the three day deadline for the filing of bankruptcy pursuant to the Commitment Letter.  Namely, PEPI stated as follows:

> As had been previously indicated to you, **all material due diligence on the Loan has been completed by PEPI** and PEPI is ready, willing and able to immediately fund the Loan in accordance with the Commitment Letter upon receipt of Bankruptcy Court approval. Although PEPI has also told you repeatedly during this past week that the Borrowers are free to file Chapter 11 at any time, **please consider this your formal 3**

15

> **business day notice that due diligence has been completed**.
> (Depo. Exh. 6, ¶4) (emphasis added).

(Lorio Depo. p. 171, lines 12-25; p. 172, lines 1-5; Fine Depo. p. 156, lines 8-25; p. 157, line 1)

The written confirmation from PEPI of the Due Diligence Sign-Off is a clear and unequivocal admission by PEPI that they were in fact required to provide the Due Diligence Sign-Off under the Commitment Letter in advance of, and as a condition to, the Debtors filing for bankruptcy. For PEPI to argue otherwise, as they attempt to do in the Response, flies directly in the face of their own admissions in the response letter.

*Seventh*, on page 5 of the Response, PEPI admits that the waterfall concept in the Commitment Letter was "*demanded*" by both the Debtors and Mr. Ferrao, and that it was "*significant and unusual*."  The Debtors agree that the Waterfall Provision was significant, which is why PEPI's refusal to comply with the terms of the Waterfall Provision constituted a material default of the Commitment Letter.

*Eighth*, on page 6 of the Response, PEPI states through Mr. Fine's affidavit that "*throughout the process, PEPI remained in agreement with the waterfall concept, a fact it communicated to the Debtors many times.*"  Once again, Mr. Fine's self-serving statement is inconsistent with the record testimony from PEPI's own representatives and the draft loan documents prepared by Mr. Fine and his colleagues on behalf of PEPI.

The initial draft of the proposed DIP Loan agreement that PEPI provided to the Debtors on February 2, 2010 actually properly reflected the Waterfall Provision set forth in the Commitment Letter in that it provided in Section 10.4 thereof that "*[i]n the event [PEPI] begins to exercise its rights and remedies against the Reserved Collateral, [PEPI] shall use*

16

*commercially reasonable efforts to exercise its **rights with respect to each piece of the Reserved Collateral** in the order in which is it listed on* <u>*Exhibit E*</u> ***before commencing the exercise of its rights against the next piece*** *of the Reserved Collateral.*" (Gulf Bay Exh. 1, DiNardo Depo, section 10.4.)(emphasis added). However, PEPI cannot deny that starting on February 11, 2010 and thereafter, PEPI changed the Waterfall Provision in the DIP Loan agreement in a significant and material manner, which was contrary to the terms of the Commitment Letter and to the initial drafts of the loan agreement provided by PEPI. Namely, PEPI's revised version of the proposed DIP loan agreement provided, in section 10.4 thereof, that PEPI **had the right to foreclose on the Debtors' real estate and obtain foreclosure judgments on all of the collateral within the waterfall at the same time**. (Fine Depo. p. 142, lines 9-20) (emphasis added). This provision was contrary to the terms of the Commitment Letter in that the Commitment Letter clearly required that PEPI "**will not foreclose** on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts **to first collect** out of the property use described in the numbered items before it in the below list." Instead of providing language requiring that PEPI will not foreclose on the real property until it first collected out of each prior parcel of property in the waterfall (as PEPI did in the February 2, 2010 draft of the DIP loan agreement), PEPI now insisted on a process where it could foreclose on all of the property at one time, obtain foreclosure judgments against all such real property at the same time and then schedule foreclosure sales one at a time in order to recover on its debt. The foreclosure process that PEPI insisted on including in the DIP Loan documentation, which was contrary to the terms of the Commitment Letter, clearly did not provide assurances to the Debtors' pre-petition secured lenders that their collateral was secure or

17

that they were adequately protected, a critical provision for approval of the DIP Loan, which was also understood by PEPI. (Lorio Depo. p. 63, lines 22-25; p. 64, lines 1-15; p. 81, lines 11-25; Fine Depo. p.76, lines 13-25; p. 77, lines 1-8; p. 80, lines 11-23; Radunsky Depo. p. 73, lines 24-25; p. 74, lines 1-5; Depo. Exh. 14)

*Ninth*, on page 6 of the Response, PEPI asserts that "*very late in the negotiation process, Ferrao raised a new term*" – namely the Purchase Option. The clear implication of this statement is that Ferrao waited until the last minute to raise the Purchase Option and that the Purchase Option was somehow nefarious. Notwithstanding PEPI's attempt to paint Mr. Ferrao in a bad light, the record evidence is that Patricia Redmond, not Mr. Ferrao, raised the purchase option issue and in fact raised it weeks **prior** to the signing of the Commitment Letter, which was actually very early in the process, (Ferrao Depo. p. 17, lines 22-25; p. 32, lines 11-25; p. 33, lines 1-19, p. 34, lines 18-21; p. 36,lines 2-25; p. 37, lines 1-3)

*Tenth*, on page 7 of the Response, PEPI asserts, based on the Fine Affidavit, that "*it also appeared that all of the loan documents were close to final form and ready for filing (with the primary exception of the Purchase Option*)." (emphasis added) Clearly, PEPI is seeking to use this alleged "undisputed fact" to support its argument that the Debtors had waived PEPI's defaults or had failed to negotiate in good faith. Notwithstanding PEPI's attempt, however, this "fact" is simply more conjecture by Mr. Fine in that he qualifies his statement by saying "it appeared." Moreover, this "fact" is belied by the record evidence obtained from PEPI's own representatives. As set forth above in detail, PEPI was well aware that the Debtors had serious issues with the failure of PEPI to include the proper Waterfall Provision, as well as any of the Escrow Provisions, in the DIP Loan agreement. Again, PEPI cannot use a self-serving

18

AA00516

generalized statement that is at odds with its prior testimony to support denial of the SJ Motion.

*Lastly*, on page 8 of the Response, PEPI, again relying on conclusory arguments from the Fine Affidavit, attempts to divert this Court's attention away from the issues in the SJ Motion by claiming that the Debtors misled PEPI, which PEPI then uses to try to support its argument that the Debtors did not act in good faith and had unclean hands, which PEPI then argues should prevent the Court from granting the SJ Motion. PEPI is wrong for a number of reasons.

First, even assuming the truth of the "facts" relied upon by PEPI in support of its argument, the alleged effort to mislead PEPI occurred at 4:47 pm on Friday, February 19, 2010 when Mr. DiNardo sent an email to PEPI stating "we are conferring with counsel and will get back to you as soon as we can." (*See* Fine Affidavit at footnote 7, Composite Exh. 5.) Mr. DiNardo's statement is absolutely true. Over the course of that weekend, the Debtors were conferring with counsel to prepare the Default Letter to PEPI, which was sent to PEPI on Monday, February 22, 2010. It is simply not credible for PEPI to legitimately claim to have been misled by Mr. DiNardo's email. Moreover, there is no record evidence that PEPI did anything in detrimental reliance on that email.

Most importantly, however, what happened over the weekend between February 19, 2010 and February 22, 2010 is wholly irrelevant to the issues in the SJ Motion. The SJ Motion focuses on PEPI's conduct in regard to its unequivocal refusal to provide the Due Diligence Sign Off on February 16, 2010, and its unequivocal refusal to include the correct Waterfall Provision and any of the Escrow Provisions in the DIP loan documents in the manner required by the Commitment Letter, which came to final fruition on February 18, 2010. As a result, all of PEPI's factual and legal arguments as to what happened from and after February 19, 2010 have

AA00517

no bearing on, let alone are sufficient to create a genuine issue of material fact that would prevent the granting of the SJ Motion.

## III.  PEPI'S LEGAL ARGUMENTS ARE FLAWED AND ARE NOT SUPPORTED BY THE UNDISPUTED MATERIAL FACTS

### A.  Rule 56 Permits this Court to Enter Partial Summary Judgment of Liability Based Upon PEPI's First Breach and Anticipatory Breach.

PEPI has improperly characterized the relief sought in the SJ Motion as a request for a "declaratory determination."  Rule 56(a) states explicitly that a party may move for summary judgment on a "part of a claim or defense."  In fact, the comments to the 2010 amendments to subsection (a) of Rule 56 state that the "first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case, but also as to a claim, defense, or part of a claim or defense."  *See also Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc.*, 791 F.Supp.2d 626, 631-32 (E.D. Wis. 2011) (quoting Fed.R.Civ.P. 56 Advisory Committee's note (2010 amendments, (a))(inner quotations omitted).

PEPI has not cited any authorities after the 2010 amendments to Rule 56 in support of the Response.  Since the 2010 amendments, federal courts have specifically entered partial summary judgments of liability on claims of breach of contract without addressing evidence on the issue of damages.[10]  For example, in *In re: B & M Linen Corp.*, slip copy, No. 12-11560 (ALG), 2013 WL 3579340 at *9 (Bankr. S.D. N.Y. 2013), the defendants moved for partial summary judgment on just the issue of whether the debtor/plaintiff and third party defendants materially

---

[10] In footnote 3 of the Response, PEPI complains that the Plaintiff has not timely produced certain records related to the damages issue and unfortunately accuses the Plaintiff of "discovery manipulation."  The Plaintiff objects to any such characterization of the events and asserts that not only did the Plaintiff fully comply with PEPI's discovery, but the discovery that PEPI complains about relates to PEPI's alleged damages, not the Plaintiff's damages.  As a result,

20

breached their obligations under an asset purchase agreement. The court entered partial summary judgment on liability for breach of contract without ruling on the issue of damages. *Id.* The court stated: "it is evident that the debtor and [third party defendants] materially breached the Modified Agreement . . . the issue of damages was not raised in the Buyer's motion for partial summary judgment and we do not reach it." *Id.*

In the SJ Motion, the Debtors expressly ask the Court to find that PEPI first breached the Commitment Letter by refusing to include any of the Escrow Provisions and by insisting on a revised version of the Waterfall Provision, and anticipatorily breached the Commitment Letter by refusing to provide the Due Diligence Sign-Off, and as a result, the Debtors are relieved of any further obligations under the Commitment Letter. (SJ Motion, p. 34) In addition to seeking such relief under Counts I and II of the Complaint, the Debtors have expressly raised these issues throughout their pleadings. For example, Count V of the Complaint (objection to proofs of claim filed by PEPI) expressly asks the Court to find that PEPI breached the terms of the Commitment Letter and, therefore, the Debtors have no further financial obligation to PEPI. Similarly, the Debtors have raised as their fourth affirmative defense, excuse of performance and/or anticipatory breach based upon the same issues. Partial summary judgment is appropriate on affirmative defenses. *See Tingley Systems, Inc. v. Healthlink, Inc.*, 509 F.Supp.2d 1209, 1218 (M.D. Fla. 2007). The Court may therefore enter partial summary judgment in favor of the Debtors since PEPI is clearly on notice of the Debtors' position consistently asserted throughout the pleadings. *See Artistic Entm't, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201-02 (11th Cir. 2003) (citng *Burton v. City of Belle Glade*, 178 F.3d 1175, 1204-05 (11th Cir. 1999)).

---

even if PEPI's recitation of the facts is correct, PEPI was not impaired in responding to the SJ Motion because

AA00519

With respect to PEPI's anticipatory breach claim regarding the Due Diligence Sign-Off, PEPI makes the additional claim, based upon Florida state law, that an affirmative claim for anticipatory breach requires the movant to establish not only the breach, but that the movant could have performed all of the requirements of the contract.  However, all of the cases relied upon by PEPI in the Response relate to a final judgment.  More importantly, this argument again ignores the parameters of Rule 56, as discussed above.  The Debtors are entitled to have the Court establish PEPI's anticipatory breach, and determine the other elements of the claim at a later time.

Even more troubling is that PEPI asserts (without any support) that the Debtors have failed to present evidence to show their compliance with the Commitment Letter.  Such an assertion is contrary to the record.  In so doing, PEPI ignores the numerous deposition transcripts of both PEPI and the Debtors, as well as the myriad of Exhibits in connection therewith, which, taken as a whole, clearly evidence that the Debtors and their counsel were working very hard to push PEPI to a closing of the DIP loan, complying at every turn with each and every due diligence request received from PEPI, developing the various loan and security documents required by PEPI, drafting the numerous pleadings that would be required by the bankruptcy filing and the approval of the DIP Loan and even making every effort to try to resolve the issues raised by PEPI to the Waterfall Provision and the Escrow Provisions.  At no time did PEPI imply or intimate (and there is nothing in the record to support even an inference) that the Debtors had not, and were not, fully complying with the Commitment Letter, or unable to do so, through at least the date that PEPI defaulted on the Commitment Letter.  Even Fine's February 23, 2010

---

PEPI's alleged damages are not at issue in the SJ Motion.

AA00520

letter sent in response to the Debtors' Default Letter does not assert that the Debtors were unable to meet the requirements of the Commitment Letter absent PEPI's prior and anticipatory breaches.

> **B.     PEPI's Refusal to Include the Escrow Provisions and the Correct Version of the Waterfall Provisions in the DIP Loan Documents Was Not a Mere Suggestion or Request - - it Was a Repeated, Clear and Unequivocal Refusal to do so.**

PEPI concedes in the Response that a refusal to abide by a material term of the Commitment Letter would constitute a breach of contract as a matter of law.  *See e.g. 999 v CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985) (cited by PEPI); *see also, SIGA Technologies, Inc. v.PharmAthene*, 67 A.3d 330, 345-46 (Del. 2013) (cited by PEPI).  To avoid this inevitable outcome, PEPI argues that its refusal to include the Escrow Provisions and the correct version of the Waterfall Provision in the DIP loan documents was nothing more than a simple suggestion or request in the context of ongoing negotiations over the language of the DIP loan documents.  In other words, PEPI would have this Court believe that after repeated requests by the Debtors to include these provisions, as well as proposals made by the Debtors through counsel to resolve the issues raised by PEPI, and repeated refusals by PEPI to do so, that PEPI was merely making suggestions and not taking firm and unequivocal stands on these issues!  Common sense dictates otherwise.

PEPI's attempt to convince the Court that such refusals were nothing more than a benign negotiation is not supported by the record evidence and is fanciful.  The only "evidence" offered by PEPI on this point is the self-serving Fine Affidavit where Mr. Fine again makes a conclusory statement that PEPI did not unequivocally demand that the Escrow Provisions be removed.  This

AA00521

type of conclusory statement is not sufficient to create an issue of material fact on whether PEPI defaulted on the Commitment Letter by refusing to include the Escrow Provision or the correct version of the Waterfall Provision. *Astro*, 979 F.Supp.2d at 1295-96.

Moreover, the record evidence clearly shows that the Debtors made several attempts to resolve these issues with PEPI and PEPI steadfastly refused to agree to include the Escrow Provisions or revise the Waterfall Provision in a manner consistent with the Commitment Letter. At no time did PEPI relent in its position over the course of weeks of negotiations over these issues, other than after the Debtors issued the Default Letter, at which point PEPI responded in writing and merely indicated that it would "**negotiate** the provisions of a valuation mechanisms for deeds in lieu of foreclosure and will include that in the loan documentation."  (Blasnick Depo. Exh. 6.)  Clearly, PEPI's continued refusal to agree to the Debtors' several attempts to resolve these issues with PEPI rises well above the level of a "mere suggestion" by PEPI.

Despite the efforts of Mr. Fine to spin PEPI's actions and conduct into a "mere suggestion," the following chronology confirms PEPI's continuous refusal to agree to the Escrow Provisions and the correct Waterfall Provision:

- • On February 11, 2010, Lorio wrote to the Debtors in respect of the Escrow Provision and stated as follows:

    "the evaluation mechanism for deed in lieu of foreclosure – we [PEPI] do not need these and to get this moving and avoid complexity **propose deleting this in the structure entirely**." (Depo. Exh. 17)(emphasis added)

    (Lorio Depo. p. 112, lines 11-15; p. 113, lines 11-25; p. 114, lines 1-15; p. 119, lines 6-25; p. 120, lines 1-21)

- • On February 15, 2010, counsel to the Debtors proposed a potential solution to the issues with the Escrow Provisions and the Waterfall Provision, which was to

24

pursue the interim order without a resolution of the issues involving the Escrow Provisions and the Waterfall Provision, and rely on the "commercially reasonable" language related thereto. (Depo Exh 21) (Lorio Depo. p. 143, lines 15-25; p. 144, lines 1-4; Fine Depo. p. 129, lines 6-25). For the final order on the DIP Loan, counsel to the Debtors also proposed a different valuation structure for the foreclosures. *Id.* Notwithstanding such efforts to propose an alternate solution to PEPI's refusal to honor the Escrow Provisions and the Waterfall Provision in the Commitment Letter, PEPI did not agree. (Fine Depo. p. 130, lines 10-25; p. 131, lines 1-17) Specifically, on February 16, 2010, Lorio wrote to the Debtors and stated as follows:

> "We probably need to discuss the waterfall and where we are on that. I think **there is not agreement right now on how we would work through collateral in a foreclosure process**." (Depo. Exh. 19)(emphasis added)

- During a conference call on February 16, 2010, PEPI again told the Debtors that it would not agree to the valuation mechanism relating to the foreclosure on the collateral that counsel to the Debtors had proposed on February 15, 2010 as a solution to PEPI's refusal to abide by the Escrow Provisions in the Commitment Letter. (Fine Depo. p. 136, lines 13-25; p. 137, lines 1-5; Depo. Exh. 19)

- On the same conference call, PEPI further advised the Debtors that the proposed loan agreement for the DIP Loan would not incorporate any language that effectuated the Escrow Provisions related to the deeds in lieu of foreclosure and the consent judgments. (Fine Depo. p. 136, lines 13-25; p. 137, lines 1-4) (Depo. Exh. 19).

- Still further in respect of the Waterfall Provision, when the Debtors received a revised proposed loan agreement for the DIP Loan that PEPI sent on February 16, 2010, the Debtors' counsel noted that PEPI's version of the Waterfall Provision (contained in section 10.4 of the proposed loan agreement) "did not match the loan commitment." (Depo. Exh. 20, p. 52)

**C.  PEPI's Refusal to Include the Escrow Provisions in the DIP Loan Documents, and its Refusal to Comply with the Commitment Letter in Respect of the Waterfall Provision Were Material Breaches of the Commitment Letter and Do Not Constitute "Substantially the Same" Language as Allowed Under the Commitment Letter.**

With respect to the Escrow Provisions, PEPI argues that its refusal to include these

provisions in the DIP loan documents did not constitute a material default, notwithstanding the

specific requirement in the Commitment Letter.  PEPI's argument on this issue does not make any practical sense.

First, the Escrow Provisions contain a requirement that the Debtors sign and place deeds in lieu of foreclosure with PEPI in respect of the real estate collateralizing the DIP loan. Pursuant to the Commitment Letter, the first three categories of real estate in the Waterfall are comprised of unencumbered land.  If the Debtors were to default on the DIP Loan, then PEPI did not need to commence a foreclosure against the unencumbered land because there would be no junior liens to extinguish on the unencumbered land.

Second, the Commitment Letter required the Escrow Provisions to be part of the DIP loan documents.  (Depo. Exh. 2 at p. 12 of 45.)  For PEPI to suggest that wholly excluding the Escrow Provisions from the DIP loan documents equates to substantial compliance with the Commitment Letter defies logic and common sense.   How could PEPI comply with a requirement to include the Escrow Provisions by specifically refusing to include them?  The answer is obvious.  PEPI did not comply with the Commitment Letter on this point and therefore defaulted.

Turning to the Waterfall Provision, PEPI's proposed changes to the terms of the waterfall also constituted a material deviation from the requirements in the Commitment Letter, and as such were not "substantially the same" as PEPI attempts to assert.  Specifically, the Waterfall Provision in the Commitment Letter clearly required that PEPI "*agrees that **it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect** out of the property described in the numbered items before it in the below list*."  (Depo. Exh. 2 at p. 12 of 45 (emphasis added)).  In the first

AA00524

draft of the DIP loan agreement that PEPI prepared and circulated to the Debtors on February 2, 2010, PEPI drafted the Waterfall Provision in a manner that was actually consistent with and in compliance with the Commitment Letter. (*See* Gulf Bay Exh. 1, DiNardo Depo, section 10.4.) Specifically, in the first draft of the proposed DIP Loan agreement, PEPI provided in Section 10.4 thereof that *"[i]n the event [PEPI] begins to exercise its rights and remedies against the Reserved Collateral, [PEPI] shall use commercially reasonable efforts to exercise its **rights with respect to each piece of the Reserved Collateral** in the order in which is it listed on* Exhibit E *before commencing the exercise of its rights against the next piece of the Reserved Collateral."* *Id.* (emphasis added) Based on such language, which was prepared by PEPI initially from the language in the Commitment Letter, PEPI could not exercise any remedies, including commencement of a foreclosure or obtaining foreclosure judgments, against any piece of collateral in the waterfall until it first exercised its rights with respect to the prior collateral in the waterfall. Such language was consistent with the provisions of the Commitment Letter.

Thereafter, however, on February 11, 2010, PEPI revised the proposed DIP Loan agreement to change the language in Section 10.4 in a manner that was materially inconsistent with the provisions of the Commitment Letter, and therefore in violation thereof. (Gulf Bay Exh. 2, DiNardo Depo, section 10.4.) Specifically, PEPI revised section 10.4 to provide that PEPI *"shall use commercially reasonable efforts to effect a foreclosure sale of such assets in the order listed on Exhibit E …, provided that [PEPI] shall not be prevented from commencing foreclosure proceedings against any asset listed on Exhibit E prior to the foreclosure sale of an asset listed prior thereto."* *Id.* The change made to Section 10.4 of the DIP loan agreement by PEPI was in

27

violation of the Commitment Letter and materially changed the terms of the Waterfall Provision as contemplated by the Commitment Letter.

In the Response, PEPI takes the position that it was honoring the waterfall – which it describes as "the list of sale order of properties" [*See* Response, at p. 34] and that the Debtors do not dispute that PEPI is not in breach of this aspect of the waterfall.[11]  PEPI's argument in this context is very nuanced and disingenuous.  The relevant issue in the Waterfall Provision is that the Commitment Letter (and the first draft of the DIP loan agreement) required that PEPI not exercise any remedies against any property unless they first collected out of the prior property in the waterfall.  So, the focal point of the Debtors' declaration of a default against PEPI in regard to the Waterfall Provision is that PEPI insisted on changing the terms of the Commitment Letter to obtain foreclosure judgments against ALL of the real property in the waterfall at the same time and only then sell each piece at foreclosure sale in the order of the waterfall listing.  This change was, and is, a material deviation from the Commitment Letter and one that PEPI continued to insist remain in the DIP loan documents through February 17, 2010, when they forwarded the final version for the Debtors' consideration.  (Depo. Exh. 23 at Section 10.4.)

Despite PEPI's effort to downplay the impact of commencing foreclosure actions and obtain foreclosure judgments against all of the property in the Waterfall at the same time, the Waterfall Provision was put into place in order to provide adequate protection to the Debtors' pre-petition secured lenders who were being primed by the DIP loan.  As this Court is aware, each pre-petition secured lender had a lien on a different parcel of real estate to secure its

---

[11] In support of this factual representation, PEPI cites to the deposition transcript of Mr. DiNardo at p. 255. However, a reading of such testimony clearly evidences that PEPI has again misquoted Mr. DiNardo.  In fact, Mr.

AA00526

separate debt. In fact, as is evidenced by the Waterfall Provision of the Commitment Letter, the real estate in the waterfall was owned by a number of the Debtors. (Depo. Exh. 2 at pps. 12-13.) The borrowers under the DIP loan (as evidenced by the Commitment Letter) were Fiddler's Creek, LLC and GB Peninsula, Ltd. The rest of the Debtors were guarantors of the DIP loan. The mortgages on the real estate either secured the promissory note with respect to the borrowers or secured by the guaranties with respect to the guarantors. Moreover, as is evidenced by the Commitment Letter, the first three categories of real estate in the waterfall – those owned by FC Hotel, Ltd., GB Peninsula, Ltd. and 951 Land Holdings, Ltd. – were all unencumbered. As a result, no pre-petition secured lender would be adversely affected by a foreclosure action commenced against these parcels of unencumbered real property, which in turn created the adequate protection that the Debtors were required to show to the Court in order to obtain the priming DIP loan.

When PEPI insisted on changing the terms of the Waterfall Provision to be able to foreclose on all of the real property in the waterfall at the same time, PEPI wholly undermined the Waterfall Provision by placing the pre-petition secured lenders in the middle and bottom part of the waterfall at risk, thereby impeding the Debtors' ability to prove the requisite level of adequate protection in order to support the priming liens. Therefore, PEPI's change to the Waterfall Provision in section 10.4 of the DIP loan agreement was materially different than the terms required by the Commitment Letter, which resulted in PEPI defaulting under the Commitment Letter.

---

DiNardo testified on p. 255 of his deposition that the waterfall was not supposed to enable PEPI to sue everyone at the same time. Rather, it was to be done in a "pecking order."

AA00527

In its Response, PEPI attempts to conflate and confuse the important distinction between foreclosing on and obtaining foreclosure judgments against the real property in the waterfall with conducting foreclosure sales of the real property in the waterfall. If PEPI was allowed to file foreclosure actions and obtain foreclosure judgments against <u>all</u> of the collateral in the waterfall at the same time, as it insisted during the DIP loan negotiations, and only then commence the foreclosure sales in the order of the waterfall, then the adequate protection that the Waterfall Provision was designed to accomplish would be eviscerated. Under PEPI's insisted language, each pre-petition secured lender would be foreclosed out by the foreclosure judgment that PEPI insisted on being able to obtain, even though PEPI could easily be repaid from property higher up in the waterfall. PEPI's proposed language even failed to give any priority to the unencumbered property at the top of the waterfall.

PEPI also attempts to justify its refusal to comply with the terms of the Commitment Letter, and attempts to excuse its default of the Commitment Letter, by claiming the Gulf Bay loan facility allowed Gulf Bay to commence foreclosure actions against more than one parcel of real estate. (*See* Response, p. 34.) PEPI has misinterpreted the Gulf Bay loan facility. [12] The language quoted by PEPI from the Gulf Bay loan facility is NOT the operative language. Rather, a review of the operative language in section 14 of the Gulf Bay commitment letter [Main Case DE 10-1, p. 11 of 57] and the Gulf Bay DIP loan agreement [Depo. Exh. 10, DiNardo Depo at p.

---

[12] As a preliminary matter, comparing the Gulf Bay facility to the PEPI facility to try to prove that PEPI did not violate the PEPI Commitment Letter is simply comparing apples to oranges. The provisions of the PEPI Commitment Letter were different than the provisions of the Gulf Bay commitment letter in regard to the waterfall provisions. [Main Case DE 10-1]. As a result, the focal point is whether PEPI complied with the terms of its Commitment Letter, and not the commitment letter issued by Gulf Bay.

AA00528

27]$^{13}$ clearly shows: (i) Gulf Bay would first pursue collection from the unencumbered real property before moving to the encumbered real property; and (ii) if and when Gulf Bay was required to seek recovery against the encumbered real property, Gulf Bay agreed that it would NOT obtain a final judgment of foreclosure in respect of any parcel of encumbered property in the waterfall without first collecting out of the property prior in the waterfall. As a result, unlike the language that PEPI insisted upon having in its DIP loan agreement, Gulf Bay could not obtain a foreclosure judgment against the encumbered property in the waterfall until it first collected out of the prior property in the waterfall. PEPI on the other hand, demanded the right to obtain a foreclosure judgment against <u>all</u> of the property in the waterfall, unencumbered and encumbered, at the same time.

Therefore, despite PEPI's effort in the Response to obfuscate the distinctions between the PEPI DIP loan agreement and the Gulf Bay loan agreement (even assuming it is a proper comparison given the differences in the commitment letters), the distinctions are significant and material. In PEPI's case, the Waterfall Provision language PEPI insisted on having was a violation of the Commitment Letter and also seriously impaired the Debtors' chances of providing adequate protection to the Debtors' secured lenders with liens on the encumbered property.

---

[13] Exhibit 10 from the DiNardo deposition has been filed by PEPI in this case as Item 4 in DE 97.

AA00529

**D.** **The Waterfall Provision and the Escrow Provisions Were "Performable" Under Florida Law and Therefore PEPI's Refusal to Include Them in Accordance With the Commitment Letter Constituted Material Breaches of the Commitment Letter.**

In the Response, PEPI argues that its refusal to include the Escrow Provisions and the correct version of the Waterfall Provision in the DIP loan documents does not constitute a breach of the Commitment Letter because such provisions are not "performable" under Florida law. PEPI's arguments are unfounded and conflate several issues in a clear effort to try to confuse the matters before the Court.

First, there is nothing inappropriate, unenforceable or contrary to public policy for a borrower to execute and deliver a deed in lieu of foreclosure in connection with a mortgage transaction. Florida law recognizes the enforceability of deeds in lieu of foreclosure. *Stovall v. Stokes*, 115 So. 828, 837-38 (Fla. 1927). Moreover, escrowing of deeds in lieu as part of a loan transaction has been permitted by Florida courts. *Ringling Joint Venture II v. Huntington Nat'l Bank*, 595 So. 2d 180, 182-83 (Fla. 2d DCA 1992). Accordingly, while a borrower's right of redemption cannot be abridged by a deed in lieu of foreclosure to secure a debt, a borrower can forego that right and receive credit for the value of the property against the indebtedness. *Id.*

Moreover, contrary to PEPI's assertion, a deed in lieu of foreclosure does not create title issues when recorded because the presumption (as discussed above) is that the deed in lieu would practically only apply to the transfer of the unencumbered property, which represented the top three parcels of real estate in the waterfall.

In addition, while the Plaintiff acknowledges that confessions of judgment are not enforceable in Florida, the consent judgments referred to in the Commitment Letter could have

32

AA00530

been drafted or structured to alleviate PEPI's issues. However, and importantly, because PEPI steadfastly refused to include these provisions in the DIP loan documents, the Debtors were never given an opportunity to work through any of the issues that PEPI believed may have existed in connection with the delivery of consent judgments. In fact, drafts of the consent judgments were never prepared given the insistence by PEPI that they be excluded from the DIP loan documents. As a result, PEPI's own actions in connection with refusing to include these provisions in the DIP loan documents precluded any resolution of the issues PEPI purported to have with them.

With respect to the Waterfall Provision, PEPI argues that multiple foreclosure practice is prohibited either by merger, estoppel or res judicata. As result, according to PEPI, the Waterfall Provision was not legally "performable" and therefore PEPI should be excused from liability for its refusal to comply with the Commitment Letter. PEPI's argument on this point is not accurate, not consistent with the DIP loan documents, and not applicable to the undisputed facts of this case.[14]

At the outset, PEPI incorrectly represents to the Court (without any cite to the record) that "*the PEPI DIP loan was a single note and only one mortgage.*" (*See* Response at p. 35 (emphasis in original)). PEPI also generalizes to the Court that "*the actual list of properties in the Waterfall, have common owners.*" *Id*. Based upon these erroneous assumptions, PEPI

---

[14] PEPI's argument regarding its inability to perform is curious since it was never previously raised. The Court should remember that the Plaintiff has not alleged that PEPI refused to include the Waterfall Provision into the DIP loan documents as PEPI did with the Escrow Provision. Rather, the Plaintiff has alleged in the SJ Motion that PEPI insisted on language in the Waterfall Provision (discussed more fully above in regards to the difference between commencing foreclosure actions, obtaining final judgments and pursuing foreclosure sales) that was materially inconsistent with the provisions of the Commitment Letter and therefore in default of the Commitment Letter. It appears as though PEPI is now saying in the Response that even the version of the Waterfall Provision that it

33

AA00531

implicitly concludes that it would be required under Florida law to foreclose on all of the real estate in the waterfall at the same time or face arguments of merger, estoppel or res judicata in any subsequent foreclosure action. Notwithstanding the facial attractiveness of this argument, it does not stand up to even the slightest scrutiny, either factually or legally.

First, contrary to PEPI's representations in the Response, there was not "*only one mortgage.*" Specifically, the DIP loan agreements prepared by PEPI defined "Mortgage" as "one or more deeds of trust or mortgages in in favor of Lender…." (Depo, Exh. 23 at page 23.) Moreover, the term "Loan Documents" in the DIP loan agreement prepared by PEPI is defined to include "the Mortgages." (*Id.* at p. 22.) Still further, the closing checklists that PEPI used to track the status of the various documents required for the closing included as item 4 therein - "Mortgages." (DiNardo Exh. 4-39.)[15] Still further, as set forth above, there were two borrowers under the DIP loan – Fiddler's Creek, LLC and GB Peninsula, Ltd. The other Debtors, including those that owned the bulk of the real property in the waterfall, were guarantors of the debt. Therefore, any mortgage from a guarantor to PEPI would necessarily need to secure the obligations under the guarantee. In addition, since many of the parcels of property in the waterfall were owned by a different entity, it stands to reason that there would have been multiple mortgages, one from each mortgagor to PEPI encumbering property owned by that mortgagor. (Depo. Exh. 2 at pps. 12-13.)

Second, as with the Gulf Bay DIP loan, PEPI could have agreed (i) to first pursue collection from the unencumbered real property before moving to the encumbered real property;

---

insisted on having in the DIP loan documents was not legally performable. This result wholly undermines PEPI's argument.

[15] Exhibit 4-39 from the DiNardo deposition has been filed by PEPI in this case as Item 1 in DE 97.

AA00532

and (ii) if and when PEPI was required to seek recovery against the encumbered real property, PEPI could have agreed that it would NOT obtain a final judgment of foreclosure in respect of any parcel of encumbered property in the waterfall without first collecting out of the property prior in the waterfall. Instead, PEPI insisted on its language for the Waterfall Provision which allowed it to obtain final judgments of foreclosure against <u>all</u> of the real property in the Waterfall at the same time, and then and only then conduct foreclosure sales in the order of the Waterfall. PEPI's position was in violation of the Commitment Letter and therefore constituted a default thereunder.

Moreover, under Florida law and contrary to PEPI's legal arguments, multiple foreclosure actions would have been possible. Where a debt is secured by a mortgage of multiple properties, the creditor may file suit to foreclose the mortgage against one of the properties, and subsequently file a second suit as to another, so long as the sale of the first property did not satisfy the indebtedness. *Prudence Co. v. Garvin*, 160 So. 7, 8 (Fla. 1935) ("If one holds two mortgages on different parcels of land, or one mortgage on two parcels of land, to secure the same debt, in the absence of any equities in subsequent purchasers he may foreclose either one without the other; and a foreclosure of one will bar a foreclosure of the other only where the land foreclosed is equal in value to the debt.")(inner citations and quotations omitted); *Waybright v. Turner*, 176 So. 424, 428 (Fla. 1937) aff'd on rehearing, 179 So. 412, 413-14 (Fla. 1938) (where single mortgage covered two parcels of real property, creditor could proceed to judgment for foreclosure against one parcel and, if debt remains unsatisfied, foreclose the second property). *Cf. Symon v. Charleston Capital Corp.*, 242 So. 2d 765, 768 (Fla. 4th DCA 1971)

35

AA00533

(one may hold two mortgages on different parcels of land to secure the same debt; the mortgagee may foreclose either without the other, and foreclosure of one will not bar foreclosure of the other except where the value of the land foreclosed in the first is sufficient to satisfy the debt.). *See also*, *Royal Palm Corporate Center Assoc., Ltd v. PNC Bank, N.A.*, 89 So. 3d 923, 930-31 (Fla. 4th DCA) (Florida is among the majority of states that adhere to the traditional common law rule that a mortgagee may sue either on the note or foreclose on the mortgage and may pursue all remedies at the same time or at different times, so long as there is no double recovery on the debt).

### E. PEPI Was Not Free to Waive the Escrow Provisions of the Commitment Letter Because Those Provisions Were Not for the Exclusive Benefit of PEPI.

In the Response, PEPI argues that since the Escrow Provision was a "right of PEPI" it could "therefore be waived by PEPI." (*See* Response, pp. 17-19). Based on this argument, PEPI asserts that it had the absolute right to exclude the Escrow Provisions from the DIP loan agreements, notwithstanding the requirement in the Commitment Letter that they be included in the DIP loan documents. Therefore, PEPI concludes that it was not in default of the Commitment Letter by wholly excluding the Escrow Provisions. PEPI is wrong.

PEPI conflates all of the Escrow Provisions into one. In fact, the Escrow Provisions included three components, namely the consent judgments, the deeds in lieu of foreclosure and the valuation mechanism. (Depo. Exh. 2 at p. 12.) When each of these is considered separately, as they must, PEPI's argument falls apart. Specifically, the valuation mechanism within the Escrow Provisions was for the benefit to the junior secured lenders as it provided for the valuation of property foreclosed upon in the waterfall for purposes of reducing the priming lien

AA00534

debt. Clearly, the valuation mechanism was a benefit to the junior secured creditors because property at the top of the waterfall (mainly the unencumbered property) would be properly valued for purposes of reducing the priming DIP loan. Also, the existence of a speedy foreclosure process by the senior lender was, in fact, beneficial to the junior lenders because the property in the top three tiers of the waterfall was unencumbered and, when liquidated, would reduce, if not fully repay, the priming DIP loan.

As discussed above, the deed in lieu of foreclosure and the consent judgments were practical alternatives to foreclosure in the context of the unencumbered property since there are no junior liens to foreclose. The quicker the priming DIP loan was repaid, the sooner the other secured lenders would be able to commence foreclosures on their specific property without the delay occasioned by a drawn-out, lengthy foreclosure process on the unencumbered property. As a result, PEPI's argument that the escrow for the deeds in lieu and the consent judgments did not provide a benefit to the other secured creditors is factually incorrect. Therefore, PEPI – even under the case law cited by it – was not entitled to waive the Escrow Provisions.

**F. The Debtors Did Not Waive the Breaches by PEPI of the Commitment Letter.**

PEPI argues that the Debtors waived PEPI's material breaches of contract by failing to declare PEPI in default sooner than February 22, 2010. As discussed above, the Debtors learned of PEPI's anticipatory repudiation of the Due Diligence Sign-Off requirement during the February 16, 2010 conference call. Further, the Debtors confirmed PEPI's breach of the Escrow Provisions and Waterfall Provision when the final draft of the DIP loan document was issued by PEPI on February 17, 2010, once again with materially different terms than required by the

37

AA00535

Commitment Letter. In other words, PEPI would have the Court believe that any implied waiver (since no express waiver was given) should be found based upon a five- or six-day delay in issuing a default notice (inclusive of a weekend).

PEPI can only show a material issue of fact regarding an implied waiver by presenting evidence showing the Debtors undertook unequivocal acts or conduct evidencing an intent to waive, which acts PEPI cannot and has not shown. *In re: SFD @ Hollywood, LLC*, 411 B.R. 788, 800 (Bankr. S.D. Fla. 2009). Intent cannot be inferred from doubtful or ambiguous factors. *Id.* (citing *Woods v. Christensen Shipyards, Ltd.*, 2005 WL 5654643, *2 (S.D. Fla. 2005)). Moreover, a mere delay in enforcing one's rights without prejudice to another does not establish a waiver as a matter of law. *In re: B.J. Thomas, Inc.*, 45 B.R. 91, 95-96 (Bankr. M.D. Fla. 1984). S*ee e.g., Sundale, Ltd. v. Fla. Assoc. Capital Enter. Inc*., No. 11-20635-CIV, 2012 WL 488110 at *9 (S.D. Fla. Feb. 14, 2012) (no waiver found based upon two and a half-year delay); *Kirschner v. Baldwin*, 988 So. 2d 1138, 1142 (Fla. 5th DCA 2008) (five-month delay insufficient to find implied waiver); *see also Air Prods. & Chem., Inc. v. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir. 1989) (applying Florida law in holding no clear waiver shown after five-year delay); *see also Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So. 2d 997 (Fla. 4th DCA 1981) (no waiver found after almost three-year delay). Rather, an implied waiver requires conduct or a representation demonstrating an intent to relinquish a known right. *Hale v. Dept. of Revenue*, 973 So. 2d 518, 522-23 (Fla. 1st DCA 2007). *See also*, *Continental Real Estate Equities, Inc. v. Rich Man Poor Man, Inc.*, 458 So. 2d 798, 799 (Fla. 2d DCA 1984).

PEPI has cited no authority that would suggest that an issue of fact regarding waiver could exist from a delay of only five or six days before declaring a default. Moreover, the

AA00536

evidence presented clearly shows that when the Debtors learned of PEPI's intransigent position of not complying with the Commitment Letter, the Debtors explored their available options given their precarious financial situation and looming need for bankruptcy protection. The Debtors raised the idea if Mr. Ferrao providing the DIP loan on the evening of Thursday, February 18, 2010 and only learned of his willingness to provide an alternative DIP loan on Friday, February 19, 2010. Thereafter, on the following Monday (the next business day), the Debtors issued the Default Letter to PEPI. PEPI identifies no representations or conduct which in any way would establish an intent to waive a legal right under these facts.

### G. The Debtors Did Not Mislead PEPI and are Otherwise Not Estopped From Asserting that PEPI Breached the Commitment Letter Prior to February 22, 2010.

Similar to the waiver argument, PEPI also cannot establish a defense of equitable estoppel sufficient to deny the SJ Motion. Simply stated, PEPI cannot establish any material issue of fact of detrimental reliance on any representation or conduct of the Debtors. As a matter of law, a defense of equitable estoppel fails without detrimental reliance. *MDS (Canada) Inc. v. RAD Source Technologies, Inc.*, 720 F.3d 833, 852 (11th Cir. 2013) (cited by PEPI). The only detrimental reliance alleged by PEPI are the self-serving allegations in paragraph 28 of the Fine Affidavit claiming PEPI relied on the Debtors' five- or six-day delay in issuing a default notice and continued its due diligence, efforts to negotiate the loan documents and "expended resources." (Response, p. 20.) So that the Court is not misled, it is important to note that PEPI is referring to its continued efforts for a period of two (2) days. After the February 16, 2010 conference call, PEPI continued to negotiate and exchange emails with the Debtors on February 17 and February 18, 2010. Thereafter, on February 19, 2010, the Debtors made the decision to

39

AA00537

declare PEPI in default and did not negotiate further. Also, the assertion that PEPI expended resources is also disingenuous since the Debtors paid all of PEPI's costs and expenses pursuant to the terms of the Commitment Letter. In other words, PEPI did not change its position in any way to support equitable estoppel.

The facts of this case are a far cry from the authorities cited by PEPI. For example, in *Acosta v. District Bd. of Trustees of Miami-Dade Comm. College*, 905 So. 2d 226, 228-29 (Fla. 3d DCA 2005), the court found an estoppel from enforcing an alleged agreement between a student and community college not to increase tuition where the student commenced the program, satisfied all course requirements, paid the higher tuition and graduated before declaring a breach of contract. Similarly, in *Pretka v. Kolter City Plaza II, Inc.*, No. 09-80706-CIV, 2013 WL 1192378 at *4-5 (S.D. Fla. Mar. 22, 2013) the court granted summary judgment on the defendant's equitable estoppel defense because the plaintiff waited at least three years to assert the breach of contract, continued to perform under the contract, negotiated new terms and made additional deposit payments, all of which the defendant relied upon in completing performance of the contract.

Additionally, the record does not support that Debtors misled PEPI in any way which would create a material issue of fact with respect to PEPI's equitable estoppel defense. PEPI, through the Fine Affidavit, alleges it was misled by a February 19, 2010 email in which Mr. DiNardo stated the Debtors are "conferring with counsel and will get back to you as soon as we can." As a matter of fact, Debtors were conferring with counsel, as counsel was preparing a default notice. Nothing in Mr. DiNardo's statement was false. Moreover, the parties were clearly adverse at this point in the negotiations given PEPI's adamant refusal to comply with the

AA00538

Commitment Letter. As a matter of law, any reliance on misrepresentations made in the context of an adversarial relationship is unreasonable. *See Sundale*, 2012 WL 488100 at *8 (citing *Megens v. Dreyfoos*, 166 F.3d 1114, 1118-19 (11th Cir. 1999)).

> **H.** **The Debtors Acted in Good Faith, Do Not Have Unclean Hands and Did Not Breach the Commitment Letter.**

The longest discussion in PEPI's Response is with respect to its assertion that Debtors breached their duty to negotiate in good faith. (Response, pp. 22-33.) PEPI suggests that the law implies a duty to negotiate in good faith and then extrapolates an obligation to provide notice and opportunity to cure, even though no such provisions were negotiated into the Commitment Letter. PEPI desperately needs the Court to find an implied notice and opportunity to cure because PEPI's response to the default letter admitted default. PEPI cites no case interpreting Florida law which finds a duty to negotiate in good faith as defined by PEPI in their Response other than insurance cases which require a carrier to negotiate settlement of claims in good faith, which is clearly inapposite. *See e.g. Venn v. St. Paul Fire & Marine Ins. Co.*, 99 F.3d 1058, 1065 (11th Cir. 1996).

The Plaintiff concedes Florida law implies a covenant of good faith and fair dealing in every contract. *Meruelo v. Mark Andrew of the Palm Beaches, Ltd.* 12 So. 3d 247, 250-51 (Fla. 4th DCA 2009). However, the covenant of good faith is not an abstract and independent term which may be enforced without the breach of an express term of the written contract. *Id.* "The implied duty of good faith cannot be used to vary the fully specified, unambiguous terms of a contract because the court is not at liberty to change the parties' bargain as to those terms." *Id.* PEPI has failed to identify **any** express provision of the contract which the Debtors breached.

AA00539

Therefore, PEPI may not argue a breach of the implied covenant of good faith and fair dealing. *Flagship Resort Dev. Corp. v Interval Intern., Inc.*, 28 So. 3d 915, 924 (Fla. 3d DCA 2010).

PEPI also incorrectly relies on cases dealing with at-will employment and service agreements for an indefinite duration to suggest the Court should imply some reasonable notice requirement prior to termination. Such cases are not analogous nor applicable, particularly where a party is in default of the contract. *See e.g. Leghorn v. Wieland*, 289 So. 2d 745, 748 (Fla. 2d DCA 1974); *see also Shell Oil Co. v. A.Z. Services, Inc.*, 990 F.Supp. 1406, 1415 (S.D. Fla. 1997). Simply stated, PEPI cannot imply a notice and opportunity to cure provision to the Commitment Letter when no such term exists.[16]

PEPI has also not shown any course of dealing between the parties which would modify the Commitment Letter to require notice and an opportunity to cure before declaring a default. The express terms of the Commitment Letter do not provide such terms, which is conceded by PEPI. Before PEPI's breach of the Escrow Provisions and Waterfall Provision, as well as the Due Diligence Sign-Off, there had not been any course of dealing between the parties involving a refusal by either side to comply with the material terms of the Commitment Letter. The Court should enforce the express terms of the Commitment Letter and not impose non-existent terms which would only seek to reward PEPI's misconduct. *Landstar Global Logistics, Inc. v.*

---

[16] Nevertheless, as discussed above, PEPI had ample opportunity to avoid the default notice and termination of the Commitment Letter. The Debtors attempted to obtain PEPI's compliance with the Escrow Provision and Waterfall Provision over several days of negotiations between February 11 and February 18, 2010, with express notice that Debtors considered PEPI's position to be a material variation from the Commitment Letter. Similarly, Debtors' counsel made numerous requests for the written Due Diligence Sign-Off from the signing of the Commitment Letter on January 27, 2010 through the February 16, 2010 conference call, only to learn that PEPI had no intent to honor this obligation.

AA00540

*Haskins*, No. 3:09-CV-1163-J-32JRK, 2012 WL 39514 at *5-6 (M.D. Fla. Jan. 9, 2012); *Excess Risk Underwriters v. Lafayette Life Ins. Co.*, 328 F.Supp.2d 1319, 1340-41 (S.D. Fla. 2004).

In its discussion of good faith negotiations, PEPI incredibly attempts to compare the Debtors to the borrowers in *Teachers Ins. & Annuity Ass'n. of America v. Butler*, 626 F.Supp. 1229 (S.D. N.Y. 1986). Yet, the Debtors are in no way similar to the borrowers in the *Teachers* decision. If the Court were to compare the facts in *Teachers* to the events in this matter, it would reach the inevitable conclusion that Debtors negotiated in good faith at all times.

In *Teachers*, there is no indication whether the subject commitment letter had a prohibition on proposing materially different terms as occurred with PEPI. Rather, the lender proposed a term (Default Prepayment Fee Language) which was not expressly provided for or prohibited in the commitment letter. *Id.* at 1230. Moreover, the term was an industry standard which carried out the intent of the commitment letter. *Id.* at 1235. The borrowers were aware of the insertion of the new term for approximately <u>nine</u> months and never raised an objection until four days before the closing. *Id.* at 1233-34. In the interim, the borrowers focused only on another provision of the commitment letter which the lender subsequently waived. *Id.* at 1233. Most egregiously, the court found that the borrowers had been searching for alternative financing for the loan for <u>several months</u> in order to take advantage of more favorable interest rates. *Id.* at 1232.

The Debtors did not engage in any of the misconduct which occurred in *Teachers*. PEPI refused to honor express and material terms of the Commitment Letter, despite the Debtors' multiple efforts to obtain compliance. Further, the Debtors declared PEPI in default within five (5) days of determining that PEPI would not honor the Commitment Letter. Debtors repeatedly

AA00541

told PEPI that the modifications to the Escrow Provisions and Waterfall Provision were unacceptable to the Debtors. Accordingly, assuming Florida law were to create a duty to negotiate in good faith as discussed in *Teachers*, PEPI has presented no evidence to create a material issue of fact that the Debtors failed to perform such a duty.

## I. PEPI Has Admitted a Written Due Diligence Sign-Off Was Required by the Commitment Letter.

As has been discussed throughout this Reply, the uncontroverted facts show that on the evening of February 16, 2010, PEPI unequivocally advised the Debtors that it had no intent to provide the Due Diligence Sign-Off. Moreover, PEPI advised, to the dismay of the Debtors, that it would never confirm the completion of due diligence until the funding of the DIP loan.

There can be no doubt that if a written Due Diligence Sign-Off was required by the Commitment Letter, the statement by PEPI on February 16, 2010 would constitute an unequivocal repudiation of the Commitment Letter. PEPI's unequivocal statement that it never had the intent to provide the Due Diligence Sign-Off is the casebook definition of anticipatory breach. *See Mori v. Matsushita Elec. Corp. of Am.*, 380 So. 2d 461, 463 (Fla. 3d DCA 1980) ("A prospective breach of the contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute.")

In order to avoid liability for its uncontroverted anticipatory breach, however, PEPI asserts the incredible position that the Due Diligence Sign-Off was not required by the Commitment Letter. Unfortunately for PEPI, its counsel, Jeffrey Fine, admitted in his written

44

response to the Default Letter, that PEPI had the obligation to provide the written Due Diligence Sign-Off. Fine attempted to cure the anticipatory breach of the Commitment Letter by finally providing the Due Diligence Sign-Off after the declaration of default. Fine stated:

> 3. As had been previously indicated to you, all material due diligence on the Loan has been completed by PEPI and PEPI is ready, willing and able to immediately fund the Loan in accordance with the Commitment Letter upon receipt of Bankruptcy Court approval. Although PEPI has also told you repeatedly during this past week that the Borrowers are free to file Chapter 11 at any time, ***please consider this your formal 3 business day notice that due diligence has been completed***. . . .
> (emphasis added)

(Blasnick Depo. Ex. 6)

Fine was designated as PEPI's corporate representative in deposition with respect to its affirmative defenses and counterclaims in this matter and has submitted the only affidavit in opposition to the SJ Motion. PEPI is clearly bound by the admission of its counsel in the response letter. *Laird v. Air Carrier Engine Service, Inc.*, 263 F.2d 948, 953 (5th Cir. 1959).

PEPI also admitted in deposition that there was a requirement to provide the written Due Diligence Sign-Off. Radunsky testified:

> Q. Could the commitment terminate on February 8th, 2010, given the parenthetical that follows the February 2010 date?
>
> A. I think if you read this in the following way it could and that would be on February 1st, if Pepi had given notice it had completed due diligence under this paragraph – had given that notice, and then by February 8th there wasn't a bankruptcy filing, then it would have terminated, I think.

(Radunsky Depo. p. 85, lines 6-14)

> Q. Well, the reason I'm asking you that question is the only way the commitment could terminate on February 8, 2010 is

45

if Pepi had given prior notice of completion of its due diligence, right?

    A.    ***I think that's right.  That's how I'm reading it now.***

(Radunsky Depo. p. 86, lines 6-15) (emphasis added)

Based upon Fine's and Radunsky's admissions, PEPI cannot avoid liability for the obligation to provide the Due Diligence Sign-Off by submitting a self-serving affidavit denying the obligation. "Parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions."  *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985).

    Later in deposition, Radunsky disclosed PEPI's secret intent to only be bound to provide the Due Diligence Sign-Off as a way to avoid its obligations under the Commitment Letter, notwithstanding the agreement of the parties.  Radunsky admitted:

    Q.    If it was Pepi's intent not to provide a confirmation that due diligence was completed until the actual funding date, what was the purpose of the parenthetical in the Commitment Letter that we talked about earlier?

        *    *    *

    A.    It was a – it was never expected to be used by us to trigger a termination of the Commitment Letter.  It was a safety valve in case we needed it to terminate the Commitment Letter.  It would be used only if it appeared that Fiddler's was not gonna file bankruptcy and so it would need some trigger to make the commitment go away.  It was absolutely not expected to be used.

(Radunsky Depo. p. 103, lines 10-14; lines 18-25)

46

Notwithstanding the clear bad faith of such conduct, PEPI is necessarily admitting that written confirmation of the Due Diligence Sign-Off could be provided before a closing of the DIP Loan by taking the position that the Due Diligence Sign-Off was a trigger that only PEPI could pull.

The Due Diligence Sign-Off was intended to be a written confirmation of "PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of [Debtors] …" (Commitment Letter p. 4). The Due Diligence Sign-Off is identified in the parenthetical phrase contained in the following provision of the Commitment Letter:

> . . . The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by [Debtors}, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 *(**or such later date that is three business days after Agent has advised Company it has completed its due diligence**)* . . . (emphasis added)

Therefore, PEPI's contention in the Response that completion of due diligence could only occur at the funding of the DIP Loan is disingenuous, at a minimum, and completely contrary to their admissions and the language of the Commitment Letter, at most.

Obviously, the closing, or funding of the DIP Loan would occur subsequent to issuance of the Due Diligence Sign-Off. PEPI's Response tries to confuse or obfuscate closing conditions, which are continuing to be satisfied up to the funding of the DIP Loan, with the requirement to provide written confirmation of the Due Diligence Sign-Off. However, since PEPI has argued that the Due Diligence Sign-Off was a trigger for PEPI to terminate the Commitment Letter, then PEPI is necessarily admitting the Due Diligence Sign-Off could, and would, be provided before closing.

47

Additionally, reasonable contract construction requires the Court to find that the Due Diligence Sign-Off was intended for the parties' mutual benefit, given the use of the phrase "the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence) . . . ." Clearly, the language selected by the parties was to provide the Debtors assurance that PEPI was ready to proceed with a DIP loan before filing for bankruptcy protection. In fact, Radunsky admitted as follows:

> Q.    Why was the earlier date tied to notice from Pepi of completion of due diligence? Do you know?
>
> A.    **_I think that was seen as a way to let the borrower know then that we were ready to go._**

(Radunsky Depo. p. 83, lines 20-23) (emphasis added)

Accordingly, the parties were mutually bound to honor the Due Diligence Sign-Off obligations under the Commitment Letter. To state otherwise would make the Commitment Letter illusory and unenforceable by either party. "It is basic hornbook law that a contract which is not mutually enforceable is an illusory contract" *Pan-Am Tobacco Co. v. Dept. of Corrections*, 471 So. 2d 4, 5 (Fla. 1984) citing to *Howard Cole & Co, v. Williams,* 27 So. 2d 352 (1946).

Based upon the anticipatory breach, the Court must grant partial summary judgment in favor of the Debtors and enforce the language of the Commitment Letter that states the Debtors' "indemnities and obligations shall not survive in the event of a default by PEPI hereunder." (Commitment Letter, p. 4) Therefore, the Debtors are entitled to a partial summary judgment finding that they have no obligation to pay the Break Up Fee or the second half of the Commitment Fee based upon PEPI's anticipatory breach of contract.

48

AA00546

## IV.   CONCLUSION

PEPI's Response is nothing more than a concerted effort to confuse and obfuscate the issues in connection with the SJ Motion, including (i) attempting to seek relief in violation of the Scheduling Order, (ii) advancing numerous self-serving conclusory statements from Mr. Fine as opposed to material facts, (iii) advancing theoretical arguments based on "appearances" or conjecture as opposed to "facts," (iv) spinning the undisputed material facts in a way that contorts them completely out of shape, and (v) generally doing everything possible to exhaust the Court to the point of "throwing up its hands" in the hope that the Court will simply deny the SJ Motion.  Despite all of those efforts, PEPI cannot escape some very simple truths.

First, the Commitment Letter required that PEPI provide the Due Diligence Sign Off before the Debtors were required to file Chapter 11.  Not only did PEPI not provide the Due Diligence Sign Off, but after numerous requests from the Debtors, PEPI finally, affirmatively and unequivocally told the Debtors on February 16, 2010 that PEPI never had an intent to provide the Due Diligence Sign Off.  The best evidence though of the requirement for the Due Diligence Sign Off is the undisputed fact that PEPI's counsel and designated corporate representative, Mr. Fine, sent his letter responding to the Debtors' Default Letter wherein PEPI, through Mr. Fine, provided the Due Diligence Sign Off and attempted to commence the deadline for the Debtors to file bankruptcy.  There is no clearer admission of a default under the Commitment Letter than Mr. Fine's letter.  Moreover, nothing PEPI can or has said in the Response or the Fine Affidavit can undo that stark admission.

49

AA00547

Second, the Commitment Letter clearly provided for the Escrow Provisions to be included in the DIP loan documents. The undisputed facts are that PEPI unilaterally refused to include the Escrow Provisions. The deeds in lieu of foreclosure, the consent judgments and the valuation mechanism were each designed to provide for a speedy foreclosure process with regard to the unencumbered property at the top of the waterfall, which in turn was beneficial to PEPI and more importantly beneficial to the Debtors' prepetition secured lenders with liens on real estate farther down on the waterfall. PEPI's efforts in the Response to try to justify its refusal to include the Escrow Provisions and excuse its blatant breach of the Commitment Letter are not supported by the undisputed facts or the applicable law.

Third, the Commitment Letter clearly provided for the inclusion of the Waterfall Provision in the DIP loan documents wherein PEPI specifically agreed that it would **not foreclose** on any real property in the waterfall **unless it has first collected out** of the property earlier in the waterfall. In PEPI's first draft of the DIP loan agreement, PEPI drafted the Waterfall Provision in a manner consistent with the Commitment Letter. However, thereafter, PEPI changed its position and insisted on language for the Waterfall Provision that allowed PEPI to commence foreclosure actions and obtain foreclosure judgments against all of the real property in the waterfall at the same time, agreeing only to conduct foreclosure sales in the order of the waterfall. PEPI's insistence on this revised language eviscerated the protections that the Waterfall Provision provided for the Debtors' secured creditors, and violated the specific provisions of the Commitment Letter. Again, all of PEPI's machinations in the Response to try to explain or justify its blatant breach of the Commitment Letter are unfounded and do not excuse such breach.

50

AA00548

As a result, the Debtors are entitled to partial summary judgment pursuant to the SJ Motion that PEPI breached the Commitment Letter in respect of the Escrow Provisions and the Waterfall Provision, and also anticipatorily breached the Commitment Letter in connection with its unequivocal statement that it never intended to provide the Due Diligence Sign Off as required by the Commitment Letter.

AA00549

## CERTIFICATE OF SERVICE

## AND COMPLIANCE WITH LOCL RULE 2090-1

WE HEREBY CERTIFY that on March 12, 2015, we electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to: Alan J. Perlman, Esq., Roetzel & Andress, Attorneys for PEPI Capital, 350 E. Las Olas Blvd., Suite 1150, Ft. Lauderdale, Florida 33301.

I HEREBY FURTHER CERTIFY that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Plaintiff
100 S.E. Second Street, 44th Floor
Miami, FL 33131

/s/ Paul J. Battista
Paul J. Battista
Florida Bar No. 884162

Phone:     (305) 349-2300
Fax:         (305) 349-2310
pbattista@gjb-law.com

and

TOBIN & REYES, P.A.
Attorneys for Plaintiff
Mizner Park Office Tower
225 N. E. Mizner Blvd., Suite 510
Boca Raton, FL 33432

/s/Ricardo A. Reyes
Ricardo A. Reyes

52

Florida Bar No. 864056
Carrie Stolzer Robinson
Florida Bar No. 0354030
Phone:     (561) 620-0656
Fax:          (561) 620-0657
eservice@tobinreyes.com
rar@tobinreyes.com
csrobinson@tobinreyes.com

AA00551

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates

        Debtors

_____/

Case No.: 8:10-BK-03846-KRM
(Jointly Administered)

Chapter 11

FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries and affiliates,

        Plaintiffs/Counterdefendants,

vs.

Adv. Proc. No.: 11-ap-00809-KRM

PEPI CAPITAL, L.P.,

        Defendant/Counterplaintiff and
        Third Party Plaintiff

_____

PEPI CAPITAL, L.P.,

        Third Party Plaintiff,

vs.

GULF BAY CAPITAL, INC. and
AUBREY J. FERRAO,

        Third Party Defendants.

_____/

**PLAINTIFF'S NOTICE OF FILING ADDITIONAL EXHIBITS IN SUPPORT OF
PLAINTIFF'S REPLY TO PEPI CAPITAL, L.P.'S RESPONSE IN OPPOSITION TO
DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW**

Fiddler's Creek, LLC ("Fiddler's Creek") and its twenty-seven, pre-confirmation,

subsidiaries (collectively the "Debtors"), by and through undersigned counsel, hereby gives

notice and files the following additional exhibits in support of Plaintiff's Reply to Pepi Capital,

L.P.'s Response in Opposition to Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law [ECF No._____], which exhibits are attached hereto as *Exhibit "A"*:

1. Gulf Bay Capital Exh. 1 to DiNardo Deposition, which is an Email from Jeffrey Fine, dated February 2, 2010 with an attachment.

2. Gulf Bay Capital Exh. 2 to DiNardo Deposition, which is an Email from Elizabeth Helm, dated February 11, 2010 with an attachment.

Dated: March 12, 2015.

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for the Plaintiffs
100 Southeast Second Street
Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:   /s/ Paul J. Battista
     Paul J. Battista, Esq.
     Florida Bar No. 884162
     pbattista@gjb-law.com

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice was served via transmission of a Notice of Electronic Filing through the Court's CM/ECF system upon all parties listed on the below service list this <u>12th</u> day of March, 2015.

By:   /s/ Paul J. Battista
     Paul J. Battista, Esq.

AA00553

# EXHIBIT "1"

AA00554

| From: | Fine, Jeffrey [Jeff.Fine@klgates.com] |
|---|---|
| Sent: | Tuesday, February 02, 2010 11:44 PM |
| To: | pbattista@gjb-law.com; Patricia Redmond |
| Cc: | david.radunsky@pgrp.net; cj.lorio@pgrp.net; K.Springfield@pgrp.net; Cox, John; Helm, Elizabeth; Daniel, Rick; Feroze, Zammurad |
| Subject: | RE: -Fiddler's Loan Agreement |
| Attachments: | DA-#3086014-v5-DIP_Loan_Agreement_(Pepi_Fiddler's_Creek).DOC |

All: I attach a draft comprehensive Loan Agreement ("LA") which contains comprehensive guaranty, pledge, DIP financing and related terms. We will forward in the near future draft form mortgage, note and related loan documents.

Although we expect you to thoroughly review and comment upon the LA, there are some items we want to bring to your attention:

1. As indicated in a prior email, we assume that we are adding DW Land Associates and GB Development to the agreement--you will see these entities are italicized. We are also unclear regarding DY Land Holdings II as an LP or LLC--also italicized.

2. We will need an assignment of declarant rights re HOA and development issues from GB 31-- that agreement, as well as the pledge of equity interests from the immediate upstream owners of the borrowers, as well as the subordination agreement from Mr. Ferrao will be separate documents not part of the LA (other than being listed as items to complete as conditions precedent).

3. Please fill in any blanks for which you may have the relevant information.

4. The LA contains a carve-out provision--but no numbers plugged in--this is a subject best addressed to begin with in a discussion between Paul and I.

5. We are very close to forwarding a draft Interim Order which will be conformed to the LA.

Finally, in order to expedite these matters, I am forwarding this document without my client (or partners) having first revie <<DA-#3086014-v5-DIP_Loan_Agreement_(Pepi_Fiddler's_Creek).DOC>> wed same. Therefore, the LA is subject to the review, comment, change and ultimate approval of PEPI and counsel.

Thank you,

Jeff Fine

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

SWM002805

AA00555

KLG Draft of 2.2.10

# DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

### by and among

### FIDDLER'S CREEK LLC,
### GB PENINSULA, LTD.,

### as Borrowers

951 LAND HOLDINGS LTD,
951 LAND HOLDINGS LLC,
DY LAND ASSOCIATES LTD,
DY LAND ASSOCIATES LLC,
[DW LAND ASSOCIATES, LTD.]
DY LAND HOLDINGS II, [LTD][LLC],
FC BEACH LTD,
FC BEACH LLC,
FC COMMERCIAL, LLC,
FC GOLF LTD,
FC GOLF LLC
FC HOTEL, LTD,
FC HOTEL LLC,
FC MARINA LLC,
FC PARCEL 73, LLC,
FC RESORT, LTD,
FC RESORT LLC,
FIDDLER'S CREEK MANAGEMENT INC.,
[GB DEVELOPMENT, LTD.]
GBFC DEVELOPMENT LTD,
GBFC DEVELOPMENT LLC,
GBFC MARINA LTD,
GBP DEVELOPMENT LTD.,
GULF BAY HOSPITALITY LTD,
GULF BAY HOSPITALITY COMPANY, LLC,
GULF BAY HOTEL COMPANY LTD,
GULF BAY HOTEL COMPANY, LLC,

### as Guarantors

### PEPI CAPITAL, L.P., AS AGENT

### and

### THE LENDERS PARTY HERETO
### Dated as of February __, 2010

DA-3086014 v4 1203528-00006

SWM002806

AA00556

DA-3007339 v4 1203528-00001
DA-3086014 v4 1203528-00006

SWM002807

AA00557

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT, is entered into as of February ___, 2010, by and among

    (i)    PEPI Capital, L.P., a Delaware limited partnership ("*Agent*"), with a place of business located at 2300 West Plano Parkway, Plano, Texas 75075;

    (ii)    the lenders party hereto (each a "*Lender*" and, collectively, "*Lenders*");

    (iii)    Fiddler's Creek LLC, a Delaware limited liability company ("*Fiddler's Creek*") as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined), with its principal place of business located at _____ and GB Peninsula, Ltd., a _____ limited partnership ("*GBP*") as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____ (each a "*Borrower*" and, collectively "*Borrowers*"); and

    (iv)    951 Land Holdings, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; 951 Land Holdings, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; DY Land Associates Ltd, a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; DY Land Associates LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; DY Land Holdings Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; DY Land Holdings II, *[Ltd.][LLC]*, a Florida limited *[partnership][liability company]*, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; FC Beach Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; FC Beach LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; FC Commercial LLC, a Florida limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; FC Golf Ltd., Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at _____; FC Golf LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the

SWM002808

AA00558

Bankruptcy Code, with its principal place of business located at
_____; FC Hotel Ltd., a Florida limited partnership,
as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal
place of business located at _____; FC Hotel LLC, a
Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the
Bankruptcy Code, with its principal place of business located at
_____; FC Marina LLC, a Delaware limited liability
company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its
principal place of business located at _____; FC
Parcel 73, LLC, a Florida limited liability company, as debtor and debtor in possession under
Chapter 11 of the Bankruptcy Code, with its principal place of business located at
_____; FC Resort Ltd., a Florida limited partnership,
as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal
place of business located at _____; FC Resort LLC, a
Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the
Bankruptcy Code, with its principal place of business located at
_____; Fiddler's Creek Management Inc., Florida
corporation, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with
its principal place of business located at _____;
GBFC Development Ltd., a Florida limited partnership, as debtor and debtor in possession under
Chapter 11 of the Bankruptcy Code, with its principal place of business located at
_____; GBFC Development LLC, a Delaware
limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy
Code, with its principal place of business located at
_____; GBFC Marina Ltd., a Florida limited
partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with
its principal place of business located at _____; GBP
Development Ltd., a _____ limited partnership, as debtor and debtor in
possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located
at _____; Gulf Bay Hospitality Ltd.., a Florida
limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy
Code, with its principal place of business located at
_____; Gulf Bay Hospitality Company, LLC, a
Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the
Bankruptcy Code, with its principal place of business located at
_____; Gulf Bay Hotel Company Ltd., a Florida
limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy
Code, with its principal place of business located at
_____; and Gulf Bay Hotel Company LLC, a
Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the
Bankruptcy Code, with its principal place of business located at
_____ (each a "*Guarantor*" and, collectively,
"*Guarantors*").

*Need to check entities against ownership schedule to add DW Land Associates, Ltd. and GB Development, Ltd.*

SWM002809

AA00559

PRELIMINARY STATEMENTS:

        1.      On February ___, 2010 (the "**Petition Date**"), Borrowers and Guarantors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Fort Meyers Division (the "**Bankruptcy Court**"), administratively consolidated Case No. _____ (collectively, the "**Chapter 11 Case**").

        2.      Borrowers and Guarantors are continuing to operate their business and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

        3.      Borrowers have an immediate need for funds to continue to operate their business.

        4.      Borrowers have requested that Lenders provide to Borrowers a Debtor-in-Possession credit facility in an aggregate amount not to exceed $27,000,000 in conjunction with the Chapter 11 Case (the "**Loan**" or "**DIP Facility**"). Under the Commitment Letter, Borrowers agreed to deposit the Commitment Fee (as defined herein) with Agent, with the agreement that, upon funding of the Initial Advance (as defined herein), $405,000 of the Commitment Fee would be retained by Agent; the balance would be paid from the proceeds of the Initial Advance; and Agent would remit the remaining escrow to Borrowers. Borrowers have requested that the DIP Facility consist of (i) an initial advance (the "**Initial Advance**") of $4,000,000, consisting of $_____ to cover operations, $405,000 to pay the balance of Lenders' Commitment Fee (as defined below), $275,000 for Agent's due diligence expenses and $_____ for other bankruptcy expenses, and (ii) upon entry of the Final Order (as defined below) approved by the Bankruptcy Court subsequent monthly advances subject to the approved 18 Month Budget.

        5.      Lenders have indicated their willingness to make the Loan *provided* Borrowers shall obtain (i) the Interim Order (as defined below) approving the Loan and the Initial Advance on an emergency interim basis, which Interim Order shall not be reversed, modified, amended, stayed, rescinded or vacated and (ii) obtain within forty-five (45) days after the Interim Order Entry Date, the Final Order (as defined below) approving the Loan including, without limitation, the Initial Advance, on a final basis, which Final Order shall not be appealed, reversed, modified, amended, stayed, rescinded or vacated. The Interim and Final Orders shall provide that all advances under the Loan, including without limitation the Initial Advance, shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by first priority liens on and first priority senior security interests in all now owned and hereafter acquired unencumbered assets of each Borrower and each Guarantor pursuant to Sections 364(c)(2) and (c)(3) (only as to Permitted Liens) and 364(d) of the Bankruptcy Code, and secured by priming first priority liens on and first priority senior security interests in favor of Agent in all of the Collateral now owned or hereafter acquired by any Debtor pursuant to Sections 364(c)(2) and (c)(3) (only as to Permitted

SWM002810

AA00560

Liens) and 364(d) of the Bankruptcy Code (subject only to the Carve-Out (as defined below)). The Interim and Final Orders shall, at a minimum, contain provisions (y) granting all such senior and priming liens and claims to Agent for all monies actually advanced even if such Interim and Final Orders are subsequently vacated, modified, rescinded or set aside and (z) providing for the lifting of the 362 automatic stay and any other stay to permit Agent immediately to realize upon the Collateral (as defined below) should any Event of Default (as defined below) remain uncured after the expiration of any applicable grace period. All liens and claims granted to Agent shall have cross default and cross collateral provisions.

NOW THEREFORE, in consideration of the premises set forth above and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION.

1.1 **Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"*13 Week Budget*" means the cash budget of Borrowers and Guarantors prepared and submitted to Lender on a quarterly basis, setting forth, on a weekly basis, for the 13-week period commencing with each calendar quarter (i) the anticipated combined consolidated cash receipts of Borrowers (and the sources thereof), (ii) all expenditures proposed to be made during such 13-week period and (iii) a comparison of each Borrower's and Guarantor's actual expenditures and receipts to the 13 Week Budget most recently delivered to Agent, in form and substance satisfactory to Agent.

"*18 Month Budget*" means the operating and financial budget of Borrowers and Guarantors prepared and submitted to Agent, setting forth, on a monthly basis, for the 18-month period commencing January, 2010, (i) the anticipated cash receipts of each Borrower and Guarantor (and the sources thereof), (ii) all expenditures proposed to be made during such 18-month period, including, without limitation, all working capital needs, operating expenses, professional fees to be paid to Debtors' Professionals, financing costs for secured lenders, real estate taxes, community development district assessments, and Managed Expenses, and (iii) a comparison of each Borrower's and Guarantor's actual expenditures and receipts to the 18 Month Budget most recently delivered to Agent, in form and substance satisfactory to Agent.

"*Acceptable Plan*" means any plan of reorganization of either Borrowers or any Guarantor, (a) that, with respect to the claims or interests of Agent and Lenders, leaves unaltered the legal, equitable, and contractual rights to which such claims or interests entitle Agent and Lenders as the holder of such claims or interests, and (b) in favor of which Agent and Lenders vote.

"*Accessions*" means all "accessions" (as that term is defined in the Code).

"*Account Debtor*" means any Person who is or who may become obligated under, with respect to, or on account of an Account.

SWM002811

AA00561

"*Accounts*" of a Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "accounts" (as that term is defined in the Code), and any and all Supporting Obligations in respect thereof.

"*Advance*" means an advance made by any Lender to either Borrower pursuant to Section 2 hereof.

"*Affiliate*" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For purposes of this definition, "control" as applied to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract, or otherwise.

"*Agent*" has the meaning set forth in the introductory paragraph to this Agreement

"*Agent Related Persons*" means Agent, its agents, employees, and attorneys in fact, and "*Agent Related Person*" means any of them.

"*Agent's Account*" means the Deposit Account of Agent designated by Agent from time to time as the account into which Borrowers and Guarantors shall make all payments to Agent for the benefit of Agent and Lenders and into which Lenders shall make all payments to Agent under this Agreement and the other Loan Documents; unless and until Agent notifies Borrowers and Lenders to the contrary, Agent's Account shall be that certain deposit account bearing account number _____ and maintained by Agent with _____, ABA No. _____.

"*Agreement*" means this Debtor-In-Possession Loan and Security Agreement and any extensions, restatements, riders, supplements, amendments, or modifications to or in connection with this Debtor-In-Possession Loan and Security Agreement.

"*As-Extracted Collateral*" means all "as-extracted collateral" (as that term is defined in the Code).

"*Assignment and Acceptance*" means an Assignment and Acceptance Agreement substantially in the form of Exhibit D.

"*Authorized Officer*" of a Person means any officer of such Person.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as in effect from time to time and including any successor statute.

"*Bankruptcy Court*" has the meaning set forth in the first Preliminary Statement to this Agreement and includes any court taking jurisdiction over the Chapter 11 Case.

"*Books*" of a Person means all of such Person's now owned or hereafter acquired books and Records including without limitation: ledgers; records indicating, summarizing, or evidencing such Person's properties or assets (including the Collateral or the Real Property) or liabilities; all information relating to such Person's business operations or financial condition and

SWM002812

AA00562

all of its goods or General Intangibles related to such information; and all computer programs, disc or tape files, printouts, runs, or other computer prepared information, and the equipment containing such information.

"*Borrower*" and "*Borrowers*" have the meanings set forth in the introductory paragraph of this Agreement.

"*Borrower's Account*" means the account of Borrowers maintained by Borrowers with [_____] at its office at [_____], Account No. [_____].

"*Borrowing*" means a borrowing consisting of an Advance made by a Lender.

"*Break-Up Fee*" means a fee in the amount of $1,000,000.00.

"*Business Day*" means any day which is not a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of Texas or the State of Florida.

"*Capital Expenditures*" means, with respect to any Person, all expenditures made and liabilities incurred for the acquisition of assets which are capitalized in accordance with GAAP.

"*Carve-Out*" means an aggregate amount not exceeding $_____, which amount may be used by Borrowers after the occurrence and during the continuance of a Default or an Event of Default, notwithstanding Agent's security interests in the Collateral and Agent's and Lenders' rights and superpriority claims hereunder, to pay fees or expenses (the "*Administrative Fees*") incurred by any Debtor constituting (i) allowances of compensation for services rendered or reimbursement or expenses awarded by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code or otherwise, to Debtors' Professionals, (ii) allowances of compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy Court under Section 105(a), 330 or 331 of the Bankruptcy Code, to accountants, attorneys and other professionals retained in the Chapter 11 Case by the official unsecured creditors' committee (the "*Committee*") appointed in accordance with Section 1102 of the Bankruptcy Code, (iii) fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under Section 1930(a), Title 28, United States Code, and (iv) the actual, necessary expenses, other than compensation, and reimbursement pursuant to Section 503(b)(4) of the Bankruptcy Code, incurred by a member of the Committee (but excluding fees and expenses of third party professional persons employed by individual Committee members), if such expenses are incurred in the performance of the duties of such Committee and are allowed by the Bankruptcy Court; *provided, however*, that (a) the total aggregate amount of such fees and expenses for the Debtors' Professionals shall not exceed $_____, (b) the total aggregate amount of such other fees and expenses described in clauses (ii), (iii), and (iv) above shall not exceed $_____ (in each case, in addition to compensation awarded on a monthly or other interim basis in accordance with applicable Orders of the Bankruptcy Court prior to the occurrence of a Default or an Event of Default (whether or not paid)), and (c) such dollar limitation on fees and disbursements shall not include any retainer fees paid to the Debtors' Professionals prior to the Petition Date (the "*Retainers*") and shall not be reduced by the amount of any compensation and reimbursement of expenses paid prior to the occurrence of a Default or an Event of Default in

SWM002813

AA00563

respect of which the Carve-Out is invoked or any fees, expenses, indemnities or other amounts paid to Agent, Lenders, and their attorneys and agents under this Agreement or otherwise.

"*CDD*" means CDD #1 or CDD #2.

"*CDD #1*" means Fiddler's Creek Community Development District 1, established August 13, 1996.

"*CDD #2*" means Fiddler's Creek Community Development District 2, established November 19, 2002.

"*Chapter 11 Case*" has the meaning set forth in the first Preliminary Statement to this Agreement.

"*Closing Date*" means the date all of the conditions set forth in Section 3.1 have been met or waived in writing by Agent and the Initial Advance is made to Borrowers.

"*Code*" means the Florida Uniform Commercial Code, as in effect from time to time.

"*Collateral*" means all of the Debtor Collateral and all assets, real and personal, pledged to Agent for the benefit of Lenders pursuant to the Loan Documents by all other Obligors, including, without limitation, the Real Property.

"*Collateral Monitoring Fee*" means a fee in the amount of $7,500 per month.

"*Commitment*" means, with respect to each Lender, its Commitment, and, with respect to all Lenders, their Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 17.1, *provided* that the aggregate of all Commitments shall not exceed the Maximum Committed Amount.

"*Commitment Fee*" means a fee in the amount of $810,000.

"*Commitment Letter*" shall mean, collectively, (a) that certain commitment letter, dated as of December 31, 2009, from Agent to Borrowers, (b) that certain fee letter, dated as of December 31, 2009, from Agent to Borrowers, and (c) that certain amendment letter, dated as of January 15, 2010, from Agent to Borrowers, each of such letters consented to by Borrowers.

"*Consumer Goods*" means all "consumer goods" (as that term is defined in the Code).

"*Copyright Licenses*" means any written agreement naming a Borrower as licensor or licensee granting any right under any Copyright, including the grant of rights to copy, publicly perform, create derivative works, manufacture, distribute, exploit and sell materials derived from any Copyright.

SWM002814

AA00564

"*Copyrights*" means (a) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof and (b) the right to obtain all renewals thereof.

"*Customary Expenses*" means all customary Agent and Lender costs associated with the Chapter 11 process, including, without limitation, the Commitment Fee, the Exit Fee, the Break-Up Fee, the Collateral Monitoring Fee, an initial expense deposit of $_____ provided to Agent upon Borrowers' execution of the Proposal Letter to cover Agent's out of pocket expenses, and, upon the funding of the Initial Advance, $_____ to be paid to Agent for its benefit and for the benefit of Lenders to cover Lender Expenses and, upon two (2) Business Days' written request from time to time such additional deposits as may be requested by Lender to cover Lender Expenses.

"*Debtor Collateral*" means all of each Debtor's now owned or hereafter acquired assets, whether real, personal, tangible or intangible including, without limitation, all right, title and interest of each Debtor in and to the following:

        (a)      Accounts,

        (b)      Books,

        (c)      Deposit Accounts,

        (d)      General Intangibles, including without limitation all Intellectual Property and Payment Intangibles,

        (e)      Goods, including without limitation (i) Equipment, (ii) Inventory, (iii) Consumer Goods, (iv) Farm Products, (v) Fixtures, (vi) Accessions and (vii) As-Extracted Collateral,

        (f)      Investment Property,

        (g)      Equity Interests,

        (h)      Negotiable Collateral,

        (i)      Real Property,

        (j)      All other goods and personal property of each Debtor, whether tangible or intangible and wherever located, including money, cash, cash equivalents or other assets of each Borrower that now or hereafter come into the possession, custody, or control of Agent or any Debtor,

        (k)      All present and future rights, titles, and interests each Debtor may now have or be or become entitled to under or by virtue of any licenses, leases of real property,

SWM002815

AA00565

leases of personal property, contracts (including, without limitation, sales contracts with home buyers, developers, and other Persons), warranties, insurance policies (including, without limitation, insurance for construction and other defects), all rights under all covenants, conditions, and restrictions relating to any of the Real Property, consents, permits, franchises, variances, certifications and approvals of governmental agencies and all other similar tangible and intangible property of each Debtor and the Proceeds thereof, and

(l)     the Proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Deposit Accounts, General Intangibles, Goods, Investment Property, Negotiable Collateral, Real Property, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the Proceeds thereof.

"*Debtors*" means Borrowers and Guarantors and "*Debtor*" means any of them.

"*Debtors' Professionals*" means all persons retained or engaged by Debtors as professional persons within the meaning of Section 327 of the Bankruptcy Code.

"*Declarants*" means 951 Land Holdings, Ltd., GBFC Development, Ltd., GB Peninsula, Ltd., GB 31, Ltd., and GBP Development, Ltd. and "*Declarant*" means any of them.

"*Deed of Trust*" means one or more deeds of trust or mortgages in favor of Agent, in form and substance satisfactory to Agent, covering the real property described in Exhibit A hereto in the form attached hereto as Exhibit F.

"*Default*" means any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"*Defaulting Lender*" means any Lender that fails to make any Advance (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

"*Defaulting Lender Rate*" means (a) for the first 3 days from and after the date the relevant payment is due, the then-current one-month LIBOR published in the "Money Rates" section of the *Wall Street Journal*, and (b) thereafter, the interest rate then applicable to Advances.

"*Default Interest Rate*" means the rate per annum equal to the lesser of (i) the Non-Default Interest Rate plus 300 basis points, and (ii) the maximum rate provided by applicable law.

"*Deposit Account*" of any Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to any "deposit account" as that term is defined in the Code.

"*Eligible Transferee*" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a

SWM002816

AA00566

commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, *provided* that such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates and Related Funds) total assets in excess of $250,000,000, (d) any Lender or any Affiliate (other than individuals) or Related Fund of a Lender, and (e) any other Person approved by Agent.

"*Equipment*" means all of each Borrower's now owned or hereafter acquired right, title, and interest with respect to "equipment" as that term is defined in the Code.

"*Equity Interest*" means (i) ownership interests in a Person, (ii) all rights associated with such ownership interests, (iii) all shares of, all securities convertible or exchangeable into, and all warrants, options or other rights to purchase shares of stock, partnership interests, membership interests or other ownership interests in such Person, (iv) any certificates or instruments representing the Equity Interest or any additional shares, convertible or exchangeable securities, warrants, and other rights and all dividends, cash, options, warrants, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such shares and other interests in such Person, and (v) all accessions and additions to and proceeds of the foregoing, including, without limitation, any and all cash, instruments, dividends and other property from time to time received, receivable, or otherwise distributed in respect of or in exchange for any of the foregoing.

"*Event of Default*" has the meaning set forth in Article 9.

"*Extension Conditions*" means, for any Extension Period, (i) Agent's receipt at least 30 days prior to the then-current Maturity Date of written notice from Borrowers requesting an Extension Period, (ii) Agent's receipt, at least 30 days prior to the then-current Maturity Date, of the Extension Fee for such Extension Period, (iii) Agent's receipt and approval of a budget for such Extension Period, and (iv) as of the then-effective Maturity Date, no Default shall have occurred and be continuing.

"*Extension Fee*" means a fee, determined as of the first day of an Extension Period, equal to 0.5% of the sum of (i) the outstanding principal balance of the Loan as of such date and (ii) the difference between the Maximum Committed Amount and the aggregate Advances made under the Loan.

"*Extension Period*" means a six month period extending the Maturity Date for such period. There shall be no more than two Extension Periods.

"*Existing Liens*" has the meaning set forth in Section 5.1.

SWM002817

AA00567

"*Exit Fee*" means, with respect to any principal payment, whether mandatory or voluntary, a fee in the amount equal to 2.0% of such payment of the principal balance of the Loan.

"*Farm Products*" means all "farm products" (as that term is defined in the Code).

"*Fiddler's Creek*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Final Order*" means an order in form and substance satisfactory to Agent entered following a hearing by the judge of the Bankruptcy Court in which the Chapter 11 Case is pending, which is not stayed, which has not been appealed and with respect to which the time for appeal has expired, which order shall address, *inter alia*, in form and substance acceptable to Agent and its counsel, the following matters:

(i)     approval of Debtors' motion to obtain credit from Lenders on the basis described herein, and final approval of the terms and provisions hereof;

(ii)     pursuant to Sections 364(c)(1) of the Bankruptcy Code, the grant of super priority administrative (subject only to certain Permitted Liens) liens and security interests to Agent in and to the Collateral then owned or thereafter acquired that is unencumbered to secure the Obligations, and the enforceability of such liens and security interests and pursuant to Sections 364(c)(2) and (3) (only as to Permitted Liens) and 364(d) of the Bankruptcy Code, the grant of priming first priority liens on and first priming priority senior security interests to Agent in all of the Collateral then owned or thereafter acquired by any Debtor (subject only to certain Permitted Liens and the Carve Out) to secure the Obligations, and the enforceability of such liens and security interests, with all such liens and claims to be cross-defaulted and cross-collateralized;

(iii)     the automatic perfection of such liens and security interests;

(iv)     the inability of any Debtor to prime or surcharge the Collateral of Agent or grant other liens or security interests thereon of equal or senior priority;

(v)     appropriate findings to ensure protection under Section 364(e) of the Bankruptcy Code if an appeal is taken;

(vi)     appropriate findings of fact that the Loan, including without limitation the Initial Advance, is necessary to avoid immediate and irreparable harm to Debtors;

(vii)     appropriate findings regarding the adequacy of notice to creditors;

(viii)     the inability of any Debtor to modify the rights of Agent or any Lender in a plan of reorganization without the consent of Agent;

(ix)     approval of the remedies available to Agent upon the occurrence of an Event of Default;

SWM002818

AA00568

(x)     binding effect on successors and trustees in superseding proceedings; and

(xi)    relief from the automatic stay of Section 362 of the Bankruptcy Code as necessary to carry out the terms of the Loan Documents and to permit enforcement of Agent's and Lenders' rights and remedies hereunder.

"*Final Order Entry Date*" means the date on which the Final Order is entered by the Bankruptcy Court following a hearing on Debtors' motion for final approval of the Loan and this Agreement.

"*Fixtures*" means all "fixtures" (as that term is defined in the Code).

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"*GBP*" has the meaning set forth in the introductory paragraph to this Agreement.

"*General Intangibles*" of any Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "general intangibles" as that term is defined in the Code.

"*Goods*" means all "goods" (as that term is defined in the Code).

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"*Guarantor*" and "*Guarantors*" have the meanings set forth in the introductory paragraph of this Agreement.

"*Guaranty*" means the guaranty set forth in Article 16 hereof.

"*Initial Advance*" has the meaning set forth in the fourth Preliminary Statement to this Agreement.

"*Intellectual Property*" means, collectively, all rights, priorities and privileges of each Borrower relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including Copyrights, Copyright Licenses, Patents, Patent Licenses, Software, Trademarks, Trademark Licenses, and trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all Proceeds and damages therefrom.

"*Interim Order*" means an order, in substantially the form of Exhibit B hereto, entered following an initial hearing on Debtors' motion for approval of this Agreement by the judge of the Bankruptcy Court in which the Chapter 11 Case is pending, which is not stayed and which

SWM002819

AA00569

order shall address, *inter alia*, in form and substance acceptable to Agent and its counsel, the following matters:

(i)     approval of Debtors' motion to obtain credit from Lenders on the basis described herein, and approval of the terms and provisions hereof;

(ii)    pursuant to Sections 364(c)(1) of the Bankruptcy Code, the grant to Agent of super priority administrative liens and security interests (subject only to certain Permitted Liens) in and to the Collateral then owned or thereafter acquired to secure the Obligations, and the enforceability of such liens and security interests and pursuant to Sections 364(c)(2) and (3) and 364(d) of the Bankruptcy Code, the grant to Agent of priming first priority liens on and first priming priority senior security interests in all of the Collateral then owned or thereafter acquired by either Borrower or any Guarantor (subject only to certain Permitted Liens and the Carve Out) liens and security interests in and to the Collateral to secure the Obligations, and the enforceability of such liens and security interests;

(iii)   the automatic perfection of such liens and security interests;

(iv)    the inability of any Debtor to prime or surcharge the Collateral or grant other liens or security interests thereon of equal or senior priority;

(v)     appropriate findings to ensure protection under Section 364(e) of the Bankruptcy Code if an appeal is taken;

(vi)    appropriate findings of fact that the amount sought by Debtors for the Loan, including without limitation the Initial Advance, is necessary to avoid immediate and irreparable harm to Debtors pending a final hearing on Debtors' motion to obtain credit;

(vii)   appropriate findings regarding the adequacy of notice to creditors;

(viii)  the inability of any Debtor to modify the rights of Agent or any Lender in a plan of reorganization without the consent of Agent;

(ix)    approval of the remedies available to Agent upon the occurrence of an Event of Default;

(x)     binding effect on successors and trustees in superseding proceedings; and

(xi)    relief from the automatic stay of Section 362 of the Bankruptcy Code as necessary to carry out the terms of the Loan Documents and to permit enforcement of Agent's and Lenders' rights and remedies hereunder.

"*Interim Order Entry Date*" means the date on which the Interim Order is entered by the Bankruptcy Court following a hearing on Debtors' motion for approval of the Loan, including without limitation the Initial Advance, and this Agreement.

"*Inventory*" of a Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "inventory" as that term is defined in the Code.

SWM002820

AA00570

"**Investment Property**" of a Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "investment property" as that term is defined in the Code, and any and all Supporting Obligations in respect thereof.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Issuer**" means an issuer of any Equity Interest.

"**Lender**" and "**Lenders**" have the meanings set forth in the introductory paragraph to this Agreement.

"**Lender Expenses**" means all: (i) Customary Expenses, including, without limitation, costs, expenses or both (including taxes, photocopying, notarization, telecommunication and insurance premiums) required to be paid by any Debtor under any of the Loan Documents that are paid or advanced by Agent or any Lender; (ii) documentation, filing, recording, publication, appraisal (including periodic collateral appraisals), environmental audit, and search fees assessed, paid, or incurred by Agent or any Lender in connection with Agent's or such Lender's transactions with any Debtor; (iii) to the extent not waived under the Bankruptcy Code, stamp taxes and intangibles taxes; (iv) costs and expenses incurred by Agent or any Lender in the disbursement of funds to each Borrower (by wire transfer or otherwise); (v) charges paid or incurred by Agent or any Lender resulting from the dishonor of checks; (vi) costs and expenses paid or incurred by Agent or any Lender to correct any Default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; (vii) costs and expenses paid or incurred by Agent or any Lender in examining the Books of each Debtor; (viii) costs and expenses of third party claims or any other suit paid or incurred by Agent or any Lender in enforcing or defending the Loan Documents; and (ix) Agent's and each Lender's reasonable attorneys' fees and expenses incurred in advising, structuring, drafting, reviewing, administering, amending, terminating, enforcing (including attorneys fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Debtor or any other Obligor), defending, or concerning the Loan Documents, irrespective of whether suit is brought.

"**Loan**" has the meaning set forth in the fourth Preliminary Statement to this Agreement.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Pledge Agreements, the Deeds of Trust, any assignment documents, any other note or notes executed by either Borrower and payable to any Lender, and any other written agreement entered into in connection with this Agreement, including the Orders.

"**Managed Expenses**" means the real estate taxes, parcel administration real estate taxes, CDD debt service assessments, and contingency expenses set forth on the 18 Month Budget and such other expenses as Agent and Borrowers identify to be included as Managed Expenses.

SWM002821

AA00571

"*Material Adverse Change*" means any material adverse change in the business, condition (financial or otherwise), finances, operations, performance, properties or prospects of any Debtor or on the value of the Collateral.

"*Material Contracts*" has the meaning set forth in <u>Section 5.3</u>.

"*Maturity Date*" has the meaning set forth in <u>Section 3.5</u>.

"*Maximum Committed Amount*" means an amount equal to Twenty-Seven Million Dollars ($27,000,000.00).

"*Maximum Outstanding Amount*" means, during each period set forth below, the amount set forth opposite such period:

| Period | Maximum Outstanding Amount |
| --- | --- |
| January 31, 2010 – July 30, 2010 | $10,000,000 |
| July 31, 2010 – September 29, 2010 | 12,000,000 |
| September 30, 2010 – October 30, 2010 | 13,000,000 |
| October 31, 2010 – January 30, 2011 | 15,000,000 |
| January 31, 2011 – February 27, 2011 | 12,000,000 |
| February 28, 2011 – March 30, 2011 | 10,000,000 |
| March 31, 2011 – April 29, 2011 | 8,000,000 |
| April 30, 2011 – May 30, 2011 | 6,000,000 |
| May 31, 2011 – June 29, 2011 | 5,000,000 |
| June 30, 2011 | 0 |

In no event shall the Maximum Outstanding Amount exceed $15,000,000.

"*Negotiable Collateral*" of any Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "letter-of-credit rights", "instruments", "promissory notes", "documents," "certificated securities," and "chattel paper" as each of those terms are defined in the Code, and any and all Supporting Obligations in respect thereof.

"*Net Proceeds*" means the gross proceeds paid in respect of the sale of any Collateral in which Agent or any Lender has a lien or security interest less closing costs, which shall include, without limitation, title costs, commissions, any required CDD buy down, past due real property taxes, and other allowable, normal and customary closing costs.

"*Non-Default Interest Rate*" means the rate per annum equal to the lesser of (i) 12% *per annum*, and (ii) the maximum rate provided by applicable law.

"*Notes*" means those certain Promissory Notes, dated as of the date of this Agreement, executed by Borrowers and payable to the order of Lenders in the aggregate maximum principal amount of $27,000,000.

"*Obligations*" means all loans, advances, debts, principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), contingent

SWM002822

AA00572

reimbursement obligations, and other indebtedness owing by any Debtor to each of Agent and any Lender under this Agreement, the other Loan Documents, by any note or other instrument, or pursuant to any other agreement between Agent or any Lender and any Debtor, and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including any debt, liability, or obligation owing from any Debtor to others that Agent or any Lender may have obtained by assignment or otherwise, and further including all interest not paid when due and all Lender Expenses that any Debtor is required to pay or reimburse by the Loan Documents, by law, or otherwise.

"*Obligors*" means Debtors and all other Persons that have pledged assets to secure or have guaranteed any of the Obligations and "*Obligor*" means any of them.

"*Order*" means the Interim Order or the Final Order, as applicable.

"*Patent License*" of any Person means all agreements, whether written or oral, providing for the grant by or to such Person of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent.

"*Patents*" means (a) all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"*Payment Intangibles*" means all "payment intangibles" (as that term is defined in the Code).

"*Permitted Liens*" means: (a) liens and security interests held by Agent; (b) liens for unpaid taxes that are not yet delinquent; (c) liens that have been specifically consented to, in advance and in writing, by Agent; (d) purchase money security interests and liens of lessors under capital leases so long as the security interest or lien only secures the purchase price of the asset; (e) easements, rights of way, reservations, covenants, conditions, restrictions, zoning variances, and other similar encumbrances that do not materially interfere with the use or value of the property subject thereto; and (f) mechanics', materialmen's, warehousemen's, or similar liens that arise by operation of law where payment for the goods or services giving rise to such liens are not yet due and payable.

"*PEPI*" means PEPI Capital, L.P., a Delaware limited partnership.

"*Person*" means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"*Petition Date*" has the meaning set forth in the introduction to this Agreement.

SWM002823

AA00573

"*Pledge Agreements*" means pledge agreements from each owner of each Borrower, in form and substance satisfactory to Agent, pledging to Agent such Person's Equity Interest in such Borrower.

"*Prepayment Event*" means (i) any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Debtor, (ii) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Debtor, (iii) the issuance by any Debtor of any ownership interest, or the receipt by either Borrower of any capital contribution, or (iv) the incurrence by any Debtor of any indebtedness, other than indebtedness permitted under Section 7.2.

"*Proceeds*" means any and all "proceeds", as such term is defined in the Code.

"*Project*" means the Fiddler's Creek development located in Collier County, Florida, consisting of approximately 3,932 acres and including single family, commercial, and recreational development.

"*Proposal Letter*" means that certain letter dated effective as of December 31, 2009, from Agent to Borrowers generally describing the non-exclusive terms of this Agreement.

"*Pro Rata Share*" means, as of any date of determination, for any Lender, the percentage obtained by dividing (i) such Lender's Commitments, by (ii) the aggregate amount of Commitments of all Lenders, *provided, however*, that in the event the Commitments have been terminated or reduced to zero, Pro Rata Share shall be the percentage obtained by dividing (A) the outstanding principal amount of such Lender's Advances as of such date, by (B) the outstanding principal amount of all Advances as of such date.

"*Real Property*" means any estates or interests in real property now owned or hereafter acquired by any Debtor and the improvements and fixtures thereto.

"*Related Fund*" means a fund, money market account, investment account or other account managed by a Lender or an Affiliate of a Lender or its investment manager or an Affiliate of its investment manager.

"*Records*" means all "records" (as that term is defined in the Code).

"*Required Lenders*" means, at any time, Lenders whose aggregate Pro Rata Shares equal or exceed 50.1%.

"*Software*" means any and all "software", as such term is defined in the Code.

"*Subsidiary*" means (i) any corporation of which at least a majority of the outstanding shares of stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by a Debtor or by one or more other Subsidiaries of a Debtor or by a Debtor and one or more of such

SWM002824

AA00574

Subsidiaries; and (ii) any other entity (A) of which at least a majority of the ownership, equity or voting interest is at the time directly or indirectly owned or controlled by one or more of a Debtor and other Subsidiaries and (B) which is treated as a subsidiary in accordance with GAAP.

"***Supporting Obligations***" means all "supporting obligations" (as that term is defined in the Code).

"***Trademark License***" of a Person means any agreement, whether written or oral, providing for the grant by or to such Person of any right to use any Trademark.

"***Trademarks***" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (b) the right to obtain all renewals thereof.

"***Transaction Costs***" means the fees, costs, and expenses paid or payable by Debtors in connection with the filing and confirmation of the Acceptable Plan of Debtors under Chapter 11 of the Bankruptcy Code.

"***Unused Loan Fee***" means, as of any date, a fee in the amount of 1.0% *per annum* of the difference between the Maximum Committed Amount and the amount of the Loans advanced to Borrowers as of such date.

"***Voidable Transfer***" has the meaning set forth in <u>Section 17.10</u>.

       1.2    **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean the combined Borrowers and all of their consolidated Subsidiaries unless the context clearly requires otherwise.

       1.3    **Code.** Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein.

       1.4    **Construction.** Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Section, subsection, clause, schedule, and exhibit references are to this Agreement unless otherwise specified. Any reference in this Agreement or in the Loan Documents to this Agreement or any of the Loan Documents

SWM002825

AA00575

shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements, thereto and thereof, as applicable.

      1.5    **Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2. LOAN AND TERMS OF PAYMENT.

      2.1    **Advances.** Subject to the terms and conditions of this Agreement, each Lender agrees, on the terms and conditions set forth herein, to make (i) the Initial Advance to Borrowers upon the fulfillment by Borrowers of the conditions set forth in Sections 3.1 and 3.3 and (ii) additional Advances to Borrowers no more frequently than once every month, during the period from the Final Order Entry Date until the Maturity Date upon the fulfillment by Borrowers of the conditions set forth in Sections 3.2 and 3.3. After giving effect to such Advance, (i) the aggregate amount of all Advances made to Borrowers, regardless of whether all or any part of such Advances have been repaid or are then outstanding, shall not exceed the Maximum Commitment Amount, and the aggregate amount of Advances then outstanding to Borrowers shall not exceed the then-applicable Maximum Outstanding Amount, and no Lender's Pro Rata Share of the then-outstanding Advances shall exceed its Pro Rata Share of the Maximum Outstanding Amount. Each Borrowing shall be in an aggregate amount which does not exceed the reasonable cash needs of Borrowers for the following monthly period as disclosed in the most recent 13 Week Budget, *provided*, that the minimum amount of any Advance shall be $500,000 and Advances shall be in increments of $100,000. Amounts borrowed and repaid hereunder may not be reborrowed.

      (b)    Other than the Borrowings constituting the Initial Advance, which shall be made on notice given no later than 5:00 P.M. (Dallas, Texas, time) one Business Day prior to such Borrowing, each Borrowing shall be made on notice given by Borrowers to Agent not later than 12:00 P.M. (Dallas, Texas, time) five Business Days prior to such Borrowing, or less time if Agent consents. Each such notice of a Borrowing (a "***Notice of Borrowing***") shall be by telephone and confirmed immediately by fax, in substantially the form of Exhibit C hereto, specifying therein the requested (i) date of such Borrowing and (ii) the aggregate amount of such Borrowing. Each Notice of Borrowing shall be for an amount consistent with the 18 Month Budget.

      (c)    Promptly after receipt of a Notice of Borrowing, Agent shall notify Lenders, not later than 1:00 p.m. (Dallas, Texas, time) two Business Days immediately preceding the funding date applicable thereto, by telecopy, telephone, or other similar form of transmission, of the requested Borrowing. Each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 10:00 a.m. (Dallas, Texas, time) on the funding date applicable thereto. After Agent's receipt of the proceeds of such Advances, Agent shall make the proceeds thereof available to Borrowers on the applicable funding date by transferring immediately available funds equal to such proceeds received by Agent to Borrower's Account, *provided, however*, that, subject to the provisions of Section 2.2(d)(ii), Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Advance if Agent shall have actual knowledge that

SWM002826

AA00576

one or more of the applicable conditions precedent set forth in <u>Article 3</u> will not be satisfied on the requested funding date for the applicable Borrowing unless such condition has been waived.

(d)     Unless Agent receives notice from a Lender prior to 9:00 a.m. (Dallas, Texas, time) on the date of a Borrowing, that such Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the funding date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount.  If and to the extent any Lender shall not have made its full amount available to Agent in immediately available funds and Agent in such circumstances has made available to Borrowers such amount, that Lender shall on the Business Day following such funding date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period.  A notice submitted by Agent to any Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error.  If such amount is so made available, such payment to Agent shall constitute such Lender's Advance on the date of Borrowing for all purposes of this Agreement.

(e)     Agent shall not be obligated to transfer to a Defaulting Lender any payments made by any Obligors to Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments to each other non-Defaulting Lenders ratably in accordance with their Commitments (but only to the extent that such Defaulting Lender's Advance was funded by the other Lenders).  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero.  This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Agent, and Borrowers shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Pro Rata Share of the applicable Advance and pays to Agent all amounts owing by Defaulting Lender in respect thereof.  The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender.  Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be acceptable to Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever, *provided however*, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lenders' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

SWM002827

AA00577

(f)     Anything to the contrary in subsection (a) above notwithstanding, Agent may (i) reduce or withhold making any Advances without declaring an Event of Default if it determines, in its reasonable discretion, that there is a material impairment of the prospect of repayment of all or any portion of the Loan or a material impairment of the value or priority of Agent's security interests in the Collateral, or (ii) reserve an amount equal to the Carve-Out from the loan availability created under subsection (a) above, to the extent the administrative expense priority claim under Section 364(c)(1) of the Bankruptcy Code granted to Agent pursuant to the Order is subordinated to the payment of all or any portion of the Administrative Fees.

(g)     No Lender shall have any obligation to make any Advance hereunder to the extent such Advance would cause either (i) the outstanding Obligations under the Loan to exceed the then-applicable Maximum Outstanding Amount or (ii) the aggregate outstanding amount of all Advances made to Borrowers, regardless of whether such Advances remain outstanding, to exceed the Maximum Committed Amount.

(h)     All Advances (other than Protective Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

(i)     Unless payment is otherwise made by Borrowers, the becoming due of any amount required to be paid under any Loan Document or of any Obligation shall be deemed to be a request for an Advance on the due date in the amount required to pay such amount, and such request shall be irrevocable. Neither Agent nor any Lender shall have any obligation to Borrowers to honor any deemed request for an Advance but may do so in their sole and absolute discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default.

### 2.2     Overadvances.

a.     If, at any time or for any reason, the amount of Obligations owed by Borrowers to Lenders pursuant to Section 2.1 is greater than either the dollar or percentage limitations set forth in Section 2.1 (an "*Overadvance*"), Borrowers, jointly and severally, immediately shall pay to Agent, in cash, the amount of such excess.

b.     Agent hereby is authorized by Borrowers and Lenders, from time to time in Agent's sole discretion, (i) after the occurrence and during the continuance of a Default or an Event of Default, or (ii) at any time that any of the other applicable conditions precedent set forth in Article 3 are not satisfied, to make Advances to Borrowers on behalf of the Lenders that Agent, in its sole discretion deems necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of repayment of the Obligations, or (C) to pay any other amount chargeable to either Borrower pursuant to the terms of this Agreement, including Lender Expenses and the costs, fees, and expenses described in Section 10 (any of the Advances described in this Section 2.2(b) shall be referred to as "*Protective Advances*").

SWM002828

AA00578

c.     Each Protective Advance and each Overadvance shall be deemed to be an Advance hereunder and, upon request of Agent, each Lender shall pay to Agent such Lender's Pro Rata Share of such Protective Advance.    The Protective Advances and Overadvances shall be repayable on demand, secured by the Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances.  The provisions of this <u>Section 2.2(c)</u> are for the exclusive benefit of Agent and Lenders and are not intended to benefit any Obligor in any way.

### 2.3     Interest: Rates, Payments, and Calculations.

(a)     <u>Interest Rate</u>.  Prior to an Event of Default, Borrowers shall, jointly and severally, pay interest on the unpaid principal amount of each Advance owing to Lenders from the date of such Advance until such principal shall be paid in full, at the Non-Default Interest Rate.

(b)     <u>Default Rate</u>.     From and after the occurrence and during the continuance of an Event of Default, at the option of Agent and after giving notice to Borrowers, Borrowers shall, jointly and severally, pay interest at the Default Rate on the unpaid principal amount of each Advance owing to Lenders and on the unpaid amount of all interest, fees and other amounts payable hereunder.

(c)     <u>Interest Payments</u>.  Interest hereunder shall be due and payable, in full, on the first day of each month and on the Maturity Date.  Borrowers hereby authorize Agent, at its option, without prior notice to either Borrower, to charge such interest, all Lender Expenses (as and when incurred), and all installments or other payments due under any note or other Loan Document to Borrower's loan account, which amounts thereafter shall accrue interest at the rate then applicable hereunder.  Any interest not paid when due shall be compounded by becoming a part of the Obligations, and such interest thereafter shall accrue interest at the rate then applicable hereunder.

(d)     <u>Principal Payments</u>.  The unpaid principal amount of all Advances shall be due and payable, in full, on the Maturity Date.

(e)     <u>Prepayments</u>.     Upon the occurrence of a Prepayment Event, Borrowers shall, jointly and severally, pay or cause to be paid to Agent all Net Proceeds of such Prepayment Event, by depositing or causing to be deposited such Net Proceeds into Agent's Account, to be applied first to the unpaid Lender Expenses and fees (including, without limitation, the applicable Exit Fee), then to the accrued but unpaid interest on the principal amount being repaid, and then to the principal amount of the outstanding Advances.

(f)     <u>Intent to Limit Charges to Maximum Lawful Rate</u>.  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts contracted for, charged, or received in connection herewith, which are considered in law to be interest, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  All Obligors, Agent, and Lenders, in executing this Agreement and the other Loan Documents, intend legally to agree upon the rate or rates of interest and manner of payment stated within it, *provided, however,* that, anything contained

SWM002829

AA00579

herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto* as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

       (g)    <u>Computation</u>.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year for the actual number of days elapsed.

    2.4   **Fees.**

       (a)    <u>Commitment Fee</u>.  Borrowers, jointly and severally, agree to pay Agent the Commitment Fee contemporaneously with the execution and delivery of this Agreement, which Commitment Fee shall be fully earned and non-refundable when paid and shall be payable by Borrowers to Lender on the date hereof.  Agent acknowledges that the Commitment Fee will be paid by Agent's retaining one-half of the commitment fee deposited with Agent and the balance shall be paid from the Initial Advance.

       (b)    <u>Break-Up Fee</u>. Borrowers, jointly and severally, agree to pay Agent for the benefit of Lenders the Break-Up Fee which shall be due and payable if any Debtor, directly or indirectly, enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the facility provided in this Agreement and such alternate financing is approved by the Bankruptcy Court. The Break-Up Fee shall be due and payable upon the earlier of (i) the funding of such alternative financing or (ii) 30 days after the approval of such alternative financing by the Bankruptcy Court.  Borrowers agree to take all actions necessary to effect the authorization of the payment of the Break-Up Fee authorized by the Bankruptcy Court, including, without limitation, (A) stipulating that such fee is an allowed Chapter 11 administrative expense, payable immediately, (B) budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and (C) filing an application to payment Break-Up Fee, if necessary.

       (c)    <u>Exit Fee</u>.  Borrowers, jointly and severally, agree to pay Agent for the benefit of Lenders the Exit Fee which shall be immediately due and payable upon the occurrence of any of the following: (i) the payment in full of the Loan on the Maturity Date, and (ii) a partial principal payment of the Loan prior to the Maturity Date.

       (d)    <u>Collateral Monitoring Fee</u>.  Borrowers, jointly and severally, agree to pay Agent the Collateral Monitoring Fee monthly in advance beginning on the date hereof and continuing on the first day of each month hereafter until payment in full of the Loan and termination of the Commitment. The Collateral Monitoring Fee shall be deemed fully earned by Agent on each date payment of such fee is due.

       (e)    <u>Unused Loan Fee</u>.  Borrowers, jointly and severally, agree to pay Agent for the benefit of Lenders the Unused Loan Fee monthly on the first day of each month, commencing upon the approval of the Final Order and continuing thereafter until payment in full

SWM002830

AA00580

of the Loan and termination of the Commitment, based on the amount of the Loan advanced to Borrowers as of the end of the immediately preceding month.

2.5 **Lender Expenses.**

Upon two Business Days' written notice from Agent to Borrowers, Borrowers shall deliver to Agent additional deposits necessary to cover continuing Lender Expenses projected through the Maturity Date and payment in full of the Loan. Neither Agent nor any Lender shall be required to make any application to the Bankruptcy Court, to give any notice to any Person (other than Borrowers as set forth in this section), or obtain review of the Bankruptcy Court or authorization from the Bankruptcy Court as a condition Borrower's obligation to pay any Lender Expense or make any such deposit. In the event of any failure of Borrower to pay any Lender Expenses after notice from Agent, Borrowers hereby jointly and severally authorize Agent to make Advances hereunder from time to time to pay such expenses.

2.6 **Crediting Payments; Application of Collections.** The receipt of any wire transfer of funds, check, or other item of payment by Agent immediately shall be applied to provisionally reduce the Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds and is made to the appropriate Agent's Account or unless and until such check or other item of payment is honored when presented for payment. Should any check or item of payment not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment, and interest shall be recalculated accordingly. Anything to the contrary contained herein notwithstanding, any wire transfer, check, or other item of payment shall be deemed received by Agent only if it is received into Agent's Account on or before 11:00 a.m. Dallas, Texas, time. If any wire transfer, check, or other item of payment is received into Agent's Account after 11:00 a.m. Dallas, Texas, time it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

## 3. CONDITIONS; TERM OF AGREEMENT.

3.1 **Conditions Precedent to Initial Advance.** The obligation of Lenders to make the Initial Advance is subject to the fulfillment, to the satisfaction of Agent, Lenders, and their counsel, of each of the following conditions on or before the Closing Date:

(a) the Initial Advance must be requested to be made on a date that is on or after five (5) days of the Interim Order Entry Date;

(b) each Debtor's Chapter 11 Case is pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and no motion is pending to dismiss same;

(c) Agent shall have received evidence that each Debtor shall have filed (i) bankruptcy petitions in the Bankruptcy Court, (ii) first day motions, including, without limitation, motions for cash management, bank accounts, business as usual, tax and employee payments, and utility payments, and (iii) motions for use of cash collateral in form satisfactory to Agent, and that each Debtor has filed a motion for debtor in possession financing consistent with the terms of this Agreement;

SWM002831

AA00581

(d)     Agent shall have received copies of the Bankruptcy Court's orders approving each Debtor's motion for use of cash collateral and budget satisfactory to Agent;

(e)     Agent shall have received accounts payable agings and the service list for each Debtor;

(f)     Agent shall have received a certificate from an Authorized Officer of each Obligor that is not a natural person (or if an Obligor is a limited partnership, such Person's general partner) or a attesting to the resolutions of such Person's Board of Directors, Board of Managers, or general partner's board of directors, as appropriate, or partners' consents, as appropriate, authorizing (i) such Person's commencement of a case in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code (as applicable), (ii) such Person's execution and delivery of this Agreement (as applicable) and the other Loan Documents to which such Person is a party, and (iii) specific officers of such Person to execute same;

(g)     the Bankruptcy Court shall have entered the Interim Order, in substantially the form of <u>Exhibit B</u> hereto, Agent shall have received a certified copy of the Interim Order, and the Interim Order shall remain in full force and effect and shall not have been stayed, except for such modifications thereto acceptable to Agent;

(h)     no motion shall have been filed requesting (a) the appointment of a trustee (or an examiner with expanded powers) in any Debtor's Chapter 11 case, or (b) the conversion of any Debtor's Chapter 11 case into a case under Chapter 7 of the Bankruptcy Code;

(i)     Debtor shall have provided Agent an updated 13 Week Budget in form and substance satisfactory to Agent, setting forth all of Debtors' projected expenses for the duration of the Chapter 11 Case;

(j)     Debtor shall have provided Agent with Debtors' business plan, in form and substance satisfactory to Agent, for the duration of the Chapter 11 Case;

(k)     Agent shall have received this Agreement, duly executed, and in full force and effect;

(l)     each Lender shall have received its Note, in form and substance satisfactory to such Lender, duly executed, and in full force and effect;

(m)     Agent shall have received the Deeds of Trust, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(n)     Agent shall have received the Pledge Agreements, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(o)     to the extent that any pledged Equity Interests are represented by certificates, Agent shall have received all original stock and membership certificates and powers of sale executed in blank;

SWM002832

AA00582

(p)     Agent shall have received the assignments of all material contracts of each Debtor, including, without limitation, sales contracts with home buyers, developers, and other Persons, and leases of real and personal property, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(q)     Agent shall have received environmental indemnities for the Real Property described in the Deeds of Trust, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(r)     Agent shall have received assignments of rents for the Real Property described in the Deeds of Trust, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(s)     Agent shall have received assignments of policies of insurance for construction and other defects where any Debtor is an insured thereunder, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(t)     Agent shall have received assignments of all warranties benefiting any Debtor, in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(u)     Agent shall have received a collateral assignment of declarant's rights under covenants, conditions, and restrictions, in form and substance satisfactory to Agent, duly executed by each Declarant, and in full force and effect;

(v)     Agent shall have received a subordination agreement from Florida Financial Investments, Inc., in form and substance satisfactory to Agent, duly executed, and in full force and effect;

(w)     Agent shall have received an agreement from any Person that leases, as lessee, all or part of the Real Property for agricultural purposes that such Person will not terminate or amend its lease with any Debtor respecting such Real Property;

(x)     Agent shall have received deposit account control agreements with respect to each Debtor's Deposit Account, in form and substance satisfactory to Agent, duly executed by each Borrower and _____ and in full force and effect;

(y)     Agent shall have received from each Obligor an authorization to file financing statements, in form and substance satisfactory to Agent, duly executed by such Obligor;

(z)     Agent shall have filed all UCC-1 financing statements deemed necessary or desirable to encumber the Collateral;

(aa)    Agent shall have received a notice of final agreement, in form and substance satisfactory to Agent, duly executed by all Lenders and all Obligors, and in full force and effect;

SWM002833

AA00583

(bb)     Agent shall have received a deed in lieu of foreclosure for each parcel of Real Property mortgaged to Agent under a Deed of Trust, in form and substance satisfactory to Agent, duly executed by the Debtor that is the owner of such Real Property;

(cc)     Agent shall have received consent judgments from each Obligor, in form and substance satisfactory to Agent, which can be delivered for filing in any court of the State of Florida;

(dd)     Agent shall have received an opinion of legal counsel to Obligors in form and substance satisfactory to Agent;

(ee)     Agent shall have received a certificate from an Authorized Officer of each Obligor that is not a natural person (or the general partner thereof, if such Person is a limited partnership) (i) authorizing specific officers of such Person to execute the Loan Documents to which such Person is a party, and (ii) attesting to the incumbency and signatures of such specific officers of such Person;

(ff)     Agent shall have received a certified copy of the certificate or articles of formation of each Obligor that is not a natural person, and all amendments thereto, issued by the Secretary of State of its state of formation, certified by an Authorized Officer of such Obligor;

(gg)     Agent shall have received a copy of for each Obligor that is not a natural person, operating or limited liability company agreement, bylaws, or partnership agreement, as appropriate, and all amendments thereto, of such Person certified by an Authorized Officer of such Person;

(hh)     Agent shall have received a certificate of status with respect to each Obligor that is not a natural person, dated within 20 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Person, which certificate shall indicate that such Person exists and is in good standing in such jurisdiction;

(ii)     Agent shall have received certificates of status with respect to each Obligor that is not a natural person, dated within 20 days of the Closing Date, such certificates to be issued by the appropriate officer of the Florida and the jurisdictions (other than such Person's jurisdiction of organization) in which such Person's failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that such Person is in good standing in such jurisdictions;

(jj)     Agent shall have received a detailed description and summary of all insurance currently held by each Debtor and a list of any pending claims, in each case in form and substance satisfactory to Agent;

(kk)     Agent shall have received and be satisfied with all insurance policies and all policy endorsements required pursuant to <u>Section 6.7</u>;

SWM002834

AA00584

(ll)     Agent shall have received evidence satisfactory to Agent that Debtors have recorded documentation satisfactory to Agent in accordance with any covenants, conditions, and restrictions respecting any of the Real Property, naming Agent as "Institutional Mortgagee" thereunder and including a covenant that no Debtor shall revoke the applicable declarant's "Class B" status;

(mm)     Agent shall have received evidence satisfactory to Agent that Agent has all rights of Debtors in respect of boat slips pertaining to the Project;

(nn)     Agent shall have received evidence satisfactory to Agent, that since Agent has reviewed Debtors' schedule of litigation, there has been no change or development in any litigation, suit or proceeding which could be expected to result in a Material Adverse Change;

(oo)     Agent's shall have received Phase I environmental reports with respect to the Real Property, in form, scope and substance satisfactory to Agent, prepared by a qualified engineer approved by Agent, and showing the environmental condition of such Real Property satisfactory to Agent;

(pp)     Agent shall have received the most recent surveys of the Real Property prepared for Debtors;

(qq)     Agent shall have received mortgagee's policies of title insurance insuring the liens of the Deeds of Trust, such policies of title insurance to be issued by a title insurance company acceptable to Agent and to be in such amounts, and to contain such endorsements as Agent may require;

(rr)     Agent shall have received the following for each parcel of Real Property (i) copies of all zoning letters therefor, (ii) copies of flood letters therefor, (iii) copies of all utility letters therefor; (iv) copies of the most recent real property tax statements therefor and evidence that such taxes have been paid, and (v) copies of all plats therefor;

(ss)     Agent shall have received the following information for each CDD:  (i) enabling legislation or creation order; (ii) the construction of its board of directors, (iii) the name and contact information for each board member; (iv) the name and contact information for its attorney; (v) the name and contact information for its financial advisor and/or bookkeeper; (vi) the name and contact information for its auditor; (vii) the name and contact information for its engineer; (viii) copies of each project improvement acquisition agreement entered into by such CDD and any developer of land in the district; (ix) each assignment of the any project improvement acquisition agreements in item H; (x) a copy of the most recent offering statement; (xi) a copy of the most recent audit; (xii) confirmation of the development status of land within the CDD; (xiii) confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD; (xiv) identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD; (xv) such CDD's budget; (xvi) such CDD's bank account information; (xvii) assessments on all properties for debt service and other operations; (xviii) the most recent financial statements for the CDD; (xix) the amount of annual assessments for 2010; (xx) total bond obligations related to debtor-owned properties in

SWM002835

AA00585

each bond issue (by unit/lot); and (xxi) copies of all annual financial information and operating data delivered as part of the CDD's continuing disclosure obligations pursuant to its offering statement;

(tt)     Agent shall have received the following information for each homeowner's association affecting any of the Real Property: (i) identification of the specific real property collateral subject to the such homeowner's association; (ii) documentation of such homeowner's association's financial condition; (iii) such homeowner's association's organizational documents; (iv) such homeowner's association's budget; (v) such homeowner's association's most recent financial statements; (vi) copies of all conditions, covenants, and restrictions and all amendments thereto; (vii) the results of the most recent facility and common area inspect for such homeowner's association; (viii) an analysis of such homeowner's association's overhead; (ix) a list of such homeowner's association's declarants and board positions; and (x) comprehensive dues information;

(uu)     Agent shall have received duly executed estoppel certificates in form and substance satisfactory to Agent from each of the master homeowner's association and each village subassociation affecting any of the Real Property;

(vv)     Agent shall have received a list of all leases between a Debtor and any of its Affiliates, in form and substance satisfactory to Agent;

(ww)     Agent shall have received a list of all payments or other obligations required to maintain entitlements and zoning relating to the Real Property, in form and substance satisfactory to Agent;

(xx)     Agent shall have received financial statements for each Debtor, dated no earlier than _____, in form and substance satisfactory to Agent;

(yy)     Agent shall have received a report of all cash flow from operations of the Project and each revenue generating activity at the Project;

(zz)     Agent shall have received the most recently filed federal and, if applicable, state tax returns of each Debtor;

(aaa)     Agent shall have received a 13 Week Budget for Debtors and their subsidiaries, in form and substance satisfactory to Agent;

(bbb)     Agent shall have received the 18 Month Budget and business plan for Debtors and their subsidiaries, in form and substance satisfactory to Agent;

(ccc)     Agent shall have received UCC, tax lien, and judgment lien searches for each Debtor and each other Obligor;

(ddd)     Agent shall have received (i) a list of all lenders to each Debtor, (ii) a description of all loan facilities from such lenders to each Debtor, (iii) copies of all loan documentation executed and delivered in connection with each such loan facility, and (iv) a description of all collateral for each such loan facility;

SWM002836

AA00586

(eee)     Agent shall have received the following collateral reports: (i) identification of each Debtor's outstanding receivables for all real and personal property collateral, in form and substance; (ii) a list of all deposits being held by each owner of the Real Property and any anticipated forfeitures thereof; (iii) a list of all fixed assets of each Debtor, including, without limitation, all vehicles and equipment; (iv) a list of all Copyrights, Trademarks, and Patents owed by or licensed to any Debtor; (v) a list of and copies of all agreements containing a right of first refusal with respect to any of the Collateral;

(fff)     Agent shall have received a list, in form and substance satisfactory to Agent, of any pending litigation against any Debtor, or any Debtor's assets, including, without limitation, any of the Collateral;

(ggg)     Agent shall have received copies of all joint ventures agreements to which any Debtor is a party;

(hhh)     Agent shall be satisfied that there has not been any Material Adverse Change since it completed its business, legal, environmental, industry, technical and collateral due diligence,. In that regard, Agent may conduct a review, examination and appraisal of the Collateral and review of each Debtor's and its Subsidiaries' Books, a review of each Debtor's Collateral valuation methods, and verification of each Debtor's representations and warranties to Agent, the results of which shall be satisfactory to Agent;

(iii)     no Debtor has entered into any transactions with any of its Affiliates that have not been disclosed to Agent;

(jjj)     no material changes in governmental regulations or policies affecting any Debtor, Agent, or any Lender have occurred;

(kkk)     the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the date of such Initial Advance, as though made on and as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date);

(lll)     all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered or executed or recorded and shall be in form and substance satisfactory to Agent and its counsel;

(mmm)     there is no default under any Material Contract;

(nnn)     no Default or Event of Default shall have occurred and be continuing on the date of the Initial Advance nor shall either result from the making of the Initial Advance;

(ooo)     Agent shall have received payment of the Commitment Fee;

(ppp)     all Lender Expenses shall be current and paid when due; and

SWM002837

AA00587

(qqq)   Agent shall have received all other documents and diligence items reasonably requested by Agent.

**3.2   Conditions Precedent to All Advances Subsequent to the Initial Advance.**  The following shall be conditions precedent to all Advances subsequent to the Initial Advance:

(a)   each Debtor's Chapter 11 Case is still pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and no motion is pending to dismiss same;

(b)   the Bankruptcy Court shall have entered the Final Order, Agent shall have received a certified copy of the Final Order, and the Final Order shall remain in full force and effect, except for such modifications thereto acceptable to Agent;

(c)   the Final Order shall remain in full force and effect and shall not be the subject of any appeal, time for appeal shall have expired, and the Final Order shall not have been reversed, modified, amended, rescinded, stayed or vacated, except for such modifications thereto acceptable to Agent;

(d)   such Advance shall be consistent with the 18 Month Budget;

(e)   no motion shall have been filed requesting (i) the appointment of a trustee (or an examiner with expanded powers) in any Debtor's Chapter 11 case, or (ii) the conversion of any Debtor's Chapter 11 case into a case under Chapter 7 of the Bankruptcy Code;

(f)   Agent shall have received ALTA surveys of the Real Property in form, scope and substance satisfactory to Agent, prepared by a qualified surveyor acceptable to Agent and certified to Agent;

(g)   no material changes in governmental regulations or policies affecting any Debtor or Agent or any Lender have occurred;

(h)   the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the date of such advance, as though made on and as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date);

(i)   no Default or Event of Default shall have occurred and be continuing on the date of such Advance nor shall either result from the making of such Advance;

(j)   all conditions precedent set forth in <u>Section 3.1</u> hereof that Agent agreed to defer have been satisfied or further deferred or waived in writing by Agent; and

(k)   all Lender Expenses shall be current and paid when due.

**3.3   Conditions Subsequent to All Advances.**  The following shall be conditions subsequent to all Advances by Lenders and the failure to satisfy the following shall constitute an Event of Default hereunder:

SWM002838

AA00588

(a)    any conditions relating to the execution and delivery of other Loan Documents deferred until after the Closing Date with the agreement of Agent shall be satisfied within such post-closing time periods as were agreed to by Agent.

3.4    **Maturity.**  This Agreement shall become effective upon acceptance by Agent and Lenders.  The Loan shall mature and the obligation of any Lender to make Advances hereunder shall expire upon the earliest of (a) 18 months from the date of the Final Order unless Borrowers have satisfied the Extension Conditions in which case such period shall be extended for the applicable Extension Period; (b) the effective date of a plan of reorganization for any Debtor which has been confirmed by an order of the confirmation of the United States Bankruptcy Court; (c) the date upon which a final order is entered by the Bankruptcy Court that (i) converts any Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code (unless expressly agreed to by Agent), (ii) approves the 363 sale of some or substantially all of any Debtor's assets (unless expressly agreed to by Agent), (iii) appoints a trustee or examiner (with or without extended powers) in any Debtor's Chapter 11 case, or (iv) dismisses any Debtor's bankruptcy case (unless expressly agreed to by Agent); and (d) the termination by Agent and Lenders of this Agreement and the Commitment as the result of an Event of Default (such earliest date being known herein as the "***Maturity Date***").

3.5    **Effect of Maturity.**  On the Maturity Date, all Obligations immediately shall become due and payable without notice or demand and any commitment to lend hereunder shall terminate.  Each Debtor's duties, Obligations, and covenants hereunder, and Agent's continuing security interests in and liens upon the Collateral, shall remain in effect until all Obligations have been fully discharged and Lenders' obligation to provide Advances hereunder is terminated.

3.6    **Purchase Option.**  Within 30 days after the Maturity Date, Debtors or any of their Affiliates may purchase the Loan for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Agent or any Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan.  Such sale shall be made without recourse, representation, or warranty by Agent and Lenders pursuant to documentation satisfactory to Agent and Lenders, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Agent Related Person.

## 4.  CREATION AND REAFFIRMATION OF SECURITY INTERESTS AND LIENS.

4.1    **Grant of Security Interests and Liens.**  Each Debtor hereby grants to Agent for the benefit of Agent and Lenders security interests in and liens upon all currently existing and hereafter acquired Debtor Collateral in order to secure prompt repayment of any and all Obligations and in order to secure prompt performance by each Debtor and each other Obligor of its covenants and duties under the Loan Documents, the priority of which security interests shall be as set forth in the Preliminary Statements at the beginning of this Agreement. Agent's security interests in and liens upon the Debtor Collateral shall attach to all Debtor Collateral without further act on the part of Agent, any Lenders, or any Debtor.  The security interests and liens granted herein are in addition to, and not in limitation of, any and all security

SWM002839

AA00589

interests in and liens upon the Collateral which were granted to Agent for the benefit of Agent and the Lenders pursuant to the terms of the Orders.

Each counterparty to any contract to which any Debtor is a party is hereby given notice that such contract has been pledged and assigned to Agent for the benefit of Lenders.

4.2 **Negotiable Collateral.** In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, Debtors shall, immediately upon the request of Agent, endorse and assign in suitable form for transfer such Negotiable Collateral to Agent and deliver physical possession of such Negotiable Collateral to Agent. Certificated securities shall be accompanied by a duly executed stock power or assignment in blank in form and substance satisfactory to Agent.

4.3 **Delivery of Additional Documentation Required.** Each Debtor shall at any time upon the reasonable request of Agent execute and deliver to Agent all financing statements, continuation financing statements, fixture filings, security agreements, chattel mortgages, lease assignments and/or lease mortgages, real property mortgages, pledges, assignments, endorsements of certificates of title, applications for title, affidavits, reports, notices, consents, schedules of accounts, letters of authority, proxies, stock powers, and all other documents that Agent may reasonably request, in form satisfactory to Agent, to perfect and continue perfected Agent's security interests in and liens upon the Debtor Collateral, and in order to fully consummate all of the transactions contemplated hereby and under the other the Loan Documents. Each Debtor hereby authorizes Agent to file in any jurisdiction Agent may deem appropriate, without the signature of such Debtor, one or more financing statements, continuation statements, and amendments thereto, relating to and describing the Debtor Collateral as all assets of such Debtor or words of similar effect, regardless of whether any particular asset comprised in the Debtor Collateral falls within the scope of Article or Chapter 9 of the Code, or as being of an equal or lesser scope or with greater detail, and containing any other information required by subchapter E of Chapter 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment. Nothing herein shall limit the effect of the Orders.

4.4 **Power of Attorney.**

(a) Each Debtor hereby irrevocably makes, constitutes, and appoints Agent (and any agents designated by Agent) as such Debtor's true and lawful attorney, with power to: (a) if such Borrower refuses to, or fails timely to execute and deliver any of the documents described in Section 4.3, sign the name of such Debtor on any of the documents described in Section 4.3 or on any other similar documents to be executed, recorded, or filed in order to perfect or continue the perfection of Agent's security interests in and liens upon the Collateral; (b) at any time that an Event of Default has occurred and is continuing, sign such Debtor's names on any invoice or bill of lading relating to any account, drafts against account debtors, schedules and assignments of accounts, verifications of accounts, and notices to account debtors; (c) send requests for verification of accounts; (d) at any time that an Event of Default has occurred and is continuing, endorse such Debtor's names on any checks, notices, acceptances, money orders, drafts, or other item of payment or security that may come into Agent's or any Lender's possession; (e) at any time that an Event of Default has occurred and is continuing,

SWM002840

AA00590

notify the post office authorities to change the address for delivery of such Debtor's mail to an address designated by Agent, to receive and open all mail addressed to such Debtor, and to retain all mail relating to the Collateral or the inventory and forward all other mail to such Debtor; (f) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under such Debtor's policies of insurance and make all determinations and decisions with respect to such policies of insurance; and (g) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Agent determines to be reasonable, and Agent may cause to be executed and delivered any documents and releases which Agent determines to be necessary. The appointment of Agent as each Debtor's attorney, and each and every one of Agent's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and Lenders' obligation to extend credit hereunder is terminated.

(b)     With respect to any pledge of Equity Interests, each Debtor hereby makes, constitutes and appoints Agent or its nominee, its true and lawful attorney in fact and in its name, place, and stead, and on its behalf, and for its use and benefit to complete, execute and file with the United States Securities and Exchange Commission one or more notices of proposed sale of securities pursuant to Rule 144 under the Securities Act of 1933, as amended (the "*1933 Act*") and/or any similar filings or notices with any applicable state agencies, and said attorney in fact shall have full power and authority to do, take, and perform all and every act and thing whatsoever requisite, proper, or necessary to be done, in the exercise of the rights and powers herein granted, as fully to all intents and purposes as such Debtor might or could do if personally present. This power shall be irrevocable and deemed coupled with an interest. The rights, powers, and authority of said attorney in fact herein granted shall commence and be in full force and effect from the date of this agreement, and such rights, powers, and authority shall remain in full force and effect, and this power of attorney shall not be rescinded, revoked, terminated, amended, or otherwise modified, until all Obligations have been fully satisfied and any agreement to make Advances hereunder has terminated.

4.5     **Right to Inspect.**     Each Debtor agrees to permit Agent and any representatives designated by Agent (including employees of Agent or any consultants, accountants, lawyers and appraisers retained by Agent), upon reasonable prior notice, to visit, inspect, test and appraise its properties and the Collateral, to examine and make extracts from its Books, and to discuss its affairs, finances and condition and the Collateral with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested.

4.6     **Equity Interests.**

(a)     Any and all payments, dividends, other distributions (including redemption proceeds), or other securities in respect of or in exchange for the pledged Equity Interests, whether by way of dividends, stock dividends, recapitalizations, mergers, consolidations, stock splits, combinations, or exchanges of shares or otherwise, received by any Debtor shall be held by such Debtor in trust for Agent, and such Debtor shall immediately deliver same to Agent in the form received, together with all stock powers or other powers of sale or assignments required by Agent and all necessary endorsements, to be held as part of

SWM002841

AA00591

the Collateral. Debtors may retain ordinary cash dividends, to the extent otherwise permitted hereunder, unless and until Agent requests that same be paid and delivered to Agent (which Agent may request either before or after Default).

        (b)      Neither Agent nor any Lender shall ever be liable for its failure to give notice to Debtors of default in the payment of or upon any Collateral. Neither Agent nor any Lender shall have any duty to fix or preserve rights against prior parties to the Collateral and shall never be liable for its failure to use diligence to collect any amount payable in respect to the Collateral, but shall be liable only to account to each Debtor for what it may actually collect or receive thereon. Without limiting the foregoing, it is specifically understood and agreed that neither Agent nor any Lender shall have any responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders, or similar matters relating to any of the Collateral or for informing any Debtor with respect to any of such matters (irrespective of whether Agent or any Lender actually has, or may be deemed to have, knowledge thereof). The foregoing provisions of this section shall be fully applicable to all Equity Interests held in pledge hereunder, irrespective of whether Agent may have exercised any right to have such securities or similar property registered in its name or in the name of a nominee.

        (c)      Each Debtor consents to the pledge by each other owner and holder of Equity Interests in any Debtor to Agent, to the further conveyance by foreclosure or otherwise of such Equity Interests in connection with Agent's exercise of its rights and remedies as a secured creditor with respect thereto, and that any transferee of such Equity Interests shall be entitled to all rights of an owner in such issuing Debtor without, in any case, any further compliance with any provisions of any organizational documents of any issuing Debtor.

## 5.  REPRESENTATIONS AND WARRANTIES.

        Each Debtor represents and warrants to Agent and Lenders as follows:

        5.1    **No Prior Encumbrances.**  There are no liens (including liens or retained security titles of conditional vendors) of any nature whatsoever on any properties of any Debtor other than (i) Permitted Liens, (ii) Liens created pursuant to the Loan Documents and the Orders and (iii) the Liens set forth on <u>Schedule 5.1</u> hereto (all of the foregoing being the "***Existing Liens***"). No Debtor is a party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a lien on the property or assets of such Debtor, other than Permitted Liens and contracts for the sale of lots, or otherwise result in a violation of this Agreement.

        5.2    **Intellectual Property.**  Set forth on <u>Schedule 5.2</u> hereto is a complete and accurate list of all Patents, Software, Trademarks, trade names, service marks and Copyrights, and all applications therefor and licenses thereof, of each Debtor or any of its Subsidiaries or Affiliates, showing as of the date hereof the jurisdiction in which registered, the registration number, the date of registration and the expiration date.

        5.3    **Material Contracts.**  Set forth on <u>Schedule 5.3</u> hereto is a complete and accurate list of all material contracts of each Debtor including without limitation all contracts

SWM002842

AA00592

filed with the Securities and Exchange Commission and all contracts with utility providers ("***Material Contracts***").

     5.4    **Location of Equipment.**  No Debtor's equipment is stored with a bailee, warehouseman, or similar party.

     5.5    **Location of Chief Executive Office; State of Incorporation; Organizational Identification Number.**  The chief executive offices of each Debtor are located at the respective addresses indicated in the introduction to this Agreement.  Each Debtor is located (within the meaning of Section 9-307 of the Code) in the jurisdiction set forth on Schedule 5.5, applicable thereto; the organizational identification number of each Debtor issued by its jurisdiction of organization is set forth on Schedule 5.5; and the correct legal name of each Debtor, including spelling and punctuation, as shown in such Debtor's articles or certificate of incorporation or formation or limited partnership on file with the secretary of state of its jurisdiction of organization is as set forth in the introduction to this Agreement.

     5.6    **Due Organization and Qualification; No Subsidiaries.**  Each Borrower is duly organized and existing and in good standing under the laws of the state of its formation and qualified and licensed to do business in, and in good standing in, any state where the failure to be so licensed or qualified could reasonably be expected to have a material adverse effect on the business, operations, condition (financial or otherwise), finances, or prospects of such Borrower or on the value of the Collateral to Agent.  All Subsidiaries of each Borrower are set forth on Schedule 5.5 attached hereto and made a part hereof.  To the extent a Debtor is a limited partnership, "Debtor" shall also include such Debtor's general partner.

     5.7    **Due Authorization; No Conflict.**  The execution, delivery, and performance of the Loan Documents are within each Debtor's corporate, limited liability company, or partnership powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in such Debtor's Articles or Certificate of Incorporation or Formation, or such Debtor's Bylaws, Operating or Limited Liability Company Agreement, or partnership agreement, nor will they constitute an event of default under any material agreement to which such Debtor is a party or by which its properties or assets may be bound.  To the extent a Debtor is a limited partnership, "Debtor" shall also include such Debtor's general partner.

     5.8    **Reliance by Agent and Lenders; Cumulative.**  Each warranty and representation contained in this Agreement automatically shall be deemed repeated with each Advance and shall be conclusively presumed to have been relied upon by Agent and Lenders regardless of any investigation made or information possessed by Agent or any Lender.  The warranties and representations set forth herein shall be cumulative and in addition to any and all other warranties and representations that each Debtor now or hereafter shall give, or cause to be given, to Agent or any Lender pursuant to the terms and conditions of this Agreement.

     5.9    **Secured Super-Priority Obligations.**

         (a)    On and after the Interim Order Entry Date, the provisions of the Loan Documents and the Interim Order are effective to create in favor of the Agent for the benefit

SWM002843

AA00593

of itself and Lenders, legal, valid and perfected liens on and security interests (having the priority provided for herein and in the Interim Order) in all right, title and interest in the Collateral, enforceable against Debtors and all other Obligors.

(b) Pursuant to subsections 364(c)(2) and 364(d) of the Bankruptcy Code and the Interim Order, the Obligations are secured by a priming first priority perfected and enforceable lien on the Collateral, subject only to Permitted Liens.

(c) Pursuant to section 364(c)(1) of the Bankruptcy Code and the Interim Order, all Obligations of each Debtor under the Loan Documents at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code subject only to the Carve-Out.

(d) The Interim Order has been entered and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended, rescinded or stayed without the prior, written consent of Agent.

(e) Upon making any Advance after the Initial Advance, the Final Order will have been entered and the transactions contemplated hereby and thereby, will be in full force and effect, no appeal will have been taken therefrom, and the time for appeal will have expired. The Final Order will not have been appealed, vacated, reversed, modified, amended, rescinded or stayed without the prior, written consent of Agent.

(f) Upon the Maturity Date, Agent and Lenders will be entitled to immediate payment in full of the Obligations without further application to or order by the Bankruptcy Court.

5.10 **No Brokers.** Other than _____, no broker has been used by Debtors in connection with the transactions described in this Agreement.

5.11 **CDD Debt Service and Outstanding Assessments.** As of December 31, 2009, (i) for CDD #1, the aggregate past due assessments were $3,858,191.26, and the aggregate assessments were $36,671,476.99 and (ii) for CDD #2, the aggregate past due assessments were $3,470,653.89, and the aggregate assessments were $72,887,413.41.

5.12 **Land Platted.** The land securing the repayment of the CDD #2 2003A Series, 2003B Series, and 2004 Series bonds has been platted and is subject to final platting.

5.13 **Equity Interests.**

(a) All Equity Interests pledged under this Agreement (i) are genuine, validly, issued, and outstanding, fully paid and nonassessable, and are not issued in violation of the preemptive rights of any person or of any agreement by which the Issuer thereof or any Debtor is bound; (ii) are not subject to any interest, option, or right of any third Person; and (iii) are in compliance with applicable law concerning form, content, and manner of preparation and execution, as applicable. Each Debtor pledging Equity Interests acquired and holds such Equity Interests in compliance with all applicable laws and regulations.

SWM002844

AA00594

(b)    Schedule 5.13 attached hereto and made a part hereof sets forth the capitalization and ownership of each Debtor.

(c)    The Equity Interests of any Debtor that is a limited partnership or limited liability company are uncertificated, and the Issuer thereof has not elected to have such Equity Interests treated as a "security" under Article 8 of the Code.  Each Debtor covenants and agrees with Agent that it will not agree to an election to have any of such Equity Interests treated as a "security" under Article 8 of the Code.

5.14   **Declarants under CCRs.**  There are no declarants under any covenants, conditions, and restrictions affecting any of the Real Property other than the Declarants.

# 6.  AFFIRMATIVE COVENANTS.

Each Debtor covenants and agrees that, so long as any credit hereunder shall be available and until payment in full of the Obligations, and unless Agent shall otherwise consent in writing, each Debtor shall do all of the following:

6.1    **Reporting Requirements.**

(a)    Financial Reports.  Each Debtor shall provide to Agent, within 30 days after the end of each month an unaudited consolidated and consolidating balance sheet, income statement, and cash flow statement covering such Debtor and its Subsidiaries' operations during such period and year-to-date, together with a comparison of actual results to those projected in the most recent 18 Month Budget and 13 Week Budget.

Each Debtor agrees promptly to provide Agent with all financial reports requested by Agent from time to time.

(b)    Third Party Reports.  Each Debtor shall promptly provide Agent copies of all reports such Debtor delivers to any third party, including, without limitation, reports delivered to any creditor, creditor committee, the US Trustee, or any other governmental authority.

(c)    Weekly Sales Report.  Debtors shall provide to Agent, on or before the close of business of each Wednesday for the week immediately preceding, weekly sales reports, which shall include, without limitation,

(i)    a listing of closed sales by unit or property description with the name of the buyer, the sales price therefor, the cost of the sale (including any sales commissions and CDD buys downs), Net Proceeds, and any discounts or concessions outside the ordinary course of Debtors' business;

(ii)   listings of assets under contract, including, without limitation, sale price, release price, expected closing date, and the amount of the down payment,

(iii)     a sales pipeline report, which shall include residential units, bulk units, bulk lots, home sites, hotel condo, land or any other material asset of any Debtor, and

(iv)     a reporting of marketing activities.

(d)     <u>Litigation and Liens</u>.  Debtors shall provide to Agent, within ___ days after the end of each month, a report as of the end of such month, detailing the status of all property liens with respect to any of the Collateral and all litigation against any Debtor.

(e)     <u>Project Report</u>.  Debtors shall provide to Agent, within ___ days after the end of each month, a report as of the end of such month, which shall include (i) a narrative description of the status of sales of units in the Project, development of the Project, the status of home owners associations, any developments with respect to either CDD, and any other information necessary to keep Agent informed of the status of the Project; (ii) an updated club membership roll, including, without limitation, additions, submitted resignations, removals, and delinquencies, (iii) the status of CDD projects and cash balances; and (iv) all permitting and zoning activity.

(f)     <u>Appraisals</u>.  Each Debtor agrees to deliver to Agent annual updates to the Real Property and Collateral appraisals delivered to Agent in connection with the Initial Advance.

(g)     <u>Notices</u>.  Each Debtor agrees to provide Agent with at least (i) two (2) Business Days' prior notice of any filings such Debtor plans to make in the Bankruptcy Case, and (ii) five (5) Business Days' prior notice of any hearing with the Bankruptcy Court regarding the Loan, this Agreement, or the transactions described herein.

(h)     <u>Updated Budgets</u>.  No later than 15 days prior to each calendar quarter-end, Debtors shall deliver to Agent (i) a comparison of actual year-to-date results to the 18 Month Budget, and (ii) an updated 13 Week Budget for the next calendar quarter.

6.2     **Title to Equipment.**     Upon Agent's reasonable request, Debtors immediately shall deliver to Agent properly endorsed, any and all evidences of ownership of, certificates of title, or applications for title to any items of equipment.

6.3     **Maintenance of Equipment.**     Each Debtor shall keep and maintain its equipment in good operating condition and repair (ordinary wear and tear excepted), and make all necessary replacements thereto so that the value and operating efficiency thereof shall at all times be maintained and preserved.  No Debtor shall permit any item of equipment to become a fixture to real estate or an accession to other property, and the equipment is now and shall at all times remain personal property.

6.4     **Maintenance of the Project-Related Clubs.**     Subject to the limitations of the 18 Month Budget and unless otherwise prohibited by the Bankruptcy Code, Debtors will perform all obligations and responsibilities required of Debtors in connection with their participation in, management of, and oversight of the Fiddlers Creek Foundation, the Tarpon

SWM002846

AA00596

Club, and Fiddler's Creek Golf Club to ensure continued operations thereof and to provide services to the members thereof.

6.5 **Taxes.** Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code and provided for in the 18 Month Budget, all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against any Debtor or any of its property have been paid, and shall hereafter be paid in full, before delinquency or before the expiration of any extension period, *provided, however,* that no Debtor shall be required to pay or discharge any such assessment or tax that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained. Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code, Debtors shall make due and timely payment or deposit of all federal, state, and local taxes, assessments, or contributions required of it by law, and will execute and deliver to Agent, on demand, appropriate certificates attesting to the payment thereof or deposit with respect thereto. To the extent permitted or required under the Bankruptcy Code, each Debtor will make timely payment or deposit of all tax payments and withholding taxes required of it by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Agent with proof satisfactory to Agent indicating that Debtors have made such payments or deposits.

6.6 **CDD Maintenance.** Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code and provided for in the 18 Month Budget, all current maintenance assessments and obligations payable to either CDD shall be paid.

6.7 **Insurance.** Subject to the limitations in the 18 Month Budget, Debtors, at their expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in amounts satisfactory to Agent in its sole discretion. Each Debtor also shall maintain business interruption with respect to its operations and its chief executive office and public liability and property damage insurance relating to each Debtor's ownership and use of the Collateral, as well as insurance against larceny, embezzlement, and criminal misappropriation, all in amounts satisfactory to Agent in its sole discretion.

(b) All such policies of insurance shall be in such form, with such companies, and in such amounts as may be reasonably satisfactory to Agent. Debtors shall deliver to Agent certified copies of such policies of insurance and evidence of the payment of all premiums therefor. All proceeds payable under any such policy shall be payable to Agent to be applied on account of the Obligations. Debtors shall deliver to Lender (i) an endorsement to its commercial general liability insurance showing Agent as "additional insured" and (ii) "mortgagee" and "lender's loss payable" endorsements to its property insurance. Debtors agree that providing ACORD 25 certificates and merely naming Agent as "loss payee" are not sufficient to satisfy the requirements of this Section.

6.8 **No Setoffs or Counterclaims.** All payments hereunder and under the other Loan Documents made by or on behalf of each Debtor shall be made without setoff or

SWM002847

AA00597

counterclaim and free and clear of, and without deduction or withholding for or on account of, any federal, state, or local taxes.

6.9 **Compliance with Laws.** Each Debtor shall comply with the requirements of all applicable laws, rules, regulations, and orders of any governmental authority, including the Fair Labor Standards Act and the Americans With Disabilities Act, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, would not and could not reasonably be expected to result in a Material Adverse Change.

6.10 **Compliance with Material Contracts.** Unless prohibited by the Bankruptcy Court, each Debtor shall comply with all requirements of each Material Contract to which it is a party.

6.11 **Leases.** Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code, each Debtor shall promptly pay when due all rents and other amounts payable under any leases to which such Debtor is a party. To the extent that any Debtor fails timely to make payment of such rents and other amounts payable when due under its leases, Agent shall be entitled, in its discretion, and without the necessity of declaring an Event of Default, to reserve an amount equal to such unpaid amounts from the loan availability created under Section 2.1 hereof.

6.11 **Use of Proceeds.** Debtor shall use the proceeds of each Advance for payment of the items set forth in the 18 Month Approved Budget and for no other purpose.

## 7. NEGATIVE COVENANTS.

Each Debtor covenants and agrees that, so long as any credit hereunder shall be available and until payment in full of the Obligations, no Debtor shall or shall permit any Subsidiary to, without the prior, written consent of Agent:

7.1 **Liens.** Create, incur, assume or suffer to exist, any lien or claim on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or assign any accounts or other right to receive income (or apply to the Bankruptcy Court for authority to do so, except in connection with an Acceptable Plan) on a *pari passu* or senior in priority to any lien or claim granted to Agent, except for the liens shown on Schedule 5.1 as "Senior Priority Liens."

7.2 **Debt.** Create, incur, assume or suffer to exist any debt (or apply to the Bankruptcy Court for authority to do so, except in connection with an Acceptable Plan) other than debt under the Loan Documents and debt existing as of the Filing Date (the "*Existing Debt*").

7.3 **Sales of Assets.** Sell, lease, transfer or otherwise dispose of any of its assets, including, without limitation, any sale-leaseback arrangement, or apply to the Bankruptcy Court for authority to do so except with the prior, written consent of Agent, *provided,* that the properties described on Schedule 7.3 attached hereto and made a part hereof may be sold if (i) such property sells for at least the minimum gross sales price set forth on such schedule and

SWM002848

AA00598

(ii) Agent receives at least the minimum release price set forth on such schedule and (iii) all Net Proceeds are deposited in the Agent's Account to be applied to the Obligations.

7.4 **Contracts and Leases.** Assume, reject, assign, or amend or file a motion to assume, reject, assign, or amend any contract or lease to which any Debtor is a party.

7.5 **Orders.** Make or permit to be made any changes, amendments or modifications, or any application or motion for any change, amendment or modification, to either of the Orders.

7.6 **Budget.** Except as otherwise agreed by the parties in writing, incur cash expenses which in the aggregate are greater than ten percent (10%) above that for which provision is made in the 18 Month Budget in any 13 week period, or in any other budget approved by Agent.

7.7 **Payment of Managed Expenses.** As of any date, pay any Managed Expenses set forth in the most recent 18 Month Budget unless Debtors have met the applicable Minimum Net Cumulative Sales required for such payment:

| Date | Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses |
|---|---|
| January 31, 2010 | $12,000,000 |
| February 28, 2010 | 12,000,000 |
| March 31, 2010 | 12,000,000 |
| April 30, 2010 | 12,000,000 |
| May 31, 2010 | 12,000,000 |
| June 30, 2010 | 12,000,000 |
| July 31, 2010 | 12,000,000 |
| August 31, 2010 | 12,000,000 |
| September 30, 2010 | 12,000,000 |
| October 31, 2010 | 15,000,000 |
| November 30, 2010 | 15,000,000 |
| December 31, 2010 | 15,000,000 |
| January 31, 2011 | 15,000,000 |
| February 28, 2011 | 15,000,000 |
| March 31, 2011 | 20,000,000 |
| April 30, 2011 | 20,000,000 |
| May 31, 2011 | 20,000,000 |
| June 30, 2011 | 30,000,000 |

7.8 **Mergers, etc.** Become a party to a merger or consolidation, or purchase or otherwise acquire all or any part of the assets of any Person or any shares or other evidence of beneficial ownership of any Person, or wind-up, dissolve, or liquidate.

7.9 **Restricted Payments.** Declare or pay any dividends or make any other payment or distribution (in cash, property, or obligations) on account of its equity interests, or redeem, purchase, retire, call, or otherwise acquire any of its equity interests, or permit any of its

SWM002849

AA00599

Subsidiaries to purchase or otherwise acquire any equity interest of any Debtor or any Subsidiaries, or set apart any money for a sinking or other analogous fund for any dividend or other distribution on its equity interests or for any redemption, purchase, retirement, or other acquisition of any of its equity interests.

       7.10   **Subordinated Debt Payments.**  Make any payment or distribution that is prohibited pursuant to the terms of any subordination or intercreditor agreement between Agent and any creditor.

       7.11   **Transactions With Affiliates.**  Enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service, with any Affiliate of any Debtor or any Affiliate of any Subsidiary.

       7.12   **Issuance of Equity.**  At any time issue, sell, assign, or otherwise dispose of (a) any of its equity interests, (b) any securities exchangeable for or convertible into or carrying any rights to acquire any of its equity interests, or (c) any option, warrant, or other right to acquire any of its equity interests.

       7.13   **Amendments of Organizational Documents.**  Permit any amendment to the articles of incorporation, limited liability company agreement, or partnership agreement, as appropriate, of any Issuer to create any new class of shares, membership units, or partnership interests, change the designation of any class of shares, membership units, or partnership interests, or impair the position of Agent, without the prior, written consent of Agent.

       7.14   **Minimum Net Cumulative Sales.**  Fail to achieve cumulative Net Proceeds from sales set forth below, as of the dates set forth:

| Date | Minimum Cumulative Net Proceeds |
|---|---|
| June 30, 2010 | $5,000,000 |
| September 30, 2010 | 8,000,000 |
| December 31, 2010 | 12,000,000 |
| March 31, 2011 | 20,000,000 |
| June 30, 2011 | 30,000,000 |

       7.15   **Capital Expenditures.**  Except as approved in the 18 Month Budget, directly or indirectly make or incur any Capital Expenditures.

       7.14   **Debt Payments Prohibited.**  Make any payment of principal or interest on any indebtedness owed to any existing secured creditor without the express, prior, written consent of Agent unless such payment is expressly identified in the 18 Month Budget.

## 8. CONSENTS AND WAIVERS OF GUARANTORS.

       (a)     Each Guarantor (whether as a guarantor or pledgor) hereby authorizes Agent and each Lender, without notice or demand and without affecting its liability hereunder, from time to time to (i) renew, compromise, forbear, extend, accelerate, or otherwise change the time for payment or the terms of any of the Obligations, or any part thereof, including, without limitation, increasing or decreasing the rate of interest thereof or the amount of

SWM002850

AA00600

indebtedness thereunder; (ii) take and hold security, guaranties, or other assurances of payment for the payment of the Obligations, and exchange, enforce, waive, and release any such security; (iii) apply such security and direct the order or manner of sale thereof as Agent or any Lender in its discretion may determine; (iv) release or substitute any one or more endorsers or guarantors of all or any part of the Obligations; and (v) assign, without notice, this Agreement in whole or in part and Agent's rights hereunder to anyone at any time.

Each Guarantor agrees that Agent and Lenders may do any or all of the foregoing in such manner, upon such terms, and at such times as Agent or any Lender, in its discretion, deems advisable, without, in any way or respect, impairing, effecting, reducing or releasing such Guarantor from its undertakings hereunder, and each Guarantor hereby consents to each and all of the foregoing acts, events and occurrences.

(b)       It shall not be necessary for Agent or any Lender (and each Guarantor hereby waives any rights which such Guarantor may have to require Agent or any Lender), in order to enforce such payment to such Guarantor, first to (i) institute suit or exhaust its remedies against either Borrower or any other Obligor or any other Person, (ii) enforce Agent's or any Lender's rights against any security which shall ever have been given to secure the Obligations, (iii) enforce Agent's or any Lender's rights against any guarantors of the Obligations, (iv) join either Borrower or any other Obligor in any action seeking to enforce this Agreement or any other Loan Document, (v) exhaust any remedies available to Agent or any Lender against any security which shall ever have been given to secure the Obligations, except as expressly provided in this Agreement, or (vi) resort to any other means of obtaining payment of the Obligations. Neither Agent nor any Lender shall be required to mitigate damages or take any other action to reduce, collect or enforce the Obligations.

(c)       Each Guarantor agrees to the provisions of this Agreement, and hereby waives notice of (i) any loans or advances made by Agent or any Lender to either Borrower, (ii) acceptance of this Agreement, (iii) any amendment or extension of the Loan Agreement or of any other Obligations, (iv) the execution and delivery by either Borrower and Agent or any Lender of any other loan or credit agreement or of either Borrower's execution and delivery of any promissory notes or other documents in connection therewith, (v) the occurrence of any breach by any Borrower or any other Obligor or Event of Default, (vi) Agent's or any Lender's transfer or disposition of the Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any Collateral, except to the extent such notice cannot be waived, (viii) protest, proof of non-payment or default by either Borrower or any other Obligor, or (ix) any other action at any time taken or omitted by Agent or any Lender, and, generally, all demands and notices of every kind in connection with this Agreement or any other Loan Document.

(d)       Each Guarantor hereby consents and agrees to each of the following, and agrees that such Guarantor's obligations under this Agreement or any other Loan Document shall not be released, diminished, impaired, reduced, or adversely affected by any of the following, and waives any common law, equitable, statutory, or other rights (including without limitation rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:

SWM002851

AA00601

(i)     the invalidity, illegality, or unenforceability of all or any part of the Obligations, or any document, or agreement executed in connection with the Obligations, for any reason whatsoever, including without limitation the fact that (A) the Obligations, or any part thereof, exceeds the amount permitted by law, (B) the act of creating the Obligations or any part thereof is *ultra vires*, (C) the officers or representatives executing the Agreement or other documents or otherwise creating the Obligations acted in excess of their authority, (D) the Obligations violate applicable usury laws, (E) any Borrower or any other Obligor has valid defenses, claims, or offsets (whether at law, in equity or by agreement) which render the Obligations wholly or partially uncollectible from such Borrower or such Obligor, (F) the creation, performance or repayment of the Obligations (or the execution, delivery, and performance of any document or instrument representing part of the Obligations or executed in connection with the Obligations, or given to secure the repayment of the Obligations) is illegal, uncollectible, or unenforceable, or (G) any of the Loan Documents have been forged or otherwise are irregular or not genuine or authentic;

(ii)     any release, surrender, exchange, subordination, deterioration, waste, loss, or impairment (including without limitation negligent, willful, unreasonable, or unjustifiable impairment) of any collateral, property, or security, at any time existing in connection with, or assuring or securing payment of, all or any part of the Obligations;

(iii)     the failure of Agent, any Lender, or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of the Collateral;

(iv)     the fact that any collateral, security, security interest, or lien contemplated or intended to be given, created, or granted as security for the repayment of the Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by such Guarantor that such Guarantor is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility, or value of any of the collateral for the Obligations;

(v)     the insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, or lack of power of any Borrower or any other Obligor, (ii) any dissolution of any Borrower or any other Obligor, or any sale, lease or transfer of any or all of the assets of any Borrower or such Guarantor, or any change in the shareholders, partners, or members of any Borrower, or (iii) any reorganization, merger, or consolidation of any Borrower into or with any other corporation or entity;

(vi)     any payment by any Borrower or any other Obligor to Agent or any Lender is held to constitute a preference under bankruptcy laws, or for any reason Agent or any Lender is required to refund such payment or pay such amount to any Borrower or any other Person; or

SWM002852

AA00602

(vii)   any other action taken or omitted to be taken with respect to this Agreement, any other Loan Document, the Obligations, or any of the Collateral, whether or not such action or omission prejudices such Guarantor.

(e)   Each Guarantor hereby waives any right to assert against Agent or any Lender as a defense, counterclaim, set-off, or cross-claim, any defense (legal or equitable), set-off, counterclaim, or cross-claim which such Guarantor may now or any time hereafter have against any Borrower or any other Obligor.   Each Guarantor hereby waives all defenses, counterclaims, and off-sets of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of this Agreement or any Loan Document or any security interest granted under this Agreement or any Loan Document.

(f)   Each Guarantor hereby waives any defense arising by reason of any claim or defense based upon an election of remedies by Agent or any Lender, which, in any manner impairs, affects, reduces, releases, destroys, or extinguishes such Guarantor's subrogation rights, rights to proceed against any Borrower or any other Obligor for reimbursement, or any other rights of such Guarantor to proceed against any Borrower or any other Obligor or against any other rights of such Guarantor or against any other Person or collateral.   Each Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notices of protests, notices of dishonor, notices of default, notice of acceptance of this Agreement, and notices of the existence, creating or incurring of new or additional indebtedness, and all other notices or formalities to which such Guarantor may be entitled.

(g)   As a condition to payment or performance by any Guarantor under this Agreement, neither Agent nor any Lender shall be required to, and each Guarantor hereby waives any and all rights to require Agent or any Lender to prosecute or seek to enforce any remedies against any Borrower or any other Obligor or to require Agent or any Lender to seek to enforce or resort to any remedies with respect to any security interests, liens, or encumbrances granted to Agent by any Borrower or any other Obligor.

(h)   Insofar as Guarantors and Borrowers are concerned, any payment hereunder by any Guarantor shall be deemed a contribution to the capital of Borrowers, and each Guarantor shall have no right of subrogation with respect hereto. Each Guarantor hereby waives any rights to enforce any rights of subrogation, contribution, reimbursement, indemnification, exoneration, and any other remedy which such Guarantor may have against any Borrower or any other Person with respect to this Agreement, the Obligations, or applicable law.   Each Guarantor hereby irrevocably agrees, to the fullest extent permitted by law, that it will not exercise (and herein waives) any rights against any Borrower or any other Person which it may acquire by way of subrogation, contribution, reimbursement, indemnification, or exoneration under or with respect to this Agreement, the Obligations, or applicable law, by any payment made hereunder or otherwise.   If the foregoing waivers are adjudicated unenforceable by a court of competent jurisdiction, then each Guarantor agrees that no liability or obligation of any Borrower or any other Obligor that shall accrue by virtue of any right to subrogation, contribution, indemnity, reimbursement, or exoneration shall be paid, nor shall any such liability or obligation be deemed owed, until all of the Obligations shall have been paid in full and all commitments and other agreements of any Lender to make loans to either Borrower shall have terminated.

SWM002853

AA00603

## 9. EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "*Event of Default*") under this Agreement:

9.1    If any Debtor fails to pay when due and payable (on the Maturity Date or otherwise) or when declared due and payable, any portion of the Obligations (whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on the Obligations), fees and charges due Agent or any Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations);

9.2    If any Obligor shall fail to perform or observe any term, covenant or agreement (i) contained in this Agreement (other than a failure described in Section 9.1) or (ii) contained in any Loan Document, if such failure shall remain unremedied for 10 days after the earlier of the date on which (A) an Authorized Officer becomes aware of such failure or (B) written notice thereof shall have been given to such Obligor by Agent;

9.3    If Agent determines in its reasonable discretion that there is a material impairment of the prospect of repayment of any portion of the Obligations owing to Agent or any Lender or a material impairment of the value of the Collateral or priority of Agent's security interests in or liens on the Collateral;

9.4    If any material portion of any Obligor's properties or assets is attached, foreclosed upon, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person or if the automatic stay or other applicable stay is lifted in favor of any third Person, and such attachment, seizure, writ, lifting of stay, warrant, or levy is not released, discharged, or bonded against within fifteen days of the date it first arises;

9.5    If a trustee (or examiner with expanded powers) is appointed in any Debtor's Chapter 11 case, if any Debtor's Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, or if any Debtor's Chapter 11 Case is dismissed;

9.6    If a plan of reorganization of any Debtor, other than an Acceptable Plan, is confirmed by the Bankruptcy Court;

9.7    If any Debtor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

9.8    If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Person is a party with one or more third Persons and such Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code;

9.9    If the entry of the Final Order shall not have occurred within forty-five (45) days after entry of the Interim Order;

9.10    If any material misstatement or misrepresentation exists now or hereafter in any warranty, representation, statement, or report made to Agent or any Lender by any

SWM002854

AA00604

Obligor, or any officer, employee, agent, or director of any Obligor, or if any such material warranty or representation is withdrawn;

        9.11    If the Interim Order or the Final Order ceases to remain in full and effect, except for such modifications thereto acceptable to Agent; or

        9.12    If any Debtor shall fail to perform or observe any material term, covenant or agreement contained in the Orders.

## 10. LENDER'S RIGHTS AND REMEDIES.

        10.1    **Rights and Remedies.**  Upon the occurrence, and during the continuation, of an Event of Default, the Required Lenders (at their election but without notice of their election and without demand) may authorize and instruct Agent to do any one or more of the following on behalf of Lenders (and Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of Lenders), all of which are authorized by Debtors:

        (a)    Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

        (b)    Cease advancing money or extending credit to or for the benefit of either Borrower under this Agreement, under any of the Loan Documents, or under any other agreement between either Borrower and any Lender;

        (c)    Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Agent and Lenders, but without affecting Agent's and Lenders' rights and security interests in the Collateral and without affecting the Obligations;

        (d)    Settle or adjust disputes and claims directly with account debtors for amounts and upon terms which Agent considers advisable, and in such cases, Agent will credit Borrowers' loan account with only the net amounts received by Agent in payment of such disputed Accounts after deducting all Lender Expenses incurred or expended in connection therewith;

        (e)    Without notice to or demand upon any Debtor, make such payments and do such acts as Agent considers necessary or reasonable to protect its security interests in the Collateral. Borrowers agree to assemble the Collateral if Agent so requires, and to make the Collateral available to Agent as Agent may designate. Debtors authorize Agent to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in Agent's determination appears to be prior or superior to its security interests and to pay all expenses incurred in connection therewith. Debtor further agrees to cooperate fully with Agent to permit Agent to sell at foreclosure or other private sale any Collateral consisting of Equity Interests, including, without limitation, fully complying with all federal and state securities laws applicable to any such sale. With respect to any of any Debtor's owned or leased premises, each Debtor hereby grants Agent a license to enter into possession of such premises and to occupy the

SWM002855

AA00605

same, without charge, for up to one hundred twenty (120) days in order to exercise any of Agent's and Lenders' rights or remedies provided herein, at law, in equity, or otherwise;

(f)     Without notice to any Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of each Debtor held by Agent or any Lender, or (ii) indebtedness at any time owing to or for the credit or the account of each Debtor held by Agent or any Lender;

(g)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral.  Agent is hereby granted a license or other right to use, without charge, each Debtor's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and each Debtor's rights under all channel leases or subleases, all licenses and all franchise agreements shall inure to Agent's and Lenders' benefit;

(h)     Apply to the Bankruptcy Court upon proper notice to Debtors, Debtors' counsel, counsel for the official creditors committee in such case, and the United States Trustee for the District of Florida and any other parties entitled to special notice under the Local Rules for the United States Bankruptcy Court for the District of Florida, for one or more of the following forms of relief:  (i) appointment of an examiner for Debtors; (ii) appointment of a Chapter 11 trustee for Debtors; (iii) conversion of each Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (iv) dismissal of each Debtor's Chapter 11 Case. Nothing in this paragraph shall limit the right of Agent to apply to the Bankruptcy Court for such other or further relief as may be justified and appropriate, and nothing in this paragraph shall limit the other rights and remedies of Agent or any Lender provided for elsewhere in this Agreement or in any other Loan Document;

(i)     Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Debtor's premises) as Agent determines is commercially reasonable.  It is not necessary that the Collateral be present at any such sale;

(j)     Agent shall give notice of the disposition of Debtor Collateral as follows:

(1)     Agent shall give Debtors and each holder of a security interest in the Debtor Collateral who has filed with Agent a written request for notice, a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other disposition other than a public sale is to be made of the Debtor Collateral, then the time on or after which the private sale or other disposition is to be made;

(2)     The notice shall be personally delivered or mailed, postage prepaid, to Debtors as provided in <u>Section 13</u>, at least ten (10) days before the date fixed for the sale, or at least ten (10) days before the date on or after which the private sale or other

SWM002856

AA00606

disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Debtor Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to Persons other than Debtors claiming an interest in the Debtor Collateral shall be sent to such addresses as they have furnished to Agent;

(3)     If the sale is to be a public sale, Agent also shall give notice of the time and place by publishing a notice one time at least ten (10) days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

(k)     Agent or any Lender may credit bid and purchase at any public or private sale;

(l)     Any deficiency that exists after disposition of the Debtor Collateral as provided above will be paid, jointly and severally, immediately by Debtors. Any excess will be returned, without interest and subject to the rights of third Persons, by Agent to Debtors; and

(m)     In addition to the foregoing rights in this <u>Section 10.1</u>, Agent shall have all other rights and remedies available to it at law or in equity pursuant to any other Loan Documents, including any lease assignments, lease mortgages, and real property mortgages or deeds of trust.

10.2     **Remedies Cumulative.**  Agent's and Lenders' rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Agent and Lenders shall have all other rights and remedies not inconsistent herewith as provided under the Orders, the Bankruptcy Code, the Code, by law, or in equity. No exercise by Agent or any Lender of one right or remedy shall be deemed an election, and no waiver by Agent or any Lender of any Default or Event of Default shall be deemed a continuing waiver. No delay by Agent or any Lender shall constitute a waiver, election, or acquiescence by it.

10.3     **Equity Interests.**

(a)     The 1933 Act and other laws or regulations may impose legal restrictions or limitations on the ability of Agent to dispose of certain of the Collateral in the enforcement of its rights and remedies hereunder. Agent is hereby authorized by each Debtor, but not obligated, in the event of the occurrence and during the continuation of an Event of Default, to sell all or any part of the Equity Interests at private sale, subject to investment letter or in any other manner which will not require such Collateral, or any part thereof, to be registered in accordance with the 1933 Act or the rules and regulations promulgated thereunder, or any other law or regulations. Agent is also hereby authorized by each Debtor, but not obligated, to take such actions, give such notices, obtain such rulings and consents, and do such other things as Agent may deem appropriate in the event of a sale or disposition of any of the Equity Interests. Each Debtor understands that Agent may in its discretion approach a restricted number of potential purchasers and that a sale under such circumstances may yield a lower price for such Collateral or any part or parts thereof than would otherwise be obtainable if such Collateral were registered and sold in the open market, and each Debtor agrees that such private sales shall constitute a commercially reasonable method of disposing of such Collateral.

SWM002857

AA00607

(b)      Agent shall have the right at any time and from time to time after the occurrence and during the continuance of an Event of Default to notify and direct any Issuer to make all payments, dividends, and distributions regarding the Collateral directly to Agent. Agent shall have the authority to demand of the issuer or obligor, and to receive and receipt for, any and all payments, dividends and other distributions payable in respect thereof, regardless of the medium in which paid and whether they are ordinary or extraordinary. Each Issuer making payment to Agent hereunder shall be fully protected in relying on the written statement of Agent that it then holds a security interest which entitles it to receive such payment, and the receipt by Agent for such payment shall be full acquittance therefore to the one making such payment.

(c)      Upon the occurrence and during the continuation of an Event of Default, Agent shall have the right, at its discretion, to transfer to or register in the name of Agent or any nominee of Agent any of the Equity Interests, and/or to exercise any or all voting rights as to any or all of the Equity Interests. For such purposes, each Debtor hereby names, constitutes and appoints the President or any Vice President of Agent as such Debtor's proxy in such Debtor's name, place, and stead to vote any and all of the securities, as such proxy may elect, for and in the name, place, and stead of such Debtor, as to all matters coming before shareholders, such proxy to be irrevocable and deemed coupled with an interest. The rights, powers, and authority of such proxy shall remain in full force and effect, and shall not be rescinded, revoked, terminated, amended, or otherwise modified, until all Obligations have been fully satisfied and any agreement to make Advances has terminated.

10.4    **Exercise of Certain Remedies.**

(a)      Notwithstanding anything to the contrary set forth herein or in any other Loan Document, Agent and Lenders agree that (i) Agent shall not foreclose its liens encumbering any Equity Interest prior to January 1, 2011, if the only Event of Default then continuing is Debtors' breach of Section 7.12 hereof and (ii) before Agent exercises its rights and remedies against the Collateral described on Exhibit E attached hereto and made a part hereof (the "*Reserved Collateral*"), Agent shall use commercially reasonable efforts to realize on other Collateral pledged to it. In the event Agent begins to exercise its rights and remedies against the Reserved Collateral, Agent shall use commercially reasonable efforts to exercise its rights with respect to each piece of the Reserved Collateral in the order in which it is listed on Exhibit E before commencing the exercise of its rights against the next piece of the Reserved Collateral. Notwithstanding anything in this Section 10.3(a) to the contrary, if any Obligor contests Agent's or any Lender's exercise of its rights and remedies with respect to any of the Collateral or Agent believes in its reasonable credit judgment that the value of any of the Reserved Collateral may decline in value by more than ___% from the value provided therefor in Debtors' disclosure schedules before Agent has exercised its rights in other Collateral, Agent may exercise its rights in any of the Reserved Collateral.

(b)      Agent agrees to hold in escrow the deeds in lieu of foreclosure and consent judgments delivered to Agent by Debtors as a condition to the Initial Advance. Debtors agree that, upon the occurrence and during the continuance of an Event of Default, Agent may, with no further action on the part of or consent from any Obligor, release such deeds in lieu of foreclosure and consent judgments from escrow, record such deeds in lieu of foreclosure and file such consent judgments in any court in the state of Florida.

SWM002858

AA00608

## 11. TAXES AND EXPENSES.

If any Debtor fails to pay any monies (whether taxes, rents, assessments, insurance premiums, or otherwise) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, to the extent that Agent determines that such failure by such Debtor could result in a Material Adverse Change, in its discretion and without prior notice to Debtors, Agent may do any or all of the following:  (a) make payment of the same or any part thereof; (b) set up such reserves in Borrowers' loan account as Agent deems necessary to protect Agent from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in <u>Section 6.4</u>, and take any action with respect to such policies as Agent deems prudent.  Any such amounts paid by Agent or any Lender shall constitute Lender Expenses.  Any such payments made by Agent or any Lender shall not constitute an agreement by Agent or Lenders to make similar payments in the future or a waiver by Agent or Lenders of any Default or Event of Default under this Agreement.  Agent need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance, or lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 12. WAIVERS; INDEMNIFICATION.

12.1   **Demand; Protest; etc.**  Each Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of acceleration, notice of intent to accelerate, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Agent or any Lender on which any Debtor may in any way be liable.

12.2   **Agent's Liability for Collateral.**  So long as Agent complies with its obligations, if any, under the Code, neither Agent or any Lender shall in any way or manner be liable or responsible for:  (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral shall be borne by Debtors.

12.3   **Indemnification.**   Debtors agree, jointly and severally, to defend, indemnify, save, and hold Agent, Lenders, and their respective agents harmless against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other Person arising out of or relating to the transactions contemplated by this Agreement or any other Loan Document, and (b) all losses (including attorneys' fees and disbursements) in any way suffered, incurred, or paid by Agent or any Lender as a result of or in any way arising out of, following, or consequential to the transactions contemplated by this Agreement or any other Loan Document, except, in any such case, to the extent that the same arises from the gross negligence or willful misconduct of Agent or such Lender or its officers, agents, or employees.  This provision shall survive the termination of this Agreement.

SWM002859

AA00609

## 13. NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, telefacsimile, or telegram (with messenger delivery specified) to Debtors or to Agent, as the case may be, at its address set forth below:

If to a Debtor
c/o Fiddler's Creek LLC
8156 Fiddlers Creek Parkway
Naples, Florida 34114
Attn:_____
Telephone:_____
Facsimile:_____

with a copy to:
_____
_____
_____
Attn:_____
Telephone:_____
Facsimile:_____

If to Agent:
PEPI Capital, L.P.
2300 West Plano Parkway
Plano, Texas 75075
Attn: CJ Lorio and David Radunsky
Telephone: (972) 535-1900
Facsimile: (972) 535-1991

with copies to:
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone: (214) 939-5567
Facsimile: (214) 939-5849
Attn: Jeffrey R. Fine, Esq.
jeff.fine@klgates.com

SWM002860

AA00610

And

_____
_____
_____
Attn:_____
Telephone:_____
Facsimile:_____

    If to a Lender, at its address set forth on the signature page hereto or in its Assignment and Acceptance.

    The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other. Debtors acknowledge and agree that notices sent by Agent in connection with the exercise of enforcement rights against Debtor Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

**14. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

    **THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE), IT BEING THE INTENT OF THE PARTIES THAT FEDERAL LAW SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO WITHOUT REGARD TO THE APPLICATION OF ANY PROVISION OF STATE LAW. TO THE EXTENT THAT FEDERAL LAW WOULD APPLY THE LAW OF ANY STATE AS THE FEDERAL RULE FOR THE PURPOSES OF THIS AGREEMENT, THE PARTIES AGREE THAT THE LAWS OF THE STATE OF FLORIDA SHALL BE USED TO SUPPLEMENT APPLICABLE FEDERAL LAW.**

    **THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT OR IN THE STATE OR FEDERAL DISTRICT COURTS IN THE MIDDLE DISTRICT OF FLORIDA. EACH OF EACH DEBTOR, AGENT, AND EACH LENDER WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 14</u>.**

**15. AGENT.**

    15.1   **Appointment and Authorization of Agent**. Each Lender hereby designates and appoints PEPI as its representative under this Agreement and the other Loan

SWM002861

AA00611

Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as such on the express conditions contained in this Article 15. The provisions of this Article 15 are solely for the benefit of Agent, and the Lenders, and neither any Obligor nor any of its Subsidiaries shall have any rights as a third party beneficiary of any of the provisions contained herein. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent; it being expressly understood and agreed that the use of the word "Agent" is for convenience only, that PEPI is merely the representative of the Lenders, and only has the contractual duties set forth herein. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the collections of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Advances, for itself or on behalf of Lenders as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the collections of Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the collections of Collateral, (f) perform, exercise, and enforce any and all other rights and remedies of Agent and Lenders with respect to the Obligors, the Obligations, the Collateral, the collections of Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

15.2 **Delegation of Duties**. Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3 **Liability of Agent**. No Agent Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for

SWM002862

AA00612

any recital, statement, representation or warranty made by any Obligor or any Subsidiary or Affiliate of any Obligor, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Obligor or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of any Obligor or the books or records or properties of any Obligor's Subsidiaries or Affiliates.

15.4 **Reliance by Agent.** Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Obligor or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

15.5 **Notice of Default or Event of Default.** Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrowers referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 10, *provided, however*, that if an event occurs or a circumstance exists that materially and imminently threatens the ability of Agent and the Lenders to realize upon any material part of the Collateral, such as, without limitation, fraudulent removal, concealment or abscondment thereof, destruction (other than to the extent covered by insurance) or material waste thereof, or failure of any Debtor after reasonable demand to maintain or reinstate adequate casualty insurance coverage with respect thereto, Agent may take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable,

SWM002863

AA00613

*provided* that Agent shall use commercially reasonable efforts to contact the Required Lenders regarding the taking of such action concurrently with or as promptly as reasonably practicable after the taking of such action.

      15.6   **Credit Decision.** Each Lender acknowledges that none of the Agent Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of the Obligors and their Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent Related Person to any Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Agent Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors and any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers. Each Lender also represents that it will, independently and without reliance upon any Agent Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors and any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of the Obligors and any other Person party to a Loan Document that may come into the possession of any of the Agent Related Persons.

      15.7   **Costs and Expenses; Indemnification.** Agent may incur and pay Lender Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys' fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Obligors are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise. Agent is authorized and directed to deduct and retain sufficient amounts from the collections of Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders. In the event Agent is not reimbursed for such costs and expenses from the collections of Collateral received by Agent, each Lender hereby agrees that it is and shall be obligated to pay to or reimburse Agent for the amount of such Lender's Pro Rata Share thereof. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers or any other Obligors to do so), according to their Pro Rata Shares, from and against any and all Indemnified Liabilities, *provided, however,* that no Lender shall be liable for the payment to any Agent Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance

SWM002864

AA00614

or other extension of credit hereunder. Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of the Obligors. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8 **Agent in Individual Capacity**. PEPI and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Obligors and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though PEPI were not Agent hereunder, and, in each case, without notice to or consent of any of the Lenders. The other Lenders acknowledge that, pursuant to such activities, PEPI or its Affiliates may receive information regarding Obligors or their Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Obligors or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them. The terms "Lender" and "Lenders" include PEPI in its individual capacity.

15.9 **Successor Agent**. Agent may resign as Agent upon 45 days notice to the Lenders. If Agent resigns under this Agreement, the Required Lenders shall appoint a successor Agent for the Lenders. If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders, a successor Agent. If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders. In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Article 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is 45 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10 **Lender in Individual Capacity**. Any Lender and its respective Affiliates and Related Funds may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Debtors and their Subsidiaries and Affiliates and

SWM002865

AA00615

any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other Lenders. The other Lenders acknowledge that, pursuant to such activities, such Lender and its respective Affiliates and Related Funds may receive information regarding Debtors or their Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Persons and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

    15.11 **Withholding Taxes.**

        (a) All payments made by any Obligor hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes, and in the event any deduction or withholding of Taxes is required, each Debtor shall comply with the penultimate sentence of this Section 15.11(a). "Taxes" shall mean, any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of a Lender) and all interest, penalties or similar liabilities with respect thereto. If any Taxes are so levied or imposed, each Borrower agrees to pay the full amount of such Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 15.11(a) after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein, *provided, however,* that Borrowers shall not be required to increase any such amounts if the increase in such amount payable results from Agent's or such Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). Each Borrower will furnish to Agent as promptly as possible after the date the payment of any Tax is due pursuant to applicable law certified copies of tax receipts evidencing such payment by any Borrower.

        (b) If a Lender claims an exemption from United States withholding tax, such Lender shall deliver to Agent, for the benefit of Agent or the assigning Lender, as applicable, and for the benefit of Borrowers:

        (i) if such Lender claims an exemption from United States withholding tax pursuant to its portfolio interest exception, (A) a statement of the Lender, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of any Debtor (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to any Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower or the assigning Lender, as applicable;

SWM002866

AA00616

(ii) if such Lender claims an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower or the assigning Lender, as applicable;

(iii) if such Lender claims that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender, two properly completed and executed copies of IRS Form W-8ECI before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower or the assigning Lender, as applicable; or

(iv) such other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower or the assigning Lender, as applicable.

Each Lender agrees promptly to notify Agent and Borrowers or the assigning Lender, as applicable, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c) If a Lender claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender shall deliver to Agent, for the benefit of Agent or the assigning Lender, as applicable, and for the benefit of Borrowers, any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or Borrowers or the assigning Lender, as applicable.

Each Lender agrees promptly to notify Agent and Borrowers or the assigning Lender, as applicable, of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d) If any Lender claims exemption from, or reduction of, withholding tax and such Lender sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender (other than to an Affiliate of such Lender or a Related Fund of such Lender), such Lender agrees to notify Agent and Borrowers of the percentage amount in which it is no longer the beneficial owner of Obligations of Debtors to such Lender. To the extent of such percentage amount, Agent and Borrowers will treat such Lender's documentation provided pursuant to Sections 15.11(b) or 15.11(c) as no longer valid. With respect to such percentage amount, such Lender may provide new documentation, pursuant to Sections 15.11(b) or 15.11(c), if applicable.

(e) If any Lender is entitled to a reduction in the applicable withholding tax, Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction. If the forms or other documentation required by subsection (b) or (c) of this Section 15.11 are not

SWM002867

AA00617

delivered in accordance with such subsections, then Agent or the assigning Lender, as applicable, may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(f)     If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of such Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the proper Person of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent under this <u>Section 15.11</u>, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

### 15.12  **Collateral Matters**.

(a)     The Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion, to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Debtors of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrowers certify to Agent that the sale or disposition is permitted under <u>Section 7.3</u> of this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Obligor or its Subsidiaries owned any interest at the time the Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to an Obligor or its Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior, written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders.  Upon request by Agent or Borrowers at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this <u>Section 15.12</u>, *provided, however,* that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Debtors in respect of) all interests retained by Debtors, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)     Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by the Obligors or is cared for, protected, or insured or has been encumbered, or that the Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to

SWM002868

AA00618

any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

### 15.13  Restrictions on Actions by Lenders; Sharing of Payments.

(a)      Each of the Lenders agrees that it shall not, without the express, written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to any Debtor or any deposit accounts of any Debtor now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)      If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's ratable portion of all such distributions by Agent, such Lender promptly shall (1) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares, *provided, however*, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

### 15.14  Agency for Perfection.  Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Agent's Liens in assets which, in accordance with Article 8 or Article 9 of the Code, as applicable, of the Code can be perfected only by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

### 15.15  Payments by Agent to the Lenders.  All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.

SWM002869

AA00619

Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.16 **Concerning the Collateral and Related Loan Documents**. Each Lender authorizes and directs Agent to enter into this Agreement and the other Loan Documents. Each Lender agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

15.17 **Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information**. By becoming a party to this Agreement, each Lender:

(a) is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report (each a "<u>Report</u>" and collectively, "<u>Reports</u>") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b) expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Debtors and will rely significantly upon the books and records of Debtors and their Subsidiaries, as well as on representations of Debtors' personnel,

(d) agrees to keep all Reports and other material, non-public information regarding Debtors and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner, and

(e) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to any Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers; and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing: (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Debtors

SWM002870

AA00620

to Agent that has not been contemporaneously provided by Debtors to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Debtors, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Borrowers, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Borrowers a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

      15.18  **Several Obligations; No Liability**.  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in <u>Section 15.7</u>, no Lender shall have any liability for the acts of any other Lender or Agent, and Agent shall have no liability for the acts of any other Lender.  No Lender shall be responsible to any Debtor other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder, nor to advance for it or on its behalf in connection with its Commitment, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

## 16. GUARANTY.

      16.1  **Guaranty.**  Each Guarantor hereby absolutely and unconditionally guarantees to Agent and Lenders the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations (including, without limitation, all interest which would have accrued but for the filing of a petition under the Bankruptcy Code) and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by any of Agent or any Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, either Borrower, any Guarantor, or any other Obligor of all or any part of the Obligations and incurred in connection with any proceedings involving either Borrower or any Guarantor under the Bankruptcy Code or any other insolvency law (such costs and expenses, together with the Obligations, collectively the "*Guaranteed Obligations*").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  Each Guarantor is jointly and severally liable for the Obligations.

SWM002871

AA00621

16.2 **Guaranty of Payment**. This Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require Agent or Lenders to sue either Borrower, any other Guarantor, or any other Obligor for all or any part of the Guaranteed Obligations, or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

16.3 **No Discharge or Diminishment of Guaranty**. The provisions of Article 8 hereof are incorporated herein by reference.

16.4 **Reinstatement; Stay of Acceleration.** If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of either Borrower or otherwise, each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not Agent or any Lender is in possession of this Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of either Borrower or any other Obligor, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by Agent.

16.5 **Information.** Each Guarantor assumes all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that neither Agent nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

16.6 **Termination.** The guarantee obligation of each Guarantor under this Article 16 shall terminate only at such time as the Guaranteed Obligations have been fully and indefeasibly paid in cash .

16.7 **Taxes.** All payments of the Guaranteed Obligations will be made by each Guarantor free and clear of and without deduction for or on account of any and all present or future taxes, levies, imposts, duties, charges, deductions or withholdings of whatever nature imposed by any governmental authority with respect to such payments, and any and all liabilities with respect to the foregoing, but excluding franchise taxes and taxes imposed on overall net income of Agent or any Lender by the U.S (collectively, "Taxes"). If any Guarantor is required by law to deduct any Taxes from or in respect of any sum payable to Agent or any Lender under this Guaranty, (a) the sum payable must be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this provision) Agent or such Lender receives an amount equal to the sum it would have received had no such deductions been made, (b) the Guarantors must then make such deductions, and must pay the full amount deducted to the relevant authority in accordance with applicable law, and (c) the Guarantors must furnish to Agent within forty-five days after their due date certified copies of all official receipts evidencing payment thereof.

SWM002872

AA00622

16.8  **Severability.**  The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by Guarantors, Agent, or Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "<u>Maximum Liability</u>").  This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of Agent and Lenders to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other Person shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law.  Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of Agent or any Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

16.9  **Contribution.**  In the event any Guarantor (a "<u>Paying Guarantor</u>") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "<u>Non-Paying Guarantor</u>") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "<u>Pro Rata Share</u>" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this <u>Article 16</u>, each Non-Paying Guarantor's "<u>Pro Rata Share</u>" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from each Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from each Borrower after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of both Agent and Lenders and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

16.10  **Liability Cumulative.**  The liability of each Guarantor under this <u>Article 16</u> is in addition to and shall be cumulative with all liabilities of such Guarantor to Agent and

SWM002873

AA00623

Lenders under this Agreement and the other Loan Documents to which such Guarantor is a party or in respect of any obligations or liabilities of the other Debtors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## 17. GENERAL PROVISIONS.

17.1 **Effectiveness.** This Agreement shall be binding and deemed effective when executed by each Debtor and accepted and executed by Agent and Lenders.

17.2 **Successors and Assigns.** (a) This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties, *provided, however*, that no Debtor may assign this Agreement or any rights or duties hereunder without Agent's prior, written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Agent shall release any Debtor from its Obligations. Subject to the further provisions of this Section 17.2, each Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by any Debtor is required in connection with any such assignment. In connection with any such assignment or participation, a Lender may disclose all documents and information which such Lender now or hereafter may have relating to any Obligor and any Obligor's business.

(b) Any Lender may assign and delegate to one or more assignees (each an "Assignee") that are Eligible Transferees all, or any ratable part of all, of the Obligations, the Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents, in a minimum amount of $_____ (except such minimum amount shall not apply to (x) an assignment and delegation by any Lender to any other Lender or an Affiliate of the assigning Lender or a Related Fund of the assigning Lender or (y) a group of new Lenders, each of whom is an Affiliate of each other or a Related Fund of such new Lender or an Affiliate of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $_____), *provided, however*, that Debtors and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Debtors and Agent by such Lender and the Assignee, (ii) such Lender and its Assignee have delivered to Borrowers and Agent an Assignment and Acceptance, and (iii) the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $____. Anything contained herein to the contrary notwithstanding, the payment of any fees shall not be required and the Assignee need not be an Eligible Transferee if (x) such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of the assigning Lender or (y) the assignee is a Related Fund of a Lender or an Affiliate (other than an individual) of a Lender.

(c) From and after the date that Agent notifies the assigning Lender (with a copy to Borrowers) that it has received an executed Assignment and Acceptance and payment of the above-referenced processing fee (if required), (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned and delegated to it pursuant to such Assignment and Acceptance, shall have the rights and

SWM002874

AA00624

obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned and delegated by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 12.3 hereof) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation between Debtors and the Assignee, *provided, however*, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Article 15 of this Agreement.

(d)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (1) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (2) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Debtors or the performance or observance by Debtors of any of their obligations under this Agreement or any other Loan Document furnished pursuant hereto, (3) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (4) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (5) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (6) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(e)     Immediately upon Agent's receipt of the required processing fee payment (if required) and the fully executed Assignment and Acceptance, this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender pro tanto.

(f)     Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, the Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents, *provided, however*, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall

SWM002875

AA00625

not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Debtors, Agent, and Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender, or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, and (v) all amounts payable by any Debtor hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Debtors, the collections of Collateral, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(g)     Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of (i) any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24 and (ii) any Person providing financing or other credit support to a Lender or any of its Affiliates or Related Funds, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

17.3   **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Agreement.

17.4   **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Agent, Lenders, or any Debtor, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

SWM002876

AA00626

17.5 **Good Faith.** Each of the parties hereto agrees that it will exercise its rights and remedies hereunder, and perform each of its obligations hereunder, in a commercially reasonable manner and in good faith.

17.6 **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.7 **Amendments and Waivers.** (a) No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Obligor therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and such Obligor and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given, *provided, however*, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders affected thereby and Borrowers, do any of the following:

(i) increase or extend any Commitment of any Lender,

(ii) postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(iii) reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document,

(iv) change the Pro Rata Share that is required to take any action hereunder,

(v) amend or modify this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(vi) other than as permitted by Section 15.12, release Agent's Lien in and to any of the Collateral,

(vii) change the definition of "Required Lenders" or "Pro Rata Share",

(viii) contractually subordinate any of the Agent's Liens, except to Permitted Liens,

(ix) release any Debtor from any obligation for the payment of money, or

(x) amend any of the provisions of Article 15.

and, provided further, however, that no amendment, waiver or consent shall, unless in writing and signed by Agent, affect the rights or duties of Agent under this Agreement or any other Loan Document. The foregoing notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan

SWM002877

AA00627

Document that relates only to the relationship of any the Agent and Lenders among themselves, and that does not affect the rights or obligations of Debtors, shall not require consent by or the agreement of Debtors.

      (b)    Replacement of Lenders.

      If any action to be taken by the Lenders or Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders, and a Lender ("Holdout Lender") fails to give its consent, authorization, or agreement, then Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Lenders (each, an "Agent Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

      Prior to the effective date of any replacement, the Holdout Lender or Replaced Lender, as applicable, and the applicable Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender or Replaced Lender, as applicable, being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Holdout Lender or Replaced Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender or Replaced Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender or Replaced Lender shall be made in accordance with the terms of Section 15.1. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender or Replaced Lender, as applicable, hereunder and under the other Loan Documents, the Holdout Lender or Replaced Lender, as applicable, shall remain obligated to make the Holdout Lender's or Replaced Lender's, as applicable, Pro Rata Share of Advances.

      17.8   **Cumulative Remedies**. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

      17.9   **Counterparts; Telefacsimile Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

      17.10  **Revival and Reinstatement of Obligations.** If the incurrence or payment of the Obligations by any Debtor or the transfer by either or both of such parties to Agent or any Lender of any property of either or both of such parties should for any reason subsequently be

SWM002878

AA00628

declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, and other voidable or recoverable payments of money or transfers of property (collectively, a "*Voidable Transfer*"), and if Agent or any Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Agent or such Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Agent or such Lender related thereto, the liability of Debtors or such guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

17.11 **Integration.** THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, SUPERSEDES THE COMMITMENT LETTER, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[SEPARATE SIGNATURE PAGES FOLLOW.]

SWM002879

AA00629

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in Dallas, Texas.

**BORROWERS:**

FIDDLER'S           CREEK           LLC,           a
_____ limited liability company


By:_____
Name:_____
Title:_____


GB PENINSULA, LTD., a _____
limited partnership

By:     GB Peninsula Inc., its general partner


        By:_____
        Name:_____
        Title:_____


**GUARANTORS:**

951 LAND HOLDINGS LTD, a _____
limited partnership

By:     951 Land Holdings LLC, its general partner


        By:_____
        Name:_____
        Title:_____


951 LAND HOLDINGS LLC, a _____
limited liability company


By:_____
Name:_____
Title:_____

SWM002880

AA00630

DY LAND ASSOCIATES LTD, a _____
limited partnership

By:    DY Land Associates LLC, its general
partner

           By:_____
           Name:_____
           Title:_____

DY LAND ASSOCIATES LLC, a _____
limited liability company

By:_____
Name:_____
Title:_____

DY LAND HOLDINGS II, *[LLC][LTD]*, a
_____ limited *[partnership][liability
company]*

By:    Fiddler's Creek LLC, its general partner

           By:_____
           Name:_____
           Title:_____

FC BEACH LTD, a _____
limited partnership

By:    FC Beach LLC, its general partner

           By:_____
            Name:_____
           Title:_____

SWM002881

AA00631

FC BEACH LLC, a _____ limited
liability company


By: _____
Name: _____
Title: _____


FC COMMERCIAL, LLC, a _____
limited liability company


By: _____
Name: _____
Title: _____


FC GOLF LTD, a _____
limited partnership

By:     FC Golf LLC, its general partner


        By: _____
        Name: _____
        Title: _____


FC GOLF LLC, a _____ limited
liability company


By: _____
Name: _____
Title: _____


FC HOTEL, LTD, a _____
limited partnership

By:     FC Hotel, LLC, its general partner


        By: _____
        Name: _____
        Title: _____

SWM002882

AA00632

FC HOTEL LLC, a _____ limited
liability company

By: _____
Name: _____
Title: _____


FC MARINA LLC, a _____ limited
liability company

By: _____
Name: _____
Title: _____


FC PARCEL 73, LLC, a _____
limited liability company

By: _____
Name: _____
Title: _____


FC RESORT, LTD, a _____
limited partnership

By:     FC Resort, LLC, its general partner

        By: _____
        Name: _____
        Title: _____


FC RESORT LLC, a _____ limited
liability company

By: _____
Name: _____
Title: _____

SWM002883

AA00633

FIDDLER'S CREEK MANAGEMENT INC., a
_____ corporation


By:_____
Name:_____
Title:_____


GBFC DEVELOPMENT LTD, a _____
limited partnership

By:     GBP Development LLC, its general partner


        By:_____
        Name:_____
        Title:_____


GBFC DEVELOPMENT LLC, a _____
limited liability company


By:_____
Name:_____
Title:_____


GBFC MARINA LTD, a _____
limited partnership

By:     FC Marina LLC, its general partner


        By:_____
        Name:_____
        Title:_____

SWM002884

AA00634

GBP DEVELOPMENT LTD., a
_____ limited partnership

By:   GBP Development LLC, its general partner

      By:_____
      Name:_____
      Title:_____


GULF BAY HOSPITALITY LTD, a
_____ limited partnership

By:   Gulf Bay Hospitality Company, LLC, its
general partner

      By:_____
      Name:_____
      Title:_____


GULF BAY HOSPITALITY COMPANY, LLC, a
_____ limited liability company

By:_____
Name:_____
Title:_____


GULF BAY HOTEL COMPANY LTD, a
_____ limited partnership

By:   Gulf Bay Hotel Company, LLC, its general
partner

      By:_____
      Name:_____
      Title:_____

SWM002885

AA00635

GULF BAY HOTEL COMPANY, LLC, a
_____ limited liability company


By:_____
Name:_____
Title:_____

SWM002886

AA00636

**AGENT AND LENDER:**

PEPI CAPITAL, L.P., a Delaware limited partnership

By: _____
     Its General Partner


     By:_____
     Name:_____
     Title:_____

SWM002887

AA00637

# EXHIBIT A

## Real Property Description

SWM002888

AA00638

**EXHIBIT B**

<u>Interim Order</u>

EXHIBIT B TO DEBTOR-IN POSSESSION LOAN AND SECURITY AGREEMENT
DA-3086014 v4 1203528-00006

SWM002889

AA00639

# EXHIBIT C

## Notice Of Borrowing

[Date]

PEPI CAPITAL, L.P.

Attention:

Ladies and Gentlemen:

The undersigned, Fiddler's Creek LLC and GB Peninsula, Ltd., refer to the Debtor-In-Possession Loan and Security Agreement, dated as of February ___, 2010 (the "*Loan Agreement*", the terms defined therein being used herein as therein defined), between the undersigned and you, and hereby gives you notice, irrevocably, pursuant to Section 2.1(b) of the Loan Agreement that the undersigned hereby requests a Borrowing under the Loan Agreement, and in that connection sets forth below the information relating to such Borrowing (the "*Proposed Borrowing*") as required by Section 2.1(b) of the Credit Agreement:

(i)    The date of the Proposed Borrowing is _____, 20___.

(ii)    The aggregate amount of the Proposed Borrowing is $_____.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

(a) each Borrower's Chapter 11 Case is still pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code;

(b) no motion has been filed requesting (a) the appointment of a trustee in either Borrower's Chapter 11 case, or (b) the conversion of either Borrower's Chapter 11 case into a case under Chapter 7 of the Bankruptcy Code;

(c) the Orders are in full force and effect and have not been reversed, modified, amended, rescinded, stayed or vacated, except for such modifications thereto acceptable to Agent

(d) the representations and warranties contained in each Loan Document are true and correct in all respects after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date); and

SWM002890

AA00640

(e) no Default or Event of Default has occurred and is continuing on the date of such Advance nor shall either result from the making of the Advance.

Very truly yours,

FIDDLER'S CREEK LLC, a _____
limited liability company

By:_____
Name:_____
Title:_____

GB PENINSULA, LTD., a _____
limited partnership

By:     GB Peninsula Inc., its general partner

By:_____
Name:_____
Title:_____

SWM002891

AA00641

# EXHIBIT D

<u>Form of Assignment and Acceptance</u>

*[attached]*

SWM002892

AA00642

## EXHIBIT E

Cash on hand and personal property securing the Loan;

The remaining unencumbered hotel condominium units owned by FC Hotel Ltd.;

The remaining finished developed land lots owned by GBP that are unencumbered and the remaining undeveloped land owned by 951 Holding Ltd. that is unencumbered;

The remaining finished developed land lots owned by GBFC Development Ltd. and all finished housing units owned by Borrowers and their Subsidiaries;

Parcels 32, 36, 37, and 40 owned by 951 Land Holdings Ltd.;

The Tarpon Club owned by GBFC Marina Ltd.;

The Creek Golf Course owned by FC Golf, Ltd.;

The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;

The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc;

The undeveloped land included in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America; and

The Fiddler's Creek Sales and Administration buildings owned by 951 Land Holding Ltd.

SWM002893

AA00643

**EXHIBIT F**

Form of Deed of Trust

*[attached]*

SWM002894

AA00644

# SCHEDULE C-1

## Lenders' Commitments

SWM002895

AA00645

**SCHEDULE 5.1**

<u>Liens</u>

Junior Priority Liens:

[List]


Senior Priority Liens:

SWM002896

**AA00646**

**SCHEDULE 5.2**

<u>Intellectual Property</u>

[List]

SWM002897

**AA00647**

## SCHEDULE 5.3

<u>Material Contracts</u>

[List]

SWM002898

**AA00648**

# SCHEDULE 5.5

## Debtors' Organizational Information

| Debtor | Jurisdiction of Organization | Organizational Identification Number | Subsidiaries |
|---|---|---|---|
| Fiddler's Creek LLC | | | |
| GB Peninsula, Ltd. | | | |
| 951 Land Holdings, Ltd. | | | |
| 951 Land Holdings, LLC | | | |
| DY Land Associates LLC | | | |
| DY Land Holdings Ltd. | | | |
| DY Land Holdings II, Ltd. | | | |
| FC Beach Ltd. | | | |
| FC Beach LLC | | | |
| FC Commercial LLC | | | |
| FC Golf Ltd. | | | |
| FC Golf LLC | | | |
| FC Hotel Ltd. | | | |
| FC Hotel LLC | | | |
| CFC Marina LLC | | | |
| FC Parcel 73, LLC | | | |
| FC Resort Ltd. | | | |
| FC Resort LLC | | | |
| Fiddler's Creek Management Inc. | | | |
| GB 100 Ltd. | | | |
| GB 100 Inc. | | | |
| GBFC Development Ltd. | | | |
| GBFC Development LLC | | | |
| GBFC Marina Ltd. | | | |
| GBFC II LLC | | | |
| GBP Development Ltd. | | | |
| GBP Development LLC | | | |
| Gulf Bay Hospitality Ltd. | | | |
| Gulf Bay Hospitality Company, LLC | | | |
| Gulf Bay Hotel Company Ltd. | | | |
| Gulf Bay Hotel Company LLC | | | |

SWM002899

AA00649

## SCHEDULE 5.13

### Capitalization of Debtors

| Debtor | Interest | Owner | Percentage/Certificate Information |
|---|---|---|---|
| Fiddler's Creek LLC | | | |
| GB Peninsula Ltd. | | | |
| 951 Land Holdings, Ltd. | | | |
| 951 Land Holdings, LLC | | | |
| DY Land Associates LLC | | | |
| DY Land Holdings Ltd. | | | |
| DY Land Holdings II, Ltd. | | | |
| FC Beach Ltd. | | | |
| FC Beach LLC | | | |
| FC Commercial LLC | | | |
| FC Golf Ltd. | | | |
| FC Golf LLC | | | |
| FC Hotel Ltd. | | | |
| FC Hotel LLC | | | |
| FC Marina LLC | | | |
| FC Parcel 73, LLC | | | |
| FC Resort Ltd. | | | |
| FC Resort LLC | | | |
| Fiddler's Creek Management Inc. | | | |
| GBFC Development Ltd. | | | |
| GBFC Development LLC | | | |
| GBFC Marina Ltd. | | | |
| GBP Development Ltd. | | | |
| Gulf Bay Hospitality Ltd. | | | |
| Gulf Bay Hospitality Company, LLC | | | |
| Gulf Bay Hotel Company Ltd. | | | |
| Gulf Bay Hotel Company LLC | | | |

SWM002900

AA00650