# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

---

### CASE NO.  8:19-CV-00008-VMC
### BANKRUPTCY CASE NO. 8:10-BK-03846-CPM
### ADVERSARY CASE NO. 8:11-AP-00809-CPM

---

## PEPI CAPITAL, L.P.,

### Appellant,

### vs

## FIDDLER'S CREEK, LLC, et al.

### Appellees.

---

### APPELLANT'S APPENDIX
### VOLUME 4
### AA00651-AA00747

---

### On Appeal from The United States Bankruptcy Court
### Middle District of Florida, Tampa Division

**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
*Attorneys for Pepi Capital, L.P.*

## TABLE OF CONTENTS

| VOL. | BATES RANGE | DOCUMENT |
|---|---|---|
| 4 | AA00651-AA00743 | Plaintiff's Notice of Filing Additional Exhibits In Support of Plaintiff's Reply To Pepi Capital, L.P.'s Response In Opposition to Debtors' Motion for Partial Summary Judgment And Incorporated Memorandum of Law, filed March 12, 2015, (Doc No. 103 in Adv. Case No. 8:11-ap-00809) Part 2 |
| 4 | AA00744-AA00747 | Notice of Filing of Excerpts of Debtors Response to Admissions with Respect to Motion for In Camera Review and Opposition to Summary Judgment, filed March 20, 2015, (Doc No. 104 in Adv. Case No. 8:11-ap-00809) |

## SCHEDULE 7.3

### Minimum Release Prices

| Village | Unit | Minimum Gross Sale Price | CDD Buy down | Minimum Release Price |
|---|---|---|---|---|
| Cotton Green | Lot 45 | 201,719 | 6,100 | 174,618 |
| Mallards Landing | 31-A | 414,720 | 20,327 | 345,743 |
| Bellagio | 6 | 713,359 | 17,257 | 624,241 |
| Bellagio | 11 | 605,063 | 17,257 | 526,556 |
| Bellagio | 16 | 380,439 | 17,257 | 308,932 |
| Bellagio | 30 | 629,909 | 17,257 | 551,402 |
| Bellagio | 33 | 640,941 | 17,257 | 562,434 |
| Bellagio | 34 | 688,505 | 17,257 | 609,997 |
| Bellagio | 35 | 290,137 | 17,257 | 211,630 |
| Majorca | 4 | 888,783 | 25,035 | 794,098 |
| Majorca | 5 | 1,027,459 | 25,035 | 918,424 |
| Cranberry Crossing | 25 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 30 | 356,270 | 25,907 | 298,863 |
| Cranberry Crossing | 36 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 43 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 47 | 450,162 | 25,907 | 382,605 |
| Sauvignon | 8 | 963,115 | 15,718 | 877,396 |
| Serena | 6-102 | 161,954 | 11,398 | 123,492 |
| Serena | 7-201 | 249,337 | 11,398 | 210,875 |
| Serena | 8-201 | 246,405 | 11,398 | 207,943 |
| Serena | 11-202 | 254,468 | 11,398 | 216,006 |
| Serena | 13-202 | 247,584 | 11,398 | 209,122 |
| Serena | 15-201 | 477,800 | 11,398 | 439,338 |
| Serena | 17-102 | 508,548 | 11,398 | 459,354 |
| Serena | 17-201 | 518,231 | 11,398 | 479,769 |
| Serena | 17-202 | 652,546 | 11,398 | 593,182 |
| Serena | 19-101 | 435,318 | 11,398 | 396,856 |
| Serena | 19-102 | 435,318 | 11,398 | 396,856 |
| Serena | 19-201 | 539,653 | 11,398 | 501,191 |
| Marengo | 1-102 | 160,765 | 13,943 | 125,822 |
| Marengo | 3-202 | 153,857 | 13,943 | 116,814 |
| Marengo | 4-103 | 155,683 | 13,943 | 120,740 |
| Marengo | 6-202 | 394,182 | 13,943 | 357,139 |
| Marengo | 7-203 | 144,227 | 13,943 | 107,184 |
| Marengo | 8-204 | 186,745 | 13,943 | 146,552 |
| Marengo | 9-201 | 420,959 | 13,943 | 380,766 |
| Marengo | 9-203 | 388,387 | 13,943 | 351,344 |

SWM002901

AA00651

| Marengo | 10-103 | 374,163 | 13,943 | 332,220 |
| Marengo | 10-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 10-203 | 398,637 | 13,943 | 354,594 |
| Marengo | 10-204 | 431,670 | 13,943 | 383,077 |
| Marengo | 11-102 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-103 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-201 | 434,199 | 13,943 | 394,006 |
| Marengo | 11-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 11-203 | 398,637 | 13,943 | 361,594 |
| Millbrook | 10 | 728,692 | 45,420 | 629,824 |
| Millbrook | 11 | 884,609 | 45,420 | 774,729 |
| Millbrook | 12 | 878,236 | 45,420 | 768,806 |
| Millbrook | 13 | 900,143 | 45,420 | 789,166 |
| Callista | 06-101 Model | 514,434 | 11,748 | 465,936 |
| Callista | 06-102 Model | 476,295 | 11,748 | 429,897 |
| Callista | 06-103 | 421,565 | 11,748 | 383,566 |
| Callista | 06-104 | 470,261 | 11,748 | 430,863 |
| Callista | 06-201 | 396,997 | 11,748 | 354,449 |
| Callista | 06-202 Model | 564,532 | 11,748 | 516,033 |
| Callista | 06-203 | 476,992 | 11,748 | 436,193 |
| Callista | 06-204 Model | 645,349 | 11,748 | 591,951 |
| Callista | 10-101 | 463,267 | 11,748 | 423,869 |
| Callista | 10-102 | 421,565 | 11,748 | 383,566 |
| Callista | 10-103 | 423,102 | 11,748 | 383,704 |
| Callista | 10-104 | 468,622 | 11,748 | 429,224 |
| Callista | 10-202 | 465,408 | 11,748 | 426,010 |
| Callista | 10-203 | 469,158 | 11,748 | 429,760 |
| Callista | 12-101 | 457,911 | 11,748 | 418,513 |
| Callista | 12-103 | 303,544 | 11,748 | 265,545 |
| Callista | 12-104 | 200,036 | 11,748 | 160,638 |
| Callista | 12-201 | 265,387 | 11,748 | 222,839 |
| Callista | 12-203 | 338,560 | 11,748 | 297,762 |
| Callista | 12-204 | 265,387 | 11,748 | 222,839 |
| Callista | 13-101 | 338,466 | 11,748 | 299,068 |
| Callista | 13-103 | 307,155 | 11,748 | 269,157 |
| Callista | 13-202 | 452,556 | 11,748 | 411,758 |
| Callista | 13-203 | 210,469 | 11,748 | 169,670 |
| Callista | 14-101 | 340,071 | 11,748 | 300,673 |
| Callista | 14-102 | 372,434 | 11,748 | 334,436 |
| Callista | 14-103 | 190,391 | 11,748 | 152,393 |
| Callista | 14-202 | 256,612 | 11,748 | 215,814 |
| Callista | 14-204 | 294,341 | 11,748 | 251,792 |
| Callista | 15-101 | 447,201 | 11,748 | 407,803 |

SWM002902

AA00652

| Callista | 15-102 | 406,500 | 11,748 | 368,502 |
|---|---|---|---|---|
| Callista | 15-103 | 229,847 | 11,748 | 191,849 |
| Callista | 15-201 | 413,047 | 11,748 | 370,499 |
| Callista | 15-202 | 342,480 | 11,748 | 301,682 |
| Callista | 15-203 | 342,480 | 11,748 | 301,682 |
| Callista | 16-102 | 191,194 | 11,748 | 153,195 |
| Callista | 16-204 | 297,921 | 11,748 | 255,373 |
| Callista | 17-101 | 271,056 | 11,748 | 231,658 |
| Callista | 17-102 | 246,566 | 11,748 | 208,568 |
| Callista | 17-103 | 324,542 | 11,748 | 286,544 |
| Callista | 17-201 | 348,916 | 11,748 | 306,368 |
| Callista | 17-203 | 274,000 | 11,748 | 233,202 |
| Menaggio | 4-102 | 658,237 | 8,558 | 608,029 |
| Menaggio | 5-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 5-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-102 | 502,117 | 8,558 | 453,309 |
| Menaggio | 11-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-201 | 845,892 | 8,558 | 788,684 |
| Menaggio | 12-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-201 | 639,878 | 8,558 | 591,070 |
| Menaggio | 16-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 16-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-201 | 322,770 | 8,558 | 273,962 |
| Menaggio - SOLD | 19-102 | 314,272 | 8,558 | 272,464 |
| Chiasso | Lot # 1 | 1,497,350 | 33,100 | 1,394,250 |
| Chiasso | Lot # 2 | 1,559,146 | 33,100 | 1,456,046 |
| Chiasso | Lot # 3 | 1,751,889 | 33,100 | 1,648,789 |
| Mahogany Bend | B23 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B24 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B27 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B28 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B29 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B30 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B31 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B32 | 212,735 | 13,943 | 184,975 |

SWM002903

AA00653

| | | | | |
|---|---|---|---|---|
| Mahogany Bend | B33 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B34 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B35 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B36 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B37 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B38 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C1 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C2 | | 13,943 | -27,760 |
| Mahogany Bend | C3 | | 13,943 | -27,760 |
| Mahogany Bend | C4 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C5 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C6 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C7 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C8 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C9 | 212,735 | 13,943 | 184,975 |
| Isla Del Sol | 2 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 3 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 4 | | 13,943 | -32,293 |
| Isla Del Sol | 10 | | 13,943 | -32,293 |
| Isla Del Sol | 17 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 18 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 19 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 20 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 22 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 25 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 28 | 140,203 | 13,943 | 107,910 |
| Isla Del Sol | 29 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 30 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 31 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 32 | | 13,943 | -32,293 |
| Isla Del Sol | 33 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 34 | 325,841 | 13,943 | 293,548 |

SWM002904

AA00654

# EXHIBIT "2"

AA00655

| | |
|---|---|
| **From:** | Helm, Elizabeth [Elizabeth.Helm@klgates.com] |
| **Sent:** | Thursday, February 11, 2010 9:13 PM |
| **To:** | Peter Desiderio; Fine, Jeffrey |
| **Cc:** | david.radunsky@pgrp.net; CJ Lorio; K Springfield; Cox, John; Daniel, Rick; Fields, David; Feroze, Zammurad; Soards, Anthony; Battista, Paul J.; Patricia Redmond; Meister, Joseph; Jane Houk |
| **Subject:** | RE: Fiddler's Creek LSA and Note |
| **Attachments:** | DA-#3086014-v9-DIP_Loan_Agreement_(Pepi_Fiddler_s_Creek).DOC; DA-#3086014-vdoc-DIP_Loan_Agreement_(Pepi_Fiddler_s_Creek).DOC |

Attached is the revised, redlined LSA. I understand that Paul will provide comments to the carve out but I wanted to get these changes out.

---

**From:** Peter Desiderio [mailto:PDesiderio@stearnsweaver.com]
**Sent:** Thursday, February 11, 2010 1:40 AM
**To:** Fine, Jeffrey
**Cc:** david.radunsky@pgrp.net; CJ Lorio; K Springfield; Cox, John; Daniel, Rick; Helm, Elizabeth; Fields, David; Feroze, Zammurad; Soards, Anthony; Battista, Paul J.; Patricia Redmond; Meister, Joseph; Jane Houk
**Subject:** RE: Fiddler's Creek LSA and Note

Attached hereto are our comments to the latest draft of the DIP Loan and Security Agreement and Guaranty Agreement. Contemporaneously herewith, we are delivering a copy of the foregoing to our client and Debtor's bankruptcy counsel who have not had the opportunity to review same. Therefore, we reserve the right to make any changes or other modifications requested by them.

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Wednesday, February 10, 2010 11:14 PM
**To:** Battista, Paul J.; Patricia Redmond; Jane Houk; Peter Desiderio
**Cc:** david.radunsky@pgrp.net; CJ Lorio; K Springfield; Cox, John; Daniel, Rick; Helm, Elizabeth; Fields, David; Feroze, Zammurad; Soards, Anthony; Meister, Joseph
**Subject:** FW: Fiddler's Creek LSA and Note

All: I attach a redline of the Loan Agreement (redlined to version 5--the one with your comments), a clean copy of the Loan Agreement, and a draft Note. PEPI personnel have not reviewed this draft and it is subject to their review, comment and approval. Additional documents will be forwarded in separate emails.

We will speak to you in the morning. Elizabeth's contact information is listed below.

Thank you,


**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263

1

SWM005883

AA00656

Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

---

**From:** Helm, Elizabeth
**Sent:** Wednesday, February 10, 2010 10:06 PM
**To:** Fine, Jeffrey
**Subject:** Fiddler's Creek LSA

*Please note that my e-mail address has changed.*

**Elizabeth Helm**
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
214.939.5827
214.939.5849
elizabeth.helm@klgates.com

This message and all attachments are confidential and may be protected by the attorney-client or other privileges. Any review, use, disclosure or distribution by persons other than the intended recipients is prohibited and may be unlawful. If you believe this message has been sent to you in error, please notify the sender by replying to this transmission or calling K&L Gates at 214-939-5500 and delete this message and any copy of it (in any form) without disclosing it. Unless expressly stated in this e-mail, nothing in this message should be construed as a digital or electronic signature.

As required by United States Treasury Regulations, this communication is not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on such taxpayer under United States federal tax laws.

Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

---

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

---

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

2

SWM005884

AA00657

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Elizabeth.Helm@klgates.com.

SWM005885

AA00658

KLG Draft of 2.10.102.11.10

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT
## AND GUARANTY AGREEMENT

by and among

**FIDDLER'S CREEK LLC,**
**GB PENINSULA, LTD.,**

as Borrowers

**951 LAND HOLDINGS, LTD,**
**951 LAND HOLDINGS, LLC,**
**DY LAND ASSOCIATES, LTD,**
**DY LAND ASSOCIATES, LLC,**
**DY LAND HOLDINGS II, LLC,**
**FC BEACH, LTD,**
**FC BEACH, LLC,**
**FC COMMERCIAL, LLC,**
**FC GOLF, LTD,**
**FC GOLF, LLC,**
**FC HOTEL, LTD,**
**FC HOTEL, LLC,**
**FC MARINA LLC,**
**FC PARCEL 73, LLC,**
**FC RESORT, LTD,**
**FC RESORT LLC,**
**FIDDLER'S CREEK MANAGEMENT, INC.,**
**GBFC DEVELOPMENT, LTD.,**
**GBFC DEVELOPMENT, LLC,**
**GBFC MARINA, LTD,**
**GBP DEVELOPMENT, LTD.,**
**GBP DEVELOPMENT, LLC,**
**GULF BAY HOSPITALITY LTD,**
**GULF BAY HOSPITALITY COMPANY, LLC,**
**GULF BAY HOTEL COMPANY, LTD,**
**GULF BAY HOTEL COMPANY, LLC,**

as Guarantors

and
**PEPI CAPITAL, L.P.**

Dated as of February __, 2010

SWM005970

AA00659

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT
## AND GUARARANTY AGREEMENT

This DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT AND GUARANTY AGREEMENT, is entered into as of February ___, 2010, by and among

      (i)     PEPI Capital, L.P., a Delaware limited partnership ("**Lender**"), with a place of business located at 2300 West Plano Parkway, Plano, Texas 75075;

      (ii)   Fiddler's Creek LLC, a Delaware limited liability company ("**Fiddler's Creek**") as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as hereinafter defined), with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114, and GB Peninsula, Ltd., a Florida limited partnership ("**GBP**") as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114 (each a "**Borrower**" and, collectively "**Borrowers**"); and

      (iv)   951 Land Holdings, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114 ; 951 Land Holdings, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; DY Land Associates, Ltd, a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; DY Land Associates, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; DY Land Holdings II, LLC, a Florida limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Beach, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Beach, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Commercial, LLC, a Florida limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Golf, Ltd., Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Golf, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Hotel, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Hotel, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its

SWM005971

AA00660

principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Marina, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Parcel 73, LLC, a Florida limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Resort, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; FC Resort, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; Fiddler's Creek Management Inc., Florida corporation, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; GBFC Development, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; GBFC Development, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; GBFC Marina, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; GBP Development, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; GBP Development, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; Gulf Bay Hospitality, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; Gulf Bay Hospitality Company, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; Gulf Bay Hotel Company, Ltd., a Florida limited partnership, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114; and Gulf Bay Hotel Company, LLC, a Delaware limited liability company, as debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, with its principal place of business located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114 (each a "*Guarantor*" and, collectively, "*Guarantors*").

PRELIMINARY STATEMENTS:

        1.    One or both Borrowers have a direct or indirect ownership interest in each Guarantor.

        2.    Certain of the Debtors are owners of the real and personal property and amenities that comprise the Project (as defined herein), which is, and has been marketed as, an integrated residential, commercial, and recreational facility, while other

SWM005972

AA00661

of the Debtors hold Equity Interests (as defined herein) in other of the Debtors. The Debtors operate the Project as a common enterprise.

3.    On February ___, 2010 (the "***Petition Date***"), Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Florida, Fort Meyers Division (the "***Bankruptcy Court***"), administratively consolidated Case No. _____ (collectively, the "***Chapter 11 Case***").

4.    Debtors are continuing to operate their business and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.    Debtors have an immediate need for funds to continue to operate their business.

6.    Borrowers have requested that Lender provide to Borrowers a Debtor-in-Possession credit facility for Advances (as defined herein) in an aggregate amount not to exceed $27,000,000 in conjunction with the Chapter 11 Case (the "***Loan***" or "***DIP Facility***"), which funds are for the use of all Debtors. Under the Commitment Letter, Lender retained $405,000 (out of funds previously deposited with Lender) as a partial payment of the Commitment Fee (as defined herein), with the agreement that, upon funding of the Initial Advance (as defined herein), an additional $405,000 of the Commitment Fee would be paid from the proceeds of the Initial Advance. Borrowers have requested that the DIP Facility consist of (i) an initial advance (the "***Initial Advance***") of $4,000,000, _____, consisting of $_____ to cover operations, $405,000 to pay the balance of Lender's Commitment Fee (as defined below), and (ii) upon entry of the Final Order (as defined below) approved by the Bankruptcy Court subsequent monthly advances subject to the 18 Month Budget.

7.    Lender has indicated its willingness to make the Loan *provided* Borrowers shall obtain (i) the Interim Order (as defined below) approving the Loan and the Initial Advance on an emergency interim basis, which Interim Order shall not be reversed, modified, amended, stayed, rescinded or vacated and (ii) obtain within forty-five (45) days after the Interim Order Entry Date, the Final Order (as defined below) approving the Loan including, without limitation, the Initial Advance, on a final basis, which Final Order shall not be appealed, reversed, modified, amended, stayed, rescinded or vacated. The Interim and Final Orders shall provide that all Obligations, including without limitation the Initial Advance, (A) shall be super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and (B) shall be secured by (i) first priority liens on and first priority senior security interests in favor of Lender in all now owned and hereafter acquired Collateral of each Debtor that are not encumbered by any Liens, pursuant to Sections 364(c)(2) of the Bankruptcy Code; (ii) first priority liens on and first priority senior security interests in favor Lender in all now owned and hereafter acquired Collateral of each Debtor, which is not subject to any Lien securing debt for Money Borrowed, pursuant to Section 364(c)(3), which first priority liens and security interests shall be junior only to Permitted Liens; and (iii) priming first priority liens on

SWM005973

AA00662

and first priming priority security interests in favor of Lender in all Collateral of Debtors that is subject to any Liens securing debt for Money Borrowed, pursuant to Section 364(d) of the Bankruptcy Code, subject only to Permitted Liens, *provided*, that the claims and priority liens and security interests described in clauses (A) and (B) of this section shall be subject to the Carve-Out (as defined herein). The Interim and Final Orders shall, at a minimum, contain provisions (y) granting all such senior and priming Liens and claims to Lender for all monies actually advanced even if such Interim and Final Orders are subsequently vacated, modified, rescinded or set aside and (z) providing for the lifting of the 362 automatic stay and any other stay to permit Lender immediately to realize upon the Collateral (as defined below) upon the occurrence of an Event of Default (as defined below). All Liens and claims granted to Lender shall have cross default and cross collateral provisions.

NOW THEREFORE, in consideration of the premises set forth above and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION.

1.1 **Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"*13 Week Budget*" means the cash budget of Debtors prepared and submitted to Lender on a quarterly basis, setting forth, on a weekly basis, for the 13-week period commencing with each calendar quarter (i) the anticipated combined consolidated cash receipts of Debtors (and the sources thereof), (ii) all combined, consolidated expenditures proposed to be made during such 13-week period and (iii) a comparison of the actual expenditures and receipts to the previous 13 Week Budget, in form and substance reasonably satisfactory to Lender.

"*18 Month Budget*" means the operating and financial budget of Debtors prepared and submitted to Lender and attached hereto as Exhibit D, setting forth on a monthly basis, for the 18-month period commencing [January][February], 2010, (i) the anticipated combined, consolidated cash receipts of Debtors (and the sources thereof) and (ii) all combined, consolidated expenditures proposed to be made during such 18-month period, including, without limitation, all working capital needs, operating expenses, professional fees to be paid to Debtors' Professionals, financing costs for secured lenders, real estate taxes, community development district assessments, and Managed Expenses.

"*Acceptable Plan*" means any plan of reorganization of either Borrower or any Guarantor, (a) that, with respect to the claims or interests of Lender, leaves unaltered the legal, equitable, and contractual rights to which such claims or interests entitle Lender as the holder of such claims or interests, and (b) in favor of which Lender votes.

"*Accessions*" means all "accessions" (as that term is defined in the Code).

"*Account Debtor*" means any Person who is or who may become obligated under, with respect to, or on account of an Account.

SWM005974

AA00663

"*Accounts*" of a Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "accounts" (as that term is defined in the Code), and any and all Supporting Obligations in respect thereof.

"*Advance*" means an advance made by Lender to either Borrower pursuant to <u>Section 2</u> hereof.

"*Affiliate*" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For purposes of this definition, "control" as applied to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract, or otherwise.

"*Agreement*" means this Debtor-In-Possession Loan and Security Agreement and any extensions, restatements, riders, supplements, amendments, or modifications to or in connection with this Debtor-In-Possession Loan and Security Agreement.

"*As-Extracted Collateral*" means all "as-extracted collateral" (as that term is defined in the Code).

"*Authorized Officer*" of a Person means any officer, manager, or other authorized signatory, as appropriate, of such Person or if such Person is a limited partnership and such Person does not have officers, shall mean any officer of the general partner of such Person.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*), as in effect from time to time and including any successor statute.

"*Bankruptcy Court*" has the meaning set forth in the third Preliminary Statement to this Agreement and includes any court taking jurisdiction over the Chapter 11 Case or any part thereof.

"*Books*" of a Person means all of such Person's now owned or hereafter acquired books and Records including without limitation: ledgers; records indicating, summarizing, or evidencing such Person's properties or assets (including the Collateral or the Real Property) or liabilities; all information relating to such Person's business operations or financial condition and all of its goods or General Intangibles related to such information; and all computer programs, disc or tape files, printouts, runs, or other computer prepared information, and the equipment containing such information.

"*Borrower*" and "*Borrowers*" have the meanings set forth in the introductory paragraph of this Agreement.

"*Borrower's Account*" means the account of _____ with [_____] at its office at [_____], Account No. [_____].

"*Borrowing*" means a borrowing consisting of an Advance made by Lender.

"*Break-Up Fee*" means a fee in the amount of $1,000,000.00.

SWM005975

AA00664

"***Business Day***" means any day which is not a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of Massachusetts or the State of Florida.

"***Business Plan***" means the business plan of Debtors delivered to Lender pursuant to Section 3.1.

"***Capital Expenditures***" means, with respect to any Person, all expenditures made and liabilities incurred for the acquisition of assets which are capitalized in accordance with GAAP.

"***Carve-Out***" means an aggregate amount not exceeding $250,000, which amount may be used by Borrowers after the occurrence and during the continuance of a Default or an Event of Default, notwithstanding Lender's security interests in the Collateral and Lender's rights and superpriority claims hereunder, to pay fees or expenses (the "***Administrative Fees***") incurred by any Debtor constituting (i) allowances of compensation for services rendered or reimbursement or expenses awarded by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code or otherwise, to Debtors' Professionals, (ii) allowances of compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy Court under Section 105(a), 330 or 331 of the Bankruptcy Code, to accountants, attorneys and other professionals retained in the Chapter 11 Case by the official unsecured creditors' committee (the "***Committee***") appointed in accordance with Section 1102 of the Bankruptcy Code, (iii) fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under Section 1930(a), Title 28, United States Code, and (iv) the actual, necessary expenses, other than compensation, and reimbursement pursuant to Section 503(b)(4) of the Bankruptcy Code, incurred by a member of the Committee (but excluding fees and expenses of third party professional persons employed by individual Committee members), if such expenses are incurred in the performance of the duties of such Committee and are allowed by the Bankruptcy Court; *provided, however*, that (a) the total aggregate amount of such fees and expenses for the Debtors' Professionals shall not exceed $250,000, (b) the total aggregate amount of such other fees and expenses described in clauses (ii), (iii), and (iv) above shall not exceed $_____ (in each case, in addition to compensation awarded on a monthly or other interim basis in accordance with applicable Orders of the Bankruptcy Court prior to the occurrence of a Default or an Event of Default (whether or not paid)), and (c) such dollar limitation on fees and disbursements shall not include any retainer fees paid to the Debtors' Professionals prior to the Petition Date (the "***Retainers***") and shall not be reduced by the amount of any compensation and reimbursement of expenses paid prior to the occurrence of a Default or an Event of Default in respect of which the Carve-Out is invoked or any fees, expenses, indemnities or other amounts paid to Lender and its attorneys and agents under this Agreement or otherwise.

"***CDD***" means CDD #1 or CDD #2.

"***CDD #1***" means Fiddler's Creek Community Development District 1, established August 13, 1996.

"***CDD #2***" means Fiddler's Creek Community Development District 2, established November 19, 2002.

SWM005976

AA00665

"*CDD Debt*" means debt of any Debtor (i) evidenced by the following developer bonds issued by CDD #1:  the 1996 Series, the 1999 Series, the 2002A Series, the 2002B Series, and the 2005 Series; (ii) evidenced by the following developer bonds issued by CDD #2:  the 2003A Series, the 2003B Series, the 2004 Series, and the 2005 Series; and (iii) arising under assessments by either CDD in respect of the Project.

"*Chapter 11 Case*" has the meaning set forth in the third Preliminary Statement to this Agreement.

"*Closing Date*" means the date all of the conditions set forth in <u>Section 3.1</u> have been met or waived in writing by Lender and the Initial Advance is made to Borrowers.

"*Code*" means the Florida Uniform Commercial Code, as in effect from time to time.

"*Collateral*" means all of the Debtor Collateral and all assets, real and personal, pledged to Lender pursuant to the Loan Documents by all other Obligors, including, without limitation, the Real Property.

"*Collateral Monitoring Fee*" means a fee in the amount of $7,500 per month.

"*Commitment*" means Lender's commitment to make Advances to Borrower in an aggregate amount not to exceed the Maximum Committed Amount.

"*Commitment Fee*" means a fee in the amount of $810,000.

"*Commitment Letter*" shall mean, collectively, (a) that certain commitment letter, dated as of December 31, 2009, from Lender to Borrowers, (b) that certain fee letter, dated as of December 31, 2009, from Lender to Borrowers, (c) that certain amendment letter, dated as of January 15, 2010, from Lender to Borrowers, and (d) that certain amendment letter, dated as of _____, 2010, from Lender to Borrowers, each of such letters accepted or agreed to by Borrowers.

"*Consumer Goods*" means all "consumer goods" (as that term is defined in the Code).

"*Copyright Licenses*" means any written agreement naming a Borrower as licensor or licensee granting any right under any Copyright, including the grant of rights to copy, publicly perform, create derivative works, manufacture, distribute, exploit and sell materials derived from any Copyright.

"*Copyrights*" means (a) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any foreign counterparts thereof and (b) the right to obtain all renewals thereof.

SWM005977

AA00666

"*Debtor Collateral*" means all of each Debtor's now owned or hereafter acquired assets, whether real, personal, tangible or intangible including, without limitation, all right, title and interest of each Debtor in and to the following:

     (a)     Accounts,

     (b)     Books,

     (c)     Deposit Accounts

     (d)     General Intangibles, including without limitation all Intellectual Property and Payment Intangibles,

     (e)     Goods, including without limitation (i) Equipment, (ii) Inventory, (iii) Consumer Goods, (iv) Farm Products, (v) Fixtures, (vi) Accessions and (vii) As-Extracted Collateral,

     (f)     Investment Property,

     (g)     Equity Interests,

     (h)     Negotiable Collateral,

     (i)     Real Property,

     (j)     All other goods and personal property of each Debtor, whether tangible or intangible and wherever located, including money, cash, cash equivalents or other assets of each Borrower that now or hereafter come into the possession, custody, or control of Lender or any Debtor,

     (k)     All present and future rights, titles, and interests each Debtor may now have or be or become entitled to under or by virtue of any licenses, leases of real property, declarant rights (including, without limitation, all rights under the Master Declaration (as defined herein) or any other Declaration (as defined herein), leases of personal property, contracts (including, without limitation, sales contracts with home buyers, developers, and other Persons), warranties, insurance policies (including, without limitation, insurance for construction and other defects), all rights under all covenants, conditions, and restrictions relating to any of the Real Property, consents, permits, franchises, variances, certifications and approvals of governmental agencies and all other similar tangible and intangible property of each Debtor and the Proceeds thereof, and

     (l)     the Proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all Accounts, Books, Deposit Accounts, General Intangibles, Goods, Investment Property, Negotiable Collateral, Real Property, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the Proceeds thereof,

SWM005978

AA00667

*provided*, that "Debtor Collateral" shall not include any avoidance actions of any Debtor under Chapter 5 of the Bankruptcy Code.

"**Debtors**" means Borrowers and Guarantors and "**Debtor**" means any of them.

"**Debtors' Professionals**" means all persons retained or engaged by Debtors as professional persons within the meaning of Section 327 of the Bankruptcy Code.

"**Declarants**" means 951 Land Holdings, Ltd., GBFC Development, Ltd., GB Peninsula, Ltd, GB 31, Ltd., and GBP Development, Ltd. and "**Declarant**" means any of them.

"**Default**" means any event that would constitute an Event of Default but for the requirement that notice be given or time elapse or both.

"**Default Interest Rate**" means the rate per annum equal to the lesser of (i) the Non-Default Interest Rate plus 300 basis points, and (ii) the maximum rate provided by applicable law.

"**Deposit Account**" of any Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to any "deposit account" as that term is defined in the Code.

"**Equipment**" means all of each Borrower's now owned or hereafter acquired right, title, and interest with respect to "equipment" as that term is defined in the Code.

"**Equity Interest**" means (i) ownership interests in a Person, (ii) all rights associated with such ownership interests, (iii) all shares of, all securities convertible or exchangeable into, and all warrants, options or other rights to purchase shares of stock, partnership interests, membership interests or other ownership interests in such Person, (iv) any certificates or instruments representing the Equity Interest or any additional shares, convertible or exchangeable securities, warrants, and other rights and all dividends, cash, options, warrants, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such shares and other interests in such Person, and (v) all accessions and additions to and proceeds of the foregoing, including, without limitation, any and all cash, instruments, dividends and other property from time to time received, receivable, or otherwise distributed in respect of or in exchange for any of the foregoing.

~~"*Escrow Agreement*" shall mean an escrow agreement, in form and substance satisfactory to Lender, among Lender, Debtors, and an escrow agent acceptable to Lender, respecting the holding of deeds in lieu of foreclosure and consent judgments in escrow, subject to the terms thereof.~~

"**Event of Default**" has the meaning set forth in Article 9.

"**Extension Conditions**" means, for any Extension Period, (i) Lender's receipt at least 30 days prior to the then-current Maturity Date of written notice from Borrowers requesting an Extension Period, (ii) Lender's receipt, at least 30 days prior to the then-current Maturity Date, of the Extension Fee for such Extension Period, (iii) Lender's receipt and approval of a budget

SWM005979

AA00668

for such Extension Period, which shall include Maximum Outstanding Amounts for such proposed Extension Period and minimum cumulative net sales used to determine payment of Managed Expenses for such proposed Extension Period, and (iv) as of the then-effective Maturity Date, no Default shall have occurred and be continuing.

"*Extension Fee*" means a fee, determined as of the first day of an Extension Period, equal to 0.5% of the sum of (i) the outstanding principal balance of the Loan as of such date and (ii) the difference between the Maximum Committed Amount and the aggregate Advances that have been made on or prior to such date under the Loan, which fee may be paid from proceeds of the Loan, *provided,* that the conditions for making an Advance, set forth in Section 2.1 hereof, are met.

"*Extension Period*" means a six month period extending the Maturity Date for such period. There shall be no more than two Extension Periods.

"*Existing Liens*" has the meaning set forth in Section 5.1.

"*Exit Fee*" means, with respect to any principal payment, whether mandatory or voluntary, a fee in the amount equal to 2.0% of such payment of the principal balance of the Loan.

"*Farm Products*" means all "farm products" (as that term is defined in the Code).

"*Fiddler's Creek*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Final Order*" means an order in form and substance satisfactory to Lender entered following a hearing by the judge of the Bankruptcy Court in which the Chapter 11 Case is pending, which is not stayed, which has not been appealed and with respect to which the time for appeal has expired (unless the title company issuing the title insurance policies insuring Lender's Liens under the Mortgages has endorsed such policies to remove appeal of the Final Order as an exception to coverage), which order shall address, *inter alia,* in form and substance acceptable to Lender and its counsel, the following matters:

(i)     approval of Debtors' motion to obtain credit from Lender on the basis described herein, and final approval of the terms and provisions hereof;

(ii)     pursuant to Section 364(c)(1) of the Bankruptcy Code, the provision that all Obligations, including, without limitation, the Initial Advance, shall be super-priority administrative claims;

(iii)     the grant to Lender to secure the Obligations, including, without limitation, the Initial Advance of (A) first priority liens on and first priority senior security interests in favor of Lender in all now owned and hereafter acquired Collateral of each Debtor which is not subject to any Liens securing debt for Money Borrowed, that are not encumbered by any Liens, pursuant to Sections 364(c)(2) of the Bankruptcy Code; (B) first priority liens on and first priority senior security interests in favor Lender in all now owned and hereafter acquired Collateral of each Debtor, pursuant to Section 364(c)(3), which first priority liens and security

SWM005980

AA00669

interests shall be junior only to Permitted Liens; and (C) priming first priority liens on and first priming priority security interests in favor of Lender in all Collateral of Debtors that is subject to any Liens securing debt for Money Borrowed, pursuant to Section 364(d) of the Bankruptcy Code, subject only to Permitted Liens, with all such Liens and claims to be cross-defaulted and cross-collateralized, *provided*, that the claims and priority liens and security interests described in this clause (iii) shall be subject to the Carve-Out;

        (iv)    the automatic perfection of such Liens and security interests;

        (v)    the inability of any Debtor to prime or surcharge the Collateral of Lender or grant other Liens or security interests thereon of equal or senior priority;

        (vi)    appropriate findings to ensure protection under Section 364(e) of the Bankruptcy Code if an appeal is taken;

        (vii)    appropriate findings of fact that the Loan, including without limitation the Initial Advance, is necessary to avoid immediate and irreparable harm to Debtors;

        (viii)    appropriate findings regarding the adequacy of notice to creditors;

        (ix)    the inability of any Debtor to modify the rights of Lender in a plan of reorganization without the consent of Lender;

        (x)    approval of the remedies available to Lender upon the occurrence of an Event of Default;

        (xi)    binding effect on successors and trustees in superseding proceedings; and

        (xii)    relief from the automatic stay of Section 362 of the Bankruptcy Code as necessary to carry out the terms of the Loan Documents and to permit enforcement of Lender's rights and remedies hereunder.

"*Final Order Entry Date*" means the date on which the Final Order is entered by the Bankruptcy Court following a hearing on Debtors' motion for final approval of the Loan and this Agreement.

"*Fixtures*" means all "fixtures" (as that term is defined in the Code).

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"*GBP*" has the meaning set forth in the introductory paragraph to this Agreement.

SWM005981

AA00670

"*General Intangibles*" of any Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "general intangibles" as that term is defined in the Code.

"*Goods*" means all "goods" (as that term is defined in the Code).

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"*Guarantor*" and "*Guarantors*" have the meanings set forth in the introductory paragraph of this Agreement.

"*Guaranty*" means the guaranty set forth in Article 16 hereof.

"*Initial Advance*" has the meaning set forth in the sixth Preliminary Statement to this Agreement.

"*Intellectual Property*" means, collectively, all rights, priorities and privileges of each Borrower relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including Copyrights, Copyright Licenses, Patents, Patent Licenses, Software, Trademarks, Trademark Licenses, and trade secrets, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all Proceeds and damages therefrom.

"*Interim Order*" means an order, in substantially the form of Exhibit B hereto, entered following a hearing on Debtors' motion for approval of this Agreement by the judge of the Bankruptcy Court in which the Chapter 11 Case is pending, which is not stayed and which order shall address, *inter alia*, in form and substance acceptable to Lender and its counsel, the following matters:

(i) approval of Debtors' motion to obtain credit from Lender on the basis described herein, and approval of the terms and provisions hereof, including, without limitation, the Initial Advance;

(ii) pursuant to Section 364(c)(1) of the Bankruptcy Code, the provision that all Obligations, including, without limitation, the Initial Advance, shall be super-priority administrative claims;

(iii) the grant to Lender to secure the Obligations, including, without limitation, the Initial Advance of (A) first priority liens on and first priority senior security interests in favor of Lender in all now owned and hereafter acquired Collateral of each Debtor that are not encumbered by any Liens, pursuant to Sections 364(c)(2) of the Bankruptcy Code; (B) first priority liens on and first priority senior security interests in favor Lender in all now owned and hereafter acquired Collateral of each Debtor, that is not subject to any Lien seucring~~seucring~~securing debt for Money Borrowed, pursuant to Section 364(c)(3), which first priority liens and security interests shall be junior only to Permitted Liens; and (C) priming first priority liens on and first priming priority security interests in favor of Lender in all Collateral of Debtors

SWM005982

AA00671

that is subject to any Liens securing debt for Money Borrowed, pursuant to Section 364(d) of the Bankruptcy Code, subject only to Permitted Liens, with all such Liens and claims to be cross-defaulted and cross-collateralized, *provided*, that the claims and priority liens and security interests described in this clause (iii) shall be subject to the Carve-Out;

      (iv)    the automatic perfection of such Liens and security interests;

      (v)    the inability of any Debtor to prime or surcharge the Collateral or grant other Liens or security interests thereon of equal or senior priority;

      (vi)    appropriate findings to ensure protection under Section 364(e) of the Bankruptcy Code if an appeal is taken;

      (vii)    appropriate findings of fact that the amount sought by Debtors for the Loan, including without limitation the Initial Advance, is necessary to avoid immediate and irreparable harm to Debtors pending a final hearing on Debtors' motion to obtain credit;

      (viii)    appropriate findings regarding the adequacy of notice to creditors;

      (ix)    the inability of any Debtor to modify the rights of Lender in a plan of reorganization without the consent of Lender;

      (x)    approval of the remedies available to Lender upon the occurrence of an Event of Default;

      (xi)    binding effect on successors and trustees in superseding proceedings; and

      (xii)    relief from the automatic stay of Section 362 of the Bankruptcy Code as necessary to carry out the terms of the Loan Documents and to permit enforcement of Lender's rights and remedies hereunder.

"*Interim Order Entry Date*" means the date on which the Interim Order is entered by the Bankruptcy Court following a hearing on Debtors' motion for approval of the Loan, including without limitation the Initial Advance, and this Agreement.

"*Inventory*" of a Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "inventory" as that term is defined in the Code.

"*Investment Property*" of a Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "investment property" as that term is defined in the Code, and any and all Supporting Obligations in respect thereof.

"*Insolvency Proceeding*" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

SWM005983

AA00672

"*Issuer*" means an issuer of any Equity Interest.

"*Lender*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Lender Expenses*" means all: (i) all customary Lender costs associated with the Chapter 11 process, including, without limitation, the Commitment Fee, the Exit Fee, the Break-Up Fee, and the Collateral Monitoring Fee, (ii) all costs, expenses or both (including taxes, photocopying, notarization, telecommunication and insurance (including, without limitation, title insurance) premiums) required to be paid by any Debtor under any of the Loan Documents that are paid or advanced by Lender; (iii) documentation, filing, recording, publication, appraisal (including periodic collateralfor real and personal property appraisals obtained in connection with Lender's realizing on any of the Collateral), environmental audit, and search fees assessed, paid, or incurred by Lender in connection with Lender's transactions with any Debtor; (iv) to the extent not waived under the Bankruptcy Code, stamp taxes and intangibles taxes; (v) costs and expenses incurred by Lender in the disbursement of funds to each Borrower (by wire transfer or otherwise); (vi) charges paid or incurred by Lender resulting from the dishonor of checks; (vii) costs and expenses paid or incurred by Lender to correct any Default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; (viii) costs and expenses paid or incurred by Lender in examining the Books of each Debtor; (ix) costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents; and (x) Lender's reasonable attorneys' fees and expenses incurred in advising, structuring, drafting, reviewing, administering, amending, terminating, enforcing (including attorneys fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Debtor or any other Obligor), defending, or concerning the Loan Documents, irrespective of whether suit is brought, and upon two (2) Business Days' written request from time to time such additional deposits as may be requested by Lender to cover Lender Expenses.

"*Lender Related Persons*" means Lender, its agents, employees, and attorneys in fact, and "*Lender Related Person*" means any of them.

"*Lender's Account*" means the Deposit Account of Lender designated by Lender from time to time as the account into which Debtors shall make all payments to Lender under this Agreement and the other Loan Documents; unless and until Lender notifies Borrowers to the contrary, Lender's Account shall be that certain deposit account bearing account number 059099 and maintained by Lender with Mellon Trust of New England, ABA No. 011 001 234.

"*Lien*" means, with respect to any Person, any security interest, chattel mortgage, charge, mortgage, deed to secure debt, deed of trust, lien, pledge, capitalized lease, conditional sale or other title retention agreement, special assessments, or other security interest or encumbrance of any kind in respect of any property of such Person or upon the income or profits therefrom.

"*Loan*" has the meaning set forth in the sixth Preliminary Statement to this Agreement.

"*Loan Documents*" means, collectively, this Agreement, the Note, the Pledge Agreements, the Mortgage(s)Mortgages, any assignment documents, any other note or notes

SWM005984

AA00673

executed by either Borrower and payable to Lender, and any other written agreement entered into in connection with this Agreement, including the Orders.

"*Managed Expenses*" means the real estate taxes, parcel administration real estate taxes, CDD debt service assessments, and contingency expenses set forth on the 18 Month Budget under the section entitled "Managed Expenses" and such other expenses as Lender and Borrowers identify to be included as Managed Expenses.

"*Material Adverse Change*" means any material adverse change in the business, condition (financial or otherwise), finances, operations, performance, properties or prospects of any Debtor or on the value of the Collateral that Lender reasonably believes could impair such Debtor's ability to perform timely its obligations under the Loan.

"*Material Contracts*" has the meaning set forth in Section 5.3.

"*Maturity Date*" has the meaning set forth in Section 3.5.

"*Maximum Committed Amount*" means an amount equal to Twenty-Seven Million Dollars ($27,000,000.00).

"*Maximum Outstanding Amount*" means, during each period set forth below, the amount set forth opposite such period:

| Period | Maximum Outstanding Amount |
|---|---|
| January 31, 2010 – July 30, 2010 | $10,000,000 |
| July 31, 2010 – September 29, 2010 | 12,000,000 |
| September 30, 2010 – October 30, 2010 | 13,000,000 |
| October 31, 2010 – January 30, 2011 | 15,000,000 |
| January 31, 2011 – February 27, 2011 | 12,000,000 |
| February 28, 2011 – March 30, 2011 | 10,000,000 |
| March 31, 2011 – April 29, 2011 | 8,000,000 |
| April 30, 2011 – May 30, 2011 | 6,000,000 |
| May 31, 2011 – June 29, 2011 | 5,000,000 |
| June 30, 2011 | 0 |

and, during any Extension Period, the Maximum Outstanding Amounts set forth in the Lender-approved budget for such Extension Period. In no event shall the Maximum Outstanding Amount exceed $15,000,000.

"*Money Borrowed*" means debt (i) payable by any Debtor to any of Fifth Third Bank, Florida Financial Investments, Inc., KeyBank National Association, Mellon United National Bank, Orion Bank, Regions Bank, Regions Equipment Finance Corporation, Textron Financial Corporation, Tomen America, Inc., and any successors and assigns thereof, (ii) that is represented by notes payable, drafts accepted, bonds, debentures or similar instruments that represent extensions of credit, (iii) upon which interest charges are customarily paid (other than trade debt), (iv) that was issued or assumed as full or partial payment for property, (v) that is evidenced by a guarantee (but only if the obligations guaranteed would otherwise qualify as

SWM005985

AA00674

Money Borrowed), or (vi) that constitutes a capitalized lease obligation, *provided* that "Money Borrowed" shall not include CDD Debt.

"*Mortgage*" means one or more deeds of trust or mortgages in favor of Lender, in form and substance satisfactory to Lender, covering the real property described in <u>Exhibit A</u> hereto in the form attached hereto as <u>Exhibit F</u>.

"*Negotiable Collateral*" of any Person means all of such Person's now owned or hereafter acquired right, title, and interest with respect to "letter-of-credit rights", "instruments", "promissory notes", "documents," "certificated securities," and "chattel paper" as each of those terms are defined in the Code, and any and all Supporting Obligations in respect thereof.

"*Net Proceeds*" means the gross proceeds paid in respect of the sale of any Collateral in which Lender has a Lien or security interest less closing costs, which shall include, without limitation, title costs, commissions, any required CDD buy down, past due real property taxes, reasonable attorneys' fees, and other allowable, normal and customary closing costs.

"*Non-Default Interest Rate*" means the rate per annum equal to the lesser of (i) 12% *per annum*, and (ii) the maximum rate provided by applicable law.

"*Note*" means that certain Promissory Note, dated as of the date of this Agreement, executed by Borrowers and payable to the order of Lender in the maximum principal amount of $27,000,000.

"*Obligations*" means all loans, advances, debts, principal, interest (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued), contingent reimbursement obligations, and other indebtedness owing by any Debtor to Lender under this Agreement (including, without limitation, the Guaranteed Obligations), the other Loan Documents, by any note or other instrument, or pursuant to any other agreement between Lender and any Debtor, and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and further including all interest not paid when due and all Lender Expenses that any Debtor is required to pay or reimburse by the Loan Documents, by law, or otherwise <u>(but excluding any debt, liability, or obligation owing from any Debtor to a Person other than Lender that Lender may have obtained by assignment or otherwise)</u>.

"*Obligors*" means Debtors and all other Persons that have pledged assets to secure or have guaranteed any of the Obligations and "*Obligor*" means any of them.

"*Order*" means the Interim Order or the Final Order, as applicable.

"*Patent License*" of any Person means all agreements, whether written or oral, providing for the grant by or to such Person of any right to manufacture, use, import, sell or offer for sale any invention covered in whole or in part by a Patent.

"*Patents*" means (a) all letters patent of the United States, any other country or any political subdivision thereof and all reissues and extensions thereof, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and

SWM005986

AA00675

continuations-in-part thereof, and (c) all rights to obtain any reissues or extensions of the foregoing.

"*Payment Intangibles*" means all "payment intangibles" (as that term is defined in the Code).

"*Permitted Liens*" means: (a) Liens held by Lender; (b) Liens for unpaid taxes that are not yet delinquent; (c) Liens securing CDD Debt; (d) Liens that have been specifically consented to, in advance and in writing, by Lender; (e) purchase money security interests on assets purchased after the date hereof, so long as the security interest or Lien on any such asset only secures the purchase price of such asset; (f) Liens of lessors under capital leases so long as the security interest or Lien only secures the purchase price of the asset; (g) easements, rights of way, reservations, covenants, conditions, restrictions, zoning variances, and other similar encumbrances that do not materially interfere with the use or value of the property subject thereto; and (h) mechanics', materialmen's, warehousemen's, or similar Liens that arise by operation of law where payment for the goods or services giving rise to such Liens are not yet due and payable.

"*PEPI*" means PEPI Capital, L.P., a Delaware limited partnership.

"*Person*" means and includes natural persons, corporations, limited partnerships, general partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"*Petition Date*" has the meaning set forth in the introduction to this Agreement.

"*Pledge Agreements*" means pledge agreements from each owner of each Borrower, in form and substance satisfactory to Lender, pledging to Lender such Person's Equity Interest in such Borrower to secure all Obligations.

"*Prepayment Event*" means (i) any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Debtor, (ii) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Debtor, (iii) the issuance by any Debtor of any ownership interest, or the receipt by either Borrower of any capital contribution, or (iv) the incurrence by any Debtor of any indebtedness, other than indebtedness permitted under Section 7.2.

"*Proceeds*" means any and all "proceeds", as such term is defined in the Code.

"*Project*" means the Fiddler's Creek development located in Collier County, Florida, consisting of approximately 3,932 acres and including single family, commercial, and recreational development.

"*Real Property*" means any estates or interests in real property now owned or hereafter acquired by any Debtor and the improvements and fixtures thereto.

SWM005987

AA00676

"**Related Fund**" means a fund, money market account, investment account or other account managed by Lender or an Affiliate of Lender or its investment manager or an Affiliate of its investment manager.

"**Records**" means all "records" (as that term is defined in the Code).

"**Software**" means any and all "software", as such term is defined in the Code.

"**Subsidiary**" means (i) any corporation of which at least a majority of the outstanding shares of stock having by the terms thereof ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether or not at the time stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by a Debtor or by one or more other Subsidiaries of a Debtor or by a Debtor and one or more of such Subsidiaries; and (ii) of which at least a majority of the ownership, equity or voting interest is at the time directly or indirectly owned or controlled by one or more of a Debtor and other Subsidiaries and (B) which is treated as a subsidiary in accordance with GAAP.

"**Supporting Obligations**" means all "supporting obligations" (as that term is defined in the Code).

"**Trademark License**" of a Person means any agreement, whether written or oral, providing for the grant by or to such Person of any right to use any Trademark.

"**Trademarks**" means (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, and (b) the right to obtain all renewals thereof.

"**Transaction Costs**" means the fees, costs, and expenses paid or payable by Debtors in connection with the filing and confirmation of the Acceptable Plan of Debtors under Chapter 11 of the Bankruptcy Code.

"**Voidable Transfer**" has the meaning set forth in Section 17.10.

    1.2    **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean the combined Borrowers and all of their consolidated Subsidiaries unless the context clearly requires otherwise.

    1.3    **Code.** Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein.

SWM005988

AA00677

1.4    **Construction.**  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Section, subsection, clause, schedule, and exhibit references are to this Agreement unless otherwise specified.  Any reference in this Agreement or in the Loan Documents to this Agreement or any of the Loan Documents shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, and supplements, thereto and thereof, as applicable.

1.5    **Schedules and Exhibits.**  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2.  LOAN AND TERMS OF PAYMENT.

2.1    **Advances.**

(a)    Subject to the terms and conditions of this Agreement, Lender agrees, on the terms and conditions set forth herein, to make (i) the Initial Advance to Borrowers upon the fulfillment by Debtors of the conditions set forth in Sections 3.1 and 3.3 and (ii) additional Advances to Borrowers no more frequently than once every month, during the period from the Final Order Entry Date until the Maturity Date upon the fulfillment by Debtors of the conditions set forth in Sections 3.2 and 3.3.  After giving effect to an Advance, (x) the aggregate amount of all Advances made to Borrowers, regardless of whether all or any part of such Advances have been repaid or are then outstanding, shall not exceed the Maximum Committed Amount, and (y) the aggregate amount of Advances then outstanding to Borrowers shall not exceed the then-applicable Maximum Outstanding Amount.  Other than the Initial Advance, each Borrowing shall be in an aggregate amount which does not exceed the reasonable cash needs of Borrowers for the following monthly period as disclosed in the most recent 13 Week Budget, *provided*, that the minimum amount of any Advance shall be $500,000 and Advances shall be in increments of $100,000.  Amounts borrowed and repaid hereunder may not be reborrowed.

(b)    The Initial Advance shall be made on notice given no later than 5:00 P.M. (Dallas, Texas, time) one Business Day prior to such Borrowing.  All other Borrowings shall be made on notice given by Borrowers to Lender not later than 12:00 P.M. (Dallas, Texas, time) five Business Days prior to such Borrowing, or less time if Lender consents.  Each such notice of a Borrowing (a "***Notice of Borrowing***") shall be by telephone and confirmed immediately by fax, in substantially the form of Exhibit C hereto, specifying therein the requested (i) date of such Borrowing and (ii) the aggregate amount of such Borrowing.  Each Notice of Borrowing shall be for an amount consistent with the 18 Month Budget.

(c)    Anything to the contrary in subsection (a) above notwithstanding, Lender may (i) reduce or withhold making any Advances without declaring an Event of Default if it determines that there is a material impairment of the prospect of repayment of all or any portion of the Loan or a material impairment of the value or priority of Lender's security interests in the Collateral; or (ii) reserve an amount equal to the Carve-Out from the loan availability created

SWM005989

AA00678

under <u>subsection (a)</u> above, to the extent the administrative expense priority claim under Section 364(c)(1) of the Bankruptcy Code granted to Lender pursuant to the Orders is subordinated to the payment of all or any portion of the Administrative Fees.

(d)  Unless payment is otherwise made by Borrowers, the becoming due of any amount required to be paid under any Loan Document or of any Obligation shall be deemed to be a request for an Advance on the due date in the amount required to pay such amount, and such request shall be irrevocable.  Lender shall not have any obligation to Borrowers to honor any deemed request for an Advance but may do so in its sole and absolute discretion and without regard to the existence of, and without being deemed to have waived, any Default or Event of Default.

2.2  **Overadvances**.  If, at any time or for any reason, the amount of Obligations owed by Borrowers to Lender pursuant to <u>Section 2.1</u> is greater than the limitations set forth in <u>Section 2.1(a)</u>, <u>clause (x)</u> or <u>(y)</u> (an "<u>Overadvance</u>"), Borrowers, jointly and severally, immediately shall pay to Lender, in cash, the amount of such excess.  For the avoidance of doubt, amounts constituting Overadvances shall be secured by Lender's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances.

2.3  **Interest: Rates, Payments, and Calculations.**

(a)  <u>Interest Rate</u>.  Prior to an Event of Default, Borrowers shall, jointly and severally, pay interest on the unpaid principal amount of each Advance from the date of such Advance until such principal shall be paid in full, at the Non-Default Interest Rate.

(b)  <u>Default Rate</u>.  From and after the occurrence and during the continuance of an Event of Default, at the option of Lender and after giving notice to Borrowers, Borrowers shall, jointly and severally, pay interest at the Default Rate on the unpaid principal amount of each Advance and on the unpaid amount of all interest, fees and other amounts payable hereunder.

(c)  <u>Interest Payments</u>.  Interest hereunder shall be due and payable, in full, on the first day of each month and on the Maturity Date.  Borrowers hereby authorize Lender, at its option, without prior notice to either Borrower, to charge such interest, all Lender Expenses (as and when incurred), and all installments or other payments due under any note or other Loan Document to Borrower's loan account, which amounts thereafter shall accrue interest at the rate then applicable hereunder.  Any interest not paid when due shall be compounded by becoming a part of the Obligations, and such interest thereafter shall accrue interest at the rate then applicable hereunder.

(d)  <u>Principal Payments</u>.  The unpaid principal amount of all Advances shall be due and payable, in full, on the Maturity Date.

(e)  <u>Prepayments</u>.  Upon the occurrence of a Prepayment Event, Debtors shall, jointly and severally, pay or cause to be paid to Lender all Net Proceeds of such Prepayment Event, by depositing or causing to be deposited such Net Proceeds into Lender's Account, to be applied first to the unpaid Lender Expenses and fees (including, without

SWM005990

AA00679

limitation, the applicable Exit Fee), then to the accrued but unpaid interest on the principal amount being repaid, and then to the principal amount of the outstanding Advances.

(f) <u>Intent to Limit Charges to Maximum Lawful Rate</u>. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts contracted for, charged, or received in connection herewith, which are considered in law to be interest, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. All Obligors and Lender, in executing this Agreement and the other Loan Documents, intend legally to agree upon the rate or rates of interest and manner of payment stated within it, *provided, however*, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto* as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be refunded to Borrowers. Lender and Borrowers agree that any such refund may, at Lender's option, be accomplished by applying the excess amount to the principal balance of the Obligations to the extent of such excess.

(g) <u>Computation</u>. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year for the actual number of days elapsed.

2.4 **Fees.**

(a) <u>Commitment Fee</u>. Under the Commitment Letter, Borrowers agreed to pay the Commitment Fee to Lender, and the Commitment Fee was fully earned upon execution by Borrowers and Lender of the Commitment Letter. Borrowers, jointly and severally, confirm such agreement to pay Lender the Commitment Fee. Lender acknowledges that one-half of the Commitment Fee ($405,000) has been paid to Lender and the balance of the Commitment Fee ($405,000) shall be paid from the Initial Advance.

(b) <u>Break-Up Fee</u>. Borrowers, jointly and severally, agree to pay Lender the Break-Up Fee which shall be due and payable if any Debtor, directly or indirectly, enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the facility provided in this Agreement and such alternate financing is approved by the Bankruptcy Court (the "*Court Approved Alternative Financing*"). The Break-Up Fee shall be due and payable upon the earlier of (i) the funding of such alternative financing or (ii) 30 days after the approval of such alternative financing by the Bankruptcy Court. With respect to the Court Approved Alternative Financing, Borrowers agree to take all actions necessary to effect the authorization of the payment of the Break-Up Fee authorized by the Bankruptcy Court, including, without limitation, (A) stipulating that such fee is an allowed Chapter 11 administrative expense, payable immediately, (B) budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and (C) filing an application to pay the Break-Up Fee, if necessary.

SWM005991

AA00680

(c)    <u>Exit Fee</u>.  Borrowers, jointly and severally, agree to pay Lender the Exit Fee which shall be immediately due and payable on each payment of principal of the Loan, whether such principal payment is in whole or in part, on the Maturity Date or otherwise.

(d)    <u>Collateral Monitoring Fee</u>.  Borrowers, jointly and severally, agree to pay Lender the Collateral Monitoring Fee monthly in advance beginning on the date hereof and continuing on the first day of each month hereafter until payment in full of the Loan and termination of the Commitment.  The Collateral Monitoring Fee, for any month or partial month, shall be deemed fully earned by Lender on each date payment of such fee is due.

(e)    <u>Unused Loan Fee</u>.  Borrowers, jointly and severally, agree to pay Lender a monthly fee, commencing upon the approval of the Final Order and continuing thereafter on the first day of each month until payment in full of the Loan and termination of the Commitment, equal to 1.0% *per annum* of the difference between the Maximum Committed Amount and the cumulative, aggregate amount of the Loan advanced to Borrowers as of the end of the immediately preceding month.

### 2.5    **Lender Expenses.**

Upon two Business Days' written notice from Lender to Borrowers, <u>which notice shall include an estimate of projected Lender Expenses,</u> Borrowers shall deliver to Lender additional deposits necessary to cover continuing Lender Expenses projected through the Maturity Date and payment in full of the Loan.  Lender shall not be required to make any application to the Bankruptcy Court, to give any notice to any Person (other than Borrowers as set forth in this section), or obtain review of the Bankruptcy Court or authorization from the Bankruptcy Court as a condition Borrower's obligation to pay any Lender Expense or make any such deposit.  In the event of any failure of Borrower to pay any Lender Expenses after notice from Lender, Borrowers hereby jointly and severally authorize Lender to make Advances hereunder from time to time to pay such expenses.

### 2.6    **Crediting Payments; Application of Collections and Payments.**  The

receipt of any wire transfer of funds, check, or other item of payment by Lender immediately shall be applied to provisionally reduce the Obligations, but shall not be considered a payment on account unless such wire transfer is of immediately available federal funds and is made to Lender's Account or unless and until such check or other item of payment is honored when presented for payment.  Should any check or item of payment not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment, and interest shall be recalculated accordingly.  Anything to the contrary contained herein notwithstanding, any wire transfer, check, or other item of payment shall be deemed received by Lender only if it is received into Lender's Account on or before 11:00 a.m. Dallas, Texas, time.  If any wire transfer, check, or other item of payment is received into Lender's Account after 11:00 a.m. Dallas, Texas, time it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.  All payments on the Obligations shall be applied first to the unpaid Lender Expenses and fees (including, without limitation, the applicable Exit Fee), then to the accrued but unpaid interest on the principal amount being repaid, and then to the principal amount of the outstanding Advances

SWM005992

AA00681

2.7 **Common Enterprise.** The successful operation and condition of each of the Debtors is dependent on the continued successful performance of the functions of the group of Debtors as a whole and the successful operation of each Debtor is dependent on the successful performance and operation of each other Debtor. Each of the Debtors expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from successful operations of each of the other Debtors and the Project as a whole. Each Debtor expects to derive benefit (and the boards of directors or other governing body of each such Debtor have determined that it may reasonably be expected to derive benefit), directly and indirectly, from the credit extended by Lender to Debtors hereunder, both in their separate capacities and as members of the group of companies. Each Debtor has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by each Debtor is within its corporate purpose, will be of direct and indirect benefit to such Debtor, and is in its best interest.

## 3. CONDITIONS; TERM OF AGREEMENT.

3.1 **Conditions Precedent to Initial Advance.** The obligation of Lender to make the Initial Advance is subject to the fulfillment, to the reasonable satisfaction of Lender and its counsel, of each of the following conditions on or before the Closing Date:

(a) the Initial Advance may be requested immediately upon entry by the Bankruptcy Court of the Interim Order, in form acceptable to the Lender;

(b) each Debtor's Chapter 11 Case is pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and no ~~motion is pending~~order has been entered to dismiss same;

(c) Lender shall have received evidence that each Debtor shall have filed (i) bankruptcy petitions in the Bankruptcy Court, (ii) first day motions customary for chapter 11 bankruptcies of similar debtors with similar assets, and (iii) motions for use of cash collateral in form satisfactory to Lender, and that each Debtor has filed a motion for debtor in possession financing consistent with the terms of this Agreement;

(d) Lender shall have received copies of the Bankruptcy Court's orders approving each Debtor's motion for use of cash collateral and budget satisfactory to Lender;

(e) Lender shall have received accounts payable agings and the service list for each Debtor;

(f) Lender shall have received a certificate from an Authorized Officer of each Obligor that is not a natural person (or if an Obligor is a limited partnership, such Person's general partner) attesting to the resolutions of such Person's Board of Directors, Board of Managers, or general partner's board of directors, as appropriate, or partners' consents, as appropriate, authorizing (i) such Person's commencement of a case in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code (as applicable), (ii) such Person's execution and delivery of this Agreement (as applicable) and the other Loan Documents to which such Person is a party, and (iii) specific officers of such Person to execute same;

SWM005993

AA00682

(g)    the Bankruptcy Court shall have entered the Interim Order, in substantially the form of Exhibit B hereto, Lender shall have received a certified copy of the Interim Order, and the Interim Order shall remain in full force and effect and shall not have been stayed, except for such modifications thereto acceptable to Lender;

(h)    no motion shall haveorder has been filed requestingentered for (a) the appointment of a trustee (or an examiner with expanded powers) in any Debtor's Chapter 11 case, or (b) the conversion of any Debtor's Chapter 11 case into a case under Chapter 7 of the Bankruptcy Code;

(i)    Debtor shall have provided Lender an updated 13 Week Budget in form and substance satisfactory to Lender, setting forth all of Debtors' projected expenses for such 13-week period;

(j)    Lender shall have received the 18 Month Budget and business planBusiness Plan for Debtors and their subsidiaries, in form and substance satisfactory to Lender;

(k)    any amendments to Debtors' business plan for the duration of the Chapter 11 Case shall be satisfactory to Lender;

(l)    Lender shall have received this Agreement, duly executed, and in full force and effect;

(m)    Lender shall have received the Note, in form and substance satisfactory to Lender, duly executed, and in full force and effect;

(n)    Lender shall have received the Mortgage(s)Mortgages, in form and substance satisfactory to Lender, duly executed, and in full force and effect;

(o)    Lender shall have received the Pledge Agreements, in form and substance satisfactory to Lender, duly executed, and in full force and effect;

(p)    to the extent that any pledged Equity Interests are represented by certificates, Lender shall have received all original stock and membership certificates and powers of sale executed in blank;

(q)    the escrow agent under the Escrow Agreement shall have received the Escrow Agreement, in form and substance satisfactory to Lender, duly executed and in full force and effect;

(q)    (r) the escrow agent under the Escrow AgreementLender shall have received the collateral assignments of all material contracts of each Debtor, including, without limitation, sales contracts with home buyers, developers, and other Persons, and leases of real and personal property, in form and substance satisfactory to Lender, duly executed, and in full force and effect, which assignments are included in this Agreement and the Mortgages;

SWM005994

AA00683

(r)      (s) Lender shall have received environmental indemnities for the Real Property described in the Mortgage(s)Mortgages, in form and substance satisfactory to Lender, duly executed, and in full force and effect;

(s)      (t) Lender shall have received assignments of rents and leases for the Real Property described in the Mortgage(s)Mortgages, in form and substance satisfactory to Lender, duly executed, and in full force and effect;

(t)      (u) Lender shall have received collateral assignments of policies of insurance for construction and other defects where any Debtor is an insured thereunder, in form and substance satisfactory to Lender, duly executed, and in full force and effect, which assignments are included in this Agreement and the Mortgages;

(u)      (v) Lender shall have received collateral assignments of all warranties benefiting any Debtor, in form and substance satisfactory to Lender, duly executed, and in full force and effect, which assignments are included in this Agreement and the Mortgages;

(v)      (w) Lender shall have received a collateral assignment of declarant's rights under covenants, conditions, and restrictions, in form and substance satisfactory to Lender, duly executed by each Declarant, and in full force and effect;

(w)      (x) Lender shall have received a subordination agreement from Florida Financial Investments, Inc., in form and substance satisfactory to Lender, duly executed, and in full force and effect;

(x)      (y) Lender shall have received deposit account control agreements with respect to each Debtor's Deposit Account, in form and substance satisfactory to Lender, duly executed by each Borrower and _____ and in full force and effect;

(y)      (z) Lender shall have received from each Obligor that is not a Debtor an authorization to file financing statements, in form and substance satisfactory to Lender, duly executed by such Obligor;

(z)      (aa) Lender shall have filed all UCC-1 financing statements deemed necessary or desirable to perfect Lender's security interest in the Collateral;

(aa)      (bb) Lender shall have received a notice of final agreement, in form and substance satisfactory to Lender, duly executed by all Lenders and all Obligors, and in full force and effect;

(cc)      Lender shall have received in escrow pursuant to the Escrow Agreement a deed in lieu of foreclosure for each parcel of Real Property mortgaged to Lender under a Mortgage, in form and substance satisfactory to Lender, duly executed by the Debtor that is the owner of such Real Property;

(dd)      Lender shall have received in escrow pursuant to the Escrow Agreement consent judgments from each Obligor, in form and substance satisfactory to Lender, which can be delivered for filing in any court of the State of Florida;

SWM005995

AA00684

(bb)   (ee) Lender shall have received an opinion of legal counsel to Obligors in form and substance satisfactory to Lender;

(cc)   (ff) Lender shall have received a certificate from an Authorized Officer of each Obligor that is not a natural person (or the general partner thereof, if such Person is a limited partnership) (i) authorizing specific officers of such Person (or if such Person does not have officers, of such Person's general partner) to execute the Loan Documents to which such Person is a party, and (ii) attesting to the incumbency and signatures of such specific officers of such Person;

(dd)   (gg) Lender shall have received a certified copy of the certificate or articles of formation, articles of incorporation, or certificate of limited partnership, as appropriate, of each Obligor that is not a natural person, and all amendments thereto, issued by the Secretary of State of its state of formation, certified by an Authorized Officer of such Obligor;

(ee)   (hh) Lender shall have received a copy of for each Obligor that is not a natural person, operating or limited liability company agreement, bylaws, or partnership agreement, as appropriate, and all amendments thereto, of such Person certified by an Authorized Officer of such Person;

(ff)   (ii) Lender shall have received a certificate of status with respect to each Obligor that is not a natural person, dated within 30 days before the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Person, which certificate shall indicate that such Person exists and is in good standing in such jurisdiction;

(gg)   (jj) Lender shall have received certificates of good standing or existence, as appropriate, with respect to each Obligor that is not a natural person, dated within 30 days before the Closing Date, such certificates to be issued by the appropriate officer of the Florida and the jurisdictions (other than such Person's jurisdiction of organization) in which such Person's failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that such Person is in good standing or active status, as appropriate, in such jurisdictions;

(hh)   (kk) Lender shall have received a detailed description and summary of all insurance currently held by each Debtor and a list of any pending claims, in each case in form and substance satisfactory to Lender;

(ii)   (ll) Lender shall have received and be satisfied in Lender's reasonable discretion with all insurance policies and all policy endorsements required pursuant to Section 6.7;

(jj)   (mm) Lender shall have received evidence satisfactory to Lender that Debtors have recorded documentation satisfactory to Lender in accordance with any covenants, conditions, and restrictions respecting any of the Real Property, naming Lender as "Institutional Mortgagee" thereunder and including a covenant that no Debtor shall revoke the applicable declarant's "Class B" status, which shall be included in the Mortgages;

SWM005996

AA00685

(kk) ~~(nn) Lender~~ the Mortgages shall ~~have received evidence satisfactory to include Lender that Lender has a's~~ collateral interest in all rights of Debtors in respect of boat slips pertaining to the Project;

(ll) ~~(oo)~~ Lender shall have received evidence satisfactory to Lender, there has been no change or development from the disclosures attached to the Commitment Letter in any litigation, suit or proceeding which could be expected to result in a Material Adverse Change;

(mm) ~~(pp)~~ Lender shall have received Phase I environmental reports with respect to the Real Property, in form, scope and substance satisfactory to Lender, prepared by a qualified engineer approved by Lender, and showing the environmental condition of such Real Property satisfactory to Lender and such reliance letters from the issues of such reports as Lender requires;

(nn) ~~(qq)~~ Lender shall have received the most recent surveys of the Real Property prepared for Debtors;

(oo) ~~(rr)~~ Lender shall have received mortgagee's policies of title insurance or commitments for such policies and agreements from the issuers of such policies as required by Lender, insuring the Liens of the ~~Mortgage(s)~~ Mortgages, such policies of title insurance to be issued by a title insurance company acceptable to Lender and to be in such amounts, and to contain such endorsements as Lender may require;

(pp) ~~(ss)~~ Lender shall have received the following for each parcel of Real Property (i) copies of all zoning letters therefor, (ii) copies of flood letters therefor, (iii) copies of all utility letters therefor; (iv) copies of the most recent real property tax statements therefor ~~and evidence that such taxes have been paid~~, and (v) copies of all plats therefor;

(qq) ~~(tt)~~ Lender shall have received the following information for each CDD: (i) enabling legislation or creation order; (ii) the current composition of its board of directors, (iii) the name and contact information for each board member; (iv) the name and contact information for its attorney; (v) the name and contact information for its financial advisor and/or bookkeeper; (vi) the name and contact information for its auditor; (vii) the name and contact information for its engineer; (viii) copies of each project improvement acquisition agreement entered into by such CDD and any developer of land in the district that are currently in effect; (ix) each assignment of the any project improvement acquisition agreements in item H; (x) a copy of the most recent offering statement; (xi) a copy of the most recent audit; (xii) confirmation of the development status of land within the CDD; (xiii) confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD; (xiv) identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD; (xv) such CDD's budget; (xvi) such CDD's bank account information; (xvii) assessments on all properties for debt service and other operations; (xviii) the most recent financial statements for the CDD; (xix) the amount of annual assessments for 2010; (xx) total bond obligations related to debtor-owned properties in each bond issue (by unit/lot); and (xxi) copies of all annual financial information and operating data delivered for the _____

SWM005997

AA00686

period ending _____ as part of the CDD's continuing disclosure obligations pursuant to its offering statement;

(rr)   (uu) Lender shall have received the following information for each homeowner's association affecting any of the Real Property: (i) identification of the specific real property collateral subject to the such homeowner's association; (ii) documentation of such homeowner's association's financial condition; (iii) such homeowner's association's organizational documents; (iv) such homeowner's association's budget; (v) such homeowner's association's most recent financial statements; (vi) copies of all conditions, covenants, and restrictions and all amendments thereto; (vii) the results of the most recent facility and common area inspect for such homeowner's association; (viii) an analysis of such homeowner's association's overhead; (ix) a list of such homeowner's association's declarants and board positions; and (x) comprehensive dues information;

(ss)   (vv) Lender shall have received duly executed estoppel certificates in form and substance satisfactory to Lender from each of the master homeowner's association and each village subassociation affecting any of the Real Property, respecting such representations and agreements as shall be required by Lender;

(tt)   (ww) Lender shall have received a list of all leases between a Debtor and any of its Affiliates, in form and substance satisfactory to Lender;

(uu)   (xx) Lender shall have received a list of all payments or other obligations required to maintain entitlements and zoning relating to the Real Property, in form and substance satisfactory to Lender;

(vv)   (yy) Lender shall have received the audited, consolidated financial statements for each Borrower and its respective Subsidiaries, dated no earlier than December 31, 2008, and the draft, unaudited, consolidated financial statements for each Borrower and its respective Subsidiaries, dated as of December 31, 2009, in form and substance satisfactory to Lender;

(ww)   (zz) Lender shall have received a report of all cash flow from operations of the Project and each revenue generating activity at the Project;

(xx)   (aaa) Lender shall have received the most recently filed Federal income tax and, if applicable, state income tax returns of each Debtor that is not treated as a "disregarded entity" for Federal and state income tax purposes;

(yy)   (bbb) Lender shall have received UCC, tax lien, and judgment lien searches for each Debtor and each other Obligor;

(zz)   (ccc) Lender shall have received (i) a list of all lenders to each Debtor, (ii) a description of all loan facilities from such lenders to each Debtor, (iii) copies of all loan documentation executed and delivered in connection with each such loan facility, and (iv) a description of all collateral for each such loan facility;

SWM005998

AA00687

(aaa)    (ddd) Lender shall have received the following collateral reports: (i) identification of each Debtor's outstanding receivables for all real and personal property collateral; (ii) a list of all deposits being held by each owner of the Real Property and any anticipated forfeitures thereof; (iii) a list of all fixed assets of each Debtor, including, without limitation, all vehicles and equipment; (iv) a list of all Copyrights, Trademarks, and Patents owed by or licensed to any Debtor; (v) a list of and copies of all agreements containing a right of first refusal with respect to any of the Collateral;

(bbb)    (eee) Lender shall have received a list, in form and substance satisfactory to Lender, of any pending litigation against any Debtor, or any Debtor's assets, including, without limitation, any of the Collateral;

(ccc)    (fff) Lender shall have received copies of all joint ventures agreements to which any Debtor is a party;

(ddd)    (ggg) Lender shall be satisfied that there has not been any Material Adverse Change since it completed its business, legal, environmental, industry, technical and collateral due diligence. In that regard, Lender may conduct a review, examination and appraisal of the Collateral and review of each Debtor's and its Subsidiaries' Books, a review of each Debtor's Collateral valuation methods, and verification of each Debtor's representations and warranties to Lender, the results of which shall be satisfactory to Lender;

(eee)    (hhh) no Debtor has entered into (i) any transaction with any other Debtor respecting any of the Collateral that has not been disclosed to Lender or (ii) any transaction with any of its Affiliates that are not Debtors that has not been disclosed to Lender;

(fff)    (iii) no material adverse changes in governmental regulations or policies affecting any Debtor or Lender have occurred;

(ggg)    (jjj) the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of such Initial Advance, as though made on and as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date);

(hhh)    (kkk) all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered or executed or recorded and shall be in form and substance satisfactory to Lender and its counsel, other than documents and legal matters that are expressly provided in this Agreement to be provided after the Initial Advance;

(iii)    (lll) there is no default under any Material Contract for which any applicable grace period has expired;

(jjj)    (mmm) no Default or Event of Default shall have occurred and be continuing on the date of the Initial Advance nor shall either result from the making of the Initial Advance;

SWM005999

AA00688

(kkk)    (nnn) Lender shall have received payment of the Commitment Fee, one-half of which Lender has previously received and the balance of which shall be paid from the proceeds of the Initial Advance;

(lll)    (ooo) all Lender Expenses shall be current and paid when due;

(mmm) (ppp) Lender shall have received appraisals dated as of _____, 2009, in form and substance acceptable to Lender, for all real property owned by Debtors, prepared by Integra Realty; and

(nnn)    (qqq) Lender shall have received all other documents and diligence items reasonably requested by Lender.

3.2    **Conditions Precedent to All Advances Subsequent to the Initial Advance.** The following shall be conditions precedent to all Advances subsequent to the Initial Advance:

(a)    each Debtor's Chapter 11 Case is still pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and no motion is pending order has been entered to dismiss same;

(b)    the Bankruptcy Court shall have entered the Final Order, Lender shall have received a certified copy of the Final Order;

(c)    the Final Order shall remain in full force and effect and shall not be the subject of any appeal, and time for appeal shall have expired (unless the title company issuing the title insurance policies insuring Lender's Liens under the Mortgages has endorsed such policies to remove appeal of the Final Order as an exception to coverage), and the Final Order shall not have been reversed, modified, amended, rescinded, stayed or vacated, except for such modifications thereto acceptable to Lender;

(d)    such Advance shall be consistent with the 18 Month Budget;

(e)    Lender shall have received the applicable 13 Week Budget for Debtors;

(f)    no motion shall have order has been filed requesting entered for (i) the appointment of a trustee (or an examiner with expanded powers) in any Debtor's Chapter 11 case, or (ii) the conversion of any Debtor's Chapter 11 case into a case under Chapter 7 of the Bankruptcy Code;

(g)    Lender shall have received ALTA surveys of the Real Property for which the applicable title policy includes a survey exception, in form, scope and substance satisfactory to Lender and the title company, prepared by a qualified surveyor acceptable to Lender and the title company and certified to Lender;

(h)    no material changes in governmental regulations or policies adversely affecting any Debtor or Lender have occurred;

SWM006000

AA00689

(i)      the representations and warranties contained in this Agreement and the other Loan Documents shall be true and correct in all respects on and as of the date of such advance, as though made on and as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date);

(j)      no Default or Event of Default shall have occurred and be continuing on the date of such Advance nor shall either result from the making of such Advance;

(k)      all conditions precedent set forth in Section 3.1 hereof that Lender agreed to defer have been satisfied or further deferred or waived in writing by Lender;

(l)      Lender shall have received mortgagee policies of title insurance insuring the Liens of the Mortgages, pursuant to the commitments described in Section 3.1 hereof, issued by a title insurance company acceptable to Lender and to be in such amounts and to include such endorsements as Lender may require; and

(m)      all Lender Expenses shall be current and paid when due.

3.3    **Conditions Subsequent to All Advances.**    The following shall be conditions subsequent to all Advances by Lender and the failure to satisfy the following shall constitute an Event of Default hereunder:

(a)      any conditions relating (i) to any Advance, the satisfaction of which was deferred with the written agreement of Lender unless Lender has expressly completely waived satisfaction of such condition and (ii) to the execution and delivery of other Loan Documents deferred until after the Closing Date with the agreement of Lender shall be satisfied within such time periods as were agreed to by Lender.

3.4    **Maturity.**    This Agreement shall become effective upon acceptance by Lender. The Loan shall mature and the obligation of Lender to make Advances hereunder shall expire upon the earliest of (a) 18 months from the date of the Final Order unless Borrowers have satisfied the Extension Conditions in which case such 18-month period shall be extended for the applicable Extension Period; (b) the effective date of a plan of reorganization for any Debtor which has been confirmed by an order of the confirmation of the United States Bankruptcy Court (unless expressly agreed to by Lender); (c) the date upon which a final order is entered by the Bankruptcy Court that (i) converts any Debtor's Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code (unless expressly agreed to by Lender), (ii) approves the 363 sale of all or substantially all of any Debtor's assets (unless expressly agreed to by Lender), (iii) appoints a trustee or examiner (with or without extended powers) in any Debtor's Chapter 11 case, or (iv) dismisses any Debtor's bankruptcy case (unless expressly agreed to by Lender); and (d) acceleration of the Maturity Date under Section 10.1(a) or the termination under Section 10.1(c) by Lender of this Agreement and the Commitment as the result of an Event of Default (such earliest date being known herein as the "*Maturity Date*").

3.5    **Effect of Maturity.**    On the Maturity Date, all Obligations immediately shall become due and payable without notice or demand and any commitment to lend hereunder shall terminate.    Each Debtor's duties, Obligations, and covenants hereunder, and Lender's continuing security interests in and Liens upon the Collateral, shall remain in effect until all

SWM006001

AA00690

Obligations have been fully discharged and Lender's obligation to provide Advances hereunder is terminated.

3.6 **Purchase Option.** ~~Within~~Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, within 30 days after the Maturity Date, upon written notice of exercise of this option given to Lender by Fiddler's Creek, the Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice ~~may purchase~~ (the ~~Loan~~ _**"Designated Buyer"**_) for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, _provided_, that the purchase of the Loan has closed and been consummated within such 30-day period. The ~~buyer so designated~~Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages.

## 4. CREATION AND REAFFIRMATION OF SECURITY INTERESTS AND LIENS.

4.1 **Grant of Security Interests and Liens.** Each Debtor hereby grants to Lender security interests in and liens upon all currently existing and hereafter acquired Debtor Collateral in order to secure prompt repayment of any and all Obligations and any and all Guaranteed Obligations and in order to secure prompt performance by each Debtor and each other Obligor of its covenants and duties under the Loan Documents, the priority of which security interests shall be as set forth in the Preliminary Statements at the beginning of this Agreement. Lender's security interests in and liens upon the Debtor Collateral shall attach to all Debtor Collateral without further act on the part of Lender or any Debtor. The security interests and liens granted herein are in addition to, and not in limitation of, any and all security interests in and liens upon the Collateral which were granted to Lender pursuant to the terms of the Orders.

Each counterparty to any contract to which any Debtor is a party is hereby given notice that such contract has been pledged and assigned to Lender.

4.2 **Negotiable Collateral.** In the event that any Collateral, including Proceeds, is evidenced by or consists of Negotiable Collateral, Debtors shall, immediately upon the request of Lender, endorse and assign in suitable form for transfer such Negotiable Collateral to Lender and deliver physical possession of such Negotiable Collateral to Lender. Certificated securities shall be accompanied by a duly executed stock power or assignment in blank in form and substance satisfactory to Lender.

4.3 **Delivery of Additional Documentation Required.** Each Debtor shall at any time upon the reasonable request of Lender execute and deliver to Lender all financing statements, continuation financing statements, fixture filings, security agreements, chattel mortgages, lease assignments and/or lease mortgages, real property mortgages, pledges,

SWM006002

AA00691

assignments, endorsements of certificates of title, applications for title, affidavits, reports, notices, consents, schedules of accounts, letters of authority, proxies, stock powers, and all other documents that Lender may reasonably request, in form satisfactory to Lender, to perfect and continue perfected Lender's security interests in and liens upon the Debtor Collateral, and in order to fully consummate all of the transactions contemplated hereby and under the other the Loan Documents. Each Debtor hereby authorizes Lender to file in any jurisdiction Lender may deem appropriate, without the signature of such Debtor, one or more financing statements, continuation statements, and amendments thereto, relating to and describing the Debtor Collateral as all assets of such Debtor or words of similar effect, regardless of whether any particular asset comprised in the Debtor Collateral falls within the scope of Article or Chapter 9 of the Code, or as being of an equal or lesser scope or with greater detail, and containing any other information required by subchapter E of Chapter 9 of the Code for the sufficiency or filing office acceptance of any financing statement or amendment. Nothing herein shall limit the effect of the Orders.

### 4.4     Power of Attorney.

(a)     Each Debtor hereby irrevocably makes, constitutes, and appoints Lender (and any agents designated by Lender) as such Debtor's true and lawful attorney, with power to:  (a) if such Borrower refuses to, or fails timely to execute and deliver any of the documents described in <u>Section 4.3</u>, sign the name of such Debtor on any of the documents described in <u>Section 4.3</u> or on any other similar documents to be executed, recorded, or filed in order to perfect or continue the perfection of Lender's security interests in and liens upon the Collateral; (b) at any time that an Event of Default has occurred and is continuing, sign such Debtor's names on any invoice or bill of lading relating to any account, drafts against account debtors, schedules and assignments of accounts, verifications of accounts, and notices to account debtors; (c) send requests for verification of accounts; (d) at any time that an Event of Default has occurred and is continuing, endorse such Debtor's names on any checks, notices, acceptances, money orders, drafts, or other item of payment or security that may come into Lender's possession; (e) at any time that an Event of Default has occurred and is continuing, notify the post office authorities to change the address for delivery of such Debtor's mail to an address designated by Lender, to receive and open all mail addressed to such Debtor, and to retain all mail relating to the Collateral or the inventory and forward all other mail to such Debtor; (f) at any time that an Event of Default has occurred and is continuing, make, settle, and adjust all claims under such Debtor's policies of insurance and make all determinations and decisions with respect to such policies of insurance; and (g) at any time that an Event of Default has occurred and is continuing, settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable, and Lender may cause to be executed and delivered any documents and releases which Lender determines to be necessary. The appointment of Lender as each Debtor's attorney, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully and finally repaid and performed and Lenders' obligation to extend credit hereunder is terminated.

(b)     With respect to any pledge of Equity Interests, each Debtor hereby makes, constitutes and appoints Lender or its nominee, its true and lawful attorney in fact and in its name, place, and stead, and on its behalf, and for its use and benefit to complete, execute and

SWM006003

AA00692

file with the United States Securities and Exchange Commission one or more notices of proposed sale of securities pursuant to Rule 144 under the Securities Act of 1933, as amended (the "*1933 Act*") and/or any similar filings or notices with any applicable state agencies ("*Filings*"), and said attorney in fact shall have full power and authority to do, take, and perform all and every act and thing whatsoever requisite, proper, or necessary to be done, in the exercise of the rights and powers herein granted, as fully to all intents and purposes as such Debtor might or could do if personally present. This power shall be irrevocable and deemed coupled with an interest. The rights, powers, and authority of said attorney in fact herein granted shall commence and be in full force and effect from the date of this agreement, and such rights, powers, and authority shall remain in full force and effect, and this power of attorney shall not be rescinded, revoked, terminated, amended, or otherwise modified, until all Obligations have been fully satisfied and any agreement to make Advances hereunder has terminated. Lender has no obligation to complete, execute, or file any Filings and will have no liability to any Obligor or any other Person for making any Filing or failure to make any Filing, unless resulting from Lender's gross negligence.

4.5 **Right to Inspect.** Each Debtor agrees to permit Lender and any representatives designated by Lender (including employees of Lender or any consultants, accountants, lawyers and appraisers retained by Lender), upon reasonable prior notice, to visit, inspect, test and appraise its properties and the Collateral, to examine and make extracts from its Books, and to discuss its affairs, finances and condition and the Collateral with its officers, employees and independent accountants, all at such reasonable times and as often as reasonably requested.

4.6 **Equity Interests.**

(a) Any and all payments, dividends, other distributions (including redemption proceeds), or other securities in respect of or in exchange for the pledged Equity Interests, whether by way of dividends, stock dividends, recapitalizations, mergers, consolidations, stock splits, combinations, or exchanges of shares or otherwise, received by any Debtor shall be held by such Debtor in trust for Lender, and such Debtor shall immediately deliver same to Lender in the form received, together with all stock powers or other powers of sale or assignments required by Lender and all necessary endorsements, to be held as part of the Collateral. Debtors may retain ordinary cash dividends, to the extent otherwise permitted hereunder, unless and until Lender requests that same be paid and delivered to Lender (which Lender may request either before or after Default).

(b) Lender shall never be liable for its failure to give notice to Debtors of default in the payment of or upon any Collateral. Lender shall not have any duty to fix or preserve rights against prior parties to the Collateral and shall never be liable for its failure to use diligence to collect any amount payable in respect to the Collateral, but shall be liable only to account to each Debtor for what it may actually collect or receive thereon. Without limiting the foregoing, it is specifically understood and agreed that Lender shall not have any responsibility for ascertaining any maturities, calls, conversions, exchanges, offers, tenders, or similar matters relating to any of the Collateral or for informing any Debtor with respect to any of such matters (irrespective of whether Lender actually has, or may be deemed to have, knowledge thereof). The foregoing provisions of this section shall be fully applicable to all Equity Interests held in

SWM006004

AA00693

pledge hereunder, irrespective of whether Lender may have exercised any right to have such securities or similar property registered in its name or in the name of a nominee.

        (c)     Each Debtor consents to the pledge by each other owner and holder of Equity Interests in any Issuer to Lender, to the further conveyance by foreclosure or otherwise of such Equity Interests in connection with Lender's exercise of its rights and remedies as a secured creditor with respect thereto, and that any transferee of such Equity Interests shall be entitled to all rights of an owner in such Issuer without, in any case, any further compliance with any provisions of any organizational documents of any Issuer.

    4.7    **Declarant Rights.**

        (a)     Portions of the Real Property are or may become subject to the terms and provisions of the Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek dated August ___, 2004, and recorded at OR 3685, Page 319 of the Official Records of Collier County, Florida (as the same may be amended from time to time, the "***Master Declaration***") and various ancillary "village" and/or condominium declarations (together with the Master Declaration, and as the same may be amended from time to time as permitted by any Mortgage, the "***Declarations***"). Debtors and GB 31, Ltd. hold all of the rights of the "Declarant" under the Declaration recorded at _____ of the Official Records of Collier County, Florida. For purposes of and pursuant to Section 1.24 of the Master Declaration and any similar provision in any of the other Declarations, Debtors hereby declare and agree that Lender is an "Institutional Mortgagee" under such documents, with all of the rights and benefits associated therewith.

        (b)     Debtors hereby represent and warrant that the "Class B Control Period" (as defined in Section 1.6 of the Master Declaration) and any similar control period set forth in any of the other Declarations (collectively, the "***Control Periods***") have not terminated. Without limiting any covenants of Debtors contained herein or in any of the Loan Document otherwise prohibiting any Debtor from amending, modifying or terminating any material contracts or agreements without the consent of Lender, no Debtor shall, without the prior, written consent of Lender (which consent may be granted or withheld in Lender's sole and absolute discretion), terminate or take any action that would cause the any of the Control Periods to terminate prior to the calendar date specified in Section 1.6 of the Master Declaration (or similar applicable provision).

## 5. REPRESENTATIONS AND WARRANTIES.

    Each Debtor represents and warrants to Lender as follows:

    5.1    **No Prior Encumbrances.**    There are no Liens (including Liens or retained security titles of conditional vendors) of any nature whatsoever on any properties of any Debtor other than (i) Permitted Liens, (ii) Liens created pursuant to the Loan Documents and the Orders and (iii) the Liens set forth on Schedule 5.1 hereto (all of the foregoing being the "***Existing Liens***"). No Debtor is a party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or

SWM006005

AA00694

require the creation of a lien on the property or assets of such Debtor, other than Permitted Liens and contracts for the sale of lots, or otherwise result in a violation of this Agreement.

5.2 **Intellectual Property.** Set forth on <u>Schedule 5.2</u> hereto is a complete and accurate list of all Patents, Software, Trademarks, trade names, service marks and Copyrights, and all applications therefor and licenses thereof, of each Debtor or any of its Subsidiaries or Affiliates, showing as of the date hereof the jurisdiction in which registered, the registration number, the date of registration and the expiration date.

5.3 **Material Contracts.** Set forth on <u>Schedule 5.3</u> hereto is a complete and accurate list of all material contracts of each Debtor including without limitation all contracts filed with the Securities and Exchange Commission and all contracts with utility providers ("*Material Contracts*").

5.4 **Location of Equipment.** No Debtor's equipment is stored with a bailee, warehouseman, or similar party.

5.5 **Location of Chief Executive Office; State of Incorporation; Organizational Identification Number.** The chief executive offices of each Debtor are located at the respective addresses indicated in the introduction to this Agreement. Each Debtor is located (within the meaning of Section 9-307 of the Code) in the jurisdiction set forth on <u>Schedule 5.5</u>, applicable thereto; the organizational identification number of each Debtor issued by its jurisdiction of organization is set forth on <u>Schedule 5.5</u>; and the correct legal name of each Debtor, including spelling and punctuation, as shown in such Debtor's articles or certificate of incorporation or formation or limited partnership on file with the secretary of state of its jurisdiction of organization is as set forth in the introduction to this Agreement.

5.6 **Due Organization and Qualification; No Subsidiaries.** Each Borrower is duly organized and existing and in good standing under the laws of the state of its formation and qualified and licensed to do business in, and in good standing in, any state where the failure to be so licensed or qualified could reasonably be expected to have a material adverse effect on the business, operations, condition (financial or otherwise), finances, or prospects of such Borrower or on the value of the Collateral to Lender. All Subsidiaries of each Borrower are set forth on <u>Schedule 5.5</u> attached hereto and made a part hereof. For purposes of this <u>Section 5.6</u>, to the extent a Debtor is a limited partnership, "Debtor" shall also include such Debtor's general partner.

5.7 **Due Authorization; No Conflict.** The execution, delivery, and performance of the Loan Documents are within each Debtor's corporate, limited liability company, or partnership powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision contained in such Debtor's Articles or Certificate of Incorporation or Formation, or such Debtor's Bylaws, Operating or Limited Liability Company Agreement, or partnership agreement, nor will they constitute an event of default under any material agreement to which such Debtor is a party or by which its properties or assets may be bound. For purposes of this <u>Section 5.7</u>, to the extent a Debtor is a limited partnership, "Debtor" shall also include such Debtor's general partner.

SWM006006

AA00695

5.8 **Reliance by Lender; Cumulative.** Each warranty and representation contained in this Agreement automatically shall be deemed repeated with each Advance and shall be conclusively presumed to have been relied upon by Lender regardless of any investigation made or information possessed by Lender. The warranties and representations set forth herein shall be cumulative and in addition to any and all other warranties and representations that each Debtor now or hereafter shall give, or cause to be given, to Lender pursuant to the terms and conditions of this Agreement.

5.9 **Secured Super-Priority Obligations.**

(a) On and after the Interim Order Entry Date, the provisions of the Loan Documents and the Interim Order are effective to create in favor of Lender, legal, valid and perfected liens on and security interests (having the priority provided for herein and in the Interim Order) in all right, title and interest in the Collateral, enforceable against Debtors and all other Obligors.

(b) Pursuant to subsections 364(c)(2), (c)(3), and 364(d) of the Bankruptcy Code and the Interim Order, the Obligations are secured by (i) first priority liens on and first priority senior security interests in favor of Lender in all now owned and hereafter acquired Collateral of each Debtor that are not encumbered by any Liens; (ii) except to the extent that any Collateral of any Debtor is encumbered by Permitted Liens, first priority liens on and first priority senior security interests in favor Lender in all of such Collateral; and (iii) priming first priority liens on and first priming priority security interests in favor of Lender in all Collateral of Debtors that are subject to any Liens securing debt for Money Borrowed, subject only to Permitted Liens, with all such liens and claims to be cross-defaulted and cross-collateralized, *provided*, that the claims and priority liens and security interests described in this clause (b) shall be subject to the Carve-Out;

(c) Pursuant to section 364(c)(1) of the Bankruptcy Code and the Interim Order, all Obligations of each Debtor under the Loan Documents at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Case having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code subject only to the Carve-Out.

(d) The Interim Order has been entered and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended, rescinded or stayed without the prior, written consent of Lender.

(e) Upon making any Advance after the Initial Advance, the Final Order will have been entered and the transactions contemplated hereby and thereby, will be in full force and effect, no appeal will have been taken therefrom, and the time for appeal will have expired (unless the title company issuing the title insurance policies insuring Lender's Liens under the Mortgages has endorsed such policies to remove appeal of the Final Order as an exception to coverage). The Final Order will not have been appealed, vacated, reversed, modified, amended, rescinded or stayed without the prior, written consent of Lender.

SWM006007

AA00696

(f)     Upon the Maturity Date, Lender will be entitled to immediate payment in full of the Obligations without further application to or order by the Bankruptcy Court.

5.10    **No Brokers.**  Other than Ken Montgomery of Belmont Capital Partners, LLC, no broker has been used by Debtors in connection with the transactions described in this Agreement, and Debtors have paid or upon the funding of the Initial Advance will have paid, all commissions payable to brokers in connection with the transactions contemplated by this Agreement. Debtors acknowledge and agree that all commissions and other amounts payable to any brokers in connection with the transactions contemplated hereby are obligations of Debtors to such Persons and that Lender has no obligation to any of Debtors' brokers.

5.11    **CDD Debt Service and Outstanding Assessments.**  As of December 31, 2009, (i) for CDD #1, the aggregate past due assessments with respect to debt service were $3,858,191.26, and the aggregate assessments were $36,671,476.99 and (ii) for CDD #2, the aggregate past due assessments with respect to debt service were $3,470,653.89, and the aggregate assessments were $72,887,413.41.

5.12    **Land Platted.**  The land securing the repayment of the CDD #2 2003A Series, 2003B Series, and 2004 Series bonds has been platted and is subject to final platting.

5.13    **Equity Interests.**

(a)     All Equity Interests pledged under this Agreement (i) are genuine, validly issued and outstanding, fully paid and nonassessable, and are not issued in violation of the preemptive rights of any person or of any agreement by which the Issuer thereof or any Debtor is bound; (ii) are not subject to any interest, option, or right of any third Person; and (iii) are in compliance with applicable law concerning form, content, and manner of preparation and execution, as applicable.  Each Debtor pledging Equity Interests acquired and holds such Equity Interests in compliance with all applicable laws and regulations.

(b)     Schedule 5.13 attached hereto and made a part hereof sets forth the capitalization and ownership of each Debtor.

(c)     The Equity Interests of any Debtor that is a limited partnership or limited liability company are uncertificated, and the Issuer thereof has not elected to have such Equity Interests treated as a "security" under Article 8 of the Code.  Each Debtor covenants and agrees with Lender that such Debtor will not agree to an election to have any of such Equity Interests treated as a "security" under Article 8 of the Code.

5.14    **Declarants under CCRs.**  There are no declarants under any covenants, conditions, and restrictions affecting any of the Real Property other than the Declarants.

# 6. AFFIRMATIVE COVENANTS.

Each Debtor covenants and agrees that, so long as any credit hereunder shall be available and until payment in full of the Obligations, and unless Lender shall otherwise consent in writing, each Debtor shall do all of the following:

SWM006008

AA00697

6.1   **Reporting Requirements.**

(a)   Financial Reports. Each Borrower shall provide to Lender, within 30 days after the end of each month an unaudited consolidated and consolidating balance sheet, income statement, and cash flow statement covering such Borrower and its Subsidiaries' operations during such period and year-to-date, together with a comparison of actual results to the amounts shown in the 18 Month Budget and in the most recent 13 Week Budget.

Each Debtor agrees promptly to provide Lender with all financial reports requested by Lender from time to time.

(b)   Third Party Reports. Each Debtor shall promptly provide Lender copies of all reports such Debtor delivers to any third party, including, without limitation, reports delivered to any creditor, creditor committee, the US Trustee, or any other governmental authority.

(c)   Weekly Sales Report. Debtors shall provide to Lender, on or before the close of business of each Wednesday for the week immediately preceding, weekly sales reports, which shall include, without limitation,

(i)   a listing of closed sales by unit or property description with the name of the buyer, the sales price therefor, the cost of the sale (including any sales commissions and CDD buys downs), Net Proceeds, and any discounts or concessions outside the ordinary course of Debtors' business;

(ii)   listings of assets under contract, including, without limitation, sale price, release price, expected closing date, and the amount of the down payment,

(iii)   a sales pipeline report, which shall include residential units, bulk units, bulk lots, home sites, hotel condo, land or any other material asset of any Debtor, and

(iv)   a reporting of marketing activities.

(d)   Litigation and Liens. Debtors shall provide to Lender, within 10 days after the end of each month, a report as of the end of such month, detailing the status of all property Liens with respect to any of the Collateral and all litigation against any Debtor.

(e)   Project Report. Debtors shall provide to Lender, within 10 days after the end of each month, a report as of the end of such month, which shall include (i) a narrative description of the status of sales of units in the Project, development of the Project, the status of home owners associations, any developments with respect to either CDD, and any other information necessary to keep Lender informed of the status of the Project; (ii) an updated club membership roll, including, without limitation, additions, submitted resignations, removals, and delinquencies, (iii) the status of CDD projects and cash balances; and (iv) all permitting and zoning activity.

SWM006009

AA00698

(f)     <u>Appraisals</u>. Each Debtor agrees to deliver to Lender any appraisals of any of the Real Property or other Collateral obtained by such Debtor.

(g)     <u>Notices</u>. Each Debtor agrees to provide Lender with at least (i) two (2) Business Days' prior notice of any filings such Debtor plans to make in the Bankruptcy Case, *provided,* that Debtors shall provide as much notice as is reasonably possible for emergency motions, and (ii) five (5) Business Days' prior notice of any hearing with the Bankruptcy Court regarding the Loan, this Agreement, or the transactions described herein.

Debtors agree to provide to Lender prompt notice of any Default or Event of Default, or event that would constitute a default or event of default by any Debtor under any Material Contract (other than this Agreement) to which such Debtor is a party.

(h)     <u>Updated Budgets</u>. No later than 15 days prior to each calendar quarter-end, Debtors shall deliver to Lender an updated 13 Week Budget for the next calendar quarter.

6.2    **Title to Equipment.**  Upon Lender's reasonable request, Debtors immediately shall deliver to Lender any and all evidences of ownership of, certificates of title, or applications for title to any items of equipment, together with all documents necessary to note Lender's Lien on any certificates of title or evidence that Debtors have taking all action necessary to note Lender's Lien thereon.

6.3    **Maintenance of Equipment.**  Each Debtor shall keep and maintain its equipment in good operating condition and repair (ordinary wear and tear excepted), and make all necessary replacements thereto so that the value and operating efficiency thereof shall at all times be maintained and preserved. No Debtor shall permit any item of equipment to become a fixture to real estate or an accession to other property, and the equipment is now and shall at all times remain personal property.

6.4    **Maintenance of the Project-Related Clubs.**  Subject to the limitations of the 18 Month Budget and unless otherwise prohibited by the Bankruptcy Code, Debtors will perform all obligations and responsibilities required of Debtors in connection with their participation in, management of, and oversight of the Fiddlers Creek Foundation, the Tarpon Club, and Fiddler's Creek Golf Club to ensure continued operations thereof and to provide services to the members thereof.

6.5    **Taxes.**  Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code, and to the extent provided for in the 18 Month Budget, all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against any Debtor or any of its property have been paid, and shall hereafter be paid in full, before delinquency or before the expiration of any extension period, *provided, however,* that no Debtor shall be required to pay or discharge any such assessment or tax that is being contested in good faith and by proper proceedings and as to which appropriate reserves are being maintained. Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code, Debtors shall make due and timely payment or deposit of all federal, state, and

SWM006010

AA00699

local taxes, assessments, or contributions required of it by law, and will execute and deliver to Lender, on demand, appropriate certificates attesting to the payment thereof or deposit with respect thereto. To the extent permitted or required under the Bankruptcy Code, each Debtor will make timely payment or deposit of all tax payments and withholding taxes required of it by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Lender with proof satisfactory to Lender indicating that Debtors have made such payments or deposits.

      6.6    **CDD Maintenance.** Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code and to the extent provided for in the 18 Month Budget, all current maintenance assessments and obligations payable to either CDD shall be paid.

      6.7    **Insurance.** Subject to the limitations in the 18 Month Budget, Debtors, at their expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks, and in amounts satisfactory to Lender in its sole discretion. Each Debtor also shall maintain business interruption with respect to its operations and its chief executive office and public liability and property damage insurance relating to each Debtor's ownership and use of the Collateral, as well as insurance against larceny, embezzlement, and criminal misappropriation, all in amounts satisfactory to Lender in its sole discretion.

      (b)    All such policies of insurance shall be in such form, with such companies, and in such amounts as may be reasonably satisfactory to Lender. Debtors shall deliver to Lender certified copies of such policies of insurance and evidence of the payment of all premiums therefor. All proceeds payable under any such policy shall be payable to Lender to be applied on account of the Obligations. Debtors shall deliver to Lender (i) an endorsement to its commercial general liability insurance showing Lender as "additional insured" and (ii) "mortgagee" and "lender's loss payable" endorsements to its property insurance. Debtors agree that providing ACORD 25 certificates and merely naming Lender as "loss payee" are not sufficient to satisfy the requirements of this Section.

      6.8    **No Setoffs or Counterclaims.** All payments hereunder and under the other Loan Documents made by or on behalf of each Debtor shall be made without setoff or counterclaim and free and clear of, and without deduction or withholding for or on account of, any federal, state, or local taxes.

      6.9    **Compliance with Laws.** Each Debtor shall comply with the requirements of all applicable laws, rules, regulations, and orders of any governmental authority, including the Fair Labor Standards Act and the Americans With Disabilities Act, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, would not and could not reasonably be expected to result in a Material Adverse Change.

      6.10   **Compliance with Material Contracts.** Unless prohibited by the Bankruptcy Court and to the extent provided for in the 18 Month Budget, each Debtor shall comply with all requirements of each Material Contract to which it is a party.

SWM006011

AA00700

6.11 **Leases.** Except as otherwise provided by a confirmed plan of reorganization, and to the extent permitted or required under the Bankruptcy Code and to the extent provided for in the 18 Month Budget, each Debtor shall promptly pay when due all rents and other amounts payable under any leases to which such Debtor is a party. To the extent that any Debtor fails timely to make payment of such rents and other amounts payable when due under its leases, Lender shall be entitled, in its discretion, and without the necessity of declaring an Event of Default, to reserve an amount equal to such unpaid amounts from the loan availability created under Section 2.1 hereof.

6.12 **Use of Proceeds.** Debtors shall use the proceeds of each Advance for payment of the items set forth in the 18 Month Approved Budget and for no other purpose, unless approved by Lender.

6.13 **Agricultural Exemption.** Debtors shall maintain all agricultural exemptions on the Project that are in effect on the date of this Agreement.

## 7. NEGATIVE COVENANTS.

Each Debtor covenants and agrees that, so long as any credit hereunder shall be available and until payment in full of the Obligations, no Debtor shall or shall permit any Subsidiary to, without the prior, written consent of Lender:

7.1 **Liens.** Create, incur, assume or suffer to exist, any Lien or claim on or with respect to any of its properties of any character (including, without limitation, accounts) whether now owned or hereafter acquired, or assign any accounts or other right to receive income (or apply to the Bankruptcy Court for authority to do so, except in connection with an Acceptable Plan) on a *pari passu* or senior in priority to any Lien or claim granted to Lender, except for Permitted Liens.

7.2 **Debt.** Create, incur, assume or suffer to exist any debt (or apply to the Bankruptcy Court for authority to do so, except in connection with an Acceptable Plan) other than debt under the Loan Documents, debt existing as of the Filing Date, and debt incurred in the ordinary course of each Debtor's business, including, without limitation, trade indebtedness.

7.3 **Sales of Assets.** Sell, lease, transfer or otherwise dispose of any of its assets, including, without limitation, any sale-leaseback arrangement, or apply to the Bankruptcy Court for authority to do so except that (a) the properties described on Schedule 7.3 attached hereto and made a part hereof may be sold if (i) such property sells for at least the minimum gross sales price set forth on such schedule and (ii) Lender receives at least the minimum release price set forth on such schedule and (b) Debtors may sell other assets with the prior, written consent of Lender, which consent will not be unreasonably withheld. As an example, it is agreed that if Lender believes that such sale or the proposed price for such assets could adversely affect the market value of other Collateral, a refusal to consent will be considered reasonable. Net Proceeds of all sales or other dispositions of assets of any Debtor shall be deposited in the Lender's Account to be applied to the Obligations.

7.4 **Contracts and Leases.** Assume, reject, assign, or amend or file a motion to assume, reject, assign, or amend any contract or lease to which any Debtor is a party.

SWM006012

AA00701

7.5 **Orders.** Make or permit to be made any changes, amendments or modifications, or any application or motion for any change, amendment or modification, to either of the Orders.

7.6 **Budget.** Except as otherwise agreed by the parties in writing, incur cash expenses which in the aggregate are greater than ten percent (10%) above that for which provision is made in the 18 Month Budget either in any 13 week period or from the commencement of the 18 Month Budget to the date of determination, or in any budget approved by Lender with respect to any extension of the Maturity Date.

7.7 **Payment of Managed Expenses.** Pay any Managed Expenses until due and payable and will not:

(a) Pay any Managed Expenses which become due and payable prior to October 1, 2010, unless and until Debtors shall have closed sales of inventory, after the Petition Date, totaling at least $12,000,000;

(b) Pay any Managed Expenses which become due and payable on or after October 1, 2010, but prior to March 1, 2011, unless and until Debtors shall have closed sales of inventory, after the Petition Date, totaling at least $15,000,000;

(c) Pay any Managed Expenses which become due and payable on or after March 1, 2011, but prior to June 1, 2011, unless and until Debtors shall have closed sales of inventory, after the Petition Date, totaling at least $20,000,000; nor

(d) Pay any Managed Expenses which become due and payable on or after June 1, 2011, unless and until Debtors shall have closed sales of inventory, after the Petition Date, totaling at least $30,000,000.

7.8 **Mergers, etc.** Become a party to a merger or consolidation, or purchase or otherwise acquire all or any part of the assets of any Person or any shares or other evidence of beneficial ownership of any Person, or wind-up, dissolve, or liquidate.

7.9 **Restricted Payments.** Declare or pay any dividends or make any other payment or distribution (in cash, property, or obligations) on account of its equity interests, or redeem, purchase, retire, call, or otherwise acquire any of its equity interests, or permit any of its Subsidiaries to purchase or otherwise acquire any equity interest of any Debtor or any Subsidiary, or set apart any money for a sinking or other analogous fund for any dividend or other distribution on its equity interests or for any redemption, purchase, retirement, or other acquisition of any of its equity interests.

7.10 **Subordinated Debt Payments.** Make any payment or distribution that is prohibited pursuant to the terms of any subordination or intercreditor agreement between Lender and any creditor.

7.11 **Transactions With Affiliates.** Enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service, with any Affiliate of any Debtor or any Affiliate of any Subsidiary, except for transactions

SWM006013

AA00702

entered into with Gulf Bay Construction Company regarding warranty work and maintaining standing inventory and for transactions entered into with Fiddler's Creek Realty, Inc, in connection with brokerage services, *provided*, that such transactions are no less favorable to such Debtor than would be obtained in an arm's length transaction with a non-Affiliate.

7.12    **Issuance of Equity.**  At any time issue, sell, assign, or otherwise dispose of (a) any of its equity interests, (b) any securities exchangeable for or convertible into or carrying any rights to acquire any of its equity interests, or (c) any option, warrant, or other right to acquire any of its equity interests except for approved transfers between Obligors or to the extent included in Debtors' Approved Plan.

7.13    **Amendments of Organizational Documents.**  Permit any amendment to the articles of incorporation, limited liability company agreement, or partnership agreement, as appropriate, of any Issuer to create any new class of shares, membership units, or partnership interests, change the designation of any class of shares, membership units, or partnership interests, or impair the position of Lender, without the prior, written consent of Lender.

7.14    **Minimum Net Cumulative Sales.**    Fail to achieve cumulative Net Proceeds from sales set forth below, as of the dates set forth:

| Date | Minimum Cumulative Net Proceeds |
|---|---|
| June 30, 2010 | $5,000,000 |
| September 30, 2010 | 8,000,000 |
| December 31, 2010 | 12,000,000 |
| March 31, 2011 | 20,000,000 |
| June 30, 2011 | 30,000,000 |

7.15    **Capital Expenditures.**  Except as approved in the 18 Month Budget, directly or indirectly make or incur any Capital Expenditures.

7.16    **Debt Payments Prohibited.**  Make any payment of principal or interest on any indebtedness owed to any existing secured creditor without the express, prior, written consent of Lender unless such payment is expressly identified in the 18 Month Budget.

7.17    **Impairment of Lender's Debt or Liens.**  Without the prior, express, written approval of and Lender, (i) file with the Bankruptcy Court any pleading or request to (a) limit, alter, modify, or terminate any provision of the Loan or any protection granted to Lender hereunder or under any other Loan Document, or (b) extinguish, subordinate or diminish any security interest, lien or claim of Lender, or (ii) seek, consent to, or join in the approval of any matter or any plan of reorganization which purports to do any of the things described in clauses (i)(a) or (i)(b) of this Section 7.17.

## 8.   CONSENTS AND WAIVERS OF GUARANTORS.

(a)    Each Guarantor (whether as a guarantor or as a pledgor of assets) hereby authorizes Lender, without notice or demand and without affecting its liability hereunder, from time to time to (i) renew, compromise, forbear, extend, accelerate, or otherwise change the time for payment or the terms of any of the Obligations, or any part thereof, including, without

SWM006014

AA00703

limitation, increasing or decreasing the rate of interest thereof or the amount of indebtedness thereunder; (ii) take and hold security, guaranties, or other assurances of payment for the payment of the Obligations, and exchange, enforce, waive, and release any such security; (iii) apply such security and direct the order or manner of sale thereof as Lender in its discretion may determine; (iv) release or substitute any one or more endorsers or guarantors of all or any part of the Obligations; and (v) assign, without notice, this Agreement in whole or in part and Lender's rights hereunder to anyone at any time.

Each Guarantor agrees that Lender may do any or all of the foregoing in such manner, upon such terms, and at such times as Lender, in its discretion, deems advisable, without, in any way or respect, impairing, effecting, reducing or releasing such Guarantor from its undertakings hereunder, and each Guarantor hereby consents to each and all of the foregoing acts, events and occurrences.

(b)     It shall not be necessary for Lender (and each Guarantor hereby waives any rights which such Guarantor may have to require Lender), in order to enforce payment by any Guarantor, first to (i) institute suit or exhaust its remedies against either Borrower or any other Obligor or any other Person, (ii) enforce Lender's rights against any security which shall ever have been given to secure the Obligations, (iii) enforce Lender's rights against any guarantors of the Obligations, (iv) join either Borrower or any other Obligor in any action seeking to enforce this Agreement or any other Loan Document, (v) exhaust any remedies available to Lender against any security which shall ever have been given to secure the Obligations, except as expressly provided in this Agreement, or (vi) resort to any other means of obtaining payment of the Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Obligations.

(c)     Each Guarantor agrees to the provisions of this Agreement, and hereby waives notice of (i) any loans or advances made by Lender to either Borrower, (ii) acceptance of this Agreement, (iii) any amendment or extension of the Loan Agreement or of any other Obligations, (iv) the execution and delivery by either Borrower and Lender of any other loan or credit agreement or of either Borrower's execution and delivery of any promissory notes or other documents in connection therewith, (v) the occurrence of any breach by any Borrower or any other Obligor or Event of Default, (vi) Lender's transfer or disposition of the Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any Collateral, except to the extent such notice cannot be waived, (viii) protest, proof of non-payment or default by either Borrower or any other Obligor, or (ix) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Agreement or any other Loan Document, except for notices that Lender is expressly required under this Agreement to give to such Guarantor.

(d)     Each Guarantor hereby consents and agrees to each of the following, and agrees that such Guarantor's obligations under this Agreement or any other Loan Document shall not be released, diminished, impaired, reduced, or adversely affected by any of the following, and waives any common law, equitable, statutory, or other rights (including without limitation rights to notice) which such Guarantor might otherwise have as a result of or in connection with any of the following:

SWM006015

AA00704

(i)     the invalidity, illegality, or unenforceability of all or any part of the Obligations, or any document, or agreement executed in connection with the Obligations, for any reason whatsoever, including without limitation the fact that (A) the Obligations, or any part thereof, exceeds the amount permitted by law, (B) the act of creating the Obligations or any part thereof is *ultra vires*, (C) the officers or representatives executing the Agreement or other documents or otherwise creating the Obligations acted in excess of their authority, (D) the Obligations violate applicable usury laws, (E) any Borrower or any other Obligor has valid defenses, claims, or offsets (whether at law, in equity or by agreement) which render the Obligations wholly or partially uncollectible from such Borrower or such Obligor, (F) the creation, performance or repayment of the Obligations (or the execution, delivery, and performance of any document or instrument representing part of the Obligations or executed in connection with the Obligations, or given to secure the repayment of the Obligations) is illegal, uncollectible, or unenforceable, or (G) any of the Loan Documents have been forged or otherwise are irregular or not genuine or authentic;

(ii)     any release, surrender, exchange, subordination, deterioration, waste, loss, or impairment (including without limitation negligent, willful, unreasonable, or unjustifiable impairment) of any collateral, property, or security, at any time existing in connection with, or assuring or securing payment of, all or any part of the Obligations;

(iii)     the failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of the Collateral;

(iv)     the fact that any collateral, security, security interest, or lien contemplated or intended to be given, created, or granted as security for the repayment of the Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by such Guarantor that such Guarantor is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility, or value of any of the collateral for the Obligations;

(v)     the insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, or lack of power of any Borrower or any other Obligor, (ii) any dissolution of any Borrower or any other Obligor, or any sale, lease or transfer of any or all of the assets of any Borrower or such Guarantor, or any change in the shareholders, partners, or members of any Borrower, or (iii) any reorganization, merger, or consolidation of any Borrower into or with any other corporation or entity;

(vi)     any payment by any Borrower or any other Obligor to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to any Borrower or any other Person; or

(vii)     any other action taken or omitted to be taken with respect to this Agreement, any other Loan Document, the Obligations, or any of the Collateral, whether or not such action or omission prejudices such Guarantor.

SWM006016

AA00705

(e) Each Guarantor hereby waives any right to assert against Lender as a defense, counterclaim, set-off, or cross-claim, any defense (legal or equitable), set-off, counterclaim, or cross-claim which such Guarantor may now or any time hereafter have against any Borrower or any other Obligor. Each Guarantor hereby waives all defenses, counterclaims, and off-sets of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of this Agreement or any Loan Document or any security interest granted under this Agreement or any Loan Document.

(f) Each Guarantor hereby waives any defense arising by reason of any claim or defense based upon an election of remedies by Lender, which, in any manner impairs, affects, reduces, releases, destroys, or extinguishes such Guarantor's subrogation rights, rights to proceed against any Borrower or any other Obligor for reimbursement, or any other rights of such Guarantor to proceed against any Borrower or any other Obligor or against any other rights of such Guarantor or against any other Person or collateral. Each Guarantor waives all presentments, demands for performance, notices of non-performance, protests, notices of protests, notices of dishonor, notices of default, notice of acceptance of this Agreement, and notices of the existence, creating or incurring of new or additional indebtedness, and all other notices or formalities to which such Guarantor may be entitled.

(g) As a condition to payment or performance by any Guarantor under this Agreement, Lender shall not be required to, and each Guarantor hereby waives any and all rights to require Lender to prosecute or seek to enforce any remedies against any Borrower or any other Obligor or to require Lender to seek to enforce or resort to any remedies with respect to any security interests, liens, or encumbrances granted to Lender by any Borrower or any other Obligor.

(h) Insofar as Guarantors and Borrowers are concerned, any payment hereunder by any Guarantor shall be deemed a contribution to the capital of Borrowers, and each Guarantor shall have no right of subrogation with respect hereto. Each Guarantor hereby waives any rights to enforce any rights of subrogation, contribution, reimbursement, indemnification, exoneration, and any other remedy which such Guarantor may have against any Borrower or any other Person with respect to this Agreement, the Obligations, or applicable law. Each Guarantor hereby irrevocably agrees, to the fullest extent permitted by law, that it will not exercise (and herein waives) any rights against any Borrower or any other Person which it may acquire by way of subrogation, contribution, reimbursement, indemnification, or exoneration under or with respect to this Agreement, the Obligations, or applicable law, by any payment made hereunder or otherwise. If the foregoing waivers are adjudicated unenforceable by a court of competent jurisdiction, then each Guarantor agrees that no liability or obligation of any Borrower or any other Obligor that shall accrue by virtue of any right to subrogation, contribution, indemnity, reimbursement, or exoneration shall be paid, nor shall any such liability or obligation be deemed owed, until all of the Obligations shall have been paid in full and all commitments and other agreements of Lender to make loans to either Borrower shall have terminated.

## 9. EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an event of default (each, an "*Event of Default*") under this Agreement:

SWM006017

AA00706

9.1     If any Debtor fails to pay when due and payable (on the Maturity Date or otherwise) or when declared due and payable, any portion of the Obligations (whether of principal, interest (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on the Obligations), fees and charges due Lender, reimbursement of Lender Expenses, or other amounts constituting Obligations), and such failure shall remain unremedied for 2 days after the date on which written notice thereof shall have been given to Borrowers by Lender;

9.2     If any Obligor shall fail to perform or observe any term, covenant or agreement (i) contained in this Agreement (other than a failure described in Section 9.1) or (ii) contained in any Loan Document, if such failure shall remain unremedied for 10 days after ~~the earlier of the date on which (A) an Authorized Officer becomes aware of such failure or (B)~~ written notice thereof shall have been given to such Obligor by Lender;

9.3     If either (i) a Material Adverse Change occurs or (ii) Lender determines in its reasonable discretion that ~~there is~~ a material impairment ~~of the prospect of repayment of any portion of the Obligations owing to Lender or a material impairment of the value of the Collateral or~~ in the priority of Lender's security interests in or Liens on the Collateral has occurred and, in either case, the condition or conditions creating such Material Adverse Change or impairment have not been remedied to Lender's satisfaction within 20 days after the date on which written notice thereof shall have been give to Borrowers by Lender;

9.4     If any material portion of any Obligor's properties or assets is attached, foreclosed upon, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person or if the automatic stay or other applicable stay is lifted in favor of any third Person, and such attachment, seizure, writ, lifting of stay, warrant, or levy is not released, discharged, or bonded against within ~~fifteen~~20 days of the date it first arises;

9.5     If a trustee (or examiner with expanded powers) is appointed in any Debtor's Chapter 11 case, if any Debtor's Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, or if any Debtor's Chapter 11 Case is dismissed;

9.6     If a plan of reorganization of any Debtor, other than an Acceptable Plan, is confirmed by the Bankruptcy Court;

9.7     If any Debtor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs that Lender determines could threaten such Debtor's ability to operate in accordance with or execute the Business Plan;

9.8     If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such ~~Person~~Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or lifting of stay could threaten such Debtor's ability to operate in accordance with or execute the Business Plan;

9.9     If the entry of the Final Order shall not have occurred within forty-five (45) days after entry of the Interim Order;

SWM006018

AA00707

9.10   If any material misstatement or misrepresentation exists now or hereafter in any warranty, representation, statement, or report made to Lender by any Obligor, or any officer, employee, agent, or director of any Obligor, or if any such material warranty or representation is withdrawn by an Obligor;

9.11   If the Interim Order or the Final Order ceases to remain in full and effect, except for such modifications thereto acceptable to Lender; or

9.12   If any Debtor shall fail to perform or observe any material term, covenant or agreement contained in the Orders and any applicable grace period with respect to such breach shall have expired.

## 10. LENDER'S RIGHTS AND REMEDIES.

10.1   **Rights and Remedies.**  Upon the occurrence, and during the continuation, of an Event of Default, Lender (at its election but, except as explicitly provided, without notice of its election and without demand) may do any one or more of the following, all of which are authorized by Debtors:

(a)   Declare all Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable, thereby accelerating the Maturity Date;

(b)   Cease advancing money or extending credit to or for the benefit of either Borrower under this Agreement, under any of the Loan Documents, or under any other agreement between any Debtor and Lender;

(c)   Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of Lender, but without affecting Lender's rights and security interests in the Collateral and without affecting the Obligations;

(d)   Settle or adjust disputes and claims directly with account debtors for amounts and upon terms which Lender considers advisable, and in such cases, Lender will credit Borrowers' loan account with only the net amounts received by Lender in payment of such disputed Accounts after deducting all Lender Expenses incurred or expended in connection therewith;

(e)   Without notice to or demand upon any Debtor, make such payments and do such acts as Lender considers necessary or reasonable to protect its security interests in the Collateral. Borrowers agree to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate. Debtors authorize Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or Lien that in Lender's determination appears to be prior or superior to its security interests and to pay all expenses incurred in connection therewith. Debtor further agrees to cooperate fully with Lender to permit Lender to sell at foreclosure or other private sale any Collateral consisting of Equity Interests, including, without limitation, fully complying with all

SWM006019

AA00708

federal and state securities laws applicable to any such sale  After the occurrence and during the continuance of an Event of Default, with respect to any of any Debtor's owned or leased premises, each Debtor hereby grants Lender a license to enter into possession of such premises and to occupy the same, without charge, for up to one hundred twenty (120) days in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

      (f)     Without notice to any Debtor (such notice being expressly waived), and without constituting a retention of any collateral in satisfaction of an obligation (within the meaning of the Code), set off and apply to the Obligations any and all (i) balances and deposits of each Debtor held by Lender, or (ii) indebtedness at any time owing to or for the credit or the account of each Debtor held by Lender;

      (g)     Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral.  Lender is hereby granted a license or other right to use, without charge, each Debtor's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and each Debtor's rights under all channel leases or subleases, all licenses and all franchise agreements shall inure to Lender's benefit;

      (h)     Apply to the Bankruptcy Court upon proper notice to Debtors, Debtors' counsel, counsel for the official creditors committee in such case, and the United States Trustee for the District of Florida and any other parties entitled to special notice under the Local Rules for the United States Bankruptcy Court for the District of Florida, for one or more of the following forms of relief:  (i) appointment of an examiner for Debtors; (ii) appointment of a Chapter 11 trustee for Debtors; (iii) conversion of each Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or (iv) dismissal of each Debtor's Chapter 11 Case.  Nothing in this paragraph shall limit the right of Lender to apply to the Bankruptcy Court for such other or further relief as may be justified and appropriate, and nothing in this paragraph shall limit the other rights and remedies of Lender provided for elsewhere in this Agreement or in any other Loan Document;

      (i)     Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Debtor's premises) as Lender determines is commercially reasonable.  It is not necessary that the Collateral be present at any such sale;

      (j)     Exercise its rights as a mortgagee under each Mortgage, including, without limitation, bringing suit for foreclosure, subject to the provisions of Section 10.4 hereof;

      (k)     Lender shall give notice of the disposition of Debtor Collateral as follows:

      (1)     Lender shall give Debtors and each holder of a security interest in the Debtor Collateral who has filed with Lender a written request for notice, a notice in writing of the time and place of public sale, or, if the sale is a private sale or some other

SWM006020

AA00709

disposition other than a public sale is to be made of the Debtor Collateral, then the time on or after which the private sale or other disposition is to be made;

        (2)    The notice shall be personally delivered or mailed, postage prepaid, to Debtors as provided in <u>Section 13</u>, at least ten (10) days before the date fixed for the sale, or at least ten (10) days before the date on or after which the private sale or other disposition is to be made; no notice needs to be given prior to the disposition of any portion of the Debtor Collateral that is perishable or threatens to decline speedily in value or that is of a type customarily sold on a recognized market. Notice to Persons other than Debtors claiming an interest in the Debtor Collateral shall be sent to such addresses as they have furnished to Lender;

        (3)    If the sale is to be a public sale, Lender also shall give notice of the time and place by publishing a notice one time at least ten (10) days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

        (l)    Lender may credit bid and purchase at any public or private sale;

        (m)    Any deficiency that exists after disposition of the Debtor Collateral as provided above will be paid, jointly and severally, immediately by Debtors. Any excess will be returned, without interest and subject to the rights of third Persons, by Lender to Debtors; and

        (n)    In addition to the foregoing rights in this <u>Section 10.1</u>, Lender shall have all other rights and remedies available to it at law or in equity pursuant to any other Loan Documents, including any lease assignments, lease mortgages, and real property mortgages or deeds of trust.

    10.2   **Remedies Cumulative.**   Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Orders, the Bankruptcy Code, the Code, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Default or Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

    10.3   **Equity Interests.**

        (a)    The 1933 Act and other laws or regulations may impose legal restrictions or limitations on the ability of Lender to dispose of certain of the Collateral in the enforcement of its rights and remedies hereunder. Lender is hereby authorized by each Debtor, but not obligated, in the event of the occurrence and during the continuation of an Event of Default, to sell all or any part of the Equity Interests at private sale, subject to investment letter or in any other manner which will not require such Collateral, or any part thereof, to be registered in accordance with the 1933 Act or the rules and regulations promulgated thereunder, or any other law or regulations. Lender is also hereby authorized by each Debtor, but not obligated, to take such actions, give such notices, obtain such rulings and consents, and do such other things as Lender may deem appropriate in the event of a sale or disposition of any of the Equity Interests. Each Debtor understands that Lender may in its discretion approach a restricted number of potential purchasers and that a sale under such circumstances may yield a lower price for such

SWM006021

AA00710

Collateral or any part or parts thereof than would otherwise be obtainable if such Collateral were registered and sold in the open market, and each Debtor agrees that such private sales shall constitute a commercially reasonable method of disposing of such Collateral.

(b)     Lender shall have the right at any time and from time to time after the occurrence and during the continuance of an Event of Default to notify and direct any Issuer to make all payments, dividends, and distributions regarding the Collateral directly to Lender. Lender shall have the authority to demand of the issuer or obligor, and to receive and receipt for, any and all payments, dividends and other distributions payable in respect thereof, regardless of the medium in which paid and whether they are ordinary or extraordinary. Each Issuer making payment to Lender hereunder shall be fully protected in relying on the written statement of Lender that it then holds a security interest which entitles it to receive such payment, and the receipt by Lender for such payment shall be full acquittance therefore to the one making such payment.

(c)     Except as expressly provided in clause (i) of <u>Section 10.4(a)</u> hereof, upon the occurrence and during the continuation of an Event of Default, Lender shall have the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Equity Interests, and/or to exercise any or all voting, consent, or management rights as to any or all of the Equity Interests. For such purposes, each Debtor hereby names, constitutes and appoints the President, the Chief Operating Officer, and all Vice Presidents of Lender as such Debtor's proxy in such Debtor's name, place, and stead to vote any and all of the securities and to execute consents, as such proxy may elect, for and in the name, place, and stead of such Debtor, as to all matters coming before shareholders, such proxy to be irrevocable and deemed coupled with an interest. The rights, powers, and authority of such proxy shall remain in full force and effect, and shall not be rescinded, revoked, terminated, amended, or otherwise modified, until all Obligations have been fully satisfied and any agreement to make Advances has terminated.

### 10.4     **Exercise of Certain Remedies.**

————(a)——Notwithstanding anything to the contrary set forth herein or in any other Loan Document, Borrowers and Guarantors have requested, and Lender hereby agrees, that (i) Lender shall not foreclose its Liens encumbering any Equity Interest prior to January 1, 2011, if the only Event of Default then continuing is Debtors' breach of <u>Section 7.14</u> hereof and (ii) except as provided in clause (i) of this subsection, while Lender may exercise its rights and remedies with respect to any Collateral at any time after the occurrence and during the continuance of an Event of Default (including, without limitation, any Collateral consisting of declarant's rights under the Master Declaration or any other Declaration), with respect to the Collateral described on <u>Exhibit E</u> attached hereto, Lender shall use commercially reasonable efforts to exercise its rights with respect to such Collateraleffect a foreclosure sale of such assets in the order in which such Collateral is listed thereon.————————(b)——Debtors agree that, upon the occurrence and during the continuance of an Event of Default, Lender may, with no further action on the part of or consent from any Obligor, notify the escrow agent under the Escrow Agreement to release to Lender the deeds in lieu of foreclosure and the consent judgments held by such escrow agent, and that Lender may record such deeds in lieu of foreclosure in the real property records of Collier County, Florida, and file such consent

SWM006022

AA00711

judgments in any court in the state of Florida listed on Exhibit E and shall use commercially reasonable efforts not to effect such a foreclosure sale of any asset listed thereon until Lender's Lien on the asset listed prior to such asset has been foreclosed, *provided,* that Lender shall not be prevented from commencing foreclosure proceedings against any asset listed on Exhibit E prior to the foreclosure sale of an asset listed prior thereto. As an example, Lender may file a foreclosure suit against all of the Real Property but would use commercially reasonable efforts to have foreclosure sales thereon occur in the order of the assets set forth on Exhibit E.

## 11. TAXES AND EXPENSES.

If any Debtor fails to pay any monies (whether taxes, rents, assessments, insurance premiums, or otherwise) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, to the extent that Lender determines that such failure by such Debtor could result in a Material Adverse Change, in its discretion and without prior notice to Debtors, Lender may do any or all of the following: (a) make payment of the same or any part thereof; (b) set up such reserves in Borrowers' loan account as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in <u>Section 6.4</u>, and take any action with respect to such policies as Lender deems prudent. Any such amounts paid by Lender shall constitute Lender Expenses. Any such payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Default or Event of Default under this Agreement. Lender need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 12. WAIVERS; INDEMNIFICATION.

12.1    **Demand; Protest; etc.**  Each Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of acceleration, notice of intent to accelerate, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Debtor may in any way be liable, *provided,* that Lender shall give Borrowers notice of default prior to Lender's exercise of rights and remedies against the Collateral.

12.2    **Lender's Liability for Collateral.**  So long as Lender complies with its obligations, if any, under the Code, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by Debtors.

12.3    **Indemnification.**  Debtors agree, jointly and severally, to defend, indemnify, save, and hold Lender and its agents harmless against: (a) all obligations, demands, claims, and liabilities claimed or asserted by any other Person arising out of or relating to the transactions contemplated by this Agreement or any other Loan Document, including, without

SWM006023

AA00712

limitation, any claims of any loan broker, and (b) all losses (including reasonable attorneys' fees and disbursements) in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to the transactions contemplated by this Agreement or any other Loan Document, except, in any such case, to the extent that the same arises from the gross negligence or willful misconduct of Lender or its officers, agents, or employees. This provision shall survive the termination of this Agreement.

## 13. NOTICES.

Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, overnight mail, telefacsimile, or telegram (with messenger delivery specified) to Debtors or to Lender, as the case may be, at its address set forth below:

| | |
|---|---|
| If to a Debtor | c/o Fiddler's Creek LLC<br>8156 Fiddlers Creek Parkway<br>Naples, Florida 34114<br>Attn:_____<br>Telephone: 239.732.9400<br>Facsimile: 239.732.9402 |
| with copies to: | Genovese, Joblove & Battista<br>Bank of America Tower<br>100 Southeast 2nd Street, 44th Floor<br>Miami, Florida 33131<br>Attn: Paul J. Battista<br>Telephone: 305.372.2457<br>Facsimile: 305.349.2310 |
| | Woodward, Pires and Lombardo, PA<br>3200 Tamiami Trail N.<br>Suite 200<br>Naples, Florida 34103<br>Attn: Mark Woodward<br>Telephone: 239.649.6555<br>Facsimile: 239.649.7342 |
| If to Lender: | PEPI Capital, L.P.<br>2300 West Plano Parkway<br>Plano, Texas 75075<br>Attn: CJ Lorio and David Radunsky<br>Telephone: (972) 535-1900<br>Facsimile: (972) 535-1991<br>cj.lorio@pgrp.net<br>david.radunsky@pgrp.net |
| with copies to: | K&L Gates LLP<br>1717 Main Street, Suite 2800 |

SWM006024

AA00713

Dallas, Texas 75201
Telephone: (214) 939-5567
Facsimile: (214) 939-5849
Attn: Jeffrey R. Fine, Esq.
jeff.fine@klgates.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other. Debtors acknowledge and agree that notices sent by Lender in connection with the exercise of enforcement rights against Debtor Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above. All other notices shall be deemed to have been given when deposited in the mail (whether the US Mail or overnight mail), personally delivered, or transmitted by telefacsimile.

## 14. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

**THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE), IT BEING THE INTENT OF THE PARTIES THAT FEDERAL LAW SHALL GOVERN THE RIGHTS AND DUTIES OF THE PARTIES HERETO WITHOUT REGARD TO THE APPLICATION OF ANY PROVISION OF STATE LAW. TO THE EXTENT THAT FEDERAL LAW WOULD APPLY THE LAW OF ANY STATE AS THE FEDERAL RULE FOR THE PURPOSES OF THIS AGREEMENT, THE PARTIES AGREE THAT THE LAWS OF THE STATE OF FLORIDA SHALL BE USED TO SUPPLEMENT APPLICABLE FEDERAL LAW.**

**THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT OR IN THE STATE OR FEDERAL DISTRICT COURTS IN THE MIDDLE DISTRICT OF FLORIDA. EACH DEBTOR AND LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 14.**

**EACH DEBTOR AND LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH DEBTOR AND LENDER REPRESENT THAT THEY HAVE REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A**

SWM006025

AA00714

**COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT**

**15. GUARANTY.**

      15.1   **Guaranty.**  Each Guarantor hereby absolutely and unconditionally guarantees to Lender the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations (including, without limitation, all interest which would have accrued but for the filing of a petition under the Bankruptcy Code) and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by any of Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, either Borrower, any Guarantor, or any other Obligor of all or any part of the Obligations and incurred in connection with any proceedings involving either Borrower or any Guarantor under the Bankruptcy Code or any other insolvency law (such costs and expenses, together with the Obligations, collectively the "*Guaranteed Obligations*").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  Each Guarantor is jointly and severally liable for the Obligations.

      15.2   **Guaranty of Payment**.  This Guaranty is a guaranty of payment and not of collection.  Each Guarantor waives any right to require Lender to sue either Borrower, any other Guarantor, or any other Obligor for all or any part of the Guaranteed Obligations, or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

      15.3   **No Discharge or Diminishment of Guaranty**.  The provisions of <u>Article 8</u> hereof are incorporated herein by reference.

      15.4   **Reinstatement; Stay of Acceleration.**  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of either Borrower or otherwise, each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not Lender is in possession of this Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of either Borrower or any other Obligor, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by Lender.

      15.5   **Information.**  Each Guarantor assumes all responsibility for being and keeping itself informed of each Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that Lender shall not have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

SWM006026

AA00715

15.6 **Termination.** The guarantee obligation of each Guarantor under this Article 16 shall terminate only at such time as the Guaranteed Obligations have been fully and indefeasibly paid in cash .

15.7 **Setoff.** All payments of the Guaranteed Obligations will be made without setoff, counterclaim, or any other defense.

15.8 **Severability.** The provisions of this Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by Guarantors or Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability"). This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of Lender to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other Person shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

15.9 **Contribution.** In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Pro Rata Share" of such payment or payments made, or losses suffered, by such Paying Guarantor. For purposes of this Article 16, each Non-Paying Guarantor's "Pro Rata Share" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from each Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from each Borrower after the date hereof (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability). Each of the Guarantors covenants and agrees that its right to

SWM006027

AA00716

receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations. This provision is for the benefit of both Lender and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

15.10 **Liability Cumulative.** The liability of each Guarantor under this <u>Article 16</u> is in addition to and shall be cumulative with all liabilities of such Guarantor to Lender under this Agreement and the other Loan Documents to which such Guarantor is a party or in respect of any obligations or liabilities of the other Debtors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## 16. GENERAL PROVISIONS.

16.1 **Effectiveness.** This Agreement shall be binding and deemed effective when executed by each Debtor and accepted and executed by Lender.

16.2 **Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties, *provided, however,* that no Debtor may assign this Agreement or any rights or duties hereunder without Lender's prior, written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Lender shall release any Debtor from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by any Debtor is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate, or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any such assignment or participation, Lender may disclose all documents and information which Lender now or hereafter may have relating to each Debtor and each Debtor's business. To the extent that Lender assigns its rights and obligations hereunder to a third Person, Lender thereafter shall be released from such assigned obligations to Debtors and such assignment shall effect a novation between Debtors and such third Person.

16.3 **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each section applies equally to this entire Agreement.

16.4 **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or any Debtor, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

16.5 **Good Faith.** Each of the parties hereto agrees that it will exercise its rights and remedies hereunder, and perform each of its obligations hereunder, in a commercially reasonable manner and in good faith.

16.6 **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

SWM006028

AA00717

16.7 **Amendments and Waivers.** No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Debtor therefrom, shall be effective unless the same shall be in writing and signed by Lender and such Debtor and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

16.8 **No Waivers; Cumulative Remedies.** No failure by Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by each Debtor of any provision of this Agreement. Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

16.9 **Counterparts; Telefacsimile Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

16.10 **Revival and Reinstatement of Obligations.** If the incurrence or payment of the Obligations by any Debtor or the transfer by either or both of such parties to Lender of any property of either or both of such parties should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, and other voidable or recoverable payments of money or transfers of property (collectively, a "*Voidable Transfer*"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of Debtors or such guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

16.11 **Integration.** THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, SUPERSEDES THE COMMITMENT LETTER, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

[SEPARATE SIGNATURE PAGES FOLLOW.]

SWM006029

AA00718

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in Dallas, Texas.

**BORROWERS:**

FIDDLER'S CREEK LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

GB PENINSULA, LTD., a Florida limited partnership

By:     GB Peninsula Inc., its general partner

By:_____
Name:_____
Title:_____

**GUARANTORS:**

951 LAND HOLDINGS, LTD, a Florida limited partnership

By:     951 Land Holdings, LLC, its general partner

By:_____
Name:_____
Title:_____

951 LAND HOLDINGS, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

SWM006030

AA00719

DY LAND ASSOCIATES, LTD, a Florida limited partnership

By:    DY Land Associates, LLC, its general partner

    By:_____
    Name:_____
    Title:_____

DY LAND ASSOCIATES, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

DY LAND HOLDINGS II, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

FC BEACH, LTD, a Florida limited partnership

By:    FC Beach, LLC, its general partner

    By:_____
    Name:_____
    Title:_____

SWM006031

AA00720

FC BEACH, LLC, a Delaware limited liability
company

By:_____
Name:_____
Title:_____


FC COMMERCIAL, LLC, a Delaware limited
liability company

By:_____
Name:_____
Title:_____


FC GOLF, LTD, a Florida limited partnership

By:    FC Golf, LLC, its general partner


By:_____
Name:_____
Title:_____


FC GOLF, LLC, a Delaware limited liability
company

By:_____
Name:_____
Title:_____


FC HOTEL, LTD, a Florida limited partnership

By:    FC Hotel, LLC, its general partner


By:_____
Name:_____
Title:_____

SWM006032

AA00721

FC HOTEL, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____


FC MARINA, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____


FC PARCEL 73, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____


FC RESORT, LTD, a Florida limited partnership

By:     FC Resort, LLC, its general partner

By:_____
Name:_____
Title:_____


FC RESORT, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

SWM006033

AA00722

FIDDLER'S CREEK MANAGEMENT INC., a
Florida corporation

By:_____
Name:_____
Title:_____

GBFC DEVELOPMENT, LTD, a Florida limited
partnership

By:     GBP Development, LLC, its general partner

By:_____
Name:_____
Title:_____

GBFC DEVELOPMENT, LLC, a Delaware limited
liability company

By:_____
Name:_____
Title:_____

GBFC MARINA, LTD, a Florida limited
partnership

By:     FC Marina, LLC, its general partner

By:_____
Name:_____
Title:_____

SWM006034

AA00723

GBP DEVELOPMENT LTD., a Florida limited partnership

By:     GBP Development LLC, its general partner

By:_____
Name:_____
Title:_____


GBP DEVELOPMENT, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____


GULF BAY HOSPITALITY, LTD, a Florida limited partnership

By:     Gulf Bay Hospitality Company, LLC, its general partner

By:_____
Name:_____
Title:_____


GULF BAY HOSPITALITY COMPANY, LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

SWM006035

AA00724

GULF BAY HOTEL COMPANY, LTD, a Florida
limited partnership

By:     Gulf Bay Hotel Company, LLC, its general
partner

By:_____
Name:_____
Title:_____


GULF BAY HOTEL COMPANY, LLC, a
Delaware limited liability company


By:_____
Name:_____
Title:_____

SWM006036

AA00725

**LENDER:**

PEPI CAPITAL, L.P., a Delaware limited partnership

By:_____

    David Radunsky, Chief Operating Officer

SWM006037

AA00726

# EXHIBIT A

Real Property Description

SWM006038

AA00727

**EXHIBIT B**

Interim Order

SWM006039

**AA00728**

**EXHIBIT C**

Notice Of Borrowing

[Date]

PEPI CAPITAL, L.P.

Attention:

Ladies and Gentlemen:

The undersigned, Fiddler's Creek LLC and GB Peninsula, Ltd., refer to the Debtor-In-Possession Loan and Security Agreement, dated as of February ___, 2010 (the "*Loan Agreement*", the terms defined therein being used herein as therein defined), between the undersigned and you, and hereby gives you notice, irrevocably, pursuant to Section 2.1(b) of the Loan Agreement that the undersigned hereby requests a Borrowing under the Loan Agreement, and in that connection sets forth below the information relating to such Borrowing (the "*Proposed Borrowing*") as required by Section 2.1(b) of the Credit Agreement:

      (i)      The date of the Proposed Borrowing is _____, 20__.

      (ii)     The aggregate amount of the Proposed Borrowing is $_____.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the Proposed Borrowing:

      (a)     each Borrower's Chapter 11 Case is still pending in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code;

      (b)     no motion order has been filed requesting (a entered for (i) the appointment of a trustee in either Borrower's Chapter 11 case, or (b ii) the conversion of either Borrower's Chapter 11 case into a case under Chapter 7 of the Bankruptcy Code;

      (c)     the Orders are in full force and effect and have not been reversed, modified, amended, rescinded, stayed or vacated, except for such modifications thereto acceptable to Lender

      (d)     the representations and warranties contained in each Loan Document are true and correct in all respects after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date); and

SWM006040

AA00729

(e)    no Default or Event of Default has occurred and is continuing on the date of such Advance nor shall either result from the making of the Advance.

Very truly yours,

FIDDLER'S CREEK LLC, a Delaware limited liability company

By:_____
Name:_____
Title:_____

GB PENINSULA, LTD., a Florida limited partnership

By:    GB Peninsula Inc., its general partner

By:_____
Name:_____
Title:_____

EXHIBIT C TO DEBTOR-IN POSSESSION LOAN AND SECURITY AGREEMENT AND GUARANTY AGREEMENT – Page 2
DA-3086014 v89 1203528-00006

SWM006041

AA00730

**EXHIBIT D**

<u>18 Month Budget</u>

*[attached]*

SWM006042

**AA00731**

**EXHIBIT E**

<u>Collateral Waterfall</u>

1.     Cash on hand and personal property securing the Loan;

2.     [The remaining unencumbered hotel condominium units owned by FC Hotel Ltd.;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

3.     [The remaining finished developed land lots owned by GBP that are unencumbered and the remaining undeveloped land owned by 951 Holding Ltd. that is unencumbered;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

4.     [The remaining finished developed land lots owned by GBFC Development Ltd. and all finished housing units owned by Borrowers and their Subsidiaries;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

5.     [Parcels 32, 36, 37, and 40 owned by 951 Land Holdings Ltd.;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

6.     [The Tarpon Club owned by GBFC Marina Ltd.;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

7.     [The Creek Golf Course owned by FC Golf, Ltd.;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

8.     [The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

9.     [The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

10.     [The undeveloped land included in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America;] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

11.     [The Fiddler's Creek Sales and Administration buildings owned by 951 Land Holding Ltd.; and] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

12.     [The real property owned by GB Peninsula, Ltd.] [The foregoing will be replaced with a recordable legal description describing the foregoing property.]

SWM006043

AA00732

# EXHIBIT F

<u>Form of Mortgage</u>

*[attached]*

SWM006044

**AA00733**

# SCHEDULE 5.1

## Liens

SWM006045

AA00734

# SCHEDULE 5.2

Intellectual Property

[List]

SWM006046

AA00735

**SCHEDULE 5.3**

<u>Material Contracts</u>

[List]

SWM006047

**AA00736**

## SCHEDULE 5.5

Debtors' Organizational Information

| Debtor | Jurisdiction of Organization | Organizational Identification Number | Subsidiaries |
|---|---|---|---|
| Fiddler's Creek LLC | | | |
| GB Peninsula, Ltd. | | | |
| 951 Land Holdings, Ltd. | | | |
| 951 Land Holdings, LLC | | | |
| DY Land Associates LLC | | | |
| DY Land Holdings Ltd. | | | |
| DY Land Holdings II, Ltd. | | | |
| FC Beach Ltd. | | | |
| FC Beach LLC | | | |
| FC Commercial LLC | | | |
| FC Golf Ltd. | | | |
| FC Golf LLC | | | |
| FC Hotel Ltd. | | | |
| FC Hotel LLC | | | |
| CFC Marina LLC | | | |
| FC Parcel 73, LLC | | | |
| FC Resort Ltd. | | | |
| FC Resort LLC | | | |
| Fiddler's Creek Management Inc. | | | |
| GB 100 Ltd. | | | |
| GB 100 Inc. | | | |
| GBFC Development Ltd. | | | |
| GBFC Development LLC | | | |
| GBFC Marina Ltd. | | | |
| GBFC II LLC | | | |
| GBP Development Ltd. | | | |
| GBP Development LLC | | | |
| Gulf Bay Hospitality Ltd. | | | |
| Gulf Bay Hospitality Company, LLC | | | |
| Gulf Bay Hotel Company Ltd. | | | |
| Gulf Bay Hotel Company LLC | | | |

SWM006048

AA00737

# SCHEDULE 5.13

### Capitalization of Debtors

| Debtor | Interest | Owner | Percentage/Certificate Information |
|---|---|---|---|
| Fiddler's Creek LLC | | | |
| GB Peninsula Ltd. | | | |
| 951 Land Holdings, Ltd. | | | |
| 951 Land Holdings, LLC | | | |
| DY Land Associates LLC | | | |
| DY Land Holdings Ltd. | | | |
| DY Land Holdings II, Ltd. | | | |
| FC Beach Ltd. | | | |
| FC Beach LLC | | | |
| FC Commercial LLC | | | |
| FC Golf Ltd. | | | |
| FC Golf LLC | | | |
| FC Hotel Ltd. | | | |
| FC Hotel LLC | | | |
| FC Marina LLC | | | |
| FC Parcel 73, LLC | | | |
| FC Resort Ltd. | | | |
| FC Resort LLC | | | |
| Fiddler's Creek Management Inc. | | | |
| GBFC Development Ltd. | | | |
| GBFC Development LLC | | | |
| GBFC Marina Ltd. | | | |
| GBP Development Ltd. | | | |
| Gulf Bay Hospitality Ltd. | | | |
| Gulf Bay Hospitality Company, LLC | | | |
| Gulf Bay Hotel Company Ltd. | | | |
| Gulf Bay Hotel Company LLC | | | |

SWM006049

AA00738

# SCHEDULE 7.3

## Minimum Release Prices

| Village | Unit | Minimum Gross Sale Price | CDD Buy down | Minimum Release Price |
|---------|------|-------------------------:|-------------:|----------------------:|
| Cotton Green | Lot 45 | 201,719 | 6,100 | 174,618 |
| Mallards Landing | 31-A | 414,720 | 20,327 | 345,743 |
| Bellagio | 6 | 713,359 | 17,257 | 624,241 |
| Bellagio | 11 | 605,063 | 17,257 | 526,556 |
| Bellagio | 16 | 380,439 | 17,257 | 308,932 |
| Bellagio | 30 | 629,909 | 17,257 | 551,402 |
| Bellagio | 33 | 640,941 | 17,257 | 562,434 |
| Bellagio | 34 | 688,505 | 17,257 | 609,997 |
| Bellagio | 35 | 290,137 | 17,257 | 211,630 |
| Majorca | 4 | 888,783 | 25,035 | 794,098 |
| Majorca | 5 | 1,027,459 | 25,035 | 918,424 |
| Cranberry Crossing | 25 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 30 | 356,270 | 25,907 | 298,863 |
| Cranberry Crossing | 36 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 43 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 47 | 450,162 | 25,907 | 382,605 |
| Sauvignon | 8 | 963,115 | 15,718 | 877,396 |
| Serena | 6-102 | 161,954 | 11,398 | 123,492 |
| Serena | 7-201 | 249,337 | 11,398 | 210,875 |
| Serena | 8-201 | 246,405 | 11,398 | 207,943 |
| Serena | 11-202 | 254,468 | 11,398 | 216,006 |
| Serena | 13-202 | 247,584 | 11,398 | 209,122 |
| Serena | 15-201 | 477,800 | 11,398 | 439,338 |
| Serena | 17-102 | 508,548 | 11,398 | 459,354 |
| Serena | 17-201 | 518,231 | 11,398 | 479,769 |
| Serena | 17-202 | 652,546 | 11,398 | 593,182 |
| Serena | 19-101 | 435,318 | 11,398 | 396,856 |
| Serena | 19-102 | 435,318 | 11,398 | 396,856 |
| Serena | 19-201 | 539,653 | 11,398 | 501,191 |
| Marengo | 1-102 | 160,765 | 13,943 | 125,822 |
| Marengo | 3-202 | 153,857 | 13,943 | 116,814 |
| Marengo | 4-103 | 155,683 | 13,943 | 120,740 |
| Marengo | 6-202 | 394,182 | 13,943 | 357,139 |
| Marengo | 7-203 | 144,227 | 13,943 | 107,184 |
| Marengo | 8-204 | 186,745 | 13,943 | 146,552 |
| Marengo | 9-201 | 420,959 | 13,943 | 380,766 |
| Marengo | 9-203 | 388,387 | 13,943 | 351,344 |
| Marengo | 10-103 | 374,163 | 13,943 | 332,220 |
| Marengo | 10-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 10-203 | 398,637 | 13,943 | 354,594 |
| Marengo | 10-204 | 431,670 | 13,943 | 383,077 |
| Marengo | 11-102 | 384,412 | 13,943 | 349,469 |

SWM006050

AA00739

| Marengo | 11-103 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-201 | 434,199 | 13,943 | 394,006 |
| Marengo | 11-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 11-203 | 398,637 | 13,943 | 361,594 |
| Millbrook | 10 | 728,692 | 45,420 | 629,824 |
| Millbrook | 11 | 884,609 | 45,420 | 774,729 |
| Millbrook | 12 | 878,236 | 45,420 | 768,806 |
| Millbrook | 13 | 900,143 | 45,420 | 789,166 |
| Callista | 06-101 Model | 514,434 | 11,748 | 465,936 |
| Callista | 06-102 Model | 476,295 | 11,748 | 429,897 |
| Callista | 06-103 | 421,565 | 11,748 | 383,566 |
| Callista | 06-104 | 470,261 | 11,748 | 430,863 |
| Callista | 06-201 | 396,997 | 11,748 | 354,449 |
| Callista | 06-202 Model | 564,532 | 11,748 | 516,033 |
| Callista | 06-203 | 476,992 | 11,748 | 436,193 |
| Callista | 06-204 Model | 645,349 | 11,748 | 591,951 |
| Callista | 10-101 | 463,267 | 11,748 | 423,869 |
| Callista | 10-102 | 421,565 | 11,748 | 383,566 |
| Callista | 10-103 | 423,102 | 11,748 | 383,704 |
| Callista | 10-104 | 468,622 | 11,748 | 429,224 |
| Callista | 10-202 | 465,408 | 11,748 | 426,010 |
| Callista | 10-203 | 469,158 | 11,748 | 429,760 |
| Callista | 12-101 | 457,911 | 11,748 | 418,513 |
| Callista | 12-103 | 303,544 | 11,748 | 265,545 |
| Callista | 12-104 | 200,036 | 11,748 | 160,638 |
| Callista | 12-201 | 265,387 | 11,748 | 222,839 |
| Callista | 12-203 | 338,560 | 11,748 | 297,762 |
| Callista | 12-204 | 265,387 | 11,748 | 222,839 |
| Callista | 13-101 | 338,466 | 11,748 | 299,068 |
| Callista | 13-103 | 307,155 | 11,748 | 269,157 |
| Callista | 13-202 | 452,556 | 11,748 | 411,758 |
| Callista | 13-203 | 210,469 | 11,748 | 169,670 |
| Callista | 14-101 | 340,071 | 11,748 | 300,673 |
| Callista | 14-102 | 372,434 | 11,748 | 334,436 |
| Callista | 14-103 | 190,391 | 11,748 | 152,393 |
| Callista | 14-202 | 256,612 | 11,748 | 215,814 |
| Callista | 14-204 | 294,341 | 11,748 | 251,792 |
| Callista | 15-101 | 447,201 | 11,748 | 407,803 |
| Callista | 15-102 | 406,500 | 11,748 | 368,502 |
| Callista | 15-103 | 229,847 | 11,748 | 191,849 |
| Callista | 15-201 | 413,047 | 11,748 | 370,499 |
| Callista | 15-202 | 342,480 | 11,748 | 301,682 |
| Callista | 15-203 | 342,480 | 11,748 | 301,682 |
| Callista | 16-102 | 191,194 | 11,748 | 153,195 |
| Callista | 16-204 | 297,921 | 11,748 | 255,373 |
| Callista | 17-101 | 271,056 | 11,748 | 231,658 |
| Callista | 17-102 | 246,566 | 11,748 | 208,568 |
| Callista | 17-103 | 324,542 | 11,748 | 286,544 |

SWM006051

AA00740

| | | | | |
|---|---|---|---|---|
| Callista | 17-201 | 348,916 | 11,748 | 306,368 |
| Callista | 17-203 | 274,000 | 11,748 | 233,202 |
| Menaggio | 4-102 | 658,237 | 8,558 | 608,029 |
| Menaggio | 5-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 5-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-102 | 502,117 | 8,558 | 453,309 |
| Menaggio | 11-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-201 | 845,892 | 8,558 | 788,684 |
| Menaggio | 12-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-201 | 639,878 | 8,558 | 591,070 |
| Menaggio | 16-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 16-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-201 | 322,770 | 8,558 | 273,962 |
| Menaggio - SOLD | 19-102 | 314,272 | 8,558 | 272,464 |
| Chiasso | Lot # 1 | 1,497,350 | 33,100 | 1,394,250 |
| Chiasso | Lot # 2 | 1,559,146 | 33,100 | 1,456,046 |
| Chiasso | Lot # 3 | 1,751,889 | 33,100 | 1,648,789 |
| Mahogany Bend | B23 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B24 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B27 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B28 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B29 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B30 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B31 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B32 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B33 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B34 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B35 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B36 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B37 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B38 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C1 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C2 | | 13,943 | -27,760 |
| Mahogany Bend | C3 | | 13,943 | -27,760 |
| Mahogany Bend | C4 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C5 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C6 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C7 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C8 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C9 | 212,735 | 13,943 | 184,975 |

SWM006052

AA00741

| Isla Del Sol | 2  | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 3  | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 4  |         | 13,943 | -32,293 |
| Isla Del Sol | 10 |         | 13,943 | -32,293 |
| Isla Del Sol | 17 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 18 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 19 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 20 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 22 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 25 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 28 | 140,203 | 13,943 | 107,910 |
| Isla Del Sol | 29 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 30 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 31 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 32 |         | 13,943 | -32,293 |
| Isla Del Sol | 33 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 34 | 325,841 | 13,943 | 293,548 |

SWM006053

AA00742

Document comparison done by DeltaView on Thursday, February 11, 2010 8:04:41 PM

| Input: | |
|---|---|
| Document 1 | PowerDocs://DA/3086014/8 |
| Document 2 | PowerDocs://DA/3086014/9 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 120 |
| Deletions | 119 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 239 |

SWM006054

AA00743

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Case No. 8:10-bk-03846-KRM

FIDDLER'S CREEK, LLC, et al.
                                                Jointly Administered

                                                Chapter 11

            Debtors.
_____/

FIDDLER'S CREEK, LLC, et al.

            Plaintiffs,                         Adv. Pro. No. 8:11-ap-00809-KRM

v.

PEPI CAPITAL, L.P.

            Defendant.
_____/

## NOTICE OF FILING EXCERPTS OF DEBTORS' RESPONSE TO ADMISSIONS WITH RESPECT TO MOTION FOR IN CAMERA <u>REVIEW AND OPPOSITION TO SUMMARY JUDGMENT</u>
### (Hearing Scheduled for March 23, 2015 at 2:00 p.m.)

Defendant, PEPI Capital, L.P. ("PEPI"), by and through its undersigned counsel,   hereby

files the following excerpts of Debtors' Response to Admissions with Respect to PEPI's Motion

for in Camera Review [DE 98] and opposition to Summary Judgment [DE 84].

Dated:  March 20, 2015.

                                                **ROETZEL & ANDRESS**

                                                /s/Alan J. Perlman
                                                Alan J. Perlman
                                                Florida Bar No. 826006
                                                350 E. Las Olas Boulevard, Suite 1150
                                                Ft. Lauderdale, FL 33301
                                                Telephone: (954) 462-4150
                                                Facsimile:  (954) 462-4260
                                                E-mail:  aperlman@ralaw.com

**AA00744**

*Attorneys for PEPI Capital, L.P.*

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 2090-1(A)

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on March 20, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).


/s/Alan J. Perlman
Alan J. Perlman

**AA00745**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

In re:                                                              Chapter 11

FIDDLER'S CREEK, LLC, and its twenty-seven              Case No. 8:10-bk-03846-KRM
subsidiaries and affiliates,


                                                                   (Jointly Administered under
        Debtors.                                                   Case No. 8:10-bk-03846-KRM)
_____/

FIDDLER'S CREEK, LLC, and its twenty-seven
subsidiaries and affiliates,

        Plaintiffs/Counter-Defendants,                 ADV. CASE NO. 8:11-ap-00809-KRM

v.

PEPI CAPITAL, L.P.

        Defendant/Counter-Plaintiff.
_____/

PEPI CAPITAL, L.P.,

        Third Party Plaintiff,

v.

GULF BAY CAPITAL, INC. and
AUBREY J. FERRAO,

        Third Party Defendants.
_____/

### PLAINTIFFS' RESPONSES AND OBJECTIONS
### TO PEPI CAPITAL, L.P.'S REQUEST FOR ADMISSIONS
### AND FIRST SET OF INTERROGATORIES

Fiddler's Creek, LLC and its affiliates and subsidiaries (collectively, "Fiddler's"), by and

through the undersigned counsel and pursuant to Fed.R.Civ.P. 33 and 36 as incorporated by

Fed.R.Bankr.P. 7033 and 7036, serves its responses and objections to the Interrogatories and

AA00746

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO 82:** Admit that the terms and provisions of your DIP financing agreement with Gulf Capital is based on the Term Sheet.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 83:** Admit that the terms and provisions of your DIP financing agreement with Gulf Capital is based on the Commitment Letter.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 84:** Admit that the Term Sheet is substantially similar to the term sheet between you and Gulf Capital.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 85:** Admit that the Commitment Letter is substantially similar to the commitment letter between you and Gulf Capital.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 86:** Admit that Ferrao is not a party to the Term Sheet.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 87:** Admit that Ferrao is not a party to the Commitment Letter.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 88:** Admit that you requested Ferrao have an option to acquire any DIP loan provided by PEPI in the event of your default.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 89:** Admit that you requested that the proposed option to Ferrao to acquire any DIP loan provided by PEPI in the event of your default be kept confidential.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 90:** Admit that you requested that the proposed option to Ferrao to acquire any DIP loan provided by PEPI in the event of your default remain undisclosed.

AA00747