# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

---

### CASE NO.  8:19-CV-00008-VMC
### BANKRUPTCY CASE NO. 8:10-BK-03846-CPM
### ADVERSARY CASE NO. 8:11-AP-00809-CPM

---

## PEPI CAPITAL, L.P.,

### Appellant,

### vs

## FIDDLER'S CREEK, LLC, et al.

### Appellees.

---

### APPELLANT'S APPENDIX
### VOLUME 5
### AA00748-AA001397

---

## On Appeal from The United States Bankruptcy Court
## Middle District of Florida, Tampa Division

**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
*Attorneys for Pepi Capital, L.P.*

## TABLE OF CONTENTS

| VOL. | BATES RANGE | DOCUMENT |
|------|-------------|----------|
| 5 | AA00748-AA00810 | Notice of filing Exhibits In Support of Pepi Capital, LP's Motion for Partial Summary Judgment, filed March 20, 2015, (Doc No. 105 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA00811- AA00838 | Pepi Capital, L.P.'S Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed March 20, 2015, (Doc. No. 106 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA00839-AA00853 | Amended Affidavit of Jeffrey R. Fine In Opposition To Debtors' Motion for Partial Summary Judgment, filed March 25, 2015, (Doc. No. 107-1 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA00854-AA00982 | Transcript of April 15, 2015 hearing re Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed May 11, 2015 by Paul J. Bauttista on behalf of Plaintiff Fiddler's Creek, LLC (Doc. No. 117 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA00983-AA01099 | Transcript of April 29, 2015 Continued hearing re Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed May 11, 2015 by Paul J. Bauttista on behalf of Plaintiff Fiddler's Creek, LLC (Doc. No. 118 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA01100-AA01242 | Transcript of May 13, 2015 hearing re Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed June 18, 2017 by Paul J. Bauttista on behalf of Plaintiff Fiddler's Creek, LLC, (Doc. No. 143 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA01243-AA01342 | Transcript of May 19, 2015 Continued hearing re Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed August 10, 2015 by Paul J. Battista on behalf of Plaintiff Fiddler's Creek, LLC (Doc. No. 124 in Adv. Case No. 8:11-ap-00809) |

| VOL. | BATES RANGE | DOCUMENT |
|------|-------------|----------|
| 5 | AA01343-AA01344 | Notice of Filing of Exhibits from Summary Judgment Hearings, filed June 16, 2015, (Doc No. 123 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA01345-AA01356 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re: Mere suggestions/proposals and lack of demands by PEPI (Doc No. 123-1 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA01357-AA01382 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re:  Florida law prohibits deeds in escrow/stipulated judgments in initial transaction. (Doc No. 123-2 in Adv. Case No. 8:11-ap-00809) |
| 5 | AA01383-AA01397 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re:  The Escrow Provision was for sole benefit of PEPI and therefore can be waived by PEPI. (Doc No. 123-3 in Adv. Case No. 8:11-ap-00809) |

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

In re:                                    Case No. 8:10-bk-03846-KRM

FIDDLER'S CREEK, LLC, et al.
                                          **Jointly Administered**

                                          **Chapter 11**

                    Debtors.
_____/

FIDDLER'S CREEK, LLC, et al.

                    **Plaintiffs,**            Adv. Pro. No. 8:11-ap-00809-KRM

v.

PEPI CAPITAL, L.P.

                    Defendant.
_____/

**NOTICE OF FILING EXHIBITS IN SUPPORT OF PEPI CAPITAL, L.P.'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, PEPI Capital, L.P. ("PEPI"), by and through its undersigned counsel,  hereby

files the following in support of PEPI's Motion for Partial Summary Judgment:

1.      Email from Debtors on 2/12/10 @ 4:40 p.m. as to its delays.

2.      Email from Debtors on 2/13/10 @ 11:56 a.m. as to revised Budget.

3.      Email from Jane Houk on 2/15/10 at 2:11 p.m., regarding corporate due diligence

checklist.

4.      Email to Debtors on 2/16/10 at 10:45 a.m., regarding revised Budget.

5.      Email from Debtors on 2/17/10 at 8:22 a.m., regarding DIP Motion and

confirming PEPI approval of Budget.

AA00748

6.   Email from Debtors on 2/18/10 at 12:46 p.m., regarding approval of Title Insurance.

7.   Email from Debtors on 2/18/10 at 4:39 p.m., regarding approval of Title Insurance.

8.   Email to Debtors on 2/18/10 at 12:13 p.m., regarding Purchase Option and comment to file.

9.   Exhibit "2" from Debtors' Motion for Partial Summary Judgment [DE 84].

10.   Exhibit "6" from Debtors' Motion for Partial Summary Judgment [DE 84].

11.   Deposition Transcripts filed by Debtors [previously filed as DE 80, 81, 82 and 83].

12.   Affidavit of Jeffrey R. Fine and Exhibits thereto [previously filed as DE 99].

13.   Notice of Filing Deposition Transcripts [previously filed as DE 96].

14.   Notice of Filing Exhibits [previously filed as DE 97].

Dated:  March 20, 2015.

**ROETZEL & ANDRESS**

/s/Alan J. Perlman
Alan J. Perlman
Florida Bar No. 826006
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile: (954) 462-4260
E-mail: aperlman@ralaw.com
*Attorneys for PEPI Capital, L.P.*

AA00749

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 2090-1(A)

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on March 20, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

/s/Alan J. Perlman_____
Alan J. Perlman

AA00750

Erenbaum, Jessica

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Friday, February 12, 2010 4:40 PM |
| **To:** | 'Jeff.Fine@klgates.com' |
| **Cc:** | 'david.radunsky@pgrp.net'; 'cj.lorio@pgrp.net'; 'k.springfield@pgrp.net'; 'John.Cox@klgates.com'; 'David.Fields@klgates.com' |
| **Subject:** | Re: Fiddler's Due Diligence items |

Thx Jeff. I understand. I learned from my client that Mark is supposed to have that to you tomorrow. We will stay on top of it.

Paul

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.
————————————————
Sent from my BlackBerry Wireless Device

---

**From:** Fine, Jeffrey
**To:** Battista, Paul J.
**Cc:** david.radunsky@pgrp.net ; cj.lorio@pgrp.net ; k.springfield@pgrp.net ; Cox, John ; Fields, David
**Sent:** Fri Feb 12 16:32:02 2010
**Subject:** Fiddler's Due Diligence items
Paul: You asked that I keep you apprised on due diligence issues. One of our primary issues is to identify and review the various parcels of unencumbered collateral for inclusion in the waterfall under the Loan Agreement. As we have discussed previously, Mark Woodward has committed to provide us with descriptions of the unencumbered collateral broken out per the waterfall categories, as well as for other purposes such as the title policy. We were both on joint phone calls where we were promised delivery of that information first earlier in the week, then no later than Wednesday, and then no later than yesterday. Unfortunately, my real estate colleagues have advised me as of an hour or so ago, that we still have not received the relevant information.

As I have told you before, receipt, review of the information, and inclusion in the Loan Agreement is an integral part of what we need to do in order for the loan to go forward. Please look into this matter and let us know when we can expect to receive the information.

Thanks!

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com



No.: 4-10
Name: DiNardi
Date: 2/9/16
Amory Ranck



EXHIBIT
1

FIDD 000328

AA00751

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Tony DiNardo <dinardoT@gulfbay.com> |
| **Sent:** | Saturday, February 13, 2010 11:56 AM |
| **To:** | CJ Lorio; K Springfield |
| **Cc:** | Battista, Paul J.; Joe Gillis |

CJ & Kenny
Attached is the revised 18 month Business Plan


Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office  239-732-9400
Direct  239-732-3013
Cell     239-641-4274
email dinardoa @gulfbay.com



EXHIBIT

2



No.: 4 - 12
Name: DiNardo
Date: 2/9/15
Amory Ranck

**FIDD 003192**

**AA00752**

| From: | Jane Houk |
| --- | --- |
| Sent: | Monday, February 15, 2010 2:11 PM |
| To: | Meister, Joseph; 'Helm, Elizabeth' |
| Cc: | 'jeff.fine@klgates.com'; Peter Desiderio; 'Battista, Paul J.' |
| Subject: | 1 of 4 pdfs of Additional Corp Due Diligence Items |
| Attachments: | 1078_001.pdf |

Joe/Elizabeth:

Attached is the first of four emails including the following information relating to your open corporate due diligence checklist:

1. First Amendments to each of 951 Land Holdings, LLC, FC Marina, LLC, FC Hotel, LLC, FC Resort, LLC, Gulf Bay Hotel Company, LLC, Gulf Bay Hospitality Company, LLC, FC Beach, LLC, GBFC Development, LLC and DY Associates, LLC LLC Agreements.
2. Certified copy of Certificate of Formation of GBFC Development, LLC
3. FC Hotel, Ltd. LPA and First Amendment thereto
4. FC Resort, Ltd. LPA and First Amendment thereto
5. Certified copy of Certificate of Formation of Gulf Bay Hotel Company, LLC
6. Certified copy of Gulf Bay Hospitality Company, LLC
7. Gulf Bay Hospitality Company, LLC LLC Agreement (note 1st Amendment and 2nd Amendment have been provided to you under separate cover previously)
8. Amended and Restated Bylaws of Fiddler's Creek Management, Inc.
9. GBP Development, Ltd. LPA
10. Certified copy of Certificate of Limited Partnership of GBP Development, Ltd.

I believe that leaves open from the checklist you sent earlier today a number of certificates of good standing, which are available on the website but for which we will need to get new ones anyway to meet the time lines in the loan agreement — so I will not resend the ones that will be outdated, but will wait until we obtain new ones.

I believe the only other items outstanding will be (i) the Bylaws of GB Peninsula, Inc. (which I need to obtain from the client and (ii) the articles of organization and the new operating agreement with respect to the new entity being formed to hold the LP interest which is being pledged in GB Peninsula, Ltd.

Jane

**From:** Canon23East@stearnsweaver.com [mailto:Canon23East@stearnsweaver.com]
**Sent:** Monday, February 15, 2010 1:58 PM
**To:** Jane Houk
**Subject:** Scanned document





SWM007693

AA00753

| From: | CJ Lorio |
|---|---|
| To: | Tony DiNardo |
| Cc: | K Springfield |
| Subject: | RE: |
| Date: | Tuesday, February 16, 2010 10:45:08 AM |

Tony, we are reviewing this, 13-week budget, and the other material sent over wrt unencumbered property/FI Financial encumbered.

Can you explain the changes made to Managed Expenses in the 18-month plan? Looks like $7 million less spending than earlier forecasts. Much of it in Parcel Administration Real estate taxes.

Thanks

C.J. Lorio
Perot Investments, Inc.
972-535-1972
972-535-1991 (Fax)
cj.lorio@pgrp.net

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Saturday, February 13, 2010 10:56 AM
**To:** CJ Lorio; K Springfield
**Cc:** Battista, Paul J.; Joe Gillis
**Subject:**

CJ & Kenny

Attached is the revised 18 month Business Plan

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office  239-732-9400
Direct  239-732-3013
Cell    239-641-4274
email dinardoa @gulfbay.com



EXHIBIT
4



_ N.  4 - 24
Name: Di Nardo
Date: 2/9/15
Amory Ranck

**FIDD 006298**

**AA00754**

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Wednesday, February 17, 2010 8:22 AM |
| **To:** | Fine, Jeffrey |
| **Subject:** | DIP Motion. |
| **Attachments:** | DIP Financing Motion.version blacklined against 2.14. version.DOC |

Jeff, here is the latest version of the DIP motion blacklined against the version I sent you on Monday (which was the 2/14 version). We still need to conform the "purchase option" langauge in the DIP term summary before this is final. However, I think this is 99.9% there. Please provide any remaining comments.

I also understand that your client signed off on the budget yesterday. Please confirm.

I also understand that there was another call last night on the loan agreement and that good progress was made. I am told another version is being circulated this morning reflecting the changes. Assuming this is now complete, I think the only item remaining for us to be comfortable filing is your client's sign off on the due diligence, including related to the title issues.

Please let me know as we are prepared to file today as soon as we have these last pieces together.

Thanx
Paul

**GENOVESE**
**JOBLOVE &**
**BATTISTA**
— P.A. —
*Attorneys at Law*

**Paul J. Battista, Esq.**
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone: (305) 349-2300
Direct: (305) 372-2457
Facsimile: (305) 349-2310
Cell: (305) 812-8030
E-mail: pbattista@gjb-law.com

**www.gjb-law.com**

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Also, please note, send a copy you have received this communication in error, and delete the copy thereof you have received. Thank you.

**EXHIBIT**
**5**
ALL-STATE LEGAL®



No.: 4-34
Name: DiNardo
Date: 2/9/16
Amory Ranck

FIDD 000390

**AA00755**

| From: | Battista, Paul J. [pbattista@gjb-law.com] |
|---|---|
| Sent: | Thursday, February 18, 2010 12:46 PM |
| To: | Fine, Jeffrey |
| Cc: | Guitian, Mariaelena; Patricia Redmond |
| Subject: | FW: Language for Title Company on Organizational Documents |

This issue at least appears to have been solved.

Paul

**From:** Atlas, Alan [mailto:AtlasA@CTT.com]
**Sent:** Thursday, February 18, 2010 12:40 PM
**To:** Jane Houk
**Cc:** Battista, Paul J.; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** RE: Language for Title Company on Organizational Documents

For purposes of insuring the lien of the DIP mortgage, I have no objections to the language below..


*Alan Atlas*

*State Underwriting Counsel*

*Fidelity National Title Group*

*4210 Metro Parkway, Suite 210*

*Fort Myers, FL 33916*

*Phone No. 239-275-8212, Ext. 223*

*Fax No. 239-275-3194*

*E-Mail Address: atlasa@ctt.com*


**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Wednesday, February 17, 2010 6:17 PM
**To:** Atlas, Alan
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** FW: Language for Title Company on Organizational Documents

Alan:

At your request, attached as a Word document are the relevant provisions in the organizational documents of each of the five entities mentioned to you previously. In addition, below are the relevant excerpts from the Motion and Order.

Please contact me if you have any questions regarding same.

1



EXHIBIT
6



No: 4-44
Name: DiNardo
Date: 2-9-15
Amory Ranck

SWM009690

AA00756

| | |
|---|---|
| **From:** | Jane Houk |
| **Sent:** | Thursday, February 18, 2010 4:39 PM |
| **To:** | 'Helm, Elizabeth' |
| **Cc:** | 'Mark Woodward' |
| **Subject:** | FW: Language for Title Company on Organizational Documents |

Jeff/Elizabeth:

As a condition precedent to the Loan Agreement, the Lender must receive confirmation from Chicago Title that the title insurance policies being issued for the benefit of the Lender will not include exceptions or defenses to coverages or payment based on prohibitions in the org docs. Alan has confirmed to us that there will be no exceptions to title for this issue. Please let me know if email below is acceptable to Lender, or if you have a specific confirmation form we need to get executed.

Thanks,
Jane

**From:** Atlas, Alan [mailto:AtlasA@CTT.com]
**Sent:** Thursday, February 18, 2010 12:40 PM
**To:** Jane Houk
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** RE: Language for Title Company on Organizational Documents

For purposes of insuring the lien of the DIP mortgage, I have no objections to the language below..

*Alan Atlas*

*State Underwriting Counsel*

*Fidelity National Title Group*

*4210 Metro Parkway, Suite 210*

*Fort Myers, FL 33916*

*Phone No. 239-275-8212, Ext. 223*

*Fax No. 239-275-3194*

*E-Mail Address: atlasa@ctt.com*

---

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Wednesday, February 17, 2010 6:17 PM
**To:** Atlas, Alan
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** FW: Language for Title Company on Organizational Documents



EXHIBIT

7



No. 4-45
Name: DiNardo
Date: 2/9/15

Amory Ranck

SWM009702

AA00757

Alan:

At your request, attached as a Word document are the relevant provisions in the organizational documents of each of the five entities mentioned to you previously. In addition, below are the relevant excerpts from the Motion and Order.

Please contact me if you have any questions regarding same.

Best regards,
Jane

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Wednesday, February 17, 2010 3:56 PM
**To:** Jane Houk
**Subject:** Language for Title Company on Organizational Documents

Here is the language now in the motion on this issue:

1.     Furthermore, none of the restrictive provisions contained in the Debtors' corporate governance documents would impair the Court's ability to approve the DIP Loan or the ability of the Debtors to file these Chapter 11 Cases. Specifically, the corporate governance documents of the following five (5) Debtors contain restrictive provisions which either (a) purport to require the consent of such Debtor's secured creditor to the DIP Loan, (b) contain restrictions upon the entering into of indebtedness or guarantying debts of others which would conflict with the terms of the DIP Loan, or (c) prohibit the filing of a bankruptcy petition: (i) FC Parcel 73, LLC (Tomen); (ii) FC Commercial, LLC (Tomen); (iii) DY Land Holdings II, LLC (Tomen); (iv) FC Golf, LLC (Textron); and (v) FC Golf, Ltd. (Textron).

2.     However, organizational documents do not supersede the rights afforded by the Bankruptcy Code, and this principal is expressly recognized in the Bankruptcy Code. For example, the definition of "property of the estate" in Section 541 provides that a debtor's becomes property of the estate "notwithstanding any provisions in an agreement, transfer instrument *or applicable nonbankruptcy law* that restricts or conditions such transfer of such interest by the debtor." 11 U.S.C. § 541(c)(1)(A) (emphasis added). Also, the Bankruptcy Code allows implementation of a chapter 11 plan of reorganization through amendments or additions to a debtor's organizational document. See, e.g., 11 U.S.C. § 1123(a)(5)(I) (noting that a chapter 11 "plan shall—provide adequate means for the plan's implementation, such as—amendment of the debtor's charter"); U.S.C. § 1123(a)(6) (noting that a chapter 11 plan shall "provide for the inclusion in the charter of the debtor . . . a provision prohibiting the issuance of nonvoting equity securities"); *see also, Final Order Authorizing* Debtors

2

SWM009703

AA00758

to, *inter alia*, Obtain Postpetition Secured Financing, C.P. # 527 at ¶ 17(i), *In re General Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (authorizing Debtors to implement any necessary amendment to its certificate of incorporation, bylaws or comparable governing documents in order to comply with post-petition DIP loan). Accordingly, the Debtors are entitled to pursue their rights under the Bankruptcy Code to use their cash and to encumber their property, regardless of any purported limitations contained in the organizational documents, so long as the Debtors obtain this Court's approval pursuant to the applicable provisions of the Bankruptcy code.

3.      Moreover, the purported restrictions in the organizational documents on the ability of certain Debtors to file a voluntary petition in bankruptcy constitute unenforceable pre-petition waivers which would adversely affect the interests of third parties. *See In re South East Fin. Associates, Inc.*, 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) (Paskay, J.) ("A prepetition waiver of bankruptcy benefits may be binding unless the agreement was obtained by coercion, fraud or mutual mistake of fact. Such waivers are not self-executing and are not binding on third parties. Thus, if a waiver adversely affects other creditors, it is unlikely that the waiver will be enforced.") (citations omitted).

4.      In this case, the Debtors have a large number of secured and unsecured creditors, each of whom is a third party that is not bound by any such restriction and would be detrimentally impacted by a dismissal, because the approval of the DIP Loan as contemplated by this Motion would be in the best interests of all creditors. As a result, these restrictions are unenforceable, and do not impair any Debtors' ability to institute these chapter 11 proceedings. *See Id.*

--------------------

Here is the language in the order that grants the ability to borrow money and grant liens:

In order to enable them to continue to operate their business during the Interim Period (as defined below), subject to the terms and conditions of this Interim Order, the DIP Loan Agreement, the other DIP Loan Documents, and the Budget (which Budget may not be materially amended or modified during the Interim Period), the Debtors are hereby authorized under the DIP Loan to borrow up to the amount of the Initial Advance during the Interim Period. Notwithstanding any provision of its certificate or articles of incorporation, bylaws, operating agreement, partnership agreement, membership agreement, certificate of formation, certificate of limited partnership, regulations, or comparable governing documents to the contrary, each Debtor is authorized to, and each officer, member, manager, partner, or other comparable authorized signatory of each

3

SWM009704

AA00759

Debtor is hereby authorized to cause such Debtor to, jointly and severally guarantee and pay the DIP Obligations of each other Debtor obligated under the DIP Loan Agreement, and pledge, mortgage and grant security interests in its assets to secure such DIP Obligations, and to execute and enter into any and all of the DIP Loan Agreement, the DIP Loan Documents, and all other documents and transactions necessary to implement and effectuate the terms of the DIP Loan and the DIP Loan Agreement.

Paul

**GENOVESE JOBLOVE & BATTISTA**
PA
*Attorneys at Law*

Paul J. Battista, Esq.
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone:     (305) 349-2300
Direct:     (305) 372-2457
Facsimile: (305) 349-2310
Cell:        (305) 812-8030
E-mail:   pbattista@gjb-law.com
www.gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information contained herein. Also, please notify sender that you have received this communication in error, and delete the copy thereof you have received. Thank you.

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

SWM009705

AA00760

| | |
|---|---|
| From: | K Springfield |
| Sent: | Thursday, February 18, 2010 12:13 PM |
| To: | Tony DiNardo |
| Subject: | FW: Fiddler's |

Here is the final language that was sent to Paul. No more changes so that you can go ahead and file.

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 11:12 AM
**To:** Battista, Paul J.
**Cc:** K Springfield; CJ Lorio; David Radunsky; Helm, Elizabeth; Cox, John
**Subject:** Fiddler's

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the "*Designated Buyer*") for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term "*Purchase Option Period*" shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further,* that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or

REVIEW060481

**EXHIBIT**

8

ALL-STATE LEGAL®

**AA00761**

**PEPI CAPITAL, L.P.**
2300 WEST PLANO PARKWAY
PLANO, TEXAS 75075
(972) 535-1900
FAX: (972) 535-1991

Dated as of December 31, 2009

Anthony DiNardo
Chief Financial Officer
Fiddler's Creek LLC
8156 Fiddlers Creek Parkway
Naples, FL 34114

Commitment Letter
$27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility

Dear Mr. DiNardo:

PEPI Capital, L.P., as Agent[1] and Lender (collectively, "PEPI") is pleased to confirm to Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company") the commitment of PEPI to provide a senior secured debtor-in-possession multiple advance term loan facility to the Company with total advances of up to $27,000,000 (the "Credit Facility") based upon and subject to the terms and conditions set forth in this letter and the term sheet and exhibits attached as Exhibit A hereto (the "Term Sheet" and all exhibits thereto together with this letter, collectively, the "Commitment Letter").

While PEPI has provided a commitment for the entire amount of the Credit Facility, subject to the terms and conditions of this Commitment Letter and the Term Sheet, PEPI may syndicate some of the Credit Facility to additional lenders with a corresponding reduction in PEPI's share of the Credit Facility. PEPI's obligations under the Credit Facility are not contingent upon or conditioned upon syndication of the Credit Facility. Moreover, PEPI has no plans to syndicate the Credit Facility, however, PEPI has the absolute and sole right to syndicate some or all of the Credit Facility.

PEPI shall manage all aspects of any syndication of the Credit Facility, including the timing of all offers to potential lenders, the allocation and acceptance of commitments, the amount offered, and the compensation provided to any lender. The Company agrees that no lender will receive any compensation for its participation in the Credit Facility except as expressly agreed to and offered by PEPI.

The Company agrees to cooperate in PEPI's syndication efforts and use commercially reasonable efforts, at no additional out of pocket cost to the Company, to assist PEPI in forming a syndicate acceptable to PEPI. Such assistance shall include but not be limited to (a) using commercially reasonable efforts to make senior management and representatives of the Company available to participate in meetings and to provide information to potential lenders at such times and places as PEPI may

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Term Sheet attached hereto as Exhibit A.

DA-3072429 v11 1203528-00006



1 of 45

EXHIBIT
9

AA00762

reasonably request, and (b) using commercially reasonable efforts to provide all information reasonably deemed necessary by PEPI to complete the syndication, subject to confidentiality agreements in form and substance reasonably satisfactory to the Company and PEPI. The terms of the Commitment Letter, including those attached as Exhibit A, shall not be modified due to PEPI's syndication efforts.

The Company hereby represents, warrants and covenants that (i) all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading, and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to PEPI by or on behalf of the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to PEPI such Information and Projections as PEPI may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is true and correct on the Closing Date of the Credit Facility.

The Company will promptly reimburse PEPI for all reasonable costs and expenses incurred by PEPI in connection with its continuing review of the Information and Projections and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), any and all due diligence, any and all loan documentation for the Credit Facility, the closing of the Credit Facility, and the enforcement of any of PEPI's rights and remedies under this Commitment Letter, in each case including, without limitation, reasonable attorneys' fees and legal expenses, appraisal fees, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus out-of-pocket expenses for the field examiners of PEPI in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses), and in each case whether or not the Credit Facility closes.

All such charges and expenses are to be paid to PEPI upon demand, together with such advance funds on account of such charges and expenses as PEPI may from time to time request or PEPI may require that the Company pay such charges directly. PEPI has the right to apply to such charges and expenses any sums received from or on behalf of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation. Deposits for expenses received by PEPI will be returned to the Company without interest, less the expenses and charges described above if the Credit Facility does not close, and applied to reduce the loans if the Credit Facility closes.

The Company and all Guarantors agree to indemnify and hold harmless PEPI, and each director, partner, officer, employee, attorney, advisor, agent and affiliate of PEPI (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any and all losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any

2 of 45

DA-3072429 v1I 1203528-00006

AA00763

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

DA-3072429 v11 1203528-00006

AA00764

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the consummation of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

DA-3072429 v11 1203528-00006

AA00765

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter is for the sole benefit of the Company and may not be relied upon by any third party. This Commitment Letter may not be assigned by the Company without the prior written consent of PEPI and may not be amended, waived, or modified, except in writing signed by PEPI and the Company.

This Commitment Letter is governed by and construed in accordance with the laws of the State of Florida, without regard to principles of conflicts of law.

PEPI, THE COMPANY AND ALL GUARANTORS EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

This letter is pursuant to that certain Term Sheet letter dated October 20, 2009, addressed to Mr. Ken Montgomery of Belmont Capital Partners LLC, advisor to you, by Agent under Agent's prior name.

If the Company accepts and agrees to the foregoing, please so indicate by executing the enclosed copy of this letter and returning it to PEPI on or before 6 p.m., eastern time, January 27, 2010, to be effective as of December 31, 2009.

Very truly yours,

PEPI CAPITAL, L.P.

By: _____
David Radunsky, Chief Operating Officer of it general partner

DA-3072429 v11 1203528-00006

5 of 45

AA00766

ACCEPTED to be effective as of December 31, 2009:

**Fiddler's Creek, LLC**

By: GBFC II Two, LLC

By: _Anthony D. Nardo_

Anthony DiNardo, as Chief Financial Officer

and not individually


**GB Peninsula, Ltd.**

By: GB Peninsula, Inc.

By: _Anthony DiNardo_

Anthony DiNardo, as Secretary/Treasurer

and not individually

AA00767

EXHIBIT A

PEPI Capital, L.P.

$27,000,000 Senior Secured Debtor-In-Possession Multiple Advance Term Loan Credit Facility
("Credit Facility")

Summary of Principal Terms and Conditions
("Term Sheet")

| | |
|---|---|
| Borrower: | Fiddler's Creek LLC and GB Peninsula, Ltd. (collectively, the "Company"). |
| Agent: | PEPI Capital, L.P. |
| Lenders: | PEPI Capital, L.P. or its designated affiliate and/or other lenders who may be added from time to time. |
| Guarantors: | All subsidiaries and affiliates of the Company that are listed on Exhibit B (collectively, the "Guarantors"). |
| DIP Financing: | Subject to the terms and conditions hereof, Lenders shall provide a multiple advance senior secured debtor-in-possession - term loan credit facility with aggregate advances of up to $27,000,000 (the "Loan") for use in connection with the anticipated voluntary Chapter 11 bankruptcy filings by the Company and the Guarantors (the "Bankruptcy Cases"), subject to approval by the United States Bankruptcy Court (the "Bankruptcy Court") or any other court taking jurisdiction over such Bankruptcy Cases. The Loan is not a revolving line of credit. Specifically, the repayment of any principal amount of the Loan may not be reborrowed and will not provide additional or renewed availability under the Loan. Advances under the Loan will be subject to limitation based on the maximum outstanding balance at any particular time as set forth on Exhibit D. |
| Purpose and Proceeds: | The proceeds of the Loan shall be used in accordance with an 18-month budget and business plan through the anticipated exit from the Bankruptcy Cases submitted by the Company to the Agent and approved by the Agent in connection with the execution of the Commitment Letter, with any amendments to the budget thereafter to be approved by the Agent (collectively, the "18 Month Budget"). The initial 18-Month Budget attached hereto as Exhibit G is hereby approved by the Lender. The 18 Month Budget shall include, among other things, the Company's operating expenses, working capital needs, professional fees for the bankruptcy proceedings, financing costs for secured lenders, real estate taxes, CDD assessments and the fees and costs |

6 of 45

DA-3072429 v11 1203528-00006

AA00768

associated with the Loan and the preparation and negotiation of documentation for the Loan. Subject to the prior approval of the Agent, Managed Expenses set forth in the 18 Month Budget shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on <u>Exhibit D</u> as of the respective dates set forth on <u>Exhibit D</u>. No proceeds of the Loan will be advanced unless and until each condition precedent thereto has been fulfilled, and with respect to the Initial Advance or any subsequent advances under the Credit Facility, no proceeds of the Loan will be advanced while any event of default has occurred and is continuing there under. The Company will provide to Agent, no later than 15 days prior to each calendar quarter-end, an updated 13-week cash budget for the upcoming 13-week period.

Loan Advances:

Upon and after entry of the Interim Order (hereinafter defined) by the Bankruptcy Court, an advance in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility (the "<u>Initial Advance</u>") may be made in an amount not to exceed $4 million consistent with the initial 13-week budget for amounts for the period of time between the filing of the Bankruptcy Cases and the hearing on the Final Order. Upon entry of the Final Order by the Bankruptcy Court, additional advances (the "<u>Subsequent Advances</u>" and together with the Initial Advance, the "Loan <u>Advances</u>") may be made from time to time thereafter in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility. The Subsequent Advances will be made monthly, with the Company providing Agent with each request for a Loan Advance at least 5 business days prior to any Loan Advance. Loan Advances will be made in multiples of $100,000, with a minimum amount of $500,000. Aggregate Loan Advances may not exceed $27,000,000.00.

Unused Loan Fee:

Upon and after approval of the Loan by the Bankruptcy Court in the Final Order, there will be a 1% per annum fee, calculated and payable monthly, on the amount of the Loan not yet advanced to the Company. Such fee may be paid from the proceeds of the Loan.

Expenses:

Upon two (2) business day's written request from Agent, the Company shall deliver to Agent such deposits as may be necessary, in Agent's reasonable discretion, to cover continuing out of pocket expenses through the maturity and payment in full of the Loan. The Company has provided $275,000 as a deposit for Agent expenses related to Agent due diligence and preparation of this Commitment Letter. In addition to the Commitment Fee, pursuant to the terms of the Fee Letter Agreement (defined below) the Company has deposited an additional $250,000 with Agent, and Agent may retain the

DA-3072429 v11 1303528-00006

AA00769

$250,000 expense deposit, to cover Agent expenses related to remaining due diligence, loan documentation and other third party expenses Agent will incur to obtain Loan approval by the Bankruptcy Court. The deposit is not a cap or a limit on such expenses and the Company shall pay to Agent any expenses in addition to the deposit upon demand. Upon and after funding of the Loan, the Company will advance to Agent such additional expenses as may be required in the reasonable discretion of the Agent to cover continuing expenses of Agent in monitoring and administering the Loan. Subject to Bankruptcy Court approval and inclusion in the approved 18 Month Budget, the Company will reimburse to third parties those expenses and costs advanced to or paid on behalf of the Company to the Agent associated with the Bankruptcy Cases, this Commitment Letter, and closing of the Credit Facility.

**Loan Amount:** Up to $27,000,000, disbursed in multiple advances consisting of the Initial Advance and the Subsequent Advances. At no time shall the outstanding Loan balance exceed $15,000,000. Further, the Loan balance shall not exceed the "Maximum Outstanding Loan Balance" set forth on Exhibit D as of the date set forth on Exhibit D.

**Interest Rate:** 12% per annum, payable monthly in arrears but not greater than the maximum rate provided by applicable law.

**Default Rate:** Upon the occurrence of an event of default, the Interest Rate shall be increased by 300 basis points but not greater than the maximum rate provided by applicable law.

**Mandatory Prepayments:** Proceeds of issuances of equity or indebtedness, any insurance or condemnation recoveries, and 100% of net asset sale proceeds (defined as gross receipts from sale of assets, less costs of closing, including but not limited to, title costs, commissions, CDD buy down, real estate taxes, other allowable normal and customary closing costs) (the "Net Asset Sales Proceeds") shall be applied first to the Loan unless otherwise agreed to by Agent. Until such time as the Loan has been paid in full (including, without limitation, all principal, interest and fees), no payments of principal or interest shall be paid to any existing secured creditors without the express prior written approval of Agent, unless identified in the 18 Month Budget approved by Agent. For avoidance of doubt, the 18 Month Budget includes the payment of interest to secured creditors with mortgage liens on the assets of the Company during the period of the 18 Month Budget.

**Closing Date:** The Initial Advance shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of an Interim Order in form and substance satisfactory to Agent in its reasonable

8 of 45

DA-3072429 v11 1203528-00006



AA00770

discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Initial Advance to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of the Commitment Fee at the time of the Initial Advance and payment in full of all expenses.   The Subsequent Advances shall be funded upon (i) approval thereof by the Bankruptcy Court through the entry of a Final Order in form and substance satisfactory to Agent in its reasonable discretion, (ii) satisfaction of all conditions precedent set forth herein as to the Subsequent Advances to the satisfaction of Agent in its reasonable discretion, and (iii) Agent's receipt of payment in full of all expenses.

**Maturity Date:**

The earlier of (a) eighteen (18) months from the date of the Final Order of the Bankruptcy Court approving the Loan (or such later date as set forth below in the section entitled "Extension Date")(the "Initial Maturity Date"), (b) the entry by the Bankruptcy Court of an order confirming a plan of reorganization for the Company or any Guarantor (unless expressly agreed to by Agent), or (c) the date upon which a final order is entered by the Bankruptcy Court either (i) converting the Company's or any Guarantor's Chapter 11 case to a case under Chapter 7 (unless expressly agreed to by Agent), (ii) approving one or more 363 sales of all or substantially all of the Company's or any Guarantor's assets (unless expressly agreed to by Agent), (iii) appointing a trustee or examiner (with or without expanded powers) in the Company's or any Guarantor's Chapter 11 case, (iv) dismissal of any of the Company's or any Guarantor's bankruptcy cases (unless expressly agreed to by Agent), or (d) the occurrence of an event of default under the Loan documentation and the expiration of any applicable cure period.

**Acceptance Date:**

The Company must accept this Commitment Letter by 6 p.m. eastern time on January 27, 2010, to be effective as of December 31, 2009.

**Commitment Fee:**

On December 31, 2009, the Company and Agent entered into that certain fee letter agreement, as amended by that certain amended fee letter agreement dated January 15, 2010 (collectively, the "Fee Letter Agreement") under which the Company deposited with Agent in escrow the sum of $785,000 to be applied, with the previously paid application fee of $25,000, to the payment of an $810,000 commitment fee (the "$810,000 Commitment Fee Deposit Escrow"). Upon Agent's issuance of this Commitment Letter and execution of this Commitment Letter by both Agent and the Company, 100% of the $810,000 commitment fee (the "Commitment Fee") shall be deemed fully earned, but shall be paid to the Agent by the Agent retaining one half of the $810,000 Commitment Fee Deposit

DA-3072429 v11 1203528-00006

AA00771

Escrow as a non-refundable payment and the remaining unpaid one-half of the Commitment Fee ($405,000.00) shall be financed as part of the Credit Facility and shall be paid to Agent upon funding of the Initial Advance. The remaining one half of the $810,000 Commitment Fee Deposit Escrow will then be wired the next business day by Agent to the account designated by the Company in the Fee Letter Agreement.

Exit Fee:

2% of the funds used to pay the principal outstanding at any time of the Loan, whether (a) upon payment in full of the Loan at maturity, (b) any partial principal payment of the Loan prior to maturity, or (c) any other reduction in accordance with the 18 Month Budget and the terms and conditions of the Credit Facility of the principal amount of the Loan.

Break-Up Fee:

If the Company directly or indirectly, enters into a letter of intent, proposal letter, expense deposit arrangement, commitment letter, loan agreement, or other agreement for a financing alternative to the Credit Facility that is approved by the Bankruptcy Court, then the Company immediately shall pay to PEPI a break-up fee of $1,000,000 (the "Break-Up Fee"). The Break-Up Fee is in addition to any other amount paid or payable hereunder. The Break-Up Fee shall be payable on the earlier of (1) the funding of the alternative financing, or (2) 30 days after approval of the alternative financing by the Bankruptcy Court. The Break-Up Fee is in addition to any other fee or expense reimbursement herein. The Company shall take all necessary action in the Bankruptcy Court to authorize the payment of the Break-Up Fee when it accrues including, without limitation, stipulating that such fee is an allowed Chapter 11 administrative expense payable immediately, budgeting for the Break-Up Fee in any alternative cash collateral or financing budget, and filing an application to pay the Break-Up Fee, if necessary.

Collateral:

The Initial Advance and all indebtedness and obligations under the Loan associated with the Initial Advance will be secured by a Bankruptcy Court-ordered Interim Order providing for first priority liens and first priority senior security interests in all unencumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership

10 of 45

DA-3072429 v11 1203528-00006

interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Unencumbered Collateral") and senior priming liens on all Collateral (as defined below) of the Company and Guarantors. The Subsequent Advances (together with the Initial Advance upon entry of the Final Order, the Loan Advances) and all indebtedness and obligations under the Loan associated with the Initial Advance and the Subsequent Advances will be secured by a Bankruptcy Court-ordered Final Order providing for first priority priming liens and first priority senior security interests in all Unencumbered Collateral and all encumbered tangible and intangible assets, proceeds and cash collateral thereof of the Company and the Guarantors, including, without limitation: all lockbox agreements and lockbox cash; cash and cash equivalents; restricted cash; cash collateral; deposit accounts; accounts; contract rights; inventory; improved and unimproved real property; personal property; goods; plant; equipment; fixtures; vehicles; intangibles (i.e., licenses, franchises, signage, advertising, sales process, websites, domain names, trademarks, patents, etc.); a pledge of 100% of the equity interests (whether stock, membership interests, partnership interests or other ownership interest) of the Company, all Guarantors, and all general partners thereof; Loan guarantees from the Guarantors; and assignment of all material leases, contracts, licenses and permits (all of the foregoing, together with the Unencumbered Collateral, being referred to as the "Collateral").    Both the Unencumbered Collateral and the Collateral shall have no permitted encumbrances senior or equal to the Agent's and the Lenders' liens and security interests except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral, and those matters commonly included as exceptions to title insurance policies in Southwest Florida that may be specifically agreed to in writing by Agent in its sole discretion ("Permitted Liens"). Permitted Liens shall also include the Replacement Liens as defined below, provided that all such Replacement Liens shall be subordinate to the Agent and Lender's liens. Final loan documentation will include provisions that provide for the granting of replacement liens (the "Replacement Liens") subordinate to those of the Agent and Lender to be provided to those secured lenders who have the collateral securing their respective prepetition allowed secured claims sold during the Bankruptcy Cases by the Company and the proceeds from which are not paid to such secured lender in accordance with their prepetition loan documents. The Agent agrees that all such Replacement Liens may be subordinate to its senior priming liens on remaining real estate assets of the Company. For purposes of illustration only, if the Company sells a developed

11 of 45

AA00773

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the "Minimum Net Cumulative Sales Covenant if not paying Managed Expenses" set forth on Exhibit D for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly. In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development, Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

AA00774

6. The Tarpon Club owned by GBFC Marina, Ltd.;

7. The Creek Golf Course owned by FC Golf, Ltd.;

8. The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;

9. The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc.;

10. The undeveloped land including in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America; and

11. The Fiddlers' Creek Sales and Administration buildings owned by 951 Land Holding, Ltd.

| | |
|---|---|
| Cash Account | All cash from Net Asset Sale Proceeds and other operating cash will be held in accounts pledged to benefit of the Agent and over which Agent shall have control (the "Cash Collateral Accounts"), which Cash Collateral Accounts shall be debtor in possession accounts in accordance with the guidelines of the Office of the United States Trustee and shall be disbursed pursuant to the 18 Month Budget so long as there is no pending event of default. All Net Asset Sale Proceeds shall be paid to the Agent to be applied to reduce the Loan. All cash generated from the operations of the Company ("Operating Cash") shall be deposited into separate Cash Collateral Accounts and may be used by the Company in accordance with the 18 Month Budget. |
| Use of Cash Collateral | So long as no event of default occurs and is continuing under the Loan, the Company may use cash in the Cash Collateral Accounts, other than Net Asset Sale Proceeds which shall be paid to the Lender to reduce the Loan, in accordance with the 18 Month Budget. The use of Operating Cash in accordance with the 18 Month Budget as provided herein shall not be deemed a Loan Advance. |
| Collateral Monitoring Fee: | The Company shall pay to Agent a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding or there is any remaining availability under the Loan. The Collateral Monitoring Fee may be paid from the proceeds of the Loan. |
| Extension Date: | Upon 30 days' prior written notice to Agent, payment of the |

DA-3072429 v11 1203528-00006

AA00775

|                    | Extension Fee (hereinafter defined), and submission to Agent of an approved budget for the extension period, the Company may extend the Initial Maturity Date for up to two (2) consecutive six (6) month periods, provided that as of the date of any proposed extension no uncured event of default has occurred and is continuing, and no earlier termination triggering event has occurred. |

Extension Fee:

An Extension Fee equal to 0.5% of the then-outstanding principal balance on the Loan plus any amount not yet advanced under the Loan (the "Extension Fee"), shall be payable by the Company for each exercised extension on or before the date of each such extension. The Extension Fee may be paid from the proceeds of the Loan.

DIP Provisions:

The Company will obtain (a) within forty-five (45) days of filing of the Bankruptcy Cases an interim order of the Bankruptcy Court approving the Initial Advance (the "Interim Order"), and (b) will within forty-five (45) days after the entry of such Interim Order obtain a final order (the "Final Order"; and collectively with the Interim Order, the "Orders") of the Bankruptcy Court approving the Loan Advances on a final basis, and fixing the funding date for the Subsequent Advances, which Final Order shall not have been appealed, reversed, modified, amended, stayed or vacated. Subject to Agent's approval, one or more advances may be made under the Loan in accordance with the terms herein. The Interim Order shall provide that the Initial Advance shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by first priority liens on and first priority senior security interests in favor of Agent and the Lenders in all of the Unencumbered Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code and also secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other administrative expenses as may be agreed to by Agent and Permitted Liens). The Final Order shall provide that the Initial Advance together with the Subsequent Advances shall be secured by super-priority administrative claims under Section 364(c)(1) of the Bankruptcy Code and secured by priming first priority liens on and first priming priority senior security interests in favor of Agent and the Lenders in all of the Collateral then owned or thereafter acquired by the Company or any Guarantor pursuant to Sections 364(c)(2), and (c)(3) and 364(d) of the Bankruptcy Code (subject only to such "carve-outs" for professional fees, other

DA-3072429 v11 1203528-00006

AA00776

administrative expenses as may be agreed to by Agent and Permitted Liens). The Orders as entered by the Bankruptcy Court shall be in form and substance acceptable to Agent in its reasonable discretion, and at a minimum, shall contain provisions under Section 364(e) granting all such senior and priming liens, security interests and claims to Agent and the Lenders for all monies actually advanced even if such Orders are subsequently appealed, vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Agent and the Lenders to, upon five business days notice to the Company, immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens, security interests and claims granted to Agent and the Lenders shall contain cross default and cross collateral provisions with all other debt owed to the Lender. Agent and Lenders shall have no obligation to fund the Initial and Subsequent Advances should the Orders, at the time of Closing and funding, have been stayed, or as to the Final Order, is subject to appeal or modification, or otherwise not be in a form satisfactory to Agent in its reasonable discretion.

**Other Conditions Precedent:**   Standard and customary for loans and transactions of this type and such other conditions precedent to the Initial Advance and each Subsequent Advance under the Loan as required by Agent in its reasonable discretion including, but not limited to, the following:

1. All the Company fees payable to Agent shall be current as provided herein, including without limitation, all fees of Agent's professionals.

2. Subject to the 18 Month Budget and limited by the terms and conditions herein, all of the Company's chapter 11 administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or addressed in a manner satisfactory to Agent in its reasonable discretion.

3. Completion of due diligence to the satisfaction of Agent, such due diligence to include, but not be limited to, examination of the Collateral and title thereto and additional due diligence related to the Company's business, industry, legal, environmental and technical related matters.

4. Completion of legal due diligence investigation by counsel to Agent, with results satisfactory to Agent and its counsel, of all matters which Agent deems relevant, in its reasonable discretion.

15 of 45

5. The Company shall have executed and delivered all documentation required by Agent and its counsel in form and substance satisfactory to Agent and its counsel including, without limitation, a general release of all claims against Agent and Lenders through the time of funding, and the Company and Guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the liens, security interests and claims of Agent and the Lenders.

6. All necessary consents and approvals for the Company to enter into the Credit Facility shall have been obtained.

7. Receipt of current financial statements. Further, Agent must be satisfied that all financial statements required by Agent have been received and delivered to it fairly present the business and financial condition of the Company and its subsidiaries.

8. No material misstatements in or omissions from the materials previously furnished to Agent for its review.

9. No previously undisclosed intercompany transactions shall have occurred. Further, Agent must be satisfied that all listings of inter company transactions and transactions with affiliates required by Agent have been received.

10. There shall not be any litigation or other proceeding the result of which might have a material adverse effect on the Company and its affiliates and subsidiaries or any of their assets other than as listed on Exhibit F.

11. No material changes in governmental regulations or policies having a material adverse effect on the Company shall have occurred prior to the Closing Date.

12. The Company and each Guarantor shall be in good standing in its state of incorporation and qualified to do business in any state in which Collateral is located.

13. All motions, orders and bankruptcy court documentation regarding the Loan shall be in form and substance reasonably satisfactory to Agent and consistent with the terms herein.

14. Until all the Company obligations are paid in full to Agent and the Lenders, the Company shall provide to Agent not less than two (2) business days' advance notice of any filings made in the bankruptcy case(s) of

16 of 45

the Company and the Guarantors, provided that the Company and Guarantors shall provide as much notice as is reasonably possible for emergency motions. Agent shall be given not less than five (5) business days' advance notice of any hearing regarding the Loan.

15. Such other commercially reasonable conditions precedent as Agent may require in its reasonable discretion, including, without limitation, satisfaction of each of the items listed on Exhibit B attached hereto.

16. Florida Financial Investments, Inc. shall execute and deliver to Agent documentation to subordinate its liens on the Collateral to those liens granted Agent and Lenders in the Interim and Final Orders consistent with the terms of this Commitment Letter.

**Collateral Monitoring**  Agent or its financial advisor shall have customary rights to enter and inspect the premises, interview employees and accountants, and examine books and records, etc., upon reasonable notice to the Company. The Company shall provide Agent with all reports provided to any third party as well as such financial reports as Agent may request from time to time.

**Guarantees:**  All of the Guarantors shall guaranty the Loan and shall execute the Loan documents required by Agent. The Company represents, warrants, covenants and agrees that (i) all of the entities that operate, own, or control real estate within the Fiddlers' Creek development are listed on Exhibit E, provided however that the Guarantors shall not include GB 31, Ltd., Fiddler's Creek Foundation, Inc. or Aubrey Ferrao, (ii) all of such entities shall be Guarantors, and (iii) all of such entities will be the subject of individual chapter 11 case filings. For avoidance of doubt, equity interests in the Company owned by Mr. Ferrao will be pledged as Collateral under the Loan.

**Representations and Warranties:**  Customary for loans and transactions of this type and such other representations and warranties required by Agent in its reasonable discretion.

**Covenants:**  Definitive documentation to contain affirmative and negative covenants customary for loans and transactions of this type and such other affirmative and negative covenants required by Agent in its reasonable discretion, including but not limited to:

1. The actual amount spent for any line item in the 18 Month Budget shall not vary from the amount provided for such item in the 18 Month Budget by more than 10% in any 13 week period, or in the aggregate.

DA-3072429 v11 1203528-00006

AA00779

2. Covenants related to asset sales, lot sales and milestones related to the Company's business plan and ultimate exit from bankruptcy, as specified in Exhibits C and D.

3. Limitations on maximum outstanding loan balance as set forth in Exhibit D.

4. Prohibitions on additional indebtedness without the Agent's prior written consent.

5. Restricted payments and related party transactions prohibited without the Agent's consent.

6. Restriction on the Company's ability to transfer or sell assets outside of the ordinary course of business without the Agent's consent (including pursuant to sale/leaseback transactions), unless required in conjunction with the Loan, with all proceeds used first to repay the Loan.

7. Limitation on incurrence of liens subject to the Agent's reasonable consent.

8. Subject to the limitations in the 18 Month Budget and contained herein, maintain all taxes (including without limitation ad valorem taxes) current with respect to the Collateral as authorized by Bankruptcy Court order.

9. Restriction on subsidiaries' ability to issue or sell ownership interests, unless as included in the Company's Plan of Reorganization.

10. Restriction on the Company's ability to consolidate, merge or transfer all or substantially all of its assets and the assets of its subsidiaries or affiliates.

11. Subject to the limitations in the 18 Month Budget and contained herein, maintain adequate insurance coverage in types and amounts satisfactory to Agent in its reasonable discretion.

12. The Company and the Guarantors will maintain current status on obligations with respect to assessments and other obligations to Community Development District #1 ("CDD#1") and Community Development District #2 ("CDD#2"). Subject to the prior approval of the Agent, Managed Expenses under the 18 Month Budget, including past due obligations to CDD#2 2003A Series, 2003 B Series, and 2004 Series bonds, shall only be paid if the Company meets the "Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses" as set forth on Exhibit D as of the respective dates set forth on Exhibit D. Otherwise, the Company and the Guarantors will make no payment of any CDD#1 or CDD#2 assessments for debt service, either pre-petition or post-petition.

DA:3072429 v11 1203528-00006

AA00780

13. The Company shall make representations that the debt service and outstanding assessments as of 12/31/09 are $3,858,191.26, and $36,671,476.99 respectively, for CDD1 and $3,470,653.89 and $72,887,413.41 respectively, for CDD2.

14. The Company shall represent that all land securing the 2003 and 2004 CDD2 bonds is platted and subject to final platting.

15. Subject to the limitations in the 18 Month Budget and contained herein and unless otherwise prohibited by the Bankruptcy Code, the Company will perform all obligations and responsibilities with respect to their participation, management and oversight of Fiddlers Creek Foundation, Tarpon Club and Fiddlers Creek Golf Club to ensure the club operations continue to provide their respective services to the members of each club.

16. Deposit of all Net Asset Sale Proceeds into Cash Collateral Account.

17. Weekly and monthly reporting to Agent, including:
    a. Weekly Sales Report to be submitted no later than close of business on the Wednesday following, to include:
       i. Closed sales by unit or property description, with buyer, sales price, costs of sales (including any commissions, and CDD buy downs), and net sales proceeds, and identifying any special discounts or concessions
       ii. Listing of assets put under contract, including sale price, release price, expected closing date, down payment
       iii. Weekly sales pipeline report, including any residential units, bulk lots, home sites, hotel condo, land or any other material asset of the Company
       iv. Report on any marketing activity undertaken
       v. Closings Report (Sales Price less seller costs for net cash at closing).
    b. Rolling 13 week cash forecast with comparison of actual to projected, including comments explaining variances from the forecast and 18 Month Budget
    c. Monthly update of litigation and property liens
    d. Monthly report of changes in any club membership roll, including:
       i. Additions
       ii. Submitted resignations
       iii. Removals
       iv. Delinquencies
    e. Monthly report on status of Community Development District projects and cash balances
    f. Monthly reports on any permitting and zoning activity

19 of 45

DA-3072429 v11 [203528-00006]

AA00781

g. Monthly financial reports for each Debtor, including a
balance sheets and separate reports for each operating
entity (golf course, clubs, etc.).

h. All reports submitted to any creditor, creditor
committee, US Trustee, or other governmental authority

i. A monthly narrative description of the status of sales,
development, legal, CDD, operating properties, HOA,
financing and bankruptcy issues such that we are fully
informed as to the status of the project

j. A rolling monthly forecast to be provided quarterly,
which shall include the year-to-date actual results (i.e.,
from the funding date to the current period) plus receipts
and disbursements which are anticipated to be incurred
for the next 18 months, together with a comparison to
the approved business plan

k. Monthly operating statement and statement of cash
receipts and disbursements showing both the current
month and year-to-date actual results compared to the
approved business plan

l. Such other weekly or monthly reports that Agent may
request

**Events of Default:**    Customary for loans and transactions of this type and such other
Events of Default required by Agent in its reasonable discretion
including, but not limited to, a breach of the variance covenant
relating to the Budget, exceeding maximum outstanding loan
balance for a specific period as set forth on Exhibit D, failing to
achieve minimum cumulative sales as set forth on Exhibit D, or
selling assets at prices less than the minimum release prices as
set forth on Exhibit C. In addition, the events of default shall
contain reasonable notice and cure provisions before
acceleration of the debt and enforcement of remedies.

**Purchase Option:**    The Company and/or any of its affiliates or principals shall have
the right, exercisable for thirty calendar days beginning upon
occurrence of the Maturity Date, to acquire the Loan from Agent
and Lenders for a cash payment in an aggregate amount equal to
the sum of the then outstanding principal indebtedness, accrued
but unpaid interest thereon to the date of purchase, plus any and
all fees, costs and expenses due and owing by the Company
under the Loan, including, without limitation, all fees, costs and
expenses that would be earned upon payment in full of the
outstanding balance of the Loan. Upon exercise of the Purchase
Option, the Company and the Guarantors shall provide a written
general release of all claims to the Agent and Lenders in form
reasonably acceptable to Agent, and Agent and Lenders will quit
claim and assign to purchaser without recourse, representation,
or warranty whatsoever all of Agent's and Lender's right, title
and interest under the Loan, and all collateral and other

DA-3072429 v11 1203528-00006

AA00782

|  | supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan documentation. |
|---|---|
| Governing Law: | State of Florida. |
| Due Diligence: | There is a due diligence checklist which shall be updated regularly to reflect the delivery and receipt of items required by the conditions precedent terms herein. |
| Expenses and Indemnification: | Until such time as the Loan is paid in full, the Company shall reimburse Agent, upon demand, for all direct and indirect costs, fees, and expenses of Agent. Indemnification and release provisions customary for loans and transactions of this type and satisfactory to Agent in its reasonable discretion will be provided for in the definitive documentation. |

DA-3072429 v11 1203528-00006

AA00783

## EXHIBIT B

### Additional Conditions Precedent

1. Payment of the Commitment Fee to Agent.

2. Bankruptcy Court Approval of the Credit Facility and all documentation for the Credit Facility shall be in form and substance acceptable to Lender.

3. Delivery to Agent of Certified Articles/Certificates of Formation/Organization for the Company and each limited liability company Guarantor or general partner of a Guarantor.

4. Delivery to Agent of Certified Certificates of Limited Partnership for each limited partnership Guarantor.

5. Delivery to Agent of Certified Articles/Certificates of Incorporation for each corporate Guarantor or general partner of a Guarantor.

6. Delivery to Agent of Operating Agreements/Regulations for the Company and each limited liability company Guarantor or general partner of a Guarantor.

7. Delivery to Agent of Agreements of Limited Partnership for each limited partnership Guarantor.

8. Delivery to Agent of Bylaws for each corporate Guarantor or general partner of a Guarantor.

9. Delivery to Agent of Certificates of Existence and Good Standing for the Company, each Guarantor, and each general partner of a Guarantor from such person's jurisdiction of organization and, if not organized in Florida, from the State of Florida.

10. Delivery to Agent of appraisals from early 2009 for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an appraiser, satisfactory to Agent. The Agent consents to Integra Realty as being satisfactory to the Agent for this purpose only.

11. Delivery to Agent of current ALTA or comparable Surveys for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by a surveyor, satisfactory to Agent.

12. Delivery to Agent of current Phase I Environmental Reports for all real property owned by the Company, any subsidiary of the Company, or any Guarantor in form and substance, and performed by an engineer, satisfactory to Agent.

13. Delivery to Agent of Zoning Letters for all real property collateral.

14. Delivery to Agent of Flood Letters for all real property collateral.

15. Delivery to Agent of Utility Letters for all real property collateral.

16. As to the Interim Order, delivery to Agent of Title Searches / Commitments for Mortgagee's Title Insurance Policies for all unencumbered real property collateral in form and substance, and prepared by a title company, satisfactory to Agent. As to the Final Order, delivery to Agent of

Title Searches / Commitments for Mortgagee's Title Insurance Policies for all real property collateral in form and substance, and prepared by a title company, satisfactory to Agent and showing no title exceptions other than those approved by Agent.

17. For each Community Development District affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A.    Enabling Legislation or Creation Order;

B.    Construction of its Board of Directors;

C.    Name and contact information for each board member;

D.    Name and contact information for its attorney;

E.    Name and contact information for its financial advisor and/or bookkeeper;

F.    Name and contact information for its auditor;

G.    Name and contact information for its engineer;

H.    Copy of each Project Improvement Acquisition Agreement entered into by the CDD and any developer of land in the district;

I.    Each assignment of the Project Improvement Acquisition Agreements in item H;

J.    Copy of the last offering statement;

K.    Copy of the last audit;

L.    Confirmation of the development status of land within the CDD;

M.    Confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD;

N.    Identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD;

O.    It's budget;

P.    All bank account information;

Q.    Assessments on all properties for debt service and other operations;

R.    Financial statements for the CDD;

S.    Annual assessments;

T.    Total bond obligations related to debtor-owned properties in each bond issue (by unit/lot); and

DA-3072429 v11 1203528-00006

AA00785

U.     Copies of all annual financial information and operating data delivered as part of the CDD's continuing disclosure obligations pursuant to its offering statement.

18.     For each Homeowner's Association affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A.     Identification of the specific real property collateral subject to the Homeowner's Association;

B.     Documentation of its financial condition;

C.     Its organizational documents;

D.     Its budget;

E.     Its Financial Statements;

F.     Any CCRs (with all amendments);

G.     The results of a Facility Inspection (pool, building, entries, etc.);

H.     An overhead analysis;

I.     A list of Declarants and Board positions (i.e., who controls); and

J.     Comprehensive Dues information (land, lots, homes, etc.).

19.     Delivery to Agent of copies of the real property tax statements for all real property collateral.

20.     Delivery to Agent of all plats for all real property collateral.

21.     Delivery to Agent of a list of leases with affiliated entities, in form and substance satisfactory to Agent.

22.     Delivery to Agent of a list of all payments or other obligations required to maintain entitlements and zoning, in form and substance satisfactory to Agent.

23.     Delivery to Agent of Financial Statements for the Company and each Guarantor, in form and substance satisfactory to Agent.

24.     Delivery to Agent of a 13 week Cash budget for the Company and its subsidiaries, in form and substance satisfactory to Agent.

25.     Delivery to Agent of the 2010 Budget and Business Plan for the Company and its subsidiaries, in form and substance satisfactory to Agent.

26.     Delivery to Agent of UCC Searches for the Company and each Guarantor.

27.     Delivery to Agent of a list of all existing lenders to the Company or any Guarantor in form and substance satisfactory to Agent.

DA-3072429 v11 1203528-00006

AA00786

28. Identification by the Company of the specific real property collateral impacted by each existing loan to the Company or any Guarantor, in form and substance satisfactory to Agent.

29. Delivery to Agent of copies of all existing loan and collateral documents for each existing loan to the Company or any Guarantor.

30. Identification by the Company of all outstanding receivables for all real and personal property collateral, in form and substance satisfactory to Agent. Delivery to Agent of all operating cash flow reports for any revenue generating activity at the project.

31. Delivery to Agent of a list showing the amount of deposits being held by each owner of real property collateral and any anticipated forfeitures, in form and substance satisfactory to Agent.

32. Delivery to Agent of a list of all fixed assets of the Company and each Guarantor, including, without limitation, vehicles and equipment, in form and substance satisfactory to Agent.

33. Delivery to Agent of a list of all copyrights, trademarks and patents owned or licensed to the Company and each Guarantor, in form and substance satisfactory to Agent.

34. Delivery to Agent of a detailed description and summary of all insurance currently held by the Company and each Guarantor and a list of any pending claims, in each case in form and substance satisfactory to Agent.

35. Delivery to Agent of copies of the most recent tax returns filed by the Company and each Guarantor.

36. Delivery to Agent of a list, in form and substance satisfactory to Agent, of any pending litigation against the Company, any Guarantor, or any of their respective assets, including, without limitation, any real or personal property collateral.

37. Delivery to Agent of a list and copies of any agreements containing a right of first refusal with respect to any real or personal property collateral.

38. Delivery to Agent of copies of any joint venture agreements entered into by the Company or any Guarantor.

39. The execution of and delivery to Agent by the Company and each Guarantor, as applicable, of each of the following documents, in form and substance satisfactory to Agent:

    A. Loan Agreement;

    B. Promissory Note;

    C. Security Agreement (shareholder of the Company, the Company and each Guarantor);

    D. Pledge Agreement (the Company and each Guarantor) covering such person's ownership interests in the Company and its subsidiaries;

    E. Stock Power (for each certificated ownership interest pledged to Agent and Lenders);

    F. Account Control Agreements for each deposit account of the Company and each

DA-3072429 v11 1203528-00006

AA00787

Guarantor;

G.    Guaranty Agreement (Guarantors);

H.    Mortgages for all real property collateral and security agreements and financing statements for all personal property collateral;

I.    Assignments of Leases and Rents for all real property collateral;

J.    Environmental Indemnities for all real property collateral;

K.    Assignments of all material contracts of the Company and each Guarantor;

L.    Omnibus Officer's Certificates of the Company and each Guarantor with Incumbency; and

M.    Notice of Final Agreement.

40.    Preparation and filing of UCC-1 Financing Statements for the Company and each Guarantor.

41.    Delivery to Agent of all stock certificates or other certificates of ownership in the Company and its subsidiaries pledged as collateral.

42.    Delivery to Agent of Legal Opinion Letters from legal counsel to the Company and each Guarantor containing customary opinions of legal counsel including, without limitation, legal opinions with respect to the Company, the Guarantors, all documentation for the Loan, the collateral, and the transactions contemplated hereby, all of which opinions are satisfactory to the Agent and its counsel.

44.    Delivery to Agent of Certificates of Insurance for all insurance held by the Company and each Guarantor.

45.    Delivery to Agent of Insurance Policy Endorsements for all insurance held by the Company and each Guarantor in form and substance acceptable to Agent.

46.    Delivery to Agent of Resolutions/Unanimous Consent of the Company and each Guarantor in form and substance satisfactory to Agent and authorizing, among other things, the Loan, all transactions contemplated hereby, and all documentation for the Loan and such transactions.

47.    Delivery to Agent of Mortgagee's Title Insurance Policies for all encumbered and unencumbered real property collateral in form and substance, and issued by a title company, satisfactory to Agent, containing Endorsements satisfactory to Agent, and subject only to exceptions approved by Agent.

48.    Payment of all mortgage taxes on all real property collateral except as agreed to by the Company and the Agent.

49.    Filing of Bankruptcy Petitions in the Bankruptcy Court for the Company and all related entities and subsidiaries.

50.    Delivery by the Company of Creditor accounts payable listings and service lists for each filing

DA-3072429 v11 1203528-00006

AA00788

entity.

51.  Filing of First Day motions with the Bankruptcy Court customary for chapter 11 bankruptcies of this type.

52.  Filing with the Bankruptcy Court of motion for use of cash collateral in form satisfactory to Agent and the Company.

53.  The Bankruptcy Court's entering of the Interim Order in form satisfactory to Agent and the Company.

54.  The Bankruptcy Court's entering of the Final Order in form satisfactory to Agent and the Company.

54.  The Bankruptcy Court's entering an order for the use of cash collateral in accordance with the 18 Month Budget, which is in form satisfactory to Agent and the Company.

55.  Filing of a motion for debtor-in-possession financing with the Bankruptcy Court in form satisfactory to Agent and the Company.

56.  Timely delivery to Agent of any other materials and information requested by Agent and needed in Agent's reasonable discretion for completion of Agent's due diligence with respect to the Company, the Guarantors and the collateral, including, without limitation, all real and personal property collateral.

57.  Without the prior express written approval of the Agent and Lenders, the Company and each Guarantor shall not (i) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or terminate any provision of the Credit Facility or any protection granted to Agent and the Lenders there under, or (B) extinguish, subordinate or diminish any security interest, lien or claim of the Agent or any Lender, or (ii) seek, consent to, or join in the approval of any matter or any plan of reorganization which purports to do any of the things described in (i)(A) and (i)(B). Any such action taken by the Company or any Guarantor will be an enforceable Event of Default under the Credit Facility, and if such action is taken by the Company or any Guarantor, the commitment of Agent to provide the Credit Facility will terminate and Agent and the Lenders will have no obligation to provide any advances under the Credit Facility.

DA-3072429 v11 1203528-00006

**AA00789**

## Minimum Release Price/CDD Buy down Schedule
### Exhibit C

| Village | Unit | Minimum Gross Sale Price | CDD Buy down | Minimum Release Price |
|---|---|---|---|---|
| Cotton Green | Lot 45 | 201,719 | 6,100 | 174,618 |
| Mallards Landing | 31-A | 414,720 | 20,327 | 345,743 |
| Bellagio | 6 | 713,359 | 17,257 | 624,241 |
| Bellagio | 11 | 605,063 | 17,257 | 526,556 |
| Bellagio | 16 | 380,439 | 17,257 | 308,932 |
| Bellagio | 30 | 629,909 | 17,257 | 551,402 |
| Bellagio | 33 | 640,941 | 17,257 | 562,434 |
| Bellagio | 34 | 688,505 | 17,257 | 609,997 |
| Bellagio | 35 | 290,137 | 17,257 | 211,630 |
| Majorca | 4 | 888,783 | 25,035 | 794,098 |
| Majorca | 5 | 1,027,459 | 25,035 | 918,424 |
| Cranberry Crossing | 25 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 30 | 356,270 | 25,907 | 298,863 |
| Cranberry Crossing | 36 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 43 | 450,162 | 25,907 | 382,605 |
| Cranberry Crossing | 47 | 450,162 | 25,907 | 382,605 |
| Sauvignon | 8 | 963,115 | 15,718 | 877,396 |
| Serena | 6-102 | 161,954 | 11,398 | 123,492 |
| Serena | 7-201 | 249,337 | 11,398 | 210,875 |
| Serena | 8-201 | 246,405 | 11,398 | 207,943 |
| Serena | 11-202 | 254,468 | 11,398 | 216,006 |
| Serena | 13-202 | 247,584 | 11,398 | 209,122 |
| Serena | 15-201 | 477,800 | 11,398 | 439,338 |
| Serena | 17-102 | 508,548 | 11,398 | 459,354 |
| Serena | 17-201 | 518,231 | 11,398 | 479,769 |
| Serena | 17-202 | 652,546 | 11,398 | 593,182 |
| Serena | 19-101 | 435,318 | 11,398 | 396,856 |
| Serena | 19-102 | 435,318 | 11,398 | 396,856 |
| Serena | 19-201 | 539,653 | 11,398 | 501,191 |
| Marengo | 1-102 | 160,765 | 13,943 | 125,822 |
| Marengo | 3-202 | 153,857 | 13,943 | 116,814 |
| Marengo | 4-103 | 155,683 | 13,943 | 120,740 |
| Marengo | 6-202 | 394,182 | 13,943 | 357,139 |
| Marengo | 7-203 | 144,227 | 13,943 | 107,184 |
| Marengo | 8-204 | 186,745 | 13,943 | 146,552 |

DA-3072429 v11 1203528-00006

AA00790

| | | | | |
|---|---|---|---|---|
| Marengo | 9-201 | 420,959 | 13,943 | 380,766 |
| Marengo | 9-203 | 388,387 | 13,943 | 351,344 |
| Marengo | 10-103 | 374,163 | 13,943 | 332,220 |
| Marengo | 10-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 10-203 | 398,637 | 13,943 | 354,594 |
| Marengo | 10-204 | 431,670 | 13,943 | 383,077 |
| Marengo | 11-102 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-103 | 384,412 | 13,943 | 349,469 |
| Marengo | 11-201 | 434,199 | 13,943 | 394,006 |
| Marengo | 11-202 | 398,637 | 13,943 | 361,594 |
| Marengo | 11-203 | 398,637 | 13,943 | 361,594 |
| Millbrook | 10 | 728,692 | 45,420 | 629,824 |
| Millbrook | 11 | 884,609 | 45,420 | 774,729 |
| Millbrook | 12 | 878,236 | 45,420 | 768,806 |
| Millbrook | 13 | 900,143 | 45,420 | 789,166 |
| Callista | 06-101 Model | 514,434 | 11,748 | 465,936 |
| Callista | 06-102 Model | 476,295 | 11,748 | 429,897 |
| Callista | 06-103 | 421,565 | 11,748 | 383,566 |
| Callista | 06-104 | 470,261 | 11,748 | 430,863 |
| Callista | 06-201 | 396,997 | 11,748 | 354,449 |
| Callista | 06-202 Model | 564,532 | 11,748 | 516,033 |
| Callista | 06-203 | 476,992 | 11,748 | 436,193 |
| Callista | 06-204 Model | 645,349 | 11,748 | 591,951 |
| Callista | 10-101 | 463,267 | 11,748 | 423,869 |
| Callista | 10-102 | 421,565 | 11,748 | 383,566 |
| Callista | 10-103 | 423,102 | 11,748 | 383,704 |
| Callista | 10-104 | 468,622 | 11,748 | 429,224 |
| Callista | 10-202 | 465,408 | 11,748 | 426,010 |
| Callista | 10-203 | 469,158 | 11,748 | 429,760 |
| Callista | 12-101 | 457,911 | 11,748 | 418,513 |
| Callista | 12-103 | 303,544 | 11,748 | 265,545 |
| Callista | 12-104 | 200,036 | 11,748 | 160,638 |
| Callista | 12-201 | 265,387 | 11,748 | 222,839 |
| Callista | 12-203 | 338,560 | 11,748 | 297,762 |
| Callista | 12-204 | 265,387 | 11,748 | 222,839 |
| Callista | 13-101 | 338,466 | 11,748 | 299,068 |
| Callista | 13-103 | 307,155 | 11,748 | 269,157 |
| Callista | 13-202 | 452,556 | 11,748 | 411,758 |
| Callista | 13-203 | 210,469 | 11,748 | 169,670 |
| Callista | 14-101 | 340,071 | 11,748 | 300,673 |
| Callista | 14-102 | 372,434 | 11,748 | 334,436 |
| Callista | 14-103 | 190,391 | 11,748 | 152,393 |
| Callista | 14-202 | 256,612 | 11,748 | 215,814 |

DA-3072429 v11 1203528-00006

AA00791

| | | | | |
|---|---|---|---|---|
| Callista | 14-204 | 294,341 | 11,748 | 251,792 |
| Callista | 15-101 | 447,201 | 11,748 | 407,803 |
| Callista | 15-102 | 406,500 | 11,748 | 368,502 |
| Callista | 15-103 | 229,847 | 11,748 | 191,849 |
| Callista - SOLD | 15-104 | | 11,748 | -39,398 |
| Callista | 15-201 | 413,047 | 11,748 | 370,499 |
| Callista | 15-202 | 342,480 | 11,748 | 301,682 |
| Callista | 15-203 | 342,480 | 11,748 | 301,682 |
| Callista | 16-102 | 191,194 | 11,748 | 153,195 |
| Callista | 16-204 | 297,921 | 11,748 | 255,373 |
| Callista | 17-101 | 271,056 | 11,748 | 231,658 |
| Callista | 17-102 | 246,566 | 11,748 | 208,568 |
| Callista | 17-103 | 324,542 | 11,748 | 286,544 |
| Callista | 17-201 | 348,916 | 11,748 | 306,368 |
| Callista | 17-203 | 274,000 | 11,748 | 233,202 |
| Menaggio | 4-102 | 658,237 | 8,558 | 608,029 |
| Menaggio | 5-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 5-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 6-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 7-102 | 502,117 | 8,558 | 453,309 |
| Menaggio | 11-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 11-201 | 845,892 | 8,558 | 788,684 |
| Menaggio | 12-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 12-201 | 639,878 | 8,558 | 591,070 |
| Menaggio | 16-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 16-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-101 | 502,117 | 8,558 | 460,309 |
| Menaggio | 17-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-102 | 502,117 | 8,558 | 460,309 |
| Menaggio | 18-201 | 322,770 | 8,558 | 273,962 |
| Menaggio - SOLD | 19-102 | 314,272 | 8,558 | 272,464 |
| Chiasso | Lot # 1 | 1,497,350 | 33,100 | 1,394,250 |
| Chiasso | Lot # 2 | 1,559,146 | 33,100 | 1,456,046 |
| Chiasso | Lot # 3 | 1,751,889 | 33,100 | 1,648,789 |
| 116 | | | | 0 |
| | | | | 0 |
| Mahogany Bend | B23 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B24 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B27 | 212,735 | 13,943 | 184,975 |

DA-3072429 v11 1203528-00006

AA00792

| | | | | |
|---|---|---|---|---|
| Mahogany Bend | B28 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B29 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B30 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B31 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B32 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B33 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B34 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B35 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B36 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B37 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | B38 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C1 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C2 | | 13,943 | -27,760 |
| Mahogany Bend | C3 | | 13,943 | -27,760 |
| Mahogany Bend | C4 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C5 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C6 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C7 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C8 | 212,735 | 13,943 | 184,975 |
| Mahogany Bend | C9 | 212,735 | 13,943 | 184,975 |
| Isla Del Sol | 2 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 3 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 4 | | 13,943 | -32,293 |
| Isla Del Sol | 10 | | 13,943 | -32,293 |
| Isla Del Sol | 17 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 18 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 19 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 20 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 22 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 25 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 28 | 140,203 | 13,943 | 107,910 |
| Isla Del Sol | 29 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 30 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 31 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 32 | | 13,943 | -32,293 |
| Isla Del Sol | 33 | 325,841 | 13,943 | 293,548 |
| Isla Del Sol | 34 | 325,841 | 13,943 | 293,548 |

DA-3072429 v11 1203528-00006

AA00793

## EXHIBIT D

### Fiddler's Creek

Cumulative Home Sales/Maximum Outstanding Loan Balance Covenant

| Date | Minimum Net Cumulative Sales Threshold for Payment of Managed Expenses | Minimum Net Cumulative Sales Covenant if not paying Managed Expenses | Maximum Outstanding Loan Balance Covenant |
|---|---|---|---|
| January 31, 2010 | $12,000,000 | | $10,000,000 |
| February 28, 2010 | $12,000,000 | | $10,000,000 |
| March 31, 2010 | $12,000,000 | | $10,000,000 |
| April 30, 2010 | $12,000,000 | | $10,000,000 |
| May 31, 2010 | $12,000,000 | | $10,000,000 |
| June 30, 2010 | $12,000,000 | $5,000,000 | $10,000,000 |
| July 31, 2010 | $12,000,000 | | $12,000,000 |
| August 31, 2010 | $12,000,000 | | $12,000,000 |
| September 30, 2010 | $12,000,000 | $8,000,000 | $13,000,000 |
| October 31, 2010 | $15,000,000 | | $15,000,000 |
| November 30, 2010 | $15,000,000 | | $15,000,000 |
| December 31, 2010 | $15,000,000 | $12,000,000 | $15,000,000 |
| January 31, 2011 | $15,000,000 | | $12,000,000 |
| February 28, 2011 | $15,000,000 | | $10,000,000 |
| March 31, 2011 | $20,000,000 | $20,000,000 | $8,000,000 |
| April 30, 2011 | $20,000,000 | | $6,000,000 |

DA-3072429 v11 1203528-00006

AA00794

| | | | |
|---|---|---|---|
| May 31, 2011 | $20,000,000 | | $5,000,000 |
| June 30, 2011 | $30,000,000 | $30,000,000 | $0 |

DA-3072429 v11 1203528-00006

AA00795

EXHIBIT E

Schedule of Fiddler's Creek LLC and Affiliates and Subsidiaries

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| 951 LAND HOLDINGS LTD | Limited Partnership | 03/14/00 | 59-3684895 |
|    951 Land Holdings LLC | General Partner | 04/07/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| DY LAND ASSOCIATES LTD | Limited Partnership | 03/14/00 | 59-3684898 |
|    DY Associates LLC | General Partner | 04/07/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| GBFC DEVELOPMENT LTD | Limited Partnership | 03/14/00 | 59-3684897 |
|    GBFC Development LLC | General Partner | 04/06/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| GBFC MARINA LTD | Limited Partnership | 03/14/00 | 59-3684890 |
|    FC Marina LLC | General Partner | 04/06/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC BEACH LTD | Limited Partnership | 03/14/00 | 59-3684896 |
|    FC Beach LLC | General Partner | 04/06/00 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC GOLF LTD | Limited Partnership | 12/03/02 | 03-0509355 |
|    FC Golf LLC | General Partner | 11/25/02 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| DY LAND HOLDINGS II, LTD | Limited Liability Company | 04/25/08 | 26-2495367 |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC PARCEL 73, LLC | Limited Liability Company | 04/25/08 | 26-2494498 |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC COMMERCIAL, LLC | Limited Liability Company | 04/25/08 | 26-2495276 |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC HOTEL, LTD | Limited Partnership | 03/30/04 | 34-2024547 |
|    FC Hotel, LLC | General Partner | 11/25/02 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| FC RESORT, LTD | Limited Partnership | 03/30/04 | 34-2024546 |
|    FC Resort, LLC | General Partner | 11/25/02 | |
|    Fiddler's Creek LLC | Limited Partner | | |
| GULF BAY HOSPITALITY LTD | Limited Partnership | 12/31/03 | 59-3790126 |
|    GULF BAY HOSPITALITY COMPANY, LLC | GEN PARTNER | 11/25/02 | N/A |
|    Fiddler's Creek LLC | Limited Partner | | |

DA-3072429 v11 1203528-00006

AA00796

| FIDDLER'S CREEK LLC | TYPE | DATE INCORP | FED ID # |
|---|---|---|---|
| GULF BAY HOTEL COMPANY LTD | Limited Partnership | 12/04/02 | 56-2495068 |
|    GULF BAY HOTEL COMPANY, LLC | General Partner | 11/25/02 | N/A |
|    Fiddler's Creek LLC | Limited Partner | | |
| | | | |
| FIDDLER'S CREEK LLC | Limited Liability Company | | 59-3639729 |
|    GBFC II LLC | Managing Member | | |
|    GBFC II TWO LTD | Member | | |
| | | | |
| GBFC II LP | Limited Partnership | | 59-3705460 |
|    GBFC II LLC | General Partner | | |
|    GB 100 LTD | Limited Partner | | |
| | | | |
| GB 100 LTD | Limited Partnership | 12/07/95 | 65-0628890 |
|    GB 100 Inc. | General Partner | 02/22/93 | 65-0395715 |
| | | | |
| Fiddler's Creek Management Inc. | Sub Charter C | 10/11/94 | 65-0532185 |
| | | | |
| GB Peninsula Ltd (Land) | Limited Partnership | | 59-3692446 |
|    GB Peninsula Inc (Gen. Partner) | General Partner | | 59-3692447 |
| | | | |
| GBP Development Ltd (sell house) | Subsidiary of Peninsula | | TBD |
|    GB Peninsula Ltd | Limited Partner | | 59-3692446 |
|    GBP Development LLC | General Partner | | TBD |

DA-3072429 v11 1203528-00006

AA00797

EXHIBIT F

Material Pending Litigation

| ENITIY NAME | | CASE NAME | CASE NUMBER; COURT | TYPE OF ACTION |
|---|---|---|---|---|
| GB PENINSULA, LTD. | | | | |
| GB Peninsula, Ltd.<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 001 | GBP Development, Ltd. vs. Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician vs. GBP Development, Ltd., GBP Development, LLC and GB Peninsula, Ltd. | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescision (return of deposit)<br><br>Contract Rescision/ Counterclaim for Specific Performance |
| GB Peninsula, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action / Counterclaim to be filed |
| GBP DEVELOPMENT, LTD. | | | | |
| GBP Development, Ltd. GBP Development LLC | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescision; and other damages |
| GBP Development, Ltd. GBP Development, LLC<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 001 | GBP Development, Ltd. vs. Glen and Dawn Vician<br><br>AND<br><br>Glen and Dawn Vician vs. GBP Development, Ltd., | Case No. 07-4043-CA; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 07-3816-CA; 20th Judicial Circuit, Collier | Specific Performance / Counterclaim for Contract Rescision (return of deposit)<br><br>Contract Rescision/ Counterclaim for Specific Performance |

– Page 36 of 45

DA-3072429 v11 1203528-00006

AA00798

| | | | | |
|---|---|---|---|---|
| | | GBP Development, LLC and GB Peninsula, Ltd. | County, Florida | |
| GBP Development, Ltd. | 004 | Daniel Sussman and Peter Ferrara vs. GBP Development, Ltd. Fiddler's Creek Realty, Inc. | Case No. 05-1585-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| GBP Development, Ltd. | 005 | Daniel Sussman and Roberta Sussman vs. GBP Development, Ltd. | Case No. 07-1358-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs. Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership  Counts for: Breach of Contract Piercing Corp Veil Dissipation of Escrow Civil Conversion Statutory Conversion and Civil Theft |
| GBP Development, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action  / Counterclaim to be filed |
| GBP Development, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |
| 951 LAND HOLDINGS, LTD. | | | | |
| 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |

DA-3072429 v11 1203528-00006

AA00799

| | | Gulf Bay 100, Ltd.<br>Gulf Bay 100, Inc. | | |
|---|---|---|---|---|
| 951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>Counts for:<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| **FIDDLER'S CREEK, LLC** | | | | |
| Fiddler's Creek, LLC<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>Counts for:<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow<br>Civil Conversion<br>Statutory Conversion and Civil Theft |
| Fiddler's Creek, LLC | 007 | Textron Financial Corp. vs.<br>FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action<br><br>/ Counterclaim filed |
| Fiddler's Creek, LLC | ## | Fiddler's Creek, LLC vs.<br>Cushman Wakefield, Inc. and Cushman Wakefield Sonnenblick Goldman | Case No. 10-00272-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract; B/ Fiduciary Duty; B/Good Faith and Fair Dealing; Tortuous Interference, etc. |
| **FC GOLF, LTD.** | | | | |
| FC Golf, Ltd.<br>The Golf Club at Fiddler's Creek<br><br>THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE | 006 | Glenn and Dawn Vician and Richard and Kristi Lohmeyer vs.<br>Fiddler's Creek, LLC, GBP Development, Ltd. d/b/a Gulf Bay, GBP Development, LLC, 951 Land Holdings, Ltd.; 951 Land Holdings, | Case No. 09-CV-314-Ftm-29 DNF; Federal District Court, Middle District of Florida | Alleged Class Action Complaint; Rescission of Membership<br><br>Counts for:<br>Breach of Contract<br>Piercing Corp Veil<br>Dissipation of Escrow |

DA-3072429 v11 1203528-00006

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | LLC; The Golf Club at Fiddler's Creek, FC Golf, Ltd.; Aubrey Ferrao |  | Civil Conversion Statutory Conversion and Civil Theft |
| FC Golf, Ltd. | 007 | Textron Financial Corp. vs. FC Golf, Ltd, Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action / Counterclaim filed |
| FC Golf, Ltd. | ## | FC Golf, Ltd. GBP Development, Ltd. vs. Glenn and Dawn Vician and Richard and Kristi Lohmeyer Robert Stochel | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract, etc. (to be filed) |

**FIDDLER'S CREEK MANAGEMENT, INC. (LLC)**
(currently being represented by Foundation insurance company counsel)

|  |  |  |  |  |
|---|---|---|---|---|
| Fiddler's Creek Mgt, Inc. | 008 | Sally and Gerald Bergmoser vs. Fiddler's Creek Foundation, Inc. d/b/a The Club and Spa at Fiddler's Creek and Fiddler's Creek Management, LLC | Case No. 09-4388-CA; 20th Judicial Circuit, Collier County, Florida | Damages |

**GBFC DEVELOPMENT, LTD.**

|  |  |  |  |  |
|---|---|---|---|---|
| GBFC Development, Ltd. **THIS MATTER IS SETTLED AND DISMISSED, WITH PREJUDICE** | 009 | John and Jane Baldwin vs. Gulf Bay Construction Co. Gulf Bay Construction Ltd. GBFC Development, Ltd. | Case No. 08-8984-CA; 20th Judicial Circuit, Collier County, Florida | Damages |
| GBFC Development, Ltd. | 010 | Thomas and Sandra Gollinger vs. GBFC Development, Ltd. | Case No. 08-6226-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 011 | GBFC Development, Ltd. vs. Frederick Smith | Case No. 08-9676-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 012 | Ellen Spear v GBFC Development, Ltd. | Case No. 07-2193-CA [Marengo] ; 20th Judicial Circuit, Collier County, Florida | Contract rescission/ Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 013 | GBFC Development, Ltd. vs. Leonard Bubri | Case No. 09-2148-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

| | | | | |
|---|---|---|---|---|
| GBFC Development, Ltd. | 014 | GBFC Development, Ltd. Vs. Dennis Bauries and Brian Cramer | Case No. 08-3953-CA [Marengo]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 015 | GBFC Development, Ltd. vs. Thomas and Kelly Armstrong | Case No. 09-3528-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 016 | GBFC Development, Ltd. vs. Steen, Eric | Case No. 09-3453-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / DEFAULT JUDGMENT ENTERED |
| GBFC Development, Ltd. | 017 | GBFC Development, Ltd. vs. David and Jane Moreton | Case No. 08-9678-CA [Service accepted by the Foreign] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 018 | GBFC Development, Ltd. [Callista]; vs. Michael and Susan Lofstedt | Case No. 08-9184-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 019 | GBFC Development, Ltd. vs. Michael Tierney and Melvin Christiansen | Case No. 08-8396-CA [Awaiting Service – Foreign National] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 020 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0848-CA [Awaiting Service – Foreign National] [Callista 12-104]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 021 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0847-CA [Awaiting Service – Foreign National] [Callista 12-204]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 022 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2486-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |

– Page 40 of 45

DA-3072429 v11 1203528-00006

AA00802

| GBFC Development, Ltd. | 023 | Robert and Charlene Edwards vs. GBFC Development, Ltd. | Case No. 07-2458-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
|---|---|---|---|---|
| GBFC Development, Ltd. | 024 | Brian and Jody Boland vs. GBFC Development, Ltd. | Case No. 08-7795-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Specific Performance |
| | | GBFC Development, Ltd. vs. Brian and Jody Boland | Case No. 08-8395-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 025 | GBFC Development, Ltd. vs. Jay and Myra Browne | Case No. 08-9677-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 026 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2485-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 027 | GBFC Development, Ltd. vs. Mark and Kimberly Woolley | Case No. 09-3529-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 028 | GBFC Development, Ltd. vs. Brannigan, Jane R. | Case No. 09-2149-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |

DA-3072429 v11 1203528-00006

AA00803

EXHIBIT G

Approved 18-Month Budget

(In $000's)

DA-3072429 v11 I203528-00006

AA00804

Attachment A
Fiddler Creek, LLC and Subsidiaries
Consolidated Budget for DIP Loan

| Expense Category | 1 Jan-10 | 2 Feb-10 | 3 Mar-10 | 4 Apr-10 | 5 May-10 | 6 Jun-10 | 7 Jul-10 | 8 Aug-10 | 9 Sep-10 | 10 Oct-10 | 11 Nov-10 | 12 Dec-10 | 13 Jan-11 | 14 Feb-11 | 15 Mar-11 | 16 Apr-11 | 17 May-11 | 18 Jun-11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Club Subsidy | (18) | (18) | (18) | (19) | (16) | (5) | (6) | (6) | (6) | (5) | (7) | (12) | (17) | (18) | (19) | (20) | (17) | (8) | (253) |
| Real Estate Taxes | - | - | (900) | (835) | - | - | - | - | - | - | - | - | - | - | - | (531) | - | - | (2,276) |
| CDD Maintenance Funding | - | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (87) | (1,477) |
| CDD Debt Service Assessments | - | - | (2,472) | - | (1,130) | - | - | - | - | - | (1,042) | - | - | - | - | - | (1,130) | - | (5,773) |
| Development Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Development | (80) | (19) | (19) | (20) | (22) | (19) | (66) | (19) | (20) | (19) | (20) | (20) | (59) | (20) | (3) | (109) | (11) | (3) | (572) |
| Parcel Construction | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (35) | (30) | (30) | (30) | (30) | (30) | (30) | (30) | (546) |
| Outside Consultants/Bankruptcy Cost | (350) | (250) | (250) | (250) | (250) | (100) | (100) | (75) | (75) | (75) | (75) | (50) | (100) | (200) | (200) | (200) | (300) | (250) | (3,000) |
| Marketing | (103) | (46) | (66) | (87) | (30) | (30) | (43) | (34) | (23) | (42) | (58) | (78) | (125) | (65) | (99) | (120) | (39) | (37) | (1,237) |
| Project Administration | (176) | (235) | (132) | (130) | (135) | (128) | (152) | (115) | (130) | (120) | (95) | (107) | (324) | (235) | (134) | (132) | (117) | (117) | (2,956) |
| Parcel Administration | (152) | (500) | (2,263) | (2,502) | (439) | (67) | (63) | (431) | (63) | (63) | (426) | (19) | (17) | (405) | (45) | (2,023) | (344) | (182) | (10,365) |
| DIP Loan Commitment Fee reimbursement | (810) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| DIP Loan closing expenses | (500) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (500) |
| Collateral Monitoring Fee | - | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (136) |
| DIP loan Unused Availability Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Loan Exit Fee (provided on loan paid) | - | - | - | - | - | - | (100) | - | - | (60) | - | - | (80) | - | - | (160) | - | - | (400) |
| Contingency | (244) | (121) | (624) | (397) | (213) | (45) | (65) | (79) | (44) | (53) | (185) | (39) | (91) | (107) | (62) | (372) | (198) | (53) | (3,087) |
| Total Operating Budget | (2,633) | (1,302) | (6,869) | (4,367) | (2,343) | (526) | (720) | (874) | (487) | (582) | (2,035) | (428) | (997) | (1,178) | (657) | (4,095) | (2,178) | (560) | [illegible] |
| Financing Payments | (445) | (408) | (493) | (223) | (507) | (492) | (432) | (477) | (417) | (417) | (436) | (485) | (526) | (526) | (554) | (660) | (614) | (605) | [illegible] |
| Total Expenses | (3,137) | (1,780) | (7,362) | (5,589) | (2,851) | (1,018) | (1,152) | (1,350) | (903) | (997) | (2,471) | (910) | (1,523) | (1,704) | (1,211) | (4,755) | (2,793) | (1,165) | (41,6[illegible]) |
| Cumulative Expenses | (3,137) | (4,917) | (12,279) | (17,868) | (20,719) | (21,736) | (22,888) | (23,479) | (24,382) | (25,379) | (27,850) | (28,760) | (30,283) | (31,988) | (33,199) | (38,013) | (40,806) | (41,971) | |
| Managed Expenses | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | - | - | 900 | 835 | - | - | - | - | - | - | - | - | - | - | - | 531 | - | - | 2,576 |
| Parcel Administration Real Estate Taxes | - | - | 2,173 | 2,424 | - | - | - | - | - | - | - | - | - | - | - | 1,950 | - | - | 6,591 |
| CDD Debt Service Assessments | - | - | 2,472 | - | 1,130 | - | - | - | - | - | 1,042 | - | - | - | - | - | 1,130 | - | 5,773 |
| Contingency | 244 | 121 | 624 | 397 | 213 | 45 | 65 | 79 | 44 | 53 | 185 | 39 | 91 | 107 | 62 | 372 | 198 | 53 | 2,487 |
| Total | 244 | 121 | 6,169 | 3,659 | 1,343 | 45 | 65 | 79 | 44 | 53 | 1,227 | 39 | 91 | 107 | 62 | 3,304 | 1,328 | 53 | 12,537 |
| Base Expenses | (3,157) | (1,780) | (1,317) | (1,623) | (1,721) | (1,015) | (1,152) | (1,300) | (901) | (997) | (1,439) | (910) | (1,523) | (1,704) | (1,333) | (1,923) | (1,664) | (1,169) | |
| Cumulative Managed Expenses | 244 | 366 | 6,535 | 10,193 | 11,536 | 11,581 | 11,646 | 11,725 | 11,773 | 11,825 | 13,053 | 13,082 | 13,182 | 13,290 | 13,352 | 16,556 | 17,884 | 15,937 | |
| Net Cumulative Expenses | (2,893) | (4,551) | (5,744) | (8,375) | (8,453) | (9,433) | (10,538) | (11,750) | (12,605) | (13,554) | (14,783) | (15,609) | (17,102) | (18,698) | (19,907) | (21,499) | (22,925) | (24,021) | |
| Maximum DIP Loan Balance | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 12,000 | 12,000 | 13,000 | 15,000 | 15,000 | 15,000 | 13,000 | 10,000 | 8,000 | 8,000 | 5,000 | - | |
| Managed Expenses Sales Trigger/Covenant | | | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | |
| Sales Covenant (if no Managed expenses paid) | - | - | - | - | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 8,000 | 12,000 | 12,000 | 12,000 | 20,000 | 20,000 | 20,000 | 18,000 | |

DA-3072429 v11 1203528-00006

44

45

AA00807

# K&L | GATES

K&L Gates LLP
1717 Main Street
Suite 2800
Dallas, TX 75201-7342
T 214.939.5500    www.klgates.com

February 23, 2010

Jeffrey R. Fine
Partner
D 214.939.5567
F 214.939.5849
jeff.fine@klgates.com

**Via E-Mail pbattista@gjb-law.com**

Paul J. Battista, Esq.
Partner
Genovese Joblove & Battista, P.A.
Bank of America Tower
at International Place
100 Southeast Second Street,
44th Floor
Miami, Florida 33131

Re:    Commitment Letter (the "Commitment Letter"), dated as of December 31, 2009, between PEPI Capital, L.P. ("PEPI") and Fiddler's Creek, LLC and GB Peninsula, Ltd. (the "Borrowers") in connection with a $27,000,000 Senior Secured Debtor-In-Possession Term Loan Facility (the "Loan")

Dear Paul:

I forwarded to PEPI your letter to me dated February 22, 2010 (the "Letter") which asserts that PEPI "is in material default of and under the terms of the Commitment Letter." PEPI was shocked by the Letter and disagrees with the assertions made therein, especially because PEPI has worked diligently and reasonably with the Borrowers to negotiate and address Borrower concerns by modifying Commitment Letter provisions, such as taking out the syndication terms and committing to fund the whole loan itself.

At no time has PEPI ever been notified, or warned by Borrowers that it thought PEPI had materially defaulted on the terms of the Commitment Letter, and PEPI is disappointed that Borrowers had not expressed its concerns to PEPI and worked them out, as compared to pursuing this approach on the brink of chapter 11 filing, and after so much work and effort on the part of both parties.

For the sake of brevity, PEPI will make very brief comments below, and will expand upon these comments at a later date, if appropriate:

1. In PEPI's February 16, 2010 call with the Borrowers, it was reported that all PEPI due diligence had been completed except for receipt of title information, which although repeatedly promised to us, had been delayed since early December 2009.

DA-3092287 v3





AA00808

# K&L|GATES

Paul J. Battista, Esq.
February 23, 2010
Page 2

2.  As late as Thursday, February 18, 2010, Borrowers were advising PEPI that the draft Loan documents were acceptable to Debtors except for the verbiage of the Purchase Option. PEPI was promised rewording by your counsel of the Purchase Option language, continued to check over the weekend to inquire why a rewording of the language had not been forwarded, and PEPI is still waiting for the promised rewording of the Purchase Option provision.

3.  As had been previously indicated to you, all material due diligence on the Loan has been completed by PEPI and PEPI is ready, willing and able to immediately fund the Loan in accordance with the Commitment Letter upon receipt of Bankruptcy Court approval. Although PEPI has also told you repeatedly during this past week that the Borrowers are free to file Chapter 11 at any time, please consider this your formal 3 business day notice that due diligence has been completed. Let us know if, for some important reason, Debtors need an extension of the contractual deadline.

4.  Regarding the deed in lieu and consent judgment provision on page 12 of the Commitment Letter, please remember that this provision was originally proposed by you for Lender's benefit. Later, you realized that consent judgments are not available under Florida law and that the provision therefore, could not be performed. If you are now telling PEPI that you were mistaken about the availability of consent judgments and want to put that provision back into the Loan documents, PEPI will certainly review your proposed provision. Likewise, the valuation mechanism you refer to is only in regard to a deed in lieu of foreclosure, and if you believe that a deed in lieu of foreclosure provision, and its related valuation mechanism, should be included in the Loan, even though PEPI does not require it, then PEPI will promptly review deed in lieu language and will negotiate the provisions of a valuation mechanism for deeds in lieu of foreclosure and will include that in the Loan documentation.

5.  In regard to the wording of the waterfall provisions of the Loan, PEPI was under the impression that wording of those provisions was acceptable to the Borrowers. If that is not the case, then PEPI wants to cure this inadvertent misunderstanding and will diligently review the wording of the waterfall provisions as you think are compatible with the terms of the Commitment Letter.

6.  While due diligence on the Loan is completed, PEPI has consistently advised Borrowers that conditions precedent remain active and must be satisfied through funding. We believe that this is entirely standard in transactions of this type and clearly anticipated by the Commitment Letter.

# K&L|GATES

Paul J. Battista, Esq.
February 23, 2010
Page 3

Finally, I want to reiterate on behalf of PEPI that any perceived missteps on it part were inadvertent and certainly were not intentional. PEPI agrees with you that the negotiation process has been lengthy and complex, but PEPI maintains that it has at all times acted in good faith and looks forward to promptly completing funding of the Loan.

Sincerely,

Jeffrey R. Fine

cc:    David Radunsky

AA00810

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

In re:                                                   **Case No. 8:10-bk-03846-KRM**

**FIDDLER'S CREEK, LLC, et al.**

                                                                  **Jointly Administered**
          Debtors.                                           **Chapter 11**

_____/

**FIDDLER'S CREEK, LLC, et al.**

          **Plaintiffs/Counterdefendants,**      **Adv. Pro. No. 8:11-ap-00809-KRM**

v.

**PEPI CAPITAL, L.P.**

          **Defendant/Counterplaintiff and**
          **Third Party Plaintiff.**

_____/

**PEPI CAPITAL, L.P.**

          **Third Party Plaintiff,**

v.

**GULF BAY CAPITAL, INC.,**

          **Third Party Defendant.**

_____/

**PEPI CAPITAL, L.P.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

      PEPI Capital, L.P. ("PEPI"), by and through its undersigned counsel and pursuant to Rule

56 of the Federal Rules of Civil Procedure, made applicable to these proceedings by virtue of

Rule 7056 of the Federal Rules of Bankruptcy Procedure, respectfully files its Motion for Partial

Summary Judgment [DE 84] with respect to Count I (Breach of Contract) and Count III (Breach

of the Covenant of Good Faith and Fair Dealing)  of PEPI's Counterclaim [DE 22], and requests

**AA00811**

that this Court enter a judgment in favor of PEPI, awarding PEPI the balance of the Commitment Fee and the Break Up Fee owed by the Debtors under the applicable agreement, plus interest, attorneys' fees and costs it incurred,[1] and in support of the relief requested herein, PEPI states as follows:

## Preliminary Statement

Based on the case law relied upon by even the Debtors, PEPI is entitled to summary judgment as a matter of law due to the Debtors' A) improper demand of a new provision consisting of a "written" due diligence signoff; B) failing to negotiate the loan documents in good faith by: i) not providing a counter to PEPI or negotiating further; ii) not providing notice of a default or opportunity to cure; and/or iii) obtaining Ferrao to replace PEPI as the DIP Lender, which not coincidentally, occurred literally within hours after PEPI rejected their efforts to modify a provision in the Commitment Letter that jeopardized Mr. Ferrao's only vehicle to safeguard his equity – the Purchase Option; C) their breach of the non-disclosure provision of the Commitment Letter; and/or D) their breach of the "truthful" provision by misrepresenting the status of the loan agreements when Mr. Ferrao had already ceased control of PEPI's loan, thereby depriving PEPI of the ability to resolve the alleged default; and E) violating the "exclusivity" provision of the Commitment Letter. Regardless, and most importantly, this conclusion is mandatory even assuming what the Debtors' assert is correct, because they never provided notice of any intended termination in a manner that would allow PEPI to respond. This is further supported given the undisputed fact that the Debtors declared their default only <u>after</u> Mr. Ferrao took over PEPI's loan.

---

[1] The Debtors have conceded that if PEPI was not in default, the Debtors owe PEPI the entire Commitment Fee and Break-up Fee under the Commitment Letter (DiNardo, p. 40, DiNardo/Gulf Bay, p. 23).

AA00812

I. **UNDISPUTED FACTS**

A. **Overview**

For a period of several months prior to the Debtors filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code, PEPI and the Debtors diligently negotiated a complicated $27,000,000.00 DIP Loan for the benefit of the Debtors. Affidavit of Jeffrey R. Fine, ¶ 5. During this time, PEPI continuously made significant concessions to alleviate all concerns and requests made by the Debtors, and in turn, received repeated assurances by the Debtors and Aubrey Ferrao ("Ferrao"), the Managing Member of the Debtors, that PEPI would be the DIP Loan lender for the Debtors. *Id.* Notwithstanding the continuing efforts to finalize the underlying loan documents, at the very end it appeared that the Debtors were reluctant to comply with the obligation of obtaining a release in favor of PEPI in connection with any assignment of the loan to an insider of the Debtors, as required under the Purchase Option[2] provision of the Commitment Letter. *Id.,* ¶ 6. In addition to the possible loss of Mr. Ferrao's only device to protect his equity, the Debtors were also concerned that PEPI's intention was a "loan to own" (Ferrao Trans., p. 48).

Consequently, on the eve of the Debtors' Chapter 11 filings, with no prior warnings or indication of any potential termination, and instead of negotiating in good faith with PEPI, and only _after_ the Debtors obtained Mr. Ferrao's secret agreement to be the new DIP lender, the Debtors manufactured a purported Default Letter alleging reasons the Debtors believed PEPI would not fund the DIP Loan and, therefore, was in default under the Commitment Letter. (Fine Aff). Unlike prior negotiation experiences, however, which included the resolution of issues

---

[2] Significantly, per the Debtors testimony, the Purchase Option was the sole and final safety net for Mr. Ferrao to safeguard his tens of millions of dollars in equity in the project from PEPI in the event of a default.  (DiNardo, p. 54-55, Ferrao p. 15, 16, 18, 43-44)

3

AA00813

presented during the course of the loan documentation process, the Debtors, *after* securing the replacement loan with Mr. Ferrao, and being non-responsive for several days, actually unilaterally terminated the DIP Loan Agreement and provided no opportunity for PEPI to cure or deal with the manufactured alleged default. Fine Aff., ¶ 6. Nonetheless, within 24 hours, PEPI responded that it was in fact ready, willing, and able to fund the loan per the Commitment Letter and the applicable loan documents. *Id.*

Simply put, the Debtors breached the Commitment Letter. Instead of complying with the Commitment Letter and negotiating in good faith, secretly the Debtors and Mr. Ferrao, ultimately via his other entity, Gulf Bay Capital, Inc. ("Gulf Bay"), chose to utilize virtually the same confidential documents negotiated by PEPI and the Debtors to facilitate fundamentally the same DIP loan that PEPI was prepared to fund to the Debtors (with all of its nuanced, particular, and unusual provisions). Fine Aff., ¶ 7. Notably, what took PEPI and the Debtors several months to negotiate, Ferrao, through Gulf Bay, was able to achieve in less than three (3) days or so. Only now, given the manufactured termination, the Purchase Option for the insider was a non-issue, the Debtors obligation under the Break Up Fee could in theory be disputed, there was no risk of a "loan to own" and most importantly, knowing an insider priming lien was a problem, the Debtors were able to choreograph the appearance of no other option for financing in its bankruptcy cases, which were filed the very next day.

### B. The Negotiation and Execution of the Commitment Letter.

Specifically, on October 20, 2009, the Debtors signed a Term Sheet with PEPI that outlined the general provisions of a DIP Loan to the Debtors and certain of its subsidiaries and affiliates for up to $27,000,000.00. *Id.,* ¶ 8. Upon execution of the Term Sheet, Ferrao, as the Managing Member of the Debtors, and the Debtors' counsel participated in key telephone

AA00814

conferences with PEPI to finalize the terms of the DIP Loan. *Id.,* ¶ 9. During the course of negotiating the Commitment Letter, the Debtors and Ferrao demanded that the Commitment Letter include significant and unusual provisions. *Id.,* ¶ 10. First, instead of a customary provision that upon a default, the lender has a right to foreclose on whatever collateral the lender chooses, the Debtors insisted that the DIP Loan contain a waterfall concept that specified the order of priority of the collateral to be sold by PEPI in the event the Debtors were in default under the DIP Loan. *Id.*

PEPI acquiesced and the waterfall concept was included in the Commitment Letter. In connection with the waterfall concept, the Debtors suggested, for PEPI's benefit (to "speed" the foreclosure and sale process), that deeds in lieu of foreclosure and consent judgments be held in escrow and used instead of an ordinary foreclosure process. *Id.,* ¶ 11. Although the deeds in lieu of foreclosure and consent judgment provision were included in the Commitment Letter, the parties later learned that, apparently, said instruments were not available under Florida law in connection with an initial loan or created an issue for title insurance. *Id.,* ¶ 12. As a result, because said provisions were either subject to waiver as a benefit of PEPI or simply not performable under Florida law, the deeds in lieu of foreclosure and consent judgment provisions were not included for the time being in certain draft loan documents being negotiated by the parties at that time. *Id.* Nevertheless, throughout the process, PEPI remained in agreement with the waterfall concept, a fact it communicated to the Debtors many times. *Id.*

Second, very late in the negotiation process, Ferrao raised a new term - that he would require a right of first refusal for the Debtors' principal to acquire the DIP Loan from PEPI upon default of the DIP Loan. *Id.* Not satisfied with restricting PEPI's ability to sell particular properties through the use of the waterfall concept, Ferrao demanded that he have the ability to

5

take over the loan obligations himself upon a default (the "Purchase Option"). *Id.* Such a provision was included in the Commitment Letter. *Id.* The Debtors and PEPI eventually signed the Commitment Letter effective December 31, 2009. *Id.*, ¶ 14.

### C.    Items Related to Due Diligence, the Loan Documents, and Closing.

The parties continued to finalize the necessary loan documents in order to close under the facility. *Id.,* ¶ 15.  In order to successfully close the DIP Loan and fund, numerous conditions precedent needed to be satisfied pursuant to the parties' Closing and Due Diligence Checklist. *Id.* As the parties progressed towards finalizing the documents to close and fund the DIP Loan, PEPI updated the items set forth in the above-mentioned checklists. *Id.*  At all times, the due diligence review and closing process was extensive, was ongoing in nature and continuously updated.  *Id.* Multiple parties on behalf of the Debtors and PEPI were tasked with working on specified matters, especially in view of the magnitude of the transaction contemplated by the Commitment Letter.  *Id.*  Indeed, the legal description of the property that was to be encumbered by the DIP Loan was over fifty (50) pages.  *Id.*

PEPI was prepared to proceed with the DIP Loan pursuant to the Commitment Letter (unless otherwise agreed), a fact it communicated to the Debtors numerous times, including on February 16, 2010. *Id.,* ¶ 16.  By February 17, 2010, the actual DIP Loan documents were substantially completed, which Debtors' counsel communicated to Affiant in an e-mail that very day. *Id.*

During this time, it also appeared that all of the loan documents were close to final form and ready for filing (with the primary exception of the Purchase Option). *Id.,* ¶ 17. As such, the Debtors were only commenting on the break-up fee in the event PEPI was not the DIP lender and the Purchase Option. *Id.*  For example, the Debtors' counsel requested clarification of a scenario

he believed was "a real issue and one that [was] sure to come up." *Id.* Indeed, the Debtors wanted confirmation that that the negotiated break-up fee would only be due "if [the Debtors] tr[ied] to replace [PEPI] when [PEPI was] otherwise ready, willing, and able to fund." *Id.* Pursuant to the course of conduct between the parties, this aspect, like many others, was resolved. *Id.*

With respect to the Purchase Option mentioned above, the Commitment Letter required that the Debtors execute a full release in favor of PEPI, which had to be approved by the Bankruptcy Court. *Id., ¶ 18.* Contrary to the mandatory language in the Commitment Letter, the Debtors proposed language requesting instead that PEPI simply accept an assignment and indemnification. *Id.* On February 18, 2010, counsel for PEPI sent counsel for the Debtors an e-mail including the final language of the Purchase Option that it would accept, keeping the language related to the full release, and PEPI also informed the Debtors that it may proceed to file the Debtors' Chapter 11 cases. *Id., ¶ 19.* On February 19, 2010, PEPI believed the issues raised by the Debtors related to the Purchase Option were nearing resolution. *Id., ¶ 20.* PEPI expected that the Debtors would file their bankruptcy petitions any time and that the DIP Loan would close with PEPI as the lender. *Id.* To the surprise of PEPI, the Debtors ceased communicating with PEPI, and in response to an inquiry regarding the sudden silence, the Debtors' misled PEPI intentionally and stated that it was conferring with counsel. *Id., ¶ 21.* The Debtors' silence was ended with the termination and the bankruptcy filings the next day, with its affiliate (Gulf Bay) as the proposed DIP lender. *Id.*

However, unbeknownst to PEPI, following PEPI's 5:00 p.m. or so rejection of the Debtors' request to modify the Purchase Option under the Commitment Letter (*Id.*), within hours the Debtors reached out to Mr. Ferrao for the very first time to suggest that he

7

be the new DIP Lender (DiNardo, pgs. 183, 184; Ferrao, p. 30). After thinking about it overnight, in the following morning (2/19/10) he agreed to provide the facility. *Id.* Only <u>AFTER</u> Mr. Ferrao agreed to replace PEPI, did the Debtors' decide to declare a default (DiNardo, p. 194; Ferrao, p. 28), which still was not communicated to PEPI until several days later, on February 22, 2010. (*Id.;* Fine Aff. ¶ 26 (vi, ix). Quite interesting, is that although the Debtors' abandoned the negotiations with PEPI and procured Mr. Ferrao as the new lender, the Debtors' kept it a secret from PEPI and instead misled them to believe they were simply conferring with counsel. (Fine Aff., Note 7). Given no knowledge of the Debtors' true actions, PEPI continued to attempt to finalize the open issue on the Purchase Option and continued its efforts to pursue to close the loan (Fine Aff., ¶ 26 xviii, xix, xx) - actions clearly not demonstrative of a party allegedly in breach.

## II. <u>STANDARD FOR MOTION FOR SUMMARY JUDGMENT</u>

A court can properly grant a motion for summary judgment if " . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Ellenberg v. Plaind Enterprises, Inc.* (*In re T.B. Home Sewing Enterprises, Inc.*), 173 B.R. 790, 793 (Bankr. N.D.Ga. 1993) (*quoting* FED. R. CIV. P. 56(c)). Moreover, "[a] fact [will be deemed] material if it ' . . . might affect the outcome of the suit under the governing (substantive) law . . . .'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985)). A court will consider "[a] dispute of fact is genuine [to the extent] . . . 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (*quoting Anderson*, 477 U.S. at 248). The mere assertion that a fact is in dispute is insufficient. *See id.* In this connection, "[t]he moving party has the burden of establishing [it is entitled to] summary judgment. *Id.*

8

In determining whether a genuine issue of material fact exists, "the court must view the evidence in the light most favorable to the party opposing the motion." *Id.* (*citing* Fifth and Eleventh Circuit cases). Significantly, "[t]he moving party must identify those evidentiary materials listed in Federal Rule 56(c) that establish the absence of a genuine issue of material fact." *Id.* (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). When the moving party make a prima facie case that it is entitled to a judgment as a matter of law, the burden of proof shifts to the opposing party, who "must go beyond the pleadings and demonstrate that there is a material issue of fact" that warrants a trial. *Id.* (*citing Celotex*, 477 U.S. at 324).

With respect to any affirmative defenses raised by a defendant in response to a plaintiff's claim for the avoidance any recovery of a preferential transfer(s), the defendant has the ultimate burden to prove its affirmative defenses. *See* 11 U.S.C. 547(g). However, for purposes of summary judgment, "the movant must merely demonstrate an absence of evidentiary support in the [summary judgment] record for the non-movant's case." *Rand Energy Co. v. Strata Directional Technology, Inc. (In re Rand Energy Co.),* 259 B.R. 274, 278 (Bankr. N.D.Tex. 2001).

### III.   <u>SUMMARY OF ARGUMENTS</u>

In an effort to assist the Court, the following shall serve as a summary of the legal arguments developed more fully below:

> A. The Debtors breached the Commitment Letter by demanding a new term consisting of a "written" due diligence sign off as a condition precedent to file their bankruptcy proceeding - Due diligence is one of many conditions precedent solely to the actual "funding" (not filing) under the Commitment Letter, which would only occur subsequent to the commencement of a bankruptcy. Thus, there was no obligation for PEPI to deliver a "written" due diligence sign off to PEPI under the Commitment Letter as a prerequisite to the Debtors filing bankruptcy. Rather, the provision mistakenly relied upon by the Debtors is solely a right of PEPI to terminate its obligations to fund under the Commitment Letter and because it is clear and unambiguous, the Debtors' are legally prohibited from asking this Court to re-write said provisions.

9

B. The Debtors breached their obligation to negotiate in good faith - By abandoning the negotiations with PEPI and instead obtaining a replacement DIP lender via Mr. Ferrao, the Debtors' breached their obligation to negotiate in good faith with PEPI, as well as the duty of good faith and fair dealings and/or course of conduct.   Moreover, the Debtors breached the Commitment Letter and the above duties yet again by intentionally refusing to not only inform PEPI at that very moment, but by instead misrepresenting the precise facts and delaying the delivery of the true facts to the point where it was too late for PEPI to resolve the matters raised.   Additionally, the Debtors' also breached their obligations to negotiate in good faith/good faith and fair dealings, by not providing PEPI with notice and an opportunity to cure.   The Debtors likewise breached the Commitment Letter by disclosing same to Gulf Bay and violating the "exclusivity" provision.

## IV.   LEGAL ARGUMENT

Based on the undisputed material facts and the applicable law, PEPI is entitled to Summary Judgment. This conclusion is inescapable based on the following facts and legal arguments:

A.   The Debtors Breached the Commitment Letter by insisting on a new term - a "written" due diligence sign off as a condition precedent for the Debtors to <u>file</u> reorganization

Due diligence is just one of several conditions precedent to "funding" only under the Commitment Letter.  Thus, there is no obligation for PEPI to deliver a "written" due diligence sign off to PEPI under the Commitment Letter as a prerequisite to the Debtors *filing* bankruptcy. Rather, the provision mistakenly relied upon by the Debtors is solely a right of PEPI to terminate its obligations to fund under the Commitment Letter and because it is clear and unambiguous, the Debtors' are legally prohibited from asking this Court to re-write said provisions.  Consequently, the Debtors breached the Commitment by demanding the new term.  See *999 Corp. v. CIT Corporation*, 776 F. 2d 866 (9th Cir. 1985); *Teachers Ins and Annuity Assoc. of Amer. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987).

10

As stated in the Fine Affidavit and the Commitment Letter itself, due diligence was to be completed to the satisfaction of PEPI and its counsel, and more importantly, was continuing in nature and actually a condition precedent to both the "Initial Advance and each Subsequent Advance". (Fine Aff., ¶ 24). PEPI's commitment was also subject to "completion of and reasonable satisfaction in all material respects with a due diligence investigation" (*Id.*, ¶23), which was a fraction of the items included in the conditions precedent Section of the Commitment Letter.

Applying simple contract interpretation principals, PEPI's due diligence was limited to that, always within its discretion and more importantly, related only to the actual *funding* of the loan – having absolutely nothing to with the Debtors' filing a proceeding. To be sure, the funding would only take place *subsequent* to any bankruptcy being filed, hence the terminology, "<u>post</u>-petition financing". Surely, this is not news to the Debtors since one of the many other conditions precedent to fund included an Order from the Bankruptcy Court.

All parties agree that not only did the Commitment Letter provide for a due diligence checklist, but that it was routinely updated throughout the process. (Fine Aff., ¶ 15, 24 and Exhibit 3 thereto). That was exactly what was contemplated by the "Due Diligence Section" on pg. 21 of the Commitment Letter (Fine Aff., p. 24, 26 xii). Importantly, this was the case as the parties approached the finalization of the loan agreement negotiations, as reflected by Exhibits 4-39 and 4-41 to the DiNardo deposition. (See Notice of Filing Exhibits [DE 97]). These two exhibits demonstrate the updated due diligence communications as of February 17, 2010, including corporate and real estate due diligence status. Although a few due diligence items remained open (DiNardo, p. 133), PEPI had advised the Debtors they were satisfied with the corporate and real estate due diligence (Fine Aff., ¶ 26 iv). The Debtors have even conceded this

11

AA00821

point (Debtors' Motion [DE 84], p. 17, ¶ 3, PEPI "verbally...assured the Debtors that its due diligence was substantially completed").[3]   Significantly, however, under the Commitment Letter, due diligence continued until "funding." (Fine Aff., ¶ 24).

The mistaken reference by the Debtors related to a right exclusively of PEPI so as to terminate its obligations to fund, which is clear and unambiguous, thereby legally precluding the Debtors' efforts to re-write said provision. There is no obligation for PEPI to provide a "written" due diligence sign off in order for the Debtors to file bankruptcy. In fact, the Debtors request for a written due diligence sign off to be included in the Commitment Letter was rejected (Fine Depo. 86-87, 89).

No such provisions to the contrary, as incorrectly suggested by the Debtors, actually exists in the Commitment Letter (Fine Aff., ¶ 26 xiii, xiv). What does exist however, is a mechanism whereby PEPI in its absolute and sole discretion, could proceed to terminate its obligations to fund. The Commitment Letter could not remain open ended indefinitely. (Lorio, p. 95-97). Thus, PEPI (not the Debtors) had a contractual right to terminate its obligation to fund unless certain actions were taken (*Id.*, Fine Aff., ¶ 30). This right of PEPI was completely different than the due diligence required to *fund* as referenced above under the conditions precedent Section of the Commitment Letter.

Clearly, the Debtors were terribly confused and subsequent to the execution of the Commitment Letter were asking for something that did not exist. Specifically, the Debtors completely ignore the dozens of conditions precedent and instead incorrectly believe all that was

---

[3] To remove any doubt, the Court need only consider the Debtors' very own fundamental position – they absolutely had to have the non-existent written due diligence  sign off to file a bankruptcy (notwithstanding the assurance of the Commitment Letter and verbal assurance that PEPI completed its due diligence).  That convenient assertion, however, *cannot*  be reconciled with the Debtors eventual filing, which, by their own admissions, had absolutely no "assurance" of any DIP financing  due to the risks associated with the insider status of the lender.  (DiNardo, p. 154-155).

AA00822

needed for PEPI to <u>fund</u> was due diligence and a court order.  (DiNardo, p. 62-63).    This however is grossly incorrect. (See Commitment Letter and Exhibit B thereto; Fine Aff., ¶ 24). Regardless, the assurance the Debtors were seeking, actually already existed – i.e., the Commitment Letter itself.  That contained the obligations of PEPI to fund and is routinely the basis for Court's to approve such financing.

Specifically, the Commitment Letter stated:

> The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company,  will terminate upon the earlier to occur of: (1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised the Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date; and (2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving  the Credit Facility on or prior to such date.

See PEPI's Commitment Letter, p. 4.

The provision mistakenly relied upon by the Debtors is solely a right of PEPI to terminate its obligations to fund under the Commitment Letter (Fine Depo., p. 156; Fine Aff., p. 30). Because it is clear and unambiguous, the Debtors' are legally prohibited from asking  this Court to re-write said provisions.  That provision is not a right of the Debtors and their improper request is nothing more than a demand to revise and re-write the provision to make it a condition precedent owed to them in order to file bankruptcy.  If they wanted that, they should have requested it. It is not in the Commitment Letter and they can't ask the Court to re-write the Commitment Letter in said regard as a matter of law.  Indeed, Florida courts uniformly hold that "where the language of a contract is clear and unambiguous, a trial court is not at liberty to modify the agreement and therefore must give effect to its express provisions." <u>Dickerson Florida, Inc. v. McPeek</u>, 651 So. 2d 186, 187 (Fla. 4th DCA 1995).  More importantly, "a trial

AA00823

court may not rewrite the terms of a contract in an effort to relieve one of the parties from the apparent hardship of an improvident bargain." *Id.* Likewise, "it is not the role of the trial court to make an otherwise valid contract more reasonable from the standpoint of one of the contracting parties." *Id.*; *see* Beach Street Bikes, Inc. v. Bourgett's Bike Works, Inc., 900 So. 2d 697, 701 (Fla. 5th DCA 2005); *see also* Andersen Windows, Inc. v. Hochberg, 997 So. 2d 1212, 1214 (Fla.3d DCA 2008) ("[c]ourts, without dispute, are not authorized to rewrite clear and unambiguous contracts . . . , [a]nd where a contract is clear and unambiguous, it must be enforced as written").

This is also the conclusion since the Debtors' interpretation is beyond unreasonable in view of the Commitment Letter. Due diligence was coordinated via a checklist. See Exhibit B to Commitment Letter and Exhibits 4-39 and 4-41 of Notice of Filing [DE 97]. That was what was required under the Commitment Letter (See Fine Aff. ¶ 15 and 24). The Commitment Letter incorporated due diligence with in the "conditions precedent" section, which related only to "funding". (*Id*). Nothing in these sections required a "written" due diligence sign off for the Debtors to file bankruptcy. To argue the Commitment Letter contains such a provision requires the Court to ignore, if not delete, the various provisions above that control the due diligence aspects. However, to force a reading of the Commitment Letter in such a manner is impossible and hence, is not a reasonable interpretation as a matter of law.

Thus, given that due diligence aspects under the Commitment Letter have no such requirements as suggested by the Debtors, and PEPI's termination right is both clear and unambiguous, the Debtors' are legally powerless to alter said provision. It is important to note that the Debtors' rationale in trying to re-write the Commitment Letter, was a combination of its self-induced and baseless belief the PEPI loan was a "loan to own" (Ferrao, p. 48) coupled with

AA00824

the risks of the safety net in the form of the Purchase Option not functioning. However internally justified, the fact remains no such contractual provision existed in the Commitment Letter and it was a breach on their part to demand its inclusion. *See, 999 Corp; Tribune Co.*

> B.      By: 1) breaching its duty to negotiate in good faith, abandoning PEPI and failing to provide notice and opportunity to cure; 2) breaching the "truthful" provision of the Commitment Letter and by misleading PEPI of the status; and 3) secretly negotiating with Gulf Bay in violation of the "non-disclosure" and/or "exclusivity" provision, the Debtors breached the Commitment Letter and the <u>covenant of good faith and fair dealings</u>.

Based on the Debtors own admissions, it is overwhelming  clear that the Debtors breached their obligations, including that of good faith and fair dealings, by: i) failing to counter, abandoning the negotiations with PEPI and secretly  obtaining a replacement loan with Gulf Bay; and ii) failing to provide notice of the alleged default or providing an opportunity to cure to PEPI.  In addition to the above, it is likewise undisputed that the Debtors further breached  the "truthful",  "non-disclosure" and "exclusivity" provisions under the Commitment Letter.

To best understand the Debtors' primary duty to negotiate in good faith, the Court need only review <u>Teachers Ins. & Annuity Ass'n of America v. Bulter</u>, 626 F.Supp. 1229 (S.D.N.Y. 1986). In addition to being remarkably instructive on several issues raised in the instant matter, that Court properly discusses the obligations of the parties in regards to a commitment letter. In *Teachers,* the parties entered into a binding commitment letter where Teachers would lend money to OCCA subject to drafting closing documents in accordance with the terms of the commitment letter. The parties resolved all disagreements regarding the proposed language of the closing documents, except the language to be used in the default prepayment provision. *Id.* at 1230.

Just prior to closing the final loan documents, OCCA's attorney informed the lender that OCCA was unwilling to accept the loan from Teachers as long as the disputed default

15

prepayment provision was included. *Id.* Teachers commenced an action for damages based upon a claim of breach of contract - that the defendant failed to negotiate the closing documents in good faith.[4] *Id.* OCCA countered that it was Teachers who breached the contract by insisting on the inclusion of a provision in the closing documents that was not in the commitment letter. *Id.* Further, OCCA alleged that they refused to close because they could not meet the commitment letter's requirements that the subject building be pre-leased by the closing date. *Id.*

The *Teachers* court held that both parties "were required to negotiate in good faith with respect to the closing documents needed to consummate the transaction. [OCCA] breached that duty to negotiate in good faith and therefore breached the contract with Teachers." *Id.* at 1232. Moreover, the court held that OCCA could not rely on the pre-leasing requirement as an opt out, as the requirement "was clearly for the benefit of Teachers alone; a condition which Teachers could, and ultimately did, waive." *Id.* In sum, the court held:

> Defendant's actions during the last few months prior to the scheduled closing date conclusively establish that, as the closing drew near, the defendants deliberately intended not to proceed with this loan—at least not on the terms contained in the Commitment Letter. By contrast, Teachers not only took the steps necessary to close the loan, as it was obligated to do under the Commitment Letter, but it offered the defendants alternatives designed to reduce the likelihood of a default. *Id.* at 1233.

The evidence showed that the defendants tried to use the default prepayment provision as a "pretext" for not going forward with the loan, despite Teachers willingness to close the deal and continue to negotiate in good faith. Importantly, "<u>instead of making a counteroffer or engaging in good faith negotiations…defendants arbitrarily refused to negotiate and insisted that</u>

---

[4] Interestingly, similar to the allegation that the Debtors breached since the significant Purchase Option was not unconditional (release required), in *Teachers*, the Plaintiff argued that OCCA breached because of the interest rate change. Additionally, the Debtors were concerned PEPI was a "loan to own", which made the need for an unconditional Purchase Option even more critical. (Exh. 5 to Fine Aff.)

AA00826

[the disputed provision] be deleted in its entirety." *Id.* at 1235 (emphasis added). Accordingly, the Court found that OCCA breached the commitment letter. *Id.* at 1236.

There are amazing factual similarities between the *Teachers* case and the instant dispute between the Debtors and PEPI. Both involve binding commitment letters where the parties agreed to finalize documents for a loan. Both involve one party unilaterally terminating the contract and refusing to counteroffer/negotiate in good faith based on ulterior motives - the "pretext" of a purported default.

Moreover, the *Teachers* court found that the OCCA was "less than forthright" during the negotiations and said nothing about backing out of the deal while they simultaneously negotiated with other lenders. *Id.* at 1233. Disturbingly similar to our facts, here, the Debtors went radio silent during the final stage and instead of negotiating with PEPI, secretly approached Mr. Ferrao to replace PEPI. The Debtors' are attempting to do *exactly* what the defendants in *Teachers* tried to do: "[w]hen they were unable to persuade Teachers to lower the interest rate…and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an *eleventh hour comparison of the closing documents to the Commitment Letter to come up with an ostensible reason for not going forward with the loan*." *Id.* at 1236 (emphasis added). Here, within hours of PEPI rejecting the Debtors request to remove the release provision in the Purchase Option to make it unconditional, the Debtors never advised PEPI of their decision to not negotiate further and instead secretly approached Mr. Ferrao to replace PEPI. (DiNardo, p. 183, 184; Ferrao, p. 30). After Mr. Ferrao agreed, the Debtors were "less than forthright" and mislead PEPI intentionally as to the status of the finalization of the loan documents.[5] Per the

---

[5] *See* Composite Exhibit in Note 7 to Fine Affidavit, consisting of the Debtors deliberate efforts to mislead PEPI as to the true status of the PEPI loan. This conclusion is inescapable given the 11:38 secret email confirming Gulf Bay as lender compared with the 4:47 email from Debtors that same day (2/19/10) misleading PEPI by stating they are "conferring with counsel and will get back to you [PEPI] as soon as we can."

AA00827

testimony of both the Debtors and Mr. Ferrao, it was only <u>after</u> the loan was stolen from PEPI, that the Debtors declared a default. (DiNardo, p. 194; Ferrao, p. 28) The Debtors' even admit they were in breach given their admission that negotiating (DiNardo, p. 194; Ferrao, p. 28) in good faith requires "communicating effectively" (DiNardo, p. 188), which clearly was not the case towards PEPI.  There can be no dispute that the Debtors breached their obligation to negotiate in good faith by abandoning the loan, not providing a counter-proposal, failing to advise that negotiations would not proceed and having Mr. Ferrao take over PEPI's position. Although rather shocking, the Debtors made this point abundantly clear when it mistakenly volunteered that if Mr. Ferrao would have taken over the PEPI loan *sooner*, the Debtors would have terminated PEPI *earlier* (DiNardo, p. 30, Gulf Bay).  There can be no doubt to the Court that the Debtors decided to breach their obligations to PEPI and present the loan to Mr. Ferrao instead.  This explains why PEPI was still attempting to finalize the Purchase Option on February 19, 2010, or the final step in the loan agreement. See Notice of Filing Exhibits filed contemporaneously herewith.

Additionally, although *Bulter* is dispositive, *Tribune* likewise compels the same conclusion. In fact, regardless of anything else, and even assuming what the Debtors' argue is correct, notice and opportunity was still required <u>from</u> the Debtors - obligations of a commitment letter "bar a party from renouncing the deal [or] abandoning the negotiations". That is so because negotiating in good faith demands it, but also based on Florida law.  See *Hospital Mortgage Group v. First Prudential Development*, 411 So.2d 181 (Fla. 1982) (termination of loan commitment requires notice and a reasonable amount of time to attempt compliance absent a specific deadline, citing *Felt v. Morse, 80 Fla. 154 (Fla., 1920)*).

AA00828

Moreover, and as the parties agree, under Florida law, "every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1151 (11th Cir. 2005). As in the present case, where parties are under a duty to perform, "the courts will enforce a duty of good faith, *including good faith negotiation*, in order that a party not escape from the obligation he has contracted to perform." Candid Productions, Inc. v. International Skating Union, 530 F. Supp. 1330, 1334-35 (S.D.N.Y. 1982); *see generally* Venn v. St. Paul Fire and Marine Ins. Co., 99 F. 3d 1058, 1065 (11th Cir. 1996). Consequently, the Debtors' breached this covenant given the obligations under the Commitment Letter, including to negotiate definitive agreements for the Credit Facility and the "exclusivity" provision. See Commitment Letter, pgs. 3 and 4.

As set forth in Wallace v. NCL (Bahamas) Ltd., 891 F.Supp. 2d 1343, 1352 (S.D.Fla. 2012), "Florida law imposes a duty of good faith and fair dealing on parties to a contract." *Id.* By implication, each contractual party "promises to perform" his "part of the bargain in good faith" and "expects the other party to do the same." *Id.* (quoting Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1097 (Fla. 1st DCA 1999)). Such a promise applies "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Id.* (*quoting* Publix Super Mkts. v. Wilder Corp. of Del., 876 So.2d 652, 654 (Fla. 2d DCA 2004)). Significantly, if "the terms of the contract afford a party substantial discretion to promote the party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Id.* (*quoting* Cox, 732 So.2d at 1097–98).

AA00829

As explained above, while the Debtors and PEPI discussed the final provisions of the Purchase Option, inexplicably and with no prior notice or indication of termination whatsoever, the Debtors concocted the "Default Letter," dated February 22, 2010, stating that PEPI was in default under the Commitment Letter, of course only after Mr. Ferrao agreed to fund (DiNardo, p. 194; Ferrao p. 28). Most importantly, PEPI sent the Debtors a Response Letter, dated February 23, 2010 (24 hours after it received the Default Letter), confirming that it was ready, willing, and able to close on the PEPI DIP Loan per the Commitment Letter (Fine Aff., ¶ 6). The Debtors never even responded to PEPI (DiNardo, p. 163), which fact by itself renders the Debtors' story almost unbelievable.

Based on the foregoing, the Debtors breached the implied covenant of good faith and fair dealing when they failed to negotiate in good faith, and failed to provide notice and/or refused to allow PEPI to cure the purported default so that the parties could fulfill their contractual obligations as originally intended. Clearly, the intent of the Commitment Letter was for PEPI to provide the Debtors with a DIP loan for its Chapter 11 cases. The expectation of the parties was that each would fulfill their end of the bargain, which required the negotiation of definitive loan agreements. The Debtors, however, chose not to do so.

Additionally, given the circumstances and conduct of the Debtors, the Debtors had created a "legitimate expectation" that it would provide notice to PEPI of a default under the Commitment Letter and an adequate amount of time to cure said defaults. Indeed, the course of conduct between the parties clearly establishes that the Debtors owed a duty to PEPI to negotiate honestly and provide reasonable notice of a default and an opportunity to cure. *See* T-3 Martinsville, LLC v. U.S. Holding, LLC, 916 N.E. 2d 205, 207 (Ind. Ct. App. 2009). In *U.S. Holding,* several landlords sought rehearing of the trial court's determination that they failed to

20

provide reasonable notice and an opportunity to cure to a commercial tenant who had missed several rent payments. The landlords argued that under the contract, only certain "events of default" required notice and an opportunity to cure. However, for several months, the parties entered into negotiations and proposed various solutions to the non-payment issues under the lease. By virtue of the ongoing negotiations, coupled with the declaration of default without notice, the court held that the course of conduct in actively negotiating made it that <u>neither side can suddenly declare the contract terminated and "simply walk away."</u> Instead, Landlords <u>were required to give reasonable notice to USH with an opportunity to perform within a reasonable amount of time before taking action to terminate</u> the Lease. *Id.* (emphasis added).

Like in *U.S. Holdings*, the Debtors here intentionally acquiesced by willingly not declaring a prior default  so as to keep the Commitment Letter alive and available since they had no "plan B" or other alternatives (DiNardo, pgs. 183, 185, 187-189, 192, 207, 227).  Similar to the facts in *U.S. Holding*, the Debtors and PEPI continued to "actively negotiate" solutions to several issues with the Commitment Letter, including the Purchase Option provision. Accordingly, the Debtors are simply not allowed to "walk away" in the final negotiations.  Thus, as the parties were actively negotiating terms of the DIP facility, the Debtors were  required to give PEPI an opportunity to perform prior to terminating the Commitment Letter.

Unrelated to the duty of good faith and fair dealings, contracting parties "may modify the written agreement through their conduct in the course of performance." <u>Saglio v. Chrysler First Commercial Corp.</u>, 839 F.Supp. 830, 834 (M.D. Fla. 1993); s*ee* <u>Pan American Engineering Co., Inc. v. Poncho's Construction Co.</u>, 387 So.2d 1052, 1053 (Fla. 4th DCA 1980); <u>Braille Excavating v. Vacuum Under–Drain</u>, 362 So.2d 117, 119 (Fla. 1st DCA 1978); <u>Fletcher v. Laguna Vista Corp.</u>, 275 So.2d 579, 580–81 (Fla. 1st DCA 1973); *see also* <u>Wisconsin Knife</u>

AA00831

Works v. Nat'l Metal Crafters, 781 F.2d 1280, 1294 (7th Cir. 1986) ("based on conduct or other means of expression induced a reasonable belief by [the contracting party] that strict enforcement was not insisted upon, but that . . . modified performance was satisfactory and acceptable as equivalent").

The case of Duffield v. First Interstate Bank of Denver, N.A., 13 F.3d 1403, 1406 (10th Cir. 1993) is also instructive. There, a lending bank unilaterally assigned revenues from gas and oil wells to itself without giving notice to the borrower/owner. The borrower argued that the lender breached the terms of the subject mortgage requiring the lender to give the borrower notice prior to exercising its assignment rights. The borrower further argued that the lender's conduct breached the duty of good faith and fair dealing.

The Duffield court held that: "[t]he Bank created a reasonable expectation in Mr. Duffield that the assignment provision would not be used absent a good reason and an adequate chance to cure so that the basic structure of the loan would not be frustrated. Thus, under both Big Horn and Colorado law, the Bank breached an implied covenant of good faith and fair dealing by invoking the assignment provision without reasonable prior notice and without a good faith basis for doing so." Id. Based on the negotiations with the Debtors, PEPI had a reasonable expectation that both notice and an opportunity to cure would be provided (Fine Aff., ¶ 29).

Throughout the parties' contractual relationship, the Debtors permitted PEPI to revise, negotiate or correct any and all issues the Debtors believed to exist during the performance of the parties' contractual negotiations and drafting. (Fine Aff., ¶ 6). By doing so, the Debtors and PEPI modified the applicable agreements to include a new contractual term – the right to cure any alleged defaults upon notice. To suggest otherwise would be the exact opposite of the Debtors explanation of negotiating in good faith - "effective communications." (DiNardo, p.

188).  Therefore, the Debtors had the obligation to provide notice and to allow PEPI to cure any purported default before it chose to terminate the Commitment Letter with PEPI.

In fact, if a contract contains no termination provisions, "the intention of the parties with respect to…termination is to be determined from the surrounding circumstances and by application of a reasonable construction of the agreement as a whole."  Sound City, Inc. v. Kessler, 316 So.2d 315, 318 (Fla. 1st DCA 1975).  Further, the contract "will be terminable within a reasonable time depending on the circumstances and that it may not be terminated by either party without first giving *reasonable notice*." *Id.* (emphasis added); *see* Perri v. Byrd, 436 So.2d 359, 361 (Fla. 1st DCA 1983) (party terminating contract must give reasonable notice to the other party); City of Homestead v. Beard, 600 So.2d 450, 453 (Fla. 1992) (contract may be terminated at will upon the giving of reasonable notice); *see* Crawford v. David Shapiro & Co., P.A., 490 So.2d 993, 996 (Fla. 3rd DCA 1986) (party may seek to recover damages caused by failure of other party to give reasonable notice of termination).

Alternatively, "[i]f at any time during the negotiations time became, because of an act of either of the parties, of the essence of the contract, the other party was entitled to a reasonable time after notice of such act within which to perform the contract." Felt v. Morse, 85 So. 656, 657 (Fla. 1920).

The above law is important because the Commitment Letter is silent as to a default notice or cure provision.   However, as stated above, it is well-established under Florida law that a party wishing to terminate a contract *must give reasonable notice* of the intention to terminate, and also allow a reasonable amount of time for the defaulting party to cure.  *Id.* ("[N]otice of the rescission must be brought home to the opposite party, and reasonable time must be given him after the notice to comply…[and also] allow him a reasonable time thereafter to comply with the

23

contract…."). [6]  Although primarily involving sales contracts without closing deadlines, the same rationale has been applied to loan commitments and therefore should apply to the Commitment Letter here. See, *Hospital Mortgage*, 411 So.2d 181 (Fla. 1982) (citing *Felt*).

Indeed, in *Felt*, a purchaser and seller of land entered into an agreement for the sale of land in Florida.  There was no formal written contract. *Id.*  As the sale negotiations continued, the purchaser's attorneys noted several defects in the chain of title. *Id.*  Additionally, the value of the property began to drop. *Id.*  In order to facilitate the sale, the seller began to correct the defects in title.  *Id.* While this was occurring, an employee of the purchaser notified an agent of the seller that the purchaser intended to rescind the contract. *Id.* The Florida Supreme Court found that the purchaser had not given sufficient notice of his intention to terminate the contract, and also determined it was "incumbent upon [the seller] to so notify the [buyer] and allow him a reasonable time thereafter within which to comply with the contract." *Id.* at 658.

In the present case, the Debtors did not negotiate in good faith.  The Debtors instead abandoned the negotiations, did not counter and ran to a new lender behind PEPI's back.  In doing so, the Debtors failed to give any, let alone sufficient, notice of its intent to declare a default and terminate the Commitment Letter. (Fine Aff., ¶ 6, 26 vi, viii, ix).  When viewing the Commitment Letter as a whole and the course of dealing between the parties, the Debtors were under a duty to provide PEPI with reasonable notice should it decide to allege a breach with a reasonable opportunity to cure.  Moreover, PEPI promptly notified the Debtors that it was willing and ready to comply with all the terms of the Commitment Letter and to provide the DIP financing. (*Id.,* ¶ 6).  Regardless, by virtue of the Florida Supreme Court's holding in *Felt*, the

---

[6]  It should be noted further that the Commitment Letter provided that the loan documents would provide  for reasonable notice and an opportunity to cure in the event *the Debtors* committed an event of default.

AA00834

Debtors were required to give PEPI a reasonable time to cure any alleged defaults (in addition to providing reasonable notice of those defaults). As the Debtors did not provide adequate notice of default to PEPI nor a reasonable opportunity for PEPI to cure, the Debtors failed to negotiate in good faith. *See* <u>Kessler</u>, 316 So.2d at 318 ("However, breach of the contract prior to the expiration of the time provided in such reasonable notice will, upon proper proof, subject the breaching party to damages.").

This conclusion is mandated by the record, but driven home even further based on the Debtors' intentional breach of the "non-disclosure", "truthful" and "exclusivity" provisions.

The Commitment Letter states:

> Except as required by applicable law, this Commitment and the contents of it ***shall not be disclosed by the Company to any third party without the prior written consent of PEPI***

[DE 22-5, pg. 4].

As explained above, there is no dispute that the Debtors disclosed the Commitment Letter and loan documents to Gulf Bay in breach of the confidentiality provisions contained in the Commitment Letter. The Debtors admit as much (DiNardo, p. 28, 29, 36), hence the conclusion is beyond debate. Clearly, without stealing PEPI's work product, it would have been impossible for the Debtors to finalize the terms of the Gulf Bay loan in a mere three days. In fact, Mr. DiNardo testified the PEPI Commitment Letter and loan documents were not only disclosed and shared with Gulf Bay, but actually formed the basis of their deal and documents (DiNardo, II, p. 7-10, 18-19).

The Debtors likewise breached the "truthful" provision of the Commitment Letter:

> (i) "all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "<u>Information</u>") is and will be complete <u>and correct in all</u> material respects as of the date made available to PEPI and does not <u>and will not contain any untrue statement of material fact or omit to state a material fact</u> necessary to make the statements contained therein

AA00835

not materially misleading." (Commitment Letter, p. 2) (emphasis added).

At this point, it is quite obvious the communication from the Debtors that they were "conferring" when they had already secured a replacement lender, is anything but truthful, as demonstrated by Note 6 above. In fact, it was PEPI still chasing the Debtors at the end to finalize the loan agreements to close and fund. Little did PEPI know that the agreed upon Purchase Option restriction (release) and the Debtors' paranoid concern that PEPI was a "loan to own" lender, would result in the Debtors replacing PEPI with Mr. Ferrao as its lender, who actually was advised to do so from the very beginning. ( Exhibit 6 to Fine Aff.; Ferrao, p. 30 and p. 59). And, by conducting themselves in this manner, the Debtors' breached the "exclusivity" provision in the Commitment Letter that required PEPI to serve as the sole DIP lender and "consummate the documentation and closing of the Credit Facility" (See Commitment Letter, p. 3).

## V.   **CONCLUSION**

There was no obligation for a written due diligence sign off to be issued by PEPI as a condition precedent for Fiddler's to file bankruptcy. Thus, the demand for it was a breach of the Commitment Letter by the Debtors. Secondly, only when the Debtors realized that the Purchase Option would not be unconditional did they refuse to counter or negotiate further under the Commitment Letter. Instead, they simply abandoned the loan with PEPI and in doing so, kept PEPI in the dark until the filing. Regardless, the Debtor attempted to declare a default only AFTER Mr. Ferrao agreed to take over PEPI's loan. Thus, there can be no dispute that the Debtors breached their duty to negotiate in good faith with PEPI and/or the duty of good faith and fair dealings.

AA00836

Based on the undisputed facts regarding the Debtors' demand for the non-existing written due diligence sign off, their failure to negotiate in good faith and/or breach of the non-disclosure, "exclusivity" or "truthful" provisions, and the obligation to negotiate definitive loan agreements, the Debtors have breached the Commitment Letter and the covenant of good faith and fair dealings as a matter of law under both Count I and III.  Consequently, by way of the Commitment Letter, PEPI is entitled to the balance of its Commitment Fee and the Break Up Fee as agreed to by the parties.  Indeed, although the Debtors had the ability to obtain a new lender, it was subject to payment in full of the foregoing fees.  The Debtors received the benefits, and must now pay as contemplated in the Commitment Letter.  After all, this was the only way Gulf Bay could steal PEPI's loan in a mere 3 days, notwithstanding the 3 months it took PEPI to get to that stage.

WHEREFORE, based upon the foregoing, PEPI Capital, L.P. respectfully requests that this Court grant the Motion and enter such other and further relief that this Honorable Court may deem just and proper for PEPI Capital, LLC.

Dated:  March 20, 2015.

**ROETZEL & ANDRESS**

/s/Alan J. Perlman
Alan J. Perlman
Florida Bar No. 826006
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile:  (954) 462-4260
E-mail:  aperlman@ralaw.com

*Attorneys for PEPI Capital, L.P.*

AA00837

## <u>CERTIFICATE OF SERVICE</u>
## <u>AND COMPLIANCE WITH LOCAL RULE 2090-1</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on March 20, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1.

/s/Alan J. Perlman
Alan J. Perlman

28

9135905 _1

**AA00838**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In re:                                          Case No. 8:10-bk-03846-KRM

**FIDDLER'S CREEK, LLC, et al.**

                                        **Jointly Administered**
                                        **Chapter 11**

            Debtors.

_____/

**FIDDLER'S CREEK, LLC, et al.**

            **Plaintiffs/Counterdefendants,**      Adv. Pro. No. 8:11-ap-00809-KRM

v.

**PEPI CAPITAL, L.P.**

           **Defendant/Counterplaintiff and**
           **Third Party Plaintiff.**

_____/

**PEPI CAPITAL, L.P.**

           **Third Party Plaintiff,**

v.

**GULF BAY CAPITAL, INC.,**

           **Third Party Defendant.**

_____/

## AMENDED AFFIDAVIT OF JEFFREY R. FINE IN OPPOSITION TO
## DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT
### (Amended as to Paragraph 12.5 only)

STATE OF TEXAS            )
                             ) SS
COUNTY OF DALLAS        )

      BEFORE ME, the undersigned authority, personally appeared, JEFFREY R. FINE

(hereinafter "Affiant"), being duly sworn, hereby deposes and says:

**AA00839**

1.      Affiant is an individual over the age of 18 years and submits this Affidavit based upon personal knowledge of the facts stated herein and in the Response in Opposition to the Motion for Partial Summary Judgment with respect to Counts I and III of the Complaint (the "Motion"), filed by Fiddlers Creek et al. ("Fiddlers"). For purposes of efficiency, I hereby incorporate by reference the factual allegations of the Response in Opposition, along with the exhibits thereto.

2.      While a partner at K&L Gates LLP ("K&L Gates"),[1] Affiant served as counsel to PEPI Capital, L.P. ("PEPI")[2] in connection with the negotiation and drafting of the Commitment Letter between PEPI and the Debtor, Fiddler's Creek, LLC and its affiliates (collectively, the "Debtors"), and with regard to the actions taken in an effort to finalize and close on the DIP facility. In this capacity, Affiant is familiar with the documents that relate to the DIP Loan and those that are material to the Motion, as well as those attached to PEPI's Response in Opposition Thereto ("Response"). All of these documents were maintained by K&L Gates and/or PEPI (at my direction and request) in the regular course of business and are/were made at or near the time of the transaction(s) using information transmitted by persons with personal knowledge of the facts or were produced via discovery. Upon my departure from K&L Gates, K&L Gates, at PEPI's direction, provided to Affiant at Dykema true and correct copies of the documents that were kept in the K&L Gates client files of this matter.

---

[1] From January 1, 2008 through February 2011, Affiant was a partner at K&L Gates. Affiant joined Dykema Gossett PLLC ("Dykema") in February 2011 and is currently a Member of Dykema.

[2] Any reference to PEPI herein shall refer to actions taken by Affiant, as counsel to PEPI in connection with (i) the negotiation and preparation of the Term Sheet, Commitment Letter, and the applicable loan documents; (ii) the events that ultimately led to the Debtor sending PEPI the Default Letter; and (iii) PEPI's response thereto, including all efforts to cure the alleged default.

AA00840

3.     Since receipt of these documents from K&L Gates, it is the regular practice of Dykema and PEPI (at my direction and request) to maintain and keep these documents referenced herein or in the Response in the possession of our respective offices.   These documents, which Affiant has examined, are now managed by employees or agents of Dykema and PEPI (at my direction and request) and whose duty it is to accurately and completely keep and maintain the above.  Furthermore, Affiant has personal knowledge of the matters referenced or contained in the documents as they relate to the Debtors and Commitment Letter referred to in the Motion.

4.     Affiant has personal knowledge of the facts contained in this Affidavit. Specifically, Affiant has personal knowledge of the facts regarding the drafting and negotiation of the Commitment Letter and the multitude of DIP Loan closing documents, the alleged facts and circumstances that ultimately resulted in the Debtors unilaterally terminating the Commitment Letter with PEPI (and electing to use an insider lender to fund the DIP Loan), and PEPI's efforts to cure the alleged default and proceed to funding the DIP Loan.

I.     **OVERVIEW**

5.     For a period of at least five months prior to the Debtors filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code, PEPI and the Debtors diligently negotiated a complicated $27,000,000.00 DIP Loan facility for the benefit of the Debtors.  Both before and after PEPI entered into a binding commitment letter for a $27,000,000.00 DIP Loan facility with the Debtors (the "Commitment Letter"), PEPI continuously made significant concessions to alleviate and address all concerns and requests made by the Debtors, and in turn, received repeated assurances by the Debtors and Aubrey Ferrao ("Ferrao"), the Managing Member of the

3

AA00841

Debtors, that PEPI would be the exclusive DIP Loan lender for the Debtors, and that Debtors would abide by all of the terms of the Commitment Letter.

6.  Notwithstanding the continuing efforts to finalize the underlying loan documents, just prior to the Debtors unilaterally declaring default, it appeared that the Debtors were reluctant to comply with the Commitment Letter provisions obligating them to obtain a release in favor of PEPI in connection with any assignment of the loan to an insider of the Debtors, as required under the final version of the Commitment Letter. Consequently, on the eve of the Debtors' Chapter 11 filings, with no prior warnings or indication of any potential termination or default and only after Mr. Ferrao agreed to provide the same loan, the Debtors manufactured a purported Default Letter alleging reasons the Debtors believed PEPI would not fund the DIP Loan and, therefore, was allegedly in default under the Commitment Letter. Instead of seeking to resolve the alleged default and proceed with the PEPI DIP Loan, the Debtors created a convenient basis to avoid the Commitment Fee and breakup fee obligation. Unlike prior experiences, including the resolution of various issues presented during the course of the loan negotiation/documentation process, the Debtors, after being non-responsive for several days, actually unilaterally terminated the commitment Letter by providing no opportunity for PEPI to cure or deal with the manufactured alleged default. In fact, within 24 hours of receiving the Default Letter, PEPI responded in writing that it was in fact ready, willing, and able to fund the loan per the Commitment Letter and the negotiated applicable loan documents.

7.  Instead of closing with PEPI under the Commitment Letter and/or negotiating in good faith, the Debtors and Ferrao, chose to utilize virtually the same confidential documents negotiated by PEPI and the Debtors to facilitate fundamentally the same DIP loan that PEPI was

4

AA00842

prepared to fund to the Debtors (with all of its nuanced, particular, and unusual provisions). Notably, what took PEPI and the Debtors several months to negotiate, Ferrao, through Gulf Bay Capital, Inc. ("Gulf"), was able to achieve in less than three (3) days or so. Only now, given the manufactured termination, the Purchase Option for the insider was a non-issue and the Debtors choreographed the appearance of no other option for financing in its bankruptcy cases (even though PEPI had made it clear it was ready willing and able to proceed with the DIP Loan), which bankruptcy cases were filed the very next day, so as to overcome the problems associated with an insider priming lien. Conveniently, the Debtors also utilized the manufactured termination to seek recovery of the Commitment Fee and as a defense to payment of the Break-up Fee obligation owed under the Commitment Letter when the Debtors utilized financing other than that provided by PEPI.

## II.    THE NEGOTIATION AND EXECUTION OF THE COMMITMENT LETTER

8.    Specifically, on October 20, 2009, the Debtor signed a Term Sheet with PEPI that outlined the general provisions of a DIP Loan facility to the Debtor and certain of its subsidiaries and affiliates for up to $27,000,000.00.

9.    Upon execution of the Term Sheet, Ferrao, as the Managing Member of the Debtor, and the Debtor's counsel participated in key telephone conferences with PEPI to finalize the terms of the DIP Loan.

10.    During the course of negotiating the DIP Commitment Letter, the Debtor and Ferrao demanded that the DIP Commitment Letter include significant and unusual provisions. First, instead of a customary provision that upon a default, the lender has a right to foreclose on whatever collateral the lender chooses, the Debtor insisted that the DIP Loan contain a waterfall

5

concept that specified the order of priority in which the collateral would be sold by PEPI in the event the Debtors were in default under the DIP Loan.

11.    PEPI acquiesced and the waterfall concept was included in the Commitment Letter.  In connection with the waterfall concept, the Debtors suggested, for PEPI's benefit, that deeds in lieu of foreclosure and consent judgments be held in escrow and used to speed the liquidation process instead of an ordinary foreclosure process.

12.    Although the deeds in lieu of foreclosure and consent judgment provision was included in the Commitment Letter, the parties later learned that, apparently, consent judgments and deeds in lieu were not available on initial loans under Florida law and/or, the title company suggested it be removed since a foreclosure process would still be required.  As a result, the deeds in lieu of foreclosure and consent judgment provisions were not included for the time being in the negotiation of the proposed negotiated loan documents.  Nevertheless, at all times, PEPI remained in agreement with the waterfall concept, a fact it communicated to the Debtor many times.

12.5    I had communications with the Debtors' counsel with regard to the drafting of the loan agreement, note and mortgage, to incorporate the waterfall provisions of the Commitment Letter.  As part of these communications with Debtors' counsel, we discussed terminology and drafting issues so as to secure the facility by a single note and mortgage.  The wording proposed by PEPI was negotiated with Fiddlers' representatives based on certain input and guidance from the title insurance representative and/or real estate counsel, so that the lien rights to be granted to PEPI would be and remain valid and enforceable, to the reasonable satisfaction of PEPI and its counsel in accordance with the Commitment Letter.

6

AA00844

13.     Second, very late in the negotiation process, Ferrao raised a new term that he would require—a right of first refusal to acquire the loan. Not satisfied with restricting PEPI's ability to foreclose on particular properties through the use of the waterfall concept, Ferrao demanded that he have the ability to take over the obligation himself upon a default (the "Purchase Option").    Such a provision was included in the DIP Commitment Letter. Concurrently, the Debtors asked for concessions on the payment of the Commitment Fee by requesting that one half of the Commitment Fee be paid upon DIP Loan funding.

14.     The Debtors and PEPI eventually signed the DIP Commitment Letter, effective December 31, 2009.

## III.    ITEMS RELATED TO DUE DILIGENCE, THE LOAN DOCUMENTS, AND CLOSING

15.     In order to successfully close and fund the DIP Loan, numerous conditions precedent needed to be satisfied, including due diligence.    The parties' routinely updated the Closing and Due Diligence Checklist.[3]    As the parties progressed towards the documentation and closing of the DIP Loan, PEPI methodically completed the items set forth in the above-mentioned checklists.  At all times, the due diligence review and closing process was extensive, was ongoing in nature, and continuously updated upon the completion of each item.  Multiple parties on behalf of the Debtors and PEPI were tasked with working on specified matters, especially in view of the magnitude of the transaction contemplated by the DIP Commitment Letter.  Indeed, as just one example of the complexity of the DIP Loan, the legal description of the property that was to be encumbered by the DIP Loan was over fifty (50) pages.

---

[3] *See* Exhibit 1.

7

AA00845

16.    PEPI was prepared to close and fund the DIP Loan pursuant to the Commitment Letter (unless otherwise agreed), a fact it communicated to the Debtors as early as February 16, 2010.   By February 17, 2010, the actual DIP Loan documents and bankruptcy filings were substantially completed, which Debtor's counsel communicated to Affiant in an e-mail that very day.

17.    During this time, it also appeared that all of the loan documents were close to final form and ready for signature and filing.   As such, the Debtors were only commenting on the break-up fee in the event PEPI was not the DIP lender and the Purchase Option.[4]   In this near final regard, Debtors' counsel requested clarification of a scenario he believed was "a real issue and one that [was] sure to come up."   Indeed, the Debtors wanted confirmation that the negotiated break-up fee would only be due "if [the Debtors] tr[ied] to replace [PEPI] when [PEPI was] otherwise ready, willing, and able to fund."   Pursuant to the course of conduct between the parties, this request, like many others, was resolved in the ordinary course.[5]

18.    With respect to the Purchase Option mentioned above, the DIP Commitment Letter required that the Debtors execute a full release in favor of PEPI, which had to be approved by the Bankruptcy Court.   Contrary to the mandatory language in the Commitment Letter, and fearful the Court would not allow a release, thereby rendering Mr. Ferrao's  Purchase Option a nullity, the Debtors proposed language requesting instead that PEPI simply accept assignment and indemnification.

---

[4]    *See* Composite Exhibit 2 (redacted).   The Purchase Option was intended for Mr. Ferrao personally to safeguard his equity and per him had to be "unequivocal."

[5]    *See* <u>Composite Exhibit 3</u>.   Emails regarding the final negotiations of these two areas.

AA00846

19.    As evidenced by Composite Exhibit 4, on February 18, 2010, consistent with the Commitment Letter and in rejecting the Debtors' request to alter same, counsel for PEPI sent counsel for the Debtors an e-mail including the final language of the Purchase Option that it would accept, including the language related to the full release. PEPI also informed the Debtors that day of the inability to revise the Purchase Option as requested and that it may proceed to file the Debtors' Chapter 11 cases.[6] More importantly, it appears to Affiant that the emails (in Exhibit 4) on February 18, 2010 between the Debtors and their counsel relate to PEPI's refusal to alter the Purchase Option, which emails continue until 6:29 p.m., just prior to the secret call to Mr. Ferrao to take over PEPI's loan.

20.    On February 19, 2010, PEPI believed the issues raised by the Debtor related to the Purchase Option were nearing resolution. PEPI expected that the Debtor would file its bankruptcy petition any time and that the DIP Loan would close with PEPI as the lender in due course.

21.    To the surprise of PEPI, the Debtors ceased communicating with PEPI, and in response to an inquiry regarding the sudden silence, the Debtor's only explanation was the misleading statement that it was conferring with counsel. Secretly, however, and based on the Debtors' own sworn testimony, I now understand that the Debtors' had already decided to proceed with Mr. Ferrao but refused to advise and instead actively misled PEPI until it was too late.[7] The Debtors' silence was ended with the purported termination of PEPI as the DIP Lender,

---

[6]    See Composite Exhibit 4, as to the proposal by Debtors to change the Commitment Letter provision and PEPI's inability to do same.

[7]    See Composite Exhibit 5, consisting of the Debtors deliberate efforts to mislead PEPI as to the true status of the PEPI loan. This conclusion is inescapable given the 11:38 secret email confirming Gulf Bay as lender compared

AA00847

the bankruptcy filings the very next day, and with the substitution of affiliate (Gulf Bay) as the proposed DIP lender, notwithstanding PEPI's emails to proceed and finalize the Purchase Option on February 19th. (See Comp. Exh. 5).

22.    Based on the circumstances, and as reflected by the last email in Exhibit 5 (2/21/10), the Debtors appeared to be concerned that the PEPI loan was a "loan to own", which would suggest that the inability of the "unequivocal" Purchase Option was a deal breaker for Mr. Ferrao once PEPI advised the Debtors that the release provision in the Commitment must remain. Even more disturbing, which may explain the Debtors actions ever further, based on recent discovery, Mr. Ferrao and/or Gulf Bay had been suggested to be the DIP lender from the very beginning – a fact not previously known to PEPI. [8]

23.    The Commitment Letter stated as follow:

"PEPI's commitment…is subject to:

*  *  *

(b) PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries.

*  *  *

(e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects." (p. 4)

24.    The Commitment Letter also provided that:

---

with the 4:47 email from Debtors that same day (2/19/10) misleading PEPI by stating they are "conferring with counsel and will get back to you [PEPI] as soon as we can."

[8]    *See* Exhibit 6 – Email from A. Ferrao of 2/20/10.

10

AA00848

"Other Conditions Precedent:

Standard and customary for loans and transactions of this type and such other conditions precedent to the Initial Advance and each Subsequent Advance under the Loan as required by Agent in its reasonable discretion including, but not limited to, the following:

\* \* \*

    3.  Completion of due diligence to the satisfaction of Agent, such due diligence to include, but not be limited to, examination of the Collateral and title thereto and additional due diligence related to the Company's business, industry, legal, environmental and technical related matters. (p. 15)

\* \* \*

    4.  Completion of legal due diligence investigation by counsel to Agent, with results satisfactory to Agent and its counsel, of all matters." (p. 15)

\* \* \*

"Due Diligence: There is a due diligence checklist which shall be updated regularly to reflect the delivery and receipt of items required by the conditions precedent terms herein." (p. 21)

\* \* \*

"The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein…" (p. 4)

\* \* \*

(i) "all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading". (p. 2)

\* \* \*

"Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in

11

AA00849

each case who need to know the terms hereof... If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined)." (p. 3)

25.     The Commitment Letter does not contain a provision obligating PEPI to provide a written signoff on due diligence as a condition precedent to Fiddlers filing bankruptcy.

26.     At all material times through February 22, 2010:

i.  PEPI negotiated in good faith in accordance with the Commitment Letter.

ii. PEPI took such actions to perform its due diligence under the Commitment Letter, which were just two of several dozen conditions precedent to any funding.

iii. PEPI never made an unequivocal demand in violation of the Commitment Letter, including as to the escrow, waterfall or its due diligence.

iv. PEPI verbally advised Fiddlers more than once that it had completed corporate and real estate due diligence, including on February 16, 2010.

v.  PEPI always acted in a manner consistent with honoring the sale order of the properties listed by the Debtor in the "Waterfall".

vi. At no time prior to February 22, 2010 did the Debtors ever advise PEPI that PEPI was in material default and will terminate the Commitment Letter.  Rather, any and all communications were in the nature of simply negotiating the corresponding loan documents.

vii. PEPI was not in material breach of the Commitment Letter as of February 22, 2010.

viii. At no time prior to February 22, 2010 did Fiddlers threaten to default PEPI or terminate the Commitment Letter.

ix. At no time prior to February 22, 2010 did Fiddlers advise PEPI it refused   to further negotiate the finalization of any loan document or such other aspect of the Commitment Letter.

12

AA00850

x. Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi. Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii. Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii. The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv. Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv. PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi. PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii. To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii. The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix. Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv. PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

13

AA00851

27.     Based on discovery regarding, and/or the testimony of, the Debtors' agents, Fiddlers was unable to (or failed to) comply with the Commitment Letter for several reasons, including the refusal of Mr. Ferrao to execute an Environmental Indemnification and the provisions as to the Purchase Option requiring a general release to PEPI if and when exercised.

28.     PEPI relied to its detriment on the continued loan agreement negotiations with Fiddlers through February 20, 2010 and the representation that PEPI was the sole DIP lender, and continued its efforts to finalize the loan documents and expended resources in said regard.

29.     Based on the negotiations by the parties and the course of conduct related thereto, PEPI expected notice and an opportunity to cure any alleged default issued by the Debtors.

30.     Only after the Debtors' breached the Commitment Letter did PEPI on February 23, 2010 proceed to terminate same in accordance with the provisions of the Commitment Letter.

31.     Affiant has read the Affidavit and knows from his own personal knowledge that the facts contained herein are true, accurate, and correct or are based on the sworn testimony of the Debtors' representatives.

**[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]**

14

AA00852

FURTHER AFFIANT SAYETH NAUGHT.

_____
AFFIANT

The foregoing instrument was sworn to and subscribed before me this 25ᵗʰ day of March

2015, by JEFFREY R. FINE, as Counsel to Defendant, PEPI CAPITAL, L.P., who is personally

known to me or who has produced   Tx Driver License   as identification.

_____
NOTARY PUBLIC

My Commission Expires:



DEBBY BOWEN
Notary Public
STATE OF TEXAS
My Comm. Exp. April 04, 2017

AA00853

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| FIDDLER'S CREEK, LLC | : | Case No. 8:10-bk-03846-KRM |
|   Debtors | : | Chapter 11 |
| - - - - - - - - - - - - - - - | : | |
| FIDDLER'S CREEK, LLC | : | Adv. No. 8:11-ap-00809-KRM |
|   Plaintiffs/ | : | |
|   Counter-Defendants | : | |
| v. | : | |
| PEPI CAPITAL, L.P. | : | |
|   Defendant/Counter-Plaintiff | : | |
| - - - - - - - - - - - - - - - | : | |
| PEPI CAPITAL, L.P. | : | |
| FIDDLER'S CREEK, LLC | : | |
|   Third Party Plaintiff | : | |
| v. | : | |
| GULF BAY CAPITAL, INC. and | : | |
| AUBREY J. FERRAO | : | |
|   Third Party Defendants | : | |
| - - - - - - - - - - - - - - - | : | |

U.S. Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Held April 15, 2015

TRANSCRIPT OF HEARING
[Re: 11-ap-00809]
1-Motion For Partial Summary Judgment and Incorporated
Memorandum of Law Filed by Paul J. Battista on behalf of
Plaintiff Fiddler's Creek, LLC (Doc. #84).....
*[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

BEFORE THE HONORABLE K. RODNEY MAY
UNITED STATES BANKRUPTCY JUDGE

PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

AA00854

*[FULL NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

[Re: 11-ap-00809 Continued]
.....Affidavit of Jeffrey R. Fine in Opposition filed by Alan J. Perlman on behalf of the Defendant (Doc. #99); Amended Affidavit (Doc. #107); Response in Opposition filed by Alan J. Perlman on behalf of the Defendant (Doc. #100); Reply filed by Paul J. Battista (Doc. #102); 2-Ex Parte Motion for Leave to File Document under Seal for in Camera Inspection as to Privilege Filed by Alan J. Perlman on behalf of Defendant PEPI Capital, L.P. (Doc. #98)

AA00855

APPEARANCES:


For Fiddler's Creek, LLC,          PAUL J. BATTISTA, Esquire
the Reorganized Debtor             Genovese Joblove & Battista
                                   100 S.E. 2nd Street
                                   Floor 44
                                   Miami, Florida 33131
                                   305-349-2300
                                   pbattista@gjb-law.com


For PEPI Capital, L.P.             ALAN J. PERLMAN, Esquire
                                   Roetzel & Andress
                                   350 East Las Olas Boulevard
                                   Suite 1150
                                   Fort Lauderdale, Florida 33301
                                   954-462-4150
                                   APerlman@ralaw.com


For Gulf Bay Capital,              RICARDO A. REYES, Esquire
Inc.                               Tobin & Reyes PA
                                   225 NE Mizner Blvd.
                                   Suite 510
                                   Boca Raton, FL 33432-4083
                                   561-620-0656
                                   rar@tobinreyes.com

AA00856

```
 1                    P R O C E E D I N G S
 2            (Proceedings commenced at 2:03 p.m.)
 3            COURTROOM CLERK:  All rise.  Court is again in
 4    session.  You may be seated.
 5            THE COURT:  All right.  If you would call our
 6    adversary, please?
 7            COURTROOM CLERK:  Yes, sir.  Thank you, sir.
 8    Case No. 10-3846, Fiddler's Creek, LLC; Adversary Proceeding
 9    11-809.
10            THE COURT:  All right.  I can't read that.  Those
11    kinds of things, I can't deal with.  In any event, let's take
12    appearances.
13            MR. BATTISTA:  Good afternoon, Judge.  Paul
14    Battista of Genovese, Joblove & Battista, on behalf of the
15    Plaintiff, Fiddler's Creek, LLC, and its affiliates.  And,
16    Judge, we will not address the adjourned hearing.
17            THE COURT:  It's just too far away, and I can't see
18    that.
19            MR. BATTISTA:  I appreciate that.
20            THE COURT:  Thank you.  And Mr. Perlman?
21            MR. PERLMAN:  Good afternoon, Judge.  Alan Perlman
22    on behalf of PEPI Capital, L.P., Counter-Plaintiff.
23            THE COURT:  Yeah, these are perfectly fine.
24            MR. BATTISTA:  That's why we brought them.
25            THE COURT:  This is great; this is all you need.
```

AA00857

```
 1              MR. BATTISTA:  Excellent.

 2              THE COURT:  And Mr. Reyes, go ahead and make an

 3    appearance.

 4              MR. REYES:  Yes, Your Honor.  Rick Reyes on behalf

 5    of Gulf Bay Capital, Inc., Your Honor.

 6              THE COURT:  Okay.  And we have a motion for summary

 7    judgment.  Now, I'm not sure how seriously each of you argue

 8    that we need to have a trial, that there's a genuine issue of

 9    material fact.  I mean, it seems like you're both arguing for

10    summary judgment based on the record before me.  And I want

11    to hear a little bit more about that.  Whether you think we

12    need a trial; either of you thinks we need a trial.  I don't

13    see it.

14              MR. BATTISTA:  Judge, on behalf of the Plaintiff,

15    the summary judgment we seek today is a partial summary

16    judgment on liability --

17              THE COURT:  That's right.  That's what I meant,

18    yeah.

19              MR. BATTISTA:  Okay.  Because we haven't gotten to

20    the stage of damages yet.

21              THE COURT:  Yeah, right.

22              MR. BATTISTA:  That may or may not require a trial;

23    we'll have to work that out.  But in terms of liability, we,

24    the Plaintiff, don't think there are any material issues of

25    disputed fact.  And I don't believe, in Mr. Perlman's
```

AA00858

1  response to our motion, he raised any material disputes

2  about the facts that we rely upon.

3         He raised other facts that he may believe deal with

4  his separately-filed motion for summary judgment that we

5  haven't yet responded to.

6         THE COURT:  Uh-huh.

7         MR. BATTISTA:  And, of course, he hasn't replied,

8  and it's not for hearing today.  But with respect to the,

9  I think, limited issues we have raised, I do not believe

10  there's any material dispute about the facts.

11         THE COURT:  All right.  Mr. Perlman, just on that

12  point?  I mean, I know you've requested summary judgment in

13  your own right on this very -- on this very issue.

14         MR. PERLMAN:  Certainly.  I think it's a

15  complicated question.  I think it's a fair question.

16  I think, to respond to Your Honor's pointed question, I

17  would say for the most part you're correct in that read.

18         I think the dispute is perhaps the interpretation

19  of the facts and the application of the law, if that's any

20  guidance.

21         THE COURT:  Well, I noticed that, you know, you

22  used the word "misled."  That your client was misled.  And,

23  you know, I don't know that I am going to get a sense of how

24  misled somebody was, just reading a transcript but if -- I

25  think what I'm trying to determine is whether the parties are

AA00859

```
 1   satisfied with me making a ruling based on the depositions
 2   and declarations and documents that are before me, and I just
 3   pick a winner.
 4           MR. BATTISTA:  And we are satisfied with that,
 5   Judge.
 6           THE COURT:  And I don't want to box you in.
 7   I just --
 8           MR. PERLMAN:  Yeah, I --
 9           THE COURT:  I think I see you asking me, on the
10   same record, to rule summary judgment in favor of you.  And
11   that's kind of an up or down thing; you're either liable or
12   you're not.
13           MR. PERLMAN:  I think Your Honor's correct,
14   although we raise significant positions that contradict their
15   ability to proceed factually --
16           THE COURT:  Okay.
17           MR. PERLMAN:  -- legally and otherwise.
18           THE COURT:  All right.  Well, holding that thought,
19   then, why don't we hear argument, if you want to add to
20   anything.  It looks like you're ready to add.
21           MR. BATTISTA:  Well, Judge, I was frankly going to
22   argue based on our motion --
23           THE COURT:  Yeah.
24           MR. BATTISTA:  -- and while I believe the issues
25   are fairly limited, there's a lot in the papers obviously.
```

AA00860

```
 1              THE COURT:  There is.

 2              MR. BATTISTA:  And there's a lot in the exhibits.

 3   We have tried to put in front of Your Honor what I describe

 4   as an evidence binder.  These are a series of exhibits that

 5   we have culled out of --

 6              THE COURT:  The pages from deposition.

 7              MR. BATTISTA:  Pages from some -- from depositions.

 8   Those are at the back.  And then the first -- you know, the

 9   bulk of them are select exhibits, emails, principally copies

10   of the loan documents, the Commitment Letter, and that type

11   of stuff.

12              THE COURT:  Uh-huh.

13              MR. BATTISTA:  We culled them out of the much more

14   voluminous set of exhibits so I can walk through and tie them

15   specifically to the relief that we seek, to make it easy for

16   the Court.

17              I've also handed up to the Court, as you see,

18   these blowups, if you will, of provisions of the Commitment

19   Letter, which I think will be helpful as we go through it.

20              And lastly, to try to make things a little bit

21   easier, I gave the Court a one-page piece of paper with seven

22   -- I'll call them -- questions on it, which it's titled.

23              We believe if Your Honor were to work through

24   these seven questions as sort of a roadmap -- yes, sir --

25              THE COURT:  Yeah.
```

AA00861

1        MR. BATTISTA:  -- as a roadmap for this hearing and

2  the pleadings, you will find that as you get through these

3  questions, you will have addressed all of the issues that we

4  raised in our summary judgment motion and the relief that we

5  requested, and will have dealt with all of the defenses that

6  Mr. Perlman raised in his response.

7        This is an effort to try to condense a significant

8  amount of paper into one piece of paper with questions.

9  We believe we've captured all of the issues that have been

10  presented to the Court, and we'll walk through them, and this

11  is what I proposed to use as my roadmap for my argument.

12        THE COURT:  Mr. Perlman, have you seen the one-page

13  with questions or these demonstrative exhibits with the

14  blowups that I'm holding, which -- do you have any problem

15  with me using these in making a decision?

16        MR. PERLMAN:  With regard to the colored copies, I

17  think that I've seen all of those documents before, and I

18  don't see why I'd have a --

19        THE COURT:  I think it's six pages of blue and

20  yellow.  And on the left-hand side is a small copy of various

21  documents, and the right-hand side is a blowup of portions of

22  the document on the left-hand side.

23        And I would rely on this unless you either tell me

24  that there's something in here that's misquoted, or that the

25  exhibit itself is somehow not to be seen by me, or if you'd

```
 1   like more time to review it?
 2              MR. PERLMAN:  Judge, I think that those are merely
 3   excerpts of the Commitment Letter --
 4              THE COURT:  That's what it --
 5              MR. PERLMAN:  -- that was executed by the parties.
 6   And if that's the case, I don't have an objection.  However,
 7   there's obviously parts of the Commitment Letter that I'll
 8   bring to Your Honor's attention that are not part of those
 9   exhibits.
10              THE COURT:  That's fine.
11              MR. PERLMAN:  The problem I have with the -- what
12   Mr. Battista referred to as a road map, I think something
13   like that is not demonstrative.  And I think something like
14   that, to the extent it was going to be offered up to Your
15   Honor, it should have been done so on a joint basis and I
16   would have had an -- I would have liked an opportunity to
17   co-author that, because I feel as if many of the issues are
18   presented in a one-sided fashion and don't necessarily
19   reflect all of my arguments, and so --
20              THE COURT:  Well, let's assume I take this under
21   advisement for some period of time, would have a problem
22   trying to co-author questions or would you rather -- he can
23   just tell me these things.
24              MR. PERLMAN:  Certainly.
25              MR. BATTISTA:  That's why I was -- Judge, this is
```

AA00863

 1    just for the purpose of you following along.

 2              THE COURT:  Yeah, right, right.

 3              MR. BATTISTA:  That's all I was doing.  If you

 4    don't want to follow along, well -- or there's an objection

 5    to that, it's okay.

 6              THE COURT:  If we take it under advisement, I'll

 7    give you time to respond to these if you don't -- to the

 8    extent you don't do it already in your argument.  Okay?

 9              MR. BATTISTA:  All right, thank you.

10              THE COURT:  And I'll consider this to be argument

11    rather than any kind of a definitive statement of what the

12    legal issues are.

13              MR. PERLMAN:  Thank you.

14              MR. BATTISTA:  And that's all I intended, Judge.

15              THE COURT:  And I understood that, but Mr. Perlman

16    made a good suggestion.  But then again, maybe you would

17    never agree on something that could be co-authored; I don't

18    know.  Mr. Battista, go ahead.

19              MR. BATTISTA:  Thank you, Judge.  So, Judge, we are

20    here on Fiddler's motion for partial summary judgment.  Your

21    Honor will have noted that the evidence that we rely upon

22    consists entirely of deposition testimony and deposition

23    exhibits that were obtained in our depositions of the PEPI

24    representatives.  There is not an affidavit from any of the

25    principals or employees of Fiddler's Creek.

AA00864

1    We did that purposely because we believe that the

2 admissions that were made by PEPI in those depositions fully

3 support the relief we seek today, and so that's what we rely

4 upon.

5    Mr. Perlman filed a response, and he attached one

6 affidavit of Jeffrey Fine.  Your Honor, I don't believe, met

7 Mr. Fine during the bankruptcy case, but he was counsel to

8 PEPI during the negotiation of the Debtor-in-Possession loan

9 facility pre-bankruptcy.

10    He was also put up to us in response to our request

11 for a 30(b)(6) representative of PEPI.  They chose to

12 designate Mr. Fine, who was their counsel as the 30(b)(6)

13 representative.

14    THE COURT:  Is he a private attorney or is he

15 in-house?

16    MR. BATTISTA:  He was with K&L Gates during the

17 negotiations of the DIP loan.

18    THE COURT:  Uh-huh.

19    MR. BATTISTA:  Since then, he has left.  I don't

20 know which firm he's at, but he's with a big firm, maybe a

21 Haynes & Boone-type, but he's with a big firm in the --

22    MR. PERLMAN:  Dykema.

23    MR. BATTISTA:  Thank you.  Dykema, I apologize.  So

24 he was not in-house, Judge.  He was the outside counsel and

25 he was -- he is a bankruptcy lawyer.

AA00865

```
 1              THE COURT:  All right.

 2              MR. BATTISTA:  I point that out because that's who

 3    they designated as their 30(b)(6) representative, so his

 4    testimony binds PEPI in that fashion.

 5              We will deal with Mr. Fine's affidavit a little bit

 6    later, Judge, but suffice it to say:  Like all good lawyers,

 7    his affidavit is actually more like a pleading than it is a

 8    series of material facts based on his personal experience.

 9              We believe, based on the cases that we've cited in

10    our reply, that Your Honor should give little to no weight to

11    conclusions that a lawyer trying to act as a witness makes in

12    his affidavit.

13              In fact, at one point, he has twenty separate

14    bullet point, I call them, conclusions, in which he asserts

15    are facts.  And we'll go through them quickly, but when you

16    see that, you'll decide whether you believe they're facts or

17    they're legal conclusions or self-serving conclusions.  We

18    don't believe they give rise to create a dispute of any

19    material fact.

20              THE COURT:  Well, let me ask you --

21              MR. BATTISTA:  Yes, sir.

22              THE COURT:  I hate to keep interrupting you

23    because --

24              MR. BATTISTA:  No, please, I invite it.

25              THE COURT:  -- you're never going to get out of the
```

AA00866

```
1   gate.

2           MR. BATTISTA:  No, I will.

3           THE COURT:  We have until about ten minutes until

4   5:00.

5           MR. BATTISTA:  Yes, sir.  I know that.

6           THE COURT:  You have the rest of the afternoon.  I

7   don't know how much argument you have, but what I don't want

8   to have happen is have you argue until 4:30 and leave Mr.

9   Perlman.

10          So I don't know whether the two of you together

11  would take an hour, hour and a half, or whether I need to

12  actually watch the clock and monitor that.

13          MR. BATTISTA:  Judge, I had thought about that.

14          THE COURT:  What do you think?

15          MR. BATTISTA:  I had thought about that, and I was

16  going to try to get my argument done inside of an hour, give

17  Mr. Perlman as much time as he wants, and then have a few

18  minutes for my rebuttal.  And if we can do that this

19  afternoon, that would be good.

20          THE COURT:  Well, we could do that on an hour.  Do

21  you think you could do yours within an hour?

22          MR. PERLMAN:  I'd hate to be held to that.

23          THE COURT:  All right.  It's 2:15.  Mr. Battista,

24  I'm going to cut you off at 3:20, we'll take a five minute

25  break, and then you can have an hour and 15 minutes, which
```

AA00867

```
 1   is about what I'm giving him.  And then you can have five
 2   minutes or ten minutes for rebuttal.
 3            MR. BATTISTA:  Yes, sir.  And hopefully I can
 4   finish sooner and we can have a little bit of extra time at
 5   the end.
 6            THE COURT:  All right.  That's as good as we can do
 7   today.
 8            MR. BATTISTA:  Yes, sir.  That's fine.  I
 9   appreciate that, and I appreciate the Court's attention.
10            THE COURT:  Okay.  And in an hour and a couple
11   minutes, I'll cut you off.
12            MR. BATTISTA:  Yes, sir.  So, Judge, what I have
13   handed up to the Court is our evidence -- what we call our
14   evidence binder.  We're going to walk through that in my
15   argument.
16            As I indicated at the beginning, we think the
17   issues for our summary judgment are fairly limited.  We
18   assert that PEPI breached the Commitment Letter that was
19   signed pre-bankruptcy with the Debtors on three bases, and
20   we're going to focus in on those.
21            One is, the Commitment Letter required the
22   inclusion of what we call the escrow provisions, and we'll go
23   through what they are.  There are three of them that were
24   required.
25            We will show -- and PEPI has admitted throughout
```

AA00868

1  the depositions -- that they deleted those escrow provisions

2  in the loan documents that were prepared by PEPI in

3  connection with this DIP loan pre-bankruptcy, and refused

4  to include them.

5        They have a number of excuses as to why, but the

6  bottom line is they refused to include those escrow

7  provisions in the loan documents, and that was a material

8  deviation from the Commitment Letter, and hence a breach.

9        Secondly, we have what we call the waterfall

10  provision.  Your Honor is familiar with this, having heard

11  the argument back then, but that's a provision that is

12  required by the Commitment Letter that -- the Commitment

13  Letter specifically says that the -- that PEPI, in this case,

14  could not foreclose on the collateral, the real estate,

15  except in the order of the waterfall, and was specifically

16  listed in the Commitment Letter.

17        PEPI initially complied with that Commitment

18  Letter in the first draft of the loan documents and in emails

19  leading up to it, and then in midstream shifted and proposed

20  -- and would not recede from a material change to that

21  language in the loan documents, which we asserted was a

22  default by them of the Commitment Letter on that front.

23        And thirdly, after several attempts to get PEPI

24  to provide what we described as the due diligence signoff

25  under the Commitment Letter, we were told on the infamous

AA00869

1  conference call you'll hear a lot about, on February 16th,

2  2010 in the evening, that in fact PEPI never intended to give

3  us that due diligence signoff, and we assert that was an

4  anticipatory breach of the Commitment Letter.

5      So, Judge, we think that was fairly

6  straightforward.  Mr. Perlman, as a fine lawyer, raised a

7  number of issues and responses in his response, and with Mr.

8  Fine's affidavit.  We filed a lengthy reply.  We apologize to

9  the Court for the length of that but we believed we needed it

10  to try to set the record straight, and we believe we did

11  that.

12      And then today, the roadmap, I think, will help us

13  walk through all of the issues.  And when we get done with

14  it, I believe we will have captured all the arguments, all

15  the issues, and Your Honor will be able to rule by looking at

16  answering those questions.

17      So we're going to start, Judge, with the first

18  question on this sheet, and that's the first argument that

19  Mr. Perlman raised in response to our motion for partial

20  summary judgment.

21      He took the position that -- in his response, that

22  the Court cannot grant partial summary judgment on the issue

23  of liability without also dealing with the issue of damages.

24      That's his argument.  And, of course, if the Court

25  concludes that you cannot grant partial summary judgment on

AA00870

```
 1   liability, then I guess we don't need to go any further.  We
 2   have to come back and deal with the broader issue which,
 3   respectfully, would be closer to a trial than it would be
 4   summary judgment.  But nevertheless, Judge, we responded.
 5   And we believe Mr. Perlman's argument is wrong.
 6            All of the cases that he relied upon in his
 7   response predated the 2010 amendments to Rule 56.  Rule 56(a)
 8   specifically was modified in 2010 to add a number of things
 9   but, in particular, it added language or a clause called "or
10   part of each claim or defense."
11            So now Rule 56(a) reads:  A party may move for
12   summary judgment, identifying each claim or defense, or part
13   of each claim or defense on which summary judgment is sought.
14            Cases that came after 2010 -- the December 2010
15   amendment that we've cited in our reply -- clearly provide
16   that the Court has the authority now to issue partial summary
17   judgment on liability without reaching the issues of damages.
18            Frankly, I think that disposes of that threshold
19   issue as a matter of law, so we can move on, in our view, to
20   question two.
21            Question two is really the guts of this argument.
22   And that is whether PEPI defaulted under the Commitment
23   Letter by requiring the deletion of the escrow provisions, by
24   requiring a material change to the waterfall provision, and
25   by anticipatorily breaching by indicating late in the game
```

1  that they had no -- and never had any -- intent to provide a

2  due diligence signoff.

3         These are three separate and independent defaults.

4  You only have to find one in order to grant summary judgment

5  in favor of Fiddler's, finding that PEPI has defaulted under

6  the Commitment Letter.  If you just find one, then we move

7  on.  And if you find all three, which we think you will, then

8  obviously there are three defaults, not just one.  But you

9  only have to find one; they're independent.

10        So let's start, Judge, with the Commitment Letter.

11 And if you take out the very first colored sheet, you'll see

12 we describe it as the Default Provisions.

13        And what we say in here is -- not what we say but

14 what the Commitment Letter says is -- quote, "the terms and

15 conditions of the documentation of the Credit Facility shall

16 be substantially the same as those set forth herein" --

17 meaning in the Commitment Letter and in the Term Sheet,

18 which, by the way, was attached to the Commitment Letter --

19 "and such documentation shall not contain additional terms,

20 covenants, conditions, representations and warranties

21 materially different than those required herein."

22        So that tells us that PEPI agreed that the loan

23 documents that would come out of this Commitment Letter had

24 to be substantially the same as those as the terms of the

25 Commitment Letter and could not be materially different.

AA00872

1    When I walk through the three defaults, the first

2    two, they deleted the escrow provisions.  Hard to suggest

3    that that wasn't materially different than what was required

4    by the Commitment Letter -- hence a breach -- and they

5    significantly modified the Commitment Letter terms as it

6    related to the waterfall provisions.

7    So this Commitment Letter, that's the default

8    provision that we assert gives rise to the default by PEPI,

9    both for the waterfall provisions and the escrow provisions.

10    A little further down, you'll see this is the

11    effect of that default, the next paragraph that we cite

12    out of the Commitment Letter.  And that is, quote, "All

13    indemnities and obligations of the company and its

14    subsidiaries hereunder shall survive the termination of the

15    Commitment Letter or the commitment of PEPI hereunder" -- and

16    here's the critical language -- "provided, however, that such

17    indemnities and obligations shall not survive in the event of

18    a default by PEPI hereunder."

19    Said differently:  If PEPI defaults, the Debtors

20    are excused from further obligations under this Commitment

21    Letter.

22    THE COURT:  And the terminology here, just for the

23    record, you're arguing about "Debtors."  This provision says,

24    "The Company."

25    MR. BATTISTA:  I apologize.

AA00873

```
 1              THE COURT:  No, I mean --

 2              MR. BATTISTA:  The Company is defined as -- because

 3   it was pre-bankruptcy, so they weren't the Debtors at that

 4   point in time.

 5              THE COURT:  Just for the record.

 6              MR. BATTISTA:  No, I thank you for that

 7   clarification.  You're absolutely right.  And so we sit here

 8   with a Commitment Letter that is framed.  The loan documents

 9   have to be substantially the same as the Commitment Letter

10   terms and cannot be materially different.

11              And if they are, a default exists under the

12   Commitment Letter.  And if there's an event of default by

13   PEPI, then the Debtors -- at this time, the pre-bankruptcy

14   Debtors -- would be relieved from any obligations or

15   indemnities after that fact.  Those are the terms of the

16   Commitment Letter; they're not disputed.

17              And so now -- one note before I move on.  Nothing

18   in this Commitment Letter -- and by the way, the Commitment

19   Letter is also Item 1 in our evidence book, the entire

20   Commitment Letter --

21              THE COURT:  Okay.

22              MR. BATTISTA:  -- with all of its exhibits.  And we

23   can go through it -- Mr. Perlman can go through if it he

24   wants, and other points of it.

25              But nothing in that Commitment Letter -- it's
```

AA00874

1  undisputed -- there's not a word in there that would give

2  PEPI -- or would require the Debtors to give PEPI notice of

3  a default and an opportunity to cure.  It does not exist in

4  that Commitment Letter.

5          The only reference to an opportunity -- notice and

6  opportunity to cure, is in connection with the loan documents

7  that are supposed to arise out of this Commitment Letter.

8  And that was a request that the Debtors would have in the

9  loan documents.  They would be entitled to notice of a

10 default and an opportunity cure.  PEPI giving us notice of

11 default and us an opportunity cure.

12         That's in the Commitment Letter, the terms of

13 what the loan documents would say.  But as it relates to

14 the Commitment Letter, there was nothing in here that gave

15 PEPI -- obligated us to give them notice or gave them any

16 right to cure.  We'll get back into that when PEPI argues

17 that there is some implied notice and opportunity to cure,

18 but it is not expressed in the Commitment Letter.

19         So let's go back, Judge, to the escrow provisions.

20 And so I'm going to turn to the second blue and yellow

21 handout I gave you.  That's a cut-and-paste of the escrow

22 provisions from page 12 of 45 of the Commitment Letter.

23         And let me back up a second.  Your Honor knows that

24 this was proposed to be a priming DIP loan.  Rather unusual

25 in terms of the ability to obtain a priming DIP loan.  And

AA00875

1   Your Honor knows very well the requirements.  We had to

2   provide adequate protection to the junior secured creditors

3   -- or who would become the junior secured creditors -- in the

4   real estate in order to achieve Your Honor's approval of a

5   364(d) priming DIP loan.

6           So in the development of this Commitment Letter,

7   understanding what that meant, we provided for the escrow

8   provisions and the waterfall provisions.  These were heavily

9   negotiated provisions.

10          And so in terms of the escrow provisions, what did

11  they say?  Very clear on this blue and yellow sheet.  It

12  says, quote, "In addition, the final loan documentation for

13  the Credit Facility shall provide one, two and three."  One

14  is an escrow mechanism to hold consent judgments to any

15  foreclosure in the order of the priority in the waterfall to

16  speed judgment and foreclose -- the judgment and foreclosure

17  process.  So there had to be consent judgments drafted and

18  put in escrow under an escrow mechanism.

19          Two, there had to be deeds in lieu of foreclosure

20  prepared and held in escrow.  And three, there had to be a

21  valuation mechanism in the loan documents so that if property

22  were acquired through a deed in lieu of foreclosure, the DIP

23  loan debt would be reduced accordingly.  There would be a

24  mechanism to properly value that property after PEPI, in this

25  instance, took a deed in lieu of foreclosure and took control

AA00876

 1 | of the property.  Those were conditions that were required to
 2 | be in the loan documentation.  Very, very clear.
 3 | PEPI admits in their response -- and they cite
 4 | cases -- that if, in fact, they refuse to abide by a material
 5 | term of the Commitment Letter, they admit that they would be
 6 | in breach.
 7 | So the questions for the Court here are:  Were
 8 | these escrow provisions material, a material term of the
 9 | Commitment Letter?  And two, did PEPI refuse to include them
10 | in the loan documents?  If you answer yes to both of those,
11 | you have to find PEPI defaulted.  And pursuant to the first
12 | handout, you have to find that the Debtor's obligations with
13 | them do not survive that default.
14 | So let's go ahead and ask those questions.  Were
15 | the escrow provisions material?  Well, you can look at this
16 | language here, and you can look at the entire Commitment
17 | Letter and you can conclude on your own in the terms on --
18 | in the section on collateral and adequate protection, page 12
19 | of 45 in Exhibit Binder 1, a lengthy description of the
20 | collateral and adequate protection.  This is right in the
21 | middle of it, and it's one of the two critical provisions
22 | for adequate protection.
23 | But more importantly, PEPI's representatives
24 | testified in deposition that in fact that was the case, they
25 | were material.  And so let me refer Your Honor back to the

1  evidence binder, Item 4 of the evidence binder.  And, Mr.

2  Perlman, that's Depo Exhibit 12, if that helps you.  When

3  Your Honor is there, let me know.

4          THE COURT:  I'm not there yet.

5          MR. BATTISTA:  Yes, sir.

6          MR. PERLMAN:  You said Exhibit 12?

7          MR. BATTISTA:  It is Depo Exhibit 12.

8          MR. PERLMAN:  Oh, okay.

9          MR. BATTISTA:  But it's Item 4 in the evidence

10  binder.

11          MR. PERLMAN:  Thank you.

12          THE COURT:  Wait just a second.  I have the binder.

13  And before I've even turned there, it says 4 is an email from

14  Mr. Battista.

15          MR. BATTISTA:  Yes, sir, and I'm going to show

16  you --

17          THE COURT:  Okay.

18          MR. BATTISTA:  -- how that plays out.

19          THE COURT:  Okay.  I thought we were going to go to

20  a document.  Okay, I'm with you.

21          MR. BATTISTA:  The bulk of the documents in this

22  evidence binder are in fact emails.

23          THE COURT:  Okay.

24          MR. BATTISTA:  So we start with -- this is under

25  the question of:  Are these escrow provisions material to the

AA00878

1    Commitment Letter?

2            So you're looking at Item 4, my email of January 6,

3    2010.  It was admitted in the deposition of Mr. Lorio down on

4    the bottom right.  It's from me to Mr. Fine copying other

5    lawyers, and it's entitled Quick Outline of Points for Call

6    Today.

7            And in here, Item 6 of that email, I state,

8    "Discussion on mechanism to deal with liquidation of

9    collateral in the waterfall.  Trish and I" -- Trish being

10   Trish Redmond -- "have some good ideas that will be of

11   benefit to your client" -- meaning PEPI -- "in this process,

12   and will also allow us to satisfy the other secured creditors

13   that the waterfall is meaningful and not illusory."

14           And then I go through our three thoughts.  Our

15   three thoughts are:  Escrow for consent judgments, escrow

16   for deed in lieu of foreclosure, and need for a valuation

17   mechanism.

18           And I conclude by saying:  "We think this saves

19   your client a significant amount of time and expense in the

20   foreclosure process and also allows us to show the junior

21   lenders that the waterfall is real."  So that's how I

22   presented it to Mr. Fine.

23           If you turn to Item 5 in the evidence binder, and

24   this is the admission from PEPI.  This is Exhibit 13, by the

25   way, Mr. Perlman, on the deposition exhibit.

1    And in here you'll see there's two emails, but
2  the important one is the bottom one from a K. Springfield.
3  Mr. Springfield is a representative of PEPI and was -- in
4  deposition, admitted to being able to bind PEPI.  And it's to
5  Mr. DiNardo, who you know is the Debtor's CFO, copying Mr.
6  Lorio and Mr. Redunsky, both representatives of PEPI.
7    And in item 3 of that email, you see he says:
8  "Following a conversation this afternoon," he says, quote,
9  "Deed in lieu of foreclosure concept, as outlined in Paul's
10  email on January 6, 2010 to Jeff Fine."  That's Item 4 of the
11  evidence binder.  "We do agree that this shows the other
12  lenders the waterfall is real and that the borrower is
13  committed to the project."
14    And then go to Item 6, if you could, Judge, in the
15  evidence binder.
16    THE COURT:  Uh-huh.
17    MR. BATTISTA:  And you have an email from Mr. Fine
18  to me dated January 15, 2010.
19    MR. PERLMAN:  What exhibit?  I'm sorry.
20    MR. BATTISTA:  It's Exhibit 14.  Sorry about that.
21  And in Item 2 of that email, Mr. Fine says, "We have
22  incorporated Paul's concept of deeds in lieu, et cetera, and
23  the waterfall concept."
24    Judge, we believe that those three emails together
25  clearly show that PEPI understood and agreed that these

AA00880

1   escrow provisions were material to the waterfall and material

2   to the provisions of the Commitment Letter, and that they

3   showed the other secured creditors that the waterfall was

4   real.

5           There's nothing in Mr. Perlman's response or Mr.

6   Fine's affidavit that disputes the materiality of these

7   escrow provisions.  What they say, and we'll deal with this

8   later, is those escrow provisions were solely for the benefit

9   of PEPI and therefore PEPI can waive them.

10          We'll deal with whether PEPI had the right to waive

11  them as part of its defense, but they don't dispute that --

12  they don't say that they weren't material.  They don't say

13  anything like that.  They simply say, "We have the right to

14  waive it."

15          MR. PERLMAN:  Judge, I apologize for interrupting,

16  but perhaps it makes more sense if I get to present my

17  opposition than having Mr. Battista, since we're trying to

18  operate under a clock.  Just an observation.

19          THE COURT:  I'm not sure I follow you.  Your

20  opposition when, and on what?

21          MR. PERLMAN:  Mr. Battista's making my arguments

22  for me in terms of my opposition.  I'd like the opportunity

23  to present the opposition.

24          THE COURT:  Well, you will be, absolutely.

25  Absolutely.  I think that's just Mr. Battista's style.  But

AA00881

1    it also -- I won't let that -- I'll try not to let that

2    prejudice you.  Go ahead.

3          MR. BATTISTA:  Thank you, Judge.  And I think I

4    have an obligation, Judge, to refute his defenses to my

5    motion as part of trying to get summary judgment granted in

6    my favor, so I'll continue.

7          In any event, Judge, we believe the answer to the

8    first question is yes, PEPI admitted that these provisions

9    were material to the Commitment Letter.  And Your Honor can

10   make the conclusion on your own, reading it, whether you

11   believe they were material to our ability to obtain a priming

12   DIP loan based on the terms of the Commitment Letter.

13         So the second question, then, once you conclude

14   that, is:  Did PEPI refuse to include the escrow provisions

15   in the loan documents?  And if the answer to that is yes,

16   then you have to conclude that they, in fact, defaulted by

17   including -- they don't even decide to add substantially

18   different terms or materially different terms.  They just

19   excluded them in total.  And so that, we believe, would fall

20   squarely within the default provisions of the Commitment

21   Letter.

22         So let's find out whether in fact they did in fact

23   refuse to include that.  Let's start with the first draft of

24   the loan agreement.  And that is Item 8 in our evidence

25   binder.  Mr. Perlman, that's Exhibit 16.

AA00882

```
 1              MR. PERLMAN:  Thank you.

 2              MR. BATTISTA:  When Your Honor's there, I'll move

 3   on.

 4              THE COURT:  I'm sorry.  Where are we now?

 5              MR. BATTISTA:  It's Item 8 in the evidence binder.

 6              THE COURT:  Oh, Item 8.  Okay.

 7              MR. BATTISTA:  And in here you'll see that there's

 8   an email from Mr. Fine to myself and a number of people:

 9   Lawyers and other representatives of PEPI.  And he starts it

10   off by saying -- this is dated February 2nd, 2010.  He says,

11   "All, I attach a draft comprehensive loan agreement," which

12   contains a number of things.

13              So when we turn the page, Your Honor will see

14   two pages later is the cover page for the draft Debtor-in-

15   Possession loan and security agreement; at the top right-hand

16   corner dated 2/2/10.

17              And what we did is instead of giving you the 50-

18   page or 60-page document, we pulled out the provisions that I

19   wanted the Court to focus on, which was Section 10.4 of that

20   loan agreement.  And it is on the next page in the evidence

21   binder and it's entitled Exercise of Certain Remedies.

22              And if you go to 10.4(b) as in boy, you'll see

23   there is the provision that PEPI put into its first draft of

24   the loan agreement, including some of the escrow provisions.

25   And it says, quote, in 10.4(b), "Agent" -- which is PEPI --
```

AA00883

```
 1   "agrees to hold in escrow the deeds in lieu of foreclosure
 2   and consent judgments delivered to agent by Debtors as a
 3   condition to the initial advance."
 4            And it goes on and talks about how those items can
 5   be released from escrow.  But in this document, which is the
 6   first draft of the loan agreement circulated by PEPI, they
 7   included two of the three aspects of the escrow provisions.
 8   One was the escrow for deed in lieu of foreclosure and, two,
 9   escrow for consent judgment.  So PEPI started off adding
10   these to the --- adding these provisions to the loan
11   documents.
12            If you go to Item 10 in the evidence binder, you'll
13   see in there --
14            MR. PERLMAN:  Which Exhibit?
15            MR. BATTISTA:  Oh, I apologize.  It's Exhibit 44.
16   Deposition Exhibit 44.
17            THE COURT:  I'm sorry.  You said No. 10.
18            MR. BATTISTA:  Item 10, yes, sir.  And you'll see
19   in Item 10, in the bottom half of it, an email from myself to
20   Mr. Fine and others dated February 8th, in which -- you go to
21   the second page of my email, Item 16.
22            And Item 16 of that email, I say to Mr. Fine, in
23   Section 10.4 that we just read, "We need to build in the
24   concept of a valuation mechanism for purposes of reduction
25   of the debt through the foreclosure or deeds in lieu."
```

AA00884

1    So I point out to him that he did not include the

2 valuation mechanism in the loan agreement as required by the

3 Commitment Letter.

4    You go on again to Item 12 -- Mr. Perlman, it's

5 Exhibit 30.  Item 12 of the exhibit binder.  And, again,

6 there's an email from me to Mr. Fine and others.  By the

7 way, Judge, all of these emails were admitted -- or were

8 introduced and identified in the depositions of the PEPI

9 representatives.

10    MR. PERLMAN:  I'm sorry, Paul.  Did you say, 30?

11    MR. BATTISTA:  Thirty.  Three-0.  Mr. Redunsky's

12 deposition.

13    MR. PERLMAN:  Okay.

14    MR. BATTISTA:  And so in this email, February 11,

15 Judge, I say to Mr. Fine in Point 4 on the top, I say, "Jeff,

16 I would add the following additional items that we need to

17 discuss.  Item 4.  Adding the language per the Commitment

18 Letter on a valuation mechanism in respect to the deeds in

19 lieu or foreclosure under the waterfall.

20    So again I say to him, "We need to add the

21 valuation mechanism for the third leg of the three escrow

22 provisions."

23    And Mr. Lorio on that same day, a few hours later,

24 in Item 13 of our exhibit binder, Exhibit 17, Mr. Lorio

25 writes an email to Mr. DiNardo.  And here's where Mr.

AA00885

1   Lorio and PEPI proposed deleting the escrow provisions,

2   notwithstanding the requirement in the Commitment Letter.

3           In here, Mr. Lorio says -- in the middle of that

4   email dated February 11th, Item 3 -- he says, "The items we

5   have to discuss on the list are, three, issues regarding

6   valuation mechanism for deeds in lieu of foreclosure.  We do

7   not need these, and to get this moving and avoid complexity,

8   propose deleting this in the structure entirely."  That's

9   February 11th.

10          The first time now we hear from PEPI that they

11  want to delete the escrow provisions, notwithstanding the

12  requirement of materiality from the Commitment Letter.

13          Item 14, which is Exhibit 18, Al, Mr. DiNardo

14  writes back an hour later to Mr. Lorio.  And in Item 6 of

15  that email down at the bottom, 6(b), as in boy, he says, "The

16  deed in lieu and escrow concept only works with respect to

17  the unencumbered property because of the valuation issues

18  associated with the mortgage lenders' liens.  C, you need a

19  valuation method for the waterfall.  One acceptable method

20  would be to get an updated appraisal by Integra at that time.

21  Jeff Fine seemed to be okay with this solution, at least

22  initially, on the call."

23          So here's Mr. DiNardo trying to talk Mr. Lorio

24  back into the escrow provisions.  Item 15, which -- one

25  second; I'm going to show Mr. Perlman this one.  (Counsel

AA00886

1   conferring.)

2           MR. PERLMAN:  Thank you.

3           MR. BATTISTA:  Judge, this is an email from

4   Elizabeth Helm.  This is in Item 15 of our evidence book,

5   dated February 11th, later on in that evening, after the

6   exchange of emails.

7           THE COURT:  I'm sorry - - oh, there's her ---

8   there's her name.

9           MR. BATTISTA:  At the very top, you'll see Ms.

10  Helm.

11          THE COURT:  Okay, uh-huh.

12          MR. BATTISTA:  This is late in the evening on

13  February 11th after the exchange of all those emails.  She

14  was at K&L Gates and was counsel to PEPI in drafting the loan

15  documents.

16          And per this email she says, quote, "Attached is a

17  revised redlined LSA" -- which Loan and Security Agreement.

18  And we have attached an excerpt from that to show you that --

19  three pages later you'll see the cover page dated February

20  11th, 2010.  And I'm going to focus you on the next page back

21  to Section 10.4, which we've already looked at.

22          You'll see at the bottom of Section 10.4 the

23  language in the last six lines has been deleted.  And when

24  you can -- that language that was deleted was the escrow

25  provision that was in the first draft that Mr. Fine sent

AA00887

```
 1   around.
 2           So here we have a sequence of events where the
 3   first loan agreement has the equitable provisions but does
 4   not have the valuation mechanism.  The valuation mechanism
 5   gets raised by me; it gets shot down by Mr. Lorio.  Mr.
 6   DiNardo tries to talk him into it.  And shortly later, we
 7   get a new loan agreement where the entire escrow provisions,
 8   not just the valuation mechanism, are gone.
 9           THE COURT:  Let me just focus on that.
10           MR. BATTISTA:  Yes, sir.
11           THE COURT:  10.4(b) --
12           MR. BATTISTA:  Yes, sir.
13           THE COURT:  -- has been deleted.
14           MR. BATTISTA:  And that was -- if you go back to
15   the original one, 10.4(b), you'll see in the stricken section
16   were the escrow provisions.
17           THE COURT:  Okay, I see.  It's interesting the way
18   it's written.  It's an exercise of a remedy rather than the
19   creation of the mechanism itself.
20           MR. BATTISTA:  Right.
21           THE COURT:  It talks about:  To release to the
22   lender, the way it would work, the deeds in lieu of
23   foreclosure and the consent judgments.  Okay.
24           MR. BATTISTA:  Right, but they're no longer there.
25           THE COURT:  Yeah.  No, I understand that.
```

AA00888

```
 1              MR. BATTISTA:  They've taken them out.

 2              THE COURT:  It's just that - okay.  Go ahead.

 3              MR. BATTISTA:  So Item 16 -- and this is, Alan,

 4    Exhibit 21.  And this is my attempt -- we're in the second --

 5    to try to resolve the issue yet again on the escrow

 6    provisions.

 7              This is February 15th, 2010.  I write an email to

 8    Mr. Fine and lots of other people where I say, quote, "All,

 9    pursuant to our call Friday morning, we have worked the

10    weekend to come up with a firm proposal on the foreclosure

11    and valuation issues for the waterfall."

12              And without getting into it, I propose a way to

13    solve the problem by dealing with it under an interim order,

14    and then sort of postponing the issue for the final order.

15              The terms of the proposal are not relevant to this,

16    but the fact that I made a proposal to try to resolve this

17    issue is the important piece.

18              And then lastly on this point, Judge, Item 19

19    in the exhibit binder -- and it's Exhibit 19, Al -- Mr. Lorio

20    later on that day -- I'm sorry, the next day, I apologize,

21    Tuesday, February 16th -- writes to Mr. DiNardo and says in

22    the last paragraph:  "We probably need to discuss the

23    waterfall and where we are on that.  I think there is not

24    agreement right now on how we work through the collateral in

25    the foreclosure process."
```

AA00889

1     So here's Mr. Lorio on behalf of PEPI telling us

2  there's not an agreement on that, despite the Commitment

3  Letter, despite the first draft of the loan agreement,

4  despite our pleas and my proposal to resolve it.

5     There is then a conference call that occurs that

6  evening, February 16th, amongst the parties, and a lot

7  happens in that conference call -- and we'll talk about some

8  other things.  But in that conference call, PEPI confirms yet

9  again to us that they're not going to include the escrow

10  provisions in the loan documents.

11     THE COURT:  That's 20?

12     MR. BATTISTA:  That is -- no, that's a conference

13  call on February 16th.

14     THE COURT:  Oh.

15     MR. BATTISTA:  It's not one of the exhibits.

16     THE COURT:  I see.

17     MR. BATTISTA:  I will actually point the Court --

18  Mr. Fine, in his deposition, which is attached, on pages 135,

19  136 and 137, goes through the results of that conference call

20  and admits that they were not including the escrow provisions

21  and they were not agreeing to my proposed resolution in my

22  February 15th email.

23     To save time, I won't go through all that

24  testimony, but I'd point the Court to those three pages of

25  Mr. Fine's deposition, which is attached.  And when you read

AA00890

1  that, you will conclude that PEPI put a final nail in the

2  coffin, if you will, in terms of not including the escrow

3  provisions.

4          And lastly, after that conference call on that

5  Tuesday the 16th, Item 22 of the binder -- and Alan, it's

6  Exhibit 23.  The very next day, February 17th, Ms. Helm, on

7  behalf of PEPI, sends around yet another revised redlined

8  loan and security agreement.

9          So this is after the conference call on the 16th.

10 This is on Wednesday the 17th.  And we attached an excerpt of

11 the pages, specifically Section 10.4.  And I represent to the

12 Court that at no place in 10.4, or any other aspect of this

13 loan agreement, was there a reference to the escrow

14 provisions.

15         So we have this conference call, which is a

16 culmination of a lot of back and forth, and we're told we're

17 not getting it.  And, in fact, the next day we get a loan

18 agreement without the escrow provisions in there.

19         Based on that, Judge -- and I will back up.

20 That's the 17th, Wednesday the 17th.  We will get into the

21 testimony a little bit, but on Thursday evening, the next

22 day, is when we admittedly reach out to Mr. Ferrao.  "We,"

23 meaning Mr. DiNardo and myself, to Mr. Ferrao, to ask him

24 whether he would in fact make the DIP loan to the Debtors,

25 in part because of PEPI's refusal and default under the

1    Commitment Letter in respect to the escrow provisions.

2          The evidence is uncontradicted that the next

3    morning Mr. Ferrao contacted us -- that's Friday morning

4    now -- and said, yes, he would do that.

5          THE COURT:  If you would walk me back through that.

6    Who contacted Mr. Ferrao?

7          MR. BATTISTA:  So putting it in a timeframe --

8          THE COURT:  I think you said "we."

9          MR. BATTISTA:  "We," meaning myself and Mr. DiNardo

10    on behalf of the Debtors.

11          THE COURT:  Okay.

12          MR. BATTISTA:  I was representing the Debtors at

13    that -- pre-bankruptcy Debtors at that time, and still did,

14    but we concluded that we needed to ask Mr. Ferrao to make the

15    DIP loan.

16          THE COURT:  Okay.

17          MR. BATTISTA:  And that's admitted.  That's in the

18    testimony.  Mr. Ferrao testified to it, Mr. DiNardo testified

19    to it, and that's admitted and not in dispute.  That was

20    Thursday evening.

21          The day after, we got the final loan document from

22    Ms. Helm refusing to include the escrow provisions.

23          THE COURT:  Say that again.

24          MR. BATTISTA:  So on February 17th -- let me back

25    up.  February 16th, we had that conference call --

AA00892

```
 1              THE COURT:  Conference call.

 2              MR. BATTISTA:  It was a Tuesday.  Tuesday night.

 3              THE COURT:  February 17th you got another draft.

 4              MR. BATTISTA:  I get another draft.  And, sure

 5    enough, consistent with what they told us, they were not

 6    going to include the escrow provisions.

 7              THE COURT:  And then February 18th --

 8              MR. BATTISTA:  It's a Thursday.  We conclude that

 9    we have to ask Mr. Ferrao to make the DIP loan.

10              THE COURT:  Okay, thank you.

11              MR. BATTISTA:  And Friday morning, the 19th, Mr.

12    Ferrao agrees to make a DIP loan.  We stop communicating with

13    PEPI on the 19th, that Friday.  And the following Monday, we

14    issue our default letter.  Just to put the Court -- just to

15    put that timeline together, because lots of this stuff will

16    fit within that timeline.

17              And, of course, the very next day, that Tuesday,

18    the 23rd, we file bankruptcy.

19              THE COURT:  Okay.

20              MR. BATTISTA:  Let me move on then to the second

21    default.  Well, just right there, Judge, you could find

22    that PEPI refused to include those provisions in the loan

23    agreement, that's a violation of the Commitment Letter, which

24    required those provisions in the loan documentation, and

25    they're in default, and we're done.  That's that.
```

AA00893

1    PEPI, as I said, will say that they had a right to

2  waive it, but I will point to the Court -- you can go back

3  and re-read the exhibit I just told you -- there's an

4  admission in there -- a presentation by me that this is not

5  only good for PEPI but it's also good for the other lenders.

6  Why?  Because it shows them that the waterfall is real.

7    And Mr. Springfield, in the email I showed you,

8  says the same thing.  This shows the other lenders that

9  the waterfall is real.  We don't believe PEPI can waive a

10  provision of a Commitment Letter that was for the benefit

11  of itself -- and others -- not just itself.

12    So let's go to the waterfall, the waterfall

13  provisions.  And that's the very next blue and white -- blue

14  and yellow, excuse me, handout.  This is also on page 45 --

15  12 of 45 of the Commitment Letter.

16    In here, it says, quote, in addition, the final

17  loan documentation for the Credit Facility shall provide that

18  he agent and lender" -- those are both PEPI at this point in

19  time -- "agrees that it will not foreclose" -- it will not

20  foreclose -- "on the real property described in the numbered

21  item in the following list unless it has previously used

22  commercially reasonable efforts to first collect out of the

23  property described in the numbered items before it in the

24  below list.

25    And so we listed the collateral, the asset, the

1    real estate that the Debtors had, in a certain order of

2    priority.  And on top of that was, of course, cash and

3    personal property.  Then there were unencumbered hotel units.

4    Then there was remaining finished developed land lots owned

5    by GB Peninsula that are unencumbered, and the remaining

6    undeveloped land owned by 951 Holding Limited that is

7    unencumbered.

8              There are several categories below that, but I only

9    put the three top ones, which were unencumbered assets.

10             So why did we do that?  Well, it's pretty clear why

11   we did that.  And Your Honor heard the testimony.  A lender

12   farther down the chain on a piece of real estate -- and you

13   remember, we had eight senior secured creditors in this case,

14   each with liens on different pieces of property.  It wasn't

15   one lender with a lien on everything.  It made it a challenge

16   to get a priming DIP loan approved.

17             So this waterfall was a way to provide adequate

18   protection to those junior secured lenders.  So they would

19   know those down in the water -- further down in the

20   waterfall, that the property ahead of them in the waterfall

21   would first be used to pay off the DIP debt before it came to

22   foreclosing on their property.

23             That was the concept of the waterfall.  And the

24   language of the Commitment Letter says that the lender agrees

25   that it will not foreclose on real property in the waterfall

AA00895

1  unless in accordance with the waterfall.  No dispute about

2  that.

3          Was that -- now, we're back to our two questions.

4  Was that a material term of the Commitment Letter?  Because

5  if it was, then PEPI could not have language that was

6  materially different.

7          And, again, the very fact that that waterfall was

8  in existence, the very fact that that waterfall provided

9  adequate protection, Your Honor can clearly find that it was

10  a critical provision.

11          But we can go further because, as I told you

12  before, Mr. Springfield, in his earlier email -- Item 5 in

13  the evidence book you looked at -- admitted the waterfall was

14  important because it showed the other creditors it was real.

15  The lenders -- the borrower was real.

16          Mr. Fine, in his affidavit at paragraph 10,

17  describes the waterfall, quote, "as a significant and

18  unusual provision," close quote.  Paragraph 10 of Mr. Fine's

19  affidavit.  Demanded by Fiddler's.  He's admitting it was a

20  significant and unusual provision.  In our mind, that equates

21  to materiality.  It was a material provision of the

22  Commitment Letter.

23          Let me turn to Item 2 back in the exhibit

24  binder, and it's item -- it's Exhibit 10, Alan.  And this

25  is important because it tells you PEPI's mindset at the

AA00896

1    beginning of this process just prior to the Commitment Letter

2    being finalized.

3           This is an email from Mr. Lorio, who's a

4    representative of PEPI, December 23rd, to several parties:

5    Myself, Mr. DiNardo, Mr. Fine.  And in paragraph 3 of that

6    email, he says -- and it's important to see what he says

7    because this was their mindset.

8           THE COURT:  I'm sorry.  This is December 23?

9           MR. BATTISTA:  December 23, 2009.

10          THE COURT:  Thank you.

11          MR. BATTISTA:  Item 2 in the evidence book.  Have

12   you got that?

13          THE COURT:  I do.

14          MR. BATTISTA:  Okay.  In Item 3 of that email, he

15   says, quote, "PEPI does agree with the waterfall concept as a

16   means of addressing potential concerns of certain prepetition

17   lenders with respect to the order in which real property will

18   be foreclosed on."

19          So we agree that when it comes to foreclosing on

20   property, we will follow the order described in the list.  So

21   this is PEPI admitting the materiality of that provision and

22   admitting that they will, quote, "foreclose on the property

23   in the order described in the list."  And that's an important

24   point because that's consistent with the language of the

25   waterfall in the Commitment Letter which says "Lender will

AA00897

```
 1    not foreclose on real property."  So, clearly a material
 2    provision.
 3          Second question.  Did PEPI require something
 4    materially different?  And the answer is yes.  The very first
 5    draft of the loan agreement that came out with Mr. Fine --
 6    and we looked at it already.  It's Item 8 in the evidence
 7    binder.  It's Exhibit 16, Alan.
 8          We're back to Section 10.4.  This time we're in
 9    Section 10.4(a), as in apple.
10          THE COURT:  I'm sorry, I was writing.  Which
11    exhibit?
12          MR. BATTISTA:  No worries.
13          THE COURT:  Which item?
14          MR. BATTISTA:  Item 8 in the evidence binder.
15          THE COURT:  Thank you.  Uh-huh.
16          MR. BATTISTA:  In the middle of 10.4(a), you see
17    this is the first draft, now, coming out of Mr. Fine, of the
18    loan agreement.
19          In the middle of it, the sentence reads:  "In the
20    event agent begins to exercise its rights and remedies
21    against the reserve collateral" -- that's the waterfall
22    collateral -- "agent shall use commercially reasonable
23    efforts to exercise its rights with respect to each piece of
24    the reserve collateral in the order in which it is listed on
25    Exhibit E before commencing the exercise of its rights
```

AA00898

1    against the next piece of the reserve collateral."

2         We believe that was consistent with the Commitment

3    Letter, that they would not foreclose on the collateral in

4    the waterfall until they first collected out of the

5    collateral ahead.

6         This talks about "will not exercise its rights and

7    remedies against any piece of collateral except in the order

8    of the waterfall," consistent with the Commitment Letter.

9         PEPI changed after that.  The next draft of the

10   loan agreement, which is Item 15 in the exhibit binder -- and

11   that's again Ms. Helm's email.  Alan, that's the one without

12   an exhibit on it, but it's Ms. Helm's email attaching the

13   February 11th draft of the loan agreement.  When Your Honor

14   gets there, it's Item 15 again.

15        THE COURT:  I have it.

16        MR. BATTISTA:  It's Section 10.4.  You see where

17   the strike-out exists on (b)?  Just --- the sentence just

18   above that.  The clause just above that.

19        It says, quote, "Lender shall use commercially

20   reasonable efforts to, quote -- they struck "exercise

21   its rights with respect to.  It now reads, "shall use

22   commercially reasonable efforts to effect a foreclosure sale

23   of such assets in the order of" -- and it goes on -- "the

24   waterfall."

25        Next page:  "Provided that lender shall not be

AA00899

1    prevented from commencing foreclosure proceedings against any

2    asset listed on Exhibit E prior to the foreclosure sale of an

3    asset listed prior thereto."

4          What does that mean?  They give us an example.

5    The very last sentence.  As an example, "lender may file a

6    foreclosure suit against all of the real property in the

7    waterfall, but would use commercially reasonable efforts to

8    have foreclosure sales thereon occur in the order of the

9    assets in Exhibit E.  It is a subtle but critical

10   distinction.

11         The water -- the Commitment Letter requires "will

12   not foreclose on any collateral except in the order of the

13   waterfall."  That means:  Will not commence a foreclosure

14   suit, will not get a judgment of foreclosure and will not

15   accomplish a sale, in our view.  In fact, that's consistent

16   with what Mr. Lorio said in his email on December 23rd.

17         It's consistent with Mr. Fine's first draft of the

18   loan agreement, where he said they won't exercise remedies --

19   rights or remedies against the collateral except in the order

20   of the waterfall.  And now, February 11th, they change.

21         Now, it's:  We can start a foreclosure against all

22   of the property.  We can get a foreclosure judgment against

23   all of the property, but we just won't sell it, except in

24   accordance with the waterfall.  That's a subtle but critical

25   distinction.  That's a material change to the provisions of

AA00900

1   the waterfall.  Why?  Put yourself in the shoes of that

2   junior secured creditor that's down the waterfall.

3           Now, under PEPI's new version, he's now facing

4   getting a foreclosure lawsuit filed against him before the

5   property ahead of him gets sold, getting a judgment against

6   him, wiping him out before the property ahead of him is sold,

7   and then sitting around to see whether the property ahead of

8   him will actually generate enough value from the sale to pay

9   off the DIP debt.

10          That's a far cry from sitting there without a

11  foreclosure sale against you, without a judgment against you,

12  and waiting for the property in the waterfall ahead of you to

13  be liquidated and pay off the DIP debt.

14          We told -- the Debtors told PEPI that was

15  unacceptable.  Item 14 in the evidence binder is an email

16  from Mr. DiNardo, again, to Mr. Lorio.  And that's Exhibit

17  18, Alan.  That same evening, in which he says --

18          MR. PERLMAN:  I'm sorry, Paul.  What number is it

19  in your white book?

20          MR. BATTISTA:  It's Exhibit 18.  It's No. 14 in the

21  white book.

22          MR. PERLMAN:  Thank you.

23          MR. BATTISTA:  I'm sorry that the exhibits are

24  messed up.

25          MR. PERLMAN:  That's okay; we'll get there.

AA00901

```
 1              MR. BATTISTA:  Item 14 in the evidence book, Mr.
 2   DiNardo's email to Mr. Lorio, which you've seen already,
 3   Item 6.  Now, it's 6(a).
 4              Mr. DiNardo says to Mr. Lorio, "(a), the language
 5   to the waterfall that has been set forth in the Commitment
 6   Letter has been diluted and is less clear.  The language that
 7   is in the Commitment Letter works."
 8              That's him responding to the change that they made.
 9   Mr. Lorio's email later that evening, Item 19 in the exhibit
10   book -- which is Exhibit 19, Alan.  You looked at this
11   already.
12              THE COURT:  19?
13              MR. BATTISTA:  19.  This is Mr. Lorio again saying,
14   same evening, "We probably need to discuss the waterfall and
15   where we are on that.  I think there is not agreement right
16   now on how we work through the collateral and the foreclosure
17   process."
18              Item 20, the very next one -- which is Exhibit 20,
19   Alan -- is an email from Jane Houk.  Jane Houk was a lawyer
20   at Stearns Weaver who was working on the documentation for
21   the Debtors that's -- now we're on Tuesday, the 16th --
22   writes an email to Elizabeth Helm, counsel to PEPI, and
23   attaches the blacklined February 15th loan and security
24   agreement.
25              And when you go to the second page of that exhibit
```

AA00902

1   -- third page -- excuse me, third page -- you'll see Section

2   10.4 again.  And in there you're going to see a blacklined

3   addition all in bold in caps, which was added by Ms. Houk, in

4   which she says in that Section 10.4 -- she says, quote, "Note

5   this does not match loan commitment discussed with client."

6          This was sent to Ms. Houk in which we -- so Mr.

7   DiNardo put PEPI on notice that this change was not

8   consistent with the Commitment Letter.  Ms. Houk put PEPI's

9   lawyers on notice this was not consistent with the Commitment

10  Letter.  And that's on February 16th, midday on February

11  16th, late afternoon.

12         We have that conference call on that February 16th

13  evening.  The testimony from PEPI is:  They were not going to

14  include the waterfall provision as we proposed; they wanted

15  it as they proposed.  That's in references to the ex --

16  references to testimony in our summary judgment motion,

17  without going through those detailed testimony.  But it's in

18  there, and Your Honor will see it.

19         Item 22, which you've already seen -- it's Exhibit

20  23, Alan -- this is now -- again, we're back to Wednesday,

21  February 17th.  This is the day after that conference call

22  when Ms. Helm, notwithstanding Mr. DiNardo's complaint and

23  Ms. Houk's complaint, sends us that revised loan agreement,

24  and Section 10.4 continues to have the waterfall language

25  drafted as PEPI revised it, meaning they could decide on

AA00903

```
 1   foreclosure against everything at once, they could get a

 2   judgment against everything at once, they would only agree to

 3   sell in accordance with the waterfall, which we assert is

 4   directly materially different and substantially different

 5   than what was required by the Commitment Letter that would

 6   require them to, quote, "foreclose on each piece before

 7   moving on to the next one."

 8           So, Judge, a combination of all of that -- and,

 9   again, that's February -- that's Wednesday, the 17th.  The

10   18th is when I just described to you that Mr. DiNardo and I

11   asked Mr. Ferrao to make a DIP loan.  On the 19th, he agrees.

12   That's a Friday.  And the following Monday, the 22nd, we sent

13   a default letter.

14           So on that Thursday, we now have two things that

15   have happened.  PEPI has deleted, after initially including

16   in the loan documents the escrow provisions, and they have

17   materially changed the waterfall provisions.  Two critical

18   aspects of the Commitment Letter for us to get a priming DIP

19   loan approved and show --

20           THE COURT:  What was the first?

21           MR. BATTISTA:  The escrow provisions.  The escrow

22   for deed in lieu of foreclosure, the escrow for consent

23   judgments and a valuation mechanism.  I walked you through

24   the same --

25           THE COURT:  No, I just didn't hear what you said.
```

AA00904

1          MR. BATTISTA:  No, I apologize.

2          THE COURT:  I just didn't hear what you say. You

3    said they -- by Thursday, February 17th, they had -- we know

4    that they had -- and I just didn't hear.

5          MR. BATTISTA:  Yeah.  We know that they had refused

6    to include the escrow provisions --

7          THE COURT:  Uh-huh.

8          MR. BATTISTA:  -- that were required by the

9    Commitment Letter into the loan documents.  And that's Ms.

10   Helms' February 17th draft, after several attempts through

11   the emails to convince them otherwise.

12         And we also knew on that Wednesday, the 17th,

13   that they refused to go back to what we believe was

14   consistent with the Commitment Letter in respect of the

15   waterfall.  Foreclosure against each piece before moving on

16   versus sale of each piece before moving on.

17         So we assert -- and did assert in the default

18   letter -- that that change, albeit subtle, was critical in a

19   default of the Commitment Letter.  Change in respect to the

20   waterfall provisions.

21         So we had two defaults that existed as of late in

22   the day on February 17th that we believe existed with respect

23   to PEPI that we were dealing with.  And we tried several

24   times, including making a proposal by me to resolve things

25   that were shot down on the February 16th conference call and

AA00905

1  in emails.

2          Those facts I just gave you are not disputed.

3  Drafts of these documents are not disputed.  They say what

4  they say.  The emails say what they say.  No one is saying,

5  "No, Battista, you're wrong.  You don't look to Section 10.4;

6  you look to Section 11.4.  It's in there."  That's not what's

7  being said.

8          There's no dispute that PEPI pulled the escrow

9  provisions away from the loan documents despite what's in the

10  Commitment Letter.  There's no dispute about the back-and-

11  forth asking them to put it back; we need it.

12          There's no dispute that they changed the structure

13  of the waterfall, as required by the Commitment Letter,

14  from foreclosing against each piece before moving on, to

15  foreclosing against everything and then selling one at a time

16  in the order of priority.  There's no dispute about that.

17          And if Your Honor finds that those changes are

18  materially different than what the Commitment Letter

19  required, you have to find that they defaulted under both

20  of those provisions.  And if they defaulted under both

21  provisions, then we are excused from performance pursuant to

22  the second part of the default provision of the Commitment

23  Letter.

24          It says specifically in an event of default by

25  PEPI, then the Debtors' obligations do not survive that

AA00906

1    default, obligations under the Commitment Letter.

2          That's why this is pretty simple, in terms of the

3    facts being undisputed.  What was required, what they did,

4    what we tried to accomplish through negotiation, what they

5    refused to agree to, time and time and time again, until on

6    February 18th we had had enough.

7          The third thing that we say they did that breached

8    the Commitment Letter was the due diligence sign-off.  And

9    you have to go now to the next blue and yellow sheet.  There

10   are actually two of them, but I'll stop at the first one.

11         The Commitment Letter provides, on page 4 of 45,

12   the following:  "PEPI's commitment hereunder to provide

13   the Credit Facility is subject to" -- there's actually a

14   subparagraph (a) through (g).  We've pulled out (b) because

15   we believe this is the important one with respect to this

16   argument.

17         THE COURT:  Wait a second.

18         MR. BATTISTA:  Are you in the due diligence

19   sign-off definition?

20         THE COURT:  I'm on page -- ah, I was on the second

21   page of it.  I'm with you now.

22         MR. BATTISTA:  Okay.  This is the definition --

23         THE COURT:  I'm with you, yes.

24         MR. BATTISTA:  Yes, sir.  So, in the Commitment

25   Letter, the paragraph starts, "PEPI's commitment hereunder to

```
 1    provide the Credit Facility, is subject to -- and there are
 2    sub-clauses (a) through (g) -- we're going to focus on (b).
 3            And you can read (a) through (g), I'll tell you
 4    what they say, but (b) is:  "PEPI's completion of and
 5    reasonable satisfaction in all material respects with a due
 6    diligence investigation of the company and subsidiaries."
 7            PEPI, not surprisingly so, wanted to do due
 8    diligence to figure out whether it would actually go
 9    forward with this loan, whether it would go forward with
10    a $27 million DIP loan on the real estate that we were
11    proposing as collateral.  They wanted to do their diligence.
12    Fair enough.
13            The rest of the conditions in that paragraph,
14    when you go back and read them, (a) and then (c) through (g),
15    are conditions to closing.  And that's another critical
16    distinction that gets conflated by PEPI in their response.
17    There's due diligence, and then there's closing conditions.
18            Due diligence is a threshold issue.  Will the
19    lender make this loan, all things being equal?  Will the
20    lender make a $27 million loan?  Go do your diligence.  Go
21    figure out whether this is a loan you want to do.  And if you
22    do, tell us.  And if you tell us you want to do this loan,
23    then, of course, we know we have to satisfy a whole slew of
24    closing conditions.  We got that.
25            And that's (a) -- you'll see in there (a).  And
```

AA00908

1   then (c) through (g).  And you'll see in Mr. Perlman's

2   response the closing checklists.  We understood that there

3   were closing conditions that had to be satisfied once PEPI

4   was prepared to go forward and make this loan.

5          PEPI admits that due diligence and closing

6   conditions are two different things.  In fact, PEPI admits --

7   and we'll go to it in a second -- that they were required to

8   give us a due diligence sign-off, and in fact they did.  They

9   just did it too late.

10         And so if you go to the response letter that PEPI

11  sent to my default letter, which is Item 27 in the evidence

12  book.  It's Exhibit 6, Alan.  Item 27 in the exhibit book.

13         THE COURT:  And this is the response to your

14  default letter.

15         MR. BATTISTA:  Yes, sir, it is.  And this is from

16  Mr. Fine to me.  And if you go to page 2, Item 3, you'll see

17  in the second full sentence, "Although PEPI has told you

18  repeatedly during the past week that the borrowers are free

19  to file Chapter 11 at any time, please consider this your

20  formal three business-day notice that due diligence has been

21  completed."

22         THE COURT:  I'm sorry.

23         MR. BATTISTA:  Sure thing.  Paragraph 3 on page 2

24  of that letter.  Paragraph number 3, sorry.

25         THE COURT:  Mine starts, "As had been previous" --

AA00909

1    MR. BATTISTA:  Yes, sir.  The second full sentence

2  is the important one.

3    THE COURT:  Oh, the second full sentence, okay.

4  "Although PEPI has told you."

5    MR. BATTISTA:  Right.

6    THE COURT:  Okay.

7    MR. BATTISTA:  -- "repeatedly during the past week

8  that the borrowers are free to file Chapter 11 at any time,

9  please consider this your formal three business-day notice

10  that due diligence has been completed."

11    This was after we called PEPI in default, including

12  for the failure to give us that due diligence sign-off.

13    A little further down, paragraph 6 -- numbered 6 of

14  that response letter -- that admission letter, we call it --

15  Mr. Fine also says to me in paragraph 6, "While due diligence

16  on the loan is completed, PEPI has consistently advised

17  borrowers" -- that us -- "that conditions precedent remain

18  active and must be satisfied through funding.

19    Mr. Fine is making the appropriate distinction

20  between a due diligence sign-off and conditions precedent or

21  closing conditions for the loan.

22    In PEPI's response, they make a big deal out of the

23  due diligence requirement existed through the closing of the

24  loan.  And they would not give us -- and they admit, by the

25  way -- there's an admission by PEPI in the testimony on that

AA00910

1    February 16th conference call, despite repeated, repeated,

2    requests from us for that sign-off.

3            They finally tell us on February 16th they're not

4    going to give it to us.  And more importantly, they never had

5    any intent to give it to us -- this is their sign-off on due

6    diligence -- until the loan closed.

7            We got that very clear -- very clear message from

8    PEPI, express message from PEPI on that conference call on

9    February 16th, that Tuesday the 16th.

10           THE COURT:  Meaning what?  That you wouldn't know

11   until the last second that they weren't going to make the

12   loan.

13           MR. BATTISTA:  Bingo.  And where would I be, under

14   their theory?  In Chapter 11, with an order approving the DIP

15   loan, not even knowing whether they're going to go forward.

16           And so I told -- and you'll see.  There's email

17   after email after email where I'm begging them for that due

18   diligence signoff.  Why?  So I would know that I had a lender

19   who was going to make this loan, assuming I could satisfy the

20   closing conditions.

21           They told us on that February 16th conference call

22   they were not -- had no intent to give it to us -- this is an

23   admission in the record -- no intent to give it to us until

24   the closing.

25           So I didn't know -- the Debtor didn't know whether

AA00911

1   it even had a lender who was going to make a $27 million

2   loan.  What if they told me, "You know, Battista, we'll make

3   a $3 million loan, that's what our diligence tells us we can

4   make"?

5          Well, I would like to have known that, and I told

6   them this, prior to the filing of the bankruptcy, because we

7   would be in a desperate situation post-bankruptcy, post-

8   approval by you, of a DIP loan, to only find out at the

9   closing that they weren't interested in doing it.

10          We'd be in a very difficult spot when a project

11   that, as Your Honor knows, we asserted had several hundred

12   million of equity in it.  But now we'd be in a very difficult

13   spot with no DIP lender.

14          Mr. Redunsky.  Mr. Redunsky admitted to us in

15   deposition that he knew why we wanted this.  And that is in

16   Item (c) of the exhibit book -- this is his deposition.

17          THE COURT:  I'm sorry, where is Item (c) in the

18   exhibit --

19          MR. BATTISTA:  At the very end, Your Honor.  It's

20   the second to the last --

21          THE COURT:  Oh, I see.  You changed from numbers.

22          MR. BATTISTA:  Yeah, it changed, because we had --

23          THE COURT:  No, that's fine.  I just didn't see it.

24          MR. BATTISTA:  Okay.  This is Mr. Redunsky's

25   deposition, Alan.

AA00912

```
 1              MR. PERLMAN:  Okay.

 2              MR. BATTISTA:  And it is on page 83.  And this is

 3    only the excerpts, but page 83, Your Honor, lines 20 to 23.

 4    Mr. Redunsky was asked the following question and gave the

 5    following answer:

 6              Question:  "Why was the later date tied to notice

 7    from PEPI of completion of due diligence?  Do you know?"

 8              Answer:  "I think that was seen as a way to let the

 9    borrower know then that we were ready to go."

10              "We," being PEPI, were ready to go, ready to make

11    the DIP loan.

12              And, in fact, Mr. Fine gave us that sign-off on

13    February 22nd, in his response letter.  That wasn't at the

14    closing.  That was in response to our default letter.

15              Now, if you go to the next of the due diligence

16    sign-off requirement, the blue and yellow sheet that I gave

17    you.  So now we've established that the Commitment Letter

18    required that PEPI have completed its due diligence to its

19    reasonable satisfaction in all material respects.  That had

20    to be done.

21              This is a separate provision of the Commitment

22    Letter that said, "The obligations of PEPI to provide the

23    Credit Facility under this Commitment Letter, if timely

24    accepted and agreed to by the company" -- which it was --

25    "will terminate upon the earlier to occur of (1)" -- and then
```

AA00913

1   (2) later on, which is not here.  The (2) is irrelevant for

2   this argument.  The (2) was if we don't get an interim DIP

3   order from you within 90 days, they could terminate.  That's

4   not relevant to this argument because that pre -- that's

5   after we filed bankruptcy.

6          So their commitment to lend would terminate upon

7   the earlier to occur of the close of business on February 8th

8   or such later date that is three business days after agent

9   has advised company it has completed its due diligence.

10         It ties right back to Condition B:  Have they

11  completed their due diligence?  And if they have, give me

12  notice, and I have three business days after that notice to

13  institute a bankruptcy proceeding or their commitment would

14  terminate.  Because it goes on to say, "Will terminate upon

15  the earlier to occur of (1) the close of business on February

16  8, 2010" -- skip the parenthetical -- "unless the company has

17  instituted the bankruptcy cases on or before that date."

18         So if we hadn't gotten the due diligence sign-off

19  from them by February 8th, they could not terminate the

20  Commitment Letter unless they gave us that notice, and then

21  we had three days to file the bankruptcy.

22         The due diligence sign-off was clearly, by this

23  language, tied to the filing of the bankruptcy, because it

24  makes infinite sense to do that.  Then we knew we had a

25  lender, subject to conditions of closing, which we could

**AA00914**

1  control.

2  We couldn't control PEPI's desire to "I don't want

3  to make a DIP loan anymore."  I couldn't stop that.  As we

4  all know, if there's a due diligence "out" in any Commitment

5  Letter, then can find any reason to get out of it.  I can't

6  do anything about that.

7  I needed to know, and Mr. Redunsky admitted, we

8  needed to know that they were ready to go.  That's why we

9  needed their due diligence sign-off.

10  And for PEPI to continually -- for PEPI to receive

11  our requests, time and time again, and it's in -- all the

12  references to my requests are in evidence and are in our

13  response -- our motion and our reply.  Time and time again,

14  to then finally tell us on February 16th, "You know, guys,

15  we're not giving it to you and we never intended to give it

16  to you until the closing."

17  So on February 18th, we have now received three

18  things from PEPI.  You're not getting your due diligence

19  sign-off, sorry, until closing.  We've taken the escrow

20  provisions out; sorry.  And we're changing the waterfall

21  provisions, despite many, many attempts, as I just went

22  through, to stop that.  Those three things occurred.

23  And at that point in time, we reached out to

24  Mr. Ferrao and asked him to make the DIP loan, and the next

25  morning he agreed.  So, Judge --

AA00915

```
 1              THE COURT:  Let's go back.
 2              MR. BATTISTA:  Yes, sir.
 3              THE COURT:  You had said that on February 16th,
 4  they said no due diligence.
 5              MR. BATTISTA:  Yes, sir.
 6              THE COURT:  Just help me navigate back to where
 7  that is.
 8              MR. BATTISTA:  That is in -- one second.  It's in
 9  the depositions of several of the PEPI representatives, but
10  let me just find it.
11              THE COURT:  Is that in one of these items in the
12  white book?
13              MR. BATTISTA:  Yes, sir.  It's in the deposition
14  testimony.  It did not come in -- it did not come in an
15  email.
16              THE COURT:  Ah, okay.  All right, you might hold
17  that thought, then.
18              MR. BATTISTA:  I will.  I will find that exact
19  reference in --
20              THE COURT:  Just hold -- yeah, just hold that
21  thought.
22              MR. BATTISTA:  Yes, sir.
23              THE COURT:  Because you've told me what I need to
24  know, is that I don't remember looking at that or seeing
25  that.
```

AA00916

```
 1              MR. BATTISTA:  No, I have not shown it to you yet.

 2              THE COURT:  Okay, fine.

 3              MR. BATTISTA:  And, Judge, I will tell you, that's

 4   not disputed.

 5              THE COURT:  Okay.

 6              MR. BATTISTA:  Mr. Perlman will not dispute that we

 7   were told that on that conference call on February 16th.

 8              THE COURT:  Okay.

 9              MR. BATTISTA:  It's not a disputed fact.

10              THE COURT:  Okay, so that's -- the refusal to give

11   you the due diligence sign-off was communicated in the

12   conference call.

13              MR. BATTISTA:  Yes, sir, it was.

14              THE COURT:  Okay.

15              MR. PERLMAN:  Judge, I only rise to say --

16              THE COURT:  Pull the mike around so I can make sure

17   we can all hear you.

18              MR. PERLMAN:  Certainly.  I would oppose the use of

19   that reference of "refusal," if you will.  That suggests an

20   obligation, and there lies the underlying issue.  So, I

21   understand that's how counsel's paraphrasing it, but I don't

22   want my silence to be deemed an acknowledgement, since Mr.

23   Battista stated that I would not be opposing it.  I would

24   oppose it worded that way for sure.

25              THE COURT:  Okay, fair enough.
```

AA00917

```
 1              MR. BATTISTA:  And, Judge, to be fair, they told
 2    us, "We won't give you that until the closing, and we never
 3    had an intent to give it to you until the closing."  That, I
 4    think, is what was said.  And the language of the testimony
 5    will speak for itself.  That's what we were told, despite the
 6    asking for it time and time and time again.
 7              THE COURT:  And kind of walk me through this again.
 8    I found --
 9              MR. BATTISTA:  Which one?
10              THE COURT:  This is page 4 of 45, the obligations
11    of PEPI to provide the credit facility.  If timely accepted
12    and agreed to by the company  --
13              MR. BATTISTA:  Yes.
14              THE COURT:  -- will terminate upon the earlier to
15    occur of February 8th, okay.
16              MR. BATTISTA:  Or such later date.
17              THE COURT:  Or such later date that is -- I'm
18    having a hard time navigating through this.  That is three
19    business days after agent has advised the company and has
20    completed its due diligence, meaning -- this is what I take
21    away from this.  That this provision reveals the parties'
22    contemplation that that would occur before the bankruptcy
23    filing.
24              MR. BATTISTA:  That's correct, Judge.
25              THE COURT:  Is that -- that's your point?
```

AA00918

1          MR. BATTISTA:  Exactly right.  And if you put it in

2     timeframe -- let's take some different dates here.  Let's

3     take a date of February 2nd, all right?

4          THE COURT:  Uh-huh.

5          MR. BATTISTA:  PEPI could have sent us -- and

6     you'll read Mr. Redunsky's deposition testimony but he admits

7     in there that if they gave us the due diligence sign-off --

8     sorry.  If we had not filed bankruptcy by February 8th, he

9     could terminate the Commitment Letter.

10         That's what it says.  Take out the parenthetical.

11    Their obligations will terminate on the close of business on

12    February 8th unless --

13         THE COURT:  Unless you had filed before then.

14         MR. BATTISTA:  Unless I had filed before then.

15         THE COURT:  Which you wouldn't have done.

16         MR. BATTISTA:  Without the parenthetical having

17    been satisfied.

18         THE COURT:  Right.

19         MR. BATTISTA:  And so let's take -- let's now use

20    the parenthetical.  They can't terminate until the earlier of

21    three business days after they told us they had completed the

22    due diligence.

23         So whether you use February 8th or the three

24    business-day rule, they couldn't terminate unless we were in

25    bankruptcy.

AA00919

1     So if I didn't file bankruptcy by February 8th,

2  let's presuppose this, they don't give me that due diligence

3  sign-off through February 8th.  They can't terminate because

4  of the parenthetical.

5     I'm not in bankruptcy on February 8th; they have

6  not given me the sign-off by February 8th; they can't

7  terminate under this language.

8     They could only terminate after February 8th once

9  they had given me three business days notice that they signed

10 off on due diligence.  That's what that language says.

11    And why?  Because I need a lender that's going

12 to -- as Mr. Redunsky said, the borrowers need to know we

13 were ready to go.  That's what he said that language meant,

14 by the way.  And that quote I just gave you, page 83 of his

15 deposition, that's what he said that language meant.  The

16 borrowers needed to know that we were ready to go.

17    THE COURT:  I don't see the point of February 8th

18 then, but that's probably not germane to the point you're

19 making.

20    MR. BATTISTA:  It's not.  It's the parenthetical

21 because -- they couldn't do anything on February 8th because

22 of the parenthetical.

23    THE COURT:  Okay.

24    MR. BATTISTA:  So, Judge -- I know I'm at my time.

25 I want to make one more observation, then turn it over to Mr.

AA00920

1   Perlman.  And I'm not going to get into his -- arguing his

2   piece of it.

3          PEPI makes a great deal of argument in its papers

4   that they were ready, willing and able to close this loan in

5   that response letter, Mr. Fine's response letter.  And they

6   essentially proposed in there that they were curing it.

7          When you read that response letter -- and you will

8   at the appropriate time -- you'll see that they say in --

9   this is Item 27.  You'll see in paragraph 4 and 5, Item 27,

10  PEPI says consistently they're ready, willing and able to

11  close the loan.

12         In paragraph 4, which speaks to the deed in lieu

13  and consent judgment provisions, the escrow provisions, they

14  say in the middle of it, "We will certainly review your

15  proposed provision."

16         A little further down, "Even though PEPI does not

17  require it, then PEPI will promptly review deed in lieu

18  language and will negotiate the provisions of a valuation

19  mechanism for deeds in lieu of foreclosure, and will include

20  that in the loan documentation."

21         If that's not an admission that it was not in the

22  loan documentation, I don't know what was.  He's admitting

23  that they did not include the escrow provisions in the loan

24  documentation because here on February 23rd, he's saying,

25  "Oh, you want those things?  Send us the language, we'll

AA00921

```
 1   review it, and we'll negotiate it and we'll include it in the
 2   loan documentation."
 3          Too little, too late, based on the outlined
 4   timeline I just gave you.  So they weren't ready, willing and
 5   close the loan.  They just wanted to keep negotiating that
 6   provision that we were begging them to include that was in
 7   the Commitment Letter.
 8          Item 5 in that same letter -- and this is my last
 9   point -- he refers to the waterfall provisions, and suggests
10   that there was an inadvertent misunderstanding, and that
11   PEPI will diligently review the wording of the waterfall
12   provisions as you think are compatible with the terms of the
13   Commitment Letter.
14          So they just wanted to keep negotiating with
15   respect to the waterfall provisions.  They weren't ready,
16   willing and able to close.
17          And lastly, Judge, you read a transcript of --
18   Mr. Ferrao got on the stand at the hearing on the DIP loan
19   approval.  And he said, in response to a question about
20   whether he really wanted to make this loan.  And he said,
21   quote, "I would give this up in a New York second."  And
22   we've included that deposition -- that trial transcript in
23   the evidence binder.  That is Item 28.  This is an excerpt
24   from that transcript.
25          I'm sure you remember it because it was quite
```

AA00922

1 poignant when he said, "I would give it up in a New York
2 second." PEPI was represented in court that day by Mr.
3 Simonitsch of K&L Gates, and didn't say a word.
4      He didn't get up and say, "We'll make that loan.
5 We're prepared to cure, assuming we had the right to do so,
6 of those defaults. We're prepared to make that loan."
7 Didn't say that. Never said that. So, Judge, they were
8 never prepared to close this loan.
9      THE COURT: As I recall, there was a lot of
10 suspicion about Mr. Ferrao being a lender. There was a
11 lot of -- it was controversial.
12      MR. BATTISTA: It certainly was. Insider DIP loan.
13      THE COURT: Right.
14      MR. BATTISTA: Insider priming DIP loan. Even more
15 controversial. That's why if anybody stepped up, like PEPI,
16 when he said, "You can have it in a New York second," then --
17 but they didn't.
18      So, Judge, with that, we believe that the Court
19 should grant us partial summary judgment on liability for one
20 or all three of those defaults that I just outlined to you in
21 the Commitment Letter.
22      THE COURT: All right.
23      MR. BATTISTA: Thank you.
24      THE COURT: Let's take a five-minute recess and you
25 can have the same hour and a quarter, okay?

AA00923

```
1              MR. PERLMAN:  Thank you.

2              MR. BATTISTA:  Thank you, Judge.

3              COURTROOM CLERK:  All rise.

4              (Recess taken from 3:30 to 3:37 p.m.)

5              COURTROOM CLERK:  Court is again in session.  You

6    may be seated.

7              THE COURT:  All right.  Mr. Perlman, you're not

8    going to use this white book that Mr. Battista provided; are

9    you?

10             MR. PERLMAN:  I may reference certain things.

11             THE COURT:  Okay.

12             MR. PERLMAN:  I may.

13             THE COURT:  All right.

14             MR. PERLMAN:  This has been somewhat of an

15   organizational task type of presentation and it's been a

16   little bit difficult, so bear with me.

17             But I would like to start, to say the following.

18   That I do dispute the majority of the factual allegations

19   and/or interpretations as presented.  And I think several

20   were probably just outright incorrect, as well as the

21   underlying assertions.

22             And it'd be virtually -- it wouldn't be fair to

23   myself, my client, or Your Honor if I thought that I could

24   get through this in an hour.  I just find that impossible.

25   My presentation's very lengthy and I have to deal with what
```

AA00924

1    was argued this afternoon.

2           And I'm further handicapped because one of the

3    smoking gun issues that's set for today is my request for an

4    *in camera* hearing.  I had asked for a particular document,

5    which cannot possibly be privileged, but it in fact is

6    extremely relevant, which is why they're opposing the

7    release, because that's really what went on in this case.

8           As Your Honor had already noticed, well, if things

9    went awry on the 16th, what are the parties doing on the

10   16th, 17th and 18th?  Why are they still negotiating.  Very

11   fair question.  And the answer is:  The Debtors, without a

12   backup lender, were still negotiating because they had no

13   Plan B.  It was only until after they secretly went to Mr.

14   Ferrao and asked him to steal the loan, did they decide to

15   put Fiddler in default.

16          And that didn't happen --

17          THE COURT:  You mean PEPI.

18          MR. PERLMAN:  I'm sorry, PEPI.  And that didn't

19   happen, Judge, for several days.  So two things.  One, what

20   was going on when that happened?  Well, those last two days,

21   the only thing being negotiated was the purchase option

22   whereby Mr. Ferrao could pick up the loan in the event of a

23   default.

24          And the problem, per Mr. Battista, to his team,

25   with regard to the purchase option was:  The Commitment

AA00925

1  Letter said PEPI gets a release.  And the Debtor was

2  concerned that the Bankruptcy Court would not issue the

3  release.  And so now all of a sudden, the safety net to

4  preserve his equity was no more.

5      The Debtor proposed an alternative.  We said no.

6  The Commitment Letter --

7      THE COURT:  I'm sorry.  What do you mean by "safety

8  net"?

9      MR. PERLMAN:  That if there was a default, Mr.

10  Ferrao would have an option to pick up the debt facility,

11  assign the loan documents, stand in the shoes of PEPI and

12  have a priming lien.  And that is what happened.  Judge, now

13  you --

14      THE COURT:  I'm sorry, I'm not following what

15  happened.

16      MR. PERLMAN:  Well, I'm ahead of myself.  What

17  we're suggesting is -- and I'll walk you through the emails.

18  Notwithstanding the story you heard, the parties still

19  negotiated past the 16th, 17, 18th --

20      THE COURT:  Well, the default letter was sent on

21  the 18th.

22      MR. PERLMAN:  On the 22nd.

23      THE COURT:  The 22nd, sorry.

24      MR. PERLMAN:  That's right.  And on the evening of

25  the eight --

AA00926

```
 1              THE COURT:  No, no.  The default letter was sent --
 2              MR. PERLMAN:  On the 22nd.
 3              THE COURT:  Yes, thank you.
 4              MR. PERLMAN:  Sure.  The only issue being
 5    negotiated at that time was this purchase option.  And that
 6    evening is when the Debtor was told the release has to stay
 7    in, we can't change it per your request, where they wanted us
 8    to tinker with the release.  We said no.  That's what the
 9    Commitment Letter provided for.
10              And that evening it sent off a bunch of
11    communications between counsel and their client, which
12    culminated in a conference call whereby the Debtor went to
13    Ferrao and said, "Will you make this loan?"  And his response
14    was, "I'll let you know tomorrow."  And then the next day, he
15    said, "I'll take the loan."
16              Now, what did the Debtors do the next day on the
17    19th?  We're still chasing down -- PEPI's still chasing down
18    the purchase option language.  We're still trying to close
19    the loan.  We're pursuing the Debtor to finalize the loan
20    agreement.  They are telling us they're conferring with
21    counsel when in fact they have already decided to give this
22    loan to someone else.
23              So the question for Your Honor is:  Why?  Why
24    wouldn't they have said:  "PEPI, we're putting you in
25    default, this is why."
```

AA00927

1       What is so difficult?  If everything is to be

2   believed.  Mr. Ferrao didn't want to do this loan.  He had to

3   do this loan, quote, unquote.  Yet they never told PEPI

4   that's what was going on until the evening of the Chapter 11

5   filing.  And still, then, we had no idea that Mr. Ferrao had

6   taken over PEPI's loan.

7       And to suggest that we sat on the sidelines in

8   Bankruptcy Court, Your Honor's been around the block.

9   Lenders can't make a Debtor take their loan.  And the terms

10  of the loan were substantially different.  Why?  Mr. Ferrao

11  controlled both ends.  My client didn't control the Debtor.

12  It was a completely different loan.

13      Now, so what's really -- what's missing from the

14  presentation is not only what happened at the tail end and

15  afterwards, but many things in the interim.  But, first,

16  Judge -- and I don't want to waste my time trying to get this

17  document in, but it's kind of critical, with regard to my

18  motion for leave to file the document under seal.

19      I don't know if there was any opposition that was

20  filed.  I know it's set for hearing today.  And I need it as

21  part of my presentation.

22      THE COURT:  All right.  Let's talk about that.  I

23  haven't seen it.

24      MR. BATTISTA:  Judge --

25      MR. PERLMAN:  Well, I have not submitted the target

AA00928

```
 1    until --
 2              THE COURT:  Of course not.
 3              MR. PERLMAN:  Yeah.
 4              THE COURT:  So you both are holding copies of
 5    something.
 6              (Counsel conferring.)
 7              THE COURT:  And Mr. Perlman, if you feel like you
 8    need more time, that we're going to run out of time, we're
 9    not going to decide that right this minute, because you have
10    another hour and ten minutes, we can start looking for a time
11    and maybe you can participate maybe by telephone conference,
12    although I imagine you'd rather not do that.  But we can
13    start looking for another hour, hour and a half of time.
14              MR. PERLMAN:  That would be -- that would be most
15    welcome, Judge, and I think it'd be helpful too.
16              THE COURT:  And I don't know if we can do that in
17    the next five days or not.  But Ms. Murphy's going to be
18    doing that while you're talking to me.
19              MR. PERLMAN:  Okay.  All right.  Well, it's our
20    contention that Mr. Ferrao was represented individually in
21    the Chapter 11 case by Stearns Weaver -- with Patricia
22    Redmond at Stearns Weaver.
23              And I did attach to the motion -- I don't know if
24    you have 98 in front of you, Judge.  But I did attach certain
25    of her confidential emails to --
```

AA00929

```
 1              THE COURT:  If you'd --  you're at one speed and
 2    my brain's moving at a slower speed.  You said Exhibit where?
 3    You attached it to --
 4              MR. PERLMAN:  I'm sorry.  I'm on the motion for the
 5    in camera, which is DE 98.
 6              THE COURT:  Okay, that's what you said, DE 98.
 7              MR. PERLMAN:  Yeah, and --
 8              THE COURT:  And we use a different nomenclature,
 9    but when I heard that, I just -- my brain just locked up.
10    Ms. Murphy, do you have a copy?  It should be on the desk
11    here but --
12              COURTROOM CLERK:  I'm sorry, sir.  Which document?
13              THE COURT:  I have it.  I already have it.  I do
14    have it.  Okay, go ahead.  Now, you can proceed.
15              MR. PERLMAN:  Thank you.  Ms. Redmond served as
16    personal bankruptcy counsel, if you will, for Mr. Ferrao.
17              THE COURT:  Uh-huh.
18              MR. PERLMAN:  And attached to this motion are some
19    of her confidential communications with regard to the
20    purchase option we're referring to.
21              THE COURT:  I'm looking at Exhibit 1?
22              MR. PERLMAN:  Yes.
23              THE COURT:  And I see two emails.
24              MR. PERLMAN:  That's right.
25              THE COURT:  Okay, thank you.
```

AA00930

1    MR. PERLMAN:  So this is her first advising to the

2  parties that it would be an option to the principals.  The

3  only principal is Mr. Ferrao.  And that's to purchase the DIP

4  facility.

5    And then the next page is a confidential

6  communication from Ms. Redmond to Mr. Ferrao, but also we say

7  he waived because someone else is copied and, she writes,

8  "You want the right to buy the DIP."  This has to do --

9    THE COURT:  Wait a minute.  Oh, you're looking at

10  item -- you're looking at the second page of Exhibit 1 to

11  Document 98.  And Item No. 1 under the ROFR, which is, I

12  guess, a right of first refusal.

13    MR. PERLMAN:  Correct.

14    THE COURT:  And that's where you are right now.

15    MR. PERLMAN:  That's correct.

16    THE COURT:  Okay.  Now, I'm looking at what you're

17  reading.

18    MR. PERLMAN:  Okay.

19    THE COURT:  And what do you want me to --

20    MR. PERLMAN:  There was another email.

21    THE COURT:  Oh, I thought you were going to

22  continue reading.  What do you want me to look at here.

23    MR. PERLMAN:  Well, just that first six words:

24  "You want the right to buy the DIP indebtedness" --

25    THE COURT:  Okay.

AA00931

```
 1            MR. PERLMAN:  -- "from PEPI."

 2            THE COURT:  Okay.

 3            MR. PERLMAN:  Okay?

 4            THE COURT:  Uh-huh.

 5            MR. PERLMAN:  So that's what morphed into the

 6    purchase option.  And what came with the purchase option was

 7    the release in favor of PEPI.  So there's another email from

 8    Mr. Ferrao to people other than Ms. Redmond discussing his

 9    option.  And I am arguing that because he sent that to

10    others --

11            THE COURT:  I'm sorry, it's an email from --

12            MR. PERLMAN:  Mr. Ferrao.

13            THE COURT:  Okay.

14            MR. PERLMAN:  To a group of people in addition to

15    Ms. Redmond, outside of the Stearns Weaver firm that didn't

16    represent him individually.  And so my contention is it can't

17    possibly be --

18            THE COURT:  Privileged.

19            MR. PERLMAN:  Correct.  Nor do I think if Your

20    Honor reviewed it --

21            THE COURT:  Okay, so there's a third email that's

22    not attached to your motion.

23            MR. PERLMAN:  That's right.

24            THE COURT:  And you want to have me look at that.

25            MR. PERLMAN:  That's right.
```

AA00932

```
1              THE COURT:  And argue based on that.

2              MR. PERLMAN:  Right.

3              THE COURT:  Okay.

4              MR. PERLMAN:  And in the -- well, in their request

5    for admissions, the Debtor acknowledged and admitted that Mr.

6    Ferrao was not a party to this Commitment Letter, and that

7    the Debtor did not request that Mr. Ferrao have this purchase

8    option.  So the notion of a joint interest could not possibly

9    exist.

10             But I think even if Your Honor reviewed it in

11   camera you would conclude that it wasn't a confidential

12   communication in terms of the content.  I don't think that

13   there's a privilege.  I don't think it's privileged

14   communication, and it was waived, regardless.  And I would

15   like it introduced as part of my presentation.

16             THE COURT:  Mr. Battista?

17             MR. BATTISTA:  Yes, sir.  Judge, Stearns Weaver

18   represented -- let me give you the background and you can

19   then have the full flavor.  Stearns Weaver was corporate

20   counsel to Fiddler's Creek and its affiliates for many years

21   before I came on the scene.

22             THE COURT:  Right.

23             MR. BATTISTA:  Stearns Weaver introduced me to the

24   Debtors.  We proceeded down the path where Stearns Weaver was

25   representing the Debtors as corporate counsel.  You saw all
```

AA00933

1  the emails involving Ms. Houk, who was at Stearns Weaver,

2  negotiating the loan documents.

3         Ms. Redmond, who was also with Stearns Weaver,

4  represented Mr. Ferrao as well, individually.  Mr. Ferrao, as

5  you know, is the hundred percent owner of the Fiddler's Creek

6  Debtors.

7         At some point in time, principally February 19th,

8  the day that -- maybe the 18th -- the day that Mr. Ferrao

9  agreed to make the loan through Gulf Bay Capital, Stearns

10  Weaver represented Gulf Bay Capital in that loan.

11         We have agreed with Mr. Perlman -- and you remember

12  we were here before you a couple months ago about a dispute

13  over discovery.  We agreed that from that date forward, any

14  emails between Stearns Weaver and myself would not be

15  privileged because we were representing borrowers and

16  lenders.

17         Prior to that date, though, Stearns Weaver was

18  representing the Debtors, Battista was representing the

19  Debtors, Mr. Ferrao was the principal of the Debtors, Mr.

20  DiNardo was the CFO of the Debtors, and Ms. Houk, on behalf

21  of the Debtors, was doing the corporate work.

22         The email that Mr. Perlman wants you to look at, is

23  an email from Mr. Ferrao, February 11th -- long before Gulf

24  Bay Capital came on the scene -- to me, copying Jane Houk and

25  Mr. DiNardo.  That's the email that he claims is not subject

AA00934

```
 1   to privilege.

 2           Mr. Ferrao was the principal of the Debtor.  I'm

 3   the Debtor's lawyer.  He's communicating to me and copying

 4   Ms. Houk, the corporate counsel to the Debtor, and Mr.

 5   DiNardo, the Debtor's CFO.

 6           On the face of it, it is privileged, and I'm not

 7   prepared to waive the privilege on behalf of my client.  I

 8   can't waive the privilege on behalf of my client.

 9           And so just like we didn't introduce to Mr. Perlman

10   -- I mean, to the Court -- inadvertently produce privileged

11   emails that Mr. Perlman gave us -- and there were several.

12   We gave them back to him.  We didn't raise them, despite I

13   would have loved to have Your Honor see what they said.  But

14   we couldn't do that.  We didn't do that.

15           Mr. Perlman is trying to get a privileged email in

16   front of you between my client's principal and myself,

17   copying my co-counsel and Mr. DiNardo.  That's privileged,

18   despite what it may or may not say, or what he thinks it may

19   or may not say.

20           We can have lots of dispute over what this email

21   says.  It was inadvertently produced.  Everything else is

22   redacted, and there's a sentence -- well, actually a fragment

23   of a sentence that was not redacted, and inadvertently

24   produced.  And we pointed it out to him, and that's why he's

25   coming to the Court to seek permission to break that
```

AA00935

1     privilege.  It's that simple.

2            MR. PERLMAN:  Judge, brief response.  This can't

3     possibly be a communication by Mr. Ferrao to Debtor's counsel

4     because this relates to his individual right to exercise the

5     option whereby Ms. Redmond was representing his personal

6     interests.  And that's the distinction.

7            And I think if you saw this *in camera*, you would

8     concur that it's outside the scope of the corporation.

9     It's his individual right, and that's not Mr. Battista.

10    That's not his client.  That's my point.  It's Mr. Ferrao

11    individually with respect to this purchase option.  That was

12    his right per his testimony that it was Ms. Redmond's idea as

13    his personal counsel.

14           MR. BATTISTA:  Judge, quickly, the Commitment

15    Letter, the document that started all this, page 20 of 45,

16    describes the purchase option.  It says, "The company" --

17    meaning the Debtors -- "and/or any of its affiliates or

18    principals shall have the right to acquire the loan from

19    agent."  It was not solely Mr. Ferrao's right.

20           The Commitment Letter says it's the company and/or

21    any of its affiliates or principals.  So when Mr. Ferrao was

22    communicating to me about the purchase option, Mr. Perlman

23    wants to assume it was on behalf of himself personally, but

24    the Commitment Letter says differently.

25           MR. PERLMAN:  Judge, the Debtor couldn't obviously

AA00936

1    exercise this option.  It didn't have the funds.  Mr. Ferrao

2    testified -- my question on page 18 of his examination:

3    "Under the circumstances you just described, you would them

4    have the right to exercise the option and acquire the loan;

5    correct?"

6              "The option to exercise the option, yeah."

7              It was always understood it was his.  How could the

8    Debtor exercise an option -- you can't buy your own debt;

9    it's not permissible.

10             MR. BATTISTA:  It says, "The company and/or its

11   affiliates or principals."  That's what the Commitment Letter

12   says.  Whether Mr. Perlman thinks it's impossible or not,

13   it's a different issue.  He's trying to convince you that Mr.

14   Ferrao was the only one who could acquire -- who could

15   acquire that loan.

16             And as a result of that, he wasn't talking to me in

17   my capacity as counsel to the Debtors that he owned.  You

18   have to jump through several hoops to come close to what Mr.

19   Perlman's suggesting, which is that email is not privileged.

20             THE COURT:  Is the purpose of the email, Mr.

21   Perlman, to establish that Mr. Ferrao was not brought in at

22   the last minute on the 18th or 19th, but was interested in

23   this from earlier?

24             MR. PERLMAN:  No, that email's already in place.

25   This email explains what happened at the end and why he

```
 1   decided to make the loan, as we contend.  And that's why
 2   there is such opposition.
 3           This is our smoking gun email; we'd be prejudiced.
 4   I mean, I'd ask Your Honor to at least review it in camera,
 5   decide for yourself if it's actually confidential and if
 6   there's actually a privilege.  I'd say it was waived.
 7           It's from an individual.  Mr. Battista doesn't
 8   represent him.  It's a right that he has per his own counsel
 9   based on these other documents, which predated the date Mr.
10   Battista referenced.
11           THE COURT:  The date -- I'm sorry, what?
12           MR. PERLMAN:  That predates the date Mr. Battista
13   referenced.  Before Gulf Bay's involvement.  December and
14   January.  Not February.
15           THE COURT:  What's the date?
16           MR. PERLMAN:  February 11th.
17           THE COURT:  Okay.  I'm assuming that Mr. Battista,
18   your engagement letter predates --
19           MR. BATTISTA:  Oh, yeah, it goes back to March or
20   April of 2009.
21           THE COURT:  Okay.  That's what I recall.  So at
22   that time, you have Mr. Ferrao sending an email to company
23   counsel and to his attorney.
24           MR. BATTISTA:  Actually the company coun -- both
25   company coun -- Ms. Houk was corporate counsel at that time
```

AA00938

1    to Fiddler's Creek.  The person who's not on here is Ms.

2    Redmond.

3           Mr. Perlman wants you to believe that Ms. Redmond

4    represented him personally.  Why is Mrs. Redmond not on this

5    email?  Because it's from Mr. Ferrao to me, corporate

6    counsel, to Ms. Houk, corporate counsel, and Mr. DiNardo.

7           THE COURT:  I don't see how it's privileged.

8           MR. BATTISTA:  Mr. --

9           THE COURT:  You're saying in his capacity --

10          MR. BATTISTA:  No, I'm --

11          THE COURT:  -- as president of the company, and

12   as owner, he's talking to his company's attorneys.  That's

13   your --

14          MR. BATTISTA:  I have hundreds of --

15          THE COURT:  Here's the issue.

16          MR. BATTISTA:  Sure.

17          THE COURT:  Mr. Perlman's arguing that this is Mr.

18   Ferrao in his individual capacity talking about his ability,

19   I guess -- I'm guessing.  I'm just guessing.  His ability to

20   buy the DIP facility if it goes sour.

21          And he's sending -- and you're talking about a

22   structure where it's the owner of a company talking to the

23   company's lawyers, which would probably be privileged.  I

24   guess.

25          MR. BATTISTA:  I will tell you, Judge, this is a

AA00939

1   fragment of a sentence.  And what I don't want to do here is

2   leave -- Mr. Perlman is doing a good job of trying to imply

3   that there's something --

4           THE COURT:  There's a smoking gun that I'm never

5   going to see.

6           MR. BATTISTA:  Right.  And that's just not the

7   case.  But I still can't get --

8           MR. PERLMAN:  Well --

9           MR. BATTISTA:  I still can't allow, at least

10  willingly, a privilege to be breached.

11          THE COURT:  Well, that's what I'm trying to get my

12  head around.  You weren't Mr. Ferrao's attorney; you were --

13          MR. BATTISTA:  Oh, no, not at all.

14          THE COURT:  You were the company's attorney..

15          MR. BATTISTA:  Yes, sir.  And Mr. Ferrao was the

16  company's owner.

17          THE COURT:  And that's your -- that's your

18  assertion of the privilege.  It's the owner of the company --

19          MR. BATTISTA:  Certainly.

20          THE COURT:  -- talking to the company's lawyers.

21          MR. BATTISTA:  Certainly.  I have hundreds of

22  emails from Mr. Ferrao.

23          THE COURT:  No, I -- okay.

24          MR. PERLMAN:  Judge, I think it's clear if you

25  review it *in camera*, and it's in res -- first of all, I

AA00940

```
 1   redacted everything else, so that Mr. Battista would not have

 2   a problem with the balance of the communications, which may

 3   or not be privileged.  I don't need it, I don't want it, I

 4   don't care, so I redacted it.

 5           But you should know -- and that's why it's only one

 6   line.  But you should know that that one line that I think is

 7   imperative, is in response to an email from PEPI that says,

 8   "This was supposed to be provision for giving Aubrey some

 9   ability to acquire the loan to protect his equity interest,

10   and now it seems you want something else."  That's the

11   content.

12           Everything that I'm going to present to you needs

13   to go back in content.  This is just one example.  So the

14   communication from Mr. Ferrao is in relation to that, his

15   individual right, and it's communicated to people that don't

16   represent him individually.

17           THE COURT:  Well, I think I do need to read it.  If

18   he's wearing his hat as an individual, it may have a bearing

19   as to -- it seems to me it has to do with which hat he's

20   wearing, in the context of the email.  If he's wearing his

21   hat as president of the company and he's talking to the

22   company's attorneys, I think that is privileged.

23           If he's wearing his hat as equity, but he's riding

24   in the context of a relationship that would be adverse to the

25   company, it seems to me that would waive the privilege, or
```

1    the privilege would not be applicable.  And I will read it.

2              MR. BATTISTA:  May I -- I'll give it to you, Judge.

3              THE COURT:  Would you do that?

4              MR. BATTISTA:  And it won't take you long, then

5    maybe we'll take a few minutes and argue about what it

6    doesn't say.

7              THE COURT:  Okay.

8              MR. PERLMAN:  Well, I'd --

9              MR. BATTISTA:  I think that's appropriate.

10             MR. PERLMAN:  I'd like to continue, but --

11             MR. BATTISTA:  No, I think it's appropriate.  You

12   put it in front of him.  I need to be able to argue it once

13   he reads it.

14             MR. PERLMAN:  You need to read that prior email

15   first, Judge.

16             THE COURT:  I'm sorry?

17             MR. PERLMAN:  If you could read the second page

18   first, I think it would put it in context.

19             THE COURT:  What's been handed up to me are two

20   pages.  The first page is -- these are copies of emails.  The

21   first page is Aubrey J. Ferrao and, as the parties have

22   noted, dated February 11th, 2010 at 4:06 p.m.  And the

23   recipients are Battista, Houk, and DiNardo.

24             And Mr. Perlman has directed me to page 2.  Which

25   one?  There are two emails on page 2.

AA00942

1          MR. PERLMAN:  Just the top email, starting on Item

2     No. 2.

3          THE COURT:  The top is from Mr. Lorio, also

4     February 11, 2010, to Mr. DiNardo.  Is that right?

5          MR. PERLMAN:  Yes.

6          THE COURT:  That wouldn't be privileged.

7          MR. BATTISTA:  That's not privileged.

8          MR. PERLMAN:  That part's not privileged.

9          THE COURT:  Okay, that's --- okay, you want me to

10    just read it to catch up to you.

11         MR. PERLMAN:  Correct.

12         THE COURT:  Okay.  Now, I'm with you.  Do you have

13    another copy of this, Mr. Battista?

14         MR. BATTISTA:  I took his, Judge, so I don't.

15         THE COURT:  I mean, I'd like to highlight this if

16    necessary, and I don't want to take your last copy.

17         MR. PERLMAN:  I have a couple.

18         MR. BATTISTA:  I'll take mine back then.

19         MR. PERLMAN:  Oh, I'm sorry.  I was just going to

20    hand it up to you.

21         THE COURT:  Okay.  All right, let me just read it

22    and start digesting.  (Reviewing document.)

23         Okay, I've just read two emails, both on February

24    11th, 2010, which Mr. Perlman, just a few minutes ago, has

25    summarized.

AA00943

        The one is from Mr. DiNardo basically asking, "What

are the last open items?"  And Mr. Lorio writes back to him

that this was supposed to be a provision that he references

for giving Mr. Ferrao some ability to acquire the loan to

protect his equity interest.

        And he's saying back to Mr. DiNardo, "And now it

seems you want something else."

        Neither of which is privileged.  I've read those as

background.  Now, Mr. Perlman, what do you want me to do?

        MR. PERLMAN:  Thank you, Judge.  What I'm asking

Your Honor to weigh in on is the first page, the line

starting No. 2.  "Jane knows what we need."  And then the

rest.  "I need to be able to purchase unequivocally," and

that's from Mr. Ferrao.  And that --

        THE COURT:  Now, this -- oh, I see.  I see.  Has

something been covered over?

        MR. PERLMAN:  I've redacted --

        THE COURT:  No, that's fine.

        MR. PERLMAN:  Yeah.

        THE COURT:  It's just the formatting.  I almost

didn't see this.

        MR. PERLMAN:  Well, this relates to No. 2 from the

prior page.

        THE COURT:  Okay.

        MR. PERLMAN:  Hence the 2.  And this is more

AA00944

1    of what's attached to my motion whereby Ms. Redmond's

2    confidential communications to her client relating to the

3    purchase options are being discussed.  This is more of that.

4         THE COURT:  Uh-huh.  (Reviewing document.)  All

5    right.  It would appear the unredacted version of this --

6    we're now focused on the very first email, which was later on

7    February 11, 2010 from Mr. Ferrao to Mr. Battista, Jane Houk

8    and Tony DiNardo.

9         And it would appear to me that Mr. Ferrao is

10   wearing his individual hat here to purchase the loan from

11   PEPI Capital, which would put him in a -- at least in that

12   regard, in an adversarial situation with the company.  And

13   I'm going to allow it.

14        MR. BATTISTA:  Judge, and that's fine.  I would

15   point out two things to you.  One, not to change your mind,

16   but just to put it into context.  This is dated February 11.

17   So if you go back to my timeline --

18        MR. PERLMAN:  Well, can I --

19        THE COURT:  I know.

20        MR. PERLMAN:  Your ruling's sufficient --

21        THE COURT:  Well, hold that thought.

22        MR. PERLMAN:  Your ruling's sufficient and I'd like

23   to proceed if I could.  Another thing --

24        THE COURT:  Okay.  Your motion is granted.

25        MR. PERLMAN:  Thank you.

AA00945

```
 1              THE COURT:  Your motion is granted.  And it's
 2   without prejudice.  We're probably going to have to pick up
 3   another two-hour time slot.  And the time slots that I have
 4   are next Wednesday at 3:00 p.m., the next Monday at 10:00
 5   a.m. until lunch.  And then the next Wednesday, April 29th,
 6   at 2:00 p.m.
 7              MR. BATTISTA:  I'm sorry, Judge.  I missed those
 8   dates.  I apologize.
 9              THE COURT:  Yes, of course.  April 22nd, 3:00 p.m.,
10   April 27th at 10:00 a.m., or April 29th at 2:00 p.m., which
11   gives you probably a three-hour window.  And that will give
12   -- Mr. Battista will have a more full time to reply.  Mr.
13   Perlman can then weave this sentence into his argument.  You
14   can tell me -- set the stage for it, and we could finish it
15   up.  I mean, we can take the time we have left today.
16              MR. PERLMAN:  Did you say 3:00 o'clock on the 29th?
17              THE COURT:  No, 2:00.
18              MR. PERLMAN:  Yeah.  Will there be --
19              THE COURT:  You'd get an extra hour on the 29th.
20              MR. PERLMAN:  I know; I think we need it so --
21              MR. BATTISTA:  I was going to suggest the 27th
22   because it's 10:00 in the morning.
23              THE COURT:  Well, that's less time.
24              MR. BATTISTA:  It is?
25              THE COURT:  Well, it probably is.  I mean, 10:00 to
```

AA00946

```
 1   12:00.
 2           MR. BATTISTA:  Oh, I didn't know -- you have
 3   something in the afternoon probably.  Okay.
 4           THE COURT:  Well, I don't know about that.  But you
 5   know what the studies show?  They did a study of Israeli
 6   judges on -- or maybe it was some hearing officer dealing
 7   with paroles and probations.  And they got worse outcomes
 8   right before lunch and right before the end of the day.
 9           If you were an astute attorney, you wanted to be
10   first up on any calendar, so the judge was full of juice.
11           MR. BATTISTA:  Right after the big cup of coffee.
12           THE COURT:  I think 10:00 to noon is probably not
13   the best time --
14           MR. BATTISTA:  Okay.
15           THE COURT:  -- for any of us, because I can see us
16   going until 1:00 o'clock --
17           MR. BATTISTA:  Fair enough.
18           THE COURT:  -- and I probably do have something at
19   1:30.
20           COURTROOM CLERK:  Yes, sir, you do.
21           THE COURT:  Yeah.  So --
22           MR. PERLMAN:  I was just going to suggest -- and,
23   Judge, we greatly appreciate the time, whatever time you can
24   afford, but if it was possible to start even earlier on the
25   29th, I know we need it.  But I'm not imposing myself; I'm
```

1    just making the suggestion.

2             THE COURT:  Well, maybe we can -- what do we have?

3    Do we have something at 1:30?

4             COURTROOM CLERK:  You actually have an afternoon

5    scheduled but I will --

6             THE COURT:  You're going to move something.

7             COURTROOM CLERK:  Yes.

8             THE COURT:  But do we have 1:30?

9             COURTROOM CLERK:  We could start at 1:30, sir.

10            THE COURT:  We could start at 1:30.

11            MR. BATTISTA:  I'm sorry, Judge, I apologize.  1:30

12   on the 19th, you said?

13            THE COURT:  Yes, we could do that.  Now, are you

14   okay with that, I mean, or do you feel -

15            MR. BATTISTA:  What day of the week is the 29th?

16   I'm sorry.

17            THE COURT:  Yeah, the 29th is a Monday -- is a

18   Wednesday.

19            COURTROOM CLERK:  Wednesday.

20            MR. BATTISTA:  Then that'll be fine.  Thank you.

21            THE COURT:  Is a Wednesday.  And part of my plan

22   would be to have this -- the oral argument transcribed.  I

23   think it would be very helpful to me and to whatever law

24   clerk I get to start the analysis.

25            So to some extent, you're disadvantaged.  Mr.

AA00948

```
 1    Perlman now has two weeks to -- will now have two weeks to

 2    kind of ponder.  But, you know, sometimes it's -- you get

 3    more juice when you just come right out of the box and talk.

 4    And you've made your presentation.  What you've done so far

 5    has been very helpful and is certainly going to be preserved

 6    for everyone to read.  And I hope you don't feel prejudiced

 7    by that.

 8              MR. BATTISTA:  I'm okay, Judge.  I'm going to get

 9    to rebut him anyway, when it's all said and done.

10              THE COURT:  That you are.  Okay, Mr. Perlman --

11              MR. PERLMAN:  I love Paul for a lot of reasons, but

12    confidence is definitely one of them.

13              THE COURT:  You've accomplished something in your

14    hour.

15              MR. PERLMAN:  Thank you.

16              THE COURT:  You've gotten your motion granted.

17    Let me ask you this.  I'm inclined to let us use the next

18    45 minutes.  Or if you think it would be better and more

19    coherent to come back and start fresh, I'll let you tell me.

20              MR. PERLMAN:  I'd like to start.

21              THE COURT:  That's fine.

22              MR. PERLMAN:  I think it'd be helpful for Your

23    Honor.

24              THE COURT:  That's fine.  I'm here and I'm ready to

25    hear it.
```

AA00949

1    MR. PERLMAN:  Okay.

2    THE COURT:  Okay.

3    MR. PERLMAN:  I'm going to jump around a little bit

4    just to give you a flavor, and then I'm going to jump into

5    it, because I am going to have to walk you through some

6    emails, as I alluded to in terms of what was really going

7    on at the end and what we believe happened.

8        But before doing that, Judge, you know, part of

9    the problem that I have with Mr. Battista's very well

10   presentation is it lacks the requisite facts.

11       I sat there and I took notes, and he used terms --

12   or I should say adjectives like "refused," and suggested to

13   Your Honor that there was actually a debate where one side

14   made a demand and the other side refused.  And I ask you:  In

15   his entire presentation, did you see one single communication

16   where PEPI refused?

17       Everything was qualified, Judge.  "We need to

18   discuss this, we think this, we propose that."  It was a

19   negotiation.  It was a negotiation.  That never changed.

20   That never changed until the 22nd when, after they ran to Mr.

21   Ferrao, several days later that they put us in default.

22       Before then -- and Mr. Fine's affidavit's clear,

23   and they've even -- and the Debtor has testified they never

24   provided any form of written default or termination or

25   refusal to negotiate further, ever, ever, until the 22nd.

AA00950

1          And so for there to be a breach, there had to be a

2   breach.  There had to be demands.  Either they made the

3   demands and we refused, like he suggests but the record

4   doesn't support, or we insisted on a material change outside

5   the confines.  And there's nothing in either direction.

6          There's not a single email where we say we insist

7   that it read like this.  Anywhere.  Anywhere.  And that's a

8   fundamental problem, because Mr. Battista says, "Well, if you

9   find that any one of these is not in the documents, you know,

10   we're in breach."  That's not true.

11          Because even if you found that to be the case,

12   which I think would be impossible, you still have to get

13   over the hurdle, Judge, as to whether or not they had an

14   obligation under the Commitment Letter or under the implied

15   covenant of good faith -- and the case law is pretty clear

16   that they do -- to negotiate in good faith.

17          And negotiating in good faith means communicating

18   effectively.  You don't go dark, you don't go rogue, and

19   you don't pretend there's a default and don't tell anyone.

20   That's not in good faith when the parties are charged with

21   finalizing the negotiation of documentation.

22          There's -- you know, in most of the breach cases,

23   Judge, I'm sure you've seen the email exchange, and they got

24   heated.  "If you don't put this in, we're going to put you in

25   default."  "If you don't do this, we're going to do that."

AA00951

1    Nowhere.  Nowhere in this file.

2          Mr. Battista, all of his emails about the due

3    diligence sign-off, "we would like, we request, hey, when can

4    we have it."  Not, "You're obligated under the Commitment

5    Letter under paragraph whatever.  We hereby make formal

6    demand."

7          Now, why is that?  Why didn't he point to a single

8    email that said something so simple?  Perhaps because there's

9    no obligation under the Commitment Letter.  Your Honor, read

10   that provision.  It's the right for PEPI to terminate.  It's

11   nothing else.  The testimony was they needed a mechanism to

12   terminate this.

13         What if PEPI never filed bankruptcy?  Does this

14   Commitment Letter run forever?  No.  It does not.  That was

15   the testimony of PEPI.  This was a way to terminate it.

16         Mr. Battista tells you that the responsive letter

17   was an admission.  It's not an admission.  They're pulling

18   the trigger on the three-day termination.  And this is what I

19   mean by the facts may not be in dispute, but I can tell you

20   what, the interpretation is vastly apart.

21         He, favorably, of course, thinks that that's the

22   satisfaction of some type of due diligence signoff that

23   doesn't exist under the Commitment Letter, that was never

24   nego -- that was never provided for.  It's not.

25         It's to terminate the facility under the agreement

AA00952

1  of the Commitment Letter that says PEPI's obligation

2  continues until.  Now, you had the dialogue about "Well,

3  when could you terminate it, soon or later?"  It could be

4  terminated by the 8th.

5       Had PEPI grown tired and the Debtor not doing

6  anything by, just, example, on the 5th.  They could have

7  said, "Hey, you're ready to go, you're either doing this or

8  you're not.  We're giving you the three day notice.  File or

9  we're done."

10      And what they conveniently leave out of the

11  argument, Judge, two things.  One, there was a second

12  provision.  It was the earlier of one or two.  Two is nowhere

13  in their cheat sheet.  Two is:  You file and you don't get a

14  -- you don't walk an order through within 90 days.

15      THE COURT:  Well, he told me about that.

16      MR. PERLMAN:  Okay.  So our right to terminate

17  continued postpetition as well, but it was our right.  It

18  wasn't the Debtor's right.  It says "PEPI's obligation."

19      Judge, let me say it this way.  And I think this is

20  a critical point.  If anyone in this room wanted to draft a

21  particular sentence that obligated the lender to issue a

22  written due diligence sign-off as a condition precedent to

23  filing -- not funding, to filing -- how difficult would it be

24  to draft that sentence?  It takes less than five minutes for

25  that sentence.  Why isn't that sentence in there?

AA00953

1    Because it doesn't exist.  And if it doesn't exist,

2    then there's no obligation.  And, Judge, as a matter of law,

3    that paragraph that says "PEPI's obligation continues until"

4    is clear and unambiguous.  And the Debtor cannot, as a matter

5    of law, ask Your Honor to interpret it, to rewrite it.

6    If they wanted it, they should have written it in

7    the agreement and the parties sign it.  That didn't happen.

8    You can't change it now and say, "Well, you know, we really

9    wanted that as a condition of our filing," number one.

10    Number two, as a matter of course, Judge, I doubt

11    you've ever seen a Commitment Letter that had a due diligence

12    written sign-off pre-filing.  The Commitment Letter itself is

13    the assurance of the funding.

14    The way this Commitment Letter reads, Judge, the

15    conditions precedent are to funding, not filing.  Included in

16    the conditions precedent are due diligence.  The parties

17    negotiated a contract that said due diligence relates to

18    conditions precedent, and the conditions precedent is to

19    funding the initial advance and the subsequent advance.  Not

20    filing.

21    The contract is clear.  Yes, if you parse out a

22    particular sentence -- and I argue out of context, "Look at

23    this, it doesn't make any sense," that's not how it works.

24    In the context -- and when I walk you through the

25    entire Commitment Letter and you see 50 conditions precedent,

1  several of which involve due diligence, Your Honor will

2  understand that this had nothing to do with filing; it had

3  to do with funding.

4         There was a due diligence checklist.  That's all it

5  said.  It didn't say for filing.  It was for funding.  It was

6  all controlled by funding.  And so, yeah, they can ask for

7  whatever they want.  If there's no obligation, no one's in

8  breach for saying, "We're not going to give it to you."

9         Where is it in the agreement, where is an email

10  that says, "Hey, you have an obligation, we want it or we're

11  going to bust you.  This is it, we're tired, we're putting in

12  a default."  Where is that?  It's nowhere.  Why?  They don't

13  have the contractual right, they don't have the remedy, and

14  they can't amend the contract because it was a right of PEPI

15  to terminate, having nothing to do with the Debtor.

16         So when I say that we're really fighting over the

17  interpretation, this is yet another example.

18         I'll give you another food for thought, Judge.  Mr.

19  Battista suggested to Your Honor how critically material the

20  escrow provisions were, right?  He even suggested, I believe,

21  that PEPI admitted it.  How critically important were the

22  escrow provisions?

23         Well, let me ask you rhetorically.  Why is it that

24  those escrow provisions were not in the Gulf Bay loan?  They

25  were so critical.  "All the junior lienholders, they needed

1  it.  It was critical, Judge."  Why was it not in the Gulf Bay

2  loan that Your Honor approved?

3          Well, for several reasons.  One, it's not critical,

4  or it would have been in there.  Two, do you know what the

5  Debtor testified?  It was the right and benefit of the

6  lender, and they had every right to waive it, and that's what

7  Mr. Ferrao did.

8          Yet, in the presentation, how dare PEPI say, "We

9  don't need it" when every email says, "Hey, we're going to do

10  this for your benefit"?

11          Have you ever heard of a Debtor, Judge, complaining

12  that a deed in escrow and a judgment in foreclosure in escrow

13  is something they really want?  "Wipe us out faster.  We're

14  upset you didn't wipe us out faster.  We're going to, you

15  know, claim breach."  It's insane.  Of course, it's our right

16  and we can waive it.

17          And the valuation mechanism was only related to the

18  deeds because there were no junior lienholders, and so there

19  wouldn't be a foreclosure.

20          And so once the deeds were not going to be placed

21  in escrow, there was no need for a valuation mechanism for

22  those deeds.  And there's no valuation mechanism, Judge, for

23  a foreclosure.  Why?  That's how it works under Florida law.

24          Let's talk about the law for a second, because

25  we're vastly apart there.  The other side grossly cites a

AA00956

1  Florida Supreme Court.  I contend in addition to being able

2  to waive it, like Gulf Bay did, it's not enforceable as a

3  matter of law, and therefore you can't be in breach for

4  noncompliance.  It's not enforceable, Judge, for two reasons.

5  One --

6          THE COURT:  You're talking about a valuation

7  mechanism --

8          MR. PERLMAN:  No, I'm back to the escrow.

9          THE COURT:  Okay.

10          MR. PERLMAN:  The Supreme Court has said you can't

11  give a deed in the first instance.  You can't.  If you give a

12  deed to secure debt, it's a mortgage.  I don't care what you

13  call it; it's a mortgage.  And that's what the case law says

14  that we cited.

15          If you want that deed to be up in escrow for

16  purposes other than the mortgage, it has to be a subsequent

17  transfer for subsequent consideration.  That's the Supreme

18  Court.  I don't think that comes as a surprise to Your Honor.

19          So during this negotiation process, it comes to

20  light that, hey, the title company's got a problem, we have a

21  problem, the real estate guys have a problem.  This stuff's

22  not enforceable.  We can't get con -- we can't get deeds in

23  lieu in the first instance.

24          And you know what else?  It's against public

25  policy.  There's a Florida law statute that says you can't

```
 1   get a confession of judgment either.  We don't want it.  We
 2   can't -- this is unenforceable.  We don't want it; we don't
 3   need it.  We'll just foreclose.
 4           How are you prejudiced?  You're not.  It's actually
 5   helpful, you get to stay longer in control, yet that's the
 6   burning breach.  Completely out of context.  It doesn't even
 7   make any sense for anyone.
 8           And the fact that Gulf Bay waived it and the Debtor
 9   said it was their right to waive, and they're still making
10   this argument today, is more than odd, Judge.  They should
11   have just let it go.
12           If Gulf Bay had the authority to waive it because
13   it was to their benefit, per their testimony, then so goes
14   the right of PEPI to waive it, even if it was permissible,
15   which it's not, under Florida law.  And so --
16           THE COURT:  I'm sorry.  What testimony?
17           MR. PERLMAN:  I'm more than happy to reference
18   that.
19           THE COURT:  Is that a deposition of Mr. --
20           MR. PERLMAN:  Yes, it is.  (Locating documents.)
21   Let's see, page -- Mr. DiNardo at page 156.
22           THE COURT:  Is that in the record?
23           MR. PERLMAN:  Yes, it is.
24           THE COURT:  Attached to your motion?
25           MR. PERLMAN:  96-1.
```

AA00958

```
 1              THE COURT:  Uh-huh.  Pages?

 2              MR. PERLMAN:  156.  Page 39 of 69.  96-1.

 3              THE COURT:  I'm sorry, say that again, please.

 4              MR. PERLMAN:  Certainly.

 5              THE COURT:  It's Document -- it's in the court file

 6   at Document 96-1.

 7              MR. PERLMAN:  Right.  Page 39 of 69.

 8              THE COURT:  Okay.  Page 39.  Okay.

 9              MR. PERLMAN:  Where he states on page 156:

10   "Because the escrow clause" --

11              THE COURT:  Wait, wait, wait.  You say page 39 of

12   69?

13              MR. PERLMAN:  That's in the filing information.

14              THE COURT:  Oh.

15              MR. PERLMAN:  I apologize.

16              THE COURT:  Okay.  And that references -- you have

17   one of the miniature --

18              MR. PERLMAN:  Yeah, I apologize.

19              THE COURT:  One of the miniature -- okay, now I'm

20   with you.

21              MR. PERLMAN:  Yeah, yeah.

22              THE COURT:  Okay, so that refers you to page 156 of

23   the depo.

24              MR. PERLMAN:  Right.

25              THE COURT:  Okay.
```

1    MR. PERLMAN:  And he stated on line 11:  "Because

2  the escrow clause was for the protection of the DIP lender

3  and Gulf Bay Capital knew the assets, so they did not need

4  the escrow clause.  So my recollection is we didn't put it in

5  because that's what the escrow clause was supposed to

6  protect."

7    "The escrow clause and this consent judgment were

8  for the benefit of the DIP lender.  So if we didn't put them

9  in, we put Gulf Bay at a disadvantage from other DIP lenders,

10  but Gulf Bay Capital had the knowledge of the value of the

11  assets, so it didn't require the escrow clause."

12    What are you talking about?  Really?  The insider

13  could waive it but a third party lender, whose benefit it

14  really was for can't?  You know, and it was difficult to stay

15  in my seat, Judge.  But these are the issues that we have

16  today.

17    There is a huge disconnect in terms of putting

18  these issues in proper context in the face of the Commitment

19  Letter.  So let's go back now to the Commitment Letter.

20  "The terms and conditions of the Credit Facility shall

21  be substantially the same and shall not be materially

22  different."

23    What is "materially different" of having to

24  foreclose?  It could never be a breach under any definition.

25    THE COURT:  Of what now?  What?

AA00960

```
 1            MR. PERLMAN:  The provisions in the Commitment
 2   Letter said that the provisions -- that the Credit Facility
 3   terms to be negotiated had to be substantially the same.
 4            THE COURT:  No, I got -- yeah, and I got that.
 5   But then you said something about --
 6            MR. PERLMAN:  Certainly.
 7            THE COURT:  -- foreclosure.
 8            MR. PERLMAN:  Right, so --
 9            THE COURT:  And I didn't follow that.
10            MR. PERLMAN:  Certainly.  And I apologize.  We
11   have spent so many man-hours.  I promised you that you would
12   regret some of this.  And, you know, the briefs are probably
13   part of that.
14            So, anyways, what I'm suggesting, Judge, is
15   the foreclosure was required with the consent judgments.
16   It's still substantially the same.  We're going to have to
17   foreclose.  What's the big deal.  It's not in breach.  In
18   the worst case, it's still not in breach.
19            And even if it were a breach, at the end of each
20   one of these litanies, Judge, you're still going to have to
21   ask yourself:  Since the parties are negotiating these
22   documents and they're obligated to do so in good faith,
23   and they -- and the Debtors admitted that means effective
24   communications -- were they obligated to tell us point blank
25   when they reached the point where they were going to issue a
```

1    default before they abandoned the loan, went dark, and gave

2    it to Mr. Ferrao behind our backs and didn't tell us for four

3    days?

4            At the end of every default, even if you said there

5    were a default, you still have to go through that litany.

6    And I think the Florida case law is, yeah, when it's silent.

7    And the cases that the parties have cited, both of us, stand

8    for the proposition that a Commitment Letter requires,

9    obligates the parties to negotiate in good faith and not

10   abandon the facility.  Both sides cite the same cases for

11   that proposition.

12           And I know I went fast, Judge, but I was trying to

13   explain that the deeds were for unencumbered and the consent

14   judgments were for encumbered, meaning juniors.  And so if a

15   deed was supposed to be pulled, in theory, there wouldn't be

16   a foreclosure.  And so there needed to be a valuation

17   mechanism.

18           But if the deeds aren't going to go in escrow and

19   the deeds are not going to get pulled, there need not be a

20   valuation mechanism.  It sort of is rendered moot, and the

21   Debtor is protected all the while because it still requires

22   a foreclosure.  All their rights were preserved.  Now,

23   what's --

24           THE COURT:  Because the deed in lieu process is

25   unenforceable.

AA00962

```
 1            MR. PERLMAN:  Correct.  Correct.

 2            THE COURT:  The title company won't touch it.

 3            MR. PERLMAN:  Correct.  And rightfully so.  And

 4   this was understood.  And that's why the documents existed as

 5   they did.

 6            Counsel did not point to one single document that

 7   said, "We hereby demand that you put this in or that in."

 8   Yeah, they're, "Oh, it does not match, we need to discuss."

 9   That's completely different worlds, if not universes.

10            For there to be a material breach, there had to

11   be that notification:  "Hey, you're in violation of this

12   provision, that provision, here's what we want.  Do it or

13   else."  There's no emails like that.

14            There was a constant negotiation, let's discuss,

15   here's some thoughts, I propose, you propose, whatever.  And

16   Mr. Fine's affidavit, which is established as a matter of

17   fact on this record today, because it was not controverted --

18   okay, that's the law, Judge, under Rule 56  -- that all these

19   communications were negotiations and never rising to the

20   level of demands and defaults and things of that nature.

21            So everything in that affidavit is now law in this

22   case.  I'm sorry, established as fact in this case.

23            Now, I probably -- let's see if it's in here.

24   (Locating documents.)  Judge, I apologize.  I think the

25   Commitment Letter is in one of the exhibits.  I don't know
```

AA00963

```
 1    which now.
 2              THE COURT:  Well, I'm sure it's attached to Mr.
 3    Battista's motion.
 4              MR. BATTISTA:  It's No. 1 in the exhibit binder,
 5    Judge, that we gave you.
 6              MR. PERLMAN:  The whole thing?
 7              MR. BATTISTA:  Yes, sir.
 8              MR. PERLMAN:  Okay, great.  Great.  Again, we need
 9    to put this in -- we need to put this in context.  If you can
10    turn to page 12 of 45.  Let me know when Your Honor's there.
11              THE COURT:  Okay, 12 of 47.  Well, actually it says
12    10 of 45, 12 of 47.  I'm looking at our adversary docket,
13    22-5, and that's page 12 of 47, or do you want me to look at
14    12 of 45, which is the numbering at the bottom?
15              MR. PERLMAN:  The bottom, please.
16              THE COURT:  All right.  So I'm looking at page 14
17    of court document 22-5.
18              MR. PERLMAN:  Okay, thank you.
19              THE COURT:  Go ahead.
20              MR. PERLMAN:  And the first full paragraph starts
21    off with the final loan documentation.  Yes?
22              THE COURT:  Yes.  The final loan documentation for
23    the credit facility.
24              MR. PERLMAN:  Okay.
25              THE COURT:  Okay?
```

```
 1            MR. PERLMAN:  Okay.  What I want to bring Your
 2   Honor's attention to is the end of sub little Roman one,
 3   where it reads, "For an escrow mechanism to hold consent
 4   judgments to any foreclosure in the order of priority in the
 5   waterfall below" -- and I'm emphasizing -- "to speed the
 6   judgment and foreclosure process."  Okay?
 7            So "to speed," I think is kind of an important
 8   provision that Your Honor be made aware of.  The notion --
 9   the interpretation of this whereby we would live with the
10   order of collateral under a list, which is not in dispute
11   that we were complying with the list of order.
12            Which -- and the reason why we say it was unique
13   and unorthodox, Judge, because most lenders aren't going to
14   agree to a takedown of a checkerboard of parcels.  Most
15   lenders are going to say, "No, no, we want to take it all or
16   we want to do it in our form of order."  But the Debtor was
17   insistent and we played ball.  And so we agreed to some type
18   of checkerboard board pattern of a list.
19            No one is disputing that PEPI violated the
20   waterfall list.  They've acknowledged that that's not the
21   issue.  So what is the issue?  Well, this is supposed to
22   speed up the foreclosure -- I'm sorry.  This is kind of
23   important.  This is supposed to speed the judgment and
24   foreclosure process.  Not the judgment and judgment process.
25            Foreclosure doesn't mean judgment.  Foreclosure
```

AA00965

1    in that context means sale because it's judgment and

2    foreclosure.  It's not judgment and judgment.  And under

3    this document, Judge, we already have the foreclosure

4    judgments in escrow, right?  So why would it mean foreclosure

5    judgments?  I've already got them.

6              Foreclosure means sale.  And so when you read it --

7    and why is that, Judge?  Because, remember, this is supposed

8    to speed up the process.  Not the judgment and judgment

9    process, but the judgment and foreclosure process.

10             So when you say that after the sub little three, it

11   picks up, "In addition to the final loan documentation for

12   the credit facility" -- I'm sorry.  "In addition, the final

13   loan document for the credit facility shall provide that the

14   agent and lenders agree that it will not foreclose on real

15   property" -- it's talking about sale -- "unless it has

16   previously used commercially reasonable efforts to first

17   collect out of the property above it."

18             Now, surely, Judge -- and I think you can take

19   notice of this fact, okay?  Back in 2010.  The Debtor can't

20   possibly be suggesting that, yeah, we were going to subject

21   you to a ten-year foreclosure process, welcome to the party.

22   Because under their theory, you couldn't file multiple

23   foreclosures.

24             You had to go one at a time, go to sale, establish

25   a deficiency, and then, only then, would you be able to go

AA00966

1  after the next parcel.

2          You can't possibly suggest at this level, with a

3  50-page legal description on a $27 million facility with

4  sophisticated counsel that's spent a lot of time, that that

5  was the arrangement.  Far from it.  It was supposed to speed

6  up the process.

7          So what's the essence of the contract?  The

8  waterfall list.  What's the deal?  You won't go to sale on

9  the next rung until you establish a deficiency from the one

10  above it.  Fine.  That was always in this.

11          The Debtor has admitted that is not the basis of a

12  breach.  The basis of the breach was that we wanted to get a

13  foreclosure judgment and then implement the sale by sale by

14  sale based on deficiency.

15          Well, guess what, Judge, that's the only way you

16  could do it.  There's a little thing called the Florida *res*

17  *judicata*, issue preclusion, collateral estoppel, estoppel by

18  judgment.  I can't sue Party A, get a judgment, go to sale,

19  establish deficiency, and then sue Party A again, on the same

20  note that's merged, and go after Parcel 5.  Can't do it.

21          I have to bring all my actions at once.  It

22  all relates to a single event, one note, one mortgage.

23  The mortgage that Mr. Battista showed you was a singular

24  instrument.  It was one note, one mortgage, one default.

25          And, sure, Judge, if I am Gulf Bay, what do I care?

AA00967

 1   I control both sides.  I can do what I want.  We're not Gulf

 2   Bay.  We're an independent third party lender and we don't

 3   want to be deprived of our collateral rights by not getting

 4   it done the first time.  This isn't a "trick-you" and this

 5   isn't a ten-year deal.  It's supposed to speed up the

 6   judgment and foreclosure process.  That's how it works;

 7   that's how it's written.

 8           THE COURT:  But then you determined that it wasn't

 9   going to work.  The consent judgments -- or, no, the deeds in

10   lieu.

11           MR. PERLMAN:  I'm passed that.

12           THE COURT:  The consent judgments would work.

13           MR. PERLMAN:  No.  No.  You can't confess judgments

14   under Florida law.  Not in the first instance.  That's the

15   escrow.  That's gone.  I'm on the waterfall.

16           THE COURT:  Okay.

17           MR. PERLMAN:  Okay?  The escrow, we can -- you

18   know, I've covered, just like Gulf Bay did.  It's been waived

19   and it's not enforceable, regardless.  And even if it were,

20   it's not material.  And even if it were, they had to give us

21   notice.  You can't possibly -- and it still was substantially

22   the same because it still has a foreclosure.  No breach.  End

23   of that litany.  I'm over on the waterfall, okay?

24           The waterfall -- the essence of the waterfall was

25   before you take the next lockdown, we're going to make you

AA00968

```
 1   establish a deficiency, because we're trying to protect value

 2   for juniors.  We said, "Fine."  That was never a dispute

 3   between the parties.

 4          How that gets effectuated was the negotiation,

 5   and there's nothing in the record where they say, you

 6   know, "you're in default, we hereby demand."  It's all the

 7   negotiation.  It's a negotiation.  None of this should have

 8   happened.

 9          If Mr. Ferrao didn't want to place the loan, you

10   should have brought us in and said, "Look, you're in default,

11   fix it or I'm doing my own thing," and then let the parties

12   decide.  That didn't happen.  I mean, I guess he did want to

13   make the loan.

14          He testified he was told to make the loan through

15   Gulf Bay before bankruptcy.  But how can he do that?  Judge,

16   how could an insider get a priming lien?  How?  That's tricky

17   business.  You'd have to claim that you were in desperate

18   need, and you'd have to have, like, a stalking horse deal

19   like --

20          THE COURT:  And there's no other deal.

21          MR. PERLMAN:  That's right.  But you've got PEPI,

22   and they matched or beat PEPI.  "Hey, we're matching a third

23   party deal, Judge, no prejudice."

24          So they kicked us to the curb.  He did what he was

25   always told to do.  He decided at the last minute, only after
```

1    the purchase option was no longer, quote, unequivocal.

2    Judge, why were we fighting over that silly document where

3    Mr. Ferrao states the obvious?

4         You know why?  You know what he testified in his

5    deposition?  It didn't have to be unconditional.  "Well, you

6    know, it wasn't that important, it didn't have to be

7    unconditional."  Really?  That email suggests opposite.

8         The timing stinks.  Why didn't they blow this up on

9    the 16th?  You heard all about the 16th.  The 16th, oh, we

10   told them no due diligence.  Right, because you don't get

11   one, it's not under the contract.  So why didn't you kick us

12   to the curb then?  They didn't.

13        How about the 17th?  They didn't.  How about the

14   18th?  They didn't.  Until that evening when we told them we

15   can't change the release that goes with the purchase option,

16   then all of a sudden they've had enough and they go to Aubrey

17   behind our back.  And then don't even tell us, while we're

18   chasing them on the updated verbiage on the purchase option.

19        This is all in the record, this is all part of the

20   exhibits I filed.  I'm going to walk you through it when we

21   have the time.  I'm just trying to counter the presentation,

22   and give you a flavor of what's to come, Judge, because when

23   you put everything in context, these worlds are completely

24   different.  Completely.

25        And when you take into account the fact that he

AA00970

1    misrepresented his position at his deposition and said it

2    didn't have to be unconditional in light of that email, I

3    think Your Honor's going to have some pause.

4            And nobody knew, nobody knew, that he was advised

5    originally to provide the DIP facility.

6            THE COURT:  Say that again.

7            MR. PERLMAN:  Nobody knew at the time that he was

8    told by his advisors to give -- to make the DIP loan.

9            THE COURT:  You're saying nobody knew.

10           MR. PERLMAN:  Nobody outside that camp.  PEPI

11   didn't know.  I don't think Your Honor knew.

12           THE COURT:  Well, that was before my time.

13           MR. PERLMAN:  Correct.

14           THE COURT:  I mean, I didn't come onto the scene

15   until well after -- or until sometime after the 23rd, when

16   I substituted in for Judge Paskay.  But --

17           MR. PERLMAN:  Let me bring Your Honor's

18   attention --

19           THE COURT:  I just want to come back.  You say

20   nobody knew what?

21           MR. PERLMAN:  It was not disclosed to PEPI and I

22   believe this Court or these creditors, that Mr. Ferrao was

23   told that he should be the DIP lender early on prebankruptcy.

24           THE COURT:  Okay.

25           MR. PERLMAN:  I mean, Judge, think about it.  The

AA00971

1    parties had busted their tails for three months to finalize

2    this agreement.  They could have done it in three days.  How

3    does that happen?

4              And that was the purpose of the breakup fee.  Hey,

5    you can shop it; you can take it.  We get it; we understand.

6    But you're going to have to pay the breakup fee; and they

7    said okay.  That's how it works.

8              It was assignable.  And they could have done it.

9    But that comes -- there's a drag with it, it comes with a

10   breakup fee.  That's the deal.  That's from the Commitment

11   Letter.

12             So what do they do?  "Oh, you guys are in breach,

13   we're not paying."  You never told us before.  It's just now

14   how it works, Judge, not at this level.

15             So let me go -- let me try and close the loop on

16   this waterfall.

17             THE COURT:  Okay.  Why don't you kind of think

18   about five minutes and how you can kind of make a clean break

19   for coming back the next time.

20             MR. PERLMAN:  Oh, I'm happy to do so, but I think

21   you'll find this one very intriguing.  Okay, I'm back to File

22   No. -- Docket Entry 96-1.

23             THE COURT:  Yes.

24             MR. PERLMAN:  Page 65 of 69, which is deposition

25   transcript, page 260.

AA00972

1              THE COURT:  Of whom?

2              MR. PERLMAN:  Of Mr. DiNardo.

3              THE COURT:  DiNardo, yeah.  And it's -- you said

4   page 260.

5              MR. PERLMAN:  Yes.

6              THE COURT:  Okay.

7              MR. BATTISTA:  Page two six zero?

8              MR. PERLMAN:  Yes.  Question -- actually it starts

9   on 259.

10             THE COURT:  Okay.

11             MR. PERLMAN:  Let me just read these two sentences

12  because I think it's a good segue to break.  "Can you explain

13  to me what was not in conformity with the Commitment Letter?"

14             Answer:  "What I understood is that in the

15  Commitment Letter, the collateral is in a given waterfall and

16  each item would be foreclosed on and the proceeds realized,

17  applied against the loan for PEPI, then the next step would

18  go, the next piece would go."

19             Question:  "When you say next step, next piece" --

20             Answer:  "Next item in the waterfall.  If number

21  two was the first one used, because number one was cash, then

22  number three.  Then it would be number four, then number

23  five, until PEPI was totally paid off."

24             Question:  This is important.  "Would the next step

25  be to sell the next sequential parcel?"

AA00973

1         Answer:  "Yes."

2         Not go for the judgment.  To sell the parcel.

3   Exactly what we proposed that Mr. Battista says was a

4   violation.

5         And I think that that's critical, because that's

6   really what we're fighting over.  Their interpretation is:

7   We were loaning into a ten-year mortgage foreclosure scenario

8   under a checkerboard of a list that they created, which we

9   said okay to.  And it was supposed to be sped up, not

10  delayed.

11        The only way you can do this, because of the *res*

12  *judicata* issues, is to get the judgment and go sale by sale,

13  which is recognized by Florida law.  And let's say after the

14  first deficiency, go to sale on the second one, deficiency,

15  go to the third sale, right, Judge?  We're satis -- we're

16  paid.  We're paid.

17        So what would happen?  The judgment would be

18  satisfied and the liens would all be restored.  They don't

19  get wiped out for all purposes if the property's not being

20  sold.  The judgment would have called for those junior

21  lienholders to remain in title in the event of no sale.

22        So after the third property gets sold and PEPI's

23  satisfied, PEPI files a satisfaction of judgment.  So all

24  those remaining parcels with their liens come back to life.

25  We can't take them.  The Debtor doesn't own them free and

AA00974

```
 1   clear.  What happens?  Everyone gets restored.

 2            What's the big deal?  The essence of this contract

 3   is being complied with.  The order of the waterfall to

 4   preserve whatever value is in these properties.  That's what

 5   they asked for and that's what they were getting.

 6            They even admit that they expected it to go sale

 7   by sale by sale.  Not sale, deficiency, file a new lawsuit.

 8   That's not what the Commitment Letter says.  That's not what

 9   it says.  Nowhere does it say it.  That is a critical,

10   critical admission by their person in charge of everything.

11            But it doesn't really matter, Judge, because the

12   loan documents had to be in a form satisfactory to PEPI's

13   counsel.  Reasonable, of course.  And because of the res

14   judicata issue, this was the only way it could be created.

15            But why should they care?  The valuation is built

16   into Florida foreclosure.  No one's seeking an advantage of

17   anything.  They get the essence of the waterfall.  They get

18   it.  We didn't breach it.

19            So, Judge, there's a lot of ground to cover because

20   I need to walk you through the Commitment Letter, I need to

21   walk you through some critical exhibits, to put this in

22   context.

23            What happened was wrong, and it shouldn't have

24   happened.  But had the Debtors communicated effectively,

25   which Mr. DiNardo acknowledges is an obligation of
```

AA00975

1    negotiating in good faith, which is the obligation under the

2    Commitment Letter, it would have given an opportunity to

3    resolve this.

4            But the problem with that, Judge, is -- and this

5    is the kicker -- the purchase option.  Mr. Ferrao was not

6    prepared to let go of his baby and not have a parachute.

7    That was the problem at the twelfth hour.  You'll see all the

8    emails when we return.  You will see it yourself.  That's

9    what happened on the 18th, when we said, "Look, the release

10   has to stay in."

11           They all huddled, and that's when they went to Plan

12   New Lender.  Because it had to be unequivocal notwithstanding

13   his deposition.  And it wasn't unequivocal, because what if

14   there was a default, and what if he tried to exercise the

15   option, and they tried to get Your Honor to issue the

16   releases, and someone objected and there's no release.  Guess

17   what?  You can't acquire the facility.  Now, he's at risk.

18           And that's why we are suggesting, and the emails

19   confirm it, that this is what happened.  It wasn't a breach.

20   Where's all the default letters?  Nowhere.  We didn't get it

21   on the 18th.  We got it on the 22nd.  And we're chasing them

22   on the purchase option revisions and they don't respond, "Hey

23   we gave the loan to Ferrao, take a hike, we're defaulting

24   you, take a hike."  Nothing.

25           In fact, the email back -- we've got, like, three

AA00976

1    or four emails saying, "Hey, let's go, let's go, I thought we

2    were done, we're finalizing it, let's file."  The email back

3    is, "We're conferring with counsel, we'll get right back to

4    you."

5          That email is a misstatement.  It's not truthful.

6    They had already decided, and the emails confirm it that

7    predate this, that they gave the loan to Ferrao and he said

8    he would do it.

9          And the Commitment Letter says you've got to be

10    truthful.  The Commitment Letter says you can't have

11    inaccurate information or material omissions.

12          The Commitment Letter says, Judge, you can't

13    disclose the Commitment Letter to third parties.  They took

14    it and ran with it.  And you know what his explanation is?

15    "We're all the same people.  Hey, it's still me, it's still

16    Aubrey, we're the same people."

17          Well, were those people parties to the loan

18    agreement?  No, that's not how it works.  So what?  Because

19    you just form a new company, give them the loan and that's

20    not a breach of the nondisclosure and exclusivity?  That's

21    how they can get out of a breakup fee?  I don't think so.

22          And if you remember how this case started, we tried

23    dragging him in individually.  We get a third party in Gulf

24    Bay.  Obviously we're not entitled to double recovery.  And

25    that's for another day, if ever.  But my point is:  They

AA00977

1   breached the Commitment Letter by giving Mr. Ferrao and Gulf

2   Bay, I should say, the Commitment Letter.  Couldn't do it.

3           So there's -- you know, when we say that they're

4   estopped or we say they waived or we say they've got unclean

5   hands, I say it with conviction.  And I say it because I know

6   this record.  And Your Honor will be hard pressed to disagree

7   when I'm done with my presentation when we have the proper

8   time, and I thank you for that.

9           THE COURT:  All right.  I think the marshals -- or

10  not marshals -- the CSOs will require you all to leave.

11          MR. BATTISTA:  Yes, sir.

12          THE COURT:  I cannot find -- it's probably right

13  here -- this email.  Yes, here it is.  I guess we'll receive

14  this in open court as an addition to the record on summary

15  judgment, and I don't know if it should be kept under seal.

16  I don't see any reason for that.  But I'm thinking we put it

17  in the Court -- in the record of this adversary as received

18  in open court.

19          MR. PERLMAN:  I could do a notice of filing and not

20  burden Your Honor.

21          THE COURT:  Would you do that?  Your motion is

22  granted and you can do that.

23          MR. PERLMAN:  Thank you.

24          MR. BATTISTA:  And, Judge, now that that email

25  is in, I would ask the Court for permission to file a

AA00978

```
1    supplemental brief to deal with the issues that are now

2    raised by Mr. Perlman in that email.  They were not addressed

3    in our motion or in his response or in our reply because

4    obviously Your Honor just let it into evidence -- or let it

5    into the hearing.

6              THE COURT:  I mean, I'm inclined to -- if you want

7    to write something, but I mean you're going to have a chance

8    to argue it.  Do you want to --

9              MR. BATTISTA:  Well, that's true.  Maybe I will

10   take -- if I had the option, that would be great.  If I write

11   something, it will not be very long.  I want to be able to

12   think about whether I want to write something that Your Honor

13   could have in front of you.

14             THE COURT:  Less than ten pages --

15             MR. BATTISTA:  Of course.

16             THE COURT:  -- and you can reply.  All right?

17             MR. PERLMAN:  That's --

18             THE COURT:  If you need to.

19             MR. PERLMAN:  Whatever Your Honor thinks is

20   appropriate.

21             THE COURT:  You can file something prior to the

22   next hearing.  Less than ten pages.

23             MR. BATTISTA:  Yes, sir.

24             THE COURT:  Supplemental as to the email allowed

25   into the record today on motion by Mr. Perlman.  And you all
```

AA00979

1    better scoot.

2              MR. BATTISTA:  Thank you, Judge.

3              MR. PERLMAN:  Judge, so long as it's not an

4    affidavit because --

5              THE COURT:  No, not an affidavit.  Not something

6    new like that.

7              MR. PERLMAN:  Thank you.

8              THE COURT:  All right.

9              MR. PERLMAN:  I know we're trying to scoot --

10             THE COURT:  It'll be argument, just as if we had

11   another three hours today.  Okay?

12             MR. PERLMAN:  Thank you so much, Judge.

13             THE COURT:  Thank you very much.

14             (Proceedings concluded at 4:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

AA00980

<div align="center">CERTIFICATE</div>

I certify that the foregoing is the official verbatim transcript prepared on an expedited basis to the best of my ability from the digitally-recorded audio proceedings of the above-entitled matter.

_Cheryl Culver_
_____          April 25, 2015
Cheryl Culver (CER, CCR)           Date
Transcriber

I certify that the foregoing is a federally certified transcript authenticated by:

_Kimberley S Johnson_
_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com

**AA00982**

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                            :
FIDDLER'S CREEK, LLC              :  Case No. 8:10-bk-03846-KRM
  Debtors                         :  Chapter 11
- - - - - - - - - - - - - - - :
FIDDLER'S CREEK, LLC              :  Adv. No. 8:11-ap-00809-KRM
  Plaintiffs/                     :
  Counter-Defendants              :
v.                                :
PEPI CAPITAL, L.P.                :
  Defendant/Counter-Plaintiff :
- - - - - - - - - - - - - - - :
PEPI CAPITAL, L.P.                :
FIDDLER'S CREEK, LLC              :
  Third Party Plaintiff           :
v.                                :
GULF BAY CAPITAL, INC. and        :
AUBREY J. FERRAO                  :
  Third Party Defendants          :
- - - - - - - - - - - - - - - :

                              U.S. Courthouse
                              801 North Florida Avenue
                              Tampa, Florida 33602
                              Held April 29, 2015

                  TRANSCRIPT OF HEARING
                    [Re: 11-ap-00809]
    Con't. Motion for Partial Summary Judgment and Incorporated
      Memorandum of Law Filed by Paul J. Battista on behalf of
          Plaintiff Fiddler's Creek, LLC (Doc. #84).....
         *[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*


              BEFORE THE HONORABLE K. RODNEY MAY
              UNITED STATES BANKRUPTCY JUDGE


          PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
       TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

[Re: 11-ap-00809 Continued]
.....Affidavit of Jeffrey R. Fine in Opposition filed by
Alan J. Perlman on behalf of the Defendant (Doc. #99);
Amended Affidavit (Doc. #107); Response in Opposition
filed by Alan J. Perlman on behalf of the Defendant (Doc.
#100); Reply filed by Paul J. Battista (Doc. #102);
Supplement filed by Paul J. Battista on behalf of
Plaintiff (Doc. #113); Response to PEPI Capital's Motion
for Partial Summary Judgment and Incorporated Memorandum
of Law Filed by Paul J Battista (Doc. #114)

AA00984

APPEARANCES:


| For Fiddler's Creek, LLC, and its post-confirmation affiliates | PAUL J. BATTISTA, Esquire<br>Genovese Joblove & Battista<br>100 S.E. 2nd Street<br>Floor 44<br>Miami, Florida 33131<br>305-349-2300<br>pbattista@gjb-law.com |
|---|---|
| For PEPI Capital, L.P. | ALAN J. PERLMAN, Esquire<br>Roetzel & Andress<br>350 East Las Olas Boulevard<br>Suite 1150<br>Fort Lauderdale, Florida 33301<br>954-462-4150<br>APerlman@ralaw.com |
| For Gulf Bay Capital, Inc. | RICARDO A. REYES, Esquire<br>Tobin & Reyes PA<br>225 NE Mizner Blvd.<br>Suite 510<br>Boca Raton, FL 33432-4083<br>561-620-0656<br>rar@tobinreyes.com |

AA00985

```
 1                    P R O C E E D I N G S
 2            (Proceedings commenced at 1:39 p.m.)
 3            (Reporter's Note:  Quotation marks are used for
 4     readability purposes and not intended as actual quotes.)
 5            COURTROOM CLERK:  Court is again in session.  You
 6     may be seated.
 7            THE COURT:  Thank you, Ms. Murphy.  If you would
 8     call our adversary, please?
 9            COURTROOM CLERK:  Yes, sir.  Thank you, sir.
10     Case No. 10-3846, Fiddler's Creek, LLC; Adversary Proceeding
11     11-809.
12            THE COURT:  And appearances for the recording,
13     please.
14            MR. BATTISTA:  Good afternoon, Judge.  Paul
15     Battista of Genovese Joblove & Battista on behalf of the
16     Plaintiff, Fiddler's Creek, LLC, and its post-confirmation
17     affiliates.
18            THE COURT:  Thank you.
19            MR. REYES:  Good afternoon, Your Honor.  Rick Reyes
20     on behalf of Gulf Bay Capital, Inc.
21            THE COURT:  Thank you.
22            MR. PERLMAN:  Good afternoon, Judge.  May it please
23     the Court.  Alan Perlman on behalf of Defendant, Counter-
24     Plaintiff, PEPI Capital.
25            THE COURT:  Okay.  We're in the middle of oral
```

1  argument on motion for summary judgment -- partial summary

2  judgment by Plaintiff, Fiddler's Creek, and we were in the

3  middle of Mr. Perlman's responsive argument.

4        The last notes I have had to do with the email from

5  Mr. Ferrao to Mr. Battista, copy to DiNardo and Houk.  And

6  then, let's see, we went on.  I'm not at the end of my notes

7  after all.

8        The last thing we were talking about was that PEPI

9  was abiding by the waterfall, and then we had to break you

10  off.  The last notes I have had to do with your reference to

11  the Debtor's breach and lack of unclean hands.

12        So help me pick up my mental -- because my head's

13  spinning at the same rhythm as you were arguing, and you may

14  continue.

15        MR. PERLMAN:  Thank you, Judge.  If I may approach,

16  I have prepared a more elegant way to present the issues,

17  Your Honor.  (Presenting documents.)  And I think I'm saying

18  this on behalf of both of us, Judge, that we appreciate

19  having the opportunity to basically, you know, present the

20  trial in this manner.

21        On the left-hand pocket, Judge --

22        THE COURT:  And you have that, too, Mr. Battista?

23  It looks like you do.

24        MR. BATTISTA:  It was just handed to me, Judge,

25  yes.

AA00987

```
1              THE COURT:  Okay.  Go ahead and describe what it is
2    in the left-hand pocket.  It's separately stapled three pages
3    that have the case caption.  And then below that, I guess, is
4    something that you've prepared.
5              MR. PERLMAN:  Judge, this is a few pages of our
6    opposition, if you will.
7              THE COURT:  I see.
8              MR. PERLMAN:  And I'm giving it to Your Honor
9    because I think it may simplify when you try and work through
10   these issues -- or however you address it outside of court,
11   I think that this summarizes --
12             THE COURT:  All right.
13             MR. PERLMAN:  -- the issues that we were presenting
14   so --
15             THE COURT:  It's pages 9 and 10 of -- excuse me.
16   9 through 11 of Document 100 in this adversary.
17             MR. PERLMAN:  Right.  And that ECF was filed on
18   March 2nd, so --
19             THE COURT:  Thank you.
20             MR. PERLMAN:  -- it's no surprise, as well as
21   everything else that I'm going to present to you so --
22             THE COURT:  And my judicial assistant is going to
23   bring me a cup of hot tea through the side door in a few
24   minutes, and don't let that bother you.  Just keep going,
25   okay?
```

```
 1              MR. PERLMAN:  Not a problem.
 2              MR. BATTISTA:  Judge, before we start, may I ask a
 3    question on timing.  I think the last time we were before you
 4    on the 15th, we --
 5              THE COURT:  We have until ten 'til 5:00.
 6              MR. BATTISTA:  All right.
 7              THE COURT:  So it's ten 'til 2:00 almost, so we
 8    have three hours.  I hope it doesn't take three hours, but we
 9    have three hours.
10              MR. BATTISTA:  I ask only because I don't know how
11    long Mr. Perlman's argument will take.  He did have about an
12    hour at the end of the last one, after my about an hour and
13    15 minutes.  I just want to make sure that we have sufficient
14    time to rebut.
15              THE COURT:  I would hope you'd have sufficient
16    time.  You're not going to go more than an hour now; are you?
17              MR. PERLMAN:  I don't know.  That would be a big
18    push to say under an hour.  And, you know, Judge, we're the
19    counter-plaintiff, the --
20              THE COURT:  Let's do this.  Why don't you try to --
21    I don't know if you take your watch off when you're making
22    presentations.  The clock's behind you.  It's quarter of
23    2:00.  Let's go to 3:00.  We'll take a break.  But try to see
24    if you can go an hour and 15 minutes, which gives you 2:15,
25    and then Mr. Battista can have maybe an hour after that, if
```

AA00989

1  needed.

2          MR. BATTISTA:  Thank you, Judge.

3          THE COURT:  You're welcome.

4          MR. PERLMAN:  I will do my best.  Thank you.  All

5  right, so if Your Honor will turn to A-1, this --

6          THE COURT:  In the book?  In the book you've just

7  handed me?

8          MR. PERLMAN:  Correct.  I'm going to refer

9  specifically to everything in the book, because it's too much

10  labor to deal with all the various pleadings, filings and

11  notebooks.

12          THE COURT:  Okay.

13          MR. PERLMAN:  So, in this first section, Judge, the

14  purpose of these emails is to demonstrate that contrary to

15  the argument, but consistent with the evidence, PEPI was not

16  making any demands, not insisting on anything in particular,

17  but rather this was a negotiation process.

18          So the first thing you have is the February 11

19  email, and I highlighted for Your Honor item 3 where PEPI is

20  proposing deleting.  And that's a critical --

21          THE COURT:  I'm glad you said that, because I'm

22  looking at this and there is something highlighted, and I'm

23  thinking I haven't seen this book before.  So these aren't my

24  highlights.

25          MR. PERLMAN:  That's correct.  They're my --

AA00990

 1          THE COURT:  Yeah, I thought -- I was sitting here

 2  having this out-of-body experience, like:  How could I have

 3  marked this?

 4          MR. PERLMAN:  No.  Judge, I used the color printer

 5  to help everybody along.

 6          THE COURT:  All right.

 7          MR. PERLMAN:  So the markings on it primarily are

 8  by me.

 9          THE COURT:  Thank you.

10          MR. PERLMAN:  All right.

11          THE COURT:  This is something you've just handed

12  up.  And the markings on it, at least up to now, are yours,

13  not mine.

14          MR. PERLMAN:  That's correct.

15          THE COURT:  Okay, thank you.

16          MR. PERLMAN:  So what I'm emphasizing in Item 3 is

17  that PEPI is proposing the revision.  And it's a critical

18  distinction.  If you turn to page 2, again, the highlighted

19  version of this email of February 16 is demonstrating on an

20  evidentiary basis --

21          THE COURT:  I'm sorry, Mr. Perlman.  Did you say

22  page 2?

23          MR. PERLMAN:  Item 2.

24          THE COURT:  Item 2.  Behind Tab 2.  Thank you.

25  Okay.

AA00991

1    MR. PERLMAN:  So Item 2 is yet another document

2 confirming that demands were not made by PEPI but rather this

3 process was a negotiation.

4    The highlighted portion confirms that by requesting

5 a status call on outstanding issues.  And, again, the second

6 paragraph, they'd like to talk -- to hear from you -- hear

7 your response regarding the, quote, proposed carve-outs.

8    And then if you go to Item 3, Judge --

9    THE COURT:  Uh-huh.

10    MR. PERLMAN:  -- the highlighted portion again

11 confirms that the changes were, quote, suggested.

12    If you turn to Item 4, Judge, just to drive the

13 point home, I refer you to the Fine affidavit, page 12, where

14 Mr. Fine states that PEPI never made an unequivocal demand

15 violation of the Commitment Letter, including as to the

16 escrow waterfall or its due diligence.

17    Judge, as a matter of law, that has not been

18 contradicted.  For purposes of summary judgment, that is a

19 fact established on this record.  As such, the Plaintiff

20 could never succeed because there was never a demand that

21 they allege occurred in connection with this negotiation

22 process contrary to the Commitment Letter.

23    If you turn to Tab 5, Judge?

24    THE COURT:  Uh-huh.

25    MR. PERLMAN:  Tab 5 is a portion of our brief, and

AA00992

1    it's basically just summarizing the position that because a

2    foreclosure process was still required, the documents were

3    substantially similar to the Commitment Letter, and therefore

4    there could be, as a matter of law, no, quote, "material

5    default."

6            For there to be a material default, Judge, as

7    alluded to in the Beefy Trails case, the nonperformance had

8    to go to the essence of the contract.  The essence.  The very

9    essence.

10           Additionally, Judge, the Commitment Letter states

11   that the loan documents will be substantially the same.  And

12   we contend that because the foreclosure process was still

13   required, it in essence was substantially the same.  Again,

14   no default as a matter of law.

15           And when I gave my 10,000-foot presentation last

16   time, Judge, with the 40 minutes or so that I had, I think I

17   raised to Your Honor, you know, a fundamental question:  Has

18   Your Honor ever heard of a Debtor complaining of having more

19   time to own its property and actually say, "No, we want you

20   to foreclose faster.  You should have taken our title and

21   escrow and wiped us out sooner."  It's really not a plausible

22   position for anyone to suggest, nor could it ever be a

23   breach.

24           If you turn to Tab B-1, Judge -- and let me just

25   back up for one second.  I'm trying to go fast.  I understand

AA00993

```
 1   Your Honor's directive.

 2          THE COURT:  Well, I don't want you to go fast, but

 3   I mean, you've got an hour and ten minutes.

 4          MR. PERLMAN:  Understandable.  I just --

 5          THE COURT:  I don't want you to be under duress.

 6          MR. PERLMAN:  Thank you.  I just wanted to back

 7   up one second and say that, you know, right now what I'm

 8   referring to is the escrow provisions.

 9          THE COURT:  Uh-huh.

10          MR. PERLMAN:  You know, the contention that it was

11   a breach to ask that they be removed and the issues related

12   to that.  So the next issue that was raised was whether or

13   not those provisions were performable as a matter of law.

14          Now, the first item in Tab B-1 is the Debtor's

15   response, Judge.  And they cite a Supreme Court decision,

16   Stovall v. Stokes, and Ringling Joint Venture II, for a

17   proposition that a deed can be issued contemporaneously with

18   regard to a mortgage.  And I would contend, Judge, that that

19   is not the law, that's not the holding.  In fact, just the

20   opposite.

21          But before I turn to that, I also bring to Your

22   Honor's attention the bottom, where I highlighted the consent

23   judgments, which we said are not enforceable.  And I believe

24   the Plaintiff is conceding that point in the very end here

25   where:  "Plaintiff acknowledges that confessions of judgments
```

AA00994

1  are not enforceable in Florida." Period, the end. Period,

2  the end. They know this. There's a statute on it.

3       In any event, Judge, if you go to Tab 2, that's the

4  Stovall case that they think stands for the proposition that

5  it's appropriate to get deeds in connection with the initial

6  financing.

7       If you turn to page 10 of this Florida Supreme

8  Court decision, I think it succinctly rejects that very

9  notion. Is Your Honor there?

10       THE COURT: I'm sorry. Where?

11       MR. PERLMAN: Tab B-2.

12       THE COURT: Yes.

13       MR. PERLMAN: Page 10. It's on the bottom right.

14       THE COURT: Thank you.

15       MR. PERLMAN: And I'll just read this into the

16  record. This will come as no surprise to Your Honor.

17       THE COURT: Go ahead.

18       MR. PERLMAN: No contemporaneous understanding,

19  however formally expressed or artfully concealed, will be

20  permitted to deprive the Debtor of this right. It can be

21  defeated only by a subsequent agreement. Subsequent. Upon a

22  further consideration.

23       It's never permissible in connection with the

24  underlying transaction.

25       Now, for example, a forbearance agreement would be

AA00995

1    a subsequent agreement with additional consideration. That's

2    when it happens. But never, ever in connection with the

3    first loan. That's what this case says.

4         In fact, this case said that the deed, because it

5    secured a debt, wasn't a deed; it's a mortgage. And I think

6    Your Honor's familiar with that law as well.

7         So even the deed itself would have to be foreclosed

8    on. You can't use self-help if it's in connection with the

9    underlying loan, so says the Florida Supreme Court, period.

10         If you go to Tab 2, Judge, Ringling Joint Venture,

11    they cite for the wrong position again.

12         Ringling Joint Venture is consistent with the

13    Florida Supreme Court, and states, "Mortgagor cannot, by

14    agreement made contemporaneously with or as part of a

15    mortgage transaction, bind himself not to assert right of

16    equity redemption."

17         And it says it again: It does not apply if the

18    right is relinquished by a subsequent agreement upon further

19    consideration.

20         That's not what we had here. We had an initial

21    loan transaction. It's not permissible as a matter of law.

22    The deed's not a deed; the deed's a mortgage, period. It had

23    to be foreclosed. And the consent judgments are invalid.

24    The Florida statute is cited in our brief. If you go to

25    Tab 4, Judge --

AA00996

```
 1              THE COURT:  Uh-huh.

 2              MR. PERLMAN:  -- we cite the case law that supports

 3    the proposition that contractual provisions that are contrary

 4    to public policy are unenforceable.

 5              So it's impossible as a matter of law for anyone to

 6    suggest to Your Honor that removing the escrows constitutes a

 7    breach, because the escrow with regard to the deed and the

 8    escrow with regard to the consent judgments are unenforceable

 9    as a matter of law.  And as a result of this case, on Tab 4,

10    it could never be enforced and therefore are not ever a

11    breach.

12              Lastly, Judge, to drive the point home -- and this

13    is kind of important when I circle back to some of the cases.

14    If you look at Tab 5.

15              THE COURT:  Uh-huh.

16              MR. PERLMAN:  This is a part of the Commitment

17    Letter that's in the record, and I highlighted Subsection E

18    that states that the negotiation, execution and delivery of

19    definitive documentation with respect to the Credit Facility

20    reasonably satisfactory to PEPI and its counsel in all

21    respects.

22              So PEPI had the ability under the Commitment Letter

23    to make the escrow provision read reasonable in its counsel's

24    mind.  And that's what it did.

25              If you could turn to C-1, the next argument,
```

AA00997

1   Judge, is that the escrows were for the benefit of PEPI and

2   therefore waivable by PEPI and cannot constitute a default as

3   a matter of law.

4           So if you look at Tab 1, you have an admission by

5   the Debtor to this very point.  What's highlighted is Mr.

6   Battista telling PEPI, "Here's an idea that will be of

7   benefit to your client" -- and I highlighted two other

8   sections -- "so that you can immediately get a judgment and

9   go to sale, which saves your client a significant amount of

10  time and expense."

11          This is overwhelming documentation that the escrow

12  was intended for the benefit of PEPI.  If you turn to Tab 2.

13          THE COURT:  Uh-huh.

14          MR. PERLMAN:  This is Mr. DiNardo's testimony on

15  behalf of the Debtors --

16          THE COURT:  Deposition --

17          MR. PERLMAN:  -- where --

18          THE COURT:  Deposition testimony?

19          MR. PERLMAN:  Yeah.  It's under DE 96-1.  I tabbed

20  it on the bottom --

21          THE COURT:  Uh-huh.

22          MR. PERLMAN:  -- for record purposes.

23          THE COURT:  Uh-huh.

24          MR. PERLMAN:  This is Mr. DiNardo.  He's

25  testifying, "So putting things in escrow, putting the titles

AA00998

1   in escrow, having the consent judgment in escrow, would

2   speed, in my opinion -- but I'm not a lawyer -- would speed

3   up the litigation that would happen if PEPI foreclosed on all

4   the real estate."  Again, demonstrating that this was what,

5   Judge?  For the benefit of PEPI.

6           If you look to Tab 3, we have the affidavit of

7   Mr. Fine, which has not been contradicted, and therefore is

8   established as a matter of fact, which states in sub-17, to,

9   quote, "speed up foreclosure and sale process, the Commitment

10  Letter included an escrow provision for the benefit of PEPI,

11  as lender."

12          And then to drive the point home, Judge, if

13  you'll quickly go to Tab 4, this is the escrow provision

14  that we've heard much about and the Commitment Letter.

15  And I highlighted the portion, again, that's tied to the

16  benefit from PEPI where it says, "To speed the judgment and

17  foreclosure process."  There should be no doubt in anyone's

18  mind, Judge, that the escrow was for the benefit of PEPI and

19  freely waivable.

20          But since the Debtors are still contesting this for

21  some odd reason, I would turn Your Honor to Tab 5, which I

22  think will be sufficient for purposes of today.

23          On Tab 5, we've got Mr. DiNardo's sworn testimony

24  explaining that the escrow was for the benefit of the lender.

25  And therefore, the DIP lender approved by this Court, Gulf

AA00999

1    Bay, affiliated with the Debtor, was free to waive it.

2            The question Your Honor has is:  Well, why wouldn't

3    that be true with an unaffiliated lender such as PEPI?  It

4    wouldn't.  It's the same.  So if you look at Tab 5, you've

5    got Mr. DiNardo testifying that the escrow clause was, quote,

6    "for the protection of the DIP Lender."  And then he's

7    explaining that Gulf Bay did not need the escrow.

8            Later, that it was for the benefit of the DIP

9    lender, Gulf Bay, but it didn't require the escrow clause.

10           So Gulf Bay was free to waive it.  But apparently

11   that's a default by PEPI.  It makes no sense.  It contradicts

12   everything and should give your Court -- Your Honor some

13   pause.

14           And, Judge, if you turn to Tab 6, I just brought to

15   Your Honor's attention the portion of our brief where we cite

16   the applicable case law that says contracts for the benefit

17   of a party are freely waivable as a matter of law.

18           So it's our position that, as a result, it was

19   clearly of benefit to PEPI, so says the Debtor multiple

20   times.  And like the waiver by Gulf Bay, PEPI was free to do

21   so as well, which would never constitute a breach of the

22   escrow contract.

23           I'd like now to turn to Tab D, Judge, which is the

24   waterfall, another area of contention.  And initially I would

25   state that they have no evidence that suggests the waterfall

AA01000

1    negotiation was anything other than a negotiation.  Under

2    the law, there had to be an outright unequivocal demand or

3    mandate.  There's no such evidence before you.  In fact, the

4    contrary.

5            So if you start with Tab 1, it's an email from a

6    PEPI rep to a Debtor rep dated February 16th, and it says,

7    where I highlighted:  "We probably need to discuss the

8    waterfall.  I think there's not agreement right now on how

9    we would work through the collateral."

10           There's no demand here.  It's asking for a

11   discussion to deal with the issues, and that's how it's

12   supposed to happen.

13           Same thing, Judge, if you turn to Tab 2.  You

14   have an email from Mr. Lorio, making no demands, but rather,

15   asking for a call to go over, quote, the suggested changes.

16           If Mr. Battista's arguments were to be believed,

17   this email would say "the mandated," "that we insist

18   changes."  Not changes, but the form that must be signed.

19   That's not the evidence before Your Honor.

20           If you turn to Exhibit 3, this is testimony --

21   I apologize, this is Mr. Fine.

22           THE COURT:  I'm sorry.  D-3, I'm looking at page

23   131.

24           MR. PERLMAN:  That's correct.  This is testimony of

25   Mr. Fine.  And he's explaining --

AA01001

```
 1              THE COURT:  Okay.
 2              MR. PERLMAN:  -- that these negotiations, Judge,
 3    that there was -- not an agreement right now, but there very
 4    well may be agreement shortly.  Again, no per se unequivocal
 5    demands.  He continues on the following page.
 6              THE COURT:  I'm sorry.  He's talking about a quote,
 7    "right now."  Is he testifying about the email we just looked
 8    at?
 9              MR. PERLMAN:  No, and he's test -- well --
10              THE COURT:  Or wait -- or a couple --
11              MR. PERLMAN:  Actually, yes, because if you go to
12    line 4 -- actually he's referring to the email that I brought
13    up --
14              THE COURT:  D-1.
15              MR. PERLMAN:  -- in Tab 1 of D.
16              THE COURT:  Tab 1, yeah.
17              MR. PERLMAN:  Correct.  He's just explaining that
18    the discussions are ongoing.  And he says it again on page
19    135 in lines 19 that, you know, PEPI was, of course, going to
20    come to an agreement on some language that will make that "in
21    addition" sentence work.
22              The point is they were trying to work through
23    the issues.  Same thing, continuing on page 136.
24              So if you go to Tab 4, Judge, you have Mr.
25    Battista's request on the 15th to insert, for now, a
```

AA01002

1   commercially reasonable aspect of it and return later,

2   when we get to the final order, and sort of put it on the

3   back burner for now.

4           And if you turn to Tab 5 --

5           THE COURT:  Wait a second.  (Reviewing documents.)

6   Okay, so Tab 4 is Mr. Battista using the words "we propose."

7           MR. PERLMAN:  Right.

8           THE COURT:  That's the gist of that.

9           MR. PERLMAN:  Right.  And that he's suggesting that

10  the document contain, quote, "commercially reasonable,"

11  quote, "provision."

12          THE COURT:  Right.

13          MR. PERLMAN:  Okay.  And this is on the 15th.

14          THE COURT:  Okay.  Now to Tab 5.

15          MR. PERLMAN:  So on the 17th, if you turn to Tab 5,

16  again, this is an email from a PEPI rep to the Debtors.  It's

17  not a demand.  It's not an unequivocal statement.  Instead,

18  it's qualified.  And says that these are revisions based on

19  the call we had yesterday evening.

20          And it says at the bottom, highlighted, "We believe

21  that the revisions comport with our conversation yesterday."

22  That's all it says.  This is a negotiation.  This is what we

23  think transpired.  Please read the attached.

24          So if you go to the next page, it says -- it uses

25  "commercially reasonable."  "Lender will use commercially

AA01003

1   reasonable efforts."  And then it continues:  First, to hold

2   the auction sales or otherwise exercise -- as the secured

3   creditor rights that are previously described in Item 1.

4            Then, "to conduct the foreclosure sales of the real

5   property waterfall collateral in the order such collateral is

6   listed on Exhibit E."

7            So the record evidence, Judge, is that there were

8   no mandates, there were no demands as alleged, with regard to

9   the waterfall.  The parties were working through that issue,

10  exchanging drafts, proposals, suggested changes, things of

11  that nature.  So that's not a, quote, "default."

12           You have to take an irretraceable position -- or

13  make a demand in violation and insist on it.  That's when a

14  default happens.  There's no emails to that effect.  You

15  haven't seen any because there aren't any.

16           So if you look to Tab 6, we start off with what

17  the waterfall provision says.  And if you start with the

18  highlighted portion that says, "to speed" -- do you see that,

19  Judge?

20           THE COURT:  I do.

21           MR. PERLMAN:  Okay.

22           THE COURT:  Is this the same page as we just saw,

23  where you showed me a provision --

24           MR. PERLMAN:  Yes.

25           THE COURT:  -- from the Commitment Letter that

AA01004

```
 1    looked just like this.
 2             MR. PERLMAN:  Correct.
 3             THE COURT:  Okay.
 4             MR. PERLMAN:  This is that same page from the
 5    Commitment --
 6             THE COURT:  And it's in here twice just because
 7    that's the flow?
 8             MR. PERLMAN:  It's just easier, yeah.  Rather than
 9    going back and forth.
10             THE COURT:  That's fine.
11             MR. PERLMAN:  Anyways, remember, above this, it's
12    talking about consent judgments.  And that's important.  That
13    consent judgments are already existing.
14             So it goes on to say, "To speed the judgment and
15    foreclosure process."  It doesn't say, "Judgment and judgment
16    process."  It's "judgment and foreclosure."  The implication
17    of foreclosure was obviously sale.
18             So it goes on to say, on the next section
19    that's highlighted, "It will not foreclose on real property
20    described in the numbered item in the following list unless
21    it has previously used commercially reasonable efforts to
22    first collect out of the property described in the numbered
23    items before it in the below list."
24             So before you can go to sale on Item 3, you've got
25    to dispose and go to sale of Item 2.  That was the essence of
```

AA01005

1    the waterfall.  They wanted the property to go in tranches --

2             THE COURT:  But your point here is that this

3    language in the Commitment Letter that everybody signed,

4    distinguishes between judgment and foreclosure process.  And

5    in the second highlighted language, where it talks about the

6    order of foreclosure, your version --- your view of this is

7    that that means the sale.

8             MR. PERLMAN:  Correct.  Correct.

9             THE COURT:  Not ----

10            MR. PERLMAN:  For a lot of reasons.

11            THE COURT:  Okay.

12            MR. PERLMAN:  It doesn't say a judgment.  For them

13   -- for foreclosure to mean judgment, it would be "judgment"

14   and "judgment process."

15            Judge, nothing would be sped up under their theory

16   if foreclosure judgments were staggered and you couldn't get

17   one until you went to sale, then you had your credit hearing.

18   And then I guess you'd have to file the next one.

19            This process would take ten years in 2010, maybe

20   longer.  There's nothing about that argument that comports

21   with the obligation to speed the judgment and foreclosure

22   process.  And they wouldn't be prejudiced because the list,

23   the order of the takedowns and the valuation in between to

24   protect any equity, remains.  This is critical.

25            And I believe, Judge, this was everyone's firm

AA01006

1 understanding, including the Debtor.  And let me tell you

2 how.  If you turn to Tab 7.

3          And, yes, you saw this, too.  This is the Debtor's

4 letter of January 6th to the PEPI Rep.  And the middle

5 highlighted section, Judge -- and I'm emphasizing this --

6 "so that you can immediately" -- immediately, not over ten

7 years, immediately -- "get a judgment and" -- what?  "Go to

8 sale."  Go to sale.

9          "We think this saves your client a significant

10 amount of time and expense in the foreclosure process."

11 Well, if that were to be true, their argument can never

12 exist, because a ten-year foreclosure process, where you have

13 to go parcel, start over, parcel, start over, parcel, start

14 over, is not going to save anyone anything.  It's the

15 opposite of saving money.  It does nothing.  And it's the

16 opposite of this representation of being able to immediately

17 go to judgment and go to sale.  Immediately.

18          This was the Debtor.  This was the Debtor's rep

19 speaking.  The Debtor's principal had a similar view, Judge.

20 If you go to Tab 8.  This is Mr. DiNardo testifying.  Stating

21 on the top about what was negotiated in the PEPI Commitment

22 Letter.  The order of the waterfall.  One step at a time.

23          So I asked.  Question: "Right.  One step is the

24 reference of the sale order sequentially?"  "That's right."

25 That's what we're talking about.  They knew it.

AA01007

```
 1              In fact, he said it again, if you turn to Tab 6.
 2    Mr. DiNardo is answering, saying, "what I understand -- what
 3    I understood is that in the Commitment Letter, the collateral
 4    is in a given" --
 5              THE COURT:  You're talking now about Tab 9?
 6              MR. PERLMAN:  Yes.
 7              THE COURT:  D-9.
 8              MR. PERLMAN:  Yes.  Did I say 6?
 9              THE COURT:  6.
10              MR. PERLMAN:  Yeah, I flipped it over and it went
11    upside down on me.
12              THE COURT:  That's okay.
13              MR. PERLMAN:  Sorry.
14              THE COURT:  We're at 9.
15              MR. PERLMAN:  Thank you.  Feel free to keep me
16    honest.  Okay, so at Tab 9, Mr. DiNardo says that the -- on
17    line 2, "The collateral is in a given waterfall, and each
18    item would be foreclosed on and the proceeds realized,
19    applied against the loan for PEPI.  Then the next step would
20    go -- the next piece would go."
21              And then I say on 11:  "Right.  Will the next step
22    be to sell the next sequential parcel?"  Answer:  "Yes."
23              Everybody on the Debtor's side is agreeing that the
24    next step would be the sale of the next parcel.  Unequivocal
25    record evidence.
```

AA01008

1    So not only did they suggest it and agree to it

2  and acknowledge it as an admission, but as a matter of law,

3  Judge, we say it's mandatory because otherwise the lender

4  would be prejudiced by simple doctrines of *res judicata* and

5  issue preclusion.  And that's demonstrated on Tab 10.

6    Putting aside the chicken scratch, what I wanted to

7  do on Tab 10, Judge, was to show you that various parcels are

8  owned by the same entities.  So you've got GB Peninsula,

9  Limited.  It's got a parcel on 3 and 4.

10    You've got 951 Holding, Limited.  It's got a parcel

11  in 3, 5 and 11 on the next page.

12    You have -- on Item 4, it says units owned by the

13  company and its subsidiaries, which would sweep into the mix

14  everybody owning a parcel on this list.

15    So if the Debtor's position is to believe what

16  would happen is there'd be a foreclosure action filed on

17  the first available property, a judgment, a sale, a credit

18  hearing and, to the extent a deficiency, a second action

19  would be commenced, a second judgment would be entered, and

20  so on.

21    However, if I've already sued the same party on the

22  identical default, my client would probably take it on the

23  chin under the doctrine of *res judicata* or issue preclusion,

24  et cetera, that I had to bring all my claims against that

25  same party arising out of the same facts and circumstances

AA01009

1  in the first action.

2          You don't get to continually sue people over time

3  and time again under the --

4          THE COURT:  For the same --

5          MR. PERLMAN:  For the --

6          THE COURT:  For the same debt.

7          MR. PERLMAN:  Correct.  Correct.  And so, you know,

8  Your Honor realizes what I'm saying.  Obviously this is not

9  an issue, Judge, if the insider is going to provide the DIP

10  Facility.  He controls both sides.  Very comfortable dealing

11  with this issue.  He's got the borrower and the lender.

12          But when you are an independent lender, like PEPI

13  was, and these are rights that you may have to enforce, it

14  was not appropriate to try and restrict the order of actions

15  and judgments, particularly when everyone understood it

16  was going to be an expedited sale-by-sale process, as

17  demonstrated thus far.

18          In fact, Judge, if you go to Tab 11, just to drive

19  this point home a little bit, I've got Mr. DiNardo testifying

20  again, where I asked, "What was the problem with the

21  waterfall, that in PEPI's view they perceived the ability

22  to file multiple foreclosures at once?"  Answer:  "That's

23  right."

24          And so I asked -- which I thought was fair game:

25  "Do you know if the Gulf Bay Facility allows multiple

AA01010

1  foreclosures to be filed or pending at the same time?"

2       Now, the question is, "Filed or pending at the same

3  time?"  His answer:  "No."

4       Let's take a look at Tab 13, which is the actual

5  document with Gulf Bay, and test that answer.

6       THE COURT:  I'm sorry, are you saying 13 or 12?

7       MR. PERLMAN:  Sorry.  12.  Should have my glasses

8  on.  12, Judge, is the notice of filing of the closing

9  documents with the insider DIP lender.  And if you turn to --

10  ECF page 9 of 10 on the top right.

11       THE COURT:  Uh-huh.

12       MR. PERLMAN:  Let's see what it says.  I

13  highlighted it for Your Honor.  "Lender may file one or

14  more real property foreclosure actions in Florida."  Exact

15  opposite of what Mr. DiNardo testified to.

16       Now, granted, further below it discusses how they

17  want things staggered.  But, again, they control both sides.

18  They can have it any way they want, Judge.  But that's not

19  commercially reasonable for an unaffiliated lender.  But what

20  I want to bring to Your Honor's attention, because I'm not

21  sure that this does that anyways -- and I say that because I

22  boxed where it says, "For example."  Do you see it, Judge?

23       THE COURT:  Uh-huh.

24       MR. PERLMAN:  So what it says, in parentheses,

25  "For example, Exhibit E, Parcel 3 is before E, Parcel 4, and

AA01011

1    lender agrees to use commercially reasonable efforts to hold

2    foreclosure sales and/or auction on the property described in

3    Exhibit E-3 before holding a foreclosure sale and auction of

4    the property described in E-4."

5            Well, that's what we wanted.  That example couldn't

6    be any clearer.  That's exactly what PEPI was requesting.

7    Sale by sale.  We were not going to go to sale with the next

8    tranche until we've gone to sale with the one above it.

9            And here it is.  The very provision they claim PEPI

10   was defaulting with regards to.  And, Judge, if you turn to

11   Tab 13.

12           THE COURT:  Uh-huh.

13           MR. PERLMAN:  As -- no differently than the Gulf

14   Bay loan documents, that was a single note and mortgage.

15   That was always contemplated.  Mr. Fine confirms that as

16   well, with regard to the PEPI instrument, by stating on page

17   6 of his affidavit it was a single note and mortgage.

18           And then to bring you back into the equation that

19   provision I showed you in the Commitment Letter that the

20   documents had to be to the reasonable satisfaction of PEPI

21   and its lender in all respects.

22           And he's saying that was the basis of those

23   requests.  It wasn't unreasonable.  It wasn't commercially

24   unfair.  In fact, it was appropriate and apparently

25   understood and agreed to by the Debtors before, and clearly

AA01012

1 with regard to the Gulf Bay Facility by their own, quote,

2 example, if you will.

3          So the notion that PEPI breached by requesting

4 modifications with respect to the waterfall has no basis in

5 fact or law and therefore no summary can issue because PEPI

6 was not in default with regard to either the escrow or the

7 waterfall.

8          So that leaves next the, quote, unquote, written --

9 and I'm emphasizing that word, due diligence sign-off.

10 That's the story, Judge, that there was an obligation to

11 issue a written due diligence signoff.

12          So this is a two-part discussion.  The first part,

13 Judge, requires us to spend a couple minutes on the actual

14 Commitment Letter that relates to due diligence because,

15 as Your Honor has done before in terms of contract

16 interpretation, you can't just remove sections and make

17 determinations.  You have to give it the appropriate meaning

18 in the context of the overall agreement.

19          So let's do that.  If Your Honor will turn to Tab

20 E-1?

21          THE COURT:  Okay.

22          MR. PERLMAN:  This is the Commitment Letter.  And

23 on the bottom, it says, "PEPI's commitment hereunder to

24 provide the Credit Facility" -- and I'm stressing the Credit

25 Facility, that's the loan -- "is subject to" -- and then it

AA01013

1    says B, continuing on the following page, "PEPI's completion

2    of and reasonable satisfaction in all material respects with

3    a due diligence investigation of the company and its

4    subsidiaries."

5             And G, "The other conditions set forth are referred

6    to in the term sheet including, without limitation, the

7    satisfaction of all conditions precedent set forth in the

8    term sheet in a manner satisfactory to PEPI in its reasonable

9    discretion."

10            Now, these were conditions -- due diligence and

11   conditions precedent to the Credit Facility, not the Debtor

12   filing bankruptcy.  This is actually the closing and funding

13   of the loan.  That's how this works.  That's what this says.

14   It's beyond debate.

15            So if you turn to the next page, this is the

16   Commitment Letter again, continuing on page 15 of 45 of that

17   document.  And the caption that I'm bringing to Your Honor's

18   attention says "other conditions precedent."  Are you there?

19            THE COURT:  Uh-huh.

20            MR. PERLMAN:  Okay.  So, and it reads, "Standard

21   and customary for loans and transactions of this type

22   and such other conditions precedent to the" -- and I'm

23   emphasizing -- "initial advance and each subsequent advance."

24   Not filing.  Advancing.  And, as Your Honor knows, to advance

25   requires a court order that approves the Facility.

1       And our court order only happens after a bankruptcy

2 is filed.  So the condition precedent that related to due

3 diligence were limited and associated with the funding under

4 an order that happened postpetition.

5       In fact, if you look at Item 3 and 4, it couldn't

6 be any clearer.  Item 3, the completion of due diligence to

7 the satisfaction of agent.  Same thing with 4.  Completion of

8 legal due diligence.

9       So the due diligence was a subpart of conditions

10 precedent that was related solely to funding the initial

11 advance and the subsequent advance which would only occur

12 postpetition.  So if go to -- if you turn two more pages,

13 judge, to page 17 of 45 of that document.

14       THE COURT:  Uh-huh.  (Locating page.)  Okay.

15       MR. PERLMAN:  Item 15.  "Such other commercially

16 reasonable conditions precedent as agent may require in

17 its reasonable discretion including without limitation

18 satisfaction of each of the items listed on Exhibit B

19 attached hereto."

20       And then B continues for several pages.  And I just

21 wanted to bring to Your Honor's attention that there were a

22 series of conditions precedent that needed to be satisfied

23 for funding postpetition.  Almost 50 or more.  Plus Exhibit

24 B.

25       So later, when you hear, or later when you read the

AA01015

1   contention that, "Oh, well, you know, if they signed off on

2   due diligence, they were obligated -- we had them obligated

3   to fund." Not true. It's completely an irrelevant argument.

4   It's the farthest from the truth.

5          So what is the truth? If you turn this up two,

6   Judge?

7          THE COURT: Okay.

8          MR. PERLMAN: This is part of the Commitment

9   Letter, and this section says, "Due Diligence." Now, if

10   you believe the Debtors, there would be a sentence in here

11   that says, "must be satisfied as a condition of Debtor's

12   bankruptcy filing with notice by such and such a date."

13   That's not what it says.

14          What it says instead is that there's a due

15   diligence checklist, which shall be updated regularly to

16   reflect the delivery and receipt of items required by the

17   conditions precedent.

18          Conditions precedent, Judge. Again, that relates

19   to the postpetition financing which comes after bankruptcy,

20   unrelated to what the Debtor's suggesting. In fact, if you

21   turn to the next page, Judge --

22          THE COURT: I guess I'm not following this

23   reference here in E-2.

24          MR. PERLMAN: Sure.

25          THE COURT: So I'm going to ask you to repeat it.

AA01016

1  There's a due diligence checklist which shall be updated

2  regularly, to reflect the delivery and receipt of items

3  required by the conditions precedent.

4          MR. PERLMAN:  That's right.

5          THE COURT:  Which refer back to the laundry list in

6  Exhibit B.

7          MR. PERLMAN:  Correct.  And I'm just trying to make

8  sure Your Honor's aware of the various provisions in the

9  Commitment Letter that related to due diligence.

10          THE COURT:  I see.

11          MR. PERLMAN:  And it was all dealt with as part of

12  the condition precedent for postpetition financing, which

13  would happen after an order, which is after a filing.

14          The Debtor is trying to spin the due diligence

15  signoff and ask Your Honor to rewrite the contract to require

16  that PEPI is obligated to provide a written due diligence

17  signoff as a condition of the Debtor filing bankruptcy.  No

18  such provision exists.

19          And everywhere you look about due diligence, it's

20  tied to the conditions precedent, which is funding.  Not

21  filing.  Funding.  And so I'm trying to work through that so

22  Your Honor has a better understanding so it's not taken out

23  of context.

24          So if you turn to the next page, you've got a

25  version of one of the checklists that was used by the

AA01017

1  parties.  And if you turn to page 3 of that, which is ECF

2  99-1, page 3 of 10, you'll see that it starts off "Due

3  Diligence Organizational."  And it's got a series of

4  information being provided amongst the parties.

5         If you turn to page 7 of that document, 7 of 10,

6  the parties are discussing various due diligence items with

7  respect to real estate.  And on the next page, "Bankruptcy

8  Requirements."  And on the page after that, "Other

9  Diligence."

10         This is what was meant by the parties with regard

11  to due diligence.  And you can't change the contractual

12  provision that says that they are conditions precedent to

13  funding.  The Debtor is desperate to suggest to Your Honor

14  that they are conditions precedent to filing.  That's not

15  what the Commitment Letter says.

16         If you turn to Tab 3.

17         THE COURT:  Uh-huh.

18         MR. PERLMAN:  You've got the Fine affidavit, which

19  states now, as a matter of fact, that PEPI performed its due

20  diligence under the Commitment Letter, which were just two of

21  a dozen conditions precedent to funding.

22         THE COURT:  I'm sorry.  What is this document?

23  107?

24         MR. PERLMAN:  This is the Fine affidavit.

25         THE COURT:  Okay.

AA01018

1    MR. PERLMAN:  Now, Judge, interestingly, under Tab

2  4, if I could direct Your Honor to further testimony of the

3  Debtor's representative --

4    THE COURT:  Uh-huh.

5    MR. PERLMAN:  -- the Debtor agrees, the Debtor

6  understood.  Question --

7    THE COURT:  Who is this --

8    MR. PERLMAN:  This is Mr. DiNardo.  It's filed of

9  record, DE 96-1.

10    THE COURT:  Okay.

11    MR. PERLMAN:  Page 173 of that depo transcript.

12  Question:  "Do you agree with me that this document states

13  that the following is a list of items that are conditions

14  precedent to the initial advance and each subsequent

15  advance?"  "Yes."

16    Question on 13:  "These conditions precedent that

17  must be satisfied prior to the initial advance and each

18  subsequent advance continue on the following page, Items 5

19  through 14."  On line 25, the answer is:  "That's correct."

20    And if you go to two pages in, Judge, Transcript

21  page 175.

22    THE COURT:  (Locating page.)

23    MR. PERLMAN:  Line 14.  Now, Item 15, I think you

24  just reviewed, states, "Such other commercially reasonable

25  conditions precedent, as agent may require in its reasonable

AA01019

1    discretion, including -- and it references the items in the

2    exhibit being attached hereto.  Yes?"  "Yes."

3              And, in closing, with regard to this argument,

4    Judge, I would point Your Honor to pages 178 and the page

5    behind that.  If you can turn quickly, I will publish it to

6    the record.

7              THE COURT:  Okay.

8              MR. PERLMAN:  Question, page 10:  "Right.  But this

9    in particular says completion of agent's due diligence.  See

10   that"

11             THE COURT:  Yeah.

12             MR. PERLMAN:  And the ans -- no, that's the

13   question, sorry.  And Mr. DiNardo answers on line 12, "Yes,

14   but these are all conditions that have to be met for them to

15   fund."

16             They knew -- they knew that the due diligence was

17   tied to fund.  He said it right there.  And that's what the

18   document says.  In fact, it's even more clear on the next

19   page, Judge.

20             THE COURT:  Mr. DiNardo was a 30(b) representative

21   witness?

22             MR. PERLMAN:  Yes.  Yes.  On the very next page,

23   Judge, Question:  "Did you understand that the Commitment

24   Letter contained a condition precedent including the

25   completion of due diligence to the satisfaction of PEPI?"

AA01020

1    Answer:  "Yes."  "But prior to the closing of the loan."

2    "That's right, prior to the closing of the loan."

3            Now, if I could turn Your Honor's attention to Tab

4    5, I think you'll find this next point very interesting.

5    Now, remember, I flashed Your Honor the version of the

6    checklists and due diligence lists --

7            THE COURT:  Uh-huh.

8            MR. PERLMAN:  -- that were being exchanged amongst

9    the parties.  The Debtor was always kept abreast of due

10   diligence status.  They don't challenge that.  In fact, if

11   you look at Tab 5, this is the Debtor's motion for summary

12   judgment.  And what I highlighted is that they acknowledge

13   that PEPI verbally assured the Debtors that its due diligence

14   was substantially completed.  What are they complaining

15   about?

16           Now, parenthetically, they put, "But not in

17   writing."  And I'll get to that in a second.  So if Your

18   Honor could turn to Tab 6.  This is the -- what PEPI

19   describes as the termination provision, where PEPI had

20   the right to basically terminate this Facility by giving

21   a three-day notice.

22           And it reads, "The obligations of PEPI to provide

23   the Credit Facility under the Commitment Letter will

24   terminate upon the earlier to occur of" and there's 1 and 2.

25   "The earlier of 1 and 2."

AA01021

```
 1              Well, let's take a look at No. 2.  No. 2, Judge,
 2    is, you know, 90 days after filing unless an order's been
 3    issued, right?
 4              THE COURT:  All right.
 5              MR. PERLMAN:  That's what it says.
 6              THE COURT:  If you're 90 days in and you haven't
 7    gotten a court order.
 8              MR. PERLMAN:  That's right.  So that has nothing to
 9    do with due diligence signoff.  You know, if everyone in this
10    courtroom was trying to write it the way they're suggesting
11    to this Court, it would take about three minutes to come up
12    with a sentence that says PEPI is obligated to issue in
13    writing a due diligence signoff as a condition precedent
14    for the Debtor to file a bankruptcy.  And should it not do
15    so, the commitment fee is returned -- what have you.
16              That's what they're asking Your Honor to say.
17    They're asking Your Honor to revise a contract that's clear
18    and unambiguous.  And as you know, under Florida law, that's
19    not permissible.  That's not permissible.
20              And they can torture this paragraph as much as
21    possible, but their reading is contrary to everything we just
22    walked through in terms of the Commitment Letter and the
23    conditions precedent, which incorporate due diligence to
24    funding that filing.
25              And option 2 -- Option 2 has nothing to do.  They
```

AA01022

1   can file.  They've got get the order in within 90 days or

2   it's over.  What does that have to do with a due diligence

3   signoff?  Nothing.  Nothing.

4           And what does 1 say?  Agent has advised company it

5   has completed its due diligence.  Does Your Honor see -- does

6   Your Honor have magic glasses and, unlike me, the word

7   "written" appears in your version?  I don't see it.

8           All of a sudden there's an obligation to deliver

9   this in writing.  Where?  It doesn't even exist in this

10  document that they're relying on.  Their position's a joke.

11  There is no obligation to do it.  There's -- even if it

12  existed, there's no obligation in writing.  And in the

13  document before that, they acknowledge they had it.

14          If you turn to Tab 7, Judge.  This is Mr. Fine's

15  deposition transcript, in which he testifies that Mr.

16  Battista asked for this type of right.

17          Mr. Fine went to his client and reported back,

18  "No such due diligence signoff will be included in this

19  Commitment Letter.  I got back to him and I told him that

20  we would not provide it."  That's the record evidence.

21          THE COURT:  Let me just -- I'm not sure I

22  comprehend what you're --

23          MR. PERLMAN:  This is Mr. Fine stating that Mr.

24  Battista requested this ability.  Mr. Fine went to his client

25  and came back and said, "It will not be included in the

AA01023

1    Commitment Letter."  We would not provide a due diligence

2    signoff, if that's the verbiage.  That's consistent with the

3    Commitment Letter.

4         If you turn to Tab 8, Judge, this is likewise

5    consistent.

6         THE COURT:  I must be missing something.  If you

7    were to tell -- if PEPI advised the Debtor and the Debtor's

8    people verbally that they'd completed their due diligence,

9    why would they refuse to provide a letter that says the same

10   thing?

11        MR. PERLMAN:  Because what that transcript says is

12   that it was requested and rejected.  And the rationale,

13   Judge, was it's a continuing condition precedent to funding.

14   Lenders would never waive any rights until they get the

15   funding because they would be prejudiced in connection with

16   the loan.  That's why they spelled it out in the Commitment

17   Letter, how it would work, what the conditions precedent

18   were, and how it flowed.

19        Now, there was a due diligence checklist.  I showed

20   it to you.  Mr. Fine gave an affidavit that said they knew

21   where we were.  They even admitted in their pleadings they

22   were told.  It's just not customary to be issued in writing

23   to that regard.  They had everything they were entitled to

24   under the Commitment Letter.  That's the issue.

25        THE COURT:  Well, it seems to me that if somebody

AA01024

1    tells me verbally that they've completed something and they

2    won't send me an email or a letter confirming that, doesn't

3    that undercut the verbal assurance?

4             MR. PERLMAN:  I would say --

5             THE COURT:  It would make me nervous, I think.

6             MR. PERLMAN:  Perhaps, Judge, but I think that

7    commercially that's how it works.  If they wanted it in the

8    agreement --

9             THE COURT:  Yeah.

10            MR. PERLMAN:  -- they had to negotiate for it.  You

11   know, the parties weren't free to inject new components that

12   the other side was objectionable with.  That's not how a

13   contract works.

14            THE COURT:  Uh-huh.

15            MR. PERLMAN:  So that's my point.  They could want

16   it all they want.  It could make as much sense as they wanted

17   it to.  They had to have it in the agreement to say it was an

18   obligation that was breached.  Those facts don't exist.

19            THE COURT:  Well, it seems to me you've got a

20   situation -- and I haven't read the entire Commitment Letter

21   to know the flow of it, but it seems to me you have a certain

22   -- if it was only the Debtor and PEPI, you would have a

23   certain level of due diligence to know whether you wanted to

24   be their DIP lender partner going into the Chapter 11.

25            And then possibly -- likely other conditions to

AA01025

```
1   actual funding, the most important which, I suppose, would be
2   Bankruptcy Court approval.  I don't know if the Commitment
3   Letter -- it doesn't seem like it's structured quite like
4   that -- to have this two-tiered approval -- but now we're
5   struggling with it as to whether due diligence is before the
6   filing or after the filing, in writing, not in writing, it
7   was verbally done but they wouldn't give the written
8   confirmation of what they said verbally.  And now we're left
9   with this mashup of whether there was a deal or not a deal.
10          MR. PERLMAN:  Judge, I'm going to get to an
11  argument later that's going to render your comments moot,
12  but I think --
13          THE COURT:  At least you didn't say "silly."
14          MR. PERLMAN:  Well, that would be --
15          MR. BATTISTA:  Or "a joke."
16          MR. PERLMAN:  Right.
17          THE COURT:  Okay.
18          MR. BATTISTA:  I'm sorry.
19          MR. PERLMAN:  Of course not.
20          THE COURT:  All right.
21          MR. PERLMAN:  Of course not.  But I think the
22  answer-- and I'll move on -- is the question is not what
23  would they have liked, what makes sense now looking back.
24  The question is:  Does the obligation exist under the
25  Commitment Letter.
```

AA01026

1           THE COURT:  Right.

2           MR. PERLMAN:  And that's a fundamentally no.  It

3    doesn't say written.  You can't insert written.  It doesn't

4    say written.  There's no requirement for a due diligence

5    signoff as a condition to filing.  In fact, the other way.

6    If they file, they've got 90 days to get the orders in.

7    It has nothing to do with due diligence.

8           And I walked Your Honor through the Commitment

9    Letter with respect to due diligence.  That's all tied to

10   funding, not filing.  You can't change the contract after the

11   fact because they would like some additional comfort because

12   they think this is a loan to own.  I don't know.  It doesn't

13   matter.  They should have negotiated it on the front end.

14   The Commitment Letter is the Commitment Letter.  If they want

15   to change it, that'd be a breach by them.

16          Anyways, I think I'm going to render that moot

17   when I get there.  If you could turn to Tab 8, Judge.

18          THE COURT:  (Locating page.)  All right.

19          MR. PERLMAN:  Okay.  This is Mr. Battista stating

20   at line 9 that we are trying to gauge the filing to coincide

21   with the completion of your due diligence.  Not that you're

22   obligated to.  Not that it must be.  We are trying.  That's

23   not how people speak when there is an obligation under a

24   contract.

25          And if you have any doubt, Judge, take a look at

AA01027

1    Tab 9.

2           THE COURT:  Wait just a second.  (Locating tab.)

3    Okay.

4           MR. PERLMAN:  Tab 9, email January 27 on behalf of

5    the Debtors to PEPI.  And it says, "I assume that you and

6    your team are now commencing due diligence in earnest so that

7    we can get to the filing in the next several days.  Please

8    let us know what we still need to get you in order to keep

9    the process moving."

10          There's nothing in here that says pursuant to the

11   obligations and the Commitment Letter as a precondition of us

12   filing.  They're contemplating filing bankruptcy in the next

13   several days.  It's completely contradictory to a position

14   that there was an obligation for a written due diligence

15   signoff when that's not what the contract says.

16          And I think what the problem was, if you look

17   to Tab 10, was confusion on the Debtor's part, where Mr.

18   DiNardo, to my question, "So assuming PEPI had the money and

19   the judge entered the order, it's your understanding there

20   were no other conditions."  "Yeah, I don't there was any

21   other conditions."

22          Judge, I showed you over 50 conditions precedent.

23   There was tons of conditions precedent.  They thought, I

24   guess, that if there was a due diligence satisfaction, that

25   that was it.  That's not how it works.  That's not how the

AA01028

```
 1  document reads.

 2           And if you turn to page 11, because --

 3           THE COURT:  You mean E-11?

 4           MR. PERLMAN:  No, I'm sorry.  Tab 11.  Yes, yes.

 5           THE COURT:  Uh-huh.

 6           MR. PERLMAN:  Because I suspect you'll hear about,

 7  you know, "Oh, Mr. Redunsky said it means we're ready to go."

 8           You know, I don't know that that record was

 9  developed properly because if you read the following

10  testimony "ready to go" means perhaps --

11           THE COURT:  I'm sorry.  Testimony of whom?  E-11?

12           MR. PERLMAN:  Mr. Redunsky.  I'm just giving you

13  some background.

14           THE COURT:  No.  I just need to know what I'm

15  looking at.

16           MR. PERLMAN:  It's on the bottom, Redunsky,

17  DE 83-1.

18           THE COURT:  His deposition.

19           MR. PERLMAN:  Correct

20           THE COURT:  Thank you.

21           MR. PERLMAN:  This is a --

22           THE COURT:  And just remind me who he is.

23           MR. PERLMAN:  He's a PEPI rep.  General counsel for

24  PEPI.

25           THE COURT:  30(b) rep?
```

AA01029

```
1          MR. PERLMAN:  No.

2          THE COURT:  No?

3          MR. PERLMAN:  Just a witness.

4          THE COURT:  Okay.

5          MR. PERLMAN:  Mr. Fine was the 30(b).

6          THE COURT:  Thank you.

7          MR. PERLMAN:  In any event, he explains that the

8   notice -- and he's talking about giving that 3-day notice.

9   That the notice and that date that's determined by the notice

10  is to PEPI's advantage, as I understand it.

11         It's bad for Fiddler's to get that notice because

12  that's a trigger.  They were going to have to file within

13  three days or the commitment's going to expire.  And he

14  continues on the following page --

15         THE COURT:  Wait.  Just go back.  Let's just step

16  back.  The Commitment -- Item 2 of the Commitment Letter.  Or

17  Item 1, excuse me.  Where is that little guy.  The right to

18  terminate.

19         MR. PERLMAN:  Sure.  Turning to Tab 5 of this --

20  I'm sorry.  In Tab 6 of this section.

21         THE COURT:  Okay, I've got it.  Let me just read

22  it.  (Reviewing document.)

23         All right, so the notice that's referred to in

24  Redunsky's depo that would be bad for the Debtor, that's what

25  I'm confused about.  I want to make sure the jargon is
```

AA01030

```
1   consistent.  He refers to a three-day notice.  But that
2   really refers back to subparagraph 1, which is the advice to
3   the company, the Borrower, that PEPI has completed its due
4   diligence.
5            MR. PERLMAN:  That's right.
6            THE COURT:  Okay, so it's a notice of completion of
7   due diligence.
8            MR. PERLMAN:  Well, I don't know if it -- I think
9   the document says "advised," but in his answer he's saying --
10           THE COURT:  Well, it says -- that's right.  It says
11  "advised."
12           MR. PERLMAN:  Right.
13           THE COURT:  But that triggers a three-day filing
14  window.
15           MR. PERLMAN:  To the extent they're refiling,
16  right.  And so --
17           THE COURT:  Right, so if nothing had happened and
18  the company advises verbally that it's completed its due
19  diligence, it would kick off the three days to file.  If the
20  Debtor filed within the three days, then PEPI would be the
21  DIP Lender -- the designated DIP Lender.  PEPI would have to
22  go forward.  And then you'd have your conditions to funding,
23  which would be a court order, and I suppose no material
24  change in circumstance.
25           Now, it just seems counter-intuitive to me that
```

AA01031

1    you could have a critical three-day window that would be

2    triggered by a phone call where PEPI later would not put it

3    in writing.  That --

4              MR. PERLMAN:  Well, Judge, I don't think you have

5    to wrestle with that.  I'm going to get there in a second.

6              THE COURT:  Yeah, you said -- that's right, you

7    did.  You said that.  And I'll wait for that.

8              MR. PERLMAN:  Sure.  But I wanted Your Honor to

9    take a look at Mr. Redunsky's testimony because, you know,

10   he's explaining it's bad for Fiddler's to get this.  And he

11   continues on page 103 on Line 18.

12             THE COURT:  Well, let me just stop and digest that.

13   Bad for Fiddler's to get that notice because then they've got

14   to hurry up and file.

15             MR. PERLMAN:  Right, and he --

16             THE COURT:  But then Mr. Battista says they're

17   getting ready to file in the next couple days.  I think "next

18   few days" didn't sound to me like there was that much

19   disharmony about that.

20             MR. PERLMAN:  That's right, but if you turn to page

21   103 --

22             THE COURT:  And I will, thank you.

23             MR. PERLMAN:  Okay.  He explains, starting on line

24   18, that it was never expected to be used by us to trigger a

25   termination of the Commitment Letter.  It was a safety value.

AA01032

1          And, you know, he continues to say that basically
2    if the Debtors blew them off, they needed some trigger to
3    make the commitment go away.  They had no idea whether this
4    Debtor would file or not.  They couldn't make the Debtor
5    file.
6          THE COURT:  Right.  It had to have a shelf life.
7          MR. PERLMAN:  Right, and this is --
8          THE COURT:  No, I get that.
9          MR. PERLMAN:  And -- right.  And it was -- it was
10   the right of PEPI to start that termination provision, if
11   you will.  Again, the Debtor's interpretation is impossible
12   because of Subsection 2, which is unrelated to due diligence.
13          If you can turn to F-1.  This next argument, Judge,
14   relates to --
15          THE COURT:  You're talking about a "next argument."
16   Let's take a five-minute break, and then you can resume,
17   okay?
18          MR. PERLMAN:  Thank you.
19          THE COURT:  Let's do that.
20          COURTROOM CLERK:  All rise.
21          (Recess taken from 2:54 to 3:04 p.m.)
22          COURTROOM CLERK:  Court is again in session.  You
23   may be seated.
24          THE COURT:  All right.
25          MR. PERLMAN:  Judge, before turning to Section F,

AA01033

1    which is the purchase option, I just wanted to say one more

2    thing in closing with regard to the due diligence.  The way

3    it's worded, PEPI -- if PEPI did nothing with regard to that

4    termination right, that does not mean the Debtor could never

5    file bankruptcy.

6            And I think if you think of it in that manner, Your

7    Honor will realize that it was solely a termination right of

8    PEPI having nothing to do with what the Debtor may or may not

9    have wanted later, and that's clear for the reasons I just

10   stated but also because of Option 2, which is completely

11   divorced from any type of due diligence.

12           So let's turn to F real quick, which is the

13   purchase option.  And I'm going to walk Your Honor through,

14   you know, basically the last week or so that mushroomed into

15   why we're here today.  And I wanted to start off with 13,

16   Tab 1.

17           THE COURT:  I'm sorry?

18           MR. PERLMAN:  I'm sorry.  F-1.

19           THE COURT:  F-1, okay.

20           MR. PERLMAN:  F-1.

21           THE COURT:  Uh-huh.

22           MR. PERLMAN:  This is the purchase option under the

23   Commitment Letter.  And what I highlighted was the obligation

24   for a written general release of all claims.  We'll come back

25   to that in a second.

AA01034

1    If you look at Tab 2, Judge, this is the affidavit

2  of Mr. Fine, which has been established as fact, that there

3  was never notice or warning or threat of a default or

4  termination or the end of negotiations until delivery of

5  that email of the 22nd.

6    If you turn to Tab 3, Mr. DiNardo corroborates Mr.

7  Fine's position by stating nothing was presented to PEPI in

8  writing from Fiddler's, that Fiddler's was in default,

9  that it was in breach, and that it would not continue to

10  negotiate, or that it would terminate and seek financing

11  from someone else.

12    I am not aware of any other -- any documents to

13  that effect other than the twenty -- the email of the 22nd.

14    On the last of those pages, Mr. DiNardo -- I

15  questioned, "Was there ever an email to PEPI that said we're

16  not negotiating this issue any further at any point?"

17  "A, not to my knowledge."

18    And that's important, Judge, for reasons that I'll

19  get to in a second.  But you had to understand that at this

20  point in time, PEPI was not aware of any alleged default that

21  negotiations would cease, that the Commitment Letter would be

22  terminated, or that Fiddler's would run to a different

23  lender.  No notice to us or by them.

24    So if you look at Tab 4, this is February 17th.

25  Mr. Ferrao took the position -- took over the DIP Facility on

AA01035

```
 1    the 19th.  Just so Your Honor has this in perspective, okay?

 2              This is February 17th.  And these dates are kind of

 3    critical as I walk you through what's happening.  So this is

 4    a PEPI rep sending a Debtor rep the updated checklist of

 5    corporate diligence items.

 6              THE COURT:  Wait just a second.  This is a PEPI rep

 7    to Debtor rep with a checklist.

 8              MR. PERLMAN:  Right.  Checklist of corporate

 9    diligence items.  So when Your Honor says, "Well, maybe it

10    should have been in writing," this was in writing.  This if

11    the form I showed you before.  This was being exchanged

12    throughout the process.  Everybody knew where everything was.

13              So this is on the 17th, and there's a couple

14    outstanding items that they needed to get us.

15              THE COURT:  Okay.

16              MR. PERLMAN:  Now, the next item, 5, this is the

17    same day, the 18th.  This is a Debtor rep email to a PEPI

18    rep.  This is the 18th, the day before Mr. Ferrao took over

19    the loan.  And they've finalized the issue regarding title

20    commitment -- the title company, where the underwriter,

21    Allen, has confirmed to us that there will be no exception

22    to title for this issue.

23              One of the last components, if you will, that the

24    parties were dealing with at this time.  So on the 18th --

25              THE COURT:  So the path was clear for your
```

AA01036

1    mortgage.

2           MR. PERLMAN:  That's correct.  That certain

3    restrictions would not be an issue but -- from the title

4    company for this Facility.

5           THE COURT:  Uh-huh.

6           MR. PERLMAN:  This is the 18th.  This is an email

7    from the Debtor.  So question:  If they were told no due

8    diligence on the 16th, why are the parties working through

9    the title on the 18th?  I think it renders the issue rather

10   moot.

11          In fact, Judge, if you turn to Tab 5 -- I'm sorry,

12   6, there's basically two or three issues that the parties are

13   dealing with these last couple days before the big hiccup.

14   That title that's been resolved on the 18th, and the purchase

15   option.  This email is from the Debtor agent to the PEPI

16   agent.  And it says -- it's regarding purchase option, and it

17   says, "The following are our comments to the purchase option

18   redraft."

19          So this starts on the 17th.  Then you turn the tab

20   to Tab 7.  And it's an email from the Debtor rep to PEPI rep,

21   and it's trying to resolve another last second issue related

22   to the breakup fee.  So we're dealing with the purchase

23   option, the breakup fee, and the title commitment.  That's

24   where the parties were on the 17th and 18th.

25          So if you turn to Tab 8.

AA01037

1          THE COURT:  Okay.

2          MR. PERLMAN:  Tab 8.  Mr. Battista, on behalf of

3   the Debtors, email to a PEPI rep -- this is February 18th.

4   Any update -- I'm sorry, let me start with Mr. Fine's email,

5   the PEPI email below by Mr. Fine to the Debtor rep, Mr.

6   Battista.  And it says, "I need to speak with Elizabeth

7   regarding the purchase option language.  I will get back with

8   you as soon as possible.  Jeff Fine."

9          And Mr. Battista responds and says, "Any update?

10  The day is beginning to get away from us in terms of filing."

11  They're trying to file today.  Well, what does that tell Your

12  Honor about all these other stories about, "Oh, we were --

13  PEPI was in default.  We defaulted PEPI.  They breached."

14  Really?

15         How about now?  How about the night -- the day of

16  the -- the night -- the day of the -- when we went to Mr.

17  Ferrao, that evening, on the 18th, they were trying to get

18  the case filed.  And what's being discussed, Judge?  The

19  purchase option.

20         Not, "Hey, where's my due diligence signoff?"

21  "Hey, what about the escrow?"  "Hey, what about he

22  waterfall?"  Nothing.  "We're filing, get ready."

23         "Where are you on the purchase option?  The day is

24  getting away, we need to file."  This is the 18th.

25         Now, you have -- on the next tab, Tab 9, Judge, you

AA01038

1    have the Debtor rep again writing to the PEPI rep saying,

2    "Please advise us as to status of the redraft of the purchase

3    option."  That's basically what's going on right now.

4            So what happens on Tab 10?  A PEPI rep is writing

5    the Debtor rep, Mr. DiNardo, on February 18th.  "Tony, I just

6    talked to Jeff" -- that's Jeff Fine, the lawyer for PEPI --

7    "and they are completing language and you should have it

8    shortly."

9            And that's what happens.  If you turn to Tab 11,

10   Mr. Fine is writing Mr. Battista:  "Paul, here is the

11   acceptable purchase option language."  And, again, this is

12   February 18.  This is D-day for the Debtor.  If you turn to

13   Tab 12, 12 is a PEPI rep to Mr. DiNardo, the Debtor rep, and

14   it's forwarding Mr. Fine's purchase option provision, and it

15   says, "Here's the final language that was sent to Paul, no

16   more changes, so that you can go ahead and file."

17           PEPI wasn't playing any games.  PEPI was ready to

18   proceed.  They're saying, "Go ahead and file.  We can make

19   them file, but go ahead and file.  Here's the language you've

20   been asking for.  Let's go.  You're telling us the day's

21   getting away from you and you need to file, file."

22           So if you turn to Tab 13, the parties are speaking

23   again on the 18th now.  They're reviewing the purchase option

24   language, and we need to deal with the breakup fee.  There's

25   nothing else in this email, Judge.  That's all that's going

1   on on D-day, the day they're filing.  "We are reviewing now

2   and will respond ASAP."  Not, "Well, we're not going to file

3   without the escrow and the waterfall and due diligence

4   signoff."  No.  "We will respond ASAP."

5        These are the only two issues on the 18th.

6   Purchase option and breakup fee.  Now, things get

7   interesting, Judge, on Tab 14.  And this is why we fought

8   over that document last time.

9        Tab 14 is an email from the PEPI rep -- I'm sorry.

10  From the Debtor rep to PEPI February 18th at almost 3:00 p.m.

11  And at the bottom is what starts the fun.

12       "In addition, as Paul mentioned to Jeff earlier

13  today, there may be an issue" --

14       THE COURT:  I'm sorry, let's go back.  This is

15  Debtor to PEPI.

16       MR. PERLMAN:  Correct.

17       THE COURT:  Okay.

18       MR. PERLMAN:  Correct.

19       THE COURT:  Okay, thank you.  Go ahead.

20       MR. PERLMAN:  Right.  And on the bottom, it reads,

21  "In addition, as Paul mentioned to Jeff earlier today, there

22  may be an issue with the Bankruptcy Court approving general

23  releases being executed by the obligors.  We understand your

24  concerns.  And to address this issue, we propose that to the

25  extent the Bankruptcy Court does not approve the giving of

AA01040

1   such releases, that designated buyer would provide a complete

2   indemnification to the lender secured by a collateral

3   assignment of the loan documents."

4         So this starts off the fun at 3:00 o'clock on

5   D-day.  Let's turn to Tab 15.

6         THE COURT:  Okay.

7         MR. PERLMAN:  This is from Mr. DiNardo on behalf

8   of the Debtor to Mr. Redunsky on behalf of PEPI regarding

9   purchase option.  Issues 1 and 2 are agreed to, so that's put

10  to bed.

11        The only issue left is what he's about to say,

12  which is a continuation of the prior email, which says,

13  "Also, please let me know if you can accept the resolution

14  below with regard to the collateral assignment in lieu of" --

15  in lieu of, that's important -- "in lieu of the general

16  release which may not be obtained from the Bankruptcy Court.

17  So this is at 3:11 p.m. on the 18th.

18        Tab 16, Mr. Fine on behalf of PEPI is forwarding

19  the purchase option language previously sent that day to Ms.

20  Houk, who is an agent of the Debtor.

21        Tab 17.  This is the email from a PEPI rep to Mr.

22  DiNardo on behalf of the Debtor.  "Tony" -- this is February

23  18th.  Now, it's 4:35.  "Tony, I talked to David and Jeff,

24  and the bottom line is that general release will have to

25  remain.  Unfortunately, there will not be any change to that

AA01041

1   component."

2          Now, the Debtor will try and tell you that Mr.

3   DiNardo or someone else said that's fine.  There's not a

4   single email to corroborate that.  In fact, the opposite.

5          And the opposite starts on Tab 18.  What does that

6   email do, Judge?  What does that email that says the

7   provision in the Commitment Letter has to remain?

8          It starts off a series of emails where Mr. DiNardo

9   forwards Mr. Springfield's email to the team.  At 4:49, Tab

10  19, same thing.  At 5:00 p.m. --

11         THE COURT:  I'm sorry, you were on 19?

12         MR. PERLMAN:  Yeah.  Tab 18, 19, 20 and 21 -- well,

13  let's start with 20 -- all relate to emails stemming from Mr.

14  Springfield or PEPI's position that the release has to

15  remain.

16         THE COURT:  These are privileged redactions?

17         MR. PERLMAN:  That's correct.

18         THE COURT:  And you're drawing the inference that

19  since they all have the other email at the bottom, that

20  that's your -- that's what you just said.

21         MR. PERLMAN:  That's right.

22         THE COURT:  That they spring from -- okay.

23         MR. PERLMAN:  That's right.

24         THE COURT:  Spring from F-17?

25         MR. PERLMAN:  Correct.

AA01042

1          THE COURT:  Okay.  Okay.

2          MR. PERLMAN:  And it continues on 21.  Mr. Redunsky

3  sends an email to Mr. DiNardo at 6:30 regarding the purchase

4  option.  And Mr. DiNardo flips that purchase option email to

5  the same privilege group at 6:33.

6          Now, if you'd turn to Tab 23, you have Mr. Ferrao

7  testifying -- are you on Tab 23, Judge?

8          THE COURT:  I am.  That's Mr. Ferrao?  Yes.

9          MR. PERLMAN:  Yes.

10          THE COURT:  I see that.

11          MR. PERLMAN:  And question:  "And the evening of

12  the 18th, that was when Mr. DiNardo suggested that you

13  provide the financing and become the new DIP lender;

14  correct?"  Answer, line 7:  "Yes."

15          Now, it's important, I'm not sure why, but the

16  Debtor seems to take issue of the timing, and I'm guessing

17  that this discussion to take over the loan took place in the

18  evening, which is sort of when those emails were going on or

19  after.

20          Mr. Ferrao answered yes.  And my question was:

21  "And the evening of the 18th, that's when this went down."

22  Okay, those emails were 6:00, 6:30.  So they were -- they had

23  this discussion after those emails.

24          So Your Honor may ask yourself why.  Why was all

25  this -- why were they filing the case, and standing here

AA01043

1    today -- and negotiating a purchase option, and standing here

2    today and saying that PEPI breached all these provisions, and

3    that's really what happened.

4         Well, Mr. DiNardo in Tab 24 -- and you don't have

5    to read it now -- states several times that they had no

6    alternative.  That they gave instructions to Mr. Battista to

7    press forward, to proceed with this transaction because it

8    was the only opportunity they had.

9         So when I say that they waived all of these issues,

10   they did so because they wanted the Facility, and made the

11   business decision, and he states affirmatively numerous times

12   that "I instructed my team to press on because we needed --

13   we were going to close, we wanted the Facility."

14        So it was out of convenience after the fact, we

15   suggest, that they trumped up all these breaches, which had

16   nothing to do on D-day on the 18th.

17        So if you turn to Tab 25, Judge -----

18        THE COURT:  Well, you just summarized something

19   that I haven't read.

20        MR. PERLMAN:  Okay.

21        THE COURT:  Something about instructions to Mr.

22   Battista to press on --

23        MR. PERLMAN:  Okay.

24        THE COURT:  -- and close the loan and -- so where

25   is that?  What are you referring to?

AA01044

```
 1              MR. PERLMAN:  Sure.

 2              THE COURT:  The new deal or the PEPI deal?

 3              MR. PERLMAN:  The PEPI deal.

 4              THE COURT:  I don't --

 5              MR. PERLMAN:  I'll give it to you.

 6              THE COURT:  I don't remember pressing on.

 7              MR. PERLMAN:  Okay.  So -- I was just trying to

 8   speed up my presentation.

 9              THE COURT:  Well, no, I mean I just need to know --

10              MR. PERLMAN:  But so on line -- on page -- if

11   you're under Tab 24, if you go to page 27.  It's a question

12   on line 19.

13              THE COURT:  Wait a second.

14              MR. BATTISTA:  What page are you on?

15              MR. PERLMAN:  207.  Question, line 19.  "Okay.  So

16   when you say status" --

17              THE COURT:  Well, wait, let me just -- let me just

18   get my notes.

19              MR. PERLMAN:  Sure.

20              THE COURT:  This is F-24 at page 207 is where

21   you've referred me to.  Okay, now I'm there.

22              MR. PERLMAN:  Okay.  Line 19, question:  "So when

23   you say status quo, you mean full steam ahead, let's get this

24   thing closed if we can."  Answer, "Yes, because I did not

25   have that decision made until the 19th."  He's referring to
```

AA01045

1    Mr. Ferrao taking the loan.
2           So if you turn the page, page 211, line 13, "Okay.
3    So as of the 18th, the parties were still negotiating the
4    purchase option, right?"  Answer:  "Yes."  So --
5           THE COURT:  Let me just see here.  I don't have the
6    stamp at the bottom.  This is still Mr. Ferrao's testimony?
7           MR. PERLMAN:  No.  This is all DiNardo.
8           THE COURT:  This is DiNardo?
9           MR. PERLMAN:  Yeah.  The 96-1.
10          THE COURT:  I see it.
11          MR. PERLMAN:  Sorry.
12          THE COURT:  Okay.
13          MR. PERLMAN:  All right.  So if you turn to Tab 25.
14          THE COURT:  Okay.
15          MR. PERLMAN:  Where PEPI's following up.  PEPI
16   sends an email to Mr. DiNardo on the 19th, "Where do we
17   stand?"  We're trying to -- at this point, we're trying to
18   finalize the purchase option and they're filing, where do we
19   stand?
20          On the 26th -- I'm sorry.  Tab 26.  Mr. DiNardo
21   sends an email to his group.  Now, you know, Judge, I think I
22   had to fight for some of these documents because they were
23   held back on privilege and later I got them.  This is one of
24   them.  And it's not privileged.  And it's an email on the
25   19th.  And the Debtor is talking to the team saying, "I got a

AA01046

1    voicemail from Kenny.  His lawyers are waiting on redraft of

2    the purchase option from our lawyers."

3            And the Debtor says in response on the 19th, "Stand

4    down on speaking with them at this point and we have arranged

5    for counsel to Gulf Bay."

6            THE COURT:  Let's just see, who's Kenny?

7            MR. PERLMAN:  Kenny Springfield --

8            THE COURT:  Okay.

9            MR. PERLMAN:  -- is a PEPI rep.

10           THE COURT:  Okay.

11           MR. PERLMAN:  The same individual that sent the

12   email before that said, "Where do we stand."

13           THE COURT:  Right.

14           MR. PERLMAN:  So PEPI is chasing the deal --

15           THE COURT:  Well, let me just read this and digest

16   it.

17           MR. PERLMAN:  Sure.

18           THE COURT:  Okay.  So this is Mr. DiNardo to Mr.

19   Battista saying that Springfield's lawyers, PEPI's lawyers,

20   are waiting on a redraft of the repurchase option.

21           MR. PERLMAN:  Right.

22           THE COURT:  And that's on 2/19 at 11:31.  And then

23   Mr. Battista to DiNardo is "stand down."

24           MR. PERLMAN:  That's right, stating, "We've

25   arranged for counsel to Gulf Bay.  Now, PEPI has no knowledge

AA01047

1   of this, that this is not shared.  PEPI's still chasing the

2   deal.  They sent an email before this that I showed and now

3   they're calling saying, "Where is the revised purchase option

4   that we talked about that we're expecting?"

5         So on the 19th at 11:30, it's the word he

6   understood, on the Fiddler's side, that the Facility will be

7   provided by Mr. Ferrao via Gulf Bay.

8         So if you turn to the next page.

9         THE COURT:  F-26?

10        MR. PERLMAN:  No.  Yeah, yeah, I'm sorry.  Yeah,

11  still 26, the very next document.  This was fought over, it

12  was redacted, and then upon demand produced.  And it starts

13  off with Springfield on behalf of PEPI reaching out to Mr.

14  DiNardo on the morning of the 19th, "Where do we stand?

15       Mr. DiNardo flipping it to his team, and at 11:39

16  Mr. Battista responding.  Now, this is 11:39.  They've

17  already gone into Aubrey Ferrao Gulf Bay mode.  We

18  established that in the prior email, which is earlier

19  than 11:39.

20       So at the time of this communication, they know

21  that Ferrao is taking the loan through Gulf Bay.  They know

22  this for a fact.  The email is earlier.

23       And the Debtor team says, "If you want to respond,

24  you can say that you're conferring with Aubrey and your

25  counsel and that you will get back to them as soon as you

AA01048

1   can.  Clearly disingenuous.

2          Again, it's a secret.  It's a secret that they're

3   going to be in default.  It's a secret that the loan is being

4   taken over by an insider.  And, instead, PEPI is chasing the

5   deal.  Most parties that are chasing the deal are not the

6   ones in breach.

7          So Document Tab 27, what does Mr. DiNardo do?  He

8   states on the 19th to the PEPI rep, Mr. Springfield, "Kenny,

9   we are conferring with counsel and will get back to you as

10  soon as we can," knowing, of course, that that's not true.

11         And if you look to tab -- the next tab, 28, the

12  Debtor team is in the process of formulating their documents

13  and agreements.  They're going to file the case early the

14  following week, and the name of the lender will be in the

15  filing documents.  Obviously that's not PEPI.

16         So if you turn to Tab 30, remember, Judge, the

17  discussion took place on the evening of the 18th asking Mr.

18  Ferrao to take over the Facility and replace PEPI secretly.

19  And then the morning of the 19th, he said, "Yes, I'll do it."

20  And that's when this plan got hatched of going forward with

21  Gulf Bay and not telling PEPI anything, notwithstanding their

22  repeated requests of, you know, phone calls, emails, where

23  are we.

24         So if you look at Tab 30, you have Mr. Fine on

25  behalf of PEPI.  This is now the 19th.  The 19th.  "J, when

AA01049

1  we last spoke yesterday, you and Peter were going to redraft

2  the purchase option paragraph and send that to me for review.

3  Please let me know when I can expect to receive the redraft

4  of the paragraph."

5          We're still chasing down what they told us we'd

6  get; the final purchase option provision.  No response,

7  Judge.  No response.  And so per Tab 31, on the 20th, PEPI --

8  not the Debtor, but PEPI -- is commenting on the dearth of

9  communications and that it's disconcerting to us, after

10 everything that we've gone through.

11         So why not tell PEPI?  Why not give them notice?

12 Why not tell them they've got one day or else?  It doesn't

13 make any sense.  Especially, Judge, if Your Honor's being

14 asked to believe Mr. Ferrao, who's like, "Oh, I didn't want

15 to make this loan."  Really?

16         See, by hatching this plan, they accomplish their

17 objective of creating the appearance of an emergency with no

18 other lender.  And Mr. Ferrao, the reluctant lender, is the

19 only option to avoid a meltdown.  That's not true.  They

20 could have told PEPI, "You've got one day to fix something."

21         That wasn't even an issue on the 18th.  On the

22 18th, they're getting ready to file.  We need to file -- we

23 need to finalize this purchase option language.

24         They tried to substitute it.  We said no.  They

25 disappeared.  That's the record evidence on the 18th.  On D-

AA01050

1    day, on the 18th.  And that night, they go to Ferrao and say,

2    "You're going to have to make this loan."

3          But as of the 18th, there were no issues.  They

4    were ready to file, "We need to finalize the purchase option

5    language."  That's it.

6          So why not tell them -- why not tell PEPI?  Why not

7    put the onus on them?  And, you know, Judge, if you go to

8    Court and say, "Look, we told PEPI this is what they had to

9    do, they balked, so Mr. Ferrao is going to step up."

10          That's an interesting perspective that probably

11    should have been developed.  But they didn't want to do that

12    because they didn't want PEPI because the purchase option

13    gave them heartache.  And they had other issues.

14          So if you look at Tab 32, Judge, because Tab 32 is

15    quite telling.  Tab 32 are communications between the Debtor

16    and the affiliated lender.  And it starts off with Ms. Houk

17    saying she's concerned about getting the DIP approved, given

18    the affiliated lender status.  And she also comments

19    gratuitously that the PEPI DIP terms were over the top and

20    potentially a loan-to-own.

21          So the Debtor was concerned obviously.  You've got

22    this purchase option, which was the only issue when they

23    disappeared.  And now you've got them acknowledging a

24    potential loan-to-own.  They don't want PEPI to be the

25    lender.  Clearly.

1       And they're concerned, Judge, about the affiliated

2    lender status.  What's a bigger risk, given everything PEPI

3    did to get this loan ready to go?  They never signaled a

4    retraction.  They busted their tail to get this done.

5    They're ready to file; we're finalizing the purchase option.

6       If you were to believe them, "Oh, well, we didn't

7    have this extra assurance of this due diligence signoff" --

8    which didn't exist again.  But even if you believed it,

9    what's the bigger risk?

10      PEPI, who's been disclosing to you the whole time

11   about their due diligence status pursuant to the Commitment

12   Letter, who's busted their tail to get a Facility in place, a

13   third party lender, versus an insider loan.

14      What would have happened if the Court said, "Sorry,

15   we don't permit insider priming loans, that's not how it

16   works, that's called capital?"  So it's kind of odd that they

17   want to argue on the one hand it was so vitally important,

18   yet on the other they took probably a bigger flyer with

19   regard to an insider priming loan.  Those are rare.  They're

20   completely unorthodox.

21      And so they went from the pan to the fire in terms

22   of risks.  It doesn't make sense unless you take into account

23   the purchase option dilemma, you take into account the fact

24   that this was, from their eyes, perhaps, a loan-to-own.

25      And so I asked Mr. Ferrao, "Was it important

AA01052

1    that the purchase option be an option you could exercise

2    unconditionally?"

3           THE COURT:  You're looking at G-1?

4           MR. PERLMAN:  Yup, G-1.  I asked him, "Was it

5    important that the purchase option be an option you could

6    exercise unconditionally, yes or no?"  And the answer is on

7    page 22, line 7, "No."

8           Now, you know, Judge, I'm not going to get a lot of

9    Perry Mason moments.  Those days, I think, are over.  But I

10   think, as exhibited by the email attached to Tab 2 that we

11   fought over last time, that's not a genuine statement.

12          So if you look at the email of Tab 2 with respect

13   to the purchase option, Mr. Ferrao writes on February 11 to

14   his team as to Item 2, "J knows what we need."  This is the

15   purchase option.  And then he adds, "I need to be able to

16   purchase unequivocally."  That's not qualified, that's not

17   conditioned, that's not limited.  That doesn't relate to

18   something else.  Unequivocally means unconditionally, period,

19   full stop.

20          This was the safety net.  This is why the risk of

21   not having it sent them into privileged communications that

22   night, which spiraled into the communication with Mr. Ferrao

23   that evening.

24          And remember, the emails that day on the 18th were,

25   "We're filing.  We just to need to work out this purchase

AA01053

1    option.  We're filing."  That was the day.

2         So there were no defaults.  The purchase option put

3    this whole thing sideways.  Why?  Because despite their best

4    way to cover it up at the deposition that it -- oh, it didn't

5    have to be unconditional, it had to be unequivocal.  And that

6    makes sense to everyone in this room.  There were tens of

7    millions of equity.  I get that.  I don't get the cover-up.

8         But they know where we're going and they're not

9    going to allow the Perry Mason moment other than this.  And

10   what's even odder, Judge, is Tab 3.  Tab 3 --

11        MR. BATTISTA:  Judge, I apologize for interrupting,

12   I'm sorry.  But the problem is we've been going now for over

13   two hours.  I'm not sure we're going to get done today and I

14   didn't know whether the Court perceived the same thing or

15   not, but he was moving on to a new subject, which is why I

16   wanted to interrupt him at that point.

17        MR. PERLMAN:  This is the -- I apologize for

18   interrupting you.  This is the same subject.  I'm trying to

19   go as quickly as possible.  It's hard to do it without

20   developing this aspect.  I just probably need ten more

21   minutes.

22        I'm not going to have an opportunity -- well, I'd

23   like to do more if I can.  If Your Honor's saying you're

24   going to have to curtail, I'll do so.  I would just ask for

25   ten more minutes.

AA01054

1          THE COURT:  Well --

2          MR. PERLMAN:  You know, we're basically having the

3  trial, if you will, in this --

4          THE COURT:  Without witnesses.

5          MR. PERLMAN:  Right, in this format, because the

6  facts aren't disputed.  And our cases are mirror cases.  They

7  claim we're in default.  Our defense is you're in default.

8          THE COURT:  Now, let -- just refresh my memory.

9  There's a partial -- a motion for a partial summary judgment

10  by Debtor, right?

11          MR. PERLMAN:  Yes, sir.

12          THE COURT:  Do you have a motion for summary

13  judgment?

14          MR. PERLMAN:  Yes, and let me answer that twofold.

15  In our opposition to Debtor's motion for summary judgment, I

16  moved for summary judgment.

17          THE COURT:  Okay.  Well, then we'll permit that.

18          MR. PERLMAN:  Correct.

19          MR. BATTISTA:  Except, Judge --

20          MR. PERLMAN:  And they -- let me --

21          MR. BATTISTA:  I'm sorry.  Except, Judge, your

22  scheduling order did not.

23          MR. PERLMAN:  Let me finish, if I could.

24          THE COURT:  Okay, well that's --

25          MR. PERLMAN:  The scheduling order didn't deprive

AA01055

1  me of our rights under Rule 56.  They were on notice that

2  pleading came with an affidavit.  They chose not to file a

3  contra-affidavit.

4         Now, pursuant to the scheduling order, I cross-

5  moved as well.  It's the flip side of the same issues.  And

6  they filed their response yesterday, I think.

7         MR. BATTISTA:  Monday.

8         MR. PERLMAN:  Now, the question there -- and I'd

9  like to have this discussion with Your Honor when you tell

10 me I'm done and I'm begging for ten more minutes.  But Mr.

11 Battista -- not the 30(b)(6) that they designated.  Mr.

12 Battista published an affidavit in opposition to my motion.

13 He's now a witness.  I don't think it's appropriate for him

14 to be arguing anything in this case.

15        I left that up to them.  I never set Mr. Battista

16 for deposition.  I wouldn't dare inconvenience him.  It's now

17 how I roll.  So when I did my 30(b)(6), I invited them to

18 tell me who it is.  They gave me their corporate reps.

19        So Mr. Battista's never been deposed.  He's not the

20 person most knowledgeable.  And it doesn't matter because now

21 he's injected himself as a fact witness and cannot represent

22 his client in connection with these proceedings, I think.

23        I'm not here to harm him or the process, but I

24 think it may be -- if there's harm, I think it's self-

25 induced.  I don't know why they chose to do it that way.

AA01056

```
 1    I would imagine that I should have had Mr. Battista
 2    designated as the 30(b)(6), but that's not how it panned out.
 3            I only say that in response to Your Honor's query
 4    about the pleadings.  And perhaps when I'm done with my
 5    presentation we can discuss that, to the extent Your Honor
 6    has any questions.  But I just wanted to answer it the way I
 7    did so you would understand our perspective under Rule 56 and
 8    with respect to the cross-motion.
 9            THE COURT:  Hmmm.  You can't make this stuff up.
10            MR. BATTISTA:  May I be heard, Judge?
11            MR. PERLMAN:  Yeah, I mean -- yes, you may be
12    heard.  We've got begging for more time.
13            MR. BATTISTA:  I heard.
14            THE COURT:  We've got whether there's any
15    additional time in our calendar, and we've got scheduling
16    issues related to that.  We've got Mr. Perlman's cross-motion
17    for summary judgment, whether that's properly before the
18    Court, and we've got your affidavit in response, which is
19    kind of extraordinary.  And what does that mean for the
20    representation of your client?
21            MR. BATTISTA:  Let me start with the last question
22    first, Judge.  A lawyer can be an advocate in a case even
23    though he's a witness.  We are not here today on this
24    motion --
25            THE COURT:  No, we're not --
```

AA01057

```
 1          MR. BATTISTA:  -- on Mr. Perlman's --
 2          THE COURT:  But we're here --
 3          THE COURT:  -- separate summary judgment motion.
 4          THE COURT:  But we're here today.
 5          MR. BATTISTA:  Certainly we are.
 6          THE COURT:  Okay.
 7          MR. BATTISTA:  And so what's before you today is
 8   our motion for partial summary judgment on the three issues
 9   we raised:  Breach of the escrow provisions, waterfall
10   provisions and the due diligence signoff.
11          Mr. Perlman filed a response.  Your Honor's
12   scheduling order said:  Battista, file your motion on this
13   date.  Mr. Perlman, respond to that on this date.  And if you
14   want to file your separate summary judgment motion, you can
15   do it by another date.
16          Mr. Perlman has conflated those two issues and is
17   trying to get summary judgment.  And I realize Rule 56 says
18   that, but Your Honor's scheduling order was very clear about
19   who is doing what when.
20          THE COURT:  Yeah.
21          MR. BATTISTA:  Okay.  Secondly, the motion that
22   he filed for his separate summary judgment is on different
23   issues.  He just said they're on the flip side.  They're not.
24   Mr. Perlman's motion for summary judgment says the Debtors
25   breached because we required a condition that was not in the
```

AA01058

1    Commitment Letter.  That's not what we're asserting in our

2    motion.  And the Debtors breached three or four other

3    provisions of the Commitment Letter that's not discussed in

4    our motion.

5          He's trying to assert we breached other provisions

6    that's not in our motion.  I filed an affidavit in opposition

7    to that when we filed our response.

8          Whether or not I argued those issues at that point

9    in time, we can discuss.  I'm not on the stand testifying

10   right now.  Mr. Perlman, if he would like, I assume has the

11   right, and I'm not going to even -- I'm not going to admit it

12   -- to depose me in respect of that.  But that's not up for

13   today.

14         What's up for today is the Debtor's motion,

15   responded to by Mr. Perlman --

16         THE COURT:  All right.

17         MR. BATTISTA:  -- and he just spent two hours going

18   through exhibits.  I have to go back and show Your Honor why

19   all those do not say what he says they said.  But that's for

20   my rebuttal.  We're certainly not going to finish that today

21   unfortunately.

22         THE COURT:  Well, it strikes me, just as a general

23   take on it, that if Mr. Perlman has gone through, with his

24   story line dangling from all these pieces of paper, and that

25   you are going to take me through your interpretation of all

AA01059

1  these pieces of paper, the buoy markers are really the

2  deposition testimony in between these emails, how could I not

3  conclude that there's genuine issues of material fact?

4        I mean, the emails say what they say but they're

5  anchored by testimony of people whose -- I mean, I think the

6  more back and forth there is, the more solidified I am in my

7  view that I need to hear the witnesses.

8        And I'm not criticizing you.  I mean, I know you

9  have a very clear story to tell, but it just gets murkier and

10  murkier.  Not murkier, but it just seems clear to me that

11  there are -- you said parallel cases.  I mean, there are two

12  divergent views of what happened.  And the parties talking

13  about redrafting things right up -- even beyond the time when

14  Mr. DiNardo asked Mr. Ferrao to take the loan -- may well be

15  enough in itself to have a trial.

16        MR. BATTISTA:  Judge, it may, except what Mr.

17  Perlman didn't tell you, or didn't focus on was PEPI on

18  February 16th told us emphatically no to the escrow

19  provisions, no to the waterfall provisions, and never

20  intended to give a due diligence signoff.  And that's what

21  Mr. DiNardo was talking about when Mr. Perlman read his

22  testimony.  We had no other options until Mr. Ferrao said yes

23  on Friday morning.

24        So when we said the only things being negotiated at

25  that point in time was the purchase option and the breakup

AA01060

1   fee, that was because they told us emphatically, after many

2   times asking, no, on February 16th.

3           THE COURT:  I don't think, having heard just what

4   I've heard -- you haven't finished --

5           MR. BATTISTA:  Certainly.

6           THE COURT:  -- you haven't had your opportunity.

7   And just to use a silly metaphor, it's like a food fight.

8   And I think the only way to really get to it is to have

9   witnesses under the lights, under oath, bringing their direct

10  testimony to bear on these issues, because I don't think this

11  -- I don't think the documents -- from what I've heard, the

12  escrow provisions were in their favor.  The waterfall is

13  certainly --the documents don't -- there is an ambiguity

14  there, and one which I -- again, you haven't had your chance

15  -- seems to favor PEPI as to whether judgment versus

16  foreclosure.

17          And as to the due diligence signoff, the Commitment

18  Letter doesn't say it has to be in writing, but as you saw

19  from my reaction, how could it not be?  If it's something

20  that's triggering a deadline, how could it not be in writing?

21  And there was a verbal, but then there was a refusal to back

22  it up in writing.  That -- and yet there's no -- there

23  appears to be no real reaction to that between the time that

24  happened and the default letter.

25          MR. BATTISTA:  Well, Judge, respectfully, that was

AA01061

1  the evening of February 16th.  We went to Mr. DiNardo -- Mr.

2  Ferrao on February 18th, and he said yes on February 19th.

3  That was Friday.  The default letter came out Monday, the

4  22nd.  It was pretty close in time after they said,

5  "absolutely no" to the due diligence signoff.  It was

6  pretty close in time.

7          THE COURT:  Yeah, but then you go back.  Best

8  practices, what would it have been?  You know, if this was

9  the only game in town, you'd say, "Look, we can't do this

10 loan."

11         MR. BATTISTA:  That's correct.

12         THE COURT:  "We can't do this loan unless X, Y and

13 Z," instead of going back and forth on drafts or not

14 responding to emails regarding drafts.

15         If I had to decide right this second, I'd say you

16 need a trial.  Alternatively, I would say that I'll give you

17 ten minutes and I'll give you another hour and a half.  It's

18 a tough call to make.  But it's clear here that there's more

19 than meets the eye.  I'm not impressed with the waterfall and

20 the escrow argument.

21         The other, the due diligence signoff, the question

22 is:  Was there a breach?  And it seems to me there's lacking

23 a document that puts them in breach on that.  There's nothing

24 in the Commitment Letter.  The Commitment Letter doesn't

25 require a written document.  They gave a verbal.  They said

AA01062

1    they wouldn't give a written.

2          And you never came back -- your side never came

3    back and said, "Look, it's got to be in writing.  That's what

4    we interpreted.  We need a written signoff that you're going

5    to be our DIP lender partner going in," or whatever --

6    however you would say it -- "or we can't do the deal."

7    Whatever.  However you would have said it, rather than the

8    emails that I just read about, you know, tell them we're

9    still talking to counsel, which is really just a deferral of

10   any resolution.

11         And so if I had to make a decision right this

12   minute, it would be to deny your motion.  And I'm inclined to

13   do that.  I don't know that you need another ten minutes.  If

14   you feel like I've been unfair to you, you can have some time

15   to respond.  And I've tipped my hand, which I don't need to

16   keep my hand a secret unless I'm in doubt.  But I've

17   explained why I would rule the way I would rule.

18         MR. BATTISTA:  Judge, if your ruling, as I

19   understand it, is that you believe that there are factual

20   issues that need to be further developed on those three

21   defaults, I understand that.

22         I don't hear Your Honor saying that you do not

23   believe based -- subject to whatever -- assuming the facts

24   were to come out to solve your concerns, you're not

25   prejudging, as I'm understanding it, whether defaults

AA01063

1    occurred on any one of those three or not.

2            MR. PERLMAN:  Well, if I may interrupt --

3            THE COURT:  No.

4            MR. BATTISTA:  Please let him respond, Mr. Perlman.

5            THE COURT:  Well, if I want to hear what he has to

6    say, I'll do that too.

7            MR. BATTISTA:  Of course.

8            THE COURT:  But --

9            MR. BATTISTA:  Of course you can do that.

10           THE COURT:  But that's a -- I mean that's a fair

11   question.  That's a fair question.  And my answer to that is

12   I'm not prejudging it.  Based on just what I've heard, which

13   omits witnesses.

14           MR. BATTISTA:  And omits a number of things that I

15   would prompt to the Court.

16           THE COURT:  Okay.  And it may.  I would certainly

17   keep an open mind as to whether you could make your case at

18   trial.  I think what I said was I'm not impressed with the

19   argument that the waterfall and the escrow provision dispute

20   was a default.  I'm not impressed with that argument, but I

21   haven't prejudged it.

22           And to the extent that you've heard that analysis,

23   it may enable you to craft a stronger presentation at trial

24   with witnesses.

25           And I've talked about the due diligence signoff and

 1   the three-day provision.  And the real question comes down to

 2   whether PEPI breached.  And I think there are factual issues

 3   as to whether PEPI breached and whether the Debtor waived --

 4   which is one of your arguments -- waived it by just pushing

 5   them back rather than giving them a clear response that had

 6   to be cured or resolved by a certain date and then you're in

 7   default.

 8            MR. BATTISTA:  Notwithstanding no obligation to be

 9   given notice and opportunity to cure.

10            THE COURT:  Yeah, but then there was no obligation

11   to have a due diligence signoff in writing.  That's kind of

12   my intuitive reaction, like how could there not be?  How

13   could it not be in writing?  How can you trigger a three-day

14   time clock without something in writing?  But it doesn't say

15   that.

16            It's the same argument that you're making.  There's

17   no obligation to give a written notice of default.  Well, how

18   could you -- you'd always have this uncertainty that we're

19   dealing with now.  If you don't give someone a chance to cure

20   or to respond or -- that's what happens, when you don't give

21   someone a written notice of intent to default them.

22            I think there's just -- I don't think the documents

23   make a clear case for a breach without a trial.

24            Now, Ms. Murphy -- I don't know if you all want to

25   come back, I don't know if we're beating a dead horse, but

AA01065

1  that's my reaction to what I've heard over the last four

2  hours.  And I don't know if you have any more time with Judge

3  Delano or not.

4          MR. BATTISTA:  We haven't spoken to Judge Delano,

5  my goodness, in months, Judge, to be honest with you --

6          THE COURT:  Well --

7          MR. BATTISTA:  -- on this issue.

8          THE COURT:  And I don't know if -- yeah, and

9  there's apparently more issues because, as you said, Mr.

10  Perlman's filed a motion for summary judgment on some other

11  grounds.

12          MR. BATTISTA:  Respectfully grounds that are not in

13  any of his pleadings but that's one of our responses but it's

14  a different issue.

15          THE COURT:  And yet to make out your case, it seems

16  to me that your client's deal -- here's what I see as the

17  factual issue that the documents just don't address.  I think

18  this is the way I would put it.  Your theory is that this was

19  all kabuki theater, or at least at some point it turned into

20  that, that your client had the money to do the deal.

21          Somebody approached somebody to be the DIP lender.

22  Maybe your client saw an opportunity to pick up equity if the

23  Debtor couldn't rehabilitate.  The Debtor, seeing equity in

24  the properties and a future fortune to be reaped, didn't want

25  to expose himself to that risk.  But that's one piece of it.

AA01066

1       The other is that either from the beginning or

2   somewhere through the process your deal became the backdrop

3   of a justification for an insider DIP loan.  I think that's a

4   genuine issue of material fact.  I don't think the documents

5   say that.  That's an inference that has to be drawn from

6   either someone's admission -- and I haven't seen it.

7       MR. PERLMAN:  I have it.  That's my next ten

8   minutes.

9       THE COURT:  What?

10      MR. PERLMAN:  That's my next ten minutes.  I have

11  it.

12      THE COURT:  Okay.

13      MR. BATTISTA:  Judge, respectfully it doesn't, but

14  I guess we can go back through it and deal with it.

15      THE COURT:  Well, that's on his motion for summary

16  judgment but -- or maybe not.

17      MR. PERLMAN:  No, on this.  And I was waiting for

18  the opportunity to speak, Judge.  I don't want to interrupt

19  either of the parties, when you asked me to wait.

20      But I heard everything you said, but I would just

21  suggest respectfully that because the opposition --

22      THE COURT:  Before I lose my train of thought --

23  I mean, your theory is that it was a theater to have these

24  documents prepared with the essential terms set forth.  They

25  never had any intention -- at some point they vacated their

AA01067

1  -- abandoned their intention to go forward with PEPI, and

2  used this as a framework to justify an insider DIP loan

3  versus what would be a very understandable concern, by the

4  owner of a valuable company, that a third party DIP lender

5  would end up taking the company out from under them.

6          And then there are all these side issues about an

7  insider DIP priming loan, which we eventually worked through

8  during the Chapter 11 case.

9          What I've heard so far doesn't prove your case or

10  MR. Battista's case.  And you say you have ten more minutes.

11  And I guess in fairness I have to let Mr. Battista regroup

12  and give me whatever else you want to give me.  If nothing

13  else, then to perhaps reprogram -- reopen my mind in the

14  event that we do go to a trial.  And I think --

15          MR. BATTISTA:  I think that will be fair, Judge.

16          THE COURT:  And I think that's fair.  I do think

17  that's fair.

18          MR. PERLMAN:  Well, that's -

19          THE COURT:  And we have -- and Ms. Murphy has given

20  me some times.  Now --

21          MR. PERLMAN:  Certainly, but -- I apologize.

22          THE COURT:  I interrupted you interrupting me.  So

23  finish your thought, if you can.

24          MR. PERLMAN:  Thank you.  Thank you, Judge.  When

25  I was waiting for the opportunity to, I guess, suggest or

AA01068

```
 1   remind or present to Your Honor is that I formally moved for
 2   summary judgment on these issues.  They had actual notice.
 3   They saw the affidavit.  The affidavit was uncontradicted.
 4   Under 56, I can get summary judgment.
 5        Based on the evidence presented today, including
 6   that affidavit, the issue of an alleged default of the escrow
 7   or the waterfall are gone.  There is no way that Your Honor
 8   should be able to think there's any issues of fact that would
 9   deny me the opportunity to walk out with a ruling by Your
10   Honor that says there was not a default.
11        That's different than having to do this all over
12   again based on the same evidence, if you will.  But the time
13   to contest it was with a contra-affidavit.  The time to
14   present it was when they went forward to give you evidence of
15   the breach.  They didn't present any.  It's not like I
16   rebutted it.  They didn't present any.
17        And the majority of my arguments, Judge, were
18   legal, having nothing to do with an email or what have you.
19   The escrow was a benefit -- clearly I established that -- in
20   favor of PEPI.  It was entitled to be waived under the law.
21   That's what they did with Gulf Bay.  It could never be a
22   default.  That's even assuming those rights were enforceable.
23   Which they're not.  I showed you Florida Supreme Court case
24   law on that --
25             THE COURT:  Right.  Don't -- let's not be
```

AA01069

1    repetitive.

2            MR. PERLMAN:  Okay.  But I'm just asking Your Honor

3    to keep that in mind, that all this perhaps was not done for

4    nothing, that the evidence and the arguments were sufficient

5    to dispose of those issues once and for all.  And that's the

6    only thing that I was trying to jump in and say.

7            THE COURT:  All right.

8            MR. PERLMAN:  Now, with regard to your final

9    remarks and my last ten minutes -- and then I guess we'll

10   discuss how Your Honor would like to proceed, I would

11   start --

12           THE COURT:  Well, I have time, but let's give him

13   his ten -- go ahead.

14           MR. BATTISTA:  One comment, Judge, because I can't

15   leave it out there.  And I guess I'll get to it.  Mr. Perlman

16   has said several times in his argument that Mr. Fine's

17   affidavit is uncontradicted and therefore it is established

18   fact for purposes of summary judgment.

19           There's a line of cases that are well-known that

20   says you cannot submit an affidavit that contradicts your own

21   deposition testimony or that of your clients.

22           We have shown that -- and we will show -- that his

23   affidavit contradicts what his clients testified to at

24   deposition.  So we didn't have to submit additional evidence

25   showing that that was contradictory.  It was already in the

AA01070

```
 1   record.
 2            So Mr. Perlman can finish his ten minutes, and we
 3   can decide what we do in the --
 4            THE COURT:  What we have is the afternoon of May
 5   6th and the afternoon of May 11th, and that's --
 6            MR. BATTISTA:  I'm actually in court all day on the
 7   6th in Miami, so it doesn't work for me.  The 11th may work.
 8   What day of the week is that, Judge?
 9            THE COURT:  That's a Monday, I think.
10            MR. PERLMAN:  Yeah. That's not going to work for
11   me, I apologize.
12            THE COURT:  All right.  We'll look for another time
13   while you're taking your time.
14            MR. PERLMAN:  Oh.
15            THE COURT:  Okay, go ahead.
16            MR. PERLMAN:  Thank you.  If we can return back to
17   the note book, category --
18            THE COURT:  But the irony is not lost on me that
19   the argument on summary judgment is going to be over three,
20   three and a half days, different pieces of three and a half
21   days, like you could try things in that amount of time.
22   Maybe not this, but --
23            MR. PERLMAN:  Well --
24            THE COURT:  Go ahead.
25            MR. PERLMAN:  -- I hear you.  We're sort of, I
```

AA01071

```
 1    thought, in theory doing that now, but --

 2            THE COURT:  Well, this is very helpful to me but

 3    I've told you my misgivings about the summary judgment about

 4    doing this on summary judgment.

 5            MR. PERLMAN:  Certainly.  Your Honor --

 6            THE COURT:  With the asterisk that this is much the

 7    same presentation that I would see at trial.  This summary

 8    judgment argument itself has been extraordinary on both

 9    sides, in terms of its depth and intensity.

10            MR. PERLMAN:  Certainly.

11            THE COURT:  You may finish.

12            MR. PERLMAN:  Thank you.  Okay, and so if you go

13    to Tab G-3, what I have is an email on February 20 from Mr.

14    Ferrao to his team.  And it states emphatically, in the

15    highlighted portion -- well, let me back up.  You've got the

16    -- Ms. Houk commenting -- let me back up to the bottom one,

17    sorry.  Okay, so it's starting over.

18            If you look at the bottom of Tab 3, you have an

19    email from Stearns Weaver to the group dated February 20.

20    And it says, "Attached is a clean and blacklined version,

21    paren, lined against the latest PEPI draft of the Gulf

22    Capital DIP loan agreement."

23            So they clearly stole the deal, including the docs.

24    They had the ability to do so but here was a million dollar

25    breakup fee.  So I think Your Honor understands why they
```

1   didn't give notice and why they trumped up the default.

2          Anyways, the next email above that is at 8:21 p.m.

3   to the same group.  And what I highlighted was the comment

4   that says, "I think both Paul and Trish feel that there are

5   hurdles to getting insider DIP approved."  No surprise there.

6          But what is surprising is Mr. Ferrao's response on

7   the very top on the same day, February 20th, where he says,

8   "In fact, I heard from Paul and Trish that they wanted Gulf

9   Bay Capital to make the DIP loan, and they mentioned it very

10  early on."

11         THE COURT:  Okay.

12         MR. PERLMAN:  So, the next are a series of

13  transcripts that I think are quite telling, now that Your

14  Honor has seen the dialog on the 18th and 19th and 20th,

15  where PEPI is trying to get the deal done.

16         And first is the hearings from March 3.  This is

17  Tab 4.  And the Court, on page 204, is asking:  "You learned

18  that they" -- they is PEPI, Judge, and this is kind of

19  important.

20         "You learned that they declared the default

21  and would walk away and won't lend the rest of the money;

22  correct?"  This is Mr. Ferrao.  You know sitting there right

23  now the answer's no.  He says, "Yes."

24         And then Mr. Battista tries to rescue the

25  situation.  "Mr. Ferrao, did PEPI declare the default or did

AA01073

Case 8:10-cv-00108-JDW-MAP Case 8:10-bk-00809-KRM Doc 19-2 Filed 03/12/2011 Page 730 of 9536 Page 330 of 653 PageID 7591

92

1   the Debtors declare the default?"  Answer:  "We declared the

2   default."

3          So you go to the next page, page 206.  The Court --

4   are you there, Judge?

5          THE COURT:  Not yet.

6          MR. PERLMAN:  Okay.

7          THE COURT:  Okay, page 206?

8          MR. PERLMAN:  Yeah.

9          THE COURT:  Uh-huh.

10         MR. PERLMAN:  "The Court," line 5.  The question,

11  "You had decided that because they were unable to come to the

12  table and close the deal, you got tired of it and said

13  default it."  The witness:  "Yes."

14         Judge, you know that didn't happen.  We were unable

15  to come to the table and close the deal?  They abandoned it.

16  The day they were supposed to file, they ran to somebody

17  else, without telling us, behind our back.  And we are not

18  coming to the table to close the deal?  They didn't come to

19  the table to close the deal.

20         And he says, "Yes."  This is under oath to this

21  Court, trying to sell a priming lien.  Completely

22  contradictory to the facts.

23         Question, at the bottom, "And was that the first

24  time since Chapter 11 was considered that you individually

25  considered making a DIP loan in the amount of 25 million to

AA01074

1  the Debtors?"  "Yes."

2        I'm not sure that that's a hundred percent

3  accurate.  He was told by his advisors to do it.  Nothing's

4  offered.  That's shielded.  Well, Judge, I was told early on

5  to do it.  Nope, don't want to tell you that.  Why?  Because

6  I'm trying to sneak this one in on an emergency basis, we

7  kept PEPI in the dark.

8        This is important stuff.  You need to have candor

9  to a tribunal.  This is the insider asking for a priming

10  lien, saying anything he thinks he has to say, none of which

11  is accurate yet.  And what's interesting, Judge, on page 208,

12  question -- I'll wait until you're there.  Are you there?

13        THE COURT:  I am.

14        MR. PERLMAN:  Okay.  Question:  "And you have a

15  loan to Florida Financial as well."  "Yes."  Well, what's

16  that, Judge?  You probably don't remember, but he was already

17  funding the Debtors through Florida Financial.  He was

18  providing this loan.

19        Question:  "Between the time that you learned of

20  the PEPI alleged default and the time that the Debtors filed

21  bankruptcy, how much time was that?  How many days are we

22  talking about?"  Answer:  "I learned maybe three -- maybe

23  three days or four days."

24        So, Judge, in that email where you said they ran

25  the compared version of the PEPI version for Gulf Bay on the

AA01075

1    20th, within the three days of him stealing the loan and

2    filing BK, they did what took the parties three months, and

3    they don't want to pay the breakup fee.  They literally stole

4    the deal.  In three days.

5              "Is that where this DIP loan, the Gulf Bay Capital,

6    was negotiated and finalized?"  "Yes."  Virtually impossible

7    to do.

8              THE COURT:  I guess the one piece of that argument

9    I haven't -- I'm not acquainted with, is whose loan documents

10   were these?  I mean, I know they were back and forth, but

11   you make it sound now as if this was a package that PEPI

12   provided, or that the starting documents were provided by

13   PEPI.

14             MR. PERLMAN:  Well --

15             THE COURT:  I mean, if they were on Trish Redmond's

16   word processor, you know -- you make it sound like they stole

17   the loan documents that PEPI prepared, and I haven't heard

18   that yet.

19             MR. PERLMAN:  Right.  Well, that's because I'm not

20   going to be able to get to it today, but there's provisions

21   in the Commitment Letter that preclude them disclosing the

22   Commitment Letter and things of that nature.  So that was a

23   restriction under the Commitment Letter that they

24   intentionally violated when they took this document.

25             I mean, the purpose is obvious.  You can't sort of

AA01076

1    sidestep the breakup fee.  Either there's a lender and you

2    pay or that's it.  But you can't take our deal and give it to

3    somebody else without the breakup fee.  So -- and there's

4    provisions in there.

5          So on the next page, 209, he says:  Answer, "Well,

6    we had to breach PEPI because they weren't coming to the

7    closing table, we had not options.  So my initial reaction

8    was that we would do it the same as PEPI because that was

9    negotiated with a third party in very hard negotiations."

10         So we were coming to the closing table?  That's not

11   proper.  Again, they're trying to suggest that we stepped

12   into the PEPI deal, it's a third party deal, so no one should

13   be considered that I'm an insider, by design.

14         So if you turn to Tab 6, page 197 of the hearing

15   transcript before Your Honor.  And you've got Mr. Ferrao

16   testifying -- oh, Mr. Battista arguing that Mr. Ferrao

17   testified he didn't want to make the DIP Loan.  But by the

18   way, you know, the Debtor suggests that the option wasn't

19   critical because Mr. Ferrao could have just paid off the

20   loan, something like that.

21         That should be offensive to Your Honor, because you

22   know to approve a DIP loan, he had to get on the stand and

23   the Debtor had to present evidence to Your Honor that said

24   there's no other unsecured Facility available, as a matter of

25   law, period, to get a priming lien.  That's a condition

AA01077

1    precedent Your Honor had to determine.

2           And now they show up and say, "Oh, well, he could

3    have just wri -- he could have just paid it off."  Really?

4    That ship has sailed.  They told Your Honor that could never

5    happen, it can't happen, and it won't happen.  Hence, approve

6    this priming lien.  And now they show up and they're like,

7    "Well, he could have just paid it all off."  Not so simple.

8           Anyways, Mr. Battista states at the end, on line

9    23, referring to Mr. Ferrao, "He had to make a decision over

10   the weekend, once we lost the DIP Lender."  When did the DIP

11   lender lose -- get lost?  We were left hanging.  We didn't

12   lose the -- they lost the DIP lender?  We were chasing them

13   for everything.  Again, the perception that was presented to

14   the Court was not accurate.

15          And if you look -- I'm just looking for my closing

16   argument here.  If you could turn to Tab 2, Judge, page 2.

17          THE COURT:  Well, I was just looking at page 197 in

18   the summary, where it says -- you've highlighted it, but I'm

19   not sure you just read it -- where Mr. Battista said, "This

20   waterfall and these provisions, every one of them was

21   dictated to us by the company, PEPI Financial."

22          MR. PERLMAN:  We know that's not true.  I mean,

23   that's laughable.  If anything's clear, Judge, that's a

24   complete misstatement.  PEPI is being asked to limit their

25   collateral to an order that the Debtor designed.  And in

AA01078

```
 1   exchange, they're going to make it go really fast.  This is
 2   not right.  This is what happened.  It's not right.
 3            THE COURT:  All right.
 4            MR. PERLMAN:  And to conclude, Judge, if you can go
 5   to H-2.
 6            THE COURT:  Okay.
 7            MR. PERLMAN:  Because this is important.
 8            THE COURT:  All right, these are Fiddler's
 9   responses.
10            MR. PERLMAN:  That's right.  Now, in Tab 3, I've
11   got a series of admissions by Mr. DiNardo that he basically
12   used the PEPI Commitment Letter and loan docs to commit -- to
13   prepare the Gulf Bay Facility.  But that's not what he said
14   in his Request for Admission Responses.
15            So if you look at the first one, 82, "Admit that
16   the terms and provisions of your DIP financing agreement with
17   Gulf Capital is based on the term sheet."  "Denied."
18            "Admit that the terms and provisions of your DIP
19   financing agreement with Gulf Capital is based on the
20   Commitment Letter."  "Denied."
21            "Admit that the term sheet is substantially
22   similar."  "Denied."
23            "Admit that the Commitment Letter is substantially
24   similar."  "Denied.
25            "Admit that Ferrao is not a party to the term
```

AA01079

1    sheet."  Finally we get an admission.

2            I'm not going to belabor the point, Judge, but

3    if you look at Tab 3, on the first page, Mr. DiNardo

4    acknowledges that he was precluded from disclosing the

5    Commitment Letter to any other entity.  Clearly, that's Mr.

6    Ferrao and he's not a party.  He just said so in the

7    admission.

8            And if you look at the next page, "Was the PEPI

9    compared to the terms of the loan for Gulf Bay Capital?"

10   Answer:  "I recall seeing a document that does a comparison

11   between the Commitment Letter that PEPI proposed, and we

12   executed with PEPI, and the loan that we were going to

13   create, yes."

14           He says, again, "I know there was a comparison done

15   between the loan document and PEPI's Commitment Letter."

16           Question:  "Were there comparisons done between

17   PEPI's Commitment Letter and Gulf Bay's Commitment Letter?"

18   "I saw a document between PEPI's Commitment Letter and Gulf

19   Bay Capital."  "Loan or term sheet?"  "I'd say the term

20   sheet, yes."

21           Remember, these are all things he said in the

22   admissions no.  No different than false testimony at trial.

23   And it continues on page 9.  "Do I understand this email to

24   suggest that the Gulf Bay Capital DIP loan was based on the

25   version prepared with regard to PEPI?"  "Yes."

AA01080

1          Same question in the Request for Admissions, and

2     denied.  Now, it's yes.

3          This is the part that Your Honor was asking that I

4     didn't get to about them basically substituting Gulf Bay in

5     at PEPI's expense.  And here's the best part, on the

6     following page, page 10.

7          "Question:  Was the PEPI Commitment Letter used to

8     formulate the Commitment Letter between Gulf Bay and

9     Fiddler's?"  The answer, which is odd, starts off by saying,

10    "No," but then he explains.

11         THE COURT:  Where are you now?

12         MR. PERLMAN:  Page 10.

13         THE COURT:  Oh, yes, I see it now.

14         MR. PERLMAN:  "The PEPI Commitment Letter was used

15    as a benchmark."  I think Your Honor said that, and that may

16    have been the word you used not ten minutes ago.  "Used as a

17    benchmark to see what PEPI had, and what we had to do to

18    come up with a more favorable DIP loan than what PEPI was

19    producing?"

20         Why?  On line 15.  "Because we knew we'd have to

21    face the concept that it was an insider DIP loan."

22         Question:  "Gulf Bay Facility did not include a

23    purchase option, correct?"  "Yes."

24         Problem solved.  Purchase option problem solved.

25         Now, I have not -- I'm not going to overstep my

AA01081

1    time, Judge.  You've been extremely generous.  But there is

2    more, and I think it's quite compelling.  I think Your Honor

3    hit on it earlier in terms of the good faith and fair

4    dealing.

5           The obligation to provide notice and a cure, which

6    I think is inherent based on the conduct of the parties that

7    are charged with an obligation to negotiate final loan

8    documents.  And there's about eight things that the parties

9    had to do that required an applied covenant of good faith.

10           Mr. Ferrao agreed -- I'm sorry, Mr. DiNardo agreed,

11    in Tab 1 of the next section, that the parties were required

12    to negotiate in good faith.  He answered yes.

13           Then on the following page, I asked, "Does that

14    require effective communications?"  "Yes."

15           By definition, Judge, he was obligated to put it to

16    PEPI and say, "This is it or we're going elsewhere."  Whether

17    you call it a good faith obligation, that he admits himself,

18    or a covenant in good faith and fair dealing, or under the

19    case law we cited that they cited as well, both courts stated

20    that the parties have an obligation to negotiate in good

21    faith, which means neither party gets to abandon.

22           You don't get to abandon.  So this ties in with

23    Your Honor's point about, you know, you guys are ready to

24    file.  There's no notice of a default, and you don't even

25    give one later.  In fact, you kept it secret.  Why?  So that

AA01082

1   they can run to court and create this appearance that sold
2   the DIP Facility to an insider.  Which they did.

3           And, yeah, Judge, I raised issue in my summary
4   judgment that may be outside the facts in the complaint.  Do
5   you know why?  When we came back here to Your Honor and I was
6   requesting appropriate time to build my case, and I basically
7   came out with a schedule.  But within the schedule, I had --
8   I was fighting for documents, I had to go get discovery, I
9   had to get the transcripts and I had to file a response, and
10  then cross-move.

11          Only until I walked out with these documents that
12  day, only until we took the deposition and heard all of this
13  testimony that contradicted the testimony to Your Honor, that
14  contradicted the Request for Admissions, that shielded us
15  from what really happened at the time in question, that
16  showed that they were trying to take the loan for obvious
17  reasons -- only until I had all that information, that was at
18  the deposition in connection with the discovery.

19          So I can't be prejudiced because they tried to move
20  quickly and, you know, play gotcha.  I can understand why.
21  This is compelling stuff.  And this is why I cross moved.
22  And this is why I don't have a contra-affidavit.

23          But I stand again, Judge, I don't know that you
24  need a trial.  This is the record you saw -- you know, Judge,
25  this is a scene out of Chicago.  I'm sure you're familiar

AA01083

1    with the play or the movie.  And what you hear the other side

2    saying, I think which was from Richard Gere, they're saying,

3    "Hey, Judge, are you going to believe the words coming out of

4    their mouth or your own lying eyes?"

5         I have walked you through -- your eyes aren't

6    lying.  I have walked you through the record.  These are

7    documents.  The most compelling ones were issued by agents of

8    the Debtor.  There could never be a default in connection

9    with the escrow or the waterfall.  And if it was, it was

10   waived.  Same thing with the due diligence.  If so, it was

11   waived.

12        And if it was -- even if there was a default, they

13   had the obligation to give notice.  They never did that.

14   They acknowledge effective communicating that they're lying

15   to us about what's happening.  PEPI's chasing them on the

16   deal for several days.  Phone calls, emails.  "Hey, we're

17   waiting for this, we're waiting for that, where is it?"  You

18   know, nothing.

19        We're conferring when they've already conspired to

20   hatch the plan to give the loan to Aubrey, and they come in

21   to Your Honor, or Judge Paskay, and tell half truths.  That's

22   the record.  That's it.

23        So even if -- even if PEPI defaulted on all three

24   and he waived it when they were getting ready to file on the

25   18th and were finalizing the purchase option with no word of

AA01084

```
 1    anything, and they waived it when they never provided a

 2    notice of default, and breached their duty, and abandoned

 3    the negotiations and ran to PEPI -- I'm sorry, to Gulf Bay

 4    Capital.

 5          And I say that because the sworn testimony of the

 6    Debtor is, "After Aubrey returned on the morning of the 19th

 7    and said I'll do the loan, did I instruct Mr. Battista to

 8    default you."

 9          That's not how it works.  Think about it.  Why did

10    it work that way?  What if they defaulted PEPI and PEPI said,

11    "We're not doing it without this general release, what have

12    you," and they have no loan, and Aubrey says, "I'm not doing

13    it"?

14          So of course they went to Aubrey first.  But the

15    question is why'd they keep it a secret?  Because they had

16    this agenda of an insider priming lien and inviting PEPI to

17    that opportunity would have wrecked the party.  Because that

18    purchase option had to be unequivocal.  It had to be

19    unconditional.

20          This is a guy who's told from day one he should be

21    the lender.  "Oh, I've never considered being a lender,

22    Judge.  Never, ever."

23          This is -- I can't make this stuff up.  And this is

24    the record.  We can have witnesses.  It's still going to be

25    all the same testimony, all the same arguments, all the same
```

AA01085

1  legal theory.  Everything they said was right, but they never

2  gave notice, and I contend that that's an obligation, okay?

3  It's an obligation under Florida law, and we cite cases, as

4  do they, that they can't abandon.

5       Both sides rely on the same case.  If that's true,

6  then it doesn't matter, because they breached by abandoning

7  the loan and going off and hatching a secret plan for Mr.

8  Ferrao through Gulf Bay.  That ends everything.

9       It renders all these other issues moot, as does the

10  emails on the 18th, "Hey, we're filing."  Really?  All the

11  defaults, I guess, don't exist.  And that's consistent with

12  Mr. DiNardo's testimony.  "We are pressing forward, we're

13  going forward.  I gave strict marching orders.  Let's go."

14       So the email comes out on the 26th, they file on

15  the -- I'm sorry.  The default -- the termination letter

16  comes out on the 22nd.  They file, I believe, starting on the

17  23rd, and that's all she wrote.

18       So I know it 's a lot, Judge.  I think that it was

19  helpful for me last time to give you a 10,000-foot level

20  because I don't think we expect that to belabor Your Honor

21  with the briefs.

22       We have lived with this case for awhile and it's a

23  bit much to sort of spill out to you in an orderly fashion,

24  you know, in one afternoon.  So I think coming back today was

25  extremely, extremely helpful.  I know that for sure.

AA01086

1        And what I tried to do was instead of going back

2 and forth between all the different filings and binders, I

3 basically put my case in chief, if you will, in an organized

4 manner to walk you through everything.  And I think factually

5 and legally Your Honor could conclusively rule that there was

6 no default.  And if there was, it was waived.

7        And if it wasn't waived, there was no default

8 under the Commitment Letter because they failed to give the

9 requisite notice that they acknowledge by citing the same

10 cases required under the case law that says the parties are

11 obligated to negotiate in good faith and not abandon the

12 documents required under the Commitment Letter.

13        And I do cite, Judge, a Florida case that dealt

14 with a Commitment Letter, and it swept into -- it's the

15 termination of a Commitment Letter.  And it cited other

16 Florida case law.

17        This, I believe, is Tab 5.  Tab 5.  This was

18 actually a breach of a Commitment Letter.  And initially

19 there was a deadline.  And the parties agreed to extend it.

20 That deadline was never established.  And so one party

21 terminated it.

22        And the Court said, "Nope, you have to give

23 notice."  There was no notice in that termination.  And they

24 cited Florida -- I think a Supreme Court case.  There was no

25 notice provision because at that time the date was extended

AA01087

```
 1  indefinitely.

 2          And the Court, like Your Honor stated earlier,

 3  you've got to give notice.  And you should be offended as to

 4  why they didn't.  We know why.  Now, in the cases we cite, it

 5  was in part because the interest rate dropped and so the

 6  borrowers were shopping the loan.

 7          There's no Perry Mason moment, no one confesses,

 8  "Well, that's why we breached, because we wanted the

 9  different Facility that was cheaper.  The rates were dropping

10  and we wanted to take this loan from ABC Company."

11          That didn't happen.  But the Court inferred that

12  that's what happened because the evidence was that the

13  interest rates were dropping and so they had the ability to

14  get a better, cheaper loan.

15          That's what happened here.  When you look at the

16  purchase option at the end, the last two days of the deal,

17  you know, with the release being taken out in lieu of -- in

18  lieu of.  And us saying no, and them going dark, and having

19  their meetings, and selling Mr. Ferrao on the concept.

20          That's our version of what happened in those other

21  cases, as to why they switched and breached.  And in all

22  those cases, like here, it was the lender chasing the

23  borrower to do the Facility.  Breaching parties don't chase

24  the deal.  It's just the way it is.

25          So who was chasing who in this case?  PEPI was
```

AA01088

```
 1   chasing the Debtor.  Who was not chasing whom?  The Debtor
 2   abandoned PEPI.  And if PEPI was in breach after all this
 3   work, why would they be chasing a deal that they're not going
 4   to fund?  For the sport of it?  This was expensive, time
 5   consuming.  The legal description was 50 pages.
 6           This was a significant deal.  It took a lot of
 7   resources to get their head around, and everybody was
 8   committed to that.  They know that.  That's why they kept it
 9   secret.  That's why they kept it secret.
10           So I don't know, Judge, how you want to proceed.
11   I'm not going to be presumptuous enough to tell you.  I think
12   you know my arguments on --
13           THE COURT:  Well, there are a couple things, here.
14           MR. PERLMAN:  Yeah.
15           THE COURT:  One is:  I think in order to be fair to
16   Mr. Battista, I need to let you regroup and have some
17   additional time.
18           MR. BATTISTA:  Thank you, Judge.
19           THE COURT:  That's Item No. 1, additional time for
20   Mr. --
21           MR. PERLMAN:  That's outlandish.
22           THE COURT:  What's that?
23           MR. PERLMAN:  I'm teasing.
24           THE COURT:  Oh.
25           MR. BATTISTA:  One hour to four hours is a little
```

AA01089

1    unfair.  One to four.

2            THE COURT:  Well, yeah.  Additional time for Mr.

3    Battista.  I want to make sure that all of the references --

4    you've taken me through bits and pieces of documents, which

5    was very helpful to my education of your side.  Whether

6    they're from documents that everyone acknowledges are in the

7    record for these motions.

8            MR. BATTISTA:  Judge, I would have to go back and

9    confirm.  I think for the most part they are.  They are, of

10   course, just snippets, without the full story --

11           THE COURT:  No, they are --

12           MR. BATTISTA:  -- would be my presentation.

13           THE COURT:  -- but they would refer back to things

14   in the record.

15           MR. PERLMAN:  Everything is, with the exception of

16   the hearing transcripts from the bankruptcy case that are

17   attached in that last section.  I mean, they're part of the

18   record, but not in this adversary, with the exception of what

19   I gave you in the notebook.

20           THE COURT:  The depositions are part of the record?

21           MR. PERLMAN:  Absolutely.

22           MR. BATTISTA:  Yes, sir, they are.

23           THE COURT:  The Request for Admissions?

24           MR. PERLMAN:  Absolutely, everything --

25           THE COURT:  The emails?

AA01090

```
1           MR. PERLMAN:  Everything Your --

2           THE COURT:  The Commitment Letter, the --

3           MR. BATTISTA:  Yes, sir.

4           MR. PERLMAN:  Everything Your Honor has seen --

5           THE COURT:  Okay.

6           MR. PERLMAN:  -- with the exception of the hearing

7    transcripts from the main case are part of this record.

8           THE COURT:  Okay.  That's the other thing.  And

9    some additional time until we come back again.  I hate to

10   make you come back, but I'm certainly willing to give you the

11   time.  This is important.  There are two thoughts I have.

12          One is:  I think I need to revisit -- or at

13   least -- just revisit and think more about the answer to your

14   question.  Is my mind closed on some or all of the issues to

15   where I can rule today finally, and you go take your appeal,

16   either side, or whether it's simply come back for a trial.

17   I want to think that through.

18          MR. BATTISTA:  Judge, respectfully, I think you can

19   only do that after you hear my rebuttal to what --

20          THE COURT:  Oh, absolutely.  Absolutely.  I just

21   want to make sure that we have all the tools, all the

22   elements that we need to go one way or the other.  And I

23   certainly want to hear what you have to say.

24          And whether there's any benefit whatsoever in you

25   seeking out the services of Judge Delano, whether how this
```

AA01091

1  has played out, and maybe my reactions, would cause either of

2  you to think -- think about that, or whether you want to just

3  keep pushing into the unknown.

4  And we can do either one.  I'm here for that.  So

5  you want to think about that between now and then.

6  I have the 11th in the afternoon.  I heard the 6th

7  is not good.  Did I hear the 11th is not good?

8  MR. PERLMAN:  Unfortunately, that is correct.

9  THE COURT:  Okay.  And now I have another date

10  here.  May 13th in the afternoon?

11  MR. BATTISTA:  It's a Wednesday, Judge?

12  THE COURT:  That's a Wednesday.

13  MR. BATTISTA:  I think that may work.  I'd need to

14  check my calendar.  I think that may work.

15  THE COURT:  What time, Ms. Murphy?  1:30?

16  COURTROOM CLERK:  Yes, sir.

17  THE COURT:  You're going to have to move something;

18  aren't you?

19  COURTROOM CLERK:  Probably so, sir.

20  THE COURT:  I've pushed her to the limit already

21  today in terms of moving things, and it's --

22  COURTROOM CLERK:  I'm sorry, sir.  Which day are we

23  speaking of again?

24  THE COURT:  May 13th.

25  COURTROOM CLERK:  Thank you, sir.

AA01092

1           THE COURT:  Monday.

2           MR. BATTISTA:  Wednesday.

3           THE COURT:  I mean, Wednesday.  Wednesday.

4   Wednesday.

5           COURTROOM CLERK:  Actually, we've had a hearing

6   that settled, so 1:30 would be fine, sir.

7           THE COURT:  Okay.  Wednesday, the 13th.  I'm sorry,

8   what time?  1:30?

9           COURTROOM CLERK:  Yes, sir, I apologize, 1:30.

10          THE COURT:  So you will have three and a half

11  hours.

12          MR. BATTISTA:  Thank you, Judge.

13          THE COURT:  I mean, you won't need that.  And I

14  hate to keep the ping pong ball going.  You have a motion for

15  summary judgment.  I'm inclined not -- I don't know what to

16  do about that, whether I should let you argue that then and

17  just --

18          MR. BATTISTA:  It's not been briefed, Judge, yet.

19          THE COURT:  I'm sorry.

20          MR. BATTISTA:  It's not been fully briefed, so --

21          THE COURT:  That's a good point.

22          MR. PERLMAN:  Well --

23          THE COURT:  That's a good -- that's a fair point.

24          MR. PERLMAN:  That's not necessarily true.

25          MR. BATTISTA:  Unless you're not going to file a

AA01093

```
1    reply.
2            MR. PERLMAN:  I'm not obligated to file a reply to
3    the opposition.  His opposition's in.  As far as he's
4    concerned, it's fully briefed.
5            I was going to suggest this, if it makes sense,
6    Your Honor, but I'm open to whatever suggestions you may
7    have.  Because they're more or less, I think, the same,
8    perhaps we suspend the briefing on that, come back on the
9    13th.  And then depending on how Your Honor rules, we either
10   pick that up if it's appropriate or not, but we suspend my
11   reply in the interim until we have a better idea of how you
12   think that we should proceed.
13           I don't need to waste the resources if we're going
14   to come back on the 13th and you're going to dispose of the
15   matter one way or another.  So it's just a suggestion.
16           MR. BATTISTA:  Judge, Mr. Perlman has, I think,
17   until the 15th of May to file his reply.  If he needs an
18   extension, including to deal with this, that's okay.  We
19   don't need to have this fully briefed by then.
20           THE COURT:  Okay.
21           MR. BATTISTA:  I appreciate that.
22           THE COURT:  We'll leave the briefing on your motion
23   for summary judgment -- your cross motion -- in suspense.
24   Depending on the -- and we won't reschedule a deadline for
25   you to reply until I tell you to, until further court order.
```

AA01094

```
 1              MR. PERLMAN:  Thank you.

 2              THE COURT:  And Ms. Murphy's going to put that in

 3    the Pro Memo that a response -- excuse me.  That PEPI's reply

 4    to Fiddler's response to the cross-motion for summary

 5    judgment not due until further order of the Court.

 6              We'll come back on the 13th and hear everything you

 7    have to say, and maybe my lens will be more clear.

 8              MR. BATTISTA:  I'm confident you will be.

 9              THE COURT:  I think I've got it.  I think I've got

10    it pretty much.  And you all have gone through this with

11    Judge Delano.  I'm sure you explained all this to her.  And

12    then you've gone through it with me, and you've gone through

13    it in writing, so --

14              MR. BATTISTA:  Judge, I actually think -- Mr.

15    Perlman can correct me.  I think we did mediation with Judge

16    Delano before any depositions were taken.

17              THE COURT:  Okay.

18              MR. PERLMAN:  Right.  So a lot of what was

19    developed and what was presented wasn't known, and perhaps --

20              THE COURT:  That was the point you made earlier,

21    that --

22              MR. PERLMAN:  Yeah.

23              THE COURT:  I think back now -- I can't remember

24    now when it was.  January of this year, when you thought you

25    were being pushed --
```

AA01095

```
1              MR. PERLMAN:  Yes, it was.
2              THE COURT:  -- on the summary judgment motion.
3              MR. PERLMAN:  It was January.
4              THE COURT:  Now, whether you were or you weren't,
5    I'm not going to comment on.  But it's just I remember that
6    was your reaction.
7              MR. PERLMAN:  Yeah.
8              THE COURT:  And you just made a point about that,
9    but you've learned more since then, so --
10             MR. PERLMAN:  Yeah.  I think we were just
11   responding to Your Honor, that had the discovery taken place,
12   perhaps we could have empowered the mediator to be more
13   convincing, I guess.
14             THE COURT:  Well, I'm willing to talk to Judge
15   Delano if either of you on your -- in consultation with your
16   clients, thinks that that would be beneficial.
17             I don't know what your views of mediation were, or
18   your clients' views towards settlement, I don't need to know.
19   But whether anything that's happened since then might change
20   the dynamic, I'd be glad to facilitate that if that's needed,
21   if the parties would like to do that.
22             MR. BATTISTA:  Yes, sir.  I think we need to both
23   talk to our clients and communicate with each other and get
24   back to you.
25             THE COURT:  Of course.  Well, then we'll be in
```

AA01096

1    recess.  We'll see you back here on this matter on the 13th.

2    And I appreciate your presentation, both sides.  I really do.

3            MR. PERLMAN:  Thank you, Judge.

4            THE COURT:  Thank you.

5            COURTROOM CLERK:  All rise.

6            (Proceedings concluded at 4:43 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AA01097

CERTIFICATE

I certify that the foregoing is the official verbatim transcript prepared on an expedited basis to the best of my ability from the digitally-recorded audio proceedings of the above-entitled matter.

_Cheryl Culver_

_____              May 4, 2015
Cheryl Culver (CER, CCR)              Date
Transcriber

I certify that the foregoing is a federally certified transcript authenticated by:

_Kimberley S. Johnson_

_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com

AA01098

AA01099

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
IN RE:                            :
FIDDLER'S CREEK, LLC, et al       :    Case No. 8:10-bk-03846-KRM
  Debtors                         :    Chapter 11
                                  :    (Jointly Administered)
- - - - - - - - - - - - - - - -   :
FIDDLER'S CREEK, LLC, et al       :    Adv. No. 8:11-ap-00809-KRM
  Plaintiffs/                     :
  Counter-Defendants              :
v.                                :
PEPI CAPITAL, L.P.                :
  Defendant/Counter-Plaintiff     :
- - - - - - - - - - - - - - - -   :
PEPI CAPITAL, L.P., et al         :
FIDDLER'S CREEK, LLC              :
  Third Party Plaintiffs          :
v.                                :
GULF BAY CAPITAL, INC. and        :
AUBREY J. FERRAO                  :
  Third Party Defendants          :
- - - - - - - - - - - - - - - -   :
```

                                  U.S. Courthouse
                                  801 North Florida Avenue
                                  Tampa, Florida 33602
                                  Held May 13, 2015

TRANSCRIPT OF HEARING

[Re: 11-ap-00809]
Motion for Partial Summary Judgment and Incorporated
Memorandum of Law, filed by Paul J. Battista on behalf of
Plaintiff Fiddler's Creek, LLC (Doc. #84).....
*[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

BEFORE THE HONORABLE K. RODNEY MAY
UNITED STATES BANKRUPTCY JUDGE

PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[FULL NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

[Re: 11-ap-00809 Continued]
.....Affidavit of Jeffrey R. Fine in Opposition, filed by
Alan J. Perlman on behalf of the Defendant (Doc. #99),
and Amended Affidavit, (Doc. #107); Response in
Opposition filed by Alan J. Perlman on behalf of the
Defendant (Doc. #100); Reply filed by Paul J. Battista
(Doc. #102); Supplement filed by Paul J. Battista on
behalf of the Plaintiff (Doc. #113)

AA01101

APPEARANCES:


For Fiddler's Creek, LLC     PAUL J. BATTISTA, Esquire
                                        Genovese Joblove & Battista
                                        100 S.E. 2nd Street
                                        Floor 44
                                        Miami, Florida 33131
                                        305-372-2457
                                        pbattista@gjb-law.com


For PEPI Capital, L.P.       ALAN J. PERLMAN, Esquire
                                        Roetzel & Andress
                                        350 East Las Olas Boulevard
                                        Suite 1150
                                        Fort Lauderdale, Florida 33301
                                        954-462-4150
                                        aperlman@ralaw.com


For Gulf Bay Capital        RICARDO A. REYES, Esquire
                                          Tobin & Reyes PA
                                          225 NE Mizner Blvd.
                                          Suite 510
                                          Boca Raton, FL 33432-4083
                                          561-620-0656
                                          rar@tobinreyes.com


Also Present                Aubrey Ferrao
                                          Principal of Debtor

                                          Joseph Parisi
                                          In-House
                                          General Counsel

1          P R O C E E D I N G S

2               (Reporter's Note:  Quotation marks are used for

3     readability reasons and not intended to reflect direct

4     quotes.)

5               (Proceedings commenced at 1:43 p.m.)

6               COURTROOM CLERK:  All rise.  Court is again in

7     session.  You may be seated.

8               THE COURT:  All right.  Thank you, Ms. Murphy.

9     If you would call our adversary, please?

10              COURTROOM CLERK:  Yes, sir.  Thank you, sir.

11    Case No. 10-3846, Fiddler's Creek, LLC; Adversary Proceeding

12    11-809.

13              THE COURT:  And appearances?

14              MR. BATTISTA:  Good afternoon, Judge.  Paul

15    Battista, of Genovese Joblove & Battista, on behalf of the

16    Plaintiffs, Fiddler's Creek, LLC, and subsidiaries.  And

17    joined by Rick Reyes from the Tobin & Reyes firm, on behalf

18    of Gulf Bay Capital.

19              Also in the courtroom, Your Honor may recognize

20    Mr. Aubrey Ferrao, who is the principal of the Debtor.  And

21    next to him is Mr. Joseph Parisi, who is the Debtor's in-

22    house general counsel.

23              THE COURT:  Okay, thank you.

24              MR. PERLMAN:  Good afternoon, Judge.  May it

25    please the Court, Alan Perlman, on behalf of Counter-

AA01103

1   Plaintiff, PEPI Capital.

2          THE COURT:  Okay, thank you.  Okay, are there any

3   housekeeping matters before we get started?  This is the

4   third installment of our argument on summary judgment, which

5   I believe maybe both parties agree the record is not going

6   to be substantially enhanced by an actual trial.  But I'm

7   not sure if you really agree to that yet.

8          It might depend on which way I'm going to rule.

9   But as I see it, most of the documents speak for themselves,

10  and they lay out a trail of one thing or another, depending

11  on which view you're the viewer of.

12         MR. BATTISTA:  Judge, if may, I think the

13  documents are relatively complete.  I'm not aware of any

14  other documents that would come into evidence at a trial

15  that's not already been presented to the Court in terms of

16  these summary judgment motions.  And you have the

17  depositions of substantially all of the players.

18         THE COURT:  Right.

19         MR. BATTISTA:  There may be other depositions to

20  be taken that are not before the Court today, that would be

21  relevant.

22         THE COURT:  And as I understand it, we're here

23  today for your rebuttal.  Had you finished?  Or did I cut

24  you off last time?

25         MR. PERLMAN:  I think that Your Honor was

```
 1   extremely generous with the time that you allotted me.
 2   And I don't want to say that Your Honor cut me off, but --
 3            THE COURT:  Well, I didn't mean to put you in
 4   that kind of a box.
 5            MR. PERLMAN:  Yeah.
 6            THE COURT:  -- but I do recall we had a time
 7   limitation.  And Mr. Battista was very insistent, in a very
 8   professional way, that we reserve time, if I could do it, to
 9   have you provide your side of what I had just heard over a
10   few hours of oral argument.
11            MR. BATTISTA:  About four and a half, Judge,
12   but --
13            MR. PERLMAN:  Absolutely.  And I think that that
14   would only be fair.  I was just trying to --
15            THE COURT:  So I'm inclined to let Mr. Battista go
16   and then maybe give you some short period of time if there's
17   anything that's -- that you think really needs to be
18   corrected from your side.
19            MR. PERLMAN:  Thank you, Judge.  I just wanted
20   to respond to your initial query.  I think Your Honor
21   extracted that concession at the beginning of the very
22   initial hearing in terms of -- I think you had a thumbs up
23   or thumbs down, that you were able to rule and that the
24   parties were comfortable with that, and I think that you
25   were given that assurance at that time.
```

AA01105

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. PERLMAN:  Thank you.

 3              MR. BATTISTA:  Judge, I have a supplement to

 4    our evidence notebook.  If I could approach your --

 5    Ms. Murphy --

 6              THE COURT:  You may.

 7              MR. BATTISTA:  -- and hand it to her?  I've given

 8    Mr. Perlman a copy.  I'm not going to deal with it for a

 9    little while but I thought I'd give it to you now.

10              THE COURT:  Okay.

11              MR. BATTISTA:  (Presenting notebook.)  Judge, also

12    I assume -- I would request, do you have the original white

13    evidence binder that the Debtors had submitted to you in our

14    first hearing?

15              THE COURT:  I do.

16              MR. BATTISTA:  Good.  Thank you, Judge, because

17    I'm going to refer to that in my argument.

18              THE COURT:  Which -- I'm sorry.  The white one or

19    this one (displaying)?

20              MR. BATTISTA:  The one I just gave you, I'll deal

21    with in a little bit.  That's the supplement, but I'm

22    focused on the big white one.  There you go.

23              THE COURT:  I've got it.

24              MR. BATTISTA:  Thanks.  Judge, thank you again.  I

25    know that Your Honor questioned whether we should come back
```

AA01106

1  for me to rebut PEPI's arguments and just set a trial, but

2  it's important to me, professionally -- and I'll explain

3  why in a second -- as well as personally, to have this

4  opportunity, and I do intend to take the time that I need so

5  the Court can have a full and fair perspective from the

6  Debtors.

7         Judge, on behalf of my client, we filed what we

8  thought, frankly, was a relatively straightforward summary

9  judgment motion.  Three issues at issue.  We didn't think

10  the facts were much in dispute, concerning the three

11  defaults that we asserted, the due diligence signoff,

12  the escrow provision, refusal to include those in the

13  material change to the waterfall provisions.

14         And some five and a half hours of argument later,

15  it looks like it wasn't so straightforward as I had thought.

16  And Mr. Perlman did an admirable job, doing what I think

17  anyone who was trying to contest summary judgment should do,

18  and that is to create as much confusion as possible so that

19  the Court concludes that a trial is appropriate.

20         Hopefully, when I finish my argument today, Your

21  Honor will have a different perspective on that and find

22  your way clear to granting summary judgment in favor of the

23  Plaintiffs.

24         Mr. Perlman's argument, the way he approached it,

25  reminds me of the old adage that when the law is against

AA01107

1   you, you argue the facts.  And when the facts are against

2   you, you argue the law.  And when they're both against you,

3   you create confusion as best you can, and then hope that the

4   trier of fact gets fed up and just simply says, "Let's go

5   to trial because I can't sort through all of this."

6          And Your Honor had some of that reaction when you

7   said, you know, "Why are we here going on, now, a third day,

8   which will approximate about eight hours of argument on what

9   I thought was a fairly straightforward summary judgment

10  hearing?"  And so Mr. Perlman has succeeded, at least today,

11  in accomplishing that goal.

12         But he did so, Judge, respectfully, by pointing

13  the Court to snippets of emails, reading only parts of

14  emails, reading only -- and supplying the Court with only

15  one or two pages of depositions, and focusing only on a

16  few words on a page, only parts of exhibits, frankly,

17  underlining only parts of the case law, and frankly and

18  respectfully taking a lot of that out of context,

19  that I'm hoping to put back into context today.

20         And, Judge, importantly, in addition to only

21  giving you part of the story, in his defense, he ignored,

22  over the course of his entire -- all of his pleadings and

23  the four and a half hours of his argument, three critical

24  facts that -- it was all I could do to jump up during those

25  hearings and tell the Court what I'm going to tell you know.

AA01108

1          One is:  Mr. Fine, who represented PEPI during

2    this entire process, wrote a letter on February 23rd.  It's

3    in our evidence book as Item 27.  We'll get to it more than

4    once today.  And that letter was in response to the Debtor's

5    default letter.  We described that, we believe aptly so, as

6    PEPI's admission letter, to the three defaults that we have

7    asserted in our summary judgment motion.

8          No place in all of Mr. Perlman's pleadings or

9    in his four and a half hours of arguments did he at all

10   mentioned that letter.  He didn't attempt to distinguish

11   it, didn't attempt to explain it.  And when we get through

12   with today you'll see why, because he cannot.

13          And we assert that Mr. Fine, on behalf of PEPI,

14   admitted to one or all three of these defaults, which

15   support our summary judgment motion.  That's the first

16   critical fact that he didn't deal with at all.

17          The second fact is one that's in the record as

18   well, and that is -- and it's an important one and it's

19   been missing from this entire discussion.  The Debtor spent

20   $955,000 in connection with this commitment letter to PEPI.

21   The Debtor paid PEPI $405,000 for the commitment letter,

22   that was half the commitment fee, and also reimbursed PEPI

23   for $550,000 of their legal fees in negotiating the

24   commitment letter and negotiating the loan documents.

25          The Debtor is the one who's put that almost

AA01109

1 | $1 million, not PEPI.  PEPI has made a profit so far.

2 | They've received their $405,000 commitment fee and didn't

3 | have to loan money.  And they've had all of their legal fees

4 | paid, at least in connection with the commitment letter and

5 | the DIP loan documents.

6 | I'm not speaking for this litigation here.  We

7 | obviously haven't paid their legal fees for this litigation.

8 | But that's an important factor when you consider all the

9 | other stuff that's going on here, that the Debtors have

10 | expended in connection with that type of money.  Mr. DiNardo

11 | testified to that.

12 | THE COURT:  Wait just a second.  Mr. Perlman has

13 | stood up, and we need to just deal with whether I should sit

14 | you down of whether it's something I should hear.

15 | MR. PERLMAN:  And I'm happy to do whatever Your

16 | Honor thinks is --

17 | THE COURT:  I think we should just let Mr.

18 | Battista continue.

19 | MR. PERLMAN:  Okay.  Enough said, Judge.

20 | THE COURT:  And I'm making notes.  You know

21 | exactly what's going on in terms of the facts, and I'm sure

22 | you can navigate your way back to this moment.

23 | MR. PERLMAN:  I will do so.  It's just that the

24 | use of the word "facts" is the reason why I rose.  Those

25 | were -- that's outside the record.  But I'll deal with it

```
 1   when I --
 2            THE COURT:  All right.
 3            MR. PERLMAN:  -- when I have my turn.
 4            MR. BATTISTA:  Judge, Mr. DiNardo testified to
 5   that in respect of Mr. Perlman's deposition of him in
 6   connection with the reply he filed in this case.  And I
 7   believe --
 8            THE COURT:  Well, of course, the more -- as
 9   you know, the more it turns out to be "he said versus he
10   said" --
11            MR. BATTISTA:  Yes, sir.
12            THE COURT:  -- it points more towards a trial.
13            MR. BATTISTA:  It does, Judge, but I will tell
14   you, if you were to ask Mr. Perlman a direct question:
15   "Is it contested by PEPI that the Debtor paid $955,000 to
16   PEPI," he's an officer of the Court, he will tell you it's
17   not contested.  There's no one from PEPI who's going to say
18   they didn't receive $955,000.
19            THE COURT:  You can respond at the end.
20            MR. BATTISTA:  He can.
21            THE COURT:  Go ahead.
22            MR. BATTISTA:  Thank you.  So that's the second
23   fact.  And that's important for Your Honor to consider our
24   version of the fact.  Your Honor can consider -- when you
25   think about all the reasons PEPI says that the Debtors have
```

1    done something wrong here in connection with the default,

2    why would we have paid $950,000 to get what Mr. Perlman

3    suggests that we tried to get here.  And I'll get into

4    that in more detail.

5           The third fact that Mr. Perlman didn't deal with,

6    and it's in the record as well.  Mr. Ferrao testified at the

7    initial hearing on the DIP loan, that he would give up this

8    DIP loan in a New York second.  He was making the DIP loan

9    reluctantly, and he would give it up.

10          That testimony was unrebutted by anybody, and

11   no one got up, including PEPI, who was in the courtroom

12   represented and said, "We'll make that DIP loan.  You don't

13   have to, Mr. Ferrao."  Nobody said that.

14          Your Honor will remember that during the case, the

15   bondholders offered up a purported replacement DIP loan by a

16   company called EFO.  You were there.

17          THE COURT:  I can't remember, EF --

18          MR. BATTISTA:  EFO was the name of the company.

19          THE COURT:  And I don't --

20          MR. BATTISTA:  And that's not in this record but

21   your Honor will --

22          THE COURT:  No, and I don't remember it.

23          MR. BATTISTA:  Okay, then I won't -- then I'll

24   leave that alone.

25          THE COURT:  I mean, I don't remember the company

AA01112

1  name.

2           MR. BATTISTA:  In any event, there was the

3  suggestion by the bondholders that they could replace the

4  DIP loan that Mr. Ferrao had given.

5           And I told Your Honor that they should do so as

6  soon as they can.  That never came to fruition because

7  obviously Mr. Ferrao continued as a DIP lender throughout

8  the case.

9           That's not a fact in the record today.  That's

10  something that I thought Your Honor would remember, but if

11  you haven't, that's fine.

12           So, Judge, none of those three critical facts have

13  been dealt with by Mr. Perlman.  Why?  Because they don't

14  fit the conspiracy theory that he advanced to the Court in

15  his argument at the last hearing.

16           If he had to deal with them, it would destroy his

17  conspiracy theory.  And so his job -- and he did the best he

18  could with the facts that he has, I believe -- was to create

19  confusion.  My job is to clear it up and to have the Court

20  have what we believe to be the accurate record to make an

21  informed decision.

22           That's why it was important to me to come back

23  today professionally so I could explain.  I only had an hour

24  and 15 minutes at the first hearing.  It's my summary

25  judgment motion.

1              THE COURT:  And you're named in the emails.

2              MR. BATTISTA:  Abs --

3              THE COURT:  You're in the emails.

4              MR. BATTISTA:  Absolutely, Judge.

5              THE COURT:  Okay.

6              MR. BATTISTA:  You know, and that's the challenge

7   in large measure, in this case, for me.  I was there, I

8   lived it, I made the phone calls, I wrote the emails, I know

9   what happened.  And if we get to a trial, I suspect I'm

10  going to be testifying, which means I'm probably not going

11  to be trying the case.  And that's fine.

12           So I have that challenge, and I'm doing my best,

13  which is why I wanted to come back here so the Court could

14  hear from me professionally.  And also personally, Judge.

15  Why?  Because, again, with all due respect to Mr. Perlman,

16  he didn't stop after creating the confusion on the three

17  issues that were in the summary judgment motion; he went a

18  good bit further.

19           It was unfortunate and, in large measure,

20  upsetting both to me and to my client, and that's in large

21  measure why Mr. Ferrao is here today.

22           What am I talking about?  PEPI's theory of the

23  case, advanced by Mr. Perlman at the last hearing, with some

24  zeal, by the way, at a high level, is that the defaults that

25  we asserted on February 22nd, 2010 were concocted and

AA01114

1   manufactured.

2          It was part of, according to PEPI, a grand scheme

3   to use PEPI as a front or a facade to create cover so Mr.

4   Ferrao could get this DIP loan.

5          That was Mr. Ferrao's intention all along to

6   be the DIP lender, and we used PEPI as that facade,

7   notwithstanding the fact that we spent almost a million

8   dollars to do that.  And what did he say to support that

9   theory?

10          He told you, and he read it from the transcript

11   of the hearing on the DIP loan, that the entire DIP loan

12   presentation was essentially a fraud on the Court.  "It was

13   not what was happening," is that he said.  "That's not what

14   our intention was, that's not what we were trying to do."

15          He also said to you, reading Mr. Ferrao's

16   testimony, that Mr. Ferrao lied to the Court when he

17   testified on the DIP loan.  He said at one point, "Battista

18   tried to correct the record."  And necessarily, Judge, if

19   Mr. Ferrao lied, I was counsel to the Debtors at that time,

20   so presumably I'm involved in that.  Now, he didn't say

21   that, but that's the presumption that underlies this.

22          Patricia Redmond represented Mr. Ferrao at that

23   hearing and all through the case.  He didn't say this either

24   but presumably she'd have to be involved in it because she

25   presumably assisted in the preparation of his testimony.

AA01115

1      What follows?  We filed this complaint, in which

2  we seek the recovery of the one-half commitment fee that we

3  paid and the professional fees.

4      In this case, Mr. Perlman said at the last

5  hearing, Mr. DiNardo lied in deposition to you -- in this

6  case.  He said that.  When Mr. DiNardo testified as to the

7  reasons that the Debtor defaulted PEPI, the three reasons

8  that we assert in our summary judgment motion, Mr. DiNardo

9  said the purchase option was not one of those reasons.

10  Mr. Perlman suggested that was not true.

11      He also said that Mr. Ferrao, who likewise

12  testified that the purchase option issue was of no moment to

13  him, or not of great significance, Mr. Perlman said that was

14  not true, leading to the conclusion that Mr. Ferrao lied.

15      And lastly, you'll remember this, Mr. Perlman used

16  the term cover-up at least twice in the transcript.  He

17  called this entire case a cover-up.  He said he didn't

18  understand why we were covering it up, but that's what he

19  said.

20      And so that necessarily involves everyone I

21  just talked about -- I just mentioned to you:  Myself,

22  Mr. Ferrao, Mr. DiNardo, Mr. Reyes, all of whom are

23  suggested implicitly in this alleged cover-up.

24      Judge, I've worked a long time for my reputation,

25  almost 30 years.  Besides my family, it's the most important

AA01116

1  thing to me.  I know Mr. Ferrao values, and Mr. DiNardo

2  value their reputation immensely, as does Mr. Reyes, and so

3  that's why it's important for me to be here personally and

4  explain to the Court our view of what happened and have that

5  opportunity.

6          So win, lose, or draw on this summary judgment

7  motion, and win lose or draw on this trial, I guarantee that

8  the one thing you're going to come away with is I was not

9  involved in a conspiracy or a cover-up or perjury or

10  anything like that, and neither was my client.

11          So if I accomplish anything, it's going to be

12  that, win, lose or draw, of this case.  This case is not big

13  enough -- no case is big enough -- for what we have been

14  accused of.  So let's start with that, Judge.

15          You've been presented with two explanations of the

16  same set of events.  One from us, which is we asserted three

17  legitimate defaults in February of 2010.  And you have the

18  version from PEPI, which they assert were concocted defaults

19  in a conspiracy cover-up for some improper purpose.

20          You have to decide at one point which one is

21  right.  And you do that all the time.  You decide facts and

22  law and you come to conclusions.  But I'm going to suggest

23  to the Court -- and maybe you have actually used this in the

24  past.

25          I'm a fan of science and philosophy, and there's a

1  scientific and philosophical tool that goes back to the time

2  of Aristotle.  It's called Occam's Razor.  I don't know if

3  you have ever heard of the term.

4          THE COURT:  I have.

5          MR. BATTISTA:  You have.  I'm glad.  Because it

6  stands for a very simple proposition.  And what is that?

7  When you are faced -- when anyone's faced with two different

8  explanations for the same event, Occam's Razor tells us,

9  time and time again, over 2,000 years, that the simplest

10  explanation tends to be the correct one.  And the complex

11  one tends to be the wrong one.

12          Why?  Because the complex one has to have a number

13  of things that come into fruition at the same time:  A

14  confluence of events, a confluence of variables, several of

15  them, and also the accuracy of a number of underlying

16  assumptions.  And so all things being equal, Occam's Razor

17  tells us that the simplest explanation is the correct

18  explanation.

19          And so let's look at the two explanations.  The

20  Debtor says we were in the midst of the worst real estate

21  and banking crisis since the Great Depression.  We were

22  running out of money.  Your Honor heard the DIP loan

23  testimony.  We were out of money; we needed the DIP loan

24  to pay payroll.

25          We had 1,700 homeowners in this community who

AA01118

1   were about to lose the Debtor and the Debtor's support in

2   the community.  We had already paid PEPI about a million

3   dollars, $955,000 for the commitment fee and legal fees.

4   And we had PEPI who, despite the commitment letter -- and

5   we'll get into it -- said that not only were they not giving

6   us a due diligence signoff but they had never had an intent

7   to give us a due diligence signoff.  I didn't have a lender;

8   that's our assertion.

9          And then we had, of course, PEPI, we suggest,

10  refused to comply with two of the critical terms of the

11  commitment letter:  The escrow provisions and the waterfall

12  provisions.  So our claim is that we had no choice to issue

13  a default based on that.  Okay?  That's one explanation.

14         The other explanation from PEPI is:  It's a grand

15  conspiracy from the beginning to get Mr. Ferrao the DIP

16  loan.  We intentionally led PEPI down the altar.  We paid

17  for that privilege.  There was a suggestion of fraud on the

18  Court.  There's a suggestion of perjury then, perjury now,

19  cover-ups, and everybody risking everything that they worked

20  for, for this case.

21         Which of these two explanations is simplest and

22  the most plausible?  Common sense, logic and Occam's Razor

23  tells you that the Debtor's is.  Now, whether or not that

24  leads to PEPI actually being in default of the commitment

25  letter, you'll decide that.  You will decide whether or not

AA01119

```
 1   the facts that we assert lead to a default.

 2           But, again, one thing is for certain.  PEPI's

 3   fraud and conspiracy and cover-up theory is not what

 4   happened here.  Not what happened here.  So let's get into

 5   the case, Judge.

 6           I was here initially, and Mr. Perlman complained

 7   when I started my presentation, that I should not deal with

 8   his defenses.  So I just dealt with my case in chief.  I did

 9   not address any of his defenses in his papers.  I'm going to

10   spend some time today on those defenses.

11           THE COURT:  Actually, that was helpful to the

12   Court --

13           MR. BATTISTA:  I understand.

14           THE COURT:  -- that approach.

15           MR. BATTISTA:  I understand.

16           THE COURT:  So I don't feel as though you left

17   something out at that time.

18           MR. BATTISTA:  And I didn't have enough time

19   anyway, so it wasn't going to be -- it wasn't going to be a

20   significant issue.

21           So, Judge, as you know, we have sort of three

22   defaults.  And I've said to you and I'll say to you

23   again that you only have to find one of them.  They're

24   independent, they're not conditioned on each other.  If

25   you find one default, the commitment letter is clear,
```

AA01120

 1  there's no dispute that the Debtors are relieved from

 2  any further obligations under that commitment letter.

 3          The first default are the escrow provisions, all

 4  right?  And there are three of them.  There's the -- again,

 5  the escrow for the consent judgments, the escrow for the

 6  deeds in lieu of foreclosure, and the valuation mechanism.

 7          Mr. Perlman has done a good job, I believe,

 8  conflating the escrow provisions with the waterfall

 9  provisions.  They're different; they're separate.  Yes,

10  they are both designed to enhance the approval of the DIP

11  loan as an adequate protection package, but they are

12  different.  They are dealt with differently in the

13  commitment letter.

14          And I'll turn the Court to Item 1, Exhibit 1,

15  which is the commitment letter.  And on page 12 of 45, I

16  believe it's highlighted -- which are the two provisions,

17  the escrow provisions.  I think the escrow provisions is the

18  only one highlighted.  When Your Honor's there, let me know.

19          THE COURT:  Let's see.

20          MR. BATTISTA:  It's page 12 of 45, Item 1.

21          THE COURT:  Okay.  The pagination is different at

22  the top and the bottom.

23          MR. BATTISTA:  Oh, I'm sorry.  That will -- on the

24  top --

25          THE COURT:  But you're looking at the --

AA01121

```
1          MR. BATTISTA:  -- it will be 14 of 47.

2          THE COURT:  That's -- I'm there.

3          MR. BATTISTA:  Okay.  So, Judge, you'll see in the

4    middle of it, it starts, "In addition."  There's two "in

5    addition" sentences in the middle of that.  The first one

6    we refer to as the escrow provision.  And it says, "In

7    addition, the final loan documentation for the credit

8    facility shall provide" -- then it has one, two and three --

9    romanettes i, ii, and iii.

10         That provision, Judge, does not say "may provide."

11   It doesn't say "best efforts to provide."  It doesn't say

12   "will provide if we feel like it."  It says "shall provide."

13   "Shall provide."  There's no ambiguity there.  The loan

14   documents shall provide these three things, period, end of

15   story.

16         You will note in the record that there was an

17   original term sheet that predated this commitment letter

18   that was dated in October of 2009.  From October 2009 to

19   January 27th, when this was signed, 2010, that's just about

20   three months.  It took three months to negotiate this

21   commitment letter.

22         And from January 27th to February 22nd, which

23   is less than a month, three and a half weeks, we were

24   negotiating the loan documents, so put that in perspective

25   as to which of these was more heavily negotiated and which
```

AA01122

1    of these was more focused and clearer.

2              So you have a provision that says, "Shall provide

3    the escrow provisions."  Where do they come from?  Where did

4    this concept come from?  For the Court to understand whether

5    or not PEPI should be excused from these, you should

6    understand the genesis of that.

7              And so if you go to Item 4 in our evidence book,

8    you'll see where this came from.  And when you get there,

9    Judge, it's paragraph 6.

10             THE COURT:  I have it.

11             MR. BATTISTA:  And Mr. Perlman pointed you to this

12   exhibit, an email from me to Mr. Fine January 6th.  This is

13   prior to the signing of the commitment letter, although a

14   number of drafts had gone back and forth.

15             And Mr. Perlman focused you on the sections of

16   Item 6 or paragraph 6 that talked about the benefit to your

17   client, meaning the benefit to PEPI.  And there's two

18   provisions in which it talks about a benefit to PEPI or

19   saves PEPI a significant amount of time and money.

20             What Mr. Perlman did not show you was the

21   sentence after the word -- the clause after the word "and"

22   in both sections.  So let's talk about the whole paragraph.

23   Paragraph 6 says, "Discussion on a mechanism to deal with

24   the liquidation of collateral in the waterfall."

25             "Trish and I have some good ideas that will be of

AA01123

1   benefit to your client in this process."  That's PEPI.  No

2   question about it.  "And will also allow us to satisfy the

3   other secured creditors that the waterfall is meaningful and

4   not illusory, and to benefit to PEPI and the other secured

5   lenders."

6          And then I go on and describe our thoughts in 1, 2

7   and 3.  And interestingly enough, those are the three escrow

8   provisions that found their way into the commitment letter.

9          The last sentence -- second to last sentence of

10  this paragraph says, "We think this saves your client, PEPI,

11  a significant amount of time and expense in the foreclosure

12  process."  Absolutely it did.  That's all Mr. Perlman read

13  to you and that's all he underlined in his paragraph.

14         However, it goes on to say, "And also allows us to

15  show the junior lenders that the waterfall is real."  So

16  when you read the entire paragraph, you will see quickly

17  that the escrow provisions, the genesis of the escrow

18  provisions were to benefit both PEPI and the other junior

19  lenders.

20         That's where this came from.  This is the first

21  email, the first discussion of these escrow provisions,

22  coming from me to Mr. Fine describing why they are needed,

23  what their genesis is.  That's not questioned.

24         So if we turn to Item 5, the very next one,

25  this is a representative of PEPI, K. Springfield, Kenny

AA01124

1    Springfield, that same day, writing an email to Mr. DiNardo

2    and others.  And he says in point 3, "Deed in lieu of

3    foreclosure concept, that's one of the three escrow

4    provisions."

5           As outlined in Paul's email on January 6th, the

6    one I just read to you.  "We do agree that this shows other

7    lenders the waterfall is real and the borrower is committed

8    to the project."

9           If that's not an admission that the escrow

10   provisions benefited the other lenders, I don't know what

11   is.  He didn't say "deed in lieu of foreclosure, that only

12   benefits PEPI."  He said, "It shows the other lenders the

13   waterfall is real."

14          So I can stop right there.  PEPI's argument that

15   they had the ability to waive the escrow provisions on the

16   basis that they were solely for the benefit of PEPI, doesn't

17   work.

18          The genesis email on these, and Mr. Springfield,

19   PEPI's representative, tells you that it was for another

20   reason as well.  The junior secured lenders benefited from

21   these escrow provisions.  That's why they were there, in

22   addition to benefiting PEPI.

23          THE COURT:  Wait just a second.

24          MR. BATTISTA:  Yes, sir.

25          THE COURT:  I think you used the term "conflate,"

AA01125

1  and I think I've done been conflated.

2          MR. BATTISTA:  Okay.  Tell me where I went wrong.

3          THE COURT:  Well, I was looking at Exhibit 4.

4          MR. BATTISTA:  Yes, sir.

5          THE COURT:  And it talks about the waterfall.

6          MR. BATTISTA:  Are you in paragraph 6?

7          THE COURT:  I am in paragraph 6.  And then I go

8  to paragraph 5 and it talks about the deed in lieu of

9  foreclosure concept, which is one of the escrow provisions.

10          MR. BATTISTA:  Well, let me back up.

11          THE COURT:  And so --

12          MR. BATTISTA:  And let me clear it up, Judge.

13  Paragraph 6 in item 4 --

14          THE COURT:  Uh-huh.

15          MR. BATTISTA:  -- does talk about a mechanism to

16  deal with the liquidation of collateral in the waterfall.

17          THE COURT:  Right.

18          MR. BATTISTA:  Okay.  And then if you look at the

19  concepts, our thoughts are 1, 2 and 3, the 1 is to create an

20  escrow of some sort to hold consent judgments.

21          THE COURT:  Right.

22          MR. BATTISTA:  2, perhaps a deed in lieu of

23  foreclosure held in escrow and, 3, the need for a valuation

24  mechanism.

25          THE COURT:  That's the escrow.

AA01126

```
 1              MR. BATTISTA:  That's the escrow.  Those three
 2   provisions found their way into the commitment letter almost
 3   verbatim.  Now, the reason that those are tied to the
 4   waterfall but they're different than the waterfall is
 5   because -- and Mr. DiNardo testified to this, and there's
 6   an email in the record that talks about this.
 7              The escrow provisions are for the unencumbered
 8   property.  The waterfall had a listing of property.  What
 9   was on top of the waterfall?  The first three categories of
10   property in the waterfall were unencumbered property.  No
11   other lender had a lien on it.
12              And so when we talk about the escrow provisions in
13   Mr. DiNardo's email -- and later one we'll get to it -- it
14   talks about this in discussions with PEPI's representative,
15   we're prepared to give a deed in lieu of foreclosure on
16   unencumbered property.  Well, you can't give a deed in lieu
17   on encumbered property.  It doesn't work.
18              Because you're going to take that deed and
19   record it, you can't wipe out a lien on property by a deed
20   in lieu.  You can only take a deed in lieu of foreclosure
21   on unencumbered property.  So, yes, the escrow provisions
22   were important but they were important to the three top
23   layers on the waterfall, unencumbered property.
24              And Your Honor heard testimony from an appraiser
25   that they were worth some -- it was north of $30 million.
```

AA01127

1    That's not a fact in the record, but it is a fact in the

2    record.  When you look at the waterfall provisions, the top

3    three say "unencumbered property."

4           That's what the escrow provisions were meant

5    for.  They don't work for any property down the line that's

6    encumbered.  It doesn't make sense.  And Mr. DiNardo points

7    it out to Mr. -- to one of the PEPI representatives in an

8    email we'll get to --

9           THE COURT:  Well, that's the -- that's the

10   confusion is that the escrow piece of the default was the

11   very top -- applied to the very top of the waterfall.

12          MR. BATTISTA:  It could only apply to that.

13          THE COURT:  Yeah.

14          MR. BATTISTA:  It could only apply to it.  Because

15   why would anybody take a -- record a deed with a lien on it.

16          THE COURT:  Okay, I'm with you.

17          MR. BATTISTA:  All right.  Okay.  So that's what

18   that's about.  There's the confusion, Judge.  And so when we

19   talk about liquidation of the collateral in the waterfall in

20   my email here, I'm talking about the provisions to deal with

21   the unencumbered property that Mr. DiNardo in the record

22   tells PEPI that's exactly why it's there.

23          THE COURT:  Okay.

24          MR. BATTISTA:  And we'll get to that email in a

25   second.  So these are the escrow provisions.  And in Item 5,

AA01128

1    PEPI admits that the deed in lieu of foreclosure concept at

2    a minimum, one of the three, benefited other lenders, was --

3    it was important to have -- we do agree that this shows

4    other lenders the waterfall is real.  I'm not putting words

5    in his mouth.  To me, that means they acknowledge that it's

6    for the benefit of others, as opposed to themselves.

7              So if you come to that conclusion based on these

8    two emails, then you have to come to the conclusion that

9    PEPI cannot waive it.  Cannot waive those escrow provisions,

10   which is their entire argument.

11             They had the ability to waive it, so no default.

12   Well, if they can't waive it, they assuredly didn't include

13   it in the documents.  There's no dispute there.  We'll get

14   into those emails.  And so, hence, they defaulted by not

15   including those escrow provisions when they had no ability

16   to waive it.

17             So the question then is:  Did they refuse to

18   include them?  And this is a whole second series of

19   arguments that Mr. Perlman raises, but we'll deal with

20   now.

21             Item 8 in our evidence book is an email -- and

22   when you get there, let me know.  It's an email from Mr.

23   Fine to myself, along with a bunch of other people, dated

24   February 2nd, 2010.

25             THE COURT:  Okay.

AA01129

```
 1              MR. BATTISTA:  And what is it?  It's the first

 2   draft of the Debtor-in-Possession loan agreement.  PEPI took

 3   the task of preparing the first draft of the Debtor-in-

 4   Possession loan agreement.

 5              And if you flip to -- let's see -- the fourth page

 6   of this email -- this attachment.  The third page is the

 7   cover sheet to the Debtor-in-Possession loan agreement, and

 8   I've only -- and I gave you -- as opposed to all 50 or 60

 9   pages, I gave you page 51, which is the exercise of

10   remedies, Section 10.4.

11              THE COURT:  I have it.

12              MR. BATTISTA:  And in 10.4(b), you will see

13   reference in there to the agent agreeing to hold escrow to

14   deeds in lieu of foreclosure and consent judgments.  Do you

15   see that?

16              THE COURT:  Right.

17              MR. BATTISTA:  So PEPI took the commitment letter

18   and, as they should have, drafted the loan documents --

19   initial set of loan documents.  Some were consistent with

20   that.  They inserted the concept of an escrow for deeds in

21   lieu of foreclosure and consent judgments.  It's in 10.4(b).

22   No dispute.

23              We, of course, followed up and said, "Thank you

24   very much, Mr. Fine, but you're missing the third piece of

25   the escrow provisions, which is the valuation mechanism."
```

AA01130

1    We don't see a valuation mechanism built into this loan

2    document.  And where do I say that to him?  Item 10 is my

3    email of a few days later.

4            And this is a long email, February 8th, and it

5    goes on for two-plus pages, in which I'm giving him

6    comments.  The title is Fiddler's DIP Loan and Security

7    Agreement Comments.  Does Your Honor have that?

8            THE COURT:  I do, and I'm on the second page.

9            MR. BATTISTA:  Yes. sir.  And Item 16, I'll bring

10    your attention to that one.  I specifically tell Mr. Fine

11    in Section 10.4, "We need to build in the concept of a

12    valuation mechanism, for purposes of reduction of the debt

13    through the foreclosure or deeds in lieu."

14            THE COURT:  Wait.  Now, I've lost you.

15            MR. BATTISTA:  I apologize, sir.

16            THE COURT:  I'm at Item 10.

17            MR. BATTISTA:  Yup.  In the second page of the

18    email.

19            THE COURT:  Okay.  I thought you said Exhibit 16.

20            MR. BATTISTA:  I apologize.

21            THE COURT:  You mean paragraph 16.

22            MR. BATTISTA:  Paragraph 16.  Yes, sir.

23            THE COURT:  Okay, I'm with you now.

24            MR. BATTISTA:  And so I'm pointing out to Mr.

25    Fine, this is not -- this can't be in dispute.  We need a

AA01131

1   valuation mechanism.  You've given me two of the three

2   escrow provisions.  You've not given me the valuation

3   mechanism.

4           And why is that important?  Well, think about what

5   happens here.  We give them a deed in lieu of foreclosure on

6   a piece of unencumbered property.  They go and record that

7   deed.  That's what it -- that's the concept.  There's no

8   other liens on it.

9           How do we value -- how are we going to put a value

10  for that piece of property that they just took, they just

11  recorded the deed on?

12          THE COURT:  How much is the credit?

13          MR. BATTISTA:  Exactly.  So we needed a valuation

14  method.  It could have been an appraisal; it could have come

15  through the Court; it could have been a number of things.

16  We just needed a mechanism.

17          So when other creditors down the chain would say,

18  "Okay, at least if PEPI gives credit for that piece of

19  property it took for a deed in lieu of foreclosure, we,

20  down the chain, know that fair value was given, and maybe

21  that helps us in terms of our adequate protection package."

22  That's what's behind that.  It's no secret.  That's what

23  that meant.  So we pointed it out to them in Item 10.  That

24  was on February 8th.

25          Item 12, if you turn to it, it's an email from me

AA01132

1    to Mr. Fine and others, three days later, February 11th.

2    And in paragraph 4 of that email, I say to him, again,

3    "Jeff, I would add the following additional items that we

4    need to discuss."  It's in the top of my email.

5           Paragraph 4, adding the language per the

6    commitment letter on a valuation mechanism in respect of the

7    deeds in lieu of foreclosure under the waterfall.  So as of

8    February 11th, we still don't have the valuation mechanism

9    in the loan agreement and we still don't have anything from

10   PEPI on it.

11          So February 2nd, we get an agreement.  It only has

12   two of the three provisions in it.  I asked twice over the

13   course of nine days, that we have to add the valuation

14   mechanism.  And, now, there's no ambiguity about that.

15          What do we get in exchange?  Next email, paragraph

16   -- Item 13.  This is an email from Mr. Lorio, PEPI's

17   representative, to Mr. Springfield and Mr. Redunsky,

18   copied to Mr. DiNardo.  So this is Mr. Lorio of PEPI, to

19   DiNardo.

20          And in paragraph 3 of that email, he says -- this

21   is the same day, by the way, I said, again, "I need the

22   valuation mechanism"  My email that we just referred to in

23   Item 12.

24          Mr. Lorio says, quote, "Issues regarding valuation

25   mechanism for deeds in lieu of foreclosure, we do not need

AA01133

```
 1    these.  And to get this moving and avoid complexity, propose
 2    deleting this in the structure entirely."  Okay.
 3            So he's talking about "We do not need the
 4    valuation mechanisms.  PEPI does not need it."  Well, that's
 5    great.  The Debtor needed it, the commitment letter required
 6    it, and here he is telling me on February 11th, "We, PEPI,
 7    do not need it."
 8            Now, Mr. Perlman showed you this email as well.
 9    But what he focused you on was the word "propose."  See
10    where he says in the second line?  "Propose deleting this in
11    the structure entirely."  And Mr. Perlman suggested that
12    that was not a firm unequivocal demand or commitment by
13    PEPI.  PEPI was merely negotiating.  It was a suggestion,
14    a proposal to resolve it.
15            Well, I can read it differently, when he says
16    earlier, "We do not need these," but okay, let's assume that
17    on February 11th that was a proposal by PEPI in respect to
18    the valuation mechanism.
19            Let's turn to Item 14.  Same day.  A little later
20    in the day.  There's an email from Mr. DiNardo back to Mr.
21    Lorio.  And in paragraph 6(a) --
22            THE COURT:  All this occurred on the same day.
23            MR. BATTISTA:  Yes, sir.  It's moving pretty
24    quickly.
25            THE COURT:  Okay.
```

1          MR. BATTISTA:  Occurred on the same day.

2    Mr. DiNardo writes back and respected that position.  In

3    paragraph 6 of that email, items (b) and (c).  Item (b), he

4    says -- and this, again -- if you look at the very top of

5    the email, "CJ," who's Mr. Lorio, "here are the open items."

6          And you roll down to 6(b).  "The deed in lieu and

7    escrow concept only works with respect to the unencumbered

8    property," which is what I told you, "because of valuation

9    issues associated with the mortgage lender's liens."

10          So here's Mr. DiNardo telling Mr. Lorio, "This

11   only works for the unencumbered property."  And then in

12   (c), he tells him, "You need a valuation method for the

13   waterfall.  One acceptable method would be to get it --

14   to get an updated appraisal by Integra at that time.

15   Jeff Fine seemed to be okay with this solution, at least

16   initially on the call."

17          So we don't get a valuation mechanism in the first

18   draft of the loan documents.  I raised it on the 8th.  I

19   raised it again on the 11th.  Mr. Lorio says, "We do not

20   need these.  Propose deleting them."  Mr. DiNardo says --

21   he presses him the same day, "We need these.  We need it

22   and, oh, by the way, Jeff Fine seemed okay with it."

23          Let's see what happens next.  Item 15, again, same

24   day, the 11th, three hours later.  Now, we're at 9:13 p.m.

25   We get a revised loan agreement from PEPI's counsel.  This

AA01135

1    is an email from Elizabeth Helm to several lawyers including

2    myself, attaching a revised redlined LSA, Loan and Security

3    Agreement.

4            And I provided to you, in this Item 15, the cover

5    page to the agreement, and then again Section 10.4, which is

6    the applicable section.  You can take a look at that, and

7    you can see the redlining in Section 10.4.

8            The escrow provisions used to be in 10.4(b) as

9    in boy, in the first draft.  You'll see 10.4(b) has been

10   deleted in its entirety.  So not only did they not add the

11   valuation mechanism as we have been -- I asked twice and

12   Mr. DiNardo asked once.  Not only did they not add it; they

13   deleted the entire escrow provisions.

14           There's no longer a provision in here for an

15   escrow for deeds in lieu of foreclosure or an escrow for

16   consent judgment.  It's gone.

17           So was that still a suggestion by PEPI?

18   A negotiation?  Here we are the fourth time, sending me back

19   a loan document, a second loan document, three requests

20   leading up to it, not only not giving me the valuation

21   mechanisms, which is undoubtedly required by the commitment

22   letter, it said "shall provide," but they take out the first

23   two that they gave me.  The escrows.  They're gone.  Still a

24   suggestion by PEPI?  Still a mere negotiation?

25           Then you turn to Item 16.  Let's see what happens

AA01136

1    next.  This is February 15th.  This is an email from me to

2    Mr. Fine and others, in which I suggest to him in the first

3    line, that we work through the weekend to come up with a

4    firm proposal on the foreclosure and valuation issues.

5          Mr. Perlman pointed you to the word "proposal."

6    Yeah, I was trying to solve their unwillingness to include

7    the escrow provisions, and I gave them some options.  These

8    were interim options, to deal with the interim order, and

9    defer the issue down the road, okay?

10          So what does PEPI do in response to that, in

11    response to my suggestion?  Item 19, the next day, we get

12    the email from Mr. Lorio to Mr. DiNardo, which says, in this

13    last paragraph:  "We probably need to discuss the waterfall

14    and where we are on that.  I think there is not agreement

15    right now on how we work through the collateral in a

16    foreclosure process."

17          Still a suggestion by PEPI or are they telling me

18    yet again there's no agreement on these provisions?

19          Judge, it's hard to come to the conclusion that we

20    had an unequivocal commitment letter, "shall provide," the

21    first set of loan documents, they gave me two of the three

22    provisions.  I asked for the third one.  I asked again for

23    the third one.  Mr. DiNardo explained why we needed the

24    third one again.

25          We get a response from Mr. Lorio, "We do not need

AA01137

1   these.  Propose deleting them."  The next day we get a loan

2   document that deletes the entire thing, sending me a message

3   telling me "no."  When is it not at suggestion anymore and

4   when is it a firm position by PEPI?

5          And to the extent there's any lingering doubt, the

6   evidence in the record is that on February 16th, that same

7   day that Mr. Lorio sent the last email, Item 19, there was a

8   conference call in the evening amongst all the parties.

9          THE COURT:  I'm sorry.  Where are you now?

10          MR. BATTISTA:  I'm just -- there's not an exhibit

11   to it --

12          THE COURT:  Okay.

13          MR. BATTISTA:  -- but there's testimony in the

14   record.

15          THE COURT:  Okay.

16          MR. BATTISTA:  And I can obviously point you to it

17   but it's undisputed.

18          THE COURT:  On the 16th, the February 16th

19   conference call.

20          MR. BATTISTA:  There's an evening conference call

21   February 16th with all the PEPI representatives and all the

22   Debtor representatives.

23          THE COURT:  All hands.

24          MR. BATTISTA:  All hands.  It's undisputed on that

25   call several things happened.  One was we were told they're

AA01138

1   not including the escrow provisions.  They also told us on

2   that call, which we'll get to in a bit that not only were

3   they not giving us the due diligence signoff, but they never

4   intended to give us that due diligence signoff.  This was an

5   important phone call.  All hands call.

6            After about two weeks of negotiating the loan

7   documents, which came after three months of negotiating a

8   commitment letter in which we were told, "You're not getting

9   the escrow provisions."  Still a suggestion by PEPI?

10           THE COURT:  I'm sorry, not getting the escrow

11  provisions?

12           MR. BATTISTA:  The escrow provisions.  They said

13  -- they told us several things but on this piece right here,

14  we're not getting the escrow provisions.  They told us --

15           THE COURT:  You had just said, I think, not

16  getting the due diligence signoff.

17           MR. BATTISTA:  Oh, I apol -- they said that too.

18           THE COURT:  That's what I was thinking.

19           MR. BATTISTA:  Yeah, we'll get to that.  And we'll

20  get to that but they said several things to us in that

21  conference call.  One of which, relevant to this discussion

22  was we're not getting the escrow provisions.  Okay.

23           So to avoid any doubt, and to use Mr. Perlman -- I

24  actually love the comment -- to drive it home, which he used

25  several times in his argument.  Item 22, let's drive it

1    home.  This is February 17th, the next day, 1:20 in the

2    afternoon, Ms. Helm, who's counsel to PEPI, sends yet

3    another revised redlined loan and security agreement.

4           And she says, "With revisions based on the call

5    we had yesterday evening."  That's Item 22 and that's what

6    her email says.  Attached is a revised redlined loan and

7    security agreement with revisions based on the call we had

8    yesterday evening.  That's the February 16th call.

9           And I've included the first page of that

10   agreement, as well as Section 10.4 in its entirety.  You

11   can take my word for it, or you can read it if you'd like,

12   there's no escrow provisions in there.  None of the three

13   escrow provisions are in there.  There's no escrow for

14   deed in lieu, there's no escrow for consent judgments,

15   and there certainly is no valuation mechanism.  Not there.

16          How is it possible, after that long sequence of

17   events, in respect to the escrow provisions alone, that

18   PEPI's position was anything but firm and unequivocal?  We

19   were not getting them.  We asked several times.  We had a

20   conference call.  We were told no.  And to drive it home,

21   we got the document the next day without them included.

22          THE COURT:  Now, Mr. Perlman had argued that, as a

23   matter of law, you can't put these documents into escrow and

24   the initial collateral package.

25          Now, we can debate that back and forth, but is

**AA01140**

1    there anything in these doc -- in these letters or drafts

2    that makes that complaint at the time?

3           MR. BATTISTA:  There is a discussion between

4    Mr. Fine and I -- I don't know if I have the email here, but

5    certainly he refers to it in his February 23rd letter, what

6    I call the admission letter.

7           We had a discussion about whether or not the

8    consent judgments that were proposed were enforceable in

9    Florida.  I admit -- and I admitted it in my pleadings,

10   that consent judgments generally are not enforceable in

11   connection with the original loan.

12          But what I say in my pleadings is:  PEPI didn't

13   want to discuss how to solve that problem.  But they never

14   said deeds in lieu of foreclosure were not enforceable, they

15   never said valuation mechanisms were not enforceable.

16          So let's go back.  Judge, we spent three months

17   negotiating a commitment letter.  The lawyers representing

18   PEPI were at K&L Gates, the Texas office and the Florida

19   office, very fine lawyers.  Mr. Fine is a very fine lawyer.

20   He's pretty smart.  He's a bankruptcy lawyer; he's a

21   transactional lawyer.

22          How is it possible that we negotiate a commitment

23   lawyer for three months and nobody says anything about the

24   enforceability of these escrow provisions.  They end up in a

25   commitment letter that's 45 pages long.  45 pages long.

AA01141

```
 1            And I've got to tell you.  Mr. Fine, to his
 2    credit, admonished me more than once in the negotiations of
 3    the loan documents.  He said to me more than once -- and
 4    actually he refers to it in his affidavit that Mr. Perlman
 5    filed in opposition.
 6            He said, "Battista, the language in the commitment
 7    letter was carefully chosen and thoroughly negotiated."
 8    "Carefully chosen and thoroughly negotiated."  He told me
 9    that more than once when I asked about ways to solve issues.
10    And he says that in his email -- in his affidavit, excuse
11    me.
12            So we're to believe that after three months of
13    negotiating that with some of the best lawyers in the
14    country, who don't raise any issue with these escrow
15    provisions or enforceability, that all of a sudden when
16    this litigation is filed they're not enforceable.  Not
17    enforceable.
18            And in the negotiation of the loan documents, the
19    only thing that is discussed is the enforceability of the
20    consent judgments.  Never -- you won't find an email or
21    testimony, and Mr. Perlman won't be able to give it to you,
22    about the enforceability of the deeds in lieu of foreclosure
23    or the waterfall provision.  I'm sorry, or the valuation
24    mechanism, excuse me.
25            I handed to you case law, and I refer to case law
```

AA01142

1    in my original brief, that tells you that deeds in lieu of

2    foreclosure, even in this context, are enforceable.  We'll

3    get to it; you'll decide whether you agree with my view of

4    the case law or Mr. Perlman's view of the case law.  But

5    I'll show you the cases that say that, and they go back to a

6    Florida Supreme Court case in 1935.

7            THE COURT:  I wonder if there's an overlay for a

8    Bankruptcy Court order buttressing the collateral package

9    for a DIP loan?

10           MR. BATTISTA:  Thank you.  Thank you.  What is a

11   bankruptcy?  It is a massive workout.  This is what this is

12   about.  The case law says that deeds in lieu of foreclosure

13   are approvable -- in fact, the case law says are encouraged

14   -- courts are encouraged to adopt them in the context of a

15   workout.

16           Where were we?  We were facing your -- this is not

17   a surprise.  We were facing a bankruptcy.  We were out of

18   money.  We were having lenders foreclose on our collateral.

19   A DIP loan was being given to us as part of a massive

20   workout.  That's what a Chapter 11 is.  It's a reorganized

21   -- it's a workout.  We can't -- I proposed it.

22           In the cases that Mr. Perlman refers to, it was

23   the -- it was the poor mother whose son was taking advantage

24   of her.  It wasn't knowledgeable counsel bringing the issue

25   to the Bankruptcy Court and asking you to approve it.

AA01143

1  So let's think about that, all right?

2  It's not enforceable?  You set the package.

3  You set the adequate protection package.  You set these

4  mechanisms in place.  You determined that's adequate

5  protection.  You tell the seven lawyers who are objecting to

6  my DIP Loan that they're adequately protected by virtue of

7  these provisions.  You tell them that.

8  We roll forward.  Let's assume that we defaulted

9  and PEPI has to go foreclose, right?  And PEPI says, Judge,

10  Battista is now saying that this deed in lieu is not

11  enforceable.  You would sanction me on the spot if the

12  Debtor took that position.  That's why this makes no sense.

13  You have to understand the context of where these came from

14  and when they -- and how they were being approved.  And

15  thank you for making that observation; I was going to get

16  there.

17  And the same thing applies to the waterfall

18  provisions.  Not performable.  *Res judicata* is going to

19  somehow stop the enforceability of their effort to

20  foreclose?  Really?  The Debtor's the one who raises *res*

21  *judicata*.  The other lenders are the ones who would raise

22  *res judicata* when PEPI tried to foreclose on the collateral

23  down the waterfall.  Mr. Perlman's entire argument is, "Hey,

24  we couldn't do this because they would assert *res judicata*

25  and collateral estoppel and we wouldn't be able to

AA01144

1    foreclose.  Woe is me."

2          Well, really?  He would have been back -- first of

3    all, he had to come back to you -- PEPI had to come back to

4    you to get stay relief to go foreclose; right?  That's what

5    typically happens in DIP loan orders.

6          And if you then said, "PEPI, go your way and start

7    foreclosing."  And, God forbid, I assert a *res judicata*

8    defense in State Court after what I just brought to the

9    Court, had approved, then defaulted, and Your Honor said to

10   go, how is it possible that you would let me, the Debtor, or

11   any of the lenders assert *res judicata* in that situation.

12         And, Judge, that's why nobody raised the

13   enforceability of these escrow provisions or the waterfall

14   provisions during the commitment letter, or save the consent

15   judgment in any of the negotiations on the loan documents.

16         This is a very creative argument created after the

17   fact to defend this litigation.  It had nothing to do with

18   what was going on through the entire case.  So thank you for

19   raising that.

20         So I'm going to -- that's the escrow provisions.

21   And if you conclude, as I have shown you, that they were not

22   solely for PEPI's benefit, but they were for the benefit of

23   the other lenders as well, which PEPI admits, then their

24   waiver argument was out the window.  They could not have

25   waived it.

AA01145

1      Their case law says if it's solely for their

2   benefit, they can waive it.  I agree with that.  It just

3   wasn't solely for their benefit.  They can't waive it.

4      And if they can't waive it and they admit they

5   didn't include it -- you've seen the loan documents now,

6   you've seen the request after request after request from us

7   to add it.  And them saying "we do not need these, don't

8   have an agreement yet."

9      And despite the reference to propose deleting, how

10  many times do I have to get a loan document that doesn't

11  include the language before I realize I'm not getting it?

12  That's their position.

13     And you can conclude:  Is it once, is it twice, or

14  was it three times, as what happened in this case, I'm not

15  getting it?  And does that rise to the level from mere

16  suggestion or proposal to definitive position?  Refusal to

17  put it in, when the commitment letter says "shall provide"

18  one, two and three?

19     THE COURT:  Well, you actually pointed out it was

20  deleted.

21     MR. BATTISTA:  Thank you.  They put two of the

22  three in to start with, and then said, "Nah, we're going to

23  take them out," despite me asking to put the valuation

24  mechanism in.  How is that not in violation of that

25  commitment letter?

AA01146

1         How was it not -- they say they can waive it

2  Well, if they can't waive it, how is it not in violation?

3  That's one default, Judge.  And all you have to do is find

4  that default and we're done.  We're excused from any further

5  obligations under the commitment letter, and they're in

6  default, and then we can get to the damage phase.

7         Mr. Perlman said, "Why would" -- he made this

8  argument.  It was actually, on the face of it, a pretty

9  good argument.  "Why would the Debtor want to speed up the

10  foreclosure process?"

11         He pointed you to the provisions in the

12  commitment letter that talked about the escrow provisions

13  being necessary to speed up the foreclosure process.  He

14  said to you, "Why would the Debtor want to speed the

15  foreclosure process?  Debtors never want to do that.

16  Debtors always want to delay the foreclosure process."

17         And he read to you from Mr. DiNardo's deposition,

18  and it's in his Exhibit B-2, and suggested, when Mr. DiNardo

19  said that it was done to speed the foreclosure process,

20  that that wasn't credible.  He was trying to undercut the

21  significance of the escrow provisions, saying it didn't

22  make any sense for the Debtor to want to speed it up.

23         Well, Judge, outside of bankruptcy, he's

24  absolutely right.  But, as you observe, we're in bankruptcy.

25  I'm a Debtor, and what do I have to do?  I've got to provide

AA01147

1  an adequate protection package.  And so when I talk about

2  speeding up the foreclosure process for the top three pieces

3  of collateral, the unencumbered collateral, the indisputably

4  unencumbered -- the top three pieces of that waterfall,

5  that's so I can tell the junior lenders, "Hey guys, the

6  foreclosure process, at least to those three pieces, will

7  be fast, because it'll be through a deed in lieu of

8  foreclosure, and you -- and PEPI's debt will be credited

9  quickly to the value of that collateral."

10       So you, as junior lenders, don't need to sit

11  around for -- as Mr. Perlman said, two, three, or more

12  years and wait and see what happens with that foreclosure

13  process.  Speeding the foreclosure process with respect to

14  the waterfall, the unencumbered property, certainly helped

15  PEPI get their money faster, or their property faster.

16       But it also got a credit, assuming they would have

17  put the valuation mechanism into the loan documents, got a

18  credit for everybody else to know what was left owed under

19  the DIP loan.  Perhaps nothing.  Perhaps a lot.  But that

20  was the purpose of it.

21       So, yeah, we weren't crazy when we wanted those

22  escrow provisions to speed up the foreclosure process.

23  It was done to help get that adequate protection package

24  approved by Judge Paskay, God rest his soul, and you.

25       It was calculated; it wasn't crazy.  It was

AA01148

1   credible, when you consider the context of where we were,

2   in bankruptcy.

3        Let's take a moment and go to what I describe as

4   our smoking gun, which is the response letter from Mr. Fine

5   to me on January -- February 23rd, 2010.  It's Item 27 in

6   my book.  And, again, Mr. Perlman has never responded to

7   this -- never dealt with this letter, because he can't.

8   It is damning for them.

9        When Your Honor is there, let me know and I'll

10  point you to the provision.

11       THE COURT:  I am.  I'm on the second page.

12       MR. BATTISTA:  Yes, sir.  And we assert that this

13  letter is a series of admissions to the three defaults that

14  we talked about.  When you go to page 2, Section 4, you'll

15  see at the beginning:  "Regarding the deed in lieu and

16  consent judgment provision on page 12 of the commitment

17  letter," which we just read, "Please remember that this

18  provision was originally proposed by you for lender's

19  benefit."

20       Well, that's convenient.  He admits that it was

21  proposed by me, and we saw the email, but he doesn't go

22  further and say that it was for the other lenders, which

23  is what my email says and what his client committed to.

24  Remember, he's writing this letter, Judge, after we have

25  defaulted him.

AA01149

1    Then he says later, "You realize the consent

2  judgments are not available under Florida law."  That's what

3  I referred to you.  There was discussion of whether the

4  consent judgments only were enforceable under Florida law.

5  And by the way, who realized it?  Me or PEPI?  He says

6  I realized it and I brought it to his attention.

7    This isn't PEPI saying, "Hold on, these are not

8  enforceable, we can't do it."  This is me telling him there

9  may be an issue with this, okay?  And it's only on that

10  one aspect of it.  Not on the deeds in lieu, not on the

11  valuation mechanism.

12    Then he goes on and says:  "If you are now

13  telling PEPI that you were mistaken about the availability

14  of consent judgments and want to put that provision back

15  into the loan documents, PEPI will certainly review your

16  proposed provision."  Okay?

17    So we already had it in the loan documents.  He

18  took it out once, and then took it out again.  But now he's

19  telling me, "Oh, if we were mistaken, we'll put them back."

20  What was there to mistake about those email chains and those

21  three sets of loan documents?

22    But, okay, the more important piece is the next

23  one.  "Likewise, the valuation mechanism that you refer to

24  is only in regard to a deed in lieu of foreclosure.  And if

25  you believe that a deed in lieu of foreclosure provision and

AA01150

1    its related valuation mechanism should be included in the

2    loan, even though PEPI does not require it, then PEPI

3    will promptly review the language and will negotiate the

4    provisions."

5            If I believe they should be included in the loan?

6    What was the commitment letter all about?  What was my email

7    in advance of the commitment letter all about?  What was the

8    language that said "shall provide these three things"?

9    Judge, he knew exactly what was required.

10           For him to say, "Oh, if you now believe," well,

11   what are you talking about?  It was in there, you put it in

12   the first set of loan documents.  I asked you put the

13   valuation mechanism in once, twice.  You said -- your client

14   said, "No, delete them."  DiNardo begged them to put it back

15   in.

16           THE COURT:  And you're saying this is an admission

17   that they weren't in there?

18           MR. BATTISTA:  Of course.  He's now saying after

19   the fact, "Oh, we'll put them back in if you really want

20   them."  And he says here, "even though PEPI does not require

21   it."  That's the waiver argument.  PEPI doesn't require

22   this.  Well, it isn't all for PEPI, as the emails show.

23           So I don't know how you get past the admission

24   that they didn't put it in, even though it was in the

25   commitment letter.

AA01151

1          Again, you could stop right there and decide that

2     it's a default under the escrow provisions based on just

3     that alone and we're excused from this commitment letter.

4          But let's move on to the waterfall, because

5     the same thing happened with the waterfall.  A little

6     different development but the same thing.  And so if you go

7     back to the commitment letter on Item 1, paragraph -- sorry,

8     page 14 of 47 or 12 or 45, depending upon where you're

9     looking at it.  And I'll point you to that provision and

10    we'll discuss it a little bit.

11         THE COURT:  Let's see.  I'm on 12 of 45.

12         MR. BATTISTA:  Yes, sir.  And so we already talked

13    about the "in addition" sentence where it has 1, 2 and 3,

14    the escrow provisions.

15         THE COURT:  Uh-huh.

16         MR. BATTISTA:  The next sentence starts, "In

17    addition, the final loan documentation for the credit

18    facility shall provide that the agent," which is PEPI and

19    Lender, which is also PEPI, "agrees that it will not

20    foreclose on the real property described in the numbered

21    item in the following list, unless they have used

22    commercially reasonable efforts to first collect under the

23    property described in the numbered items before it and in

24    the below list."

25         The critical language here is:  "Agrees it will

AA01152

1    not foreclose." What does that mean? Agrees it will not

2    foreclose? Mr. Perlman says, "Oh, that means sale." We

3    agree we won't sell, except in the order of the waterfall.

4    Let's cut right to it.

5         He pointed you to the provision just above in

6    the escrow provision. You'll see an Item 1 just above it.

7    He referred to judgment and foreclosure process.

8         And he said, "Judge, that should mean judgment

9    and sale process. So the waterfall really was we couldn't

10   sell, except in accordance with the waterfall. But he was

11   pointing you to a provision that dealt with the escrow that

12   didn't deal with the waterfall. The critical language for

13   the waterfall is what does it mean to say: Lender agrees

14   that it will not foreclose on the real property described,

15   except in the waterfall.

16        We tell you that means you can't -- you can't

17   either file a foreclosure judgment or you can't get a

18   foreclosure -- if I file a foreclosure action, or you can't

19   get a foreclosure judgment until you first deal with -- you

20   foreclose on and sell each piece at a time.

21        Mr. Perlman makes the argument that, no, no, no,

22   no, that's not what it means. It means we can foreclose, we

23   can get a final judgment of foreclosure against all of it,

24   but we can only sell in accordance with the waterfall.

25        That's the dispute here. Make no mistake about

AA01153

1   it.  That's the dispute between us as to what that -- what

2   those words mean.

3           There's no question there's a waterfall.  There's

4   no question you take down property in accordance with the

5   waterfall.  But it's how far can you go in the foreclosure

6   process, okay?

7           THE COURT:  Let me just take a moment.

8           MR. BATTISTA:  Take a moment, because it's

9   important and it's an important distinction but that's

10  what we are disputing.

11          THE COURT:  (Reviewing document.)  All right.

12  You've directed me to the second sentence, or the next

13  sentence, that says that the commitment letter that says

14  "in addition" -- that begins "in addition."

15          MR. BATTISTA:  Yes, sir.  And that's the escrow --

16  that's the waterfall provision.

17          THE COURT:  "Agrees that it will not foreclose on

18  real property unless it has previously used commercially

19  reasonable efforts to first collect out of the property

20  described in the numbered items before it in the below

21  list."  And that starts with cash and personal property.

22          MR. BATTISTA:  That's easy, all right?  But then

23  look at 2, 3 -- look at 2 and 3.

24          THE COURT:  Unencumbered.

25          MR. BATTISTA:  Unencumbered hotel units.

AA01154

1   3, remaining finished developed land lots owned by GB

2   Peninsula that are unencumbered.  And the remaining

3   undeveloped land owned by 951 Holding Limited that is

4   unencumbered.  Those two pieces of unencumbered collateral

5   go first, hence the escrow provisions and the deed in lieu

6   of foreclosure.

7          You don't need to foreclose unencumbered property.

8   Here's a deed.  There's a speedier foreclosure process and

9   it will get credit to that DIP loan pretty fast, once we

10  have a valuation mechanism to value that collateral that

11  you just took in satisfaction of your DIP loan.  That's the

12  escrow provision.

13         The waterfall is:  Which piece do you take first?

14  And so if you look at it, this is carefully discussed.

15  Every one of our creditors -- you see there's eleven pieces

16  of that waterfall.  Every creditor had a different -- every

17  creditor had a lien, excuse me.  Seven creditors had liens

18  on different property here.  But it didn't stop until you

19  hit Point 4.

20         Point 4, 5, and all the way down was encumbered

21  by one or more of those seven senior secured creditors in

22  court.  2 and 3 were not.  So the escrow was for 2 and 3 per

23  Mr. DiNardo's email to Mr. Lorio.

24         The waterfall is simply:  Here's the property you

25  take and the order that you take it.  So the question is:

AA01155

1    What does "will not foreclose on"?  Does it mean, "Will not

2    file a foreclosure action"?  Does it mean, "Will not get a

3    final judgment of foreclosure"?  Or does it mean, as PEPI

4    suggests, "Will not sell, except in accordance with the

5    waterfall"?

6         PEPI's argument is it presupposes they can file a

7    foreclosure against all of it.  They can get a foreclosure

8    judgment against all of it and everybody, all the senior

9    secured lenders.

10         Think about that.  You're the senior secured

11   lender on the bottom of the waterfall.  You've been sued for

12   foreclosure, you've gotten a foreclosure judgment against

13   you, and then you're going to sit around and wait for PEPI

14   to sell in accordance with the waterfall.

15         How do you deal with that?  Do you think those

16   seven senior secured creditors would have put up for a

17   foreclosure judgment against them?  Foreclosure judgments

18   wipe everybody out.  So we say, "No, you couldn't get a

19   foreclosure judgment against all of it at the same time."

20   You had to get a foreclosure judgment against one, sell it,

21   and move on to the next, okay?

22         So that was out position.  And, Judge,

23   interestingly enough, until this litigation, or until the

24   middle of the negotiation of the loan documents, that was

25   PEPI's position.  How do I know that?  I know that with two

AA01156

1   things.

2          Let's go to Item 2 in my book here.  This is an

3   email from Mr. Lorio, PEPI's representative, to several

4   people on the Debtor's side.  It's prior -- December 23rd,

5   2009 -- to the signing of the commitment letter.

6          And here in paragraph 3, PEPI says:  "PEPI does

7   agree with the waterfall concept as a means of addressing

8   potential concerns of certain prepetition lenders with

9   respect to the order in which real property will be

10  foreclosed upon.

11         So we agree that when it comes to foreclosing on

12  property, we will follow the water -- the order described in

13  the list.  He didn't sale "foreclose and sale."  But, look,

14  I appreciate it, he's a lay person.  He may not have

15  understood -- may not have understood the distinction

16  between a foreclosure, a foreclosure judgment, and a sale.

17  But at least you see that they agree to the concept.

18         Why?  To solve the concerns of the prepetition

19  lenders who have liens in the property.  Okay.

20         Let's see what PEPI's lawyers did.  They clearly

21  knew the distinction between the two; right?  Mr. Fine, who

22  was in Texas, out of the Texas office, and they had their

23  Miami office working on this.

24         THE COURT:  I'm sorry, where are we?

25         MR. BATTISTA:  I apologize.  I'm going to go back

AA01157

```
 1   to Item 3, just to drive the point home again about the

 2   importance of the waterfall.  This is an email from me, in

 3   Item 3, to Mr. Fine.  And you're going to see this a few

 4   times, but if you look at paragraph 6 of that email, you'll

 5   see a discussion about the Replacement Liens - Waterfall.

 6            And I say in here, "Thank you for the revisions to

 7   the replacement lien section in waterfall.  We believe that

 8   the replacement lien revisions may suffice and will confirm

 9   ASAP."

10            Then I go on to say, "On the waterfall,

11   however, we need to consider the issues and mechanics of

12   the commercially reasonable efforts to collect in line with

13   the waterfall.  We appreciate effort on your part to help

14   with that concern.  We are not sure that this gets us home,

15   however, as it leaves open the question of what does it mean

16   principally to lenders like Textron and Orion who have the

17   amenity loans.  We need to discuss additional ways to beef

18   this up in order to assure approval by the Court."

19            What am I telling Mr. Fine here?  We need to talk

20   about what it means to have commercially reasonably efforts

21   to collect in accordance with the waterfall.  We're talking

22   about foreclosure versus judgment of foreclosure versus

23   sale.  What does it mean -- what mechanics can we come up

24   with for commercially reasonable efforts to collect?  So,

25   clearly, it's at the forefront of our discussion.
```

AA01158

1          It's in the commitment letter -- and here we are

2    prior to the commitment letter talking about how to

3    structure it.  It ends up in the commitment letter with the

4    language will not -- PEPI agrees it will not foreclose

5    except in the order of the waterfall.

6          And now let's go to what PEPI's lawyers believe

7    that language said.  Item 8, again, in my evidence book.

8    This is the first draft of the loan agreement that comes

9    from Mr. Fine on February 2nd.  We've already looked at it

10   in connection with the escrow provisions.

11         Mr. Fine is a lawyer.  He knows the differences

12   now between foreclosure, foreclosure judgment, and sale.

13   and what does he put in the first draft of the loan

14   agreement in respect to the waterfall provisions.  The

15   issue of foreclosure versus foreclosure judgment versus

16   sale, in the order of the waterfall.  It's 10.4(a) in

17   Item 8.

18         THE COURT:  I'm sorry, where is it?

19         MR. BATTISTA:  Yes, sir.  It's Item 8 in my

20   binder.

21         THE COURT:  I am there.

22         MR. BATTISTA:  And it's on the -- one, two --

23   fourth page of the exhibit.  And you'll see Section 10.4

24   again.  We saw it before.

25         THE COURT:  Okay.

AA01159

1    MR. BATTISTA:  Entitled "Exercise of Certain

2    Remedies."

3    THE COURT:  Uh-huh.

4    MR. BATTISTA:  Previously, we focused on subclause

5    (b) for the escrow provisions.  Now, I'm going to focus on

6    subclause (a).

7    If you go to the second sentence of that

8    subclause, it says, "In the event agent begins to exercise

9    its rights and remedies against the reserve collateral" --

10   that's the waterfall, by the way -- "agent, PEPI, shall use

11   commercially reasonable efforts to exercise its rights with

12   respect to each piece of the reserve collateral in the order

13   in which it is listed on Exhibit E before commencing the

14   exercise of its rights against the next piece of the reserve

15   collateral."  Those are PEPI's lawyer's words in the loan

16   agreement.

17   This says -- and you can come to your own

18   conclusion -- "we will foreclose and sell the first piece,

19   then we will foreclose and sell the second piece."  He

20   actually went broader.  "We will exercise rights and

21   remedies against each piece before exercising rights and

22   remedies on the next one."  That's consistent, in my view,

23   with the waterfall.

24   He didn't say, here, "We're going to foreclose

25   against all of them and then sell in accordance with the

AA01160

1    waterfall."  He has the broad term, "Exercise rights and

2    remedies before moving on to the next one."

3          So PEPI's lawyers drafted in the first draft,

4    language consistent with the commitment letter and

5    consistent with our view of how this works.  That's the best

6    evidence right there of what they thought the waterfall

7    meant in the commitment letter.  Absolutely.  It's his

8    words; not my words.  His words.  I agree with them.

9    We're happy with that language?

10          However, nine days later, when we get the next

11   draft of the loan agreement, the February 11th draft, which

12   is in Item 15 of my book.  And we've seen this before as

13   well, but if you turn to Item 15.  Again, the one, two,

14   three -- fifth page.  This is the same Section 10.4 Exercise

15   of Remedies.

16          MR. PERLMAN:  Paul, what exhibit?

17          MR. BATTISTA:  It's Item 15 in my book.

18          MR. PERLMAN:  Thank you.

19          MR. BATTISTA:  Exercise of Remedies.  Now, it's

20   blacklined, but you can see pretty clearly that he -- that

21   what they now  -- what they've now added in the middle,

22   where it says, "Lender shall use commercially reasonable

23   efforts to affect a foreclosure sale of such assets in the

24   order listed on Exhibit E, and shall use commercially

25   reasonable efforts not to affect such a foreclosure sale of

AA01161

1   any asset listed thereon until lender's lien on the asset

2   listed prior, such asset has been foreclosed, provided that

3   lender shall not be prevented from commencing foreclosure

4   proceedings against any asset listed on Exhibit C" -- that's

5   the waterfall -- "prior to the foreclosure sale of an asset

6   listed prior thereto.

7           And to be clear, "As an example," he says, "Lender

8   may file a foreclosure suit against all of the real property

9   which is in the waterfall, but would use commercially

10  reasonable efforts to have foreclosure sales thereon occur

11  in the order of the assets."

12          What happened?  He changed the waterfall

13  provisions.  He went from, "We won't take any action against

14  any property until we exercise all our rights and remedies

15  against the one ahead of it," which I was believe was

16  consistent with the waterfall, to "We're going to foreclose

17  on all of them, we're going to get a judgment against

18  everybody, and then we will sell in accordance with the

19  waterfall."

20          That's materially different than the first draft

21  of the loan agreement.  What happened?  The answer is:  I

22  don't know what happened.  They just decided that's what

23  they wanted.  Maybe they thought -- and this is my

24  speculation -- they had so much leverage over us, they

25  could do what they want.

AA01162

1    Clearly, this second provision was better for

2  them.  Clearly, being able to foreclose against all at once,

3  and then selling under the waterfall is better for them, but

4  that's not what the commitment letter said.  And arguably

5  not better for the junior lenders, who are going to be the

6  guy on the bottom of the waterfall who gets sued for

7  foreclosure on his collateral by his priming lender, gets

8  a judgment entered against him, and then has to sit and

9  wait.  That's not better for those lenders.  It's better

10  for PEPI but not better for those lenders.

11    They changed.  And I can only surmise, because

12  nobody explained why they changed.  They just did it, even

13  though they gave us the right one the first go-around.

14    THE COURT:  Let's take a five to ten minute

15  break --

16    MR. BATTISTA:  Certainly.

17    THE COURT:  -- and then we'll come right back.

18    MR. BATTISTA:  Thank you, Judge.

19    COURTROOM CLERK:  All rise.

20    (Recess taken from 3:00 p.m. to 3:11 p.m.)

21    COURTROOM CLERK:  Court is again in session.  You

22  may be seated.

23    THE COURT:  All right.

24    MR. BATTISTA:  Thank you, Judge.  So, Judge, we

25  were discussing the change in the waterfall provision of the

AA01163

loan document, the second set of loan -- the second draft of

the loan document on February 11th.  Came out with now a new

waterfall provision materially different than -- certainly

materially different from the first one, and we assert

materially different from what was required by the

commitment letter.  Clearly better for PEPI but nowhere

near as good for the other junior lenders.

And so what did we do when they sent that revised

loan agreement on February 11th?  Well, again, undisputed,

Mr. DiNardo sent an email to Mr. Lorio, and it's Item 14 in

my book.  So on February 11th, after receiving the revised

loan agreement, with now the new waterfall provision in it,

Mr. DiNardo writes to Mr. Lorio and again describes, "Here

are the open issues," in his email of February 11th at

6:10 p.m.

And in Item 6 of that, titled Waterfall 6(a), he

says, "The language to the waterfall that has been set forth

in the commitment letter has been diluted and is less clear.

The language that is in the commitment letter works."  Do

you see that, Judge?

THE COURT:  Yes.

MR. BATTISTA:  That's Mr. DiNardo saying, "Hey,

hold on, the language you just put in that document has been

diluted.  The waterfall has been diluted and the commitment

letter language works.

AA01164

1    So we are saying to them, "Don't do that."

2    THE COURT:  You're complaining.

3    MR. BATTISTA:  I'm com -- thank you.  I'm

4    complaining.  Some might say at this point, I'm begging,

5    given our position of what we were facing at that point in

6    time and the circumstances we faced.

7    And then on the 15th, I again try to propose

8    the same interim solution.  This is Item 16 of my evidence

9    book.  This is the same email that you saw earlier from me,

10   February 15th, in which I propose an interim solution after

11   working all weekend.  And in there, there's a discussion

12   about how to solve the waterfall problem.

13   And if you'll go to the second paragraph of my

14   email, in Item 16 here, and I say, "First, in an effort to

15   move things along, we are okay pursuing the interim order,"

16   that's the interim DIP order, "without a resolution of

17   this issue.  Rather, we will rely upon the commercially

18   reasonable language for the waterfall and argue to the Court

19   that the lenders do not need the valuation mechanism for the

20   interim order."  And then I go on and describe what we would

21   do with the final order.

22   This is an effort to resolve both the escrow

23   provision impasse and the value -- and the waterfall

24   provision impasse.  And, again, in Item 19, Mr. Lorio --

25   you saw the saw the same email as well -- because this is

AA01165

1    all happening at the same time in a very compressed time

2    period.  Lots of emails going back and forth over a very

3    short time period.  And the emails are dealing with numerous

4    things.

5           And this Item 19 is Mr. Lorio's email in which he

6    says, on February 16th, "We probably need to discuss the

7    waterfall and where we are on that.  I think there is not

8    agreement right now on how we would work through collateral

9    and a foreclosure process."

10          He's talking about the change in the waterfall

11   provision in the February 11th document, and our complaining

12   about it, that it's not consistent with the commitment

13   letter.

14          Is he telling us no?  Well, I suggest he is.  But

15   Mr. Perlman wants to focus on the language, you know, "we

16   probably need to discuss."  "Not agreement right now."

17   Okay?

18          THE COURT:  Okay.

19          MR. BATTISTA:  Then we come to that evening

20   conference call.  This is the 16th, and that same conference

21   call.  Testimony from the people on this case are, "We were

22   again told, we're not changing the waterfall structure."

23          And, again, just like with the escrow provisions,

24   Item 22 is the same, yet revised, draft of the loan

25   agreement that came out the next day after that evening

AA01166

1  conference call, February 17th from Ms. Helm to everybody,

2  and I attached to that part of the DIP loan agreement,

3  Section 10.4 again.

4         You can take my word for it, but that did not

5  change their February 11th version of the waterfall.  They

6  continued to assert that it had to -- they could foreclose

7  against everything and only sell in accordance with the

8  waterfall.  Again, different than the original version they

9  sent and different than the commitment letter.

10        So we were told on February 16th we're not getting

11 it -- the waterfall provision this time.  And the 17th, we

12 get a document mailing at home, we're not getting it.

13        So, again, Judge, when does PEPI's position turn

14 from a mere suggestion or a proposal to "You're not getting

15 it?"  That's it, stop asking.  How many times do I have to

16 be told no before it sticks?

17        I tell my kids "no" a lot, but this is not in

18 the context of a commercial deal when I'm trying to borrow

19 $25 million to save a 1700-home community when we were

20 running out of cash.  It's a little bit more serious than

21 that.  We've been told "no" several times on this provision,

22 like with the escrow provision.

23        So by February 17th, their position was firm.  And

24 frankly, Judge, there's no other conclusion that you could

25 reach based on that exchange of emails and loan documents.

1  We were told "no" on February 17th finally with respect to

2  this waterfall provision.

3          And so let's go back to Mr. Fine's letter, all

4  right?  Because he talks about this again on February 23rd,

5  Item 27th.

6          And in Item 27 on page 2 -- this is now paragraph

7  5, and I'll read it to you quickly.  It says -- his letter

8  to me says, quote, "In regard to the wording of the

9  waterfall provisions of the loan" -- what we've just been

10  talking about -- "PEPI was under the impression that wording

11  of these provisions was acceptable to the borrowers."  Well,

12  where did he get that from?  Mr. DiNardo's email?  I don't

13  think so.

14          "If that is not the case, then PEPI wants to

15  cure this inadvertent misunderstanding."  Inadvertent

16  misunderstanding.  "And will diligently review the wording

17  of the waterfall provisions as you think are compatible with

18  the terms of the commitment letter."

19          He's admitting that we told him it's not

20  consistent or compatible with the commitment letter.

21  He's now trying to say, "Oh, it's an inadvertent

22  misunderstanding."  Really?  You saw the emails that

23  started with the waterfall and what it was for and why it

24  was there and who would benefit.

25          You saw the language in the commitment letter, you

1  saw their first draft of the loan agreement, you saw Mr.

2  DiNardo saying, "This is not consistent; it's diluted."  You

3  saw Mr. Lorio say, "We don't have an agreement right now."

4  What's there not to agree to?  Go back to the first draft of

5  the loan agreement that you sent us.  And here we have him

6  suggesting it's an inadvertent misunderstanding, after the

7  fact.  Respectfully, Judge, he's again admitting that this

8  -- his -- their provision was not consistent with the

9  commitment letter.

10          And oh, by the way, just as a sidenote, where

11  in here does it say, "Oh, and the waterfall provision,

12  Battista, is not enforceable."  Where does it say, "We

13  have *res judicata* issues or collateral estoppel issues?"

14  It doesn't say that.  It doesn't any anything like that,

15  because the argument on *res judicata* and collateral estoppel

16  and unenforceability is an argument developed for this

17  litigation.  It was not an issue back then.

18          This is the last correspondence we had with PEPI

19  after months of negotiation.  No one said in this letter,

20  "And oh, by the way, it's not enforceable."  Do you think if

21  he had a defense of unenforceability when he's responded to

22  my default letter, he would have told me?  Absolutely, he

23  would have told me.

24          He would have said, "Battista, you're wrong.  We

25  don't have to put it in there; it's not enforceable."  He

AA01169

1   doesn't say that. He also doesn't say, "By the way, as a

2   sidenote above, that the deed in lieu of foreclosure is not

3   enforceable." He doesn't say that either. These are

4   arguments that have been developed for this litigation.

5   They didn't exist back when we were doing this.

6           So, Judge, again, we think that's yet, another

7   admission by PEPI that they failed to comply with the

8   waterfall provisions. Okay, let's move on to due diligence.

9           When I was before Your Honor the first time, I

10  told you there were a number of emails that the Debtor and I

11  sent to PEPI begging them for the due diligence sign-off.

12          I didn't have a chance to walk through them in the

13  preparation for this, and at the last hearing I realized how

14  powerful they are, and you need to see them because they

15  give you a different perspective as to that provision in the

16  commitment letter.

17          Let's go with first, Item 3 in my evidence book.

18  And, again, you've seen this email because it covered a lot

19  of issues. This is December 29th, 2009, me responding to

20  the draft of the commitment letter.

21          THE COURT: Mr. Perlman?

22          MR. PERLMAN: Judge, I've got two points that I'd

23  like to raise in this regard. I could just mark it and take

24  a seat and wait for Your Honor's lead, or I could present

25  them. I'm happy to proceed however Your Honor thinks would

AA01170

1   be appropriate.

2           THE COURT:  I'll let you come back later.

3           MR. BATTISTA:  Thank you, Judge.  So, Judge, Item

4   3, this is my email to Jeffrey Fine.  And if you turn the

5   page to the second page, it's paragraph 8.

6           THE COURT:  Uh-huh.

7           MR. BATTISTA:  And in there, it's entitled due

8   diligence.  So let's take a moment and read that because

9   it's important.  This is prior to the signing of the

10  commitment letter.  I say to him, "We need to obtain some

11  additional clarity on where we stand with the due diligence

12  investigation."

13          THE COURT:  I'm sorry.  The date of this is --

14          MR. BATTISTA:  I apologize.  It's December 29th.

15  Yup, December 29th.  I apparently didn't have much of a

16  holiday that year.

17          THE COURT:  Okay.

18          MR. BATTISTA:  It's Item -- paragraph 8 in Item 3,

19  and it's entitled Due Diligence.  Do you have it, Judge?

20          THE COURT:  Yes.

21          MR. BATTISTA:  So if you read along with me,

22  you'll see.  I say, "We need to obtain some additional

23  clarity on where we stand with the due diligence

24  investigation.  We appreciate the checklist with the

25  updates.  You heard that from Mr. Perlman earlier."

AA01171

1    "However, can you advise to date whether there are

2    any due diligence issues that you have uncovered that may

3    cause you not to go forward with the loan?"  "That may cause

4    you not to go forward with the loan?"

5    "Second, can you advise generally as to what you

6    are concerned about in terms of future due diligence that

7    would cause you not to go forward with the loan?"

8    "Lastly, we need to have some agreement that

9    reimburses us for the commitment fee if you elect not to go

10   forward on any due diligence conditions after the signing of

11   the commitment letter and payment of the commitment fee?

12   Otherwise, we run the risk that we pay the fee and the loan

13   does not go forward."

14   Now, I realize that the commitment letter was

15   drafted after this.  But this gives you a perspective as to

16   what I've been telling you, and I think Your Honor caught on

17   to this.

18   I needed to know whether I had a lender.  Due

19   diligence -- and we'll get it because Mr. Fine says it in

20   his February 23rd letter.  Due diligence is different than

21   closing conditions.  You made that point as well.  Due

22   diligence is:  Do I want to make this loan, all other things

23   being equal.

24   Do I want to make a real estate loan?  Do I want

25   to make a $27 million real estate loan?  Do I want to make a

AA01172

1    real estate loan on vacant land, on housing developments?

2    That's what due diligence is about?  We don't need a case --

3    we don't need case law to tell you that.  You know that from

4    your experience.  Do I have a lender?  And if I don't want

5    to make this loan, the due diligence out lets me leave in my

6    sole discretion.  I'm just going to -- I don't want to make

7    it, I'm out of here.

8            Well, once I tell you that my due diligence is

9    complete, I can't leave anymore unless there's a failure of

10   a condition to close it, like title, environmental, et

11   cetera, the long laundry list that Mr. Perlman showed you.

12           So that's our mindset and that's what I'm showing

13   you this for, is what our mind set was.  I need to know

14   whether you're going to go forward this loan.  That's what

15   paragraph -- because, Judge, without that, the commitment

16   letter isn't worth the paper it's written on.

17           If they tell me, "We're walking because we don't

18   like to make real estate loans anymore," what do I do?  I

19   don't have their signoff.  I don't have them telling me

20   they've completed their due diligence and they're still

21   going forward.  So it's not worth anything unless I get

22   that.

23           And anybody, any commercial lawyer and judge,

24   anybody whose bought or sold a home knows you have a due

25   diligence period, and you and you can walk before that

AA01173

1   period expires, for any reason.  That's what that's all

2   about.

3           So let's go to Item 4.  Let me know when you're

4   there, Judge.

5           THE COURT:  I am there.

6           MR. BATTISTA:  It's an email from me on January

7   6th to Mr. Fine.  And in paragraph 9 of that email, I say to

8   him -- this is an outline of the points we have to discuss.

9           I say to him in No. 9:  "Timing of the closing

10  from and after the signing of the letter" -- that's the

11  commitment letter -- "namely we need" -- sorry.  "Namely,

12  when we sign the letter, what is your expected timing to

13  complete due diligence and do the loan documents?"

14          We are trying to gauge the filing" -- to do what?

15  -- "to coincide with the completion of your due diligence so

16  that we know we are good to go other than the Court's order.

17          Mr. Perlman argued strongly that due diligence was

18  not a condition of the filing.  It was not contemplated to

19  be a condition of the filing.  It was a condition of the

20  funding, in addition to all the closing conditions.  This

21  email, I'm telling Mr. Fine in January 6th, I need to know

22  when you're going to complete your due diligence so I can

23  coincide that with the filing.

24          He knew it.  This email says it.  To suggest

25  otherwise is fanciful.  I'll make this point before going

AA01174

```
 1   any further.  There's not one email in here that Mr. Fine
 2   didn't testify in his deposition that he told me in an email
 3   or otherwise that they weren't giving me that due diligence
 4   signoff before filing.  He never said that.
 5          So I say this to him here.  How come he didn't
 6   just write back and go, "Whoa, Battista, you're crazy.
 7   We're not giving you that signoff until funding."  He didn't
 8   say it in response to my first email.  He didn't say it in
 9   response to this email.  And I'm going to show you five or
10   six others.  He didn't say it in response to that either.
11          THE COURT:  Now, I got lost in the double
12   negatives.
13          MR. BATTISTA:  I'm sorry.
14          THE COURT:  There's not one email that he
15   testified about where it says --
16          MR. BATTISTA:  Yeah, let me back up.  I'll clear
17   it up.  So I'm saying to him in these two emails, and in
18   several more I'm going to show you --
19          THE COURT:  You need to know where they are in the
20   due diligence process.
21          MR. BATTISTA:  So I can file.
22          THE COURT:  Okay.  That's what you've said.
23          MR. BATTISTA:  He -- there's nothing that comes
24   back from him, anywhere, that says, "We're not giving that
25   to you.  Why do you keep asking for it?"  He doesn't say
```

1    that to me.

2            He never says, "Paul, you're wrong.  The

3    commitment letter doesn't require us to give that to you

4    before filing, so stop focusing on the filing.  We'll give

5    that to you, if we decide to, by the funding," which is

6    their argument now.

7            So if their position was I wasn't getting that

8    signoff until funding, how come nobody told me?  How come

9    I keep asking -- and you'll see several more -- for the

10   signoff so I can file?  Nobody said, "We're not giving it to

11   you before you file.  That's not what we're required to do."

12   He doesn't say that anyplace in here.

13           THE COURT:  Okay.  So your argument is that the

14   current analysis is retrospective.  I mean, it's --

15           MR. BATTISTA:  Absolutely.  And I'll get to you --

16   and I'll tell you, we'll get there.  The February 23rd

17   letter, which is not addressed by PEPI in any of their

18   pleadings or argument, says just that.  So let's keep going.

19           But I had to point it out to you, Judge, because

20   it's important.  I keep asking for this for a particular

21   reason in which I say why I need it, and no one says,

22   "You're not getting it."  By the way, we did get that "no."

23   We got that "no" on February 16th in an evening conference

24   call.  But by then, I had asked a dozen times.  So let's

25   keep going.

AA01176

```
1            Item 7.  Let me know when you're there, Judge.
2            THE COURT:  Okay.
3            MR. BATTISTA:  Item 7 is an email from me to Mr.
4    Fine on the date the commitment letter was signed, January
5    27th.  And I say to him, "Jeff, thank you for all of your
6    help in getting us to this point.  I assume that you and
7    your team are now commencing due diligence in earnest."
8    Why?  "So that we can get to the filing in the next several
9    days."  "Please let us know what we still need to get to you
10   in order to keep the process moving.
11           So putting aside me asking before we sign it and
12   why I need it, the day we sign it, the day we sent it back
13   to him -- because if you look down in the email chain below,
14   you see people exchanging signature pages.
15           I asked him -- the very first thing I asked him,
16   after thanking him, is:  "When are you going to complete
17   your due diligence so we can get ready to file in the next
18   several days?"
19           Item 9.  And when you get there, Judge, you'll see
20   two emails in Item 9.  It's two emails in an email chain
21   between Mr. Fine and myself.  Starting on February 5th in
22   the morning where I say to him, quote, "Jeff, can you give
23   me an update on the timing of the completion of the due
24   diligence, as well as other things?  We are still shooting
25   to file next Tuesday and Wednesday."
```

AA01177

1      So my tying completion of due diligence to a

2  filing, you can decide for yourself.  I was, but you can

3  decide from that language whether I was or I wasn't.

4      Mr. Fine responds to me in the email just above

5  it.  He doesn't talk about the due diligence; does he?  He

6  talks about the draft interim order.

7      I respond again a little later in the day,

8  actually early evening.  And I say, "Thank you, Jeff, we

9  will review and respond ASAP."  I'm referring to the interim

10  order.  Then I say, "In the meantime, can you update on the

11  status of due diligence and the expected completion date?"

12      So I'm asking twice now on the same day, and I

13  still don't have a response.

14      THE COURT:  What does it say about due diligence

15  in the commitment letter.

16      MR. BATTISTA:  We're going to get there, Judge.

17      THE COURT:  Okay.

18      MR. BATTISTA:  Let me just tell you how -- me

19  asking for it, then we'll go and see what -- to me, this is

20  an important context so you can see what this meant to us,

21  how many times we kept asking for it.

22      THE COURT:  And the due diligence -- I mean,

23  excuse me.  The commitment letter was signed on January

24  26th?

25      MR. BATTISTA:  27th, I believe, Judge.

AA01178

1          THE COURT:  Okay.

2          MR. BATTISTA:  So the next email is actually the

3    most telling one, and it's the next one, Item 10.  And this

4    is an email on February 8th.  It's a Monday.  And, again,

5    you can see a lot happening in a very compressed time

6    period.

7          But in Item 10, I say to Jeff in an email on

8    February 8th.  Point 1, I say, "We understand that you,

9    Jeff, are conferring with your team so as to let us know

10   whether you are able to provide the due diligence signoff,

11   and if more information is needed, and what you need from us

12   in order to make that decision."

13         What does that tell you?  That tells you that he

14   is conferring with his team at PEPI as to whether to give us

15   that signoff.  If that wasn't required by the commitment

16   letter, what am I doing?  How come he's not saying, "What

17   are you doing?"  I'm clearly referring to the conversation

18   where he's conferring with his team as to whether -- let us

19   know whether you'll be able to provide that signoff on

20   February 8th.

21         Item 11.  The very next one.  Now, it's February

22   10th.  In the middle of that email chain, I say to Jeff,

23   quote, "Jeff, is it realistic that we can file tomorrow" --

24   with what?  "With due diligence signoff"?  Am I tying the

25   filing to the due diligence signoff?  Absolutely I am.

AA01179

```
 1              Why?  Because I need to know I have a lender, as I
 2     said in my earlier emails.  And does he believe that that's
 3     what I'm doing?  Absolutely, he believes it, but he was
 4     referring to his team to figure out whether they can give
 5     it to us.
 6              THE COURT:  Where does it say that?  I see --
 7     I saw the email --
 8              MR. BATTISTA:  Item 10.  Go back to Item 10.
 9              THE COURT:  And I saw the email where you were --
10              MR. BATTISTA:  Right.  I'm just recounting a
11     conver -- we understand.  There's no question that I'm
12     recounting, apparently, a conversation he and I had.
13              THE COURT:  Okay.  All right, go ahead.
14              MR. BATTISTA:  Item 17.  Rolling forward a few
15     more days.  Now, we're on February 15th.
16              THE COURT:  I'm there.
17              MR. BATTISTA:  7:07 p.m.  I write to Jeff again.
18     In the middle of that paragraph, I say, quote, "Also we need
19     to know when we can get the due diligence signoff."  "We
20     need to know when we can get the due diligence signoff."
21              The last time I asked for it was the next email,
22     Item 18.  This is almost midnight on that same Monday,
23     February 15th.  An email from me to Jeff and others, and I
24     say, in addition to "Understood, thanks." Quote, "Any word
25     on the title due diligence or the budget signoff?"
```

AA01180

```
 1          It was the last time I asked for it.  Why?
 2   Because in the sequence of events, the next day, the 16th,
 3   was the conference call in the evening where we were told,
 4   "You're not getting it until funding."
 5          Okay.  So now let's circle back to -- what does
 6   the commitment letter say?  Which is the point that the
 7   Court raised with me.  And that's in Item 1, and it's on
 8   page 4 of 45, or on the top, 5 of 47.
 9          THE COURT:  Page what?
10          MR. BATTISTA:  On the bottom, 4 of 45.  Or if
11   you're looking at the top of the page, it's 5 of 47.  In
12   Item 1.
13          THE COURT:  Okay.  Okay, I'm on page 4 of 45.
14          MR. BATTISTA:  Okay.  In the middle of the first
15   full paragraph, the one that begins "the commitment letter
16   will be of no force and effect."  Do you see that paragraph?
17          THE COURT:  Uh-huh.
18          MR. BATTISTA:  In the middle of it, it says, "The
19   obligations of PEPI to provide a credit facility."  Do you
20   see that?
21          THE COURT:  Yes.
22          MR. BATTISTA:  Okay.  The "obligations of PEPI to
23   provide a credit facility under this commitment letter, if
24   timely accepted and agreed to by the company," which it was,
25   "will terminate upon the earlier of" -- "the earlier to
```

AA01181

```
 1   occur or 1 or 2."  Okay.
 2          First, that language is self-effectuating; isn't
 3   it.  This will terminate upon the earlier of 1 or 2.
 4   Termination doesn't require a notice.  It doesn't require --
 5   it's self-effectuating.  And so earlier of what?  1 or 2?
 6   Well, let's deal with 2 first, because Mr. Perlman made a
 7   big deal out of it.  It's irrelevant to this discussion.
 8          No. 2 talks about if we don't get the interim
 9   order and the final order within 90 days of the bankruptcy.
10   Okay.  Well, that presupposes we file bankruptcy.  That's
11   not what we're complaining about.  We're not complaining
12   about Point 2.  What we say is in Point 1.
13          So this commitment terminates on the earlier to
14   occur of 1.  Automatic.  The close of business of February
15   8th.  It's going to terminate on February 8th unless
16   something.  Let's skip the parenthetical and go to the end
17   of clause 1.  "Unless the company has instituted the
18   bankruptcy cases on or before that date."
19          So this says unless we file bankruptcy before
20   February 8th, the commitment will terminate automatically.
21   I got that.
22          Now, overlay the parenthetical.  And the
23   parenthetical says, "Or such later date that is three
24   business days after agent has advised company it has
25   completed its due diligence."
```

AA01182

1          So what does that mean?  What does it do to the

2    February 8th date?  Let's assume we haven't filed bankruptcy

3    by February 8th.  Let's make that assumption.  Does this

4    commitment terminate?  No.  Because February 8th is extended

5    by the parenthetical.  It's extended for three business days

6    after they advise us that they've completed their due

7    diligence.

8          So when PEPI says to you -- and Your Honor made

9    this observation as well -- well, we had to have a basis to

10   terminate our commitment letter.  We couldn't have it out

11   there forever.  That's crazy.  I agree, it's crazy.  But

12   unless they gave us -- unless they advised us -- we'll get

13   to the wording in a second.

14         Unless they advised us that the due diligence was

15   complete, guess what.  It's out there forever unless we file

16   bankruptcy.  Because the only way trigger the termination is

17   if we file bankruptcy or they give us that advice.  If we

18   never file bankruptcy, they have a never-ending commitment

19   letter unless they give that advice that they've completed

20   their due diligence.

21         And by the way, that's exactly consistent with

22   the emails you saw prior to this, which is "I'm not filing

23   until I know I've got a lender and I've got completed due

24   diligence.  Closing conditions aside, and we'll get to that

25   in a second.  Do I have a lender who's committed to this

AA01183

 1   deal?  That's why that language is in there.  Now, could it
 2   have been better drafted?  Of course.
 3          THE COURT:  Yeah, I was going to say, it's
 4   strangely worded.  Why even have February 8th in there?
 5          MR. BATTISTA:  Judge, we had to pick a date by
 6   when we were going to get this thing filed.  So they picked
 7   -- one of us picked February -- I don't even know who it
 8   was.  It doesn't matter because the parenthetical is the
 9   important one.  February 8th is irrelevant, unless I got
10   that notice.  Right?  It doesn't matter.
11          If I don't file by February 8th; what happens?
12   Nothing happens.  They can't terminate.  It's not -- the
13   termination isn't even -- this is self-effectuating.  It
14   doesn't even terminate.  So February 8th is just a date.
15          Was it a target date?  Sure.  But it's an
16   irrelevant date in terms of this commitment termination
17   because it doesn't terminate until three business days after
18   they've advised us they've completed their due diligence.
19          And by the way, this says "completed its due
20   diligence."  It doesn't say "substantially completed its due
21   diligence or materially completed its due diligence."  It
22   says "completed."
23          So PEPI has argued, "We told them all along.
24   We were giving them checklists and we told them it was
25   substantially complete.  That's what the argument is.

AA01184

```
 1   "We told them it was substantially complete."
 2           Well, that's nice but that's not what the
 3   commitment letter required.  It required "completed its due
 4   diligence."  I don't know what substantially completed
 5   means.  What is not -- so that begs the question.  What is
 6   not completed if it's substantially completed?
 7           This required advice of completion of due
 8   diligence, so the fact that they want to say it was
 9   substantially complete, we told them all along, is
10   irrelevant to this discussion?
11           And let's talk about the writing part of it.
12           THE COURT:  Okay.
13           MR. BATTISTA:  Because there's been a lot made of
14   that.  I agree with you, that if they were going to give me
15   that notice, that advice verbally, that they were completed,
16   why not put it in writing?  It's a critical issue.
17           It triggers the termination of the complaint --
18   it triggers my obligation to file bankruptcy to file
19   bankruptcy.  But, okay, put that aside.  I agree, it doesn't
20   say "written."  It doesn't say "written notice."  Actually,
21   it says advised.  "Has advised the company."
22           So whether that's by writing, by email, by phone
23   call, by carrier pigeon, it doesn't matter how it is, they
24   had to advise me -- us -- that they completed their due
25   diligence.  It's undisputed, they never advised us of that.
```

AA01185

1    However you want to say they had to do it, whatever method,

2    whatever means, they never did it.

3         In fact, worse, on the phone call, on February

4    16th, they said, "We're not giving it to you, we're not

5    going to advise you that we've completed it.  We'll tell you

6    we substantially completed it," which is what they said,

7    "but we're not going to advise you that we've completed it

8    until we fund this loan.

9         We find out in deposition afterwards, Mr. Redunsky

10   testified, "We never intended to give it to you."  So let me

11   get this straight.  I've been asking for this due diligence

12   signoff since before the loan -- the commitment letter was

13   signed, as it was being negotiated, all the way through,

14   from January 6th to February 15th, I'm asking, asking,

15   asking, asking and tying it to filing, and now we find out

16   you never intended to give it to me?

17        Talk about equitable estoppel, talk about me

18   relying on this commitment letter, they never intended to

19   give it to me.  And that's what he testified to.  Now, on

20   the phone call they said, "We're not giving it to you."  He

21   didn't say, "We never intended to."  In the deposition in

22   this case, he said, "We never intended to give it to you."

23   How come they didn't tell me that after all of these emails?

24   Me asking, yet begging, to get that sign off?

25        How come they didn't say, "We're not giving it to

AA01186

1  you"?  It had to culminate on February 16th on a conference

2  call where they told us that.  So I don't ask anymore, after

3  February 16th, because I've been told I'm not getting it.

4          So, Judge, one of PEPI's dilemmas is, if this is a

5  termination provision, as they say, and it couldn't be out

6  there forever, how do they -- how do they reconcile that

7  with the fact that it is going to be out there forever

8  unless they advise us of completion of due diligence?  That

9  doesn't make any sense, and their reason doesn't make any

10  sense because the argument doesn't make any sense.

11          It's created for after the fact litigation.  They

12  knew we needed this.  They knew this language is in there

13  for a reason.  Perhaps not artfully drafted.  But we were

14  at this for three months of negotiating with it on this

15  document.  It's 45 pages long, hundreds of issues to deal

16  with.

17          Okay, I'll take some fault for that.  But it says

18  something -- it says that for a reason.  We don't have to

19  file until we get that advice of due diligence signoff.

20  Completion of due diligence.

21          Mr. Redunsky, who's PEPI's representative,

22  testified -- on page 83 of his deposition -- it's attached

23  to our summary judgment motion at Exhibit 3.  We asked

24  him --

25          THE COURT:  I'm sorry, which page?

AA01187

1         MR. BATTISTA  It's page 83 of his deposition.

2    It's Exhibit 3 to our summary judgment motion.  It's

3    actually not in this book and I apologize.

4         THE COURT:  That's okay.

5         MR. BATTISTA:  (Conferring.)  I thought -- Mr.

6    Reyes just corrected me.  It's actually in this book, Judge.

7    You can actually turn to it.  It's at the back.

8         It is (c).  It's the second to last exhibit in my

9    book, and it's the oral deposition taken of David Redunsky,

10   taken May 29th, of this year -- actually, of last year,

11   excuse me.

12        THE COURT:  Okay.

13        MR. BATTISTA:  And page 83.  I hope it's -- do you

14   have page 83, Judge?

15        THE COURT:  I do.

16        MR. BATTISTA:  Okay.  Lines 20 to 23.  And here

17   we're talking about this provision in the commitment letter.

18   And the question is:  "Why was the later date -- that's the

19   date in the parenthetical tied to notice from PEPI of

20   competition of due diligence?  Do you know?"

21        Mr. Redunsky on behalf of PEPI says, "I think that

22   was seen as a way to let the borrower know then that we were

23   ready to go."  So he knew we needed that notice so we could

24   -- so they would be ready to go as a lender.  He knew that

25   we needed them to be committed to this loan.

AA01188

 1          So that leaves you with, in my view, the question

 2    of:  Did PEPI refuse to give it, provide that advice, even

 3    assuming it didn't have to be in writing?

 4          THE COURT:  I was just looking here at page 85.

 5          MR. BATTISTA:  Oh, I'm sorry.

 6          THE COURT:  Somebody -- Mr. -- somebody's asking

 7    the question.  I don't know who's doing the interrogation.

 8          MR. BATTISTA:  Mr. Reyes was, actually, to his

 9    credit.

10          THE COURT:  And the question on page 85 at line 6

11    is:  "Could the commitment terminate on February 8th, given

12    the parenthetical that follows," something I was tripping

13    over, the draftsmanship of that.

14          And the answer is:  "I think if you read this in

15    the following way, it could -- and that would be on February

16    1st, if PEPI had given notice it had completed due diligence

17    under this paragraph, had given that notice, and then by

18    February 8th there wasn't a bankruptcy filing, then it would

19    have terminated, I think."

20          MR. BATTISTA:  Exactly.  But what if they didn't

21    give the notice -- the advice?

22          THE COURT:  It would just sit there.

23          MR. BATTISTA:  It would just sit there.  Until

24    they gave that advice.  A never-ending commitment.  Which

25    they also say is not what they wanted, they couldn't have

1    that.  That's commercially unreasonable to have that.

2    No lender would have an unending commitment letter.

3    So, Judge --

4              THE COURT:  Well, as I see it, I mean, they hold

5    the keys to their own cell.

6              MR. BATTISTA:  Exactly.  And at the same time ----

7              THE COURT:  I mean, just the language there would

8    suggest that.

9              MR. BATTISTA:  That's right.  It does.  They do.

10   You're absolutely right.  Except they also sad a gun to my

11   head because they know that I have to file.  They know that

12   we're running out of money.  They know the situation that a

13   real estate development is facing in early 2010.  And they

14   don't give it to me.

15             They say substantially complete.  That's their

16   testimony.  He told me it was substantially completed.

17   What's he complaining about?  It's not good enough.

18             And now let's turn to Mr. Fine's letter, because

19   after all of that, Item 27, we're back to that same letter

20   -- again not addressed anyplace in PEPI's presentation to

21   the Court.  And it's on page 2 of that Item 27, it's

22   Paragraph No. 3.

23             We've already looked at the other paragraphs, but

24   now he says in here.  "As has been previously indicated to

25   you, all material due diligence on the loan has been

AA01190

 1  completed by PEPI."  "All material due diligence."  That's

 2  not telling me that it's completed, as the commitment letter

 3  requires.  He's hedging again.  Hedging.  I don't have a

 4  lender even here.

 5        And then he goes on:  "And PEPI is ready, willing

 6  and able to immediately fund the loan in accordance with the

 7  commitment letter upon receipt of Bankruptcy Court

 8  approval."  Well, I read that language and I understand it,

 9  but in the first part he says "material due diligence has

10  been completed," not all due diligence.  So what if there's

11  an item out there that somebody doesn't like, could he still

12  pull the loan?

13        Respectfully, in the situation that I'm in at that

14  point in time, absolutely, that's my concern.  But this is

15  all too little too late.  Let's keep going.

16        He then says, "Although PEPI has told you

17  repeatedly during this past week that the Borrower --

18  Borrowers are free to file Chapter 11 at any time, please

19  consider this your formal three-business day notice that due

20  diligence has been completed."

21        Finally, I've been begging for it since January,

22  I have to default them before he finally tells me due

23  diligence has been completed.  In the first part of it, he

24  repeatedly told me that we would file any time.  That can't

25  be more self-serving.  He knows I can't file without that

AA01191

1    due diligence completion.  Now he finally gives it to me.

2           How come he couldn't give it to met three days

3    earlier when I was begging for it?  How come he couldn't

4    give it to me three days earlier when I was begging for it?

5           How come I couldn't it on the February 16th

6    conference call when I was told "you're not getting it until

7    funding."  Now, all of a sudden, less than a week later, I

8    got it.  Why?  Because we defaulted them.  Why?  Because

9    they didn't think we had any other choice, any other

10   opportunity.  They had us cornered, they thought.  Because

11   if not, why not give it to me.  Why not give it to me?

12          Why keep saying no?  And why keep hedging and

13   why keeping saying, "You're not getting it until funding."

14   These are smart people.  They know what we want it for.

15   They're not giving it to us.

16          And if it wasn't required by the commitment

17   letter, why are they getting it now.  I'll tell you; they

18   knew it was required; they just didn't want to give it to

19   me, because this letter would have said, "We're not required

20   to give it to you until funding," right?  That's the

21   position now.  He doesn't say that in here.

22          He's admitting he had to give it, and he's giving

23   it to me.  That's why this letter is not in PEPI's pleadings

24   or in argument, because it's damning for them on all three

25   of these issues.

```
 1              And so the issue that -- of due diligence versus
 2    closing condition, let's deal with that -- tackle that right
 3    now.  I know the difference.  The Debtors weren't confused,
 4    as was suggested in the pleadings.  I knew, we knew, that
 5    we has to satisfy the closing conditions, the long list
 6    of conditions that Mr. Perlman showed you in his
 7    presentation, but that's different than due diligence
 8    signoff.
 9              So here's PEPI's argument to the logical
10    conclusion.  They don't tell us that their due diligence is
11    completed before bankruptcy.  We say they've ignored the
12    commitment letter.  We filed Chapter 11 and we don't have
13    that signoff.  We come to this Court, we put on a full dog
14    and pony show, and we get to Court to approve the DIP loan
15    over the objection of seven senior secured creditors.
16              We go to a closing.  We satisfy all of the
17    conditions precedent that Mr. Perlman talked about:  Title,
18    certificate to good standing, environmental, you name it.
19              And then PEPI says, "You know guys, we don't like
20    real estate loans.  We don't want to lend 27 million; we'll
21    lend 2 million.  We don't want vacant land as collateral.
22    Any other reason that they're not satisfied with their due
23    diligence, they can get out of that loan.
24              So what then?  We've gone through all of that, and
25    now we melt down.  That's the risk that we were facing on
```

AA01193

1    February 17th and 18th when I went to Mr. Ferrao and said,

2    "Please make this loan.  I can't tell you that I have a

3    committed lender.  I don't know why they're playing games

4    but they are.  I don't know why they keep telling me

5    substantially complete or materially complete.  I don't

6    know why they can't tell me it's complete.

7         But if we file Chapter 11 now and they walk, as

8    they are able to, because they're not satisfied with their

9    due diligence or it's not been completed, you're done.

10   You're in Chapter 11 with no lender, after we had it

11   approved by Your Honor, and we get to the closing table and

12   there's no money and there's no lender.

13        Now, maybe there's a renegotiation or whatever

14   else happens, but talk about the bargaining position there,

15   between us and PEPI at that point in time.

16        If I had that due diligence signoff, then I can

17   live by the closing conditions because I control those.  I

18   can get the certificate of good standing.  I can get the

19   title insurance.  I can get all these things that I need to

20   get because I can control those.  I can't control whether

21   they're going to make a loan or not.  That's in their

22   control.  That's in their due diligence investigation.

23        And I take the risk that you may or may not

24   approve this loan that created an adequate protection

25   package that I believe will get me there.  There's always

AA01194

1  risk in that, right?  I got that.  But you try to minimize

2  that as a bankruptcy lawyer.

3         If their due diligence investigation failed, they

4  could walk from this loan and there's not a thing I could

5  do about it.  They couldn't walk after they gave me that

6  signoff unless a closing condition wasn't satisfied, and I

7  controlled those.  And Mr. Fine has essentially told you

8  that in his letter of February 23rd.

9         And the last paragraph I'm going to point you to

10  in that Item 27, his letter is paragraph 6.  He makes this

11  exact conclusion, quote, "While due diligence on the loan is

12  completed" -- of course he just gave that to me up in

13  paragraph 3 -- "PEPI has consistently advised that borrowers

14  -- that conditions precedent remain active and must be

15  satisfied through funding."  He is drawing the correct

16  distinction between due diligence and closing conditions.

17         Due diligence has now been given -- that

18  completion has been given before filing and before funding,

19  yet closing conditions exist through funding.

20         PEPI's argument today is that due diligence was

21  never a filing condition; it was always a funding condition.

22  How do you reconcile that with Mr. Fine's admission in

23  Paragraph 6?  The answer is you can't.  Because back on

24  February 23rd, 2010, he knew the difference, and he knew

25  that you can get due diligence signed off upfront and

1    closing conditions through a closing.

2         So the argument that due diligence had to continue

3    through funding is created for this litigation.  It didn't

4    exist back on February 23rd, 2010, because if it did, he

5    would have told me.  He didn't tell me that.  That's why

6    this letter is not addressed in PEPI's papers and not

7    addressed by Mr. Perlman in his arguments, because every one

8    of those paragraphs is an admission as to the defaults that

9    we're talking about, or position that is different than

10   what's being taken by PEPI in its papers today.

11        So, Judge, I have now gone through the three

12   defaults in a lot more detail that will hopefully give you

13   perhaps a granular understanding of what we were doing, what

14   we were trying to accomplish, what we were told, and where

15   we found ourselves.

16        So let me run quickly through PEPI's defenses,

17   because I didn't have that chance at the last time.  And

18   they've raise essentially seven reasons as to why what we

19   suggest are their admitted defaults as to why they should be

20   excused from those defaults.

21        We've talked about the first one, and that is

22   PEPI suggests that its refusal to include the expert

23   provisions and its refusal to go back to the original

24   waterfall provision was a mere suggestion, or a request,

25   not a, quote, absolute, unequivocal demand.

AA01196

1    I'm not sure I have to go back through that.  I've

2    walked you through it painstakingly.  And I may be slow on

3    the uptake with this process but I've been told a lot of

4    times in this process that I'm not getting it, and at some

5    point in time, reality has to set in.  And that set --

6    and that reality occurred throughout this process that --

7    absolutely as of February 17th when we had the last drafts

8    of the loan documents.  If not February 16th, on that

9    conference call, when we were told emphatically, no.

10   No proposals, no suggestions, no.

11       And I've already shown you that they have admitted

12   and we propose that the escrow provisions were not only for

13   their benefit but for the junior lenders.  And so they, by

14   their own case law, could not be waived.

15       PEPI, second, argues that:  Well, what's the big

16   deal?  For there to be a material default, the language in

17   the loan documents had -- well, had to be substantially the

18   same.  And if it were substantially the same, it's not a

19   default.  And they argue that moving the escrow provisions

20   actually helped the Debtor.

21       That's Mr. Perlman's argument of speeding the

22   foreclosure process.  "Hey, we didn't want to speed the

23   fore" -- "we, PEPI, didn't want to speed the foreclosure

24   process, and so that helps the Debtor."  So that's, in their

25   words, substantially the same as including the escrow

AA01197

1 provisions.

2          I've got to tell you I don't understand that.  The

3 document says you shall provide the following.  They don't

4 provide the following, and someone that's substantially the

5 same.  You can draw your own conclusions, but that's one of

6 their arguments, is that deleting the escrow provisions is

7 substantially the same as including them, as required by the

8 commitment letter.

9          The third argument that PEPI makes is that the

10 Debtors waived these defaults.  So I appreciate that PEPI

11 is presupposing that, yes, they defaulted in all three of

12 these provisions, but somehow we waived those defaults.

13          And their argument is that we waived those

14 defaults because we continued to negotiate the loan

15 documents for what's essentially going to be one and a half

16 business days.  So let's look at the timing.

17          Let me back up.  They say we should have defaulted

18 them before February 22nd. That's the Monday before we

19 filed.  The prior Tuesday was February 16th.  You put it

20 on a timeline.  The conference call occurs the evening of

21 February 16th and we default them on February 22nd, the

22 following Monday.

23          What happens?  So on the 16th of the evening,

24 we're told no to escrow provisions, no to the waterfall and

25 no to the due signoff.

AA01198

1    On Wednesday the 17th in the afternoon, we get the

2    revised loan agreement from Ms. Helm confirming we're not

3    getting any one of the -- confirming we're not getting the

4    escrow provisions or the waterfall provision.  I stopped

5    asking for the due diligence signoff.

6    So that's Wednesday afternoon on the 17th, okay?

7    We contact Mr. Ferrao on Thursday, the 18th.  Mr. DiNardo

8    and I -- it's in our papers -- called Mr. Ferrao and said,

9    "Pease make this DIP loan."

10    Mr. Ferrao didn't answer us until Friday morning,

11    late Friday morning, I think it was, but when he said he

12    would do it.  So between Wednesday afternoon when we got

13    the final nail in the coffin on the loan agreements where

14    they said no, yet again, until -- oh, and by the way, on

15    Friday morning, when we got that yes from Mr. Ferrao, we

16    stopped negotiating with PEPI.  We admit that.  We stopped

17    negotiating with PEPI, because now we had an alternative

18    that we never had.

19    So Wednesday afternoon, Thursday, and we stopped

20    negotiating on Friday.  That's one and a half business days.

21    Wednesday afternoon and Thursday.

22    After we finally were told no on Wednesday

23    afternoon on all these issues, we negotiated Wednesday

24    afternoon, Wednesday evening, and Thursday, and then we

25    stopped on Friday.  So that's the delay that PEPI said

AA01199

1    occurred that gives rise to a waiver by us of defaults.

2         We've been at this for three months in the

3    commitment letter and almost a full month on the loan

4    documents, and it takes us 1-1/2 business days to stop

5    talking to them.  That's what they say is a waiver of their

6    defaults.  "Hey, if we defaulted on the 17th, you should

7    have told us on the 17th.  The fact that you waited, that

8    you kept talking to us on the evening of the 17th and all

9    day on the 18th, you waived for those defaults."  Really?

10   One and a half business days is a waiver?

11        First of all, they're not arguing that there's an

12   express waiver.  We didn't send them a letter saying we're

13   waiving these defaults.  There's no express waiver.  This is

14   an implied waiver.  They say we impliedly those defaults.

15        I just walked you through the facts.  It's one and

16   a half business days.  We outlined the law on waiver on page

17   38 of our reply.  And when you have an opportunity, you'll

18   read it, but I'll tell you what it says.

19        Implied waiver in Florida requires unequivocal

20   acts evidencing an intent to waive some right.  It requires

21   a conduct or representation demonstrating an intent to waive

22   a right.  It cannot be inferred from ambiguous facts.

23        PEPI's offered you no facts that show an

24   unequivocal waiver by us.  What they say is, "Hey, they kept

25   talking to us for day and a half when they knew that we

AA01200

1   defaulted." We cite to you in that, on page 38 of our

2   reply, several cases in Florida, and you'll read them, which

3   talk about delays that lasted five months to five years as

4   not being sufficient evidence of intent to waive rights, of

5   an implied waiver. We're talking about one and a half

6   business days. Not five months or even five years. That's

7   what the case law in Florida says on what an implied waiver

8   requires.

9           PEPI then argues in addition to the waiver -- they

10  say, "Well" -- this is their fourth argument -- "The Debtors

11  are equitably estopped from enforcing those defaults because

12  of the delay, and because Mr. DiNardo sent an email on

13  Friday saying he was conferring with counsel."

14          Again, Judge, equitable estoppel -- case law is

15  cited on pages 39 to 41 of our reply -- requires that PEPI

16  show detrimental reliance on our actions. That's a classic

17  element of equitable estoppel. The facts are the same. One

18  and a half business days, all right?

19          We stopped talking to PEPI on Friday Morning.

20  They say --- they're arguing that we should be equitably

21  estopped because we talked to them for one and a

22  half business days, yet there's no evidence that they

23  detrimentally relied upon anything. They didn't expend any

24  resources. We paid all their legal fees, $550,000.

25          But put that aside a second. They've offered you

AA01201

 1    no evidence of detrimental reliance for one and a half

 2    business days of talking to us while we tried to figure out

 3    what we were going to do.  Nothing wrong with that.

 4              I had a community or 1700 homes hanging in the

 5    balance.  One and a half business days is pretty fast to

 6    figure out what to do.

 7              They make it sound like the worst people in the

 8    world for having them hang out there for one and a half

 9    business days.  God forbid.

10              They cite you to two cases in their papers, as

11    evidence for saying that we are just like the people in

12    these two cases.  And therefore because those people were

13    equitably estopped, we should be estopped.

14              There's a case called Acosta v. District Board of

15    Trustees, and a case called Pretka, P-r-e-t-k-a v. Cotler

16    City Plaza.  You'll see it.  They spend a few pages on it in

17    their briefs.

18              In Acosta, you had a student who went to college.

19    The student started college, satisfied all of his courses,

20    paid tuition at the full rate, graduated from school.  And

21    after he graduated, he came back and said, you know -- he

22    sued the college and said, "You promised me I'd have tuition

23    cheaper than what I had to pay."

24              And the Court said, "Wait a minute.  If you had

25    that problem, you should have sued before you started

AA01202

1 school, completed all your classes and graduated. You are

2 equitably estopped from asserting that they charged you too

3 much tuition." That's the Acosta case. That's not what we

4 have here.

5 What do we do? We begged and pleaded to get these

6 provisions added to the loan documents. We begged and

7 pleaded for the sign-off. We didn't get it. We waited one

8 and a half business days before we started talking to them.

9 That's not equitable estoppel. That's not the Acosta case.

10 We didn't get all the benefits and then come back

11 and say we don't want to pay for it. The Pretka case is

12 very much the same. This is a Plaintiff who waited three

13 years to call a default.

14 Plaintiff performed the contract, even negotiated

15 new terms, made deposits, and the Defendant completed

16 performance in reliance upon the contract and all the

17 payments that were made, and then the guy came back and

18 said, "I'm suing you, after he accepted all the performance.

19 That's not what we have here. That's the Pretka case.

20 Neither one of them have anything to do with the facts of

21 this case.

22 So when you read them in their brief, you should

23 ask yourself: How does that match up to one and a half days

24 of delay before we start talking to them? The answer is it

25 doesn't.

AA01203

1    And then you have the alleged infamous email from

2  Mr. Ferrao on Friday afternoon, as Mr. Perlman pointed to

3  you, that said PEPI kept asking on Friday, "Hey, what's up

4  with the radio silence?"  As if they didn't know, by the

5  way.  But, "What's up with the radio silence?"

6    Mr. DiNardo responded, by the way, based on what I

7  told him to say, which is:  He was conferring with counsel

8  and he'd get back to them.  "Oh, that's a lie, Judge," he

9  said to you.  "That's not true."

10    Well, of course it was true.  He was conferring

11  with counsel.  We didn't say we were going to get back to

12  you with comments to the loan documents.  He didn't say,

13  "Hey, send us the next version of the loan documents."  He

14  said, "I'm conferring with counsel."  He just didn't go

15  further and say, "To put you in default."  That's what he

16  didn't say.

17    Because what's happening?  This is all crashing

18  down around us after we get that February 17th set of loan

19  documents.  And we begged Mr. Ferrao on Thursday to give us

20  the loan and he tells us on Friday he will.  Well, my

21  goodness, I have a little bit of things to do on Friday.

22  I've got to default PEPI.  I spend the entire weekend

23  preparing the letter and send it out on Monday.

24    I have to prepare for a finalized preparation for

25  a bankruptcy.  Yes, switch DIP lenders and get the case

AA01204

```
 1   filed the following Tuesday.

 2            So when Mr. DiNardo said "We're conferring with

 3   counsel," he's absolutely right, he was conferring with

 4   counsel on a number of things.

 5            PEPI somehow suggests that they detrimentally

 6   relied upon that "conferring with counsel" email over the

 7   weekend.  What did they do over the weekend?  Nothing.

 8   Because we weren't talking to them.  Because they defaulted.

 9   And they knew why Monday when they got the letter.

10            Frankly, they knew why before that, all right?

11   They knew why before that.  They knew the whole history of

12   events.  They knew what we were complaining about and why we

13   needed it.  So there was nothing wrong with that email.

14   There's nothing improper.  It wasn't a lie.  We weren't

15   baiting them.

16            Mr. Perlman says, "Since when does a DIP lender

17   chase the Debtor for a loan?"  Well, when the DIP lender is

18   not complying with the commitment letter, yeah.  They want

19   that loan made on their terms, not on the terms of the

20   commitment letter.

21            The fifth argument he makes, as an excuse, is that

22   the escrow provisions and waterfall provisions were not

23   legally performable.  I will tell you I'm not even so sure I

24   understand today what that means or, more importantly, how

25   that excuses compliance with the commitment letter.
```

AA01205

1       He doesn't argue impossibility of performance,

2    which I understand to be a defense to a contract.  He argues

3    not legally performable.  I'm not even sure I know what

4    that means, but let's assume that it's somehow akin to

5    impossibility.

6       And I've told you that nobody raised these issues

7    other than the consent judgments during the three months

8    of negotiating the commitment letter.  It's not discussed

9    in the commitment letter or in the entire time we're

10   negotiating the loan documents until this litigation happens

11   and all of a sudden those provisions are not enforceable as

12   a defense to their failure to put them in.

13       And I remind you that Mr. Fine admonished me more

14   than once that, quote, the language of the commitment letter

15   was carefully chosen and thoroughly negotiated.  It's

16   Exhibit 3 to his affidavit that Mr. Perlman attached to his

17   response, Exhibit 3, and there's an email in there to me

18   telling me that.

19       So let's talk about not performable.  Escrow

20   provisions, there were three of them.  I've told you about

21   the consent judgment, okay?  Let's even give them that one.

22       Let's talk about valuation mechanism.  There's

23   nothing in PEPI's papers or Mr. Perlman's argument that the

24   valuation mechanism was not legally performable.  They

25   ignore it.  They just lump it together with the escrow

AA01206

```
 1   provisions.  There are three separate escrow provisions:
 2   Escrow for deeds in lieu, escrow for consent judgments, and
 3   valuation mechanism.
 4          They never put the valuation mechanism in the
 5   documents.  We've shown you that.  And he doesn't argue
 6   anyplace that the valuation mechanism is not enforceable.
 7   That alone is a default.  He hasn't even offered an excuse
 8   for that one.  I challenge him to find it anyplace in his
 9   papers.  It's not there.
10          So let's talk about the deed in lieu.  Argues it's
11   against public policy.  Florida does not recognize deeds in
12   lieu of foreclosure in connection with initial loans.  Or at
13   one point he said, "A deed is oftentimes recharacterized as
14   a mortgage, when in fact that's what it was."
15          Now, we've cited the Court to two cases in our
16   brief.  And they are items, if you go to my supplement that
17   I handed up to you, they are cases -- first the second case,
18   which are in my brief.  One is the 1928 -- I think 27,
19   Supreme Court of Florida case.  And if Your Honor goes to
20   that, I've highlighted it.  Mr. Perlman has a full set,
21   highlighted as well, so I can draw your attention to what I
22   believe to be the important pieces of this.
23          If you go to the front page of the opinion,
24   Stovall v. Stokes, 94 Fla. 717.  Do you see that, Judge?
25          THE COURT:  Uh-huh.
```

AA01207

 1          MR. BATTISTA:  So this was -- at the very

 2    beginning, it's a suit by someone named Faye Stokes Stovall

 3    against Clifford Stokes -- by the way, it was her son -- and

 4    others to, quote, "have a deed declared a mortgage."

 5          So here's a situation where a woman, a mother,

 6    gave a deed to her son and is trying to recharacterize it as

 7    a mortgage.  It's what this case is about.

 8          And we roll over to page 4 of the case and you

 9    have the summary, the syllabus of the Court, which is the

10    Court's findings and conclusions.

11          Mr. Perlman has said to you that this case stands

12    for the proposition, in part, that deeds are recharacterized

13    as mortgages and therefore deeds in lieu of foreclosure are

14    not enforceable in Florida.

15          We had cited it for a different proposition of for

16    -- that this shows that these deeds are enforceable, but

17    look at page 4 in the left-hand column.  And you don't need

18    to read very far.  It says, quote, "to make mortgagor's

19    sale to mortgagee valid, it must be shown that mortgagee's

20    conduct was fair and that he paid property's value and took

21    no advantage of the latter's affairs or property."

22          Essentially a deed is enforceable, not as a

23    mortgage but as a transfer of property, if it was fair, and

24    paid property value, and took no advantage.  That's what

25    this case stands for.

AA01208

1    I've highlighted several other provisions but they
2    all come to this same conclusion.  A deed is not going to be
3    recharacterized as a mortgage if it was fair, for fair
4    value, and nobody was taking advantage of anybody else.
5    That's what this case stands for.

6         Now, perhaps a little bit more current and more
7    relevant is the next case, Ringling Joint Venture, which is
8    cited in our brief.  And this one, Mr. Perlman told you
9    stands for the proposition that deeds in lieu of foreclosure
10   are not enforceable if they're in conjunction with an
11   initial loan.  And you made that comment, I think, earlier
12   today.  So let's take a look at -- and this is a District
13   Court of Appeal in Florida, the Second DCA, 1992 case, a
14   little bit more current than the prior one.

15        Just look at the holding on the first page.
16   I highlighted it.  The District Court of Appeal held that
17   transaction whereby to avoid foreclosure on the prior
18   mortgages, third mortgagee made a new loan to mortgagor and
19   mortgagor executed warranty deed to be placed in escrow and
20   delivered to mortgagee upon future default was not void --
21   not void, under doctrine under clogging the right of
22   redemption.  What does that mean?

23        Well, we all know that the right of redemption is,
24   when you give a mortgage, if you pay if off, you can redeem
25   your mortgage and get your property back and preserve your

AA01209

1   equity in the property.

2          This case says with a new loan to the mortgager,

3   which were a deed escrowed -- a deed in lieu of foreclosure

4   escrowed, and it would only be broke out of escrow upon a

5   future default, it was not void.  It was not void.  That's

6   what we cited this for.  Mr. Perlman says, no, no, no, no,

7   that only applies to subsequent transactions.  Okay, let's

8   take a look at the case.  It's very short actually, but it's

9   very powerful.

10          The next page, page 2, you see kind the

11   highlighted -- just the basic facts.  On the bottom of that

12   first page, left hand column, it says, quote, "In order to

13   resolve this complex dispute, in September 1998, Huntington

14   agreed to loan Ringling $8.6 million under revised documents

15   which made Huntington the first mortgage holder.

16          Just above, "Two of the documents executed were a

17   conveyance agreement and an escrow agreement.  The

18   conveyance agreement provided for a deed in lieu of

19   foreclosure to be held in escrow by a title insurance

20   company," exactly what we have here.

21          A little further down, what does Ringling argue?

22   This is the mortgagor.  "Ringling primarily argues that the

23   conveyance and escrow agreements, which Ringling and its

24   lawyers helped create" -- sounds familiar doesn't it, to

25   this case -- "are void and unlawful because they violate the

AA01210

1   doctrine against clogging the equity redemption."

2          So Ringling is making the argument that, hey, even

3   though we were part of this and we drafted it, deeds in lieu

4   of foreclosure on this loan, a new loan, are void because

5   they clog the equity of redemption.

6          Now, we know the Court found otherwise but let's

7   keep going and find out what.  Next page, and the last page

8   of the opinion, I've highlighted what the Court says and

9   I recognize this.  The Court says, "The doctrine against

10  clogging the right of redemption does not create an absolute

11  right."  This is what we've been telling you.  "The courts

12  have recognized that this doctrine of equity does not apply

13  if the right is relinquished by a subsequent agreement upon

14  a further consideration."

15         That's Mr. Perlman's argument.  Hey, Judge, these

16  don't work on new loans.  They only work on subsequent

17  agreements.  That's his argument.  Okay, I got it.  In fact,

18  so did Ringling.

19         If you read a little further, the Court says,

20  "Technically, Ringling may be correct that the conveyance

21  agreement is not a subsequent agreement because it was

22  created in connection with new mortgage documents."

23  So Ringling is making exactly the same argument that Mr.

24  Perlman is making.  It's void because it was created in

25  conjunction with new mortgage documents.

AA01211

```
 1          And then the Court concludes in the top paragraph.
 2   "Nevertheless" -- meaning irrespective of that argument --
 3   "it is an agreement subject to the promissory notes and
 4   mortgages involved in the earlier foreclosure proceeding.
 5   It is clear that this agreement was given to avoid
 6   foreclosure and that Ringling received valuable new
 7   consideration to relinquish its right of redemption."
 8          "If we examine the underlying policy for the
 9   doctrine against clogging the right of redemption, it is
10   obvious that this agreement was intended to assist Ringling
11   at the time of the earlier foreclosure and was not an unfair
12   scheme to take Ringling's equity in the property or its
13   right of redemption."  Isn't that exactly what we have here?
14          Leading up to the bankruptcy, we have seven
15   prepetition senior secured creditors.  Foreclosure
16   litigation pending.  We come to this Court to stop all that
17   and to do a reorganization, a massive workout under this
18   Court's direction.
19          PEPI's making a new loan in the context of that
20   situation.  Even though it is technically a subsequent
21   agreement, it is clearly fitting within the exception here
22   that the Second DCA says exists because this was not a
23   scheme, an unfair scheme to take out equity.  My God, we
24   were offering it.  It was my idea to give the deed in lieu
25   of foreclosure in escrow.  In effect, we begged them to put
```

AA01212

1   it back in the documents.  How was that -- they're not

2   taking advantage of us.  It was our idea.

3           THE COURT:  Well, it would also run the gauntlet

4   of a court hearing where everybody has --

5           MR. BATTISTA:  Of course.  Of course.  So is a

6   deed in lieu of foreclosure enforceable?  Absolutely.

7   Especially in the context of a court hearing before this

8   Court.  We're not poor Mrs. Stovall who was taken advantage

9   of by her son in the first case.

10          So, Judge, it's pretty clear to me that PEPI's

11  excuse that the escrow provisions, especially the deed

12  in lieu of foreclosure, was not enforceable, is not an

13  excuse at all.  It was enforceable.  It was performable.

14  Especially in light of this Court.  So that excuse doesn't

15  work.  They can not use that excuse to get out from

16  underneath their unwillingness to put that into the loan

17  documents.

18          I've already told you that they don't even address

19  that valuation mechanism.  It's ignored.  And I will

20  concede, for purposes of today, the consent judgments.

21  I believe, by the way, we could have solved that too,

22  because we could have come to you and said, "Here's what we

23  want to do."  We could have solved that, right?  You're a

24  court of equity.  You can do a lot of things that would

25  solve issues.  PEPI didn't want to talk about it.  No, I'm

1    not putting it in.  No, not putting it in.  Okay.  I got it.

2    We could have solved that too.  Legally performable was not

3    an issue before this Court.

4         PEPI then argues -- well, *res judicata*, collateral

5    estoppel.  We only had one mortgage and one note.  And as a

6    result, we had to foreclose everybody at once.  Now I'm on

7    the waterfall provisions.  We couldn't possibly start a

8    foreclosure here, get a judgment and sell, and then go down

9    the waterfall on that -- using that same construct because

10   people would raise *res judicata*.

11        And the documents required one note and one

12   mortgage.  We couldn't split it up, Judge.  Well, I will

13   tell you that when you go back and take a look at the loan

14   documents -- these are minor points, but Item 30 in our

15   binder, the definition of mortgage was plural.  Mortgages

16   plural.  When you looked at Mr. Perlman's closing checklist

17   that he handed up to you in his exhibits, it references

18   multiple mortgages, plural.  But irrespective of that, who

19   controlled how many mortgages we had?  Who controlled how

20   many notes we had?  The lender.

21        PEPI's complaining now saying that, "Oh, we only

22   had one note and mortgage.  We couldn't possibly foreclose

23   in the order of the waterfall.  We had to take them all at

24   once."  They created the situation.  They could have said to

25   us, "We want ten mortgages.  We want one mortgage for each

AA01214

1    one of these pieces of property.  We want one note or a

2    different note from everybody."  And, oh, by the way we

3    could always come to you to solve this problem.

4            So to argue now that they only had one note and

5    one mortgage, it was their doing.  It doesn't make any

6    sense.  They could have said to us then, "we'll take" --

7    I don't care how many notes you have or how many mortgages

8    have you.  It's the same issue to me.  But now all of a

9    sudden, they said, "Only one note and mortgage, therefore we

10   have *res judicata* and collateral estoppel."  It doesn't

11   work.

12           Now, we cited to you in our brief, and it's in my

13   supplement.  It's items -- it's cases number 4 and 5, two

14   relatively old Florida Supreme Court cases, Item 4 in the

15   supplement, there's a case called Prudence Company v.

16   Garvin, a 1935 case, 118 Fla. 96.  And I've highlighted

17   the Court's finding.  By the way, the reason these cases are

18   so old is because it's the law.  It hasn't changed.  Can't

19   find any cases any newer.  They don't exist.

20           So on page two of this opinion -- this is the

21   Prudence v. Garvin opinion, the Court says, "We find the

22   rules stated thus" -- they, of course, spoke differently

23   than we do today.  Quote, "If one holds two mortgages on

24   different parcels of land or one mortgage on two parcels of

25   land to secure the same debt, in the absence of any equities

AA01215

1    in subsequent purchases, he may foreclose either one without

2    the other, and a foreclosure of one will bar a foreclosure

3    of the other only where the land foreclosed is equal to the

4    value of the debt."

5          So even if we only one note and mortgage, Florida

6    Supreme Court law says that's okay, you can foreclose one

7    and then come back -- or if one mortgage covers two pieces

8    of property, you can foreclose one piece of property.  And

9    if you're not paid in full, keep going.  If you're paid in

10   full, you've got to stop.  That's what the Florida Supreme

11   Court says, since 1927.

12         Next case, Waybright v. Turner, 1937 Florida

13   Supreme Court case, says the same thing.

14         So even if they want to continue with the argument

15   that they only one had one note and mortgage, even though it

16   was their doing, Florida law allows it to happen, and at the

17   end of the day, could always come back to you.

18         PEPI's next argument, Judge, is that they had the

19   unilateral right to waive the escrow provisions.  I've dealt

20   with it, and I want to repeat it, and then move on.

21         THE COURT:  So these two cases --

22         MR. BATTISTA:  Yes, sir.

23         THE COURT:  As you say, sanction separate

24   foreclosure actions.

25         MR. BATTISTA:  That's what the Court's findings

AA01216

1    were in both of them.

2         THE COURT:  Okay.

3         MR. BATTISTA:  And even if they don't, which they

4    do, Your Honor's point is well taken.  We'll come back to

5    you to deal with this.  No one's going to raise *res judicata*

6    or collateral estoppel, not in the context of this case.

7         All right, PEPI's last excuse as to why it should

8    be excused from the defaults, was that the Debtors did not

9    negotiate in good faith, the Debtors breached the covenant

10   of good faith and fair dealing, and the Debtors did not

11   provide notice and an opportunity to cure.

12        I've given you a pretty detailed description of

13   the back and forth events between us and PEPI, with us

14   trying to get all the things that we're now complaining

15   about into the documents.  I think you can conclude, without

16   me going through it, that we negotiated in good faith.

17        Now, PEPI cites to a case called <u>Teachers</u>

18   <u>Insurance v Butler</u>.  It's a New York case, Southern District

19   of New York, 1986, as establishing a duty to negotiate in

20   good faith.  There's no Florida case that says that but

21   we're willing to live by the New York case because we did

22   negotiate in good faith.

23        PEPI suggests that, no, no, no, the <u>Teachers</u> case,

24   which they spend several pages in their brief talking about,

25   is on all fours with this case and shows that the Debtors

AA01217

1   did not negotiate in good faith.  Okay, let's take a look at

2   what Teachers says.  You'll read it and you'll tell, but

3   you'll conclude that.

4           In Teachers, Teachers signed a loan commitment to

5   make a loan.  It's a take-out loan, a permanent loan.  And

6   they included in that loan --

7           THE COURT:  Is that in -- is that in your book?

8           MR. BATTISTA:  It's in my book and it's also in

9   Mr. Perlman's book.  Oh, and I'm sorry.  You know what?

10  It's not in my book, but it actually may be in Mr. Perlman's

11  book.

12          MR. PERLMAN:  It is.

13          THE COURT:  I'm sorry, in the trial notebook?

14          MR. BATTISTA:  Yes, sir.  It is Item I, as in

15  Idaho, 3, Teachers v. Butler.

16          THE COURT:  I'm sorry, it's where?

17          MR. BATTISTA:  I.  I as in Idaho.

18          THE COURT:  Oh, I, uh-huh.

19          MR. BATTISTA:  I-3.

20          THE COURT:  Okay.

21          MR. BATTISTA:  Okay, let's talk about that for a

22  minute.

23          THE COURT:  Wait a minute.

24          MR. BATTISTA:  Sure.  Do you have it?

25          THE COURT:  My I is empty.

AA01218

1    MR. BATTISTA:  Really?  Oh, I is empty, but how

2  about 3?

3    THE COURT:  Well, I have it here now.  It's 4,

4  it's behind --

5    MR. PERLMAN:  Well, actually, Judge, it's 3.

6  There's two Teachers from New York.

7    MR. BATTISTA:  There's two Teachers, okay.

8    MR. PERLMAN:  Yeah, 3 and 4.

9    MR. BATTISTA:  Yeah, it's two.  The first -- I'm

10  talking about the first one, right.

11    THE COURT:  Okay.  I have 3 and 4, okay..

12    MR. BATTISTA:  I'm talking about Teachers v.

13  Butler, the first one, Item 3.

14    THE COURT:  Okay.  I've got that, yes.  It's --

15    MR. BATTISTA:  Okay.  So what Teachers did.

16  Teachers made a loan -- a loan commitment, excuse me, and it

17  had a prepayment penalty.  Okay?

18    The evidence that the Court said was that the

19  borrower immediately went out and shopped the loan for a

20  better deal.  Literally, after the commitment letter was

21  signed, the borrower ran out and started shopping the loan

22  for a better deal.  It stopped it for 19 months.

23    That's not what we have here.  We didn't go out

24  and shop this loan after signing the commitment letter.  We

25  didn't shop it until the Thursday after PEPI continuously

AA01219

1    refused to give us what we needed and was required by the

2    commitment letter.  So that's a major difference.

3          And back in Teachers, the Teachers lawyer sent out

4    draft loan documents, much like PEPI did in this case.  It

5    included a slightly different provision.  It included a

6    prepayment penalty on a default as opposed to a voluntary

7    prepayment.  And that's how lenders like to do that because

8    you're not going to get around the prepayment penalty by

9    intentionally defaulting.  Not a problem.

10          Technically, though, it was not in the commitment

11   letter in the Teachers case, okay?  Teachers counsel asked

12   the borrower in that case for comments, time and time again.

13   Didn't get any response for many months.  Asking for

14   comments, didn't -- the lender asked for comments, didn't

15   get a response for many months.

16          Finally, the borrower engaged and negotiated the

17   documents and didn't raise any issues with that new

18   provision.  Didn't raise it.  That's not what we have here,

19   all right?  They sent us loan documents.  We immediately

20   raised the issues over and over and over again.

21          In Teachers, nine months go by, when they had the

22   loan documents, and four days before the closing, the

23   borrower finally objected to that provision, for the first

24   time, after nine months of negotiating.

25          And when Teachers said, "Okay, what do you want to

AA01220

1    do, give us a proposal," the borrower in that case said,

2    "No, not negotiating.  Take it out or else."

3        So the Court found that the borrowers were not

4    negotiating in good faith under those facts.  Those facts

5    are nowhere near what we have here.  If anything, you can

6    find PEPI was not negotiating in good faith.  We were

7    chasing them from the beginning right to the end until

8    February 17th.

9        We weren't shopping the DIP loan to anybody until

10   that Thursday when I called Mr. Ferrao, after all that I

11   described to you had happened, over the course of many, many

12   weeks.  We didn't ignore or not respond to the comments.  We

13   raised the issues time and time again with PEPI and asked

14   them to keep changing them, and we kept getting told no.

15       So when you read Teachers and the pages and pages

16   in Mr. Perlman's brief on that, you'll quickly figure out

17   that nowhere near implicates the Debtor in that we didn't

18   negotiate in good faith.  We absolutely did.

19       Next, PEPI argues that we breached the covenant of

20   good faith and fair dealing that exists in every contract.

21   We agree, there's a con -- there's a provision -- Florida

22   law requires and imposes a covenant of good faith and fair

23   dealing in every contract, no question about it.

24       However, there has to be a breach of an express

25   provision of the contract before you get to the covenant of

AA01221

1   good faith and fair dealing.  PEPI does not point in its

2   papers to any breach by the Debtors of this loan agreement

3   -- loan commitment, excuse me.

4        And so, yeah, there is a covenant of good faith

5   and fair dealing, putting aside that we did negotiate and

6   did act in good faith and did deal fairly under the facts,

7   they have not asserted any independent breach by us, so that

8   argument fails.

9        Lastly, PEPI argues that they were entitled to

10  reasonable notice and an opportunity to cure defaults.

11  Now, we know, because we've talked about this, the

12  commitment letter does not provide for notice of default or

13  an opportunity to cure.  It just doesn't.

14       It's 45 pages long, negotiated over three months

15  by very good lawyers, and PEPI did not require that

16  provision.  Okay.  I could stop right there and say, "But

17  Mr. Fine told me many times, it was carefully chosen and

18  thoroughly negotiated."

19       You don't have that provision.  You can't rely

20  upon it.  You can't say, "Oh, now we want notice and an

21  opportunity to cure, after you thoroughly negotiated that

22  commitment letter."

23       So PEPI says, "No, it's implied in every contract

24  and we're entitled to it."  They cite first four cases.

25  I'll quickly put them into the record, but you'll see them

AA01222

1    in their brief.  It's called the <u>Sound City v. Kessler</u>.

2    Second case, <u>Perri, P-e-r-r-i v. Bird</u>.  Third case is

3    <u>Crawford v. David Shapiro & Company</u>.  And the last case is

4    <u>City of Homestead v. Beard</u>.  And they say these cases stand

5    for the proposition that they're entitled to reasonable not

6    ice before termination.

7              Well, Judge, each one of those cases was either

8    an at-will employment contract, or a contract with no

9    expiration, no duration tied to it.

10             And the Courts in those cases said:  In that

11   instance, you're not entitled to an opportunity to cure.

12   What you are entitled to is a notice of termination.  You're

13   an employee.  I'm giving you notice and terminating you.

14   That's it.  No opportunity to cure.  That's what those cases

15   stand for.

16             That's not what we have here.  We don't have

17   employment contracts.  We don't have at-will contracts.  We

18   don't have contracts with no duration.  And even if we did,

19   all these cases stand for is they were entitled to notice of

20   termination, which they got a notice of termination on

21   February 22nd.  They're complaining about not getting an

22   opportunity to cure.

23             And then they cite to a Florida Supreme Court

24   case, 1920, called <u>Felt v. Morse</u>, 85 So. 656.  And <u>Felt</u> --

25   and they say <u>Felt</u> says every contract in Florida has an

AA01223

 1    implied notice of default and opportunity to cure in it.

 2    You can stop there and just from how long you've been on the

 3    bench and were practicing law, every contract in Florida

 4    does not have an implied notice of default and opportunity

 5    to cure.  It doesn't exist.

 6          Felt stands for a much more limited proposition.

 7    Felt was a real estate deal, and there was no written

 8    contract in Felt.  And like most real estate deals, Your

 9    Honor knows this, there's a time of the essence provision.

10    Time is always of the essence in a real estate contract.

11    There was no written agreement and therefore no time of the

12    essence provision.

13          And what Felt says is, hey, without those things

14    in the contract, if you want to terminate it, you have to

15    give notice to the other party, that you expect performance

16    by a date certain and if you don't get it, you're

17    terminating.  That's what Felt stands for, in the context

18    of a real estate deal.  It's not our situation.  Not our

19    situation at all.  It doesn't apply.

20          There's also a slew of cases which are in my

21    supplement, but I admit are not in my brief.  But they're

22    important because they go to the following concept.  And

23    there's a case that's in the Fifth Circuit prior to Bonner,

24    which is binding on this Court.

25          There's a case, Supreme Court of Pennsylvania,

1   which of course is not binding but it gives you food flavor,

2   and then there's the Middle District of Florida, the Orlando

3   Division, U.S. District Court, Judge Honeywell, has a

4   decision from 2013, which adopts the following -- they're

5   in there, they're highlighted for you -- adopts the

6   following concept.

7          Even in contracts that have express provisions

8   that require notice and an opportunity to cure a default,

9   if the default goes to the heart or the essence of the

10  contract, those per -- the non-defaulting party is not

11  required to give that notice and is not required to give the

12  opportunity to cure.

13         I actually was surprised by that, but that's

14  what the Fifth Circuit has said prior to Bonner in a case

15  called Olin Corporation, which is at Item 6.  The

16  Pennsylvania Supreme Court in Item 7 and LJL Transportation

17  has a great explanation and it calls Olin the seminal case.

18  And then the U.S. District Court, Middle District of Florida

19  in 7-Eleven, Inc. v. Kapoor Brothers adopts it in Florida,

20  and adopts it in the Middle District, and says, point blank,

21  "Even though those provisions exist in contracts" -- not

22  implied, these are express provisions, notice and

23  opportunity to cure.  "If the default goes to the heart or

24  essence of the contract, you don't have to comply with those

25  provisions to terminate."

AA01225

1          We don't even have those provisions here.  And we

2     have a default in particular, the due diligence signoff.

3     And I would suggest even the escrow provisions and waterfall

4     provisions go to the heart of this contract, this commitment

5     letter, absolutely to the heart of it.  I didn't have a

6     lender unless I got that signoff.  I couldn't get adequate

7     protection to prove my view without those provisions.

8          So, Judge, those cases stand for that proposition,

9     so I stand here and say, with those cases and with no

10    provision in our contract, how is it possible that we had to

11    give them an opportunity to cure when it went to the heart,

12    the essence of this contract?

13         My last points here that I want to make go back to

14    all the time Mr. Perlman spent on the purchase option.  We

15    heard a lot about the purchase option.  By the way, this is

16    not an excuse as to why they didn't default.  This has

17    nothing to do with their defaults because I just walked you

18    through the factual and legal basis for all three of the

19    defaults.

20         THE COURT:  Yeah, it goes to whether the default

21    that you've declared was contrived.

22         MR. BATTISTA:  Exactly.  And so you can see, from

23    what I just walked you through, that our three defaults were

24    not contrived, just by virtue of the back and forth, by

25    virtue of the commitment letter, by virtue of the loan

 1   documents, you can see that -- and by virtue of Mr. Fine's

 2   admission letter, these were not contrived.  But let's talk

 3   about this.

 4          We filed a supplement, which Your Honor authorized

 5   me to file at ECF 113.  And we admit, we agree, the

 6   commitment letter gave the Debtors and its principal an

 7   option to purchase the loan, absolutely.  In fact, it was

 8   suggested by Ms. Redmond on behalf of Mr. Ferrao.  Mr.

 9   Perlman showed you those emails.

10          It required that at the time of exercise, the

11   Debtors had to come to this Court and get the Court to

12   approve a release of PEPI.  So Mr. Ferrao's going to buy the

13   debt.  PEPI said, "Hey, we're selling you the debt, you need

14   to release us."  That's what the commitment letter provides

15   for.  No question about it.

16          So Mr. Perlman shows you the first email, which is

17   Mr. Ferrao's February 11th email.  It's in Item 9 of my

18   binder, my supplement.  And that's the email in which --

19          THE COURT:  I'm sorry, where are we?

20          MR. BATTISTA:  My supplement.

21          THE COURT:  Your supplement with all the cases in

22   it.

23          MR. BATTISTA:  Yes, sir.  Thank you.

24          THE COURT:  And behind the cases --

25          MR. BATTISTA:  Is Item 9 which are the exhibits I

AA01227

1    attached to my pleading that Your Honor authorized me to

2    file at ECF-113.

3              THE COURT:  All right.  So my -- I think that

4    answers my question.  These emails, they're at the back of

5    your supplement book, are in the record for this proceeding.

6              MR. BATTISTA:  Yes, sir.  In fact, these were

7    offered by Mr. Perlman, and that's okay.  At least the first

8    one was.

9              THE COURT:  All right.

10             MR. BATTISTA:  So let's look at this one.  This is

11   the one where he says, "Ah-ah, smoking gun, we've got him

12   now."  Mr. Ferrao admitted that, quote, "I need to be able

13   to purchase unequivocally."  That's what the email says.

14   And it's dated February 11, 2010.  And that's an important

15   date.  That's what Mr. Ferrao said in that email.

16             And it was in response to an email from Mr. Lorio

17   earlier that day to Mr. DiNardo, which is on page 2 of the

18   email, talking about the purchase option language.

19             If you go to the second page, you'll see it.  It

20   says, "Purchase option language.  This is a material change

21   that we need to discuss your reasons for wanting," et

22   cetera.

23             And Mr. Perlman draws the conclusion that, "See,

24   they're talking about the purchase option."  And Mr. Ferrao

25   says, "I need to purchase unequivocally."  There is it,

AA01228

```
 1   smoking gun.  We got him.  That's his argument.

 2           Let's talk about reality.  The general release

 3   that he complains about it, that is the sub rosa reason that

 4   he asserts that we defaulted them, or we concocted our

 5   defaults, they admit didn't even come into existence until

 6   February 17th, a week later.  Why?  Because you'll get to

 7   the emails in a second -- I raised it.

 8           I said to everybody, "Hey, what if we don't get

 9   the release from the Bankruptcy Court?  Can we do something

10   else?"  That wasn't raised until February 17th, a week after

11   this email on February 11th.  So Mr. Ferrao is not talking

12   about the general release when he said, "I need to purchase

13   unequivocally."  It didn't even -- these didn't even exist

14   until a week later.  That's not disputed?

15           What is Mr. Ferrao talking about?  Well, let's go

16   to Exhibit B, the next email, which by the way is in my

17   evidence book but I pulled it out separately to make it

18   easier for Your Honor to review.  You will recognize this

19   email from Mr. DiNardo to Mr. Lorio, February 11th, because

20   we talked about the other things, the waterfall and some

21   other things in here.

22           This is Mr. DiNardo's response to the original

23   email to Mr. Lorio that Mr. Perlman points to.  So he

24   said --

25           THE COURT:  I'm sorry, it's Mr. DiNardo's
```

```
 1   response --

 2           MR. BATTISTA:  Right.  So if you go -- if you go

 3   to this --

 4           THE COURT:  -- on the same day, February 11th.

 5           MR. BATTISTA:  Exactly.  So if you go to the

 6   second page, you'll see the same email from Mr. Lorio to Mr.

 7   DiNardo raising the purchase option language.  See it there,

 8   point two?  I'll just give you the rest of the email so you

 9   have a complete understanding.

10           THE COURT:  All right.

11           MR. BATTISTA:  So he raises that issue, right?

12   And what happens next is Lorio to DiNardo on the 11th at

13   14:41, which is 2:41.

14           Lorio writes at 5:00 p.m.  We need to address and

15   resolve these issues -- these and other issues sooner rather

16   than later.

17           And then at 6:10 p.m., Mr. DiNardo writes back to

18   him.  And in paragraph 5, he talks about the purchase

19   option.  And what does he say?  He says a trigger-up option

20   needs to be upon your failure to fund as well as on the

21   maturity date.  What's he talking about?  He's trying to

22   talk about when would the Debtor or Mr. Ferrao have the

23   right to purchase?  What would trigger the option to

24   purchase?  And he describes what has to be there.

25           And second, in Point B, he says, there needs to be
```

1    a notice provision requiring either party to notify of the

2    occurrence of a triggering event.

3            So what is Mr. Ferrao talking about?  He's

4    responding to these two issues.  One, what are the trigger

5    events and, two, how do I get notice so I can exercise a

6    trigger?

7            And if you go back to Mr. Ferrao's email, okay?

8    Because there's two different email chains going on now.

9    There's Lorio to DiNardo on the same day, February 11th, and

10   there's DiNardo to Ferrao.  All right?

11           And so Mr. Lorio starts this email chain at 2:41

12   in the afternoon.  And if you go to Mr. Ferrao's, the first

13   Exhibit A, you'll see 2:41 -- 2:35 in the afternoon, sorry.

14   2:41 in the after -- 3:42 in the afternoon is the purchase

15   option language, and then Mr. DiNardo sent it to me and Ms.

16   Houk.  And then I sent back an email, and then it gets sent

17   to Mr. Ferrao.

18           And then Mr. Ferrao writes the "I need to be able

19   to purchase unequivocally" email.  What time does he write

20   that email?  4:06 p.m.  The "I need to purchase

21   unequivocally" is 4:06 p.m.

22           At 6:00 o'clock p.m., going to the next email, Mr.

23   DiNardo responds to Mr. Lorio and talks about the trigger

24   mechanism and the notice of the trigger.  No discussion of a

25   general release.  It's not -- it doesn't exist at this time.

AA01231

```
 1            That's when Mr. Ferrao says, "I need to purchase
 2   unequivocally."  He's talking about, "Give me a trigger and
 3   give me notice.  Otherwise, I can't purchase unequivocally
 4   unless I have a trigger and I have notice."
 5            That's the smoking gun that was presented to the
 6   Court.  It's not a smoking gun at all.  It's a legitimate
 7   concern about trigger option -- trigger mechanisms and
 8   notice that has to be able to purchase unequivocally.
 9            Now, let's talk about the week later, the February
10   18th emails, which are also part of the alleged smoking gun.
11            THE COURT:  Where is that?
12            MR. BATTISTA:  They are in Mr. Perlman's evidence
13   book, and it's Item's F-20 and F-21.
14            THE COURT:  Okay.
15            MR. BATTISTA:  And you'll see in here this is the
16   exchange of emails in which -- but let's use F-20.  It's
17   easier to use F-20.  Are you there, Judge?
18            THE COURT:  I am.  This is DiNardo to Battista.
19            MR. BATTISTA:  Yes.  So let's go to the last page
20   of that email, because that's where it stops, right?
21            THE COURT:  The last page is --
22            MR. BATTISTA:  Is on the bottom.
23            THE COURT:  Oh, yeah, it goes about four pages
24   back.
25            MR. BATTISTA:  Yes, sir.
```

AA01232

```
 1              THE COURT:  Or, five pages.

 2              MR. BATTISTA:  And it's an email from Jane Houk;

 3  right?  And we can't see who it's going to because it's cut

 4  off, but that's okay.  It doesn't matter.

 5              THE COURT:  Okay.

 6              MR. BATTISTA:  Ms. Houk says in the last -- in the

 7  "in addition" paragraph.

 8              THE COURT:  Uh-huh.

 9              MR. BATTISTA:  This is, by the way, on February

10  18th.  This is a week later.  "In addition, as Paul

11  mentioned to Jeff earlier today, there may be an issue with

12  the Bank of Secord approving general release being executed

13  by the obligors."  So this is evidence that I raised it on

14  February 18th.

15              "We understand your concerns and to address this

16  issue, we propose that to the extent the Bankruptcy Court

17  does not approving giving the releases, the designated buyer

18  would provide a complete indemnification secured by an

19  assignment of loan documents."

20              So Ms. Houk legitimately raises the concern I

21  raised and asks for a way to solve it, okay?

22              The next email, come back one page, is from Mr.

23  Springfield to Mr. DiNardo.  It says, Tony, I talked to

24  David and Jeff and the bottom line is that general release

25  would have to remain.  Unfortunately, there will not be any
```

AA01233

1  change to that component." Okay? Agreed. He said that.

2  We proposed it; he said no.

3  And then there's a series of emails back and forth

4  between Mr. Ferrao, myself, Ms. Houk and -- during the rest

5  of that day.

6  And Mr. Perlman says, "Aha, I got him." It's

7  clear that the general release refusal was the reason for

8  the defaults.

9  Other than the fact that we asked and they said

10  "no," that's all those emails show you.

11  Now, what does the rest of the evidence show you?

12  Well, you won't be surprised that Mr. Perlman asked about

13  these emails in deposition. Right? Both Mr. Ferrao and Mr.

14  DiNardo testified consistently. Mr. DiNardo testified the

15  general release was a, quote, sideshow. He testified that,

16  quote, "We will go with the general release because it is in

17  the commitment letter."

18  Mr. Ferrao testified -- and by the way, all of

19  these cites to these depositions are in my supplement, the

20  one I filed at Court Paper at 113. I'm trying to move

21  through it quickly.

22  Mr. Ferrao testified it was of no great

23  significance to him, that is the general release. Mr.

24  Ferrao and DiNardo both testified as to why Battista and

25  DiNardo asked Ferrao to make the DIP loan and why Mr. Ferrao

AA01234

1    decided to make the DIP loan.  The testimony is unequivocal

2    and clear.

3            Mr. Ferrao testified that Fiddler's had no money,

4    Fiddler's could not get a due diligence signoff from PEPI.

5    And without the signoff, we could go, quote, from 11 to 7

6    meltdown if PEPI reneged, and that there were issues with

7    the waterfall, although he didn't understand what they were.

8    But he said we could go from 11 to 7 if PEPI reneged.

9            Both of them said the purchase option and the

10   general release, under oath, were not the reasons for the

11   defaults.  That's the only testimony that exists today.

12   That's it.  It's unrebutted and clear.

13           To buy into PEPI's argument, they would have had

14   to have lied, both of them, in deposition.  And I would have

15   had to have been, along with Ms. Redmond, part of this

16   conspiracy back on February 18th.

17           Judge, this is not even close to a smoking gun.

18   It's a toy gun.  It doesn't exist.  There's no evidence to

19   support it.  The only evidence is:  We asked for a change,

20   they said no, and that's it.

21           And Mr. DiNardo and Ferrao both testified as to

22   why and that it wasn't of great significance and was not the

23   basis for the default.  Period.  End of story.

24           So, Judge, I've gone my entire time.  I apologize

25   for that, but obviously you can tell it was pretty important

AA01235

1  to us to outline this to the Court.  I wanted you to have

2  this full flavor.  I could not have accomplished that in the

3  first hour and 15 minutes.  There's a lot more I could do,

4  but you now have virtually my entire presentation on all of

5  these issues and I've done my best to try to respond to all

6  of PEPI's defenses.

7           So unless the Court has any questions, I will take

8  a drink of water and sit down.

9           THE COURT:  All right, thank you.

10          MR. BATTISTA:  Thank you.

11          THE COURT:  I promised Mr. Perlman additional

12  time, but we're out of time.  I hate to do this.  I have

13  additional time I can give you.

14          MR. BATTISTA:  Judge, I appreciate that.  I would,

15  of course, make the observation that this is my motion.

16  Generally, the movant goes last.  Mr. Perlman had four and a

17  half hours.  I've now had four and a half hours.

18          If Your Honor's druthers is to come back and

19  listen, I mean, I certainly will have no position to

20  overrule that or suggest otherwise, except that it's my

21  motion, I'm the movant, I should go last.

22          THE COURT:  Mr. Perlman, what else do you have

23  to add?

24          MR. PERLMAN:  Well, I've got some significant

25  dispositive objections.  I purposely presented it to Your

AA01236

```
 1   Honor so that I would not interfere with Mr. Battista's
 2   presentation.
 3            THE COURT:  Right.
 4            MR. PERLMAN:  I have not a great deal but, as Your
 5   Honor knows from the prior hearing, I also moved for summary
 6   judgment in my response.  They had notice --
 7            THE COURT:  All right.
 8            MR. PERLMAN:  -- we filed an affidavit --
 9            THE COURT:  All right.  I mean, I'm just -- you
10   know, you objected earlier to Mr. Battista's use of the word
11   "facts."  That's a nothing objection.  You know, I'm not
12   persuaded by that.  It was just a rubric he used for one,
13   two and three.
14            But I have the afternoon of May 19th and I can
15   give each of you 45 minutes to an hour each, and we'd be
16   done.  We'll have to be done.  Or I could let you respond in
17   writing and give you some time to respond in writing.
18            MR. PERLMAN:  Judge, I would prefer the
19   opportunity, as you've outlined, on the 19th.  An hour
20   each, I think, would be gracious and necessary and much
21   appreciated.
22            THE COURT:  Can you be here, counsel?
23            MR. BATTISTA:  Judge, I --
24            THE COURT:  You don't know yet.
25            MR. BATTISTA:  Can I have one moment to check my
```

```
 1   phone?

 2           THE COURT:  You can certainly check your phone.

 3           (Brief pause.)

 4           MR. BATTISTA:  Judge, do you know what day of the

 5   week that is?

 6           MR. PERLMAN:  Tuesday.

 7           MR. BATTISTA:  Thank you.

 8           THE COURT:  What'd I say?  May 19th, which would

 9   be --

10           MR. BATTISTA:  Next Tuesday.

11           THE COURT:  -- like next week.  Right?

12           COURTROOM CLERK:  Yes.

13           MR. PERLMAN:  Yes.

14           MR. BATTISTA:  Do you a time, Judge?  Is the

15   morning better?  I have a business dinner that evening.

16   If we had it in the morning, I could be back.

17           THE COURT:  Well, it's 1:30.  And if you have two

18   hours, that's 3:30 with a break.  So you wouldn't be out the

19   door until 4:00.

20           MR. BATTISTA:  All right.  So I'm going to miss

21   my --

22           THE COURT:  Well, we could do have a day on June

23   -- we could do the same time on June 1st.

24           MR. BATTISTA:  One second.

25           MR. PERLMAN:  That's fine with me, Judge.
```

AA01238

```
1          MR. BATTISTA:  Actually, I would go back to the

2    19th, only because I'm not in town that day.  I'm at a

3    family event.  So if the 19th is the day, we'll go with

4    that, and I'll deal with the dinner.

5          THE COURT:  We could go longer but I hate to do

6    that.

7          MR. BATTISTA:  No, I'm not looking to do that,

8    Judge.  The 19th is fine.  I'll just -- I'll rearrange my

9    dinner.  It's not work.

10         THE COURT:  All right.  The 19th, 1:30.  And I'll

11   say this only because we have your client in the courtroom,

12   this has been an extraordinary event.  It's not often that

13   we take this long to argue.  But it's been extraordinary on

14   both sides in terms of the education of this judge as to

15   what's happened.

16         So I'm going to not pre-judge anything else.  I

17   reacted last time and I think I have a more refined analysis

18   -- or understanding of what I perceive, and I'm going to let

19   Mr. Perlman fine-tune me.

20         MR. BATTISTA:  So, Judge, an hour and an hour?

21         THE COURT:  An hour and an hour.  You get to go.

22   I'll let you go last.

23         MR. BATTISTA:  All right, okay.  Thank you, Judge.

24         THE COURT:  All right.

25         MR. BATTISTA:  And I appreciate it.
```

AA01239

```
1          MR. PERLMAN:  Fair enough.  Thank you, sir.

2          THE COURT:  See you back here on next Tuesday.

3          MR. BATTISTA:  Yes, sir.

4          THE COURT:  All right.

5          COURTROOM CLERK:  All rise.

6          (Proceedings concluded at 4:55 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

AA01240

CERTIFICATE

I certify that the foregoing constitutes the
official verbatim transcript, prepared to the best degree
possible on an expedited basis from the FTR, and/or MP3
backup files, and/or telephone audio appearances, as
recorded and provided by the court.


*Cheryl Culver*
_____          June 6, 2017
Cheryl Culver, Court Reporter            _____
For Johnson Transcription Service        Date
Approved Court Transcribers

AA01241

**AA01242**

IN THE UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:                              :
FIDDLER'S CREEK, LLC                :  Case No. 8:10-bk-03846-KRM
  Debtors                           :  Chapter 11
- - - - - - - - - - - - - - - :
FIDDLER'S CREEK, LLC                :  Adv. No. 8:11-ap-00809-KRM
  Plaintiffs/                       :
  Counter-Defendants                :
v.                                  :
PEPI CAPITAL, L.P.                  :
  Defendant/Counter-Plaintiff :
- - - - - - - - - - - - - - - :
PEPI CAPITAL, L.P.                  :
FIDDLER'S CREEK, LLC                :
  Third Party Plaintiff             :
v.                                  :
GULF BAY CAPITAL, INC. and          :
AUBREY J. FERRAO                    :
  Third Party Defendants            :
- - - - - - - - - - - - - - - :

                U.S. Courthouse
                801 North Florida Avenue
                Tampa, Florida 33602
                Held May 19, 2015

TRANSCRIPT OF HEARING
[Re: 11-ap-00809]
Con't. Motion for Partial Summary Judgment and Incorporated
Memorandum of Law Filed by Paul J. Battista on behalf of
Plaintiff Fiddler's Creek, LLC (Doc. #84).....
*[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]*

BEFORE THE HONORABLE K. RODNEY MAY
UNITED STATES BANKRUPTCY JUDGE

PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL
TRANSCRIPT PRODUCED BY COURT-APPROVED TRANSCRIPTION SERVICE

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

*[FULL NATURE OF PROCEEDINGS CONTINUED FROM PREVIOUS PAGE]*

[Re: 11-ap-00809 Continued]
.....Affidavit of Jeffrey R. Fine in Opposition filed by
Alan J. Perlman on behalf of the Defendant (Doc. #99);
Amended Affidavit (Doc. #107); Response in Opposition
filed by Alan J. Perlman on behalf of the Defendant (Doc.
#100); Reply filed by Paul J. Battista (Doc. #102);
Supplement filed by Paul J. Battista on behalf of
Plaintiff (Doc. #113); Response to PEPI Capital's Motion
for Partial Summary Judgment and Incorporated Memorandum
of Law Filed by Paul J. Battista (Doc. #114)

AA01244

APPEARANCES:


For Fiddler's Creek, LLC     PAUL J. BATTISTA, Esquire
                              Genovese Joblove & Battista
                              100 S.E. 2nd Street
                              Floor 44
                              Miami, Florida 33131
                              305-349-2300
                              pbattista@gjb-law.com


For PEPI Capital, L.P.       ALAN J. PERLMAN, Esquire
                              Roetzel & Andress
                              350 East Las Olas Boulevard
                              Suite 1150
                              Fort Lauderdale, Florida 33301
                              954-462-4150
                              APerlman@ralaw.com


For Gulf Bay Capital       RICARDO A. REYES, Esquire
(Appearing by phone)       Tobin & Reyes PA
                              225 NE Mizner Blvd.
                              Suite 510
                              Boca Raton, FL 33432-4083
                              561-620-0656
                              rar@tobinreyes.com

AA01245

<pre>
  1                    P R O C E E D I N G S
  2              (Note, quotation marks are used for readability
  3   purposes and may not reflect direct quotes.)
  4              (Proceedings commenced at 1:40 p.m.)
  5              COURTROOM CLERK:  All rise.  Court is again in
  6   session.  You may be seated.
  7              THE COURT:  All right, thank you, Ms. Murphy.
  8   If you would call our case, please?
  9              COURTROOM CLERK:  Yes, sir.  Thank you, sir.
 10   Case No. 10-3846, Fiddler's Creek, LLC; Adversary Proceeding
 11   11-809.  We do have one party, sir, scheduled to appear by
 12   phone.
 13              THE COURT:  Okay.  Let's take appearances for the
 14   recording.  Go ahead.
 15              MR. PERLMAN:  May it please the Court.  Good
 16   afternoon, Judge.  Alan Perlman on behalf of Counter-
 17   Plaintiff, PEPI Capital.
 18              THE COURT:  Thank you.
 19              MR. BATTISTA:  Good afternoon, Judge.  Paul
 20   Battista, Genovese Joblove & Battista on behalf of the
 21   Plaintiff, Fiddler's Creek, LLC.  And on the phone is Ricardo
 22   Reyes on behalf of Gulf Bay Capital.  I believe he's on
 23   listen-only.
 24              THE COURT:  Okay, thank you.  All right.  I always
 25   ask this, sometimes for no benefit, and that is whether there
</pre>

AA01246

1  are new developments.

2       MR. PERLMAN:  None that I'm able to report.

3       MR. BATTISTA:  Me neither, Judge.  I'm hoping that

4  we stick with one hour, and one hour, today.

5       THE COURT:  Yeah, that's what I'm hoping for as

6  well.

7       MR. BATTISTA:  Thank you.

8       THE COURT:  Okay.  Mr. Perlman, you can go first in

9  your final rebuttal.  It's a rebuttal situation.  I think

10  you've said everything you need to say, but this is a

11  rebuttal opportunity.

12       MR. PERLMAN:  Thank you, Judge.  And I think it's

13  important and necessary and will greatly assist the Court in

14  ruling on the papers.  So I thank you for the opportunity.

15       At the last time we were before Your Honor, counsel

16  suggested that the Court was confused or not clear, following

17  my presentation, in part because I presented -- I believe the

18  word was "snippets" -- and suggested that the Razor Theory

19  should influence Your Honor by adopting less assumptions in

20  regards to your analysis.

21       I would submit to Your Honor the exact opposite

22  transpired.  And unlike the prior hearing, when I presented

23  before Your Honor, I did not testify.  All I did, Your Honor,

24  was walk you through, in a painstaking fashion, all of the

25  documentary evidence to put the claims in absolute context,

AA01247

1    so Your Honor could deal with the issues in dispute.

2         To the extent the Debtor suffered a wound with

3    regard to conflicting testimony about in this court there's

4    no unsecured loan, but in deposition they would gladly put

5    the money in, or the inconsistency with regard to the

6    admissions that were filed versus the testimony at

7    deposition, or the inconsistency with regard to the

8    testimony in trial, those were self-inflicted wounds

9    that had nothing to do with me as counsel or my client.

10   Those were, pure and simple, self-inflicted wounds.

11        And as I sat here last time, what I heard was, for

12   the first time, a new theory, a new argument, that Fiddler's

13   defense is now that, yes, PEPI was chasing the loan but PEPI

14   knew it was in default.  And all the while, it was done so it

15   could walk away from the loan at closing.  That's a silly

16   position, Judge.  There's no evidence to support it.

17   It's defied by the record and makes absolutely no sense.

18        And the same is true with the Razor Theory.  The

19   Razor Theory doesn't help anything.  First of all, Judge,

20   there's several Anti-Razor Theories that have been -- that

21   disprove that notion.

22        More importantly, Your Honor doesn't have to deal

23   with assumptions.  We're not here about assumptions.  We're

24   here about evidence.  And so the reference of a Razor Theory

25   has no import in any context before this case.

AA01248

```
 1              And I would also submit, Judge, that there's a

 2    difference between argument and evidence.  Your Honor saw it

 3    last time and Your Honor was not confused.  And suggesting to

 4    Your Honor that PEPI made a profit or was paid in full is

 5    grossly improper.  There's absolutely no evidence.  And

 6    that's one of the reasons why I rose at the last hearing

 7    to object to certain arguments.

 8              And likewise, calling the Fine response letter an

 9    admission is another distortion.  And suggesting that's why I

10    never referenced it to Your Honor is no different.  I think

11    the Court knows I had limited time, and I don't believe it's

12    that relevant.  But what does that Fine letter demonstrate,

13    Judge?  Two important things.

14              One, and it's consistent, total shock and

15    surprise by PEPI that there was a default, from nowhere.

16    Two, notwithstanding this twelfth hour surprise default,

17    PEPI's desire and willingness to cure and resolve all the

18    issues.  That's not an admission.  That's part of the charge,

19    the duty, of the parties to negotiate in good faith.

20              So what, Judge -- what was conspicuously absent

21    from the Debtor's three and a half hour presentation?  Why

22    didn't the Debtor make a demand or default to PEPI?  Why?

23    Why didn't the Debtor advise PEPI the loan was going to Mr.

24    Ferrao (pronouncing Ferr-oh) unless PEPI does one, two,

25    three, whatever it is.
```

AA01249

1          THE COURT:  You mean Mr. Ferrao (pronouncing

2    Ferr-ow).

3          MR. PERLMAN:  Yes.  I'm sorry.  I think I did say

4    Ferrao (pronouncing Ferr-oh).  You are correct.  I meant to

5    say --

6          THE COURT:  And I thought you said Perrao

7    (pronouncing Perr-oh).

8          MR. PERLMAN:  I may have.

9          THE COURT:  Okay.

10          MR. PERLMAN:  I meant to say Ferrao (pronouncing

11    Ferr-oh) -- or I guess Ferrao (pronouncing Ferr-ow).

12          THE COURT:  But your point is:  Why was there no

13    demand before the default?

14          MR. PERLMAN:  Right.  And why was there no notice

15    that said, "Look, unless you do one, two or three per the

16    commitment letter, this loan is going to go to Mr. Ferrao."

17          Why did they default PEPI after Mr. Ferrao decided

18    to take the loan?  That's critical.  Why was it kept a

19    secret?  Why did Mr. Ferrao testify that PEPI refused to

20    come to the closing table when in fact PEPI was chasing the

21    deal?  And why was the Aubrey email, that said the purchase

22    option had to be unequivocal, not produced?

23          If Your Honor recalls, that was obtained a year or

24    more later by a separate round of production against Stearns

25    Weaver.  And even then, it was being blocked.  So if it's not

AA01250

1　the smoking gun as they allege, then why did the Debtors

2　argue to Your Honor that it was privileged and ought not be

3　disclosed when in fact no privilege attached?

4　　　　　And, Judge, the word unequivocal is the reason why.

5　It's one of those magic words.  It doesn't have any other

6　meaning.  Something is either unequivocal or it's not,

7　period.  You can't take that out of context.  So what I'd

8　like to do, Judge, with that backdrop, is simplify the case,

9　given where we are today.

10　　　　　So it is Fiddler's position that PEPI breached.

11　And as a result, they should have half of the commitment fee

12　back, $405,000.  It is PEPI's position that the Debtors have

13　unclean hands and/or breached, and they're obligated to pay

14　the second portion of the commitment fee, an additional

15　$405,000, plus the breakup fee of a million dollars.

16　That is the issue between the parties.

17　　　　　So, with that, Judge, there are two extremely

18　critical facts that I believe are going to control, if not be

19　dispositive, for purposes of this Court's ruling.

20　　　　　And if Your Honor has my trial notebook in front

21　of you, I'd ask that you turn to Item F-8.  I'm going to be

22　referring to various sections of that, if it would be easier

23　to keep that with you, Judge.

24　　　　　THE COURT:  Okay, F-8.

25　　　　　MR. PERLMAN:  Right.  F-8.

AA01251

```
 1              THE COURT:  And it starts at the top with a stamp

 2   that says Doc. 99-3?

 3              MR. PERLMAN:  That's correct, sir.

 4              THE COURT:  Okay.

 5              MR. PERLMAN:  And this is an email of February 18th

 6   from the Debtor to PEPI, and it says, "The day is beginning

 7   to get away from us in terms of filing."

 8              So as of the 18th, as of this moment, the

 9   Debtor is filing the bankruptcy case, notwithstanding the

10   assertions regarding emails on the 11th about the escrows,

11   notwithstanding the discussion that took place on the 16th

12   regarding due diligence, notwithstanding the draft loan

13   agreement on the 17th regarding the waterfall.

14              As of the 18th, Judge, the Debtor is filing, and

15   the only outstanding issue relates to the purchase option.

16   That's what's going on.  So when Your Honor hears me suggest

17   waiver or estoppel, it's because of that.

18              And when Your Honor referenced at the hearing, you

19   know, the retroactive insertion of issues, it's actually the

20   other way.  Why does PEPI have to raise anything at this

21   juncture if the documents are in final form and they're

22   ready to file?

23              These debates never took place, because the Debtor

24   acquiesced.  It's actually the converse.  It's the Debtor

25   retroactively, after the 18th, raising all of these issues.
```

AA01252

1    But here they are, in their own words, trying to file on the

2    18th.

3            And, Judge, if you turn to -- well, what's

4    strikingly important here, Judge, is the argument that they

5    would never file, I guess -- although there's no evidence --

6    without the due diligence signoff.  What are they doing here?

7    They're just chasing down the purchase option.  That's all.

8    Nothing else.

9            If Your Honor can turn to F-12?

10           THE COURT:  Okay.

11           MR. PERLMAN:  This is Mr. Springfield's email to

12   the Debtor representative of the 18th.  "Here is the final

13   language that was sent to Paul, no more changes, so that you

14   can go ahead and file."

15           So now we have record evidence the Debtor said it.

16   PEPI said it.  And if Your Honor has in front of you the

17   affidavit of Mr. Fine at ECF-107?

18           THE COURT:  Is this a supplemental affidavit or the

19   original one?

20           MR. PERLMAN:  It's an amended.

21           THE COURT:  An amended.

22           MR. PERLMAN:  107.

23           THE COURT:  I have that.

24           MR. PERLMAN:  Okay.  If Your Honor could turn to

25   page 8, paragraph 17.

AA01253

```
 1            THE COURT:  Now, this says it was -- okay, go

 2   ahead.  Page --

 3            MR. PERLMAN:  Page 8, paragraph 17.

 4            THE COURT:  Okay.

 5            MR. PERLMAN:  Paragraph 17, Mr. Fine states under

 6   oath that:  "During this time it also appeared that all of

 7   the loan documents were close to final form and ready for

 8   signature and filing.  As such, the Debtors were only

 9   commenting on the breakup fee in the event PEPI was not

10   the DIP Lender and the purchase option."

11            This is an uncontroverted affidavit that validates

12   the other two documents that the Debtor was filing.  The only

13   issues were breakup fee and purchase option.  Nothing else.

14   Nothing else that was raised retroactively, Judge.

15            As Your Honor knows from the prior hearing, the

16   only thing that changed was the discussion about the purchase

17   option that went into the evening, and then Mr. Ferrao got

18   the opportunity to be the lender.

19            But what does this do?  The affidavit and those two

20   emails contradict the story that there was a default.  Why is

21   the Debtor filing if there was a default?

22            So our position is that those issues were

23   manufactured after the fact, and as of the 18th and 19th they

24   were waived, and the Debtor should be estopped from trying to

25   retroactively raise them in this case.  That uncontroverted
```

AA01254

1   affidavit, I believe, establishes it as a fact, as a matter

2   of law.

3           And, Judge, to suggest, as what happened last time,

4   "Well, Judge, PEPI was in the courtroom and they could have

5   taken the loan back," the PEPI loan didn't exist.  As you

6   recall from Mr. DiNardo's testimony, they took the PEPI

7   commitment letter and enhanced it knowing it would be an

8   insider loan.  And so now it's a different loan that they're

9   offering to the world, with no commitment fee, no breakup

10  fee, no stock pledge.

11          That's not the loan that PEPI negotiated.  So it's

12  a hollow argument to Your Honor to suggest that PEPI could

13  have just stepped in at the hearing, they sat there, they did

14  nothing.  They did nothing because there was nothing.  They

15  were kicked to the curb in the middle of the night and Mr.

16  Ferrao went forward with a completely different loan that

17  PEPI had no interest in pursuing, for obvious reasons.

18          So let's turn to the primary arguments, first of

19  which is the escrow.  There has been no -- and they're

20  sitting here right now -- still is no evidence of an

21  unequivocal demand or a refusal whatsoever in connection

22  with the escrows.  Everything was qualified as a proposal,

23  a suggestion, for the parties to discuss.

24          Judge, if you look at A-4.  Let me know when Your

25  Honor's there.

AA01255

```
 1              THE COURT:  My A-4 has Document 100.

 2              MR. PERLMAN:  That's right.

 3              THE COURT:  And it's an excerpt from Document 100.

 4              MR. PERLMAN:  That's right.  That's right.

 5              THE COURT:  Okay.

 6              MR. PERLMAN:  This is an affidavit by Mr. Fine,

 7   paragraph 26, sub (iii):  "PEPI never made an unequivocal

 8   demand in violation of the commitment letter, including as to

 9   the escrow, waterfall or its due diligence."

10              That's uncontroverted.  Which means under

11   dispositive case law, that is a fact established for

12   purposes of today.

13              THE COURT:  Now, where are you?

14              MR. PERLMAN:  Paragraph 26, little (iii).

15              THE COURT:  Wait a minute.

16              MR. PERLMAN:  Did I say A-4?

17              THE COURT:  Yeah, and I was on B-4.  Okay, A-4 is

18   Document 107-1.

19              MR. PERLMAN:  That's correct.

20              THE COURT:  Sorry to throw you off.

21              MR. PERLMAN:  No worries.

22              THE COURT:  Okay, 26(iii) is:  "PEPI never made an

23   unequivocal demand" --

24              MR. PERLMAN:  That's right.

25              THE COURT:  -- "in violation of the commitment
```

AA01256

```
 1   letter."
 2              MR. PERLMAN:  That's right.  That's uncontroverted
 3   and as such that's a fact established as a matter of law in
 4   this -- for this purpose.
 5              And if you turn the page, Judge,
 6              THE COURT:  Okay.
 7              MR. PERLMAN:  If you take a look at Item little
 8   Roman 19.
 9              THE COURT:  Right.
10              MR. PERLMAN:  I'm sorry.  Yeah. 19.
11              THE COURT:  "Up until February 22nd"?
12              MR. PERLMAN:  That's right.
13              THE COURT:  Okay, go ahead.
14              MR. PERLMAN:  The testimony is that everything
15   consisted solely of negotiations.  That, too, is an
16   uncontroverted fact.
17              So there's no evidence of a material default, nor
18   could there be, Judge, because the foreclosure under Florida
19   law rectifies the situation and renders it substantially the
20   same as the commitment letter.  So those initial arguments
21   have no merit.
22              With regard to the other argument, Judge, the law
23   is that the escrow provisions are not performable and
24   therefore are excused.
25              And if you could take a look at B-3.
```

AA01257

```
 1              THE COURT:  E, right?

 2              MR. PERLMAN:  B.  B-3.

 3              THE COURT:  B-3.

 4              MR. PERLMAN:  This is the debate about deeds in

 5    lieu.  Let me know when you're there, Judge.

 6              THE COURT:  Okay.

 7              MR. PERLMAN:  Okay.  B-3 is the Ringling decision.

 8    And if you turn to the second page under the opinion, the

 9    second paragraph, starting "Ringling owned a parcel."

10              THE COURT:  Wait a minute.  Okay.  B-3.

11              MR. PERLMAN:  B-3, page 2.

12              THE COURT:  Okay.

13              MR. PERLMAN:  This is the Ringling decision.

14              THE COURT:  Uh-huh.

15              MR. PERLMAN:  If you look at the second paragraph

16    under the per curiam, starting "Ringling owned," and you go

17    to the second to last sentence, it says, "Huntington held the

18    third mortgage."

19              And then the next paragraph, the Court states,

20    "Under the revised documents which made Huntington the first

21    mortgage older."  My point, Judge, consistent with Florida

22    law is:  It's a subsequent transaction for additional

23    consideration.  There's no Florida case that says you can

24    do it otherwise.

25              Of course, you can do it as a resolution of an
```

AA01258

```
 1   existing lien.  And that's what the Supreme Court says.
 2   It has to be a subsequent transaction for additional
 3   consideration.
 4            And, in fact, the case cited by Mr. Battista denies
 5   it for that very reason, that it was in connection with the
 6   initial transaction.  So Florida law does not permit deeds in
 7   lieu unless you are an existing lender.
 8            And Your Honor raised the point, "Well, is this
 9   something that I could have dealt with in the order?"  That's
10   not necessarily an issue before Your Honor, but I will say
11   this.  And it won't be the first time Your Honor has heard
12   this.
13            The title companies deal with these issues, and the
14   parties outside of the courtroom are stuck with how the title
15   company conducts its business.  So that's where that issue
16   ended up.
17            And the fact that PEPI -- sorry -- Fiddler's
18   asserted the default on the consent judgments, made a big
19   deal about that default, then appear before Your Honor and
20   say, well, they realize that that's not enforceable, only
21   lends support that they're misinterpreting the law.
22            But regardless, Judge, I would ask Your Honor to
23   turn to D-13.
24            THE COURT:  D?
25            MR. PERLMAN:  D as in dog.
```

AA01259

1          THE COURT:  All right.

2          MR. PERLMAN:  This is Mr. Fine's affidavit, again

3    uncontroverted, established as a matter of fact for purposes

4    of this proceeding.

5          And in paragraph 12, Mr. Fine avers that:  "The

6    deeds in lieu of foreclosure and consent judgment provision

7    was included in the commitment letter.  The parties later

8    learned that apparently consent judgments and deeds in lieu

9    were not available on initial loans under Florida law and/or

10   the title company suggested it be removed since a foreclosure

11   process would still be required."

12         That's it.  It's not that big of a mystery.

13   There's probably a reason why this is not controverted.

14   It doesn't matter.  It's now established.

15         THE COURT:  Let me just re-read it.

16         MR. PERLMAN:  Certainly.

17         THE COURT:  Paragraph 12?

18         MR. PERLMAN:  Yes, sir.

19         THE COURT:  Okay.  (Reviewing document.)  Okay,

20   next.

21         MR. PERLMAN:  Certainly.  And even if it were

22   enforceable, Judge, which the case law says it was not, it

23   was waivable.  And it was in fact waived by Gulf Bay in this

24   case as lender.

25         So let's turn to C-3.

AA01260

```
1              THE COURT:  C-3.

2              MR. PERLMAN:  C-3.

3              THE COURT:  Okay.

4              MR. PERLMAN:  Page 13 of the same affidavit,

5   little 27, where Mr. Fine avers, "To speed the foreclosure

6   and sale process, the commitment letter included an escrow

7   provision for the benefit of PEPI as lender."  That fact has

8   been established with no contravening affidavit.

9              What's interesting, Judge, is not only did we say

10  it -- and Your Honor saw the emails that support it -- but if

11  Your Honor could turn to C-5?

12             THE COURT:  Uh-huh.

13             MR. PERLMAN:  The Debtor admitted it as well in its

14  sworn testimony.  This is of Mr. DiNardo, filed as ECF 96-1.

15  And he is saying -- and I've highlighted it, starting in line

16  11 on page 156 of the transcript.  "The escrow clause was for

17  the protection of the DIP lender."

18             And then he goes on.  "They didn't need it."  He

19  says again on line 18, "It was for the benefit of the DIP

20  lender and Gulf Bay didn't require it."  Nor did PEPI.

21  What's the big deal?  Yet apparently that's a default.

22  They could waive it, but we couldn't.

23             And, Judge, so Your Honor understands, if there was

24  no deed in escrow, the mechanism to have a valuation for a

25  deed that's taken out of escrow is rendered moot.  There'd be
```

AA01261

1  no valuation mechanism needed because there'd be no deeds in

2  escrow.  So that becomes a moot issue by itself.

3          THE COURT:  Let's go back.  I just want to -- I saw

4  something here.  Mr. DiNardo's testimony, it says the escrow

5  clause -- he says in line 11 and 12, "The escrow clause was

6  for the protection of the DIP lender," and that's what

7  they're talking about.  But the preceding question was:

8  "An escrow for the stipulated judgments of foreclosure,"

9  which I think is a different issue than putting deeds in

10 lieu in escrow.

11         MR. PERLMAN:  Right, but if you look at line 2,

12 it clarifies that we're talking about both.  Mr. Battista,

13 "Escrow for deeds in lieu and escrow for consent judgments."

14         THE COURT:  Okay.

15         MR. PERLMAN:  So we are talking about any escrow.

16 There was no escrow at all for either in the Gulf Bay because

17 they were waivable.

18         So there was no default, period, with regard to the

19 escrow provision.  So we next turn to the waterfall, Judge.

20         THE COURT:  Well, I'm still not following you.

21         MR. PERLMAN:  Sure.

22         THE COURT:  Aren't we talking apples and oranges?

23 You're talking about waiver.  That, to me, suggests -- or to

24 my understanding, it's you have a commitment letter, you have

25 a contractual obligation to do something and the other --

1    for the benefit of the other party, and they can waive it.

2         Gulf Bay's situation wasn't a waiver.  You told me

3    that the PEPI deal was done, that the Gulf Bay deal was its

4    own deal, was a new deal on different terms, so I'm not sure

5    it's technically correct to call what they did a waiver.

6    They just did it the way they did it.

7         MR. PERLMAN:  And I think you can get there the

8    same way, Judge, because the point is, although there's no

9    evidence, the suggestion or argument has been that it was

10   critically important to have these provisions.  Critical.

11        Well, then how come it wasn't -- if it was so

12   critical, where was it in the Gulf Bay instruments?

13        THE COURT:  All right.  That's the point you're

14   making.

15        MR. PERLMAN:  That's right.  And my point, though,

16   Judge, is that Gulf Bay understood that they could have had

17   those rights, but they waived them. They did not require any

18   escrows because the escrow runs to the benefit of the DIP

19   Lender.  It happened to be them.  And I would suggest that

20   that option is the same for PEPI.  That's all.

21        THE COURT:  Okay.

22        MR. PERLMAN:  Was there another point, Judge?

23        THE COURT:  That's it.

24        MR. PERLMAN:  Okay.  So that turns -- now we turn

25   to the waterfall.  There's been no evidence of a breach or a

AA01263

1  material breach because what resulted was substantially the

2  same since the list, the waterfall order, which was the

3  essence, is being honored.

4        And, Judge, they don't cite to a single case in

5  Florida that permits -- and this is critical -- a second

6  action filed against the same party for the same defaults

7  under a judgment that was obtained in the first case.  And

8  that's because that's black letter, *res judicata*, issue

9  preclusion, and the works.

10        And the cases that are cited are not helpful -- by

11  the Debtors.  If you just turn to -- well, if I may approach,

12  Judge, I have an update with regard to one of the cases.

13  I had given it to Mr. Battista before the hearing.

14        THE COURT:  Sure.

15        MR. PERLMAN:  Thank you.  (Presenting document.)

16  Okay.  So the Waybright v. Turner case was touted by the

17  Debtors that stood for a blanket proposition, even though the

18  facts weren't relevant.  What I just gave Your Honor, though,

19  Judge, was the rehearing, the order on rehearing, in that

20  very same case.

21        And it explains -- because, you know, the detail is

22  missing in these older cases.  But it explains, consistent

23  with what I stated, that in the other case the lender had a

24  junior position and was being foreclosed out, may be entitled

25  to a surplus, but they weren't the Plaintiff in that case.

1    That second position lender was a Plaintiff in a subsequent

2    case.

3         Well, that's fair, but it doesn't stand for the

4    proposition that they have suggested.  And this rehearing

5    memorandum clarifies that there is still no such case that

6    would avoid the implications of *res judicata*.

7         And for anyone to stand before Your Honor and say,

8    "Well, that would have been the case because, you know, you

9    would have -- Your Honor would have sanctioned me," is not

10   fair or appropriate and it's certainly not evidence.

11        There's no ruling, there's no decision, they're

12   not bound.  It's just argument that has no place with

13   regard to Your Honor's analysis as to the issues before you.

14   Clearly --

15        THE COURT:  I'm not sure I understand what this

16   case -- this 1938 rehearing order does.  I mean, I know

17   you've handed it up and argued it, but I'm trying to read

18   the highlighted section and I'm just not grasping it.

19        MR. PERLMAN:  Right, I -- well, they cited

20   this case for a provision that says if you have multiple

21   mortgages, you can foreclose any way you want.  None of the

22   cases actually say that on their facts.  And what I'm trying

23   to do is put that proposition, if you will, in better

24   context.

25        And that was done in rehearing.  And in rehearing,

1  the Court clarified that the Plaintiff in the second action

2  was not the Plaintiff in the first action, where that would

3  have been *res judicata*.  He was actually a junior mortgagee

4  in the first action, being foreclosed out.

5        THE COURT:  Okay.  Different parties.

6        MR. PERLMAN:  Correct, correct.  I mean, clearly,

7  Judge, the concern that the foreclosure judgment would be an

8  issue is nonsensical, because once it got satisfied, it would

9  be satisfied, and the juniors would continue on in their

10  previous positions.  Those properties would not be sold.

11  The properties would not be sold if you went down the rung

12  in order of the waterfall.

13        So if there became a point in time where the debt

14  was satisfied, then the properties would still be owned

15  and liened how ever that order was on each property.  The

16  judgment would be satisfied.  So it's not that big of a deal.

17        But what's important, Judge, is that we said it,

18  and they said it, and Gulf Bay said it.  So let's take a look

19  at D-13.  D-13 is Mr. Fine's uncontroverted affidavit.

20        I'm directing Your Honor to the bottom paragraph on

21  page 6, which explains that the wording proposed by PEPI was

22  negotiated with Fiddler's representatives based on certain

23  input and guidance from the title insurance representative

24  and/or real estate counsel, so that the lien rights to be

25  granted to PEPI would be and remain valid and enforceable,

AA01266

```
 1   uncontroverted.
 2           I would direct Your Honor's attention to D-9.
 3           THE COURT:  Okay.  D-9.  We're back at --
 4           MR. PERLMAN:  Where Mr. DiNardo in line 11 said the
 5   next step would be to sell -- I'm sorry.  I asked, "Would the
 6   next step be to sell the next sequential parcel?"  Answer:
 7   "Yes."  They knew how the waterfall was to work.  Not go get
 8   a judgment, start over, and this thing's going to take ten
 9   years.  Which would be contradictory to the speed-up proposal
10   that was part of this arrangement.
11           And then if Your Honor could turn to D-12.
12           THE COURT:  Okay.
13           MR. PERLMAN:  On page ECF 9 of 10 of 97-4.
14           THE COURT:  Uh-huh.
15           MR. PERLMAN:  Are you there, Judge?
16           THE COURT:  I am.
17           MR. PERLMAN:  Okay.  This is Section 8.4.  And if
18   you go down to the bottom paragraph, there's a "for example."
19   This is the actual facility approved by Your Honor for Gulf
20   Bay.  And it says, "For example, E-3 is before E-4 and
21   lender agrees to use commercially reasonable efforts to
22   hold foreclosure sales and/or auction on the property
23   described in E-3 before holding a foreclosure sale and/or
24   auction on the property described in Exhibit E-4."  Same
25   thing.
```

AA01267

1          So that only leaves this due diligence issue, as

2    well as the ultimate issue, Judge, which is the actual duty

3    to negotiate in good faith under the commitment letter and/or

4    the implied covenant of good faith and fair dealings, both of

5    which PEPI asserts Fiddler's breached.

6          Now, I rose at the last hearing, but I did not want

7    to take time off Mr. Battista's clock.  I'm not sure that I

8    should be penalized as well, but there are two additional

9    issues for the Court to deal with in this regard, the first

10   of which is fatal.  Fatal to the Debtor proceeding on summary

11   judgment on this ground.

12         And that is:  There is no claim or count in the

13   complaint for anticipatory repudiation.  And therefore, as a

14   matter of law, the Debtors are incapable of seeking summary

15   judgment on something not pled for a count that does not

16   exist.  That is a fatal flaw that ends the discussion with

17   regard to this issue.

18         And even if it were pled, Judge, they have failed

19   to assert any evidence that they were able to comply with the

20   conditions.  No affidavit, no evidence, no summary judgment.

21   And that's because the case law is clear that that evidence

22   is needed to avoid a purported windfall.

23         THE COURT:  I'm not sure I followed that.  What

24   conditions?

25         MR. PERLMAN:  That they were otherwise able to

AA01268

1  comply with the commitment letter but for the default.  There

2  was no evidence in that, so there'd be no claim for that.

3  But it's more fatal than that because the claim doesn't exist

4  under the complaint.  So no relief could be granted in terms

5  of the --

6          THE COURT:  I'm still trying to get my head around

7  it.  So you're saying there's no evidence that they were able

8  to close the loan documents.  Or at least execute the loan

9  documents.

10          MR. PERLMAN:  That's correct.  That's correct.

11  None.  So that's a mandatory aspect of anticipatory

12  repudiation.  But what I'm saying in the first instance,

13  Judge, is they can't argue it because it's not a claim

14  that exists under the complaint.

15          THE COURT:  Okay.

16          MR. PERLMAN:  Nowhere.  I would also suggest,

17  Judge, that they can't raise it because of the integration

18  provision.  If you take a look at -- well, there's an

19  integration provision on page 4 of 45, which is in E-6, and

20  it says you can't -- it's typical.  You can't contradict --

21  there's no other agreements, you can't contradict it, unless

22  it's signed by the parties.

23          So what's needed -- well, actually I would like you

24  to turn to E-6, Judge, because we're going to have to spend a

25  minute there anyways.  Let me know when you're there, Judge.

AA01269

```
1              THE COURT:  I take it what you're responding to is

2    Mr. Battista's argument that:  How long do I have to wait

3    before I know it's a no?

4              MR. PERLMAN:  Well, yes, but --

5              THE COURT:  How many times do I have to get

6    redlined versions before I know there's no deal?

7              MR. PERLMAN:  Actually, no.  What I'm dealing with

8    is their effort to alter the agreement that deals with a

9    termination provision and convert it into some type of due

10   diligence signoff condition.

11             THE COURT:  Okay.

12             MR. PERLMAN:  That would be contradictory to the

13   plain language.  And under this integration provision, they

14   are not permitted to do that.

15             So the integration provision is on the bottom of

16   page 4 out of 45, second to last paragraph, and it's pretty

17   standard.

18             THE COURT:  Wait a minute.

19             MR. PERLMAN:  When I say 4 of 45, it's the bottom

20   number.

21             THE COURT:  I'm looking at that.  4 of 45.  Next to

22   the last -- is it the paragraph that begins "This commitment

23   letter will"?

24             MR. PERLMAN:  No.

25             THE COURT:  "This commitment letter contains"?
```

AA01270

```
 1              MR. PERLMAN:  Correct.

 2              THE COURT:  That's the next paragraph.  Okay.

 3              MR. PERLMAN:  That's right.

 4              THE COURT:  And what do you want me to look at?

 5              MR. PERLMAN:  I'm just identifying --

 6              THE COURT:  The entire commitment?

 7              MR. PERLMAN:  I'm just identifying, Judge, that

 8    that's the integration provision that prohibits anyone from

 9    contradicting the provisions of the commitment letter.

10              THE COURT:  Well, let me just read it then.

11              MR. PERLMAN:  Certainly.

12              THE COURT:  (Reviewing document.)  Okay.

13              MR. PERLMAN:  All right.  So it's our position that

14    their arguments violate this integration provision and it's

15    not permissible.  And that's because if Your Honor examines

16    the paragraph above that --

17              THE COURT:  Uh-huh.

18              MR. PERLMAN:  -- the highlighted portion, where it

19    says, "The obligations of PEPI to provide the credit facility

20    under this commitment letter" -- and I'm skipping a few words

21    -- "will terminate upon the earlier to occur of (1) and (2),"

22    okay?  And (1) says, "The close of business on February 8,

23    2010," and then there's that parenthetical that we've spent

24    much time discussing.

25              THE COURT:  Uh-huh.
```

AA01271

1        MR. PERLMAN:  Well, their position is the due

2    diligence signoff was a condition precedent to the Debtor to

3    file bankruptcy.  That's not what this agreement -- that's

4    not what this provision says.

5        And if they wanted to -- if the Debtor wanted to

6    file the case in February, let's just say February 3rd, this

7    parenthetical is not triggered.

8        If it's not triggered, then clearly it's not a

9    condition precedent.  You can't say it's a condition

10   precedent but it's only sometimes.  It's either a condition

11   precedent or it's not.  And I submit it's not because the

12   Debtor could have filed at any moment.

13       Likewise, Judge, paragraph (2), "90 days after the

14   filing of the bankruptcy case unless the order gets entered."

15   There's no due diligence signoff required at all under

16   subsection (2).  It doesn't exist.  The Debtor could have

17   filed the case, and there's a 90-day window to walk the

18   orders through.  There's no condition precedent of a due

19   diligence anything.

20       The argument has very little merit.  And I say

21   that, Judge, because all the parties agree that the

22   conditions precedent -- I'm sorry.  That the due diligence

23   that's being discussed, everybody agrees were conditions

24   precedent to funding.  Funding.  Not filing.  And those

25   facts are established in E-1, E-3 and E-4.  Uncontroverted.

AA01272

```
 1              I believe E-3 is actually the Debtor saying so.
 2   I take that back.  E-3 is Mr. Fine's affidavit, saying
 3   it's a condition precedent to funding.  E-4 is Mr. DiNardo
 4   acknowledging that the conditions -- that the due diligence
 5   aspects in 3 and 4 are conditions precedent to funding.  And
 6   that's in E-4, Judge.
 7              THE COURT:  Okay.  Now, let's see.  You're talking
 8   about lines 13 through 16?
 9              MR. PERLMAN:  Yes.
10              THE COURT:  Okay.
11              MR. PERLMAN:  And if you go up to line 8, when I
12   referenced Items 3 and 4, those relate to the completion of
13   due diligence.  They are conditions of funding.  They knew
14   it.  They said so.  We said so.  Those facts are established
15   as a matter of law.
16              And, Judge, I would submit that no argument could
17   ever be made to the contrary, and that's because what the
18   Debtor would be forced to say, Judge, is that PEPI waived the
19   due diligence conditions precedent to funding somehow, by
20   signaling what they suggest.  And there's nothing in this
21   document, and there's no evidence to suggest that that would
22   be a waiver.
23              And so in essence it's sort of a meaningless
24   exercise because unless -- if it's not waived as a condition
25   precedent to funding, then it still exists as of the funding
```

AA01273

```
1   date, and that's how the commitment letter read.
2           So unless there was a provision that said, "And
3   PEPI hereby waives these condition precedents as the due
4   diligence," they can't make this argument, at all.
5           So it's our position, Judge, that they can't
6   attack the termination provision and call it a due
7   diligence provision -- due diligence signoff provision.
8   And regardless, Judge, as Your Honor knows from prior
9   arguments, there's no requirement that it be in writing.
10  It was in fact provided and they were aware of it per their
11  own brief, DE-84, page 17.
12          And any demands would have been premature.  Why?
13  Take a look at F-4 an d F-5.  The parties didn't even
14  complete the due diligence with regard to title insurance
15  until the 18th.  What is it they're asking for?  No one
16  knows.  But if the title insurance wasn't finalized until the
17  18th, I think it's fair to say that they shouldn't have been
18  asking for anything before that, even if they had a right to.
19  And that's evidenced in F-4 and F-5.
20          But it doesn't matter, Judge, because as I showed
21  you in the February 18 email, these issues were waived, if
22  they existed at the time, and the Debtor was filing its case.
23  They were filing.
24          But if Your Honor were to review F-4 and F-5, your
25  Honor would realize that the due diligence with regard to the
```

AA01274

1    title insurance hadn't been done until the 18th.  So any

2    demand would have been premature, regardless.

3            Then you have the Fine letter.  I think the Fine

4    letter, Judge, only hurts the Debtor.  What does it do?

5            THE COURT:  Is that in your book?

6            MR. PERLMAN:  No.  I believe it's in theirs under

7    Item 27.

8            THE COURT:  Okay.

9            MR. PERLMAN:  Okay.  This letter was issued years

10   ago.  And all it does is validate everything you've seen.

11   The initial paragraph where it says PEPI was shocked.  The

12   second paragraph where it says at no time was PEPI notified

13   or warned by borrowers that it thought PEPI had materially

14   defaulted.

15           In paragraph one, it says that we've kept you

16   apprised of all the due diligence efforts.  With the

17   exception of what I've just described, the title information

18   was still in process.

19           Paragraph two, as of the 18th -- and this is

20   consistent with everything you've seen, Judge -- the

21   borrowers were advising PEPI that the draft loan documents

22   were acceptable to the Debtors except for the verbiage of

23   the purchase option.  That's where the parties were as of

24   the 18th.

25           Now, paragraph 3, three lines from the bottom,

1   says, "Please consider this your formal three business day

2   notice that due diligence has been completed."  And the

3   Debtor's trying to make hay:  Aha, they admit they have an

4   obligation to issue this.  That's not what this says.

5         And it's consistent with Mr. Redunski's testimony

6   that I presented to Your Honor, where that notice is bad

7   for the Debtor because it means PEPI's terminating.  In this

8   context, I'm not even sure if it had any relevance because I

9   believe the Debtor had already commenced filing its

10  bankruptcy proceedings.  But it was of no matter, since we

11  were kicked to the curb.

12        But if you take a look at paragraph 4, it says how

13  the escrows were for the benefit of the lender and that you

14  stated consent judgments couldn't be performed.  And at the

15  end, it says. "Even though PEPI does not require it, PEPI

16  will promptly review deed in lieu language and will negotiate

17  the provisions of whatever it is that's needed."

18        That's not an admission.  This is what's required

19  by the parties when someone's surprised as to a default, to

20  try and sit down and finalize everything.  PEPI wanted to do

21  this loan, Judge.  They wanted to do this loan.

22        And there should be no confusion with regard to the

23  three-day notice in paragraph 3 and paragraph 6.  I think Mr.

24  Battista alluded to that.  They're consistent, because in

25  paragraph 6 he's stating PEPI's not waiving conditions

AA01276

1  precedent.  They continue through closing.

2         That's what the commitment letter says.  Due

3  diligence remains a condition precedent until initial advance

4  and each subsequent advance.  That's what the Debtor admitted

5  to understanding.  That's all he's saying here.  Please do

6  not confuse the three-day notice.  That's us terminating the

7  facility.  That's not us agreeing that there needed to be

8  some type of due diligence sign-off.

9         And then in the last paragraph, Judge, Mr. Fine is

10  reiterating that if there's perceived mis-steps, they were

11  inadvertent and they wanted them to be resolved.  I think

12  PEPI should be commended for keeping it together and trying

13  to keep the facility place and asking for a sit-down to

14  resolve.  And as it turns out, that's exactly what's required

15  under the case law.

16         So that's the real issue for Your Honor, because

17  this is very simple.  And I'm going to simplify the entire

18  issue.  The real issue before Your Honor is:  What's the duty

19  under a commitment letter, directly and/or in connection with

20  the implied covenant of good faith and fair dealing?

21         Both sides cited the same cases.  Those cases say

22  the parties must negotiate in good faith and can't abandon

23  the process.  That's what they say.  So what do we have?

24         There's no issue on the 18th.  The Debtor's filing;

25  that's the record evidence.  And when I told you there were

```
 1    two critical components that are going to be dispositive for

 2    Your Honor, that's one.

 3            As of the 18th, green light, Debtor's filing, only

 4    issue out there is the purchase option, which we don't need

 5    to get into.  I think we've already killed that horse.  But

 6    per the case law, if there is an issue, the parties are

 7    obligated to come clean.

 8            Now, Mr. Fine filed an affidavit in F-2, that as

 9    of then he was not aware of any defaults whatsoever.  None.

10    That fact is uncontroverted, Judge.  Uncontroverted.  No

11    warning of termination, no warning of a default, no warning

12    of a breach.  That's an uncontroverted affidavit in F-2.

13    And the Debtor agrees.

14            In F-3 -- if we can turn to F-2 and F-3 real quick,

15    Judge?

16            THE COURT:  Okay.  Okay, F-2.

17            MR. PERLMAN:  F-2.  Let's start with F-2.  F-2 is

18    the uncontroverted affidavit of Mr. Fine.  These facts are

19    established for purposes of this case.  And it says on 26

20    little (vi), "At no time prior to February 22 did the Debtors

21    ever advise PEPI that PEPI was in material default and will

22    terminate the commitment letter."

23            And little (viii), "At no time prior to February 22

24    did Fiddler's threaten to default PEPI or terminate the

25    commitment letter."
```

AA01278

```
 1              Little (ix), "At no time prior to February 22 did
 2   Fiddler's advise PEPI it refused to further negotiate the
 3   finalization of any loan document or such other aspects of
 4   the commitment letter."
 5              Now, turn to F-3.
 6              THE COURT:  Okay.
 7              MR. PERLMAN:  F-3, this is Mr. DiNardo's sworn
 8   testimony.  My question on Line 10:  "Excluding the email
 9   dated February 22" -- that was the default letter from Mr.
10   Battista -- I'm sorry, line 15.  "Excluding that email, are
11   you aware of any other written communication on behalf of
12   Fiddler as to PEPI whereby Fiddler states PEPI is in default
13   of the commitment letter?"  "No."
14              And it goes on, the next page, same thing about a
15   breach or material default.  And I'm asking for copies of any
16   written notice --
17              THE COURT:  I'm sorry, where are you now?  The next
18   page?
19              MR. PERLMAN:  Page 161.
20              THE COURT:  Okay.
21              MR. PERLMAN:  Line 18.  "The document we're
22   referring to asks for a copy of any written notice of a
23   warning that you sent to PEPI indicating that it had breached
24   or was in material default of the commitment letter.  Are you
25   aware of any?"  "I am not aware of anything in writing."
```

AA01279

1          And then it goes on, on the next page, "Nothing was

2     issued."  So when Mr. Fine says he was shocked and he signs

3     an affidavit that this was a surprise with no prior notice,

4     it's consistent with the Debtor, it's consistent with the

5     email of them filing on the 18th as well.

6          So they also have an obligation not to work in

7     secret, Judge.  How else does one negotiate in good faith?

8     And this is kind of the second most in critical --- most

9     critical aspect, in addition to the email of the 18th.  And

10    that is:  The Debtors chose to default PEPI only after they

11    abandoned the facility and ran to Mr. Ferrao and he said yes.

12         So before they defaulted PEPI, before they breached

13    the nondisclosure provision, they breached their duty to

14    negotiate in good faith under the case law, by abandoning the

15    negotiation process, they breached by not negotiating in good

16    faith, by failing to tell us they had issues, which didn't

17    exist as of the 18th.

18         So that's something that cannot escape the Court.

19    And if you take a look at F-23, I have established it as

20    record evidence --

21         THE COURT:  Which exhibit?

22         MR. PERLMAN:  F-23.

23         THE COURT:  Okay.  Okay.

24         MR. PERLMAN:  Actually that's not the one I want.

25    Oh, yeah, it is.  I'm sorry.

AA01280

1    If you'd turn to page 194, it's the second page in.

2    THE COURT:  Okay.

3    MR. PERLMAN:  This is Mr. DiNardo's testimony.

4    Question, line 7, "Okay."  This is talking about the morning

5    of the 19th.  "So Aubrey comes back and says, 'I'll do it.'

6    At that point, you instruct Mr. Battista to declare the

7    default; correct?"  Answer, "That's correct."

8    So they defaulted only after they abandon the

9    facility, only after they secretly disclose what they can't

10   disclose, all the while keeping PEPI in the dark.  That's not

11   negotiating in good faith by any definition.

12   So in analyzing the competing breach claim, the

13   record evidence establishes that before the Debtor elected to

14   default PEPI, the Debtor breached its duty to negotiate in

15   good faith, and knew this.  Why do I say "knew this"?  Take a

16   look at Exhibit I-1.

17   THE COURT:  Okay.

18   MR. PERLMAN:  I-1 is Mr. DiNardo's sworn testimony

19   in his deposition.  And I asked the question, "Did you say

20   earlier the parties were required to negotiate in good

21   faith?"  "Yes."

22   And then I asked, on the next page, on page 188 --

23   line 16 on page 188, the next page.

24   THE COURT:  Uh-huh.

25   MR. PERLMAN:  "Am I correct that negotiating in

AA01281

```
 1   good faith requires effective communication?"  "Yes."
 2          Well, rather than tell us we're in default, rather
 3   than tell us they're going to Mr. Ferrao, in literally the
 4   middle of the night they ran to him in secret.  He accepted
 5   the next morning.  They don't default us for several days,
 6   and that's it.  That's the breach.
 7          They breached before they put us in default.  And
 8   so it's important, Judge.  You know why?  Because given the
 9   status on the 18th, that everyone agreed they were filing,
10   and no defaults, and the only thing that happened that
11   evening was the purchase option discussion -- go figure.
12          And then on the 19th, the Debtor breaches the
13   nondisclosure, breaches its duty to not abandon and negotiate
14   in good faith, and secretly gives the loan to Mr. Ferrao.
15          So if that's true, Your Honor doesn't need to deal
16   with the notice and opportunity to cure because the Debtor
17   breached.  The Debtor breached first.  The Debtor has unclean
18   hands, and breached this nondisclosure provision.
19          If you take a look at H-1.
20          THE COURT:  H-1?
21          MR. PERLMAN:  H-1.
22          THE COURT:  Okay.
23          MR. PERLMAN:  If you turn to the second page, on
24   the very bottom, 3 of 45?
25          THE COURT:  Yeah.  3?
```

```
 1              MR. PERLMAN:  Yeah.  3 of 45, in the middle section
 2   -- middle paragraph starting at "Except as required."
 3              THE COURT:  Yeah, I see that.
 4              MR. PERLMAN:  Okay.  That's the obligatory
 5   nondisclosure provision that precluded the Debtors from
 6   disclosing this to any third party.  "This commitment letter
 7   and the contents of it shall not be disclosed by the company
 8   to any third party."
 9              And then I highlighted what happens.  "If the
10   company shows or circulates this commitment letter or
11   discloses the contents thereof in breach of the foregoing
12   sentence, then this commitment letter shall be deemed
13   terminated provided the company shall remain liable for any
14   and all costs, fees, expenses incurred by PEPI plus the
15   breakup fee."
16              So you have now an additional breach, where the
17   Debtor secretly ran to Mr. Ferrao.  And if you turn to the
18   next one -- I'm sorry, if you turn to H-3.
19              THE COURT:  All right.
20              MR. PERLMAN:  H-3 is Mr. DiNardo's deposition.  And
21   I ask him on line 16, "Was it your understanding when Exhibit
22   2 was" -- that's the commitment letter -- "was executed, that
23   this paragraph on page 3 of Exhibit 2 precluded Fiddler's
24   from disclosing the commitment letter to any other entity?"
25   Answer, "Yes."  They knew it.
```

AA01283

Case 8:10-cv-01010-DMD-CPT  Case 8:08-cv-00809-DMD  Document 12  Filed 12/10/11  Page 540 of 653  Page 456 of 656 PageID 7801

42

 1          And he stated later that Mr. Perrao -- not Mr.

 2   Perrao -- Mr. Ferrao was not a party to the commitment

 3   letter.  Obviously was not a borrower.

 4          So it's undisputed that the Debtors breached at

 5   this time.  And this happened before they made the decision

 6   to default and assert a breach against PEPI.  It's important.

 7   It's important.

 8          And the notion that I need to point to a provision

 9   to implicate the good faith and fair dealing provisions is

10   kind of a silly exercise, Judge, because under the commitment

11   letter case law that we both cited, the parties are charged

12   with the obligation to negotiate the closing documents.

13          That's how it works.  It's black letter law.

14   That's the only way it can work.  There is a negotiation

15   process.  That takes two.  And the case laws discuss how you

16   can't abandon that process.  That's not negotiating in good

17   faith.

18          But to be sure, in page 4, sub (e), it says the

19   commitment letter is subject to the negotiation of definitive

20   documents.  Well, negotiation involves the parties.  I'm not

21   going to spend much time on that, Judge.

22          And much was said last time about indicting the

23   Debtor based on testimony and actions or non-actions.  And

24   the Court need not do any of that to dispose of this case,

25   based on the record.  And that's because I have walked you

AA01284

1    through and established there were no demands by either party

2    in connection with the negotiations.  That fact was

3    established.

4              There were no defaults asserted by anyone until the

5    22nd.  As of the 18th, it was everyone's understanding that

6    the Debtor was filing the proceeding.  Only the purchase

7    option was to be completed.  There wasn't an issue on due

8    diligence, there wasn't an issue on escrows, there wasn't an

9    issue on the waterfall.  There were no issues other than the

10   purchase option.

11             That evening there's the -- and day, there's the

12   purchase option debate, and the Debtor turns to an insider

13   for a secret deal, breaches the nondisclosure, breaches the

14   duty to negotiate in good faith by abandoning the facility,

15   and then after that decides to default PEPI.  Those are

16   the facts.  They couldn't be any simpler.  And they're

17   uncontroverted.

18             And alternatively -- Judge, alternatively, we've

19   argued that if there was a default that pre-dated -- of PEPI,

20   that pre-dated the Debtors, then yes, they're obligated under

21   the law to provide notice and an opportunity to cure.  That

22   is implied and required to negotiate in good faith.  Mr.

23   DiNardo admitted it.  It required good faith negotiations

24   with effective communications.

25             So I think that concludes my rebuttal.  I was

AA01285

```
 1   trying to simplify and obviate the back and forth, Judge.

 2   If you have any questions, I'm more than happy to entertain

 3   them at this time.

 4            THE COURT:  All right.  Let's take a ten-minute

 5   break.

 6            MR. PERLMAN:  Certainly.

 7            MR. BATTISTA:  Thank you, Judge.

 8            COURTROOM CLERK:  All rise.

 9            (Recess taken from 2:52 to 3:08 p.m.)

10            COURTROOM CLERK:  All rise.  Court is again in

11   session.  You may be seated.

12            THE COURT:  All right.  Mr. Battista?

13            MR. BATTISTA:  Yes, sir.  Thank you.  Paul Battista

14   for the Plaintiffs, Fiddler's Creek.  Judge, I will deal --

15            THE COURT:  Last word.  The last word.

16            MR. BATTISTA:  I apologize?

17            THE COURT:  This is your last -- this is the last

18   word.

19            MR. BATTISTA:  Yes, sir.  I thank you for that.

20            THE COURT:  All right.

21            MR. BATTISTA:  In raging agreement, as we say.

22   And I will, Judge, do my best to stick to rebutting what

23   Mr. Perlman just went through in his last word --

24            THE COURT:  Very good, thank you.

25            MR. BATTISTA:  -- and not expand beyond that or
```

```
 1    re-argue things.

 2            THE COURT:  Are you going to go over the documents

 3    he cited?

 4            MR. BATTISTA:  Yes, sir.

 5            THE COURT:  Okay.  So I'll pull that back out.

 6            MR. BATTISTA:  I think it'll be helpful for the

 7    Court --

 8            THE COURT:  Sure.

 9            MR. BATTISTA:  -- to do that.

10            THE COURT:  All right.  I have the PEPI trial

11    notebook.

12            MR. BATTISTA:  Yes, sir.  So let me start, Judge,

13    by --

14            THE COURT:  Just, before you start --

15            MR. BATTISTA:  Yes.

16            THE COURT:  Mr. Perlman, just refresh my

17    understanding of the A, B, C, D, E, F, G, H sections.

18    There's an order there, right?  The A-1 through something,

19    the numbering?

20            MR. PERLMAN:  I wish there were.  I just --

21            THE COURT:  Oh, there isn't?

22            MR. PERLMAN:  Well --

23            THE COURT:  I thought maybe one dealt with the

24    waterfall and one dealt with the --

25            MR. PERLMAN:  There is, but I didn't give it a
```

AA01287

1  score sheet.

2          THE COURT:  Okay, fine.

3          MR. PERLMAN:  And I think what Your Honor's

4  referring to is --

5          THE COURT:  That's fine.

6          MR. PERLMAN:  -- I printed out a couple pages from

7  my motion.  In that motion, in the pleading, in our response

8  in which we sought summary judgment, it laid out in A, B,

9  C, D, order -- if that's what Your Honor's referring to --

10  what --

11          THE COURT:  Well, no.  I'm just referring to why

12  you used A as opposed to 1 through 63.

13          MR. PERLMAN:  Right.

14          THE COURT:  And I thought there was a purpose to

15  that.  And my law clerk -- one of my law clerks is sitting in

16  the back, and I thought maybe it would be helpful, not only

17  to her but to me, to understand the difference between the

18  A exhibits and the B exhibits and the C exhibits.

19          MR. PERLMAN:  I'm happy to walk Your Honor through

20  that at the conclusion or --

21          THE COURT:  Well, leave a note here with Ms.

22  Murphy.

23          MR. PERLMAN:  Certainly.

24          THE COURT:  All right.  Mr. Battista, that's it.

25          MR. BATTISTA:  Thank you, Judge.

AA01288

```
1              THE COURT:  You may go.

2              MR. BATTISTA:  Judge, Mr. Perlman raised a number

3    of points that kind of fall into a couple of categories.  He

4    referred to -- let me deal with them one at a time.  The Fine

5    affidavit, it's about time to kind of put an end to that.

6              Mr. Fine signed a lengthy affidavit in connection

7    with Mr. Perlman's response to this motion.  And Mr.

8    Perlman has said more than once that that affidavit is

9    uncontroverted, and as a result, as a matter of law, has

10   established the facts in connection with this motion.

11   He said that four or five times today alone.

12             Your Honor will read that affidavit.  In

13   particular, you will read paragraph 25 of that affidavit,

14   which Mr. Perlman referred to several times.  And in that

15   paragraph 25, there are 25 separate subsections, all of which

16   I would propose to the Court are either legal conclusions or

17   Mr. Fine's opinion as opposed to facts.

18             You'll make your decision -- we'll go through a few

19   of them and I'll point that out to you, but you'll read that

20   and you'll decide whether they are facts, material facts, or

21   whether they are legal conclusions.

22             And make no mistake about it, Mr. Fine is a lawyer,

23   a bankruptcy lawyer, who was involved in the negotiations of

24   the commitment letter and the loan documents.

25             We cited the Court to, I think, uncontroverted case
```

AA01289

1   law that says:  Expressions of interest or conclusions, legal

2   conclusions, are to be given no weight whatsoever in the

3   context of summary judgment.

4           That's obvious because you're supposed to decide

5   what the facts are.  And when someone asserts in an affidavit

6   a legal conclusion, it's not a fact, and you can ignore that

7   and you are in fact required to ignore that.

8           So you need to make a decision when you read Mr.

9   Fine's affidavit whether in fact he's asserting facts -- as

10  Mr. Perlman said, uncontroverted facts -- or whether he's

11  asserting legal conclusions.  I'm going to go through a few

12  of those.

13          So with that background, the second point I want to

14  make about his affidavit is that it is also well-established

15  case law -- we cite it in our brief as well -- that you

16  cannot, through a subsequent affidavit, contradict prior

17  testimony.  You just can't do it in order to create an

18  issue of fact.

19          There's a number of emails, there's a letter from

20  Mr. Fine dated February 23rd, there's testimony from all

21  of Mr. Fine's clients and himself, that came before the

22  affidavit.

23          The affidavit in many ways contradicts all of

24  those emails, letter and deposition testimony.  And it's just

25  improper to create an issue of fact with an affidavit that

AA01290

1   contradicts prior testimony. So those are the two kind of

2   legal rubrics that exist when you review Mr. Fine's

3   affidavit.

4           Now, a second kind of big issue. Mr. Perlman said

5   at the beginning that we've changed our argument. That

6   Fiddler's Creek now has a new defense, he said. And the new

7   defense is that we've asserted that PEPI knew it was in

8   default.

9           And he says, "Judge, how is that possible? Look at

10   Mr. Fine's letter expressing shock that we had defaulted

11   them." Suggesting that it's a silly position, he said.

12           Now, my argument is: Taking all the emails that I

13   walked you through last time, and said to you -- and you made

14   the point -- at what point in time do I have to say I've

15   given it my best shot, time and time again, and they have

16   said no, time and time again.

17           So did Mr. Fine know that the commitment letter

18   required escrow provisions? Of course he did. He drafted it

19   with me. Did Mr. Fine know what the -- in fact, he put it in

20   his first loan document that he sent to me, as you pointed

21   out, on those escrow provisions.

22           Did Mr. Fine know what the waterfall requirement

23   was in the commitment letter? Of course he did. He drafted

24   it properly in the first draft of his loan agreement.

25           Subsequent to that, he changed it. So did the

AA01291

1 Debtor give notice of that default prior to the February

2 22nd letter?  Did PEPI know it was in default?  Those are

3 conclusions, right?  The default is a conclusion.

4           Did he know that he was taking a position in a loan

5 document different than a commitment letter?  Absolutely he

6 knew it.  Because he drafted the commitment letter, he

7 drafted the first draft of the loan documents, and then

8 he changed it.

9           I don't care what label you put on it.  I put a

10 default on that label, but that's a conclusion.  So to

11 suggest that PEPI didn't know it was in default doesn't make

12 any sense, because they knew factually what they were doing

13 and factually what they weren't doing.

14           I put the label on it.  But to suggest that he

15 didn't know, or PEPI didn't know that they were excluding the

16 escrow provisions, to suggest that they didn't know they were

17 changing the waterfall provisions, it's just not what the

18 record is.  It's not what the facts are.  Again, that's a

19 label that people want to put on it, a conclusion.

20           So when Mr. Perlman points out Mr. DiNardo's

21 testimony, he says, "Did you give PEPI notice of default

22 prior to February 22nd?"  And Mr. DiNardo said, "No, we

23 didn't."  But that doesn't mean they weren't on notice of

24 what they were doing and not doing in respect to the

25 commitment letter.  They absolutely were.  We didn't

AA01292

1    need to put a label on it or a conclusion.

2           So he asks when Mr. Ferrao -- he said Mr. Ferrao

3    testified that, quote, "PEPI refused to come to the table,"

4    or words to that effect, when Mr. Ferrao testified at the

5    first DIP loan hearing.

6           And he said, "Well, that wasn't true."  Well, what

7    does that mean?  That means, as Mr. Ferrao testified -- and

8    it's in the record today where Mr. Perlman deposed him --

9    "PEPI reneged.  PEPI would not give us the due diligence

10   signoff.  And we would have went from 11 to 7 in a meltdown."

11   That's an almost exact quote from Mr. Ferrao's testimony when

12   Mr. Perlman deposed him in this case.

13          So when he says PEPI refused to come to the table,

14   that's what it means.  It means they didn't give us their due

15   diligence signoff.  They wouldn't tell us that they wanted to

16   make this loan.  They wouldn't commit to this loan.  That's

17   the whole underpinnings of our due diligence signoff

18   requirement.

19          Then he makes, again, much of the, quote,

20   "unequivocal" email.  First, he suggests something improper

21   when we contested the disclosure of that.  Well, I had that

22   discussion with you standing right here.  And I said to you,

23   "I have to protect my client's privilege."  You ultimately

24   concluded it was not privileged.  Okay.

25          And I said to you, "I'm okay with it coming in

AA01293

1  as long as I protect my client's privilege and it's not a

2  general waiver."  So we didn't try to hide that.  Like any

3  good lawyer, like Mr. Perlman has done in this case as well,

4  he's protecting his client's privilege.  And you concluded it

5  was not.  And that's fine.  I've explained it at length in my

6  last argument as to what it meant.

7       And when you put it in the context of the time

8  frame of February 11th, you put it in the context of the

9  original Mr. Lorio email where he raises the purchase option

10  issue, which Mr. DiNardo responds to and talks about we need

11  to have a trigger mechanism and notice of a trigger

12  mechanism.

13       And that's the same day and time that Mr. Ferrao

14  talked about being required -- being able to purchase

15  unequivocally.  It's an entire week before the general

16  release issue comes up that Mr. Perlman suggests was the

17  real reason for our defaults.

18       I did that with you already.  I'm not going to

19  go through it again.  I only mention it again because he

20  suggests again that unequivocal means unequivocal.  Yeah, it

21  does.  But in the context of what was going on at that point

22  in time:  Trigger mechanisms and notice of the trigger.

23       Okay, the next big thing -- and frankly, I think

24  his entire argument today is hinged on the email that he

25  referred to in his Item F, as in Frank, 8.

AA01294

1          And when I turn to F-8, that, of course, is an

2   email exchange between myself and Jeffrey Fine on February

3   18th.  And Mr. Perlman says, somewhat broadly, it's obvious

4   there were no other issues pending, it's obvious everything

5   had been resolved, and it's obvious the only thing

6   outstanding was the purchase option.  And as a result, the

7   Debtors were ready to file.  Everyone agreed the Debtors were

8   ready to file.  That's what he said.  And he draws all of

9   that from this one email.

10          And in here, this email says -- my first email

11  in F-8 to Mr. Fine.  The subject is:  "Please call or

12  email me ASAP on the remaining issues" -- issues plural --

13  "we discussed last night."  That's the Wednesday before.

14          And Mr. Fine responds saying he wasn't able to

15  reach Elizabeth, and then refers to putting in a provision,

16  rate of defaulted contracts, and speaking about the purchase

17  option language.

18          And I wrote back to him and said:  "Any update?"

19  Three hours later.  "The day is beginning to get away from us

20  in terms of filing."

21          That doesn't say anything about whether they were

22  in default because of the escrow provisions or the waterfall

23  provisions or due diligence.  It doesn't say any of that.

24          It doesn't refer to what the issues were that we

25  were talking about on that date.  Mr. Perlman wants to jump

AA01295

1  to the conclusion that there was only one issue, the purchase

2  option.  That's not what it says.  It's just not what it

3  says.  And its entire argument hinges on that leap of faith.

4         This talks about remaining issues.  I'm not going

5  to testify today as to what those were, but suffice it to

6  say prior to that date, I've already walked you through the

7  escrow provision issues, the waterfall provisions and the due

8  diligence.  And the call on Tuesday, the 16th, where we were

9  told no, no, and get it again, no.

10        Could it be that I'm negotiating those issues again

11  on Wednesday and Thursday?  I'm not going to testify, but

12  this doesn't say the only issue outstanding is the purchase

13  option.  It simply refers to discussing remaining issues in

14  terms of filing.  "The day is getting away from us in terms

15  of filing."  It says what it says.  It doesn't say any more

16  than that.

17        And the fact that PEPI would want us to file,

18  nothing unusual about that, because they hadn't given us the

19  escrow provisions, the waterfall provisions and due diligence

20  signoff that I talked to you about before.

21        Those issues were not solved as of this date.

22  Mr. Perlman said in his argument that the Debtor acquiesced

23  in the changes to the loan agreements.  I don't know where

24  that comes from.  It's nowhere in the record.

25        The opposite is true.  Email after email after

AA01296

1    email that I walked you through, draft of loan document, the

2    draft of the loan document, the draft of the loan document

3    that I walked you through, and the conference call where we

4    were told no, no, no, that's the record.

5           Nowhere in there is there an email where I say,

6    "You know, despite all that, we're still good to go.  That's

7    not what I said.  He draws that leap of faith from this

8    February 18th email when I say, "The day is beginning to get

9    away from us in terms of filing."  It's not what it says.

10          And then he refers to Mr. Fine's email and -- oh,

11   I didn't write down which one it was.  One second, Judge.

12   (Locating document.)

13          I'm sorry, there were several versions -- several

14   copies of Mr. Fine's affidavit in different portions of the

15   book, and I can't find the one that I was referring to, but

16   I will tell the Court what I believe Mr. Perlman was doing

17   with it.

18          He pointed to that to show that there was nothing

19   else that had been raised as of February 18th.  It was in

20   paragraph 17 of that Fine affidavit

21          And in there, paragraph 17 of his affidavit, Mr.

22   Fine said, "During this time" -- and the time frame is

23   roughly February 17th or 18th -- "it also appeared that all

24   the loan documents were close to final form and ready for

25   signature and filing."  "It also appeared."  That's Mr.

AA01297

```
 1    Fine's opinion.  It's not a fact.  It's his belief.  It's
 2    not a fact.
 3            "It also appeared."  Why did he do that?  He's a
 4    smart guy.  Why did he say "it also appeared"?  Why didn't he
 5    just simply flat-out say the loan documents were close to
 6    final form?  It's because, I would suggest, that he knew that
 7    there were still three major issues:  Escrow, waterfall and
 8    due diligence.
 9            So you can decide whether, when he says, "It also
10    appeared" -- in paragraph 17 -- "that they were in final
11    form," whether that's an opinion or a fact, for purposes of
12    summary judgment.
13            I will make the point here, because Mr. Perlman
14    made it, that the Gulf Bay loan was a different loan.  PEPI
15    never intended to make that loan, was not going to make that
16    loan.  It was a different loan.  You pointed it out there,
17    and I'm going to get back to that when we talk about the Gulf
18    Bay Facility, because there's a lot of things to talk about
19    there that have not been raised with the Court yet.
20            And then Mr. Perlman turned to the escrow
21    provisions.  And he said that there is no evidence of
22    an unequivocal demand.  Everything was qualified by
23    negotiation, by proposal, and therefore if there was never
24    an unequivocal demand -- and, by the way, he cited again to
25    Mr. Fine's affidavit for that, and that's at Item A-4.
```

AA01298

```
 1              And what did Mr. Fine say in A-4?  This is

 2    paragraph 26(iii).  "PEPI never made an unequivocal demand in

 3    violation of the commitment letter, including as to the

 4    escrow, waterfall or its due diligence."

 5              Again, Mr. Fine wants to put a conclusory label on

 6    that.  But the facts are -- and we kept raising it and --

 7    raising them, all three, escrow, waterfall and due diligence.

 8    They kept saying, "No, no, and no."  They kept sending loan

 9    documents saying, "No, no, and no."

10              We can put whatever label we want on that.  To me

11    that's no.  Whether it's an unequivocal demand, that's a

12    conclusion based on facts, right?  Mr. Fine wants to give

13    you the conclusion.  He doesn't say in here, "I never told

14    Battista no, I never sent him a document that didn't -- that

15    excluded the escrow provisions."  He didn't say the facts.

16    He tells you what his legal conclusion is.  No unequivocal

17    demand.

18              You can decide whether the string of emails back

19    and forth, and the different sets of loan documents back and

20    forth result in a no.  The fact that Mr. Fine wants to put a

21    label on it isn't sufficient for summary judgment purposes.

22              And while we're at A-4, let's just take a look at

23    some of the other provisions in his affidavit, paragraph 26.

24    Many of them have been pointed out to you by Mr. Perlman.

25    But just to give a highlight as to why each and every one
```

AA01299

1    of these is a conclusion.  This is paragraph 26 of his

2    affidavit.  He says, (1), "PEPI negotiated in good faith in

3    accordance with the commitment letter."  How is that anything

4    other than a conclusion?

5         Where are the facts that would underlie that?  He's

6    just told you in his view it was in good faith.  No facts.

7    It's a conclusion.  I already did number (2), "PEPI never

8    made an unequivocal demand."  Again, a conclusion.  No facts.

9         Number (4) is interesting, "PEPI verbally advised

10   Fiddler's more than once that it had completed corporate and

11   real estate due diligence, including on February 16th."

12   That's very nuanced.  It's cute.

13        The commitment letter required completion of

14   due diligence.  He's focusing in only on two items here,

15   suggesting that they knew, we told them.  No, that's not --

16   it may be accurate on those two pieces but it's not the due

17   diligence completion requirement that the commitment letter

18   says, which this is purporting to tell the Court.

19        (5) "PEPI always acted in the manner consistent

20   with honoring the sale order of the properties listed by the

21   Debtor in the waterfall."  A conclusion, "always acted in the

22   manner consistent."

23        Give me the facts.  Tell me why you changed the

24   loan agreement from your first draft to the second draft.

25   That's the fact.  Don't just simply say conclusory.  "Always

AA01300

1  acted consistent," that's just too easy to say that.  That's
2  not a fact.  It's conclusion.
3         Look at (7), "PEPI was not in material breach of
4  the commitment letter."  Really?  That's the ultimate
5  conclusion.  Not a fact.
6         If he said in here, "PEPI didn't delete the escrow
7  provision related to the valuation mechanism," okay, that's a
8  fact.  It would be a wrong fact, but it's a fact.  Not that
9  they were not in material breach.
10        I can go on.  Every one of these 25 has a
11 significant legal conclusion or opinion in it that knocked it
12 out of the box for being a material fact to defeat summary
13 judgment.  And many of the other ones are contradicted by his
14 client's own testimony.  In his own letter on February 23rd,
15 yeah, I call it the admission letter because that's what I
16 think it is.
17        And the first time you heard Mr. Perlman deal
18 with it in any papers or in any argument was today, now
19 suggesting that that hurts us, bad for us.  You can decide
20 that.  You don't need me to tell you what he's saying in that
21 letter and why it wasn't addressed through today.
22        You'll decide that when you read it, as to whether
23 he's admitting to those three defaults, whether he's giving
24 us the due diligence signoff that he said was never required,
25 whether he's giving us the signoff on due diligence that they

AA01301

1    now say was not required until funding.  Well, then why did

2    we get it?

3           He draws the clear distinction between due

4    diligence and closing conditions.  He separates them.

5    Diligence is complete.  Closing conditions exist.  Yeah.

6    That's exactly what I've been saying.

7           Mr. Perlman referred to the Ringling case, and I

8    referred you to it last time as well.  I put it in my

9    supplemental exhibit binder with the case law.  And he

10   suggests now -- which is a different argument than he's made

11   before.  Before, it was, if you remember, deeds in lieu of

12   foreclosure are unenforceable in Florida.  Well, his first

13   argument was.

14          Then it was, deeds in lieu are unenforceable unless

15   it's for -- unless it comes from a subsequent agreement.

16   And today he said deeds in lieu are unenforceable unless the

17   existing lender -- unless the lender existed.  And he pointed

18   you to Huntington in that case, and he said, "Oh, they were

19   already a third mortgagee, therefore they were only

20   enforceable if the lender is already a lender."

21          That's not what that case says.  You can read that

22   case.  It's very short.  I highlighted it to you.  And the

23   Court said, very clearly, Ringling made all the arguments

24   that Mr. Perlman is making today, and said:  Yeah, even

25   though this wasn't in connection with a subsequent agreement,

AA01302

1  it was in connection with a workout, the policies underlying

2  equity redemption are not implicated, as they're not

3  implicated here.  And the Court in that case found the

4  deed in lieu of foreclosure, in escrow, enforceable.

5      That's it.  That was the Court's holding and

6  finding and the analysis tracks exactly the arguments that

7  I'm making here, and the arguments that Mr. Perlman's making,

8  and found in favor of the arguments that I'm making.  You'll

9  read that again and you'll decide.  It's very short.  But his

10  argument changed as we went through this here.  Today, it was

11  you have to be an existing lender before you can have an

12  enforceable deed in lieu of foreclosure.

13      Let's go to Item D-13.  This is another one of Mr.

14  -- of the Fine affidavit issues here.

15      THE COURT:  Which exhibit?

16      MR. BATTISTA:  D-13.  Mr. Perlman's D-13.  And

17  if you look at D-13, it's one page out of his affidavit.

18  Actually, it's one page out of the amended affidavit that was

19  filed.  And you'll see that there's Section 11, Section 12,

20  and now there's Section 12.5.  That's not a numbering issue.

21  That's because Mr. Perlman filed an amended affidavit and

22  inserted paragraph 12.5.  When was that done?

23      My reply brief in this case, replying to PEPI's

24  response, was filed on March 12th.  13 days later, there's an

25  amended affidavit filed without leave of court by Mr.

1   Perlman.  And 12.5 is added to that amended affidavit.

2           And then he says today, "Judge, it's

3   uncontroverted.  12.5 is uncontroverted."  Well, yeah,

4   because it was filed two weeks after my reply brief without

5   leave of court.  12.5 needs to be ignored.  It was not in

6   the papers, and it violated the Court's order on filing

7   subsequent pleadings.

8           And even if it doesn't, it's, again, conclusory,

9   and it's again his opinion.  But you can't read -- you can't

10  use 12.5 because it came in two weeks after my briefing was

11  completed.

12          And Mr. Fine is raising in here and elsewhere --

13  there were lots of issues, legal issues.  In fact, paragraph

14  12, which was in the original affidavit, where he's talking

15  about issues with consent judgments and deeds in lieu and

16  issues with the waterfall.

17          You made the comment the other day in response to

18  mine, which was:  Where was that in any of the emails between

19  Mr. Fine and myself leading up to our default?  In fact,

20  where is it in his February 23rd response letter?

21          Why does not -- if these were such material issues,

22  why doesn't his response letter say, "Hey, Battista, the

23  waterfall provisions are not enforceable, *res judicata*,

24  collateral estoppel, issue preclusion"?  His letter doesn't

25  say any of that.

AA01304

1    Why doesn't his letter say:  Deed in lieu of

2  foreclosure, unenforceable.  Unenforceable.  We can't have

3  that.  And, oh, by the way, how convenient.  If we don't have

4  that, then we don't need the valuation mechanism.  That just

5  goes by the wayside.

6    The only thing he says in that letter -- the

7  only thing he says -- where consent judgments may not be

8  enforceable in Florida.  He doesn't go further.  Why not?

9  Because it wasn't an issue until we filed this litigation.

10  And as a good lawyer, Mr. Perlman came up with the argument

11  that it's not enforceable.  But it was not raised in Mr.

12  Fine's letter.

13    You would think that's where it would belong, after

14  we called the default.  And he'd say, "How can you default

15  me?  It's not enforceable."  Not what he says.  Not what he

16  says.  And that speaks volumes.

17    C-5, Mr. DiNardo's affidavit that Mr. Perlman

18  referred to.  C-5.  When Your Honor's there, let me know.

19  We're going to read it a little bit.  He may have pointed out

20  some of the issues here.  I'm going to point out the rest of

21  them.

22    C-5, Mr. Perlman says, "Look, the Debtors admitted

23  that the escrow provisions were waivable.  The Debtors

24  admitted it."  And so if the Debtors could -- if the Debtors

25  admitted it was waivable, then certainly PEPI could waive.

AA01305

1          Well, I'll harken back to the emails that I

2    referred to last time where I pointed out to you whose

3    benefit that escrow provision was for.  My email, Mr. Fine's

4    email, Mr. Springfield's email.  Those are all well-argued.

5          But in this context, the question to Mr. DiNardo at

6    line 7 is:  "Was there an escrow for stipulated judgments of

7    foreclosure in a loan between Fiddler's and Gulf Bay

8    Capital."

9          His first answer is, "I don't recall if there was."

10   "I don't recall if there was."  Then he says, "We had an

11   escrow clause."  Of course, the escrow clause was for the

12   protection of the DIP Lender, and Gulf Bay Capital knew the

13   asset so they did not need the escrow clause.

14         Well, Mr. Perlman wants to take that and say, "Aha,

15   he admitted it only for the protection of the DIP Lender."

16   Well, that's not what it says.  It says "The escrow clause

17   was for the protection of the DIP Lender."  There was no

18   follow-on question that said, "Was it also for the benefit

19   of others?"  That's not a follow-on question, and an answer

20   here.

21         Now, why didn't Gulf Bay -- Mr. Perlman would

22   suggest that Gulf Bay Capital didn't put it in its loan

23   agreement.  First, Gulf Bay Capital had a different

24   commitment letter than PEPI did.  And that's in the record,

25   because we filed it with the court in connection with the DIP

AA01306

1    loan that we outlined.  And, in fact, it's in my evidence

2    book.  I believe it's item 31.

3            So Gulf Bay Capital, first of all, had its own

4    commitment letter.  That commitment letter did not have a

5    requirement in there for an escrow for deeds in lieu of

6    foreclosure.

7            And Mr. Perlman says, "Aha, if Gulf Bay Capital

8    didn't require it, didn't have it, PEPI could waive it."

9    I don't see how the two of those fit together.  PEPI had a

10   specific commitment letter that expressly required it.  They

11   elected not to put it in the loan documents after first

12   putting it into the loan documents.

13           There's evidence that both sides believed it was

14   for the benefit of PEPI and the other secured lenders.  But

15   because Gulf Bay Capital didn't have it, aha, PEPI should be

16   excused.  That's not an excuse for the failure to comply with

17   the commitment letter.  It just isn't.

18           There are reasons why Gulf Bay Capital didn't have

19   it.  I'm not going to testify to that, but perhaps Mr.

20   Perlman's question was, "Well, could it only be that it

21   was for the benefit of the DIP Lender?"  No.

22           Why did we have a deed in lieu of foreclosure and

23   why did we have the escrow for it and why did we have a

24   valuation mechanism?  I told you it was because of the

25   unencumbered property.  Mr. DiNardo testified that it was

AA01307

1    because of the unencumbered property.  Excuse me, he didn't

2    testify.  It was in an email that I pointed out to you in my

3    last argument.

4            Unencumbered property was at the top of the

5    waterfall.  No dispute there.  A deed in lieu of foreclosure

6    works for the unencumbered property.  It doesn't work for

7    property that's encumbered.  Because if you take a deed

8    subject to a mortgage, it doesn't do you any good.  But you

9    can take a deed subject to no mortgage, the unencumbered

10    property, and record it.

11            When we get to the Gulf Bay Capital DIP loan

12    agreement that Mr. Perlman read to you -- we're going to get

13    there in a second -- it says something different as it

14    relates to encumbered property and unencumbered property.

15    It's treated differently in the foreclosure process by Gulf

16    Bay Capital, which obviated the need for this escrow.  And

17    I'll point it out to you as to why it obviated a need.

18            Mr. Perlman suggests there's no other reason other

19    than it could only benefit a DIP lender.  No.  There's

20    several other reasons, and it's in the loan document as

21    to why.

22            Then he says, turning to the waterfall provisions,

23    he said there's no evidence of breach.  No evidence of

24    breach.  That it was substantially the same because they

25    were honoring the list of the waterfall.

AA01308

```
 1              I've gone through this ad nauseam with you about

 2    the distinction about filing a foreclosure, getting a

 3    foreclosure judgment, and going to sale, and why those are

 4    different.  And why Mr. Fine did the right thing when he

 5    drafted the first set of loan documents and limited exercise

 6    of rights and remedies in total on each piece before moving

 7    on to the next.  And then changed his mind.  Changed his

 8    mind.

 9              He didn't make up that first draft of that loan

10    agreement.  He took it from the commitment letter.  And then

11    he changed his mind.  Fine.  He has the right to change his

12    mind, but that also means he's in default.  And he didn't go

13    back.  And now we're hearing the reason is *res judicata*,

14    issue preclusion and all that other stuff.  And I'm going

15    back to:  Why was it never raised?  And, in particular,

16    Mr. Fine's letter.

17              There's plenty of evidence of breach.  It's all

18    the emails.  It's the drafts of loan agreements.  It's the

19    consistent, no, no, no, from PEPI, culminating in the

20    February 16th evening conference call.

21              And then Mr. Perlman points to Exhibit D-9, which

22    is testimony from Mr. DiNardo.  D-9.  And he says:  You see,

23    Judge, even the Debtors admitted that the waterfall was only

24    in respect of the sale order, not in respect of anything

25    else.  And in there he points to a back and forth with Mr.
```

AA01309

1    DiNardo, and he only gives you, of course, one page.

2         And in here, when you read it, the top line -- the

3    top paragraph is an answer from Mr. DiNardo.  We don't have

4    the question because it wasn't included, but what he says is:

5    "What I understood is that in the commitment letter, the

6    collateral is in a given waterfall, and each item would be

7    foreclosed on, and the proceeds realized applied against the

8    loan for PEPI, then the next step would go, the next piece

9    would go."

10        I read that as foreclose and sell one at a time.

11   Mr. Perlman wants to read it as foreclose against all and

12   sell one at a time.

13        And then there's a couple of back and forths.  And

14   the question that Mr. Perlman wants to focus on is:  "Would

15   the next step be to sell the next sequential parcel?"

16   "Answer:  Yes."

17        Well, that's a loaded question, respectfully.

18   We're talking about, at this time leading up to it, the

19   foreclosure process.  And Mr. DiNardo says, "Each item would

20   be foreclosed on, and the proceeds realized applied against

21   the loan."

22        So trying to read into his answer that he's

23   admitting that it was a sale-by-sale and foreclosure --

24   the waterfall was only respecting the sales versus the

25   foreclosure, is not consistent with his first answer.

AA01310

1    It's kind of a gotcha which is unfortunate because

2  that's not what it says.  And when you read it in the context

3  of his deposition, you will see that.

4    In fact, we pointed this out in our brief.  I don't

5  have it with me, but page 255 of Mr. DiNardo's deposition --

6  this is page 260.  When you go back five pages -- and it's

7  in the record -- and you read it, you'll see him say very

8  specifically -- and I say it in my brief -- that the

9  waterfall was not supposed to let PEPI foreclose against

10  all at once and then sell.  It was supposed to be done in

11  the pecking order.  Foreclose and sell.  Foreclose and sell.

12  Foreclose and sell.

13    He says that on page 255 of his deposition.  And so

14  when you go back two or three or four -- actually five pages,

15  you can put this in context.

16    Now, let's go to the Gulf Bay loan document, which

17  is Exhibit D-12.  Even if it has any relevance to whether

18  PEPI defaulted under PEPI's commitment letter, given that

19  Gulf Bay had a different commitment letter -- let's assume it

20  had maximum relevance.  And somehow what we did with Gulf Bay

21  Capital influences the Court's decision on whether or not

22  PEPI defaulted.

23    Let's look at Section 8.4 that Mr. Perlman pointed

24  you to.  And I said to you earlier there's a distinction in

25  here between unencumbered property and encumbered property.

AA01311

```
 1                 And so 8.4(a) --

 2            THE COURT:  Okay.

 3            MR. BATTISTA:  -- has a proviso in the -- well,

 4    I'll just read the whole thing and the Court can follow

 5    along.

 6            "Lender may file one or more real property

 7    foreclosure actions in Florida state or federal court, and

 8    obtain one or more judgments of foreclosure that permit

 9    foreclosure and/or auction sales of any and all part of the

10    property."  That's the lead-in clearly.  It's pretty broad.

11            But then there are a bunch of provisos.  "Provided

12    however that only" -- underlined only -- "with respect to the

13    real property described in Exhibits E-3 through E-10."  E-3

14    through E-10.  What do you think E-1 and E-2 is?  That's E-3

15    through E-10.  I'll show you what E-1 and E-2 is in a second.

16            Let's keep going.  So only with respect to property

17    in E-3 through E-10, which is the designated real estate

18    collateral, Lender shall use commercially reasonable efforts,

19    (1) first to hold foreclosure and/or auction sales on the

20    collateral described in E-1 and E-2.

21            I'll show you in a second that E-1 and E-2 is,

22    guess what, the unencumbered property.  In fact, it's defined

23    that way.  You see right after E-1 and E-2?  The, quote,

24    "previously unencumbered real estate."

25            So nothing could happen down the waterfall until
```

AA01312

```
 1    we first used commercially reasonable efforts to hold
 2    foreclosures and auction sales on the unencumbered real
 3    estate.
 4          Mr. Perlman has suggested to you that this is
 5    exactly what PEPI had.  PEPI could foreclose against all, and
 6    then take them and sell them one at a time.  That's not what
 7    PEPI had.  This says, "Gulf Bay Capital, you can foreclose
 8    and sell the unencumbered property first, and only then can
 9    you proceed down the path".  That's different.  Materially
10    different.
11          And we presented testimony as to the value of that
12    unencumbered property to the Court at the hearing.  So this
13    provision goes on to say, after distinguishing previously
14    unencumbered property from everything else, and says, "And to
15    conduct the foreclosure sales for the designated real estate
16    collateral" -- which, by the way, is Exhibits 3 through 10 --
17    "which is encumbered, and in the numerical order of each such
18    Exhibit E" -- skipping ahead -- "in such a manner" -- as
19    what?  "As not to obtain a final judgment of foreclosure
20    on one of the properties" -- skipping ahead -- "until you
21    sell the one above it."
22          This, even with respect -- even after the
23    unencumbered property is gone, foreclosed and sold, they --
24    Gulf Bay Capital couldn't get a final judgment of foreclosure
25    until they sold the one above it.
```

AA01313

1           PEPI wanted to foreclose and get a final judgment

2   of foreclosure, and then do the sales.  This is not -- Gulf

3   Bay's foreclosure waterfall is materially different and,

4   respectfully, better than the one that PEPI was thrusting

5   upon us.  This is much closer to the commitment letter.

6           So if you want to do a comparison as to what the

7   Debtor did with Gulf Bay Capital, and somehow that influences

8   the Court's decision on whether or not PEPI defaulted, let's

9   look at what Gulf Bay Capital did in total.

10           It had to first go after the unencumbered real

11   estate before anything else.  It had to foreclose and sell

12   the unencumbered real estate before anything else.  And after

13   we get through that, it could only get a final judgment of

14   foreclosure and sale in the waterfall.  That was completely

15   different than PEPI wanting to wipe everybody out and then

16   sell, in the context of the waterfall.

17           So if it has any relevance, it would support my

18   position that PEPI's insistence on their version of the

19   waterfall was not consistent with the commitment letter.

20           Due diligence.  I'm not going to spend a lot of

21   time on it, Judge.  We went over it *ad nauseam*.  And by the

22   way, as I said to you several times, you only have to find

23   one default here.  One escrow provision not included, the

24   waterfall provision materially changed, or due diligence

25   signoff not given consistent with the commitment letter.

AA01314

1   You only have to find one.

2          There's only one way to make sense of the

3   parenthetical on page 4 of the commitment letter, when it

4   talks about three days after PEPI advises us that due

5   diligence is complete.  And that's there for a reason.

6   It's not just made up.

7          It ties filing of the bankruptcy to an advice of

8   completion of due diligence.  Not substantial completion.

9   Not completion on corporate matters.  Not completion on real

10  estate title matters.  Completion, period.  It ties it all

11  together.

12         There's only one way to read that.  Their

13  commitment doesn't terminate unless either we file or they

14  give us that advice.  They knew from the get-go we weren't

15  filing without that signoff.  I read you a dozen emails to

16  that effect.

17         And to suggest that, "Oh, we didn't know you were

18  looking for that, we didn't know we were in default, that we

19  didn't give that to you," again, it's the conclusion put on

20  this by Mr. Fine, not the facts.

21         And Mr. Perlman said in his argument, quote, "All

22  the parties agreed that due diligence was a condition to

23  funding."  Where did I agree to that?  Where did the Debtor

24  agree to that?  Just the opposite.  We were begging for it,

25  the signoff, prior to the filing -- which would, of course,

AA01315

1    be prior to the funding.  We never agreed to that.

2         In fact, Mr. Fine suggested in -- as was just said,

3    in his February 23rd letter:  Here's your signoff, Battista,

4    now you've got it.  And it's different than conditions

5    precedent to funding.  It's a different issue.

6         And then Mr. Perlman said, "And even the Debtor

7    admitted it, that this was a condition to funding."  And he

8    pointed you to Mr. DiNardo's testimony in his Exhibit E-4.

9    Again, one page out of a lengthy deposition -- excuse me, I'm

10   sorry.  There's two pages, I believe -- three pages in here

11   out of that lengthy deposition.  But he pointed you only to

12   one page, page 173.

13        And I read this a couple of times.  And I don't see

14   where it says that Mr. DiNardo agreed that due diligence was

15   a condition that had to be satisfied through funding.  In

16   fact, respectfully, this is somewhat convoluted.

17        But in the questioning, it talks about conditions

18   precedent to initial and subsequent advances.  It goes

19   through a variety of items.  "Items 1 through 4, Items 5

20   through 14, balance of 14 through 16, is that correct?"

21   Answer is, "That's correct."

22        I challenge you to read that come to the conclusion

23   that Mr. Perlman wants you to come to, that Mr. DiNardo said

24   due diligence is only a condition to funding.  That's not

25   what it says.  He's talking about closing conditions, which

AA01316

1   everybody, Mr. Fine included, says, it has to go through

2   funding but due diligence was in our view -- and Mr. Fine

3   admitted in his letter -- to be done prior to funding.

4        He suggested that we have asserted that PEPI waived

5   the due diligence condition to funding.  I've never said

6   that.  They had an obligation to give it to us, they didn't,

7   they defaulted.  I didn't say they waived anything.  They had

8   an obligation to give it.  They didn't.  They defaulted.

9        And they referred to an email on the 18th, where I

10   asked for the status of title due diligence, and said, "Look,

11   Judge, they were still asking for due diligence issues to be

12   solved on the 18th."  Or maybe it was the 17th, I forgot

13   which -- no, it was the 18th.

14        And so it was premature to demand a due diligence

15   signoff because, look, they're still asking for title due

16   diligence.  Well, you drew that distinction day one.  You

17   said there's due diligence, meaning do you want to do the

18   loan?  And then there's things like completing title,

19   environmental and that type of stuff.  Those are two

20   different things.  I've said it a dozen times.

21        The lender could walk away for any reason if it

22   didn't complete its due diligence to its satisfaction.  Do I

23   want to make this loan for $27 million, based on this real

24   estate collateral, to a developer in the midst of the worst

25   real estate and banking crisis since the Great Depression?

AA01317

1    That's the question.

2           And if they said no to that at any point in time, I

3    couldn't do anything about it.  But once they told me they

4    were in, and then they said, you know, we're going to

5    terminate because there's a title issue -- I could fix the

6    title issue.  And if I couldn't, I couldn't.  But at least

7    there's things in my control that I could fix.  I could come

8    to you to fix those issues.

9           I couldn't fix the issue where they said we're not

10   making this loan just because today's cloudy.  Whatever the

11   reason is.  They had an absolute out for their failure of due

12   diligence.  That's not what we're talking about here.  That's

13   not title, that's not environmental.  That's do I want to

14   make the loan.

15          I've walked through the Fine letter in detail.  I'm

16   not going to repeat it right now.  I'll just refer the Court

17   back.  You can read it.  You can decide whether it's an

18   admission or not.  You can decide why it wasn't raised.

19          Let me go to Mr. Perlman's last argument, which is

20   -- he described it as the second critical fact.  The first

21   critical fact is that email where I indicate where the day is

22   getting away from us, and I suggested to you that he reads a

23   whole lot into it that doesn't exist and eliminates a lot of

24   stuff that is in the record and leading up to that.

25          But his second issue is:  We defaulted them only

AA01318

1  after Mr. Ferrao said yes to the loan.  Mr. DiNardo testified

2  to that.  Yes, that's exactly right.  But that doesn't mean

3  they hadn't defaulted prior to that.  Whether we gave them

4  notice of default or they defaulted are two different things.

5          They defaulted, at the latest, on February 17th

6  when they sent the last draft of the loan agreement still

7  refusing to give us the escrow and waterfall provisions.

8          Perhaps back on February 16th, when they gave us

9  the absolute no to the due diligence signoff, that's when

10  they defaulted.  When we put them on notice of that default

11  is a different issue.

12          THE COURT:  I'm sorry.  On February 16th was the

13  conference call that you've called the no, no, no.

14          MR. BATTISTA:  The evening conference call, yes.

15          THE COURT:  First of all, is the text or -- is

16  there a reference in the record to what was said at the

17  conference call?

18          MR. BATTISTA:  There is.  There's reference by all

19  of the PEPI representatives including Mr. Fine.

20          THE COURT:  And you covered that in your very first

21  day.

22          MR. BATTISTA:  Yes, sir.  As to what was said on

23  that conference call.  I don't think there's any dispute as

24  to what was said on that conference call.

25          THE COURT:  No, I haven't heard any dispute.  It's

AA01319

```
 1    been so long, I've lost track of where that's anchored.
 2             MR. BATTISTA:  Fair enough.
 3             THE COURT:  And then the default on the 17th was
 4    what?
 5             MR. BATTISTA:  Was when Ms. Houck -- not Houck,
 6    excuse me.  Ms. Helm, H-e-l-m, on behalf of PEPI, sent yet
 7    another version of the loan agreement.
 8             THE COURT:  The third -- the second redline.
 9             MR. BATTISTA:  That would have been the second
10    redline, third version, correct.  The first version was
11    February 2nd.  The second version was February 11th.  The
12    third version was February 17th.
13             And in there, just to put a final nail in the
14    coffin, it did not include the escrow provisions, did not
15    include the correct waterfall provision.  And, of course,
16    the loan agreement didn't deal with due diligence, so that
17    couldn't have been -- couldn't have been in there.
18             So that's when they defaulted.  At the latest,
19    that's when they defaulted.  We put them on notice of default
20    the following Monday.  And I said to you, in my view of the
21    law -- and you will decide this -- is it when they actually
22    default or when we put them on notice of default?
23             Because, yes, Mr. DiNardo said, "We had no choice,
24    we didn't know what we were going to do."  He testified to
25    this.  "And, yes, we went to Mr. Ferrao," he testified to
```

AA01320

1 this, "on Thursday and asked him to make the loan, and he

2 decided on Friday morning to do it."

3          And that's when, because we had another option, we

4 put PEPI on notice of their prior defaults.  It was one and a

5 half business days.  And this is the entire waiver, equitable

6 estoppel argument that Mr. Perlman has made.

7          There was one and a half business days between

8 their default and us, in his words, going silent on them.

9 Is that waiver by us?  Is that an implied waiver by us?

10          He's offered no evidence of any reliance by PEPI,

11 but is that an implied waiver?  We've cited you to cases that

12 talk about silence for five months to five years as not being

13 waiver, an implied waiver.  And we worked the weekend and put

14 them on notice of default on Monday.  That's what that's all

15 about.  That's what it's all about.

16          If you conclude that one and a half days was

17 sufficient to show implied waiver of those defaults, then

18 that's your conclusion.  But respectfully, when there's no

19 reliance -- detrimental reliance by PEPI during that one and

20 a half days, I don't know how you get there.

21          And, yes, undisputed, we asked Mr. Ferrao to make

22 the loan on Thursday.  Why?  Because of those defaults.  Mr.

23 Ferrao testified to it and Mr. DiNardo testified to it when

24 Mr. Perlman asked them these questions in his adversary.  And

25 he decided Friday morning to give it to us.  Yes, that's when

AA01321

1    we decided to default them.

2          Mr. DiNardo is absolutely right.  "When I got that

3    signed -- when I got that commitment from Mr. Ferrao, I told

4    Battista to default them, put them on notice of default."  We

5    don't dispute that and we don't dispute that timing.

6          You have to conclude, decide, whether that one and

7    a half days, business days, delay is a waiver, an implied

8    waiver of those material defaults, when you consider what

9    we're going through, because you can see the emails working

10   day and night to get this done.

11         We are in the worst real estate crisis since the

12   Great Depression.  Mr. DiNardo and Mr. Ferrao both testified

13   the Debtor was out of money.  We have 1700 homes.  How many

14   employees?  I forgot.  Out of money.  There's a lot of stuff

15   hanging in the balance.

16         And so when you put it in context, one and a half

17   business days to go find another lender and ask him to make

18   the loan and he says yes, that's waiver?  I don't see it.

19   You'll decide that.  Those facts are not disputed.

20         We were not negotiating in good faith because we

21   went to Mr. Ferrao and said, "Make us the loan" on Thursday?

22   You can decide for yourself, with all the emails and all the

23   drafts of the loan documents, whether we were negotiating in

24   good faith.  I think it's uncontroverted that we are but,

25   again, you'll look at that stuff and decide whether we were.

AA01322

1          And once we made the decision to go with Mr. Ferrao

2   on Friday, yeah, I spent the weekend preparing for the final

3   filing and the loan documents, and drafting a default letter.

4   And they learned about it on Monday.  I don't see how that's

5   so improper, given the context that I just told you about.

6   And we were in bankruptcy that Tuesday.

7          If that's unclean hands in that context, I don't

8   know what could be otherwise.  I don't know how you could

9   have clean hands any other way than what we did.  We moved at

10  lightning speed to save a huge community that was running out

11  of money in the face of weeks of trying to get PEPI to comply

12  with the commitment letter that they initially complied with

13  and then pulled away from.

14         And so we didn't breach first.  We didn't breach at

15  all.  There's no evidence that we breached.  In fact, the

16  argument that Mr. Perlman made about this nondisclosure

17  provision, that's not anywhere in the record in this

18  particular motion.  That's his separate motion for summary

19  judgment.  But, okay, we can look at that and say whether

20  we breached.

21         Does the commitment letter provide for a

22  nondisclosure agreement?  Sure it does.  Sure it does.

23  But it talks about any third party.

24         Mr. DiNardo testified that when this commitment

25  letter was signed back in January 2010, he showed it to Mr.

AA01323

1   Ferrao.  Why?  Because Mr. Ferrao was the principal of the

2   Debtor.  And he showed it to Jane Houck at Stearns Weaver and

3   Patricia Redmond, who were representing the Debtor at that

4   time.  Those weren't third parties.

5           Fast forward to that weekend.  Did Mr. Ferrao and

6   Ms. Houck -- had they seen the commitment letter prior to

7   that?  Of course, in their capacity as the Debtor.

8           When you compare the two commitment letters -- and

9   it's in Item 31 in my evidence book -- to the PEPI commitment

10  letter, which is also in evidence, you can decide whether or

11  not they are mirror copies of each other.  They're not.

12  They're just not.

13          Do they deal with the same loan?  Sure they do.

14  Do they deal with the same collateral package?  Sure they do.

15  Do they deal with the same waterfall provision?  The Gulf Bay

16  one was better than what PEPI was trying to thrust upon us.

17  You can just compare the two side-by-side and you'll see

18  that, yeah, they're the same loan, same collateral, same

19  borrower, but they're different documents.

20          And Mr. DiNardo said once an individual has

21  something in his memory, you can't erase it.  He got it

22  properly.  PEPI had already defaulted -- and there's a

23  distinction between when they defaulted and when we put

24  them on notice of default -- we were relieved from that

25  obligation.

```
 1          The commitment letter doesn't say:  Only after
 2   we put them on notice of default are we relieved from the
 3   obligation.  It says we're relieved once they default.  They
 4   defaulted, at the latest, on February 17th, long before we
 5   went to -- one day before we went to Mr. Ferrao and two
 6   days before we accepted his offer to make a loan.
 7          So, Judge, I don't want to belabor this.  You've
 8   been very gracious over the course of, now, ten hours of
 9   this argument, but I felt compelled to point out the issues
10   that I just pointed out to you in response to Mr. Perlman's
11   rebuttal, and I just urge you -- and I know you will do this.
12   You will go back and you will review the exhibits, you'll
13   review the emails, you'll review the deposition testimony in
14   their completeness, not just a page here and a page there.
15          And I think you're going to find, especially when
16   you read Mr. Fine's affidavit, that all he wants to talk
17   about is conclusions, and he contradicts his client's
18   testimony.  And you'll conclude that in fact at some point
19   in time their refusal to include the escrow provisions and
20   the waterfall provisions became a no.  And at a minimum, on
21   February 16th in that conference call, it was a no, confirmed
22   on February 17th at the last draft of the loan agreement.
23   And you'll decide whether that one and a half days of delay
24   between that occurring and us going to Mr. Ferrao was an
25   implied waiver of those very important defaults by PEPI.
```

AA01325

```
 1                    THE COURT:  Thank you.

 2                    MR. BATTISTA:  Thank you.

 3                    THE COURT:  Let me ask both of you a question.  Are

 4      we here on both cross-motions for summary judgment or just

 5      yours?

 6                    MR. BATTISTA:  Judge, here's how I think this plays

 7      out.  We filed our motion for partial summary judgment.  Mr.

 8      Perlman filed a response in which he suggested that he was

 9      cross-moving for summary judgment -- I think on the same

10      issues that we were asking for.  We replied, including saying

11      that was not appropriate, but you'll decide that.

12                    He then filed a separate -- as he was entitled to

13      based on Your Honor's scheduling order -- a separate motion

14      for summary judgment alleging that we were in breach of some

15      other provisions.

16                    I responded to that.  We agreed that Mr. Perlman's

17      reply would be abated until Your Honor decided our motion for

18      summary judgment.

19                    MR. PERLMAN:  Precisely.  In fact, Judge, we

20      discussed this briefly, I think at the very initial hearing,

21      and when I stated that in my response in opposition, I sought

22      the entry of summary judgment, that the Debtors were in

23      default, I think Your Honor chimed in and said, "As Rule 56

24      permits."

25                    So it was raised.  And just to correct the record,
```

1  the notion of the breach of the disclosure was included in

2  those position papers by PEPI against the Debtors.  So that's

3  part of the reason why we suspended briefing.

4       I think that the cases for the Debtor's motion and

5  PEPI's cross-motion are basically the flip.  I feel that

6  these are the same issues that Your Honor would be dealing

7  with over there.  That's why I think I suggested, and Your

8  Honor agreed, to abate further briefing with regard to the

9  cross-motion.

10      I mean, these are the facts, these are the issues,

11 whether I am a movant, respondent or slash cross-movant, if

12 you will.  I think it's the same thing.

13      THE COURT:  But you're going to tell me, Mr.

14 Battista, that if I rule against you on your motion for

15 summary judgment, that I don't have a proper -- either a

16 proper record or that you haven't had a proper -- you haven't

17 had time to respond, I guess, to his motion for summary

18 judgment.

19      MR. BATTISTA:  Correct.  Judge, you've got -- my

20 view is you can either grant or deny our motion.  Mr. Perlman

21 said it's the flip side, all right?  So I guess you can -- in

22 terms of -- I guess you could grant his request that PEPI did

23 not default on the escrow provisions, the waterfall

24 provisions and due diligence signoff.

25      THE COURT:  That's what's teed up right now.

AA01327

```
1              MR. BATTISTA:  That's what's teed up right now.

2              THE COURT:  That's what's teed up right now.

3              MR. BATTISTA:  So when he says "flip side," I think

4    that's what he's talking about.

5              THE COURT:  That's right.  And then, today was kind

6    of the first real nudge on whether Fiddler's defaulted.  And

7    it's really the first I've heard in this oral argument about

8    the nondisclosure.  And it's a little hard for me to get my

9    head around as to a nondisclosure as to the person who owns

10   the company.

11             MR. PERLMAN:  Well, Judge, Mr. DiNardo testified

12   that he was not a party.

13             THE COURT:  No, I understand that, but he owns the

14   company.  And yet you haven't had a chance to really respond

15   to that.

16             MR. BATTISTA:  Well, actually I have.

17             MR. PERLMAN:  Well, they have.

18             MR. BATTISTA:  I filed my response --

19             MR. PERLMAN:  Yeah.

20             THE COURT:  Oh, you did, okay.

21             MR. BATTISTA:  -- but his reply isn't yet --

22             MR. PERLMAN:  Well, hold on, hold on.  Judge, I

23   apologize for interrupting, but I filed a response to the

24   Debtor's motion for summary judgment.  I asked for a judgment

25   that they defaulted.  I filed the affidavits.
```

AA01328

1      They, as the movant, replied to that.  Subsequently

2 -- so they did have a chance to respond, if that's your

3 question.  They were on notice of what I was seeking, and

4 they filed a response.

5      Subsequent to that, I cross-moved, by my own

6 position papers, for summary judgment.  They filed a

7 response.  We've suspended briefing with regard to my reply.

8      MR. BATTISTA:  Uh-huh.

9      MR. PERLMAN:  But they have responded to my

10 allegation that they breached first and/or are not entitled

11 to relief for unclean hands.  That's framed.

12      MR. BATTISTA:  I would commend the Court to read --

13 and I know you've done this.  But now with this different

14 perspective, go back and re-read Mr. Perlman's response to my

15 motion for summary judgment that's pending before the Court

16 and conclude whether it's the flip side as I suggested or

17 it's something completely different.

18      THE COURT:  Well, we can -- we can roll this out

19 and just take it, as I say sometimes, by the numbers.

20 We'll just do this deal, make a ruling on whether PEPI has

21 defaulted or not.

22      The problem you have -- if I rule one way or the

23 other -- if I grant their motion for summary judgment, let's

24 see.  I grant their motion for summary judgment, there's a

25 legal issue there.  Can I even grant their motion for summary

AA01329

1    judgment without ruling on your motion for summary judgment?

2          MR. BATTISTA:  Judge, and --

3          THE COURT:  I know, I'm just thinking out loud.

4          MR. BATTISTA:  I understand.  I appreciate that,

5    and I appreciate the opportunity to kind of give you our

6    perspective on that.

7          THE COURT:  What I was thinking was if I make a

8    ruling -- my first thought was if I make a ruling, it gets

9    appealed, and we still have this other thing hanging.  So we

10   have another year and a half.  And then my next thought was,

11   well, wait, I don't even know if we have a final order to

12   appeal from if his motion -- Mr. Perlman's motion for summary

13   judgment hasn't been ruled on.

14         And it seems to me, would it be better simply to

15   let you file a reply brief and I'll decide everything on the

16   papers?

17         MR. BATTISTA:  I am perfectly fine with that,

18   Judge.

19         THE COURT:  That we don't have another oral

20   argument on it?

21         MR. BATTISTA:  I am perfectly fine with that.

22   Because we will be arguing, in large measure, the same facts,

23   just with different spins on them.  He's filed his motion, I

24   filed our response, he can file his reply.

25         THE COURT:  Yeah, I'm not sure how much more there

AA01330

1    is in the universe.  What do you think about that?

2          MR. PERLMAN:  I think that it's probably an

3    appropriate concept.

4          THE COURT:  An -- a-n or in appropriate?

5          MR. PERLMAN:  Yes, an, an, an.

6          THE COURT:  It is appropriate?

7          MR. PERLMAN:  Correct.  Correct.  Because, you know

8    -- I say that, Judge, because I'm looking at the outline that

9    I gave you where I printed out pages 9 and 10 or whatever.

10   And it clearly has in my litany of issues that I briefed in

11   my reply, that by banning -- all the things I've discussed

12   before.

13         THE COURT:  No, I under --

14         MR. PERLMAN:  Yeah.

15         THE COURT:  And I understand that.  And I could

16   sweep up everything and just decide that one option is PEPI's

17   not in breach, the Debtor is in breach, you get your million

18   and a half.  Or I could decide just the opposite.  PEPI's in

19   breach, Debtor's not in breach.  But I think it would be

20   probably a big mistake to just to one and leave the other

21   one hanging.  Do you agree with that?

22         MR. BATTISTA:  Judge, I am perfectly fine with

23   that.  I don't want to have an appellate issue based on that.

24         THE COURT:  That's what I'm thinking.

25         MR. PERLMAN:  I don't think it's an appellate --

AA01331

```
 1              THE COURT:  You have a second thought about it.

 2              MR. PERLMAN:  Yeah, I do.  I mean, we started off

 3     the very first time saying, you know, are you in a position

 4     to -- thumbs up or thumbs down?  And I think both parties

 5     said yes.  And the debate was the interpretation of the

 6     facts, like the three-day notice for example.  And he says

 7     due diligence; I say to terminate.  Your Honor gets to make

 8     that decision.

 9              The case law.  Seeing cases being cited,

10     Proposition A versus Proposition B --

11              THE COURT:  Right.

12              MR. PERLMAN:  -- Your Honor's going to make that

13     decision.  But the issues raised in what we've argued is

14     everything because of the way I framed the -- the relief I

15     sought as an affirmative defense or outright determination

16     that the Debtors breached.

17              So, I mean, I would -- I think you have everything

18     in front of you.  I believe Mr. Battista just stated it's

19     the flip -- it's the --

20              THE COURT:  Okay.  So then the only question is:

21     Out of fairness, do you need a week to file a reply brief?

22     Or ten days?

23              MR. PERLMAN:  I'm saying you don't need to review

24     that.  I'm saying --

25              THE COURT:  I don't need it?
```

AA01332

```
 1          MR. PERLMAN:  Right.

 2          THE COURT:  That's fine.

 3          MR. BATTISTA:  Perfectly fine with me, Judge.

 4          THE COURT:  That's fine.

 5          MR. PERLMAN:  No, I'm saying you don't need my

 6   cross-motion -- you don't need anything dealing with the

 7   cross-motion.  What we've been litigating -- what we've been

 8   arguing to Your Honor, what we presented for trial in

 9   evidence, is what you can bank on in terms of --

10          THE COURT:  No, but I mean, you filed a cross-

11   motion that they breached.  How can I give them summary

12   judgment if I conclude that you've breached?  I mean, it's

13   like a blocking mechanism.  Because they can't have a victory

14   on this summary judgment without a determination that your

15   motion for summary judgment should be denied.

16          I mean -- I'm not saying how I'm going to rule.

17   I'm just telling you it seems to me it's sitting out there

18   with the possibility of unwinding everything I spend the next

19   two months doing.

20          MR. PERLMAN:  Right.  And I don't see that, because

21   they're the same issues that were presented in the reply.

22   I'm looking at it as we speak.

23          THE COURT:  Well, wait a minute.  Maybe it's me.

24   I'm not comprehending you.  Then why can't I rule on your

25   motion for summary judgment?  If it's the same issue, you
```

AA01333

Case 8:10-cv-00809-dkc Document 123 Filed 08/12/09 Page 590 of 653 PageID 7851

1  don't need any more briefing.  Why can't I just sweep that up

2  under the rubric of the oral argument that we've had already?

3          I would be willing to give you time to file an

4  additional reply brief.  But beyond that, I'll rule on both

5  motions for summary judgment and decide who wins this

6  lawsuit.  Or that we have to have a trial.

7          MR. PERLMAN:  Right.  I think, Judge, that if we

8  had to deal with my cross-motion for summary judgment, it

9  may get a little complicated because we had deposed the

10  designated corporate reps, and that's part of the transcripts

11  that are of record.

12          Mr. Battista filed an affidavit in response to my

13  cross-motion.  I think I told Your Honor last time, I've told

14  him before, I had no desire to depose him.  I was happy that

15  they designated --

16          THE COURT:  I'm sorry, depose who?

17          MR. PERLMAN:  Mr. Battista.  I'm happy that they --

18          THE COURT:  Oh, you filed an affidavit?

19          MR. BATTISTA:  Yes, sir, I did.

20          MR. PERLMAN:  Right.

21          MR. BATTISTA:  In response to his cross-motion.

22          THE COURT:  Okay.

23          MR. PERLMAN:  Right.  Not the person most

24  knowledgeable.  Mr. Battista.  So I have not -- and because

25  we parked it, I have not evaluated whether or not I need to

AA01334

```
 1   take his deposition in connection with my responsive brief.

 2           So one way of avoiding going off on those tangents

 3   -- again, that was not the designated corporate rep with the

 4   most knowledge.  That's who was deposed.  That's probably who

 5   should have done the affidavit.  They chose to do it in their

 6   way.  So now we have a new witness that's never been deposed.

 7   I think I'm entitled to test the veracity of the affidavit.

 8           I don't want to.  I'd prefer not to.  For a lot of

 9   reasons.  Primarily personal and professional and all the

10   ones you can imagine.  And that's another reason why I'm

11   suggesting that maybe we not deal with the cross-motion, if

12   all the same issues are within what we've argued as of this

13   moment.

14           MR. BATTISTA:  Judge, I guess if Mr. Perlman's

15   prepared to stipulate that that's the case, then I think you

16   have everything in front of you that you need to decide those

17   issues.

18           THE COURT:  Well, again, lots of times people

19   conclude, especially in married life, that you're both

20   talking about the same thing and it turns out maybe you're

21   not.

22           So if you are both talking about me making a

23   determination that PEPI has breached, or PEPI hasn't

24   breached, and that the debtor has breached or hasn't

25   breached, then I'll go forth -- I think.  We still have that
```

AA01335

1    cross-motion sitting out there, but then based on what we're

2    saying today, it would become moot.  I would deny it as moot.

3           MR. PERLMAN:  Depending on a particular ruling, I

4    think that that's --

5           THE COURT:  Based on a particular ruling.

6           MR. PERLMAN:  That would be correct.  I think

7    that's what we're both saying.

8           THE COURT:  That's what I want to make sure that

9    you're both saying.

10          MR. BATTISTA:  Yes, sir.

11          THE COURT:  Okay.  All right.  This has been

12    most extraordinary.  I don't think it's been wasted effort,

13    certainly not on me.  I'm still struggling, as I'm sure my

14    staff is, as just to how to write it.

15          I thought, well, maybe I would ask each of you to

16    write something and submit it, but we'll do it.

17          MR. BATTISTA:  I think we did, actually, so --

18          THE COURT:  We'll do it.  And we have the

19    transcript and a dictaphone and we can put something

20    together.

21          I guess -- there's a lot of different layers here,

22    in terms of the two overarching theories that I've heard.

23    One is that you needed to know who your lender was.  You have

24    this -- whatever you call it, it seems to me there was the

25    controversy that was kicked off by the second draft of the

AA01336

```
 1   redlined documents that was different than the commitment
 2   letter, and there was back and forth.
 3           And then there was -- as you say, the third draft
 4   preceded by the February 16th phone call.  The anxiety and
 5   stress of building up to a filing for 26 Debtors and needing
 6   a DIP Lender.  And I get that.  And it's supplemented by the
 7   postpetition testimony in the proceedings here.
 8           Your theory is that they never intended to -- or
 9   at least after a certain point in time, never intended to
10   use your client as the DIP lender, that in fact they were
11   creating a foil, and also an inventory of documents to make
12   an insider priming loan with the basis that the defaults
13   were contrived.  The termination of the relationship was
14   contrived.  And there really are problems with both views.
15           The problem with your view is that your own client
16   kicked off the controversy by not faithfully adhering to the
17   commitment letter.  And then coming back with excuses to
18   justify that.  You would have had a plain vanilla clean case
19   if you had just drafted documents and they had refused them.
20           And on your side, there's a vulnerability because
21   if Mr. Ferrao didn't want to make this loan, if he was
22   reluctant to make it, didn't want to make it in a New York
23   minute, you would think that the record would include,
24   instead of a default letter, a letter saying, "Look, we may
25   have another source of funding which we don't want to use,
```

AA01337

1   and unless you get your documents in the order that we want,

2   that the commitment letter says they need to be in, we're

3   going to have to move in a different direction in order to

4   file."

5          You would see some kind of written document that

6   attempts to shape behavior, if Mr. Ferrao really didn't want

7   to make the loan, you would see some arm-twisting to get it

8   done the right way rather than just passively reacting to

9   nos.  I mean, you're asking for input, what's the input?

10  What's the status?  And then just going in a different

11  direction.

12         That doesn't mean -- and then the other level

13  here underneath all that conceptualizing, is the strict

14  construction of the record for summary judgment.  You've done

15  a -- you've both done a great job today in pointing that out.

16         You've tried to convince me that stuff is in the

17  record.  Mr. Battista says it's just conjecture by an

18  attorney, it's just legal conclusions, it's not really facts,

19  and we don't need to deal with conceptualizations.  That's

20  essentially what you said.

21         The commitment letter says X, Y, and Z.  We never

22  got X, Y and Z after -- we never got the valuation mechanism,

23  ever, and the other stuff got watered down.  And so we had no

24  choice but to move in a different direction.

25         I think both sides have vulnerabilities here,

AA01338

1    which is why I am unable -- regretfully unable, until I start

2    drafting this, to say you win, you win, or neither of you

3    wins, we'll go to a trial.

4            It's one of the most -- Occam's Razor.  It's one of

5    the most razor-thin things I've encountered in quite awhile.

6    And I think -- I suggested that maybe you should go back and

7    see Judge Delano, but maybe you can craft your own result.

8    But I see vulnerabilities on both sides.  I really do.

9            But as I write through it, I'm sure one thing will

10   weigh more heavily than another.  I'm not convinced right now

11   exactly what that is.  But that's my initial reaction, and

12   neither of you may be pleased with that.  But I'll take what

13   I have and I'll move forward with it as quickly as we can do

14   it.

15           MR. PERLMAN:  Judge, this is from both of us.

16   You have been so generous with your time, we thank you.  Mr.

17   Battista has done an incredible job as usual.  And I think if

18   we had to do this again, it would be my suggestion that we

19   sort of go point/counterpoint instead of, you know,

20   everything at you at once.  I made a --

21           THE COURT:  It must be very difficult, but you both

22   did a magnificent job staying on the rails.

23           MR. PERLMAN:  Yeah.  I just think it would have

24   been better for us in terms of educating and persuading Your

25   Honor if we limited it and did a point/counterpoint on the

AA01339

```
 1    three or four themes.  But maybe next time.

 2               THE COURT:  All right.

 3               MR. BATTISTA:  Thank you, Judge.  I reiterate what

 4    Mr. Perlman said on all of that.

 5               THE COURT:  All right.  Well, thank you very much.

 6    It was an extraordinary, once in a decade kind of event, and

 7    I appreciate both of you.  It's high stakes and it's razor

 8    thin.  Okay?

 9               MR. BATTISTA:  Thank you, Judge.

10               MR. PERLMAN:  Thank you, Your Honor.

11               THE COURT:  Thank you very much.  We'll be in

12    recess.

13               COURTROOM CLERK:  All rise.

14               (Proceedings concluded at 4:28 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

AA01340

<u>CERTIFICATE</u>

I certify that the foregoing is the official verbatim transcript prepared on an expedited basis to the best of my ability from the digitally-recorded audio proceedings provided by the court.

_____          <u>July 30, 2015</u>
Cheryl Culver (CER, CCR)                  Date
Transcriber

I certify that the foregoing is a federally certified transcript authenticated by:

_____
Kimberley S. Johnson (CVR-M)
Certified Verbatim Reporter Master

JOHNSON TRANSCRIPTION SERVICE
7702 Lake Cypress Drive
Odessa, Florida 33556
813-920-1466
kgjjts@aol.com

AA01341

AA01342

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

In re:                                          **Case No. 8:10-bk-03846-KRM**

**FIDDLER'S CREEK, LLC, et al.**

                                                **Jointly Administered**

                                                **Chapter 11**

            Debtors.
_____/

**FIDDLER'S CREEK, LLC, et al.**

            **Plaintiffs,**                     **Adv. Pro. No. 8:11-ap-00809-KRM**

v.

**PEPI CAPITAL, L.P.**

            **Defendant.**
_____/

### NOTICE OF FILING EXHIBITS FROM SUMMARY JUDGMENT HEARINGS

Defendant/Counter-Plaintiff, Pepi Capital, L.P. ("Pepi Capital"), by and through its undersigned counsel, hereby files the Exhibits provided to the Court and relied upon during oral arguments, including Exhibit "J" which was presented to the Court at the last hearing, but not originally included in said Trial Notebook.

Dated: June 16, 2015.

                                **ROETZEL & ANDRESS**

                                /s/Alan J. Perlman
                                Alan J. Perlman
                                Florida Bar No. 826006
                                350 E. Las Olas Boulevard, Suite 1150
                                Ft. Lauderdale, FL 33301
                                Telephone: (954) 462-4150
                                Facsimile: (954) 462-4260
                                E-mail: aperlman@ralaw.com
                                *Attorneys for Pepi Capital, L.P.*

**AA01343**

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 2090-1(A)

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on June 16, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

/s/Alan J. Perlman_____
Alan J. Perlman

9466512_1

2

**AA01344**

A

AA01345

1

AA01346

From:      CJ Lorio
To:        Tony DiNardo
Cc:        K Springfield; David Radunsky
Subject:   Fw: Last Issues
Date:      Thursday, February 11, 2010 5:02:41 PM

We think we need to address and resolve these and any other issues sooner rather than later so should try to touch base early this evening.
CJ Lorio
--------------------------
Sent from my BlackBerry Wireless Handheld

From: CJ Lorio
To: Tony DiNardo <dinardoT@gulfbay.com>
Cc: K Springfield; David Radunsky
Sent: Thu Feb 11 14:41:57 2010
Subject: RE: Last Issues

The items we had to address on our list are:

1. amount of initial advance – our preference is for a single advance
2. Purchase option language -- this is material change that we need to discuss your reasons for wanting. This was supposed to be provision for giving Aubrey some ability to acquire loan to protect his equity interest and now it seems you want something else. We are proposing to delete some language in 2.1.c(i) that should alleviate your concerns.
3) issues regarding valuation mechanism for deeds in lieu of foreclosure – we do not need these, and to get this moving and avoid complexity propose deleting this in the structure entirely.
4) MAC -- there has to be a MAC clause to protect Lender from unforeseen events, we have proposed some language to where it requires determination that the ability to perform timely is impaired

C.J. Lorio
Perot Investments, Inc.
972-535-1972
972-535-1991 (Fax)
cj_lorio@pgro.net

From: Tony DiNardo [mailto:dinardoT@gulfbay.com]
Sent: Thursday, February 11, 2010 2:35 PM
To: CJ Lorio
Subject: RE: Last Issues

CJ
I am talking to our legal team and I would like to send you an email what we feel are the last open items and if you have any others you can add them to the list. Therefore we will be addresses to all the items.
Thanks

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816



Δ π EXHIBIT 17
    L012-10
Deponent
Date 5 28 14 Rptr
WWW.DEPBOOK.COM

FIDD 006294

2

AA01348

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Jane Houk <JHouk@steamsweaver.com> |
| **Sent:** | Tuesday, February 16, 2010 4:06 PM |
| **To:** | 'Helm, Elizabeth' |
| **Cc:** | Fine, Jeffrey; Patricia Redmond; Battista, Paul J.; Peter Desiderio; 'mwoodward@wpl-law.com' |
| **Subject:** | FW: Debtor in Possession Loan & Security Agreement SWM 02-16-10.doc |

Elizabeth:

Attached is a clean and blacklined version of our comments to the Loan Agreement. We would like to have a status call and call on outstanding issues to the Loan Agreement as soon as possible. We are unavailable from 5-7 tonight, but otherwise are available.

Also, I am working on Schedule 5.2, 5.5, 5.7 and 5.13 of the Loan Agreement. I believe the only other remaining Schedules will be Schedule 5.1 (Liens) and Schedule 5.3 (Material Contracts) – for which we are waiting to hear your response regarding the proposed carveouts that we mentioned on the last call.

Thanks,
Jane

**From:** Linda Myskiw
**Sent:** Tuesday, February 16, 2010 3:58 PM
**To:** Jane Houk
**Subject:** Debtor in Possession Loan & Security Agreement SWM 02-16-10.doc

Linda Myskiw
Secretary to Jane A. Houk
Steams Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: 305-789-3548
Main: 305-789-3200
Main Fax: 305-789-3395
lmyskiw@stearnsweaver.com
www.stearnsweaver.com



CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters accessore herein.

AA01349

3

AA01350

| | |
|---|---|
| From: | CJ Lorio |
| Sent: | Tuesday, February 16, 2010 5:28 PM |
| To: | Tony DiNardo; jhouk@sternsweaver.com |
| Cc: | David Radunsky; K Springfield; Helm, Elizabeth; Fine, Jeffrey |
| Subject: | loan agreement call |

Tony and Jane,

We need to have a call with you at 7 EST, 6 CST to go over the suggested changes to loan agreement just sent over so we can finish the document.  Please advise on availability.

C.J. Lorio
Perot Investments, Inc.
972-535-1972
972-535-1891 (Fax)
cj.lorio@pgrp.net



1

PEPI00015191

4

**AA01352**

Case 8:19-cv-00008-VMC   Document 19   Filed 03/12/19   Page 609 of 653 PageID 7870
Case 8:11-ap-00809-KRM    Doc 123-1   Filed 06/16/15   Page 9 of 12
Case 8:11-ap-00809-KRM    Doc 107-1   Filed 03/25/15   Page 12 of 15

each case who need to know the terms hereof... If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined)." (p. 3)

25.    The Commitment Letter does not contain a provision obligating PEPI to provide a written signoff on due diligence as a condition precedent to Fiddlers filing bankruptcy.

26.    At all material times through February 22, 2010:

i.   PEPI negotiated in good faith in accordance with the Commitment Letter.

ii.  PEPI took such actions to perform its due diligence under the Commitment Letter, which were just two of several dozen conditions precedent to any funding.

iii. PEPI never made an unequivocal demand in violation of the Commitment Letter, including as to the escrow, waterfall or its due diligence.

iv.  PEPI verbally advised Fiddlers more than once that it had completed corporate and real estate due diligence, including on February 16, 2010.

v.   PEPI always acted in a manner consistent with honoring the sale order of the properties listed by the Debtor in the "Waterfall".

vi.  At no time prior to February 22, 2010 did the Debtors ever advise PEPI that PEPI was in material default and will terminate the Commitment Letter. Rather, any and all communications were in the nature of simply negotiating the corresponding loan documents.

vii. PEPI was not in material breach of the Commitment Letter as of February 22, 2010.

viii. At no time prior to February 22, 2010 did Fiddlers threaten to default PEPI or terminate the Commitment Letter.

ix.  At no time prior to February 22, 2010 did Fiddlers advise PEPI it refused   to further negotiate the finalization of any loan document or such other aspect of the Commitment Letter.

AA01353

x. Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi. Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii. Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii. The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv. Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv. PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi. PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii. To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii. The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix. Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv. PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

13

AA01354

5

AA01355

Case 8:19-cv-00008-VMC   Document 19   Filed 03/12/19   Page 612 of 653 PageID 7873
Case 8:11-ap-00809-KRM    Doc 123-1    Filed 06/16/15    Page 12 of 12

Case 8:11-ap-00809-KRM    Doc 100    Filed 03/02/15    Page 15 of 46

be delayed, which obviously prejudices PEPI as the lender.   Regardless, the simple fact that a foreclosure process is still required under Florida law compels the conclusion that there is no material default. In fact, the removal of escrows only helps the Debtors and therefore certainly cannot be alleged to constitute a material breach of anything.   This determination is based on common sense and consistent with Florida law.   See, Beefy Trails Inc. v. Beefy King Intern., Inc., 267 So.2d 853, 857 (Fla. 4th DCA 1972) (to constitute a vital or material breach, a party's non-performance must "go to the essence of the contact").

Additionally, the Commitment Letter states that the terms and conditions of the loan documentation "shall be substantially the same as those set forth [t]herein." (Fine Aff., ¶ 24).   It follows, that because under Florida law a foreclosure is still required to divest the title owner, the proposed loan agreements were "substantially the same" notwithstanding the removal of the mechanism to "speed" PEPI's foreclosure process under the Commitment Letter.   Compare, SIGA Technologies, Inc. v. PharmAthene, 67 A.3d 330 (Del. 2013) (ultimatum to alter agreement to include radically, dramatically different terms that significantly favored party was not substantially similar).   Thus, no breach exists both factually and legally.

     iv.    The escrow provisions are not "performable" under Florida law, so the suggested removal is not a material breach.

As the Court is aware, contractual provisions that are contrary to public policy are unenforceable.   See, American Cas Co. v. Coastal Caisson Drill Co., 542 So.2d 957, 958 (Fla. 1989); Alterra Healthcare Grp. V. Bryant, 937 So.2d 263, 270 (Fla. 4th DCA 2006).   The escrow provision as to the deed in lieu, which   would be conveyed to PEPI upon default, was not performable on this basis.

15

B

AA01357

1

**AA01358**

**D.      The Waterfall Provision and the Escrow Provisions Were "Performable" Under Florida Law and Therefore PEPI's Refusal to Include Them in Accordance With the Commitment Letter Constituted Material Breaches of the Commitment Letter.**

In the Response, PEPI argues that its refusal to include the Escrow Provisions and the correct version of the Waterfall Provision in the DIP loan documents does not constitute a breach of the Commitment Letter because such provisions are not "performable" under Florida law. PEPI's arguments are unfounded and conflate several issues in a clear effort to try to confuse the matters before the Court.

First, there is nothing inappropriate, unenforceable or contrary to public policy for a borrower to execute and deliver a deed in lieu of foreclosure in connection with a mortgage transaction. Florida law recognizes the enforceability of deeds in lieu of foreclosure. *Stovall v. Stokes*, 115 So. 828, 837-38 (Fla. 1927). Moreover, escrowing of deeds in lieu as part of a loan transaction has been permitted by Florida courts. *Ringling Joint Venture II v. Huntington Nat'l Bank*, 595 So. 2d 180, 182-83 (Fla. 2d DCA 1992). Accordingly, while a borrower's right of redemption cannot be abridged by a deed in lieu of foreclosure to secure a debt, a borrower can forego that right and receive credit for the value of the property against the indebtedness. *Id.*

Moreover, contrary to PEPI's assertion, a deed in lieu of foreclosure does not create title issues when recorded because the presumption (as discussed above) is that the deed in lieu would practically only apply to the transfer of the unencumbered property, which represented the top three parcels of real estate in the waterfall.

In addition, while the Plaintiff acknowledges that confessions of judgment are not enforceable in Florida, the consent judgments referred to in the Commitment Letter could have

32

AA01359

2

AA01360

Stovall v. Stokes, 94 Fla. 717 (1927)

*(60 TO P₅ 10)*

115 So. 828

94 Fla. 717
Supreme Court of Florida.

STOVALL et al.
v.
STOKES et al.

Oct. 21, 1927.   |   Rehearing Granted Dec. 6,
1927.   |   Reaffirmed on Rehearing Feb. 13, 1928.

En Banc.

Suit by Fay Stokes Stovall and others against Clifford G.
Stokes and others to have a deed declared a mortgage, and
for other relief. From a decree for the defendants, except as
to requiring an accounting, complainants appeal.

Affirmed in part, and reversed in part, with directions.

Terrell and Strum, JJ., dissenting.

*Syllabus by the Court*

To make mortgagor's sale to mortgagee valid, it must be
shown that mortgagee's conduct was fair, and that he paid
property's value and took no advantage of latter's fears or
poverty; that mortgagor knowingly surrendered and never
intended to reclaim property is of no consequence if there
is vice in sale to mortgagee. To give validity to a sale by a
mortgagor to a mortgagee, it must be shown that the conduct
of the mortgagee was in all things fair and frank and that
he paid for the property what it was worth. He must take
no advantage of the fears or poverty of the other party; that
the mortgagor knowingly surrendered and never intended to
reclaim is of no consequence, if there is vice in the transaction.

Debtor's deed to creditor, with whom confidential
relationship exists, will be treated in equity as mortgage; but
creditor may show conveyance was valid and fair sale. Where
confidential relations exist between a debtor and a creditor,
and a conveyance is made by the debtor to the creditor, it
will be treated as a mortgage for the consideration of the deed
as a debt; and this is the construction in equity of such a
transaction. But the creditor may be affirmative proof rebut
this presumptive case by showing that actual negotiations
for sale took place and a valid and fair sale for adequate or

reasonable price was made and that no advantage was taken
of the needy circumstances of the debtor.

Allegation and proof that loan on security was intended
requires equity to hold deed is mortgage. When it is alleged
and proved that a loan on security was really intended, and the
defendant sets up the loan as a payment of purchase money,
and the conveyance as a sale, both fraud and a vice in the
consideration are sufficiently averred and proved to require a
court of equity to hold the transaction to be a mortgage.

Whenever it can be ascertained that deed is security for
money, it is only mortgage, however artfully it is disguised.
The fact that the real transaction between the parties was a
borrowing and lending will, whenever, or however, it may
appear, show that a deed absolute on its face was intended as
a security for money; and whenever it can be ascertained to be
a security for money it is only a mortgage, however artfully
it may be disguised.

Instrument conveying property to secure payment of money
may be subject to statute making it mortgage if extrinsic
facts show statute is applicable; in cases of doubt, instrument
conveying property may be held to be mortgage; relation
between parties at execution of deed absolute on face may be
considered to determine whether it is mortgage (Rev. Gen. St.
1920, § 3836). An instrument of writing conveying or selling
property, either real or personal, for the purpose or with the
intention of securing the payment of money, which upon its
face conveys title to property, may be subject to the provisions
of the statute that it 'shall be deemed and held a mortgage,'
if by extrinsic facts the statute is shown to apply; and in
cases of doubt the instrument may, when justice requires it, be
held to be in law a mortgage. The relations existing between
the parties at the time of its execution may be considered in
determining whether a deed of conveyance of land absolute
on its face was intended to operate as a mortgage to secure
the payment of a debt.

If when absolute conveyance was made, it was in legal
effect mortgage, it remains mortgage; burden of showing
that deed absolute on face was intended as mortgage is on
grantor; conduct of parties and circumstances may be shown
as bearing on whether deed absolute on face was intended
as mortgage (Rev. Gen. St. 1920, § 3836). An absolute
conveyance of property is in equity a mortgage if when made
it was intended by the parties to be security for the payment
of money. If when an absolute conveyance of property is
made it is in legal effect a mortgage it remains a mortgage.

AA01361

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

Where a conveyance of property is absolute on its face, the burden of showing that it was when executed intended to be a mortgage to secure the payment of money is upon the grantor. The conduct of the parties and the circumstances under which the instrument was executed may be shown in evidence as bearing upon the intent and purpose of the parties to the transaction.

Mere secret intention of either party as to purpose of deed will not control in deciding whether it is mortgage; grantee may foreclose mortgage evidenced by deed absolute in form, and grantor may redeem therefrom. The mere secret intention of either party as to the purpose of the instrument will not control. But if from all the facts and circumstances of the case it appears that the real purpose of the parties to an absolute conveyance of property was to secure the payment of money then due, and not the actual extinguishment of the debt, the conveyance will be regarded as a mortgage. In such a case the mortgagee may foreclose or the mortgagor may redeem.

Evidence showing property conveyed was worth considerably more than probable total indebtedness, and grantor's intent that conveyance was as security, which grantee must have understood, warrants holding deed to be mortgage. Where there is an existing debt which is not certainly extinguished by an absolute conveyance of property, and the amount of the debt is not fully known or ascertained, and the value of the property when conveyed was considerably greater than the probable total indebtedness would be when definitely ascertained, and there is evidence that the grantor intended the conveyance as a security for the debt and not as an absolute sale and there was no proposition for the sale of the property, but the attending circumstances were such that the grantee must have understood the conveyance was intended by the grantor as security for the debt the instrument may be held a mortgage, especially when by so doing justice to both parties will be best subserved.

Deed absolute on face may be shown by parol evidence to be mortgage. A deed absolute on its face may by parol evidence be shown to be a mortgage, and in cases of doubt the instrument should be held to be a mortgage.

Mere absence of terms of defeasance cannot determine whether instrument is mortgage. An instrument must be deemed and held a mortgage, whatever may be its form, if taken alone or in connection with the surrounding facts and attendant circumstances, it appears to have been given for the purpose or with the intention of securing the payment of money, and the mere absence of terms of defeasance cannot determine whether it is a mortgage or not.

When it is established that deed is mortgage, right of redemption attaches as inseparable incident; no contemporaneous understanding can deprive debtor of right of redemption from instrument constituting mortgage, but right to redeem can be defeated only by subsequent agreement on further consideration. When it is once established that a mortgage exists, the equitable right of redemption attaches to the transaction as an inseparable incident. No contemporaneous understanding, however formally expressed or artfully concealed, will be permitted to deprive the debtor of this right. It can be defeated only by a subsequent agreement upon a further consideration.

Purchase of equity of redemption by mortgagee will be carefully scrutinized. The right of a mortgagee to become the purchaser of the equity is unquestioned, but the relations of the parties are such that the transaction will be carefully scrutinized.

Conveyance of mortgaged premises by mortgagor to mortgagee will be regarded as mere change in form of security, except on clear showing of intention that it should bar redemption. A conveyance of mortgaged premises by the mortgagor to the mortgagee will be regarded as a mere change in the form of the security, unless it clearly and unequivocally appears that both parties intended that it should operate as a bar to the equity of redemption.

Only preponderance of evidence is required to establish that absolute deed of mortgaged premises to mortgagee is mortgage. The rule which requires more than a preponderance of evidence to establish an absolute deed as a mortgage cannot be applied to a deed covering premises already mortgaged by the grantor to the grantee without overruling a long-established rule pertaining to the equity of redemption.

Inadequacy of consideration is of weight in determining whether transfer of property is unconscientious or constructively fraudulent, or may tend to prove actual fraud; inadequacy of consideration for conveyance casts on party securing benefits burden of clearly proving transaction was honest, fair, and just. Inadequacy of consideration, where shown, is an element which is always given weight by courts of equity in determining whether a transaction involving the transfer of valuable property by one to another is unconscientious or constructively fraudulent, or perhaps as

AA01362

Stovall v. Stokes, 94 Fla. 717 (1927)
115 So. 828

tending to prove actual fraud. Indeed, it has always been looked upon by such courts as sufficient to create a strong suspicion that the transaction has not been characterized by good faith in the party securing benefits thereby and to cast upon him the burden of making it perfectly clear that it was in all respects honest and fair and just to the grantor.

Evidence held to require deed from mother to son who held mortgage on premises to be declared mortgage. Evidence that consideration was inadequate and that deed from mother to son, who also held mortgage given by her on premises in question, was in fact intended to secure loan, *held* to require deed to be declared mortgage.

**830  *720  Appeal from Circuit Court, Hillsborough County; F. M. Robles, judge.

**Attorneys and Law Firms**

*721  Henry Eliot Williams, of Tampa, for appellants.

R. E. L. Chancey, of Tampa, for appellees.

**Opinion**

BUFORD, J.

In this case the appellants, complainants in the court below, filed bill of complaint against the appellees, defendants in the court below, the pertinent allegations of which were as follows:

That on the 5th day of January, 1905, Susan M. Stokes, widow, purchased lot 10 of block 6 of the Riverside subdivision, and on said date received a conveyance of the feesimple title thereto by a good and sufficient warranty deed from H. G. Warner and wife. That said Susan M. Stokes paid for said lot out of the proceeds of an insurance policy upon the life of her deceased husband, Allen Wesley Stokes; that shortly thereafter she built her home on said lot, and, to complete the construction of said home, she borrowed from her son, defendant Clifford G. Stokes the sum of $625, and to secure the same executed and delivered to him a mortgage on said home and lot in that amount.

That on or about Christmas, 1905, the defendant mortgagee son, Clifford G. Stokes, offered to relieve the then anxiety and financial embarrassment of his mortgagor mother, Mrs. Susan M. Stokes (who was without means of livelihood or support, depending entirely and solely upon small remittances

from her three sons, and then in need of funds for the payment of taxes and insurance on **831 said property), by paying annually her taxes and insurance until such time as she might be able to take care of them herself. The said defendant mortgagee, Clifford G. Stokes, at that time suggested that the mortgage would not secure to him repayment of future advances on account of taxes and insurance, and that it would be necessary for his mother to execute another instrument securing past as *722 well as future advances. Whereupon, to secure the payment of said advancements from year to year to be made by him, and to secure the payment of the moneys loaned as aforesaid by him towards the construction of said home, she executed and delivered to him a paper writing as security for said moneys advanced and to be advanced, and the mortgage above described was by him canceled. That said Susan M. Stokes occupied said house as her home from the date of its completion in the spring of 1905 until she sold the same on February 17, 1925, to S. R. Binckley et al., during all of said time both she and defendant Clifford G. Stokes asserted and claimed the said home was her own and she was during all of said time unaware that the instrument she gave her son was a deed for her home.

That on or about July 10, 1925, the defendant Clifford G. Stokes received as agent of his mother and in trust for her a sum of money in excess of $9,496 from the estate of Allen Banks Stokes, brother of defendant Clifford G. Stokes and son of said Susan M. Stokes. That subsequently thereto and about January, 1916, the defendant Clifford G. Stokes received from the sale of certain property inherited by said Susan M. Stokes from her said deceased son a sum of money in excess of $4,500 as agent of his mother, Susan M. Stokes, and in trust for her. That a part of the estate of said Allen Banks Stokes was inherited by the children of said Susan M. Stokes, all of whom assigned their share to defendant Clifford G. Stokes in trust, nevertheless, for their said mother. That defendant Clifford G. Stokes has failed and refused to account to his mother, said Susan M. Stokes, or any other person, for the aforesaid moneys, though an accounting has been often demanded.

That Susan M. Stokes on February 17, 1925, sold her said home by written contract entered into by her with *723 S. R. Binckley and Joseph A. Beasley. That at the request of said Susan M. Stokes, defendant Clifford G. Stokes came to Tampa and closed said sale for her, joining with her in a conveyance of said property to said purchasers, and at the time of said closing on March 10, 1925, received, as agent for his said mother and in trust for her, a cash payment of

AA01363

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

$10,000, and in violation of the trust and confidence in him reposed by her procured to be executed and delivered to him by the purchasers two notes for $10,000 each, representing the deferred payments, due in one and two years afterward, with interest at 8 per cent. per annum and payable to defendant Clifford G. Stokes individually without any indication of his agency or trust on the face of said notes; these two notes being secured by mortgage on said property dated February 26, 1925.

In 1925 said Susan M. Stokes purchased by contract from Rita M. Bie and William H. Frank lot 2 of block 1 of Richardson Place, a subdivision as per plat thereof recorded in Plat Book 1, p. 140, in said clerk's office, for the sum of $5,500. That defendant Clifford G. Stokes at the request of his said mother, closed said purchase for her and paid the purchase money out of the funds held by him as agent for and in trust for his mother, but without her knowledge or consent procured said Richardson Place lot to be conveyed to him individually, without any indication on the face of the conveyance of his agency or trust. That said Susan M. Stokes, without knowledge of this fraud and trickery, built upon said property a new home for herself and occupied same as her homestead until her death, expending for this purpose a sum in excess of $10,000; that since her death the same has remained unoccupied; that said defendant Clifford G. Stokes fraudulently and to acquire all the property of his mother, including the new home in Richardson Place, the title to *724 which he had already fraudulently acquired, and still dominating and holding undue influence over his said mother, executed and caused to be placed of record a deed from himself to his mother purporting to convey to his said mother a life estate in said property.

That during all of the aforesaid times the said Clifford G. Stokes, defendant, was the confidant and sole adviser of his said mother, Susan M. Stokes. That during the period from 1905 to the time Mrs. Susan M. Stokes inherited the aforesaid sums of money from the estate of Allen Banks Stokes and the assignment of the interest of her other children in said estate, all of which was delivered to defendant Clifford G. Stokes as agent and in trust for his said mother, she was solely and entirely dependent for her livelihood and support upon small monthly remittances from her three sons, complainant John Stokes, Allen Banks Stokes, deceased, and defendant Clifford G. Stokes, who each contributed an equal monthly amount; she at all of said times being a quiet, timid, bookish woman, unaccustomed to and unfamiliar with business transactions of any kind, and by temperament,

training, and experience incapable of transacting business of any kind without assistance, and for the last few years was partially blind. During all of the years subsequent to the death of her husband she relied for advice and counsel as to her business transactions solely upon the defendant Clifford G. Stokes, to whom she intrusted all **832 of the moneys received by her from the estate of her son, Allen Banks Stokes, deceased, including the shares allotted to her children and by them assigned to her. Upon receipt by defendant Clifford G. Stokes of the moneys so derived from the Allen Banks Stokes estate, he sent her from time to time the remittances from the profits of said moneys, which did not exceed $65 per month, during the remainder of her life.

*725 That said Clifford G. Stokes is an aggressive, domineering, suave person, who held complete dominion over the will of his mother. That at a time just a few days before his mother's death and while she was stricken with her last illness and near death, for the purpose of preventing the presence of other children and the discovery of his nefarious schemes to defraud the estate of his mother, in answer to an inquiry of him from one of her children he responded that 'Mother is only taking a rest cure at the hospital and there is nothing to worry about,' though she was then lying prostrate at the point of death. He was at all of the aforesaid times the dominant character, who at all of said times had his mother 'completely in his hands and power' and under his complete control and influence.

That defendant Clifford G. Stokes, having fraudulently obtained the notes representing the deferred payments on the Riverside lot to be made payable to himself, on or about October, 1925, just prior to the death of his mother, obtained a personal loan of $5.000 from defendant First National Bank of Tampa, and pledged as collateral security for said loan the aforesaid two notes of $10,000, and said notes are now held by said bank as collateral.

That your orators and defendant Clifford G. Stokes are the only children, heirs at law, and next of kin of said Susan M. Stokes, deceased, and only the parties to this suit are entitled to any interest in the property involved in this suit.

That defendant Clifford G. Stokes is insolvent, and is about to and intends at the earliest possible moment to obtain said two notes of $10,000 each from the said bank and sell the same, and the said Richardson Place lot and all property, moneys, and effects in his possession belonging to the estate of said Susan M. Stokes, to a bona fide purchaser, for value without

AA01364

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

notice, thereby defeating the *726 rights of the estate and these complainants in the premises, and great and irreparable injury will result to the estate and your orators unless an order of the court issue restraining defendant First National Bank from delivering said notes to said defendant Clifford G. Stokes or any other person, and restraining said Clifford G. Stokes from selling or transferring or in any manner interfering with the aforesaid two notes, the Richardson Place house and lot, and all other property, moneys, goods, and effects of the estate of said Susan M. Stokes, deceased.

That there are no debts or claims against the estate of Susan M. Stokes.

That defendant First National Bank of Tampa was recently appointed administrator of the estate of said Susan M. Stokes, and has formed and expressed an intention to make application to be relieved as administrator, and refuses to bring this suit or instigate any proceedings for the protection of the interests of the estate and the complainants touching the matters in this bill of complaint alleged.

Alleging that complainants are entitled to the relief prayed, the prayer of the bill is:

'Your orators pray that an order of this court issue without notice restraining defendant First National Bank of Tampa from delivering aforesaid two notes of $10,000 each to defendant Clifford G. Stokes or any other person, and restraining defendant Clifford G. Stokes from selling, transferring, or in any manner interfering with the two notes above described, the Richardson Place house and lot, and all other property, moneys, goods, and effects of the said estate of the said Susan M. Stokes, deceased.

'Your orators pray that an accounting may be had under the direction of this court of all moneys, property, goods and effects of Susan M. Stokes, deceased, which have come *727 to the hands or control of the defendant Clifford G. Stokes, and particularly as to the property and moneys in this bill specifically referred to.

'Your orators pray that the deed from Susan M. Stokes to Clifford G. Stokes conveying the aforesaid Riverside lot be declared a mortgage; that an accounting be had under the direction of this court to determine the amount, if any, due defendant Clifford G. Stokes, on said mortgage, and that they may be permitted to redeem.

'Your orators pray that a decree of this court issue adjudging the defendant Clifford G. Stokes to hold said Richardson Place house and lot in trust for each of your orators and defendant Clifford G. Stokes as tenants in common, with equal interests.

'Your orators pray:

'That an order of this court issue decreeing the deed from Susan M. Stokes to Clifford G. Stokes conveying the Riverside lot, and the deed from defendant Clifford G. Stokes to Susan M. Stokes conveying a life estate in the Richardson Place lot, to be null and void and of no effect on account of the fraud and undue influence exercised over the said Susan M. Stokes by her son, defendant Clifford G. Stokes. That a decree of this court issue adjudging the estate of Susan M. Stokes to be the owner and entitled to the possession of the aforesaid two notes of $10,000 each, executed by Joseph A. Beasley et al. to Clifford G. Stokes, dated March 10, 1925, and secured by a mortgage of even date, recorded in Mortgage Book 218, p. 131, in said clerk's office. That an order of this court issue adjudging that Susan M. Stokes died seized and possessed of the Richardson Place lot in fee simple, and that your orators are the owners of an undivided four-fifths interest, and that defendant Clifford G. Stokes is the owner of an undivided one-fifth interest in said Richardson Place lot, and that the title of your *728 orators be **833 quieted as to said four-fifths interest against the claims of defendant Clifford G. Stokes and all persons claiming under him. That a decree of this court issue declaring and establishing an equitable lien in favor of your orators for the estate of Susan M. Stokes, deceased, upon the interest of defendant Clifford G. Stokes in the Richardson Place house and lot, and other property of said estate to the extent of any moneys found to be due the estate of your orators by the defendant Clifford G. Stokes on an accounting to be had in this suit.

'That an order or decree of this court adjudge the rights of the defendant Mary Stokes, wife of defendant Clifford G. Stokes, are inferior to the rights of your orators and the estate of Susan M. Stokes in the premises.

'That your orators may have such other and further relief in the premises as equity may require and to your honors shall seem meet and fit.'

The respondents Clifford G. Stokes and his wife, Mary Stokes, filed answer to the bill of complaint. The answer

AA01365

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

admitted the purchase of the lot in Riverside subdivision by Susan M. Stokes, but neither admitted nor denied that the lot was paid for as alleged in the bill.

The answer admitted that Susan M. Stokes built a home on such lot, and averred that Clifford G. Stokes donated the sum of $1,000 toward the expense of building the home and afterwards made a loan to Susan M. Stokes of $650 to complete the building, and that thereafter, the same being insisted upon by Susan M. Stokes, Clifford G. Stokes accepted a mortgage on the house and lot to secure the payment of the $650.

The answer alleges that during the summer of 1906 Susan M. Stokes represented to Clifford G. Stokes that she was unable to pay off the mortgage indebtedness and was unable to keep up the repair, pay the taxes, or other *729 legal assessments, against the said house, and that she so advised John Wesley Stokes and Allen Banks Stokes, two of her sons who were older that the respondent Clifford G. Stokes, and offered to convey the above-described property to them or either of them, subject to a life interest of the said Susan M. Stokes, if they or either of them would pay off said mortgage loan, assume the burden of paying taxes and other legal assessments on said property, and the repairs on said premises, and that the said sons had refused to accept her said offer made by the said Susan M. Stokes; that thereupon the said Susan M. Stokes offered to the respondent Clifford G. Stokes to pay off and discharge said mortgage indebtedness by conveying to said Clifford G. Stokes the title to the above-described property, reserving unto herself a life estate therein, in consideration of the said Clifford G. Stokes would cancel said mortgage indebtedness and would assume the burden of paying the taxes and other assessments against said premises and maintaining repairs on said premises and paying the electric light and telephone bills for the use and benefit of said Susan M. Stokes. Whereupon, the respondent Clifford G. Stokes accepted the said offer, canceled said mortgaged indebtedness, took title to the said property, the said Susan M. Stokes reserving a life estate therein, and since said time respondent has paid all taxes and other municipal assessments and has maintained all repairs on said house and has paid all light and telephone bills incurred by the said Susan M. Stokes since 1906, and has otherwise kept and performed all agreements required of him to be kept and performed as full and complete compensation to be paid and bestowed the said Susan M. Stokes in the purchase of said property, subject to the life interest of the said Susan M. Stokes as aforesaid; that from 1906 until the said property was *730 sold as alleged

in said bill of complaint, respondent Clifford G. Stokes, in addition to paying taxes and insurance on said building, paid one item of street assessment for paving amounting to approximately $900 and spent large sums of money during said interval of time in putting new roofs on said house and painting the same biennially and otherwise repairing said premises as often as necessities for such repairs arose. These respondents aver that, subject to the life interest of said Susan M. Stokes, the said Clifford G. Stokes was the owner of title to said premises since 1906.

The answer denied that Clifford G. Stokes ever suggested to Susan M. Stokes that the mortgage hereinbefore referred to did not secure him for the loan made or for advances made on account of taxes and insurance or to be made on account of taxes and insurance, or that he insisted that the said Susan M. Stokes convey the title to said premises to him for the purpose of better securing the indebtedness as alleged in said bill of complaint, and these respondents deny that the deed made by Susan M. Stokes to Clifford G. Stokes was made for the purpose of securing any indebtedness from said Susan M. Stokes to the said Clifford G. Stokes, either for money already advanced to her by him or for obligations to be discharged by him for her, and deny that the said deed of conveyance from said Susan M. Stokes to the said Clifford G. Stokes was for any purpose other than to convey the absolute title to said premises to said Clifford G. Stokes subject to the life interest of the said Susan M. Stokes. These respondents admit that said Susan M. Stokes occupied said house on said premises as her home from the time it was completed in 1905 until it was sold in 1925, and denied that during all of said time Susan M. Stokes and Clifford G. Stokes asserted and claimed said home was the home *731 of Susan M. Stokes, but averred that both Susan M. Stokes and Clifford G. Stokes knew and recognized the title to said premises to be in Clifford G. Stokes, subject to the life estate of Susan M. Stokes.

**834 The answer denied that Susan M. Stokes was unaware that the deed which she gave to Clifford G. Stokes was in fact a deed, but charged the truth to be that she was fully aware of the nature of said deed and that Clifford G. Stokes was taking the same with the understanding that Susan M. Stokes was to have a life estate in the property and that such was the agreement between Clifford G. Stokes and Susan M. Stokes, and that subsequent to the marriage of Clifford G. Stokes he executed the deed conveying a life estate for the protection of Susan M. Stokes, which deed was a deed of trust to Edith Stokes Rice.

AA01366

Stovall v. Stokes, 94 Fla. 717 (1927)
115 So. 828

The answer alleges that the deed was made §9 years before the filing of the bill of complaint and charges laches.

The answer admits that Clifford G. Stokes, as agent for Susan M. Stokes, received an amount of money in 1915 and 1916 for the use of Susan M. Stokes, and avers that he has at all times been ready to account for the same.

The answer admits that Susan M. Stokes entered into a contract with Binckley and Beasley for the sale of the property as alleged in the bill of complaint, but denies that Susan M. Stokes either had or claimed the right to sell the property, and in this connection avers the truth to be that the said Susan M. Stokes had for years desired to live in a different locality in the city of Tampa, and that respondent Clifford G. Stokes had on various occasions suggested to her that if they could get a judicial sale of the property hereinbefore described that he would be willing to sell said property and either buy the said Susan M. Stokes a home in another location or build the said  *732  Susan M. Stokes a home in another location which would be agreeable with her as a place to live and give to her a life estate therein the same as she had in the property hereinbefore described; that when the said contract was so made with the said Binckley and Beasley, the said Susan M. Stokes requested the respondent Clifford G. Stokes to come to Tampa for the purpose of getting his consent to said sale and building the said Susan M. Stokes a new home in a different location; that the respondent Clifford G. Stokes came to Tampa and agreed to sell the property hereinbefore described for the consideration of $30,000, and agreed to purchase lot 2 of block 1 of Richardson Place, and to build said Susan M. Stokes a home thereon, and to take title thereto in the said Clifford G. Stokes, and to convey to the said Susan M. Stokes a life interest therein, at the same time agreeing with the said Susan M. Stokes that she might have the use of the income during her life from the proceeds of the sale of said property hereinbefore first described, after deducting the costs of buying the lot in said Richardson Place subdivision and building a new house thereon; that thereupon the old home was sold and the respondent Clifford G. Stokes purchased the said lot in Richardson Place subdivision and built a home thereon, taking title thereto in his name and conveying to his mother, Susan M. Stokes, a life estate therein; that the respondent Clifford G. Stokes for the lot in said Richardson Place subdivision and for the home erected thereon expended approximately $15,000 therefor, and has allowed the said Susan M. Stokes, up to the time of her death, the interest at the rate of 8 per cent. per annum on the difference between the

cost of said house and lot and the purchase price of $30,000 obtained in the sale of Riverside subdivision home.

The answer avers that Susan M. Stokes was fully aware  *733  of all the matters averred in the answer and fully informed as to all transactions with reference to the sale of the Riverside lot and with reference to the purchase of the Richardson place and building of the house thereon, and of the taking of the title thereto in Clifford G. Stokes, and of the giving of the life estate therein to Susan M. Stokes, and denies that any fraud, trickery, or deceit was practiced, and denies that there was any fraud or undue influence perpetrated or exerted upon Susan M. Stokes. It also denied that the complainants had or are entitled to any claim of any estate in the Richardson place or in any part of the proceeds derived from the sale of the Riverside property.

The answer denies that any part of the money coming into the hands of Clifford G. Stokes as agent for Susan M. Stokes was misappropriated or not properly accounted for. It denies that there was any effort upon the part of Clifford G. Stokes to take any advantage of the complainants in his dealings with Susan M. Stokes. It denies that he was of the character which the bill of complaint represents Clifford G. Stokes to be, and denies that Clifford G. Stokes fraudulently obtained the notes representing the deferred payments on the Riverside property, and avers that the same were delivered to him with full knowledge and consent of Susan M. Stokes, with the understanding that they were the property of Clifford G. Stokes, and that Clifford G. Stokes would account to her for her lifetime for the income derived from the proceeds of the sale of the property, after first deducting the costs of building the new home, and admits that Clifford G. Stokes borrowed $5,000 from the First National Bank of Tampa and pledged as collateral security for said loan four notes in the sum of $5,000 each which were given by Binckley and Beasley, but avers that the $5,000 which was borrowed, together  *734  with the $10,000 in cash paid by Binckley and Beasley, was applied to buying the Richardson place lot and building the home thereon. It denies the insolvency of Clifford G. Stokes, and denies any intention to cheat or defraud the complainants,  **835  or either of them, or to defeat any of their rights in the estate of Susan M. Stokes.

The answer denies the right of the complainants to each and every item of relief prayed for, except to the right of an accounting for the moneys which came into the hands of Clifford G. Stokes as agent for Susan M. Stokes.

AA01367

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

A master was appointed and testimony was taken. Final decree was entered, as follows:

'This cause having been submitted to the court on a former day for a final hearing on the pleadings and testimony reported by the special master herein, and the court, having considered the same and being otherwise fully informed in the premises, finds:

'First. That the equities in this cause are against the complainants and are with the respondents as to all matters and things involved herein except on the question of an accounting on the part of the respondent Clifford G. Stokes as to his handling of the estate of Allen Banks Stokes as trustee and agent for his mother, Susan G. Stokes.

'Second. That the testimony on the question of an accounting as to the handling of the Allen Banks Stokes estate by the respondent Clifford G. Stokes is so indefinite and uncertain that the court cannot make a decree with reference to the same.

'Whereupon, it is ordered, adjudged and decreed that this cause, in so far as same involves an accounting on the part of the respondent Clifford G. Stokes with reference to his handling of the estate of Allen Banks Stokes as agent and trustee for his mother, *735 Susan M. Stokes, be and the same is hereby rereferred to George Gibbs, Esq., a practicing attorney at this bar, for the purpose of taking further proof as to said accounting, and said special master is directed to proceed with all convenient dispatch in the taking of such proofs and report the same to this court without delay, the court hereby retaining jurisdiction of this cause for the purpose of making a final adjudication as to said accounting.

'It is further ordered, adjudged, and decreed that the temporary restraining order issued herein, directed to the First National Bank of Tampa and to Clifford G. Stokes, be and the same is hereby dissolved.

'It is further ordered, adjudged, and decreed that the respondent Clifford G. Stokes is the sole owner in fee simple of the following described real estate, situate, lying, and being in Hillsborough county, Fla., to wit, lot 2 of block 1 of Richardson Place subdivision, as per plat thereof recorded in Plat Book 1, p. 140, in the public records of Hillsborough county, Fla., and that the complainants, nor either of them, have any right, claim, or interest therein.

'It is further ordered, adjudged, and decreed that the respondent Clifford G. Stokes is the sole owner of the notes

given by S. R. Binckley and Joseph A. Beasley on account of the purchase price growing out of the sale of the following described lands, situate, lying and being in Hillsborough county, Fla., to wit, lot 10 of block 6 of Riverside subdivision as per plat thereof recorded in the office of the clerk of the circuit court of Hillsborough county, Fla., and that the complainants herein have no right, title, or interest in the same.

*736 'It is further ordered, adjudged, and decreed that the respondent Clifford G. Stokes is the sole owner of any and all moneys collected by the First National Bank of Tampa on account of notes given by the said S. R. Binckley and Joseph A. Beasley in connection with the purchase of said lot 10 of block 6, Riverside subdivision, and that the complainants herein have no interest, claim, or title thereto.

'It is further ordered, adjudged, and decreed that each and every of the prayers of the complainants' bill herein be and the same is hereby denied, except in so far as the same relates to the question of the accounting as to the handling by Clifford G. Stokes, as agent and trustee for Susan M. Stokes, of the estate of Allen Banks Stokes, and for the purpose only of adjudicating the said accounting and cost, jurisdiction is hereby retained.'

From this decree, appeal was taken by the complainants.

There were 53 assignments of error. We think that all of the assignments of error may be disposed of by disposition of the first assignment of error, which was: 'That the court erred in rendering the final decree.'

The record, when stripped of all incompetent and illegal evidence and having applied to it the legal presumptions which obtain in regard to such transactions as are here under consideration, we think, presents a case which falls far short of being sufficient to sustain the decree as entered herein, although we observe the well-settled rule that the findings of the chancellor will not be disturbed on appeal, unless it is made clearly to appear that the same were erroneous. The decree appears to have been based very largely upon the effect of a deed which was said to have been executed by Susan M. Stokes to Clifford G. Stokes, but which was not filed in evidence and which is not before *737 this court, and was evidently influenced by the testimony submitted by Clifford G. Stokes as a witness in his own behalf, testifying to transactions, agreements, and understandings between

AA01368

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

himself and Susan M. Stokes, his mother, then deceased, much of which testimony coming from him was incompetent and cannot be given consideration for any purpose whatever by this court.

The allegations of the bill of complaint upon which the appellants base their rights to the relief prayed were abundantly sustained by the legal proof as shown by the record.

The bill of complaint alleges that a deed was made from Susan M. Stokes to Clifford G. Stokes in lieu of a mortgage which had been theretofore made to secure the sum of $625, and that the deed was to secure this sum, together with future advances to be made by Clifford G. Stokes to Susan M. Stokes, and that the mortgage was then canceled; that the deed was in effect a mortgage.

The answer admits the making of the deed, but avers that it passed the absolute title in **836 consideration of the discharge of the mortgage indebtedness, and Clifford G. Stokes 'would assume the burden of paying the taxes and other assessments against the said premises and maintain repairs on the said premises and paying the electric light and telephone bills for the use and benefit of the said Susan M. Stokes, * * * and the said Susan M. Stokes reserving a life estate therein.'

As the deed referred to does not appear in the record, we may only assume that such deed was made by the allegations of the pleadings, and must determine the effect of the deed from those allegations, together with the legal evidence in regard thereto. If the deed was intended to pass an absolute title, then it would have been entirely idle to have included in the transactions an agreement on the part of Clifford G. Stokes to 'assume the burden of *738 paying taxes on said property and maintaining repairs on said premises.'

The evidence shows conclusively that Mrs. Stokes never at any time considered this transaction, whatever it may have been, as passing the absolute title to the property to Clifford G. Stokes. The undisputed evidence is that Clifford G. Stokes told one of the witnesses to the deed at the time she subscribed to same as a witness that the same was made to secure him in advances which he had made and was to make. The evidence shows conclusively that the consideration for which the deed was alleged to have been made was grossly inadequate. The evidence shows that the grantee in the deed was the much beloved and greatly trusted son of the grantor, a woman of

little or no business experience, and that he exercised at all times a dominating influence over his mother, and that in those times she trusted him to protect all her interests and to handle her affairs.

[1] In Alexander v.     Rodriguez, 12 Wall. 323, 20 L. Ed. 406, the court say:
'To give validity to a sale by a mortgagor to a mortgagee, it must be shown that the conduct of the mortgagee was, in all things, fair and frank, and that he paid for the property what it was worth.'

And again, it is said:
'He must take no advantage of the fears or poverty of the other party; that the mortgagor knowingly surrendered and never intended to reclaim is of no consequence, if there is vice in the transaction.'

[2]   In the same case it is said:
'Where confidential relations exist between a debtor and a creditor and a conveyance is made by the debtor to the creditor, it will be treated as a mortgage, if the consideration of the deed is the debt; and this is the construction, in equity, of such a transaction. But the creditor may, by affirmative proof, rebut this presumptive case, by showing that actual negotiations for a sale *739 took place, and a valid and fair sale, for adequate or reasonable price, was made, and that no advantage was taken of the needy circumstances of the debtor.'

[3] In     Russell v. Southard, 12 How. 139, 13 L. Ed. 927, Mr. Justice Curtis, delivering the opinion of the court, says:
'It is the doctrine of this court, that when it is alleged and proved that a loan on security was really intended, and the defendant sets up the loan as a payment of purchase money, and the conveyance as a sale, both fraud and a vice in the consideration are sufficiently averred and proved to require a court of equity to hold the transaction to be a mortgage.'

[4]   He then quotes, with approval, from Edrington v. Harper, 3 J. J. Marsh. (Ky.) 355, 20 Am. Dec. 145, as follows:
'The fact that the real transaction between the parties was a borrowing and lending, will, whenever, or however it may appear, show that a deed absolute on its face was intended as

AA01369

Stovall v. Stokes, 94 Fla. 717 (1927)
115 So. 828

a security for money; and whenever it can be ascertained to be a security for money, it is only a mortgage, however artfully it may be disguised.'

[5] [6] [7] [8]  It is not needful for us to go beyond the portals of our own court to find the established rule governing cases of this character. In Elliott v. Conner, 63 Fla. 408, 58 So. 241, Mr. Justice Whitfield, speaking for the court, after quoting our statute, then sections 2494 and 2495 of the General Statutes, now sections 3836 and 3837, Revised General Statutes, says:
'Under these statutes a mortgagee acquires only a specific lien upon the property of the mortgagor that is covered by the mortgage, and an 'instrument of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money,' which upon its face conveys title to property, may be subject to the provisions of the statute that it 'shall be deemed and held a mortgage,' if by extrinsic *740 facts the statute is shown to apply; and in cases of doubt the instrument may when justice requires it be held to be in law a mortgage. The relations existing between the parties at the time of its execution may be considered in determining whether a deed of conveyance of land absolute on its face was intended to operate as a mortgage to secure the payment of a debt. Hull v. Burr, 58 Fla. 432, 50 So. 754; De Bartlett v. Wilson, 52 Fla. 497, 42 So. 189 [11 Ann. Cas. 311]; Conner v. Conner, 59 Fla. 467, 52 So. 727.

'An absolute conveyance of property is in equity a mortgage if when made it was intended by the parties to be a security for the payment of money. If when an absolute conveyance of property is made it is in legal effect a mortgage it remains a mortgage. Where a conveyance of property is absolute on its face, the burden of showing that it was when executed intended to be a mortgage to secure the payment of money is upon the grantor. The conduct of the parties and the circumstances under which the instrument was executed may be shown in evidence as bearing upon the intent and purpose of the parties to the transaction. The mere secret intention of either party as to the purpose of **837 the instrument will not control. But if from all the facts and circumstances of the case it appears that the real purpose of the parties to an absolute conveyance of property was to secure the payment of money then due, and not the actual extinguishment of the debt, the conveyance will be regarded as a mortgage. In such a case the mortgagee may foreclose or the mortgagor may redeem. Where there is an existing debt which is not certainly extinguished by an absolute conveyance of property, and the

amount of the debt is not fully known or ascertained, and the value of the property when conveyed was considerably greater than the probable total indebtedness *741 would be when definitely ascertained, and there is evidence that the grantor intended the conveyance as a security for the debt and not as an absolute sale and there was no proposition for the sale of the property, but the attending circumstances were such that the grantee must have understood the conveyance was intended by the grantor as security for the debt the instrument may be held a mortgage, especially when by so doing justice to both parties will be best subserved. See 1 Jones on Mortgages (6th Ed.) § 265 et seq.'

[9] [10]  In Connor v. Connor, 59 Fla. 467, 52 So. 727, the court say:
'A deed absolute on its face may by parol evidence be shown to be a mortgage, and in cases of doubt the instrument should be held to be a mortgage. De Bartlett v. De Wilson, 52 Fla. 497, 42 So. 189 [11 Ann. Cas. 311]; Hull v. Burr, 58 Fla. 432, 50 So. 754; Franklin v. Ayer, 22 Fla. 654.

'An instrument must be deemed and held a mortgage, whatever may be its form, if, taken alone or in connection with the surrounding facts and attendant circumstances, it appears to have been given for the purpose or with the intention of securing the payment of money, and the mere absence of terms of defeasance cannot determine whether it is a mortgage or not.'

[11] [12] [13]  [14]  In the case of Skeels v. Blanchard, the Supreme Court of Vermont, 85 Vt. 288, 81 A. 913, Mr. Justice Munson, delivering the opinion of the court, says:
'When it is once established that a mortgage exists, the equitable right of redemption attaches to the transaction as an inseparable incident. No contemporaneous understanding, however formally expressed or artfully concealed, will be permitted to deprive the debtor of this right. It can be defeated only by a subsequent agreement upon a further consideration.

*742 'The right of a mortgagee to become the purchaser of the equity is unquestioned, but the relations of the parties are such that the transaction will be carefully scrutinized.

Russell v. Southard, 12 How. 139, 13 L. Ed. 927;  Peugh v. Davis, 96 U. S. 332, 24 L. Ed. 775. The rule in such a case is said to be substantially the same as that prevailing when the

Stovall v. Stokes, 94 Fla. 717 (1927)
115 So. 828

deed of a beneficiary to his trustee is questioned.    Villa v. Rodriquez, 12 Wall. 323, 20 L. Ed. 406.

'A conveyance of mortgaged premises by the mortgagor to the mortgagee will be regarded as a mere change in the form of the security, unless it clearly and unequivocally appears that both parties intended that it should operate as a bar to the equity of redemption. Ennor v. Thompson, 46 Ill. 214.

See, also,    Bradbury v. Davenport, 114 Cal. 593, 46 P. 1062, 55 Am. St. Rep. 92; Hall v. Hall, 41 S. C. 163, 19 S. E. 305, 44 Am. St. Rep. 696. When premises have been mortgaged to secure a debt, subsequent transfers of property on account of the debt are to be regarded prima facie as securities, and subject to the right of redemption. 3 Lead. Cas. Eq. 444. It is evident from these authorities that the rule which requires more than a preponderance of evidence to establish an absolute deed as a mortgage cannot be applied to a deed covering premises already mortgaged by the grantor to the grantee without overruling a long established rule pertaining to the equity of redemption.'

[15] In the case of Lynch v. Lynch, a case decided by District Court of Appeals, Third District of California, and rehearing denied by the Supreme Court of California, reported 22 Cal. App. 653, 135 P. 1101, Mr. Justice Hart, speaking for the court in the opinion says:
'But the further point is urged that the consideration for the land was shown to have been inadequate when compared to its actual value at the time of the transfer, and *743 that this circumstance, viewed in connection with certain declarations which were shown to have been made by the defendants in opposition to the theory that the conveyance involved an absolute transfer of the property, and considered also in connection with the fact that the parties sustained the relation of parent and children, from which relationship the presumption arises that in the transaction a confidential relation subsisted between them, was sufficient to turn the scale in favor of the theory that the deed was intended not as a sale of the land but to have the effect only of a lien to secure to the defendants reimbursement for the money advanced by them to their father. Inadequacy of consideration, where shown, is an element which is always given great weight by courts of equity in determining whether a transaction involving the transfer of valuable property by one to another is unconscientious or constructively fraudulent or perhaps as tending to prove actual fraud. Indeed, it has always been looked upon by such courts as sufficient to create a strong suspicion that the transaction has not been characterized by good faith in the party securing benefits thereby and to cast upon him the burden of making it perfectly clear that it was in all respects honest and fair and just to the grantor. And where to the circumstance of inadequacy of consideration is added the circumstance that the parties to the transaction stand in a confidential relation toward each other or are so connected in blood as that the presumption arises that such a relation exists between them (    Nobles v. Hutton, 7 Cal. App. 14, 23, 93 P. 289, and cases therein cited), a case for the invalidation of the contract or transaction is, in the eyes of a court of equity, well-nigh complete.'

[16]    We could fill many pages with the citations of authorities supporting the rule which we have quoted with approval, supra. The law as enunciated in the cases referred to **838    *744 should be applied in the instant case, and, being so applied, we must hold that the deed referred to, executed by Susan M. Stokes to Clifford G. Stokes and purporting to convey 'lot 10 of block 6 of Riverside subdivision, as per plat thereof recorded in the office of the clerk of the circuit court of Hillsborough county, Fla.,' was a deed given in lieu of a mortgage theretofore existing and was for the purpose of securing the same indebtedness for which the mortgage had been given, together with future advances to be made by Clifford G. Stokes, and that such deed was in law and equity a mortgage; that from the proceeds of the sale of such property Clifford G. Stokes was and is entitled for reimbursement for the amount of the original loan, together with the advances, if any, thereafter made from his private funds to Susan M. Stokes.

Having so held, it necessarily follows that we must hold the conveyance of 'lot 2, block 1 of Richardson Place subdivision, as per plat thereof recorded in Plat Book 1, p. 140, in the public records of Hillsborough county, Fla.,' to have been a deed of conveyance in trust to Clifford G. Stokes for the use and benefit of Susan M. Stokes, her heirs and assigns, and that Clifford G. Stokes now holds the legal title to the said lot in trust for himself and the other heirs of Susan M. Stokes, and that he holds the residue of the proceeds of the sale of the above-described Riverside lot likewise in trust for himself and the other heirs of Susan M. Stokes. It is therefore ordered that that part of the decree which reads as follows: 'Whereupon, it is ordered, adjudged, and decreed that this case, in so far as same involves an accounting on the part of the respondent Clifford G. Stokes with reference to his handling of the estate of Allen Banks Stokes as agent and

AA01371

Stovall v. Stokes, 94 Fla. 717 (1927)

115 So. 828

trustee for his mother, Susan M. Stokes, be and the same is hereby rereferred to **\*745** George Gibbs, Esq., a practicing attorney at this bar, for the purpose of taking further proof as to said accounting, and said special master is directed to proceed with all convenient dispatch in the taking of such proofs and report the same to this Court without delay, the Court hereby retaining jurisdiction of this cause for the purpose of making a final adjudication as to said accounting,'

-be and the same is hereby affirmed. All the remainder of said decree is reversed, with directions for such further decrees and accountings as may be required not inconsistent with this opinion, and that the costs of this appeal shall be taxed against Clifford G. Stokes.

Affirmed in part.

Reversed in part.

ELLIS, C. J., and WHITFIELD, J., concur.

TERRELL and STRUM, JJ., dissent.

BROWN, J., not participating.

**Parallel Citations**

115 So. 828

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

AA01372

3

Ringling Joint Venture II v. Huntington Nat. Bank, 595 So.2d 180 (1992)
17 Fla. L. Weekly D554

595 So.2d 180
District Court of Appeal of Florida,
Second District.

RINGLING JOINT VENTURE II, a
Florida General Partnership, Appellant,

v.

The HUNTINGTON NATIONAL BANK, First Sunset
Development, Inc., an Ohio Corporation, George
E. Emmons, Jr., Susan Hanson, James C. Carswell,
III, Robert A. Graves and Ilona Ullen, Appellees.

No. 91-02103.   |   Feb. 21, 1992.
|   Rehearing Denied March 17, 1992.

Action was brought to declare deed invalid. Final summary
judgment declining to invalidate the deed was entered by
the Circuit Court, Sarasota County, Stephen L. Dakan, J.,
and appeal was taken. The District Court of Appeal held
that transaction whereby, to avoid foreclosure under prior
mortgages, third mortgagee made new loan to mortgagor and
mortgagor executed warranty deed to be placed in escrow and
delivered to the mortgagee upon future default was not void
under doctrine against clogging right of redemption.

Affirmed.

West Headnotes (5)

[1]     **Mortgages**
        ⟞ Illegality
        Assuming that transaction whereby third
        mortgagee made loan to mortgagor upon default
        on three mortgages and mortgagor executed
        warranty deed to be held in escrow and
        delivered to mortgagee upon new default
        created a mortgage, conveyance and escrow
        agreements were not void as violating doctrine
        against clogging equity of redemption, since
        agreement was subsequent to promissory notes
        and mortgages involved in earlier foreclosure
        proceeding and was given to avoid foreclosure,
        mortgagor received valuable new consideration
        to relinquish its right of redemption, all parties
        were represented by counsel and transaction
        involved commercial real estate.

4 Cases that cite this headnote

[2]     **Mortgages**
        ⟞ Provisions of Mortgage and Agreements
        Affecting Right
        Under doctrine against "clogging the equity of
        redemption," mortgagor cannot, by agreement
        made contemporaneously with or as part of
        mortgage transaction, bind himself not to assert
        right or equity of redemption.

Cases that cite this headnote

[3]     **Constitutional Law**
        ⟞ Liens, Mortgages, and Security Interests
        **Mortgages**
        ⟞ Right to Redeem in General
        Right of redemption is highly favored equity and
        should not be cut off without due process and
        considerable caution. U.S.C.A. Const.Amend.
        14.

Cases that cite this headnote

[4]     **Mortgages**
        ⟞ Right to Redeem in General
        **Mortgages**
        ⟞ Provisions of Mortgage and Agreements
        Affecting Right
        Doctrine against clogging equity of redemption
        does not create an absolute right, and does not
        apply if right is relinquished by a subsequent
        agreement upon further consideration.

Cases that cite this headnote

[5]     **Mortgages**
        ⟞ Provisions of Mortgage and Agreements
        Affecting Right
        Arrangements for resolving foreclosure
        proceedings whereby deed is placed in escrow to
        be delivered to mortgagee upon default should
        be carefully scrutinized to assure that they do not
        violate the favored right of redemption.

2 Cases that cite this headnote

Ringling Joint Venture II v. Huntington Nat. Bank, 595 So.2d 180 (1992)

17 Fla. L. Weekly D554

**Attorneys and Law Firms**

**\*181**  Charles J. Bartlett and Robin M. Orosz of Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A., Sarasota, for appellant.

A. Lamar Matthews, Jr., Steven D. Hutton and Martin Garcia of Matthews, Hutton & Eastmoore, Sarasota, for appellees.

**Opinion**

PER CURIAM.

The plaintiff, Ringling Joint Venture II (Ringling), appeals a final summary judgment in favor of Huntington National Bank (Huntington) and others in an action to declare a deed invalid. The deed was delivered from escrow to Huntington after Ringling had defaulted on its obligations in a complex, commercial real estate transaction. Under the specific facts of this case, we affirm the trial court.

Ringling owned a parcel of real estate in Sarasota County near the historic John Ringling Towers Hotel. In 1987, the land was encumbered by three mortgages, which secured promissory notes totalling in excess of $8 million. Huntington held the third mortgage. Ringling defaulted on its obligations, and the first mortgage holder filed a foreclosure action.

In order to resolve this complex dispute, in September 1988, Huntington agreed to loan Ringling $8.6 million under revised documents which made Huntington the first mortgage holder. These new documents contain different requirements from the original loan documents and are not a mere assignment of the rights of the prior first and second mortgagees. As part of this agreement, Frederick Clayton became managing general partner of Ringling and personally executed documents including a "single loan guaranty."

Two of the documents executed were a conveyance agreement and an escrow agreement. The conveyance agreement provided for a deed in lieu of foreclosure to be held in escrow by a title insurance company. The general warranty deed was executed by Ringling and transferred the property to Huntington. The escrow  **\*182**  agreement specified that the date of the deed would be intentionally left blank. If Ringling defaulted on its obligations under either the old promissory notes that were not extinguished by this transaction or under the new promissory notes, Huntington had the right, after giving due notice, to obtain the deed from escrow. The escrow agreement gave specific authorization to the title insurance company to deliver the deed in the event of a default.

Ringling defaulted on the promissory notes in May 1990. Huntington sent notices of default to Ringling in early June, advising Ringling that it intended to exercise its rights under the conveyance and escrow agreements. On June 20, it sent a letter to the title insurance company certifying Ringling's default and directing the delivery of the deed. The deed was apparently delivered shortly thereafter.

Ringling did not attempt to enjoin the delivery of the deed. After the delivery, it filed this action seeking to invalidate the deed. Ringling has never alleged an ability to pay its obligations under the promissory notes and has never attempted to make any payment into the registry of the court. From the record, it appears that the value of the property is less than the amount owed by Ringling to Huntington. On April 30, 1991, the trial court entered a final summary judgment declining to invalidate the deed.

We emphasize that the documents to this transaction are lengthy and this opinion does not attempt to explain all the nuances of those agreements. It is significant to us that all parties were represented by counsel, the agreement arose from a pending foreclosure action, and the transaction involves commercial real estate rather than residential property.

[1]  [2]  [3]  Ringling primarily argues that the conveyance and escrow agreements, which Ringling and its lawyers helped create, are void or unlawful because they violate the doctrine against clogging the equity of redemption. [1] Under that doctrine, "[a] mortgagor cannot, by any agreement made contemporaneously with or as a part of the mortgage transaction, bind himself not to assert his right or equity of redemption.... If the conveyance is a mortgage, the right of redemption is an inseparable incident, which cannot be restrained or clogged by agreement." *MacArthur v. North Palm Beach Utilities, Inc.,* 202 So.2d 181, 188 (Fla.1967) (Ervin, J., dissenting) (citation omitted). *See generally* 37 Fla.Jur.2d *Mortgages and Deeds of Trust* § 111 (1982). While we recognize that the right of redemption is "a highly favored equity," *Connor v. Connor,* 59 Fla. 467, 52 So. 727 (1910), that should not be cut off without due process and without considerable caution, we do not believe that the right of redemption compels us to reverse the trial court's decision.

AA01375

Ringling Joint Venture II v. Huntington Nat. Bank, 595 So.2d 180 (1992)

17 Fla. L. Weekly D554

[4]   The doctrine against clogging the right of redemption does not create an absolute right. The courts have recognized that this doctrine of equity does not apply if the right is relinquished by "a subsequent agreement upon a further consideration." *Stovall v. Stokes,* 94 Fla. 717, 741, 115 So. 828, 837 (1928) (quoting *Skeels v. Blanchard,* 85 Vt. 288, 81 A. 913 (1911). Moreover, as the supreme court stated in *MacArthur:*

> The doctrine against clogging the equity of redemption of a mortgage estate is an old English doctrine brought forward in this Country to prevent lenders taking an inequitable advantage of distraught borrowers. The doctrine would prevent the mortgagee from taking through any trick, scheme or contrivance the equity of redemption from the borrower.

202 So.2d at 185-86

Technically, Ringling may be correct that the conveyance agreement is not a "subsequent agreement" because it was created in conjunction with new mortgage documents. Nevertheless, it is an agreement subsequent to the promissory notes and mortgages involved in the earlier foreclosure *183 proceeding. It is clear that this agreement was given to avoid foreclosure and that Ringling received valuable new consideration to relinquish its right of redemption. If we examine the underlying policy for the doctrine against clogging the right of redemption, it is obvious that this agreement was intended to assist Ringling at the time of the earlier foreclosure and was not an unfair scheme to take Ringling's equity in the property or its right of redemption. As a result, we conclude that the trial court did not err in its ruling.

[5]   Having affirmed the trial court, we emphasize that the agreements used in this case could easily result in abuse or inequity in another case under other facts. Thus, our decision should not be interpreted as a general approval for the use of such documents in resolving other foreclosure proceedings. Such arrangements should be carefully scrutinized to assure that they do not violate the favored right of redemption. Moreover, we express no opinion on Huntington's right to seek a deficiency on the promissory notes or its ability to seek recovery under Mr. Clayton's personal guaranty. It is entirely possible that the decision to invoke the conveyance agreement could be a decision precluding alternative remedies under the mortgage and guaranty.

Affirmed.

CAMPBELL, A.C.J., and LEHAN and ALTENBERND, JJ., concur.

**Parallel Citations**

17 Fla. L. Weekly D554

Footnotes

1   Ringling argues that this transaction creates a mortgage. Huntington maintains that it is a distinct absolute conveyance. For purposes of this opinion, we assume without deciding that the transaction does involve a mortgage and, thus, invokes the doctrine against clogging the right of redemption.

Next

AA01376

4

AA01377

Case 8:19-cv-00008-VMC   Document 19   Filed 03/12/19   Page 634 of 653 PageID 7895
Case 8:11-ap-00809-KRM   Doc 123-2   Filed 06/16/15   Page 22 of 26
Case 8:11-ap-00809-KRM   Doc 100   Filed 03/02/15   Page 15 of 46

be delayed, which obviously prejudices PEPI as the lender. Regardless, the simple fact that a foreclosure process is still required under Florida law compels the conclusion that there is no *material* default. In fact, the removal of escrows only helps the Debtors and therefore certainly cannot be alleged to constitute a material breach of anything. This determination is based on common sense and consistent with Florida law. See, Beefy Trails Inc. v. Beefy King Intern. Inc., 267 So.2d 853, 857 (Fla. 4th DCA 1972) (to constitute a vital or material breach, a party's non-performance must "go to the essence of the contact").

Additionally, the Commitment Letter states that the terms and conditions of the loan documentation "shall be substantially the same as those set forth [t]herein." (Fine Aff., ¶ 24). It follows, that because under Florida law a foreclosure is still required to divest the title owner, the proposed loan agreements were "substantially the same" notwithstanding the removal of the mechanism to "speed" PEPI's foreclosure process under the Commitment Letter. *Compare*, SIGA Technologies, Inc. v. PharmAthene, 67 A.3d 330 (Del. 2013) (ultimatum to alter agreement to include radically, dramatically different terms that significantly favored party was not substantially similar). Thus, no breach exists both factually and legally.

> iv.    The escrow provisions are not "performable" under Florida law, so the
> suggested removal is not a material breach.

As the Court is aware, contractual provisions that are contrary to public policy are unenforceable. See, American Cas Co. v. Coastal Caisson Drill Co., 542 So.2d 957, 958 (Fla. 1989); Alterra Healthcare Grp. V. Bryant, 937 So.2d 263, 270 (Fla. 4th DCA 2006). The escrow provision as to the deed in lieu, which would be conveyed to PEPI upon default, was not performable on this basis.

15

Indeed, Florida is a lien theory state in which instruments purporting to convey interests in property as security for a debt are deemed mortgages. In particular, Florida Statutes section 697.01(1) provides:

> All conveyances, obligations conditioned or defeasible, bills of sale or other instruments of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money, whether such instrument be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages.

The statute is designed to protect a borrower's equity of redemption where there is no formal mortgage. *See* Rothschild Reserve Intern., Inc. v. Silver, 830 So.2d 224, 226 (Fla. 4th DCA 2002). Accordingly, contractual provisions in debt instruments "relating to forfeiture and self-help possession (or 'repossession') violate public policy and are not enforced or recognized as valid as such in law or in equity." *See* Cain & Bultman, Inc. v. Miss Sam, Inc., 409 So.2d 114, 120 (Fla. 5th DCA 1982).

In fact, "[a] contract for deed is treated like a mortgage and the seller who seeks to accelerate and foreclose his interest under it must prove both default and acceleration." *See* Parise v. Citizens Nat'l Bank, 438 So.2d 1020 (Fla. 5th DCA 1983). In general, the concept concerns transactions between sellers and buyers, *see* Free v. Free, 936 So.2d 699, 703 (Fla. 5th DCA 2006), but it includes transactions in which property would be forfeited to a creditor in the event of a default in a debt obligation. *See* Cain & Bultman, Inc., (Fla. 5th DCA 1982). See also, Mid-State Investment Corp. v. O'Steen, 133 So.2d 455 (Fla. 1st DCA 1961) (the court determined that the contract was deemed a mortgage pursuant to section 697.01 and, upon default, the corporation had nothing more than a mortgage lien); Kirkland v. Miller, 702 So.2d

16

AA01379

Case 8:19-cv-00008-VMC   Document 19   Filed 03/12/19   Page 636 of 653 PageID 7897
Case 8:11-ap-00809-KRM   Doc 123-2   Filed 06/16/15   Page 24 of 26
Case 8:11-ap-00809-KRM   Doc 100   Filed 03/02/15   Page 17 of 46

620, 621 (Fla. 5th DCA 1999) (determining the instrument to be a mortgage designed to avoid foreclosure proceedings).

Likewise, stipulated judgments of foreclosure at the time of an initial loan are unenforceable under Florida Law. In Hawke v. Broward National Bank of Fort Lauderdale, 220 So.2d 678 (Fla. 4th DCA 1969), the court considered a case in which a borrower gave a lender a note containing a confession of judgment. The court determined that, although the note was enforceable otherwise, the confession of judgment provision was void. *See Id.* at 679; *see also,* Vineberg v. Brunswick Corp., 391 F.2d 184, 186 (5th Cir. 1968); Matter of Caniglia, 17 B.R. 1982 (Bankr. M.D. Fla. 1982) (recognizing that "Fla.Stat. s 55.05 proscribes the use of a power of attorney to confess judgment made before an action is brought and declares any judgment so obtained to be null and void" but determining that Illinois law applied).

Although the above is dispositive, PEPI was also advised for title insurance reasons that the escrow concept created certain issues, including the potential need to still foreclose any junior liens, so as to form a good faith basis to request the proposed removal. (See Fine Aff., ¶ 12). This is consistent with PEPI's right under the Commitment Letter - definitive documentation "reasonably satisfactory to PEPI and its counsel in all respects". (Fine Aff., ¶ 23).

> v. Because the escrow provision was a right and benefit of PEPI to "speed" the foreclosure, PEPI was free to waive same (no different than what Gulf Bay waived under the Court approved DIP Facility).

Knowing that the escrow was to "speed" the foreclosure for PEPI, it is shocking that the Debtors would attempt to argue how critically important the provision was, when they completely waived any such notion by removing it from the insider loan with Gulf Bay. Even more telling, is the Debtors' own admission that the escrow provision was a benefit of Gulf Bay

AA01380

5

AA01381

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

DA-3072429 v11 1203528-00000

C

AA01383

1

AA01384

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Wednesday, January 06, 2010 9:02 AM |
| **To:** | 'Fine, Jeffrey' |
| **Cc:** | Patricia Redmond; Guitian, Mariaelena |
| **Subject:** | Quick Outline of Points for Call Today |

Jeff, I thought I would outline for your a quick summary of the points that we want to discuss with you so that we have an agenda and so that you could have a few minutes to think about them and be able to discuss.

1. Status of Trish's request for a right of first refusal on the debt.

2. Discussion about Pepi retaining control over the loan after syndication.

3. Clarifying that the fees and expenses of the lender after closing will be paid from the loan proceeds.

4. Clarification on the payment of Managed Expenses based on sale thresholds.

5. Clarification on the extent of the subordinate replacement liens available for FC to give to other lenders.

6. Discussion on a mechanism to deal with the liquidation of collateral in the waterfall. Trish and I have some good ideas that will be of benefit to your client in this process and will also allow us to satisfy the other secured creditors that the waterfall is meaningful and not illusory. Our thoughts are (i) to create an escrow of some sort to hold consent judgments to any foreclosure in the order of priority in the waterfall so that you can immediately get a judgment and go to sale, (ii) perhaps a deed in lieu of foreclosure held in escrow to give you that option, and (iii) the need for a valuation mechanism so that if you take back property in foreclosure or through a deed that the debt is reduced accordingly. We think this saves your client a significant amount of time and expense in the foreclosure process and also allows us to show the junior lenders that the waterfall is real. We are open to other ideas as well.

7. The title and appeal issues. We will update you and also ask that you provide a form of DIP order so that we can share it with the title company for their review.

8. Some tweaks here and there to add "reasonableness" to deal with our concerns about the various due diligence outs. I think we can get there with some added language.

9. Timing of the closing from and after the signing of the letter. Namely, when we sign the letter, what is your expected timing to complete due diligence and do the loan documents. We are trying to gauge the filing to coincide with the completion of your due diligence so that we know we are good to go other than the court's order.

10. Confirmation that Aubrey is not a guarantor on the loan.

11. We will need to have a contact at your firm to work with Mary to make sure we are getting you the due diligence informaton that you need. We would like to help keep that process moving and oversee it.

There are other minor comments as well, but these are the more material ones. Trish and Mary, please add anything else if you have any.

Thanx



15

**GENOVESE**
**JOBLOVE &**
**BATTISTA**
— P.A. —
*Attorneys at Law*

**Paul J. Battista, Esq.**
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone:      (305) 349-2300
Direct:      (305) 372-2457
Facsimile: (305) 349-2310
Cell:         (305) 812-8030
E-mail: pbattista@gjb-law.com

www.gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate or otherwise use the information contained herein. Also, please indicate to the sender that you have received this communication in error, and delete the copy you received. Thank you.

AA01386

2

AA01387

1   11.

2          We believed that in the bankruptcy, we

3   needed to protect the creditors also and PEPI as I

4   recall, there were two pieces or there was a tranche

5   of money prior to have access to the total facility

6   during the inter -- before the judge finalized the

7   DIP loan, intermediary funding.

8          We did not want to have PEPI have the

9   ability for, let's say they're putting out

10  $2 million, to sue and foreclose on hundreds of

11  millions of dollars of real estate.  What we

12  negotiated was to protect PEPI is to have the deeds

13  in lieu of foreclosure held in escrow to give PEPI a

14  consent judgment, then there would be a question how

15  do you evaluate the real estate.

16         We came out with a valuation mechanism,

17  which is really an appraisal.  That was for the

18  protection of the creditors and the debtor and the

19  order, how it would work, is what's labeled 1 through

20  11.

21         So putting things in escrow, putting the

22  titles in escrow, having the consent judgment in

23  escrow would speed, in my opinion, but I'm not a

24  lawyer, would speed up the litigation that would

25  happen if PEPI foreclosed on all the real estate.  So

3

**AA01389**

x.  Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi.  Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii.  Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii.  The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv.  Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv.  PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi.  PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii.  To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii.  The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix.  Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv.  PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

13

4

AA01391

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the "Minimum Net Cumulative Sales Covenant if not paying Managed Expenses" set forth on Exhibit D for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly. In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development, Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

DA-3072429 v11 1203528-00006

5

AA01393

Case 8:19-cv-00008-VMC   Document 19   Filed 03/12/19   Page 650 of 653 PageID 7911
Case 8:11-ap-00809-KRM   Doc 123-3   Filed 06/16/15   Page 12 of 15

156

1        Q      No.

2               MR. BATTISTA:   Escrow for deeds in lieu and

3        escrow for consent judgments.

4        Q      **Was there escrow consent provision for Gulf**

5        **Bay Capital, yes or no?**

6        A      I don't recall.

7        Q      **Was there an escrow for stipulated**

8        **judgments of foreclosure in the loan between**

9        **Fiddler's and Gulf Bay Capital?**

10       A      I don't recall if there was.  We had the

11       escrow clause.  Course the escrow clause was for the

12       protection of the DIP lender and Gulf Bay Capital

13       knew the assets so they did not need the escrow

14       clause.  So my recollection is we didn't put it in

15       because that's what the escrow clause was supposed to

16       protect.

17              The escrow clause and this consent judgment

18       were for the benefit of the DIP lender, so if we

19       didn't put them in, we put Gulf Bay Capital at a

20       disadvantage from other DIP venders, but Gulf Bay

21       Capital had the knowledge of the value of the assets

22       so it didn't require the escrow clause.

23       Q      **So based on that, your belief was they were**

24       **not in the loan agreement, correct?**

25              MR. BATTISTA:   Yes or no.

14

1    Q    Meaning that there was no requirement to

2   escrow deeds in lieu, correct?

3    A    Yes.  Because the deeds in lieu of

4   foreclosure were for the benefit of the DIP lender.

5   The DIP lender in this situation had a very good

6   understanding of the valuation and values of the

7   property.  So Gulf Bay Capital did not need that

8   extra protection having the deeds in lieu of

9   foreclosure.  We understood the values.

10    Q    Just so I'm clear, there was no provision

11   for escrows of deeds in lieu of foreclosure and

12   likewise, there was no escrow provision for

13   stipulated judgments of foreclosure under the

14   commitment letter between Gulf Bay and Fiddler's,

15   correct?

16    A    That's correct.  Done?

17    Q    You have it.  Showing you Exhibit 6,

18   entitled Notice of Filing Proposed Debtor in

19   Possession Credit and Security Agreement.

20    A    Okay.  I looked at it.

21    Q    Are you familiar with this exhibit?

22    A    Yes.  This was filed in the Fiddler's

23   Creek, LLC bankruptcy and was for Gulf Bay Capital to

24   put in place a debtor in possession credit and

25   security facility.

6

AA01396

that Gulf Bay as "lender" could and did waive (DiNardo/Gulf Bay, p. 13, 14).  The Debtors are at least correct in this regard and the same must be true for PEPI.   The Debtors admission on this point also dispenses with its nonsensical argument that the escrow (which actually speeds up the foreclosure process) somehow was beneficial to junior liens.  Surely, if that was to be believed, the escrow provision would still exist in the Gulf Bay facility.  The escrow was a right of PEPI (Fine Aff., ¶ 26 xvii), (Radunsky, p. 90) and therefore can be waived by PEPI.

A party who has a condition or provision in a contract solely for its benefit is free to waive it.  Specifically, Florida law allows insurance companies to waive policy provisions enacted solely for their benefit.  Such provisions are "solely for the protection of the company, which it may waive if it elects to do so, just as it may waive any other provision of the contract made for its personal benefit."  Martinez v. Saez, 650 So.2d 668, 669 (Fla. 3rd DCA 1995) citing Miller v. Gulf Life Ins. Co., 12 So.2d 127, 130 (Fla. 1942).  *See also*, New England Merchants Nat. Bank v. Rosenfield, 679 F.2d 467, 473 (5th Cir. 1982) ("condition was for the sole benefit of [the bank], which was therefore free to waive it.").  There can be no doubt as to this argument – the escrow "would speed up the litigation that would happen if PEPI foreclosed." (DiNardo, p. 44).

This is the law in many jurisdictions. "It is a well-established principle of California law that 'a contracting party may waive conditions placed in a contract solely for the party's benefit.'" Wyler Summit P'ship v. Turner Broad. Sys., Inc., 135 F.3d 658, 662 (9th Cir. 1998); See  Citadel Equity Fund Ltd. v. Aquila, Inc., 168 F. App'x 474, 476 (2d Cir. 2006) ("Under New York law, a party may unilaterally waive a contract provision inserted solely for its benefit."); Stephens v. Trust For Pub. Land, 475 F. Supp. 2d 1299, 1315 (N.D. Ga. 2007) ("[i]t is well recognized that a party to a contract may waive contractual provisions for his benefit.");

18