**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

---

**CASE NO. 8:19-CV-00008-VMC**
**BANKRUPTCY CASE NO. 8:10-BK-03846-CPM**
**ADVERSARY CASE NO. 8:11-AP-00809-CPM**

---

**PEPI CAPITAL, L.P.,**

**Appellant,**

**vs**

**FIDDLER'S CREEK, LLC, et al.**

**Appellees.**

---

**APPELLANT'S APPENDIX**
**VOLUME 6**
**AA01398-AA01626**

---

**On Appeal from The United States Bankruptcy Court**
**Middle District of Florida, Tampa Division**

**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
***Attorneys for Pepi Capital, L.P.***

# TABLE OF CONTENTS

| VOL. | BATES RANGE | DOCUMENT |
|---|---|---|
| 6 | AA01398-AA01435 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re: Confirming that Escrow Provision designed to speed up judgment and sale process for PEPI (Doc No. 123-4 in Adv. Case No. 8:11-ap-00809) |
| 6 | AA01436-AA01489 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re: Evidencing due diligence as a condition precedent of "funding" only (Doc No. 123-5 in Adv. Case No. 8:11-ap-00809) |
| 6 | AA01490-AA01585 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re: Demonstrating no default notice ever provided to PEPI, waiver of purported "default," rejection to revise Purchase Option Provision, leading to secret breach by Debtors (Doc No. 123-6 in Adv. Case No. 8:11-ap-00809) |
| 6 | AA01586-AA01614 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re: Concern over approval of insider loan and testimony presented to Court (Doc No. 123-7 in Adv. Case No. 8:11-ap-00809) |
| 6 | AA01615-AA01626 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re: Misrepresentation by Debtor confirming they pirated the PEPI loan documents for insider loan (Doc No. 123-8 in Adv. Case No. 8:11-ap-00809) |

D

AA01398

1

AA01399

**From:** CJ Lorio
**Sent:** Tuesday, February 16, 2010 12:50 PM
**To:** Tony DiNardo
**Cc:** K Springfield
**Subject:** Budget

Tony, I understand that the interim funding request is for $4 million.

On the 18-month budget, it appears that while the Parcel Admin line is about $1.2 million less, int total over the 18 months, that the Parcel Admin taxes are not identified in the Managed Expenses section of the budget as they should be. Can you revise and provide the budget with the amounts?

We probably need to discuss the waterfall and where we are on that. I think there is not agreement right now on how we would work through collateral in a foreclosure process.

Thanks,

C.J. Lorio
Perot Investments, Inc.
972-535-1972
972-535-1991 (Fax)
cj.lorio@pgrp.net






PEPI00015400

2

AA01401

---

**From:** CJ Lorio
**Sent:** Tuesday, February 16, 2010 5:28 PM
**To:** Tony DiNardo; jhouk@stemsweaver.com
**Cc:** David Radunsky; K Springfield; Helm, Elizabeth; Fine, Jeffrey
**Subject:** loan agreement call

Tony and Jane,

We need to have a call with you at 7 EST, 6 CST to go over the suggested changes to loan agreement just sent over so we can finish the document. Please advise on availability.

C.J. Lorio
Perot Investments, Inc.
972-535-1972
972-535-1991 (Fax)
cj.lorio@pgrp.net

3

AA01403

afternoon, yes.
Q. Is this the e-mail you were thinking of?
A. Yes. Yes, it is.
Q. And it's the language at the end of the e-mail from Mr. Lorio in Exhibit 19 when he says, "we probably need to discuss the waterfall and where we are on that. I think there's not agreement right now on how we would work through collateral in a foreclosure process," right?
A. That's what the language says, yes.
Q. So did you read Mr. Lorio's e-mail as advising Mr. DiNardo that from Pepi's perspective they were not accepting this proposed evaluation foreclosure structure that Mr. Battista put forth on February 15?
MR. PERLMAN: Objection. Form.
A. Well, my understanding is that he was not accepting the language, the precise language. The concept he was accepting that there would have to be a mechanism, but in the final -- for the final DIP, not the interim DIP but for the final DIP, and that he wasn't accepting this language. And I would point out to you his language and the use of the words "right now" which the implication from Pepi's point of view was, yeah, there's not agreement right now, but there very well may be agreement shortly. We just got to

A. -- sentence. And he goes on to say, rather, we will rely on the commercially reasonable language which remained in the 10.4 provision for the waterfall and we will argue to the Court -- meaning he on behalf of Fiddler's -- will argue to the court that the lenders -- meaning other lenders -- do not need the valuation mechanism for the interim order -- meaning that we will defer the entire issue of that "in addition" sentence and that, you know, all the mechanisms to the final order. That's exactly the way that we understood this to be. When I read it at the time, when I discussed it at the time, and reading it now, that's our understanding of it.

Q. And so on the February 16, 2010 conference call that evening, did Pepi advise Mr. Battista that it was not committing to do the second part of his e-mail, at least on February 16?

A. Yes, not the specific language, but there was -- there was a statement, I think from Mr. Radunsky to Paul, that said that we of course are going to come to an agreement on some language that will make that "in addition" sentence work. He also said some other things as well but I don't want to -- again, I don't want to add more information.

Q. So during the February 16, 2010 conference

call, Pepi advised Fiddler's that it was not committing to the structure Mr. Battista proposed in the February 15, 2010 e-mail that starts with the word second, right?

MR. PERLMAN: Objection. Form.

A. Oh, no. We were committing to the first part of the second, which was, once we get past the interim order, we are gonna work together. That was our understanding of it, again, consent on the final order and we were gonna come to a final order of what language was gonna be put in. That was our understanding of the second sentence.

Q. As of the February 16th, 2010 conference call, did Pepi let Mr. Battista know that it was not gonna bind itself to the valuation foreclosure structure Mr. Battista was describing in the February 15, 2010 e-mail?

A. To that extent one that he sets forward after his colon, yes. Yes, we told him that that was not -- I -- my recollection is, I believe, we conveyed to him that that was not acceptable but that there would be a mechanism that would be acceptable.

Q. And in that February 16, 2010 conference call, did Pepi also state to Mr. Battista that the loan documents for the time being were not going to incorporate any language that effectuated the first "in

addition" sentence?

A. I think we may have. I don't know if it was said exactly like that but I think we may have conveyed that understanding.

Q. Okay.

A. And that was our general understanding and that that, from our point of view, I think was also conveyed, resolved the issue.

Q. Now aside from the discussions on February 16, 2010 regarding the valuation mechanism and the deed in lieu provisions, Mr. Randusky testified yesterday about statements he made yesterday about the due diligence sign off. Do you remember that testimony yesterday?

A. Yes, I broadly remember it. I don't remember the specific words he used, but, yes, I broadly remember it, yes.

Q. And do you recall Mr. Randusky making a statement that he testified to yesterday?

A. Yes, except that it wasn't limited just to that. He --

Q. I was was asking you do you remember him making a statement that he testified to yesterday?

A. Yes, but the reason I'm saying it this time way -- I'm saying it because he actually added another concept when he talked about -- when he gave that

4

AA01408

**From:** Battista, Paul J. [pbattista@gjb-law.com]
**Sent:** Monday, February 15, 2010 11:23 AM
**To:** Fine, Jeffrey
**Cc:** Cox, John; Helm, Elizabeth; Fields, David; david.radunsky@pgrp.net; cj.lorio@pgrp.net, k.springfield@pgrp.net; PDesiderio@stearnsweaver.com; JHouk@stearnsweaver.com; PRedmond@stearnsweaver.com; dinardoT@gulfbay.com; Harmon, Heather; Schuster, Michael
**Subject:** Re: Fiddler's Waterfall Proposal

All, pursuant to our call Friday morning, we have worked through the weekend to come up with a firm proposal on the foreclosure and valuation issue for the waterfall.

First, in an effort to move things along, we are ok pursuing the interim order without a resolution of this issue. Rather, we will rely on the "commercially reasonable" language for the waterfall and argue to the court that the lenders do not need the valuation mechanism for the interim order.

Second, once we get past the interim order and we are working on getting consent on the final order, we propose that the valuation/foreclosure be structured as follows: PEPI would (i) obtain a blind appraisal establishing the fair market value of any collateral as to which it initiates a foreclose action prior to such action, (ii) not foreclose on any collateral (the "Identified Property") if the value of the other collateral listed prior to such Identified Property in the waterfall list exceeds 150% of the outstanding amount owed to PEPI, and (iii) credit the Debtors against their outstanding obligations the fair market value of all collateral acquired by PEPI.

Thanx and we look forward to hearing from you on the remaining issues and revised loan documents.

Paul

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.

Sent from my BlackBerry Wireless Device

---

**From:** Battista, Paul J.
**To:** Battista, Paul J.; 'Fine, Jeffrey'
**Cc:** 'Cox, John' ; 'Helm, Elizabeth' ; 'Fields, David' ; 'david.radunsky@pgrp.net' ; 'cj.lorio@pgrp.net' ; 'k.springfield@pgrp.net' ; 'Peter Desiderio' ; 'Jane Houk' ; 'Patricia Redmond' ; 'Tony DiNardo' ; Harmon, Heather; Schuster, Michael
**Sent:** Mon Feb 15 10:44:58 2010
**Subject:** RE: Fiddler's DIP Interim Order
All, attached is the final version of the interim Order makred to show changes from Jeff over the weekend.

Paul

---

**From:** Battista, Paul J.
**Sent:** Monday, February 15, 2010 10:22 AM
**To:** 'Fine, Jeffrey'
**Cc:** Cox, John; Helm, Elizabeth; Fields, David; david.radunsky@pgrp.net; cj.lorio@pgrp.net; k.springfield@pgrp.net; 'Peter Desiderio'; Jane Houk; Patricia Redmond; Tony DiNardo; Harmon, Heather; Schuster, Michael
**Subject:** RE: Fiddler's DIP Interim Order

All, attache is what I beleive to be the final version of the DIP motion (subject to some tweaks on the purchase option language to make it consistebnt with the loan documents and subject to speaking with Jeff on the Carve Out).

EXHIBIT 21
Deponent
Date
Rptr.

5

AA01410

---

| | |
|---|---|
| **From:** | Helm, Elizabeth [Elizabeth.Helm@klgates.com] |
| **Sent:** | Wednesday, February 17, 2010 1:20 PM |
| **To:** | Jane Houk; Battista, Paul J.; Peter Desiderio |
| **Cc:** | McCaughan, William P.; Daniel, Rick; David Radunsky; Fields, David; CJ Lorio; K Springfield; Soards, Anthony; Cox, John; Fine, Jeffrey |
| **Subject:** | Revised DIP LSA |
| **Attachments:** | DA-#3086014-v13-DIP_Loan_Agreement_(Pepi_Fiddler_s_Creek).DOC; DA-#3086014-vdoc-DIP_Loan_Agreement_(Pepi_Fiddler_s_Creek).DOC |

Attached is the revised, redlined loan and security agreement, with revisions based on the call we had yesterday evening and clarifications from Jeff on the 5.1 issue. Please be aware that PEPI has not had an opportunity to review; however, we believe that the revisions comport with our conversation yesterday.

I am updating the closing checklist.

*Please note that my e-mail address has changed.*

**Elizabeth Helm**
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
214.939.5827
214.939.5849
elizabeth.helm@klgates.com

This message and all attachments are confidential and may be protected by the attorney-client or other privileges. Any review, use, disclosure or distribution by persons other than the intended recipients is prohibited and may be unlawful. If you believe this message has been sent to you in error, please notify the sender by replying to this transmission or calling K&L Gates at 214-939-5500 and delete this message and any copy of it (in any form) without disclosing it. Unless expressly stated in this e-mail, nothing in this message should be construed as a digital or electronic signature.

As required by United States Treasury Regulations, this communication is not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on such taxpayer under United States federal tax laws.

Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Elizabeth.Helm@klgates.com.

registered and sold in the open market, and each Debtor agrees that such private sales shall constitute a commercially reasonable method of disposing of such Collateral.

(b) Lender shall have the right at any time and from time to time after the occurrence and during the continuance of an Event of Default to notify and direct any Issuer to make all payments, dividends, and distributions regarding the Collateral directly to Lender. Lender shall have the authority to demand of the issuer or obligor, and to receive and receipt for, any and all payments, dividends and other distributions payable in respect thereof, regardless of the medium in which paid and whether they are ordinary or extraordinary. Each Issuer making payment to Lender hereunder shall be fully protected in relying on the written statement of Lender that it then holds a security interest which entitles it to receive such payment, and the receipt by Lender for such payment shall be full acquittance therefore to the one making such payment.

(c) Except as expressly provided in ~~clause (i) of~~ Section 10.4(a) and (b) hereof, upon the occurrence and during the continuation of an Event of Default, Lender shall have the right, at its discretion, to transfer to or register in the name of Lender or any nominee of Lender any of the Equity Interests, and/or to exercise any or all voting, consent, or management rights as to any or all of the Equity Interests. For such purposes, each Debtor hereby names, constitutes and appoints the President, the Chief Operating Officer, and all Vice Presidents of Lender as such Debtor's proxy in such Debtor's name, place, and stead to vote any and all of the securities and to execute consents, as such proxy may elect, for and in the name, place, and stead of such Debtor, as to all matters coming before shareholders, such proxy to be irrevocable and deemed coupled with an interest. The rights, powers, and authority of such proxy shall remain in full force and effect, and shall not be rescinded, revoked, terminated, amended, or otherwise modified, until all Obligations have been fully satisfied and any agreement to make Advances has terminated.

10.4 **Exercise of Certain Remedies.** Notwithstanding anything to the contrary set forth herein or in any other Loan Document, Borrowers and Guarantors have requested, and Lender hereby agrees, to the following provisions respecting timing of realization on certain Collateral.

(a) Lender shall not foreclose its Liens encumbering any Equity Interest prior to January 1, 2011, if the only Event of Default then continuing is Debtors' breach of Section 7.14 hereof.

(b) Lender shall not sell or cause any sale of any Collateral or exercise any voting, consent, or management rights of a holder of Equity Interests until expiration of the Purchase Option Period as defined in Section 3.6 hereof.

(c) ~~(b)~~ Lender may file one or more real property foreclosure actions in Florida state or federal court and obtain one or more judgments of foreclosure that permit auction sales of all or any part of the Collateral consisting of Real Property; *provided, however*, with respect to the Collateral described on Exhibit E attached hereto (the "*Waterfall Collateral*"), Borrowers and Guarantors have requested, and Lender hereby agrees, that Lender will use commercially reasonable efforts (i) first to hold the auction sales or otherwise exercise as secured

creditor's rights on the personalty described in described in item 1 on Exhibit E and (ii) then to conduct the foreclosure sales of the Real Property Waterfall Collateral in the order such Collateral is listed on Exhibit E, *provided*, that foreclosure sales described in clauses (i) and (ii) can be conducted in such order.

(d) ~~(c)~~ Except as otherwise provided in Section 10.4(a) respecting timing of realization in respect of Equity Interests ~~and~~, in Section 10.4(b) respecting exercise of certain rights during the pendency of the Purchase Option Period, and in Section 10.4(c) respecting the order of realization on the Waterfall Collateral, Lender may (i) exercise its rights and remedies with respect to any other Collateral (including, without limitation, Real Property Collateral) at any time after the occurrence and during the continuance of an Event of Default (including, without limitation, any Collateral consisting of declarant's rights under the Master Declaration or any other Declaration) and (ii) Lender shall not be required first to exhaust its rights and remedies against any particular Collateral, including, without limitation, Real Property, of each Borrower before pursuing Collateral, including, without limitation, Real Property, of any Guarantor.

(e) ~~(d)~~ Notwithstanding any of the provisions of this Section 10.4 to the contrary, Lender may: (i) request and obtain a receiver for all or any portion of the Collateral, including the Waterfall Collateral, at any time or (ii) accept a deed in lieu of foreclosure.

## 11. TAXES AND EXPENSES.

If any Debtor fails to pay any monies (whether taxes, rents, assessments, insurance premiums, or otherwise) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, to the extent that Lender determines that such failure by such Debtor could result in a Material Adverse Change, in its discretion and without prior notice to Debtors, Lender may do any or all of the following: (a) make payment of the same or any part thereof; (b) set up such reserves in Borrowers' loan account as Lender deems necessary to protect Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type described in Section 6.4, and take any action with respect to such policies as Lender deems prudent. Any such amounts paid by Lender shall constitute Lender Expenses. Any such payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Default or Event of Default under this Agreement. Lender need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 12. WAIVERS; INDEMNIFICATION.

12.1 **Demand; Protest; etc.** Each Debtor waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of acceleration, notice of intent to accelerate, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which any Debtor may in any way be liable,

6

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the **"Minimum Net Cumulative Sales Covenant if not paying Managed Expenses"** set forth on Exhibit D for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly. In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development , Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

7

AA01416

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Wednesday, January 06, 2010 9:02 AM |
| **To:** | 'Fine, Jeffrey' |
| **Cc:** | Patricia Redmond; Guitian, Mariaelena |
| **Subject:** | Quick Outline of Points for Call Today |

Jeff, I thought I would outline for your a quick summary of the points that we want to discuss with you so that we have an agenda and so that you could have a few minutes to think about them and be able to discuss.

1. Status of Trish's request for a right of first refusal on the debt.

2. Discussion about Pepi retaining control over the loan after syndication.

3. Clarifying that the fees and expenses of the lender after closing will be paid from the loan proceeds.

4. Clarification on the payment of Managed Expenses based on sale thresholds.

5. Clarification on the extent of the subordinate replacement liens available for FC to give to other lenders.

6. Discussion on a mechanism to deal with the liquidation of collateralin the waterfall. Trish and I have some good ideas that will be of benefit to your client in this process and will also allow us to satisfy the other secured creditors that the waterfall is meaningful and not illusory. Our thoughts are (i) to create an escrow of some sort to hold consent judgments to any foreclosure in the order of priority in the waterfall so that you can immediately get a judgment and go to sale, (ii) perhaps a deed in lieu of foreclosure held in escrow to give you that option, and (iii) the need for a valuation mechanism so that if you take back property in foreclosure or through a deed that the debt is reduced accordingly. We think this saves your client a significant amount of time and expense in the foreclosure process and also allows us to show the junior lenders that the waterfall is real. We are open to other ideas as well.

7. The title and appeal issues. We will update you and also ask that you provide a form of DIP order so that we can share it with the title company for their review.

8. Some tweaks here and there to add "reasonableness" to deal with our concerns about the various due diligence outs. I think we can get there with some added language.

9. Timing of the closing from and after the signing of the letter. Namely,when we sign the letter, what is your expected timing to complete due diligence and do the loan documents. We are trying to gauge the filing to coincide with the completion of your due diligence so that we know we are good to go other than the court's order.

10. Confirmation that Aubrey is not a guarantor on the loan.

11. We will need to have a contact at your firm to work with Mary to make sure we are getting you the due diligence informaton that you need. We would like to help keep that process moving and oversee it.

There are other minor comments as well, but these are the more material ones. Trish and Mary, please add anything else if you have any.

Thanx

GENOVESE
JOBLOVE &
BATTISTA
P.A.
Attorneys at Law

**Paul J. Battista, Esq.**
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone: (305) 349-2300
Direct: (305) 372-2457
Facsimile: (305) 349-2310
Cell: (305) 812-8030
E-mail: pbattista@gjb-law.com
www.gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. [illegible]

8

AA01419

what was negotiated in the PEPI commitment letter, the order of the waterfall one step at a time. That's what Gulf Bay Capital was going -- what Gulf Bay Capital abided by in the DIP loan of Fiddler's Creek, LLC.

**Q Right. One step is the reference of the sale order sequentially?**

A That's right. One by one.

MR. REYES: Can I hear that comment by counsel that he answered before he finished, the last exchange, please?

(Thereupon, the requested portion of the record was read back by the reporter.)

BY MR. PERLMAN:

**Q That's for you. Exhibit 5.**

A Okay.

**Q Okay. Exhibit 5 is the Debtor's Emergency Motion for Entry of Interim and Final Orders for Financing under the Gulf Bay Capital commitment letter, correct?**

A That's correct.

**Q Okay. And is your understanding that the commitment letter between the debtors and Gulf Bay did not include or require any escrows?**

A Yes.

9

AA01421

A What I understood is that in the commitment letter, the collateral is in a given waterfall and each item would be foreclosed on and the proceeds realized applied against the loan for PEPI then the next step would go, the next piece would go.

**Q When you say next step, next piece?**

A Next item in the waterfall, if Number 2 was the first one we used, because Number 1 was cash, then Number 3. Then it would be Number 4, then Number 5 until PEPI was totally paid off.

**Q Right. Would the next step be to sell the next sequential parcel?**

A Yes.

**Q Okay. Having read 10.4 of this email, do you know whether or not the terminology as drafted does what you just described?**

A It is my understanding it does not.

**Q I know what you've been --**

A Like I said, I relied on attorneys to help me -- it was -- it's a thick document. It refers back and forth to different exhibits, was explained to me that this does not comply with what we negotiated.

**Q Right. I'm asking.**

A And what my reading is it doesn't.

10

AA01423

unit or lot owned by the Company and the proceeds are not paid to the secured lender with an allowed prepetition secured claim on such unit or lot, then the Company shall grant a Replacement Lien (pursuant to section 361 of the Bankruptcy Code) subordinate to the liens of the Agent and Lender to such prepetition secured lender as adequate protection for the sale of its prepetition collateral on real estate asset(s) of the Company in the same approximate value as the collateral sold.

The final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on pledged equity interests prior to January 1, 2011 if the sole pending uncured default is the failure to meet the **"Minimum Net Cumulative Sales Covenant if not paying Managed Expenses"** set forth on Exhibit D for June 30, 2010 and September 30, 2010. In addition, the final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly. In addition, the final loan documentation for the Credit Facility shall provide that the Agent and Lender agrees that it will not foreclose on real property described in a numbered item in the following list unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time:

1. Cash on hand and personal property securing the Loan;

2. The remaining unencumbered hotel condo units owned by FC Hotel, Ltd.;

3. The remaining finished developed land lots owned by GB Peninsula, Ltd. that are unencumbered and the remaining undeveloped land owned by 951 Holding, Ltd. that is unencumbered;

4. The remaining finished developed land lots owned by GBFC Development , Ltd. and all finished housing units owned by the Company, its subsidiaries, and GB Peninsula, Ltd.;

5. Parcels 32, 36, 37 and 40 of land owned by 951 Land Holding, Ltd.;

Dh GB

6. The Tarpon Club owned by GBFC Marina, Ltd.;

7. The Creek Golf Course owned by FC Golf, Ltd.;

8. The commercial property known as Parcel 73 and the commercial property located at SR 41 and SR 951;

9. The undeveloped land included in the property known as the DRI Parcel that is encumbered by a mortgage to Florida Financial Investments, Inc.;

10. The undeveloped land including in the property known as the DRI Parcel 2 that is encumbered by a mortgage to Tomen America; and

11. The Fiddlers' Creek Sales and Administration buildings owned by 951 Land Holding, Ltd.

| | |
|---|---|
| Cash Account | All cash from Net Asset Sale Proceeds and other operating cash will be held in accounts pledged to benefit of the Agent and over which Agent shall have control (the "Cash Collateral Accounts"), which Cash Collateral Accounts shall be debtor in possession accounts in accordance with the guidelines of the Office of the United States Trustee and shall be disbursed pursuant to the 18 Month Budget so long as there is no pending event of default. All Net Asset Sale Proceeds shall be paid to the Agent to be applied to reduce the Loan. All cash generated from the operations of the Company ("Operating Cash") shall be deposited into separate Cash Collateral Accounts and may be used by the Company in accordance with the 18 Month Budget. |
| Use of Cash Collateral | So long as no event of default occurs and is continuing under the Loan, the Company may use cash in the Cash Collateral Accounts, other than Net Asset Sale Proceeds which shall be paid to the Lender to reduce the Loan, in accordance with the 18 Month Budget. The use of Operating Cash in accordance with the 18 Month Budget as provided herein shall not be deemed a Loan Advance. |
| Collateral Monitoring Fee: | The Company shall pay to Agent a Collateral Monitoring Fee of $7,500 per month for so long as any obligations under the Loan are outstanding or there is any remaining availability under the Loan. The Collateral Monitoring Fee may be paid from the proceeds of the Loan. |
| Extension Date: | Upon 30 days' prior written notice to Agent, payment of the |

11

AA01426

A Or, I want to answer that else -- or depending where we were, I might have had to take renegotiated terms. Two things, not only salvage the facility, take the renegotiation terms that PEPI gave me so I had to look at that, too.

**Q What was the problem with the waterfall that in PEPI's view they perceived the ability to file multiple foreclosures at once?**

A That's right.

**Q Okay. Do you know if the Gulf Bay facility allows multiple foreclosures to be filed or pending at the same time?**

A No, one at a time the way it was supposed to go, one by one, one by one so I could protect the creditors because our goal was to get out of Chapter 11, not go into Chapter 7.

**Q Was Mr. Battista's default letter dated the 22nd deliberately delayed for any strategic advantages on behalf of Fiddler's?**

A Mr. Battista --

**Q Yes or no.**

A No, it wasn't delayed.

**Q Why wasn't it --**

A He had to work the weekend to get the letter -- I want to finish the answer. He had to

12

AA01428

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
**www.flmb.uscourts.gov**

| **In re:** | **Chapter 11** |
|---|---|
| **FIDDLER'S CREEK, LLC.** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |
| **Debtors.** ______________________________/ | **(Jointly Administered under Case No. 9:10-bk-03846-ALP)** |

**NOTICE OF FILING LOAN DOCUMENTS WITH GULF BAY CAPITAL, INC.**

Fiddler's Creek, LLC ("Fiddler's Creek"), by and through undersigned counsel, hereby gives notice and files copies of the following documents: (i) Promissory Note by and between



INSTR 4417002 OR 4555 PG 3218 RECORDED 4/13/2010 2:32 PM PAGES 143
DWIGHT E. BROCK, COLLIER COUNTY CLERK OF THE CIRCUIT COURT
DOC@.35 $14,000.00 INT@.002 $8,000.00 REC $1,217.00 INDX $11.00
OBLD $4,000,000.00 OBLI $4,000,000.00

PREPARED BY RECORDING
REQUESTED BY, AND WHEN
RECORDED MAIL TO:

B. Michael Bachman, Jr., Esq.
Stichter Riedel Blain & Prosser P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602

COLLIER COUNTY CLERK OF THE CIRCUIT COURT COPY

**MORTGAGE**
**ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

**MADE BY**

**FIDDLER'S CREEK, LLC., as Borrower,**
**GB PENINSULA, LTD., as Borrower and Mortgagor,**
**and each of**

**DY LAND ASSOCIATES, LTD.,**
**DY LAND HOLDINGS II, LLC, FC BEACH, LTD.,**
**FC COMMERCIAL, LLC, FC GOLF, LTD., FC HOTEL, LTD.,**
**FC PARCEL 73, LLC, FC RESORT, LTD.,**
**GBFC DEVELOPMENT, LTD., GBFC MARINA, LTD.,**
**GBP DEVELOPMENT, LTD., and 951 LAND HOLDINGS, LTD.,**
**as Mortgagors**

**to**

**GULF BAY CAPITAL, INC.,**
**a Florida corporation, as Mortgagee**

---

Effective as of March 3, 2010

THE SECURED PARTY (MORTGAGEE) DESIRES THIS MORTGAGE TO BE INDEXED AGAINST THE RECORD OWNERS OF THE REAL ESTATE DESCRIBED HEREIN. THIS MORTGAGE IS BEING RECORDED IN COLLIER COUNTY, FLORIDA, AND MORTGAGOR IS PAYING $8,000.00 IN NONRECURRING INTANGIBLE PERSONAL PROPERTY TAX AND $14,000.00 IN DOCUMENTARY STAMP TAX TO THE CIRCUIT COURT FOR COLLIER COUNTY.

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT (this "Agreement") is effective as of the 3rd day of March, 2010 (the "Effective Date") and is made and entered into between Gulf Bay Capital, Inc., a Florida corporation ("Lender"), and Fiddler's Creek, LLC, a Delaware limited liability company ("Fiddler's") as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, and GB Peninsula, Ltd., a Florida limited partnership ("GB") as debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (each of Fiddler's and GB shall be referred to herein individually as "Borrower" and collectively as "Borrowers") and all of the following as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code (each referred to herein individually as "Guarantor" and collectively as "Guarantors"): DY Associates, LLC, a Delaware limited liability company, DY Land Associates, Ltd, a Florida limited partnership, DY Land Holdings II, LLC, a Florida limited liability company, FC Beach, LLC, a Delaware limited liability company, FC Beach, Ltd., a Florida limited partnership, FC Commercial, LLC, a Florida limited liability company, FC Golf, LLC, a Delaware limited liability company, FC Golf, Ltd., Florida limited partnership, FC Hotel, LLC, a Delaware limited liability company, FC Hotel, Ltd., a Florida limited partnership, FC Marina, LLC, a Delaware limited liability company, FC Parcel 73, LLC, a Florida limited liability company, FC Resort, LLC, a Delaware limited liability company, FC Resort, Ltd., a Florida limited partnership, Fiddler's Creek Management, Inc., a Florida corporation, GBFC Development, LLC, a Delaware limited liability company, GBFC Development, Ltd., a Florida limited partnership, GBFC Marina, Ltd., a Florida limited partnership, GBP Development, LLC, a Florida limited liability company, GBP Development, Ltd., a Florida limited partnership, Gulf Bay Hospitality Company, LLC, a Delaware limited liability company, Gulf Bay Hospitality, Ltd., a Florida limited partnership, Gulf Bay Hotel Company, LLC, a Delaware limited liability company, Gulf Bay Hotel Company, Ltd., a Florida limited partnership, 951 Land Holdings, LLC, a Delaware limited liability company, and 951 Land Holdings, Ltd., a Florida limited partnership. The principal place of business of Borrowers and Guarantors is 8156 Fiddler's Creek Parkway, Naples, Florida 34114. In addition to the terms defined elsewhere in this Agreement or in any Exhibit or Schedule hereto, capitalized terms used in this Agreement have the meanings assigned to them in Schedule A (Definitions), attached hereto and made a part hereof.

**WITNESSETH:**

WHEREAS, On February 23, 2010 (the "Petition Date") Debtors filed voluntary petitions with the United States Bankruptcy Court for the Middle District of Florida, Fort Myers Division (such United States Bankruptcy Court or any other court having jurisdiction over the anticipated voluntary Chapter 11 bankruptcy filings by the Borrowers and Guarantors shall be referred to in this Agreement as the "Bankruptcy Court") initiating a case under Chapter 11 of the Bankruptcy Code under the case numbers listed on Exhibit G hereto (collectively, the "Chapter 11 Case") and Debtors have continued in possession of their assets and in the operation and management of their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, Borrowers have requested that the Lender enter into this Agreement to extend Debtor-in-Possession financing on a first priority secured basis to Borrowers in connection with the Chapter 11 Case.

WHEREAS, Each Guarantor has agreed to guaranty the obligations of each Borrower hereunder, and each of Borrowers and Guarantors has agreed to secure its obligations to Lender hereunder with first priority liens on and first priority senior security interests in favor of Lender on all of its property, whether real, personal or mixed, tangible or intangible, now existing or hereafter acquired or arising, all as more fully provided herein.

WHEREAS, Lender is willing to make the following loan to Borrowers (the "Loan"), subject to the terms, requirements, conditions and other provisions of this Agreement and subject to the approval of the Bankruptcy Court: (i) Lender shall provide a multiple advance senior secured debtor-in-possession term loan credit facility with cumulative aggregate Advances of up to $25,000,000, with the maximum outstanding balance at any one time not to exceed $12,000,000.00; (ii) each cash advance (an "Advance") made by Lender to Borrowers shall be made in accordance with the 18 Month Budget; provided that (a) from and after the entry of the Interim Order until the entry of the Final Order, the aggregate Advances (each such advance, an "Interim Advance") shall be consistent with the applicable 13 Week Budget for such period (or such lesser budgeted period approved by the Bankruptcy Court for such applicable period) and shall not in the aggregate exceed $4 million and (b) from and after the entry of the Final Order, the aggregate advances shall not exceed $25,000,000, less the aggregate amount of Interim Advances made; (iii) Advances shall be made in multiples of $100,000; (iv) the proceeds of the Loan shall be used in accordance with the Lender and Bankruptcy Court-approved 18 Month Budget and business plan and (v) subject to the Lender's approval, all real estate taxes, parcel administration real estate taxes, CDD debt service assessments, any CDD "on roll" assessments, contingency expenses and any other costs or expenses identified in the 18 Month Budget as "Managed Expenses" shall be paid only if the Borrowers obtain the applicable cumulative inventory sales set forth in Section 6.9 of this Agreement.

NOW THEREFORE, in consideration of the premises set forth above and the mutual covenants and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## 1. LOAN ; PAYMENT TERMS; MATURITY.

1.1 Advances.

(a) Subject to the terms and conditions of this Agreement, Lender agrees, on the terms and conditions set forth herein, to make (i) the Interim Advance(s) to Borrowers upon the fulfillment by Debtors of the applicable conditions set forth in Section 2 and (ii) all other Advances to Borrowers no more frequently than once every month, during the period from the Final Order Entry Date until the Maturity Date upon the fulfillment by Debtors of the applicable conditions set forth in Section 2. After giving effect to an Advance, (x) the aggregate amount of all Advances made to Borrowers, regardless of whether all or any part of such Advances have been repaid or are then outstanding, shall not exceed the Maximum Loan Amount, and (y) the aggregate amount of Advances then outstanding to Borrowers shall not exceed the Maximum

(iii) If the sale is to be a public sale, Lender also shall give notice of the time and place by publishing a notice one time at least ten (10) days before the date of the sale in a newspaper of general circulation in the county in which the sale is to be held;

(l) Lender may credit bid and purchase at any public or private sale;

(m) Any deficiency that exists after disposition of the Debtor Collateral as provided above will be paid, jointly and severally, immediately by Debtors. Any excess will be returned, without interest and subject to the rights of third Persons, by Lender to Debtors; and

(n) In addition to the foregoing rights in this Section 8.2, Lender shall have all other rights and remedies available to it at law or in equity pursuant to any other Loan Documents, including any lease assignments, lease mortgages, and real property mortgages or deeds of trust.

8.3 Remedies Cumulative. Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Orders, the Bankruptcy Code, the Code, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Default or Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

8.4 Exercise of Certain Remedies. Notwithstanding anything to the contrary set forth herein or in any other Loan Document:

(a) Lender may file one or more real property foreclosure actions in Florida state or federal court and obtain one or more judgments of foreclosure that permit foreclosure and/or auction sales of all or any part of the Property; *provided*, *however*, that **only with respect to the real property collateral described in Exhibits E (3) through Exhibit E (10)** attached hereto (the "Designated Real Estate Collateral") Lender shall use its commercially reasonable efforts to (i) first hold foreclosure and/or auction sales on the collateral described in Exhibit E (1) and Exhibit E (2) (the "Previously Unencumbered Real Estate") and (ii) to conduct the foreclosure sales for the Designated Real Estate Collateral in the numerical order of each such Exhibit E (commencing with the Designated Real Estate Collateral in Exhibit E (3) and ending with the Designated Real Estate Collateral in Exhibit E (10)) in such a manner as not to obtain a final judgment of foreclosure on one of the properties identified in the list of the Designated Real Estate Collateral unless and until Lender has previously used commercially reasonable efforts to first collect out of the Designated Real Estate Collateral described in the numbered Exhibit E before it (for example, Exhibit E (3) is before Exhibit E (4) and Lender agrees to use commercially reasonable efforts to hold foreclosure sales and/or auction on the property described in Exhibit E (3) before holding a foreclosure sale and/or auction on the Property described in Exhibit E (4)). In exercising Lender's rights (including, without limitation, Lender's obligation to use commercially reasonable efforts as set forth in this Section), Lender shall be entitled to use, as the value of the Property, the price at which such Property is sold at any foreclosure auction at which there is competitive bidding. Notwithstanding anything to the contrary contained in this Section 8.4(a) or otherwise in this Mortgage, this provision shall not

13

AA01434

concept that specified the order of priority in which the collateral would be sold by PEPI in the event the Debtors were in default under the DIP Loan.

11. PEPI acquiesced and the waterfall concept was included in the Commitment Letter. In connection with the waterfall concept, the Debtors suggested, for PEPI's benefit, that deeds in lieu of foreclosure and consent judgments be held in escrow and used to speed the liquidation process instead of an ordinary foreclosure process.

12. Although the deeds in lieu of foreclosure and consent judgment provision was included in the Commitment Letter, the parties later learned that, apparently, consent judgments and deeds in lieu were not available on initial loans under Florida law and/or, the title company suggested it be removed since a foreclosure process would still be required. As a result, the deeds in lieu of foreclosure and consent judgment provisions were not included for the time being in the negotiation of the proposed negotiated loan documents. Nevertheless, at all times, PEPI remained in agreement with the waterfall concept, a fact it communicated to the Debtor many times.

12.5 I had communications with the Debtors' counsel with regard to the drafting of the loan agreement, note and mortgage, to incorporate the waterfall provisions of the Commitment Letter. As part of these communications with Debtors' counsel, we discussed terminology and drafting issues so as to secure the facility by a single note and mortgage. The wording proposed by PEPI was negotiated with Fiddlers' representatives based on certain input and guidance from the title insurance representative and/or real estate counsel, so that the lien rights to be granted to PEPI would be and remain valid and enforceable, to the reasonable satisfaction of PEPI and its counsel in accordance with the Commitment Letter.

E

AA01436

1

AA01437

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

administrative expenses as may be agreed to by Agent and Permitted Liens). The Orders as entered by the Bankruptcy Court shall be in form and substance acceptable to Agent in its reasonable discretion, and at a minimum, shall contain provisions under Section 364(e) granting all such senior and priming liens, security interests and claims to Agent and the Lenders for all monies actually advanced even if such Orders are subsequently appealed, vacated, modified or set aside and providing for the lifting of the 362 automatic stay and any other stay to permit Agent and the Lenders to, upon five business days notice to the Company, immediately realize upon the Collateral should any event of default remain uncured after the expiration of any applicable grace period. All liens, security interests and claims granted to Agent and the Lenders shall contain cross default and cross collateral provisions with all other debt owed to the Lender. Agent and Lenders shall have no obligation to fund the Initial and Subsequent Advances should the Orders, at the time of Closing and funding, have been stayed, or as to the Final Order, is subject to appeal or modification, or otherwise not be in a form satisfactory to Agent in its reasonable discretion.

Other Conditions Precedent: Standard and customary for loans and transactions of this type and such other conditions precedent to the Initial Advance and each Subsequent Advance under the Loan as required by Agent in its reasonable discretion including, but not limited to, the following:

1. All the Company fees payable to Agent shall be current as provided herein, including without limitation, all fees of Agent's professionals.

2. Subject to the 18 Month Budget and limited by the terms and conditions herein, all of the Company's chapter 11 administrative expenses, including, without limitation, post-petition taxes, US Trustee fees, utility and lease payments shall be current, or addressed in a manner satisfactory to Agent in its reasonable discretion.

3. Completion of due diligence to the satisfaction of Agent, such due diligence to include, but not be limited to, examination of the Collateral and title thereto and additional due diligence related to the Company's business, industry, legal, environmental and technical related matters.

4. Completion of legal due diligence investigation by counsel to Agent, with results satisfactory to Agent and its counsel, of all matters which Agent deems relevant, in its reasonable discretion.

5. The Company shall have executed and delivered all documentation required by Agent and its counsel in form and substance satisfactory to Agent and its counsel including, without limitation, a general release of all claims against Agent and Lenders through the time of funding, and the Company and Guarantors shall fully cooperate in the recordation of any liens or documents as required to perfect the liens, security interests and claims of Agent and the Lenders.

6. All necessary consents and approvals for the Company to enter into the Credit Facility shall have been obtained.

7. Receipt of current financial statements. Further, Agent must be satisfied that all financial statements required by Agent have been received and delivered to it fairly present the business and financial condition of the Company and its subsidiaries.

8. No material misstatements in or omissions from the materials previously furnished to Agent for its review.

9. No previously undisclosed intercompany transactions shall have occurred. Further, Agent must be satisfied that all listings of inter company transactions and transactions with affiliates required by Agent have been received.

10. There shall not be any litigation or other proceeding the result of which might have a material adverse effect on the Company and its affiliates and subsidiaries or any of their assets other than as listed on Exhibit F.

11. No material changes in governmental regulations or policies having a material adverse effect on the Company shall have occurred prior to the Closing Date.

12. The Company and each Guarantor shall be in good standing in its state of incorporation and qualified to do business in any state in which Collateral is located.

13. All motions, orders and bankruptcy court documentation regarding the Loan shall be in form and substance reasonably satisfactory to Agent and consistent with the terms herein.

14. Until all the Company obligations are paid in full to Agent and the Lenders, the Company shall provide to Agent not less than two (2) business days' advance notice of any filings made in the bankruptcy case(s) of

the Company and the Guarantors. provided that the Company and Guarantors shall provide as much notice as is reasonably possible for emergency motions. Agent shall be given not less than five (5) business days' advance notice of any hearing regarding the Loan.

15. Such other commercially reasonable conditions precedent as Agent may require in its reasonable discretion, including, without limitation, satisfaction of each of the items listed on Exhibit B attached hereto.
16. Florida Financial Investments, Inc. shall execute and deliver to Agent documentation to subordinate its liens on the Collateral to those liens granted Agent and Lenders in the Interim and Final Orders consistent with the terms of this Commitment Letter.

Collateral Monitoring

Agent or its financial advisor shall have customary rights to enter and inspect the premises, interview employees and accountants, and examine books and records, etc., upon reasonable notice to the Company. The Company shall provide Agent with all reports provided to any third party as well as such financial reports as Agent may request from time to time.

Guarantees:

All of the Guarantors shall guaranty the Loan and shall execute the Loan documents required by Agent. The Company represents, warrants, covenants and agrees that (i) all of the entities that operate, own, or control real estate within the Fiddlers' Creek development are listed on Exhibit E, provided however that the Guarantors shall not include GB 31, Ltd., Fiddler's Creek Foundation,Inc. or Aubrey Ferrao, (ii) all of such entities shall be Guarantors, and (iii) all of such entities will be the subject of individual chapter 11 case filings. For avoidance of doubt, equity interests in the Company owned by Mr. Ferrao will be pledged as Collateral under the Loan.

Representations and Warranties:

Customary for loans and transactions of this type and such other representations and warranties required by Agent in its reasonable discretion.

Covenants:

Definitive documentation to contain affirmative and negative covenants customary for loans and transactions of this type and such other affirmative and negative covenants required by Agent in its reasonable discretion, including but not limited to:

1. The actual amount spent for any line item in the 18 Month Budget shall not vary from the amount provided for such item in the 18 Month Budget by more than 10% in any 13 week period, or in the aggregate.

Title Searches / Commitments for Mortgagee's Title Insurance Policies for all real property collateral in form and substance, and prepared by a title company, satisfactory to Agent and showing no title exceptions other than those approved by Agent.

17. For each Community Development District affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A. Enabling Legislation or Creation Order;

B. Construction of its Board of Directors;

C. Name and contact information for each board member;

D. Name and contact information for its attorney;

E. Name and contact information for its financial advisor and/or bookkeeper;

F. Name and contact information for its auditor;

G. Name and contact information for its engineer;

H. Copy of each Project Improvement Acquisition Agreement entered into by the CDD and any developer of land in the district;

I. Each assignment of the Project Improvement Acquisition Agreements in item H;

J. Copy of the last offering statement;

K. Copy of the last audit;

L. Confirmation of the development status of land within the CDD;

M. Confirmation of all CDD improvements constructed by the developer but not yet reimbursed by the CDD;

N. Identification of constructed CDD improvements that have been accepted by the CDD and those not yet accepted by the CDD;

O. It's budget;

P. All bank account information;

Q. Assessments on all properties for debt service and other operations;

R. Financial statements for the CDD;

S. Annual assessments;

T. Total bond obligations related to debtor-owned properties in each bond issue (by unit/lot); and

 DA-3072429 v11 1203528-00006

U. Copies of all annual financial information and operating data delivered as part of the CDD's continuing disclosure obligations pursuant to its offering statement.

18. For each Homeowner's Association affecting the real property collateral, delivery to Agent of each of the following in form and substance satisfactory to Agent:

A. Identification of the specific real property collateral subject to the Homeowner's Association;

B. Documentation of its financial condition;

C. Its organizational documents;

D. Its budget;

E. Its Financial Statements;

F. Any CCRs (with all amendments);

G. The results of a Facility Inspection (pool, building, entries, etc.);

H. An overhead analysis;

I. A list of Declarants and Board positions (i.e., who controls); and

J. Comprehensive Dues information (land, lots, homes, etc.).

19. Delivery to Agent of copies of the real property tax statements for all real property collateral.

20. Delivery to Agent of all plats for all real property collateral.

21. Delivery to Agent of a list of leases with affiliated entities, in form and substance satisfactory to Agent.

22. Delivery to Agent of a list of all payments or other obligations required to maintain entitlements and zoning, in form and substance satisfactory to Agent.

23. Delivery to Agent of Financial Statements for the Company and each Guarantor, in form and substance satisfactory to Agent.

24. Delivery to Agent of a 13 week Cash budget for the Company and its subsidiaries, in form and substance satisfactory to Agent.

25. Delivery to Agent of the 2010 Budget and Business Plan for the Company and its subsidiaries, in form and substance satisfactory to Agent.

26. Delivery to Agent of UCC Searches for the Company and each Guarantor.

27. Delivery to Agent of a list of all existing lenders to the Company or any Guarantor in form and substance satisfactory to Agent.

28. Identification by the Company of the specific real property collateral impacted by each existing loan to the Company or any Guarantor, in form and substance satisfactory to Agent.

29. Delivery to Agent of copies of all existing loan and collateral documents for each existing loan to the Company or any Guarantor.

30. Identification by the Company of all outstanding receivables for all real and personal property collateral, in form and substance satisfactory to Agent. Delivery to Agent of all operating cash flow reports for any revenue generating activity at the project.

31. Delivery to Agent of a list showing the amount of deposits being held by each owner of real property collateral and any anticipated forfeitures, in form and substance satisfactory to Agent.

32. Delivery to Agent of a list of all fixed assets of the Company and each Guarantor, including, without limitation, vehicles and equipment, in form and substance satisfactory to Agent.

33. Delivery to Agent of a list of all copyrights, trademarks and patents owned or licensed to the Company and each Guarantor, in form and substance satisfactory to Agent.

34. Delivery to Agent of a detailed description and summary of all insurance currently held by the Company and each Guarantor and a list of any pending claims, in each case in form and substance satisfactory to Agent..

35. Delivery to Agent of copies of the most recent tax returns filed by the Company and each Guarantor.

36. Delivery to Agent of a list, in form and substance satisfactory to Agent, of any pending litigation against the Company, any Guarantor, or any of their respective assets, including, without limitation, any real or personal property collateral.

37. Delivery to Agent of a list and copies of any agreements containing a right of first refusal with respect to any real or personal property collateral.

38. Delivery to Agent of copies of any joint venture agreements entered into by the Company or any Guarantor.

39. The execution of and delivery to Agent by the Company and each Guarantor, as applicable, of each of the following documents, in form and substance satisfactory to Agent:

   A. Loan Agreement;

   B. Promissory Note;

   C. Security Agreement (shareholder of the Company, the Company and each Guarantor);

   D. Pledge Agreement (the Company and each Guarantor) covering such person's ownership interests in the Company and its subsidiaries;

   E. Stock Power (for each certificated ownership interest pledged to Agent and Lenders);

   F. Account Control Agreements for each deposit account of the Company and each

Guarantor;

G. Guaranty Agreement (Guarantors);

H. Mortgages for all real property collateral and security agreements and financing statements for all personal property collateral;

I. Assignments of Leases and Rents for all real property collateral;

J. Environmental Indemnities for all real property collateral;

K. Assignments of all material contracts of the Company and each Guarantor;

L. Omnibus Officer's Certificates of the Company and each Guarantor with Incumbency; and

M. Notice of Final Agreement.

40. Preparation and filing of UCC-1 Financing Statements for the Company and each Guarantor.

41. Delivery to Agent of all stock certificates or other certificates of ownership in the Company and its subsidiaries pledged as collateral.

42. Delivery to Agent of Legal Opinion Letters from legal counsel to the Company and each Guarantor containing customary opinions of legal counsel including, without limitation, legal opinions with respect to the Company, the Guarantors, all documentation for the Loan, the collateral, and the transactions contemplated hereby, all of which opinions are satisfactory to the Agent and its counsel.

44. Delivery to Agent of Certificates of Insurance for all insurance held by the Company and each Guarantor.

45. Delivery to Agent of Insurance Policy Endorsements for all insurance held by the Company and each Guarantor in form and substance acceptable to Agent.

46. Delivery to Agent of Resolutions/Unanimous Consent of the Company and each Guarantor in form and substance satisfactory to Agent and authorizing, among other things, the Loan, all transactions contemplated hereby, and all documentation for the Loan and such transactions.

47. Delivery to Agent of Mortgagee's Title Insurance Policies for all encumbered and unencumbered real property collateral in form and substance, and issued by a title company, satisfactory to Agent, containing Endorsements satisfactory to Agent, and subject only to exceptions approved by Agent.

48. Payment of all mortgage taxes on all real property collateral except as agreed to by the Company and the Agent.

49. Filing of Bankruptcy Petitions in the Bankruptcy Court for the Company and all related entities and subsidiaries.

50. Delivery by the Company of Creditor accounts payable listings and service lists for each filing

2

AA01447

| | |
|---|---|
| | supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan documentation. |
| Governing Law: | State of Florida. |
| Due Diligence: | There is a due diligence checklist which shall be updated regularly to reflect the delivery and receipt of items required by the conditions precedent terms herein. |
| Expenses and Indemnification: | Until such time as the Loan is paid in full, the Company shall reimburse Agent, upon demand, for all direct and indirect costs, fees, and expenses of Agent. Indemnification and release provisions customary for loans and transactions of this type and satisfactory to Agent in its reasonable discretion will be provided for in the definitive documentation. |

Closing Checklist
DIP Loan and Security Agreement
between
PEPI Capital, L.P. as agent and a lender,
Fiddler's Creek LLC and GB Peninsula, Ltd., as borrowers
and the guarantors party thereto

**Please note that, per discussion on 2.16, the indication of completion or receipt does not equate to an agreement that a condition to funding has been satisfied.**

*Loan Documents*

| | Document | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | DIP Loan and Security Agreement | KLG | | open |
| | Ex A – Real Property | | | awaiting final legal descriptions |
| | Ex B – Form of Interim Order | | | completed |
| | Ex C – Notice of Borrowing | | | completed |
| | Ex D – 18 Month Budget | | | received |
| | Ex E – Collateral Waterfall | | | awaiting legal descriptions to match the properties |
| | Ex F – Form of Deed of Trust | | | open |
| | Sched 5.1(a) – Unencumbered Collateral | | | outstanding |
| | Sched 5.1(b) – Collateral encumbered only by Permitted Liens | | | outstanding |
| | Sched 5.2 – Intellectual Property | | | outstanding |
| | Sched 5.3 – Material Contracts | | | outstanding |
| | Sched 5.5 – Debtors' Org Info | | | outstanding |
| | Sched 5.13 – Capitalization | | | outstanding |
| | Sched 7.3 – Min Release Price | | | received |
| 2 | Promissory Note | KLG | | final |
| 3 | Pledge Agreements | KLG | | Please advise if this is final |
| | a. GBFC II Two, LLC | | | |
| | b. GBFC II, L.P. | | | |
| | c. GB Peninsula, Inc. | | | |
| | d. *NEWCO [GBPenn LP?]* | | | |
| | Certificates/Powers of Sale | BC/KLG | | Our understanding is that only corporate interests are certificated; form of power of sale has been sent |
| 4 | Mortgages | KLG | | We are revising to add concepts related to the purchase option and the default issues raised 2.16. |
| | a. "Borrower" | | | |
| | b. "Guarantors". | | | |
| 5 | Assignments of Rents and Leases | KLG | | Please advise if this is final |
| | a. "Borrower" | | | |

SWM009259

| | | | | |
|---|---|---|---|---|
| | b. "Guarantors" | | | |
| 6 | Environmental Indemnity Agreements | KLG | | Please advise if this is final |
| 7 | Subordination Agreement – Florida Financial Investments | KLG | | Revising |
| 8 | Deposit Account Control Agreements | | | *Debtors need to have their bank provide the proposed form* |
| 9 | Notice of final agreement | KLG | | Final |
| 10 | UCC-1 financing statement | KLG | | |
| | Fiddler's Creek LLC | | | |
| | GB Peninsula, Ltd. | | | |
| | 951 Land Holdings, Ltd. | | | |
| | 951 Land Holdings, LLC | | | |
| | DY Land Associates, Ltd. | | | |
| | DY Associates, LLC | | | |
| | DY Land Holdings II, LLC. | | | |
| | FC Beach, Ltd. | | | |
| | FC Beach, LLC | | | |
| | FC Commercial, LLC | | | |
| | FC Golf, Ltd. | | | |
| | FC Golf, LLC | | | |
| | FC Hotel, Ltd. | | | |
| | FC Hotel, LLC | | | |
| | FC Marina, LLC | | | |
| | FC Parcel 73, LLC | | | |
| | FC Resort, Ltd. | | | |
| | FC Resort LLC | | | |
| | Fiddler's Creek Management, Inc. | | | |
| | GBFC Development, Ltd. | | | |
| | GBFC Development, LLC | | | |
| | GBFC Marina, Ltd | | | |
| | GBP Development, Ltd. | | | |
| | Gulf Bay Hospitality Ltd | | | |
| | Gulf Bay Hospitality Company, LLC | | | |
| | Gulf Bay Hotel Company, Ltd | | | |
| | Gulf Bay Hotel Company, LLC | | | |
| | *GB 31, Ltd.* | | | |
| 11 | Authorization to file fin. stmt/UCC-1 financing statement | KLG | | |
| | a. GBFC II Two, LLC | | | |
| | b. GBFC II, L.P. | | | |
| | c. GB Peninsula, Inc. | | | |
| | d. *GBPenn, Ltd.* | | | |
| 12 | Opinion of obligors' counsel | KLG | | Draft sent to obligors' counsel |
| 13 | Closing instruction letter | KLG | | |
| 14 | Closing statement | Woodward | | |

*Due Diligence – Organizational*

| | Document | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | GB Peninsula, Inc. [pledgor and GP of GP Peninsula, Ltd.] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 2 | GB Peninsula, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 3 | GBP Development, LLC [GP of GBP Development, Ltd. and a guarantor] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 4 | FC Beach LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 5 | FC Beach Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 6 | GBFC Development LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 7 | GBFC Development Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |

| | | | | |
|---|---|---|---|---|
| 8 | DY Associates LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 9 | DY Land Associates Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 10 | 951 Land Holdings, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 11 | 951 Land Holdings, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 12 | FC Golf LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | Certificate of Formation contains restrictions on guaranteeing third party debt |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 13 | FC Golf Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 14 | FC Marina LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |

| | | | | |
|---|---|---|---|---|
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 15 | GBFC Marina Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 16 | FC Hotel LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 17 | FC Hotel Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 18 | FC Resort LLC | | | |
| | a. Officer's certificate | | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 19 | FC Resort Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 20 | Gulf Bay Hotel Company, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 21 | Gulf Bay Hotel Company, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 22 | Gulf Bay Hospitality Company LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |

| | | | | |
|---|---|---|---|---|
| | f. Certificates of authority | | | X |
| 23 | Gulf Bay Hospitality Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 24 | Fiddler's Creek Management, Inc. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 25 | DY Land Holdings II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 26 | FC Commercial, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 27 | FC Parcel 73, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 28 | Fiddler's Creek, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |

| 29 | GBP Development, Ltd. | | | |
|---|---|---|---|---|
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 30 | GBFC II Two, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | Missing |
| | f. Certificates of authority | | | Missing |
| 31 | GPFC II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |
| 31 | GBFC II, L.P. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | Missing |
| | c. Operating agreement | | | Missing |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | Missing |
| | f. Certificates of authority | | | Missing |
| 32 | GB 31, Ltd. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | Missing |
| | f. Certificates of authority | | | Missing |
| 33 | GBPenn LP, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |

*Due Diligence – Real Estate*

| | Item | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | Phase Is for the project | | | received |
| 2 | Most recent surveys of the project | | | received |
| 3 | Reissue of commitments by parties | Woodward | | received; minor comments from KLG |

| | | | | |
|---|---|---|---|---|
| | | | | have been given to Mark Woodward |
| 4 | Pro forma policies | Woodward | | *marked commitments will come before funding, based on agreements to changes to the commitments* |
| 5 | Zoning letters | | | part of CDD |
| 6 | Flood letters | | | received |
| 7 | Utility letters | | | part of CDD |
| 8 | Real property tax statements | | | received |
| 9 | Plats | | | received |
| 10 | Information for each CDD | | | received |
| 11 | Estoppel certs for each HOA | | | received some; some outstanding |
| 12 | List of all leases between any debtor and any of its affiliates | | | outstanding |
| 13 | List of obligations required to maintain entitlements and zoning | | | outstanding |
| 14 | List of unencumbered properties | Woodward | | Mark has identified and is revising to give legals |
| 15 | Identification of waterfall properties | Woodward | | Mark is revising to give legal descriptions |
| 16 | Proof of legals by title company | Woodward | | in process but not completed |
| 17 | Breakout of Marsh Cove property by owner | Woodward | | Mark is working on this |
| 18 | **Information needed from title company for tie-in endorsement** | | | **Are we still getting this endorsement?** |
| 19 | Confirmation from title company respecting restrictions in various org docs' raising a potential defense | | | outstanding; sent to underwriter; do not anticipate a response before tomorrow |

*Bankruptcy Requirements*

| | Item | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | Each Debtor's case is pending | | | |
| 2 | Each Debtor has filed its petition and 1st day motions | | | |
| 3 | Receipt of orders approving cash collateral and budget motions | | | |
| 4 | Receipt of payables aging and service list | | | received |
| 5 | Entry of interim order | | | |
| 6 | Evidence that no motion has been filed to appt a trustee or convert to Ch 7 | | | |

*Other Diligence*

| | Item | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | Description of insurance and list of pending claims | | | received |
| 2 | Insurance policies and required endorsements | | | received policies; *need endorsements* |
| 3 | No material change in litigation | | | |
| 4 | Financial statements of each debtor | | | received |
| 5 | Reports of Project cash flow and revenue generating activity | | | received |
| 6 | Most recently filed federal and state tax returns for each debtor | | | received |
| 7 | 13 Week Budget for Debtors | | | **PEPI, please confirm receipt** |
| 8 | 18 Month Budget and business plan for Debtors | | | received |
| 9 | UCC/tax lien/judgment lien searches<br>Fiddler's Creek LLC<br>GB Peninsula, Ltd.<br>951 Land Holdings, Ltd.<br>951 Land Holdings, LLC<br>DY Land Associates, Ltd.<br>DY Associates, LLC<br>DY Land Holdings II, LLC,<br>FC Beach, Ltd.<br>FC Beach, LLC<br>FC Commercial, LLC<br>FC Golf, Ltd.<br>FC Golf, LLC<br>FC Hotel, Ltd.<br>FC Hotel, LLC<br>FC Marina, LLC<br>FC Parcel 73, LLC<br>FC Resort, Ltd.<br>FC Resort LLC<br>Fiddler's Creek Management, Inc.<br>GBFC Development, Ltd.<br>GBFC Development, LLC<br>GBFC Marina, LTD<br>GBP Development, Ltd.<br>Gulf Bay Hospitality Ltd<br>Gulf Bay Hospitality Company, LLC<br>Gulf Bay Hotel Company, Ltd<br>Gulf Bay Hotel Company, LLC<br>[GBP Development, LLC]<br><br>GBFC II Two, LLC [pledgor]<br>GBFC II, L.P. [pledgor]<br>GB Peninsula, Inc. [pledgor]<br>AJF [pledgor] | | | received for Debtors<br><br>**Please advise if debtors' counsel will obtain searches for the nondebtor pledgors.** |

| | | | | |
|---|---|---|---|---|
| 10 | Current debt<br>a. List of all lenders<br>b. Description of facilities<br>c. Copies of all loan documents<br>d. Description of collateral | | | received |
| 11 | Collateral reports<br>a. ID of all receivables<br>b. list of deposits and anticipated forfeitures<br>c. list of fixed assets<br>d. list of IP owned or licensed<br>e. copies of all agreements containing a right of first refusal for any collateral | | | **PEPI, please confirm receipt** |
| 12 | Copies of joint venture agreements | | | **PEPI, please confirm receipt** |
| 13 | Collateral/books/records review | | | completed |

3

AA01459

> each case who need to know the terms hereof... If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined)." (p. 3)

25. The Commitment Letter does not contain a provision obligating PEPI to provide a written signoff on due diligence as a condition precedent to Fiddlers filing bankruptcy.

26. At all material times through February 22, 2010:

i. PEPI negotiated in good faith in accordance with the Commitment Letter.

ii. PEPI took such actions to perform its due diligence under the Commitment Letter, which were just two of several dozen conditions precedent to any funding.

iii. PEPI never made an unequivocal demand in violation of the Commitment Letter, including as to the escrow, waterfall or its due diligence.

iv. PEPI verbally advised Fiddlers more than once that it had completed corporate and real estate due diligence, including on February 16, 2010.

v. PEPI always acted in a manner consistent with honoring the sale order of the properties listed by the Debtor in the "Waterfall".

vi. At no time prior to February 22, 2010 did the Debtors ever advise PEPI that PEPI was in material default and will terminate the Commitment Letter. Rather, any and all communications were in the nature of simply negotiating the corresponding loan documents.

vii. PEPI was not in material breach of the Commitment Letter as of February 22, 2010.

viii. At no time prior to February 22, 2010 did Fiddlers threaten to default PEPI or terminate the Commitment Letter.

ix. At no time prior to February 22, 2010 did Fiddlers advise PEPI it refused to further negotiate the finalization of any loan document or such other aspect of the Commitment Letter.

x. Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi. Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii. Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii. The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv. Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv. PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi. PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii. To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii. The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix. Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv. PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

4

AA01462

discretion, then it says including, correct?

A Yes.

Q Okay. So did you -- do you agree with me that this document states that the following is a list of items that are conditions precedent to the initial advance and each subsequent advance?

A Yes.

Q Okay. And if you take a look at Items 3 and 4, both of those relate to the completion of due diligence in certain areas to the satisfaction of agent or satisfactory to agent, correct?

A Yes.

Q Okay. And in fact, these conditions precedent that must be satisfied prior to the initial advance and each subsequent advance continue on the following page, items 5 through 14?

A Let me read 5 through 14.

Q You don't necessarily have to read them. I'm just asking you to confirm the conditions precedent to the initial advance and subsequent advance start on page 15, items 1 through 4, continue on page 16, items 5 through 14 and then continue again on page 17, balance of 14 through 16; is that correct?

A That's correct.

**Q Then turning to item 15, that itself references additional conditions precedent as agent may require in its reasonable discretion including --**

A Wait, wait, you're talking about item 15?

**Q Yes.**

A Okay.

**Q Right. So item 15 on page 17 provides for --**

A Page 19 I have.

**Q I'm referring to the bottom.**

A The bottom says 19 of 45. That's what mine says, looking at 15, 19 of 45.

**Q Okay.**

A Is this correct?

**Q That's fine. I must be looking at a different pagination.**

MR. REYES: He's in the covenants section, the condition precedent section, he asked you right here.

A That one, I'm sorry.

MR. PERLMAN: Thank you, Mr. Reyes. Two points.

THE WITNESS: You should give me the numbers on the top.

MR. REYES: Why don't we decide when doing

these things DE filed, document entry items, use the page number so later on the record --

MR. PERLMAN: I think --

THE WITNESS: 103 of 138.

BY MR. PERLMAN:

**Q Correct, correct. So we were all literally on the same page before, though, with regard to the other two conditions precedent, correct?**

A Yes.

**Q All right. So now we are all on 17 of 45, which is page 19 of 47, I'm sorry, 103 of 138 for DE84-1, correct?**

A Yes.

**Q Okay. Now, item 15 I think you've just reviewed states, Such other commercially reasonable conditions precedent as agent may require in its reasonable discretion, including, and it references the items in Exhibit B attached hereto? Yes?**

A Yes.

**Q If you can turn to Exhibit B.**

A Which is what?

**Q DE108 of 138.**

A 108.

**Q Page 108 of 138 of DE84-1.**

A Okay.

Q All right. And this is Exhibit B and it states additional conditions precedent, correct?

A Yes.

Q The very first one is payment of the commitment fee to agent? Yes?

A Yes.

Q You can glance down to 16, refers to title searches and commitments, correct?

A Sixteen says interim order.

Q As to the interim order, delivery to agent of title searches commitments, right?

A Yes.

Q Okay. Then the additional conditions precedent continue on the very next page primarily with number 17.

A Right.

Q Then continuing on the following page, page 110 of 138?

A Yes.

Q Okay. And for example, 18 is asking information for each HOA, correct?

A Yes.

Q And item 26 is asking for delivery to agent of ECC searches, correct?

A What number?

Q 26.

A Yes.

Q And the conditions precedent of Exhibit B continue to the following page, page 111 of 138 starting at 28, correct?

A Yes.

Q And for example, 39F on the very bottom requires the account control agreements we talked about yesterday, correct?

A Yes.

Q And the conditions precedent continue again the very next page, 112 of 138?

A Yes.

Q Including sub j, the environmental indemnities, see that?

A Yes.

Q And then 42, delivery to agent of legal opinion letters, see that?

A Yes.

Q And you see 46, delivery to agent of resolutions, unanimous consents?

A Yes.

Q And 47, mortgagee's title insurance policy, see that?

A Yes.

Q And the conditions precedent continue to final page, 113 of 138, starting with 51, which includes 56, which states, Timely delivery to agent of any other materials and information requested by agent and needed in agent's reasonable discretion for completion of agent's due diligence. See that?

A Right. So these are all the conditions PEPI is asking of me before they initially fund the loan.

Q Right. But this in particular says completion of agent's due diligence, see that?

A Yes. But these are all conditions that have to be met for them to fund.

Q Right. So --

A As long as we're talking -- what's the major premise, what it says, for them to give the initial advance.

Q Right. Yesterday we went through a series of emails from various parties including your -- the agent's and representatives of Fiddler's, the borrowers, the debtors that related to the legal description, title insurance, budget and Mr. Ferrao's effort to modify the option to remove the release.

MR. REYES: Say again, please. I want to hear the question again.

MR. BATTISTA: Mortgagee.

A Mortgagor would be those entities that owned those properties. I don't recall at this time.

**Q Item number 10 relates to DRI Parcel Number 2 encumbered by a lien in favor of Tomen America as mortgagee. Do you recall who the mortgagors were in that regard?**

A I don't recall at this time.

**Q Is it correct the item described in number 11 was owned at the time by 951 Land Holding Limited?**

A Yes.

**Q Did you understand that the commitment letter contained a condition precedent including the completion of due diligence to the satisfaction of PEPI?**

MR. BATTISTA: Objection.

A Yes. But prior to the closing of the loan and prior to the termination of this commitment letter, otherwise the due diligence would have been open ended.

**Q Was it your practice at Fiddler's Creek that contracts would provide for you to receive notice and an opportunity to cure to the extent a default was alleged?**

5

AA01470

**collect out of the property described in the numbered items before it in the below list.**" Instead of providing language requiring that PEPI **first collect** out of each parcel of property in waterfall before moving on to collect on the next parcel, PEPI insisted on a process where it could foreclose on all of the property at one time and then schedule foreclosure sales one at a time to recover on its debt. The foreclosure process that PEPI insisted on including in the DIP Loan documentation, which was contrary to the terms of the Commitment Letter, clearly did not provide assurances to the Debtors' Prepetition Lenders that their collateral was secure, a critical provision for approval of the DIP Loan, which was also understood by PEPI. (Lorio Depo. p. 63, lines 22-25; p. 64, lines 1-15; p. 81, lines 11-25; Fine Depo. p.76, lines 13-25; p. 77, lines 1-8; p. 80, lines 11-23; Radunsky Depo. p. 73, lines 24-25; p. 74, lines 1-5; Depo. Exh. 14)

### 3. <u>PEPI's Refusal to Provide the Debtors with a Due Diligence Sign-Off</u>

On numerous occasions while the Debtors and PEPI were preparing and revising the proposed loan documentation for the DIP Loan, counsel for the Debtors repeatedly requested the Due Diligence Sign-Off from PEPI as provided for in the Commitment Letter. (Lorio's Depo. p. p. 91, lines 2-14; p. 93, lines 5-12; p. 94, lines 7-13; Radunsky's Depo. p. 103, lines 10-25; p. 104, lines 1-25; Depo Exhs. 28, 29; Fine's Depo. p. 95, lines 1-18; p. 96, lines 11-25; p. 97, line 1; p. 99, lines 1-9; p. 100, lines 17-20; Depo Exhs. 28, 29, 43, 44, and 45) On each occasion, PEPI either (i) did not address the Debtors' requests, (ii) provided just a status of its due diligence efforts, or (iii) verbally (but not in writing) assured the Debtors that its due diligence was substantially completed. (Lorio Depo. p. 103, lines 13-25; Radunsky Depo. p. 103, lines 10-25; p. 104, lines 1-25; Fine Depo p. 96, lines 11-23; p. 100, lines 21-23; p. 102, lines 1-6) However, despite the Debtors' requests, PEPI refused to provide the Debtors with a ***written*** confirmation that PEPI's due diligence was in fact completed as contemplated under the

6

AA01472

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

7

AA01474

A. Okay. I recall a series of conversations. It wasn't just one conversation. It was a series of conversations where Mr. Battista talked about some sort of written notification of, I guess, due diligence sign off. I had told him broadly that I would make inquiry of my client as to whether or not that was something I think that they could provide and then got back to him and told him that we would not provide it.

Q. This was when the Commitment Letter was being negotiated?

A. Yes. Yes, that's my recollection.

Q. Can you identify one single e-mail from you at any point in time -- not even limiting it to the negotiation of the Commitment Letter -- where you stated to Mr. Battista that Pepi will not provide a written due diligence sign off?

MR. PERLMAN: Objection to form.

A. Sitting here right now I can't do that. I don't have all my e-mails in front of me.

Q. Because there is no such e-mails right?

A. No, I have not --

MR. PERLMAN: Objection to form.

Q. Have you told Mr. Battista that Pepi would not provide a due diligence sign off?

A. I don't know. I don't know.

8

AA01476

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Battista, Paul J. |
| **Sent:** | Wednesday, January 06, 2010 9:02 AM |
| **To:** | 'Fine, Jeffrey' |
| **Cc:** | Patricia Redmond; Guitian, Mariaelena |
| **Subject:** | Quick Outline of Points for Call Today |

Jeff, I thought I would outline for your a quick summary of the points that we want to discuss with you so that we have an agenda and so that you could have a few minutes to think about them and be able to discuss.

1. Status of Trish's request for a right of first refusal on the debt.

2. Discussion about Pepi retaining control over the loan after syndication.

3. Clarifying that the fees and expenses of the lender after closing will be paid from the loan proceeds.

4. Clarification on the payment of Managed Expenses based on sale thresholds.

5. Clarification on the extent of the subordinate replacement liens available for FC to give to other lenders.

6. Discussion on a mechanism to deal with the liquidation of collateralin the waterfall. Trish and I have some good ideas that will be of benefit to your client in this process and will also allow us to satisfy the other secured creditors that the waterfall is meaningful and not illusory. Our thoughts are (i) to create an escrow of some sort to hold consent judgments to any foreclosure in the order of priority in the waterfall so that you can immediately get a judgment and go to sale, (ii) perhaps a deed in lieu of foreclosure held in escrow to give you that option, and (iii) the need for a valuation mechanism so that if you take back property in foreclosure or through a deed that the debt is reduced accordingly. We think this saves your client a significant amount of time and expense in the foreclosure process and also allows us to show the junior lenders that the waterfall is real. We are open to other ideas as well.

7. The title and appeal issues. We will update you and also ask that you provide a form of DIP order so that we can share it with the title company for their review.

8. Some tweaks here and there to add "reasonableness" to deal with our concerns about the various due diligence outs. I think we can get there with some added language.

9. Timing of the closing from and after the signing of the letter. Namely,when we sign the letter, what is your expected timing to complete due diligence and do the loan documents. We are trying to gauge the filing to coincide with the completion of your due diligence so that we know we are good to go other than the court's order.

10. Confirmation that Aubrey is not a guarantor on the loan.

11. We will need to have a contact at your firm to work with Mary to make sure we are getting you the due diligence informaton that you need. We would like to help keep that process moving and oversee it.

There are other minor comments as well, but these are the more material ones. Trish and Mary, please add anything else if you have any.

Thanx

9

AA01478

**Erenbaum, Jessica**

**From:** Battista, Paul J.
**Sent:** Wednesday, January 27, 2010 4:13 PM
**To:** 'Fine, Jeffrey'
**Cc:** 'Patricia Redmond'; Guitian, Mariaelena
**Subject:** FW: Fiddler's Creek executed commitment Letter
**Attachments:** Fiddlers Creek Commitment Letter fully executed.pdf

Jeff, thank you for all of your help in getting us to this point. I assume that you and your team are now commencing due diligence in earnest so that we can get to the filing in the next several days. Please let us know what we still need to get to you in order to keep the process moving.

In the interim, I intend to send the signed commitment letter to Mark Bloom of Greenberg Traurig tomorrow. He is counsel to Textron. I intend to try to work with he and his client to determine any issues he has and then to place him in contact with you so that the three of us can work on getting his client's consent. Please let me know if you are ok with that.

Thanx again.

Paul

---

**From:** David Radunsky [mailto:David.Radunsky@pgrp.net]
**Sent:** Wednesday, January 27, 2010 11:37 AM
**To:** Tony DiNardo; CJ Lorio; K Springfield
**Cc:** Battista, Paul J.; predmond@stearnsweaver.com; Fine, Jeffrey; Aubrey J. Ferrao
**Subject:** RE: Fiddler's Creek executed commitment Letter

Tony, et al,
Here is a fully signed copy. Because the pages seemed to contemplate 45 pages, and when it printed, 46 pages came out (the last two blank), I numbered them and drew a line through them, so it would be clear nothing was missing by accident. I trust that is ok with you.
Thanks to all for the great effort getting the deal to this point. Now we need to finish the definitive documents and close the loan.
Regards.
David

---

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Wednesday, January 27, 2010 8:40 AM
**To:** David Radunsky; CJ Lorio; K Springfield
**Cc:** Battista, Paul J.; predmond@stearnsweaver.com; Fine, Jeffrey; Aubrey J. Ferrao
**Subject:** Fiddler's Creek executed commitment Letter

David
Attached is the executed commitment letter. I will be sending two original copies to you for your execution, can you please return one of the original to me. Thanks for all the cooperation.
Tony

Tony Di Nardo
Chief Financial Office
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816

10

AA01480

know is what we had to do. We had to have the due diligence sign-off and the loan documents. PEPI had to show up and come up with the money.

**Q Right. So assuming PEPI had the money and the judge entered the order, it's your understanding there were no other conditions?**

A If the documents were done and the judge agreed, yeah, I don't think there was any other conditions. What time are we going to take a lunch break?

**Q Whenever you'd like.**

A It's ten after 12:00.

MR. BATTISTA: What's your -- off the record.

(Off the record.)

BY MR. PERLMAN:

**Q Next exhibit will be a composite. I'm showing you Exhibit 4-1, which is an email string on February 9, 2010. Can you just take a minute, read the initial one from Mr. Fine and the response by Mr. Battista. Let me know when you're ready.**

A I read it.

**Q Thank you. What is your understanding of Mr. Fine's email?**

A I think it's clear what he says: Paul and

11

AA01482

earlier date? You see, I could understand that it was February 8th or such earlier date as three business days from the Agent advising of completion of due diligence, but here is says "later date." Do you have an understanding of why it says later date?

A. Well, it's because the purpose is to allow it to run later than February 8. In other words, this is -- that notice and that date that's determined by the notice is to Pepi's advantage, as I understand it. It's bad for Fiddler's to get that notice because that's a trigger, then they have to file within three days or the commitment's going to expire.

Q. But the close of business on February 8th, 2010 would never be a deadline based on the parenthetical; right?

MR. PERLMAN: Object to the form, and object to the extent it calls for a legal conclusion.

A. I guess if we gave that notice before February 8, we couldn't cause -- we couldn't demand the bankruptcy file. We couldn't trigger the termination process -- the timing of the termination process earlier than February 8 in we couldn't start that process running earlier than February 8th that wasn't permitted by this.

Q. But could the commitment terminate at the close

never heard of it, and that the document called explicitly for due diligence to be a condition precedent to funding and therefore it had to be viable at all times until funding, and that we were providing them on a regular. I shouldn't say a regular -- not a certain schedule, but on an interest my intermittent basis commonly providing to Fiddler's the -- a status report on due diligence so they could understand where we were on due diligence.

Q. If it was Pepi's intent not to provide a confirmation that due diligence was completed until the actual funding date, what was the purpose of the parenthetical in the Commitment Letter that we talked about earlier?

MR. PERLMAN: Objection to the form.

A. It was --

MR. PERLMAN: -- and asked and answered.

A. It was a -- it was never expected to be used by us to trigger a termination of the Commitment Letter. It was a safety valve in case we needed it to terminate the Commitment Letter. It would be used only if it appeared that Fiddler's was not gonna file bankruptcy and so it would need some trigger to make the commitment go away. It was absolutely not expected to be used.

12

AA01485

each case who need to know the terms hereof... If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined)." (p. 3)

25. The Commitment Letter does not contain a provision obligating PEPI to provide a written signoff on due diligence as a condition precedent to Fiddlers filing bankruptcy.

26. At all material times through February 22, 2010:

i. PEPI negotiated in good faith in accordance with the Commitment Letter.

ii. PEPI took such actions to perform its due diligence under the Commitment Letter, which were just two of several dozen conditions precedent to any funding.

iii. PEPI never made an unequivocal demand in violation of the Commitment Letter, including as to the escrow, waterfall or its due diligence.

iv. PEPI verbally advised Fiddlers more than once that it had completed corporate and real estate due diligence, including on February 16, 2010.

v. PEPI always acted in a manner consistent with honoring the sale order of the properties listed by the Debtor in the "Waterfall".

vi. At no time prior to February 22, 2010 did the Debtors ever advise PEPI that PEPI was in material default and will terminate the Commitment Letter. Rather, any and all communications were in the nature of simply negotiating the corresponding loan documents.

vii. PEPI was not in material breach of the Commitment Letter as of February 22, 2010.

viii. At no time prior to February 22, 2010 did Fiddlers threaten to default PEPI or terminate the Commitment Letter.

ix. At no time prior to February 22, 2010 did Fiddlers advise PEPI it refused to further negotiate the finalization of any loan document or such other aspect of the Commitment Letter.

x. Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi. Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii. Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii. The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv. Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv. PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi. PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii. To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii. The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix. Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv. PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

13

AA01488

PEPI's completion of and reasonable satisfaction in all material respects with a due diligence investigation of the Company and its subsidiaries, (c) PEPI's not becoming aware after the date hereof of any material information or other matter affecting the Company and its subsidiaries or the transactions contemplated hereby which in PEPI's commercially reasonable judgment is inconsistent in a material and adverse manner with any material information or other matter disclosed to PEPI prior to the date hereof, (d) there not having occurred a material disruption of or material adverse change in conditions in the financial, banking or capital markets that, in PEPI's judgment, could reasonably be expected to materially impair the Credit Facility, provided however, that if PEPI terminates its obligations under this Commitment Letter based exclusively upon such event in clause (d), then PEPI shall immediately return the Commitment Fee to the Company, (e) the negotiation, execution and delivery of definitive documentation with respect to the Credit Facility reasonably satisfactory to PEPI and its counsel in all respects, (f) the Company's and its subsidiaries compliance with the terms of this Commitment Letter, and (g) the other conditions set forth or referred to in the Term Sheet, including, without limitation, the satisfaction of all conditions precedent set forth in the Term Sheet in a manner satisfactory to PEPI in its reasonable discretion. The terms and conditions of the documentation of the Credit Facility shall be substantially the same as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.

This Commitment Letter will be of no force and effect unless signed by PEPI and a counterpart hereof is accepted and agreed to by the Company and, as so accepted and agreed to, received by PEPI by 6 p.m., eastern time, on or before January 27, 2010. Upon signature by the Company (i) $405,000, which is one half of the wire transfer to PEPI in the amount of $785,000.00 under the Fee Letter Agreement (defined below) plus the $25,000 Term Sheet Fee, and (ii) the wire transfer to PEPI in the amount of $250,000.00 under the Fee Letter Agreement, which represents an additional deposit for expenses, will be retained by PEPI subject to the terms of this Commitment Letter. The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the Company, will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after Agent has advised Company it has completed its due diligence), unless the Company has instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date. All indemnities and obligations of the Company and its subsidiaries hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that such indemnities and obligations shall not survive in the event of a default by PEPI hereunder. The Company shall be entitled to the immediate return of the Commitment Fee as its sole and exclusive remedy in the event of a material default by PEPI hereunder.

This Commitment Letter contains the entire commitment of PEPI for this transaction and, upon acceptance by the Company, supersedes all prior proposals, term sheets, commitment letters, negotiations, discussions, and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement. No party has been authorized by PEPI to make any oral or written statements inconsistent with this Commitment Letter.

The Company is advised that PEPI may request certain information from the Company concerning its identity that will be used for verification purposes as part of the measures required by PEPI pursuant to the USA Patriot Act. To help fight the funding of terrorism and money laundering activities, Federal law requires PEPI to obtain, verify, and record information that identifies each person or corporation who enters into a business relationship with it. Any financing is of course subject to the Company being in compliance with Federal law in connection therewith.

F

AA01490

1

g. Monthly financial reports for each Debtor, including a balance sheets and separate reports for each operating entity (golf course, clubs, etc.).
h. All reports submitted to any creditor, creditor committee, US Trustee, or other governmental authority
i. A monthly narrative description of the status of sales, development, legal, CDD, operating properties, HOA, financing and bankruptcy issues such that we are fully informed as to the status of the project
j. A rolling monthly forecast to be provided quarterly, which shall include the year-to-date actual results (i.e., from the funding date to the current period) plus receipts and disbursements which are anticipated to be incurred for the next 18 months, together with a comparison to the approved business plan
k. Monthly operating statement and statement of cash receipts and disbursements showing both the current month and year-to-date actual results compared to the approved business plan
l. Such other weekly or monthly reports that Agent may request

Events of Default: Customary for loans and transactions of this type and such other Events of Default required by Agent in its reasonable discretion including, but not limited to, a breach of the variance covenant relating to the Budget, exceeding maximum outstanding loan balance for a specific period as set forth on Exhibit D, failing to achieve minimum cumulative sales as set forth on Exhibit D, or selling assets at prices less than the minimum release prices as set forth on Exhibit C. In addition, the events of default shall contain reasonable notice and cure provisions before acceleration of the debt and enforcement of remedies.

Purchase Option: The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral and other

2

AA01493

> each case who need to know the terms hereof... If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined)." (p. 3)

25. The Commitment Letter does not contain a provision obligating PEPI to provide a written signoff on due diligence as a condition precedent to Fiddlers filing bankruptcy.

26. At all material times through February 22, 2010:

i. PEPI negotiated in good faith in accordance with the Commitment Letter.

ii. PEPI took such actions to perform its due diligence under the Commitment Letter, which were just two of several dozen conditions precedent to any funding.

iii. PEPI never made an unequivocal demand in violation of the Commitment Letter, including as to the escrow, waterfall or its due diligence.

iv. PEPI verbally advised Fiddlers more than once that it had completed corporate and real estate due diligence, including on February 16, 2010.

v. PEPI always acted in a manner consistent with honoring the sale order of the properties listed by the Debtor in the "Waterfall".

vi. At no time prior to February 22, 2010 did the Debtors ever advise PEPI that PEPI was in material default and will terminate the Commitment Letter. Rather, any and all communications were in the nature of simply negotiating the corresponding loan documents.

vii. PEPI was not in material breach of the Commitment Letter as of February 22, 2010.

viii. At no time prior to February 22, 2010 did Fiddlers threaten to default PEPI or terminate the Commitment Letter.

ix. At no time prior to February 22, 2010 did Fiddlers advise PEPI it refused to further negotiate the finalization of any loan document or such other aspect of the Commitment Letter.

x. Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi. Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii. Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii. The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv. Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv. PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi. PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii. To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii. The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix. Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv. PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

3

AA01496

Q So you have just quickly, we appreciate that, reviewed a dozen or more documents that Mr. Battista identified to me that were responsive to the area that we talked about previously, correct?

A What is that area because I didn't know what to tell you?

MR. PERLMAN: Off the record.

(Off the record.)

BY MR. PERLMAN:

Q Excluding the email dated February 22, 2010 from Mr. Battista to Mr. Fine.

A Can I see it?

Q I'm excluding it.

A Excluding it.

Q Excluding that email are you aware of any other written communication on behalf of Fiddler's to PEPI whereby Fiddler's states PEPI is in default of the commitment letter?

A No.

Q Okay.

A I'm not aware of any.

Q That saved a lot of time.

MR. BATTISTA: It does. Read 7 through 13.

A We're on the record --

Q Okay. So Requests for Production Number 8,

a copy of any written notice or warning you sent to PEPI indicating it had breached or was in material default of the commitment letter. That's basically the same question I just asked you, correct?

MR. REYES: Object to the form.

A I answered the question.

Q Right. So the answer would be you're not aware of any documents other than the February 22, 2010?

MR. REYES: To be clear, are you asking were the words breach or default used or Fiddler's was asking.

MR. BATTISTA: It's important, it's important to be specific.

Q I understand. Request Number 8?

A I don't care about your request, just ask the question.

Q I will. It's based on this question or the request. It asks for a copy of any written notice or warning that you sent to PEPI indicating that it had breached or was in material default of the commitment letter. With the exception of this February 22, 2010 email from Mr. Battista to Mr. Fine, are you aware of any other responsive documents?

A I'm not aware of anything in writing.

**Q Okay.**

A Up to February 22nd that was sent to PEPI or its counsel.

**Q Item 13 requests all documents reflecting that you informed PEPI of your intent to terminate and/or no longer seek DIP financing from PEPI. My question to you, sir, is other than this email from Mr. Battista dated February 22, 2010, are you aware of any other responsive documents?**

A I am not.

MR. REYES: You mean letter?

**Q Sorry.**

A Of any written document that was sent to PEPI regarding default or breach prior to the February 22nd letter or email that was sent from Paul Battista to PEPI.

**Q Did there come a time in which PEPI responded to Mr. Battista's email of February 22nd?**

MR. BATTISTA: You mean letter.

A Letter.

**Q Letter sent via email dated February 22nd.**

A Yes.

**Q And that's a letter sent via email the very next day, correct?**

A Dated February 23rd.

It can't just go on. When the money is gone, when the pressure is put on, when decisions have to be made, you can't make decisions in a vacuum. The money is gone, decisions have to be made and PEPI still wants to negotiate.

**Q Was there ever an email to PEPI that said we're not negotiating this issue any further at any point?**

A Not to my knowledge, I don't know. All I know is it was left in Paul Battista's hands. After the letter, I don't know if Paul Battista had any conference calls with Mr. Fine.

**Q If Gulf Bay didn't provide the facility, do you believe the debtors would have borrowed from Fiddler's?**

A I don't have to answer that hypothetical. All I know is Gulf Bay did provide the facility and because they had a facility in the end, I was dealing with a potential DIP lender who was not negotiating in good faith and I was able to put them in breach.

If I would have had Gulf Bay's commitment prior, I would have put them in breach sooner. Now you're not asking me questions with regards to Gulf Bay Capital. You're asking me questions in regards to Fiddler's Creek and I don't want those questions

4

AA01501

**From:** Meister, Joseph [Joseph.Meister@klgates.com]
**Sent:** Wednesday, February 17, 2010 4:24 PM
**To:** Jane Houk
**Cc:** Helm, Elizabeth; Cox, John; Daniel, Rick
**Subject:** Outstanding Corporate Diligence Items
**Attachments:** DA-#3089037-v4-Closing_Checklist_-_Meister.DOC

Jane:

Attached again is the checklist of corporate diligence items. Of the outstanding items, the document I am most interested in reviewing is the operating agreement for GBFC II, LP.

Would you please send this to me as soon as possible?

Thx,

Joe Meister

**D. Joseph Meister**
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5441
Fax: 214.939.6100
E-mail: joseph.meister@klgates.com
Website: www.klgates.com

Anchorage | Austin | Beijing | Berlin | Boston | Charlotte | Chicago | Dallas | Dubai | Fort Worth | Frankfurt | Harrisburg | Hong Kong | London | Los Angeles | Miami | Moscow | New York | Newark | Orange County | Palo Alto | Paris | Pittsburgh | Portland | Raleigh | Research Triangle Park | San Diego | San Francisco | Seattle | Shanghai | Singapore | Spokane | Taipei | Tokyo | Washington, D.C.

<<DA-#3089037-v4-Closing_Checklist_-_Meister.DOC>>

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Joseph.Meister@klgates.com.

No.: 4-41
Name: DiNardo
Date: 2/9/15
Amory Ranck

*Due Diligence – Organizational*

| | Document | Responsible Party | Responsible KLG | Status |
|---|---|---|---|---|
| 1 | GB Peninsula, Inc. [pledgor and GP of GP Peninsula, Ltd.] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 2 | GB Peninsula, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 3 | GBP Development, LLC [GP of GBP Development, Ltd. and a guarantor] | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 4 | FC Beach LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 5 | FC Beach Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 6 | GBFC Development LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 7 | GBFC Development Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |

| | | | | |
|---|---|---|---|---|
| 8 | DY Associates LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 9 | DY Land Associates Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 10 | 951 Land Holdings, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 11 | 951 Land Holdings, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 12 | FC Golf LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | Certificate of Formation contains restrictions on guaranteeing third party debt |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 13 | FC Golf Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 14 | FC Marina LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |

| | | | | |
|---|---|---|---|---|
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 15 | GBFC Marina Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 16 | FC Hotel LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 17 | FC Hotel Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 18 | FC Resort LLC | | | |
| | a. Officer's certificate | | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 19 | FC Resort Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 20 | Gulf Bay Hotel Company, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | X |
| 21 | Gulf Bay Hotel Company, Ltd. | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 22 | Gulf Bay Hospitality Company LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |

| | | | | |
|---|---|---|---|---|
| | f. Certificates of authority | | | X |
| 23 | Gulf Bay Hospitality Ltd | | | |
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standing | | | X |
| | d. Certificates of authority | | | N/A |
| 24 | Fiddler's Creek Management, Inc. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Incorporation | | | X |
| | c. Bylaws | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 25 | DY Land Holdings II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | LP Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 26 | FC Commercial, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 27 | FC Parcel 73, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | Operating Agreement contains restrictions on guaranteeing third party debt |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | N/A |
| 28 | Fiddler's Creek, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |

| 29 | GBP Development, Ltd. | | | |
|---|---|---|---|---|
| | a. Certificate of LP | | | X |
| | b. LP agreement | | | X |
| | c. Certificate of existence/good standin… | | | X |
| | d. Certificates of authority | | | N/A |
| 30 | GBFC II Two, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | Missing |
| | f. Certificates of authority | | | Missing |
| 31 | GPFC II, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |
| 32 | GBFC II, L.P. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | Missing |
| | c. Operating agreement | | | Missing |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | Missing |
| | f. Certificates of authority | | | Missing |
| 33 | GB 31, Ltd. | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | Missing |
| | f. Certificates of authority | | | Missing |
| 34 | GBPenn LP, LLC | | | |
| | a. Officer's certificate | KLG | | |
| | b. Articles of Formation | | | X |
| | c. Operating agreement | | | X |
| | d. Resolutions | | | |
| | e. Certificate of existence/good standing | | | X |
| | f. Certificates of authority | | | Unnecessary |

5

AA01508

**From:** Jane Houk
**Sent:** Thursday, February 18, 2010 4:39 PM
**To:** 'Helm, Elizabeth'
**Cc:** 'Mark Woodward'
**Subject:** FW: Language for Title Company on Organizational Documents

Jeff/Elizabeth:

As a condition precedent to the Loan Agreement, the Lender must receive confirmation from Chicago Title that the title insurance policies being issued for the benefit of the Lender will not include exceptions or defenses to coverages or payment based on prohibitions in the org docs. Alan has confirmed to us that there will be no exceptions to title for this issue. Please let me know if email below is acceptable to Lender, or if you have a specific confirmation form we need to get executed.

Thanks,
Jane

**From:** Atlas, Alan [mailto:AtlasA@CTT.com]
**Sent:** Thursday, February 18, 2010 12:40 PM
**To:** Jane Houk
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** RE: Language for Title Company on Organizational Documents

For purposes of insuring the lien of the DIP mortgage, I have no objections to the language below..

*Alan Atlas*

*State Underwriting Counsel*

*Fidelity National Title Group*

*4210 Metro Parkway, Suite 210*

*Fort Myers, FL 33916*

*Phone No. 239-275-8212, Ext. 223*

*Fax No. 239-275-3194*

*E-Mail Address: atlasa@ctt.com*

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Wednesday, February 17, 2010 6:17 PM
**To:** Atlas, Alan
**Cc:** 'Battista, Paul J.'; 'Mark Woodward'; Schuster, Michael; Guitian, Mariaelena
**Subject:** FW: Language for Title Company on Organizational Documents

No.: 4-45
Name: DiNardo
Date: 2/9/15
Amory Ranch

Alan:

At your request, attached as a Word document are the relevant provisions in the organizational documents of each of the five entities mentioned to you previously. In addition, below are the relevant excerpts from the Motion and Order.

Please contact me if you have any questions regarding same.

Best regards,
Jane

---

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Wednesday, February 17, 2010 3:56 PM
**To:** Jane Houk
**Subject:** Language for Title Company on Organizational Documents

Here is the language now in the motion on this issue:

1. Furthermore, none of the restrictive provisions contained in the Debtors' corporate governance documents would impair the Court's ability to approve the DIP Loan or the ability of the Debtors to file these Chapter 11 Cases. Specifically, the corporate governance documents of the following five (5) Debtors contain restrictive provisions which either (a) purport to require the consent of such Debtor's secured creditor to the DIP Loan, (b) contain restrictions upon the entering into of indebtedness or guarantying debts of others which would conflict with the terms of the DIP Loan, or (c) prohibit the filing of a bankruptcy petition: (i) FC Parcel 73, LLC (Tomen); (ii) FC Commercial, LLC (Tomen); (iii) DY Land Holdings II, LLC (Tomen); (iv) FC Golf, LLC (Textron); and (v) FC Golf, Ltd. (Textron).

2. However, organizational documents do not supersede the rights afforded by the Bankruptcy Code, and this principal is expressly recognized in the Bankruptcy Code. For example, the definition of "property of the estate" in Section 541 provides that a debtor's becomes property of the estate "notwithstanding any provisions in an agreement, transfer instrument ***or applicable nonbankruptcy law*** that restricts or conditions such transfer of such interest by the debtor." 11 U.S.C. § 541(c)(1)(A) (emphasis added). Also, the Bankruptcy Code allows implementation of a chapter 11 plan of reorganization through amendments or additions to a debtor's organizational document. See, e.g., 11 U.S.C. § 1123(a)(5)(I) (noting that a chapter 11 "plan shall—provide adequate means for the plan's implementation, such as—amendment of the debtor's charter"); U.S.C. § 1123(a)(6) (noting that a chapter 11 plan shall "provide for the inclusion in the charter of the debtor . . . a provision prohibiting the issuance of nonvoting equity securities"); *see also*, <u>Final Order Authorizing Debtors</u>

to, *inter alia*, Obtain Postpetition Secured Financing, C.P. # 527 at ¶ 17(i), *In re General Growth Properties, Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (authorizing Debtors to implement any necessary amendment to its certificate of incorporation, bylaws or comparable governing documents in order to comply with post-petition DIP loan). Accordingly, the Debtors are entitled to pursue their rights under the Bankruptcy Code to use their cash and to encumber their property, regardless of any purported limitations contained in the organizational documents, so long as the Debtors obtain this Court's approval pursuant to the applicable provisions of the Bankruptcy code.

3. Moreover, the purported restrictions in the organizational documents on the ability of certain Debtors to file a voluntary petition in bankruptcy constitute unenforceable pre-petition waivers which would adversely affect the interests of third parties. *See In re South East Fin. Associates, Inc.*, 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) (Paskay, J.) ("A prepetition waiver of bankruptcy benefits may be binding unless the agreement was obtained by coercion, fraud or mutual mistake of fact. Such waivers are not self-executing and are not binding on third parties. Thus, if a waiver adversely affects other creditors, it is unlikely that the waiver will be enforced.") (citations omitted).

4. In this case, the Debtors have a large number of secured and unsecured creditors, each of whom is a third party that is not bound by any such restriction and would be detrimentally impacted by a dismissal, because the approval of the DIP Loan as contemplated by this Motion would be in the best interests of all creditors. As a result, these restrictions are unenforceable, and do not impair any Debtors' ability to institute these chapter 11 proceedings. *See Id.*

--------------------

Here is the language in the order that grants the ability to borrow money and grant liens:

In order to enable them to continue to operate their business during the Interim Period (as defined below), subject to the terms and conditions of this Interim Order, the DIP Loan Agreement, the other DIP Loan Documents, and the Budget (which Budget may not be materially amended or modified during the Interim Period), the Debtors are hereby authorized under the DIP Loan to borrow up to the amount of the Initial Advance during the Interim Period. Notwithstanding any provision of its certificate or articles of incorporation, bylaws, operating agreement, partnership agreement, membership agreement, certificate of formation, certificate of limited partnership, regulations, or comparable governing documents to the contrary, each Debtor is authorized to, and each officer, member, manager, partner, or other comparable authorized signatory of each

Debtor is hereby authorized to cause such Debtor to, jointly and severally guarantee and pay the DIP Obligations of each other Debtor obligated under the DIP Loan Agreement, and pledge, mortgage and grant security interests in its assets to secure such DIP Obligations, and to execute and enter into any and all of the DIP Loan Agreement, the DIP Loan Documents, and all other documents and transactions necessary to implement and effectuate the terms of the DIP Loan and the DIP Loan Agreement.

Paul

GENOVESE JOBLOVE & BATTISTA P.A. Attorneys at Law

Paul J. Battista, Esq.
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone: (305) 349-2300
Direct: (305) 372-2457
Facsimile: (305) 349-2310
Cell: (305) 812-8030
E-mail: pbattista@gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information contained herein. Also, please notify sender that you have received this communication in error, and delete the copy thereof you have received. Thank you.

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

6

AA01513

**Erenbaum, Jessica**

**From:** Peter Desiderio <PDesiderio@stearnsweaver.com>
**Sent:** Wednesday, February 17, 2010 4:23 PM
**To:** 'Helm, Elizabeth'
**Cc:** McCaughan, William P.; Daniel, Rick; David Radunsky; Fields, David; CJ Lorio; K Springfield; Soards, Anthony; Cox, John; Fine, Jeffrey; Jane Houk; Battista, Paul J.; Jane Houk; Battista, Paul J.
**Subject:** Purchase Option

The following are our comment to the Purchase Option redraft sent to us today. It was our understanding, based upon the conference call last night, that the Purchase Option would be triggered on the Maturity Date (or an earlier date if the Lender gave notice of Lender's intent to foreclose on or seek recovery against the collateral or equity interests).

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

EXHIBIT 3

3.6 **Purchase Option.** ~~It is the intent of~~ Lender and Borrowers hereby agree that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 ~~before~~ and Lender ~~forecloses~~ agrees not to foreclose on or seek recovery against any of the Collateral or ~~exercises~~ exercise its voting, consent, or management rights with respect to any of the Equity Interests until after such option to purchase has expired. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the "***Designated Buyer***") for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the parties hereby agree that the purchase of the Loan ~~has~~ shall be closed and ~~been~~ consummated within the Purchase Option Period. — [NOTE: THESE CHANGES ARE NECESSARY BECAUSE THE LENDER COULD FAIL TO TIMELY COMPLY WITH THE CLOSING REQUIREMENT OR BE UNABLE TO DO SO DUE TO FORCE MAJEURE AND THEREBY CAUSE THE TERMINATION OF THE OPTION]. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term "***Purchase Option Period***" shall +mean the ~~30-day~~ period commencing on the ~~later~~ earlier of (i) the ~~Maturity~~ ~~to~~ date of the Required Notice (as hereinafter defined), and (ii) the Maturity Date and expiring on the later of thirty days after (x) the Maturity Date and (y) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers (the "Required Notice") that Lender ~~is in the process of selling or causing~~ has elected to foreclose on, seek recovery against or sell or cause to be sold any of the Collateral or ~~exercising~~ exercise the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further,* that Lender shall not foreclose on, seek recovery against or sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option. Notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, Lender agrees to give Borrower written notice thereof before Lender seeks to foreclose on, recover against or sell or cause to be sold any of the Collateral or seeks to exercise the voting, consent, or management rights of a holder of any Equity Interest.

7

AA01516

**Erenbaum, Jessica**

**From:** Battista, Paul J.
**Sent:** Wednesday, February 17, 2010 6:00 PM
**To:** 'Fine, Jeffrey'
**Subject:** RE: Question on Break Up Fee

Jeff, I appreciate the response, but it is not a fair response given what has happened since then. There are several things in the commitment letter that were heavily negotiated, carefully chosen and agreed upon and yet have either changed or been eliminated in their entirety. I am trying to address an issue that is a real issue and one that is sure to come up. If you are telling me that your client is unwilling to consider the issue and attempt to resolve and address it, which we think would be a reasonable thing to do, then please tell me that. I do not think there are many scenarios that I am concerned about. My sole concern is that your client refuses to fund after we get the final order for any reason (whether it is failure of title, failure of conditions etc etc) and we are able to get one of the other lenders to step up and fund notwithstanding the issue that prevented your client from funding, then it is pretty clear to us at least that no break up fee should be due and certainly not one at 25%.

Paul

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Wednesday, February 17, 2010 5:22 PM
**To:** Battista, Paul J.
**Subject:** RE: Question on Break Up Fee

Paul: There are many scenarios that could occur and the language both in the Loan Agreement, and the Commitment Letter before it, was carefully chosen, thoroughly negotiated and there were discussions on this very topic a number of times. Nothing has changed on this.

Thanks,

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

---

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Wednesday, February 17, 2010 2:20 PM
**To:** Fine, Jeffrey
**Cc:** Jane Houk; Patricia Redmond; Tony DiNardo; Guitian, Mariaelena; Schuster, Michael; Harmon, Heather
**Subject:** Question on Break Up Fee

Jeff, in reviewing the break up fee which we are trying to get approved, it occurs to us that it is possible that we could get the initial funding completed, and then we are unable to satisfy one or more of Pepi's conditions to closing on the final order (like title insuance etc). In that situation, it is possible that other lenders on the project could come forward with a

funding package for their property and some general coverage. As drafted, it appears as though the break up fee of 1.0 mm may be due on a 4.0 mm loan. That does not seem to be the concept of the deal, including because it would be a 25% fee. Please confirm that the fee is only due if we try to replace your client when they are otherwise ready, willing and able to fund.

Thanx

GENOVESE JOBLOVE & BATTISTA PA
*Attorneys at Law*

**Paul J. Battista, Esq.**
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone: (305) 349-2300
Direct: (305) 372-2457
Facsimile: (305) 349-2310
Cell: (305) 812-8030
E-mail: pbattista@gjb-law.com
www.gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information contained herein. ... and delete the copy thereof you have received. Thank you.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

8

AA01519

**Erenbaum, Jessica**

**From:** Battista, Paul J.
**Sent:** Thursday, February 18, 2010 10:37 AM
**To:** 'Fine, Jeffrey'
**Subject:** RE: Please call or email me asap on the remaning issues we discussed last night?

Thanx.

Any update? The day is beginning to get away from us in terms of filing.

Paul

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 7:10 AM
**To:** Battista, Paul J.
**Subject:** Re: Please call or email me asap on the remaning issues we discussed last night?

I wasn't able to reach elizabeth yet. We will put in a provision re the defaulted contracts. I need to speak with elizabeth re the purchase option language. I will get back to you as soon as possible.
Thank you.

Jeffrey Fine

----- Original Message -----
From: Battista, Paul J. <pbattista@gjb-law.com>
To: Fine, Jeffrey
Sent: Thu Feb 18 06:02:15 2010
Subject: Please call or email me asap on the remaning issues we discussed last night?

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.

Sent from my BlackBerry Wireless Device

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

9

AA01521

**From:** Peter Desiderio
**Sent:** Thursday, February 18, 2010 11:13 AM
**To:** 'Helm, Elizabeth'
**Subject:** RE: Fiddler's Creek Loan Sale Agreement

Please advise as to the status of the redraft of the Purchase Option. Thanks.

Peter L. Desiderio, Esq.
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
New River Center, Suite 2100
200 East Las Olas Boulevard
Fort Lauderdale, Florida 33301
Phone: 954-462-9540
Fax: 954-462-9567
email: pdesiderio@stearnsweaver.com

10

AA01523

**From:** K Springfield
**To:** Tony DiNardo
**Date:** Thursday, February 18, 2010 11:41:14 AM

Tony, I just talked to Jeff and they are completing language and you should have shortly.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

11

AA01525

**Erenbaum, Jessica**

| | |
|---|---|
| **From:** | Fine, Jeffrey <Jeff.Fine@klgates.com> |
| **Sent:** | Thursday, February 18, 2010 12:12 PM |
| **To:** | Battista, Paul J. |
| **Cc:** | k.springfield@pgrp.net; cj.lorio@pgrp.net; david.radunsky@pgrp.net; Helm, Elizabeth; Cox, John |
| **Subject:** | Fiddler's |

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the "***Designated Buyer***") for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term "***Purchase Option Period***" shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further*, that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or lifting of stay could threaten such Debtor's ability to operate in accordance with or execute the Business Plan; for purposes of clarity, an event of default under an agreement for debt for Money Borrowed, which event of default exists on the Petition Date, shall not be an Event of Default hereunder unless the additional events described in this Section 9.8 have occurred;

Please let me know if you have any questions.

Thanks!

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

12

AA01528

**From:** K Springfield
**Sent:** Thursday, February 18, 2010 12:13 PM
**To:** Tony DiNardo
**Subject:** FW: Fiddler's

Here is the final language that was sent to Paul. No more changes so that you can go ahead and file.

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 11:12 AM
**To:** Battista, Paul J.
**Cc:** K Springfield; CJ Lorio; David Radunsky; Helm, Elizabeth; Cox, John
**Subject:** Fiddler's

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the "*Designated Buyer*") for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term "*Purchase Option Period*" shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further*, that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue:

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or

REVIEW060481

13

AA01530

**Erenbaum, Jessica**

**From:** Battista, Paul J.
**Sent:** Thursday, February 18, 2010 12:15 PM
**To:** 'Fine, Jeffrey'
**Cc:** k.springfield@pgrp.net; cj.lorio@pgrp.net; david.radunsky@pgrp.net; Helm, Elizabeth; Cox, John
**Subject:** RE: Fiddler's

Thanx Jeff. We are reviewing now and will respond asap. On the break up fee discussion from last night, I would propose to add a sentence to the DIP motion that clarifies the issue that we discussed.

Thanx and we will be right back to you

---

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Thursday, February 18, 2010 12:12 PM
**To:** Battista, Paul J.
**Cc:** k.springfield@pgrp.net; cj.lorio@pgrp.net; david.radunsky@pgrp.net; Helm, Elizabeth; Cox, John
**Subject:** Fiddler's

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the "***Designated Buyer***") for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term "***Purchase Option Period***" shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further*, that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or lifting of stay could threaten such Debtor's ability to operate in accordance with or execute the Business Plan; for purposes of clarity, an event of default under an agreement for debt for Money Borrowed, which event of default exists on the Petition Date, shall not be an Event of Default hereunder unless the additional events described in this Section 9.8 have occurred;

Please let me know if you have any questions.

Thanks!

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

14

AA01533

Case 8:11-ap-00809-KRM Doc 99-4 Filed 03/02/15 Page 15 of 19

**Erenbaum, Jessica**

**From:** Jane Houk <JHouk@stearnsweaver.com>
**Sent:** Thursday, February 18, 2010 2:58 PM
**To:** 'Helm, Elizabeth'; Fine, Jeffrey; Battista, Paul J.
**Cc:** Peter Desiderio; Patricia Redmond; dinardoa@gulfbay.com; 'Aubrey J. Ferrao'
**Subject:** Purchase Option

All:

On Tues. night's call, the parties agreed to certain terms of the Purchase Option, which we do not see reflected in your current draft:

1. Commencement of Option Period. The KLG draft provides that the Purchase Option Period commences on the later of the (i) Maturity Date or (ii) Lender's notice of the Maturity Date or notice of foreclosure. On Tues. call, the parties agreed that the commencement of option period would not be delayed until Lender gave notice – otherwise, Borrowers' rights could be impaired if Lender didn't give notice or didn't give prompt notice.
2. Duty to Close. We discussed on Tues. call that the language be revised to obligate each party to close and consummate the transaction during the Option Period. As drafted, there is no obligation on the Lender to perform and if Lender fails to timely perform, Borrowers' Option is lost.

In addition, as Paul mentioned to Jeff earlier today, there may be an issue with the Bankruptcy Court approving general releases being executed by the Obligors. We understand your concerns and to address this issue we propose that to the extent the Bankruptcy Court does not approve the giving of such releases, the Designated Buyer would provide a complete Indemnification to the Lender, secured by a collateral assignment of the Loan Documents.

Please advise when you are available to discuss these issues.

Best regards,
Jane

Jane A. Houk
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 W. Flagler Street
Miami, FL 33130
Direct dial: (305) 789-3586
Main line: (305) 789-3200
Direct facsimile: (305) 789-2660
Main facsimile: (305) 789-3395
Email address: jhouk@stearnsweaver.com

CONFIDENTIALITY NOTICE The information contained in this E-m[...]d confidential information intended only for the use of the individual(s) named above If the reader of this message is not the i[...]otified that any dissemination, distribution or copy of this

EXHIBIT 4

15

AA01535

## Erenbaum, Jessica

**From:** Tony DiNardo <dinardoT@gulfbay.com>
**Sent:** Thursday, February 18, 2010 3:11 PM
**To:** David Radunsky; CJ Lorio; K Springfield
**Subject:** FW: Purchase Option

David,

Issues one and two were agreed to – they seems straight forward and fair.

Also, please let me know if you can accept the resolution below with regard to the collateral assignment, in lieu of the general release, which may not be obtained from the bankruptcy court. Please let me know if we need to discuss this further.

Thanks

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Thursday, February 18, 2010 2:58 PM
**To:** 'Helm, Elizabeth'; Fine, Jeffrey; 'Battista, Paul J.'
**Cc:** Peter Desiderio; Patricia Redmond; Tony DiNardo; Aubrey J. Ferrao
**Subject:** Purchase Option

All:

On Tues. night's call, the parties agreed to certain terms of the Purchase Option, which we do not see reflected in your current draft:

1. Commencement of Option Period. The KLG draft provides that the Purchase Option Period commences on the later of the (i) Maturity Date or (ii) Lender's notice of the Maturity Date or notice of foreclosure. On Tues. call, the parties agreed that the commencement of option period would not be delayed until Lender gave notice – otherwise, Borrowers' rights could be impaired if Lender didn't give notice or didn't give prompt notice.
2. Duty to Close. We discussed on Tues. call that the language be revised to obligate each party to close and consummate the transaction during the Option Period. As drafted, there is no obligation on the Lender to perform and if Lender fails to timely perform, Borrowers' Option is lost.

In addition, as Paul mentioned to Jeff earlier today, there may be an issue with the Bankruptcy Court approving general releases being executed by the Obligors. We understand your concerns and to address this issue we propose that to the extent the Bankruptcy Court does not approve the giving of such releases, the Designated Buyer would provide a complete indemnification to the Lender, secured by a collateral assignment of the Loan Documents.

Case 8:11-ap-00809-KRM Doc 99-4 Filed 03/02/15 Page 38 of 196

Please advise when you are available to discuss these issues.

Best regards,
Jane

Jane A. Houk
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 W. Flagler Street
Miami, FL 33130
Direct dial: (305) 789-3586
Main line: (305) 789-3200
Direct facsimile: (305) 789-2660
Main facsimile: (305) 789-3395
Email address: jhouk@stearnsweaver.com

---

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

---

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

16

AA01538

From: Fine, Jeffrey [Jeff.Fine@klgates.com]
Sent: Thursday, February 18, 2010 3:32 PM
To: Jane Houk
Subject: FW: Fiddler's

**From:** Fine, Jeffrey
**Sent:** Thursday, February 18, 2010 11:12 AM
**To:** 'Battista, Paul J.'
**Cc:** 'Kenny Springfield (k.springfield@pgrp.net)'; 'cj.lorio@pgrp.net'; 'david.radunsky@pgrp.net'; Helm, Elizabeth; Cox, John
**Subject:** Fiddler's

Paul: Here is the acceptable Purchase Option language:

It is the intent of Lender and Borrowers that Borrowers have the option to purchase the Loan as set forth in this Section 3.6 before Lender forecloses on any of the Collateral or exercises its voting, consent, or management rights with respect to any of the Equity Interests. In furtherance thereof, notwithstanding anything to the contrary set forth in this Agreement or any other Loan Document, during the Purchase Option Period (as defined herein), upon written notice of exercise of this option given to Lender by Fiddler's Creek, Lender shall sell the Loan and all Loan Documents, free of any Liens created by Lender, to the buyer designated by Fiddler's Creek in such notice (the "***Designated Buyer***") for a purchase price, payable in cash, equal to the sum of the then-outstanding principal balance of the Loan, accrued but unpaid interest thereon to the date such purchase is consummated, and all fees, costs, and expenses due and owing by Debtors to Lender, including, without limitation, any fees, costs, and expenses that would be earned upon payment in full of the Loan, *provided*, that the purchase of the Loan has closed and been consummated within the Purchase Option Period. The Designated Buyer may be any Debtor or any Affiliate of any Debtor. Such sale shall be made without recourse, representation, or warranty by Lender pursuant to documentation satisfactory to the Designated Buyer and Lender, which documentation shall include, among other things, a general release of all claims any Obligor may have against each Lender and each Lender Related Person. The purchase option shall be referenced in the Mortgages. As used herein, the term "***Purchase Option Period***" shall mean the 30-day period commencing on the later of (i) the Maturity Date and (ii) the date that Lender has given notice to Borrowers that the Maturity Date has occurred or will occur, *provided*, that if an Event of Default has occurred and is continuing, the Maturity Date has not occurred, and Lender has not accelerated the maturity of the Obligations, but Lender has given written notice to Borrowers that Lender is in the process of selling or causing to be sold any of the Collateral or exercising the voting, consent, or management rights held by a holder of any Equity Interest, the Purchase Option Period shall be the 30-day period commencing on the date of such notice, *provided, further*, that Lender shall not sell or cause to be sold any of the Collateral or exercise the voting, consent, or management rights of a holder of any Equity Interest until the Purchase Option Period has expired. Regardless of whether the trigger for the commencement of a Purchase Option Period is the Maturity Date or notice thereof or is written notice of Lender's exercise of foreclosure rights or voting, consent, or management rights with respect to Equity Interests, Borrowers shall have only one purchase option.

Paul, here is the language in 9.8 to address the default issue;

If there is a default in one or more agreements which are material to the business operations of any Debtor, and to which such Debtor is a party, with one or more third Persons and such third Persons have obtained relief

from the automatic stay under Section 362 of the Bankruptcy Code and Lender determines that such default or lifting of stay could threaten such Debtor's ability to operate in accordance with or execute the Business Plan; for purposes of clarity, an event of default under an agreement for debt for Money Borrowed, which event of default exists on the Petition Date, shall not be an Event of Default hereunder unless the additional events described in this Section 9.8 have occurred;

Please let me know if you have any questions.

Thanks!

**Jeffrey R. Fine**
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

17

AA01541

**From:** K Springfield
**To:** Tony DiNardo
**Date:** Thursday, February 18, 2010 4:35:14 PM

Tony, I talked to David and Jeff and the bottom line is that general release will have to remain. Unfortunately, there will not be any change to that component.

I am heading to a meeting but will be available if you need to discuss.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

18

AA01543

**From:** Tony DiNardo [dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 4:49 PM
**To:** Jane Houk; Battista, Paul J.
**Cc:** Aubrey J. Ferrao
**Subject:** FW:

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** K Springfield [mailto:K.Springfield@pgrp.net]
**Sent:** Thursday, February 18, 2010 4:33 PM
**To:** Tony DiNardo
**Subject:**

Tony, I talked to David and Jeff and the bottom line is that general release will have to remain. Unfortunately, there will not be any change to that component.

I am heading to a meeting but will be available if you need to discuss.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

SWM0097

AA01544

19

AA01545

**From:** Battista, Paul J. [pbattista@gjb-law.com]
**Sent:** Thursday, February 18, 2010 5:00 PM
**To:** Tony DiNardo; Jane Houk
**Cc:** Aubrey J. Ferrao
**Subject:** RE:

Redacted

---

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 4:49 PM
**To:** Jane Houk; Battista, Paul J.
**Cc:** Aubrey J. Ferrao
**Subject:** FW:

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

---

**From:** K Springfield [mailto:K.Springfield@pgrp.net]
**Sent:** Thursday, February 18, 2010 4:33 PM
**To:** Tony DiNardo
**Subject:**

Tony, I talked to David and Jeff and the bottom line is that general release will have to remain. Unfortunately, there will not be any change to that component.

I am heading to a meeting but will be available if you need to discuss.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

20

AA01547

From: Tony DiNardo [dinardoT@gulfbay.com]
Sent: Thursday, February 18, 2010 5:14 PM
To: Battista, Paul J.; Jane Houk
Subject: RE:

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** Battista, Paul J. [mailto:pbattista@_jb-law.com]
**Sent:** Thursday, February 18, 2010 5:00 PM
**To:** Tony DiNardo; Jane Houk
**Cc:** Aubrey J. Ferrao
**Subject:** RE:

Redacted

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 4:49 PM
**To:** Jane Houk; Battista, Paul J.
**Cc:** Aubrey J. Ferrao
**Subject:** FW:

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** K Springfield [mailto:K.S_rin_fieldO_ _r_ .net]
**Sent:** Thursday, February 18, 2010 4:33 PM
**To:** Tony DiNardo
**Subject:**

Tony, I talked to David and Jeff and the bottom line is that general release will have to remain. Unfortunately, there will not be any change to that component.

I am heading to a meeting but will be available if you need to discuss.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

From: Tony DiNardo [dinardoT@gulfbay.com]
Sent: Thursday, February 18, 2010 5:22 PM
To: Battista, Paul J.; Jane Houk
Subject: RE:

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

---

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Thursday, February 18, 2010 5:15 PM
**To:** Tony DiNardo; Jane Houk
**Subject:** RE:

Redacted

---

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 5:14 PM
**To:** Battista, Paul J.; Jane Houk
**Subject:** RE:

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

---

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Thursday, February 18, 2010 5:00 PM
**To:** Tony DiNardo; Jane Houk
**Cc:** Aubrey J. Ferrao
**Subject:** RE:

Redacted

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 4:49 PM
**To:** Jane Houk; Battista, Paul J.
**Cc:** Aubrey J. Ferrao
**Subject:** FW:

**Redacted**

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** K Springfield [mailto:K.Springfield@pgrp.net]
**Sent:** Thursday, February 18, 2010 4:33 PM
**To:** Tony DiNardo
**Subject:**

Tony, I talked to David and Jeff and the bottom line is that general release will have to remain. Unfortunately, there will not be any change to that component.

I am heading to a meeting but will be available if you need to discuss.

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

1. Commencement of Option Period. The KLG draft provides that the Purchase Option Period commences on the later of the (i) Maturity Date or (ii) Lender's notice of the Maturity Date or notice of foreclosure. On Tues. call, the parties agreed that the commencement of option period would not be delayed until Lender gave notice – otherwise, Borrowers' rights could be impaired if Lender didn't give notice or didn't give prompt notice.
2. Duty to Close. We discussed on Tues. call that the language be revised to obligate each party to close and consummate the transaction during the Option Period. As drafted, there is no obligation on the Lender to perform and if Lender fails to timely perform, Borrowers' Option is lost.

In addition, as Paul mentioned to Jeff earlier today, there may be an issue with the Bankruptcy Court approving general releases being executed by the Obligors. We understand your concerns and to address this issue we propose that to the extent the Bankruptcy Court does not approve the giving of such releases, the Designated Buyer would provide a complete indemnification to the Lender, secured by a collateral assignment of the Loan Documents.

Please advise when you are available to discuss these issues.

Best regards,
Jane

Jane A. Houk
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 W. Flagler Street
Miami, FL 33130
Direct dial: (305) 789-3586
Main line: (305) 789-3200
Direct facsimile: (305) 789-2660
Main facsimile: (305) 789-3395
Email address: jhouk@stearnsweaver.com

CONFIDENTIALITY NOTICE: The information contained in this E mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E mail and destroy all copies of the original message. Thank you

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein

21

AA01553

**From:** Tony DiNardo [dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 6:33 PM
**To:** Jane Houk; Battista, Paul J.; Aubrey J. Ferrao
**Subject:** FW: Purchase Option

Redacted

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** David Radunsky [mailto:David.Radunsky@pgrp.net]
**Sent:** Thursday, February 18, 2010 6:29 PM
**To:** Tony DiNardo; CJ Lorio; K Springfield
**Cc:** Fine, Jeffrey
**Subject:** RE: Purchase Option

Tony,
I'm sorry I am just responding to the below email of earlier this afternoon.
Much discussion may have advanced the ball since your email, but I will at least mention that it was my understanding from the call the other night that we acknowledged your legitimate interest in being able to exercise the option in advance of exercise of remedies, even if we had not declared an acceleration.
But, I think we solution discussed was to provide that we would not consummate any foreclosure, etc. without giving a notice that would trigger the option exercise period. I thought this idea was in the latest draft.
David

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 18, 2010 2:11 PM
**To:** David Radunsky; CJ Lorio; K Springfield
**Subject:** FW: Purchase Option

David,

Issues one and two were agreed to – they seems straight forward and fair.

Also, please let me know if you can accept the resolution below with regard to the collateral assignment, in lieu of the general release, which may not be obtained from the bankruptcy court. Please let me know if we need to discuss this further.

Thanks

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816

Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

---

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Thursday, February 18, 2010 2:58 PM
**To:** 'Helm, Elizabeth'; Fine, Jeffrey; 'Battista, Paul J.'
**Cc:** Peter Desiderio; Patricia Redmond; Tony DiNardo; Aubrey J. Ferrao
**Subject:** Purchase Option

All:

On Tues. night's call, the parties agreed to certain terms of the Purchase Option, which we do not see reflected in your current draft:

1. Commencement of Option Period. The KLG draft provides that the Purchase Option Period commences on the later of the (i) Maturity Date or (ii) Lender's notice of the Maturity Date or notice of foreclosure. On Tues. call, the parties agreed that the commencement of option period would not be delayed until Lender gave notice – otherwise, Borrowers' rights could be impaired if Lender didn't give notice or didn't give prompt notice.
2. Duty to Close. We discussed on Tues. call that the language be revised to obligate each party to close and consummate the transaction during the Option Period. As drafted, there is no obligation on the Lender to perform and if Lender fails to timely perform, Borrowers' Option is lost.

In addition, as Paul mentioned to Jeff earlier today, there may be an issue with the Bankruptcy Court approving general releases being executed by the Obligors. We understand your concerns and to address this issue we propose that to the extent the Bankruptcy Court does not approve the giving of such releases, the Designated Buyer would provide a complete indemnification to the Lender, secured by a collateral assignment of the Loan Documents.

Please advise when you are available to discuss these issues.

Best regards,
Jane

Jane A. Houk
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 W. Flagler Street
Miami, FL 33130
Direct dial: (305) 789-3586
Main line: (305) 789-3200
Direct facsimile: (305) 789-2660
Main facsimile: (305) 789-3395
Email address: jhouk@stearnsweaver.com

---

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

22

AA01557

bankruptcy court. Why he has to get more lawyers involved and bill me, I really don't care.

**Q Okay. I've marked Exhibit 6-10 Fiddler's 3983, comprised of Houk email date 2/18/10 at 2:58 p.m. to counsel for PEPI.**

A Yes.

**Q The first paragraph deals with continuing requests to finalize the purchase option language, correct?**

A First paragraph we agree to the certain terms of purchase option -- the two items I talked about.

**Q Right. Talking about the purchase option?**

A Right. The second paragraph --

**Q This is what you've discussed --**

A -- is Jane Houk.

MR. REYES: Tony, is there a question pending?

A I'm answering.

MR. REYES: He hasn't asked you a question.

**Q The second paragraph you testified about previously whereby Paul Battista advised your group and I quote, in her email there may be an issue with the bankruptcy court approving general releases being executed by the obligors, closed quote?**

A Yes.
Q This is the email you were referring to before, correct?
A Yes.
Q And the email continuing by Fiddler's proposing an alternative resolution in place of general releases, correct?
A Yes.
MR. REYES: I know you want to go until 12:30, but if you're tired --
A Go to 12:30.
Q Okay. I'm showing Mr. DiNardo an email -- strike that.
Exhibit 6-11 is Fiddler's 3985, which is an email from Mr. DiNardo, February 18, 2010 at 3:11 p.m. to Mr. Radunsky, Lorio and Springfield regarding the purchase option?
A Yes.
Q Okay. And you write, David, issues 1 and 2 are agreed to. They seem straight forward and fair. You say, Also, please let me know if you can accept the resolution below with regard to the collateral assignment in lieu of the general release, which may not be obtained from the bankruptcy court, period. See that?

23

AA01560

and proceed to funding.

**Q And the evening of the 18th, that was when Mr. DiNardo suggested that you provide the financing and become the new DIP lender, correct?**

A He asked me to.

**Q He asked you to do what I just said?**

A Yes, would I provide DIP financing.

**Q And was that the first time you'd ever considered that concept?**

A No.

**Q When else did you consider being the DIP lender?**

A Early on in the process. I had a discussion when I first met Mr. Battista with Patricia Redmond. Paul asked me if I would provide DIP financing and I said no.

**Q Why'd you say no?**

A Because I was not interested in providing DIP financing at the time.

**Q Why?**

A Because I had many, many other assets and I didn't know how much of my money would have to go to different areas, allocation. And we're just also funding Fiddler's through Florida Financial.

**Q What does that mean?**

MR. REYES: Object to the form. Calls for speculation. Let me get my objection in.

A I don't know what I would have done at that time. I know what I did. I know what the facts were at the time. I don't know what the hypotheticals would have been.

**Q Okay. So Aubrey comes back and says I'll do it. At that point you instruct Mr. Battista to declare the default, correct?**

A That's correct. A-U-B-R-E-Y.

MR. REYES: Lorio is Lorio, not Florio.

MR. PERLMAN: Did it yesterday, too.

MR. REYES: Can we agree --

THE WITNESS: When I say Florio, it's Lorio.

BY MR. PERLMAN:

**Q This will be Composite Exhibit 5.**

A This is more than one document.

**Q Keep them together, one composite exhibit, 5-1, 5-2, 5-3.**

MR. BATTISTA: Can you identify which Bates stamp is the first page?

MR. PERLMAN: This is the shorter of the two stacks in your email dated 2/15, 10:22 on top. You can drop that last exhibit. I think we're only

24

AA01563

where we were at that time.

**Q Just answer the question and we can stay on schedule. Given what you just stated, why was the entire Fiddler's team, Ms. Houk, Mr. Battista and yourself, negotiating with Fiddler's and communicating with Fiddler's with regard to complying with the commitment letter and moving forward with the DIP facility and the bankruptcy after the 16th?**

A What I stated is that understanding the economic consequences we were looking at, we were looking at the end of Fiddler's Creek, which has at that time 1,750 members, not finishing our obligations, which PEPI made a requirement of keeping the foundation open, keeping the tarpon club open, keeping the golf club open, so we had a viable community where we had human beings living in that community who called Fiddler's Creek their home and neighborhood.

I was facing no alternative on the 16th. On the 17th, we saw PEPI's loan documents and again the waterfall issue was not resolved. On the 18th, I had a discussion with Paul Battista to help me to get an understanding of where I am. From that discussion, both Paul and I decided on the 18th to tell Mr. Ferrao this is where we are and we

an email to all the parties involved and said stand down. And that's why negotiations were going on. That's why I even spoke and kept negotiations going because I had no alternative.

Q Before I go back to my initial question, you said Mr. Battista said in the email to all parties involved to stand down?

A On the 19th.

Q And who are all the parties involved?

A Jane Houk and Peter Desiderio.

Q On the borrower's side?

A On the borrower's side.

Q Okay.

A Because he was going to craft the letter to PEPI.

Q Okay. Can you read back my question, please?

(Thereupon, the requested portion of the record was read back by the reporter.)

MR. REYES: Pretty complete answer.

MR. PERLMAN: I didn't get an answer to that question.

MR. REYES: I disagree. Want him to answer it again?

BY MR. PERLMAN:

A Before -- I'm not a lawyer.

MR. REYES: There's no question. Just look at it.

A I'm looking.

MR. REYES: When you're done, he'll ask you a question.

A I looked at it.

Q **Can you explain to me why Fiddler's is negotiating the purchase option as of 4:23 on February 17th?**

MR. REYES: Object to the form.

A As of this time, we did not give a stand down to any of the attorneys and everybody was doing status quo because as of this time, I know on the 17th, I don't know what time when I got a loan draft, the waterfall clause was not consistent with what we negotiated with in the commitment letter. So everything was ongoing.

Q **Okay. So when you say status quo, you mean full steam ahead, let's get this thing closed if we can?**

A Yes. Because I did not have that decision made until the 19th.

MR. REYES: Can I see 6-2 for a second?

Q **Okay. Showing you what's been marked**

Q And Mr. Battista is responding to Mr. Fine's email below it, right?
A Yes.
Q Okay. And Mr. Fine states in his email, I need to speak with Elizabeth regarding the purchase option language. I will get back to you as soon as possible, right?
A Yes.
Q Mr. Battista's email in response says, Thanks. Any update? The day is beginning to get away from us in terms of filing, correct?
A Yes.
Q Okay. So as of the 18th, the parties were still negotiating the purchase option, right?
A Yes.
Q Thank you.
A But I think there's an email --
Q There's no --
A -- on the 18th -- I want to finish. I remember or recall an email from David Radunsky telling me that PEPI signed off on the trigger mechanism and notice mechanism for the option agreement. There's another email from David Radunsky the same day. I recall that.
Paul, 6-5 is --

question.

Q Not really.

A At this point in time, I don't have any of this stuff. And I really -- this is Battista coming up with issue we're negotiating in good faith, whatever PEPI wants at this particular point in time, we're trying to deliver.

Q Okay. So if you have these other big issues, why are you dealing with the request to get the collateral assignments in lieu of the general release?

MR. REYES: Object to the form.

A Because at this time I'm continuing to go down all the avenues until I know what we're going to do, like I told you many a time. I had nobody else to go to.

Q Okay. I'm showing you what's marked Exhibit 6-12 Stearns Weaver 9700, an email from Fine to Houk 2/18/2010 at 3:32, see that?

A Yes.

Q Mr. Fine attached acceptable purchase option language he sent to Paul on the 18th, correct?

A Yes.

Q Okay. Showing the witness 6-13 an email from Springfield to DiNardo on February 18, 2010 at

25

AA01569

**Erenbaum, Jessica**

-----Original Message-----
From: K Springfield [mailto:K.Springfield@pgrp.net]
Sent: Friday, February 19, 2010 11:32 AM
To: Tony DiNardo
Subject:

Where do we stand

26

AA01571

**From:** Battista, Paul J. [pbattista@gjb-law.com]
**Sent:** Friday, February 19, 2010 11:38 AM
**To:** Tony DiNardo; Jane Houk
**Cc:** Aubrey J. Ferrao; Patricia Redmond
**Subject:** RE:

Thx. Per our discussions this morning, we should stand down on speaking with them at this point.

We have arranged for counsel to Gulf Bay and counsel to Florida Financial. They are formally clearing conflicts and expect no issues.

I am working on issues with the Textron hearing on Monday so as to make the decision as to whether we file Sunday or hold off to Friday so that payroll can be made Thursday.

Paul

---

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Friday, February 19, 2010 11:31 AM
**To:** Battista, Paul J.; Jane Houk
**Cc:** Aubrey J. Ferrao
**Subject:**

Paul
FYI
Got a voice mail from Kenny. That his lawyers are waiting on redraft of repurchase option from our lawyers.
Thanks

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

EXHIBIT
5

SWMEIL 2753_1

SWMPRIV0013101

Redacted text appears in red box

**From:** Battista, Paul J. [pbattista@gjb-law.com]
**Sent:** Friday, February 19, 2010 11:39 AM
**To:** Tony DiNardo; Jane Houk
**Cc:** Aubrey J. Ferrao
**Subject:** RE:

If you want to respond, you can say that you are conferring with Aubrey and your counsel and will get back to them as soon as you can.

Paul

-----Original Message-----
From: Tony DiNardo [mailto:dinardoT@gulfbay.com]
Sent: Friday, February 19, 2010 11:36 AM
To: Jane Houk; Battista, Paul J.
Cc: Aubrey J. Ferrao
Subject: FW:

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

-----Original Message-----
From: K Springfield [mailto:K.Springfield@pgrp.net]
Sent: Friday, February 19, 2010 11:32 AM
To: Tony DiNardo
Subject:

Where do we stand

27

AA01574

**Erenbaum, Jessica**

**From:** Tony DiNardo <dinardoT@gulfbay.com>
**Sent:** Friday, February 19, 2010 4:27 PM
**To:** K Springfield
**Subject:** RE:

Kenny
We are conferring with counsel and will get back to you as soon as we can.
Thanks

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

---

**From:** K Springfield [mailto:K.Springfield@pgrp.net]
**Sent:** Friday, February 19, 2010 4:14 PM
**To:** Tony DiNardo
**Subject:**

What's up with the radio silence?

---

Kenny Springfield
Perot Investments, Inc.
2300 West Plano Parkway
Plano, TX 75075

(972) 535-1996
(972) 535-1991 fax
(214) 914-3738 cell
k.springfield@pgrp.net

28

AA01576

**From:** Jane Houk
**Sent:** Friday, February 19, 2010 5:16 PM
**To:** 'Battista, Paul J.'
**Subject:** RE: Update on Filing

Paul – as now scheduled, will the name of the Lender be in the filing documents? I will get entity formed – just want to know timing when it has to be formed by?

---

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Friday, February 19, 2010 3:00 PM
**To:** Tony DiNardo; Aubrey J. Ferrao; Jane Houk; Patricia Redmond; Peter Desiderio; Harmon, Heather; Schuster, Michael; Guitian, Mariaelena; Soneet Kapila
**Subject:** Update on Filing

All, based on the events of last night and my discussion with Tony a few minutes ago, the present plan is to file the cases next Tuesday late in the day. Tony will pre-pay the payroll to the payroll company and will not spend any money between Tuesday night and the hearing on the DIP loan, which I would expect to be the early part of the following week.

Does anyone see any issues with this timetable?

Thanx

GENOVESE JOBLOVE & BATTISTA P.A. Attorneys at Law
Paul J. Battista, Esq.
Bank of America Tower
100 Southeast 2nd Street, 44th Floor
Miami, Florida 33131
Phone: (305) 349-2300
Direct: (305) 372-2457
Facsimile: (305) 349-2310
Cell: (305) 812-8030
E-mail: pbattista@gjb-law.com

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information contained herein. Also, please notify sender that you have received this communication in error, and delete the copy thereof you have received. Thank you.

29

AA01578

**From:** Jane Houk <JHouk@stearnsweaver.com>
**Sent:** 2/19/2010 10:46:06 PM +00:00
**To:** "Battista, Paul" <pbattista@gjb-law.com>
**Subject:** RE: Update on Filing
**Attachments:** Archived

Will get Monday filing date.

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Friday, February 19, 2010 5:26 PM
**To:** Jane Houk
**Subject:** Re: Update on Filing

Yes, it does.

Thx

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.

---

Sent from my BlackBerry Wireless Device

---

**From:** Jane Houk
**To:** Battista, Paul J.
**Sent:** Fri Feb 19 17:16:00 2010
**Subject:** RE: Update on Filing

Paul – as now scheduled, will the name of the Lender be in the filing documents? I will get entity formed – just want to know timing when it has to be formed by?

**From:** Battista, Paul J. [mailto:pbattista@gjb-law.com]
**Sent:** Friday, February 19, 2010 3:00 PM
**To:** Tony DiNardo; Aubrey J. Ferrao; Jane Houk; Patricia Redmond; Peter Desiderio; Harmon, Heather; Schuster, Michael; Guitian, Mariaelena; Soneet Kapila

30

AA01580

**Erenbaum, Jessica**

**From:** Fine, Jeffrey [mailto:Jeff.Fine@klgates.com]
**Sent:** Friday, February 19, 2010 5:22 PM
**To:** Jane Houk
**Subject:** Fiddler's

Jane: When we last spoke yesterday, you and Peter were going to redraft the Purchase Option paragraph and send that to me for review. We all expressed concern that some of the verbiage in the paragraph was not clear enough. I haven't received anything from you and I wanted to make sure that I hadn't missed anything. Please let me know when I can expect to receive the redraft of the paragraph.

Thanks!

Jeffrey R. Fine
Partner
K&L Gates
1717 Main Street, Suite 2800
Dallas, Texas 75201
Phone: 214.939.5567
Cell: 214.632.9263
Fax: 214.939.5849
Email: Jeff.Fine@klgates.com
Website: www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeff.Fine@klgates.com.

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

31

AA01582

**Erenbaum, Jessica**

----- Original Message -----
From: CJ Lorio <CJ.Lorio@pgrp.net>
To: Tony DiNardo
Sent: Sat Feb 20 21:25:58 2010
Subject: Status

Tony, the dearth of communication at this stage is disconcerting to us. I was hoping we had good lines of communication to address and resolve issues in manner that this loan could be approved and executed. Can we set a time to have a call tomorrow to go through the issues you have or what other decisions you have made.

KLGates and we have suspended all work on this loan.
CJ Lorio
-------------------------
Sent from my BlackBerry Wireless Handheld

32

AA01584

**From:** Battista, Paul J. [pbattista@gjb-law.com]
**Sent:** Sunday, February 21, 2010 8:48 AM
**To:** Jane Houk; Patricia Redmond
**Subject:** RE: Comparison Result GBC Loan Agreement DOC.docx

I agree with you and have other concerns. Let's discuss this morning. I am available until about 11 and then after 3:00.

---

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Saturday, February 20, 2010 10:06 PM
**To:** Battista, Paul J.; Patricia Redmond
**Subject:** FW: Comparison Result GBC Loan Agreement DOC.docx

Any chance we can have a call tomorrow morning to discuss GBC DIP in general? I need some guidance here on the redraft. Many changes of Aubrey's I can make, but others I am concerned about strategy, getting DIP approved and having palatable terms given affiliated lender status.
Also, do you see any need for pledge of equity interests? To my knowledge (which should be pretty good on this point), there aren't any encumbrances on those interests. Unless he is planning on syndicating his DIP, I don't see the point in GBC getting a pledge of the equity interests in the Borrower, it's more paperwork and it cuts against the argument that PEPI DIP terms was over the top and potentially a loan-to-own. Am I missing something?

---

**From:** Aubrey J. Ferrao [mailto:ajf@gulfbay.com]
**Sent:** Saturday, February 20, 2010 9:00 PM
**To:** Jane Houk; Patricia Redmond; Peter Desiderio; Battista, Paul J.; Tony DiNardo; ferraoa@gulfbay.com
**Subject:** Comparison Result GBC Loan Agreement DOC.docx

Changes and edits made by ajf in blue..read note at the bottom of this document...ajf

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

G

1

AA01587

this. I guess if I had enough time I could. Right now that's the first one that comes to mind. The purchase option was not that critical for the DIP. It was part of the DIP loan agreement but wasn't major.

MR. BATTISTA: There's no question pending.

A Sorry.

**Q So does that mean you didn't care if the option was unconditional or not?**

MR. BATTISTA: Objection.

A What does unconditional mean?

**Q That you could exercise it without any conditions?**

MR. BATTISTA: Same objection.

A We had a purchase option I recall in either -- I think in the term sheet, and that was negotiated. I was fine with that.

**Q My question to you: Was it important that the purchase option be an option you could exercise unconditionally, yes or no?**

MR. BATTISTA: Objection.

A I presume the purchase option would have to be approved by the court and the court said no to the purchase option then I couldn't exercise it. It was always an option not guaranteed unless the court

approved it. Did that answer your question?

Q **No, but she'll read it back.**

A It's complicated, your question.

(Thereupon, the requested portion of the record was read back by the reporter.)

MR. BATTISTA: Objection.

A No.

Q **Purchase option, so I understand it, it was not important to you that the purchase option be an unconditional option; is that your testimony?**

MR. BATTISTA: Objection.

A I guess I would say the purchase option as was in the term sheet was part of what was negotiated, I was fine with it. I didn't think -- it was okay with me.

Q **So what I said was correct?**

MR. BATTISTA: Objection.

A I think your question is a trick question, so I can't understand the tricks. I'm not a lawyer. I can't parse everything you're saying. I'm just telling you it was -- what we had in the term sheet was fine with me.

Q **So why were there efforts by certain of your representatives to change it in February?**

MR. BATTISTA: Objection.

2

AA01590

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov**

In re:

FIDDLER'S CREEK, LLC, et al.

Debtors.
______________________________/

Case No. 8:10-bk-03846-KRM

Jointly Administered

Chapter 11

FIDDLER'S CREEK, LLC, et al.

Plaintiffs,

v.

PEPI CAPITAL, L.P.

Defendant.
______________________________/

Adv. Pro. No. 8:11-ap-00809-KRM

**NOTICE OF FILING PURCHASE OPTION EMAIL OF AUBREY FERRAO**

Defendant, Pepi Capital, L.P. ("Pepi Capital"), by and through its undersigned counsel, and pursuant to this Court's ruling on the Motion for In Camera Inspection [DE 98], hereby files Aubrey Ferrao's email [Bate # SWM005858] dated February 11, 2010 (attached hereto).

Dated: April 17, 2015.

ROETZEL & ANDRESS

/s/Alan J. Perlman
Alan J. Perlman
Florida Bar No. 826006
350 E. Las Olas Boulevard, Suite 1150
Ft. Lauderdale, FL 33301
Telephone: (954) 462-4150
Facsimile: (954) 462-4260
E-mail: aperlman@ralaw.com
*Attorneys for Pepi Capital, L.P.*

## CERTIFICATE OF SERVICE AND COMPLIANCE WITH LOCAL RULE 2090-1(A)

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on April 17, 2015 via CM/ECF on all parties who are registered for electronic notice.

**I HEREBY FURTHER CERTIFY** that I am admitted to the Bar of the United States District Court for the Middle District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

/s/Alan J. Perlman
Alan J. Perlman

**From:** Aubrey J. Ferrao [ajf@gulfbay.com]
**Sent:** Thursday, February 11, 2010 4:06 PM
**To:** Battista, Paul J.
**Cc:** Jane Houk; Tony DiNardo
**Subject:** FW: Last issues

(2)jane knows what we need..i need to be able to purchase unequivocally
...ajf

**From:** Tony DiNardo
**Sent:** Thursday, February 11, 2010 4:02 PM
**To:** Aubrey J. Ferrao
**Subject:** FW: Last issues

FYI

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

**From:** Battista, Paul J. [mailt_:_battistaO_lb-lzw.com]
**Sent:** Thursday, February 11, 2010 4:00 PM
**To:** Tony DiNardo; Jane Houk
**Subject:** RE: Last issues

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 11, 2010 3:45 PM
**To:** Jane Houk; Battista, Paul J.
**Subject:** FW: Last issues

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274

email dinardoa @gulfbay.com

---

**From:** CJ Lorio [mailto:CJ.Lorio@pgrp.net]
**Sent:** Thursday, February 11, 2010 3:42 PM
**To:** Tony DiNardo
**Cc:** K Springfield; David Radunsky
**Subject:** RE: Last issues

The items we had to address on our list are:

2. Purchase option language – this is material change that we need to discuss your reasons for wanting. This was supposed to be provision for giving Aubrey some ability to acquire loan to protect his equity interest and now it seems you want something else. We are proposing to delete some language in 2.1.c(i) that should alleviate your concerns.

C.J. Lorio
Perot Investments, Inc.
972-535-1972
972-535-1991 (Fax)
cj.lorio@pgrp.net

---

**From:** Tony DiNardo [mailto:dinardoT@gulfbay.com]
**Sent:** Thursday, February 11, 2010 2:35 PM
**To:** CJ Lorio
**Subject:** RE: Last issues

CJ
I am talking to our legal team and I would like to send you an email what we feel are the last open items and if you have any others you can add them to the list. Therefore we will be addresses to all the items.
Thanks

Tony Di Nardo
Chief Financial Officer
Gulf Bay Group of Companies
8156 Fiddler's Creek Parkway
Naples ,Fl 34114-0816
Office 239-732-9400
Direct 239-732-3013
Cell 239-641-4274
email dinardoa @gulfbay.com

3

AA01595

**From:** Aubrey J. Ferrao [ajf@gulfbay.com]
**Sent:** Saturday, February 20, 2010 9:17 PM
**To:** Jane Houk
**Cc:** Battista, Paul J.; Patricia Redmond; Tony DiNardo
**Subject:** RE: Clean and Blackline of Gulf Bay Capital DIP Loan Agreement

Jane..fiddlers was paying pepi 800,000 for the same loan..500,000 is a whole lot less...and fiddlers was paying pepi tons of loan and service fees that gulf bay capital has dropped...I never heard that the insider dip has hurdles..in fact I heard from paul and trish that they wanted gulf bay capital to make the dip and they mentioned it very early on.. so they have been consistent in saying that gulf bay should make the dip...ajf

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Saturday, February 20, 2010 8:21 PM
**To:** Aubrey J. Ferrao
**Cc:** Battista, Paul J.; Patricia Redmond
**Subject:** RE: Clean and Blackline of Gulf Bay Capital DIP Loan Agreement

Paul and Trish – chime in with your thoughts. First, there will be no commitment letter (and even if we went through the additional time in doing one, it's not the same as a commitment letter between third parties where the lender is not sure the loan will occur – here you control both sides so (outside of court approval) you can make it happen. The commitment fee is in part for reserve of capital. Here we have taken out the unused loan fee – which would have also covered for opportunity cost associated with reserve of capital – so there is some argument for paying either the commitment fee or unused loan fee. I think both Paul and Trish feel that there are hurdles to getting insider DIP approved and they want to be able to show as strong of a case as possible.

Even if you determine there should be some Commitment Fee, when max outstanding is $12MM for 18 months, $500k fee is high percentage.

**From:** Aubrey J. Ferrao [mailto:ajf@gulfbay.com]
**Sent:** Saturday, February 20, 2010 8:09 PM
**To:** Jane Houk
**Cc:** Battista, Paul J.
**Subject:** RE: Clean and Blackline of Gulf Bay Capital DIP Loan Agreement

Aubrey and Tony, want the commitment fee...if it can be paid any DIP why would we be treated differently..we are ropping everything else.ajf

**From:** Jane Houk [mailto:JHouk@stearnsweaver.com]
**Sent:** Saturday, February 20, 2010 7:38 PM
**To:** 'Battista, Paul J.'; Patricia Redmond; Aubrey J. Ferrao; Tony DiNardo; Peter Desiderio
**Subject:** Clean and Blackline of Gulf Bay Capital DIP Loan Agreement

All:

Attached is a clean and blacklined version (lined against the latest PEPI draft) of the Gulf Bay Capital DIP Loan Agreement. While I need each of you to review this in its entirety, I have put your respective names by provisions that I specifically want particular people to focus on.

EXHIBIT
6

In addition, you will notice I took out the Commitment Fee. Aubrey and Tony, all of us are unanimously in agreement that this will look bad to the Court. Please call me to discuss further if you would like.

I will send under separate cover a chart with comparison of terms that Aubrey requested – as well as a Closing Checklist.

Jane

Jane A. Houk
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 W. Flagler Street
Miami, FL 33130
Direct dial: (305) 789-3586
Main line: (305) 789-3200
Direct facsimile: (305) 789-2660
Main facsimile: (305) 789-3395
Email address: jhouk@stearnsweaver.com

CONFIDENTIALITY NOTICE: The information contained in this E-mail message is attorney privileged and confidential information intended only for the use of the individual(s) named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please contact the sender by reply E-mail and destroy all copies of the original message. Thank you.

CIRCULAR 230 DISCLOSURE: To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.

4

AA01598

doc 170977

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

| | |
|---|---|
| IN RE: FIDDLER'S CREEK, LLC. Debtor Chapter 11 Cases | **VOLUME II of II** Case No. 10-03846-9P1 |
| 951 LAND HOLDINGS, LLC. | Case No. 10-03852-9P1 |
| DY ASSOCIATES, LLC. | Case No. 10-03856-9P1 |
| GBFC DEVELOPMENT, LLC. | Case No. 10-03864-9P1 |
| FC MARINA, LLC. | Case No. 10-03872-9P1 |
| FC BEACH, LLC. | Case No. 10-03873-9P1 |
| FC GOLF, LLC. | Case No. 10-03875-9P1 |
| DY LAND HOLDINGS II, LLC | Case No. 10-03878-9P1 |
| FC PARCEL 73, LLC. | Case No. 10-03881-9P1 |

(Case captions continued next page)

U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
March 3, 2010
1:14 P.M.

**AMENDED HEARING TRANSCRIPT**
**(correcting case names and numbers in caption of case only)**

Debtor's Emergency Motion for Joint Administration (Doc. #5); Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing (a) Debtor-in-Possession to obtain senior secured post-petition financing; (b) granting certain liens; (c) approving agreements relating to the foregoing; (d) modifying the automatic stay; (e) granting super-priority administrative claim status;
(f) authorizing use of cash collateral and granting adequate protection; (g) scheduling a final hearing; and (h) prescribing form and manner of notice (Doc. #6).

B E F O R E: THE HONORABLE ALEXANDER L. PASKAY
United States Bankruptcy Judge

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

exactly 400, it could be 420, 450, in that ballpark.

THE COURT: You were -- the entities were supposed to borrowing the money from PEPI; correct?

THE WITNESS: Yes.

THE COURT: And signed an agreement of intent to purchase or some other document, and part of that document you paid them $200,000 as toward the transaction?

THE WITNESS: I think we paid 400 something, Your Honor.

THE COURT: Whatever the number is.

THE WITNESS: Yes.

THE COURT: Was that your understanding that's recoverable or forfeitable?

MR. BATTISTA: Judge, that's a -- I think it's a legal question which we are valuating, to be perfectly blunt. The motion was just filed by PEPI Capital last night. I haven't even personally read the entire thing.

THE COURT: All right.

MR. BATTISTA: So we will deal with that. But at this point in time, for purposes of --

THE COURT: All right.

MR. BATTISTA: -- where we're going --

THE COURT: But anyway, you learned that they

declared the default and would walk away and won't lend the rest of the money; correct?

THE WITNESS: Yes.

MR. BATTISTA: Actually, Judge --

BY MR. BATTISTA:

Q Mr. Ferrao, did PEPI declare the default or did the Debtors declare the default?

A We declared the default.

THE COURT: Who?

THE WITNESS: We declared a default.

MR. BATTISTA: The Debtors.

THE WITNESS: The Debtors.

THE COURT: You declared the default?

THE WITNESS: Yes.

BY MR. BATTISTA:

Q And again, so the Court knows, your understanding at least of one of the reasons was what?

A We couldn't get a due diligence sign-off. There were many, many open due diligence issues after weeks of going back and forth with them, and they said they would not tell us when they were going to sign off, and they would -- and they said they would -- when they funded, they would sign off, but they wouldn't tell us when they were going to fund, and we needed to get into Chapter 11 to stabilize the community.

Q And, again, I don't want to try that case here today, that's for a future date, but I want to understand --

THE COURT: No, no, no.

MR. BATTISTA: Okay.

THE COURT: The question was that you had decided that because they were unable to come to the table and close the deal, you got tired of it and said default it.

THE WITNESS: Yes, Your Honor.

BY MR. BATTISTA:

Q And, Mr. Ferrao, at that point in time when that conclusion was made, what alternatives did you believe the Debtors had?

A We had no --

THE COURT: This happened just before they filed?

MR. BATTISTA: Before they filed, Judge, yes.

THE WITNESS: We had no DIP lender at fairly short notice -- I mean when I was told about it. We had no alternatives. Mr. Montgomery had been, you know, beating up and down to try to get a DIP lender. It was either a Chapter 7 meltdown, or I was asked to provide DIP financing.

BY MR. BATTISTA:

Q And was that the first time since Chapter 11 was considered that you, individually, considered making a DIP

loan in the amount of $25 million to the Debtors?

A Yes.

Q Mr. Ferrao, are you personally liable on any of the senior secured debt to any of the eight creditors of Fiddler's Creek?

A I have no personal guarantees.

Q Do you have any personal guarantees for any debt associated with Fiddler's Creek?

A No, I do not.

Q So if you chose not to make this DIP loan, and if Fiddler's Creek filed a Chapter 7, would you have any personal exposure on any of that debt?

A No.

Q So I guess the question, Mr. Ferrao, is why did you agree to make a DIP loan?

A I've got -- well, one choice was very stark, was a meltdown.

Q That's if no DIP loan was made?

A It was either you have a DIP so you can attempt to restructure in a Chapter 11 under Court supervision or it's a complete and utter meltdown. And we have -- I had, and my management team of 16 years, blood, sweat and tears in there, I want to preserve the community, which is a great community, and I'd like to be able to keep the community going, because we have many homeowners who are very happy,

and preserve my equity as well.

Q And you have a loan to Florida Financial as well?

A Yes.

Q Secured by some of the real estate in Fiddler's Creek?

A Yes.

Q And you would, I presume, want to recover on that loan?

A Yes. Unimproved.

Q Oh, it's unimproved land?

A Yes, yes.

Q Can you tell the Court -- well, first of all, between the time that you learned about the PEPI alleged default and the time that the Debtors filed bankruptcy, how much time was that? How many days are we talking about?

A I learned maybe three days or four days.

Q So a three or four-day span between the time you learned about the default and the time the Debtors filed bankruptcy?

A Yes.

Q Is that when this, the DIP loan by Gulf Bay Capital, was negotiated and finalized?

A Yes.

Q It wasn't before that, was it?

A No.

Q And tell me, briefly, how those negotiations went?

A Well, when we had to breach PEPI because they weren't coming to the closing table, we had no options, I mean zero options. The only choice we had was if I, one of my affiliates, made the DIP loan. So my initial reaction was that we would do it the same as PEPI because that was negotiated with a third party and very hard negotiations. And I recall you and Trish both --

Q Excuse me.

A Okay. I'm sorry.

Q Me and Ms. Redmond?

A Yes. I'm sorry.

Q Do me a favor. Please do not disclose any attorney-client privileged communications between me and you, but you can tell me what you understand.

A Well, I understood from that, since I was an insider I would have to give a much better deal as far as a DIP facility than what was negotiated, and I had no problem with that because I was not -- I mean I'm just looking to keep the place going.

Q And when you say -- then what was negotiated, you mean -- you're referring to the PEPI transaction?

A Yes.

Q And so are you familiar generally with the PEPI -- terms of the PEPI deal?

A I don't understand the question.

Q Well, let me ask you directly: Do you know if the PEPI deal had a commitment fee tied to it?

A Yes.

Q Does the loan from Gulf Bay Capital have a commitment fee?

A No.

Q Do you know if the PEPI deal had an exit fee?

A Yes.

Q Does the loan from Gulf Bay Capital have an exit fee?

A No.

Q Do you know if the loan from PEPI had an unused line fee?

A Yes.

Q Does the Gulf Bay Capital loan have an unused line fee?

A No.

Q Do you know if the PEPI loan had a breakup fee requirement?

A Yes.

Q Does the Gulf Bay Capital loan have a breakup fee requirement?

A No.

Q Is Gulf Bay Capital requiring a release of any

5

AA01607

doc 170978

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

- - - - - - - - - - - - - - - - - - - - -x
IN RE: :
:
FIDDLER'S CREEK, LLC. : Case No. 10-03846-9P1
: (and related cases)
Debtor : Chapter 11
- - - - - - - - - - - - - - - - - - - - -x

U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
April 14, 2010
9:00 A.M.

H E A R I N G

(1) Continued Hearing on Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing (A) Debtor-in-Possession to Obtain Senior Secured Post-Petition Financing; (B) Granting Certain Priming Liens; (C) Approving Agreements Relating to the Foregoing; (D) Modifying the Automatic Stay; (E) Granting Super-Priority Administrative Claim Status; (F) Authorizing Use of Cash Collateral and Granting Adequate Protection; (G) Scheduling a Final Hearing; and (H) Prescribing Form and Manner of Notice (Doc. #10); Objection by Textron Financial (Doc. #41); Objection by Regions Bank (Doc. #45 and #124); Joinder in Objections to Use of Cash Collateral and Limited Objection to Senior Secured Post-Petition Financing by Linda R. Aletermus, et al (Doc. #123); Objection by ITG Tax Free Income & Capital Appreciation fund, LTD (Doc. #125); Objection by Fiddler's Creek Community Development District I and District II (Doc. #128); Objection by U.S. Bank (Doc. #129); Objection by Colonnade Properties (Doc. #130); Limited Objection by Official by Official Committee of Homeowners (Doc. #135);

(...hearing items continued on next page)

B E F O R E: THE HONORABLE K. RODNEY MAY
United States Bankruptcy Judge

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

argument that would even remotely justify reconsideration. We ask that motion be denied and get onto what is effectively the main event today, the next hearing on the Debtor-in-Possession financing.

THE COURT: One thing I was interested in, in the finding, that the fees are reasonable. As I read the transcript, I saw a reference to the term sheet and a commitment letter to collateral monitoring fee.

MR. BATTISTA: $7,500 per month, Judge.

THE COURT: How much?

MR. BATTISTA: $7,500 per month.

THE COURT: And that is -- continues -- that was not waived or withdrawn?

MR. BATTISTA: No, sir. It was not. We had described to the Court at that time that this DIP loan had terms significantly better than the one that we have been negotiating with. You heard me say PEPI Capital earlier and that we did not go forward with.

This DIP loan has no commitment fee, while others had a 3 percent commitment fee; had no exit fee, others had a 2 percent exit fee; had no unused line fee, others had a 1 percent unused line fee. All of that was waived by Gulf Bay Capital to improve the terms of the DIP loan.

The only fee that was not waived was a $7,500

collateral monitoring fee. And Mr. Ferrao testified that he wanted -- this money comes from Mr. Ferrao's personal family, and he wanted to have an independent party engaged on behalf of his family's trust, to be able to oversee the collateral.

And much was made about, well, aren't you wearing both hats, aren't you really the Debtor and the DIP lender? And he very clearly testified at that point in time that this was separate money that belonged to his family and he wanted that money protected with a third party to oversee the collateral, and that's what that fee was for, relatively insignificant, given the millions that exist in this case.

THE COURT: All right. Anyone else wish to be heard?

Yes. Mr. Leslie.

MR. LESLIE: Representing Gulf Bay Capital. I promise I'm not just going to say "me too." Obviously, I'm going to say "me too" but there's some points I want to raise.

THE COURT: Go ahead.

MR. LESLIE: With respect to Your Honor's question, the testimony at the six-hour trial was that the terms that were offered were better than the only other terms that were out there from PEPI Capital, the

6

AA01611

doc 170982

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| IN RE: | |
| FIDDLER'S CREEK, LLC | Case No. 10-03846-9P1 |
| Debtor(s) | Chapter 11 |

Held at Sam M. Gibbons
U.S. Courthouse
801 N. Florida Avenue
Tampa, Florida 33602
Held September 2, 2010
Before Judge May

**TRANSCRIPT OF HEARING**

1-Continued Status Conference; 2-Continued Hearing On Emergency Motion To Borrow And To Obtain Senior Secured Post-Petition Financing, Motion For Approval Of Granting Certain Priming Liens And Approving Agreements Related To The Foregoing, Motion To Modify The Automatic Stay, Motion To Allow Granting Of Super-Priority Administrative Claim Status, Motion To Use Cash Collateral And Granting Adequate Protection Therefor, Motion To Set Hearing And Scheduling A Final Hearing, Motion To Limit Notice And To Prescribe Form And Manner Of Notice With Respect Thereto By The Debtor.....
***[FULL NATURE OF PROCEEDINGS CONTINUED ON NEXT PAGE]***

**BEFORE THE HONORABLE K. RODNEY MAY**
**United States Bankruptcy Judge**

*PROCEEDINGS DIGITALLY RECORDED BY COURT PERSONNEL. TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE APPROVED BY ADMINISTRATIVE OFFICE OF U.S. COURTS.*

---

**JOHNSON TRANSCRIPTION SERVICE**
7702 Lake Cypress Drive
Odessa, Florida 33556
(813) 920-1466

Debtor owned it.

MR. MILLER: DY Land Associates, Ltd. is referred to in the paper, Judge.

THE COURT: DY Land Associates, Ltd., okay.

MR. BATTISTA: Thank you.

THE COURT: Okay.

MR. BATTISTA: So, yes, that exists. The waterfall was a concept. And Your Honor may have heard this at the beginning. Mr. Ferrao testified he didn't want to make this DIP loan. We had a separate DIP lender that we were negotiating with for many months, a third party, the Perot family out of Texas, to make this DIP loan.

And literally the weekend before we filed bankruptcy, that deal blew up, and there's going to be litigation between us and that company going forward, at some point in time.

This waterfall and these provisions, every one of them, was dictated to us by that company, Pepe Financial. This wasn't something that Mr. Ferrao was sitting in his corner, rubbing his hands, "I'm going to get these guys." He had to make a decision over the weekend, once we lost that DIP lender, to just adopt those terms and to make them

economically better, which is what he testified to, which is in the record that not one could contest. And that's what happened.

So he adopted this waterfall in this concept from a third party independent proposed DIP lender, and that was the testimony before Your Honor. And so we're just continuing that.

And I'd like to be able to talk to Mr. Grammen and transfer it to him and sell it to him and put him in place as an independent third party DIP lender. And so to the extent that we do damage to this DIP loan, this priming feature as it's been structured and been in place since the beginning of this case, then we upset that potential.

They don't want Mr. Ferrao to be a DIP lender because they think he exerts too much control over it. He doesn't want to be a DIP lender. I'd like to transfer it to Mr. Grammen. But if this gets modified and significantly undercut, I suspect Mr. Grammen may have a different view or anyone else who wants to come in and buy this debt, has a different view about whether or not they want to make this loan. And I'm trying to preserve that.

I'm thrilled that Mr. Grammen came to my attention today. I'm thrilled that Mr. Hutton

H

AA01615

1

AA01616

reasonably request, and (b) using commercially reasonable efforts to provide all information reasonably deemed necessary by PEPI to complete the syndication, subject to confidentiality agreements in form and substance reasonably satisfactory to the Company and PEPI. The terms of the Commitment Letter, including those attached as Exhibit A, shall not be modified due to PEPI's syndication efforts.

The Company hereby represents, warrants and covenants that (i) all information, other than the Projections (as defined below), which has been or is hereafter made available to PEPI by or on behalf of the Company or any of its representatives in connection with its business (the "Information") is and will be complete and correct in all material respects as of the date made available to PEPI and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading, and (ii) all financial projections concerning the Company and its subsidiaries that have been or are hereafter made available to PEPI by or on behalf of the Company or any of its representatives (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions. The Company agrees to furnish to PEPI such Information and Projections as PEPI may reasonably request and to supplement the Information and the Projections from time to time until the Closing Date of the Credit Facility so that the representation, warranty and covenant in the preceding sentence is true and correct on the Closing Date of the Credit Facility.

The Company will promptly reimburse PEPI for all reasonable costs and expenses incurred by PEPI in connection with its continuing review of the Information and Projections and the preparation and negotiation of this Commitment Letter (including any amendment or modification hereto), any and all due diligence, any and all loan documentation for the Credit Facility, the closing of the Credit Facility, and the enforcement of any of PEPI's rights and remedies under this Commitment Letter, in each case including, without limitation, reasonable attorneys' fees and legal expenses, appraisal fees, filing and search charges, recording taxes and field examination expenses (including the then standard per diem charges per person per day plus out-of-pocket expenses for the field examiners of PEPI in the field and in the office, including travel, hotel and all other reasonable out-of-pocket expenses), and in each case whether or not the Credit Facility closes.

All such charges and expenses are to be paid to PEPI upon demand, together with such advance funds on account of such charges and expenses as PEPI may from time to time request or PEPI may require that the Company pay such charges directly. PEPI has the right to apply to such charges and expenses any sums received from or on behalf of the Company. The arrangements with respect to such charges after the closing of the Credit Facility will be governed by the terms of the loan documentation. Deposits for expenses received by PEPI will be returned to the Company without interest, less the expenses and charges described above if the Credit Facility does not close, and applied to reduce the loans if the Credit Facility closes.

The Company and all Guarantors agree to indemnify and hold harmless PEPI, and each director, partner, officer, employee, attorney, advisor, agent and affiliate of PEPI (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any and all losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that, the Company shall have no obligation to any

Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise. THE COMPANY AND PEPI EXPRESSLY INTEND THAT THE FOREGOING INDEMNITY SHALL COVER, AND THAT THE COMPANY SHALL INDEMNIFY AND HOLD EACH INDEMNIFIED PERSON HARMLESS FROM AND AGAINST, COSTS, EXPENSES AND LOSSES SUFFERED AS A RESULT OF THE NEGLIGENCE OF ANY INDEMNIFIED PERSON.

No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through internet, Intralinks or other similar transmission systems in connection with the Credit Facility, except through the gross negligence or willful misconduct of any such Indemnified Person. In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of or in connection with this Commitment Letter.

Except as required by applicable law, this Commitment Letter and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI, which consent shall not be unreasonably withheld or delayed, other than to its attorneys, financial advisors, accountants, and legal and financial counsel, in each case who need to know the terms hereof, provided that (i) each of such persons shall agree to be bound by the confidentiality provisions hereof, and (ii) the Company shall be liable for any breach of such confidentiality provisions by any such person, except as may be required by law or applicable judicial process. In no event shall any person other than the Company be entitled to rely hereon. If the Company shows or circulates this Commitment Letter, or discloses the contents thereof, in breach of the foregoing sentence, then this Commitment Letter shall be deemed terminated provided the Company shall remain liable for any and all costs, fees and expenses incurred by PEPI plus the Break-Up Fee (hereinafter defined). Notwithstanding anything herein to the contrary, this Commitment Letter and the terms and conditions of this Commitment Letter may be disclosed (i) in connection with the filing of the Bankruptcy Cases, and (ii) to those secured lenders who hold mortgage liens on real estate owned by the Company and upon which PEPI seeks a priming lien, including for purposes of obtaining the consent to such priming liens.

The Company acknowledges and agrees that PEPI may share with its affiliates any information relating to the Credit Facility or the Company or its subsidiaries.

On or prior to ninety days after the filing of the Bankruptcy Cases and subject to PEPI's compliance in good faith with the terms and conditions of this Commitment Letter, the Company agrees to work exclusively with PEPI to consummate the documentation and closing of the Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a financing alternative to the Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a financing alternative to the Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a financing alternative to the Credit Facility, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with a financing alternative to the Credit Facility.

PEPI's commitment hereunder to provide the Credit Facility is subject to (a) there not occurring or becoming known to PEPI any event, development or circumstance that has or could reasonably be expected to have a material adverse effect on the business, operations, property, assets, liabilities, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole, (b)

2

AA01619

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

In re: Chapter 11

FIDDLER'S CREEK, LLC, and its twenty-seven subsidiaries and affiliates,

Case No. 8:10-bk-03846-KRM

Debtors.

(Jointly Administered under Case No. 8:10-bk-03846-KRM)

_______________________________________/

FIDDLER'S CREEK, LLC, and its twenty-seven subsidiaries and affiliates,

Plaintiffs/Counter-Defendants,

ADV. CASE NO. 8:11-ap-00809-KRM

v.

PEPI CAPITAL, L.P.

Defendant/Counter-Plaintiff.

_______________________________________/

PEPI CAPITAL, L.P.,

Third Party Plaintiff,

v.

GULF BAY CAPITAL, INC. and AUBREY J. FERRAO,

Third Party Defendants.

_______________________________________/

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO PEPI CAPITAL, L.P.'S REQUEST FOR ADMISSIONS AND FIRST SET OF INTERROGATORIES**

Fiddler's Creek, LLC and its affiliates and subsidiaries (collectively, "Fiddler's"), by and through the undersigned counsel and pursuant to Fed.R.Civ.P. 33 and 36 as incorporated by Fed.R.Bankr.P. 7033 and 7036, serves its responses and objections to the Interrogatories and

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO 82:** Admit that the terms and provisions of your DIP financing agreement with Gulf Capital is based on the Term Sheet.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 83:** Admit that the terms and provisions of your DIP financing agreement with Gulf Capital is based on the Commitment Letter.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 84:** Admit that the Term Sheet is substantially similar to the term sheet between you and Gulf Capital.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 85:** Admit that the Commitment Letter is substantially similar to the commitment letter between you and Gulf Capital.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 86:** Admit that Ferrao is not a party to the Term Sheet.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 87:** Admit that Ferrao is not a party to the Commitment Letter.

**RESPONSE:** Admitted.

**REQUEST FOR ADMISSION NO. 88:** Admit that you requested Ferrao have an option to acquire any DIP loan provided by PEPI in the event of your default.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 89:** Admit that you requested that the proposed option to Ferrao to acquire any DIP loan provided by PEPI in the event of your default be kept confidential.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 90:** Admit that you requested that the proposed option to Ferrao to acquire any DIP loan provided by PEPI in the event of your default remain undisclosed.

3

AA01622

**borrowers were precluded from disclosing the commitment letter to any third-party including any Gulf Bay entity, yes or no?**

MR. BATTISTA: Objection. The problem with the question, Alan, is -- we're wasting a lot of time. You keep including Gulf Bay companies. He's saying people affiliated with Gulf Bay companies were the same people affiliated with Fiddler's Creek. We're dancing around that issue. You keep asking that way. I keep objecting. He keeps going back to his old answer. If you keep including Gulf Bay companies, we're going to be going round, round, round.

A I told you exactly what happened during that period of time.

**Q All right. Let me rephrase. Was it your understanding when Exhibit 2 was executed that this paragraph on page 3 of Exhibit 2 precluded Fiddler's from disclosing the commitment letter to any other entity?**

A Yes.

**Q Thank you.**

**(Off the record.)**

BY MR. PERLMAN:

**Q Can you take a look at Exhibit 2, please,**

**terms of the loan from PEPI compared to the terms of the loan of Gulf Bay Capital?**

A I recall seeing a document that does a comparison between the commitment letter that PEPI proposed and we executed with PEPI and the loan that we were going to create, yes.

**Q Okay. So is it your belief when it says comparison that's what it refers to?**

A I don't know if they're comparing different renditions of internal term sheets from Gulf Bay Capital against each other or comparing a Gulf Bay Capital term sheet against the PEPI term sheet, I can't tell. I know there was a comparison done between the loan document and PEPI's commitment letter.

**Q Were there comparisons done between PEPI's commitment letter and Gulf Bay's commitment letter?**

A I really don't -- I know there was a comparison done between -- I saw a document between PEPI's commitment letter and the Gulf Bay Capital loan or term sheet. I'd say the term sheet, yes. But I don't know if that email referred to that comparison.

**Q Fair enough. I'm handing you what was marked Exhibit 3, I'm giving to Mr. Reyes first then**

I'll ask you some questions. When you're done, if you can take a look and let me know when you're ready. It's an email from Gulf Bay counsel to Mr. Battista dated February 20, 2010 regarding comparison of Gulf Bay and PEPI loan.

A Okay.

Q All right. Do I understand this email to suggest that the Gulf Bay Capital DIP loan was based on the versions prepared with regard to PEPI?

A Yes.

Q Okay.

A As a starting point, Word document.

MR. REYES: This is Number 4. Zero for four, no copy for me.

MR. PERLMAN: I know.

MR. REYES: Doing great.

MR. PERLMAN: I have the rest, though.

MR. REYES: Uh-huh. Amory doesn't believe you.

THE WITNESS: This is what I remember seeing.

BY MR. PERLMAN:

Q Okay. Was the PEPI commitment letter used for the initial draft of the Gulf Bay Capital loan with Fiddler's?

A Say that again.

**Q Was the PEPI commitment letter used to formulate the commitment letter between Gulf Bay and Fiddler's?**

A No. The PEPI commitment letter was used as a benchmark to see what PEPI had and what we had to do to come up with a more favorable DIP loan than what PEPI was producing. That was our goal, to create a more favorable DIP loan.

**Q That's what Exhibit 4 relates to?**

A Yes. That's why if you notice less the fees, wanted to make sure that there's more capital, we were going through all the points and wanted to make sure that in the end Gulf Bay Capital was more favorable than PEPI's because we knew we'd have to face the concept that it was an insider DIP loan.

**Q This reflects the commitment fee was under discussion. What was the final result?**

A I think there was no commitment fee.

**Q I guess we'll find out.**

A When I do the calculation, yeah. Pretty sure there wasn't a commitment fee.

**Q The Gulf Bay facility did not include a purchase option, correct?**

A Yes.