# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

---

**CASE NO.  8:19-CV-00008-VMC**
**BANKRUPTCY CASE NO. 8:10-BK-03846-CPM**
**ADVERSARY CASE NO. 8:11-AP-00809-CPM**

---

### PEPI CAPITAL, L.P.,


**Appellant,**

**vs**

### FIDDLER'S CREEK, LLC, et al.

**Appellees.**

---

### APPELLANT'S APPENDIX
### VOLUME 7
### AA01627-AA01774

---

### On Appeal from The United States Bankruptcy Court
### Middle District of Florida, Tampa Division


**Alan J. Perlman**
**Florida State Bar No. 826006**
**DICKINSON WRIGHT PLLC**
**350 East Las Olas Blvd., Suite 1750**
**Ft. Lauderdale, FL 33301-4275**
**Telephone: (954) 991-5420**
**Email: aperlman@dickinsonwright.com**
*Attorneys for Pepi Capital, L.P.*

## **TABLE OF CONTENTS**

| VOL. | BATES RANGE | DOCUMENT |
|------|-------------|----------|
| 7 | AA01627-AA01679 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re:  Confirming obligation to negotiate in good faith and communicate effectively, including notice and opportunity to cure to PEPI.<br>(Doc No. 123-9 in Adv. Case No. 8:11-ap-00809) |
| 7 | AA01680-AA01682 | Exhibits from Summary Judgment Hearings, filed June 16, 2015, Re:  Waybright v. Turner, 131 Fla. 209 (Fla. 1938), dispensing with any argument by Fiddlers contrary to res judicata doctrine.<br>(Doc No. 123-10 in Adv. Case No. 8:11-ap-00809) |
| 7 | AA01683-AA01722 | Memorandum Opinion On Cross Motions for Summary Judgment, (Doc. Nos. 84, 106 And 113), filed May 10, 2017,<br>(Doc. No. 126 in Adv. Case No. 8:11-ap-00809) |
| 7 | AA01723-AA01724 | Partial Final Judgment, filed on May 11, 2017,<br>(Doc. No. 127 in Adv. Case No. 8:11-ap-00809) |
| 7 | AA01725-AA01774 | Notice of Appeal, filed May 25, 2017,<br>(Doc. No. 1-1 in Case No. 8:17-cv-01245) |

I

AA01627

1

AA01628

1    said exactly why the negotiations continued.

2        Q    You don't need to -- did you say earlier

3    the parties were required to negotiate in good faith?

4        A    Yes.

5        Q    And that requires effective communications,

6    correct?

7            MR. REYES:  Object to the form.

8        A    No.  I was -- we negotiated in good faith

9    until PEPI stopped negotiating good faith.  There is

10   a waterfall clause escrow clause that was negotiated

11   that shouldn't have been put into the loan documents

12   on February 2nd.  That clause was in the loan

13   documents.

14           On February 11th that clause was modified

15   in the loan documents.  I said to Lorio in an email

16   he's diluting the waterfall.  That was not good faith

17   after it was in the commitment letter.

18       Q    Okay.

19       A    I had no alternative and I kept on telling

20   you that our theme is if I had another DIP lender

21   trying to make you understand the economics of the

22   time, this is a real estate recession, if I had

23   another alternative I would have gone there.  I had

24   no alternatives.

25           I was in good faith.  I was keeping -- I

Case 8:19-cv-00008-VMC   Document 21   Filed 03/12/19   Page 6 of 150 PageID 8151
Case 8:11-ap-00809-KRM   Doc 123-9   Filed 06/16/15   Page 4 of 53

188

1   was spending legal money.  I was spending lawyers,

2   paying for PEPI's fees.  I was paying for Gulf Bay's

3   fees trying to get PEPI to give me what was in the

4   commitment letter and they did not.  So I did

5   negotiate in good faith.  They did not.

6        I have 45 pages here of a commitment letter

7   of a term, all the conditions why they can't fund.

8   Okay.  But one thing I did get is I got the

9   waterfall.  They tried to modify it.  That was not

10  acceptable.  They had to do due diligence and give me

11  a time when it was completed and they did not.

12       So I was negotiating in good faith.  I

13  think they were not negotiating in good faith.  I

14  would like to try to figure out -- one day I'll find

15  out what their motive is.

16       Q    Am I correct that <u>negotiating in good faith</u>

17  <u>requires effective communications?</u>

18       A    <u>Yes.</u>

19       MR. REYES:  Object to the form.

20       Q    Okay.  And do I understand your answer to

21  mean that the negotiations continued beyond the 16th

22  because you had no other option at that time and your

23  team was trying to salvage the facility?

24       A    Yes.

25       Q    Okay.

AA01630

2

AA01631

x. Up until around the time PEPI rejected Mr. Ferrao's attempt to modify the Purchase Option, it was PEPI's understanding and belief that PEPI and Fiddlers were mutually negotiating the various agreements and other matters as contemplated by the Commitment Letter.

xi. Any and all issues relative to the negotiation and drafting of documents, and information required for due diligence or a closing, were continuing in nature and routine by both parties through and including February 19, 2010.

xii. Relative to due diligence to fund, the parties were regularly advised of open items via a checklist. Based on the checklist and/or communications related to the Commitment Letter, as of 2/18/10, several items remained outstanding from the Debtors.

xiii. The Commitment Letter does not mandate that PEPI take any action by a date certain in order for Fiddlers to file a Chapter 11 proceeding.

xiv. Specifically, there is no obligation of PEPI in the Commitment Letter to provide a written due diligence sign off as asserted by Fiddlers. Rather, due diligence is one of many conditions precedent to PEPI actual funding the loan.

xv. PEPI was not in material breach of the Commitment Letter as of February 22, 2010, and any alleged breach was cured via the PEPI response of February 23, 2010.

xvi. PEPI did not repudiate the Commitment Letter on or about February 16, 2010.

xvii. To "speed the foreclosure and sale process," the Commitment Letter included an escrow provision for the benefit of PEPI as lender. Due to certain legal and/or title issues, PEPI elected to forego that lender right and rely instead on the Florida foreclosure process pursuant to the restricted order of sale requested by the Debtor in the Waterfall.

xviii. The negotiations by and between the Debtors and PEPI continued in the normal and ordinary course until February 19, 2010, at which time Fiddlers was non-responsive to finalizing the Purchase Option.

xix. Up and until February 22, 2010, all communication amongst the parties consisted solely of negotiations with absolutely no threat of a default or termination of the Commitment Letter by Fiddlers.

xv. PEPI intended to and was prepared to comply with the Commitment Letter and provide the loan in accordance with the provisions thereto (except to the extent agreed to the contrary).

13

27.    Based on discovery regarding, and/or the testimony of, the Debtors' agents, Fiddlers was unable to (or failed to) comply with the Commitment Letter for several reasons, including the refusal of Mr. Ferrao to execute an Environmental Indemnification and the provisions as to the Purchase Option requiring a general release to PEPI if and when exercised.

28.    PEPI relied to its detriment on the continued loan agreement negotiations with Fiddlers through February 20, 2010 and the representation that PEPI was the sole DIP lender, and continued its efforts to finalize the loan documents and expended resources in said regard.

29.    Based on the negotiations by the parties and the course of conduct related thereto, PEPI expected notice and an opportunity to cure any alleged default issued by the Debtors.

30.    Only after the Debtors' breached the Commitment Letter did PEPI on February 23, 2010 proceed to terminate same in accordance with the provisions of the Commitment Letter.

31.    Affiant has read the Affidavit and knows from his own personal knowledge that the facts contained herein are true, accurate, and correct or are based on the sworn testimony of the Debtors' representatives.


**[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]**

AA01633

3

AA01634

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

626 F.Supp. 1229
United States District Court,
S.D. New York.

TEACHERS INSURANCE & ANNUITY
ASSOCIATION OF AMERICA, Plaintiff,

v.

David L. BUTLER, James L. Grauer, James
E. Kassis, and One City Centre Associates, a
California Limited Partnership, Defendants.

No. 84 Civ. 3211 (EW).   |   Jan. 28, 1986.

Prospective lender brought action against prospective real
estate borrower for breach of loan commitment agreement
following borrower's failure to close. The District Court,
Edward Weinfeld, J., held that: (1) evidence was sufficient
to find that borrower breached its duty to bargain in good
faith over dispute in loan terms, and (2) damages were the
difference between the contracted-for rate of interest and
rate of interest at time of breach over the life of the loan,
discounted to present value.

Judgment accordingly.

West Headnotes (2)

[1]     Contracts
        Weight and Sufficiency in General
        Evidence was sufficient to find that would-be
        borrower failed to negotiate in good faith dispute
        with respect to default prepayment fee language
        in real estate loan agreement; evidence included
        testimony indicating that would-be borrower's
        real concern was the significant decline in
        interest rates in two-year period between signing
        of loan commitment and closing date and that
        similar clauses were customary in the real estate
        market in that area during the period.

        39 Cases that cite this headnote

[2]     Damages
        Failure to Pay Money

Damages for breach of contract to borrow money
were difference between contracted-for rate of
interest and rate of interest at time of breach
over the period of the loan discounted to present
value, as well as attorney fees, reduced by
commitment fee retained when loan failed to
close.

24 Cases that cite this headnote

Attorneys and Law Firms

*1229 Fried, Frank, Harris, Shriver & Jacobson, New York
City, for plaintiff; Robert E. Gerber, Mary Farrington, of
counsel.

Willkie Farr & Gallagher, New York City, for defendants;
Francis J. Menton, J. Kelly Strader, of counsel.

OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, Teachers Insurance and Annuity Association of
America ("Teachers"), is a New York nonprofit corporation
which provides annuities and insurance programs to colleges,
independent schools and other educational institutions, and
derives income for such programs from various investments,
including long-term loans on commercial real estate.

The defendant, One City Centre Associates ("OCCA"),
is a California limited partnership which undertook the
development and construction of a high rise office building,
One City Centre, in Sacramento, California. It has three
general partners, David L. Butler, James E. Kassis and
James L. Grauer, also named as defendants (collectively
"defendants" or "the Butler group").

In connection with the development of the building, OCCA
needed temporary or construction financing for the period
during which the building was under construction *1230
and upon completion "permanent financing," which would be
applied to the repayment of the construction financing. Bank
of America made the construction loan.

Teachers, after extended negotiations with representatives of
Sonnenblick-Goldman Corp., mortgage bankers and realtors

AA01635

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

who acted as the defendants' agents, and with Butler and Kassis on behalf of OCCA, issued on September 9, 1982 a Commitment Letter which was accepted by the individual defendants on behalf of OCCA. Under the Commitment Letter, which the parties acknowledge constituted a binding agreement between them, Teachers agreed to lend and OCCA agreed to borrow $20,000,000 for a thirty-five year term at a fixed interest rate of 14.25% per annum, to be secured by a first deed of trust on the building. [1] The Commitment Letter, among other matters, granted Teachers a contingent interest in the rental returns over the life of the loan, referred to as a "kicker." One provision precluded the defendants from prepayment of the mortgage during the first seventeen years (the "Lock-in Period") and another permitted prepayment during the remainder of the loan upon payment of a premium ("Prepayment Premium") at 6% in the eighteenth year and in reduced amounts thereafter until the expiration date of the loan. These provisions, to be discussed hereafter, are at the heart of this litigation.

In October 1982, Teachers, OCCA and Bank of America, the construction lender, executed a related agreement called a Take-Out Agreement. It provided that Teachers would "take out" (i.e., purchase) Bank of America's construction loan or repay it the sums it advanced for construction of the building and succeed to its rights.

In July 1983, Teachers' counsel sent to OCCA for review and comment the closing documents which Teachers proposed be executed by OCCA at the closing of the loan, including a California Deed of Trust and California Deed of Trust Notes, which in relevant part provided:

> In the event Holder exercises its right to accelerate the maturity date following default by Maker, any tender of payment of the amount necessary to satisfy the entire indebtedness secured hereby made thereafter at any time prior to a foreclosure sale, either by Maker, its successors or assigns or by anyone in behalf of Maker, shall be deemed to constitute evasion of the prepayment privilege and shall be deemed to be voluntary prepayment herein and such prepayment, to the extent permitted by law, shall include the premium required to be paid

> under the prepayment privilege set forth herein. If such occurrence takes place prior to the eighteenth loan year then the agreed premium due and owing one [sic] the unpaid indebtedness shall be the product of the premium otherwise due under the formula herein for prepayment during the eighteenth loan year multiplied by three.

The parties refer to this provision as the "Default Prepayment Fee Language" and to the second sentence thereof as the "Lock-In Period Default Prepayment Fee Language."

Prior to the time set for the closing on April 30, 1984, Teachers and OCCA, through their respective counsel, had resolved all disagreements with respect to the language of the closing documents except the Default Prepayment Fee Language. On April 30, 1984, Kassis and Grauer (with a power of attorney authorizing them to act for Butler) appeared at the office of the escrow agent the parties had mutually agreed upon and made certain changes in provisions unrelated to the Default Prepayment Fee Language which had been agreed upon by their respective attorneys. However, they also struck the Default Prepayment Fee Language in each Deed of Trust Note and the Deed of Trust before signing the documents. Later that day, OCCA's attorney informed plaintiffs *1231 attorney that OCCA was unwilling to accept the Teachers loan as long as the documents contained the Default Prepayment Fee Language. Teachers then drew the full amount of a $200,000 letter of credit which previously had been provided by OCCA under the Commitment Letter. Soon thereafter, Teachers commenced this diversity action. [2]

[1]  Plaintiff seeks to recover damages upon a claim of breach of contract—that defendant failed to negotiate in good faith the dispute with respect to the Default Prepayment Fee Language and that OCCA's claimed objection thereto was no more than a pretext for its unwillingness to proceed with the transaction as a result of a dramatic decline in interest rates from the date the Commitment Letter was signed to the date of the closing; that OCCA adamantly refused to negotiate the amount of the Default Prepayment Fee and insisted upon its deletion in its entirety—in sum that its position was wholly arbitrary and in bad faith. Plaintiff seeks to recover as damages the sum of $3,991,408, the difference between 14.25%, the rate of interest set forth in the Commitment Letter and 11.89%, the prevailing rate of interest on Teachers' loans

AA01636

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

during the month after the closing, over the thirty-five year period of the loan, discounted to present value. Plaintiff also seeks to recover $170,000 covering interest over a six-month period following defendants' refusal to close the deal, which period it claims was reasonably required before it could place a new loan, and $22,411 for the fees of its outside counsel retained for the closing.

The defendants reject plaintiff's claim, essentially upon the ground that the Commitment Letter makes no provision for a Default Prepayment Fee payable after Teachers' exercise of a right to accelerate for default during the first seventeen years of the loan. The essence of their position is that although the Commitment Letter contains a detailed provision entitled "prepayment," that provision does not mention anything about Teachers' right to an 18% default prepayment fee. Therefore, according to the defendants, it was plaintiff that breached the contract by insisting on the inclusion of a provision in the closing documents that was not in the Commitment Letter. Defendants counterclaim to recover the $400,000 commitment fee retained by plaintiff and the $25,000 appraisal and engineering inspection fee paid to plaintiff.

### DISCUSSION

After a study of the entire record [3] of the six-day nonjury trial at which plaintiff's representatives and those of the Butler group testified, principally David Butler and James Kassis, who participated in the negotiations that led to the Commitment Letter and in events prior to the closing, and upon an evaluation of the credibility of the witnesses and consideration of the legal contentions advanced by the parties, the Court finds that the plaintiff has sustained its burden of proof upon its claim for breach of contract, [4] and that the defendants have failed to sustain their burden of proof upon their counterclaim. Plaintiff is entitled to judgment in its favor.

Under New York law, a duty of fair dealing and good faith is implied in every contract. [5] As this Court has said: "Where *1232 the parties are under a duty to perform that is definite and certain the courts will enforce a duty of good faith, including good faith negotiation, in order that a party not escape from the obligation he has contracted to perform." [6] Here, defendants signed the Commitment Letter, an agreement they concede was binding on both parties,

obligating them to borrow and plaintiff to lend $20,000,000. Obviously the Commitment Letter did not contain, and the parties understood that it did not contain, all the final and definitive terms that were to be incorporated in the closing documents. Both parties were required to negotiate in good faith with respect to the closing documents needed to consummate the transaction. Defendants breached that duty to negotiate in good faith and therefore breached the contract with Teachers.

We start with an uncontested fact—that a prerequisite to the Butler group obtaining a construction or temporary loan to finance the construction of the contemplated office building was a permanent loan that would "take out" the construction loan. Defendants, through their agent Sonnenblick-Goldman, arranged for the permanent financing from Teachers. Even before signing the Commitment Letter they were aware that it was Teachers' policy to adhere to the interest rate set forth in the agreement regardless of what happened to market interest rates and that Teachers expected its borrowers to do the same. The evidence supports a finding, however, that the Butler group, almost from the time the parties obligated themselves under the Commitment Letter, communicated with various lenders and brokers to avoid taking the Teachers loan. Beginning shortly after the Commitment Letter, with its interest rate of 14.25%, was signed, interest rates started to decline and as construction went forward, continued to decline so that when the loan was ready to be closed, financing was available at approximately 12% and without a kicker. Having obtained the permanent loan commitment necessary for construction to begin, defendants took advantage of the nineteen-month period before the scheduled closing to seek a more favorable loan package from other lenders.

Defendants do not deny communicating with other lenders in an attempt to arrange for permanent financing, but they contend that their purpose was to protect themselves against their inability to meet a requirement of the Commitment Letter that the building be 50% pre-leased at the time of closing. Defendants point to the financial difficulties of Attorneys Office Management Inc. ("AOMI"), a tenant to whom the defendants were required to lease a fixed percentage of building space. The evidence establishes that this claim was spurious. The pre-leasing requirement clearly was for the benefit of Teachers alone; a condition which Teachers could, and ultimately did, waive. Defendants began communicating with other lenders over two months before receiving evidence that AOMI had filed a chapter XI

AA01637

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

proceeding. Moreover, defendants' communications to the other lenders and their testimony at trial belie their professed intention to protect themselves against a decision by Teachers not to proceed with the loan.[7] The defendants' principals, Kassis and Butler, *1233 were less than forthright with respect to this and other essential matters; bluntly, in some respects they were evasive and contrived answers to explain factual situations and documentary proof which were contradictory of, and adverse to, their contentions. Defendants' claims must be viewed in the context of their subsequent dealings with Teachers, discussed hereafter, the decline in interest rates, and their acknowledged belief that the loan was not economically favorable to them.

Defendants' actions during the last few months prior to the scheduled closing date conclusively establish that, as the closing drew near, the defendants deliberately intended not to proceed with this loan—at least not on the terms contained in the Commitment Letter. By contrast, Teachers not only took the steps necessary to close the loan, as it was obligated to do under the Commitment Letter, but it offered the defendants alternatives designed to reduce the likelihood of a default.

In July 1983, Teachers sent the draft closing documents to the Butler group for its comments.[8] These documents included the same Default Prepayment Fee Language upon which defendants ultimately based their refusal to close the loan transaction in April 1984. Defendants failed to acknowledge or respond to the request for comments. In January 1984, in connection with a checklist of matters that required attention before the closing, plaintiff's representative reminded the Butler group that Teachers was still waiting for any comments with respect to the draft documents.[9] Again there was no response. In a letter dated February 1, 1984, Teachers' in-house counsel wrote to Kassis that Teachers assumed that, in light of defendants' failure to respond with any comments, that the documents were satisfactory and would be deposited in escrow.[10]

On February 7, 1984, ten weeks before the closing, in a telephone conversation with a Teachers representative, Butler expressed his view that in light of OCCA's difficulties in meeting the 50% pre-leasing requirement, defendants did not have to close the loan.[11] The Teachers representative said that the Commitment Letter was binding and suggested that Butler should seek a legal opinion with respect to the position he was taking. Kassis, a lawyer, testified that when Butler informed him of this conversation with Teachers', Kassis felt

the defendants should "screw the two points" (the $400,000 commitment fee) and not proceed with the loan.[12]

A few weeks later, on February 22, 1984, Butler told Sullivan, Teachers representative who had negotiated the Commitment Letter with OCCA, that he assumed Teachers was not interested in closing the deal since AOMI was no longer a tenant.[13] To Butler's surprise and dismay, Sullivan responded that the pre-leasing condition was for Teachers' benefit and could be waived by plaintiff. Defendants subsequently were informed by their own attorneys and by Teachers' counsel specially retained for the purpose of closing the transaction, that under the contract Teachers could waive the pre-leasing condition and insist that the loan be closed despite the absence of AOMI.

After reviewing the leasing information for the One City Centre building sent by Kassis on February 24, 1984, Teachers decided the project was basically sound and informed defendants of its decision to close notwithstanding that the leasing percentage had not been met. In a good faith effort to meet the Butler group's concerns about the rental situation, Teachers offered *1234 the defendants a six-month extension of the commitment to October 31, 1984 to allow them more time to secure additional leases for space in the building.[14] On April 12, 1984, less than three weeks before the closing, Butler requested a reduction of the interest rate from 14.25% to 12% and of the contingent interest (the "kicker") from 40% to 33.3%. Teachers representative refused to reduce the interest rates, but reiterated the offer of a six-month extension, told Butler that OCCA could obtain a second mortgage, and offered the defendants an accrual type loan in which interest payments would be tied directly to the building's operating income, thereby reducing the likelihood of a default on the loan.[15] Throughout its dealings with OCCA, Teachers adhered to its position that its policy was "to live up to the terms and spirit of its agreements and it expects those with whom it deals to do likewise."[16]

Defendants said nothing about any of the provisions of the closing documents until it became apparent that their attempts to convince Teachers not to go forward with the loan or alternatively, to lower the interest rate, would not succeed. Although Butler admitted knowing sometime in February that the closing documents contained the Default Prepayment Fee Language,[17] neither he nor Kassis ever mentioned defendants' objections to the inclusion of this provision in the closing documents in any of their conversations or

AA01638

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

communications with Teachers. In fact, the Butler group's objections to the Default Prepayment Fee Language were not raised until April 26, 1984—only four days before the closing —in a letter sent to Teachers' counsel.[18]

Defendants insisted that the Default Prepayment Fee Language be deleted in its entirety. They made no counteroffers with respect to the amount of any default prepayment fee nor were they willing to negotiate its terms.

The defendants take the position that since the Default Prepayment Fee Language was not contained in the Commitment Letter, Teachers was seeking to change the economic terms of the transaction; that the Butler group's refusal to accede to the provision was consistent with their duty to negotiate in good faith. The evidence supports the conclusion, however, that the defendants seized on the absence of the Default Prepayment Fee Language from the Commitment Letter as a pretext for not going forward with the loan. Aware that Teachers considered the Default Prepayment Fee Language necessary to protect its interests, and having failed to convince Teachers not to close the loan, defendants struck the provision and refused to negotiate despite Teachers' willingness to do so.

It is undisputed that the Commitment Letter signed by Teachers and the Butler group contained a seventeen-year Lock-in and a Prepayment Premium, but did not contain Default Prepayment Fee Language. The evidence at trial establishes that closing documents for commercial real estate loans historically contain provisions necessary to implement the express terms of the commitment letters, but which are not contained in the commitment letters. The parties, pursuant to their duty to negotiate in good faith to close the loan transaction, are expected to negotiate the terms of provisions such as acceleration clauses, default interest rates, lender's remedies and default prepayment fees.

Here, defendants not only had an implied duty of good faith negotiation, but they expressly agreed in the Commitment Letter to abide by all matters pertaining to the due execution of documents that Teachers' attorneys found "reasonably necessary for *1235 the transaction."[19] The Default Prepayment Fee Language included by Teachers in the closing documents was not only "reasonably necessary," it was essential to protect Teachers from a voluntary default by OCCA.

The purpose of such language is to protect a lender against a drop in market interest rates which induces the borrower to default in the early years of the loan, forcing the lender to accelerate the balance, and enabling the borrower to prepay the loan with a second loan obtained at the lower interest rate.[20] There can be no doubt that the loan, if consummated, would have been a highly desirable one to plaintiff, with its prospect of a stream of income over a thirty-five year period at a high interest rate and additional income by way of a kicker. The Default Prepayment Fee Language was intended to implement the Lock-in provision of the loan; without it, the borrowers could circumvent the Lock-in without consequence, depriving Teachers of the benefit of its bargain. Financial lenders in the California market, to protect themselves against such practices, included in their closing documents Default Prepayment Fee clauses at fixed amounts which were not immutable but subject to negotiation. The evidence fully establishes that the inclusion of such clauses was the custom and practice in the California real estate financing market. Indeed, defendants' own expert acknowledged this was so, although he testified some loans were closed without its inclusion.[21] Here, the evidence is that over a period of more than twenty years, Teachers included substantially the same Default Prepayment Fee Language in all of its closing documents to protect itself against a default intended to deprive it of the benefits of the loan. Teachers' inclusion of such language in the closing documents for the OCCA loan is consistent with both Teachers' practice and industry practice.

Even Teachers probably would agree that it would have been more prudent for it to have included the Default Prepayment Fee Language in the September 1982 Commitment Letter. Some lenders include it in their commitment letters and the industry trend during the past few years appears to be towards greater specificity in commitment letters, in part due to a desire to avoid litigation such as this over provisions not contained in commitment letters. But this does not undermine the Court's conclusion that the Butler group breached its duty to negotiate in good faith to close the loan. As discussed above, defendants had the closing documents in their possession for nine months and, despite repeated reminders from Teachers to review the documents, they waited until four days before the closing to object to the Default Prepayment Fee Language. Then, instead of making a counteroffer or engaging in good faith negotiations with respect to the amount of the fee or its terms, defendants arbitrarily refused to negotiate and insisted that it be deleted in its entirety. Nine months after insisting that Teachers

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

delete the Default Prepayment Fee Language from the closing documents, defendants signed closing documents from Aetna Life Insurance Company which provided defendants with more money at a lower interest rate and without a kicker, but which contained a Default Prepayment Fee based on a formula which potentially could result in the imposition of a fee much greater than the 18% fee in Teachers' documents.

In sum, the inescapable conclusion the Court draws from the totality of the evidence is that defendants' refusal to negotiate with respect to the Default Prepayment Fee Language was simply a last-ditch attempt to scuttle the loan agreement they had entered into nineteen months earlier. *1236 The defendants signed the permanent financing agreement with Teachers to enable themselves to obtain construction financing from Bank of America. Almost immediately thereafter, as interest rates declined, defendants sought alternative financing from other lenders. When they were unable to persuade Teachers to lower the interest rate agreed to in September 1982 and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an eleventh hour comparison of the closing documents to the Commitment Letter to come up with an ostensible reason for not going forward with the loan. Defendants breached the Commitment Letter and are obligated to Teachers for its damages.

## PLAINTIFF'S DAMAGES

[2]   The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed.[22] On the issue of damages, the Commitment Letter expressly provided:

In the event [defendants] fail to comply with any of the other covenants and conditions herein ... then [Teachers] shall have the right (i) to retain so much of the amount paid hereunder and not previously returned, to receive payment on the Letter of Credit also delivered hereunder, and, in addition, to claim and receive all provable damages, including loss of bargain, sustained by us as a result of such default in excess of such amount retained or received.

Plaintiff is entitled to the difference between the contracted for rate of interest—14.25%—and the rate of interest at the time of the breach,[23] over the thirty-five-year term of the loan, discounted to present value. At the Court's request, plaintiff calculated its damages based on the interest rates at the time of the breach, 12.25%, rather than 11.89%, the average interest rate on Teachers loans during the month of May 1984. This sum discounted to present value amounted to $3,382,979.[24]

In addition, under the terms of the Commitment Letter, plaintiff is entitled to attorney's fees in the amount of $22,411 for counsel it retained for the closing.[25] The $400,000 commitment fee retained by Teachers when the loan failed to close must be deducted from this amount, to avoid giving Teachers more than the benefit of its bargain. The Court declines to award Teachers $170,000 for the difference between the contracted for rate of 14.25% and the short-term interest rate for a six-month period. Teachers offered no evidence that it took six months to close a replacement loan or that Teachers would not have made the later loan had the OCCA loan closed. Teachers is therefore entitled to judgment in the sum of $3,005,390.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Judgment may be entered accordingly.

So ordered.

Footnotes

1    Under California law, the deed of trust evidences a security interest in the real property and serves the same purpose as a mortgage on the property under New York law.

2    See Teachers Ins. & Annuity Ass'n of America v. Butler, 592 F.Supp. 1097 (S.D.N.Y.1984) (denying defendants' motion to dismiss for lack of in personam jurisdiction; denying defendants' motion to transfer pursuant to 28 U.S.C. § 1404(a); and directing expungement of a lis-pendens filed by plaintiff upon condition that defendants post a bond in the sum of $600,000, which together with $400,000 previously received by plaintiff the Court deemed adequate to protect plaintiff's interests)."

3    The record includes the deposition testimony of witnesses and numerous documents introduced into evidence by the parties.

AA01640

Teachers Ins. & Annuity Ass'n of America v. Butler, 626 F.Supp. 1229 (1986)

4     The Court finds that plaintiff failed to sustain its burden of proof with respect to its claim of fraudulent inducement, raised for the first time in the joint pretrial order and apparently abandoned by plaintiff at trial.

5     *See Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 923 n. 8 (2d Cir.1977); *Van Gemert v. Boeing Co.*, 553 F.2d 812, 815 (2d Cir.1977); *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 770 (2d Cir.1975); *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978); *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163 (1933); *Wood v. Lucy, Lady-Duff Gordon*, 222 N.Y. 88, 118 N.E. 1082 (1917).

6     *Candid Productions, Inc. v. International Skating Union*, 530 F.Supp. 1330, 1334–35 (S.D.N.Y.1982); *see also Nuvest, S.A. v. Gulf & Western Indus., Inc.*, 649 F.2d 943 (2d Cir.1981); *Sommer v. Hilton Hotels Corp.*, 376 F.Supp. 297 (S.D.N.Y.1974).

7     For example, in a letter dated November 29, 1982, Kassis responded to another lender's loan offer: "[T]he rate and term of the loan you are offering is not attractive enough to induce us to change." *See* Plaintiff's Exhibit 12. Kassis admitted on direct examination that at the time he signed the Commitment Letter, he believed OCCA would be able to meet the pre-leasing requirements. *See* Testimony of James Kassis, Tr. at 632–33, 692.

8     *See* Plaintiff's Exhibit 35.

9     *See* Plaintiff's Exhibit 56.

10    *See* Plaintiff's Exhibit 6. Defendants do not acknowledge having received this letter.

11    *See* Deposition Testimony of David Butler, at 209; Testimony of David Butler, Tr. at 938.

12    *See* Plaintiff's Exhibit 32; Testimony of James Kassis, Tr. at 819–20.

13    *See* Testimony of David Butler, Tr. at 947; Testimony of Daniel Sullivan, Tr. at 71.

14    *See* Plaintiff's Exhibit 42.

15    *See* Testimony of Ronald Bernhard, Tr. at 107–11; Testimony of David Butler, Tr. at 950–58.

16    *See* Plaintiff's Exhibit 30.

17    *See* Testimony of David Butler, Tr. at 957, 966.

18    *See* Plaintiff's Exhibit 44.

19    Plaintiff's Exhibit 1, ¶ 11(c).

20    *See* Testimony of Bruce Hyman, Tr. at 231–35; Testimony of Michael McAndrews, Tr. at 568–69; Testimony of Alan Wayte, Tr. at 302; Deposition Testimony of Kevin Starr, at 10–11.

21    Defendants' expert also agreed with plaintiff's witnesses that default prepayment fees are often negotiated by the parties. Testimony of Michael McAndrews, Tr. at 570.

22    *See, e.g., Wallace Steel, Inc. v. Ingersoll-Rand Co.*, 739 F.2d 112, 115 (2d Cir.1984); *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir.1984); *Brown v. Lockwood*, 76 A.D.2d 721, 742–43, 432 N.Y.S.2d 186, 201 (2d Dept.1980); *New York Water Serv. Corp. v. City of New York*, 4 A.D.2d 209, 213, 163 N.Y.S.2d 538, 542 (1st Dept.1957).

23    Contract damages are measured at the time of the breach. *See J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc.*, 32 N.Y.2d 425, 429, 345 N.Y.S.2d 993, 995, 299 N.E.2d 243, 245 (1973); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 232, 269 N.E.2d 21, 28 (1971); *Orange & Rockland Utilities, Inc. v. New England Petroleum Corp.*, 60 A.D.2d 233, 235, 400 N.Y.S.2d 79, 81 (1st Dept.1977).

24    Neither figure was challenged by defendants nor was any contrary evidence introduced.

25    The Commitment Letter provided: "[Defendants] agree to pay all expenses in connection with this transaction including but not limited to those for ... attorney's fees (if outside counsel is engaged by us)." Plaintiff's Exhibit 1, ¶ 3.

End of Document          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

AA01641

4

AA01642

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

670 F.Supp. 491
United States District Court,
S.D. New York.

TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA, Plaintiff,
v.
TRIBUNE COMPANY, Defendant.

No. 83 Civ. 0047 (PNL).   |   May 27,
1987.   |   As Amended June 26, 1987.

Institutional lender brought action against prospective borrower, charging it with breach of commitment letter agreement for loan. The District Court, Leval, J., held that commitment letter represented binding preliminary commitment and obligated both parties to seek to conclude final loan agreement upon agreed terms by negotiating in good faith to resolve such additional terms as were customary, and borrower's reservation of right of approval to its board of directors did not leave it free to abandon transaction.

Judgment for plaintiff.

West Headnotes (1)

[1]    Contracts
       Agreement to make contract in future;
       negotiations in general

       Upon consideration of circumstances and express terms of commitment letter between institutional lender and borrower, as well as context of parties' negotiations, letter represented binding preliminary commitment and obligated both parties to seek to conclude final loan agreement upon agreed terms by negotiating in good faith to resolve additional terms that were customary in agreements of that type, and borrower's reservation of right of approval to its board of directors did not leave it free to abandon transaction.

       279 Cases that cite this headnote

**Attorneys and Law Firms**

*491 Fried, Frank, Harris, Shriver & Jacobson, New York City (Marc P. Cherno, Robert E. Gerber, Mary C. Farrington, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (Eugene L. Girden, Lynn P. Freedman, Blair Axel, Stephen P. Younger, of counsel), for defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

LEVAL, District Judge.

This action is brought by an institutional lender against a prospective borrower charging the borrower with breach of a commitment letter agreement for a 14–year $76 million loan yielding 15.25%. The exchange of letters constituting the commitment agreement stated that the borrower and lender had made a "binding agreement," to borrow and to lend on the agreed terms, subject to the preparation and execution of final documents satisfactory to both sides and the approval of the borrower's Board of Directors. Prior to the preparation of final agreements the borrower broke off negotiations, declining to negotiate further unless the lender agreed that the borrower's obligation to borrow would be contingent on its ability to report the loan on its financial statement by an off-balance-sheet offset. The lender contends the borrower's withdrawal was attributable to an intervening decline in interest rates which permitted the borrower to secure funds at a much lower cost than agreed in the commitment letter. The borrower contends that the change in interest rates had nothing to do with its refusal to go ahead and that the availability of offset accounting had always been understood to be a condition of the loan. It contends also that its acceptance of the commitment reserving *492 right of approval to its Board of Directors left it free to decline to take down the loan if the loan did not serve its interest.

*Facts*

The borrower is Tribune Company, a Chicago communications enterprise which owned the New York Daily News. The lender is Teachers Insurance and Annuity Association of America, a large non-profit tax exempt organization that provides pension annuities and insurance programs to educational institutions. The contemplated loan

AA01643

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

was an element of a three-cornered arrangement for the sale by Tribune of the Daily News Building at 220 E. 42nd Street in New York.

For some time, Tribune had been contemplating the possibility of outright sale of the News. The Morgan Guaranty Trust Company of New York prepared a memorandum recommending to Tribune that it structure a deal in which the purchaser's payment would be deferred, and Tribune would borrow equivalent funds from a financial institution under terms that permitted Tribune the right to repay its borrowing by assigning the purchaser's installment note to the lending institution. (DX 1–4.) This device was designed to secure installment tax deferral of Tribune's gain, notwithstanding immediate realization of the full proceeds of the sale through the loan. And because its borrowing could be repaid by tender of the purchaser's note, Tribune's debt could be offset against its receivable and reported off-balance-sheet in the notes to its financial statement.

In the spring of 1982 Tribune dropped the plan to sell the News. Instead, it restructured the News subsidiary, which occasioned a nonrecurring tax loss of $75 million. To raise cash that was needed for a number of purposes including the operations of the News, Tribune decided to sell the News Building which would no longer be needed in the restructured operation.

Tribune entered into negotiations to sell the Building to LaSalle Partners, a Chicago real estate firm, with Tribune retaining an equity interest. It was important that the transaction be accomplished during the calendar year 1982 so that the loss realized from the restructuring of the News could be offset against taxable gain realized from the sale of the News Building. A suggestion was made to adapt to the sale of the Building the proposal which Morgan had made with respect to the contemplated sale of the *News*. A substantial portion of the purchase price would be deferred: LaSalle would deliver to Tribune a non-recourse long-term (35 year) purchase money mortgage note. (As the equity "kicker", this mortgage would give the mortgagee not only conventional interest payments but also a percentage of the operating profits of the building.) Tribune would "match-fund" the mortgage, *i.e.,* it would borrow from a third party in an amount approximately equal to the mortgage note. The loan agreement would give Tribune an unconditional right to satisfy its obligation to repay by putting to the lender the mortgage note which Tribune received for its sale of the building. To compensate the lender for the additional risk

inherent in the possible put of the mortgage, Tribune would pay a premium above the market interest rate.

In this manner, Tribune would realize only so much gain as it could set off against its 1982 tax loss. The taxability of the remainder of its gain would be deferred by reason of the installment sale. At the same time, through the loan, Tribune would obtain immediate use of the full purchase price in cash. It would not be obliged to carry the borrowing as a liability on its balance sheet: by reason of its right to put its mortgage receivable to the lender in satisfaction of the debt, it could employ offset accounting, setting off the asset represented by the purchase money notes against the liability to the lending institution, eliminating both from its balance sheet, and describing them rather in the footnotes to the financial statements.

The use of offset accounting was important to Tribune. Up to this point, its common stock had been privately held. It was now contemplating a public offering and believed that the market for its shares would be adversely affected if it were required **\*493** to carry so large a liability on its balance sheet.

In August, Tribune prepared an offering brochure to be shown to prospective lenders. This was a document of about 50 pages, describing the proposed mortgage and loan, together with financial information about Tribune and the Building. The brochure included two term sheets—one describing the proposed purchase money mortgage Tribune would receive upon the sale of the Building, the other giving the terms of its proposed match-fund borrowing.

Tribune's advisers believed that only a small number of institutions would have the means and flexibility to contemplate a loan of these specifications. Together with LaSalle, Tribune prepared a list of six institutions including Teachers. The other five promptly rejected the deal.

Gary Waterman of LaSalle called Martha Driver of Teachers to discuss the concept. Driver told him that Teachers would be interested in receiving a proposal from Tribune. On August 20 Scott Smith, the Vice President and Treasurer of Tribune, sent Driver the offering circular. (DX 5.) Smith's covering letter stated:

> Our objective is to "match fund" this PMM [purchase money mortgage] so that we can obtain cash equivalent to the PMM's value while maintaining the tax deferral and the upside potential associated with the cash flow participation

AA01644

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

feature. A second objective is to avoid showing both the PMM and match funding on our balance sheets since conceptually these real estate loans are not related to our basic businesses.

According to our advisers, we can meet these objectives by adding a "put" or alternative payment option to the private placement.... [giving] Tribune Company the unconditional right, at any time, to assign the PMM to the private placement lender in full satisfaction of its obligations under the Notes.

The letter went on to state that "[t]he likelihood of the 'put' being exercised is very low because of the 'penalties' Tribune would incur through loss of the tax deferral and the value of the cash flow participation." Finally, Smith's letter stated, "While we are flexible on funds delivery, our objective is to have a *firm commitment* from a lender by September 15, 1982. Consequently, we need to move the due diligence and negotiation process along very quickly." (Emphasis supplied.)

In the next weeks discussions proceeded promptly between Teachers and Tribune, with Teachers' representatives making due diligence visits to Tribune. Teachers requested and Tribune agreed to an additional ¼% yield. Both sides agree that during these meetings Smith talked about Tribune's desire to use offset accounting. Driver testified that she told Smith Teachers could not make a commitment if the deal were conditioned on Tribune's ability to use a particular method of accounting. Smith denies that Driver made any such statement. Both agree that Smith spoke of Tribune's urgent need for a commitment by September 15. Driver told Smith that the commitment could not be issued before approval by Teachers' Finance Committee which would not meet until September 16. This brief delay was acceptable to Tribune.

The loan had attractive features for Teachers: It was satisfied with Tribune as a credit risk; it would receive a premium over market interest rates to compensate it for the additional risk of being paid by tender of a long-term mortgage rather than in cash; nonetheless, absent catastrophic changes, Tribune was unlikely to exercise the right to tender the mortgage, because by doing so it would give up the tax deferment as well as its participation in the profits of the building; furthermore, an independent appraisal delivered by Tribune to Teachers valued the building at $150 million or nearly double the amount of the loan, providing a comfortable cushion of protection in the mortgaged collateral.

On September 16th, Teachers Finance Committee met and approved the Tribune loan. Driver promptly called Smith, gave him the good news, and told him that Teachers would issue its commitment letter promptly. Tribune's Assistant Treasurer wrote to Driver, "We look forward to receiving **\*494** your commitment letter next week...." (DX 46.) Driver promptly undertook the drafting of Teacher's commitment letter.

The letter, mailed on September 22, included a two page Summary of Proposed Terms drawn from the term sheet included in Tribune's Offering Circular and the ensuing conversations. Teacher's term sheet covered all the basic economic terms of a loan. Neither the term sheet nor the covering commitment letter made reference to offset accounting. The letter stated that the agreement was "contingent upon the preparation, execution and delivery of documents ... in form and substance satisfactory to TIAA and to TIAA's special counsel ...," and that the transaction documents would contain the "usual and customary" representations and warranties, closing conditions, other covenants, and events of default "as we and our special counsel may deem reasonably necessary to accomplish this transaction." It concluded by inviting Tribune to "evidence acceptance of the conditions of this letter by having it executed below by a duly authorized officer ...," and finally stated:

> Upon receipt by TIAA of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue sell and deliver to us ... the captioned securities, shall become a binding agreement between us. (DX 13.)

When Tribune received this commitment letter, the "binding agreement" language caused serious concern to its lawyers. Tribune's outside counsel, Alfred Spada of the firm of Reuben & Proctor, advised Smith not to sign a letter containing "binding agreement" language.[1] But, having been turned down by five other institutions, Smith did not want to risk losing Teacher's commitment. He made no comment orally or in writing to Teachers questioning the "binding agreement" language. He executed and returned the letter on behalf of Tribune Company adding the notation that it was subject to certain modifications outlined in his accompanying letter. In the accompanying letter Smith wrote,

AA01645

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

[O]ur acceptance and agreement is subject to approval by the Company's Board of Directors and the preparation and execution of legal documentation satisfactory to the Company.[2] (DX 14.)

Smith's acceptance letter made no mention of offset accounting.

During October Tribune proceeded with negotiations on two fronts to conclude the sale of the News Building to LaSalle and the consummation of the loan from Teachers. Tribune's lawyers had advised that in order to assure the desired tax deferral these negotiations should be conducted separately and no direct negotiation should occur between Teachers and LaSalle. The document which pertained to both transactions was the purchase money mortgage, which would be given by LaSalle to Tribune to secure its deferred payment, and could eventually be put by Tribune to Teachers in satisfaction of its obligations under the loan. As the negotiations over the mortgage proceeded, Tribune found itself pulled between the conflicting interests of its counterparties. LaSalle, as purchaser of the building, wanted a mortgage that would allow little interference by the mortgagee in the operation of the building; such mortgages are characteristically given in purchase money transactions, and Tribune, as seller, was willing to agree to such loose terms. Teachers, on the other hand, as the possible eventual holder of the mortgage, was interested in terms characteristic of institutional mortgages that give the mortgagee substantial control over the *495 mortgagor's operation of the building. LaSalle and Teachers each served on Tribune adamant objections to the other's position. Tribune ferried these objections from one set of negotiations to the other.

A second subject of controversy in the negotiations between Tribune and Teachers was conditions on Tribune's put of the mortgage. Teachers expressed concern over a variety of problems: First, it worried that the mortgage might already be in default when put to Teachers; it sought to include as a condition of exercise of the put that the mortgage not be in default. Second, because the purchase money mortgage gave the mortgagee an equity participation in the profits of the building, Teachers worried that its possession of such a mortgage might give it "unrelated business income" that would threaten its tax exempt status. It also worried that such a mortgage might not be a legal holding for it at the time of exercise of the put, fourteen years hence. Teachers sought terms that would make Tribune's right to put the mortgage conditional on these issues being resolved to Teachers'

satisfaction at the time of exercise. Tribune insisted that its right to put the mortgage to Teachers must be unconditional. Tribune believed that without an unconditional right to tender the mortgage in full satisfaction of the loan, Tribune could not justify offset accounting.

Eventually, because of the urgent need to conclude the sale of the building during the tax loss year, Tribune decided to conclude its negotiations with LaSalle, deferring the issue of Teachers satisfaction. Tribune entered into final binding agreements with LaSalle for the sale of the News Building on November 5. (DX 22.) The agreement was substantially on the terms reflected in the offering circular that Tribune had delivered to Teachers in August.

Tribune's board was scheduled to meet on October 28th. Tribune's negotiators had advised Teachers that formal board approval would be obtained at that meeting. At this meeting, Tribune's board passed resolutions which approved the sale of the Building to LaSalle. With respect to the Teachers loan, the Minutes of the meeting state that the Chairman "requested that the Board authorize the Finance Committee to approve the terms of such borrowing should the loan become available to the Company;" and that, following discussion, resolutions were adopted "that the proper officers of the Company be and they hereby are authorized" to effect the borrowing "with all of the actual terms and conditions to be subject to the prior approval by resolution of the Finance Committee." (DX 19.)

During the month of November, Tribune's accountants Price Waterhouse became worried about the availability of offset accounting. Prior to the delivery of the commitment letter, on September 7, Price Waterhouse had given Tribune an opinion letter that an unconditional option to put the mortgage note to the lender in full satisfaction of Tribune's obligation to repay the borrowing "allows (but does not require)" Tribune to offset its mortgage note receivable against its note payable. (DX 7.) In the meantime, in mid-October, the Financial Accounting Standards Board (FASB) had issued an exposure draft dealing with the appropriateness of offsetting restricted assets against related debt. (DX 25.) The exposure draft underlined the problem that the conditions Teachers had been seeking to impose on Tribune's exercise on the put were incompatible with offset accounting. In addition, Price Waterhouse began to worry that if Tribune proceeded to offer securities to the public, as it was planning, the SEC in passing on Tribune's registration statement might ask Price Waterhouse for an opinion as to whether offset accounting was "preferable." Although Price Waterhouse

AA01646

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

believed an unconditional put option would make offset accounting "appropriate," it had doubts whether it could give the opinion that such an accounting was "preferable" and whether, without such an opinion, the SEC would permit the liability to be kept off the balance sheet.

Smith called Driver and expressed Tribune's concerns about the accounting issue. Meetings and discussions were held during *496 November concerning Tribune's dissatisfaction with the conditions Teachers had demanded as to the put, the availability of offset accounting, and Teachers' problems with the terms of the mortgage.

In the meantime, interest rates had dropped rapidly, and were now substantially below the rates that prevailed when Teachers and Tribune had entered into the commitment. Driver became concerned that Tribune, which could now make a new deal to borrow at substantially cheaper rates, was seeking to back out of the transaction. Having heard nothing about the actions of Tribune Board at its meeting on October 28, she inquired of Smith whether Board approval had been voted. Smith answered to the effect that the Board had given "general approval" to the transaction.

Around December 2 Smith began to advance proposals varying the form of the transaction. He suggested delaying Tribune's take-down, paying Teachers a commitment fee in the meantime, and specifying that Tribune would not go ahead with the proposed loan if it did not receive assurance as to the availability of offset accounting. Teachers indicated flexibility as to delaying the take-down in return for a commitment fee, but not as to making the deal conditional on Tribune's accounting.

On December 6th Tribune closed with LaSalle on the sale of the building. The mortgage was executed. Teachers began to press Tribune to meet with it to put the loan documents into final form. Teachers dropped its demand for conditions on the exercise of the put that had been unacceptable to Tribune. It asked for Tribune's comments on the draft note which it had circulated on December 1. Driver asked Smith to schedule a meeting to iron out all open issues. But the drop in interest rates together with doubts as to the availability of offset accounting now made the deal much less attractive to Tribune. Smith responded that there was no point having a meeting unless Teachers were willing to make Tribune's obligation conditional on the availability of offset accounting. Driver told Smith that Tribune's satisfaction as to its accounting was not part of their

deal. Teachers sent Tribune an unsolicited letter extending Teachers' commitment for another 30 days. Tribune exhibited no further interest in pursuing the transaction. Teachers then brought the suit.

### Discussion

The primary contested issue is as to the nature of the obligations that arose out of the commitment letter agreement:

Tribune contends that although the commitment letter was an undertaking to negotiate, it did not obligate either side to enter into a loan contract that was adverse to its interest. Pointing out that the commitment letter agreement left many terms open, that both sides had reserved the right of approval of satisfactory documentation, and that Tribune had furthermore made its obligation conditioned on the approval of its Board of Directors, it argues that it had no binding commitment to the loan agreement, especially if it found the terms adverse to its interests.

Teachers argues that although the commitment letter did not constitute a concluded *loan agreement,* it was nonetheless a binding commitment which obligated both sides to negotiate in good faith toward a final contract conforming to the agreed terms; it thus committed both sides not to abandon the deal, nor to break it by a demand that was outside the scope of the agreement. Although Teachers recognizes that the letter agreement left many points unspecified, it argues that the open terms were of minor economic significance and were covered by the provision that "[t]he documents shall contain such representations and warranties, closing conditions, other covenants, events of default and remedies, requirements for delivery of financial statements, and other information and provisions *as are usual and customary in this type of transaction....*" (Emphasis supplied.) (DX 13.) It argues that these minor open terms did not render the contract illusory or unenforceable. Nor did they indicate an intention of the parties not to be bound when taken together with the express language of "binding agreement." *497 Although it was of course possible for the deal to break without liability on either side by reason of inability of the parties to reach agreement on the open terms, Teachers argues that neither side was free to break the deal over conditions which were either inconsistent with the agreed terms or outside the scope of provisions that would be "usual and customary in this type of transaction." (DX 13.)

AA01647

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

There has been much litigation over preliminary agreements. It is difficult to generalize about their legal effect. They cover a broad scope ranging in innumerable forms and variations from letters of intent which presuppose that no binding obligations will be placed upon any party until final contract documents have been signed,[3] to firm binding commitments which, notwithstanding a need for a more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed.[4] As is commonly the case with contract disputes, prime significance attaches to the intentions of the parties and to their manifestations of intent. Labels such as "letter of intent" or "commitment letter" are not necessarily controlling although they may be helpful indicators of the parties' intentions. Notwithstanding the intention of the parties at the time, if the agreement is too fragmentary, in that it leaves open terms of too fundamental importance, it may be incapable of sustaining binding legal obligation.[5] Furthermore, the conclusion that a preliminary agreement created binding obligations does not necessarily resolve disputes because it leaves open the further question of the nature, scope and extent of the binding obligations.

A primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended. Ordinarily in contract negotiation, enforceable legal rights do not arise until either the expression of mutual consent to be bound, or some equivalent event that marks acceptance of offer. Contractual liability, unlike tort liability, arises from consent to be bound (or in any event from the manifestation of consent). It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is overall agreement (or offer and acceptance) to enter into the binding contract.[6] Nor is this principle altered by the fact that negotiating parties may have entered into letters of intent or preliminary agreements if those were made with the understanding that neither side would be bound until final agreement was reached. The Court of Appeals in several recent cases has stressed the importance of recognizing the freedom of negotiating parties from binding obligations, notwithstanding their having entered into various forms of non-binding preliminary assent.[7] Those decisions have underlined various indicia that can be helpful in making the determination whether a manifestation of preliminary assent amounted to a legally binding agreement.

Notwithstanding the importance of protecting negotiating parties from involuntary **498 judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation.[8] It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties.[9]

Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in V'Soske v. Barwick, 404 F.2d 495, 499 (2d Cir.), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)."

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.[10] To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type— the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in

AA01648

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

It may often be difficult for a court to determine whether a preliminary manifestation of assent should be found to be a binding commitment. The factors mentioned by the Court of Appeals in *Winston,* 777 F.2d 78, and *R.G. Group,* 751 F.2d 69, as relevant to a determination whether final contracts had been reached in preliminary form are also relevant to determination *499 whether preliminary commitments are to be considered binding. But, for this different inquiry, the factors must be applied in a different way. For example, in *R.G. Group,* 751 F.2d at 76, the court identified the third factor as "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." The existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement. But open terms obviously have a somewhat different significance where, unlike *R.G. Group,* the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms. To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced. That is not the law.

In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is, once again, to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached. Courts must be particularly careful to avoid imposing liability where binding obligation was not intended. There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation

and execution of contract documents. Nonetheless, if that is what the parties intended, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.

Giving legal recognition to preliminary binding commitments serves a valuable function in the marketplace, particularly for relatively standardized transactions like loans. It permits borrowers and lenders to make plans in reliance upon their preliminary agreements and present market conditions. Without such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms. At the same time, a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a "firm commitment" or "binding agreement."

3

Upon careful consideration of the circumstances and the express terms of this commitment letter, I conclude that it represented a binding preliminary commitment and obligated both sides to seek to conclude a final loan agreement upon the agreed terms by negotiating in good faith to resolve such additional terms as are customary in such agreements. I reject Tribune's contention that its reservation of the right of approval to its Board of Directors left it free to abandon the transaction.

*Expression of Intent*
The Court of Appeals' first and most important factor looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities. This factor strongly supports Teachers. The exchange of letters constituting the commitment is replete with the terminology of binding contract, for example:

> If the foregoing properly sets forth your understanding of this transaction, please evidence acceptance of the conditions of this letter by having it executed below by a duly authorized officer ... and by returning one executed counterpart....

> Upon receipt by [Teachers] of an accepted counterpart of this letter, our agreement to purchase from you and your

AA01649

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

agreement to issue, sell and deliver to us ... the captioned securities, shall become a binding agreement between us.

In signing, Tribune used the words "Accepted and agreed to." Tribune's additional letter of acceptance began "Attached is an executed copy of the Commitment Letter ... for a $76 million loan." The intention to create mutually binding contractual obligations is stated with unmistakable clarity, in a manner not comfortably compatible *500 with Tribune's contention that either side was free to walk away from the deal if it decided its interests were not served thereby.

Tribune argues that this language of binding agreement was effectively contradicted by its statement that "our acceptance and agreement is subject to approval by the Company's Board of Directors and the preparation and execution of legal documentation satisfactory to the Company," as well as by similar reservations in Teachers' letter.

Contracts of preliminary commitment characteristically contain language reserving rights of approval and establishing conditions such as the preparation and execution of documents satisfactory to the contracting party. Although such reservations, considered alone, undoubtedly tend to indicate an intention not to be finally bound, they do not necessarily require that conclusion. Such terms are not to be considered in isolation, but in the context of the overall agreement. Such terms are by no means incompatible with intention to be bound. Since the parties recognize that their deal will involve further documentation and further negotiation of open terms, such reservations make clear the right of a party, or of its Board, to insist on appropriate documentation and to negotiate for or demand protections which are customary for such transactions. In *Reprosystem*, 727 F.2d at 262, and *R.G. Group*, 751 F.2d at 75, the court reasoned that a term stating the agreement would be effective "when executed" could conclusively establish that no binding force was intended prior to execution. That reasoning is of diminished force, however, where the inquiry is not whether the parties had concluded their deal, but only whether they had entered into a binding preliminary commitment which required further steps. Here, the reservation of Board approval and the expressed "contingen[cy] upon the preparation, execution and delivery of documents" did not override and nullify the acknowledgement that a "binding agreement" had been made on the stated terms; those reservations merely recognized that various issues and documentation remained open which also would require negotiation and approval. If full consideration of the circumstances and the contract language indicates that there was a mutual intent to be

bound to a preliminary commitment, the presence of such reservations does not free a party to walk away from its deal merely because it later decides that the deal is not in its interest.

*The Context of the Negotiations*

These conclusions are further reinforced by the particular facts of the negotiation. As Smith's proposal letter of August 20 advised Teachers, Tribune wanted "to have a firm commitment from a lender by September 15, 1982." If such a "firm commitment" meant nothing more than Tribune now contends it does, such a commitment would have been of little value, as the lender would have remained free to abandon the loan if it decided at anytime that the transaction did not suit its purposes, whether because of changed interest rates or for any reason: Tribune wanted a firm commitment because it felt it needed to be sure the transaction would be concluded by the end of the year.

This same thinking governed Tribune's conduct a month later when it received the Teachers' commitment letter. Tribune's lawyers, recognizing that the form of agreement committed Tribune to a "binding" obligation, warned about the consequences of signing it. Tribune, however, wanted Teachers' binding commitment to make the loan. Tribune had been turned down by the five other lenders it considered eligible, and it did not want to risk losing Teachers' commitment. Accordingly, Smith refrained from raising any question about the "binding agreement" language. If he intended by adding the reservation of approval of Tribune's Board of Directors to change the deal fundamentally by freeing Tribune from binding obligations without Teachers noticing the change, he did not accomplish this. Tribune remained committed, as Teachers did. That is to say each was obligated to seek in good faith to conclude a final agreement within the terms specified in the commitment letter, supplemented by such representations, *501 warranties and other conditions as are customary in such transactions. Teachers would not have been free to walk away from the loan by reason of a subsequent decision that the transaction was not in Teachers' interest. Nor could Tribune.

Tribune further contends that, given the uncertainties implicit in the three-cornered deal, neither party could have considered the loan commitment as binding. The agreed terms required Tribune to pay a premium over the prevailing interest rates for the privilege of its option to put the mortgage to Teachers. If Tribune had failed to conclude its deal with LaSalle for the sale of the Building, there would have been

AA01650

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

no purchase money mortgage and no reason for paying an interest premium.

The argument is not frivolous, but nor is it compelling. If Tribune had failed to sell the News Building and Teachers had nonetheless sought to compel it to take down the loan, Tribune might have succeeded in arguing that the sale of the Building was a mutually agreed implicit condition of the enforceability of the loan agreement. Tribune's argument in those circumstances would have been supported by the references in the commitment letter to the purchase money mortgage resulting from the Building sale.

But, however that dispute would have been resolved had it arisen, it does not compel the conclusion that there was no binding obligation. The Building sale did not fall through. It was concluded on the anticipated terms. [11] If the sale of the Building was an implicit condition of the borrowing, that condition was fulfilled.

### Open Terms

Tribune contends that the commitment letter agreement included so many open terms that it could not be deemed a binding contract. [12] It argues also that the numerous open terms indicate a lack of intention on either side to be bound. [13] Neither contention is convincing. Tribune does cite reputable authority to the effect that, notwithstanding language of binding agreement, if a contract fails to include agreement on basic terms of prime importance, it can be considered a nullity. [14] This principle, however, has no application to the present facts. The two page term sheet attached to the commitment letter covered the important economic terms of a loan. The fact that countless pages of relatively conventional minor clauses remained to be negotiated does not render the agreement unenforceable. [15]

The contention is superficially appealing with respect to the mortgage. The commitment letter, although referring to Tribune's optional right to put a mortgage to Teachers in satisfaction of its obligations, did not specify any of the terms of such a mortgage. Absence of agreement on so important a specification as the basic terms of the mortgage would render this agreement illusory. There was, however, no absence of agreement on the basic terms of the mortgage. The references in the commitment letter to the mortgage were understood by both parties as references to the mortgage term sheet that Tribune had furnished to Teachers in its Offering

Circular. [The commitment letter stated that the mortgage to be tendered by Tribune "shall preserve the economics proposed for the present Mortgagee (Tribune Company)." *502 ] That two-page term sheet described the important economic terms of the proposed LaSalle purchase money mortgage. Notwithstanding its silence as to countless pages of secondary conventional mortgage clauses which remained to be negotiated, it sufficiently specified the important terms to make the commitment letter agreement meaningful and enforceable. [16]

Nor did the existence of open secondary terms compel the conclusion that the parties did not intend to be bound. In support of this argument, Tribune cites the implication of the Court of Appeals in *R.G. Group*, 751 F.2d at 76–77 and *Winston*, 777 F.2d at 80, 82, that the existence of any single open term requires the conclusion that a binding contract had not yet been reached. This takes the Court's observation out of context and distorts its meaning. If the issue is whether the parties have reached final agreement requiring only formal memorialization, the recognized existence of open terms may be a strong indication that they have not. If, on the other hand, as here, the question is whether a preliminary expression of commitment was intended to bind the parties to negotiate the open terms in good faith, the mere fact of the existence of open terms is, of course, far less persuasive. Although the existence of open terms may always be a factor that suggests intention not to be bound, it is by no means conclusive. Where the parties have manifested intention to make a binding agreement, the mere fact of open terms will not permit them to disavow it.

### Partial Performance

The factor of partial performance slightly favors Teachers. The evidence shows that for Teachers, its "commitment" to lend involved a budgeting of the funds, albeit somewhat informal. Teachers was in the business of lending its funds. The amount it had available for placement in long-term loans was finite, if large. In its loan budgeting process, Teachers would informally allocate funds which had been so committed. Such allocation reduced the net amount considered available for commitments to new loans. In fact, Teachers advised Tribune that it had only $25 million remaining available to be advanced in 1982 and that the rest would be advanced in 1983.

Tribune argues that because there was no formal segregation, it was of no significance. This misses the point. However

Next

AA01651

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

informally it was done, the allocation of the loan commitment effectively reserved the funds for the Tribune loan. It reduced the amount of Teachers' funds that it would consider available to competing borrowers. It meant that Teachers would forego opportunities to procure commitments from other borrowers when its own commitments exhausted its available funds.

In urgently seeking Teachers' "firm commitment" by September 15, Tribune well understood that the commitment would involve a partial performance on Teachers' part. By virtue of the commitment given in September, Tribune was assured that when the time came in December for concluding final documents and drawdown, it would not be told that Teachers had nothing left to lend. Tribune was negotiating to reserve those funds. Teachers acceded and issued the commitment. That constituted a partial performance.

A party's partial performance does not necessarily indicate a belief that the other side is bound. A party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous. This factor was not the subject of highly focused evidence. I have not attached great importance to it and mention it primarily because it is listed among the factors suggested by the Court of Appeals in *R.G. Group* and *Winston*. I conclude, however, that this factor favors the conclusion that both sides considered the commitment binding.

#### *503   *The Customary Form for Such Transactions*
The fourth factor mentioned in *R.G. Group*, and *Winston*, is "whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80. *See also* 751 F.2d at 77. Of course, the agreement here, unlike those cases, was in writing, but that does not dispose of the issue. To give this factor a broader application, it would better be put in terms of whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue. The evidence on that question tends to favor Teachers.

Of course it is true, as Tribune argues, that $80 million loans involving mortgages are generally not concluded by means of a four-page letter. But that is not the issue. The question is rather whether the customary practices of the relevant financial community include according such binding force as Teachers here advocates to such preliminary commitment agreements. Teachers' expert evidence showed that it is within the recognized practices of the financial community to accept that preliminary commitments can be binding. Not

all preliminary commitments are binding. Some are not. Some are binding on only one side: Where, for example, the borrower pays a commitment fee for the purpose of binding the lender, the agreement may be in the nature of an option to the borrower to decide by a specified date whether to go ahead with the transaction. In such cases the seller has been paid for its one-sided commitment. Some such preliminary agreements are properly seen as merely letters of intent which leave both sides free to abandon the transaction. The point is that the practices of the marketplace are not rigid or uniform. They encompass a considerable variety of transactions negotiated to suit the needs of the parties, including mutually binding preliminary commitments. Each transaction must be examined carefully to determine its characteristics.

Tribune has failed to show to the court's satisfaction that such binding commitments are outside the usages of the marketplace.

#### *Action by Tribune's Board of Directors*
The parties disagree as to whether the Teachers' loan was or was not approved by Tribune's Board of Directors. Tribune contends that the resolutions adopted by its Board on October 28th did not involve any approval whatsoever, but merely a delegation of responsibility to the Finance Committee to approve or disapprove the transaction. Teachers contends that the action of the Board did approve the loan in concept, while delegating to the Finance Committee the right and authority to pass on the particular loan documents. Teachers contends that its interpretation is reinforced by Smith's statement to Driver, when she inquired in late November, that the Board had given "general approval" to the transaction at the October 28 meeting (a statement Smith denies having made).

I need not rule on whether the resolutions adopted by the Board of Directors did or did not constitute approval of the transaction, because nothing turns on this. As noted above, although Tribune had reserved the right of approval of the final transaction to its Board of Directors, this did not mean Tribune could defeat its obligations under the binding agreement of commitment merely by having its Board do nothing. The commitment agreement called for conclusion of the transaction and a $25 million first drawdown before the end of the year. Even if I were to accept Tribune's contention that its Board took no action other than to delegate responsibility to the Finance Committee, that would not justify Tribune's backing out of its binding agreement to negotiate in good faith to reach a complete final contract.

AA01652

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

Tribune's argument would construe the commitment letter agreement either as a free option to Tribune to decide over the next three months whether to hold Teachers to its commitment to make the loan, or alternatively as a nonbinding statement of mutual intention. Neither is consistent with either the written agreement or the conduct of the parties. Tribune had requested *504 the "firm commitment" of Teachers to make the loan. Teachers' firm commitment was not given for free but in exchange for Tribune's similarly binding commitment. The reservations as to preparation and execution of documents and as to the satisfaction of Teachers' counsel and Tribune's Board permitted each side to negotiate the implementation of the agreement and to require the inclusion of customary terms in a form which it deemed necessary or appropriate to its protection. But those reservations did not authorize either side to escape its obligation simply by declining to negotiate or to give approval.

In any event, I conclude that Tribune's Board did give approval within the meaning of the agreement. The Minutes reflect that the proper officers were expressly authorized to arrange for the borrowing at a maximum interest rate of 15.25%, "with all of the actual terms and conditions to be subject to the prior approval by resolution of the Finance Committee...." The Resolution went on to say that the "authority granted by this resolution shall expire if not utilized prior to April 30, 1983." (DX 19.) This express authorization to "the proper officers ... to arrange for" the borrowing (which would expire if not acted on by April 30, 1983), surely went beyond a mere delegation to the Finance Committee of the Board's responsibility to approve or disapprove. The fact that the authorization was "subject to" Finance Committee approval recognized rather that there were terms and documents that remained to be negotiated, calling for Board level approval. It did not mean that the Board had done nothing but delegate. On consideration of the minutes and resolutions, as well as the testimony of Tribune officers and directors who were present at the meeting, I find, as Smith later told Driver, that the Board gave "general approval" to the transaction.

Tribune's October 6 letter reserving approval to Tribune's Board did not specify any particular form of Board approval, nor did it require that approval be of the final loan documents. Indeed, it distinguished between the requirements of "*approval* by the Company's Board of Directors" and "the preparation and execution of legal documentation *satisfactory*

*to the Company.*" The general approval given was sufficient under the contract.

### Tribune's Right to Condition the Loan on Offset Accounting

Tribune contends that its right to carry the loan off-balance-sheet by offset accounting was always deemed an essential condition of the deal. It points out that the Offering Circular which it delivered to Teachers, and the Price Waterhouse background memoranda, which also were delivered to Teachers during the early due diligence and discussion phase, all underlined offset accounting as an important Tribune concern. Nor does Teachers deny that in the early discussions, Smith spoke of Tribune's accounting and tax objectives. The witnesses disagree along predictable lines as to whether Driver told Smith that Teachers would not take the risk of Tribune's accounting treatment. The conflict need not be resolved. For regardless whether Driver orally refused to have Teachers assume the risk of Tribune's right to satisfactory accounting, the signed agreement did not provide for any such condition. The written agreement between the parties contains no basis whatever for the proposition that Tribune's obligation was conditioned on satisfactory assurance that it could report the loan off balance sheet. The fact that Tribune considered this significant is not disputed, but it is not determinative.

Both parties were aware of Tribune's objectives as to both the tax and accounting for the proposed deal. Tribune could, of course, have demanded as a condition of its commitment that it receive satisfactory assurances (in the form of opinion letters of counsel and auditors, or otherwise) as to both deferred taxation and offset accounting. It could have offered to pay a fee for Teachers' commitment on terms that would have left Tribune free to proceed with the loan or not, at its option. Alternatively, it could have negotiated for the option to prepay if the Internal Revenue Service or the SEC disallowed the desired tax or accounting consequences. The problem was *505 that in September of 1982, Tribune believed that it needed an immediate "firm commitment" from Teachers to be sure of its ability to conclude the transaction as planned within 1982. Had Tribune made such demands, Teachers might well have turned down Tribune's proposal (as the five other institutions had done). Indeed, Tribune was so sensitive to its need for Teachers' firm commitment that when its counsel warned of the consequences of signing the commitment letter with its "binding agreement" language, Tribune disregarded this

AA01653

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

advice so as not to lose the lender's commitment. Neither the language of the agreement, nor the negotiations of the parties give any support to the contention that offset accounting was a condition of the agreement.

There was perhaps an additional reason why Tribune did not negotiate for offset accounting as a condition of the deal, being that in September and early October it did not have the doubts that it later developed as to the availability of offset accounting. It had received a prior opinion of Price Waterhouse to the effect that the unconditional put would make offset accounting appropriate. Only after the FASB's mid-October exposure draft did Price Waterhouse begin to emphasize doubts about offset accounting and about the position the SEC might take in the event Tribune offered public securities under an SEC registration statement.

Whether the reason was that Tribune was afraid to lose Teachers prompt firm commitment, or that Tribune had not yet worried, as it later did, about the availability of its accounting objective, or simply that Tribune was willing to take the risk to secure this important deal, the fact is that Tribune did not negotiate for and did not obtain its right to offset accounting as a condition of its bargain.

By December of 1982 Tribune faced a completely different set of factors. Interest rates had declined very substantially. The loan agreement that it negotiated with Teachers was no longer to its benefit since it could now borrow money at substantially cheaper cost. Price Waterhouse's newly expressed doubts about the availability of offset accounting gave it further reason to question whether the deal it had made was a good one. With the benefit of two months' hindsight, Tribune most likely would not have entered into the commitment agreement it made in early October. That was, however, the agreement it made.

*Conditions Precedent to Enforcement*

Tribune contends that even if the commitment letter constituted a valid, enforceable contract, there were conditions precedent to its enforcement that were never satisfied. Teachers' commitment letter stated that the authorization of the loan was "contingent upon the preparation, execution and delivery of" final contract documents; Tribune's response, likewise, stated that "our acceptance and agreement is subject to ... the preparation and execution of legal documentation satisfactory to the Company." Tribune contends that since final contract documents were never prepared, the conditions precedent

to the enforceability of the agreement were never satisfied and, accordingly, Tribune cannot be charged with breach. This argument misconceives the meaning of these clauses. The preliminary agreement envisions and requires further and final contract documents without which the loan will not be made; if, through no fault on either party, no final contract were reached, either because the parties in good faith failed to agree on the open secondary terms, or because, as often happens in business, the parties simply lost interest in the transaction and by mutual tacit consent abandoned it without having reached final contract documents, no enforceable rights would survive based on the preliminary commitment. This does not mean that the language of reservation authorized one party to kill the deal simply by refusing to negotiate or to sign the contract documents. [17] Such an interpretation would render language **\*506** like "binding agreement" and "firm commitment" meaningless.

Tribune's point would be well taken if the negotiations had aborted over inability to reach agreement on the terms of the purchase money mortgage or the put. Indeed, if they had aborted because Teachers had insisted on imposing conditions on the exercise of the put that were incompatible with the initial agreement, Tribune might properly have charged Teachers with breach of the commitment letter agreement.

What in fact happened was the other way around. Tribune broke off contract negotiations by insisting on a condition (satisfactory accounting) that was not within the scope of the agreement. Although Tribune's refusal to go ahead with the contract may well have been motivated in part by doubts as to the availability of offset accounting, I find that that decline in interest rates also substantially influenced Tribune's decision.

Of course it is true that numerous issues remained open at this time. The basic loan agreement was in draft form, recently circulated by Teachers, without any negotiations having taken place over its form and minor terms. Although I find (as a matter of disputed fact) that Teachers had expressed its agreement to a put on terms that were acceptable to Tribune, it is less clear that Teachers had ever stated its acceptance of the form of mortgage that Tribune had concluded with LaSalle. (Teacher's counsel Tencza of the Debevoise firm had recently sent Tribune a letter specifying 35 problematic points in the LaSalle purchase money mortgage.) But the existence of those open points is of no consequence because they did not break the deal. Teachers offered in mid-December to sit down with Tribune and resolve all open issues so that the

AA01654

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

first drawdown could be made before the end of the year as contemplated in the commitment letter; Tribune declined stating that such a meeting would be of no value unless Teachers was prepared to agree that Tribune's satisfaction as to its accounting would be a condition of its obligation to draw down the loans.

Whatever Teachers' past posture had been as to the mortgage put and terms, there is every reason to believe that it would have acceded to Tribune's demands so long as they were within the terms of the commitment letter. Given the fact that interest rates had dropped precipitously from the time of the commitment letter, it would have been bad business judgment for Teachers to lose the deal by refusing to agree on points of minor importance. Driver's testimony that Teachers was prepared to agree to Tribune's terms on the purchase money mortgage and the put is entirely credible. But the issue does not depend on a finding as to the likelihood of Teachers acceding to Tribune's demands on those open issues. The point is simply that Teachers, in conformity with its contract obligations, was asking Tribune to sit down and negotiate in good faith towards agreement on the open points, while Tribune refused to negotiate unless Teachers agreed to add a condition that was outside the scope of the bargain. The existence of open points and the failure of the parties to satisfy the condition of execution of final documentation is, therefore, chargeable to Tribune. It cannot rely on those circumstances to escape its contract obligation.

### The Payment–of–Expenses Clause

Tribune also argues that the provision of the commitment letter for Tribune's payment of Teachers' expenses "whether or not this transaction is consummated" (DX 13) evidences the parties' awareness that the transaction might not be concluded, hence that they did not consider the agreement binding. The argument does not follow. The parties certainly contemplated that the loan might not be concluded. They might, for example, have failed after good faith negotiation to reach final agreement on open terms, or might eventually have decided mutually that the deal was not practical. In such case Tribune would have been required to pay Teachers' expenses and nothing more. But this provision does not contradict the express acknowledgement that the agreement was *507 binding. The recognition of the possibility that the loan might not be concluded did not signify that either side was free to walk away.

### Unaccepted Counteroffer/Untimely Acceptance

Tribune makes two insubstantial further arguments seeking to refute the contention that a contract of commitment was reached:

First it argues that because Teachers' letter specified that its offer would be outstanding only until October 4 and Tribune did not accept until October 6, the acceptance was ineffectual. There is no merit to this argument. Tribune had requested Teachers to hold its commitment offer open and Teachers had agreed to do so. (Driver Aff. as to liability, ¶ 35.)

Second, Tribune argues that by reason of its amendment of terms in its letter of October 6, this letter could not constitute an acceptance of Teachers prior offer, but was rather a counteroffer which was never accepted. This contention is based on incorrect assumption as to the facts. Teachers expressly agreed to Tribune's changes. (Driver Aff. as to liability, ¶¶ 32–38.)

### The Applicability of the Butler Precedent

The parties dispute the pertinence of Judge Weinfeld's recent ruling in *Teachers Insurance and Annuity Assoc. v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986). In *Butler,* the same lender had entered into a commitment letter agreement with a real estate developer within a few days of the commitment letter in this action. It provided for a 35–year loan at a yield of 14.25%, with a "lock-in" provision forbidding prepayment for a specified number of years.

Although the commitment letter was in many ways far more elaborate and detailed than this one, it was, in several respects, similar in that it required the further preparation and execution of contract documents, and reserved approval of counsel as to such documents.

The negotiations between lender and borrower over open terms and documents proceeded during the same period of steep decline in interest rates. In the course of the negotiations, the lender proffered a Default Prepayment Fee clause, which would have attached a substantial penalty to prepayment occasioned by default. The borrower rejected this clause, made no counteroffer and refused to negotiate, or to proceed with the deal. Thereupon the lender brought suit, as here, to recover the benefits of its commitment letter agreement.

Although such a default prepayment fee was not specified in the commitment letter, Judge Weinfeld found it was generally within the intended scope of the specified "lock-

AA01655

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

in" provision, for without such a clause, the borrower might accomplish by default exactly what it was prohibited from doing by prepayment. Recognizing that the commitment letter did not specify any particular way of dealing with the problem and that the borrower might properly have objected to the particular penalty clause proposed by the lender, Judge Weinfeld nonetheless concluded that the borrower's refusal to counteroffer or negotiate the issue breached its obligations to negotiate in good faith. Judge Weinfeld further found that the breach was primarily attributable to the intervening decline in interest rates. Judgment was awarded for the plaintiff.

The two cases are governed by the same principles, although by somewhat different analysis. In each case, the commitment letter constituted a binding enforceable agreement that obligated both parties to negotiate in good faith to resolve the open terms and documents. In each case, the borrower breached its obligations by refusing to negotiate toward resolution of such open issues. The breaches were of slightly different form. While in *Butler* the borrower breached by refusing to negotiate a clause that was within the scope of the agreed terms, here the borrower breached by refusing to negotiate unless the lender agreed to modify the deal by accepting a new condition. The differences, including the greater complication of this deal, the greater detail of the *Butler* letter, the absence in *Butler* of the clause requiring approval of the borrower's Directors, *508 and the particular forms of the borrowers' refusals to negotiate, are not controlling. In this case, as in *Butler*, the borrower undertook a binding commitment to negotiate open terms in good faith and breached that commitment.

3

Judgment is granted to the plaintiff.

SO ORDERED.

Footnotes

1    A few days before Tribune had entered into a letter of intent with LaSalle for the sale of the building which, in contrast, expressly provided that it was "not a binding agreement." (DX 10.)

2    Smith's acceptance letter also revised the terms of the loan in a cosmetic, economically nonsignificant manner. Reuben & Proctor had advised Tribune that in order to protect the tax deferral, the terms of the match-fund note should not mirror too closely the terms of the purchase money mortgage. Accordingly, Smith had proposed to Driver that certain cosmetic adjustments without economic significance be made to the terms so as to better protect Tribune's tax objective. Teachers agreed. Par amount and term were slightly reduced, while coupon rate was slightly increased so as to leave the effective yield unchanged.

3    *See, e.g., Dunhill Securities Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195 (S.D.N.Y.1969); *Brause v. Goldman,* 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dept.1960), *aff'd,* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

4    *See e.g., Teachers Insurance Annuity Association v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986) (Weinfeld, J.); *Mid-Continent Telephone Corp. v. Home Telephone Co.,* 319 F.Supp. 1176 (N.D.Miss.1970); *see also Arnold Palmer Golf Co. v. Fuqua Industries, Inc.,* 541 F.2d 584 (6th Cir.1976); *Itek Corp. v. Chicago Aerial Industries, Inc.,* 248 A.2d 625 (Del.1968); *Corbin on Contracts* § 29 (1952).

5    *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 436 N.Y.S.2d 247, 249 (1981); *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1333–34 (S.D.N.Y.1982) (Weinfeld, J.).

6    *See Reprosystem v. SCM Corp.,* 727 F.2d 257 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

7    *See Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78 (2d Cir.1985); *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

8    *Cf. Washington Heights-West Harlem-Inwood Mental Health Council, Inc. v. District 1199,* 748 F.2d 105 (2d Cir.1984).

9    *See Corbin on Contracts* § 29 (1952).

10   *See Channel Home Centers, Division of Grace Retail Corp. v. Grossman,* 795 F.2d 291 (3d Cir.1986); *Butler,* 626 F.Supp. 1229; *Sommer v. Hilton Hotels Corp.,* 376 F.Supp. 297 (S.D.N.Y.1974).

11   The purchase money mortgage delivered by LaSalle was substantially in the terms outlined in Tribune's initial offering circular, which terms were incorporated by reference in the commitment letter agreement with Teachers. To the extent there was any change between the term sheet and the final mortgage, such change had no relevance to Tribune's abandonment of its loan commitment.

AA01656

Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491 (1987)

12    *See Joseph Martin, Jr., Delicatessen Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981);
      *Kleinschmidt Division of SCM Corp. v. Futuronics Corp.,* 41 N.Y.2d 972, 395 N.Y.S.2d 151, 152, 363 N.E.2d 701 (1977).

13    *See Winston,* 777 F.2d at 80, 82–83; *R.G. Group,* 751 F.2d at 76–77.

14    *See supra* notes 12 and 13.

15    *See Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 453 (2d Cir.1977); *V'Soske v. Barwick,* 404 F.2d 495, 500
      (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

16    On the earlier motion for judgment on the pleadings, the absence of specification of terms for the mortgage led this court
      to express doubt whether the Teachers-Tribune commitment letter could have been intended as binding. At the time,
      however, having received none of the evidence, I was not aware that a mortgage term sheet had been circulated between
      the parties and was implicitly incorporated in the commitment letter agreement.

17    *See Butler,* 626 F.Supp. 1229; *Mid-Continental Telephone Corp. v. Home Telephone Co.,* 319 F.Supp. 1176
      (N.D.Miss.1970).

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

AA01657

5

AA01658

Hospital Mortg. Group v. First Prudential Development Corp., 411 So.2d 181 (1982)

411 So.2d 181
Supreme Court of Florida.

HOSPITAL MORTGAGE GROUP, etc., Petitioner,

v.

FIRST PRUDENTIAL DEVELOPMENT
CORP., et al., Respondents.

No. 60156.   |   March 4, 1982.

Application was filed to review decision of the District Court
of Appeal, 390 So.2d 767, which found that an anticipatory
repudiation by lender obviated the borrowers' duty to tender
all documents, and found in favor of borrowers in action
to recover breach of contract damages. The Supreme Court,
McDonald, J., held that when lender causes an anticipatory
repudiation of a loan commitment after an extension of the
termination date, the nonbreaching party is required to plead
and prove noncompliance with all conditions precedent or
ability to comply if the performance has been excused by the
repudiation.

Reversed and remanded.

Adkins, J., concurred in result.

West Headnotes (7)

[1]     Contracts
        Acts Constituting Renunciation and
        Liabilities Therefor
        Trial court correctly found that petitioner lender
        had committed anticipatory repudiation when it
        unequivocally terminated two agreements.

        4 Cases that cite this headnote

[2]     Contracts
        What Constitutes Termination
        Correct way to terminate a contract after an
        extension to which no new termination date is
        fixed is to give the parties notice and a reasonable
        amount of time to attempt compliance.

        Cases that cite this headnote

[3]     Contracts
        Renunciation
        Anticipatory repudiation gives rise to claim for
        damages by nonbreaching party; nonbreaching
        party is relieved of its duty to tender performance
        and has an immediate cause of action against
        breaching party.

        30 Cases that cite this headnote

[4]     Contracts
        Renunciation
        Anticipatory repudiation obviates requirement
        that the conditions be performed, but not that
        they be performable.

        9 Cases that cite this headnote

[5]     Contracts
        Rights and Liabilities on Breach
        Party's duty to pay damages for total breach by
        repudiation is discharged if it appears after the
        breach that there would have been a total failure
        by injured party to perform his return promise.

        3 Cases that cite this headnote

[6]     Contracts
        Matters to Be Proved
        When lender causes an anticipatory repudiation
        of a loan commitment after an extension of
        the termination date, the nonbreaching party is
        required to plead and prove compliance with
        all conditions precedent or ability to comply
        if the performance has been excused by the
        repudiation.

        26 Cases that cite this headnote

[7]     Contracts
        Necessity of Performance
        Because trial court found that borrowers had
        not complied with conditions precedent and
        evidence was insufficient to support finding
        that they could have performed them, judgment
        should have been entered in favor of lender in
        suit for breach of contract damages.

Next

Hospital Mortg. Group v. First Prudential Development Corp., 411 So.2d 181 (1982)

Cases that cite this headnote

**Attorneys and Law Firms**

**\*181** Edward A. Perse of Horton, Perse & Ginsberg; and the Law Offices of Malspeis, Lococo, Brown & Schwartz, Miami, for petitioner.

John H. Lewis, and Stanley J. Mann of Mann, Dady, Corrigan & Zelman, Miami, for respondents.

**Opinion**

McDONALD, Justice.

This case is before us on a petition to review a decision of a district court, reported at 390 So.2d 767 (Fla. 3d DCA 1980). Because that decision conflicts with Thomson v. Kyle, 39 Fla. 582, 23 So. 12 (Fla.1897), we have jurisdiction. Art. V, s 3(b) (3), Fla.Const. We disapprove the district court decision.

The issue here is whether a prospective borrower, in an action for damages against a lender for its premature withdrawal of a commitment to loan funds, must prove that it had, or could have, fulfilled the conditions **\*182** required under the contract to close the loan.

Petitioner, Hospital Mortgage Group, a trust, is in the business of lending money. It was the defendant and appellee below. Respondents are real estate developers who were the plaintiffs and appellants below. On November 27, 1973 the parties entered into two agreements, identical mortgage commitments, to provide financing for the construction of motels in Augusta, Georgia, and Rock Hill, South Carolina.

The commitments contained a number of requirements to be met by respondents and stated that the commitments "expired" on December 12, 1973. The documents that respondents were responsible for were to meet the approval of the lender's attorney.

The December 12th expiration date passed without the respondents complying. The parties met on December 31, 1973 and agreed to extend the commitments although they did not set a new expiration date. Work on the closing continued until April 27, 1974 when petitioner advised the respondents that the commitments were terminated. By letter dated May 7, 1974 petitioner outlined respondents' failure to

comply in furnishing the documents and the passage of time as the reasons for termination. The documents that had been furnished by the respondents were returned.

Unable to find another lender, respondents leased the properties and brought suit for breach of contract damages. The trial was on liability only, and the trial court found that the lender "did not effectively terminate the two commitments" and that the borrower had not complied with the conditions precedent to the contracts. The court then granted the respondents thirty days to complete submission of the documents or else the lender's commitments would be terminated.

The respondents appealed stating that because five years had passed since the termination it was impossible to comply. The district court reversed, finding that an anticipatory repudiation by petitioner obviated the respondents' duty to tender all of the documents. The petitioner asserts that the termination was due to the respondents' inability to obtain the required documents, and, therefore, respondents were not "ready, willing and able" to comply. The original commitment was for sixteen days, and the extended time ran for almost nineteen weeks.

**[1]  [2]**   The district court correctly found that the petitioner-lender had committed an anticipatory repudiation when it unequivocally terminated the two agreements. The correct way to terminate a contract after an extension to which no new termination date is fixed is to give the parties notice and a reasonable amount of time to attempt compliance. See Felt v. Morse, 80 Fla. 154, 85 So. 656 (Fla.1920); Sound City, Inc. v. Kessler, 316 So.2d 315 (Fla. 1st DCA 1975).

**[3]  [4]**   In dealing with anticipatory repudiations the law is clear that a repudiation gives rise to a claim for damages by the nonbreaching party. As stated in Restatement (Second) of Contracts s 253 (1979):

(1) Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.

(2) Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance.

AA01660

Hospital Mortg. Group v. First Prudential Development Corp., 411 So.2d 181 (1982)

Therefore, the nonbreaching party is relieved of its duty to tender performance and has an immediate cause of action against the breaching party. Poinsettia Dairy Products, Inc. v. Wessel Co., 123 Fla. 120, 166 So. 306 (Fla.1936). This alone, however, does not entitle the nonbreaching party to damages. Anticipatory repudiation obviates the requirement that the conditions be performed, but not that they be performable.

[5]   As stated in the Restatement (Second) of Contracts s 254 (1979):

> (1) A party's duty to pay damages for total breach by repudiation is discharged *183 if it appears after the breach that there would have been a total failure by the injured party to perform his return promise.

The term "total failure" is defined in the comment to this section as:

> A failure is total in this context if it would have been sufficient to have discharged any remaining duties of the party in breach to render his performance. See s 242. The result follows even if it appears that the failure would have been justified and not a breach. Cf. s 244.

Id. at comment a (1979).

This reasoning is in accord with Thomson v. Kyle, 39 Fla. 582, 23 So. 12 (Fla.1897), and Slaughter v. Barnett, 114 Fla. 352, 154 So. 134 (Fla.1934), requiring compliance with the contract provisions. In those decisions performance or tender of performance of conditions precedent was required as a prerequisite to recovery. The holder of the duty based upon a condition precedent cannot profit from an anticipatory repudiation of a contract that he would have breached himself. It follows that if performance of the conditions precedent is excused the ability to perform them must still be shown.

In the complaint the respondents alleged that they had provided all of the documents required by the agreements and had satisfied all acts required by the agreements with the exception of the time limitations. At trial, however, the judge found, and the district court concurred in his finding, that the respondents had not complied with the conditions precedent to the contracts. The sole reason for the extension of time was so that the respondents could correct their defective tender of the conditions precedent. The petitioner alleged and proved that this noncompliance caused the extension and that it continued through the termination date. Taking the facts as a whole then, to allow recovery by the respondents is to give them credit for doing what they were unable to do even after the termination date had been extended by nineteen weeks.

The rule of law followed by the district court is correct in that the respondents are able to bring suit on the anticipatory repudiation, but is incorrect in allowing recovery when they are unable to prove that they could have performed. The commitments involved are complex financing agreements that require the submission of numerous independent legal documents. The lack of any one may be fatal to the entire set of conditions precedent and thus to the petitioner's duty to lend the sums involved.

[6]   [7]   When the lender causes an anticipatory repudiation of a loan commitment after an extension of the termination date, the nonbreaching party is required to plead and prove compliance with all conditions precedent or the ability to comply if the performance has been excused by the repudiation.[*] Because the trial court found that the plaintiffs-respondents had not complied with the conditions precedent and the evidence was insufficient to support a finding that they could have performed them, we quash the decision of the district court and remand for it to order the trial court to issue a judgment for the petitioner.

It is so ordered.

*184 SUNDBERG, C. J., and BOYD, OVERTON and ALDERMAN, JJ., concur.

ADKINS, J., concurs in result only.

Footnotes

[*]      This rule is stated in 4 A. Corbin, Contracts s 978 (1951):
         s 978. Ability to Perform Remains a Condition even Though Actual Tender of Performance is Eliminated

AA01661

Hospital Mortg. Group v. First Prudential Development Corp., 411 So.2d 181 (1982)

> In an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation. Of course, the willingness and ability that remains a condition precedent in spite of the defendant's repudiation, is willingness and ability to perform if there had been no repudiation. The defendant's wrongful repudiation justifies the plaintiff in taking him at his word and at once taking steps that may make subsequent performance impossible. The willingness and ability to perform need not continue after the repudiation; it is merely required that they should have existed before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated.

(Footnote omitted.)

End of Document                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works

AA01662

6

AA01663

999 v. C.I.T. Corp., 776 F.2d 866 (1985)
3 Fed.R.Serv.3d 923

776 F.2d 866
United States Court of Appeals,
Ninth Circuit.

999, a corporation, Plaintiff/
Appellee/Cross-Appellant,
v.
C.I.T. CORPORATION, a corporation,
Defendant/Appellant/Cross-Appellee.

Nos. 84–6561, 85–6562.   |   Argued and
Submitted Oct. 8, 1985.   |   Decided Nov. 18, 1985.

Proposed borrower brought action against proposed lender alleging breach of agreement to provide financing resulting in loss of opportunity to acquire corporation. The United States District Court for the Central District of California, Irving Hill, Senior District Judge, entered judgment in favor of proposed borrower, and proposed lender and proposed borrower filed cross appeals. The Court of Appeals, Beezer, Circuit Judge, held that: (1) district court did not abuse its discretion in denying proposed lender's motion to withdraw admission; (2) proposed lender could not complain of any error in instruction on breach of implied covenant; (3) it was more than reasonable under California law for proposed borrower to refuse financing that was subject to new unjustified condition and instead seek to mitigate damages by finding replacement financing; (4) there was ample evidence to support conclusion that proposed lender did know or should have known that his conduct endangered acquisition of corporation; and (5) it was not an abuse of discretion to submit punitive damages issue to jury.

Affirmed.

West Headnotes (13)

[1]   **Federal Courts**
         Depositions and discovery
      The Court of Appeals reviews district court's denial of motion to withdraw or amend an admission for an abuse of discretion. Fed.Rules Civ.Proc.Rule 36, 28 U.S.C.A.

      20 Cases that cite this headnote

[2]   **Federal Civil Procedure**
         Effect
      Trial courts should be cautious in exercising their discretion to permit withdrawal or amendment of an admission. Fed.Rules Civ.Proc.Rule 36, 28 U.S.C.A.

      28 Cases that cite this headnote

[3]   **Federal Civil Procedure**
         Effect
      Although it may have been appropriate for trial court to permit introduction of letter from proposed borrower's counsel to proposed lender stating that there was no lending agreement of any kind, subject to cautionary instruction to jury that proposed lender had admitted existence of some kind of agreement, district court did not abuse its discretion in denying proposed lender's motion to withdraw admission, made in the middle of trial, and holding letter was inadmissible because it was inconsistent with proposed lender's admission that an agreement did exist. Fed.Rules Civ.Proc.Rule 36, 28 U.S.C.A.

      17 Cases that cite this headnote

[4]   **Federal Civil Procedure**
         Effect
      Once trial begins, more restrictive standard is to be applied in permitting party to withdraw or amend an admission. Fed.Rules Civ.Proc.Rule 36, 28 U.S.C.A.

      17 Cases that cite this headnote

[5]   **Federal Civil Procedure**
         Effect
      Evidence inconsistent with an admission is properly excluded. Fed.Rules Civ.Proc.Rules 36, 36(b), 36 note, 28 U.S.C.A.

      13 Cases that cite this headnote

[6]   **Federal Civil Procedure**
         Necessity; waiver

AA01664

999 v. C.I.T. Corp., 776 F.2d 866 (1985)
3 Fed.R.Serv.3d 923

Proposed lender having requested jury instruction submitting claim of breach of implied covenant of good faith and fair dealing to jury as contract remedy, proposed lender could not complain of any error.

5 Cases that cite this headnote

[7]   **Federal Courts**
   Instructions

Even if defendant could object to jury instruction submitting claim of breach of implied covenant of good faith and fair dealing to jury as contract remedy, any error was harmless; the only risk was redundancy and since court carefully instructed jury against granting double damages based on alternative theories, any redundancy was harmless.

2 Cases that cite this headnote

[8]   **Federal Civil Procedure**
   Effect

Although defendant failed to raise mitigation of damages as affirmative defense in pleadings, which would ordinarily constitute waiver of that defense, issue of mitigation was included in pretrial order, which had effect of amending pleadings. Fed.Rules Civ.Proc.Rule 8(c), 28 U.S.C.A.

20 Cases that cite this headnote

[9]   **Federal Courts**
   Instructions

Failure to submit proper jury instruction is a question of law reviewable by the Court of Appeals de novo.

17 Cases that cite this headnote

[10]   **Damages**
   Breach of contract

It was more than reasonable under California law for proposed borrower to refuse financing from proposed lender that was subject to new unjustified condition of $25,000 per month

prepayment penalty and instead seek to mitigate damages by finding replacement financing.

4 Cases that cite this headnote

[11]   **Damages**
   Breach of contract in general

In action brought by proposed borrower against proposed lender alleging breach of agreement to provide financing resulting in loss of opportunity to acquire a corporation, evidence supported conclusion that proposed lender did know or should have known that its conduct in subjecting proposed borrower to new unjustified condition resulting in proposed borrower seeking financing elsewhere endangered proposed borrower's acquisition of the corporation.

Cases that cite this headnote

[12]   **Fraud**
   Questions for Jury

In action brought by proposed borrower against proposed lender alleging breach of agreement to provide financing resulting in loss of opportunity to acquire a corporation, there was sufficient evidence from which to draw inference that proposed lender's agents willfully misrepresented to proposed borrower that financing would be provided without prepayment penalty and acted oppressively to force proposed borrower to submit to new and onerous term of prepayment penalty; thus, it was not an abuse of discretion to submit punitive damages issue to jury.

1 Cases that cite this headnote

[13]   **Federal Courts**
   Particular errors

Plaintiff could not contest validity of remittitur to which it had consented, even on cross appeal.

6 Cases that cite this headnote

AA01665

999 v. C.I.T. Corp., 776 F.2d 866 (1985)

3 Fed.R.Serv.3d 923

**Attorneys and Law Firms**

**\*867** Earl Benjamin, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for plaintiff, appellee, cross-appellant.

William A. Masterson, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., William Hughes Mulligan, New York City, for defendant, appellant, cross-appellee.

On Appeal From the United States District Court for the Central District of California.

Before REINHARDT and BEEZER, Circuit Judges, and NIELSEN,[*] District Judge.

**Opinion**

BEEZER, Circuit Judge:

999, a Nevada corporation with its principal place of business in California, brought this diversity of citizenship suit against C.I.T. Corporation ("CIT"), alleging breach of an agreement to provide financing to 999, resulting in the loss of an opportunity to acquire Bee Cee, a Missouri corporation. CIT appeals from a verdict in favor of 999, and 999 filed a cross-appeal to challenge a remittitur of damages. We affirm.

**\*868 I**

**BACKGROUND**

In 1982, 999, a holding corporation, decided to acquire Bee Cee, a manufacturer of windows and doors, which was in serious financial trouble. The plan was to use Bee Cee as a "captive buyer" to manufacture finished windows and doors from aluminum frames processed by another 999 subsidiary.

999 signed a management contract in January, 1982 taking control of Bee Cee's operations and agreeing to purchase the corporation's stock. To maintain Bee Cee in operation pending conclusion of the acquisition, 999 obtained accommodations with Bee Cee's creditors, including its major suppliers and lenders, by agreeing to guarantees of Bee Cee debt. Unsecured creditors were offered payment of 30 percent in satisfaction of those debts.

Bank of America, 999's principal lender, concerned about the advisability of the Bee Cee acquisition, notified 999 in May, 1982 that its financing would not be renewed. 999 then sought

replacement financing sufficient to continue its own credit needs and to complete the acquisition of Bee Cee. 999 entered negotiations with CIT to obtain approximately $6 million in financing, $300,000 of which would be invested in Bee Cee.

On August 2, 1982, CIT obtained from 999 a deposit of $25,000 pursuant to a letter, upon which was handwritten the terms of "proposed financing." In September, 1982, CIT informed 999 that it had added a condition of a $25,000 per month prepayment penalty. 999 demanded that the new condition be dropped. When CIT insisted, 999 renewed efforts to find an alternative lender.

Even without financing from CIT, 999 proceeded with plans to acquire Bee Cee. An affiliate of 999 was created to purchase the assets of Bee Cee at a creditor's foreclosure sale in October, 1982. Although 999 had obtained substitute financing, it would not be forthcoming until December. Without such financing, 999 was unable to stave off Bee Cee's creditors. The day before the foreclosure sale was to occur, unsecured creditors of Bee Cee filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. 999 subsequently ceased its efforts to acquire Bee Cee and fulfilled its financial obligations to Bee Cee creditors under its guarantees.

999 then brought this action against CIT. At trial, the jury returned two separate verdicts of $1.9 million each for 999, one for breach of contract and an implied covenant of good faith, and one for negligent misrepresentation. The court allowed 999 to accept only one verdict. On CIT's motion for a new trial, the court conditioned its denial on a remittitur in the amount of $925,000. 999 accepted and judgment was entered.

**II**

**CIT'S APPEAL**

*A. Admissions as to Existence of Agreement*

On August 2, 1982, Robert J. Sullivan, regional sales manager for CIT, presented to Marge Penfold, president of 999, a letter calling for 999 to make a deposit with CIT of $25,000 and to submit an application for financing. Upon request by Penfold, Sullivan outlined in handwriting upon the letter the terms of "proposed financing." Penfold then signed the letter.

999 contends that this August 2 letter constituted a binding commitment by CIT to provide financing, conditioned only

AA01666

999 v. C.I.T. Corp., 776 F.2d 866 (1985)

3 Fed.R.Serv.3d 923

upon an audit to verify the accuracy of 999's financial statements. CIT denies the letter was an agreement to provide financing, as it was addressed to the lender and signed only by the borrower, 999. Rather CIT claims it was only an agreement by CIT to process and review 999's application for financing.

During pre-trial discovery proceedings, 999 served CIT with a request for an admission that the August 2 letter constituted an agreement. After the magistrate *869 issued an order compelling a response, CIT admitted that it was an agreement although it expressly refused to admit what the terms of the agreement were.

At trial, the district court excluded from evidence a September 23, 1982 letter from 999 counsel, Joel F. McIntyre, written to demand that CIT return the deposit of $25,000, and stating that "there is no agreement of any kind between you and our client." The trial court held the September 23 letter was inadmissible because it was inconsistent with the CIT admission that an agreement did exist. The district court denied CIT's motion to withdraw or amend its response to the request for admission.

Federal Rule of Civil Procedure 36(b) provides that any matter admitted in response to a request for admission is "conclusively established" unless the court permits withdrawal or amendment of the admission. The court may permit withdrawal or amendment of an admission—

> when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits.

[1]   [2]   We review a district court's denial of a motion to withdraw or amend a Rule 36 admission for an abuse of discretion. Trial courts are advised to be cautious in exercising their discretion to permit withdrawal or amendment of an admission. See 8 C. Wright & A. Miller, Federal Practice and Procedure § 2264, at 745 (1970 & Supp.1985).

[3]   CIT argues that its motion to withdraw the admission was not untimely, even though made in the middle of the trial. CIT claims that it was surprised by the trial court's decision

to exclude the September 23 letter as contradictory to the admission, and thus was not aware until that point in time of the need to have the admission withdrawn. This argument cannot be sustained. At the time of the pre-trial conference, 999 raised its objection to introduction into evidence of the September 23 letter on the express ground that it was inconsistent with CIT's admission of an agreement. CIT was fully aware of this objection and yet it failed to move to withdraw the admission prior to trial.

Still, CIT denies that withdrawal of the admission would have resulted in any prejudice to 999. CIT argues that because 999 was fully aware that CIT contested the existence of any financing agreement, 999 was not placed in the position of suddenly needing to obtain additional evidence to prove this matter. CIT asserts the lack of prejudice is plainly shown by the fact that 999 was placing into evidence other proof of the existence of a financing contract.

[4]   Had CIT made this argument while moving for withdrawal of the admission before trial, it would have been more persuasive. Instead CIT's motion was not made until the middle of the trial when 999 had nearly rested its case. Once trial begins, a more restrictive standard is to be applied in permitting a party to withdraw or amend an admission. See Brook Village North Associates v. General Electric Co., 686 F.2d 66, 70–73 (1st Cir.1982). The record shows that 999 had relied heavily on the admission as proof of an agreement. The admission already had been shown to the jury through an enlarged duplicate with no objection made by CIT.

[5]   CIT's argument actually centers on the trial court's exclusion of the September 23 letter. In its reply brief, CIT effectively concedes that its admission of an agreement was properly placed before the jury but that the September 23 letter should have been available as well. However, even accepting CIT's narrow interpretation of its admission, saying it only acknowledged an application processing agreement, the September 23 letter contravenes that admission by stating there was "no agreement of any kind." [1] Evidence inconsistent *870 with a Rule 36 admission is properly excluded. Fed.R.Civ.P. 36(b) advisory committee note (1970); Shakman v. Democratic Organization of Cook County, 481 F.Supp. 1315, 1346 n. 35 (N.D.Ill.1979).

It might have been appropriate for the trial court to permit introduction of the September 23 letter subject to a cautionary instruction to the jury that CIT had admitted the existence of some type of agreement. But we cannot conclude that the

AA01667

999 v. C.I.T. Corp., 776 F.2d 866 (1985)
3 Fed.R.Serv.3d 923

district court's ruling was such a "clear error of judgment" that it constituted an abuse of discretion. *See Ellensburg v. Brockway, Inc.,* 763 F.2d 1091, 1097 (9th Cir.1985).

### B. Instruction on Breach of Implied Covenant

CIT assigns as an error of law the district court's submission to the jury of the claim for breach of an implied covenant of good faith and fair dealing. CIT claims that, under California law, breach of an implied covenant may give rise to a cause of action in tort only in the context of an insurance contract or fiduciary relationship. *See Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of California,* 36 Cal.3d 752, 768, 686 P.2d 1158, 1166, 206 Cal.Rptr. 354, 362 (1984); *Consolidated Data Terminals v. Applied Digital Data Systems, Inc.,* 708 F.2d 385, 399–400 (9th Cir.1983) (construing California law). The district court's construction of state law is reviewable *de novo. In re McLinn,* 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).

[6]   In this case, the breach of the implied covenant was not submitted to the jury as a separate *tort* claim. The district court granted CIT's motion *in limine* to exclude any tort recovery and recovery of punitive damages for breach of the covenant. CIT expressly elected to submit the claim of breach of an implied covenant of good faith and fair dealing to the jury as a *contract* remedy. The pertinent instruction was submitted by CIT and both parties agreed to it. The district court properly denied CIT's request to withdraw the instruction on the day before the instructions were to be read to the jury. Having requested the instruction, CIT may not complain of any error in it. *Hargrave v. Wellman,* 276 F.2d 948, 951 (9th Cir.1960).

[7]   Even if CIT's objection had been timely, any error was harmless. As CIT notes in its reply brief, the claim for breach of the implied covenant as a contract remedy was given to the jury with essentially the same elements as the breach of contract claim. The only risk was redundancy. As the court carefully instructed the jury against granting double damages based on alternate theories, such redundancy was harmless.

### C. Mitigation of Damages

[8]   CIT contends that the district court erred as a matter of law in failing to instruct the jury on mitigation of damages.[2] In September, 1982, CIT informed 999 that the New York headquarters had added a new condition to the financing agreement of a $25,000 per month penalty if 999 sought to prepay the loan before expiration of the two-year financing period. 999 resisted the imposition of this new term as it

desired the flexibility to find new financing, without penalty, if a lender interfered *871 in its business judgment by restricting funding for future ventures. CIT claims 999 should have avoided damages by accepting financing from CIT and later seeking recovery for any damages resulting from the unjustified prepayment penalty.[3]

[9]   Failure to submit a proper jury instruction is a question of law reviewable by this court *de novo. See Tibbs v. Great American Ins. Co.,* 755 F.2d 1370, 1374 (9th Cir.1985).

The general principle that "victims of legal wrong should make reasonable efforts to avoid incurring further damage" is undisputed. *Davies v. Krasna,* 14 Cal.3d 502, 515, 535 P.2d 1161, 1169, 121 Cal.Rptr. 705, 713 (1975). The question in this case is whether the aggrieved party is required to mitigate damages by accepting the very performance that constitutes the breach of contract. Under California law, once a defendant has breached a contract, the mitigation doctrine requires a plaintiff to accede to new terms interposed by the defendant only if the new terms are trivial or "inconsequential" in relation to the amount of foreseeable damages the plaintiff would otherwise suffer from the breach.[4] The relevant California cases indicate that the determination of whether an unjustified new term is "inconsequential" or "substantial" is a matter for the court to decide.

[10]   We cannot conclude that CIT's requirement of a $25,000 per month prepayment penalty was so "inconsequential" that 999 was required to accept it in mitigation of damages. This is particularly true in light of 999's strong concerns about the potential impact of such penalties on its business practices.

Furthermore, at that point in time, 999 still had good reason to believe that the Bee Cee acquisition could be concluded and that alternative financing without any prepayment penalty could be obtained. It was more than reasonable for 999 to refuse financing from CIT that was subject to the new unjustified condition, and instead seek to mitigate damages by finding replacement financing.

### D. Foreseeability of Damages

CIT contends the parties did not contemplate any damages resulting from failure of 999 to acquire Bee Cee. CIT claims it was never informed by 999 that continued operation of Bee Cee and its eventual acquisition by 999 were dependent upon 999's access to financing. Based on this claim that the

AA01668

999 v. C.I.T. Corp., 776 F.2d 866 (1985)
3 Fed.R.Serv.3d 923

damages were not a foreseeable *872 consequence of the breach of the financing agreement, CIT asks us to reverse the verdict and remand for a new trial on damages.

The governing rule in California regarding award of damages from a contract breach is clear:

> It is a settled principle that general damages that may be awarded for breach of contract are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by the parties at the time they contracted, as the probable result of the breach. (Civ.Code, § 3300; *Hunt Bros. Co. v. San Lorenzo, etc., Co.,* 150 Cal. 51, 56, 87 P. 1093; 1 Witkin, Summary of Cal.Law (8th ed. 1973) § 639, pp. 542–43.)

*Glendale Fed. Sav. & Loan Ass'n v. Marina View Heights Dev., Inc.,* 66 Cal.App.3d 101, 125, 135 Cal.Rptr. 802, 816 (1977). If special circumstances result in an unusual injury, damages cannot be recovered unless those circumstances were known or should have been known by the breaching party at the time the contract was made. *Sabraw v. Kaplan,* 211 Cal.App.2d 224, 27 Cal.Rptr. 81, 83 (1962). Unless it can be ruled on as a matter of law, the question of whether consequential damages are foreseeable is one of fact to be determined by the trier of fact. *See Sun Maid Raisin Growers v. Victor Packing,* 146 Cal.App.3d 787, 790, 194 Cal.Rptr. 612, 614 (1983).

**[11]** The jury, by virtue of its verdict, found that CIT did know or should have known that its conduct endangered 999's acquisition of Bee Cee. There is ample evidence in the record to support that conclusion.[5] It is not within the province of this court to redetermine the facts as found by the jury. U.S. Const. amend. VII; *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 358–59, 82 S.Ct. 780, 782–83, 7 L.Ed.2d 798 (1962).

### E. Evidence of CIT's Net Worth

Because 999 sought punitive damages from CIT on the basis of fraudulent misrepresentation, 999 was permitted to present to the jury evidence that CIT's net worth was almost $1 billion. CIT contends this improper evidence contaminated

the jury's award of damages, even though the jury expressly declined to find fraud or assess punitive damages.

Although punitive damages are not available for mere breaches of contract, even if fraudulent or in bad faith, *Dryden v. TriValley Growers,* 65 Cal.App.3d 990, 999, 135 Cal.Rptr. 720, 726 (1977), this case was also presented to the jury on the alternate tort theory that CIT fraudulently misrepresented to 999 that no prepayment penalty would be required as a condition to financing.

If a prima facie case of oppression, fraud, or malice was established, then it was proper to submit evidence of the defendant's net worth to the jury. *See* Cal.Civ.Code § 3294 (West Supp.1985). Otherwise, presentation to the jury of such evidence was distracting and prejudicial. *Geddes v. United Financial Group,* 559 F.2d 557, 560 (9th Cir.1977). If such evidence was improperly introduced, we must reverse the verdict for a new determination of compensatory damages untainted by the net worth evidence. *Farny v. College Housing Inc.,* 48 Cal.App.3d 166, 183, 121 Cal.Rptr. 658, 670 (1975). The determination of whether a prima facie case has been established, allowing the introduction of evidence on punitive damages, is left to the *873 discretion of the trial court. *Arthur v. Davis,* 126 Cal.App.3d 684, 694–95, 178 Cal.Rptr. 920, 925–26 (1981).

**[12]** There was sufficient evidence from which to draw an inference that CIT agents willfully misrepresented to 999 that financing would be provided without a prepayment penalty, and acted oppressively to force 999 to submit to a new and onerous term. Although the jury concluded otherwise, there was evidence, for example, that CIT later took advantage of 999's desperate need for financing to coerce 999 into accepting a new prepayment penalty term. In particular, CIT's refusal to refund 999's $25,000 deposit, unless 999 succumbed to the new term, might have been indicative of oppression and fraudulent intentions on CIT's part. Although this is a close case, we conclude it was not an abuse of discretion to submit the punitive damages issue to the jury.

### III

### 999'S CROSS–APPEAL

After trial, the jury returned two verdicts for 999 under separate theories of the case, each verdict amounting to $1,972,378. 999 had stipulated that only one of the verdicts

AA01669

999 v. C.I.T. Corp., 776 F.2d 866 (1985)
3 Fed.R.Serv.3d 923

would be effective if the jury returned verdicts on both related counts. The district court found the jury verdict of $1,972,378 "grossly excessive" and stated that $925,000 was the maximum figure of damages which a rational jury could have reached. The trial court denied CIT's motion for a new trial on the condition that 999 accept a remittitur reducing the judgment to that amount. 999 brings this cross-appeal arguing that the district court abused its discretion both in requiring 999 to accept a remittitur and in setting the amount of the remittitur.

In *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 650, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977), the Supreme Court "reaffirm[ed] the longstanding rule that a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted."

999 argues that where a defendant initiates an appeal, and the objective of avoiding further litigation has been negated, the plaintiff should not be precluded from cross-appealing the propriety of the remittitur. *See Miller v. National American Life Ins. Co.* 54 Cal.App.3d 331, 343, 126 Cal.Rptr. 731, 738 (1976) (*quoting Plesko v. City of Milwaukee,* 19 Wis.2d 210, 221, 120 N.W.2d 130, 135 (1963)).

[13]   However, the rule in this circuit long has been that the plaintiff cannot contest the validity of a remittitur to which he has consented, even on a cross-appeal. *S. Birch & Sons v. Martin,* 244 F.2d 556, 560 (9th Cir.), *cert. denied,* 355 U.S. 837, 78 S.Ct. 62, 2 L.Ed.2d 49 (1957). *See also* 6A J. Moore, *Federal Practice ¶ 59.08[7],* at 59–206 (2d ed. 1984). 999's cross-appeal is dismissed.

**AFFIRMED.**

**Parallel Citations**

3 Fed.R.Serv.3d 923

---

Footnotes

\*      Honorable Leland C. Nielsen, Senior United States District Judge for the Southern District of California, sitting by designation.

1      Contrary to CIT's assertion, CIT was not prevented from contesting the existence of a financing contract at trial. The trial court never ruled that the August 2 letter or CIT's admission constituted per se evidence of an agreement to provide financing. The court only ruled that CIT was bound to the admission that an agreement of some type existed, and therefore the language in the September 23 letter denying any agreement must be excluded. CIT was not prevented from arguing that the admission applied only to an agreement to process 999's application, nor from arguing that no actual loan agreement existed. In fact, with the one objectionable sentence deleted, CIT used the September 23 letter in making that argument.

2      CIT failed to raise mitigation of damages as an affirmative defense in its pleadings, which ordinarily would constitute a waiver of that defense. *See Mayes v. Sturdy Northern Sales, Inc.,* 91 Cal.App.3d 69, 86, 154 Cal.Rptr. 43, 54 (1979); Fed.R.Civ.P. 8(c); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1273, at 322 (1969 & Supp.1985). However, the issue of mitigation was included in the pre-trial order, which has the effect of amending the pleadings. *Federal Deposit Ins. Corp. v. Glickman,* 450 F.2d 416, 419 (9th Cir.1971).

3      CIT also argues that 999 could have received, from CIT or another financer, sufficient funds to settle the claims of Bee Cee creditors and thus conclude its acquisition of Bee Cee. However, the record is uncontroverted that 999 could not borrow the additional funds for investment in Bee Cee without first refinancing its entire company. The Bank of America loan agreement prevented such an additional loan and Bank of America security agreements covered all available 999 assets. More importantly, CIT expressly stated at trial that they were not contending that 999 had failed to mitigate damages by seeking alternative financing. The only mitigation issue CIT raised below was whether 999 was required to accept the new prepayment penalty term that constituted breach of contract.

4      In *Severini v. Sutter-Butte Canal Co.,* 59 Cal.App. 154, 210 P. 49 (1922), an owner of an irrigated vineyard refused to accede to the water company's demand for earlier payment in violation of contract terms, and the water company terminated water service. The court ruled that the "inconsequential" extra interest cost of advance payment, amounting to $1.53, viewed in relation to the large foreseeable damage to his crop from lack of water, approximately $7,000, was such that the plaintiff should have acceded to the unjustified demand. 210 P. at 50; *see also* J. Calamari & J. Perillo, *The Law of Contracts* 540 & n. 24 (1977).

       Contrastingly, in *Schultz v. Town of Lakeport,* 5 Cal.2d 377, 54 P.2d 1110, *modified on other grounds* 55 P.2d 485 (1936), the disputed water bill amounted to $129.65, compared with allowable damages of $226.50 to the plaintiff's

AA01670

999 v. C.I.T. Corp., 776 F.2d 866 (1985)
3 Fed.R.Serv.3d 923

garden when the water supply was shut off. The *Schultz* court held the amount in dispute was "comparatively substantial" and accordingly the plaintiff was not required to make the payment to mitigate damages. 54 P.2d at 1113–14. *See Seaboard Music Co. v. Germano,* 24 Cal.App.3d 618, 623, 101 Cal.Rptr. 255, 258 (1972) ("the rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights").

*See also* J. Friedman, *Contract Remedies in a Nutshell* § 1.2(c), at 30–31 (1981).

5    The president of 999 testified CIT was advised that the Bank of America was placing considerable pressure on 999 to obtain new financing immediately. 999 had informed CIT of its intention to acquire Bee Cee and that it had made substantial guarantees to Bee Cee creditors. CIT was told that some of the financing funds would be used to settle debts with Bee Cee creditors. An officer of Bank of America testified that CIT agents had discussed with him the Bank's concerns about 999's proposal to acquire Bee Cee and the Bank's decision not to renew 999's financing. The president of Bee Cee testified that he had fully explained the Bee Cee acquisition to CIT agents. The business coordinator for CIT testified that he was aware of Bee Cee's financial distress and knew it could go into bankruptcy, and that CIT proceeded to consider financing for 999 despite its reservations about Bee Cee's future prospects.

End of Document                               © 2015 Thomson Reuters. No claim to original U.S. Government Works.

AA01671

7

AA01672

Belle RP LLC v. JPS Capital Partners, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 3644343
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

BELLE RP LLC, a Florida limited
Liability company, Plaintiff,
v.
JPS CAPITAL PARTNERS, LLC, a New
York limited liability company, John Doe
Corporation, an Unknown corporate entity.

No. 08–80521–CIV.   |   Oct. 30, 2009.

West KeySummary

1   **Federal Civil Procedure**
       ⚬ Contract Cases in General

Genuine issue of material fact regarding whether
the lender or the borrower was the party that
decided not to proceed with a loan, precluding
summary judgment in a breach of contract
action. Borrower claimed that the lender failed
to offer a loan at the same terms as described
on the term sheet. Lender claimed that it did
not refuse to go forward with the loan, and that
it requested but did not demand a modification
of the loan terms. It further claimed that it was
willing thereafter to go forward on the original
terms and it was the guarantor, on behalf of
the borrower, who decided to seek financing
elsewhere.

Cases that cite this headnote

**Attorneys and Law Firms**

Alvin Ernest Entin, Entin & Della Fera, Fort Lauderdale, FL,
for Plaintiff.

Stephen Joseph Padula, Padula Law Firm LLC, Boca Raton,
FL, for JPS Capital Partners, LLC.

*ORDER AND OPINION*

KENNETH A. MARRA, District Judge.

**\*1** THIS CAUSE came before the Court on Plaintiff,
Belle RP, LLC's ("Plaintiff" or "Belle") Motion for Partial
Summary Judgment as to Liability and Partial Damages (DE
36), filed September 15, 2009. The motion is fully briefed and
ripe for review. The Court has reviewed the motion, response,
reply, the record in this case, and is otherwise duly advised
in the premises.

*Background*

Plaintiff, Belle RP, LLC's ("Plaintiff" or "Belle") filed its
Complaint (DE 1) against Defendant JPS Capital Partners,
LLC ("Defendant" or "JPS") on May 16, 2008. The
Complaint arises out of a proposed loan based on a term
sheet between Belle and JPS in 2005 that ultimately failed
to result in a loan transaction between the companies. Belle
raises three claims against JPS: Breach of Contract (Count I);
Fraud in the Inducement (Count II); and Violation of Florida's
Deceptive and Unfair Trade Practices Act (Count III). JPS
filed a Counterclaim for Breach of Contract.

Plaintiff's motion for partial summary judgment seeks (1)
entry of summary judgment on liability against JPS on Counts
I–III of Belle's Complaint; (2) partial summary judgment for
damages of $51,400.00 in cost and lender fee deposits; and
(3) entry of summary judgment in Belle's favor on JPS's
counterclaim.

*Undisputed Material Facts*

The facts, as culled from affidavits, exhibits, depositions,
answers, answers to interrogatories and reasonably inferred
therefrom, for the purpose of these motions, are as follows:

1. Plaintiff, Belle RP, LLC, is a Florida limited liability
company with the sole purpose of owning and managing
Glades Glen Apartments in Belle Glades, Florida. (Affidavit
of Barry Leon at ¶ 2).

2. Defendant, JPS Capital Partners, LLC, is a New York
limited liability company with its principal place of business
in New York, New York and which does business with
entities throughout the United States. (*See* Answer and
Counterclaim, DE 5 at ¶ 3).

AA01673

Belle RP LLC v. JPS Capital Partners, LLC, Not Reported in F.Supp.2d (2009)

3. During the relevant time period, JPS was in the business of "sourcing real estate bridge loans, mezzanine loans and first mortgages on behalf of hedge funds and other unregulated institutions that wanted to invest in the real estate space but didn't want to create their own real estate structure." (Deposition of Joel Shapiro at 7:11–16).

4. JPS was formed in January, 2005 and the transaction with Belle was one of JPS' early projects. (Shapiro Dep. at 6–7).

5. Belle had purchased Glen Glades apartments with purchase money financing that needed to be refinanced. (Shapiro Dep. at 8:1–3).

6. Broker Robert Chambre brought Belle to JPS Capital Partners to obtain a loan. (Shapiro Dep. at 11:4–9).

7. JPS received financial statements, lists of assets/calculation of value, and a report of the condition of the property at issue. (Shapiro Dep. at 19).

8. According to JPS partner Joel Shapiro, based upon the fact that JPS had enough information to generate a term sheet, Shapiro assumes that Belle had provided JPS with financial information, a request for a loan, a budget with projections, and rent rolls for the property. (Shapiro Dep. at 12).

**\*2** 9. On or about May 26, 2005, Belle entered into an agreement with JPS whereby JPS or an affiliate would consider providing financing to Belle. (*See* Term Sheet attached to Complaint; Shapiro Dep. at 10).

10. The term sheet was drafted jointly by JPS partners Shapiro, Jim Hopkins, Paul Schack, and former JPS partner and attorney, Stuart Gruskin. (Shapiro Dep. at 13–14).

11. JPS was aware that the loan was being requested in the context of a refinancing of an existing loan that was coming due on the property held by Belle, and closing was to occur on or before June 28, 2005. (Shapiro Dep. at 13, 33).

12. The term sheet states that JPS or an affiliate of JPS may be the lender. (*See* Term Sheet at p. 1). The relevant language in the term sheet regarding the "Lender" is as follows:

> ..this Letter Agreement sets forth the general terms and conditions under which JPS Capital Partners, LLC, or its affiliate will consider providing financing ("the Loan") to fund the refinancing and renovation of the apartment complex known as Glen Glades Apartments ("the Project") located in Belle Glade, Florida ("the Property").
>
> ...
>
> Lender: JPS Capital Partners, LLC or an affiliate.

(*See* Term Sheet at p. 1).

13. The "Brokerage Fees" section of the term sheet states that "no broker other than Chambre & Company, Inc. has been involved in this transaction, and Borrower shall pay any fees due to the broker." (*See* Term Sheet at p. 4).

14. At the time JPS entered into the term sheet, its process was to perform due diligence on size and price structure and then bring the loan request to a funding provider JPS had a relationship with or to a third party for funding. (Shapiro Dep. at 36)

15. At the time JPS entered into the term sheet, it had no idea who the lender would be. (Shapiro Dep. at 35).

16. At the time JPS entered into the term sheet, it had no particular assurance that it would have a third-party lender. (Shapiro Dep. at 36).

17. JPS had an verbal commitment, not a written commitment, from a third party lender, Stillwater Asset–Backed Fund, to provide $10 million to JPS to loan to Belle RP. (Shapiro Dep. at 36; Shapiro Aff., DE 39 at ¶ 28).

18. The verbal commitment from third party lender, Stillwater Asset-Backed Fund, was for different terms than those set forth on the term sheet. (Shapiro Dep. at 37).

19. Belle initially paid JPS $75,000.00, which consisted of a "Fee Deposit" of $50,000.00 (stipulated "Lender's Fees" per p. 3 of the term sheet) and a "Cost Deposit" of $25,000.00 (stipulated in "Lender's Costs" per p. 3–4 of the term sheet).

20. Belle later paid JPS an additional $25,000.00 for "Lender's Costs," bringing the total of such "Cost Deposit" to $50,000.00. (Shapiro Aff. at ¶ 24).

21. The term sheet called for a mortgage with the following terms and conditions:

> a. Loan Amount: $10,000,000.00

AA01674

*Belle RP LLC v. JPS Capital Partners, LLC,* Not Reported in F.Supp.2d (2009)

b. Interest Rate: at Lender's discretion, either (a) the greater of 10.50% or 740 basis points over 30 day LIBOR, per annum, or (b) the greater of 10.5% or the prime rate as published in the Wall Street Journal plus 450 basis points.

**\*3**   c. Borrower's Contribution: $1,800,000.00

d. Guarantors: B + K Leon FLP and Barry Leon

*See* term sheet, DE 36–2.

22. The term sheet states that the guarantors of the loan are: "B + K Leon FLP and Barry Leon." (term sheet at p. 1).

23. Belle's broker, Robert Chambre, informed JPS that Barry Leon had sufficient wealth to act as a full recourse guarantor. (Shapiro Dep. at 12).

24. Belle represented to JPS that Mr. Leon had power of attorney over all of the family entities holding the assets and the family members involved. (Shapiro Dep. at 42).

25. While JPS does not independently value assets, it was not aware of any difference between the value of the assets offered by Barry Leon and the related family assets for the guarantee and what was learned in JPS' due diligence about the value of the assets. (Shapiro Dep. at 34).

26. JPS "had been proceeding under the assumption that the assets were owned solely by Mr. Leon. What [JPS] found is that virtually all of the assets were in family trusts or family partnerships, which [JPS] believed ... would have made it significantly more difficult for [JPS] to be able to proceed against the guarantee in the unlikely event that [JPS] had to." (Shapiro Dep. at 41).

27. It was the nature and control of the assets offered for the guarantee, not the assets themselves, that concerned JPS regarding whether the guarantee was sufficient. (Shapiro Dep. at 41).

28. JPS hired third party vendors for an appraisal, marketing study, and an environmental report, among other due diligence, and in so doing spent a portion of the cost deposit. (*See* Shapiro Dep.). These reports took more time than expected to obtain.

29. Approximately $1,400.00 of the cost deposit monies were not used. (Shapiro Dep. at 30–31).

30. After all third-party vendor reports were in JPS' possession, JPS contacted Belle and offered a mortgage on terms requiring that Belle place a far greater amount of capital in the transaction and a far greater amount of money in the "Draw Account" than required in the term sheet. (Leon Aff. at ¶ 13).

31. The term sheet required that if the loan did not close for any reason, the unused portion of the cost deposit would be returned to Belle. *See* term sheet p. 4 ("... In the event the Loan fails to close for any reason, the unused portion of the Cost Deposit shall be returned to the Borrower.").

32. The term sheet also provided that if JPS determined that it would not proceed with the loan, the Fee Deposit of $50,000.00 would be returned less any costs not covered by the "Cost Deposit." *See* term sheet at p. 3 ("The Fee Deposit is consideration for the Lender performing evaluation, underwriting, and due diligence with respect to the Loan, and shall not be refunded unless Lender determines that it does not wish to proceed with the Loan. In the event the Lender determines not to proceed with the Loan, the Fee Deposit for the Loan will be refunded, less any amount required to reimburse Lender for its actual costs that have not been covered by the Cost Deposit.").

**\*4**   33. JPS submitted documentation of expenditures made for due diligence from Belle's $50,000 Cost Deposit. (*See* Exhibit "E" to the Motion for Summary Judgment). This documentation consisted of check stubs, disbursement records, and wire requests created by JPS. *See id.* These expenditures totaled approximately $48,206.04. *See id.*

34. JPS did not produce cancelled checks or proof of receipt of wires for payments to vendors from Belle's cost deposit.

35. Belle's sale of the subject property occurred after Belle tried to continue working with JPS outside the time schedule stated in the term sheet. (term sheet at p. 5; Leon Aff. at ¶ 11, 16).

*Disputed Material Facts*

1. There is a disagreement between the parties regarding the status of the lender. Belle's position is that it was led to believe that in dealing with JPS, it was dealing directly with the lender or someone in control of the lender. (Belle's Statement of

Next

Belle RP LLC v. JPS Capital Partners, LLC, Not Reported in F.Supp.2d (2009)

Facts DE 36-9 at ¶ 12) *See* Leon Aff. at ¶ 5 ("JPS held itself out to us as a 'lender' who was capable of either financing the loan themselves or contractually bound to an 'affiliate' who had such financial capability.) It is JPS' position that, under the term sheet, either JPS or an affiliate of JPS may be the lender, and that an underwriter may be involved. (JPS' Statement of Facts DE 38 at ¶ 1).

2. The parties disagree over whether the delay in obtaining the reports was warranted. It is JPS' position that Belle RP and Barry Leon provided "materially incorrect" information to JPS at the time it prepared the term sheet. Additionally, JPS contends Belle exhibited dilatory conduct in providing accurate information to JPS, and that all due diligence was timely performed by JPS once accurate information was provided by Belle and Barry Leon. (DE 36-7 Exh. F–Aug. 30, 2005 email; Shapiro Aff. at ¶ 26, 27). It is Belle's position that the delay was caused solely by a delay in JPS receiving third party reports. (Exh. D, June 24, 2005 letter).

3. The parties also disagree about whether JPS ever offered Belle a loan consistent with the criteria set forth in the term sheet. It is Belle's position that JPS offered Belle a loan different from the loan set forth in the term sheet and that Belle did not want a different loan. (Leon Aff. at ¶ 16–17). It is JPS's position that JPS requested, but did not demand a modification of the loan terms. Thereafter, JPS was willing to go forward on the original terms, but Barry Leon, on behalf of Belle, decided to seek financing elsewhere. *See* DE 36-7, Aug. 30, 2005 e-mail from James Hopkins of JPS to Bob Chambre, at 2–3 ("When we indicated that we felt the circumstances justified revisiting the economics of the transaction, we were advised that the borrower would only proceed on the original terms. In response, we said that we would continue to work on this on the economic terms set forth in the term sheet, and at that point we learned that the borrower had decided to pursue other financing options."); *see also* Shapiro Aff. at ¶ 30 (By August 31, 2005, Barry Leon informed JPS Capital that he had opted for Belle RP to seek financing elsewhere.")

*5 4. The parties also disagree as to which party refused to go forward with the transaction. It is Belle's position that JPS failed to offer a loan at the same terms as the term sheet. (Leon Aff. at ¶ 14–17). Belle considers the alleged refusal by JPS to proceed with the loan on the original terms to mean that JPS decided not to proceed with the loan. *Id.* Belle also points to an August 31, 2005 email indicating that JPS does not agree to a reserve of $2.5 million as support for its position that JPS

refused to go forward with the transaction. (See Exhibit "F" to the Motion for Summary Judgment.)

It is JPS' position that it did not fail to offer the loan. JPS relies upon the express language of the term sheet, that (1) the term sheet "does not constitute a commitment or obligation on the part of [JPS] to make the Loan, and that the fee earned upon execution of this Term Sheet is consideration for [JPS] reviewing, analyzing, and underwriting the loan application;" (2) JPS's approval of the loan is "contingent upon [JPS] completing, to its sole and absolute satisfaction, all necessary due diligence with respect to the proposed Loan. [Belle] shall fully cooperate with [JPS] with respect to [JPS]'s performance of due diligence and its underwriting of the Loan;" and (3) JPS' "approval of the Loan is dependant upon the satisfactory completion, in [JPS]'s sole and absolute discretion, of underwriting as deemed necessary or customarily required for transactions of this type, including but not limited to environmental testing, structural review, title review and insurance underwriting...." *See* term sheet at p. 4, 5; *see* Shapiro Aff. at ¶ 13. It is JPS's position that Belle decided not to go forward with the loan because Barry Leon, on behalf of Belle, decided to seek financing elsewhere. *See* DE 36-7, Aug. 30, 2005 e-mail from James Hopkins of JPS to Bob Chambre, at 2–3 ("When we indicated that we felt the circumstances justified revisiting the economics of the transaction, we were advised that the borrower would only proceed on the original terms. In response, we said that we would continue to work on this on the economic terms set forth in the terms sheet, and at that point we learned that the borrow had decided to pursue other financing options."); *see also* Shapiro Aff. at ¶ 30 (By August 31, 2005, Barry Leon informed JPS Capital that he had opted for Belle RP to seek financing elsewhere.")

5. The parties disagree as to whether Belle was damaged by JPS's actions. It is Belle's position that it was damaged not only by the loss of the deposit funds of $100,000.00, but also by it having to do a "sacrifice sale." (Leon Dep. at ¶ 19, 20). It is JPS's position that Belle was not damaged because it purchased the property for $9.5 million on March 17, 2005 and sold it for $10.2 million on April 6, 2006, thus selling it for $700,000 more than what Belle paid one year earlier. (Shapiro Aff. at ¶ 31).

### *Standard of Review*

*6 Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

AA01676

Belle RP LLC v. JPS Capital Partners, LLC, Not Reported in F.Supp.2d (2009)

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the non-moving party bears the burden of proof on an issue, the moving party may discharge its burden by showing that the materials on file demonstrate that the party bearing the burden of proof at trial will not be able to meet its burden. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

When a moving party has discharged its burden, the nonmoving party must go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the party opposing the motion. *Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1369 (citations and quotations omitted).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir.1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hoffman v. Allied Corp.,* 912 F.2d 1379 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.,* 881 F.2d 1041, 1045 (11th Cir.1989).

*Discussion*

*Count I: Breach of Contract; Counterclaim I: Breach of Contract*

Because the Court is sitting in diversity, Florida substantive law applies. *See, e.g., Admiral Ins. Co. v. Feit Management Co.,* 321 F.3d 1326, 1328 (11th Cir.2003) ("Sitting in diversity, we apply the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.").

Under Florida law, a breach of contract action requires three elements: a valid contract, a material breach of that contract, and damages. *See, e.g., Beck v. Lazard Freres & Co., LLC,* 175 F.3d 913, 914 (11th Cir.1999); *Miller v. Nifakos,* 655 So.2d 192, 193 (Fla. 4th DCA 1995). Here, there are disputes of material fact regarding each of the three elements.

*7 First, regarding the existence of a valid contract, the entire premise of Belle's breach of contract claim is that, on or about May 26, 2005, the parties entered into an agreement for a particular loan as described in the term sheet. However, the term sheet itself states that it "sets forth the general terms and conditions under which JPS Capital Partners, LLC, or its affiliate *will consider providing financing ("the Loan" )* to fund the refinancing and renovation of the apartment complex known as the Glen Glades Apartments ("the Project"). Thus, there are genuine issues of material fact as to whether there is a binding contract, and if there is, what are its terms.

Second, as to whether there was a material breach of contract, there are conflicting facts in the record regarding several key issues. Most importantly, there are disputed issues of fact about which party, JPS or Belle decided not to proceed with the loan. *See* ¶ 3 and 4 of Disputed Material Facts, *supra.* It is Belle's position that JPS failed to offer a loan at the same terms as the term sheet. (Leon Aff. at ¶ 14–17). Belle considers the alleged refusal by JPS to proceed with the loan on the original terms to mean that JPS decided not to proceed with the loan. *Id.* Belle also points to an August 31, 2005 email indicating that JPS does not agree to a reserve of $2.5 million as support for its position that JPS refused to go forward with the transaction. *See* Exhibit "F" to the Motion for Summary Judgment.

In contrast, it is JPS' position that it did not fail to offer the loan. JPS relies upon the express language of the term sheet, that (1) the term sheet "does not constitute a commitment or obligation on the part of [JPS] to make the Loan, and that the fee earned upon execution of this Term Sheet is consideration for [JPS] reviewing, analyzing, and underwriting the loan application;" (2) JPS's approval of the loan is "contingent upon [JPS] completing, to its sole and

AA01677

Belle RP LLC v. JPS Capital Partners, LLC, Not Reported in F.Supp.2d (2009)

absolute satisfaction, all necessary due diligence with respect to the proposed Loan. [Belle] shall fully cooperate with [JPS] with respect to [JPS]'s performance of due diligence and its underwriting of the Loan;" and (3) JPS' "approval of the Loan is dependant upon the satisfactory completion, in [JPS]'s sole and absolute discretion, of underwriting as deemed necessary or customarily required for transactions of this type, including but not limited to environmental testing, structural review, title review and insurance underwriting...." *See* term sheet at p. 4, 5; *see* Shapiro Aff. at ¶ 13. Moreover, JPS also relies on evidence in the record that JPS requested, but did not demand a modification of the loan terms, and thereafter was willing to go forward on the original terms, but Barry Leon, on behalf of Belle, decided to seek financing elsewhere. *See* DE 36–7, Aug. 30, 2005 e-mail from James Hopkins of JPS to Bob Chambre, at 2–3 ("When we indicated that we felt the circumstances justified revisiting the economics of the transaction, we were advised that the borrower would only proceed on the original terms. In response, we said that we would continue to work on this on the economic terms set forth in the terms sheet, and at that point we learned that the borrow had decided to pursue other financing options."); *see also* Shapiro Aff. at ¶ 30 (By August 31, 2005, Barry Leon informed JPS Capital that he had opted for Belle RP to seek financing elsewhere.").

**\*8** Additionally, as to the material breach of contract element, there are disputed issues of fact over the status of the lender under the term sheet (*see* ¶ 1 of Disputed Material Facts, *supra* ) and about the cause of the delay in obtaining the reports and whether that delay was warranted (*see* ¶ 2 of Disputed Material Facts, *supra* ).

There are also genuine issues of material fact as to whether the alleged breach of agreement resulted in damages to either party.[1] Under the language of the term sheet[2], the Fee Deposit of $50,000.00 was to be returned only if JPS determined that it would not proceed with the loan. *See* term sheet at p. 3 ("The Fee Deposit is consideration for the Lender performing evaluation, underwriting, and due diligence with respect to the Loan, and shall not be refunded unless Lender determines that it does not wish to proceed with the Loan.).

Based on the foregoing, there are genuine issues of material fact precluding summary judgment as to Belle's claim for breach of contract (count I) and JPS' counterclaim for breach of contract (counterclaim I).

**Count II: Fraud in the Inducement; Count III: Violation of FDUTPA**

Counts II and III are closely connected, as Belle submits that a finding by the Court that JPS fraudulently induced Belle into agreeing to the term sheet would be sufficient to satisfy the burden of proving liability on a cause of action under Florida's Deceptive and Unfair Trade Practices Act. *See* DE 40 at 4 n. 1.

The elements of fraud in the inducement in Florida are: 1) that the defendant misrepresented a material fact, 2) that the defendant knew or should have known that the statement was false, 3) that the defendant intended the representation would induce the plaintiff to enter into a contract or a business relation; and 4) that the plaintiff was injured by acting in justifiable reliance on the misrepresentation. *Eclipse Medical, Inc. v. American Hydro–Surgical Instruments, Inc.,* 262 F.Supp.2d 1334, 1342 n. 1 (S.D.Fla.1999).

The FDUTPA declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts of practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages." *KC Leisure, Inc. v. Haber,* 972 So.2d 1069, 1073 (Fla. 5th DCA 2008).

Plaintiff's fraudulent inducement claim is predicated on the same allegations as his FDUTPA claim. In essence, Belle claims in both counts that neither JPS nor an affiliate of JPS was capable of performing on the term sheet and therefore JPS fraudulently induced Belle into signing the term sheet. As is clear from the discussion above regarding the breach of contract claims, these counts sounding in fraud are inextricably intertwined with the breach of contract claims and, accordingly, there are disputed facts which also preclude these counts from being resolved at the summary judgment stage. Additionally, Belle has not pointed to any evidence in the record of JPS' alleged fraudulent intent. "[W]hen reasonable men may differ as to whether a representation was material or whether a false answer was made with intent to deceive, those questions must be submitted to the jury." *Cardwell v. U.S.,* 186 F.2d 382 (5th Cir.1951)[3] . The inferences that could be drawn from the undisputed facts in this case could be sufficiently persuasive and plausible to a reasonable jury to allow them to conclude that JPS did not have the present intention of misleading and defrauding JPS

AA01678

Belle RP LLC v. JPS Capital Partners, LLC, Not Reported in F.Supp.2d (2009)

into entering into the alleged agreement at issue. *See, e.g., Home Design Services, Inc. v. David Weekley Homes*, 548 F.Supp.2d 1306, 1311 (M.D.Fla.2008) (denying summary judgment where, depending on the underlying factual details, a reasonable jury could find evidence of an explanation other than an intent to deceive). Accordingly, summary judgment is DENIED as to Counts II and III.

**\*9** Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** that Belle's Motion for Partial Summary Judgment as to Liability and Partial Damages (DE 36) is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 29th day of October, 2009.

*Conclusion*

Footnotes

1    At this stage in the litigation, the Court is only able to determine that approximately $1,400.00 of the cost deposit monies were not used, and are thus owed to Belle under the provisions of the term sheet. JPS appears to have agreed to repay Belle this amount. (Shapiro Dep. at 30–31).

2    Additionally, as to any other damages that may be alleged by Plaintiff, the Court points out that Belle has agreed that "any claim it may have for damages against Lender for any reason arising out of or relating to this Letter Agreement, shall be limited to the return of fees paid to Lender, less any third-party costs incurred by Lender. *See* term sheet at p. 5.

3    In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 & 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

End of Document      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

AA01679

J

AA01680

Waybright v. Turner, 131 Fla. 209 (1938)
179 So. 412

131 Fla. 209
Supreme Court of Florida.

WAYBRIGHT
v.
TURNER.

Feb. 23, 1938.

On rehearing.

Former judgment reaffirmed.

For former opinion, see 176 So. 424.

West Headnotes (1)

[1]    **Mortgages**
           Successive Foreclosures
     Where a single mortgage covered two parcels of
     property, that a foreclosure proceeding against
     one parcel barred a deficiency decree against
     owner of such parcel because the court refused
     to entertain jurisdiction to enter the decree,
     although it had been requested, did not prevent
     enforcement in equity of mortgage against the
     second parcel.

     1 Cases that cite this headnote

**\*209  \*\*412**  Appeal from Circuit Court, Alachua County;
H. L. Sebring, judge.

**Attorneys and Law Firms**

Carlton C. Arnow, of Jacksonville, for appellant.

Baxter & Clayton and Clara B. Floyd, both of Gainesville,
and J. Velma Keen, of Tallahassee, for appellee.

**Opinion**

PER CURIAM.

In a petition for rehearing it is suggested, inter alia, that the
holding in the opinion herein that the **\*210** chancellor, in

failing to **\*\*413** grant the prayer for a deficiency decree
in a mortgage foreclosure, may be deemed a declination of
the court to exercise its jurisdiction to enter such decree,
thereby allowing a mortgage to proceed further in collecting
an unpaid part of the mortgage debt, is contrary to previous
decisions of this court cited in the petition. The points made
are not well taken.

Belle Mead Development Corporation v. Reed, 114 Fla. 300,
153 So. 843, is mainly relied on by petitioner to sustain his
points. That case was an action at law to recover a balance
due on a promissory note debt of one person after foreclosure
of a mortgage upon property given by the debtor to secure
the payment of the note. In the foreclosure proceedings the
mortgagee prayed for a deficiency decree if the proceeds of
the foreclosure sale did not pay the debt. A plea in the law
action averred that a deficiency decree was refused by the
court. This indicates that the court did entertain jurisdiction
to grant to deny a deficiency decree. It was held on writ of
error to this court that by praying for a deficiency decree the
mortgagee had elected his forum and became bound by that
choice. Belle Mead Development Corporation v. Reed, 114
Fla. 300, 304, 153 So. 843, 844. See, also, Provost v. Swinson,
109 Fla. 42, 43, 146 So. 641, and cases cited.

In this case a joint and several note was made by two
parties, Olive C. Colclough, a widow, and the Plaza Theatre
Company. The mortgage to secure the payment of the note
was executed by the two makers of the note, and *covered
two separate parcels of land;* one parcel being the property
of each of the makers of the note and mortgage. The
mortgage gave a first lien upon once parcel, known as the
Colclough property, and a second lien upon the other parcel
of the mortgaged lands, known as the Plaza Theatre **\*211**
Company property. A foreclosure of the first lien held by
a third party upon the parcel known as the Plaza Theatre
Company property, on which the appellee had a second
mortgage lien, resulted in a surplus of $10,481.43, which was
placed in the registry of the court. The appellee was made a
party defendant the to the above-stated foreclosure because of
the second mortgage he held. The appellee foreclosed his first
mortgage lien upon the other parcel known as the Colclough
property, such foreclosure resulting in a deficit. The owner of
the Plaza Theatre Company property was not made a party to
the last-mentioned foreclosure suit.

The bill of complaint for foreclosing the appellee's first
mortgage on the Colclough property prayed for a deficiency
decree; but the court did not render a deficiency decree

AA01681

Waybright v. Turner, 131 Fla. 209 (1938)
179 So. 412

in personam against Olive C. Colclough or anyone. (The court did decree without authority, as shown by the opinion, because of the absence of proper parties, that the unpaid part of the mortgage debt, $9,923.99, with interest, was a charge on the Plaza Theatre Company property subordinate only to the first mortgage lien on that property which has been satisfied by foreclosure, leaving $10,491.43 in the registry of the court.) In view of the decree as made, the opinion of this court correctly states that the court below declined to exercise its jurisdiction to render a deficiency decree in the cause. The decree of the chancellor was in effect a refusal to exercise the jurisdiction of the court to enter a deficiency decree as prayed for.

In the Belle Mead Case the refusal of the court to render a deficiency decree is consistent with a recognition or assumption of jurisdiction upon the prayer for a deficiency decree, nothing appearing to the contrary.

In this case the portions of the decree as to the second **\*212** mortgage lien on the Plaza Theatre Company property, though erroneous, is inconsistent with a recognition or assumption of jurisdiction upon the prayer for a deficiency decree, and indicates an intent not to entertain jurisdiction upon the prayer for a deficiency decree.

The contest here is in equity over the disposition of the $10,491.43 in the registry of the court, as between the mortgage holder and the owner of the Plaza Theatre Company property.

Even if the prayer for a deficiency decree and the failure of the court to entertain jurisdiction to render a deficiency decree in foreclosing the first mortgage held by the appellee on the Colclough property, with the statement that appellee's second mortgage on the Plaza Theatre Company property remains to secure the balance of the mortgage debt, could bar an action at law against Olive C. Colclough for the deficiency, such prayer and failure of the court to entertain jurisdiction of it would not prevent the enforcement in equity of the appellee's second mortgage lien on the parcel of the mortgaged property known **\*\*414** as the Plaza Theatre Company property, or on the surplus proceeds of the foreclosure of the first lien on such Plaza Theatre Company parcel of land after the first mortgage lien on that property is satisfied. The second mortgage lien on the Plaza Theatre Company property, or the surplus proceeds of a foreclosure sale after paying the first mortgage lien, remains until the debt secured by the mortgage is paid or the mortgage lien is otherwise satisfied.

Reaffirmed on rehearing.

ELLIS, C. J., and WHITFIELD, TERRELL, BROWN, BUFORD, and CHAPMAN, JJ., concur.

**Parallel Citations**

179 So. 412

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

AA01682

ORDERED.

**Dated: May 10, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

FIDDLER'S CREEK, LLC, ET AL.,                    Case No. 8:10-bk-03846-KRM
                                                 Chapter 11
     Debtors.

_____/

FIDDLER'S CREEK, LLC, ET AL.,

     Plaintiffs/Counter-Defendants,

v.                                               Adv. No. 8:11-ap-0809-KRM

PEPI CAPITAL, L.P.,

     Defendant/Counter-Plaintiff and
     Third-Party Plaintiff.

_____/

**MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT
(DOC. NOS. 84, 106 AND 113)**

     The issue before the Court, on cross motions for summary judgment, is whether it was

the lender, PEPI Capital, L.P. ("PEPI"), or the borrowers, Fiddler's Creek, LLC, and its 27

subsidiaries (collectively, the "Debtors"), who defaulted under a pre-Chapter 11 loan

commitment. Debtors obtained the written commitment in January 2010 (the "Commitment

Letter") to be able to fund operations in the Chapter 11 cases that they later filed, on February

23, 2010.  Debtors paid PEPI one-half ($405,000) of the commitment fee and $550,000 for

PEPI's legal expenses.  The parties began negotiating the terms of the final loan documents.

Some three and a half weeks later – after at least five drafts of the loan documents were prepared

by PEPI, and with the time for the bankruptcy filings approaching – the loan documents were not

in conformity with the Commitment Letter.

The Debtors' owner, Aubrey Ferrao,[1] then decided to fund post-petition operations

himself and, four days later, Debtors sent a letter (the "Default Letter") alleging multiple defaults

by PEPI and demanding return of the $405,000.  The next day, February 23, 2010, Debtors filed

28 Chapter 11 petitions; the day after that, they filed an emergency motion to approve a

$25 million post-petition credit facility from Gulf Bay Capital, Inc. ("Gulf Bay"), a company

owned by Mr. Ferrao.

PEPI filed a $1.4 million claim in the Chapter 11 cases, which Debtors are obligated to

pay in full if it is allowed.[2]  The claim is based on this provision of the Commitment Letter:

> "*All indemnities and obligations of the* [Debtors] ***shall survive the termination*** *of this Commitment Letter or the commitment of PEPI hereunder,* ***provided however, such indemnities and obligations shall not survive in the event of a default by PEPI hereunder.***"[3]

Relying on the same provision, and alleging that PEPI defaulted, Debtors filed this adversary

proceeding objecting to PEPI's bankruptcy claim and seeking recovery of all pre-petition

payments.

---

[1] Mr. Ferrao is the founder, CEO, and principal owner of Fiddler's Creek, LLC.

[2] PEPI filed identical claims in each of the Debtors' 28 cases, each in the amount of $1,405,000.  Main Case, Claim No. 204.  The claim consists of the second half of the commitment fee, $405,000, and a "break up" fee of $1 million.  Main Case, Doc. No. 1134.

[3] Lorio Dep. Ex. 15 at 6 (emphasis added).

AA01684

The Court has under consideration Debtors' Motion for Partial Summary Judgment on Counts I and II of the Complaint,[4] as well as Debtors' Supplement thereto, PEPI's Response, and Debtors' Reply.[5] The Court also has under consideration PEPI's Motion for Partial Summary Judgment and Debtors' Response.[6] The Court has considered the submitted exhibits, the affidavit of Jeffrey Fine, PEPI's lead counsel, the deposition testimony of other witnesses, the cases cited, and the arguments advanced by counsel.

For the reasons stated below, the Court concludes that PEPI did breach its obligations under the Commitment Letter because, with knowledge of the Debtors' imminent need to file Chapter 11 petitions, PEPI (1) repeatedly declined to incorporate certain lien enforcement restrictions into the loan documents, as required by the Commitment Letter, and (2) refused to provide a written confirmation that its due diligence investigation had been satisfactorily completed before Debtors filed their Chapter 11 petitions. Thus, Debtor's motion for partial summary judgment is due to be granted. PEPI's motion for summary judgment will be denied.

---

[4] <u>Count I: Breach of Contract</u>
  Debtors assert that PEPI breached the Commitment Letter by: (1) materially altering the terms of the Commitment Letter, (2) deleting and redrafting critical provisions required to be in the loan documents, and (3) failing to comply with the due diligence sign off requirement under the Commitment Letter. Debtors request the Court enter a judgment against PEPI in the amount of $955,000 (the amount of the commitment fee paid to PEPI), plus interest.

<u>Count II: Breach of Implied Covenant of Good Faith and Fair Dealing</u>
  Debtors assert that PEPI acted in a way that prevented Debtors from receiving the benefit of the contract, and that judgment should be entered against PEPI in the amount of $955,000, plus interest.

[5] Doc. Nos. 84 (Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law, the "Motion"), 100 (PEPI's Response in Opposition to Debtors' Motion for Partial Summary Judgment, the "Response"), 102 (Debtors' Reply to PEPI's Response in Opposition), and 113 (Supplement to Debtors' Motion for Partial Summary Judgment). Initially, PEPI requested an affirmative ruling in its Response to Debtors' Motion for Partial Summary Judgment. Later, on March 20, 2015, PEPI filed its own Motion for Partial Summary Judgment (Doc. No. 106).

[6] Doc. Nos. 106 (PEPI's Motion for Partial Summary Judgment and Incorporated Memorandum of Law) and 114 (Debtors' Response to PEPI's Motion for Partial Summary Judgment).

AA01685

## FACTUAL BACKGROUND

<u>Overview</u>

Fiddler's Creek, LLC, was the developer of a large planned community near Naples, Florida.  The "Fiddler's Creek" development encompassed nearly 4,000 acres, including: unplatted parcels with no infrastructure; developed neighborhoods requiring maintenance; a championship golf course; a marina; Gulf Coast condominiums; and homes under construction. Much of the real estate was encumbered by liens for multiple series of bonds issued by two Community Development Districts (the "CDD's").  Some parcels were also encumbered by separate mortgages held by eight lenders (the "Pre-Petition Lenders").

Debtors plausibly assert that they were compelled to seek Chapter 11 relief after the real estate crisis in 2008 severely impacted their cash flow.  In turn, they determined that they would need a credit facility to fund operations after the Chapter 11 filings (a transaction commonly referred to as a debtor-in-possession loan, or "DIP Loan").[7]

Through the fall of 2009 and January of 2010, the parties negotiated the terms of the Commitment Letter and a term sheet.[8]  The Commitment Letter was signed on January 27, 2010, but dated as of December 31, 2009.  It called for PEPI to provide up to $27 million, to be drawn as needed in accordance with an 18-month budget.[9]  The DIP Loan was to be secured by a first mortgage on all of the Debtors' assets.  As to some parcels, this lien would "prime" the existing

---

[7] 11 U.S.C. § 364.  Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

[8] On October 29, 2009, the Debtors entered into a term sheet with Petrus Private Investments, L.P., which later changed its name to PEPI Capital, L.P.

[9] Blasnick Dep. Ex. 2 at 7.

AA01686

mortgages of the Pre-Petition Lenders.[10]  The parties anticipated that the initial borrowing would be about $2 million.[11]  The Commitment Letter incorporated a final term sheet and multiple due diligence checklists.

PEPI was to provide the DIP Loan documents, as to which the Commitment Letter required:

> "*The terms and conditions of the documentation of the Credit Facility shall be **substantially the same** as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.*"[12]

For nearly three weeks, the parties engaged in numerous email exchanges and conference calls to address substantive issues.  The Debtors worked with PEPI to clear the numerous items on the due diligence checklists.[13]

Ultimately, the parties were unable to agree on whether certain provisions of the Commitment Letter, particularly those that would restrict the lender's enforcement of its real estate liens after a default, could be omitted from the loan documents or restated in terms that materially differed from the Commitment Letter.

The Commitment Letter and the Parties' Negotiations

The Commitment Letter called for an escrow mechanism (the **"Escrow Provision"**) by which consent foreclosure judgments and deeds in lieu of foreclosure would be held in escrow,

---

[10]  Under 11 U.S.C. § 364(d), the bankruptcy court may authorize a debtor in possession to incur debt that is secured by a senior lien on property of the estate that is already subject to an existing lien, provided certain conditions are met. In particular, there must be no other available credit and sufficient proof that there is adequate protection – typically a demonstrable equity cushion – to protect the liens that are being primed.

[11]  Lorio Dep. Ex. 19 (email from Mr. Fine to Mr. Battista, January 15, 2010).

[12]  Lorio Dep. 110:9−111:4; Blasnick Dep. 49:11−50:9; Blasnick Dep. Ex. 2 at 4 (emphasis added).

[13]  *See, e.g.,* Doc. No. 105 at 6 (email from Ms. Houk to Ms. Helm, copying Jeff Fine and others, regarding due diligence check list, Monday, February 15, 2010 at 2:11 pm).

AA01687

with a related "valuation mechanism" to establish credits to reduce the debt as the properties

were acquired by PEPI from the escrow:

> "[T]*he final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly.*"[14]

The Commitment Letter also established an agreed sequence by which PEPI would

collect its debt from the mortgaged real estate (the ***"Waterfall Provision"***):

> "[T]*he final loan documentation for the Credit Facility shall provide that* [PEPI, as] *the Agent and Lender agrees* [sic] *that it **will not foreclose** on real property described in a numbered item in the following list **unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list.***"[15]

PEPI's commitment was subject to several conditions, including its "completion of and

reasonable satisfaction in all material respects with a due diligence investigation of the [Debtors]

. . . ."[16]  According to the supporting affidavit of Attorney Fine, PEPI and its team "methodically

completed" the dozens of items on the due diligence checklists.[17]

PEPI's obligation to lend was stated to expire on February 8, 2010, less than two weeks

after the parties signed the Commitment Letter.[18]  That deadline would be reset, however, to a

---

[14]  Blasnick Dep. Ex. 2 at 13.

[15]  *Id.* (emphasis added).  The Waterfall Provision specifies the order of priority in which lien enforcement rights could be taken against the collateral: (1) cash on hand and personal property; (2) unencumbered condo units owned by FC Hotel, Ltd.; (3) unencumbered platted lots and undeveloped land owned by GB Peninsula, Ltd., and 951 Holding, Ltd.; and (4) the remaining finished developed land lots owned by Debtor, GBFC Development, Ltd., and all finished housing units owned by Fiddler's Creek, LLC, its subsidiaries, and GB Peninsula, Ltd.  *Id.  See* Fine Aff. at ¶ 10.

[16]  Blasnick Dep. Ex. 2 at 3−4.

[17]  "[T]he due diligence review and closing process was extensive, . . . ongoing in nature, and continuously updated upon the completion of each item."  Fine Aff. at ¶15.

[18]  Blasnick Dep. Ex. 2 at 4.

AA01688

date that was three business days after PEPI notified Debtors that its due diligence investigation

was complete; Debtors could then extend PEPI's funding obligation by another 90 days by filing

their Chapter 11 petitions within that three-day period:

> "*The obligations of* [PEPI] *to provide the Credit Facility under this Commitment Letter if timely accepted and agreed to by the* [Debtors]*, will terminate upon the earlier to occur of: 1) the closing of business on February 8, 2010 (**or such later date that is 3 business days after* **[PEPI]** *has advised* **[Debtors]** *that it has completed its due diligence**), unless the* [Debtors have] *instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the . . . Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.*"[19]

On January 27, 2010, after the Commitment Letter was signed, Paul Battista (Debtors'

lead attorney) sent the following inquiry to Attorney Fine:

> "*Jeff, thank you for all of your help in getting us to this point.  I assume that you and your team are now commencing due diligence in earnest so that we can get to the filing in the next several days.  Please let us know what we still need to get to you in order to keep the process moving.*"[20]

The Escrow Provision was included, in part, in PEPI's first draft of the loan documents,

circulated on February 2, 2010.[21]  So, too, was the Waterfall Provision.  Section 10.4 of the draft

loan agreement provided that PEPI's "rights and remedies" against any parcel of real estate be

restricted to using "*commercially reasonable efforts to exercise its rights with respect to each*

*piece of the Reserved Collateral in the order in which it is listed* [in the Waterfall] *before*

*commencing the exercise of its rights against the next piece of* [collateral]."[22]

---

[19]  Blasnick Dep. Ex. 2 at 4 (emphasis added).

[20]  Lorio Dep. Ex. 15 (email from Mr. Battista to Mr. Fine, January 27, 2010 at 4:13 pm).

[21]  *See* Lorio Dep. Ex. 16.

[22]  *Id*. at 55.

AA01689

On February 5, 2010, Mr. Battista asked Mr. Fine for an "*update on the status of the due diligence and the expected completion date.*"[23]  On February 8, the initial expiration date, Mr. Battista repeated this request:

> "*1. We understand that you are conferring with your team so as to let us know whether you are able to provide the due diligence sign off, and if more information is needed, then what you need from us in order to make the decision.*
>
> *2. We understand that you are conferring with your team to provide us with an updated due diligence/conditions precedent checklist so that we can have everything ready to go for a closing as soon as the court enters the interim order. Our client will need to borrow under the interim facility literally the day or two after the hearing, which means by the end of next week.*"[24]

Mr. Battista also reminded Mr. Fine of the need to "*build in the concept of a valuation mechanism for purposes of reduction of the debt through the foreclosure or deeds in lieu.*"[25]

Two days later, on February 10, Mr. Battista advised Mr. Fine that Debtors were ready to file for Chapter 11 by February 11, 2010, and would need to receive the initial loan advance around February 19:

> "*Jeff, is it realistic that we can file tomorrow with due diligence sign off and revised loan agreement/ interim order* [from the bankruptcy court] *so that we can get to a closing end of next week?  I have the petition etc ready to go . . . .*"[26]

In the morning of February 11, Mr. Battista asked Mr. Fine to add "*the language per the commitment letter on a valuation mechanism in respect of the deeds in lieu of foreclosure under the waterfall.*"[27]  But, that afternoon, Mr. Lorio (PEPI's private investment analyst) emailed Mr.

---

[23] Fine Dep. Ex. 43 (email from Mr. Battista to Mr. Fine, February 5, 2010 at 6:36 pm).

[24] Fine Dep. Ex. 44 (email from Mr. Battista to Ms. Houk and Mr. Fine, February 8, 2010 at 2:24 pm).

[25] *Id.*

[26] Fine Dep. Ex. 45 (email from Mr. Battista to Mr. Fine, February 10, 2010 at 6:22 pm) (emphasis added).

[27] Radunsky Dep. Ex. 30 (email from Mr. Battista to Mr. Fine and Ms. Houk, February 11, 2010 at 10:07 am).

AA01690

DiNardo (Debtors' CFO) advising of PEPI's decision to remove the Escrow Provision and

valuation mechanism from the documents:

> ". . . [w]*e do not need these, and to get this moving and avoid complexity propose deleting this in* [sic] *the structure entirely.*"[28]

Later that day, Mr. DiNardo (for Debtors) expressed concern about PEPI's

proposed deviations from the Commitment Letter:

> "*A. The language to the Waterfall that has been set forth in the Commitment Letter has been diluted and is less clear. The language that is in the Commitment Letter works.*
>
> *B. The Deed in Lieu in escrow concept only works with respect to the unencumbered property because of valuation issues associated with the mortgage lenders' liens.*
>
> *C. You need a valuation method for the Waterfall. One acceptable method would be to get an updated appraisal by Integra at that time. Jeff Fine seemed to be okay with this solution – at least initially on the call.*"[29]

PEPI nevertheless removed the Escrow Provision from the next draft of the loan

documents. This draft also included a revised Section 10.4, which deleted the phased exercise of

all rights against the collateral and added:

> "*Lender shall use commercially reasonable efforts to effect a foreclosure sale of such assets in the order listed on Exhibit E and shall use commercially reasonable efforts not to effect such a foreclosure sale of any asset listed thereon until Lender's Lien on the asset listed prior to such asset has been foreclosed, provided, that **Lender shall not be prevented from commencing foreclosure proceedings against any asset listed on Exhibit E prior to the foreclosure sale of an asset listed prior thereto. As an example, Lender may file a foreclosure suit against all of the Real Property but would use commercially reasonable efforts to have foreclosure sales thereon occur in the order of the assets set forth on Exhibit E.***"[30]

---

[28] Lorio Dep. Ex. 17 (email from Mr. Lorio to Mr. DiNardo, February 11, 2010 at 5:02 pm).

[29] Lorio Dep. Ex. 18 (email from Mr. DiNardo to Mr. Lorio, February 11, 2010 at 6:10 pm).

[30] Doc. No. 103 at 160−61 (email from Ms. Helm to Mr. Desiderio and Mr. Fine, copying others, February 11, 2010 at 9:13 pm, with revised draft attached) (emphasis added). Fine Dep. 142:9-20; Lorio Dep. 112:11−15, 113:11−114: 15, 119:6−120:21.

AA01691

On February 15, Mr. Battista inquired of Mr. Fine: "*Jeff, we are getting really close* [to filing Chapter 11] . . . . *we need to know when we can get the due diligence sign off.*"[31] Later (at 11:41 p.m.), Mr. Battista asked Mr. Fine: "*Any word on the title due diligence or the budget sign off?*"[32] Attorney Battista also made the following proposal in an effort to buy time for the parties to resolve their dispute over the lien enforcement structure:[33]

> "*All, pursuant to our call on Friday morning, we have worked through the weekend to come up with a firm proposal on the foreclosure and valuation issue for the waterfall.*
>
> *First, in an effort to move things along, we are ok pursuing the interim order* [from the bankruptcy court] *without a resolution on this issue. Rather, we will rely on the 'commercially reasonable' language for the waterfall and argue to the court that the* [Pre-Petition Lenders] *do not need the valuation mechanism for the interim order.*
>
> [W]*e propose that the valuation/foreclosure be structured as follows: PEPI would (i) obtain a blind appraisal establishing the fair market value of any collateral as to which it initiates a foreclosure action prior to such action, (ii) not foreclose on any collateral (the 'Identified Property') if the value of the other collateral listed prior to such Identified Property in the waterfall list exceeds 150% of the outstanding amount owed to PEPI, and (iii) credit the Debtors against their outstanding obligations the fair market value of all collateral acquired by PEPI.*"[34]

PEPI did not agree to the proposed valuation structure.[35] The very next day, February 16, 2010, Mr. Lorio (for PEPI) advised Mr. DiNardo (for Debtor):

---

[31] Radunsky Dep. Ex. 28 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 7:07 pm).

[32] Radunsky Dep. Ex. 29 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 11:41pm).

[33] Lorio Dep. Ex. 21; Lorio Dep. 143:15−144:4; Fine Dep. 129:6−25.

[34] Lorio Dep. Ex. 21 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 11:23 am). The valuation mechanism for deeds in lieu would apply to real estate that was not subject to the mortgages of the Pre-Petition Lenders. The Debtors argued with PEPI that these provisions and the Waterfall Provision were needed to assure the Pre-Petition Lenders that their collateral was a last resort.

[35] Fine Dep. 130:10−131: 17.

AA01692

> "*We probably need to discuss the waterfall and where we are on that. I think* **there is not agreement right now on how we would work through collateral in a foreclosure process.**"[36]

Mr. Lorio sent Mr. DiNardo and Attorney Houk an email (at 5:28 pm) in which he requested a conference call "*to go over the suggested changes to*" the latest draft.[37]

The conference call took place in the evening of February 16. The parties discussed the Escrow Provision and the revised Waterfall Provision.[38] PEPI's representatives advised that PEPI would not agree to the valuation mechanism or add the Escrow Provision to the final loan documents.[39] In his deposition, Mr. Lorio (for PEPI) testified that PEPI's representatives advised that PEPI would not bind itself to the foreclosure valuation structure that Mr. Battista proposed in his February 15 email:

> "*A: ...Yes, we told him that was not − I − my recollection is, I believe, we conveyed to* [Mr. Battista] *that that was not acceptable but that there would be a mechanism that would be acceptable.*
> *Q: And in that February 16, 2010 conference call, did PEPI also state to Mr. Battista that the loan documents for the time being were not going to incorporate any language that effectuated the first "in addition" sentence* [from his February 15 email]*?*
> *A: I think we may have. I don't know if it was said exactly like that but I think we may have conveyed that understanding.*"[40]

PEPI's representatives also advised Debtors that it would not provide a written due diligence sign-off until the time came for making an advance under the DIP Loan, which could not occur until after the Chapter 11 cases were commenced and the bankruptcy court had

---

[36] Lorio Dep. Ex. 19 (email from Mr. Lorio to Mr. DiNardo, February 16, 2010 at 12:50 pm) (emphasis added).

[37] Lorio Dep. Ex. 22 (email from Mr. Lorio to Mr. DiNardo and Ms. Houk, February 16, 2010 at 5:28 pm).

[38] Fine Dep. 125:21−24, 135:14−24, 136:22−25, 137:1−4.

[39] Fine Dep. 132:17−133: 4; 135:14−137: 4.

[40] Fine Dep. 136: 18−139: 4.

AA01693

approved the borrowing.[41]  In his deposition, Mr. Lorio testified that Debtors were told that PEPI would not provide a written due diligence sign-off "*because due diligence is never completed until you close.*"[42]  Mr. Lorio went on to state that: "*I think we told them that we would not be signing a due diligence letter, but we would complete* [sic] *with our due diligence.*"[43]

In the morning of February 17, Mr. Battista advised Mr. Fine that Debtors were ready to file for Chapter 11:

> "*I also understand that there was another call last night on the loan agreement and that good progress was made.  I am also told another version is being circulated this morning reflecting the changes.  Assuming this is now complete, I think the only item remaining for us to be comfortable filing is your client's sign off on the due diligence, including related to the title issues.*
>
> *Please let me know as we are prepared to file today as soon as we have these last pieces together.*"[44]

Later that afternoon, Attorney Helm sent out the next draft of the loan agreement; neither the Escrow Provision nor a valuation mechanism were included.[45]  This draft again included the provision that would permit PEPI to obtain a single foreclosure of Debtors' interests in all of the mortgaged properties.[46]

Later on February 17, Mr. Battista complained to Mr. Fine that:

> "*There are several things in the commitment letter that were heavily negotiated, carefully chosen and agreed upon and yet have either changed or been eliminated in their entirety. . . .*"[47]

---

[41] Fine Dep. 135:14−24, 136:13−137:5; Fine Dep. Ex. 19; Lorio Dep. 149: 24−150:8; Radunsky Dep. 97:3−14.

[42] Lorio Dep. 149:9−11.

[43] Lorio Dep. 150:6−8.

[44] Doc. No. 105 at 8 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 8:22 am).

[45] Fine Dep.139:19−140:3; Lorio Dep. 155:8−15, 156:1−3; Radunsky Dep. 128:19−129:7, 129:21−25, 130:1−7; Lorio Dep. Ex. 23.

[46] Fine Dep. 141:12−142:20.

[47] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

AA01694

This complaint was in an email seeking revision of a provision obligating Debtors to pay a

$1 million "break up" fee in the event that PEPI withheld funding for any reason which would

force Debtors to seek funds from another lender:

> *"I am trying to address an issue that is a real issue and one that is sure to come up. If you are telling me that your client is unwilling to consider the issue and attempt to resolve and address it, which we think would be the reasonable thing to do, then please tell me that. I do not think there are any scenarios that I am concerned about. My sole concern is that your client refuses to fund after we get the final order for any reason (whether it is failure of title, failure of conditions etc etc) and we are able to get one of the other lenders to step up and fund notwithstanding the issue that prevented your client from funding, then it is pretty clear to us at least that no break up fee should be due and certainly not one at 25%."[48]*

The next day, February 18, Mr. Battista sent the following query to Mr. Fine: *"Any update? The*

*day is beginning to get away from us in terms of filing."[49]*

    The attorneys also continued to discuss another provision of the Commitment Letter,

referred to as the "***Purchase Option:***"[50]

> *"The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. **Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims** to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral*

---

[48] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

[49] Fine Aff. Composite Ex.3 (email from Mr. Battista to Mr. Fine, February 18, 2010 at 10:37 am).

[50] These emails are attached as composite exhibit 3 to Mr. Fine's affidavit.

AA01695

*and other supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan Documentation.*"[51]

The right to purchase the loan after a default was important to Mr. Ferrao, who was sensitive to PEPI being able to declare a default and then taking over the Debtors' assets − a strategy employed by some lenders that is referred to as a "loan-to-own."[52] The Debtors proposed deleting the grant of a general release, as required in the Commitment Letter, because of a concern that the bankruptcy court might not allow it, which could void the Purchase Option.[53] Attorney Houk (for Debtors) proposed the alternative of an agreement by the purchaser of the loan to indemnify PEPI, which obligation would be secured by a collateral assignment of all of the purchased loan documents and lien rights.[54]

The Court surmises that the difference between giving PEPI a general release and being indemnified was significant. If PEPI ever declared Debtors to be in default and refused to make further advances, Debtors would have the option, in the absence of the general release, of asserting lender liability claims against PEPI. The indemnification proposal would have left PEPI exposed to that risk and PEPI rejected it later that afternoon.[55]

In the evening of February 18, 2010, Mr. Ferrao decided to provide the DIP financing himself, through Gulf Bay, after meeting with his CFO, Mr. DiNardo. Mr. Ferrao decided to make the DIP Loan because: (1) Debtors had run out of money to meet payroll; (2) Debtors

---

[51] Blasnick Dep. Ex. 2 at 21 (emphasis added).

[52] Ferrao Dep. 143:3−144:11.

[53] Attorney Houk advised PEPI's attorney on Thursday, February 18, that "*there may be an issue with the Bankruptcy Court approving general releases executed by the Obligors.*"[53] Doc. No. 90, Composite Ex. 3 (email from Ms. Houk to Ms. Helm, Mr. Battista and Mr. Fine, February 18, 2010 at 2:58 pm).

[54] Doc. No. 90, Composite Ex. 3 (email from Ms. Houk to Ms. Helm, Mr. Battista and Mr. Fine, February 18, 2010, at 2:58 pm).

[55] Doc. No. 90, Composite Ex. 3 (email from Mr. Springfield to Tony DiNardo, February 18, 2010, at 4:35 pm).

AA01696

could not get the due diligence sign-off from PEPI and they could not file bankruptcy without a committed lender; and (3) there were unresolved issues with the waterfall.[56]

The parties had no further discussions on Friday, February 19, causing Mr. Springfield (an officer of PEPI's general partner) to ask Mr. DiNardo at 4:14 p.m.: "*What's up with the radio silence?*"  To which Mr. DiNardo replied, at 4:27 p.m.: "*We are conferring with counsel and will get back to you as soon as we can.*"[57]

On Saturday, February 20, Mr. Lorio (for PEPI) emailed Mr. DiNardo:

"*Tony, the dearth of communication at this stage is disconcerting to us.  I was hoping we had good lines of communication to address and resolve issues in manner that this loan could be approved and executed.  Can we set a time to have a call tomorrow* [Sunday] *to go through the issues you have or what other decisions you have made.*"

\*      \*      \*

"*KL Gates* [PEPI's lawyers] *and we have suspended all work on this loan.*"[58]

<u>The Default Letter</u>

The requested conference call did not occur.  Instead, on Monday, February 22, Mr. Battista sent the Default Letter to Mr. Fine, asserting that:

"*. . . PEPI has defaulted under the terms of the Commitment Letter for several reasons, including (i) the stated refusal by PEPI to provide Fiddlers with notice that PEPI has completed its due diligence in connection with the Loan, and (ii) the decision by PEPI to delete from the loan documents those certain critical provisions of the waterfall required by the Commitment Letter concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Loan in respect of the waterfall.  PEPI also materially modified the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure*

---

[56] Ferrao Dep. 41:10−42:9.

[57] Lorio Dep. Ex. 24.

[58] Lorio Dep. Ex. 25.

AA01697

> *judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sales process.*"

*       *       *

> "*Notwithstanding, during a phone conference call that took place during the early evening on Tuesday, February 16, 2010, representatives of PEPI for the first time unequivocally stated that PEPI would not be providing notice of the completion of its due diligence until, at the earliest, at the time of the closing of the Loan. As a result of such position, which is contrary to the provisions of the Commitment Letter and the clear understanding of the parties, Fiddlers was faced with the prospect of filing the chapter 11 cases without the benefit of knowing whether PEPI had completed its due diligence and therefore whether PEPI was prepared to make the Loan.*"[59]

The Debtors filed 28 Chapter 11 petitions the next day, February 23, beginning around noon.[60]

<u>PEPI's Response</u>

Later on February 23, Mr. Fine provided PEPI's response:

> "*Although PEPI has told you repeatedly during this past week that the* [Debtors] *are free to file Chapter 11 at any time, please consider this **your formal 3 business day notice** that due diligence has been completed.*"[61]

In paragraph 4, Mr. Fine stated that (i) "*. . . PEPI will certainly review your proposed provision*" dealing with the consent judgments and (ii) "*. . . even though PEPI does not require it, then PEPI will promptly review deed in lieu language and will negotiate the provisions of a valuation mechanism for deeds in lieu of foreclosure and will include them in the Loan documentation.*"[62]  And, in paragraph 5, Mr. Fine stated that PEPI "*will diligently review the*

---

[59] Blasnick Dep. Ex. 5.

[60] *See* Radunsky Dep. Ex. 33 (email from Mr. Battista to Mr. Fine, February 23, 2010 at 5:37 pm).

[61] Blasnick Dep. Ex. 6 at ¶ 3 (emphasis added).

[62] *Id.* at ¶ 4.

16

*wording of the waterfall provisions as you think are compatible with the terms of the Commitment Letter.*"[63]

<u>The Gulf Bay Loan</u>

Gulf Bay gave its $25 million commitment to the Debtors on February 23, 2010, the Chapter 11 petition date. Debtors filed an emergency motion the next day seeking approval of the loan (the "Gulf Bay Loan").[64]

The Gulf Bay Loan required first mortgages on several parcels that would be senior to those of the Pre-Petition Lenders.[65] The loan documents included a "waterfall" for the sequential liquidation and foreclosure of collateral.[66] The Gulf Bay Loan did not require either an escrow provision or a valuation mechanism.[67] The commitment fee was $500,000, compared to the $810,000 required by PEPI. The foreclosure process, in the event of default, permitted a single foreclosure judgment.[68] There was no need for a purchase option or any due diligence investigation.

On March 3, 2010, Mr. Ferrao appeared at the hearing on approval of the first Gulf Bay advance. He testified that he was not aware of anybody else who would make this type of loan on comparable or better terms.[69] When asked if Gulf Bay would be willing to withdraw if there was an alternative lender willing to make advances on the same terms, Mr. Ferrao answered

---

[63] Blasnick Dep. Ex. 6 at ¶ 5.

[64] Main Case, Doc. No. 10.

[65] Main Case, Doc. No. 10-1 at ¶ 8.

[66] *Id.* at ¶ 14.

[67] *Id.*

[68] *Id.*

[69] Blasnick Dep. Ex. 8 (Hearing Transcript, March 3, 2010, at 214-215).

AA01699

affirmatively – "*in a New York second.*"[70]   The Court approved the Gulf Bay Loan, by multiple

interim orders, premised on a showing of sufficient equity in the real estate to adequately protect

the Pre-Petition Lenders.

Some eighteen months later, the Debtors successfully reorganized by confirming Chapter

11 plans, facilitated by $45 million of exit financing from a third party.[71]   The outstanding

balance of the Gulf Bay Loan was fully repaid.   The Debtors' Chapter 11 plans were supported

by the CDD's, the Pre-Petition Lenders, general unsecured creditors, and the golf club members.

Among other things, the Debtors agreed to pay all allowed unsecured claims in full.   Thus, PEPI

will be entitled to $1.4 million if its claim is allowed.[72]

<u>ANALYSIS</u>

A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that no genuine issue of material

fact exists, and that it is entitled to judgment as a matter of law."[73]   "The moving party bears the

initial burden of demonstrating that no genuine issue of material fact exists.   A "genuine" dispute

means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."[74]   Once the moving party has met its burden, the non-movant must set forth specific facts

---

[70] Blasnick Dep. Ex. 8 (Hearing Transcript, March 3, 2010, at 214-215).

[71] Main Case, Doc. Nos. 1442 at 30 (Memorandum Opinion and Order Confirming the Debtors' Second Amended Plans of Reorganization as Modified) and 1279 (Notice of Filing Plan Supplement to the Second Amended Plan of Reorganization Filed on March 18, 2011).

[72] Main Case, Doc. Nos. 504-14 (Chapter 11 Plans of Reorganization), 515 (Consolidated Disclosure Statement), 661-72 (First Amended Chapter 11 Plans), 708 (Second Consolidated Disclosure Statement), 752 (Second Amended Consolidated Disclosure Statement), 754-64 (Second Amended Chapter 11 Plans), 1210-14, 1216-17 and 1238-39 (Modified Amended Chapter 11 Plans), 1442 (Memorandum Opinion and Order Confirming Chapter 11 Plans, as Modified), 1927-28 (Orders Dismissing Appeals of Confirmation Order, entered on April 25, 2012 by Judge Scriven).

[73]  Fed. R. Civ. P. 56(a) is made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056.

[74]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

18

showing there is a genuine issue for trial.[75]  "It is permissible for a trial court in a non-jury case to grant summary judgment if witness credibility is not at issue and trial would not enhance the court's ability to draw inferences and conclusions."[76]

For summary judgment, the non-moving party is given the benefit of the doubt on credibility issues and all justifiable inferences are to be drawn in favor of the non-moving party.[77]  The factual conflicts relied on by the non-moving party must be both genuine and material.[78]  A properly supported summary judgment motion will not be defeated by merely colorable evidence that is not significantly probative.[79]  In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[80]

As a preliminary matter in this proceeding, PEPI asserts that Debtors are not entitled to summary judgment because they did not claim any damages and did not produce any evidence

---

[75] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 10 S. Ct. 1348 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993).

[76] *In re French*, 2012 WL 1166248, *4 (M.D. Fla. Apr. 9, 2012); *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).  As the Fifth Circuit explained in *Nunez v. Superior Oil Company* (which is precedent in the Eleventh Circuit under *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981):

> "If a decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though the decision may depend upon inferences to be drawn from what has been incontrovertibly proved.  Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in [drawing a conclusion] even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.'  A trial on the merits would reveal no additional data . . . .  The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial."

572 F. 2d at 1124.

[77] *Official Comm. of Unsecured Creditors v. Lerner (In re Diagnostic Instrument Group, Inc.)*, 283 B.R. 87, 94 (Bankr. M.D. Fla. 2002).

[78] *Id.* (citing *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).

[79] *Dalton v. FMA Enterprises, Inc.*, 953 F. Supp. 1525, 1528 (M.D. Fla. 1997).

[80] *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

AA01701

that Debtors had performed all of their duties and obligations.[81] But partial summary judgment

on the issue of liability for breach of contract may be entered without addressing evidence on the

issue of damages.[82] The commentary to the 2010 Amendment of Rule 56(a) states that "[t]he

first sentence is added to make clear at the beginning that summary judgment may be requested

not only as to an entire case but also to a claim, defense, or part of a claim or defense." Thus,

Debtors may seek partial summary judgment on the issue of PEPI's breach.

B. Debtors' Motion for Partial Summary Judgment

The parties agree that obligations under a binding loan commitment are governed by

basic contract principles.[83] If a prospective lender breaches, for example, by conditioning the

loan closing on terms that differ from the loan commitment, the borrower may refuse to close.[84]

Likewise, a borrower may breach by refusing to close, based on a contrived dispute over the loan

terms.[85]

The Commitment Letter does not define any events of default and does not set out any

procedure for declaring a default or for providing any opportunity to cure.[86] In the absence of

---

[81] Doc. No. 100 at 12-13 (citing *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F.Supp. 2d 507, 520 (S.D.N.Y.2009)).

[82] *Servicios Especiales Al Comercio Exterior v. Johnson Controls*, Inc., 791 F. Supp. 2d 626 (E. D. Wis. 2011) (holding that Rule 56(a) makes summary judgment or partial summary judgment on parts of various claims permissible); *In re B & M Linen Corp.*, 2013 WL 3579340 (July 12, 2013 Bankr. S.D.N.Y. 2013) (granting motion for partial summary judgment on breach of asset purchase agreement without addressing issue of damages, which were not raised by movant in the motion for partial summary judgment).

[83] *See Freeman Horn, Inc. v. Trustmark Nat'l Bank*, 245 B.R. 820, 826 (S.D. Miss. 1999) (analyzing whether a letter constituted a binding loan commitment letter). *See also, Bluerack, Inc. v. Walter E. Heller & Co. of Florida*, 331 So. 2d 359, 360 (Fla. 3d DCA 1976) (finding loan commitment letters between commercial finance company and borrowers to constitute valid enforceable contracts).

[84] *See 999 v. CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985) (court found that the borrower was allowed to refuse financing from lender, and find a substitute lender, based on a lender's coercive actions to force borrower to accept a new, unjustified prepayment penalty term).

[85] *Teachers Insurance and Annuity Association of America v. Butler,* 626 F. Supp. 1229 (S.D.N.Y. 1986).

[86] *See generally,* Blasnick Dep. Ex. 2.

AA01702

express contract terms, Florida law requires that a party's nonperformance must go to the essence of the contract in order to constitute a "material" breach.[87]

1. <u>The Escrow and Waterfall Provisions</u>

The terms of the Commitment Letter were "heavily negotiated, carefully chosen and agreed upon."[88] The Commitment Letter obligated PEPI and the Debtors to work collaboratively to prepare documents for the DIP Loan that were substantially the same as those in the Commitment Letter. PEPI was charged with preparing the loan documents.

It is undisputed, however, that PEPI offered multiple drafts of the final loan documents (circulated on February 11, 12 and 17) that omitted the Escrow Provision and the valuation mechanism, even though each draft was preceded by Debtors' demands for incorporation of these provisions. As the time for Chapter 11 filings drew near, PEPI's posture of omitting these lien enforcement restrictions amounted to an unmistakable signal that those terms were never going to be in the final loan documents. The undisputed facts demonstrate that PEPI did fail, in the face of Debtors' impending need to file Chapter 11 petitions, to produce final loan documents that were substantially similar to the agreed terms of the Commitment Letter.[89]

Further, PEPI's revision of the Waterfall Provision materially deviated from the Commitment Letter's requirement of "no foreclosure" on any property without "first collecting" out of the property before it in the agreed sequence. The Waterfall Provision that PEPI included

---

[87] *MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F. 3d 833, 849 (11th Cir. 2013) (citing *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.2d 853, 857 (Fla. DCA 1972).

[88] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

[89] The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller,* 603 So.2d 1338, 1340 (Fla. 1st DCA 1992)).

AA01703

in the drafts, from February 11 on, was fundamentally different.[90]  PEPI provided that it could

seek a single foreclosure judgment against all of the mortgaged real estate, adhering to the

Waterfall sequence only as to sales.[91]

PEPI argues that it never "refused" to do anything, pointing to Mr. Fine's deposition

testimony that the parties were still negotiating and that the Escrow Provision would not be in the

draft "for the time being."[92]  PEPI maintains that the Debtors and PEPI were in on-going

negotiations between February 11, 2010, and February 17, 2010, and that there were no

demands, ultimatums, or refusals on behalf of PEPI to exclude the Escrow Provision from the

terms of the DIP Loan.

Initially, PEPI's effort to persuade Debtors' management to concede these lien

enforcement restrictions was not a breach.  But, as the Debtors' cash ran out and the time for

filing Chapter 11 drew near, any other borrower would have had little choice but to capitulate.

PEPI's repeated election to tender loan documents that omitted the Escrow Provisions

and a conforming version of the Waterfall Provision did not amount to continued negotiations, as

PEPI would have the Court find.  Rather, such conduct amounted to a refusal to faithfully abide

by its agreement to incorporate these into the final loan documents.[93]  With only days remaining

before the Chapter 11 filings, PEPI understood that the parties were not in agreement "on how

[to] work through collateral in a foreclosure process."[94]

---

[90] Doc. No. 103 at 160-61 (email from Ms. Helm to Mr. Desiderio and Mr. Fine, copying others, February 11, 2010 at 9:13 pm, with revised draft attached).

[91] *Id.*

[92] Fine Depo. 136:13−137: 4.

[93] Doc. No. 102 at 23.

[94] Lorio Dep. Ex. 19 (email from Mr. Lorio to Mr. DiNardo, February 16, 2010 at 12:50 pm).

AA01704

Debtors' counsel attempted to work around this dispute by offering to include only a framework in the bankruptcy court's initial order that would approve the first advance, leaving resolution to a later date. But, PEPI declined to agree to the proposed valuation mechanism or to revise the Waterfall Provision in a matter consistent with the Commitment Letter.

PEPI was also aware, as shown by Mr. Fine's response to the Default Letter, that the parenthetical phrase in the Commitment Letter's expiration provision was a "formal" three-day notice that PEPI had completed its due diligence investigation. This formal due diligence sign-off would have set a firm date by which Debtors would have to file for Chapter 11 to preserve the loan commitment. It would also have established a firm date by which PEPI would have had to tender final loan documents conforming to the Commitment Letter. Withholding the three-day trigger increased PEPI's leverage by keeping the negotiations open-ended, even as the Debtors were running out of time to file for Chapter 11. Such conduct, reinforced by PEPI's positions stated in the February 16 conference call, constituted PEPI's failure to perform its obligations regarding the Escrow and Waterfall Provisions.[95] PEPI's non-performance went to essential provisions of the contract.

PEPI advances four arguments to justify omitting the Escrow Provision and altering the Waterfall Provision. The Court finds none of these arguments persuasive.

---

[95] *See, e.g., 999 v. CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985), where the Ninth Circuit upheld the jury's verdict for the borrower, concluding that the lender's addition of a term for a prepayment penalty was not inconsequential and it was "more than reasonable for [borrower] to refuse financing from [the lender] that was subject to the new unjustified condition, and instead seek to mitigate damages by finding replacement financing:"

> "There was sufficient evidence from which to draw an inference that [the lender's agents] willfully misrepresented to [the borrower] that financing would be provided without a prepayment penalty, and acted oppressively to force [borrower] to submit to a new and onerous term. Although the jury concluded otherwise, there was evidence, for example, that [the lender] later took advantage of [borrower's] desperate need for financing to coerce [borrower] into accepting a new prepayment penalty term."

*Id.* at 873.

AA01705

PEPI first asserts that the Escrow Provision was not material because it was a "lender benefit" which it did not need and, therefore, had the right to abandon.[96]  The combined effect of the Escrow Provision, the related valuation mechanism, and the sequential foreclosure process required by the Waterfall Provision, however, would have been a significant restriction on PEPI's lien enforcement remedies.  When taken together, these provisions would have forced PEPI to accept parcels of real estate in the order of the Waterfall as actual payment (per agreed valuations) for outstanding debt (sometimes called "dirt for debt") in the event of default.[97]  No lender would like to have its remedies restricted in this way.

PEPI acknowledges that the waterfall concept was "demanded" by the Debtors and that such concept was "significant and unusual."[98]  PEPI had agreed to these restrictions when it signed the Commitment Letter.  These provisions were not solely for the benefit of PEPI who was not free to unilaterally remove or alter them.[99]

Second, PEPI contends that performance of the Escrow Provision was barred by Florida law.[100]  But, this assertion is much too broad.  One example to the contrary is *Ringling Joint Venture II v. Huntington National Bank,*[101] where the Second District Court of Appeals approved the escrow of foreclosure consent judgments.  The borrower was sophisticated and bargained for

---

[96] Doc. No. 100 at 13-14.

[97] According to the Debtors, the valuation mechanism was also for the benefit of the junior secured lenders, because it provided for the reduction of the priming loan first from property not encumbered by their mortgages.  Doc. No. 102 at 36-37.

[98] Doc. No. 100 at 5 (citing Fine Aff. at ¶ 10).

[99] *Id.* at 17.

[100] *Id.* at 15-16 (citing *Cain & Bultman, Inc. v. Miss Sam, Inc.*, 409 So. 2d 114 (Fla. 5th DCA); *Mid-State Investment Corp. v. O'Steen*, 133 So. 2d 455 (Fla. 1st DCA 1961); *Kirkland v. Miller*, 702 So. 2d 620 (Fla. 5th DCA 1999); *Hawke v. Broward National Bank of Fort Lauderdale*, 220 So. 2d 678 (Fla. 4th DCA 1969); *Matter of Caniglia*, 17 B.R. 858 (Bankr. M.D. Fla. 1982).

[101] 595 So.2d 180, 182-83 (Fla. 2d DCA 1992).

AA01706

the escrowing of deeds in lieu. When a default did occur, the borrower sought to invalidate the deed that had been released from escrow. The court emphasized that "all parties were represented by counsel, the agreement arose from a pending foreclosure action, and the transaction involves commercial real estate rather than residential property."[102] The court concluded that:

> "[t]he doctrine against clogging the right of redemption is not an absolute right. The courts have recognized that this doctrine of equity does not apply if the right is relinquished by 'a subsequent agreement upon a further consideration.'"[103]

In their Chapter 11 cases, the Debtors' relationship with PEPI would have been governed by this Court. If PEPI had concerns at the time that the escrow of deeds in lieu would be unenforceable, it could have incorporated (or offered to incorporate) the Escrow Provision into the loan documents with appropriate qualifying language, such as "subject to entry of an order by the Bankruptcy Court barring Debtors from contesting the validity of any deeds released from escrow," or some variation thereof.

The record shows no instance of this concern being raised by PEPI before the Default Letter was sent. The Debtors had no opportunity to address it. Rather than working through what concerns it may have had regarding the escrow of consent judgments, PEPI unilaterally and repeatedly refused to include such provisions in the loan documents.[104]

Third, PEPI contends that its revision of the Waterfall Provision was justified because a single foreclosure was required by Florida law − that multiple, sequential foreclosures would be prohibited by doctrines of merger, estoppel or res judicata.[105] Even where a mortgage is secured

---

[102] *Ringling*, 595 So.2d at 182.

[103] *Id.* (quoting *Stovall v. Stokes*, 94 Fla. 717, 741, 115 So. 828, 837 (1928).

[104] Doc. No. 102 at 33.

[105] Doc. No. 100 at 35.

AA01707

by multiple properties, foreclosure of one will not bar later foreclosure of the other, except where the value of the land foreclosed in the first is sufficient to satisfy the debt.[106] Further, the parcels in the waterfall were owned by several entities, which would have required multiple mortgages anyway.[107]

The record shows no instance where these legal issues were raised by PEPI before the Default Letter was sent. The parties could have agreed, for example, to (a) make the sequential foreclosures subject to findings by the bankruptcy court that the Waterfall Provision was consistent with Florida law or (b) subject to the entry of one or more orders by the bankruptcy court modifying the automatic stay in phases, to permit parcel-by-parcel foreclosures as needed to pay off the loan balance after a default. But, Debtors did not have the opportunity to propose methods to address these concerns.

Finally, PEPI contends that Debtors waived, or are equitably estopped from alleging, any default. There is no evidence, however, of any express waiver by the Debtors. Mr. Battista's comment in his February 17 email about the due diligence sign-off being the "only item remaining for us to be comfortable about filing," is not an express waiver. In fact, he complained about PEPI's failure to provide conforming documents in another email later that day.[108] Furthermore, the Default Letter was sent only four business days after the February 16 conference call. Waiver generally does not arise merely from forbearance for a reasonable time.[109]

---

[106] Doc. No. 102 at 35 (citing *Prudence Co. v. Garvin*, 160 So. 7, 8 (Fla. 1935); *Waybright v. Turner*, 176 So. 424, 428 (Fla. 1937), *aff'd on rehearing*, 179 So. 412, 413-14 (Fla. 1938)).

[107] *Id.* at 34.

[108] *See* footnote 47, *supra*, and accompanying text.

[109] *See In re: B.J. Thomas, Inc.*, 45 B.R. 91, 95-96 (Bankr. M.D. Fla. 1984). S*ee also, e.g., Sundale, Ltd. v. Fla. Assoc. Capital Enter. Inc.*, No. 11-20635-CIV, 2012 WL 488110 at *9 (S.D. Fla. Feb. 14, 2012) (no waiver found

AA01708

PEPI maintains that Debtors are estopped because they continued to negotiate the Purchase Option after the February 16 conference call.  Although conduct may imply the intentional or voluntary relinquishment of a known right, such conduct must do so unequivocally.[110]  The continued discussions regarding the Purchase Option do not unequivocally demonstrate that the Debtors were willing to concede PEPI's removal of the Escrow Provision and its revision of the Waterfall.  There is nothing in the record to indicate that Debtors would have conceded the Escrow Provision and Waterfall language if PEPI had agreed to concede the general release and agree to the indemnification structure.

Debtors maintain that Mr. DiNardo actually was conferring with counsel.  This disputed issue of fact is not decisive, however.  PEPI did not change its position, nor was it misled to its prejudice by Debtors' actions after February 16.  Even if Mr. DiNardo's email is construed as untrue, PEPI was not misled.  It ceased work on the DIP Loan less than 24 hours later and conceded no substantive issues.  No substantial additional due diligence would have been necessary between February 16 and February 20.[111]  Debtors had paid PEPI's expenses.

The cases cited by PEPI are not applicable to this dispute.  Debtors here obtained nothing close to the benefits of the parties who were estopped from alleging a breach in those cases.[112]  Accordingly, PEPI's defense of equitable estoppel fails.[113]

---

based upon two and a half-year delay); *Kirschner v. Baldwin*, 988 So. 2d 1138, 1142 (Fla. 5th DCA 2008) (five-month delay insufficient to find implied waiver); *see also Air Prods. & Chem., Inc. v. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir. 1989) (applying Florida law in holding no clear waiver shown after five-year delay); *see also Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So. 2d 997 (Fla. 4th DCA 1981) (no waiver found after almost three-year delay).  Rather, an implied waiver requires conduct or a representation demonstrating an intent to relinquish a known right.

[110] *MDS*, 720 F.3d at 852 (internal citations omitted).

[111] In his affidavit, Mr. Fine states that PEPI verbally advised Debtors, before and during the February 16 conference call, that its due diligence had already been completed − that Debtors could go ahead and file.  Fine Aff. at ¶ 26(iv).

[112] In *Acosta v. District Board of Trustees of Miami-Dade Community College*, the court found that a student, who had satisfied all course requirements, paid a tuition increase, and graduated, was estopped from later declaring a

AA01709

Based on the undisputed facts in the record, the Court concludes that:

1.  Each of the parties was bound, per the explicit language of the Commitment Letter, to create and agree to final DIP Loan documents that "shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein."[114]

2.  The Commitment Letter obligated PEPI to incorporate into the DIP Loan documents the negotiated terms for the Escrow Provision, the related valuation mechanism, and the Waterfall Provision barring foreclosure against any property unless the lender had "first collect[ed]" from the prior properties on the list.

3.  Debtors' attorney offered a procedure to defer resolution of the parties' disagreement regarding post-default lien enforcement until after the bankruptcy court's first interim approval, but PEPI did not agree with the "valuation/foreclosure" structure proposed by Debtors' counsel. PEPI offered no alternative. Debtors never agreed to abandon the Escrow Provision, the related valuation mechanism, or the Waterfall Provision, as set forth in the Commitment Letter.

4.  The Escrow Provision, the related valuation mechanism, and the Waterfall Provision were not solely for PEPI's benefit. Taken together, they represented a significant limitation on lien enforcement rights which was significant to Debtors and the Pre-Petition Lenders. PEPI was not free to unilaterally discard or alter these provisions.

5.  PEPI was advised multiple times, between February 10 and 17, of Debtors' imminent need to file their Chapter 11 petitions; but, PEPI repeatedly declined to incorporate the lien enforcement procedures to which it had agreed in the Commitment Letter.

6.  As of February 16, 2010, the parties were not in agreement on how to work through the collateral after default, which was not resolved by the conference call or by the revised loan documents sent out by PEPI on February 17, 2010.

7.  PEPI knew that Debtors had an urgent need for Chapter 11 relief. PEPI also knew that Debtors were waiting on the final loan documents before they filed. It is evident that PEPI's stance put Debtors, in the absence of the owner financing they utilized, in

---

breach of contract that included an agreement not to increase tuition. 905 So. 2d 226, 228-29 (Fla. 3d DCA 2005). Similarly, in *Pretka v. Kolter City Plaza II, Inc.*, the court granted summary judgment on the defendant's equitable estoppel defense because the plaintiff waited at least three years to assert the breach of contract, continued to perform under the contract, negotiated new terms and made additional deposit payments, all of which the defendant relied upon in completing performance of the contract. 2013 WL 1192378 at *4-5 (S.D. Fla. Mar. 22, 2013).

[113] "Equitable estoppel requires that: (1) the party against whom estoppel is sought made a representation about a material fact that is contrary to a position it later asserts, and (2) the party seeking estoppel detrimentally relied on that representation." *MDS*, 720 F.3d at 852.

[114] Blasnick Dep. Ex. 2 at 4.

the position of having to agree to PEPI's removal of the Escrow Provision and revised Waterfall procedure.

8. Once the parties were at impasse on how to work through the collateral after a default, and with time running out to file Chapter 11 petitions, Debtors were justified in declaring defaults regarding the Escrow and Waterfall Provisions and terminating negotiations.

9. The defenses asserted by PEPI regarding its repeated failure to include the Escrow Provision, and its alteration of the Waterfall Provision, are not persuasive.

2. The Due Diligence Sign-Off

Debtors repeatedly requested a "written due diligence sign-off" from PEPI before filing their Chapter 11 petitions.[115]  These requests were based on the parenthetical phrase in the Commitment Letter "(or such earlier date [after February 8] that is three business days after [PEPI] has advised [Debtors] it has completed its due diligence)."  According to the deposition testimony, PEPI understood that Debtors needed to know, before commencing their Chapter 11 cases, that PEPI had no open due diligence issues.[116]  It is also undisputed that during the February 16 conference call, PEPI advised Debtors that it would not provide a written due diligence confirmation even though its due diligence investigation was substantially complete.[117] It is undisputed that no such written notice was given until February 23, by Mr. Fine, after the Default Letter had been sent and the Chapter 11 petitions had been filed.

PEPI argues that the Commitment Letter did not expressly require a written due diligence sign-off before the Chapter 11 filings.  PEPI maintains that notification of completion of due diligence was a "condition precedent" to actual funding, which would only occur subsequent to the commencement of the Chapter 11 case.

---

[115] Lorio Dep. 91:2−14, 93:5−12, 94:7−13; Radunsky Dep. 103:10−104:25; Radunsky Dep. Exs. 28 and 29; Fine Dep. 95:1−18, 96:11−97:1, 99:1−9, 100:7−20; Fine Dep. Exs. 43−45.

[116] Blasnick Dep. 30:20−31:9; Fine Dep. 95:15−18; Radunsky Dep. 83:20−30.

[117] Lorio Dep. 149:24−150:8; Fine Aff. at ¶ 26(iv).

AA01711

The Court views Mr. Fine's response to the Default Letter – "your formal three business day notice that due diligence has been completed…" – as an admission that such notice was for the benefit of the Debtors, as well as PEPI.  Mr. Fine's response to the Default Letter also demonstrates that PEPI understood that such notice was an obligation arising from the Commitment Letter.  PEPI's understanding of this obligation is further evidenced by the deposition testimony of Mr. Radunsky, PEPI's Chief Operating Officer and general counsel:

> Q.      Could the commitment terminate on February 8th, 2010, given the parenthetical that follows the February 2010 date?
>
> A.       I think if you read this in the following way it could and that would be on February 1st, if PEPI had given notice it had completed due diligence under this paragraph – had given that notice, and then by February 8th there wasn't a bankruptcy filing, then it would have terminated, I think.[118]
>
> Q.      Well, the reason I'm asking you that question is the only way the commitment could terminate on February 8, 2010 is if PEPI had given prior notice of completion of its due diligence, right?
>
> A.       **I think that's right. That's how I'm reading it now.**[119]

PEPI's position is also contrary to the language and purpose of the Commitment Letter.  Even though the parenthetical phrase was placed within the "conditions precedent" section, the phrase itself called for a bankruptcy filing deadline, to be triggered by the written notice indicating that PEPI was ready to proceed with the DIP Loan.  A written and dated notice was essential to establishing the expiration of PEPI's funding obligation – three business days after the notice was given.

From early in the process, the Debtors advised PEPI of the need for the written sign-off, as assurance that the DIP Loan was ready to go, before the Chapter 11 filings.  As noted above,

---

[118] Radunsky Dep. 85:6−14.

[119] Radunsky Dep. 86:6−15 (emphasis added).

AA01712

PEPI's on-going delay in giving the formal notice – even though its due diligence was satisfied – facilitated PEPI's withholding the lien enforcement restrictions without being subject to any deadline to restore them. Thus, PEPI's advice on February 16 that it would not give this notice deprived the Debtors of a material element of performance.

PEPI's unequivocal refusal to provide the written confirmation that its due diligence was completed was a prospective breach of contract, releasing Debtors from any further obligations under the Commitment Letter. [120] Therefore, the Debtors were justified in concluding, after the February 16 conference call, that it would not get the assurance of a ready lender to which it was entitled under the Commitment Letter.

PEPI argues that to establish the non-defaulting party's entitlement to damages, the non-breaching party must establish its ability to perform at the time of the breach.[121] In this instance, the Debtors' performance, had the formal three-day notice been given, was only the voluntary election to file, or not file, for Chapter 11 by the third business day. The record fully supports the conclusion that the Debtors were ready to file for Chapter 11 after February 16; but, the parties never came to an agreement on provisions for working through the collateral in a default scenario. Therefore, the Court concludes that PEPI effectively repudiated its obligation to confirm the completion of due diligence prior to the Debtors' Chapter 11 filings.

---

[120] Doc. No. 102 at 44 (citing *Mori v. Matsushita Elec. Corp. of Am.*, 380 So.2d 461, 463 (Fla. 3d DCA 1980) ("A prospective breach of the contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute.")).

[121] *Ryan v. Landsource Holding Co., LLC*, 127 So. 3d 764, 767-68 (Fla. Dist. Ct. App. 2013) (internal citations omitted).

AA01713

## C. PEPI's Motion for Partial Summary Judgment

PEPI denies that it unequivocally refused to do anything, but that it was still "chasing the deal" when, without warning, it received the Default Letter.[122]  PEPI requests partial summary judgment on Counts I (Breach of Contract) and III (Breach of the Covenant of Good Faith and Fair Dealing), arguing that it was Debtors who breached first by: (1) insisting on a new term – the written due diligence sign-off – as a condition precedent for the Debtors to file their Chapter 11 petitions; (2) failing to negotiate in good faith and obtaining a loan from another lender; (3) failing to provide PEPI with notice of the alleged default or opportunity to cure; and (4) negotiating with Gulf Bay in violation of the "non-disclosure" provisions of the Commitment Letter.[123]

### 1. Written Due Diligence Sign-Off

PEPI argues that Debtors breached the Commitment Letter by insisting on a new term – the written due diligence sign-off – as a condition precedent for the Debtors to file their Chapter 11 petitions.  PEPI takes the position that the written due diligence sign-off was simply a condition precedent to funding, and that PEPI was not obligated under the Commitment Letter to provide a written due diligence sign-off prior to the Debtors filing for bankruptcy relief.

But, the written due diligence sign-off, which triggered the three business days Debtors had to file their bankruptcy petitions and extend PEPI's obligation to fund by another 90 days, was not Debtors' contrivance; it was in the Commitment Letter.  The Commitment Letter's expiration provisions only make sense with a prior written notice of due diligence completion, as the Court has determined above.  That Debtors raised the issue early in the process was not a

---

[122] Doc. No. 100 at 13-14.

[123] *Id.* at 22; Doc. No. 106.

AA01714

breach; it was a legitimate document-based position.  Lastly, Debtors' repeated requests for a written due diligence sign-off bears no resemblance to a coercive tactic.  For these reasons, the Court rejects PEPI's contention.

   2.  <u>Duty to Negotiate in Good Faith and Fair Dealing</u>

   PEPI asserts that Debtors' allegations of default were contrived as a "pretext" to give the deal to Gulf Bay, while avoiding the additional payments that would otherwise be due to PEPI following a termination of the transaction.  PEPI even suggests that the Debtors always intended to borrow from Mr. Ferrao, but needed a "failed" deal, with PEPI as the "foil," to argue in bankruptcy court that there was no alternative to the Gulf Bay Loan.

   PEPI points to three items in the record in support of its position:

   a)  Mr. Fine's affidavit, in which he states that just prior to declaring default, "it appeared that the Debtors were reluctant to comply with the obligations of obtaining a release in favor of PEPI" as a condition of the Purchase Option;[124]

   b)  the deposition testimony of Mr. Ferrao stating that he had considered making the loan himself, from "early in the process;"[125] and

   c)  an excerpt from an email from Mr. Ferrao to Mr. Battista, on February 11, 2010: *"(2)* [J]*ane* [Houk] *knows what we need..i need to be able to purchase unequivocally."*

   PEPI's contrived "default" theory is based primarily on Mr. Fine's supposition that the Debtors "appeared" to be "reluctant" to comply with the release provision of the Purchase Option.  But that is opinion, not a statement of fact.  The deposition testimony of both Mr. Ferrao and Mr. DiNardo was that Debtors were willing to give up on the indemnification proposal.[126]

---

[124] Fine Aff. at ¶ 6.

[125] Ferrao Dep. 30:2−16.

[126] Ferrao Dep. 44:2−11; DiNardo Dep. 55:2−21.

AA01715

The Debtors have demonstrated a genuine dispute regarding the fact issues. The deposition testimony raises doubt that the excerpt in the February 11 email was even about Mr. Ferrao being the lender or about the release. The full email thread related to the excerpt, shows that the two points made by Mr. DiNardo related to (i) the trigger mechanism of the Purchase Option that needed to be added to make sure Mr. Ferrao had the right to exercise the option if he so desired, and (ii) a notice provision that would need to be added to make sure Mr. Ferrao had notice of the commencement of the 30-day window to exercise the purchase option if he so desired.[127]

According to Debtors, the discussions about the general release did not take place until a week after the email excerpt was generated, only when Debtors' attorney raised a concern over the ability of the Debtors to obtain bankruptcy court approval of the release.[128]  Also, it appears that Debtors would have accepted incorporation of the general release in the Purchase Option because Mr. Ferrao had other alternatives to preserve his equity in the project,[129] such as loaning money to the Debtors or an equity infusion to enable the Debtors to pay off the loan.[130]

Nevertheless, the Court concludes that there is no need to try these disputed factual issues.  PEPI cannot prove its assertion that the Debtors contrived the alleged defaults because of the Purchase Option dispute (or any other reason) because PEPI never tendered loan documents that conformed to the Escrow and Waterfall Provisions.  As this Court has concluded above, there was sufficient cause for the Debtors to declare the defaults and find another funding source.

---

[127] Doc. No. 113, Ex. B.

[128] Doc. No. 113 at 4; Fine Aff. at ¶19, Composite Ex. 4.

[129] Ferrao Dep. 44:2−11; DiNardo Dep. 55:2−21.

[130] Doc. No. 113 at 5 (citing DiNardo Dep. 224:24−225:2).  Mr. DiNardo testified that "[the general release] *was not a line in the sand for us. It was negotiated in the commitment letter. We accepted in the commitment letter. We accepted it now.*"  Ferrao Dep. 224:24−225:2.

AA01716

PEPI still defaulted under the Commitment Letter related to the Escrow Provisions, the Waterfall Provision and the Due Diligence Sign-Off.

PEPI compares the Debtors to the borrower in *Teachers Insurance and Annuity Association of America v. Butler*,[131] who was held to be in breach because it refused to close unless the lender (Teachers) agreed to remove a prepayment penalty provision which had not been mentioned in the loan commitment.[132] The lender alleged that the borrower's objection to the prepayment provision was simply a pretext for its unwillingness to go through with the loan because, as the evidence showed, the borrower could obtain a more favorable loan from other lenders. The court found that the lender's inclusion of the new prepayment penalty was consistent with industry practice and that the borrower, who had waited nine months before raising any objection to the provision, had not negotiated in good faith. Thus, its refusal to close, after refusing to negotiate the terms of the prepayment penalty, constituted a breach of the commitment letter.[133]

The Debtors here have not conducted themselves in any way like the borrower in *Teachers*. There is no evidence that Debtors were "shopping" the loan to other lenders. Debtors did not sit back and withhold their concern for nine months. Here, the Debtors expended months of effort and paid nearly $1 million to PEPI, and an unstated amount of their own professional expenses. The decisive fact that distinguishes this case from *Teachers* is that PEPI never

---

[131] 626 F. Supp. 1229 (S.D.N.Y. 1986).

[132] *Id.* at 1230-31.

[133] *Id*. at 1236 ("When they were unable to persuade Teachers to lower the interest rate agreed to in September 1982 and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an eleventh hour comparison of the closing documents to the Commitment Letter to come up with an ostensible reason for not going forward with the loan. Defendants breached the Commitment Letter and are obligated to Teachers for its damages.")

tendered loan documents that were in conformity with the lien enforcement restrictions of the Commitment Letter.

    3.  <u>Notice of Default and Opportunity to Cure</u>

PEPI argues that Debtors never gave PEPI notice of its alleged default, nor an opportunity to cure. The Commitment Letter is silent, however, as to such requirement. The course of dealing between the parties does not justify implying such requirement. The undisputed facts, summarized above, establish that Debtors repeatedly advised PEPI that removal of the Escrow Provision and revision of the Waterfall Provision were unacceptable. They declared PEPI in default within five days of determining that PEPI would not honor these material terms of the Commitment Letter. The Court will not read such a provision into the contract.[134]

Even after receipt of the Default Letter, even if it were construed as a notice of default, PEPI was still unwilling to agree to incorporate the Escrow and Waterfall Provisions as required by the Commitment Letter. PEPI was then only willing to agree to consider Debtors' proposed language and resume negotiations.

    4. <u>"Truthful" and Non-Disclosure Provisions</u>

PEPI asserts that Debtors breached the "truthful" and "non-disclosure" provisions of the Commitment Letter[135] by disclosing the Commitment Letter and loan documents to Gulf Bay. PEPI cites to deposition testimony given by Mr. DiNardo, where he states that an email from

---

[134] The cases cited by PEPI in support of such an argument are inapplicable to the case at hand. Those cases deal with at-will employment and service agreements for an indefinite duration. Doc. No. 102 at 42 (citing, *e.g.*, *Leghorn v. Wieland*, 289 So. 3d 745, 748 (Fla. 2d DCA 1974); *Shell Oil Co. v. A.Z. Services, Inc.*, 990 F. Supp. 1406, 1415 (S.D. Fla. 1997).

[135] The Commitment Letter provides that: "Except as required by applicable law, this Commitment and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI."

AA01718

Gulf Bay to Mr. Battista regarding the comparison of the Gulf Bay Loan to the PEPI loan suggests that the Gulf Bay loan was based on the versions prepared with regard to PEPI.[136]

As Debtors' owner, Mr. Ferrao rightfully had on-going and intimate knowledge of the PEPI loan transaction. Mr. Ferrao also always had the right, as owner, to fund his companies during a Chapter 11. The deposition testimony supports the Debtors' position that Mr. Ferrao decided to be the lender only after the time for filing had come, and the parties could not reach an agreement on how to work through collateral in a default. It cannot be doubted that Debtors' legal team was fully capable of producing satisfactory documents for the Gulf Bay Loan without ever having gone through the months of negotiations with PEPI.

### 5. Breach of Implied Covenant of Good Faith

An implied covenant of good faith and fair dealing is a part of every contract.[137] "[A] party's good-faith cooperation is an implied condition precedent to performance of a contract; where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing himself of his own wrong doing."[138] The implied covenant of good faith and fair dealing is not an independent contract term.[139] Rather, it is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*.[140] Florida courts have refused to allow a cause of action for breach of the implied covenant of good faith and fair dealing in two circumstances. First, where the party

---

[136] DiNardo Dep., Tr. II, 7:23−10:25, 18:7−19:7.

[137] *County of Brevard v. Miorelli Eng'g, Inc.,* 703 So.2d 1049, 1050 (Fla.1997).

[138] *Bowers v. Medina,* 418 So.2d 1068, 1069 (Fla. Dist. Ct. App. 1982).

[139] *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999).

[140] *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414 (11th Cir.1990) (applying Georgia law) (citations omitted).

AA01719

alleged to have breached the implied covenant has in good faith performed all of the express contractual provisions.[141]  Second, where the implied duty of good faith alleged to have been breached would vary the express terms of the contract.[142]  The covenant may not be enforced without the breach of an express term of the written contract.[143]  PEPI has not identified any express term of the contract which the Debtors breached and, therefore, may not argue a breach of the implied covenant of good faith and fair dealing.[144]

The record does not support PEPI's portrayal of Debtors as the saboteurs of the deal. Debtors' management and lawyers spent months of effort negotiating the Commitment Letter and to obtain final DIP Loan documents.  The email exchanges demonstrate an intense and sincere effort by Debtors' management and lawyers to get to agreed forms of the DIP Loan documents.  They responded to PEPI's due diligence needs, advised of their dissatisfaction regarding the Escrow and Waterfall Provisions and the due diligence sign-off, and made proposals to resolve these disputes.  Debtors and their professionals acted in good faith in the negotiations of the Escrow Provision, Waterfall Provision, and Purchase Option.

For these reasons, the Court cannot conclude that Debtors breached the implied covenant of good faith and fair dealing.

## CONCLUSION

For the reasons stated above, the Court finds that PEPI defaulted under the Commitment Letter by: (1) failing to include the Escrow Provision and related valuation mechanism in its

---

[141] *Burger King,* 169 F.3d at 1316-17 (internal citations omitted).

[142] *Id.*

[143]  Doc. No. 102 at 41 (citing *Meruelo v. Mark Andrew of the Palm Beaches, Ltd.*, 12 So.3d 247, 250-51 (Fla. 4th DCA 2009)).

[144]  *Id.* at 41-42 (citing *Flagship Resort Dev. V. Interval Intern., Inc.*, 28 So.3d 915, 924 (Fla. 3d DCA 2010)).

AA01720

multiple drafts of the loan documents; (2) offering a material revision of the Waterfall Provision in those drafts; and (3) refusing to provide a written due diligence sign-off prior to before the Debtors had to file for Chapter 11.  PEPI breached the terms of the Commitment Letter when it advised, in the February 16 conference call, that it would not incorporate the required Escrow and Waterfall provisions into the final DIP Loan documents.  PEPI also anticipatorily breached its obligations under the Commitment Letter by stating its refusal to provide a written due diligence sign-off prior to the Chapter 11 filings.    As a result of PEPI's breach, the Debtors were relieved of any further performance under the Commitment Letter.

Additionally, the Court finds that PEPI's Motion for Summary Judgment should be denied because the evidence in the court record shows that PEPI is unable to prove that Debtors contrived defaults as a pretext to give the deal to Gulf Bay while avoiding the additional payments that would otherwise be due under the Commitment Letter.  Rather, the record supports the finding that the defaults alleged by Debtors were both real and material.

Accordingly, it is—

**ORDERED** that:

1.      The Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. No. 84) is granted as to Counts I and II of the Complaint.

2.      PEPI's Motion for Partial Summary Judgement and Incorporated Memorandum of Law (Doc. No. 106) is denied as to Counts I and III of the Complaint.

3.      Debtors are relieved from all payment obligations under the Commitment Letter.

4.      PEPI shall turn over to the Debtors $405,000, representing one-half of the commitment fee, within 30 days of the date of entry of this memorandum opinion.

5.      All 28 claims filed by PEPI in the Debtors' jointly administered bankruptcy cases

AA01721

are disallowed in their entirety.

6.    The Court reserves jurisdiction to consider additional damages, attorney's fees, and taxable costs, if any.

7.    The Court will hold a pre-trial conference on June 1, 2017 at 1:30 p.m. at the United States Bankruptcy Court, 801 North Florida Avenue, Courtroom 9B, Tampa, Florida, 33602, to determine if any issues remain to be tried and what further actions need to be taken on the issues of damages, attorney's fees, and costs in light of this Court's ruling.

Clerk's Office to serve.

AA01722

ORDERED.

**Dated:  May 10, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

FIDDLER'S CREEK, LLC, ET AL.,                    Case No. 8:10-bk-03846-KRM
                                                 Chapter 11
        Debtors.
_____/

FIDDLER'S CREEK, LLC, ET AL.,

        Plaintiffs/Counter-Defendants,

v.                                               Adv. No. 8:11-ap-0809-KRM

PEPI CAPITAL, L.P.,

        Defendant/Counter-Plaintiff and
        Third-Party Plaintiff.
_____/

## PARTIAL FINAL JUDGMENT

On May 10, 2017, the Court entered its Memorandum Opinion on Cross Motions for

Summary Judgment (Doc. No. 126).  Consistent with and to implement the Court's ruling based

on the evidence, it is appropriate to enter Partial Final Judgment.  Accordingly, it is

**ORDERED:**

        1.      The Debtors' Motion for Partial Summary Judgment and Incorporated

AA01723

Memorandum of Law (Doc. No. 84) is granted as to Counts I and II of the Complaint.

2.      PEPI's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. No. 106) is denied as to Counts I and III of the Complaint.

3.      Debtors are relieved from all payment obligations under the Commitment Letter.

4.      PEPI shall turn over to the Debtors $405,000, representing one-half of the commitment fee, within 30 days of the date of entry of the Court's Memorandum Opinion.

5.      All 28 claims filed by PEPI in the Debtors' jointly administered bankruptcy cases are disallowed in their entirety.

6.      The Court reserves jurisdiction to consider additional damages, attorney's fees, and taxable costs, if any.

Clerk's Office to serve.

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                    Case No. 8:10-bk-03846-KRM

FIDDLER'S CREEK, LLC, et al.

                                          Chapter 11
            Debtors.
_____/

FIDDLER'S CREEK, LLC, et al.

            Plaintiffs/Counter-Defendants,    Adv. No. 8:11-ap-00809-KRM
v.

PEPI CAPITAL, L.P.

            Defendant/Counter-Plaintiff and
            Third Party Plaintiff.
_____/

**NOTICE OF APPEAL**

Pepi Capital, L.P., the Defendant/Counter-Plaintiff and Third Party Plaintiff in the adversary proceeding that is the subject of this appeal, appeals from the Memorandum Opinion on Cross Motions for Summary Judgment (Doc. No. 126) entered on May 10, 2017, and from the Partial Final Judgment (Doc. No. 127) entered on May 11, 2017. Copies of each are attached hereto. The names of all parties to the orders appealed from and the names, addresses, and telephone numbers of their attorneys are as follows:

|               Party               |                Attorney                |
|-----------------------------------|----------------------------------------|
| 1. Fiddler's Creek, LLC           | Mariaelena Gayo-Guitian                |
|                                   | Genovese Joblove & Battista PA         |
|                                   | 200 East Broward Blvd. Suite 1110      |
|                                   | Fort Lauderdale, FL 33301-3535         |
|                                   | (954) 453-8000                         |

| **Party** | **Attorney** |
|---|---|
| | Paul J. Battista<br>Genovese Joblove & Battista PA<br>100 Southeast 2nd Street<br>44th Floor<br>Miami, FL 33131-2100<br>(305) 349-2300 |
| 2. 951 Land Holdings, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 3. DY Associates, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 4. GBFC Development, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 5. FC Marina, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 6. FC Beach, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 7. FC Golf, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |

AA01726

| **Party** | **Attorney** |
|---|---|
| 8. DY Land Holdings II, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 9. FC Parcel 73, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 10. FC Commercial, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 11. FC Hotel, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 12. FC Resort, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 13: Gulf Bay Hospitality Company, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 14: Gulf Bay Hotel Company, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |

AA01727

| **Party** | **Attorney** |
|---|---|
| 15: GBP Development, LLC | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 16: GB Peninsula, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 17: 951 Land Holdings, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 18: DY Land Associates, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 19: GBFC Development, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 20: GBFC Marina, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 21: FC Beach, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |

AA01728

| **Party** | **Attorney** |
| --- | --- |
| 22: FC Golf, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 23: FC Hotel, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 24: FC Resort, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 25: Gulf Bay Hospitality, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 26: Gulf Bay Hotel Company, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 27: GBP Development, Ltd. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |
| 28: Fiddler's Creek Management, Inc. | Mariaelena Gayo-Guitian<br>Genovese Joblove & Battista PA<br>200 East Broward Blvd. Suite 1110<br>Fort Lauderdale, FL 33301-3535<br>(954) 453-8000 |

AA01729

| Party | Attorney |
|---|---|
| 29: Pepi Capital, L.P. | Alan J. Perlman<br>Dickinson Wright PLLC<br>350 East Las Olas Blvd.<br>Suite 1750<br>Ft. Lauderdale, FL 33301-4275<br>Telephone (954) 991-5420 |
| 30:  Gulf Bay Capital, Inc. | Ricardo A. Reyes<br>Tobin & Reyes PA<br>225 N.E. Mizner Blvd<br>Suite 510<br>Boca Raton, FL 33432-4083<br>Telephone (561) 620-0656 |

Dated this 23rd day of May, 2017.

Respectfully Submitted

/s/ Alan Perlman
Alan J. Perlman
Dickinson Wright PLLC
350 East Las Olas Blvd.
Suite 1750
Ft. Lauderdale, FL 33301-4275
Telephone: (954) 991-5420

AA01730

## <u>CERTIFICATE OF SERVICE</u>

I certify that I am an employee of DICKINSON WRIGHT PLLC, and that on this date, I am serving a true and correct copy of the attached **NOTICE OF APPEAL** on the parties as set forth below:

___X___CM/ECF Electronic Notification

Addressed as follows:

Paul J. Battista
Genovese Joblove & Battista PA
100 Southeast 2nd Street
44th Floor
Miami, FL 33131-2100

Mariaelena Gayo-Guitian
Genovese Joblove & Batista PA
200 East Broward Blvd.
Suite 1110
Fort Lauderdale, FL 33301-3535

Ricardo A. Reyes
Tobin & Reyes PA
225 N.E. Mizner Blvd
Suite 510
Boca Raton, FL 33432-4083

DATED this 23rd day of May, 2017.

/s/ Mina Reel
An employee of DICKINSON WRIGHT, PLLC

AA01731

ORDERED.

**Dated:  May 10, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

FIDDLER'S CREEK, LLC, ET AL.,

     Debtors.

Case No. 8:10-bk-03846-KRM
Chapter 11

_____/

FIDDLER'S CREEK, LLC, ET AL.,

     Plaintiffs/Counter-Defendants,

v.

PEPI CAPITAL, L.P.,

     Defendant/Counter-Plaintiff and
     Third-Party Plaintiff.

Adv. No. 8:11-ap-0809-KRM

_____/

### MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 84, 106 AND 113)

The issue before the Court, on cross motions for summary judgment, is whether it was

the lender, PEPI Capital, L.P. ("PEPI"), or the borrowers, Fiddler's Creek, LLC, and its 27

subsidiaries (collectively, the "Debtors"), who defaulted under a pre-Chapter 11 loan

commitment.  Debtors obtained the written commitment in January 2010 (the "Commitment

Letter") to be able to fund operations in the Chapter 11 cases that they later filed, on February

AA01732

23, 2010.  Debtors paid PEPI one-half ($405,000) of the commitment fee and $550,000 for

PEPI's legal expenses.  The parties began negotiating the terms of the final loan documents.

Some three and a half weeks later – after at least five drafts of the loan documents were prepared

by PEPI, and with the time for the bankruptcy filings approaching – the loan documents were not

in conformity with the Commitment Letter.

The Debtors' owner, Aubrey Ferrao,[1] then decided to fund post-petition operations

himself and, four days later, Debtors sent a letter (the "Default Letter") alleging multiple defaults

by PEPI and demanding return of the $405,000.  The next day, February 23, 2010, Debtors filed

28 Chapter 11 petitions; the day after that, they filed an emergency motion to approve a

$25 million post-petition credit facility from Gulf Bay Capital, Inc. ("Gulf Bay"), a company

owned by Mr. Ferrao.

PEPI filed a $1.4 million claim in the Chapter 11 cases, which Debtors are obligated to

pay in full if it is allowed.[2]  The claim is based on this provision of the Commitment Letter:

> "*All indemnities and obligations of the* [Debtors] **shall survive the termination** *of*
> *this Commitment Letter or the commitment of PEPI hereunder,* **provided however,**
> **such indemnities and obligations shall not survive in the event of a default by**
> **PEPI hereunder.**"[3]

Relying on the same provision, and alleging that PEPI defaulted, Debtors filed this adversary

proceeding objecting to PEPI's bankruptcy claim and seeking recovery of all pre-petition

payments.

---

[1] Mr. Ferrao is the founder, CEO, and principal owner of Fiddler's Creek, LLC.

[2] PEPI filed identical claims in each of the Debtors' 28 cases, each in the amount of $1,405,000.  Main Case, Claim No. 204.  The claim consists of the second half of the commitment fee, $405,000, and a "break up" fee of $1 million.  Main Case, Doc. No. 1134.

[3] Lorio Dep. Ex. 15 at 6 (emphasis added).

AA01733

The Court has under consideration Debtors' Motion for Partial Summary Judgment on Counts I and II of the Complaint,[4] as well as Debtors' Supplement thereto, PEPI's Response, and Debtors' Reply.[5] The Court also has under consideration PEPI's Motion for Partial Summary Judgment and Debtors' Response.[6] The Court has considered the submitted exhibits, the affidavit of Jeffrey Fine, PEPI's lead counsel, the deposition testimony of other witnesses, the cases cited, and the arguments advanced by counsel.

For the reasons stated below, the Court concludes that PEPI did breach its obligations under the Commitment Letter because, with knowledge of the Debtors' imminent need to file Chapter 11 petitions, PEPI (1) repeatedly declined to incorporate certain lien enforcement restrictions into the loan documents, as required by the Commitment Letter, and (2) refused to provide a written confirmation that its due diligence investigation had been satisfactorily completed before Debtors filed their Chapter 11 petitions. Thus, Debtor's motion for partial summary judgment is due to be granted. PEPI's motion for summary judgment will be denied.

---

[4] Count I: Breach of Contract

 Debtors assert that PEPI breached the Commitment Letter by: (1) materially altering the terms of the Commitment Letter, (2) deleting and redrafting critical provisions required to be in the loan documents, and (3) failing to comply with the due diligence sign off requirement under the Commitment Letter. Debtors request the Court enter a judgment against PEPI in the amount of $955,000 (the amount of the commitment fee paid to PEPI), plus interest.

Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

 Debtors assert that PEPI acted in a way that prevented Debtors from receiving the benefit of the contract, and that judgment should be entered against PEPI in the amount of $955,000, plus interest.

[5] Doc. Nos. 84 (Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law, the "Motion"), 100 (PEPI's Response in Opposition to Debtors' Motion for Partial Summary Judgment, the "Response"), 102 (Debtors' Reply to PEPI's Response in Opposition), and 113 (Supplement to Debtors' Motion for Partial Summary Judgment). Initially, PEPI requested an affirmative ruling in its Response to Debtors' Motion for Partial Summary Judgment. Later, on March 20, 2015, PEPI filed its own Motion for Partial Summary Judgment (Doc. No. 106).

[6] Doc. Nos. 106 (PEPI's Motion for Partial Summary Judgment and Incorporated Memorandum of Law) and 114 (Debtors' Response to PEPI's Motion for Partial Summary Judgment).

AA01734

## FACTUAL BACKGROUND

Overview

Fiddler's Creek, LLC, was the developer of a large planned community near Naples,

Florida. The "Fiddler's Creek" development encompassed nearly 4,000 acres, including:

unplatted parcels with no infrastructure; developed neighborhoods requiring maintenance; a

championship golf course; a marina; Gulf Coast condominiums; and homes under construction.

Much of the real estate was encumbered by liens for multiple series of bonds issued by two

Community Development Districts (the "CDD's"). Some parcels were also encumbered by

separate mortgages held by eight lenders (the "Pre-Petition Lenders").

Debtors plausibly assert that they were compelled to seek Chapter 11 relief after the real

estate crisis in 2008 severely impacted their cash flow. In turn, they determined that they would

need a credit facility to fund operations after the Chapter 11 filings (a transaction commonly

referred to as a debtor-in-possession loan, or "DIP Loan").[7]

Through the fall of 2009 and January of 2010, the parties negotiated the terms of the

Commitment Letter and a term sheet.[8] The Commitment Letter was signed on January 27, 2010,

but dated as of December 31, 2009. It called for PEPI to provide up to $27 million, to be drawn

as needed in accordance with an 18-month budget.[9] The DIP Loan was to be secured by a first

mortgage on all of the Debtors' assets. As to some parcels, this lien would "prime" the existing

---

[7] 11 U.S.C. § 364. Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

[8] On October 29, 2009, the Debtors entered into a term sheet with Petrus Private Investments, L.P., which later changed its name to PEPI Capital, L.P.

[9] Blasnick Dep. Ex. 2 at 7.

AA01735

mortgages of the Pre-Petition Lenders.[10]  The parties anticipated that the initial borrowing would be about $2 million.[11]  The Commitment Letter incorporated a final term sheet and multiple due diligence checklists.

PEPI was to provide the DIP Loan documents, as to which the Commitment Letter required:

> "*The terms and conditions of the documentation of the Credit Facility shall be* **substantially the same** *as those set forth herein and in the Term Sheet and such* **documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.**"[12]

For nearly three weeks, the parties engaged in numerous email exchanges and conference calls to address substantive issues.  The Debtors worked with PEPI to clear the numerous items on the due diligence checklists.[13]

Ultimately, the parties were unable to agree on whether certain provisions of the Commitment Letter, particularly those that would restrict the lender's enforcement of its real estate liens after a default, could be omitted from the loan documents or restated in terms that materially differed from the Commitment Letter.

<u>The Commitment Letter and the Parties' Negotiations</u>

The Commitment Letter called for an escrow mechanism (the ***"Escrow Provision"***) by which consent foreclosure judgments and deeds in lieu of foreclosure would be held in escrow,

---

[10]  Under 11 U.S.C. § 364(d), the bankruptcy court may authorize a debtor in possession to incur debt that is secured by a senior lien on property of the estate that is already subject to an existing lien, provided certain conditions are met. In particular, there must be no other available credit and sufficient proof that there is adequate protection – typically a demonstrable equity cushion – to protect the liens that are being primed.

[11]  Lorio Dep. Ex. 19 (email from Mr. Fine to Mr. Battista, January 15, 2010).

[12]  Lorio Dep. 110:9−111:4; Blasnick Dep. 49:11−50:9; Blasnick Dep. Ex. 2 at 4 (emphasis added).

[13]  *See, e.g.,* Doc. No. 105 at 6 (email from Ms. Houk to Ms. Helm, copying Jeff Fine and others, regarding due diligence check list, Monday, February 15, 2010 at 2:11 pm).

AA01736

with a related "valuation mechanism" to establish credits to reduce the debt as the properties

were acquired by PEPI from the escrow:

> "[T]he final loan documentation for the Credit Facility shall provide (i) for an
> escrow mechanism to hold consent judgments to any foreclosure in the order of
> priority in the waterfall below to speed the judgment and foreclosure process, and
> (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation
> mechanism so that if property is acquired through a deed that the debt is reduced
> accordingly."[14]

The Commitment Letter also established an agreed sequence by which PEPI would

collect its debt from the mortgaged real estate (the **"Waterfall Provision"**):

> "[T]he final loan documentation for the Credit Facility shall provide that [PEPI,
> as] the Agent and Lender agrees [sic] that it **will not foreclose** on real property
> described in a numbered item in the following list **unless it has previously used
> commercially reasonable efforts to first collect out of the property described in
> the numbered items before it in the below list.**"[15]

PEPI's commitment was subject to several conditions, including its "completion of and

reasonable satisfaction in all material respects with a due diligence investigation of the [Debtors]

. . . ."[16] According to the supporting affidavit of Attorney Fine, PEPI and its team "methodically

completed" the dozens of items on the due diligence checklists.[17]

PEPI's obligation to lend was stated to expire on February 8, 2010, less than two weeks

after the parties signed the Commitment Letter.[18] That deadline would be reset, however, to a

---

[14]  Blasnick Dep. Ex. 2 at 13.

[15]  *Id.* (emphasis added).  The Waterfall Provision specifies the order of priority in which lien enforcement rights could be taken against the collateral: (1) cash on hand and personal property; (2) unencumbered condo units owned by FC Hotel, Ltd.; (3) unencumbered platted lots and undeveloped land owned by GB Peninsula, Ltd., and 951 Holding, Ltd.; and (4) the remaining finished developed land lots owned by Debtor, GBFC Development, Ltd., and all finished housing units owned by Fiddler's Creek, LLC, its subsidiaries, and GB Peninsula, Ltd.  *Id.*  *See* Fine Aff. at ¶ 10.

[16]  Blasnick Dep. Ex. 2 at 3−4.

[17]  "[T]he due diligence review and closing process was extensive, . . . ongoing in nature, and continuously updated upon the completion of each item."  Fine Aff. at ¶15.

[18]  Blasnick Dep. Ex. 2 at 4.

AA01737

date that was three business days after PEPI notified Debtors that its due diligence investigation

was complete; Debtors could then extend PEPI's funding obligation by another 90 days by filing

their Chapter 11 petitions within that three-day period:

> "*The obligations of* [PEPI] *to provide the Credit Facility under this Commitment Letter if timely accepted and agreed to by the* [Debtors]*, will terminate upon the earlier to occur of: 1) the closing of business on February 8, 2010 (or such later date that is 3 business days after* [PEPI] *has advised* [Debtors] *that it has completed its due diligence), unless the* [Debtors have] *instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the . . . Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.*"[19]

On January 27, 2010, after the Commitment Letter was signed, Paul Battista (Debtors'

lead attorney) sent the following inquiry to Attorney Fine:

> "*Jeff, thank you for all of your help in getting us to this point. I assume that you and your team are now commencing due diligence in earnest so that we can get to the filing in the next several days. Please let us know what we still need to get to you in order to keep the process moving.*"[20]

The Escrow Provision was included, in part, in PEPI's first draft of the loan documents,

circulated on February 2, 2010.[21] So, too, was the Waterfall Provision. Section 10.4 of the draft

loan agreement provided that PEPI's "rights and remedies" against any parcel of real estate be

restricted to using "*commercially reasonable efforts to exercise its rights with respect to each*

*piece of the Reserved Collateral in the order in which it is listed* [in the Waterfall] *before*

*commencing the exercise of its rights against the next piece of* [collateral]."[22]

---

[19] Blasnick Dep. Ex. 2 at 4 (emphasis added).

[20] Lorio Dep. Ex. 15 (email from Mr. Battista to Mr. Fine, January 27, 2010 at 4:13 pm).

[21] *See* Lorio Dep. Ex. 16.

[22] *Id*. at 55.

AA01738

On February 5, 2010, Mr. Battista asked Mr. Fine for an "*update on the status of the due diligence and the expected completion date.*"[23]   On February 8, the initial expiration date, Mr. Battista repeated this request:

> "*1. We understand that you are conferring with your team so as to let us know whether you are able to provide the due diligence sign off, and if more information is needed, then what you need from us in order to make the decision.*
>
> *2. We understand that you are conferring with your team to provide us with an updated due diligence/conditions precedent checklist so that we can have everything ready to go for a closing as soon as the court enters the interim order. Our client will need to borrow under the interim facility literally the day or two after the hearing, which means by the end of next week.*"[24]

Mr. Battista also reminded Mr. Fine of the need to "*build in the concept of a valuation mechanism for purposes of reduction of the debt through the foreclosure or deeds in lieu.*"[25]

Two days later, on February 10, Mr. Battista advised Mr. Fine that Debtors were ready to file for Chapter 11 by February 11, 2010, and would need to receive the initial loan advance around February 19:

> "*Jeff, is it realistic that we can file tomorrow with due diligence sign off and revised loan agreement/ interim order* [from the bankruptcy court] *so that we can get to a closing end of next week?  I have the petition etc ready to go . . . .*"[26]

In the morning of February 11, Mr. Battista asked Mr. Fine to add "*the language per the commitment letter on a valuation mechanism in respect of the deeds in lieu of foreclosure under the waterfall.*"[27]   But, that afternoon, Mr. Lorio (PEPI's private investment analyst) emailed Mr.

---

[23] Fine Dep. Ex. 43 (email from Mr. Battista to Mr. Fine, February 5, 2010 at 6:36 pm).

[24] Fine Dep. Ex. 44 (email from Mr. Battista to Ms. Houk and Mr. Fine, February 8, 2010 at 2:24 pm).

[25] *Id.*

[26] Fine Dep. Ex. 45 (email from Mr. Battista to Mr. Fine, February 10, 2010 at 6:22 pm) (emphasis added).

[27] Radunsky Dep. Ex. 30 (email from Mr. Battista to Mr. Fine and Ms. Houk, February 11, 2010 at 10:07 am).

AA01739

DiNardo (Debtors' CFO) advising of PEPI's decision to remove the Escrow Provision and

valuation mechanism from the documents:

> ". . . [w]*e do not need these, and to get this moving and avoid complexity propose deleting this in* [sic] *the structure entirely.*"[28]

Later that day, Mr. DiNardo (for Debtors) expressed concern about PEPI's

proposed deviations from the Commitment Letter:

> "*A. The language to the Waterfall that has been set forth in the Commitment Letter has been diluted and is less clear. The language that is in the Commitment Letter works.*
>
> *B. The Deed in Lieu in escrow concept only works with respect to the unencumbered property because of valuation issues associated with the mortgage lenders' liens.*
>
> *C. You need a valuation method for the Waterfall. One acceptable method would be to get an updated appraisal by Integra at that time. Jeff Fine seemed to be okay with this solution – at least initially on the call.*"[29]

PEPI nevertheless removed the Escrow Provision from the next draft of the loan

documents. This draft also included a revised Section 10.4, which deleted the phased exercise of

all rights against the collateral and added:

> "*Lender shall use commercially reasonable efforts to effect a foreclosure sale of such assets in the order listed on Exhibit E and shall use commercially reasonable efforts not to effect such a foreclosure sale of any asset listed thereon until Lender's Lien on the asset listed prior to such asset has been foreclosed, provided, that Lender shall not be prevented from commencing foreclosure proceedings against any asset listed on Exhibit E prior to the foreclosure sale of an asset listed prior thereto. As an example, Lender may file a foreclosure suit against all of the Real Property but would use commercially reasonable efforts to have foreclosure sales thereon occur in the order of the assets set forth on Exhibit E.*"[30]

---

[28] Lorio Dep. Ex. 17 (email from Mr. Lorio to Mr. DiNardo, February 11, 2010 at 5:02 pm).

[29] Lorio Dep. Ex. 18 (email from Mr. DiNardo to Mr. Lorio, February 11, 2010 at 6:10 pm).

[30] Doc. No. 103 at 160−61 (email from Ms. Helm to Mr. Desiderio and Mr. Fine, copying others, February 11, 2010 at 9:13 pm, with revised draft attached) (emphasis added). Fine Dep. 142:9-20; Lorio Dep. 112:11−15, 113:11−114:15, 119:6−120:21.

AA01740

On February 15, Mr. Battista inquired of Mr. Fine: "*Jeff, we are getting really close* [to filing Chapter 11] . . . .*we need to know when we can get the due diligence sign off.*"[31] Later (at 11:41 p.m.), Mr. Battista asked Mr. Fine: "*Any word on the title due diligence or the budget sign off?*"[32] Attorney Battista also made the following proposal in an effort to buy time for the parties to resolve their dispute over the lien enforcement structure:[33]

> "*All, pursuant to our call on Friday morning, we have worked through the weekend to come up with a firm proposal on the foreclosure and valuation issue for the waterfall.*
>
> *First, in an effort to move things along, we are ok pursuing the interim order* [from the bankruptcy court] *without a resolution on this issue. Rather, we will rely on the 'commercially reasonable' language for the waterfall and argue to the court that the* [Pre-Petition Lenders] *do not need the valuation mechanism for the interim order.*
>
> [W]*e propose that the valuation/foreclosure be structured as follows: PEPI would (i) obtain a blind appraisal establishing the fair market value of any collateral as to which it initiates a foreclosure action prior to such action, (ii) not foreclose on any collateral (the 'Identified Property') if the value of the other collateral listed prior to such Identified Property in the waterfall list exceeds 150% of the outstanding amount owed to PEPI, and (iii) credit the Debtors against their outstanding obligations the fair market value of all collateral acquired by PEPI.*"[34]

PEPI did not agree to the proposed valuation structure.[35] The very next day, February 16, 2010, Mr. Lorio (for PEPI) advised Mr. DiNardo (for Debtor):

---

[31] Radunsky Dep. Ex. 28 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 7:07 pm).

[32] Radunsky Dep. Ex. 29 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 11:41pm).

[33] Lorio Dep. Ex. 21; Lorio Dep. 143:15−144:4; Fine Dep. 129:6−25.

[34] Lorio Dep. Ex. 21 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 11:23 am). The valuation mechanism for deeds in lieu would apply to real estate that was not subject to the mortgages of the Pre-Petition Lenders. The Debtors argued with PEPI that these provisions and the Waterfall Provision were needed to assure the Pre-Petition Lenders that their collateral was a last resort.

[35] Fine Dep. 130:10−131: 17.

AA01741

"*We probably need to discuss the waterfall and where we are on that. I think* **there is not agreement right now on how we would work through collateral in a foreclosure process.**"[36]

Mr. Lorio sent Mr. DiNardo and Attorney Houk an email (at 5:28 pm) in which he requested a conference call "*to go over the suggested changes to*" the latest draft.[37]

The conference call took place in the evening of February 16. The parties discussed the Escrow Provision and the revised Waterfall Provision.[38] PEPI's representatives advised that PEPI would not agree to the valuation mechanism or add the Escrow Provision to the final loan documents.[39] In his deposition, Mr. Lorio (for PEPI) testified that PEPI's representatives advised that PEPI would not bind itself to the foreclosure valuation structure that Mr. Battista proposed in his February 15 email:

> "*A:     ...Yes, we told him that was not − I − my recollection is, I believe, we conveyed to* [Mr. Battista] *that that was not acceptable but that there would be a mechanism that would be acceptable.*
> *Q:     And in that February 16, 2010 conference call, did PEPI also state to Mr. Battista that the loan documents for the time being were not going to incorporate any language that effectuated the first "in addition" sentence* [from his February 15 email]*?*
> *A:     I think we may have. I don't know if it was said exactly like that but I think we may have conveyed that understanding.*"[40]

PEPI's representatives also advised Debtors that it would not provide a written due diligence sign-off until the time came for making an advance under the DIP Loan, which could not occur until after the Chapter 11 cases were commenced and the bankruptcy court had

---

[36] Lorio Dep. Ex. 19 (email from Mr. Lorio to Mr. DiNardo, February 16, 2010 at 12:50 pm) (emphasis added).

[37] Lorio Dep. Ex. 22 (email from Mr. Lorio to Mr. DiNardo and Ms. Houk, February 16, 2010 at 5:28 pm).

[38] Fine Dep. 125:21−24, 135:14−24, 136:22−25, 137:1−4.

[39] Fine Dep. 132:17−133: 4; 135:14−137: 4.

[40] Fine Dep. 136: 18−139: 4.

AA01742

approved the borrowing.[41]  In his deposition, Mr. Lorio testified that Debtors were told that PEPI would not provide a written due diligence sign-off (*because due diligence is never completed until you close.*"[42]  Mr. Lorio went on to state that: "*I think we told them that we would not be signing a due diligence letter, but we would complete* [sic] *with our due diligence.*"[43]

In the morning of February 17, Mr. Battista advised Mr. Fine that Debtors were ready to file for Chapter 11:

> "*I also understand that there was another call last night on the loan agreement and that good progress was made.  I am also told another version is being circulated this morning reflecting the changes.  Assuming this is now complete, I think the only item remaining for us to be comfortable filing is your client's sign off on the due diligence, including related to the title issues.*
>
> *Please let me know as we are prepared to file today as soon as we have these last pieces together.*"[44]

Later that afternoon, Attorney Helm sent out the next draft of the loan agreement; neither the Escrow Provision nor a valuation mechanism were included.[45]  This draft again included the provision that would permit PEPI to obtain a single foreclosure of Debtors' interests in all of the mortgaged properties.[46]

Later on February 17, Mr. Battista complained to Mr. Fine that:

> "*There are several things in the commitment letter that were heavily negotiated, carefully chosen and agreed upon and yet have either changed or been eliminated in their entirety. . . .*"[47]

---

[41] Fine Dep. 135:14−24, 136:13−137:5; Fine Dep. Ex. 19; Lorio Dep. 149: 24−150:8; Radunsky Dep. 97:3−14.

[42] Lorio Dep. 149:9−11.

[43] Lorio Dep. 150:6−8.

[44] Doc. No. 105 at 8 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 8:22 am).

[45] Fine Dep.139:19−140:3; Lorio Dep. 155:8−15, 156:1−3; Radunsky Dep. 128:19−129:7, 129:21−25, 130:1−7; Lorio Dep. Ex. 23.

[46] Fine Dep. 141:12−142:20.

[47] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

AA01743

This complaint was in an email seeking revision of a provision obligating Debtors to pay a

$1 million "break up" fee in the event that PEPI withheld funding for any reason which would

force Debtors to seek funds from another lender:

> *"I am trying to address an issue that is a real issue and one that is sure to come up. If you are telling me that your client is unwilling to consider the issue and attempt to resolve and address it, which we think would be the reasonable thing to do, then please tell me that. I do not think there are any scenarios that I am concerned about. My sole concern is that your client refuses to fund after we get the final order for any reason (whether it is failure of title, failure of conditions etc etc) and we are able to get one of the other lenders to step up and fund notwithstanding the issue that prevented your client from funding, then it is pretty clear to us at least that no break up fee should be due and certainly not one at 25%."[48]*

The next day, February 18, Mr. Battista sent the following query to Mr. Fine: "*Any update? The*

*day is beginning to get away from us in terms of filing.*"[49]

The attorneys also continued to discuss another provision of the Commitment Letter,

referred to as the "**Purchase Option:**"[50]

> "*The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. **Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims** to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral*

---

[48] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

[49] Fine Aff. Composite Ex.3 (email from Mr. Battista to Mr. Fine, February 18, 2010 at 10:37 am).

[50] These emails are attached as composite exhibit 3 to Mr. Fine's affidavit.

AA01744

*and other supporting obligations. The terms of the Purchase Option shall be reflected in the organic Loan Documentation.*"[51]

The right to purchase the loan after a default was important to Mr. Ferrao, who was sensitive to PEPI being able to declare a default and then taking over the Debtors' assets − a strategy employed by some lenders that is referred to as a "loan-to-own."[52] The Debtors proposed deleting the grant of a general release, as required in the Commitment Letter, because of a concern that the bankruptcy court might not allow it, which could void the Purchase Option.[53] Attorney Houk (for Debtors) proposed the alternative of an agreement by the purchaser of the loan to indemnify PEPI, which obligation would be secured by a collateral assignment of all of the purchased loan documents and lien rights.[54]

The Court surmises that the difference between giving PEPI a general release and being indemnified was significant. If PEPI ever declared Debtors to be in default and refused to make further advances, Debtors would have the option, in the absence of the general release, of asserting lender liability claims against PEPI. The indemnification proposal would have left PEPI exposed to that risk and PEPI rejected it later that afternoon.[55]

In the evening of February 18, 2010, Mr. Ferrao decided to provide the DIP financing himself, through Gulf Bay, after meeting with his CFO, Mr. DiNardo. Mr. Ferrao decided to make the DIP Loan because: (1) Debtors had run out of money to meet payroll; (2) Debtors

---

[51] Blasnick Dep. Ex. 2 at 21 (emphasis added).

[52] Ferrao Dep. 143:3−144:11.

[53] Attorney Houk advised PEPI's attorney on Thursday, February 18, that "*there may be an issue with the Bankruptcy Court approving general releases executed by the Obligors.*"[53] Doc. No. 90, Composite Ex. 3 (email from Ms. Houk to Ms. Helm, Mr. Battista and Mr. Fine, February 18, 2010 at 2:58 pm).

[54] Doc. No. 90, Composite Ex. 3 (email from Ms. Houk to Ms. Helm, Mr. Battista and Mr. Fine, February 18, 2010, at 2:58 pm).

[55] Doc. No. 90, Composite Ex. 3 (email from Mr. Springfield to Tony DiNardo, February 18, 2010, at 4:35 pm).

14

AA01745

could not get the due diligence sign-off from PEPI and they could not file bankruptcy without a committed lender; and (3) there were unresolved issues with the waterfall.[56]

The parties had no further discussions on Friday, February 19, causing Mr. Springfield (an officer of PEPI's general partner) to ask Mr. DiNardo at 4:14 p.m.: "*What's up with the radio silence?*" To which Mr. DiNardo replied, at 4:27 p.m.: "*We are conferring with counsel and will get back to you as soon as we can.*"[57]

On Saturday, February 20, Mr. Lorio (for PEPI) emailed Mr. DiNardo:

"*Tony, the dearth of communication at this stage is disconcerting to us. I was hoping we had good lines of communication to address and resolve issues in manner that this loan could be approved and executed. Can we set a time to have a call tomorrow* [Sunday] *to go through the issues you have or what other decisions you have made.*"

\* \* \*

"*KL Gates* [PEPI's lawyers] *and we have suspended all work on this loan.*"[58]

The Default Letter

The requested conference call did not occur. Instead, on Monday, February 22, Mr. Battista sent the Default Letter to Mr. Fine, asserting that:

". . . *PEPI has defaulted under the terms of the Commitment Letter for several reasons, including (i) the stated refusal by PEPI to provide Fiddlers with notice that PEPI has completed its due diligence in connection with the Loan, and (ii) the decision by PEPI to delete from the loan documents those certain critical provisions of the waterfall required by the Commitment Letter concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Loan in respect of the waterfall. PEPI also materially modified the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure*

---

[56] Ferrao Dep. 41:10−42:9.

[57] Lorio Dep. Ex. 24.

[58] Lorio Dep. Ex. 25.

AA01746

*judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sales process*."

\*     \*     \*

"*Notwithstanding, during a phone conference call that took place during the early evening on Tuesday, February 16, 2010, representatives of PEPI for the first time unequivocally stated that PEPI would not be providing notice of the completion of its due diligence until, at the earliest, at the time of the closing of the Loan. As a result of such position, which is contrary to the provisions of the Commitment Letter and the clear understanding of the parties, Fiddlers was faced with the prospect of filing the chapter 11 cases without the benefit of knowing whether PEPI had completed its due diligence and therefore whether PEPI was prepared to make the Loan.*"[59]

The Debtors filed 28 Chapter 11 petitions the next day, February 23, beginning around noon.[60]

<u>PEPI's Response</u>

Later on February 23, Mr. Fine provided PEPI's response:

"*Although PEPI has told you repeatedly during this past week that the* [Debtors] *are free to file Chapter 11 at any time, please consider this **your formal 3 business day notice** that due diligence has been completed.*"[61]

In paragraph 4, Mr. Fine stated that (i) "*. . . PEPI will certainly review your proposed provision*" dealing with the consent judgments and (ii) "*. . . even though PEPI does not require it, then PEPI will promptly review deed in lieu language and will negotiate the provisions of a valuation mechanism for deeds in lieu of foreclosure and will include them in the Loan documentation.*"[62] And, in paragraph 5, Mr. Fine stated that PEPI "*will diligently review the*

---

[59] Blasnick Dep. Ex. 5.

[60] *See* Radunsky Dep. Ex. 33 (email from Mr. Battista to Mr. Fine, February 23, 2010 at 5:37 pm).

[61] Blasnick Dep. Ex. 6 at ¶ 3 (emphasis added).

[62] *Id.* at ¶ 4.

16

AA01747

*wording of the waterfall provisions as you think are compatible with the terms of the Commitment Letter.*"[63]

The Gulf Bay Loan

Gulf Bay gave its $25 million commitment to the Debtors on February 23, 2010, the Chapter 11 petition date. Debtors filed an emergency motion the next day seeking approval of the loan (the "Gulf Bay Loan").[64]

The Gulf Bay Loan required first mortgages on several parcels that would be senior to those of the Pre-Petition Lenders.[65] The loan documents included a "waterfall" for the sequential liquidation and foreclosure of collateral.[66] The Gulf Bay Loan did not require either an escrow provision or a valuation mechanism.[67] The commitment fee was $500,000, compared to the $810,000 required by PEPI. The foreclosure process, in the event of default, permitted a single foreclosure judgment.[68] There was no need for a purchase option or any due diligence investigation.

On March 3, 2010, Mr. Ferrao appeared at the hearing on approval of the first Gulf Bay advance. He testified that he was not aware of anybody else who would make this type of loan on comparable or better terms.[69] When asked if Gulf Bay would be willing to withdraw if there was an alternative lender willing to make advances on the same terms, Mr. Ferrao answered

---

[63] Blasnick Dep. Ex. 6 at ¶ 5.

[64] Main Case, Doc. No. 10.

[65] Main Case, Doc. No. 10-1 at ¶ 8.

[66] *Id.* at ¶ 14.

[67] *Id.*

[68] *Id.*

[69] Blasnick Dep. Ex. 8 (Hearing Transcript, March 3, 2010, at 214-215).

AA01748

affirmatively – "*in a New York second*."[70]  The Court approved the Gulf Bay Loan, by multiple interim orders, premised on a showing of sufficient equity in the real estate to adequately protect the Pre-Petition Lenders.

Some eighteen months later, the Debtors successfully reorganized by confirming Chapter 11 plans, facilitated by $45 million of exit financing from a third party.[71]  The outstanding balance of the Gulf Bay Loan was fully repaid.  The Debtors' Chapter 11 plans were supported by the CDD's, the Pre-Petition Lenders, general unsecured creditors, and the golf club members. Among other things, the Debtors agreed to pay all allowed unsecured claims in full.  Thus, PEPI will be entitled to $1.4 million if its claim is allowed.[72]

<u>ANALYSIS</u>

A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law."[73]  "The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  A "genuine" dispute means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[74]  Once the moving party has met its burden, the non-movant must set forth specific facts

---

[70] Blasnick Dep. Ex. 8 (Hearing Transcript, March 3, 2010, at 214-215).

[71] Main Case, Doc. Nos. 1442 at 30 (Memorandum Opinion and Order Confirming the Debtors' Second Amended Plans of Reorganization as Modified) and 1279 (Notice of Filing Plan Supplement to the Second Amended Plan of Reorganization Filed on March 18, 2011).

[72] Main Case, Doc. Nos. 504-14 (Chapter 11 Plans of Reorganization), 515 (Consolidated Disclosure Statement), 661-72 (First Amended Chapter 11 Plans), 708 (Second Consolidated Disclosure Statement), 752 (Second Amended Consolidated Disclosure Statement), 754-64 (Second Amended Chapter 11 Plans), 1210-14, 1216-17 and 1238-39 (Modified Amended Chapter 11 Plans), 1442 (Memorandum Opinion and Order Confirming Chapter 11 Plans, as Modified), 1927-28 (Orders Dismissing Appeals of Confirmation Order, entered on April 25, 2012 by Judge Scriven).

[73] Fed. R. Civ. P. 56(a) is made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056.

[74] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

AA01749

showing there is a genuine issue for trial.[75]  "It is permissible for a trial court in a non-jury case to grant summary judgment if witness credibility is not at issue and trial would not enhance the court's ability to draw inferences and conclusions."[76]

For summary judgment, the non-moving party is given the benefit of the doubt on credibility issues and all justifiable inferences are to be drawn in favor of the non-moving party.[77]  The factual conflicts relied on by the non-moving party must be both genuine and material.[78]  A properly supported summary judgment motion will not be defeated by merely colorable evidence that is not significantly probative.[79]  In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[80]

As a preliminary matter in this proceeding, PEPI asserts that Debtors are not entitled to summary judgment because they did not claim any damages and did not produce any evidence

---

[75]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 10 S. Ct. 1348 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993).

[76]  *In re French*, 2012 WL 1166248, *4 (M.D. Fla. Apr. 9, 2012); *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).  As the Fifth Circuit explained in *Nunez v. Superior Oil Company* (which is precedent in the Eleventh Circuit under *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981):

> "If a decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though the decision may depend upon inferences to be drawn from what has been incontrovertibly proved.  Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in [drawing a conclusion] even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.'  A trial on the merits would reveal no additional data . . . .  The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial."

572 F. 2d at 1124.

[77]  *Official Comm. of Unsecured Creditors v. Lerner (In re Diagnostic Instrument Group, Inc.)*, 283 B.R. 87, 94 (Bankr. M.D. Fla. 2002).

[78]  *Id.* (citing *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).

[79]  *Dalton v. FMA Enterprises, Inc.*, 953 F. Supp. 1525, 1528 (M.D. Fla. 1997).

[80]  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

AA01750

that Debtors had performed all of their duties and obligations.[81]  But partial summary judgment on the issue of liability for breach of contract may be entered without addressing evidence on the issue of damages.[82]  The commentary to the 2010 Amendment of Rule 56(a) states that "[t]he first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also to a claim, defense, or part of a claim or defense."  Thus, Debtors may seek partial summary judgment on the issue of PEPI's breach.

B. Debtors' Motion for Partial Summary Judgment

The parties agree that obligations under a binding loan commitment are governed by basic contract principles.[83]  If a prospective lender breaches, for example, by conditioning the loan closing on terms that differ from the loan commitment, the borrower may refuse to close.[84]  Likewise, a borrower may breach by refusing to close, based on a contrived dispute over the loan terms.[85]

The Commitment Letter does not define any events of default and does not set out any procedure for declaring a default or for providing any opportunity to cure.[86]  In the absence of

---

[81] Doc. No. 100 at 12-13 (citing *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F.Supp. 2d 507, 520 (S.D.N.Y.2009)).

[82] *Servicios Especiales Al Comercio Exterior v. Johnson Controls*, Inc., 791 F. Supp. 2d 626 (E. D. Wis. 2011) (holding that Rule 56(a) makes summary judgment or partial summary judgment on parts of various claims permissible); *In re B & M Linen Corp.*, 2013 WL 3579340 (July 12, 2013 Bankr. S.D.N.Y. 2013) (granting motion for partial summary judgment on breach of asset purchase agreement without addressing issue of damages, which were not raised by movant in the motion for partial summary judgment).

[83] *See Freeman Horn, Inc. v. Trustmark Nat'l Bank*, 245 B.R. 820, 826 (S.D. Miss. 1999) (analyzing whether a letter constituted a binding loan commitment letter).  *See also, Bluerack, Inc. v. Walter E. Heller & Co. of Florida*, 331 So. 2d 359, 360 (Fla. 3d DCA 1976) (finding loan commitment letters between commercial finance company and borrowers to constitute valid enforceable contracts).

[84] *See 999 v. CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985) (court found that the borrower was allowed to refuse financing from lender, and find a substitute lender, based on a lender's coercive actions to force borrower to accept a new, unjustified prepayment penalty term).

[85] *Teachers Insurance and Annuity Association of America v. Butler,* 626 F. Supp. 1229 (S.D.N.Y. 1986).

[86]  *See generally,* Blasnick Dep. Ex. 2.

AA01751

express contract terms, Florida law requires that a party's nonperformance must go to the essence of the contract in order to constitute a "material" breach.[87]

1. <u>The Escrow and Waterfall Provisions</u>

The terms of the Commitment Letter were "heavily negotiated, carefully chosen and agreed upon."[88] The Commitment Letter obligated PEPI and the Debtors to work collaboratively to prepare documents for the DIP Loan that were substantially the same as those in the Commitment Letter. PEPI was charged with preparing the loan documents.

It is undisputed, however, that PEPI offered multiple drafts of the final loan documents (circulated on February 11, 12 and 17) that omitted the Escrow Provision and the valuation mechanism, even though each draft was preceded by Debtors' demands for incorporation of these provisions. As the time for Chapter 11 filings drew near, PEPI's posture of omitting these lien enforcement restrictions amounted to an unmistakable signal that those terms were never going to be in the final loan documents. The undisputed facts demonstrate that PEPI did fail, in the face of Debtors' impending need to file Chapter 11 petitions, to produce final loan documents that were substantially similar to the agreed terms of the Commitment Letter.[89]

Further, PEPI's revision of the Waterfall Provision materially deviated from the Commitment Letter's requirement of "no foreclosure" on any property without "first collecting" out of the property before it in the agreed sequence. The Waterfall Provision that PEPI included

---

[87] *MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F. 3d 833, 849 (11th Cir. 2013) (citing *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.2d 853, 857 (Fla. DCA 1972).

[88] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

[89] The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller,* 603 So.2d 1338, 1340 (Fla. 1st DCA 1992)).

21

AA01752

in the drafts, from February 11 on, was fundamentally different.[90]  PEPI provided that it could

seek a single foreclosure judgment against all of the mortgaged real estate, adhering to the

Waterfall sequence only as to sales.[91]

PEPI argues that it never "refused" to do anything, pointing to Mr. Fine's deposition

testimony that the parties were still negotiating and that the Escrow Provision would not be in the

draft "for the time being."[92]  PEPI maintains that the Debtors and PEPI were in on-going

negotiations between February 11, 2010, and February 17, 2010, and that there were no

demands, ultimatums, or refusals on behalf of PEPI to exclude the Escrow Provision from the

terms of the DIP Loan.

Initially, PEPI's effort to persuade Debtors' management to concede these lien

enforcement restrictions was not a breach.  But, as the Debtors' cash ran out and the time for

filing Chapter 11 drew near, any other borrower would have had little choice but to capitulate.

PEPI's repeated election to tender loan documents that omitted the Escrow Provisions

and a conforming version of the Waterfall Provision did not amount to continued negotiations, as

PEPI would have the Court find.  Rather, such conduct amounted to a refusal to faithfully abide

by its agreement to incorporate these into the final loan documents.[93]  With only days remaining

before the Chapter 11 filings, PEPI understood that the parties were not in agreement "on how

[to] work through collateral in a foreclosure process."[94]

---

[90] Doc. No. 103 at 160-61 (email from Ms. Helm to Mr. Desiderio and Mr. Fine, copying others, February 11, 2010 at 9:13 pm, with revised draft attached).

[91] *Id.*

[92] Fine Depo. 136:13−137: 4.

[93] Doc. No. 102 at 23.

[94] Lorio Dep. Ex. 19 (email from Mr. Lorio to Mr. DiNardo, February 16, 2010 at 12:50 pm).

AA01753

Debtors' counsel attempted to work around this dispute by offering to include only a framework in the bankruptcy court's initial order that would approve the first advance, leaving resolution to a later date. But, PEPI declined to agree to the proposed valuation mechanism or to revise the Waterfall Provision in a matter consistent with the Commitment Letter.

PEPI was also aware, as shown by Mr. Fine's response to the Default Letter, that the parenthetical phrase in the Commitment Letter's expiration provision was a "formal" three-day notice that PEPI had completed its due diligence investigation. This formal due diligence sign-off would have set a firm date by which Debtors would have to file for Chapter 11 to preserve the loan commitment. It would also have established a firm date by which PEPI would have had to tender final loan documents conforming to the Commitment Letter. Withholding the three-day trigger increased PEPI's leverage by keeping the negotiations open-ended, even as the Debtors were running out of time to file for Chapter 11. Such conduct, reinforced by PEPI's positions stated in the February 16 conference call, constituted PEPI's failure to perform its obligations regarding the Escrow and Waterfall Provisions.[95] PEPI's non-performance went to essential provisions of the contract.

PEPI advances four arguments to justify omitting the Escrow Provision and altering the Waterfall Provision. The Court finds none of these arguments persuasive.

---

[95] *See, e.g., 999 v. CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985), where the Ninth Circuit upheld the jury's verdict for the borrower, concluding that the lender's addition of a term for a prepayment penalty was not inconsequential and it was "more than reasonable for [borrower] to refuse financing from [the lender] that was subject to the new unjustified condition, and instead seek to mitigate damages by finding replacement financing:"

> "There was sufficient evidence from which to draw an inference that [the lender's agents] willfully misrepresented to [the borrower] that financing would be provided without a prepayment penalty, and acted oppressively to force [borrower] to submit to a new and onerous term. Although the jury concluded otherwise, there was evidence, for example, that [the lender] later took advantage of [borrower's] desperate need for financing to coerce [borrower] into accepting a new prepayment penalty term."

*Id.* at 873.

AA01754

PEPI first asserts that the Escrow Provision was not material because it was a "lender benefit" which it did not need and, therefore, had the right to abandon.[96] The combined effect of the Escrow Provision, the related valuation mechanism, and the sequential foreclosure process required by the Waterfall Provision, however, would have been a significant restriction on PEPI's lien enforcement remedies. When taken together, these provisions would have forced PEPI to accept parcels of real estate in the order of the Waterfall as actual payment (per agreed valuations) for outstanding debt (sometimes called "dirt for debt") in the event of default.[97] No lender would like to have its remedies restricted in this way.

PEPI acknowledges that the waterfall concept was "demanded" by the Debtors and that such concept was "significant and unusual."[98] PEPI had agreed to these restrictions when it signed the Commitment Letter. These provisions were not solely for the benefit of PEPI who was not free to unilaterally remove or alter them.[99]

Second, PEPI contends that performance of the Escrow Provision was barred by Florida law.[100] But, this assertion is much too broad. One example to the contrary is *Ringling Joint Venture II v. Huntington National Bank,*[101] where the Second District Court of Appeals approved the escrow of foreclosure consent judgments. The borrower was sophisticated and bargained for

---

[96] Doc. No. 100 at 13-14.

[97] According to the Debtors, the valuation mechanism was also for the benefit of the junior secured lenders, because it provided for the reduction of the priming loan first from property not encumbered by their mortgages. Doc. No. 102 at 36-37.

[98] Doc. No. 100 at 5 (citing Fine Aff. at ¶ 10).

[99] *Id.* at 17.

[100] *Id.* at 15-16 (citing *Cain & Bultman, Inc. v. Miss Sam, Inc.*, 409 So. 2d 114 (Fla. 5th DCA); *Mid-State Investment Corp. v. O'Steen*, 133 So. 2d 455 (Fla. 1st DCA 1961); *Kirkland v. Miller*, 702 So. 2d 620 (Fla. 5th DCA 1999); *Hawke v. Broward National Bank of Fort Lauderdale*, 220 So. 2d 678 (Fla. 4th DCA 1969); *Matter of Caniglia*, 17 B.R. 858 (Bankr. M.D. Fla. 1982).

[101] 595 So.2d 180, 182-83 (Fla. 2d DCA 1992).

AA01755

the escrowing of deeds in lieu. When a default did occur, the borrower sought to invalidate the deed that had been released from escrow. The court emphasized that "all parties were represented by counsel, the agreement arose from a pending foreclosure action, and the transaction involves commercial real estate rather than residential property."[102] The court concluded that:

> "[t]he doctrine against clogging the right of redemption is not an absolute right. The courts have recognized that this doctrine of equity does not apply if the right is relinquished by 'a subsequent agreement upon a further consideration.'"[103]

In their Chapter 11 cases, the Debtors' relationship with PEPI would have been governed by this Court. If PEPI had concerns at the time that the escrow of deeds in lieu would be unenforceable, it could have incorporated (or offered to incorporate) the Escrow Provision into the loan documents with appropriate qualifying language, such as "subject to entry of an order by the Bankruptcy Court barring Debtors from contesting the validity of any deeds released from escrow," or some variation thereof.

The record shows no instance of this concern being raised by PEPI before the Default Letter was sent. The Debtors had no opportunity to address it. Rather than working through what concerns it may have had regarding the escrow of consent judgments, PEPI unilaterally and repeatedly refused to include such provisions in the loan documents.[104]

Third, PEPI contends that its revision of the Waterfall Provision was justified because a single foreclosure was required by Florida law — that multiple, sequential foreclosures would be prohibited by doctrines of merger, estoppel or res judicata.[105] Even where a mortgage is secured

---

[102] *Ringling*, 595 So.2d at 182.

[103] *Id.* (quoting *Stovall v. Stokes*, 94 Fla. 717, 741, 115 So. 828, 837 (1928).

[104] Doc. No. 102 at 33.

[105] Doc. No. 100 at 35.

25

by multiple properties, foreclosure of one will not bar later foreclosure of the other, except where the value of the land foreclosed in the first is sufficient to satisfy the debt.[106] Further, the parcels in the waterfall were owned by several entities, which would have required multiple mortgages anyway.[107]

The record shows no instance where these legal issues were raised by PEPI before the Default Letter was sent. The parties could have agreed, for example, to (a) make the sequential foreclosures subject to findings by the bankruptcy court that the Waterfall Provision was consistent with Florida law or (b) subject to the entry of one or more orders by the bankruptcy court modifying the automatic stay in phases, to permit parcel-by-parcel foreclosures as needed to pay off the loan balance after a default. But, Debtors did not have the opportunity to propose methods to address these concerns.

Finally, PEPI contends that Debtors waived, or are equitably estopped from alleging, any default. There is no evidence, however, of any express waiver by the Debtors. Mr. Battista's comment in his February 17 email about the due diligence sign-off being the "only item remaining for us to be comfortable about filing," is not an express waiver. In fact, he complained about PEPI's failure to provide conforming documents in another email later that day.[108] Furthermore, the Default Letter was sent only four business days after the February 16 conference call. Waiver generally does not arise merely from forbearance for a reasonable time.[109]

---

[106] Doc. No. 102 at 35 (citing *Prudence Co. v. Garvin*, 160 So. 7, 8 (Fla. 1935); *Waybright v. Turner*, 176 So. 424, 428 (Fla. 1937), *aff'd on rehearing*, 179 So. 412, 413-14 (Fla. 1938)).

[107] *Id.* at 34.

[108] *See* footnote 47, *supra*, and accompanying text.

[109] *See In re: B.J. Thomas, Inc.*, 45 B.R. 91, 95-96 (Bankr. M.D. Fla. 1984). S*ee also, e.g., Sundale, Ltd. v. Fla. Assoc. Capital Enter. Inc.*, No. 11-20635-CIV, 2012 WL 488110 at *9 (S.D. Fla. Feb. 14, 2012) (no waiver found

AA01757

PEPI maintains that Debtors are estopped because they continued to negotiate the Purchase Option after the February 16 conference call. Although conduct may imply the intentional or voluntary relinquishment of a known right, such conduct must do so unequivocally.[110] The continued discussions regarding the Purchase Option do not unequivocally demonstrate that the Debtors were willing to concede PEPI's removal of the Escrow Provision and its revision of the Waterfall. There is nothing in the record to indicate that Debtors would have conceded the Escrow Provision and Waterfall language if PEPI had agreed to concede the general release and agree to the indemnification structure.

Debtors maintain that Mr. DiNardo actually was conferring with counsel. This disputed issue of fact is not decisive, however. PEPI did not change its position, nor was it misled to its prejudice by Debtors' actions after February 16. Even if Mr. DiNardo's email is construed as untrue, PEPI was not misled. It ceased work on the DIP Loan less than 24 hours later and conceded no substantive issues. No substantial additional due diligence would have been necessary between February 16 and February 20.[111] Debtors had paid PEPI's expenses.

The cases cited by PEPI are not applicable to this dispute. Debtors here obtained nothing close to the benefits of the parties who were estopped from alleging a breach in those cases.[112] Accordingly, PEPI's defense of equitable estoppel fails.[113]

---

based upon two and a half-year delay); *Kirschner v. Baldwin*, 988 So. 2d 1138, 1142 (Fla. 5th DCA 2008) (five-month delay insufficient to find implied waiver); *see also Air Prods. & Chem., Inc. v. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir. 1989) (applying Florida law in holding no clear waiver shown after five-year delay); *see also Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So. 2d 997 (Fla. 4th DCA 1981) (no waiver found after almost three-year delay). Rather, an implied waiver requires conduct or a representation demonstrating an intent to relinquish a known right.

[110] *MDS*, 720 F.3d at 852 (internal citations omitted).

[111] In his affidavit, Mr. Fine states that PEPI verbally advised Debtors, before and during the February 16 conference call, that its due diligence had already been completed – that Debtors could go ahead and file. Fine Aff. at ¶ 26(iv).

[112] In *Acosta v. District Board of Trustees of Miami-Dade Community College*, the court found that a student, who had satisfied all course requirements, paid a tuition increase, and graduated, was estopped from later declaring a

AA01758

Based on the undisputed facts in the record, the Court concludes that:

1.  Each of the parties was bound, per the explicit language of the Commitment Letter, to create and agree to final DIP Loan documents that "shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein."[114]

2.  The Commitment Letter obligated PEPI to incorporate into the DIP Loan documents the negotiated terms for the Escrow Provision, the related valuation mechanism, and the Waterfall Provision barring foreclosure against any property unless the lender had "first collect[ed]" from the prior properties on the list.

3.  Debtors' attorney offered a procedure to defer resolution of the parties' disagreement regarding post-default lien enforcement until after the bankruptcy court's first interim approval, but PEPI did not agree with the "valuation/foreclosure" structure proposed by Debtors' counsel.  PEPI offered no alternative.  Debtors never agreed to abandon the Escrow Provision, the related valuation mechanism, or the Waterfall Provision, as set forth in the Commitment Letter.

4.  The Escrow Provision, the related valuation mechanism, and the Waterfall Provision were not solely for PEPI's benefit.  Taken together, they represented a significant limitation on lien enforcement rights which was significant to Debtors and the Pre-Petition Lenders.  PEPI was not free to unilaterally discard or alter these provisions.

5.  PEPI was advised multiple times, between February 10 and 17, of Debtors' imminent need to file their Chapter 11 petitions; but, PEPI repeatedly declined to incorporate the lien enforcement procedures to which it had agreed in the Commitment Letter.

6.  As of February 16, 2010, the parties were not in agreement on how to work through the collateral after default, which was not resolved by the conference call or by the revised loan documents sent out by PEPI on February 17, 2010.

7.  PEPI knew that Debtors had an urgent need for Chapter 11 relief.  PEPI also knew that Debtors were waiting on the final loan documents before they filed.  It is evident that PEPI's stance put Debtors, in the absence of the owner financing they utilized, in

---

breach of contract that included an agreement not to increase tuition.  905 So. 2d 226, 228-29 (Fla. 3d DCA 2005).  Similarly, in *Pretka v. Kolter City Plaza II, Inc.*, the court granted summary judgment on the defendant's equitable estoppel defense because the plaintiff waited at least three years to assert the breach of contract, continued to perform under the contract, negotiated new terms and made additional deposit payments, all of which the defendant relied upon in completing performance of the contract.  2013 WL 1192378 at *4-5 (S.D. Fla. Mar. 22, 2013).

[113] "Equitable estoppel requires that: (1) the party against whom estoppel is sought made a representation about a material fact that is contrary to a position it later asserts, and (2) the party seeking estoppel detrimentally relied on that representation."  *MDS*, 720 F.3d at 852.

[114]  Blasnick Dep. Ex. 2 at 4.

AA01759

the position of having to agree to PEPI's removal of the Escrow Provision and revised Waterfall procedure.

8. Once the parties were at impasse on how to work through the collateral after a default, and with time running out to file Chapter 11 petitions, Debtors were justified in declaring defaults regarding the Escrow and Waterfall Provisions and terminating negotiations.

9. The defenses asserted by PEPI regarding its repeated failure to include the Escrow Provision, and its alteration of the Waterfall Provision, are not persuasive.

2. The Due Diligence Sign-Off

Debtors repeatedly requested a "written due diligence sign-off" from PEPI before filing their Chapter 11 petitions.[115]  These requests were based on the parenthetical phrase in the Commitment Letter "(or such earlier date [after February 8] that is three business days after [PEPI] has advised [Debtors] it has completed its due diligence)."  According to the deposition testimony, PEPI understood that Debtors needed to know, before commencing their Chapter 11 cases, that PEPI had no open due diligence issues.[116]  It is also undisputed that during the February 16 conference call, PEPI advised Debtors that it would not provide a written due diligence confirmation even though its due diligence investigation was substantially complete.[117] It is undisputed that no such written notice was given until February 23, by Mr. Fine, after the Default Letter had been sent and the Chapter 11 petitions had been filed.

PEPI argues that the Commitment Letter did not expressly require a written due diligence sign-off before the Chapter 11 filings.  PEPI maintains that notification of completion of due diligence was a "condition precedent" to actual funding, which would only occur subsequent to the commencement of the Chapter 11 case.

---

[115] Lorio Dep. 91:2−14, 93:5−12, 94:7−13; Radunsky Dep. 103:10−104:25; Radunsky Dep. Exs. 28 and 29; Fine Dep. 95:1−18, 96:11−97:1, 99:1−9, 100:7−20; Fine Dep. Exs. 43−45.

[116] Blasnick Dep. 30:20−31:9; Fine Dep. 95:15−18; Radunsky Dep. 83:20−30.

[117] Lorio Dep. 149:24−150:8; Fine Aff. at ¶ 26(iv).

The Court views Mr. Fine's response to the Default Letter – "your formal three business day notice that due diligence has been completed…" – as an admission that such notice was for the benefit of the Debtors, as well as PEPI.  Mr. Fine's response to the Default Letter also demonstrates that PEPI understood that such notice was an obligation arising from the Commitment Letter.  PEPI's understanding of this obligation is further evidenced by the deposition testimony of Mr. Radunsky, PEPI's Chief Operating Officer and general counsel:

> *Q.      Could the commitment terminate on February 8th, 2010, given the parenthetical that follows the February 2010 date?*
>
> *A.      I think if you read this in the following way it could and that would be on February 1st, if PEPI had given notice it had completed due diligence under this paragraph – had given that notice, and then by February 8th there wasn't a bankruptcy filing, then it would have terminated, I think.[118]*
>
> *Q.      Well, the reason I'm asking you that question is the only way the commitment could terminate on February 8, 2010 is if PEPI had given prior notice of completion of its due diligence, right?*
>
> *A.      **I think that's right. That's how I'm reading it now.**[119]*

PEPI's position is also contrary to the language and purpose of the Commitment Letter.  Even though the parenthetical phrase was placed within the "conditions precedent" section, the phrase itself called for a bankruptcy filing deadline, to be triggered by the written notice indicating that PEPI was ready to proceed with the DIP Loan.  A written and dated notice was essential to establishing the expiration of PEPI's funding obligation – three business days after the notice was given.

From early in the process, the Debtors advised PEPI of the need for the written sign-off, as assurance that the DIP Loan was ready to go, before the Chapter 11 filings.  As noted above,

---

[118] Radunsky Dep. 85:6−14.

[119] Radunsky Dep. 86:6−15 (emphasis added).

AA01761

PEPI's on-going delay in giving the formal notice – even though its due diligence was satisfied – facilitated PEPI's withholding the lien enforcement restrictions without being subject to any deadline to restore them. Thus, PEPI's advice on February 16 that it would not give this notice deprived the Debtors of a material element of performance.

PEPI's unequivocal refusal to provide the written confirmation that its due diligence was completed was a prospective breach of contract, releasing Debtors from any further obligations under the Commitment Letter. [120]  Therefore, the Debtors were justified in concluding, after the February 16 conference call, that it would not get the assurance of a ready lender to which it was entitled under the Commitment Letter.

PEPI argues that to establish the non-defaulting party's entitlement to damages, the non-breaching party must establish its ability to perform at the time of the breach.[121]  In this instance, the Debtors' performance, had the formal three-day notice been given, was only the voluntary election to file, or not file, for Chapter 11 by the third business day.  The record fully supports the conclusion that the Debtors were ready to file for Chapter 11 after February 16; but, the parties never came to an agreement on provisions for working through the collateral in a default scenario.  Therefore, the Court concludes that PEPI effectively repudiated its obligation to confirm the completion of due diligence prior to the Debtors' Chapter 11 filings.

---

[120] Doc. No. 102 at 44 (citing *Mori v. Matsushita Elec. Corp. of Am.*, 380 So.2d 461, 463 (Fla. 3d DCA 1980) ("A prospective breach of the contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute.")).

[121] *Ryan v. Landsource Holding Co., LLC*, 127 So. 3d 764, 767-68 (Fla. Dist. Ct. App. 2013) (internal citations omitted).

AA01762

C. PEPI's Motion for Partial Summary Judgment

PEPI denies that it unequivocally refused to do anything, but that it was still "chasing the deal" when, without warning, it received the Default Letter.[122] PEPI requests partial summary judgment on Counts I (Breach of Contract) and III (Breach of the Covenant of Good Faith and Fair Dealing), arguing that it was Debtors who breached first by: (1) insisting on a new term – the written due diligence sign-off – as a condition precedent for the Debtors to file their Chapter 11 petitions; (2) failing to negotiate in good faith and obtaining a loan from another lender; (3) failing to provide PEPI with notice of the alleged default or opportunity to cure; and (4) negotiating with Gulf Bay in violation of the "non-disclosure" provisions of the Commitment Letter.[123]

1. Written Due Diligence Sign-Off

PEPI argues that Debtors breached the Commitment Letter by insisting on a new term – the written due diligence sign-off – as a condition precedent for the Debtors to file their Chapter 11 petitions. PEPI takes the position that the written due diligence sign-off was simply a condition precedent to funding, and that PEPI was not obligated under the Commitment Letter to provide a written due diligence sign-off prior to the Debtors filing for bankruptcy relief.

But, the written due diligence sign-off, which triggered the three business days Debtors had to file their bankruptcy petitions and extend PEPI's obligation to fund by another 90 days, was not Debtors' contrivance; it was in the Commitment Letter. The Commitment Letter's expiration provisions only make sense with a prior written notice of due diligence completion, as the Court has determined above. That Debtors raised the issue early in the process was not a

---

[122] Doc. No. 100 at 13-14.

[123] *Id.* at 22; Doc. No. 106.

AA01763

breach; it was a legitimate document-based position. Lastly, Debtors' repeated requests for a written due diligence sign-off bears no resemblance to a coercive tactic. For these reasons, the Court rejects PEPI's contention.

2. Duty to Negotiate in Good Faith and Fair Dealing

PEPI asserts that Debtors' allegations of default were contrived as a "pretext" to give the deal to Gulf Bay, while avoiding the additional payments that would otherwise be due to PEPI following a termination of the transaction. PEPI even suggests that the Debtors always intended to borrow from Mr. Ferrao, but needed a "failed" deal, with PEPI as the "foil," to argue in bankruptcy court that there was no alternative to the Gulf Bay Loan.

PEPI points to three items in the record in support of its position:

a) Mr. Fine's affidavit, in which he states that just prior to declaring default, "it appeared that the Debtors were reluctant to comply with the obligations of obtaining a release in favor of PEPI" as a condition of the Purchase Option;[124]

b) the deposition testimony of Mr. Ferrao stating that he had considered making the loan himself, from "early in the process;"[125] and

c) an excerpt from an email from Mr. Ferrao to Mr. Battista, on February 11, 2010: *"(2) [J]ane* [Houk] *knows what we need..i need to be able to purchase unequivocally."*

PEPI's contrived "default" theory is based primarily on Mr. Fine's supposition that the Debtors "appeared" to be "reluctant" to comply with the release provision of the Purchase Option. But that is opinion, not a statement of fact. The deposition testimony of both Mr. Ferrao and Mr. DiNardo was that Debtors were willing to give up on the indemnification proposal.[126]

---

[124] Fine Aff. at ¶ 6.

[125] Ferrao Dep. 30:2−16.

[126] Ferrao Dep. 44:2−11; DiNardo Dep. 55:2−21.

AA01764

The Debtors have demonstrated a genuine dispute regarding the fact issues. The deposition testimony raises doubt that the excerpt in the February 11 email was even about Mr. Ferrao being the lender or about the release. The full email thread related to the excerpt, shows that the two points made by Mr. DiNardo related to (i) the trigger mechanism of the Purchase Option that needed to be added to make sure Mr. Ferrao had the right to exercise the option if he so desired, and (ii) a notice provision that would need to be added to make sure Mr. Ferrao had notice of the commencement of the 30-day window to exercise the purchase option if he so desired.[127]

According to Debtors, the discussions about the general release did not take place until a week after the email excerpt was generated, only when Debtors' attorney raised a concern over the ability of the Debtors to obtain bankruptcy court approval of the release.[128] Also, it appears that Debtors would have accepted incorporation of the general release in the Purchase Option because Mr. Ferrao had other alternatives to preserve his equity in the project,[129] such as loaning money to the Debtors or an equity infusion to enable the Debtors to pay off the loan.[130]

Nevertheless, the Court concludes that there is no need to try these disputed factual issues. PEPI cannot prove its assertion that the Debtors contrived the alleged defaults because of the Purchase Option dispute (or any other reason) because PEPI never tendered loan documents that conformed to the Escrow and Waterfall Provisions. As this Court has concluded above, there was sufficient cause for the Debtors to declare the defaults and find another funding source.

---

[127] Doc. No. 113, Ex. B.

[128] Doc. No. 113 at 4; Fine Aff. at ¶19, Composite Ex. 4.

[129] Ferrao Dep. 44:2−11; DiNardo Dep. 55:2−21.

[130] Doc. No. 113 at 5 (citing DiNardo Dep. 224:24−225:2). Mr. DiNardo testified that "[the general release] *was not a line in the sand for us. It was negotiated in the commitment letter. We accepted in the commitment letter. We accepted it now.*" Ferrao Dep. 224:24−225:2.

AA01765

PEPI still defaulted under the Commitment Letter related to the Escrow Provisions, the Waterfall Provision and the Due Diligence Sign-Off.

PEPI compares the Debtors to the borrower in *Teachers Insurance and Annuity Association of America v. Butler*,[131] who was held to be in breach because it refused to close unless the lender (Teachers) agreed to remove a prepayment penalty provision which had not been mentioned in the loan commitment.[132] The lender alleged that the borrower's objection to the prepayment provision was simply a pretext for its unwillingness to go through with the loan because, as the evidence showed, the borrower could obtain a more favorable loan from other lenders. The court found that the lender's inclusion of the new prepayment penalty was consistent with industry practice and that the borrower, who had waited nine months before raising any objection to the provision, had not negotiated in good faith. Thus, its refusal to close, after refusing to negotiate the terms of the prepayment penalty, constituted a breach of the commitment letter.[133]

The Debtors here have not conducted themselves in any way like the borrower in *Teachers.* There is no evidence that Debtors were "shopping" the loan to other lenders. Debtors did not sit back and withhold their concern for nine months. Here, the Debtors expended months of effort and paid nearly $1 million to PEPI, and an unstated amount of their own professional expenses. The decisive fact that distinguishes this case from *Teachers* is that PEPI never

---

[131] 626 F. Supp. 1229 (S.D.N.Y. 1986).

[132] *Id.* at 1230-31.

[133] *Id.* at 1236 ("When they were unable to persuade Teachers to lower the interest rate agreed to in September 1982 and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an eleventh hour comparison of the closing documents to the Commitment Letter to come up with an ostensible reason for not going forward with the loan. Defendants breached the Commitment Letter and are obligated to Teachers for its damages.")

AA01766

tendered loan documents that were in conformity with the lien enforcement restrictions of the Commitment Letter.

3.  Notice of Default and Opportunity to Cure

PEPI argues that Debtors never gave PEPI notice of its alleged default, nor an opportunity to cure. The Commitment Letter is silent, however, as to such requirement. The course of dealing between the parties does not justify implying such requirement. The undisputed facts, summarized above, establish that Debtors repeatedly advised PEPI that removal of the Escrow Provision and revision of the Waterfall Provision were unacceptable. They declared PEPI in default within five days of determining that PEPI would not honor these material terms of the Commitment Letter. The Court will not read such a provision into the contract.[134]

Even after receipt of the Default Letter, even if it were construed as a notice of default, PEPI was still unwilling to agree to incorporate the Escrow and Waterfall Provisions as required by the Commitment Letter. PEPI was then only willing to agree to consider Debtors' proposed language and resume negotiations.

4.  "Truthful" and Non-Disclosure Provisions

PEPI asserts that Debtors breached the "truthful" and "non-disclosure" provisions of the Commitment Letter[135] by disclosing the Commitment Letter and loan documents to Gulf Bay. PEPI cites to deposition testimony given by Mr. DiNardo, where he states that an email from

---

[134] The cases cited by PEPI in support of such an argument are inapplicable to the case at hand. Those cases deal with at-will employment and service agreements for an indefinite duration. Doc. No. 102 at 42 (citing, *e.g.*, *Leghorn v. Wieland*, 289 So. 3d 745, 748 (Fla. 2d DCA 1974); *Shell Oil Co. v. A.Z. Services, Inc.*, 990 F. Supp. 1406, 1415 (S.D. Fla. 1997).

[135] The Commitment Letter provides that: "Except as required by applicable law, this Commitment and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI."

AA01767

Gulf Bay to Mr. Battista regarding the comparison of the Gulf Bay Loan to the PEPI loan suggests that the Gulf Bay loan was based on the versions prepared with regard to PEPI.[136]

As Debtors' owner, Mr. Ferrao rightfully had on-going and intimate knowledge of the PEPI loan transaction.  Mr. Ferrao also always had the right, as owner, to fund his companies during a Chapter 11.  The deposition testimony supports the Debtors' position that Mr. Ferrao decided to be the lender only after the time for filing had come, and the parties could not reach an agreement on how to work through collateral in a default.  It cannot be doubted that Debtors' legal team was fully capable of producing satisfactory documents for the Gulf Bay Loan without ever having gone through the months of negotiations with PEPI.

### 5. Breach of Implied Covenant of Good Faith

An implied covenant of good faith and fair dealing is a part of every contract.[137]  "[A] party's good-faith cooperation is an implied condition precedent to performance of a contract; where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing himself of his own wrong doing."[138]  The implied covenant of good faith and fair dealing is not an independent contract term.[139]  Rather, it is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*.[140]  Florida courts have refused to allow a cause of action for breach of the implied covenant of good faith and fair dealing in two circumstances.  First, where the party

---

[136] DiNardo Dep., Tr. II, 7:23−10:25, 18:7−19:7.

[137] *County of Brevard v. Miorelli Eng'g, Inc.,* 703 So.2d 1049, 1050 (Fla.1997).

[138]  *Bowers v. Medina*, 418 So.2d 1068, 1069 (Fla. Dist. Ct. App. 1982).

[139] *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999).

[140]  *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414 (11th Cir.1990) (applying Georgia law) (citations omitted).

AA01768

alleged to have breached the implied covenant has in good faith performed all of the express contractual provisions.[141]  Second, where the implied duty of good faith alleged to have been breached would vary the express terms of the contract.[142]  The covenant may not be enforced without the breach of an express term of the written contract.[143]  PEPI has not identified any express term of the contract which the Debtors breached and, therefore, may not argue a breach of the implied covenant of good faith and fair dealing.[144]

The record does not support PEPI's portrayal of Debtors as the saboteurs of the deal. Debtors' management and lawyers spent months of effort negotiating the Commitment Letter and to obtain final DIP Loan documents.  The email exchanges demonstrate an intense and sincere effort by Debtors' management and lawyers to get to agreed forms of the DIP Loan documents.  They responded to PEPI's due diligence needs, advised of their dissatisfaction regarding the Escrow and Waterfall Provisions and the due diligence sign-off, and made proposals to resolve these disputes.  Debtors and their professionals acted in good faith in the negotiations of the Escrow Provision, Waterfall Provision, and Purchase Option.

For these reasons, the Court cannot conclude that Debtors breached the implied covenant of good faith and fair dealing.

<u>CONCLUSION</u>

For the reasons stated above, the Court finds that PEPI defaulted under the Commitment Letter by: (1) failing to include the Escrow Provision and related valuation mechanism in its

---

[141] *Burger King,* 169 F.3d at 1316-17 (internal citations omitted).

[142] *Id.*

[143] Doc. No. 102 at 41 (citing *Meruelo v. Mark Andrew of the Palm Beaches, Ltd.*, 12 So.3d 247, 250-51 (Fla. 4th DCA 2009)).

[144] *Id.* at 41-42 (citing *Flagship Resort Dev. V. Interval Intern., Inc.*, 28 So.3d 915, 924 (Fla. 3d DCA 2010)).

AA01769

multiple drafts of the loan documents; (2) offering a material revision of the Waterfall Provision in those drafts; and (3) refusing to provide a written due diligence sign-off prior to before the Debtors had to file for Chapter 11. PEPI breached the terms of the Commitment Letter when it advised, in the February 16 conference call, that it would not incorporate the required Escrow and Waterfall provisions into the final DIP Loan documents. PEPI also anticipatorily breached its obligations under the Commitment Letter by stating its refusal to provide a written due diligence sign-off prior to the Chapter 11 filings. As a result of PEPI's breach, the Debtors were relieved of any further performance under the Commitment Letter.

Additionally, the Court finds that PEPI's Motion for Summary Judgment should be denied because the evidence in the court record shows that PEPI is unable to prove that Debtors contrived defaults as a pretext to give the deal to Gulf Bay while avoiding the additional payments that would otherwise be due under the Commitment Letter. Rather, the record supports the finding that the defaults alleged by Debtors were both real and material.

Accordingly, it is—

**ORDERED** that:

1.    The Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. No. 84) is granted as to Counts I and II of the Complaint.

2.    PEPI's Motion for Partial Summary Judgement and Incorporated Memorandum of Law (Doc. No. 106) is denied as to Counts I and III of the Complaint.

3.    Debtors are relieved from all payment obligations under the Commitment Letter.

4.    PEPI shall turn over to the Debtors $405,000, representing one-half of the commitment fee, within 30 days of the date of entry of this memorandum opinion.

5.    All 28 claims filed by PEPI in the Debtors' jointly administered bankruptcy cases

39

AA01770

are disallowed in their entirety.

6.     The Court reserves jurisdiction to consider additional damages, attorney's fees, and taxable costs, if any.

7.     The Court will hold a pre-trial conference on June 1, 2017 at 1:30 p.m. at the United States Bankruptcy Court, 801 North Florida Avenue, Courtroom 9B, Tampa, Florida, 33602, to determine if any issues remain to be tried and what further actions need to be taken on the issues of damages, attorney's fees, and costs in light of this Court's ruling.

Clerk's Office to serve.

AA01771

ORDERED.

**Dated: May 10, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

FIDDLER'S CREEK, LLC, ET AL.,                    Case No. 8:10-bk-03846-KRM
                                                 Chapter 11
     Debtors.

_____/

FIDDLER'S CREEK, LLC, ET AL.,

     Plaintiffs/Counter-Defendants,

v.                                               Adv. No. 8:11-ap-0809-KRM

PEPI CAPITAL, L.P.,

     Defendant/Counter-Plaintiff and
     Third-Party Plaintiff.

_____/

## PARTIAL FINAL JUDGMENT

On May 10, 2017, the Court entered its Memorandum Opinion on Cross Motions for

Summary Judgment (Doc. No. 126). Consistent with and to implement the Court's ruling based

on the evidence, it is appropriate to enter Partial Final Judgment. Accordingly, it is

**ORDERED:**

    1.    The Debtors' Motion for Partial Summary Judgment and Incorporated

Memorandum of Law (Doc. No. 84) is granted as to Counts I and II of the Complaint.

2.     PEPI's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. No. 106) is denied as to Counts I and III of the Complaint.

3.     Debtors are relieved from all payment obligations under the Commitment Letter.

4.     PEPI shall turn over to the Debtors $405,000, representing one-half of the commitment fee, within 30 days of the date of entry of the Court's Memorandum Opinion.

5.     All 28 claims filed by PEPI in the Debtors' jointly administered bankruptcy cases are disallowed in their entirety.

6.     The Court reserves jurisdiction to consider additional damages, attorney's fees, and taxable costs, if any.

Clerk's Office to serve.

AA01773

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA

### APPEAL COVER SHEET

| Appellant | Appellee |
|---|---|
| | |

Bankruptcy Case No. _____

Adversary Case No. _____

Attorney: (Name, Address and Telephone Number)

Attorney: (Name, Address and Telephone Number)

## NATURE OF PROCEEDING

Check appropriate item

☐ Appeal pursuant to 28 USC §158
    Notice of Appeal filed: _____
    Date of Order Appealed: _____
    Title of Order Appealed: _____
    Debtor's County of Residence: _____

☐ Motion to Withdraw Reference
    Filed: _____ By: _____

☐ Interlocutory Appeal
    Title of Interlocutory Order or Decree: _____
    Date of Order or Decree: _____
    Brief Description of Matter Appealed: _____
_____

☐ Motion for Leave to Appeal
    Date Filed: _____

☐ Other _____

☐ Designation in Appeal
Have arrangements been made with a Court Reporter for Transcript? ☐ Yes ☐ No
If not, do you intend to do so? ☐ Yes ☐ No   If ordered, on what date? _____

_/s/ Alan J. Perlman_
Attorney/Appellant

AA01774