UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:
FIDDLER'S CREEK, LLC,
and its twenty-seven subsidiaries
and affiliates,

     Debtors.
_____/

PEPI CAPITAL, L.P.,

     Appellant,

                        Case No.        8:19-cv-8-T-33
v.                         Bankr. No.   8:10-bk-3846-CPM
                        Adv. Pro. No.  8:11-ap-809-CPM

FIDDLER'S CREEK, LLC,
its twenty-seven subsidiaries
and affiliates, and GULF BAY
CAPITAL, INC.,

     Appellees.
_____/

## ORDER

    In the context of a Chapter 11 bankruptcy proceeding,
Appellant PEPI Capital, L.P. appeals the grant of partial
summary judgment in favor of Appellees Fiddler's Creek, LLC
and its twenty-seven affiliated entities ("Debtors"), as well
as the denial of PEPI's cross-motion for partial summary
judgment in an adversary proceeding. Additionally, PEPI
appeals (1) the bankruptcy court's December 12, 2018, Order
disposing of two of Debtors' claims against PEPI as well as
all of PEPI's counterclaims and its third-party claims

against Gulf Bay Capital, Inc., and (2) the Final Judgment that was entered thereafter. The appeal is fully briefed and, as discussed below, the Court reverses and remands for trial.

## I.  Background

### A.  Factual Background

The 2008 financial crisis hit many Americans hard — homeowners and real estate developers alike. Debtors were no exception. Debtors, which all share a principal by the name of Aubrey Ferrao, were developers of a 4,000-acre planned community near Naples, Florida. (Doc. # 7-136 at 2-4). Many of the parcels within the community were "encumbered by liens for multiple series of bonds issued by two Community Development Districts (the 'CDD's')" and some "were also encumbered by separate mortgages held by eight lenders (the 'Pre-Petition Lenders')." (Id. at 4). Facing financial difficulties, Debtors decided to file for Chapter 11 bankruptcy. (Id.). To do so, Debtors needed funding in the form of a debtor-in-possession ("DIP") loan.

Debtors turned to PEPI. PEPI and Debtors negotiated terms from the fall of 2009 to January of 2010. (Id.). On January 27, 2010, Debtors and PEPI executed a binding Commitment Letter, which was dated December 31, 2009. (Doc. # 7-9). The Commitment Letter commemorated the general terms

agreed upon by the parties before finalizing the documents for a $27,000,000 DIP loan. (Id.; Doc. # 7-136 at 4-5). The DIP loan was to be secured by a first mortgage on all of Debtors' assets, such that PEPI's lien would "prime" the Pre-Petition Lenders' mortgages. (Doc. # 7-136 at 4-5). The Commitment Letter also provided that "[t]he terms and conditions of the Credit Facility [i.e., DIP loan] shall be **substantially the same** as those set forth herein . . . and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein." (Doc. # 7-9 at 8)(emphasis added).

The Commitment Letter also contained other provisions at issue here. Addressing the possibility of a default on the loan by Debtors, the Commitment Letter contained an escrow provision and a "waterfall" provision. The escrow provision was designed to hold consent judgments and deeds in lieu of foreclosure in escrow. It read:

> [T]he final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly.

(Id. at 17). Although the escrow allowed PEPI to foreclose faster in the event of a default, that provision was added at Debtors' request. (Doc. # 25-1 at 92). One of Debtors' counsel, Mr. Battista, stated in a January 6, 2010 email that the escrow provision "save[d] [PEPI] a significant amount of time and expense in the foreclosure process and also allow[ed] [Debtors] to show the [Pre-Petition] lenders that the waterfall is real." (Id.).

At the insistence of Debtors, the Commitment Letter included a waterfall provision to establish the sequence in which PEPI would have to collect from the various collateral properties. (Doc. # 7-9 at 17; Doc. # 7-116 at ¶ 10). That provision read:

> [T]he final loan documentation for the Credit Facility shall provide that the Agent and Lender **[PEPI] agrees that it will not foreclose on real property described in a numbered item** in the following list **unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it** in the below list.

(Doc. # 7-9 at 17)(emphasis added). In his affidavit, one of PEPI's counsel for the transaction, Mr. Fine, acknowledged the waterfall provision was "significant and unusual." (Doc. # 7-116 at ¶ 10). The provision required PEPI to collect against unencumbered property first, before collecting

against property also encumbered by the Pre-Petition Lenders'
mortgages. (Doc. # 7-9 at 17-18).

The Commitment Letter also included a termination
provision:

> The obligations of PEPI to provide the Credit
> Facility under this Commitment Letter, if timely
> accepted and agreed to by the [Debtors], will
> terminate upon the earlier to occur of: 1) the close
> of business on February 8, 2010 (**or such later date
> that is three business days after [PEPI] has
> advised [Debtors] it has completed its due
> diligence**), unless the [Debtors have] instituted
> the Bankruptcy Cases on or before that date, and 2)
> 90 days after the filing of the Bankruptcy Cases
> unless the United States Bankruptcy Court
> overseeing the Bankruptcy Cases has entered an
> interim order or final order authorizing and
> approving the Credit Facility on or prior to such
> date.

(Doc. # 7-9 at 8)(emphasis added). Debtors interpret this
provision as requiring PEPI to provide a written due diligence
sign off before Debtors filed for bankruptcy, with the sign
off triggering a three-day deadline for Debtors to file. (Doc.
# 25 at 38-41).

But, according to Mr. Fine, PEPI had told Debtors during
the Commitment Letter's negotiations that PEPI would not
agree to provide a written due diligence sign off before
Debtors filed for bankruptcy. (Doc. # 7-60 at 86-87). Instead,
PEPI's general counsel, Mr. Radunsky, testified that the
parenthetical about due diligence was added for PEPI's sake.

(Doc. # 7-74 at 9; 103). When the Commitment Letter was drafted, Debtors had informed PEPI that they anticipated filing for bankruptcy by February 8, 2010. (Id. at 82-83). But, on the off-chance that Debtors delayed filing for bankruptcy, PEPI was concerned that it would have an ongoing duty to fund the DIP loan under the Commitment Letter. (Id. at 83; 103). Therefore, according to Mr. Radunsky, the termination provision with the due diligence parenthetical "was a safety valve in case [PEPI] needed it to terminate the Commitment Letter," which "was absolutely not expected to be used." (Id. at 103).

Should the parties' agreement fall apart, the Commitment Letter contained a breakup provision that would require Debtors to pay PEPI $1,000,000 if they obtained financing from a different lender and the bankruptcy court approved that alternate financing agreement. (Doc. # 7-9 at 15). But the Commitment Letter also stated: "All indemnities and obligations of [Debtors] hereunder shall survive the termination of this Commitment Letter or the commitment of PEPI hereunder, provided however that **such indemnities and obligations shall not survive in the event of a default by PEPI hereunder**." (Id. at 8)(emphasis added). Yet, the Commitment Letter did not define what constitutes a default

by PEPI, nor specify a procedure for declaring a default, nor require an opportunity to cure. (Id.; Doc. # 7-136 at 20). Finally, the Commitment Letter contained a purchase option that would have allowed Debtors or any of Debtors' principals to purchase the loan from PEPI in the event of a default. (Doc. # 7-9 at 25; Doc. # 7-136 at 13-14).

With the Commitment Letter in place, the parties set about their due diligence and drafting the final loan documents. On February 2, 2010, PEPI sent Debtors a draft of the loan documents, which included the waterfall provision and a version of the escrow provision missing the valuation mechanism mentioned in the Commitment Letter. (Doc. # 25-1 at 95-195; Doc. # 7-136 at 7).

That Friday and the following Monday, February 5 and 8, counsel for Debtors, Mr. Battista, emailed PEPI's counsel to ask for an "update on the status of the due diligence and the expected completion date." (Doc. # 25-1 at 196-197). Mr. Battista also reminded PEPI's counsel that the loan documents needed to "build in the concept of a valuation mechanism for purposes of reduction of the debt through the foreclosure or deeds in lieu." (Id. at 198).

Then, on February 10, Debtors' counsel emailed PEPI's counsel to advise that Debtors were ready to file for

bankruptcy the next day. (Id. at 200). Debtors wanted to know when they would receive the due diligence sign off and whether PEPI would be able to provide the initial loan advance by around February 19, 2010. (Id.). The following day around 10:00 a.m., Debtors' counsel emailed PEPI's counsel again, asking PEPI to add "the language per the commitment letter on a valuation mechanism in respect of the deeds in lieu o[f] foreclosure under the waterfall." (Id. at 201).

Later that same day, PEPI's investment analyst, Mr. Lorio, emailed Debtors' CFO, Mr. DiNardo, to inform him that PEPI wanted to remove the escrow provision and its valuation mechanism from the loan documents: "[W]e do not need these, and to get this moving and avoid complexity propose deleting this in the structure entirely." (Id. at 202). Mr. DiNardo soon replied regarding the proposed changes:

> A.    The language to the Waterfall that has been set forth in the Commitment Letter has been diluted and is less clear. The language that is in the Commitment Letter works.
>
> B.    The Deed in Lieu in escrow concept only works with respect to the unencumbered property because of valuation issues associated with the mortgage lenders' liens.
>
> C.    You need a valuation method for the Waterfall. One acceptable method would be to get an updated appraisal by Integra at that time. Jeff Fine seemed to be okay with this solution — at least initially on the call.

(Id. at 203).

A few hours after Mr. DiNardo's email on February 11, PEPI emailed a new draft of the loan documents, which removed the escrow provision and included a modified version of the waterfall provision. (Id. at 205-292). The modified waterfall provision allowed PEPI to foreclose on all of the collateral in the waterfall at the same time, but still required PEPI to sell that property in the order specified in the waterfall. (Id. at 260-261).

Then, on February 15, 2010, Mr. Battista emailed PEPI a "firm proposal" that Debtors would seek an "interim order [from the bankruptcy court] without a resolution of this issue" of the foreclosure and valuation mechanism for the waterfall. (Id. at 293). Debtors suggested that, after an interim order was issued, the final terms for the DIP loan should incorporate a valuation mechanism for the escrow provision involving "a blind appraisal establishing the fair market value of any collateral as to which [PEPI] initiates a foreclosure action." (Id.). Additionally, Debtors proposed that, under this structure, PEPI would "not foreclose on any collateral . . . if the value of the other collateral listed prior . . . in the waterfall list exceeds 150% of the outstanding amount owed to PEPI" and that PEPI "credit the

Debtors against their outstanding obligations the fair market value of all collateral acquired by PEPI." (Id.).

But afterwards, on February 16, 2010, Mr. Lorio for PEPI emailed Mr. DiNardo the following: "We probably need to discuss the waterfall and where we are on that. I think there is not agreement right now on how we would work through collateral in a foreclosure process." (Id. at 296). Later that day, Mr. Lorio again emailed Mr. DiNardo and one of Debtors' counsel, requesting a conference call "to go over the suggested changes to" the latest draft. (Id. at 297).

During the conference call that night, PEPI's representatives advised that they would not include the escrow provision or valuation mechanism as proposed by Mr. Battista in the final loan documents. (Doc. # 25-2 at 137-38, 142-44). Indeed, PEPI's representatives stated the foreclosure and valuation mechanism proposed by Mr. Battista "was not acceptable but that there would be a mechanism that would be acceptable." (Id. at 143). According to Mr. Fine, PEPI's representatives on the call were amenable to seeking the interim bankruptcy order without a resolution and were "committing" to "work together" on language for the final bankruptcy order. (Id.). Mr. Fine testified that PEPI's representatives assured Mr. Battista that "we of course are

going to come to an agreement on some language" regarding the foreclosure and valuation structure. (Id. at 142).

PEPI also advised that, although it had "completed [its] material due diligence," it would not provide a written due diligence sign off before Debtors filed for bankruptcy. (Id. at 57-58, 90-91). PEPI believed that it had not agreed to do so in the Commitment Letter and that "due diligence is never completed until you close," which would only occur after the bankruptcy petitions were filed. (Id.). Mr. Fine averred in his affidavit that the "Commitment Letter does not contain a provision obligating PEPI to provide a written signoff on due diligence as a condition precedent to [Debtors'] filing bankruptcy" and, in fact, "PEPI verbally advised [Debtors] more than once that it had completed corporate and real estate due diligence, including on February 16, 2010." (Doc. # 7-116 at ¶¶ 25, 26iv).

On the morning of February 17, 2010, Debtors' counsel emailed PEPI's counsel, informing him that Debtors were ready to file for bankruptcy, assuming the issues with the final loan documents would be worked out. (Doc. # 25-1 at 298). That afternoon, one of PEPI's attorneys sent another draft of the loan documents, which again omitted the escrow provision and its valuation mechanism and included a waterfall

provision under which PEPI could obtain a single foreclosure judgment against all of the property listed in the waterfall provision. (Id. at 299-389).

Later on February 17, Mr. Battista emailed Mr. Fine. In the context of seeking a revision of the Commitment Letter's breakup provision, Mr. Battista wrote: "There are several things in the commitment letter that were heavily negotiated, carefully chosen and agreed upon and yet have either changed or been eliminated in their entirety." (Id. at 390). The next day, February 18, Mr. Battista sent Mr. Fine another email requesting an update from PEPI because Debtors were ready to file for bankruptcy. (Id. at 391). They also addressed a proposed change to the breakup fee and purchase option provisions that Debtors sought. (Id. at 390; Doc. # 7-136 at 14). PEPI rejected the proposed change that day. (Doc. # 7-136 at 14).

On the night of February 18, because of the unresolved issues with the waterfall provision, Debtors' running out of money to meet payroll, and Debtors' inability to get a written due diligence sign off from PEPI, Mr. Ferrao agreed to provide the DIP financing through another entity he controlled, Gulf Bay. (Id.; Doc. # 25-2 at 9).

The parties were not in communication again until the afternoon of February 19, when an officer of PEPI emailed Mr. DiNardo, "What's up with the radio silence?" (Doc. # 25-1 at 392). Mr. DiNardo replied: "We are conferring with counsel and will get back to you as soon as we can." (Id.). The next day, February 20, PEPI's Mr. Lorio emailed Mr. DiNardo, expressing concern over "the dearth of communication" and informing Debtors that PEPI had "suspended all work on this loan." (Id. at 393).

Then, on February 22, Mr. Battista sent a Default Letter to Mr. Fine, stating in relevant part:

> PEPI has defaulted under the terms of the Commitment Letter for several reasons, including (i) the stated refusal by PEPI to provide [Debtors] with notice that PEPI has completed its due diligence in connection with the Loan, and (ii) the decision by PEPI to delete from the loan documents those certain critical provisions of the waterfall required by the Commitment Letter concerning an escrow for deeds in lieu of foreclosure and consent judgments, and, most importantly, the valuation mechanism related to the foreclosure of the collateral securing the Loan in respect of the waterfall. PEPI also materially modified the terms of the Commitment Letter in respect of the waterfall by providing in the loan documents that PEPI had the right to foreclose and obtain foreclosure judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sales process.

(Id. at 395). The next day, February 23, the 28 Debtors filed
28 Chapter 11 petitions with the bankruptcy court. (Doc. # 7-
136 at 16).

According to PEPI, the accusations in the Default Letter
are untrue. Mr. Fine, PEPI's counsel, insists that PEPI "never
made an unequivocal demand in violation of the Commitment
Letter, including as to the escrow, waterfall or its due
diligence" but admits that "PEPI elected to forego [the escrow
provision] and rely instead on the Florida foreclosure
process pursuant to the restricted order of sale requested by
the Debtor in the Waterfall." (Doc. # 7-116 at ¶ 26iii, xvii).
So, later the same day, Mr. Fine responded to Debtors' Default
Letter stating, in relevant part:

> Although PEPI has told you repeatedly during this
> past week that [Debtors] are free to file Chapter
> 11 at any time, please consider this your formal 3
> business day notice that due diligence has been
> completed. . . .
>
> Regarding the deed in lieu and consent judgment
> provision . . . please remember that this provision
> was originally proposed by you for [PEPI's]
> benefit. Later, you [i.e., Debtors] realized that
> consent judgments are not available under Florida
> law and that the provision therefore, could not be
> performed. If you are now telling PEPI that you
> were mistaken about the availability of consent
> judgments and want to put that provision back into
> the Loan documents, PEPI will certainly review your
> proposed provision. Likewise, the valuation
> mechanism you refer to is only in regard to a deed
> in lieu of foreclosure, and if you believe that a

deed in lieu of foreclosure provision, and its
related valuation mechanism, should be included in
the Loan, even though PEPI does not require it,
then PEPI will promptly review deed in lieu
language and will negotiate the provisions of a
valuation mechanism for deeds in lieu of
foreclosure and will include that in the Loan
documentation. . . .

In regard to the wording of the waterfall
provisions of the Loan, PEPI was under the
impression that wording of those provisions was
acceptable to the Borrowers. If that is not the
case, then PEPI wants to cure this inadvertent
misunderstanding and will diligently review the
wording of the waterfall provisions as you think
are compatible with the terms of the Commitment
Letter.

(Doc. # 25-1 at 399).

But it was too late. Also on February 23, Gulf Bay, the
entity controlled by Mr. Ferrao, committed to provide a $25
million DIP loan to Debtors. (Doc. # 7-136 at 17). The loan
provided by Gulf Bay included a waterfall provision but did
not include an escrow provision or a valuation mechanism.
(Id.). The loan — in the event of a default — allowed for a
single foreclosure judgment on unencumbered property only.
(Id.; Doc. # 25 at 15 n.1, 35). After a hearing in which Mr.
Ferrao testified about the DIP loan proposed by Gulf Bay, the
bankruptcy court approved the loan through various orders.
(Doc. # 7-136 at 17-18).

## B.   Procedural History

After Debtors initiated the bankruptcy case with their alternate funding, PEPI filed an unsecured claim for $1,405,000 — the $405,000 balance of the commitment fee owed by Debtors and the $1,000,000 breakup fee. (Id. at 2). Because Debtors maintain that their obligation to pay those fees did not survive because PEPI breached the Commitment Letter, Debtors filed an adversary proceeding objecting to PEPI's claim and seeking to recover the fees they paid to PEPI before the alleged breach. (Doc. # 25 at 17; Doc. # 23 at 17).

Subsequently, Debtors filed a motion for summary judgment on some of their claims against PEPI, which was fully briefed. (Doc. # 7-85; Doc. # 23 at 17). PEPI then filed a motion for partial summary judgment on Debtors' claims, seeking a ruling that it was actually Debtors who breached the Commitment Letter. (Doc. # 23 at 17; Doc. # 19 at 67). PEPI's motion for partial summary judgment was not fully briefed because the motion was suspended "pursuant to stipulation and court order." (Doc. # 23 at 17; Doc. # 19 at 349-50). Hearings on Debtors' motion for partial summary judgment were held on April 15 and 29, 2015, as well as May 13 and 19, 2015.

On May 10, 2017, the bankruptcy court granted partial summary judgment for Debtors and denied partial summary judgment for PEPI, finding that PEPI breached the Commitment Letter by failing to tender loan documents that were substantially similar to the escrow and waterfall provisions in the Commitment Letter. (Doc. # 7-136). The bankruptcy court alternatively held that PEPI anticipatorily breached the Commitment Letter by refusing to provide a written due diligence sign off to Debtors. Regarding PEPI's argument that Debtors breached the Commitment Letter, the bankruptcy court found that Debtors did not breach their duties by negotiating and procuring the alternate Gulf Bay loan without providing PEPI an opportunity to cure its alleged breaches. (Id.). The bankruptcy court entered a Partial Final Judgment in accordance with its summary judgment Order. (Doc. # 7-137).

PEPI appealed, and that appeal was assigned to the undersigned. See Fiddler's Creek, LLC et al v. PEPI Capital, L.P., No. 8:17-cv-01245-VMC (M.D. Fla. May 25, 2017). However, because some claims, including PEPI's counterclaims and third-party complaint, remained pending in the bankruptcy court, the bankruptcy court's partial summary judgment Order was not final and this Court did not have jurisdiction. See

Id. at (Doc. # 29). Thus, the Court dismissed that appeal for lack of jurisdiction on May 16, 2018. See Id. at (Doc. # 37).

The case went back to the bankruptcy court. At the parties' request, the bankruptcy court dismissed Debtors' turnover and unjust enrichment claims against PEPI and granted summary judgment for Debtors and Gulf Bay on PEPI's counterclaims and third-party claims "soley based on the entry of [the bankruptcy court's] prior determinations in the Partial Final Judgment." (Doc. # 7-175). That Order also stated that "all claims and counterclaims asserted by Plaintiffs and PEPI herein are resolved, except as to attorneys' fees and costs." (Id. at 5). On December 20, 2018, the bankruptcy court entered Final Judgment in favor of Debtors and against PEPI for $405,000, and also against PEPI on PEPI's counterclaims against Debtors and PEPI's third party claims against Gulf Bay. (Doc. # 7-2; Doc. # 23 at 22).

This appeal followed and is now fully briefed. (Doc. ## 23, 25, 28).

## II.  **Analysis**

### A.  **Legal Standard**

The parties dispute the proper standard of review. Typically, the Court reviews a bankruptcy court's decision granting summary judgment de novo and "will reverse unless

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.</u>, 830 F.3d 1242, 1252 (11th Cir. 2016)(citations and internal quotation marks omitted). PEPI urges the Court to apply this standard. (Doc. # 23 at 5).

Debtors urge a different standard. Although the Order on appeal is labelled as an order granting partial summary judgment for Debtors, Debtors insist that it is better understood as a final order entered after a bench trial. (Doc. # 25 at 1-3). If that is correct, Debtors argue, the bankruptcy court's factual findings would be subject to review for clear error. (<u>Id.</u> at 3).

The Court may, under unusual circumstances, treat an order on a motion for summary judgment as an order following a bench trial. In the context of an appeal from a district court's final ruling, the Eleventh Circuit stated: "[I]n certain circumstances, we will review a decision that on its face purports to be a summary judgment under the more deferential standard applied to a judgment following a bench trial." <u>Fla. Int'l Univ. Bd. of Trustees</u>, 830 F.3d at 1253. "Under that standard of review, [a court] still review[s] legal questions de novo, but, importantly, [it] review[s]

factual findings only for clear error, drawing all inferences in favor of the district court's decision." Id. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. at 1255 (citations omitted).

"Review under this decidedly more deferential standard is appropriate when it appears that the parties intended to submit the case to the [lower] court for final resolution, not for summary judgment, and that the [lower] court in fact decided the case on that basis." Id. at 1253. In determining whether the lower court's order should be treated as a final order after a bench trial, a court considers multiple factors:

> whether the district court held "a hearing on the motions for summary judgment in which the facts were fully developed"; whether the parties "expressly stipulated to an agreed set of facts"; and whether the record reflects that the parties had "in effect submitted the case to the court for trial on an agreed statement of facts embodied in a limited written record, which would have enabled the [district] court to decide all issues and resolve all factual disputes."

Id. at 1252-53 (quoting Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1346 (11th Cir. 2015)).

Here, Debtors point out that the bankruptcy court held almost twelve hours of hearings over multiple days on the

motions for partial summary judgment. (Doc. # 25 at 1, 3).
During one hearing, counsel for PEPI stated: "You know, we're
basically having the trial, if you will, in this . . . format,
because the facts aren't disputed. And our cases are mirror
cases. They claim we're in default. Our defense is you're in
default." (Doc. # 25-3 at 203). PEPI's counsel continued:
"[T]his is the record. We can have witnesses [at a trial].
It's still going to be all the same testimony, all the same
arguments, all the same legal theory." (Id. at 233-34).
Furthermore, towards the end of the hearing, PEPI's counsel
emphasized: "[T]hese are the facts, these are the issues,
whether I am a movant, respondent or slash cross-movant, if
you will. I think it's the same thing . . . What we've been
litigating — what we've been arguing to Your Honor, what we
presented for trial in evidence, is what you can bank on."
(Id. at 473, 479).

Nevertheless, the Court finds that the traditional de
novo standard of review applies. At one hearing, counsel for
Debtors stated that, although he was "not aware of any other
documents that would come into evidence at a trial that's not
already been presented to the Court," "[t]here may be other
depositions to be taken that are not before the Court today,
that would be relevant" at trial. (Id. at 251); see Ga. State

21

Conf. of NAACP, 775 F.3d at 1346 (declining to treat order on cross-motions for summary judgment as order after a bench trial and noting that the parties had not "*expressly* stipulated to an agreed set of facts, and, as noted above, the record does not support that the parties had '*in effect* submitted th[e] case to the court for trial on an agreed statement of facts embodied in a limited written record,' which would have enabled the court to decide all issues and resolve factual disputes"). Thus, both parties did not expressly stipulate to an agreed set of facts or that the record was totally complete.

Although the oral arguments before the bankruptcy court were lengthy and PEPI referred to the arguments as a "trial," the bankruptcy court throughout those hearings acknowledged that the oral arguments were not being considered as a trial, and that an actual trial may be necessary for final determination of the case. See, e.g., (Doc. # 25-3 at 220)(bankruptcy court stating: "Well, this is very helpful to me but I've told you my misgivings about the summary judgment, about doing this on summary judgment . . . [w]ith the asterisk that this is much the same presentation that I would see at trial. This summary judgment argument itself has been extraordinary on both sides"); (Id. at 258)("Well, of course,

the more — as you know, the more it turns out to be 'he said versus he said' . . . it points more towards a trial."). Thus, the bankruptcy court did not conceptualize the oral arguments as a bench trial. Cf. Fla. Int'l Univ. Bd. of Trustees, 830 F.3d at 1253 (treating summary judgment order as an order after a bench trial where "the district court stated that it would hold a hearing where the parties could 'sum up' their pleadings 'instead of scheduling a five day trial'" and "at the beginning of the December 3 hearing, the court explained that it was conducting a hearing 'on cross motions for summary judgment slash bench trial'").

Furthermore, nothing in the bankruptcy court's Order reflects that the bankruptcy court was treating the Order as one following a bench trial. Rather, the bankruptcy court espoused the proper legal standard for summary judgment motions. (Doc. # 7-136 at 18-19); cf. Fla. Int'l Univ. Bd. of Trustees, 830 F.3d at 1254 ("[T]he district court's opinion reads far more like a judgment by a factfinder after a bench trial than a summary judgment ruling.").

True, the bankruptcy court acknowledged that "[i]t is permissible for a trial court in a non-jury case to grant summary judgment if witness credibility is not an issue and trial would not enhance the court's ability to draw inferences

and conclusions." (Doc. # 7-136 at 19)(citing In re French, No. 8:09-Bk-9454-CED, 2012 WL 1166248, at *4 (M.D. Fla. Apr. 9, 2012) and Nunez v. Superior Oil Co., 572 F.2d 1119 (5th Cir. 1978)). But the bankruptcy court did not express an intent to resolve factual disputes. See Fla. Int'l Univ. Bd. of Trustees, 830 F.3d at 1254 (treating summary judgment order as an order after a bench trial where, among other things, the district court "mischaracterized the Nunez decision as permitting it to 'make factual determinations,' which Nunez plainly does not allow a court to do at the summary judgment stage"). Nor does the Order ever identify a disputed fact issue that the bankruptcy court resolved. See, e.g., (Doc. # 7-136 at 27)(identifying a "disputed issue of fact" but determining it was "not decisive").

Therefore, the Court will review the bankruptcy court's Order as an order on a motion for summary judgment, giving de novo review to all matters and taking all inferences in favor of PEPI. See Fla. Int'l Univ. Bd. of Trustees, 830 F.3d at 1252 (explaining that, "even though the district court may draw inferences against the non-moving party at the summary judgment stage in certain limited circumstances" under Nunez, the appellate court "still review[s] the district court's summary judgment decision de novo, and 'review[s] the

evidence and all factual inferences arising from the evidence in the light most favorable to the nonmoving party'" (quoting Useden v. Acker, 947 F.2d 1563, 1572 (11th Cir. 1991))).

### B.   **Bankruptcy Court's Order**

PEPI argues that the bankruptcy court erred in numerous ways in finding that PEPI breached the Commitment Letter and in interpreting the Commitment Letter's requirements. Furthermore, PEPI contends the bankruptcy court erred in concluding that Debtors negotiated in good faith and did not breach the Commitment Letter. The Court will address each issue in turn.

But first, because the Commitment Letter did not specify what constitutes a breach by PEPI or how a breach must be handled, the Court agrees with the bankruptcy court that "a party's nonperformance must go to the essence of the contract in order to constitute a 'material' breach." (Doc. # 7-136 at 21); see MDS (Canada) Inc. v. Rad Source Techs., Inc., 720 F.3d 833, 849 (11th Cir. 2013)("To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" (citing Beefy Trail, Inc. v. Beefy King Int'l, Inc., 267 So. 2d 853, 857 (Fla. 4th DCA 1972))).

## C. Escrow and Waterfall Provisions

The bankruptcy court held that PEPI breached the Commitment Letter by failing to incorporate the escrow and waterfall provisions as described in the Commitment Letter into the proposed loan documents. As the bankruptcy court reasoned, "PEPI's repeated election to tender loan documents that omitted the Escrow Provisions and a conforming version of the Waterfall Provision did not amount to continued negotiations . . . . Rather, such conduct amounted to a refusal to faithfully abide by its agreement to incorporate these into the final loan documents." (Doc. # 7-136 at 22).

### 1. Escrow Provision

PEPI advances three arguments to support its claim that it did not breach the Commitment Letter by omitting the escrow provision in the loan documents it tendered to Debtors. First, PEPI argues the escrow provision was included in the Commitment Letter solely for its benefit, and so could be unilaterally waived by PEPI. (Doc. # 23 at 31); see In re Marineland Ocean Resorts, Inc., 242 B.R. 748, 757 (Bankr. M.D. Fla. 1999)("The doctrine of waiver holds that a party may waive a covenant of a contract for whose benefit it is inserted."). Second, PEPI argues it "did not materially breach the Commitment Letter by omitting the Escrow Provision

as a matter of law, because the Escrow Provision was unenforceable." (Doc. # 23 at 27). Third and finally, PEPI contends "removal [of the escrow provision] was not material, but rather substantially similar [to the language in the Commitment Letter], because a foreclosure process is still required under Florida law." (Id. at 35).

The Court concludes that reversal and remand is warranted on the first two grounds and does not reach the third.

### a.  **Waivability**

Regarding the first argument, the Court finds that the bankruptcy court erred in determining at the summary judgment stage that the escrow provision was not solely for PEPI's benefit. The bankruptcy court held that "[t]he combined effect of the Escrow Provision, the related valuation mechanism, and the sequential foreclosure process required by the Waterfall Provision . . . would have been a significant restriction on PEPI's lien enforcement remedies." (Doc. # 7-136 at 24). That court continued: "When taken together, these provisions would have forced PEPI to accept parcels of real estate in the order of the Waterfall as actual payment (per agreed valuations) for outstanding debt (sometimes called 'dirt for debt') in the event of default." (Id.). Considering

the escrow provision alongside the waterfall provision and apparently making inferences in Debtors' favor, the bankruptcy court concluded that "[n]o lender would like to have its remedies restricted in this way." (Id.).

No doubt the waterfall provision was a significant limitation on PEPI. PEPI does not deny that the waterfall provision was for Debtors' benefit and could not be waived unilaterally by PEPI. (Doc. # 28 at 10). PEPI's counsel during the DIP loan negotiations, Mr. Fine, acknowledged the waterfall was a "significant and unusual" provision demanded by Debtors in order to ensure that PEPI collected first from unencumbered property before property over which the Pre-Petition Lenders also held mortgages. (Doc. # 7-116 at ¶ 10). Yet, taking the facts in the light most favorable to PEPI, it is unclear that the escrow provision and its valuation mechanism, when considered alone, were not solely for PEPI's benefit. See In re Marineland Ocean Resorts, Inc., 242 B.R. at 757 ("The doctrine of waiver holds that a party may waive a covenant of a contract for whose benefit it is inserted.").

Debtors insist the bankruptcy court correctly considered the escrow provision, its valuation mechanism, and the waterfall provision together in determining the benefit issue. (Doc. # 25 at 29). But PEPI did not request to remove

the waterfall provision, so whether or not the waterfall provision was solely for PEPI's benefit is a separate issue from whether the escrow provision only benefitted PEPI. And removal of the escrow provision and valuation mechanism would not have altered PEPI's obligations under the waterfall provision. As PEPI succinctly explains, it "would have been forced to accept parcels of real estate in the order of the Waterfall whether the Escrow Provision was there or not." (Doc. # 28 at 11 n.3).

The bankruptcy court did not elaborate on how the escrow and valuation mechanisms, separate from the waterfall provision, were benefits to an entity besides PEPI. In fact, the bankruptcy court did not explicitly decide whether the escrow provision benefitted Debtors or whether it benefitted the Pre-Petition Lenders. Instead, the bankruptcy court wrote that the waterfall provision, the escrow provision, and its valuation mechanism "were not solely for the benefit of PEPI." (Doc. # 7-136 at 24).

In the bankruptcy proceeding and on appeal, Debtors argue the escrow provision and its valuation mechanism were for the benefit of the Pre-Petition Lenders. (Doc. # 7-110 at 36-37; Doc. # 25 at 28-30). During the negotiation of the Commitment Letter, Debtors' counsel posited that the escrow

provision gave teeth to the waterfall provision by making it easier and faster for PEPI to satisfy its debt with unencumbered property higher in the waterfall. (Doc. # 25-1 at 92; Doc. # 25 28-30). In doing so, the escrow provision both "save[d] [PEPI] a significant amount of time and expense in the foreclosure process and also allow[ed] [Debtors] to show the [Pre-Petition] lenders that the waterfall is real." (Doc. # 25-1 at 92).

And, when PEPI explained that it wished to remove the escrow provision and its valuation mechanism from the proposed loan documents on February 11, 2010, Debtors' CFO, Mr. DiNardo, emailed back to reiterate that a valuation mechanism was needed. (Id. at 202-203). In his deposition, Mr. Lorio of PEPI admitted that the escrow provision and its valuation mechanism were included in the Commitment Letter both "to kind of speed things up" in the event of Debtors' defaulting and "to get some protection [for] other creditors." (Doc. # 7-38 at 61-62, 64).

Still, there was some evidence suggesting that the escrow provision was really only about speeding up PEPI's ability to collect from unencumbered property. Mr. DiNardo stated in his deposition that "[t]he escrow clause and this consent judgment were for the benefit of the DIP lender."

(Doc. # 7-93 at 156). Mr. DiNardo made this comment in the context of explaining why the subsequent Gulf Bay DIP loan did not contain an escrow provision — a fact PEPI highlights. He said: "[T]he escrow clause was for the protection of the DIP lender and Gulf Bay Capital knew the assets so they did not need the escrow clause. So my recollection is we didn't put it in because that's what the escrow clause was supposed to protect." (Id.). Instead of an escrow provision, Gulf Bay was able to seek a single foreclosure on all of Debtors' unencumbered property before moving on to foreclosure of the encumbered property.

According to PEPI, the lack of escrow provision in the Gulf Bay loan "dispenses with the argument that the escrow was somehow beneficial to junior liens" because "[i]f that was true, the escrow provision would exist in the Gulf Bay facility." (Doc. # 23 at 34). In turn, Debtors insist an escrow provision was not needed in the Gulf Bay loan: "Debtors reasonably did not need to restrict Gulf Bay's lien enforcement rights because Gulf Bay is owned and controlled by [Mr.] Ferrao, an insider of Debtors." (Doc. # 25 at 31). But Gulf Bay's insider status does not explain why the Pre-Petition Lenders, who were not insiders of Debtors or Gulf

Bay, would no longer want to be reassured the waterfall concept was "real" with an escrow provision.

Even if Mr. DiNardo's statement and the lack of an escrow provision in the Gulf Bay loan do not create a genuine issue of material fact, reversal and remand to the bankruptcy court are still warranted. As PEPI points out, the Pre-Petition Lenders were not contracting parties to the Commitment Letter. (Doc. # 23 at 33). To the extent the Pre-Petition Lenders incidentally benefitted from the escrow provision of the Commitment Letter and the DIP loan, PEPI contends that "any tangential benefit to a third party is irrelevant." (Id.). The bankruptcy court did not squarely address whether PEPI would be prohibited from waiving a provision that benefitted itself and the third-party Pre-Petition Lenders, but not Debtors.

Now, in their response brief on appeal, Debtors argue that the escrow provision and its valuation mechanism were also for Debtors' benefit because the escrow provision would lead to lower interest (i.e., if the unencumbered property in the waterfall is foreclosed on faster, less interest is accrued on the defaulted loan). (Doc. # 25 at 30). Additionally, Debtors now argue the escrow provision and its valuation mechanism benefitted them because they wanted to

keep their Pre-Petition Lenders happy — "if PEPI was paid down (or paid off) faster by the escrow mechanism from properties at the top of the waterfall, Debtors also would benefit by avoiding issues with other secured lenders." (Id. at 30). For all their allure, these arguments were not made in Debtors' summary judgment briefing, nor referenced in the bankruptcy court's Order. See Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239, 1249 (11th Cir. 2012)("It is well-settled that we will generally refuse to consider arguments raised for the first time on appeal."). So Debtors' new characterization of the benefit bestowed by the escrow provision does not alter the Court's decision.

Taking the facts in the light most favorable to PEPI, there is a genuine issue of material fact as to whether the escrow provision and its valuation mechanism — when considered apart from the waterfall provision — were solely for PEPI's benefit. Additionally, the bankruptcy court did not identify which other entities benefitted from the escrow provision. So the bankruptcy court did not address whether the existence of a benefit to the Pre-Petition Lenders (non-parties to the Commitment Letter) alone would preclude PEPI from unilaterally waiving the escrow provision and its

valuation mechanism. This question should be answered by the bankruptcy court in the first instance.

### b. **Unenforceability**

As for PEPI's argument that performance of the escrow provision was barred by Florida law, the bankruptcy court did not explicitly hold that the escrow provision as written in the Commitment Letter was enforceable. Instead, the bankruptcy court wrote that PEPI's "assertion is much too broad" and cited Ringling Joint Venture II v. Huntington National Bank, 595 So. 2d 180 (Fla. 2d DCA 1992), which "approved the escrow of foreclosure consent judgments" and "the escrowing of deeds in lieu." (Doc. # 7-136 at 24-25).

But Ringling did not "approve[] the escrow of foreclosure consent judgments" as the bankruptcy court wrote. Rather, Ringling dealt with a provision to hold deeds in lieu in escrow, to be delivered to the lender in the event of default. Ringling, 595 So. 2d at 181-82. Consent judgments of foreclosure are unenforceable under Florida law. See Hawke v. Broward Nat. Bank of Fort Lauderdale, 220 So. 2d 678, 679 (Fla. 4th DCA 1969)("[A] confession of judgment is null and void in Florida."). Section 55.05, Florida Statutes, states: "All powers of attorney for confessing or suffering judgment to pass by default or otherwise, and all general releases of

error, heretofore made or to be made hereafter by any person whatsoever within or without this state, before such action brought, shall be absolutely null and void." Fla. Stat. § 55.05.

Indeed, the parties had discussed consent judgments possibly being unenforceable under Florida law while negotiating the final loan documents. (Doc. # 19 at 406). PEPI's response to Debtors' Default Letter stated that the consent judgment language had been removed after Debtors raised the issue. (Doc. # 25-1 at 399). And, in their reply for their motion for partial summary judgment, Debtors "acknowledge[d] that confessions of judgment are not enforceable in Florida," yet insisted that "the consent judgments referred to in the Commitment Letter could have been drafted or structured to alleviate PEPI's issues." (Doc. # 7-110 at 32-33). Debtors have presented no case law creating an exception for the escrow of consent judgments.

The bankruptcy court did not address consent judgments in depth, instead rejecting PEPI's unenforceability argument wholesale after discussing the escrowing of deeds in lieu. To the extent the bankruptcy court ruled that removal of the consent judgment portion of the escrow provision was a breach of the Commitment Letter by PEPI, the bankruptcy court erred.

Taking the facts in the light most favorable to PEPI, PEPI's removal of the consent judgment aspect of the escrow provision after discussing with Debtors the unenforceability of consent judgments was not a breach of the Commitment Letter.

As for the deed in lieu aspect of the escrow provision, PEPI argues the bankruptcy court erred in relying on Ringling, which is distinguishable. (Doc. # 23 at 31). In Ringling, after the borrower defaulted on its three mortgages for the same commercial real estate, the first mortgagor filed a foreclosure action. Ringling, 595 So. 2d at 181. In the context of that pending foreclosure action, the third mortgagor agreed to loan the borrower over $8 million in an agreement that made the lender the first mortgagor of the property. Id. The new loan documents also included a provision for a deed in lieu of foreclosure to be held in escrow, and to be delivered to the lender in the case of a default by the borrower. Eventually the borrower defaulted, the deed went to the lender, and the borrower argued the deed was invalid under Florida law. Id. at 182.

The Ringling court held the deed was valid. Id. at 183. While the Ringling court noted generally that "[t]he doctrine against clogging the right of redemption does not create an absolute right," the court mentioned only one exception:

"this doctrine of equity does not apply if the right is relinquished by 'a subsequent agreement upon a further consideration.'" Id. at 182 (quoting Stovall v. Stokes, 94 Fla. 717, 741 (Fla. 1927)).

Still, the Ringling court acknowledged that the escrow agreement there was "technically" not "a 'subsequent agreement' because it was created in conjunction with new mortgage documents." Id. But that court nevertheless applied the exception and held the deeds in lieu valid because the agreement was "an agreement subsequent to the promissory notes and mortgages involved in the earlier foreclosure proceedings," in which the lender already held a third mortgage on the property. Id. at 182-83. The Ringling court emphasized that the escrow agreement "was not an unfair scheme to take Ringling's equity in the property or its right of redemption" and "all parties were represented by counsel, the agreement arose from a pending foreclosure action, and the transaction involves commercial real estate rather than residential property." Id. at 182-83.

Here, unlike the lender in Ringling, PEPI was not a pre-existing lender to Debtors which later undertook the creation of a new mortgage in exchange for additional consideration. Rather, the Commitment Letter and the final loan documents to

be completed thereafter were the initial lending transaction between PEPI and Debtors. Thus, even <u>Ringling</u>'s creative characterization of the escrowing of deeds in lieu as a subsequent agreement to the lender's preexisting promissory note and mortgage does not apply here.

Debtors, in their reply in support of their motion for partial summary judgment, relied on <u>Ringling</u> as an example of the enforceability of deeds in lieu of foreclosure granted as part of a mortgage transaction. (Doc. # 7-110 at 32). Debtors did not address the "subsequent agreement and further consideration" issue in the summary judgment briefing, and Debtors did not argue that the escrow provision in the Commitment Letter qualified as such a "subsequent agreement." Now, in their response brief, Debtors argue there would have been "a 'subsequent agreement' (or in this case a subsequent court order) authorizing the recording of deeds in lieu" because the bankruptcy court would have to approve the terms of the DIP loan. (Doc. # 25 at 26). To the extent Debtors' argument that the DIP loan documents could be construed as a "subsequent agreement" has any merit or could be considered by this Court, that argument was not presented to the bankruptcy court and the bankruptcy court's Order did not address that argument. <u>See</u> <u>Ramirez</u>, 686 F.3d at 1249 ("It is

well-settled that we will generally refuse to consider arguments raised for the first time on appeal."). Nor did the bankruptcy court point to a case in which a similar escrow agreement created contemporaneously with new mortgage documents by an entirely new lender was held valid.

Instead, after its brief discussion of Ringling, the bankruptcy court emphasized that PEPI never expressed concern to Debtors about the deeds in lieu of foreclosure potentially being unenforceable until after Debtors' Default Letter. (Doc. # 7-136 at 25). True, no record evidence showed discussions between PEPI and Debtors about the legal enforceability of the deeds in lieu before Debtors sought financing elsewhere. For example, PEPI's response to the Default Letter does not mention deeds in lieu as potentially unenforceable and instead expresses willingness to negotiate on the deed in lieu language — in contrast to the response's statement that consent judgments are likely unenforceable. (Doc. # 25-1 at 399).

Nevertheless, Mr. Fine's affidavit — admittedly drafted during the litigation — states that "the deeds in lieu of foreclosure and consent judgment provisions were not included for the time being" in the proposed final loan documents because PEPI had learned at some unspecified time after the

Commitment Letter that "consent judgments and deeds in lieu were not available on initial loans under Florida law and/or the title company suggested it be removed." (Doc. # 7-116 at ¶ 12). Thus, there was some evidence in the record that PEPI had legal concerns regarding deeds in lieu being held in escrow when it was drafting the proposed loan documents. Furthermore, the question of PEPI's true motivation for deleting the escrow provision sheds no light on whether the deed in lieu aspect of the escrow provision was actually enforceable under Florida law.

Regardless, as the bankruptcy court reasoned, PEPI "could have incorporated (or offered to incorporate) the Escrow Provision into the loan documents with appropriate qualifying language," that would have prevented Debtors from later challenging the enforceability of the deeds in lieu if the bankruptcy court approved the loan. (Doc. # 7-136 at 25). Instead, PEPI chose to remove the escrow provision from the loan documents — even after Debtors requested the provision remain — without mention of the alleged unenforceability concern. It was this removal — without an attempt to negotiate the deed in lieu language to alleviate PEPI's alleged enforceability concerns — that the bankruptcy court considered a breach.

Along the same lines, Debtors argue for the first time that any unenforceability issue with the consent judgments or deeds in lieu would be done away with if the bankruptcy court had approved the DIP loan with the escrow provision. (Doc. # 25 at 26-27). But PEPI argues that Debtors' assumption — that the bankruptcy court's approval of the DIP loan would "bless" the escrow provision in the eyes of Florida state courts — is incorrect. (Doc. # 28 at 8-9). PEPI emphasizes that "no such evidence exists or was presented in this regard" by Debtors during the summary judgment briefing. (Id.). And, furthermore, PEPI contends that the estoppel "argument is nonsense because property rights are determined by State law . . . and Florida state law would prohibit enforcement of such provision." (Id.).

The Court agrees that there was no evidence presented at the summary judgment stage that the bankruptcy court would have approved a DIP loan containing the escrow provision, given the legal doubts about its enforceability. Nor did Debtors present any case law in support of their new estoppel argument to suggest that Florida state courts during foreclosure proceedings would enforce the escrow provision merely because the bankruptcy court approved a DIP loan containing it among numerous other provisions.

At this juncture, the Court need not determine whether the escrow provision as it relates to deeds in lieu of foreclosure would have been enforceable under Florida law or whether judicial estoppel would have applied if the bankruptcy court had approved a DIP loan containing the escrow provision. The Ringling court "emphasize[d] that the agreements [to escrow deeds in lieu] used in [that] case could easily result in abuse or inequity in another case under other facts." Ringling, 595 So. 2d at 183. For that reason, Ringling warned that "[s]uch arrangements should be carefully scrutinized to assure that they do not violate the favored right of redemption." Id. So that the bankruptcy court, which is more familiar with the facts and history of this case, can conduct such careful and fact-specific scrutiny in the first instance, the Court reverses and remands the case.

## 2. **Waterfall Provision**

The issues with the escrow provision do not end the Court's inquiry, however, because the bankruptcy court also found that PEPI breached the Commitment Letter on the issue of the waterfall provision. Regarding the waterfall provision, PEPI argues the bankruptcy court's ruling was error because (1) the proposed modification of the waterfall provision was materially similar to the Commitment Letter's

version, and (2) the Commitment Letter's waterfall provision "would have violated res judicata and estoppel principles." (Doc. # 23 at 37, 40). Because the Court finds that there is a genuine issue of material fact regarding whether PEPI's revision of the waterfall provision was a substantial change, the Court need not address PEPI's second argument.

PEPI asserts that its proposed modified waterfall provision was "not materially different" from the Commitment Letter's waterfall provision because the proposed language "still required PEPI to sell properties in the Waterfall order and only to the extent necessary." (Id. at 37-39). The bankruptcy court held that the language of the proposed loan documents, which "provided that [PEPI] could seek a single foreclosure judgment against all of the mortgaged real estate, adhering to the Waterfall sequence only as to sales," "materially deviated from the Commitment Letter's requirement of 'no foreclosure' on any property without 'first collecting' out of the property before it in the agreed sequence." (Doc. # 7-136 at 21-22).

PEPI insists this ruling was error because the bankruptcy court "misinterpreted the Commitment Letter in reaching this conclusion." (Doc. # 23 at 38). PEPI's argument revolves around the meaning of "foreclose" as used in the

Commitment Letter. The escrow provision, which immediately precedes the waterfall provision, states that the escrow's purpose is "to speed the judgment and foreclosure process." (Doc. # 7-9 at 17). Therefore, PEPI reasons "'foreclosure process' in this context must mean something different than 'judgment' or the word 'judgment' would be surplusage" and "'foreclosure' can only logically refer to the sale process." (Doc. # 23 at 38). So, PEPI insists the Commitment Letter's waterfall provision — which states that PEPI "agrees that it will not **foreclose** on real property described in a numbered item in [the waterfall] unless it has previously used commercially reasonable efforts to first collect out of the property" higher in the waterfall — only prohibits PEPI from **selling** property lower in the waterfall before selling property higher in the waterfall. (Id. at 38-39)(emphasis added).

The Court disagrees with PEPI. The Court is not convinced that "judgment" in the escrow provision would be surplusage if "foreclosure process" is not interpreted as "foreclosure sale." Still, assuming "judgment" would be surplusage in the escrow provision if "foreclosure process" is not interpreted as "sale," that reading of the escrow provision would not determine the meaning of "foreclose" in the waterfall

provision. Any ambiguity over the meaning of "foreclosure process" in conjunction with "judgment" does not support that the word "foreclose" in the waterfall provision — standing alone without modifiers — does not carry its plain meaning. And that plain meaning is "to subject (property) to foreclosure proceedings" or "to terminate a mortgagor's interest in property." *Foreclose*, BLACK'S LAW DICTIONARY (10th ed. 2014).

This does not end the Court's analysis. Even if the Commitment Letter required separate foreclosures, PEPI argues that its revised waterfall provision in the proposed loan documents was not materially different in result. (Doc. # 23 at 38-40; Doc. # 28 at 13-15). In its response brief and at oral argument before the bankruptcy court, Debtors emphasized that the DIP loan documents needed to be structured to protect the interests of the Pre-Petition Lenders in order to be approved by the bankruptcy court. (Doc. # 25 at 21, 34-35; Doc. # 7-122 at 42-43). Indeed, 11 U.S.C. § 364(d) provides that a priming loan (a loan that "primes" pre-existing mortgages in priority) may be approved only if there is proof of "adequate protection" for lienholders who were primed. According to Debtors, putting the Pre-Petition Lenders through foreclosure proceedings, even though PEPI could have

satisfied its debt through foreclosure and sale of unencumbered property in the waterfall first, would have been a failure to protect them. (Doc. # 25 at 35).

But, according to PEPI, its proposed loan documents that allowed for one foreclosure judgment over all the waterfall property would still have protected the Pre-Petition Lenders. (Doc. # 23 at 40; Doc. # 28 at 14-15). Basically, PEPI argues that preventing the Pre-Petition Lenders from having to go through the motions of foreclosure proceedings was not the essential purpose of the waterfall provision. Instead, the essential purpose was preventing the Pre-Petition Lenders' interests in encumbered property from being extinguished if Debtors had enough unencumbered assets to satisfy PEPI's debt. (Doc. # 23 at 39-40). And the mere entry of a foreclosure judgment over the encumbered properties would not have extinguished the Pre-Petition Lenders' interest. See AG Grp. Invs., LLC v. All Realty All. Corp., 106 So.3d 950, 952 (Fla. 3d DCA 2013)("[A] junior lien holder's interest cannot be extinguished before the issuance of a certificate of sale."); In re Neely, 256 B.R. 322, 325 (Bankr. S.D. Fla. 2000)("[J]unior mortgages survive the entry of a judgment of foreclosure by a senior interest, and are only extinguished by the issuance of a certificate of sale subsequent to a

foreclosure sale or as otherwise provided in a judgment of foreclosure.").

PEPI points out that it never challenged the sale of property in the waterfall order, and would have sold the property in the waterfall order after a single foreclosure judgment was entered. And PEPI insists that "a valuation and deficiency hearing would be required to determine the credit amount and balance remaining" after each property was sold in a foreclosure sale in the waterfall order. (Doc. # 28 at 14). Only if the debt was not satisfied by the sales of the unencumbered property would PEPI pursue foreclosure sales over the encumbered property. So, PEPI's getting a foreclosure judgment on all of the waterfall property at the same time would not have affected the ownership interests of the Pre-Petition Lenders if the unencumbered property satisfied the debt owed to PEPI. Thus, in PEPI's eyes, its proposed revised waterfall provision still provided the "adequate protection" to the Pre-Petition Lenders that Debtors described as their motivation in demanding the waterfall provision's inclusion in the Commitment Letter.

Taking all the facts in the light most favorable to PEPI, the essence of the waterfall provision was ensuring Debtors' obligation to PEPI was reduced or entirely satisfied by

unencumbered property. That way, the Pre-Petition Lenders —
whose liens on some of Debtors' properties were primed by
PEPI's lien — would be more likely to recover the money
Debtors owed them if the properties were foreclosed and sold.
"To constitute a vital or material breach, a party's
nonperformance must 'go to the essence of the contract.'"
MDS (Canada) Inc., 720 F.3d at 849. The Court finds a genuine
issue of material fact as to whether PEPI's proposed revision
of the waterfall provision — from multiple foreclosures and
sales in waterfall order to one foreclosure with sales
following in waterfall order — was a material breach that
would have undermined the purpose of providing "adequate
protection" to the Pre-Petition Lenders.

> **D.  Due Diligence Sign Off**

Alternatively, the bankruptcy court held that PEPI had
anticipatorily breached the Commitment Letter by refusing to
provide a written due diligence sign off before Debtors filed
for bankruptcy. (Doc. # 7-136 at 29-31). PEPI argues that the
bankruptcy court erred in this determination because the
Commitment Letter does not include an express term requiring
a written due diligence sign off. (Doc. # 23 at 42-44).

The Court agrees with PEPI. In its Order, the bankruptcy
court did not hold that the Commitment Letter provision

mentioning a due diligence sign off was ambiguous. See Alhassid v. Bank of Am., N.A., 60 F. Supp. 3d 1302, 1313 (S.D. Fla. 2014)("Whether a contract is or is not ambiguous is a question of law to be determined by the trial court." (quoting Ocean Reef Club, Inc. v. UOP, Inc., 554 F. Supp. 123, 128 (S.D. Fla. 1982))). Yet, the bankruptcy court relied heavily on parol evidence in determining that a due diligence sign off was required under the Commitment Letter before Debtors could file for bankruptcy. (Doc. # 7-136 at 29-30); see Lambert v. Berkley S. Condo. Ass'n, Inc., 680 So. 2d 588, 590 (Fla. 4th DCA 1996)("A court must look first to the plain language of a document and consider parol evidence only when the document is ambiguous on its face.").

The provision at issue dealt with when PEPI's duty to fund the DIP loan would terminate:

> The obligations of PEPI to provide the Credit Facility under this Commitment Letter, if timely accepted and agreed to by the [Debtors], will terminate upon the earlier to occur of: 1) the close of business on February 8, 2010 (or such later date that is three business days after [PEPI] has advised [Debtors] it has completed its due diligence), unless the [Debtors have] instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.

(Doc. # 7-9 at 8). Thus, the reference to due diligence is not phrased as a condition precedent to the filing of a bankruptcy case.

Although the provision would require Debtors to file for bankruptcy within three days of PEPI's providing a due diligence clearance, nothing in the provision's language would prevent Debtors from filing for bankruptcy before receiving any due diligence sign off. Rather, the due diligence confirmation would merely set the final date on which Debtors could file for bankruptcy. Indeed, that provision lists a second time at which PEPI could terminate its duty to fund: "90 days after the filing of the Bankruptcy Cases unless the United States Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility." (Id.). Under this provision, Debtors could file for bankruptcy regardless of whether a due diligence sign off had been given and PEPI would still have a means of terminating its duty to fund if the bankruptcy court either refused or hesitated to approve the DIP loan within 90 days. Furthermore, no mention is made of such due diligence sign off being written — a requirement the bankruptcy court read into the provision. (Doc. # 7-136 at 30-31).

The bankruptcy court understandably focused on Debtors'
desire not to file for bankruptcy before PEPI had confirmed
in writing that its due diligence was complete, lest PEPI
decide that a due diligence problem would preclude funding
after Debtors had already filed for bankruptcy. (Id. at 29-
30). No doubt Debtors felt such concern. But Debtors' anxiety
does not change the plain language of the Commitment Letter.
The Court concludes that the termination provision is not
ambiguous and did not require a written due diligence sign
off as a matter of law. See Alhassid, 60 F. Supp. 3d at 1313.
Therefore, the bankruptcy court erred in concluding that a
written due diligence sign off was a required precedent to
filing for bankruptcy under the Commitment Letter.

**E.    The Bankruptcy Court's Ruling on PEPI's Motion for
       Partial Summary Judgment is Reversed and Remanded**

PEPI insists that the bankruptcy court erred by ruling
on PEPI's cross-motion for partial summary judgment "even
though the court determined that the motion was not yet fully
briefed, as PEPI had no opportunity to file a Reply." (Doc.
# 23 at 79). Yet, despite arguing the bankruptcy court erred
in ruling on its cross-motion for partial summary judgment,
PEPI also asks this Court to determine that Debtors breached
the Commitment Letter in numerous ways because PEPI also

raised these arguments in its response to Debtors' motion. (Id. at 76-79).

As the Court has found that reversal of the bankruptcy court's Order and remand for trial is necessary on the issue of PEPI's conduct, the Court declines PEPI's invitation to rule on the propriety of Debtors' conduct. Instead, the Court reverses and remands the bankruptcy court's denial of PEPI's cross-motion for summary judgment. The bankruptcy court's ruling on whether Debtors breached the Commitment Letter is inextricably intertwined with its conclusion that PEPI breached the Commitment Letter. Having already found that PEPI anticipatorily breached the Commitment Letter by refusing to provide a written due diligence sign off, the bankruptcy court rejected PEPI's argument that Debtors breached the Commitment Letter by demanding a due diligence sign off. (Doc. # 7-136 at 32-33). And, in ruling that Debtors did not fail to negotiate in good faith regarding the alleged breaches by PEPI, the bankruptcy court held: "PEPI cannot prove its assertion that the Debtors contrived the alleged defaults because of the Purchase Option dispute (or any other reason) because PEPI never tendered loan documents that conformed to the Escrow and Waterfall Provisions." (Id. at 34).

Because the Court has reversed the bankruptcy court's ruling on PEPI's alleged breaches, the Court also reverses the bankruptcy court's denial of PEPI's motion for partial summary judgment to the extent its ruling was based on PEPI's supposed earlier breaches of the Commitment Letter. Remand is appropriate.

## III. **Conclusion**

Taking the facts in the light most favorable to PEPI, there are genuine issues of material fact as to whether PEPI could unilaterally waive the escrow provision and whether PEPI's modification of the waterfall provision was substantially the same as the original version. Additionally, the bankruptcy court did not address whether the existence of a benefit to the third-party Pre-Petition Lenders precluded PEPI from waiving the escrow provision unilaterally. Nor did the bankruptcy court decisively rule on whether the escrow provision as outlined in the Commitment Letter was unenforceable under Florida law. Finally, the bankruptcy court erred in concluding that the Commitment Letter contained a requirement that PEPI provide a written due diligence sign off before Debtors filed for bankruptcy.

For these reasons, the Court reverses the bankruptcy court's Order granting Debtors' motion for partial summary

judgment and remands for trial. Because the bankruptcy court also denied PEPI's cross-motion for summary judgment partly based on its finding that PEPI had breached the Commitment Letter, the Court reverses the denial of PEPI's motion and remands. And, because the bankruptcy court's December 12, 2018, Order dismissing all remaining claims and the subsequent Final Judgment were based on that court's summary judgment Order, the Court also reverses and remands the dismissal order and Final Judgment. The Court expresses no opinion on how the outstanding issues should be decided upon remand.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

The bankruptcy court's Order granting partial summary judgment for Debtors and denying partial summary judgment for PEPI, the Partial Final Judgment, the December 12, 2018 Dismissal Order, and the Final Judgment are **REVERSED** and **REMANDED** for trial. The Clerk is directed to transmit a copy of this Order to the bankruptcy court and thereafter close the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 13th day of May, 2019.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE